No. 14-50095

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

MICHAEL JOSEPH PEPE,
*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
The Honorable Dale S. Fischer, Presiding
No. CR-07-00168-DSF

## Appellant's Excerpts of Record
**[Volume 1 of 12]**

HILARY L. POTASHNER
Acting Federal Public Defender
JAMES H. LOCKLIN
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012
213-894-2929

*Counsel for Defendant-Appellant*

# Table of Contents

## Volume 1

Order Denying Defendant's Motion to Dismiss Indictment....................................1
[Filed December 3, 2007; Docket No. 57]

Order Denying Defendant's Motions to Suppress Evidence....................................9
[Filed December 5, 2007; Docket No. 60]

Order Denying Defendant's Motion to Suppress Evidence ...................................20
[Filed February 7, 2008; Docket No. 129]

Transcript – Sentencing (Excerpts)..........................................................26
[Dated February 28, 2014; Filed April 17, 2014; Docket Nos. 491, 512]

## Volume 2

Defendant's Motion to Suppress Evidence* .........................................................42
[Filed June 26, 2007; Docket No. 21]

Defendant's Motion to Suppress Evidence (Excerpts)........................................120
[Filed August 1, 2007; Docket No. 33]

Government's Consolidated Opposition to Motions to Suppress Evidence* ........130
[Filed August 22, 2007; Docket No. 39]

Defendant's Reply re Motions to Suppress Evidence ..........................................208
[Filed September 4, 2007; Docket No. 40]

Defendant's Motion to Dismiss Indictment........................................................220
[Filed October 4, 2007; Docket No. 43]

Transcript – Motion Hearing ...............................................................................244
[Dated October 29, 2007; Filed February 26, 2008; Docket Nos. 50, 133]

* Documents marked with an asterisk have been redacted pursuant to Federal Rule of Appellate Procedure 25(a)(5) and Federal Rule of Criminal Procedure 49.1(a).

Government's Declaration re Motions to Suppress Evidence ..............................295
[Filed November 27, 2007; Docket No. 53]

Transcript – Motion Hearing (Excerpts)* ..........................................................299
[Dated December 3, 2007; Filed February 26, 2008; Docket Nos. 58, 134]

Volume 3

Defendant's Supplemental Memorandum re Motion to Suppress Evidence.........340
[Filed December 20, 2007; Docket No. 71]

Government's Supplemental Memorandum re Motion to Suppress Evidence .....350
[Filed December 20, 2007; Docket No. 72]

First Superseding Indictment ..............................................................................372
[Filed December 20, 2007; Docket No. 83]

Government's Supplemental Declaration re Motion to Suppress Evidence (Excerpts) ..............................................................................................................374
[Filed February 5, 2008; Docket No. 127]

Transcript – Motion Hearing (Excerpts)* ..........................................................380
[Dated February 6, 2008; Filed February 26, 2008; Docket Nos. 136]

Transcript – Trial – Day 2 (Excerpts).................................................................460
[Dated May 9, 2008; Filed May 18, 2010; Docket Nos. 259, 410]

Volume 4

Transcript – Trial – Day 3 (am) (Excerpts) .......................................................635
[Dated May 13, 2008; Filed May 18, 2010; Docket Nos. 260, 411]

Transcript – Trial – Day 3 (pm)...........................................................................766
[Dated May 13, 2008; Filed June 17, 2014; Docket Nos. 260, 532]

Volume 5

Transcript – Trial – Day 4 (Excerpts).................................................................805
[Dated May 14, 2008; Filed May 18, 2010; Docket Nos. 261, 412]

Transcript – Trial – Day 5 (Excerpts)....................942
[Dated May 15, 2008; Filed May 18, 2010; Docket Nos. 262, 413]

Volume 6

Transcript – Trial – Day 6 (Excerpts)....................1022
[Dated May 16, 2008; Filed May 18, 2010; Docket Nos. 263, 414]

Volume 7

Transcript – Trial – Day 7 (Excerpts)* ....................1192
[Dated May 20, 2008; Filed May 18, 2010; Docket Nos. 264, 415]

Transcript – Trial – Day 8 (Excerpts)....................1343
[Dated May 21, 2008; Filed May 18, 2010; Docket Nos. 269, 416]

Volume 8

Transcript – Trial – Day 9 (Excerpts)....................1423
[Dated May 22, 2008; Filed May 18, 2010; Docket Nos. 270, 417]

Volume 9

Transcript – Trial – Day 10 (Excerpts)....................1538
[Dated May 23, 2008; Filed May 18, 2010; Docket Nos. 293, 418]

Transcript – Trial – Day 11 (Excerpts)....................1739
[Dated May 27, 2008; Filed June 2, 2010; Docket Nos. 294, 435]

Volume 10

Transcript – Trial – Day 12 (Excerpts)....................1805
[Dated May 28, 2008; Filed May 18, 2010; Docket Nos. 295, 419]

Transcript – Trial – Day 13 (Excerpts)....................1930
[Dated May 29, 2008; Filed May 18, 2010; Docket Nos. 296, 420]

Stipulation to Correct/Modify Record re Jury Instructions (Excerpts)[†] .............1941
[Filed February 27, 2015; Docket No. 543]

Order Correcting/Modifying Record re Jury Instructions ..................................1961
[Filed March 2, 2015; Docket No. 545]

Order Correcting/Modifying Record re Video Testimony .................................1963
[Filed March 2, 2015; Docket No. 546]

Government's Sentencing Memorandum (Excerpts) ........................................1965
[Filed September 17, 2008; Docket No. 318]

Transcript – Victim Statements ..........................................................................1977
[Dated September 25, 2008; Filed June 18, 2014; Docket Nos. 333, 533]

Defendant's Supplemental Filing re Restitution................................................1998
[Filed March 25, 2009; Docket No. 348]

Judgment ............................................................................................................2006
[Filed February 28, 2014; Docket No. 492]

Notice of Appeal .................................................................................................2012
[Filed March 3, 2014; Docket No. 493]

Docket ................................................................................................................2013

Volume 11 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 1)...................2053
[Filed March 3, 2015; Docket No. 547]

Volume 12 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 2)...................2309
[Filed March 3, 2015; Docket No. 547]

[†] Although this document and the two orders that follow were not filed until after the judgment and notice of appeal were filed, they are placed here in the excerpts because they relate to the trial proceedings.

Exhibit No. 101 ........ 2399

Exhibit No. 102 ........ 2401

Exhibit No. 103 ........ 2403

Exhibit No. 104 ........ 2405

Exhibit No. 106 ........ 2408

Exhibit No. 107 ........ 2410

Exhibit No. 108 ........ 2412

Exhibit No. 109 ........ 2414

Exhibit No. 110 ........ 2416

Exhibit No. 111 ........ 2418

Exhibit No. 114 ........ 2420

Exhibit No. 123 ........ 2423

Exhibit No. 2007 ........ 2428

Exhibit No. 2009 ........ 2454

Exhibit No. 2010 ........ 2456

Exhibit No. 2011 ........ 2458

Exhibit No. 2093 ........ 2460

Exhibit No. 2096 ........ 2462

Exhibit No. 2200A ........ 2464

Exhibit No. 2201A ........ 2467

Exhibit No. 2202A ....................2477

Verdict ....................2480
[Filed May 29, 2008; Docket No. 299]

Presentence Report ....................2488
[Dated July 30, 2008; Filed March 25, 2009; Docket No. 346]

Probation Office Letter to District Court ....................2517
[Dated September 3, 2008]

Government's Submission of Victim Impact and Restitution Information .........2523
[Filed September 19, 2008; Docket No. 329]

Supplement to Presentence Report ....................2559
[Filed March 25, 2009; Docket No. 347]

Government's Response to Defendant's Filing re Restitution ....................2562
[Filed April 21, 2009; Docket No. 355]

Government's Supplemental Submission re Restitution ....................2583
[Filed February 28, 2014; Docket No. 490]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

| Case No. | CR NO. 07-168 DSF | Date | December 3, 2007 |
|---|---|---|---|

Present: The Honorable DALE S. FISCHER, United States District Judge

Interpreter N/A

| Paul Pierson | Not Present | Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| MICHAEL JOSEPH PEPE | NOT | X | | CARLTON F. GUNN | NOT | X | |

**Proceedings:** (In Chambers) Order Denying Defendant's Motion To Dismiss Indictment (filed 10/4/07)

Defendant Michael Joseph Pepe is charged with four counts of "engaging in illicit sexual conduct in foreign places" in violation of 18 U.S.C. § 2423(c). The indictment alleges that, between September 2005 and June 2006, Defendant traveled to Cambodia and engaged in illicit sexual conduct with four minors. Presently before the Court is Defendant's Motion To Dismiss Indictment. For the reasons set forth below, Defendant's Motion is denied.

## I. FACTUAL BACKGROUND

According to the Government, in June 2006, two non-governmental organizations provided information to the United States Immigration and Customs Enforcement ("ICE") Bangkok office that a United States citizen, later identified as Defendant, had sexually abused and raped a number of children at his compound in Phnom Penh, Cambodia. (Aff. of Eddy

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 9 of 2133

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL

Wang ("Wang Aff.") ¶ 6.)[1] An ICE agent interviewed four of the child victims (between the ages of 9 and 12), all of whom identified Defendant as the individual who had sexually abused them. (Id.) According to Defendant, he had lived in Cambodia since March 2003, returning to the United States occasionally. (Mot. 5.) His last flight from the United States to Cambodia departed on September 1, 2005 and arrived on September 3, 2005. (Id. at 6.) According to the indictment, Defendant engaged in illicit sexual conduct sometime between September 1, 2005 and June 17, 2006.

## II. LEGAL STANDARD

Under Rule 12(b) of the Federal Rules of Criminal Procedure, a party may file a motion to dismiss based on "any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b); United States v. Shortt Accountancy Corp., 785 F.2d 1448, 1452 (9th Cir. 1986). In considering a motion to dismiss, the court is limited to the face of the indictment and must accept the facts alleged in that indictment as true. Winslow v. United States, 216 F.2d 912, 913 (9th Cir. 1955). A court must decide such a motion before trial "unless it finds good cause to defer a ruling." Fed. R. Crim. P. 12(d); Shortt Accountancy, 785 F.2d at 1452 (citing former Fed. R. Crim. P. 12(e)).

## III. DISCUSSION

### A. Congress May Regulate Illicit Sexual Conduct Engaged in Eight or Nine Months After Travel

#### 1. Application of Section 2423(c) Eight or Nine Months After Travel Is a Valid Exercise of Congress's Foreign Commerce Power

Defendant is charged with violating 18 U.S.C. § 2423(c), which provides that "[a]ny United States citizen or alien admitted for permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both." The Ninth Circuit has ruled that

[1] The Affidavit of Eddy Wang was submitted in connection with the Criminal Complaint, filed September 27, 2006.

CR-11 CRIMINAL MINUTES - GENERAL

__/__
Initials of Deputy Clerk pdp

Page 2 of 8

Pepe ER 2

Congress's enactment of this statute was a valid exercise of its powers under the Foreign Commerce Clause, U.S. Const. art. I, § 8, cl. 3, holding that the "combination of requiring travel in foreign commerce, coupled with engagement in a commercial transaction while abroad, implicates foreign commerce to a constitutionally adequate degree." United States v. Clark, 435 F.3d 1100, 1114 (9th Cir. 2006). In Clark, the defendant committed an illicit commercial sex act two months after arriving in Cambodia. Id. at 1103. In a footnote, the court reserved the question of "[w]hether a longer gap between the travel and the commercial sex act could trigger constitutional or other concerns." Id. at 1108 n.11. Defendant argues that an asserted eight or nine month gap between his travel to Cambodia and allegedly engaging in illicit sexual conduct renders application of § 2423(c) to him unconstitutional.[2] The Court is not persuaded.

As an initial matter, Defendant argues that he was no longer traveling at the time he allegedly engaged in illicit sexual conduct, because he permanently resided in Cambodia. (See, e.g. Reply 8.) But the definition of "travel" is not the focus of the constitutional question presented here, because Defendant did not have to be traveling at the time he engaged in illicit sexual conduct in order to be liable under § 2423(c). Clark at 1107-08; United States v. Jackson, 480 F.3d 1014, 1017 (9th Cir. 2007) ("In light of *Clark*, an individual can violate § 2423(c) even if he stops traveling before he engages in illicit sex.") The question is not whether Defendant was traveling at the time he engaged in illicit sexual conduct, but whether a close temporal proximity between completed travel and illicit sexual conduct is required. The definition of "travel" is not wholly irrelevant to this analysis, as a broad definition of travel (e.g. one encompassing the entire time one is overseas) would shorten or eliminate the gap between the end of travel and illicit sexual conduct. But even under a narrow definition of travel, construed as terminating on arrival in another country, Clark supports application of § 2423(c) here.

In Clark, the Ninth Circuit construed Congress's foreign commerce power very broadly. The court described such power as "sweeping," (id. at 1113) "exclusive[,] and plenary" (id. at

---

[2] The Court's consideration is limited to the face of the indictment and it must accept the facts alleged in that indictment as true. Winslow, 216 F.2d at 913. The indictment alleges violations of 18 U.S.C. § 2423(c). Three counts allege that "[b]etween on or about September 1, 2005, and on or about June 17, 2006," Defendant committed the elements of the offense. One alleges that "[b]etween on or about September 1, 2005, and on or about June 12, 2006," Defendant committed the elements of the offense. Accepting these allegations as true, it is possible that Defendant's illicit sexual conduct occurred up to nine months after his last travel to Cambodia. The Government presents evidence that the illicit conduct occurred as early as December 2005. (See Opp'n 6-7; Wang Decl. ¶¶ 3-4, Exs. 4-5.) Defendant disputes this evidence. (See Reply 7.) The Court need not resolve the dispute, as it concludes even an eight or nine month gap would not be grounds for dismissal.

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 11 of 2133

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

1109 (internal quotation omitted)), and noted that "the Supreme Court has never struck down an act of Congress as exceeding its powers to regulate foreign commerce." Id. Finding that the Foreign Commerce Clause confers powers greater than those under the interstate commerce clause, the court held that it was not limited to the three areas in which Congress may exercise interstate commerce power: (1) channels of commerce; (2) instrumentalities of commerce; and (3) activities substantially affecting commerce. Id. at 1116. Instead, it held that a statute is a valid exercise of Congressional power where it "bears a rational relationship to Congress's authority under the Foreign Commerce Clause" or "fairly relates to foreign commerce." Id. at 1114. Recognizing that "the Commerce Clause comprehend[s] every species of commercial intercourse between the United States and foreign nations," (id.), the court determined that "commercial sex acts with minors" constitute commercial activity subject to Congress's foreign commerce power. Id. at 1114-15.

In Clark, "[t]he combination of Clark's travel in foreign commerce and his conduct of an illicit commercial sex act in Cambodia shortly thereafter put[] the statute squarely within Congress's Foreign Commerce Clause authority." 435 F.3d at 1116 (emphasis added). This language might imply some time limit within which illicit sexual conduct must occur after travel. However, given the breadth of Congress's foreign commerce power and the Clark court's determination that criminalizing illicit sexual conduct engaged in two months after travel fell "squarely within Congress's Foreign Commerce Clause authority," id. (emphasis added), an asserted eight or nine month gap between travel and engaging in illicit sexual conduct would not render application of § 2423(c) in excess of Congress's foreign commerce power. Indeed, Defendant's argument – by focusing exclusively on proximity to travel as the basis for Congress's authority for enacting § 2423(c) – entirely ignores Clark's holding that the type of illicit sexual conduct of which Defendant is accused is itself commercial.[3] Id. at 1114-

---

[3] "Illicit sexual conduct" can be either commercial or non-commercial. 18 U.S.C. § 2423(f)(1)-(2). A commercial sex act is defined as "any sex act, on account of which anything of value is given to or received by any person." Id. § 2423(f)(2). Clark held only that the "commercial" prong of the statute was a valid exercise of Congress's foreign commerce power, reserving the question of whether the non-commercial prong was constitutional. 435 F.3d at 1110. Defendant contends that "the alleged acts are primarily non-commercial in nature and are based more on allegations of physical force and intimidation." (Mot. 12.) In addition to admitting some commercial component to Defendant's alleged activities, this statement is also untrue. The Court does not here decide what conduct Defendant actually engaged in, but Defendant is accused of paying a prostitute to broker deals with minors' families whereby he paid them to let the girls live in his house and satisfy his sexual desires. (Wang Decl., Ex. 3, bates 233-35.) In addition, he is alleged to have paid the minors each time he sexually abused them. (Id. at Ex. 5, Bates 240-41.) As in Clark, "[t]his conduct might be immoral and criminal, but it is also commercial." Id. at 1103.

CR-11 **CRIMINAL MINUTES - GENERAL**

__/__
**Initials of Deputy Clerk** pdp

Page 4 of 8

Pepe ER 4

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 12 of 2133

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

15. That illicit sexual conduct is itself commercial suggests that it need not be in particularly close temporal relationship to travel in order to be subject to regulation by Congress. Moreover, that the foreign commerce power is not limited to channels or instrumentalities of commerce likewise suggests that close temporal proximity to foreign travel is not a prerequisite to congressional power. Under Clark, an eight or nine month gap between travel and illicit sexual conduct does not render application of § 2423(c) in excess of Congress's foreign commerce power.

**2. Application of Section 2423(c) Eight or Nine Months After Travel Is a Valid Exercise of Congress's Power Under the Necessary and Proper Clause**

In addition, § 2423(c) is a valid exercise of Congress's power under the Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18. In 2002, the Senate ratified the Optional Protocol to the United Nations Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography (the "Optional Protocol"), July 5, 2000, S. Treaty Doc. No. 106-37, 2000 WL 33366017. The Optional Protocol provides, in relevant part:

> 1. Each State Party shall ensure that, as a minimum, the following acts and activities are fully covered under its criminal or penal law, whether these offenses are committed domestically or transnationally or on an individual or organized basis:
>
> (a) In the context of sale of children as defined in article 2:
>
> (i) The offering, delivering or accepting, by whatever means, a child for the purpose of:
>
> a. Sexual exploitation of the child; . . .
>
> (b) Offering, obtaining, procuring or providing a child for child prostitution, as defined in article 2; . . .
>
> 3. Each State Party shall make these offences punishable by appropriate penalties that take into account their grave nature;
>
> 4. Subject to these provisions of its national law, each State Party shall take measures, where appropriate, to establish the liability of legal persons for offenses established in paragraph 1 of the present article.

Id. at art. 3.1. "Sale of children" is defined as "any act or transaction whereby a child is transferred by any person or group of persons to another for remuneration or any other consideration." Id. at art. 2(a). "Child prostitution" is defined as "the use of a child in sexual activities for remuneration or any other form of consideration." Id. at art. 2(b).

If a treaty itself does not create legally enforceable domestic obligations, then Congress has the power to pass such legislation as is necessary and proper to implement the treaty. See Missouri v. Holland, 252 U.S. 416, 432 (1920) ("If the treaty is valid there can be no dispute

CR-11 **CRIMINAL MINUTES - GENERAL**

__/__
**Initials of Deputy Clerk** pdp

Page 5 of 8

Pepe ER 5

about the validity of the statute under Article 1, Section 8, as a necessary and proper means to execute the powers of the Government."); Whitney v. Robertson, 124 U.S. 190, 194 (1888); United States v. Bramble, 103 F.3d 1475, 1480 (9th Cir. 1996).[4] If § 2423(c) bears some reasonable relationship to a grant of power to the national government, and it is not otherwise prohibited by the Constitution, the Court must find the law to be "necessary and proper." See M'Culloch v. Maryland, 17 U.S. 316, 421 (1819) ("Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.").

Section 2423(c) bears a rational relationship to and reasonably implements the Optional Protocol, which explicitly requires signatories to criminalize the acts of purchasing a child for sexual exploitation or obtaining a child for child prostitution "domestically or transnationally." See United States v. Frank, 486 F. Supp. 2d 1353, 1358-59 (S.D. Fla. 2007). It is thus a necessary and proper means of implementing the government's treaty-making power. Because this grant of authority does not derive from regulation of commerce, there is no basis for limiting application of § 2423(c) to illicit sexual conduct engaged in within a defined period of time after travel in foreign commerce.

Application of § 2423(c) to illicit sexual conduct engaged in eight or nine months after travel is not unconstitutional.[5]

**B. The Language of Section 2423(c) Covers Sexual Conduct Engaged in Eight or Nine Months After Travel**

Defendant's statutory interpretation arguments are similarly unavailing. Defendant urges

---

[4] Treaties and laws passed pursuant to them are not "free from the restraints of the Constitution," Reid v. Covert, 354 U.S. 1, 16 (1957), such as the Bill of Rights. Defendant primarily contends that § 2423(c) exceeds Congress's constitutional authority, not that it infringes his enumerated constitutional rights. As Defendant concedes, his claim that application of § 2423(c) would violate the Due Process Clause of the Fifth Amendment is foreclosed under Clark. See 435 F.3d at 1108-09.

[5] The language of the Optional Protocol suggests that it concerns only commercial illicit sexual conduct. The Court does not decide whether criminalizing non-commercial illicit sexual conduct is valid under the Necessary and Proper Clause.

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 14 of 2133

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

the Court to construe § 2423(c) so as to avoid constitutional questions and to comport with the rule of lenity. (Mot. 13.) Defendant advocates a narrow interpretation of the statute that would preclude liability whenever sufficient time passes after travel. But there is nothing in the text of § 2423(c) that could be interpreted as imposing any temporal relationship between the elements of the offense. Section 2423(c) imposes criminal liability on "[a]ny United States citizen or alien admitted for permanent residence who travels in foreign commerce, <u>and</u> engages in any illicit sexual conduct with another person . . . ." (emphasis added). Under this language, there is no requirement that the illicit sexual conduct occur within any period of time after travel. Defendant argues that if Congress had intended that illicit sexual conduct could occur at any time after travel, it could have explicitly said so. (Mot. 14-16.) But Congress could also have explicitly stated that the illicit sexual conduct must occur within a specified period of time after travel. It did not. The statute is simply silent on the temporal relationship between the elements.[6]

Defendant argues that the word "and" joining the elements of the offense supplies this temporal element, because it means "immediately soon afterward" or "next in order of time." (Mot. 13.) However, arguing that "and" means "then" and that "then" means "immediately soon afterward" does not establish the plain meaning of the word "and." In ordinary usage, "and" means "and." Moreover, Defendant's construction of the statute is incompatible with <u>Clark</u>'s holding that § 2423(c) covers illicit sexual conduct engaged in two months after travel. The language of § 2423(c) cannot be construed as Defendant suggests.

### C. Defendant's Remaining Arguments Are Foreclosed by <u>Clark</u>

Defendant argues that application of § 2423(c) violates international law and deprives Defendant of due process. (Mot. 16-19.) As Defendant concedes (Mot. 16 n.3.), both of these arguments are foreclosed by <u>Clark</u>, which held that § 2423(c) is valid under international law and comports with due process. 435 F.3d at 1106-09.

## IV. CONCLUSION

---

[6] Because the statute is silent, rather than ambiguous, concerning the temporal relationship between the elements, the Court does not consider the legislative history of Section 2423(c). <u>See</u> <u>Abrego Abrego v. The Dow Chem. Co.</u>, 443 F.3d 676, 683 (9th Cir. 2006) (holding that a statute's silence does not create ambiguity necessary for consideration of legislative history).

CR-11 **CRIMINAL MINUTES - GENERAL**

__/__
**Initials of Deputy Clerk** pdp

Page 7 of 8

Pepe ER 7

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 15 of 2133

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

The timing of Defendant's alleged illicit sexual conduct does not place his conduct outside the scope of § 2423(c) or render the application of § 2423(c) unconstitutional. Defendant's Motion To Dismiss Indictment is DENIED.

IT IS SO ORDERED.

CR-11 **CRIMINAL MINUTES - GENERAL**

__/__
**Initials of Deputy Clerk** pdp

Page 8 of 8

Pepe ER 8

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

| Case No. | CR 07-168 DSF | Date | December 5, 2007 |
|---|---|---|---|

Present: The Honorable DALE S. FISCHER, United States District Judge

Interpreter N/A

| Paul Pierson | Not Present | Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| MICHAEL JOSEPH PEPE | NOT | X | | CARLTON F. GUNN | NOT | X | |

**Proceedings:** (In Chambers) Order DENYING Defendant's Motion To Suppress Evidence Discovered as Result of Computer Media Search Warrant, DENYING in Part Defendant's Motion To Suppress Evidence, and Ordering Further Briefing

Defendant Michael Joseph Pepe is charged with four counts of "engaging in illicit sexual conduct in foreign places" in violation of 18 U.S.C. § 2423(c). The indictment alleges that, between September 2005 and June 2006, Defendant traveled to Cambodia and engaged in illicit sexual conduct with four minors. Presently before the Court are Defendant's Motion To Suppress Evidence ("First Motion") and Motion To Suppress Evidence Discovered as Result of Computer Media Search Warrant (the "Second Motion"). Defendant seeks suppression of: 1) evidence obtained in a search of his residence by Cambodian police involving a United States official (the "Cambodian Search"); 2) evidence obtained through a forensic examination, conducted by United States officials in Singapore, of digital media seized in the Cambodian Search (the "Singapore Search"); and 3) evidence obtained through the search, pursuant to a United States warrant, of other digital media seized in the Cambodian Search (the "U.S. Search").

For the reasons set forth below, Defendant's Second Motion is DENIED, and the First Motion is DENIED in part. The Court requires additional briefing to determine some issues

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 17 of 2133

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

raised in the First Motion.

## I. BACKGROUND

In June 2006, two non-governmental organizations provided information to the United States Immigration and Customs Enforcement ("ICE") Bangkok office that a United States citizen, later identified as Defendant, had sexually abused and raped a number of children at his compound in Phnom Penh, Cambodia. (Aff. of Eddy Wang ("Wang Aff.") ¶ 6.)[1] An ICE agent interviewed four of the child victims (between the ages of 9 and 12), all of whom identified Defendant as the individual who had sexually abused them. (Id.)

The Cambodian National Police ("CNP") arrested Defendant and executed search warrants at his compound, where evidence of sexual abuse of child victims was seized. (Id.) An ICE agent was present at the search, took photographs, and observed evidence. (Decl. of Gary J. Phillips ("Phillips Decl.") ¶ 13.) The evidence seized in the Cambodian Search included pornographic photographs, a computer, emails, and digital media containing child pornography. (Wang Aff. ¶ 10(e).) ICE Bangkok took possession of evidence seized in the Cambodian Search. (See First Mot. Ex. D.) ICE Bangkok forwarded the computer hard drive and some of the digital media to ICE Singapore, where a forensic examination of the evidence was performed. (Wang Aff. ¶ 10(e).) Defendant asserts, and the Government does not deny, that no U.S. warrant was obtained prior to this examination. (First Mot. 6.) A thumb drive found in Defendant's compound contained a number of pornographic images of young girls posing in a sexually explicit manner on Defendant's bed and showering in his bathroom. (Wang Aff. ¶ 18.) Pornography found on Defendant's computer included, *inter alia*, images of children undressing and posing in a sexually explicit manner (id. ¶ 19(a)), a young Asian girl naked with her wrists bound to Defendant's bed (id. ¶ 19(c)(v)), and girls performing oral sex on a person closely matching Defendant's physical description. (Id. ¶ 19(c)(iv) & (vi).)

A search of computer media in the United States pursuant to a warrant issued May 17, 2007 produced additional evidence. The affidavit in support of this warrant contained references to evidence discovered in the Singapore Search. (See Second Mot. Ex. A at Bates 936-42.)

## II. DISCUSSION

---

[1] The Affidavit of Eddy Wang was submitted in connection with the Criminal Complaint, filed September 27, 2006.

CR-11 **CRIMINAL MINUTES - GENERAL**

**0/0**
**Initials of Deputy Clerk** pdp

Page 2 of 11

Pepe ER 10

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 18 of 2133

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

### A. The Cambodian Search Was Not a Joint Venture

Defendant contends that evidence seized during the Cambodian Search should be suppressed because the search did not comply with Cambodian law. Generally, neither the Fourth Amendment nor the judicially created exclusionary rule applies to acts of foreign officials. United States v. Barona, 56 F.3d 1087, 1091 (9th Cir. 1995). Two "very limited exceptions" apply. Id. The first occurs "if the circumstances of the foreign search and seizure are so extreme that they 'shock the [judicial] conscience,' [so that] a federal appellate court in the exercise of its supervisory powers can require exclusion of the evidence." Id. (internal quotation omitted; alteration in original). Defendant does not contend that the Cambodian Search shocked the conscience.

"The second exception to the inapplicability of the exclusionary rule applies when United States agents' participation in the investigation is so substantial that the action is a joint venture between United States and foreign officials." Id. (internal quotation omitted). "If a joint venture is found to have existed, the law of the foreign country must be consulted at the outset as part of the determination whether or not the search was reasonable." Id. (internal quotation omitted). "If foreign law was not complied with, the good faith exception to the exclusionary rule becomes part of the analysis." Id. at 1092-93 (internal quotation omitted). "The good faith exception is grounded in the realization that the exclusionary rule does not function as a deterrent in cases in which the law enforcement officers acted on a reasonable belief that their conduct was legal." Id. at 1093.

"Whether the search does become a joint venture can be determined only by a comparison of what the Federal agent did in the search and seizure with the totality of acts done in the search and seizure." United States v. Stonehill, 405 F.2d 738, 744 (9th Cir. 1969). The reason that the Fourth Amendment and the exclusionary rule do not apply to foreign officials is that "there is nothing our courts can do that will require foreign officers to abide by our Constitution." Id. at 743. This suggests that the exclusionary rule should apply only where participation and control by U.S. officials is substantial enough that the deterrent effect of the exclusionary rule could have ensured that a search would be conducted in accordance with the Fourth Amendment. U.S. participation in the Cambodian Search did not rise to this level, and was similar to that of U.S. officials in cases where no joint venture was found.

Non-governmental organizations independently informed both the CNP and the ICE Bangkok office that they had received information that Defendant had sexually abused and raped a number of children at his compound. (Phillips Decl. ¶¶ 3-4.) When they informed ICE Agent Phillips, the CNP had already begun investigation of Defendant. (Id. ¶ 4.) CNP continued surveillance of Defendant, interviewed one victim, and located Defendant's home.

CR-11 **CRIMINAL MINUTES - GENERAL**

**0/0**
**Initials of Deputy Clerk** pdp

Page 3 of 11

Pepe ER 11

(Id. ¶¶ 4-6.) Although Agent Phillips offered assistance to the CNP, they did not request help in their investigation until after the search. (Id. ¶ 9.)

Cambodian police later arrested Defendant for rape and debauchery in violation of Cambodian law. (Id. ¶ 10.) Agent Phillips did not instruct or advise the CNP to arrest Defendant and was not present during the arrest.[2] (Id. ¶ 10.) Prior to the arrest, CNP had obtained a search warrant for Defendant's residence. (Id. ¶ 11, Ex. A.) Agent Phillips did not instruct or advise CNP to obtain a search warrant. (Id. ¶ 12.) CNP transported Defendant to his residence and executed the search warrant. (Id. ¶¶ 10-11.) Approximately twenty CNP officers were present in Defendant's home.[3] (Id. ¶ 13.) Agent Phillips was also present, taking photographs and observing evidence.[4] (Id. ¶ 13.) Two days after the search was concluded, CNP placed seized items into bags and took them to CNP offices. (Id. ¶ 14.) Several days later, U.S. officials took possession of some of the evidence seized.[5] (See First Mot. Ex. D.)

As can be seen from the foregoing facts, Agent Phillips' role in planning and executing the search was insubstantial. He did not have the kind of involvement or influence that would make application of the exclusionary rule an effective means of ensuring compliance with the Fourth Amendment. There is also no evidence that the government here was using foreign officials in order to violate "the Constitution by circuitous and indirect methods." Stonehill,

---

[2] Defendant contends that U.S. officials were present at the arrest. (First Mot. 4.) However, the report cited by Defendant in support of this contention states only that "the CNP arrested PEPE for rape and debauchery." (First Mot. Ex. A at 3.) Even if U.S. officials had been present, the Court's conclusion would be the same.

[3] Defendant's assertion that "at least as far as [he] could see . . . the Cambodian police officers did very little searching," and that "[m]ost of the searching that [he] was able to see was done by an American agent . . . ans [someone] working for a non-governmental organization" (Decl. of Michael Pepe ¶ 4) is not persuasive, given the on-going CNP investigation, the active role the CNP took in investigating Defendant, arresting him, and procuring a search warrant, and the large number of CNP officers present during the search.

[4] Defendant contends that an agent from the Diplomatic Security Service was also present. (First Mot. 4.) However, Defendant does not provide any indication of what this agent is supposed to have done during the search, instead relying exclusively on the acts of Agent Phillips as demonstrating a joint venture.

[5] Defendant submits a copy of a "Custody Receipt for Seized Property and Evidence" that appears to document the transfer of evidence from the CNP to U.S. officials. (First Mot. Ex. D.) It is unclear from this document what proportion of the evidence seized was turned over to U.S. authorities; however, the Court assumes for the purpose of this motion that it was substantial.

405 F.2d at 744, 746. Agent Phillips did not request the arrest or search. (Phillips Decl. ¶¶ 10, 12.) The CNP initiated an investigation prior to any U.S. knowledge of accusations against Defendant, located Defendant's home, arrested Defendant for Cambodian violations, and obtained a search warrant without aid from U.S. officials.[6] (Id. ¶¶ 4, 10, 12.) The CNP also conducted the search and took custody of the seized evidence. (Id. ¶¶ 11, 13-14.) These facts support a finding that there was no joint venture. See United States v. Benedict, 647 F.2d 928, 930-31 (9th Cir. 1981) (finding no joint venture where "[t]he actual seizures, the custody of evidence, and the arrest of [the defendant] were effected in furtherance of a Thai prosecution"). The CNP was conducting – and controlling – its own investigation.

Although Agent Phillips was present at the search, took photographs, and observed evidence, this is not sufficient to make the search a joint venture. See United States v. Behety, 32 F.3d 503, 511 (11th Cir. 1994) (holding that U.S. agents' presence at and videotaping of search by Guatamalan officials did not trigger the exclusionary rule); Benedict, 647 F.2d at 931(holding that U.S. agents' mere presence at search by Thai officials was insufficient to create a joint venture); Stonehill, 405 F.2d at 741-42 (holding that U.S. agents' suggestion of areas to search and evidence to seize did not create joint venture). Likewise, that evidence from the search was turned over to U.S. officials does not create a joint venture. See Stonehill, 405 F.2d at 741-42. The Court finds that the CNP conducted the search in service of its own investigation, which pre-dated that of Agent Phillips. Given the evidence of CNP's independent investigation, that U.S. agents took over Defendant's prosecution after the search does not establish sufficient U.S. involvement in the search to invoke the Fourth Amendment.

At the October 29, 2007 hearing on the Motions ("Oct. 29 Hearing"), Defendant introduced into evidence portions of a videotape of the search. The videotape showed Agent Phillips looking through documents at the end of the search, picking up a stuffed animal, telling a CNP officer that he should seize a bottle of oil that one victim had told Agent Phillips was used in sexually assaulting her, and shining a black light on a mattress. These activities also do not establish a joint venture. They show at most a tangential role in the search and are consistent with Agent Phillips' statements that he was engaged in an independent, parallel investigation. Such activities fall far short of the coordinated conduct in cases finding a joint

---

[6] At the October 29 hearing on the Motions, Defendants relied on a Powerpoint presentation stating that U.S. agents had coordinated with the CNP in obtaining an arrest warrant for Defendant. The Court finds that this presentation, which was compiled by multiple authors and was not intended to detail the respective activities of U.S. and foreign agents in Defendant's arrest, does not impeach Agent Phillips' testimony that U.S. officials were not involved in Defendant's arrest. The Court credits Agent Phillips' testimony at the hearing that the presentation reflected the fact that the CNP kept U.S. officials informed of the arrest.

venture. See United States v. Peterson , 812 F.2d 486, 490 (9th Cir. 1987) (finding joint venture where U.S. agents termed the investigation a "joint investigation," and were "involved daily in translating and decoding intercepted transmissions, as well as advising the Philippine authorities of their relevance."); Barona, 56 F.3d at 1094 (finding a joint venture where "American agents requested the wiretaps, information obtained was immediately forwarded to them, and throughout the surveillance a Spanish to English interpreter was provided by the United States.")

Because the Cambodian Search was not a joint venture with American agents, it was not subject to the Fourth Amendment, and Defendant's request to suppress evidence seized during the search must be denied.

**B. The Evidence Obtained Pursuant to the May 17, 2007 Warrant Should Not Be Suppressed**

On May 17, 2007, the Government obtained a warrant authorizing the search of computer media seized from Defendant's residence in the Cambodian Search. Defendant argues that evidence found pursuant to this warrant (the "Computer Media Evidence") should be suppressed either because: 1) the Cambodian Search was unlawful; 2) the affidavit supporting the warrant was based in part on evidence unlawfully obtained in the Singapore Search; or 3) the search pursuant to the warrant was overly broad. Because the Cambodian Search was not unlawful, Defendant's first argument fails. As will be discussed below, the Court requires further briefing in order to determine the legality of the Singapore Search. Nonetheless, even assuming that evidence obtained in the Singapore Search should be suppressed, the Computer Media Evidence should not.

"When an affidavit contains evidence illegally obtained, [a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." United States v. Barajas-Avalos, 377 F.3d 1040, 1054 (9th Cir. 2004) (internal quotation omitted; alteration in original). If such probable cause existed and the agents would have sought a warrant without the illegally obtained evidence, then the warrant stands. See Murray v. United States, 487 U.S. 533, 542-43 (1988); United States v. Duran-Orozco, 192 F.3d 1277, 1281 (9th Cir. 1999).

The Government represented at the December 3, 2007 Hearing that Defendant was under investigation for violation of 18 U.S.C. § 2423(c) (engaging in foreign travel and illicit sexual conduct) and 18 U.S.C. § 2260 (production of child pornography for importation to the United States. Excising all references to evidence obtained in the Singapore Search, the affidavit in

support of the May 17, 2007 warrant details the following: 1) the victims' identification of Defendant as the person who sexually abused them (Second Mot. Ex. A ¶ 9); 2) the labeling of some computer media to be searched with the names "15 years old little girls with crazy sex event," "14 Years Old Unsensor," "GIRLS NOW," "GIRLS 121005," and "CHRISTMAS 2005"[7] (id. ¶¶ 6, 15); and 3) a letter from Defendant to his sister, in which Defendant mentioned several of his victims by name, described massages by his victims leading to "inappropriate touching, etc.," described binding and slapping one of the victims after taking Viagra, and recounted taking and storing on his computer naked pictures of two nieces of the prostitute who allegedly brokered the victims' sale to him.[8] (Id. ¶ 16.) "Probable cause means only a 'fair probability,' not certainty, and requires consideration of the totality of the circumstances." U.S. v. Hill, 459 F.3d 966, 970 (9th Cir. 2006). After excising any reference to evidence obtained in the Singapore Search, the remaining portions of the affidavit were clearly sufficient to support a "fair probability" that the computer media searched would contain evidence of the crimes for which Defendant was being investigated. It is also sufficient to have prompted the agents to seek a warrant. Even assuming that the Singapore search was unlawful, the warrant remains valid.

Defendant also argues that the search was overbroad, in that it included media that was not labeled in a suggestive manner and did not include a protocol for limiting the search of Defendant's computer. These arguments are without merit. As explained in Hill,

> Computer records are extremely susceptible to tampering, hiding, or destruction, whether deliberate or inadvertent. Images can be hidden in all

---

[7] Although not necessarily suggestive, a title like "GIRLS 121005" supports probable cause to believe that evidence establishing when the victims were in Defendant's household would be found on computer media.

[8] Defendant notes that these pictures were actually described as having been deleted from the computer. This was nonetheless support for believing that Defendant used his computer for storing photographs. Defendant also points out that there is no indication in the letter that the prostitute's nieces were minors. Nonetheless, given the other evidence that Defendant possessed child pornography (such as the suggestive names of computer media), and the identification of Defendant as their abuser by the victims, that Defendant used his computer for storing photographs of any kind supported a 'fair probability' that evidence of criminal activity would be found there. Indeed, it would be reasonable to suspect that photographs would be stored on the computer even without the evidence of pictures of the prostitute's nieces having been stored there.

> manner of files, even word processing documents and spreadsheets. Criminals will do all they can to conceal contraband, including the simple expedient of changing the names and extensions of files to disguise their content from the casual observer. Forcing police to limit their searches to files that the suspect has labeled in a particular way would be much like saying police may not seize a plastic bag containing a powdery white substance if it is labeled “flour” or “talcum powder.” There is no way to know what is in a file without examining its contents, just as there is no sure way of separating talcum from cocaine except by testing it.

459 F.3d at 978. That the Government did not explicitly state in the warrant affidavit that users of child pornography are likely to keep pornography in many locations does not destroy probable cause to search all computer media, however titled. If incriminating files are to be found in one medium, they are reasonably likely to be found in another. For the same reason, searching Defendant’s computer and computer media when Defendant possesses computer disks with names like “14 Years Old Unsensor,” is hardly “indiscriminate fishing,” as suggested by Defendant. (See Reply 9.) That Defendant stored a naked photograph of his prostitute’s niece on his computer further supported probable cause to search his computer and computer media. There was certainly a “fair probability” that evidence of the crimes for which Defendant was being investigated would be found there.

It was also reasonable to conduct searches of Defendant’s computer files that were not suggestively labeled. Defendant has not proposed any search protocol that would reasonably preserve Defendant’s privacy while allowing for the above-noted dangers of tampering or destruction of computer evidence. Similarly, searching text files was not unreasonable. First, as noted in Hill, the extensions of computer files (which would indicate whether a file was a text or image file) can be changed to conceal contraband. Second, evidence of crime was likely to be found in text files. As Agent Wang states in his declaration, pedophiles often document and correspond with other pedophiles about their activities. (Decl. of Eddy Wang ¶ 4.) He further testified at the December 3 Hearing on the Motion to Suppress that he searched for journals or fantasy writing often produced by pedophiles.

The May 17, 2007 warrant and search pursuant to it were not overbroad. The warrant was supported by probable cause, whether or not the evidence from the Singapore Search is excised from the supporting affidavit. The evidence found pursuant to the May 17, 2007

warrant will not be suppressed.[9]

### C. The Court Requires Additional Briefing to Assess the Legality of the Singapore Search

After the Cambodian Search, U.S. agents sent a computer hard drive, a thumb drive, and a digital media card to Singapore for forensic examination. (Wang Aff. ¶ 10(e).) Defendant argues that evidence found during this forensic examination should be suppressed because no U.S. warrant was obtained before the forensic examination was conducted. The Government argues that the Fourth Amendment does not apply to the Singapore Search, because it was conducted at the behest of Cambodian officials. The Court does not believe that either analysis is correct.

The Court credits Agent Phillips' testimony at the October 29 Hearing that the forensic examination was undertaken in order to aid Cambodian officials. Defendant points out that a letter submitted by the U.S. Embassy in Cambodia to Cambodian officials requesting the media does not appear to respond to any request for aid from the CNP. (See First Mot. Ex. G.) However, Agent Phillips states in his declaration that CNP requested assistance in the forensic examination of the computer media. (Phillips Decl. ¶ 15.) He also testified at the October 29 Hearing that the letter was phrased in such a way as to allow Cambodia to "save face" by not mentioning the CNP's need for U.S. aid. (Oct. 29 Hr'g Tr. at 42:15-44.) The Court credits this testimony.

Intending to demonstrate that Cambodian authorities have the capability to perform searches of computer media, Defendant also submits a Cambodian newspaper account which describes the "police" finding a large number of pornographic photographs on a suspect's computer. However, that the "police" – a generic term that could refer to coordinated efforts between Cambodian and foreign police forces – found evidence on a computer does not establish that the Cambodian police force did so without help. Moreover, even if Cambodian officials have some ability to search computer media, they could still request help in conducting the type of forensic analysis performed here.

---

[9] The Court does not address Defendant's argument that evidence found pursuant to the May 17, 2007 warrant more than sixty days after issuance of the warrant should be suppressed. Defendant acknowledges that this argument is moot, given that no evidence was obtained from media that were not determined to contain evidence within the sixty-day period. (Reply 11 n.6.)

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 25 of 2133

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

However, the Government provides no authority for the proposition that a search by U.S. officials is not subject to the Fourth Amendment where it is provided in support of a foreign investigation. Indeed, the case law regarding joint ventures makes clear that U.S. participation in a foreign investigation can subject that investigation to scrutiny under the Fourth Amendment.

The case law regarding joint ventures also undermines Defendant's argument that any search conducted by U.S. officials must be conducted pursuant to a U.S. warrant, even if conducted at the request of foreign officials. Joint ventures by their nature involve substantial U.S. participation, yet their reasonableness is judged by compliance with foreign law. Barona, 56 F.3d at 1092. Even a foreign search directed by U.S. officials in which information obtained was immediately forwarded to U.S. officials meets Fourth Amendment requirements where local search and seizure law is observed. See id. at 1094-95. Even if such a search is unreasonable under foreign law, evidence obtained in the search is not excluded if the U.S. participants acted in the good faith belief that the search complied with local law. Id. at 1092-93.

There can be little doubt that the Singapore Search was a joint venture, as U.S. officials conducted the entire examination at Cambodian officials' request. The Court must consider, then, whether the search was reasonable under Cambodian law and whether U.S. officials relied in good faith on representations that the search complied with Cambodian law. Id. However, because Defendant has argued only that a U.S. warrant was required, and the Government has argued that the Fourth Amendment is simply inapplicable, neither party has addressed these questions. The Court thus requires additional briefing regarding whether: (1) the Cambodian warrant, which authorized the search of Defendant's home, also authorized the search of computers and computer media contained within it; (2) Defendant's evidence that the warrant was obtained after the Cambodian Search was conducted establishes that the warrant was not valid for the purpose of the Singapore search; and (3) Agent Phillips and other U.S. officials involved in the Singapore search relied in good faith on representations by Cambodian officials that a search of Defendant's computer and computer media complied with Cambodian law.

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion To Suppress Evidence Discovered as Result of Computer Media Search Warrant is DENIED. Defendant's Motion To Suppress Evidence is DENIED in part. The parties should submit additional briefing addressing the issues raised by the Court by December 20, 2007.

CR-11 **CRIMINAL MINUTES - GENERAL**

**0/0**
**Initials of Deputy Clerk** pdp

Page 10 of 11

Pepe ER 18

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 26 of 2133

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

IT IS SO ORDERED.

CR-11 **CRIMINAL MINUTES - GENERAL**

**0/0**
**Initials of Deputy Clerk** pdp

Page 11 of 11

Pepe ER 19

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

| Case No. | CR NO. 07-168 DSF | Date | February 7, 2008 |
|---|---|---|---|

Present: The Honorable DALE S. FISCHER, United States District Judge

Interpreter N/A

| Paul Pierson | Not Present | Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| MICHAEL JOSEPH PEPE | NOT | X | | CARLTON F. GUNN | NOT | X | |

**Proceedings:** (In Chambers) Order DENYING Defendant's Motion To Suppress Evidence

Defendant Michael Joseph Pepe is charged with seven counts of "engaging in illicit sexual conduct in foreign places" in violation of 18 U.S.C. § 2423(c). The First Superseding Indictment alleges that, between September 2005 and June 2006, Defendant traveled to Cambodia and engaged in illicit sexual conduct with seven minors.

On June 26, 2006, Defendant filed a Motion To Suppress Evidence, seeking, among other things, the exclusion of evidence obtained in a forensic examination conducted by United States officials in Singapore (the "Singapore Search"). In an order dated December 5, 2007, the Court found that the Singapore Search had been conducted in order to assist the Cambodian National Police ("CNP") and that any evidence found during the search was admissible if obtained in compliance with Cambodian law. The Court requested further briefing regarding whether: (1) the Cambodian warrant, which authorized the search of Defendant's home, also authorized the search of computers and computer media contained within it; (2) Defendant's evidence that the warrant was obtained after the Cambodian Search was conducted establishes that the warrant was not valid for the purpose of the Singapore search; and (3) Agent Phillips and other United States officials involved in the Singapore search relied in good faith on representations by

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 28 of 2133

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

Cambodian officials that a search of Defendant's computer and computer media complied with Cambodian law.

The parties submitted their supplemental briefs on December 20, 2007. Having considered these submissions, and heard testimony, the Court DENIES Defendant's Motion.

## I. DISCUSSION

### A. Compliance with Cambodian Law is Sufficient To Meet Fourth Amendment Requirements

Despite the concerns raised by Defendant, the Court remains convinced that compliance with Cambodian law is sufficient to meet Fourth Amendment requirements where, as here, the United States government aids in a foreign investigation of a United States citizen for violation of foreign law. In joint venture cases, where United States participation is sufficient to require application of the Fourth Amendment, the reasonableness of the search is measured by compliance with foreign law. This is true even where United States officials direct foreign law enforcement authorities to gather information for the United States officials' use.[1] See United States v. Barona, 56 F.3d 1087, 1094 (9th Cir. 1995). It is also true where a court is "unable to conclude that the role [of United States officials] was subordinate to the role of [foreign] authorities" – as when United States officials engage in a "joint investigation" with foreign law enforcement, participating daily and gathering evidence regarding contraband headed for the United States. See United States v. Peterson, 812 F.2d 486, 490 (9th Cir. 1987). The Court finds the role of United States authorities in the Singapore search to be no more substantial than that of United States authorities in these joint venture cases. Compliance with Cambodian law is sufficient to satisfy the requirements of the Fourth Amendment.

### B. The Singapore Search Complied with Cambodian Law

[1] For this reason, that Agent Phillips instructed the forensic examiner in Singapore to make copies of all images from Defendant's computer and computer media for Immigration and Customs Enforcement in Bangkok and the United States Attorney (see Supplemental Mem. of P. & A. in Supp. of Mot. to Suppress Evidence Ex. A) does not mean that the standards of reasonableness applicable to joint ventures do not apply here.

CR-11 **CRIMINAL MINUTES - GENERAL**

**__/__00**
**Initials of Deputy Clerk yrl**

Page 2 of 6

Pepe ER 21

In his Motion, Defendant points out an apparent defect in the Cambodian warrant that authorized the search of his home in Cambodia. Defendant's house was searched on June 17, 2006.[2] The warrant, dated June 17, 2006, appeared to be based on a report dated June 19, 2006 that referred to information obtained on June 18, 2006. Thus, it appeared that the warrant was obtained after the search of Defendant's home. In its December 5 Order, the Court also expressed concern that the warrant – which authorized the search of Defendant's house but did not mention computers or computer media – did not authorize the search of computer media found at the house. The Government's supplemental submission addresses both of these concerns.

First, the Government submits the Declaration of Sambo Ly ("Ly Decl."), a native speaker of Khmer who has been interpreting between Khmer and English since 1979, has served as an interpreter for the Superior and Family Courts of the State of California, County of Alameda, and who currently serves as the Director of the Interpreter Services Department for the Alameda County Medical Center. (Ly Decl. ¶ 1.) Ly states that there were several errors in the previous translation of the report supporting the Cambodian warrant, which had been provided by the Government. In the top right corner of the document, the previous translator had translated the date as "19 June 2006," when it should have been "17 June 2006." (Id. ¶ 2.) The original translator mistakenly transcribed a date associated with a child victim's information as "18 June 2006," when it should have been "15 June 2006."[3] (Id.) Also, the

---

[2] At the February 6 hearing, Defendant presented two items of evidence meant to establish that the search of Defendant's Cambodian home actually took place on June 16, 2006, not June 17, 2006. First, Defendant submitted a report prepared by Agent Phillips that appears to state that the search took place on June 16, 2006. The Court credits Phillips' testimony, consistent with his earlier testimony, that the date in the report is in error.

Second, Defendant submitted a disk of digital photographs of the search of Defendant's home. The digital photographs were stored as computer files. Associated with these files were "created on" dates. The "created on" date for some of these photographs was June 16, 2006. Without further evidence that the "created on" date on the disk corresponds with the actual date in Cambodia when the picture was taken, the Court finds this evidence insufficient to discredit the testimony of the Government's witnesses that the search took place beginning on June 17, 2006. The Court takes judicial notice that the time in Cambodia is fifteen hours ahead of the time in Los Angeles, raising the possibility that the "created on" date could simply reflect the difference in time zones.

[3] This date was written in a combination of arabic numerals and Khmer words. At the February 6, 2008 evidentiary hearing, the original translator, Mr. Madden, testified that the hand-printed arabic numeral was ambiguous in appearance so that it could be either a 15 or an 18. Defendant contends that

original translator interpreted the number of the document as "450/06," when it should have been "449/06." (Id.) The residential search warrant contains a statement by the prosecutor that he saw "report number 449/06 R.M.K., dated 17 June 2006." (Decl. of Gary J. Phillips in Supp. of Opp'n to Mot. to Suppress Evid. and Mot. to Suppress Evid. Discovered as a Result of Computer Search Warrant ("Phillips Decl. I"), Ex. A.) In addition, the original translator correctly interpreted the date by the District Attorney's signature as "17/6" or June 17. (Ly Decl. ¶ 3.) At the February 6, 2008 evidentiary hearing, the original translator, Mr. Madden, testified that the dates in the original translation were in error, and that it was "unmistakable" that Ms. Ly's alternative translation was correct. Ms. Ly was also present and cross-examined, and testified that she was certain her translation was correct. The Court is satisfied, based on Ms. Ly's declaration, as well as the testimony of Ms. Ly and Mr. Madden, that the warrant was obtained prior to the search of Defendant's home.

Second, the Government submits the Declaration of Koeut Rith ("Koeut Decl."), the Under Secretary of State, Ministry of Justice of the Kingdom of Cambodia. Mr. Koeut states:

> Under Cambodian law, all search warrants authorize the police to search and seize all suspected items inside a suspect's residence, including computers and computer media, which are considered to relate to the suspect's case. When the police seize computers or computer media, officers trained in computer technology automatically are allowed to search that computer and computer media for evidence in connection with the crime. The officers may either search the computer and computer media at the search location or remove the computer and media for forensic analysis.

(Koeut Decl. ¶ 2.) "Foreign law, though formerly treated as an issue of fact, is now recognized as an issue of law, to be established by any relevant source, including testimony." Peterson, 812 F.2d at 490; Fed. R. Crim. P. 26.1. Koeut's declaration establishes that the Singapore Search was authorized by the warrant obtained by the CNP prior to the search of Defendant's home.

Defendant argues that the Singapore Search violated Cambodian law because it was requested by the police rather than being "authorized by one of the judges of the competent court or by the prosecutor." (See Mot. Ex. I, art. 20 § 2.) However, the prosecutor requested the initial search warrant (see Phillips Decl. I, Ex. A), which Koeut's testimony establishes

---

it is, in fact, an 18. Having reviewed the Khmer version of the report, the Court concludes the arabic numeral is likely a 15, and the ambiguous numeral is more consistent with other "5"'s in the document than other "8"'s. In any event, even assuming the numeral is ambiguous in appearance, the Court concludes that a date of June 15, 2006 is more consistent with the other indications in the report that the report was produced on June 17, 2006.

authorized the search of Defendant's computer and computer media.

Defendant further argues that the Singapore Search was defective because Defendant was not present at the search. "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." Rakas v. Illinois, 439 U.S. 128, 131 n.1 (1978). Defendant has not carried his burden of demonstrating that a search of computers or computer media out of his presence would violate Cambodian law. Article 20(1) of the Provisions Dated September 10, 1992 Relating to the Judiciary and Criminal Law and Procedure Applicable in Cambodia During the Transitional Period provides that "[s]earches must be conducted in the presence of the suspect and two witnesses, preferably neighbors or owners of the building." Because this provision explicitly refers to search of a building, the Court is not convinced that it imposes a requirement that the suspect be present during the search of computers and computer media seized and removed from his home. Article 20(2) states that "[i]f possible, the search should be completed in the presence of the suspect and two witnesses among the family." (Supplemental Decl. of Koeut Rith ¶ 7.) The statement that a search "should" take place in the presence of the suspect "if possible" is hardly the language of a hard and fast rule. When Mr. Koeut testified at the February 6 hearing, he indicated that there are indeed exceptions to the rule. In addition, given that the necessary equipment for conducting a forensic examination of Defendant's computer and computer media was in Singapore, not Cambodia, it was not possible to have Defendant – who was incarcerated in Cambodia – present for the search.

The Singapore Search complied with Cambodian law.

### C. The Singapore Search Was Conducted in Good Faith

Because the Court concludes that the Singapore Search complied with Cambodian law, it need not consider whether the search was carried out in good faith. If it were to reach the issue, the Court would find that the good faith exception applies. Where "foreign law was not complied with, the good faith exception to the exclusionary rule becomes part of the analysis." Barona, 56 F.3d at 1092-93. "The good faith exception is grounded in the realization that the exclusionary rule does not function as a deterrent in cases in which the law enforcement officers acted on a reasonable belief that their conduct was legal." Id. at 1093.

Agent Phillips submits a declaration stating that he has participated in at least seventy investigations in Cambodia since May 2002. (Decl. of Gary J. Phillips in Supp. of Gov't's Submission in Resp. to Ct.'s Order Dated Dec. 5, 2007 ("Phillips Decl.") ¶ 1.) On several occasions, he has observed the CNP seize computers and computer media while searching a home. (Id. ¶ 3.) To his knowledge, no separate warrant or separate showing was necessary to search computers or computer media seized at a home. (Id.)

Phillips's testimony at the October 29 hearing establishes that Cambodian officials requested that United States officials search Defendant's computer and computer media. When United States officials sent a letter to Cambodian officials, formally requesting that the computer and computer media be turned over so that it could "be sent to the United States for additional testing," (Mot. Ex. G) the Cambodian government complied. It was not "objectively unreasonable" for Phillips to rely on the implicit assertion that such a search would comply with Cambodian law, see Peterson, 812 F.3d at 492, particularly given his prior observation of Cambodian police officers seizing computers and computer media, apparently without any additional showing or warrant. The Court finds no reason not to credit Phillips' statement that he "believed and continues to believe that the search warrant authorized the seizure and search of [Defendant's] computer and computer media." (Phillips Decl. ¶ 3.)

Agent Phillips acted in the good faith belief that the Singapore Search complied with Cambodian law when he requested that Special Agent David Nguyen-Galante conduct the Singapore Search. Special Agent Nguyen-Galante reasonably believed that Agent Phillips' request was lawful. (See Decl. of David Nguyen-Galante in Opp'n to Mot. To Suppress ¶ 5.) Even if the Singapore Search had not complied with Cambodian law, the evidence uncovered during the search would not be excluded. See Barona, 56 F.3d at 1092-93.

## II. CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's Motion to Suppress Evidence obtained in the Singapore Search.

IT IS SO ORDERED.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DALE S. FISCHER

UNITED STATES DISTRICT JUDGE PRESIDING

United States of America, )
Plaintiff, )
)
vs. ) Case No. CR 07-168-DSF
)
Michael Joseph Pepe, )
Defendant. )
________________________________ )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

*Sentencing*

Los Angeles, California

Friday , February 28, 2014

Pamela A. Batalo, CSR, FCRR, RMR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California 90012
(213) 687-0446

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
BY: PATRICIA DOHANUE
ASSISTANT UNITED STATES ATTORNEY
312 N. SPRING STREET
LOS ANGELES, CA 90012

FOR DEFENDANT: OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY: Charles Brown
321 E. SECOND STREET
LOS ANGELES, CA 90012

Los Angeles, California, Friday, February 28, 2014

9:01 a.m.

-oOo-

THE CLERK: Calling Item No. 1, CR 07-168-DSF, *United States of America vs. Michael Pepe*.

MS. DONAHUE: Good mornings, your Honor. Patricia Donahue on behalf of the United States.

MR. BROWN: Good morning, your Honor. Charles Brown on behalf of Mr. Pepe, who is present in custody.

THE COURT: Good morning.

Perhaps we should start with the most recent filing, which I'm not sure I understand, Ms. Donahue, and I'm not sure whether Mr. Brown has had a chance to absorb it.

MS. DONAHUE: Your Honor, in September of 2008, the government submitted restitution information based on the numbers that were available to the two non-government organizations, Hagar and Agape at that time.

The government asked Hagar and Agape to provide updated information, since the circumstances surrounding the different victims, I was going to say have changed, but are different perhaps than what was anticipated in September of 2008 when the government made its initial filing.

The numbers that the government submitted yesterday are the updated information that the government has received from Hagar and Agape. And Hagar's calculations are based

specifically on the amounts of money that Hagar spent on caring for the two victims who are in Hagar's care, the girls whose initials are IT and NTD.

Agape in 2008, as well as now, did not have the ability to break down specific amounts of money with regard to each girl, so Agape simply took the amount of money that it spent overall at that particular shelter, divided it by the number of girls it had at the shelter, and then multiplied by five, since Agape is caring for five -- the other five victims.

Agape did that through 2010. Since 2010, Agape has, in fact, been able to keep track --

THE COURT: Why are you speaking so quickly?

MS. DONAHUE: Oh, I'm sorry. I apologize.

Since 2010, Agape has been able to keep track specifically of the amount it spent on these five girls as opposed to the division. And that's why Agape's sheet looks the way it did. The numbers are somewhat different from those that the government submitted, obviously, in 2008.

THE COURT: That was my question originally, and I'm not sure why this was. And I didn't try to figure it out.

Hagar, at least according to the probation department, was entitled to something more than $116,000, but the government's number that it had previously submitted was 78 something.

So is this the 35,400 that's in this supplemental

filing now the total number?

MS. DONAHUE: Yes.

THE COURT: Instead of the 78?

MS. DONAHUE: Yes. That is correct.

THE COURT: So it's been reduced substantially.

MS. DONAHUE: Yes.

THE COURT: And the number for Agape, which the probation officer didn't have at all, was previously 282,000 plus, and now the number is 211,813. Is that the total number for Agape?

MS. DONAHUE: Yes, your Honor.

THE COURT: Okay.

Now, Mr. Brown, have you had an opportunity to look at these figures and think about what position you wanted to take with regard to them?

MR. BROWN: Yes, your Honor.

Government counsel provided me with a courtesy copy last night, and I simply would just stand by our previous arguments with respect to that, our previous filing, your Honor, and I would submit on that, your Honor.

THE COURT: Your previous filing is that under the law, the statute does not allow for money to go to anyone other than presumably the children themselves?

MR. BROWN: Yes, your Honor.

THE COURT: All right. Well, I agree with the

government's position on that issue, and therefore I will be awarding restitution and -- do you have the total number by chance, Ms. Donahue?

MS. DONAHUE: I have the total number for Agape and the total number for Hagar. I did not add them together. I apologize, but I will do that.

THE COURT: I think it's 247,213.

MS. DONAHUE: Your Honor, I believe, yes, the total amount is 247,000 -- $247,213.

THE COURT: All right.

This is the time set for sentencing. I have previously held a hearing at which the victims and their representatives were given an opportunity to and did provide information and make statements. I also have written statements from some of them submitted long ago by the government.

I have read and considered the presentence report, with a disclosure date of July 30, 2008. And there was also a letter about updated financial information.

I have also read and considered the government's sentencing position and submission of victim impact and restitution information; the defendant's position re sentencing factors and exhibits; the government's response to defendant's position re sentencing factors; the defendant's supplemental filing re restitution; the government's response to defendant's supplemental filing; the supplemental factual corrections; and

now this supplemental information about restitution.

Does the government have any comment on the defendant's most recent statement about the amount of money that will be coming into him? He thinks it will be significantly reduced.

MS. DONAHUE: The government does not necessarily believe that is accurate. And the government will take this Court's restitution order and apply it or assist in applying it against whatever assets are available, but the information that the defendant provided, we have no reason to believe that that is correct.

THE COURT: And it's on information and belief. I don't -- without telling me what the information is that leads to that belief, it's not terribly helpful. And I haven't -- I don't know if I would have access to information myself to check it, but I certainly haven't attempted to do that.

The other factual issues won't impact sentencing. Although I don't have any reason to doubt that Mr. Pepe knows how old he is, I don't think that's terribly relevant.

But I am concerned about the financial amount. And in the government's papers some time ago, you asked for writ of garnishment, and I don't remember, frankly, whether you submitted one and I signed it or whether that's something that still needs to be addressed.

MS. DONAHUE: Your Honor, I believe -- I must not -- I

believe we did not, and my understanding is after the Court imposes a sentence, the government then submits a proposed writ of garnishment. I believe that's the proper procedure.

THE COURT: And I haven't done one of those in probably 30 years. So I don't remember whether you have to put in a specific amount. I guess it has the total amount due, and then whoever is responding to it just figures out what has to be deducted and then what goes on to the government.

MS. DONAHUE: That is the government's understanding, that we don't have -- we have to specify the total amount due, but not necessarily know the amount of funds that's remaining, although that is something that we will look into.

THE COURT: So it may or may not be relevant, whether it's 4,000 or 1,000, whatever it is --

MS. DONAHUE: Correct.

THE COURT: As far as I'm concerned, every last dime of it that doesn't have a legal priority over these children should go to the children. But I'm sure the Bureau of Prisons or whatever agency this thing will go to will figure that out.

MS. DONAHUE: Yes. It's going to go to the Veteran's Administration and to the Bureau of Prisons both.

THE COURT: All right.

Mr. Brown, have you had enough time to read all the relevant information, including the Presentence Report, and review that with Mr. Pepe?

will do what it can to protect the children of other nations from the crimes of American citizens committed abroad.

It is important to make clear that the penalty for committing such crimes against even one such victim is likely to be life in prison.

I will now state the sentence but the attorneys will have a final chance to make legal objections before sentence is imposed.

Does either counsel know of any reason why sentence should not now be imposed?

MS. DONAHUE: No, your Honor.

MR. BROWN: No, your Honor.

THE COURT: I find that the following sentence is reasonable but is no greater than necessary to comply with the purposes stated in 18 United States Code Section 3553(a).

It's ordered that the defendant shall pay to the United States a special assessment of $700, which is due immediately.

It is ordered that the defendant shall pay restitution in the total amount of $247,213 pursuant to 18 United States Code Section 2248. The amount of restitution ordered shall be paid as follows:

To Hagar International on behalf of victims IT and NTD, $35,400; to Agape -- I'm looking for the full name of.

MS. DONAHUE: Agape International Missions,

your Honor. AIM.

THE COURT: Thank you.

For victims TC, LK, KS, SS, and SR, and I'm not sure those are the initials we used at the trial. Are they different --

MS. DONAHUE: They are, your Honor.

THE COURT: Okay. And that amount is $211,813.

Restitution shall be due during the period of imprisonment at the rate of not less than $4,000 per month and pursuant to the Bureau of Prisons Inmate Financial Responsibility Program. If any amount of the special assessment -- or, I should say, both the special assessment and restitution shall be due during that period and pursuant to the Bureau of Prisons Inmate Financial Responsibility Program.

If any amount of the special assessment or restitution remains unpaid after release from custody, if Mr. Pepe is released from custody, monthly payments of at least $4,000 shall be made during the period of supervised release. Obviously if Mr. Pepe's income or other payments don't reach that amount, the probation officer will contact the Court and the Court will revisit that amount.

These payments shall begin 30 days after the commencement of supervision.

If the defendant makes a partial payment, each payee shall receive approximately proportional payment unless another

priority order or percentage payment is specified in this judgment. The defendant shall comply with General Order 01-05.

All fines are waived as I find that the defendant does not have the ability to pay a fine in addition to restitution.

Pursuant to the Sentencing Reform Act of 1984, it's the judgment of the Court that the defendant, Michael Joseph Pepe, is committed on Counts 1 through 7 of the First Superseding Indictment to the custody of the Bureau of Prisons for a term of 210 years. This term consists of 30 years on each of Counts 1 through 7 of the First Superseding Indictment, to be served consecutively.

On release from imprisonment, the defendant shall be placed on supervised release for a term of life. This term consists of life on each of Counts 1 to 7, all such terms to run concurrently under the following terms and conditions:

One, the defendant shall comply with the rules and regulations of the U.S. Probation Office and General Order 318.

Two, during the period of community supervision, the defendant shall pay the special assessment and restitution in accordance with this judgment's orders pertaining to such payment.

Three, the defendant shall cooperate in the collection of a DNA sample from the defendant.

Four, the defendant shall register with the state sex offender registration agency in any state where the defendant

resides, is employed, carries on a vocation, or is a student as directed by the probation officer. The defendant shall provide proof of registration to the probation officer within 30 days of release from imprisonment.

Five, the defendant shall participate in a psychological counseling and/or psychiatric treatment and/or sex offender treatment program which may include in-patient treatment as approved and directed by the probation officer. The defendant shall abide by all rules, requirements, and conditions of such program, including submission to risk assessment evaluations and physiological testing such as polygraph and Abel testing. The probation officer shall disclose the presentence report and any previous mental health evaluations or reports to the treatment provider.

I don't see a probation office recommendation for the Bureau of Prisons to conduct a mental health evaluation, but that seems to me an appropriate order to make, so I will make that order as well.

Six, as directed by the probation officer, the defendant shall pay all or part of the cost of treating the defendant's psychological or psychiatric disorders to the after-care contractor during the period of community supervision pursuant to 18 United States Code Section 3672. The defendant shall provide payment and proof of payment as directed by the probation officer.

Seven, the defendant shall not possess any materials, including pictures, photographs, books, writings, drawings, videos or video games depicting and/or describing child pornography as defined in 18 United States Code Section 2256(8), and I think maybe after these terms were written, there was a revision to that to allow the defendant to view images in connection with an appeal.

MS. DONAHUE: Yes, your Honor. There is a revision that allows in connection with the preparation of the appeal.

THE COURT: So I will add that as well, that exception in connection with preparation of an appeal.

Eight, the defendant shall not contact the victims by any means, including in person, by mail or electronic means or via third parties. Further, the defendant shall remain at least 100 yards from the victims at all times. If any contact occurs, the defendant shall immediately leave the area of contact and report the contact to the probation officer.

Nine, the defendant shall not associate or have verbal, written, telephonic, or electronic communication with any person under the age of 18 except (A) in the presence of the parent or legal guardian of said minor; and (B) on the condition that the defendant notify said parent or legal guardian of his conviction in the instant offense.

This provision does not encompass persons under the age of 18 such as waiters, cashiers, ticket vendors, etc., with

whom the defendant must deal in order to obtain ordinary and usual commercial services.

Ten, the defendant shall not affiliate with, own, control, volunteer or be employed in any capacity by a business or organization that causes him to regularly contact persons under the age of 18.

Eleven, the defendant's employment shall be provided -- shall be approved by the probation officer, and any change in employment must be pre-approved by the probation officer. The defendant shall submit the name and address of the proposed employer to the probation officer at least 10 days prior to any scheduled change.

Twelve, the defendant shall not reside within direct view of school yards, parks, public swimming pools, playgrounds, youth centers, video arcade facilities or other places primarily used by persons under the age of 18. The defendant's residence shall be approved by the probation officer, and any change in residence must be pre-approved by the probation officer. The defendant shall submit the address of the proposed residence to the probation officer at least 10 days prior to any scheduled move.

The drug testing condition mandated by statute is suspended based on the Court's determination that the defendant poses a lows risk of future substance abuse.

Defendant is remanded to the custody of the United

States Marshal.

Other than my advising defendant about his appeal rights, does counsel have anything further?

MR. BROWN: Yes, your Honor.

With respect to designation, your Honor, I understand that the BOP has several dedicated sex offender management program facilities within the BOP. There is one at Devens, Massachusetts and there is also one, I think, in Englewood, Colorado. We would just ask for a recommendation that Mr. Pepe be designated to such a facility that's dedicated to sex offenders. Given the risk that Mr. Pepe, I think, would face at a non-sex offender USP, your Honor, and because of the need for treatment, your Honor, we would ask for that recommendation.

THE COURT: I will make the recommendation that Mr. Pepe be housed at a facility that is either dedicated to sex offenders or has a sex offender management program.

Anything else?

MR. BROWN: No, your Honor.

THE COURT: Ms. Donahue?

MS. DONAHUE: The government moves to dismiss the underlying Indictment.

THE COURT: That will be dismissed.

The Statement of Reasons shall be included in the Commitment Order and Judgment and shall be provided to the Probation Office, the Sentencing Commission, and the Bureau of

 Prisons. A complete copy of the Presentence Report and any additions, corrections, or changes shall be provided to the Bureau of Prisons and the Sentencing Commission and any copies of the report and related materials shall remain confidential.

If an appeal is taken, counsel on appeal shall have access to the report.

Sir, you have a right to appeal your conviction and your sentence. With few exceptions, a Notice of Appeal must be filed within 10 days of judgment being entered. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: If you're unable to afford a transcript of the record in this case, one will be provided at government expense. If you're unable to pay the cost of an appeal or filing fee, you may apply within 10 days for leave to appeal in forma pauperis.

If you do not have counsel to act on your behalf and if you request it, the clerk of the court will prepare and file a Notice of Appeal on your behalf. You must make that request within 10 days. The Notice of Appeal must designate the judgment or order appealed from and the fact that you're appealing to the Court of Appeals. It should designate the portion of the proceedings not already on file that you deem necessary for the reporter to include.

Anything else?

**Certificate of Service**

I hereby certify that on May 28, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *James H. Locklin*

By: JAMES H. LOCKLIN
Deputy Federal Public Defender

No. 14-50095

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

MICHAEL JOSEPH PEPE,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
The Honorable Dale S. Fischer, Presiding
No. CR-07-00168-DSF

## Appellant's Excerpts of Record
**[Volume 2 of 12]**

HILARY L. POTASHNER
Acting Federal Public Defender
JAMES H. LOCKLIN
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012
213-894-2929

*Counsel for Defendant-Appellant*

## Table of Contents

Volume 1

Order Denying Defendant's Motion to Dismiss Indictment....................................1
[Filed December 3, 2007; Docket No. 57]

Order Denying Defendant's Motions to Suppress Evidence....................................9
[Filed December 5, 2007; Docket No. 60]

Order Denying Defendant's Motion to Suppress Evidence ....................................20
[Filed February 7, 2008; Docket No. 129]

Transcript – Sentencing (Excerpts)..........................................................26
[Dated February 28, 2014; Filed April 17, 2014; Docket Nos. 491, 512]

Volume 2

Defendant's Motion to Suppress Evidence* ....................................................42
[Filed June 26, 2007; Docket No. 21]

Defendant's Motion to Suppress Evidence (Excerpts).........................................120
[Filed August 1, 2007; Docket No. 33]

Government's Consolidated Opposition to Motions to Suppress Evidence* ........130
[Filed August 22, 2007; Docket No. 39]

Defendant's Reply re Motions to Suppress Evidence ..........................................208
[Filed September 4, 2007; Docket No. 40]

Defendant's Motion to Dismiss Indictment.......................................................220
[Filed October 4, 2007; Docket No. 43]

Transcript – Motion Hearing ..........................................................................244
[Dated October 29, 2007; Filed February 26, 2008; Docket Nos. 50, 133]

* Documents marked with an asterisk have been redacted pursuant to Federal Rule of Appellate Procedure 25(a)(5) and Federal Rule of Criminal Procedure 49.1(a).

Government's Declaration re Motions to Suppress Evidence ..............................295
[Filed November 27, 2007; Docket No. 53]

Transcript – Motion Hearing (Excerpts)* ........................................................299
[Dated December 3, 2007; Filed February 26, 2008; Docket Nos. 58, 134]

Volume 3

Defendant's Supplemental Memorandum re Motion to Suppress Evidence.........340
[Filed December 20, 2007; Docket No. 71]

Government's Supplemental Memorandum re Motion to Suppress Evidence .....350
[Filed December 20, 2007; Docket No. 72]

First Superseding Indictment ..........................................................................372
[Filed December 20, 2007; Docket No. 83]

Government's Supplemental Declaration re Motion to Suppress Evidence (Excerpts) .......................................................................................................374
[Filed February 5, 2008; Docket No. 127]

Transcript – Motion Hearing (Excerpts)* ........................................................380
[Dated February 6, 2008; Filed February 26, 2008; Docket Nos. 136]

Transcript – Trial – Day 2 (Excerpts)..............................................................460
[Dated May 9, 2008; Filed May 18, 2010; Docket Nos. 259, 410]

Volume 4

Transcript – Trial – Day 3 (am) (Excerpts) ....................................................635
[Dated May 13, 2008; Filed May 18, 2010; Docket Nos. 260, 411]

Transcript – Trial – Day 3 (pm)......................................................................766
[Dated May 13, 2008; Filed June 17, 2014; Docket Nos. 260, 532]

Volume 5

Transcript – Trial – Day 4 (Excerpts)..............................................................805
[Dated May 14, 2008; Filed May 18, 2010; Docket Nos. 261, 412]

Transcript – Trial – Day 5 (Excerpts)....942
[Dated May 15, 2008; Filed May 18, 2010; Docket Nos. 262, 413]

Volume 6

Transcript – Trial – Day 6 (Excerpts)....1022
[Dated May 16, 2008; Filed May 18, 2010; Docket Nos. 263, 414]

Volume 7

Transcript – Trial – Day 7 (Excerpts)* ....1192
[Dated May 20, 2008; Filed May 18, 2010; Docket Nos. 264, 415]

Transcript – Trial – Day 8 (Excerpts)....1343
[Dated May 21, 2008; Filed May 18, 2010; Docket Nos. 269, 416]

Volume 8

Transcript – Trial – Day 9 (Excerpts)....1423
[Dated May 22, 2008; Filed May 18, 2010; Docket Nos. 270, 417]

Volume 9

Transcript – Trial – Day 10 (Excerpts)....1538
[Dated May 23, 2008; Filed May 18, 2010; Docket Nos. 293, 418]

Transcript – Trial – Day 11 (Excerpts)....1739
[Dated May 27, 2008; Filed June 2, 2010; Docket Nos. 294, 435]

Volume 10

Transcript – Trial – Day 12 (Excerpts)....1805
[Dated May 28, 2008; Filed May 18, 2010; Docket Nos. 295, 419]

Transcript – Trial – Day 13 (Excerpts)....1930
[Dated May 29, 2008; Filed May 18, 2010; Docket Nos. 296, 420]

Stipulation to Correct/Modify Record re Jury Instructions (Excerpts)[†] .............1941
[Filed February 27, 2015; Docket No. 543]

Order Correcting/Modifying Record re Jury Instructions ..................................1961
[Filed March 2, 2015; Docket No. 545]

Order Correcting/Modifying Record re Video Testimony .................................1963
[Filed March 2, 2015; Docket No. 546]

Government's Sentencing Memorandum (Excerpts) ........................................1965
[Filed September 17, 2008; Docket No. 318]

Transcript – Victim Statements ..........................................................................1977
[Dated September 25, 2008; Filed June 18, 2014; Docket Nos. 333, 533]

Defendant's Supplemental Filing re Restitution................................................1998
[Filed March 25, 2009; Docket No. 348]

Judgment .............................................................................................................2006
[Filed February 28, 2014; Docket No. 492]

Notice of Appeal .................................................................................................2012
[Filed March 3, 2014; Docket No. 493]

Docket .................................................................................................................2013

Volume 11 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 1)...................2053
[Filed March 3, 2015; Docket No. 547]

Volume 12 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 2)...................2309
[Filed March 3, 2015; Docket No. 547]

[†] Although this document and the two orders that follow were not filed until after the judgment and notice of appeal were filed, they are placed here in the excerpts because they relate to the trial proceedings.

Exhibit No. 101 .......... 2399

Exhibit No. 102 .......... 2401

Exhibit No. 103 .......... 2403

Exhibit No. 104 .......... 2405

Exhibit No. 106 .......... 2408

Exhibit No. 107 .......... 2410

Exhibit No. 108 .......... 2412

Exhibit No. 109 .......... 2414

Exhibit No. 110 .......... 2416

Exhibit No. 111 .......... 2418

Exhibit No. 114 .......... 2420

Exhibit No. 123 .......... 2423

Exhibit No. 2007 .......... 2428

Exhibit No. 2009 .......... 2454

Exhibit No. 2010 .......... 2456

Exhibit No. 2011 .......... 2458

Exhibit No. 2093 .......... 2460

Exhibit No. 2096 .......... 2462

Exhibit No. 2200A .......... 2464

Exhibit No. 2201A .......... 2467

Exhibit No. 2202A ........................................................................................2477

Verdict ..........................................................................................................2480
[Filed May 29, 2008; Docket No. 299]

Presentence Report .......................................................................................2488
[Dated July 30, 2008; Filed March 25, 2009; Docket No. 346]

Probation Office Letter to District Court ......................................................2517
[Dated September 3, 2008]

Government's Submission of Victim Impact and Restitution Information .........2523
[Filed September 19, 2008; Docket No. 329]

Supplement to Presentence Report ..................................................................2559
[Filed March 25, 2009; Docket No. 347]

Government's Response to Defendant's Filing re Restitution ............................2562
[Filed April 21, 2009; Docket No. 355]

Government's Supplemental Submission re Restitution ....................................2583
[Filed February 28, 2014; Docket No. 490]

SEAN K. KENNEDY (No. 145632)
Federal Public Defender
(E-mail: Sean_Kennedy@fd.org)
CARLTON F. GUNN (No. 112344)
Deputy Federal Public Defender
(E-mail: Carlton_Gunn@fd.org)
CHARLES C. BROWN (No. 179365)
Deputy Federal Public Defender
(E-mail: Charles_Brown@fd.org)
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone (213) 894-1700
Facsimile (213) 894-0081

Attorneys for Defendant
MICHAEL PEPE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL PEPE,

Defendant.

NO. CR 07-168-DSF

**NOTICE OF MOTION; MOTION TO SUPPRESS EVIDENCE; MEMORANDUM OF POINTS AND AUTHORITIES**

Hearing Date: July 30, 2007
Hearing Time: 8:30 a.m.

TO: ACTING UNITED STATES ATTORNEY GEORGE CARDONA, AND ASSISTANT UNITED STATES ATTORNEY PATRICIA DONAHUE:

PLEASE TAKE NOTICE that on July 30, 2007, at 8:30 a.m., defendant, Michael Pepe, will bring on for hearing the following motion:

MOTION

Defendant, Michael Pepe, through his counsel of record, Deputy Federal Public Defender Carlton F. Gunn and Deputy Federal Public Defender Charles Brown, hereby moves this Honorable Court for an order suppressing all evidence found during (1) searches of defendant's home in Phnom Penh, Cambodia by a combined group of Cambodian and American law enforcement officers during June, 2006 and (2) subsequent searches of defendant's computer and other computer media by American government agents alone at American facilities in Singapore and/or other locations. This motion is made pursuant to the Fourth Amendment to the United States Constitution and is based upon the attached memorandum of points and authorities, all files and records in this case, and such additional argument and evidence as may be presented at the hearing on this motion.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: June 25, 2007

By /S/
CARLTON F. GUNN
Deputy Federal Public Defender

DATED: June 25, 2007

By /S/
CHARLES C. BROWN
Deputy Federal Public Defender

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.

INTRODUCTION

Michael Pepe is charged with four counts of engaging in illicit sexual conduct with a minor in foreign places, in violation of 18 U.S.C. § 2423(c) . Trial is presently set to commence on January 29, 2007. This motion seeks to suppress evidence found in two sets of searches: (1) searches of Mr. Pepe's home by a combined group of Cambodian and American law enforcement officers in Phnom Penh, Cambodia during June, 2006; and (2) subsequent searches of a computer, thumb drive, and digital media card[1] by American government agents alone at American facilities in Singapore and/or other locations.

II.

STATEMENT OF FACTS

Between June 14, 2006 and June 15, 2006, two nongovernmental organizations advocating for abused children in Cambodia provided information to the Bangkok, Thailand office of the United States Bureau of Immigration and Customs Enforcement that a United States citizen who was later identified as Mr. Pepe had sexually abused and raped a number of children at his home in Phnom Penh, Cambodia. See Exhibit A, at 2. American agents interviewed at least one of the alleged victims, conducted additional investigation regarding Mr. Pepe's background,

[1] A thumb drive is a computer storage device approximately the size of a thumb, which can store much larger amounts of data than a diskette or CD. A digital camera media card is a computer chip which is inserted in a digital camera and stores digital images when photographs are taken with the camera.

and apparently concluded there was a basis for American charges under 18 U.S.C. § 2423(c). *See id.*

It also appears that the American agents and/or the nongovernmental organizations contacted Cambodian law enforcement authorities. Those authorities, accompanied by one or more American agents and nongovernmental organization representatives, arrested Mr. Pepe on June 17, 2006, for rape and debauchery. *See* Exhibit A, at 3. Mr. Pepe's home was searched that same day, and then searched again on at least one – and possibly more – occasions during the period from June 17 through June 21. *See* Declaration of Michael Pepe, ¶ 2.[2] Various items of evidence, including physical objects, documents, and two computers and other computer media, including a thumb drive and a digital camera media card, were seized during the searches.

American agents appear to have been an integral part of the searches, moreover. Initially, it appears that American agents from at least two different agencies – the Diplomatic Security Service and the Bureau of Immigration and Customs Enforcement – were present and participated in the searches. Secondly, many, if not most, of the items of evidence were seized not by Cambodian officers but by the American agents and/or nongovernmental organization representatives who also assisted with the search. *See, e.g.*, Exhibit B, at 3 (report of interview of one of alleged victims referring to cloth rope, which was kept inside closet "which is where AIA Phillips discovered it during the search warrant"). *See also* Declaration of Michael Pepe, ¶ 4. Thirdly, it was an American agent and a nongovernmental organization representative named Ron Dunne who signed as the "1st Witness" and

[2] Different reports which have been provided in discovery reflect different dates.

"2nd Witness" on a "Search Record" dated June 21, 2006.[3] *See* Exhibit C.[4] Finally, all or much of the evidence seized was turned over to the American agents. *See* Exhibit D (United States Customs Service "Custody Receipt for Seized Property and Evidence").

As far as what authority there was for the searches, it is clear that there was no American search warrant. Whether there was a Cambodian search warrant, at least at the time of the first search, is less clear. There is a Cambodian search warrant included in the discovery which is dated June 17, 2006, *see* Exhibit E, but it appears to have been so dated after the fact. What suggests this is that the "Summary Report" which accompanies the search warrant in the discovery and was prepared "to request a residential search warrant for [Mr. Pepe's house]" is (1) dated June 19, 2006 and (2) relies on, inter alia, "information from the victim child named [redacted] dated 18 June 2006." Exhibit F.

In addition to the searches of Mr. Pepe's home, there were subsequent searches of the computer and computer media that were purely American. On June 20, 2006, the Acting Regional Security Officer Attaché at the United States Embassy in Phnom Penh sent a letter to the Cambodian Police Commissioner General stating: "[A]gents request that they have access to the evidence, specifically, Mr. Pepe's computer, hard drive, memory stick, and USB thumb drive so that they may be sent to the United States for computer forensic testing." Exhibit G. This request was granted, and one of the computers, the thumb drive, and the digital camera media card were quickly

---

[3] As discussed *infra* pp. 8-9, this likely violated Cambodian law.

[4] Exhibits C, E, and F are English translations of Cambodian records provided by the government in discovery.

sent to an American forensic computer analyst in Singapore.[5] That analyst received the items on June 30, 2006, and subsequently conducted an extensive forensic analysis – apparently without any warrant – on June 30, 2006. *See* Exhibit H. *See also* Exhibit A, at 9-11. The examination revealed pornographic and non-pornographic images of various minors, including minors believed to be the alleged victims, sometimes with and sometimes without a man "who closely matches Pepe's physical description," and some of which were in a bedroom and/or bathroom recognized as Mr. Pepe's. Exhibit A, at 9-11. There were also photos of Mr. Pepe fully clothed, in which he apparently could be definitely identified. *See* Exhibit A, at 11.

## III.
## ARGUMENT

### A. THE SEARCHES OF MR. PEPE'S HOME WERE JOINT VENTURES BETWEEN FOREIGN AND AMERICAN AUTHORITIES AND SO ALL OF THE EVIDENCE FOUND IN THE SEARCHES MUST BE SUPPRESSED UNLESS THE GOVERNMENT SHOWS THE SEARCH WAS REASONABLE UNDER THE FOURTH AMENDMENT.

#### 1. The Fourth Amendment Applies Because the Search Was a Joint Venture Between the Cambodian and American Officials.

Whether the Fourth Amendment applies to foreign officials' search of an American citizen's property in a foreign country depends on the extent of American

[5] The other computer and additional computer media were not sent to Singapore. Those items are the subject of a search warrant recently obtained here in Los Angeles which may be subject to challenge on other grounds. *See infra* p. 15 n.10.

officials' participation in the search. The leading Ninth Circuit case on the question states the rule as follows:

> With certain exceptions not applicable here, Fourth Amendment principles do not apply to searches by foreign authorities in their own countries, even if the targets of the search are American. (Citation omitted.) If, however, United States agents' participation in the investigation is so substantial that the action is a joint venture between United States and foreign officials, the law of the foreign country must be consulted at the outset as part of the determination whether or not the search was reasonable.

*United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987).

Here, there is a wealth of evidence that the search was a joint venture between Cambodian and American officials. First, the investigation appears to have been initiated by or at least jointly pursued by American officials investigating a violation of American law. Second, American officials were not only present at, but actively participated in, the search; indeed, they appear to have been more active than the Cambodian officials. *See* Declaration of Michael Pepe, ¶ 4. Third, American officials took possession of all or most of the evidence seized within a few days. Finally, there is corroboration in the fact that the ultimate prosecution of Mr. Pepe is taking place here in the United States, and he was never prosecuted in Cambodia.[6]

2. <u>The Applicability of the Fourth Amendment Requires that the Government Show the Search Was Reasonable.</u>

What the Fourth Amendment requires given the fact that the search was a joint

[6] Mr. Pepe was held in custody in Cambodia for seven to eight months, but he was never prosecuted there.

venture is "a determination whether or not the search was reasonable." *United States v. Peterson*, 812 F.2d at 490, *quoted supra* p. 7. But this does not incorporate all of the requirements that the Fourth Amendment places on searches by American officials. This is because the Fourth Amendment is not directed at foreign officials, and what an American court does will not alter the search policies of another sovereign nation. *United States v. Brulay*, 383 F.2d 345, 348 (9th Cir. 1987). Instead of looking to the usual Fourth Amendment rules, "the law of the foreign country must be consulted at the outset as part of the determination." *Peterson*, 812 F.2d at 490.

In the present case, this means the government must show – at the very least – that the search comported with Cambodian law. *Cf. United States v. Carbajal*, 956 F.2d 924, 930 (9th Cir. 1992) (burden on government to show reasonableness of warrantless search).[7] And it appears questionable whether the government can do this, for the search appears to have violated Cambodian law in at least two respects.

First, Cambodian law provides that, except in the case of certain types of offenses which the defense believes are not what was alleged here, searches must be authorized by a judge or a prosecutor. The warrant which has been provided in the discovery here, while dated June 17, 2006, appears to have been actually issued on some later date, for it is based on a report that is dated June 19, 2006 and refers to information obtained on June 18, 2006. *See supra* p. 5.

Second, there is a special provision in Cambodian law requiring that a search "must be conducted in the presence of the suspect and two witnesses, preferably

[7] While the burden is normally on the defense when there was a search warrant, and there may have been a Cambodian search warrant at some point here, the existence of a foreign warrant which does not satisfy Fourth Amendment requirements seems insufficient to shift the burden on the question of important Fourth Amendment constitutional rights. *See generally* 6 Wayne R. LaFave, *Search and Seizure* 43-45 (4th ed. 2004).

neighbors or owners of the building." Exhibit I, at 20, § 1.[8] Yet the witnesses who signed the "Search Record" for at least one search were neither neighbors nor owners of the building, but an American agent and a nongovernmental organization representative who were intimately involved in both the searches and the investigation that led up to it. *See supra* pp. 3-5.

B. THE EVIDENCE FOUND IN THE SEARCH OF MR. PEPE'S COMPUTER, THUMB DRIVE, AND DIGITAL CAMERA MEDIA CARD MUST BE SUPPRESSED BECAUSE THOSE SEARCHES WERE CONDUCTED SOLELY BY AMERICAN OFFICIALS AND THAT MADE THE FOURTH AMENDMENT'S SEARCH WARRANT REQUIREMENT APPLICABLE.

The searches of the computer, thumb drive, and digital camera media card differ from the searches of Mr. Pepe's home in that they were conducted solely by American officials. This eliminates one of the main concerns underlying the focus on compliance with foreign law in the joint venture foreign search cases – that the Fourth Amendment is not directed at foreign officials and cannot alter their conduct, *see supra* p. 8. Applying the ordinary requirements of the Fourth Amendment – such as the existence of probable cause and the use of warrants – to searches conducted solely by American officials poses no such problem. It is one thing to say that our courts will not expect foreign officials to comply with American law rather than the foreign officials' own law; it is another thing to say that even American officials acting alone may ignore American law.

The fact that the American officials chose to conduct the search of the computer, thumb drive, and digital camera media card in another country should not

[8] Alternatively, the witnesses may be family members. *See* Exhibit I, art. 20, § 2.

affect the applicability of the Fourth Amendment or its scope, moreover. As explained in *United States v. Conroy*, 589 F.2d 1258 (5th Cir. 1979):

> The Fourth Amendment not only protects all within our bounds; it also shelters our citizens wherever they may be in the world from unreasonable searches by our own government. (Citations omitted.) The mere consent of foreign authorities to a seizure that would be unconstitutional in the United States does not dissipate its illegality even though the search would be valid under local law.

*Id*. at 1264-65. *See also United States v. Streifel*, 665 F.2d 414, 419-20 n.8 (2nd Cir. 1981) (rejecting government argument that Fourth Amendment does not apply to search of vessel on high seas); *United States v. Saylor*, 374 F.2d 894, 900 (Ct. Cl. 1967) (holding Fourth Amendment applied to civilian living in residential compound under control of American military abroad); *Powell v. Zuckert*, 366 F.2d 634, 639-40 (D.C. Cir. 1966) (applying Fourth Amendment prohibition of general warrants to search of Air Force employee's off-base private dwelling by American agents in Japan); *United States v. Best*, 184 F.2d 131, 138 (1st Cir. 1950) ("[W]e assume, and we think it is probably so, that the protection of the Fourth Amendment extends to United States citizens in foreign countries under occupation by our armed forces.").

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the most recent Supreme Court case dealing with foreign searches, does not undercut the cases just cited, moreover. *Verdugo-Urquidez* dealt with application of the Fourth Amendment to searches by American agents in foreign countries of nonresident aliens. *See id.* at 261. And the holding in *Verdugo-Urquidez* turned on that status, for the Court held that the Fourth Amendment did not apply to nonresident aliens in foreign countries because the Fourth Amendment grants protections to only "the people" and "the people" means American citizens and other people living in the United States. *See id.*

at 265-66 (quoting U.S. Const. amend. IV).

At least two district courts after *Verdugo-Urquidez* have followed the *Conroy* and/or *Powell* cases cited *supra*. First, then District, now Circuit, Judge Paez – in *Colello v. S.E.C.*, 908 F. Supp. 738 (C.D. Cal. 1995) – wrote:

> The Government's first argument – that by placing their assets abroad, plaintiffs (U.S. citizens) are not entitled to the full panoply of Constitutional rights – was rejected long ago. The Bill of Rights unquestionably protects a citizen or his property from incursions by the U.S. government regardless of location. In *Reid v. Covert*, 354 U.S. 1, 77 S. Ct. 1222, 1 L. Ed. 2d 1148 (1957), the Supreme Court explained:
>
> > At the beginning, we reject the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights. The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can act only in accordance with all the limitations imposed by the Constitution. When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land. This is not a novel concept. To the contrary, it is as old as government. It was recognized long before Paul successfully invoked his right as a Roman citizen to be tried in strict accordance with Roman law.

> 354 U.S. at 5-6, 77 S. Ct. at 1225. *See also, Rosado v. Civiletti*, 621 F.2d 1179, 1189 (2nd Cir.), *cert. denied*, 449 U.S. 856, 101 S. Ct. 153, 66 L. Ed. 2d, 70 (1980); *United States v. Conroy*, 589 F.2d 1258, 1264 (5th Cir.), *cert. denied*, 444 U.S. 831, 100 S. Ct. 60, 62 L. Ed. 2d, 40 (1979); *Powell v. Zuckert*, 366 F.2d 634, 640 (D.C. Cir. 1966).

*Colello*, 908 F. Supp. at 753-54. Similarly, another district judge followed *Conroy* in 2001, writing: "[I]t is not determinative that [the agent's] seizure [of defendant's property] took place inside a United States Embassy. 'The Fourth Amendment not only protects all within our bounds; it also shelters our citizens wherever they may be in the world from unreasonable searches and seizures by our own government.'" *United States v. Wharton*, 153 F. Supp. 2d 878, 881-82 (W.D. La. 2001) (quoting *Conroy*, 589 F.2d at 1264).

Some judges have suggested in dicta that the warrant requirement of the Fourth Amendment may not apply overseas, at least in some circumstances, *see, e.g., United States v. Barona*, 56 F.3d 1087, 1092 n.1 (9th Cir. 1995); *see also United States v. Bin Laden*, 126 F. Supp. 2d 264, 276-77 (S.D.N.Y. 2000),[9] but that suggestion should

---

[9] The majority opinion in *Barona* reads *Verdugo-Urquidez* as resolving the issue, *see Barona*, 56 F.3d at 1092 n.1, but the dissenting opinion in *Verdugo-Urquidez* cited *Conroy* and pointed out that "nothing in the Court's opinion questions the validity of the rule, accepted by every Court of Appeals to have considered the question, that the Fourth Amendment applies to searches conducted by the United States Government against United States citizens abroad" and that "[a] warrantless unreasonable search and seizure is no less a violation of the Fourth Amendment because it occurs in Mexicali, Mexico, rather than Calexico, California." *Verdugo-Urquidez*, 494 U.S. at 283 n.7 (Brennan, J., dissenting). Other commentators have also recognized that *Verdugo-Urquidez* is not dispositive. *See* Comment, *The Need for Warrants Authorizing Foreign Intelligence Searches of American Citizens Abroad: A Call for Formalism*, 69 U. Chi. L. Rev. 403, 405 n.17 (2002) (concluding that "Supreme Court case law, while ambiguous, suggests that the warrant requirement could be generally applicable" and "[g]iven the heavily fractured nature of the Court, the precedential status of *Verdugo* is unclear"); advisory committee note to proposed 1990 amendment to Federal Rule of Criminal Procedure 41, *reprinted in* 129 F.R.D. 557, 581-82 (1990) (noting that "[s]ome searches and seizures by federal officers outside the territory of the United States may be governed by the Fourth Amendment" and that "[a]lthough the amendment rests on the assumption that the

be rejected for several reasons, at least in the circumstances of this case. First, one of the reasons given – that there is no express statutory authority for issuance of a warrant to search property in a foreign country, *see Bin Laden*, 126 F. Supp. 2d at 275-76 – (a) may rest on a false premise and (b) cannot override the Constitution even if the underlying premise is not false. As explained in *United States v. Wharton*, *supra*:

> Certainly, the rights guaranteed by the Fourth Amendment cannot be abrogated because Congress has failed to enable the federal courts to enforce those very rights. Indeed, some argue that United States District Courts have a common law right to issue warrants even when statutory authorization is lacking.

*Wharton*, 153 F. Supp. 2d at 882. *See also United States v. Best*, 184 F.2d at 138 ("Obviously, Congress may not nullify the guarantees of the Fourth Amendment by the simple expedient of not empowering any judicial officer to act on an application for a warrant."); *Bin Laden*, 126 F. Supp. 2d at 276-77 n.16 (collecting cases suggesting possible inherent power to issue search warrants under Fourth Amendment).

Second, in the present case, the only reason the evidence was in a foreign country was because American officials chose to send the evidence to Singapore instead of the United States. Indeed, according to the letter requesting the evidence, the agents originally intended to send the evidence to the United States, *see* Exhibit G, and that is where another computer and other computer media, *see supra* p. 6 n.5,

---

Constitution applies to some extraterritorial searches, *cf. United States v. Verdugo-Urquidez*, 110 S. Ct. ---- , --- U.S. ---- (1990) (Fourth Amendment inapplicable to extraterritorial searches of property owned by nonresident aliens), it does not address the question of when the Constitution requires a warrant"). And the view of Judge Paez – who wrote his opinion in *Colello v. S.E.C.* after *Barona* and is now also sitting on the Ninth Circuit – appears more consistent with the view that the warrant requirement does apply to American agents' searches of American citizens in foreign countries.

in fact were sent. If there was concern about how to get a warrant to conduct the search in Singapore, the agents could have sent all of Mr. Pepe's computers and computer media to Los Angeles, or some other American location. *Cf. United States v. Wharton*, 153 F. Supp. 2d at 882-83 (holding agent acted reasonably when he returned defendant's property to the United States, where a search warrant was later issued pursuant to Rule 41 of Federal Rules of Criminal Procedure). To let American officials avoid the warrant requirement when they *could* have conducted a search in the United States but *chose* to conduct the search in a foreign country would allow the grossest manipulation of Fourth Amendment requirements.

Third, the search here apparently took place on American-controlled premises where there is likely American jurisdiction under the "special maritime and territorial jurisdiction of the United States" provision of 18 U.S.C. § 7. That provision extends jurisdiction over substantive crimes "where American citizens and property need protection, yet no other government effectively safeguards those interests." *United States v. Corey*, 232 F.3d 1166, 1171 (9th Cir. 2000). These same reasons suggest extension of American constitutional protections, especially when the conduct at issue is that of solely American agents in support of an American investigation and subsequent prosecution.

In sum, the Fourth Amendment's warrant requirement must apply to a search like the computer search in the present case, whether or not it applies in all circumstances. The agents' failure to get a warrant before searching the computer, the thumb drive, and the digital camera media card made the search of those items unlawful.

IV.

CONCLUSION

The searches of Mr. Pepe's home in June, 2006 were a joint venture between the Cambodian and American agents, and so the government must show that those searches were reasonable under the Fourth Amendment, at least in the sense of complying with Cambodian law. The subsequent searches of the computer, the thumb drive, and the digital camera media card were unlawful because they were conducted by American agents alone without a warrant, and that violates the Fourth Amendment regardless of where the American agents conducted the searches. The Court should suppress the evidence found in these searches as well as any fruits.[10]

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: June 25 , 2007

By /S/
CARLTON F. GUNN
Deputy Federal Public Defender

DATED: June 25 , 2007

By /S/
CHARLES C. BROWN
Deputy Federal Public Defender

---

[10] Two additional search warrants have been disclosed in recently provided additional discovery which are based on affidavits that contain detailed summaries of the evidence found in the search of the computer, thumb drive, and digital camera media card which is challenged in this motion. Because the warrants are based on this evidence, it would appear that any evidence found in the searches conducted pursuant to the warrants would be a fruit of the searches challenged in this motion. There appear to be other bases for challenging these recently disclosed search warrants, however, so the defense will address all of the issues in a separate motion if and when the government discloses evidence found in those searches that it intends to use at trial.

DECLARATION OF MICHAEL PEPE

I, Michael Pepe, hereby declare and state:

1. I am the defendant in the above-entitled action.

2. I was present on two occasions when Cambodian and American agents (accompanied by at least one nongovernmental organization representative named Ron Dunne) searched my home in Phnom Penh, Cambodia in June, 2006. I believe the first search was on June 17, 2006 and the second search was on June 20, 2006 or June 21, 2006. I was renting the home and I had been living there for over two years.

3. I did not give the agents consent to search my home.

4. It is my recollection that the Cambodian police officers did very little searching, at least as far as I could see. Most of the searching that I was able to see was done by an American agent named Gary Phillips and an American named Ron Dunne who was working for a non-governmental organization named the International Justice Mission.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: 6/14/07 /S/
MICHAEL PEPE

TABLE OF CONTENTS

Page

MOTION. . . . . 2

MEMORANDUM OF POINTS AND AUTHORITIES. . . . . 3

I. INTRODUCTION. . . . . 3

II. STATEMENT OF FACTS. . . . . 3

III. ARGUMENT. . . . . 6

A. THE SEARCHES OF MR. PEPE'S HOME WERE JOINT VENTURES BETWEEN FOREIGN AND AMERICAN AUTHORITIES AND SO ALL OF THE EVIDENCE FOUND IN THE SEARCHES MUST BE SUPPRESSED UNLESS THE GOVERNMENT SHOWS THE SEARCH WAS REASONABLE UNDER THE FOURTH AMENDMENT. . . . . 6

1. The Fourth Amendment Applies Because the Search Was a Joint Venture Between the Cambodian and American Officials. . . . . 6

2. The Applicability of the Fourth Amendment Requires that the Government Show the Search Was Reasonable. . . . . 7

B. THE EVIDENCE FOUND IN THE SEARCH OF MR. PEPE'S COMPUTER, THUMB DRIVE, AND DIGITAL CAMERA MEDIA CARD MUST BE SUPPRESSED BECAUSE THOSE SEARCHES WERE CONDUCTED SOLELY BY AMERICAN OFFICIALS AND THAT MADE THE FOURTH AMENDMENT'S SEARCH WARRANT REQUIREMENT APPLICABLE. . . . . 9

IV. CONCLUSION. . . . . 15

DECLARATION OF MICHAEL PEPE. . . . . 16

# TABLE OF AUTHORITIES

CASES Page

*Colello v. S.E.C.*, 908 F. Supp. 738 (C.D. Cal. 1995). . . . . . . . . . 11, 12, 13

*Powell v. Zuckert*, 366 F.2d 634 (D.C. Cir. 1966). . . . . . . . . . 10, 11, 12

*Reid v. Covert*, 354 U.S. 1 (1957). . . . . . . . . . 11, 12

*Rosado v. Civiletti*, 621 F.2d 1179 (2nd Cir.). . . . . . . . . . 12

*United States v. Barona*, 56 F.3d 1087 (9th Cir. 1995). . . . . . . . . . 12, 13

*United States v. Best*, 184 F.2d 131 (1st Cir. 1950). . . . . . . . . . 10, 13

*United States v. Bin Laden*, 126 F. Supp. 2d 264 (S.D.N.Y. 2000). . . . . . . . . . 12, 13

*United States v. Brulay*, 383 F.2d 345 (9th Cir. 1987). . . . . . . . . . 8

*United States v. Carbajal*, 956 F.2d 924 (9th Cir. 1992). . . . . . . . . . 8

*United States v. Conroy*, 589 F.2d 1258 (5th Cir. 1979). . . . . . . . . . 10, 11, 12

*United States v. Corey*, 232 F.3d 1166 (9th Cir. 2000). . . . . . . . . . 14

*United States v. Peterson*, 812 F.2d 486 (9th Cir. 1987). . . . . . . . . . 7, 8

*United States v. Saylor*, 374 F.2d 894 (Ct. Cl. 1967). . . . . . . . . . 10

*United States v. Streifel*, 665 F.2d 414 (2nd Cir. 1981). . . . . . . . . . 10

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990). . . . . . . . . . 10, 12, 13

*United States v. Wharton*, 153 F. Supp. 2d 878 (W.D. La. 2001). . . . . . . . . . 12, 14

# TABLE OF AUTHORITIES

## STATUTES, RULES AND REGULATIONS

Page

18 U.S.C. § 2423(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

18 U.S.C. § 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

U.S. Const. amend. IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## OTHER

Wayne R. LaFave, *Search and Seizure* (4th ed. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 8

Comment*, The Need for Warrants Authorizing Foreign Intelligence Searches of American Citizens Abroad: A Call for Formalism,* 69 U. Chi. L. Rev. 403 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

# EXHIBIT A

U.S. Department of Homeland Security
751 Daily Drive, Suite #216
Camarillo, CA 93010

U.S. Immigration
and Customs
Enforcement

February 14, 2007

OX07QR06BK0008

The Honorable George Cardona
United States Attorney
Central District of California
312 North Spring Street
Los Angeles, California 90012

ATTN: Patricia Donahue
Assistant United States Attorney, Terrorism and Organized Crime Section

Dear Sir:

Under the provisions of law, there is a reported herein violation of the laws of the United States of America committed within the jurisdiction of the Central District of California involving the illicit sexual conduct of a U.S. citizen in a foreign place as defined by Title 18, United States Code, Section 2423(c).

**VIOLATOR INFORMATION**

| | |
|---|---|
| Subject Name: | Michael Joseph PEPE ("PEPE") |
| Date of Birth: | [redacted] 1953 |
| California DL #: | E0383375 |
| Address: | [redacted], Oxnard, California |
| Sex: | Male |
| Citizenship: | U.S. (A copy of PEPE's birth certificate is attached as **Exhibit "A"**) |
| SSN: | [redacted] |
| Criminal History: | None known |

**VIOLATIONS OF LAWS**

18 USC 2423(c) Engaging in Illicit Sexual Conduct in Foreign Places

**SYNOPSIS**

In June 2006, two Non-Governmental Organizations provided information to the Bangkok, Thailand Office of the Attaché, U.S. Immigration and Customs Enforcement (ICE), that a U.S. citizen, later identified as MICHAEL JOSEPH PEPE ("PEPE"), had sexually abused and raped a number of children at his compound in Phnom Penh, Cambodia. During the course of the investigation, Assistant ICE Attaché ("AIA") Gary Phillips interviewed four of the child victims (between the ages of 9 and 12 years-old) who all identified PEPE as the individual who sexually abused them. Based upon their investigation, the Cambodian National Police ("CNP") arrested PEPE and executed search warrants at PEPE's compound in Phnom Penh, where evidence of PEPE's sexual abuse of his child victims was seized. A copy of CNP reports regarding their investigation is attached as **Exhibit "B."**

Between June 14 and 15, 2006, two Non-Governmental Organizations, the International Justice Mission ("IJM") and World Hope International ("WHI"), provided information to ICE Bangkok that a U.S. citizen, later identified as PEPE had sexually abused minor females, ranging in age from 10-18 years-old. A copy of the IJM report is attached as **Exhibit "C."** The following is a summary of the information provided:

> I.T. is an 11-12 year-old Vietnamese girl, who stated that she had "sex" with an American known as "Michael."
>
> I.T. was able to help the IJM identify PEPE's compound located at Street 596, House #83, Tol Kork, Phnom Pehn, Cambodia. Subsequently, the IJM was able to identify PEPE as the resident of Street 596, House #83, Tol Kork, Phnom Pehn, Cambodia. Further, the IJM provided PEPE's date of birth, September 20, 1953, and his U.S. Passport number, 200451801.
>
> On or about June 12, 2006, WHI interviewed I.T., who stated that PEPE had sex with her approximately 10 times and that there were other young girls being sexually abused by PEPE.
>
> A medical examination of I.T. conducted at Phnom Penh Municipal Referral Hospital revealed injuries to her vagina.
>
> When contacted by the IJM, PEPE's neighbors confirmed that there were a number of young girls living with him.

On June 16, 2006, AIA Phillips and U.S. Embassy Investigator Suos Vansak interviewed I.T. I.T. is approximately 4'04" tall, 60 pounds, and has brown eyes and black hair. The interview was conducted through interpreters, as I.T. does not speak English. A copy of this recorded interview is located within the "[redacted]", "Interview 1" folder of **Exhibit "D."** The following is a summary of the interview: I.T.

> I.T. stated that a woman known as "Basang," later identified as SANG THI CHHOEURN ("SANG"), took her to PEPE's Phnom Penh compound.

Upon arriving at PEPE's compound, I.T. stated that PEPE provided SANG with a white capsule, which SANG then forced her to ingest. This capsule caused I.T. to become groggy and, subsequently, PEPE undressed, bound (wrists and legs), gagged, blindfolded, and raped her.

During that rape, I.T. recalled that she was crying and in pain, that PEPE had used his hands to spread her legs and insert his penis into her vagina for approximately one hour, and that PEPE did not use a condom during the sexual abuse.

On or about May 26, 2006, I.T. stated that she was called up to PEPE's bedroom where he helped undress her and instructed her to take a shower. After showering, PEPE instructed I.T. to lie on his bed where he proceeded to rape her "for a long time."

I.T. described how she and other naked girls gave PEPE massages together. During the massages, I.T. stated the other girls took turns providing oral sex to PEPE, for which he would pay each girl $1 for the massage and $5 to the girl that caused him to ejaculate through oral sex.

I.T. stated that there were a total of five girls living at PEPE's compound, believed to be between 9 and 15 years old.

Prior to being raped by PEPE in late-May 2006, I.T. stated that SANG and her husband brought I.T. to PEPE's compound, where I.T. would provide PEPE with massages where he would ejaculate and PEPE would pay I.T. approximately $5.

On June 16, 2006, U.S. Department of State, Diplomatic Security Service ("DSS") SA Andrew Simpson provided AIA Phillips with information from PEPE's registration application. A registration application is completed by U.S. Citizens traveling/residing abroad and submitted to the U.S. Embassy so that officials can contact the U.S. citizens in emergency situations. A copy of the application is attached as **Exhibit "E."** The following is a summary of the information:

On April 26, 2003, PEPE signed a registration application listing his date of birth, ███████ ██ 1953; place of birth, Boston, Massachusetts; social security number, ██████████, his U.S. Passport number, and his email address.

PEPE listed his emergency contacts as his father, Joseph Pepe, in Oxnard, California, and his sister, Elaine Williams in Port Hueneme, California.

PEPE listed that he first traveled to Cambodia on March 10, 2003.

On June 17, 2006, after PEPE left his Phnom Penh compound at Street 596, House #83, Tol Kork, Phnom Pehn, Cambodia, the CNP arrested PEPE for rape and debauchery. Later, on June 17, 2006 and June 19, 2006, while accompanied by ICE Bangkok, the DSS, and the two Non-Governmental Organizations, the CNP executed search warrant(s) at PEPE's compound in Phnom Penh. Copies of the videos of the search warrant(s) are attached as **Exhibit "F."** A copy of the evidence log of items seized from PEPE's compound and received by ICE SA Wang, on November 16, 2006, is attached as **Exhibit "G."** The following is a summary of the items that were seized:

Ropes and pieces of cloth tied in slipknots.

Viagra, KY Jelly, condoms, and unknown white pills.

Children's books, stuffed animals, games, and children's clothes.
Newspaper articles regarding pedophiles and a map cover entitled, " Sex With Children is a Crime."

Pornographic photographs, a computer, emails, and digital media containing suspected child pornography. Subsequently, ICE Bangkok forwarded the computer hard drive and some of the digital media seized to ICE Singapore, where SA Galante performed a forensic examination of the evidence. Copies of the forensics reports are attached as **Exhibit "H."**

PEPE's California driver's license and a copy of PEPE's passport.

On June 18, 2006, AIA Gary Phillips and DSS SA Andrew Simpson interviewed SANG, aka "Basang," who was arrested by the CNP for assisting PEPE in procuring children. The interview was conducted through interpreters, as SANG does not speak English. The following is a summary of the interview:

Approximately 5 years ago, SANG stated that she met PEPE at Sharkey Bar in Phnom Penh, where she works as a prostitute.

SANG stated that she has had sex with PEPE many times in exchange for payment.

SANG admitted that she worked for PEPE as a translator and provided young girls to him.

In or around April of 2006, SANG admitted to brokering the sale of I.T. to PEPE for a $200 payment to I.T.'s mother. Further, SANG claimed that she received only $5 commission for brokering I.T.'s sale.

SANG stated that I.T. was a virgin and was sold to PEPE so that he could have sex with her.

SANG stated that PEPE was unhappy with I.T. because she was very small and always crying, and that he was unable to fully penetrate her during sex.

SANG recalled that I.T. frequently screamed because she was very young, scared, and in pain. Further, SANG admitted that she gave I.T. a sedative at PEPE's direction.

SANG admitted that, in or around February of 2006, she brokered the $300 sale of L.K. to PEPE, for which she was compensated $10.

SANG admitted that she brought at least 4 other young girls (ages 9, 10, 12, and 16 years old) to PEPE.

SANG stated that PEPE paid the girls' families an "upfront fee" and monthly stipend in exchange for unlimited access to the girls for sexual gratification.

SANG stated that PEPE frequently visited Kilo-11, which is an area well known for the selling and prostitution of children to locals and foreigners.

On June 19, 2006, AIA Phillips and Investigator Suos Vansak re-interviewed I.T., an 11-12 year-old girl that PEPE had allegedly sexually abused. During this interview, I.T. again accurately described PEPE's compound and some of his personal possessions; identified PEPE from a photograph of five men; identified the rope that PEPE used to bind her; and identified L.K., S.R., and S.S. from photographs. A copy of this recorded interview is located within the "INYI", "Interview 2" folder of **Exhibit "D."**

On June 19 and 20, 2006, AIA Phillips and Investigator Suos Vansak interviewed L.K., an 11 year-old Cambodian girl that PEPE had allegedly sexually abused. Previously, on June 17, 2006, L.K. was given a medical examination at the Phnom Penh Municipal Referral Hospital, where forensic/biological (DNA) evidence was taken. The interview was conducted through interpreters, as L.K. does not speak English. L.K. is approximately 4'06" tall, 60-70 pounds, and has brown eyes and black hair. A copy of this recorded interview is located within the "[redacted]" folder of **Exhibit "D."** The following is a summary of the interview: L.K.

L.K. stated that SANG brought her and several other children to PEPE's compound.

L.K. stated that since living at PEPE's compound, she had been raped over 20 times by PEPE. Each time she was raped, PEPE gave L.K. $1.

L.K. stated that PEPE drugged, bound with eggshell-colored cloth, gagged, beat, and raped her. During one sexual assault, PEPE beat L.K. until she lost consciousness.

L.K. recalled observing PEPE's penis and a red "pea" size mark on his inner leg, which she believed to be his left inner leg.

After PEPE raped her, L.K. recalled laying in a lot of blood and experiencing pain in her vagina.

L.K. stated that she was forced to perform oral sex on PEPE over 40 times and that PEPE performed oral sex on her many times.

L.K. stated that PEPE had her view pornographic movies depicting adults performing oral sex.

L.K. stated that she and PEPE took showers together, where he also molested and photographed her naked.

L.K. stated that she was present when two other young girls, S.R. and S.S., performed massages and oral sex on PEPE.

Prior to living at PEPE's compound, L.K. stated that she was a virgin.

L.K. accurately described PEPE's compound and some of his personal possessions; identified PEPE from a photograph of five men; identified SANG from a photograph; and identified the eggshell-colored pieces of cloth that PEPE used to bind her.

On June 20, 2006, AIA Phillips and Investigator Suos Vansak interviewed S.R., a 9-10 year-old Cambodian girl that PEPE had allegedly sexually abused. The interview was conducted through interpreters, as S.R. does not speak English. S.R. is approximately 4'03" tall, 60 pounds, and has brown eyes and black hair. A copy of this recorded interview is located within the "[redacted]", folder of **Exhibit "I."** The following is a summary of the interview: S.R.

In or around March 2006, S.R. stated that SANG brought her and her sister, S.S., to PEPE's compound.

S.R. stated that SANG taught her and S.S. how to perform oral sex. More specifically, SANG instructed them to undress and go to PEPE's bedroom, where they watched SANG perform oral sex on PEPE.

S.R. stated that she performed massages and oral sex approximately 30 times on PEPE, for which she was paid $1 each time.

S.R. stated that PEPE often kissed her, touched her vagina with his fingers, and performed oral sex on her – which caused her pain.

S.R. stated that a naked PEPE and her slept together in PEPE's bedroom.

S.R. stated that PEPE mainly had sex with L.K.

S.R. stated that, according to SANG, PEPE was planning to have sex soon with her and her sister, S.S.

S.R. stated that PEPE had a red, pea-size mark on his left inner leg.

S.R. accurately described PEPE's compound and some of his personal possessions; identified PEPE from a photograph of five men; identified SANG from a photograph; and identified I.T., L.K., and S.S. from photographs.

On June 21, 2006, AIA Phillips and Investigator Suos Vansak interviewed S.S., a 10-11 year-old Cambodian girl that PEPE had allegedly sexually abused. The interview was conducted through interpreters, as S.S. does not speak English. S.S. is approximately 4'06" tall, 60 pounds, and has brown eyes and black hair. A copy of this recorded interview is located within the "[redacted]" folder of **Exhibit "I."** The following is a summary of the interview: S.S.

S.S. stated that SANG taught her how to perform oral sex. More specifically, SANG and PEPE were both naked as she taught S.S.

S.S. stated that she performed oral sex many times on PEPE, for which PEPE paid her approximately $1 each time. S.S. also stated that she had sexual contact with PEPE between 60 and 90 times.

S.S. stated that, on occasion, PEPE bound her wrists and ankles to his bed while he performed oral sex on her.

After sexual contact with PEPE, S.S. stated that she and PEPE showered together.

S.S. stated that PEPE had a red, pea-sized mark on his left inner leg.

S.S. stated that, in PEPE's workroom, she saw pictures of "small girls like me" naked and bound. Further, S.S. stated that some of the photographs might have been of "foreign girls," approximately 12-13 years of age.

S.S. accurately described PEPE's compound and some of his personal possessions; identified PEPE from a photograph of five men; identified SANG from a photograph; identified the rope that PEPE bound her; and identified I.T. from a photograph.

On June 21, 2006, AIA Phillips and WHI arranged for the medical examination of PEPE's four child victims (I.T., L.K., S.R., and S.S.) at SOS International in Phnom Penh, including taking tests for sexually transmitted diseases and collecting forensic/biological (DNA) evidence. Dr. Laura Watson was the attending physician. Copies of Dr. Watson's medical examinations are attached as **Exhibit "J."** The following is a summary of her findings:

I.T. had an obviously disrupted hymen with small vaginal tear and bruising to the vaginal opening. Dr. Watson's impression was that I.T.'s "healing vaginal injury consistent with forced penetration, pubertal stage consistent with stated age."

L.K. had no hymen visible. Dr. Watson's impression was that L.K.'s "pubertal stage consistent with stated age. Vaginal examination consistent with repeated penetration over time."

Both S.R. and S.S. had no apparent injuries and their pubertal stages were consistent with their stated ages.

On July 6 and 7, 2006, AIA Phillips and Investigator Suos Vansak met with PEPE at Prey Sar Prison in Phnom Penh, Cambodia, where he was held pending Cambodian charges. The following is a summary of the meeting:

PEPE provided his date of birth, September 20, 1953; his place of birth, Boston, Massachusetts; and his social security number, 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.

PEPE provided his addresses, 3327 South E Street, Oxnard, California and Street 596, House 83, Phnom Penh.

PEPE claimed that he was currently unemployed and a retired United States Marine Corps Captain.

AIA Philips described PEPE as a white male, 5'10" tall, 240 pounds, blue eyes, and black and silver hair with multiple scarring on his forehead, a birthmark on his right hand, and a pea-sized mole on his left inner thigh/groin region – matching the mole described by three of PEPE's child victims.

After receiving the Miranda warning, PEPE did not want to give a statement and invoked. The meeting was subsequently terminated.

On July 7, 2006, SA Wang was assigned to further investigate PEPE and his activities involving the international travel to engage sexual acts with minors and the production/distribution/possession of child pornography. Subsequently, SA Wang reviewed the Reports of Investigation prepared by AIA Phillips, which are attached as **Exhibit "K."**

On July 7, SA Wang conducted checks for PEPE through California motor vehicle databases. In addition, SA Wang conducted a record check for PEPE through Accurint. Accurint is a web-based search engine that searches public and proprietary records for identity verification information, corporate information, real property records and deed records. It also includes address history, social security numbers, and other identifying information. Copies of these record checks are attached as **Exhibit "L."** The following is a summary of the information:

> According to the California Department of Motor Vehicles database, PEPE has a valid California diver's license and, since September 25, 2002, PEPE has used [redacted] Oxnard, California 93033 as his residential address.
>
> According to Accurint, as of May 2006, PEPE's address was [redacted], Oxnard, California 93033.

On July 10, 2006, DSS SA Jeffrey Kraus provided SA Wang with a copy of PEPE's last application for a U.S. Passport, which he signed on April 9, 1999. On this U.S. passport application, PEPE listed his date of birth, [redacted], 1953, and place of birth, Boston, Massachusetts. A copy of PEPE's passport application is attached as **Exhibit "M."**

On July 20, 2006, U.S. Customs and Border Protection ("CBP") Officer Tim Kirkham checked for PEPE's most recent travel details through the CBP computer systems that query passenger, reservation, and travel itinerary information from all international flights that depart from, arrive at, or transit through the U.S. According to CBP computer systems, on September 1, 2005, PEPE departed Los Angeles International Airport for Manila, Philippines. On September 3, 2005, PEPE departed Manila, Philippines for Phnom Penh, Cambodia by way of Bangkok, Thailand. A copy of the PEPE's travel itinerary is attached as **Exhibit "N."**

Subsequent information provided by Philippine Airlines to SA Wang confirmed that, on September 1, 2005, PEPE departed Los Angeles International Airport for Manila, Philippines aboard Flight 103 and, on September 3, 2005, PEPE departed Manila, Philippines for Bangkok, Thailand aboard Flight 730. Bangkok Airways also confirmed to SA Wang that, on September 3, 2005, PEPE departed Bangkok, Thailand for Phnom Penh, Cambodia aboard Flight 926. A copy of PEPE's September 2005 travel reservation/flight itineraries from Philippine Airlines is attached as **Exhibit "O."** A copy of PEPE's September 2005 travel reservation/flight itineraries from Bangkok Airways is attached as **Exhibit "P."**

On July 21, 2006, SA Wang reviewed some of the computer information and images contained within a thumb drive that was seized during the June 2006 search warrant executed at PEPE's Phnom Penh compound. A thumb drive is a small, portable external data storage device. Copies of these images were placed on a DVD by ICE Senior Special Agent ("SSA") Timothy Sullivan and SA Wang in a digital folder labeled "JetFlash 256 Thumbdrive". The DVD is attached as **Exhibit "Q."** The following is a summary of the review:

A folder labeled, "Girls 2," contained a set of 13 images of a young Asian girl ("JANE DOE 1"), approximately 15-17 years old, in PEPE's bedroom at his Phnom Penh compound. JANE DOE 1 was photographed undressing, lying naked, and posing in a sexually explicit manner on PEPE's bed. There were also three images of a young Asian girl ("JANE DOE 2"), approximately 6-8 years old, undressing and showering naked in PEPE's bathroom.

A folder labeled, "GIRLS 3," contained a set of 35 images of JANE DOE 1 and JANE DOE 2 in PEPE's bedroom at his Phnom Penh compound. JANE DOE 1 and JANE DOE 2 were photographed undressing, lying naked, posing in a sexually explicit manner on PEPE's bed, and showering in PEPE's bathroom.

A folder labeled, "GIRLS 4," contained a set of 15 images of JANE DOE 2 in PEPE's bedroom at his Phnom Penh compound. JANE DOE 2 was photographed lying naked and posing in a sexually explicit manner on PEPE's bed.

A folder labeled, "Home girls 0705," contained a set of 19 images of a young Asian girl ("JANE DOE 3"), approximately 10-13 years old, in PEPE's bedroom at his Phnom Penh compound. JANE DOE 3 was photographed undressing, lying naked, and posing in a sexually explicit manner on PEPE's bed.

A folder labeled, "SPIDER," contained a set of 83 images of a young Asian girl ("JANE DOE 4"), approximately 10-13 years old, in PEPE's bedroom at his Phnom Penh compound. JANE DOE 4 was photographed undressing, lying naked, and posing in a sexually explicit manner on PEPE's bed.

A folder labeled, "Friend 111111," contained a set of 11 images of a young Asian girl ("JANE DOE 5"), approximately 5-8 years old, topless, undressing, changing outfits, naked, and posing for the photographs.

On July 21, 2006, SA Wang reviewed some of the computer information and images previously seized from PEPE's computer, during the June 17, 2006 search warrant executed at his Phnom Penh compound. Copies of these images can be found in the "Misc" folder of **Exhibit "Q."** The following is a summary of the review:

The computer had folders that contained hundreds of suspected child pornography images depicting young children, approximately 7-16 years old, dressed in lingerie, undressing, naked, and posing in a sexually explicit manner. Further, many of the suspected child pornography images were kept in separate folders, labeled with the children's names, containing a series or set of images of the same young child.

A folder labeled, "Little 1," contained 13 viewable images of JANE DOE 2 in PEPE's bedroom at his Phnom Penh compound. JANE DOE 2 was photographed lying naked, posing in a sexually explicit manner on PEPE's bed, and showering in PEPE's bathroom. Further, five of the viewable images were of JANE DOE 2 performing oral sex, on PEPE's bed, upon a naked male who closely matches PEPE's physical description.

There were 80 separately labeled folders containing hundreds of thumbnail images. A thumbnail image is a small, low-resolution version of a larger image used for quick identification. PEPE's computer was being used as a virtual library of his images. Copies of

these images can be found in the "PSD Image Database", "cache", "albums" folder of **Exhibit "Q."** Among those 80 folders are the following:

"19_Girls 2," contained the thumbnail image set of the images found in the "Girls 2" folder of PEPE's thumb-drive. JANE DOE 1 was photographed undressing, lying naked, and posing in a sexually explicit manner on PEPE's bed. There were also three thumbnail images of JANE DOE 2 undressing and showering naked in PEPE's bathroom.

"20_GIRLS 3," contained the thumbnail image set of the images found in the "GIRLS 3" folder of PEPE's thumb-drive. JANE DOE 1 and JANE DOE 2 were photographed undressing, lying naked, posing in a sexually explicit manner on PEPE's bed, and showering in PEPE's bathroom. There was also a thumbnail image of PEPE in this folder.

"21_GIRLS 4," contained the thumbnail image set of the images found in the "GIRLS 4" folder of PEPE's thumb-drive. JANE DOE 2 was photographed lying naked and posing in a sexually explicit manner on PEPE's bed.

"23_Little 1," contained the thumbnail image set of the images found in the "Little 1" folder. "23_Little 1" was a set of 43 thumbnail images of JANE DOE 2 in PEPE's bedroom at his Phnom Penh compound. JANE DOE 2 was photographed lying naked, posing in a sexually explicit manner on PEPE's bed, and showering in PEPE's bathroom. Further, 13 of the thumbnail images were of JANE DOE 2 performing oral sex, on PEPE's bed, upon a naked male who closely matches PEPE's physical description.

"26_Ni 102905," contained a set of 44 thumbnail images of a young Asian girl ("JANE DOE 6"), approximately 10-13 years old, in PEPE's bedroom at his Phnom Penh compound. JANE DOE 6 was photographed undressing, lying naked, and posing in a sexually explicit manner on PEPE's bed. Further, three of the thumbnail images were of JANE DOE 6 naked with her wrists bound to PEPE's bed.

"27_Ni 2," contained a set 79 thumbnail images of JANE DOE 6 in PEPE's bedroom at his Phnom Penh compound. JANE DOE 6 was photographed undressing, lying naked, and posing in a sexually explicit manner on PEPE's bed. Several of the thumbnail images showed a naked JANE DOE 6 with her wrists bound to her ankles and her exposed buttocks in the air. There were also several of the thumbnail images, which depicted JANE DOE 6 performing oral sex, on PEPE's bed, upon a naked male who closely matches PEPE's physical description.

"28_Hen 1," contained a set of 52 thumbnail images of JANE DOE 4. JANE DOE 4 was photographed undressing, lying naked, and posing in a sexually explicit manner on a bed.

"29_Hem 2," contained a set of 83 thumbnail images of JANE DOE 4 in PEPE's bedroom at his Phnom Penh compound. JANE DOE 4 was photographed undressing, lying naked, and posing in a sexually explicit manner on PEPE's bed.

"31_Nap & Kia 1," contained a set of 17 thumbnail images of two young Asian Girls ("JANE DOE 7" and "JANE DOE 8"), approximately 10-13 years old, in PEPE's bedroom at his Phnom Pehn compound. JANE DOE 7 and JANE DOE 8 were photographed undressing, lying naked, posing in a sexually explicit manner on PEPE's bed, and showering in PEPE's bathroom.

"32_Nap & Kia 2," contained a set of 24 thumbnail images of JANE DOE 7 and JANE DOE 8 in PEPE's bedroom at his Phnom Penh compound. JANE DOE 7 and JANE DOE 8 were photographed undressing, lying naked, posing in a sexually explicit manner on PEPE's bed, and showering in PEPE's bathroom. Further, within this set, there were some thumbnail images of a fully clothed PEPE posing with a fully clothed JANE DOE 7 and JANE DOE 8, respectively. Also, included in this set were four thumbnail images of a naked PEPE posing with a naked JANE DOE 7 and JANE DOE 8, respectively.

"33_Kia," contained 72 thumbnails of JANE DOE 7. JANE DOE 7 was photographed undressing, lying naked, and posing in a sexually explicit manner on a bed.

There were several photographs of PEPE's four alleged child victims: I.T., L.K., S.S., and S.R. The girls were photographed around PEPE's Phnom Penh compound, playing and posing in different outfits.

During the week of August 21, 2006, ICE SSA Taekuk Cho received information that WHI was sheltering a 14-year old girl who was allegedly sexually exploited by PEPE. Subsequently, on August 25, 2006, SSA Taekuk Cho and DSS Investigator Suos Vansak interviewed the 14-year old girl, T.C. The interview was conducted through interpreters, as T.C. does not speak English. T.C. is approximately 4'06" tall, 77 pounds, and has brown eyes and brownish-black hair. A copy of the Report of Investigation detailing the interview is attached as **Exhibit "R."** The following is a summary of the interview:

T.C. stated that she stayed at PEPE's Phnom Penh house for a one or two week time period during April or May 2006.

T.C. stated that, initially, SANG approached T.C.'s mother about selling T.C.'s virginity to a foreigner. After the initial refusal, SANG returned and convinced T.C.'s mother to allow her to live with a foreigner to attend school.

T.C. stated that approximately one week after SANG brought her to PEPE's house, PEPE bound and raped her. Specifically, T.C. stated that PEPE provided her with a soft drink, which she drank. After drinking the soft drink, T.C. felt very drowsy and could not keep her eyes open. T.C. stated that PEPE used thick, white-colored rope to tie and spread her arms and legs to the bed. Drifting in and out of consciousness, T.C. noticed that she was not wearing pants or underwear and that there was a lot of blood on the bed that came from her vagina. T.C. stated that she had a headache and experienced intense pain in her vagina.

T.C. stated that PEPE raped her four times during the second week at PEPE's house. T.C. stated that PEPE would undress himself, instruct T.C. to undress herself, had T.C. lay on his bed, and force himself upon her.

Prior to each time he raped her, T.C. stated that PEPE would take a blue-colored capsule medication.

T.C. stated that PEPE paid her $1 each time that he raped her.

T.C. stated that PEPE also forced her to perform oral sex on him and performed oral sex on her. Further, T.C. stated that SANG instructed her and other girls (L.K., S.S., and S.R.) about oral sex by performing oral sex on PEPE in front of them.

Prior to living with PEPE, T.C. stated that she was a virgin.

T.C. stated that there were three other girls living at PEPE's house: L.K., S.S., and S.R. In addition, T.C. was able to identify PEPE, PEPE's Phnom Penh residence, PEPE's bedroom, and the rope that PEPE used to bind her from photographs shown to her.

On September 12, 2006, one of PEPE's sisters provided SA Carlos Ortiz and SA Wang with dozens of emails and letters received from PEPE while he was incarcerated in Cambodia that mostly detailed his requests and health. Also, included was a letter, written by PEPE and contained within an envelope postmarked August 15, 2006 that detailed some of PEPE's actions in Cambodia. A copy of this letter is attached as **Exhibit "S."** Copies of the rest of PEPE's letters and notes are attached as **Exhibit "T."** The following is a summary of this letter:

PEPE mentioned several of his child victims by name, including one for which PEPE had dozens of pornographic and sexually-explicit photographs on his computer.

PEPE stated that his daily routine usually included a massage from the girls after they returned from school and another later in the evening. Further, PEPE stated these massages led to "inappropriate touching, etc."

PEPE stated that on one occasion, after he was given Viagra, PEPE bound a known child victim and slapped her in the face. PEPE explained that the known child victim was given to him by her mother as a wife/girlfriend and described both his "sex drive" and "willpower" as "very low."

PEPE admitted taking naked pictures, at SANG's request, of her two nieces. Further, PEPE claimed that he erased these files from his computer.

During the week of September 25, 2006, SSA Taekuk Cho received information that WHI was sheltering a 13-year old girl who was allegedly sexually exploited by PEPE. Subsequently, on September 27, 2006, SSA Taekuk Cho and DSS Investigator Suos Vansak interviewed the 13-year old girl, K.S. The interview was conducted through interpreters, as K.S. does not speak English. K.S. is approximately 5'0" tall and 85 pounds. A copy of the Report of Investigation detailing the interview is attached as **Exhibit "U."** The following is a summary of the interview:

Prior to living at WHI, K.S. stated that she had previously lived in Thailand; Phnom Penh, Cambodia; and Sihanoukville, Cambodia. K.S. stated that she moved from Phnom Penh to Sihanoukville because her aunt, "Ny," had brought her there. "Ny" is the wife of TERRY SMITH ("SMITH"). In September 2006, the CNP arrested SMITH for child sex crimes.

Subsequently, on October 14, 2006, SMITH was returned to the U.S. based upon an Oregon arrest warrant for child sodomy.

K.S. stated that SANG introduced her to PEPE several months ago and that she lived at PEPE's Phnom Penh home for approximately one and a half months, where K.S. had to clean PEPE's house and sleep with him.

K.S. stated that PEPE forced her to have intercourse with him and perform oral sex on him. Specifically, PEPE grabbed her head, pulled her head towards his penis, and forced her to place her mouth over his penis. Further, K.S. stated that PEPE paid her $1 for every time he had sex with her and other girls.

K.S. stated that PEPE had also beaten her when she refused to provide him sexual services.

Prior to having sex with PEPE, K.S. stated that she was virgin.

K.S. stated that PEPE also forced her to shower with him and took photographs of her clothed and unclothed.

K.S. stated that there were three other girls living at PEPE's house: L.K., S.S., and S.R. In addition, K.S. was able to identify PEPE, PEPE's Phnom Penh residence, and PEPE's bedroom.

On February 7, 2007, PEPE was expelled from Cambodia and accompanied to Los Angeles, California by ICE SA Henry Casillas, SA Kevin McLaughlin, and SA Wang. Prior to departing, at approximately 7:17 pm (local time), with SA McLaughlin witnessing, SA Wang provided PEPE with his Miranda warning, to which he invoked his right to remain silent.

**EXHIBITS (See sections of accompanying folder)**

| | |
|---|---|
| Exhibit A | PEPE's birth certificate |
| Exhibit B | CNP reports regarding their investigation into PEPE |
| Exhibit C | IJM's initial report regarding I.T. and PEPE |
| Exhibit D | Interviews of I.T. and L.K. |
| Exhibit E | PEPE's registration application with the U.S. Embassy in Cambodia |
| Exhibit F | Videos of the Search Warrant(s) execution at PEPE's Phnom Penh, Cambodia compound |
| Exhibit G | Evidence Log of Items Seized from PEPE's compound |
| Exhibit H | SA Galante's forensics reports regarding his examination of PEPE's computer hard drive and media storage |

| | |
|---|---|
| Exhibit I | Interviews with S.R. and S.S. |
| Exhibit J | June 21, 2006 Medical examinations of I.T., L.K., S.R., and S.S. at SOS International |
| Exhibit K | ICE Bangkok's Reports of Investigation |
| Exhibit L | Record checks conducted for PEPE |
| Exhibit M | PEPE's April 9, 1999 U.S. Passport application |
| Exhibit N | PEPE's travel itinerary information provided by CBP |
| Exhibit O | PEPE's travel itinerary/passenger information provided by Philippine Airlines |
| Exhibit P | PEPE's travel itinerary/passenger information provided by Bangkok Airways |
| Exhibit Q | Images retrieved from PEPE's computer hard drive and media storage |
| Exhibit R | Report of Investigation detailing T.C. interview |
| Exhibit S | PEPE's letter admitting the "inappropriate touching" of young girls |
| Exhibit T | PEPE's letters sent to his family |
| Exhibit U | Report of Investigation detailing T.C. interview |

**WITNESSES – GRAND JURY**

Eddy Wang, Special Agent
Ventura Office of the Resident Agent-in-Charge
U.S. Immigration & Customs Enforcement
770 Paseo Camarillo, Suite 320
Camarillo, California 93010

**WITNESSES – TRIAL**

Gary Phillips, Assistant ICE Attaché
Bangkok, Thailand Office of the ICE Attaché

David Galante, ICE Representative
Singapore Office of the ICE Attache

Timothy Sullivan, Senior Special Agent
Ventura Office of the Resident Agent-in-Charge

Sang Thi Chhoeurn aka "Basang", PEPE's child procurer

Six (6) child victims (I.T., L.K., S.S., S.R., T.C., and K.S.)

Dr. Laura Watson, SOS Attending Physician

Maureen O'Hara, PEPE's sister

**WITNESSES – TESTIMONY**

| | |
|---|---|
| Wang | Case agent. Conducted investigation in the U.S.; wrote arrest warrant affidavit; conducted one of PEPE's interview; and, reviewed suspected child pornography images. |
| Phillips | Case agent for investigation into PEPE in Cambodia. Assisted in search warrant; interviewed victims; interviewed BASANG; and interviewed PEPE |
| Galante | Conducted forensic analysis of PEPE's computer hard drive and media storage device. Generated the forensic report. |
| Sullivan | Assisted in the creation of Exhibits included in this report. |
| Sang | Procured child victims for PEPE. |
| Victims | Provided statements regarding their sexual abuse by PEPE. |
| Watson | Provided medical examinations of I.T., L.K., S.S., and S.R. |
| O'Hara | Provided SA Wang with letters written by PEPE in Cambodia. |

**CONCLUSION**

Based on the evidence referenced in this report, it is the undersigned's belief that this investigation has served to indicate that PEPE has committed acts which violate federal law as it relates to engaging in illicit sexual conduct, as set forth in Title 18, Sections 2423(c) of the United States Code.

Sincerely,

[signature]

Eddy Wang, Special Agent

Approved

DAVID C. WALES
Resident Agent-in-Charge
Ventura, California
U.S. Immigration & Customs Enforcement

Enclosures: Exhibits

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 93 of 2133

# EXHIBIT B

Pepe ER 78

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T O F I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE 1<br>CASE NUMBER BK07QR06BK0008<br>REPORT NUMBER: 009 |
|---|---|

On June 14, 2006, ICE Bangkok, the Cambodian National Police (CNP), the Diplomatic Security Service (DSS), and two NGO's, the International Justice Mission (IJM) and World Hope International (WHI), initiated an investigation into the alleged activities of Michael Joseph PEPE. PEPE is being investigated for allegations of child rape and child exploitation.

On June 15, 2006, ICE Bangkok was informed that on June 12, 2006, WHI received information from a 12-year-old Vietnamese girl, known as [redacted]. [redacted] informed that she was raped in the home of an American man, known only as Michael. Assistant ICE Attache (AIA) Gary Phillips later identified Michael as Michael Joseph PEPE, Street 596, House # 83, Tol Kork, Phnom Penh, Cambodia and U.S. address listed as 3327 South E Street, Oxnard, California.

On June 16, 2006, at approximately 1019 hours, AIA Phillips and Investigator (INV) Suos Vansak interviewed 12-year-old Inyi Tram. [redacted] informed that she was raped and sexually exploited by "Michael" (PEPE).

On June 19, 2006, ICE Bangkok interviewed another one of PEPE's child victims identified as [redacted] (11 years old). [redacted] said that she was repeatedly raped by PEPE and she was also forced to give him oral sex as well as massages.

On June 20, 2006, at approximately 1541 hours, AIA Phillips and INV Vansak interviewed [redacted] (referred to as [redacted]). [redacted] said that she did not remember when she was born (except in the year of the Cow, which corresponds to 1997), and she is 10 years old. Per the Chinese lunar year, [redacted] would be about 9 years old if she was born in the year of the cow (ox). [redacted] was born in Samaki Village, Cambodia to Youeng Lang (mother) and Nin LNU (father). [redacted] mother and father are married and live in [redacted]. Smey is approximately 4'03" tall, 60 pounds, and has brown eyes and black hair. Her father works as a bicycle repairman and moto taxi driver and her mother sells coffee. Prior to living with PEPE, [redacted] resided in Samaki Village with her parents and siblings. Smey identified her brothers as [redacted] (7), [redacted] (10) and her sister as [redacted] (11).

[redacted] said that she was attending school when she was living with PEPE; she attended Newton Thilay School from about 0700 hours to 1000 hours. She was learning to speak English and was capable of saying very basic English phrases. [redacted] informed that Newton Thilay School is located far away from PEPE's house, somewhere in Tol Kork, Phnom Penh. [redacted] stated that she likes to dance and sing but she does not like playing games. She does not have many friends in or outside of school; her friends were identified as the other girls living in PEPE's house: [redacted], Vy and [redacted].

O F F I C I A L U S E O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 95 of 2133

O F F I C I A L U S E O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T O F I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE 2<br>CASE NUMBER BK07QR06BK0008<br>REPORT NUMBER: 009 |
| --- | --- |

SR described Michael (PEPE) as fat, with a big belly, about 5'10" tall, has a fat face with a strawberry nose, white skin, a little bit of hair on his arms, minimal chest hair (if any), he sometimes wore glasses, has black and white hair that is parted on the side, brown eyes (actually they are blue), clean shaven, is a heavy smoker, has bad breath, is dirty, and "sometime he is very angry and crazy." also said that PEPE has a red mole/mark the size of a pea on his left inner leg (near his groin area). She said that PEPE also drives a white vehicle, does not know where he works, has a Cambodian girlfriend, has a wife, and is from the United States. AIA Phillips showed a photograph of five men in a picture, which she immediately identified PEPE.

Per personal observations made by AIA Phillips, this is a very accurate description of PEPE.

said that several people live in the house with PEPE. She identified the people as the cook, the gate opener (a boy), SS (her sister), Vy, KL, herself and Michael (PEPE). Another person that frequents the house and appeared to be employed by PEPE was "Basang." Basang is a Vietnamese woman described as having very long hair that she routinely clipped, is skinny and smoked Hero cigarettes.

Basang was fully identified as Sang Thi Chhouern (28 or 29 years of age) and was also arrested by the CNP for acting in the capacity of a child procurer. SR said that she met Basang about 2-3 months ago (March 2006) when she approached her and offered her free education if she lived in the house with PEPE. Basang told that PEPE would send her to school. Basang then spoke with 's mother and offered her an opportunity for her ( ) to go to school. Furthermore, would be taken care of in that she would be given a place to live and she would have food to eat. mother agreed to the offer and authorized Basang to take to PEPE's house. said that she was present when Basang and her mother agreed to let her live in PEPE's house; however, she did not believe she had knowledge of what was going on in the house (the sexual abuse).

described Michael's house as large and had two floors. The bottom level had a storage area where there is a pool table and study materials for students. Inside the house are chairs, a T.V., photographs in a cabinet, the furniture is made of wood, and there is a wooden carved fish in the living area. There is a bedroom downstairs where the cook and Vy sleep.

said that the entrance to the upstairs is up a stairwell that leads to Michael's room (located on the right) and her room and a massage room (located to the left). said that she has been in Michael's room before and she described it as having a mirror, a small cabinet near his bed, a bed with

O F F I C I A L U S E O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

00250

Pepe ER 80

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 96 of 2133

O F F I C I A L U S E O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T O F I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE 3<br>CASE NUMBER BK07QR06BK0008<br>REPORT NUMBER: 009 |
|---|---|

carved flowers in the headboard and a cabinet and a 3-tier closet. Located in the closet was a rope that was used to tie the hands and legs of some of the girls that PEPE had sex with. [redacted] said that one of the girls that PEPE tied up was [redacted] she knows this because [redacted] told her about being tied up by Michael (PEPE). [redacted] said that PEPE's room also had a bathroom that has a toilet, sink, shower and a pillar.

[redacted] described the massage room as having a massage table, which was used for giving Michael (PEPE) massages. [redacted] informed that four girls gave Michael massages at one time: [redacted], Vy, [redacted] and [redacted]. All four girls took turns providing PEPE with oral sex. When asked if she knew what oral sex was, [redacted] said, "eating penis." When the girls gave PEPE a massage, he was typically naked with the exception of a towel that might have covered parts of his body. AIA Phillips asked [redacted] how many times did she participate in giving PEPE massages. She responded and stated more than 30 times. Each time she participated in providing him with a massage, she received $1, which she eventually gave to her mother. In addition to receiving $1 for massages and oral sex, she also received a monthly salary of $30.

[redacted] said that on occasion, PEPE watched pornographic videos and would call up one of the girls for sex. Mainly, PEPE called on [redacted] to have sex with and very often he called on all of the girls for massages.

[redacted] described her bedroom as being located to the left of the massage room. She stated that she had a bed that had carved flowers, a closet, a bathroom, had photographs on the wall, had a T.V., a VCD player, stuffed toys, such as a rabbit and a tiger.

AIA Phillips asked [redacted] if there were any other rooms on the upper level of the house, which she responded "Michael's workroom." Located in the workroom were a computer, CD's, documents, sex movies, Basang's photograph and many photographs of girls inside his computer.

AIA Phillips showed [redacted] several photographs of items she described above. She identified the following items: PEPE's house, his white vehicle, the cook, PEPE's bedroom and his closet, the computer workroom, the massage table, the fishpond downstairs, the cloth rope, and the yellow bag (containing another type of rope).

When asked about the cloth rope, [redacted] said that her sister ([redacted] or [redacted], she refers to both as her sister) told her that he used the rope to tie her up. [redacted] informed that sometimes when she was cleaning PEPE's bedroom, she saw the cloth rope on the bed in the morning. [redacted] also said that the cloth rope was kept in the inside bottom of the closet (which is where AIA Phillips discovered it during the search warrant). Additionally, [redacted] said

O F F I C I A L U S E O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

00251

Pepe ER 81

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 4 |
|---|---|
| | CASE NUMBER BK07QR06BK0006 |
| R E P O R T O F I N V E S T I G A T I O N C O N T I N U A T I O N | REPORT NUMBER: 009 |

that she knew that there was another type of rope that was in a yellow bag because she opened it up and looked in it. [redacted] claimed that she did not know what purpose PEPE used the rope that she saw in the yellow bag.

AIA Phillips also showed [redacted] photographs of other individuals that she might have been associated with, or known. [redacted] identified the following individuals: Basang, Inyi Tram, herself, [redacted], Vy, [redacted] and "Uncle Lucky."

SR IT SS KL

According to [redacted], when she and her sister [redacted] moved in with PEPE, Basang led them to his house, per earlier agreements with their mother. The very night that the sisters [redacted] and [redacted]) arrived at PEPE's house, Basang immediately taught them how to perform oral sex on PEPE. [redacted] stated that Basang instructed them to go to PEPE's bedroom, undress and watch how she performed oral sex on PEPE. She said that Michael was lying on his bed, naked (and looked like a bear) and Basang was also naked.

SS SR SS

[redacted] described Basang as skinny, small breasts, no hair on her body with the exception on her pubic area. Basang licked PEPE's penis, which she described as being straight, circumcised and he had a red mark/mole on his leg. Basang taught the sisters "how to eat penis and use their hands." Basang further showed them how to lick his penis from the top to the bottom, then put their hands on his penis and put it in their mouth. [redacted] said that she observed a white, watery liquid come out of PEPE's penis, which "taste bad." [redacted] said a lot came out and it took 5, 10 or 60 minutes sometimes.

[redacted] said again that she received $1 for providing him with massages and oral sex. Furthermore, she informed that she was involved in this type of activity on about 30 occasions. [redacted] said in addition to providing PEPE oral sex and massages, he also touched her (touched her vagina with his fingers), hugged her and kissed (sucked) her mouth, which happened often. [redacted] said that she felt very bad about what PEPE did to her. [redacted] stated that she slept with him in his bedroom, but he never slept with her in her bedroom. When PEPE and [redacted] slept together in his bedroom, she slept with her clothes on and PEPE was naked. [redacted] said that on occasion, [redacted] also slept with PEPE.

SS KL SR

[redacted] said that PEPE never inserted any foreign objects into her body; however, he did have sex with some of the other girls, such as [redacted] and Vy. [redacted] SR defined sex as "boom boom." She claimed that PEPE never had "boom boom" with her or her sister, [redacted]. However, per a conversation with Basang, [redacted] said that she (Basang) was informed by PEPE that they would start having sex with PEPE in about two months (August 2006). However, Basang wanted them to "grow a little more" before having sex with PEPE. [redacted] said that she and [redacted] were scared when Basang told them about PEPE's plans, they planned to run away before he had sex with him.

SS SS

O F F I C I A L U S E O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 98 of 2133

O F F I C I A L U S E O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T O F I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE 5<br><br>CASE NUMBER BK07QR06BK0008<br><br>REPORT NUMBER: 009 |
|---|---|

[redacted] said that she did not recall PEPE taking any sexually explicit photographs or video of children or other people. She did recall that he took photographs of her with her clothes on.

AIA Phillips asked [redacted] if PEPE ever tied her up with the cloth rope she described earlier. [redacted] said that she was never tied up; however, [redacted] and [redacted] were tied up. When asked about PEPE tying up [redacted], she said she had knowledge because she told her what PEPE did to her. When she was tied up, PEPE gave her oral sex by licking her vagina. AIA Phillips asked [redacted] if PEPE did this to her, which she said that he did many times but he never tied her up. PEPE always had oral sex with [redacted] in his bedroom. She claimed, "every time I ate his penis, he ate my vagina." [redacted] said that when PEPE did this to her she was in pain. When PEPE tied [redacted] up, he had sex with her, "boom boom."

[redacted] said that she never saw or witnessed PEPE wearing a condom. Furthermore, when she was giving or receiving oral sex, or providing him with a massage, PEPE touched her all over her body. PEPE touched her with his hands and fingers, licked her vagina and kissed her all over her body, from her "breast to toes." PEPE did use a type of cream, liquid or ointment prior to receiving a massage/oral sex. [redacted] described the liquid that was used on his penis, which was contained in a pink bottle. AIA Phillips showed [redacted] a photograph of the maids' room (which had a pink bottle on the headboard). [redacted] identified the pink bottle on the headboard, which was baby oil, as the same liquid that was applied to his body.

[redacted] said that prior to meeting Michael (PEPE), she and her sister ([redacted]) were virgins.

[redacted] stated that she would testify in the United States concerning what PEPE did to her.

The interview was videotaped and is being retained for evidentiary purposes.

The interview was concluded at approximately 1800 hours.

Investigation will continue.

O F F I C I A L U S E O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

00253

Pepe ER 83

# EXHIBIT C

**Kingdom of Cambodia**
**Nation Religion King**
-----

Ministry of the Interior
General Commissariat of the National Police
Central Department of the Justice Police
Department of Human Trafficking
Prevention and Protection of Minors

**Search Record**

Objective: provide a search record for the materials of Michael Joseph involving a case of torture and rape of children and debauchery

At: The Department of Human Trafficking Prevention and Protection of Minors, year two thousand and six. Month: June Day: twenty one Time: fifteen hours and zero minutes. We: Police Colonel Sun Ro, Justice Police Officer; position: Vice President of the Department of Human Trafficking Prevention and Protection of Minors; Police Major Hin Sophal, position: Bureau Officer; Police Captain Rin Saroeun, recorder; Mr. Huot Chhuor, representative of the district attorney of the Phnom Penh Municipal Court.

Executed legitimately under the orders of: of District Attorney Nget Sarat, District Attorney of the Phnom Penh Court.

[thumb print]
*hael J. Pepe*
*e 21, 2006*

Assisted by: Huot Chhuor, Clerk of the District Attorney.

Participants: 1. Mr. *Gary J. Phillips [illegible] Asistant[sic] + Attaché*
*2. Suos Van Sak US Embassy Phnom Penh*
*3. Ron Dune [sic] Director of [illegible] (IJM)*

[Signature]
Huot Chhuor

4. Michael Joseph, material owner

We traveled to the residence of: material of Michael Joseph
At House number: 83 Road number 596 Group ....... Subdistrict Boeng Kak II District Tuol Kork
City or Province Phnom Penh

-There we did a search of the house in the presence of: materially searched in the presence of the owner named Michael Joseph.
-In that search we found and confiscated Material Exhibits, including: 1. white sheet; 2. red towels; 3. short [illegible] 4. short purple [illegible] pants; 4. *Bau [illegible]* medicine, 10 pills; 5. 14 white pills; 6. *Kam [illegible]* medicine, 1 pill; 7. yellow medicine + [illegible] 1 pill [illegible] 200 pills; 8. [illegible] documents, approximately [illegible]; 9. cloth for tying the victims + rope for tying the victims; 10. bloody cloth; 11. the drug *Cammit*, 48 pills; 12. some drugs in a white bag. 13. disks [i.e. CD, VCD, or DVD], 19; 14. pink cloth; 15. children's school books, 11 volumes. 16. bottle[s] of clear liquid oil, 1; 17.sex technique books, 3 volumes; 18. disks [illegible]; 19. instrument for cleaning inside a vagina, 10 tubes; 20. documents, 7 additional large bundles. 21. album of young children (photographs), 1 volume; 22. lubrication, 1 bottle. 23. sheets and pillow chases with cartoon pictures like children's sheets, one large bundle.
24. photo albums, 34 volumes; 25. books, 14 volumes. 26. film, 7; 27. 1 pad/mat + 1 sponge. 28. *[illegible]* medicine, 4 pills.
Total evidence: 3 white sacks numbered from number (01, 02, 03) + 01 teddy bear.
Confiscated hard disks, amount: 02
wooden club, 01.

-Aside from the material exhibits above, we did not confiscate anything else.
-This record was completed on the same date at hour: sixteen and thirty minutes and "was reviewed by the Justice Police Officer, the person in question, and listening participants" confirming that it is surely correct and agreeing to give a thumbprint or sign below.

[signature]
Huot Chhuor
Record Keeper

[signature]
Capt. Sin Saroeun

assistant
[signature]
Maj. Hin Sophal

participant
[signature]
*Suos Van Sak*

Justice Police Bureau
[signature]
**Police Colonel Sun Ro**

detainee or home owner
[thumbprint]
*Michael J. Pepe*
*June 21, 2006*

1st Witness
[signature]
*Gary Phillips*
*6/21/06*

2nd Witness
[signature]
*Ron Dunne*
*IJM*
*21/06/2006*

# EXHIBIT D

Original

U.S. CUSTOMS SERVICE

NO. 2325571

# CUSTODY RECEIPT FOR SEIZED PROPERTY AND EVIDENCE

Handbook 5200-09

1. FPF No.

2. Incident No.

3. Investigative Case No. BK07QR06BK0024

4. Prior Detention? Yes ☐ No ☐ If yes, CF 6051D No.

5. Date Seized (mm/dd/yyyy) 6/17/06 6/20/06

6. Time Seized (Use 24 Hrs) Various

7. FDIN/Misc.

8. Seized From:
Name: Michael PEPE
Address: 433 ST 596 Phnom Penh, Cambodia
Telephone No. ( ) Ext:

9. Entry No.

10. Seal or Other ID Nos.

11. Remarks: Evid TOT from CNP to DHS after execution of S.W. on Michael J. PEPE's residence. SEE attached Inventory from DHS + CNP.

12. Send Correspondence to:

13. **PROPERTY** ( By Line Item) Attach CF 58 if conveyance

| a. Line Item No. | b. Description | c. Packages Number | c. Packages Type | d. Measurements Qty. | d. Measurements UM | e. Est. Dom. Value |
|---|---|---|---|---|---|---|
| 1 | Bag #1 evid TOT to SA Phillips from CNP | 1 | BAG | 1 | EA | $ |
| 2 | BAG #2 evid, TOT to SA Phillips from CNP | 1 | BAG | 1 | EA | $ |
| 3 | BAG #3 evid TOT to SA Phillips from CNP | 1 | BAG | 1 | EA | $ |
| 4 | wooden stick TOT SA Phillips | 1 | | 1 | EA | $ |
| 5 | white Teddy bear | 1 | | 1 | EA | $ |
| 6 | computer hard-drive, Maxtor 3.5 40GB [illegible] | 1 | | 1 | EA | $ |

14. Seizing Officer

Print Name / Signature / Date

15. **ACCEPTANCE/CHAIN OF CUSTODY**

| a. Line Item No. | b. Description | c. Print Name/Title/Organization | d. Signature | e. Date |
|---|---|---|---|---|
| 1-10 | 3 bags misc evid, wooden stick, teddy bear, hard-drive, rope, [illegible], Handcuffs, [illegible] | CNP General Un Sokunthea | [signature] | 6/22/06 |
| 1-10 | 3 bags misc evid, wooden stick, teddy bear, hard-drive, rope, [illegible], handcuffs, [illegible] | Gary Phillips, DHS | [signature] | 6/22/06 |
| 1-5 | 3 bags misc evid, wooden stick, white teddy bear | Andy Simpson, RSO | [signature] | 6/22/06 |
| 1-5 | 3 bags misc evid, wooden stick, teddy bear | Suos Vansak, IAV RSO | [signature] | 6/?/06 |
| 1-5 | 3 bags misc evidence, wooden sticks, teddy bear | Gary Phillips | [signature] | 6/30/06 |

CF 6051A Continuation Sheet Attached? Yes ☐ No ☐

Customs Form 6051S (11/01)

Customs Retains Original

1-5, 7-8 see 13b + 20b

Eddy Wong SA-ICE [signature] 11/16/2006

00201

DEPARTMENT OF THE TREASURY
UNITED STATES CUSTOMS SERVICE

# CUSTODY RECEIPT FOR RETAINED OR SEIZED PROPERTY

CONTINUATION SHEET

CIS Handbook No. HB 5200-09

| 1. PORT | 2. SEIZURE NO. | 3. GENERAL ORDER NO. | 4. OTHER CONTROL NO. | 5. DATE RET./SEIZED |
|---|---|---|---|---|
| | | | [illegible] | 6/17/06 - 6/2[illegible] |

20. PROPERTY (By Line Item) Attach CF 58 if conveyance.

| a LINE ITEM NO. | b DESCRIPTION | c CONDITION | d TYPE OF CONTAINER | e U/M | f QTY | g APPRAISED DOMESTIC VALUE |
|---|---|---|---|---|---|---|
| 7 | section of rope from PEPE'S bedroom closet | | GNV | [illegible] | 1 | [illegible] |
| 8 | section of cloth rope from PEPES closet (bedroom) | | GNV | [illegible] | 1 | [illegible] |
| 9 | blue flash card & Jet Flash 256 MB D33193 USB 2.0 | | GNV | [illegible] | 1 | [illegible] |
| 10 | 16 MB Lexar USB 8X CompactFlash "PEPE bedroom closet" | | GNV | [illegible] | 1 | [illegible] |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

00202

DEPARTMENT OF THE TREASURY
UNITED STATES CUSTOMS SERVICE

# CUSTODY RECEIPT FOR RETAINED OR SEIZED PROPERTY

CONTINUATION SHEET

CIS Handbook No. HB 5200-09

| 1. PORT | 2. SEIZURE NO. | 3. GENERAL ORDER NO. | 4. OTHER CONTROL NO. | 5. DATE RET./SEIZED |
|---|---|---|---|---|
| | From BAG # 1 | BKO7QLABK0008 | From line # 1 | 6/20/06 + 6/20/06 |

20. PROPERTY (By Line Item) Attach CF 58 if conveyance.

| a LINE ITEM NO. | b DESCRIPTION | c CONDITION | d TYPE OF CONTAINER | e U/M | f QTY | g APPRAISED DOMESTIC VALUE | h HELD BY PORT |
|---|---|---|---|---|---|---|---|
| 1A | Purple pants - outside hanging | Fair | Env | EA | 1 | | 6/2?/ |
| 1B | white sheet - master bedroom | — | Env | EA | 1 | 6/20/06 | 6/20/0 |
| 1C | Blue towel - master bedroom | — | Env | EA | 1 | 6/21/06 | 6/20/0 |
| 1D | blue stuffed rabbit AND tiger (stuffed) | Good | Box | EA | 2 Pcs | | 6/20/ |
| 1E | bedsheets - kids room - pillow cases | Good | Env | EA | 1 Env | | 6/20/ |
| 1F | bedsheets - pillow cases - kids room | Good | Env | EA | 1 Env | | 6/20/ |
| 1G | Pillow - kids room | Good | Env | EA | 1 Env | | 6/20/ |
| 1H | Pink Towel - kids room | Good | Env | EA | 1 Env | | 6/20/ |
| 1I | Bedsheet - kids room | Good | Env | EA | 1 Env | | 6/20/ |
| 1J | Towel - kids bathroom | Good | Env | EA | 1 Env | | 6/20/ |
| 1K | Scarf, purse, red ribbon (kids room) | Good | Env | EA | 1 Env | | 6/20/ |
| 1L | childs panties - pink - kids room | Good | Env | EA | 1 Env | | 6/20/ |
| 1M | Photos - western (workroom) | Good | Env | EA | 1 Env | | 6/20/ |
| 1N | Photos - Asian w/ some negatives (workroom) | Good | Env | EA | 1 Env | | 6/20/ |
| 1O | Photos in small Album (workroom) | Good | Env | EA | 1 Env | | 6/20/ |
| 1P | Green disc - workroom | Good | Env | EA | 1 Env | | 6/20/ |
| 1Q | Kids books (massage room + kids room) | Good | Env | EA | 1 Env | | 6/20/ |
| 1R | [illegible] blue (Above bed) master bedroom | Good | Env | EA | 1 Env | | 6/20/ |
| 1S | misc docs: social docs, Business cards, [illegible], [illegible], cards, VA, [illegible]... | Good | Env | EA | 1 Env | | 6/20/ |
| 1T | misc Docs: [illegible] VA info, med info, [illegible] receipts, [illegible] | Good | Env | EA | 1 Env | | 6/20/ |
| 1U | photos from computer room table - workroom | Good | Env | EA | 1 Env | | 6/20/ |
| 1V | Kids drawings / paintings (workroom) | Good | Env | EA | 1 Env | | 6/20/ |
| 1W | copy of [illegible] Passport (workroom) | Good | Env | EA | 1 Env | | 6/20/ |
| | | | | | | | |

00203

LIAT #2 INVENTORY BAG 2

DEPARTMENT OF THE TREASURY
UNITED STATES CUSTOMS SERVICE

# CUSTODY RECEIPT FOR RETAINED OR SEIZED PROPERTY

CONTINUATION SHEET

2325571 "BURBANK"

CIS Handbook No. HB 5200-09

| 1. PORT | 2. SEIZURE NO. | 3. GENERAL ORDER NO. | 4. OTHER CONTROL NO. | 5. DATE RET./SEIZED |
|---|---|---|---|---|
| | | BAG #2 | BK07PR06BK0008 | 6/20/06 |

20. PROPERTY (By Line Item) Attach CF 58 if conveyance.

| a LINE ITEM NO. | b DESCRIPTION | c CONDITION | d TYPE OF CONTAINER | e U/M | f QTY | g APPRAISED DOMESTIC VALUE | h HELD BY PORT |
|---|---|---|---|---|---|---|---|
| 2A | Socrates Foundation (store room) | good | Env | EA | 1 Env | — | 6/20 |
| 2B | medicines: morphine sulfate, valium, cephalexin, nitrostat, preparation H, mycostatine, Quinine, unknowns Commit, Codalgin forte, Lithium, Envion, | good | Env | EA | 1 Env | — | 6/20 |
| | | good | Env | EA | 1 Env | — | 6/20 |
| 2C | medicines, condom: Kamagra, Plavix (master bedroom) | good | Env | EA | 1 Env | — | 6/20 |
| 2D | business cards (workroom) | good | Env | EA | 1 Env | — | 6/20 |
| 2E | Bank (checkbook) daily planner (workroom) | good | Env | EA | 1 Env | | 6/20 |
| 2F | notebooks, books, address book (bedroom + workroom) | good | Env | EA | 1 Env | | 6/20 |
| 2G | negatives - workroom | good | Env | EA | 1 Env | | 6/20 |
| 2H | notebooks (kids) - throughout house | good | Env | EA | 1 Env | | 6/20 |
| 2I | mineral oil (house?), baby oil (kids room) | good | Env | EA | 1 Env | | 6/20 |
| 2J | medicines: baby oil, valium, Lithium, nicoderm, sertedol, decolfed, | goods | Env | EA | 1 Env | | 6/20 |
| | codalgin forte, Quinine, ..., misc. seized items from car - bedroom/workroom | good | Env | EA | 1 Env | | 6/20 |
| 2K | Photos (massage room) | good | Env | EA | 1 Env | | 6/20 |
| 2L | CD's (19), spysweeper (1), dx (1) workroom | good | Env | EA | 1 Env | | 6/20 |
| 2M | comic books, kids coloring notebooks, Easy drawing, phonics, Fun spell (massage room) | good | Env | EA | 1 Env | | 6/20 |
| 2N | photos (workroom, throughout house) | good | Env | EA | 7 Env | | 6/20 |
| 2"O" | misc docs, book, kids notebook, articles receipts, papers, bills, cards, brochure calendar | good | Env | EA | 1 Env | | 6/20 |

00204

2325511 Bulk Evid Cntr
From BAG #3 Line #3

DEPARTMENT OF THE TREASURY
UNITED STATES CUSTOMS SERVICE

# CUSTODY RECEIPT FOR RETAINED OR SEIZED PROPERTY

CONTINUATION SHEET

CIS Handbook No. HB 5200-09

| 1. PORT | 2. SEIZURE NO. | 3. GENERAL ORDER NO. | 4. OTHER CONTROL NO. | 5. DATE RET./SEIZED |
|---|---|---|---|---|
| | | BKEOGROBKE008 | BAG 3, Line 3 | 6/22/06 |

20. PROPERTY (By Line Item) Attach CF 58 if conveyance.

| a LINE ITEM NO. | b DESCRIPTION | c CONDITION | d TYPE OF CONTAINER | e U/M | f QTY | g APPRAISED DOMESTIC VALUE | H |
|---|---|---|---|---|---|---|---|
| 3A | Bedsheet (Pepes bedroom, bed) | Good | Env | Ea | 1 | | 6 |
| 3B | Curtain (girls bedroom) | Good | Env | Ea | 1 | | 6 |
| 3C | cloth rope, PEPE'S bedroom closet | Good | Env | Ea | 1 | | 6/ |
| 3D | (2) bowls (2) - upstairs landing | Good | Env | Ea | 1 | | 6/2 |
| 3E | pillow cases (pink) - kids room | Good | Env | Ea | 1 | | 6/ |
| 3F | green panties (unk location in house) | Good | Env | Ea | 1 | | 6/ |
| 3G | medicines: bedroom (PEPE'S) kamagra, codalgin forte, amoxicillin, wellbutrin, Tenatze plus, prep H, Rexop, Codalgin, Cemont, Loramide, Illex, valium, mucosolvan, Xanax, Neosporin, Silomat, Rozanin, unknown | Good | Env | Ea | 1 | | 6/ |
| 3H | VCD's (2) Pepe wedding - workroom | Good | Env | Ea | 1 | | 6/ |
| 3I | rope (pepe bedroom closet) | Good | Env | Ea | 1 | | 6/2 |
| 3J | kids top + handkerchief (unk in house) | Good | Env | Ea | 1 | | 6/2 |
| 3K | "ESO" + "Variations" book (Pepe bedroom) | Good | Env | Ea | 1 | | 6/ |
| 3L | blue photo album (workroom) | Good | Env | Ea | 1 | | 6/2 |
| 3M | misc doc's (workroom) | Good | Env | Ea | 1 | | 6/2 |
| 3N | misc doc's (workroom) | Good | Env | Ea | 1 | | 6/2 |
| 3O | misc docs (workroom) | Good | Env | Ea | 1 | | 6/2 |
| 3P | books (Thai sex + Sexual xx) bedroom desk PEPE | Good | Env | Ea | 1 | | 6/2 |

00205

# EXHIBIT E

The Kingdom of Cambodia
Nation Religion King
***********

Phnom Penh Municipal Court
-------------
Number 103 A.Y.Kh.

**Residential Search Warrant**

I, Nget Sarat, the District Attorney assigned to the Phnom Penh Municipal Court

-having seen the laws regarding the appointment and function of the Courthouse of the State of Cambodia, which was promulgated by Decree number 06 Kr., dated 08 February 1993.

-having seen the law regarding criminal legal procedure, which was promulgated by Decree number 21, dated 08 March 1993.

-having seen report number 449/06 R.M.K., dated 17 June 2006 [illegible] case of human sexual commerce in the residence at Number 83, Road 596, Subdistrict Boeng Kak II, District Tuol Kork, City of Phnom Penh, resided in by Michael Joseph, nationality American.

Do hereby judge that: To free the victims and suppress the above-mentioned acts, there should be a search made of the residence at Number 83, Road 596, Subdistrict Boeng Kak II, District Tuol Kork, City of Phnom Penh

It Is Therefore Decided

To search the residence at number 83, Road 596, Subdistrict Boeng Kak II, District Tuol Kork, City of Phnom Penh, with a resident named Michael Joseph. to search for evidence to support the above-mentioned criminal matter.

Phnom Penh, 17 June 2006
**District Attorney**
[stamp]
[signature]

# EXHIBIT F

**Kingdom of Cambodia**
**Nation Religion King**
----

**Ministry of the Interior**
**General Commissariat of the National Police**
**Central Department of the Justice Police**
**Department of Human Trafficking Prevention and Protection of Minors**

Phnom Penh 19 June 2006

Number 450/06

**Summary Report**

Regarding: A case of sexual trafficking of children and torture, threatening "life puppets", as well as rape.

**Submitted**
**to the District Attorney of the Phnom Penh Municipal Court**

**Objective:** to request a residential search warrant for house number 83 Road 596, Subdistrict Boeng Kak II, District Tuol Kork, which is the residence of Michael Joseph, male, American, to free the victim children who are being imprisoned and tortured by Michael, and search for some evidence relating to the crimes.

Referencing: The report of the NGO International Justice Mission *(IJM)* dated 16-06-2006.
-the report of the representative of the American Embassy 6-16 June 2006.
-information from the victim child named [redacted] dated 18 June 2006. IT
-the responses of the suspect named Nguyen Thi Ling, aka Tam.
-Summary Report number 133/006.
-Detainer number 831 A.Y.K of the Phnom Penh Municipal Court.

Facts: On 16 June 2006, the department received a report from the NGO International Justice Mission (IJM) and the American embassy about the activities of an American buying victim children and imprisoning them, torturing them, and forcefully raping them.

Investigation: After receiving the report of the NGO International Justice Mission (IJM), in cooperation with the American embassy, and information from the victim child named [redacted] IT [redacted]; according to the confession of the suspect named Nguyen Thi Ling, aka Tam; according to the report of the Specialist Bureau of the Phnom Penh Police Commissariat, and the Detainer from the Phnom Penh Municipal Court, our department investigated and achieved the following results:

IT

-The victim child named [redacted], age 12, was tricked by the female named Nguyen Thi Ling, age 49, into being turned over to her faction. Another person named Sang and her husband, on day (forgotten), May, 2006, and the female named Sang and her husband promised to take her to perform lawful work as a masseuse, but instead Sang and her husband took her to be sold to an American named Michael Kostik [sic], male,, age approximately 40 years old, who resides at number 83 Road 596, Subdistrict Boeng Kak II, District Tuol Kork. After purchasing them for sex, about four days later the suspect named Michael Kostik tortured and tied the hands and feet of the victim child named [redacted] and also threatened her life. Then he raped her [illegible]. The victim child had sustained injuries to her vagina and was bleeding profusely. Afterward, Michael telephoned to come and bring the victim child back home, and Sang gave $100 (one hundred dollars) to her mother, then her mother took her back home. Aside from the above victim child, Michael forced 4 other victim children, including Khmer and Vietnamese children, ages from 8 to 13 years old, keeping them in his house and tying their hands and feet and torturing them, and forcing them to suck on his penis, then raping them in an inhuman fashion. Separately, Nguyen Thi Ling, aka Tam, was detained by the authorities of the Phnom Penh Bureau of Human Trafficking Prevention and Protection of Minorities on 28 May 2006. As for Sang and her husband, they got away because they did not have criminal records.

IT

**Balance and Conclusions:** Relying on the report of the NGO International Justice Mission (IJM), in cooperation with the American embassy; on information from the victim children; on the responses of the suspects; on the report of the Phnom Penh Police Commissariat and the Detainer of the Municipal Court

- Sang and her husband did indeed trick a victim child into being trafficking sexually sexually [sic].

-Michael Joseph did indeed purchase the victim children and tortured and raped them.

Request: I request that the District Attorney issue a residential search warrant on the above residence in order to free the victims as well as find evidence connected with the above crimes.

-I request the detainment of Michael Joseph and Sang and her husband to be brought in for questioning to build a case for prosecution according to the law.

**Department Chief**
[signature]
Brigadier General Un Sokunthea

Permission to detain the suspects
[illegible]
[signature] 17/6
**Nget Sarat**
**District Attorney**

# EXHIBIT G



*Embassy of the United States of America*
*Phnom Penh, Cambodia*
June 20, 2006

His Excellency Hok Lundy
Police Commissioner General
Cambodian National Police General Commissariat
Ministry of Interior
Phnom Penh,
Kingdom of Cambodia

Your Excellency:

It was good to see you last Friday and I personally want to thank you for the quick action of the Cambodian National Police (CNP) in arresting Michael Joseph Pepe. It is comforting to know that a dangerous predator like Mr. Pepe is off the Cambodian streets.

As you are aware, over the weekend, CNP officers arrested Mr. Pepe, date of birth [redacted], 1953, for crimes against children, to wit, Debauchery. U. S. Embassy representatives from the Department of Homeland Security (DHS) and Diplomatic Security Service (DSS) assisted the CNP during the investigation.

Mr. Pepe is currently being detained by the CNP in Phnom Penh. We respectfully request that agents from DHS and DSS be authorized access to interview Mr. Pepe on June 22, 2006. Additionally, agents request that they have access to the evidence, specifically, Mr. Pepe's computer, hard drive, memory stick, and USB thumb drive so that they may be sent to the United States for computer forensic testing. Additionally, we would appreciate access to the biological evidence so that it may be sent to the United States for additional testing.

If you have any questions concerning these requests, please contact me at 023-728-207 or my Senior Investigator, Yarong Van at 012-810-466. I continue to look forward to working together on matters of mutual interest.

Sincerely,

Andrew G. Simpson
Acting Regional Security Officer
Attaché

# EXHIBIT H

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE 1<br>CASE NUMBER SX07QR06BK0008<br>REPORT NUMBER: 001 |
|---|---|

DETAILS OF INVESTIGATION

On June 30, 2006, ICE Attache Singapore (ICE/SX) received a collateral request from Deputy Attache Gary Philips, ICE Attache Bangkok, Thailand (ICE/BK), to conduct forensic analysis of a computer hard disk drive, a USB JetFlash thumb drive, and a digital camera media card that were seized from Michael PEPE in June 2006. ICE Computer Forensic Agent (CFA) David Galante was requested to find evidential material specifically relating to the alleged sexual abuse of minors. In June 2006, the Cambodian National Police in Phnom Penh, Cambodia arrested PEPE for his alleged involvement in the sexual abuse of at least five females, ranging from 10-18 years in age.

On June 30, 2006, CFA Galante made a bit image copy of the Maxtor hard disk drive using EnCase, a licensed computer forensic software, version 5.05e. Utilizing EnCase software and a SureFly (Read-Only) hardware drive blocker (prevents any writing or modification to the target hard disk drive); CFA Galante created an exact duplicate image of PEPE's Maxtor hard disk drive to an ICE forensic hard drive disk (forensically wiped and fully formatted) and saved the image in a proprietary format. After the completion of the bit image copy, PEPE's Maxtor hard disk drive was stored in a secure location.

On September 19, 2006, due to ICE forensic computer failure, CFA Galante made a second bit image copy of the aforementioned seized items utilizing the same forensic process indicated above. Computer forensic analysis by CFA Galante revealed the following:

1) Maxtor hard disk drive:

HDD capacity: 40GB
HDD identification numbers: E-H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, 2F040J0310634, F64RE5E.

| | |
|---|---|
| Total Size: | 40,020,664,320 bytes (37.3GB) |
| File Integrity: | Completely Verified, 0 Errors |
| Acquisition Hash: | 663e93afb296757ded3e2e8433d52122 |
| Verify Hash: | 663e93afb296757ded3e2e8433d52122 |
| System Version: | Windows XP |

** Directory "C" Partition:

A) C/Documents and Settings/Michael/Application Data/Ahead/PSD Image Database/

Cache. Under the "Cache" directory, CFA Galante identified four subdirectories: Albums, Groups, Thumbnails, Trash_Images.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>REPORT OF INVESTIGATION<br>CONTINUATION | PAGE 2<br>CASE NUMBER SX07QR06BK0008<br>REPORT NUMBER: 001 |
|---|---|

** Writer Note: PSD (Photoshop Deluxe) Image Database is a software program that allows personal computer user to create and manage different types of picture and multimedia catalogs. The PSD Image Database software was found installed on PEPE's hard disk drive.

Under the "Cache" directory, subdirectories: Albums, Groups, Thumbnails, CFA Galante discovered a listing of folders containing images, explicit child pornography images and images of females under the age of 18 engaged in sexually explicit conduct (See note #1 below). The images were found to be home-made (photographs taken by using a digital camera).

CFA Galante conducted further review of subdirectory "Albums" and discovered a listing of 81 folders. Some examples of the images located in the 81 folders are described as follows:

- Folder "23_Little 1" contained images of an naked adult male lying on his back on a bed and a naked female under the age of 18 (approximately 8 to 11 years old) sitting on top of him engaged in sexual explicit conduct.

- Folders "26_Ni 102905" and "27_Ni 2" showed a naked female under the age of 18 (approximately 8 to 11 years old) tied to a bed and also images of her hands tied to her legs with her genitals exposed. Furthermore, folders "26_Ni 102905" and "27_Ni 2" displayed images of the same female engaged in sexual explicit conduct with an adult male.

- Folder "_32 Nap & Kia 2" displayed Michael PEPE naked in a room (appears to be a bedroom) with a naked female under the age of 18 with her arms around PEPE's waist with both of their genitals exposed. Additionally, folder "_32 Nap & Kia 2" displayed the same female described above and another naked female under the age of 18, lying on a bed with their genitals exposed.

B) C/Program Files/Agent: In the "Agent" subdirectory, images of explicit child pornography, which appear to be commercially produced, were found.

C) C/RECYLER: In the RECYLER directory, explicit child pornography images and images of females under the age of 18 engaged in sexually explicit conduct were found. (See note #1 below).

2) Transcend USB JetFlash thumb drive:

| | |
|---|---|
| Total Size: | 261,750,784 bytes (249.6MB) |
| File Integrity: | Completely Verified, 0 Errors |
| Acquisition Hash: | 94d0696242c4eddcaba97c90ca60def0 |
| Verify Hash: | 94d0696242c4eddcaba97c90ca60def0 |
| System Version: | Windows XP |

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 3 |
|---|---|
| | CASE NUMBER SX07QR06BK0008 |
| R E P O R T O F I N V E S T I G A T I O N C O N T I N U A T I O N | REPORT NUMBER: 001 |

Images of explicit child pornography were found. The images were found to be home- made (photographs taken by using a digital camera).

3) Lexar digital camera Compact Flash media card:

Total Size: 15,990,784 bytes (15.3MB)
File Integrity: Completely Verified, 0 Errors
Acquisition Hash: 2648514580eef99767864ecbb36c887c
Verify Hash: 2648514580eef99767864ecbb36c887c
System Version: Windows XP

Contained no derogatory information.

CFA Galante conducted a search of the unallocated space on the Maxtor hard disk drive and on the USB JetFlash thumb drive which resulted in the finding of explicit child pornography images and images of females under the age of 18 engaged in sexual explicit conduct. (See Note #2)

Investigations continue.

***

Note #1: Title 18, United States Code, Section 2256 defines "sexually explicit conduct" as "actual or simulated sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or lascivious exhibition of the genitals or pubic area of any person."

Note #2: When computer files are erased or deleted, the content of the file is not actually erased. The data from the 'erased file' continues to exist in an area commonly referred to as "unallocated space." As a result, the data remains behind for discovery through the use of data recovery and/or computer forensics software utilities.

O F F I C I A L U S E O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

ıme: 40GB - M.J. PEPE
Ext: PEPE
escription: Volume, Sector 0-40960015, 19.5GB
e Acquired: 06/30/06 03:02:13PM
gical Size: 8,192
ıysical Size: 8,192
arting Extent: 040GB - M.J. PEPE-C4292166
e Extents: 1
eferences: 0
ıysical Location: 17,580,711,936
ıysical Sector: 34,337,328
idence File: 40GB - M.J. PEPE
e Identifier: 0
il Path: Michael Joseph PEPE\40GB - M.J. PEPE
ginal Path: 40GB - M.J. PEPE

**lume**

e System: NTFS
ctors per cluster: 8
al Sectors: 40,960,016
al Clusters: 5,120,002
e Clusters: 2,063,555
ume Name: SYSTEM
er Information: NTFS 3.1 Chkdsk 0

Drive Type: Removable
Bytes per sector: 512
Total Capacity: 20,971,528,192 bytes (19.5GB)
Unallocated: 8,452,321,280 bytes (7.9GB)
Allocated: 12,519,206,912 bytes (11.7GB)
Volume Offset: 0

**ice**

ne: 40GB - M.J. PEPE
ual Date: 06/30/06 03:02:13PM
get Date: 06/30/06 03:02:38PM
Path: I:\Evidence\Michael Joseph PEPE\Evidence\40GB - M.J. PEPE.E01
e Number: SX07QR06BK0008
ence Number: 006
niner Name: David Galante
s: Seized from Michael J. PEPE - Bangkok, Thailand
e Type: Removable
ntegrity: Completely Verified, 0 Errors
uisition Hash: 313f7e5c5e8ccbe9233fcf259f036cd0
y Hash: 313f7e5c5e8ccbe9233fcf259f036cd0
ase Version: 3.22g
em Version: Windows 2000
Stripe Size: 0
Granularity: 0
Errors: 1
Errors: 0
pression: None
Errors

| art Sector | Sectors |
| --- | --- |
| 05,728 | 34,654,288 |

0021(

Total Size:        20,971,528,192 bytes (19.5GB)
    Sectors:       40,960,016

# EXHIBIT I

**PROVISIONS DATED SEPTEMBER 10, 1992 RELATING TO THE JUDICIARY**

**AND CRIMINAL LAW AND PROCEDURE APPLICABLE**

**IN CAMBODIA DURING THE TRANSITIONAL PERIOD**

**The Supreme National Council (Hereinafter Referred To As "The Snc"),**

**Acting in accordance with** the powers granted to it as the unique legitimate body and source of authority under Article 3 of the ***Agreement on A Comprehensive Political Settlement of the Cambodian Conflict***, of 23 October 1991, (hereinafter referred to as the Agreement"),

**Recalling** Article 6 of the Agreement, according to which the SNC has delegated to the United Nations all powers necessary to ensure the implementation of the Agreement,

**Further recalling** that the United Nations Security Council, by its resolution 745 (1992), has established the United Nations Transitional Authority in Cambodia (hereinafter referred to as "UNTAC") in accordance with Article 2 of the Agreement, to carry out the mandate set forth in Annex 1 to the Agreement,

**Considering** that UNTAC has been given responsibility, pursuant to Articles 6 and 16 of the Agreement and sections B and E of Annex 1, for direct control or supervision in the areas of maintenance of law and order, protection of human rights, law enforcement, and judicial processes,

**Considering further** that all parties to the Agreement explicitly recognized in Article 15 that all persons in Cambodia, and all Cambodian refugees and displaced persons shall enjoy the rights and freedoms embodied in the Universal Declaration on Human Rights and other relevant international human rights instruments,

**Considering** also that the SNC acceded to Covenant on Civil and Political Rights and the International Covenant on Economic, Social and Cultural Rights on 20 April 1992 and that these instruments entered into force with respect to Cambodia on 26 August 1992,

**Concerned** that the structures, laws and judicial institutions do not fully comply with the requirements of the Paris Agreement and sometimes totally or partially lacking in certain areas, and in any case are inadequate to ensure public order and human rights throughout most of the territory,

**Recognizing** that UNTAC has the responsibility to assist in establishing such structures, laws and judicial institutions where they are absent and to help improve them where they already exist in order to bring them up to the requirements of the Agreement,

**Convinced** of the urgent need to indicate clearly to all the Cambodian parties the rules of law which must be applied throughout Cambodia and the judicial procedures which must be put in place in order to ensure their effective application during the transitional period,

**Further convinced** that the application of these rules and procedures is necessary to foster a politically neutral climate and to prepare for free and fair elections,

**Therefore adopts** the following provisions relating to the judiciary, and criminal law and procedure applicable in Cambodia during the transitional period, and calls upon all Cambodian parties to apply them in good faith until such time as the Legislative Assembly resulting from the elections amends them or adopts new legislation in this area.

## SECTION I: JUDICIAL SYSTEM

### Article 1: independence of the judiciary

1. The independence of the judiciary must be ensured in accordance with The Basic Principles on the Independence of the Judiciary, adopted by the United Nations. Judges must decide in complete impartiality, on the basis of facts which are

presented to them, and in accordance with law, refusing any pressure, threat or intimidation, direct or indirect, from any of the parties to a proceeding or any other person.

2. The judiciary must be independent of the executive and legislative authorities and of any political party. Persons selected for judicial functions must be honest and competent.

3. The principle of the independence of the judiciary entitles and requires judges to ensure that judicial proceedings are conducted fairly and that the rights of the parties are respected. They must have decent and sufficient material conditions for the exercise of their functions. Judges must receive suitable training and be remunerated adequately to ensure their impartiality and independence.

**Article 2: judicial functions**

Judges and prosecutors both are magistrates. Only judges may adjudicate. Prosecutors are responsible for penal actions, which only they may initiate. They file indictments in court and in all other fora provided for in this text. The Attorney General pleads before the Supreme Court in the interest of the law, reviews the legality of indictments by provincial prosecutors, and organizes and supervises their work.

**Article 3: courts**

1. The Cambodian parties to the Agreement (hereinafter referred to as "the parties") agree to set up, with the collaboration of UNTAC, at least one trial court in each zone or province where such courts do not now function. Judges shall be appointed, promoted and dismissed by the existing administrative structure, under the supervision of UNTAC.

2. Trial courts are composed of a judge and a prosecutor. These courts have general jurisdiction over the application of these rules, as well as laws and other norms in force in their respective jurisdictions.

3. Alternate judges may be appointed in the same way to replace judges who disqualify themselves due to a conflict of interest or incapacity.

**Article 4: appellate courts**

1. The parties agree to set up, with the collaboration of UNTAC, at least one appellate court in any zone or territory under their control where they have not already established one.

2. Appellate Courts are composed of three judges and one prosecutor, appointed, promoted and dismissed by the existing administrative structure, under the supervision of UNTAC.

3. Alternate judges may be appointed in the same way to replace judges who disqualify themselves due to a conflict of interest or incapacity.

4. Any intervening party, prosecutor or the accused may appeal decisions of trial courts within a period of two months from the day judgment is pronounced in court if the accused is present; an additional fifteen days are added to this period if the judgment was rendered in absentia.

5. Appellate courts judge both law and fact.

**Article 5: supreme court**

In accordance with the wishes of the Party "State of Cambodia's, the current supreme court in Phnom Penh shall be improved so that it may comply with the requirements of Article 1 above and perform the following functions:

a) it exercises judicial review of the law;

b) it reviews appellate judgments on petition by the Attorney General, the convicted party, the intervening party or by their counsel within a period of two months from the day judgment is pronounced in the appellate court if the accused

is present for sentencing; an additional fifteen days are added to this period if the judgment was rendered in absentia.

c) it may send cases back to an appellate court and, if that court does not conform to its judgment, the Attorney General, the condemned party, the intervening party, or their counsel may resubmit the case to the Supreme Court within two months of the judgment under the same conditions mentioned under sub-paragraph b) above. The Supreme Court may then render a final decision on both the law and the facts.

**Article 6: police**

1. The police shall observe the Code of Conduct for Law Enforcement Officials and, to the extent possible, Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, adopted by the United Nations.

2. The parties whose law enforcement officials are not able to comply with the requirements of this text agree to collaborate with UNTAC in setting up and training an appropriate police force.

**Article 7: attorneys and counsel**

1. Attorneys are authorized to establish a Bar Association, which will take the form of a non-profit association with disciplinary and regulatory authority over its members. The Bar shall neither receive nor accept any instructions from any political party, nor from any legislative authority or executive authority acting for any of the Cambodian parties to the Agreement. During the transitional period, any person holding a degree equivalent at least to the university law degree or having five years of legal or judicial experience at a sufficiently high level of responsibility may be admitted to practice law.

2. Due to the small number of attorneys in Cambodia, during the transition period, any Cambodian holding a diploma of completion of secondary school education may represent an accused person in court, provided he or she is not an executive-level official or an elected official of the existing administrative structures or of a recognized political party. Furthermore, accused persons may ask a member of their family to represent them, regardless of level of education.

3. The representative of an accused party shall have the same rights in judicial proceedings as an attorney and be able to have access to any document, file motions or plead. In the present context the term counsel refers without distinction either to an attorney or to any other person representing an accused.

4. Foreign attorneys shall be allowed to appear in Cambodian courts, provided they furnish proof that they are members of a Bar in their own country or are officially authorized to practice in their country. The existing administrative structures agree to facilitate the granting of visas to attorneys coming to practice their profession in Cambodia.

**Article 8: the correctional system**

1. The aim of the correctional system is social rehabilitation. Treatment of all prisoners must be in conformity with the Standard Minimum Rules for the Treatment of Prisoners, and Basic Principles for the Treatment of Prisoners, adopted by the United Nations.

2. Any authority that arrests or detains suspects or detains anyone in pre-trial detention or following conviction, must maintain a prison registry signed every month by the prosecutor and one of the judges in the province or zone indicating, for purposes of verification, the name, age, address, date and reason of arrest, the date of arraignment, and, for convicted persons, the date of the sentencing and the prescribed punishment.

**Article 9: visits to places of detention**

1. Prosecutors and judges may at any time enter prisons to visit prisoners.

2. Authorized agents of UNTAC human rights, civil administration and civil police components have the same right. In this connection, each Cambodian party to the Agreement must compile a list of all its detention centers at the latest upon entry into force of the present text, and submit the list by this date to the central services of the UNTAC civil administration component.

**SECTION II: CRIMINAL PROCEDURE**

**Article 10: legal assistance**

1. The right to assistance of an attorney or counsel is assured for any person accused of a misdemeanor or crime.

2. No one may be detained on Cambodian territory more than 48 hours without access to assistance of counsel, an attorney, or another representative authorized by the present text, no matter what the alleged offence may be.

**Article 11: military tribunals**

Military tribunals have jurisdiction only over military offenses. Military offenses are those involving military personnel, whether enlisted or conscripted, and which concern discipline within the armed forces or harm to military property. All ordinary offenses committed by military personnel shall be tried in ordinary courts.

**Article 12: treatment of detainees**

1. No detainee shall be subjected to cruel, inhuman or degrading treatment or punishment, nor be beaten or tortured. Each detainee must have access to appropriate medical care. Prisoners must not be shackled or kept in isolation, whether they are in pre-trial detention or already sentenced. In no case shall the family of a detainee or prisoner be harassed as a result of the prisoner's behavior.

2. Arrest and detention must take place in accordance with the Standard Minimum Rules for the Treatment of Detainees, as well as the Body of Principles for the Protection of any Person Under Any Form of Detention or Imprisonment, adopted by the United Nations.

**Article 13: arrest and detention**

1. No one may be detained more than 48 hours without being brought before a judge, following charges files by a prosecutor. In the event that it is impossible to abide by this time limit due to prevailing transportation conditions in the region, the time may be extended to the extent strictly necessary to bring the detainee before a judge by the most rapid means available.

2. The public prosecutor petitions the judge to indict and possibly to detain a suspect, based on the police file, by preparing an introductory indictment making reference to specific facts and legally characterizing the infraction according to the present text.

3. The judge may thus decide, by a reasoned decision:

- to charge the suspect, with or without incarceration;
- to release the suspect because the evidence is insufficient;
- to continue the investigation without disclosing the name of the suspect.

4. Within the same time limit of 48 hours after arrest, extended if appropriate for the additional period mentioned in the sub-paragraph (1) above to allow for transportation, counsel must receive a copy of the file of accusation against the suspect.

**Article 14: pre-trial detention**

1. Only the judge, if so petitioned by the prosecutor, may decide to keep an accused in prison, and only if the accused is likely to escape and has not demonstrated an interest in remaining available to appear, such as a job, a family, a home, or if there is reason to believe that the accused will influence witnesses or the conduct of the investigation.

2. The accused has the right to petition the judge for release, either directly or through counsel. The judge must respond within five days by a reasoned decision.

3. The accused, the intervening party or their counsel or the prosecutor may appeal the decision of the judge within five days. The Appellate Court must judge within fifteen days petitions appealing decisions on detention.

4. The duration of a pre-trial detention must in no case exceed four months. However, upon the reasoned decision of a judge, this period may be extended to six months if justified by the requirements of the investigation. Minors less than 13 years of age may not be placed in pre-trial detention; minors 13 to 18 years of age may not be placed in pre-trial detention for more than one month. The length of such detention may be doubled if the minor is charged with a crime.

**Article 15: administrative detention**

No one in Cambodia may be detained by any administrative police nor for offenses not set out in this text or other applicable penal law or text.

**Article 16: release of detainees**

All persons detained or held in a center of detention not appearing on the list mentioned in Article 9 of the present text shall be considered as illegally detained and shall be immediately released, upon petition by a prosecutor, by any court, by counsel of the detained, or by any authorized representative of UNTAC civil administration, human rights or civil police components. Any person detained or held within a declared center of detention but not listed on the prison registry shall similarly be released.

**Article 17: access to the file**

1. If a judge decides that additional investigation is necessary, counsel of the accused shall, throughout the investigation, be immediately advised of new evidence presented against his or her client.

2. Counsel shall have access to the file of the person charged upon simple written request at any time during the proceeding, and shall obtain from the judge any results of investigation, expert testimony or hearings which he or she considers useful in the defense of his or her client.

**Article 18: arrest without a warrant**

Police may arrest anyone found in the act of committing a cognizable offense, in particular:

- if the suspect is observed committing a crime or misdemeanor, or if pursued by a public outcry;
- if the suspect is identified at the scene of a crime or misdemeanor by witnesses or the victim;
- if the suspect attempts to flee the scene of a crime or misdemeanor.

**Article 19: arrest based on existence of substantially incriminating evidence**

1. In all other cases, the investigating police may not arrest a suspect without substantially incriminating evidence which is exact and consistent and indicates that the suspect participated in the commission of a crime or misdemeanor.

2. A suspect who has fled may be arrested pursuant to an arrest warrant issued by a public prosecutor or judge and executed by police conducting the investigation.

3. The arrest warrant must stipulate facts and grounds for the arrest of the suspect.

4. The treatment of an arrested person shall be in accordance with the provisions of Article 13 of the present text.

5. Furthermore, the police may, if so instructed by a prosecutor or judge, subpoena any person useful to the investigation to appear before the police, judge or prosecutor if that person has refused to heed other requests to appear voluntarily. After appearance, a person so summoned shall be immediately released unless there are specific, consistent and serious charges against him or her, in which case the procedures outlined in Article 13 of the present text shall apply.

**Article 20: searches**

1. Searches must be conducted in the presence of the suspect and two witnesses, preferably neighbors or owners of the

building.

2. Except in cases of cognizable offenses, searches must be authorized by one of the judges of the competent court or by the prosecutor. They may take place only between the hours of 6:00 a.m. and 6:00 p.m. They should take place in the presence of the suspect if possible, and two witnesses from among the suspect's family members. Proof obtained in violation of the present Article is not admissible in court.

**Article 21: time limits**

1. Any person, whether or not in detention, must be judged no later than six months after arrest.

2. Counsel for the accused must be informed at least fifteen days prior to the date of the trial of his or her client.

**Article 22: release for procedural error**

1. If any of the procedures set out in Articles 10-21 is not complied with, the accused must be immediately released. This immediate release may be obtained by counsel for the accused or any authorized representative of UNTAC civil administration, human rights or civil police components. As of the date that the present text takes effect, all detained or imprisoned persons must have a file prepared in conformity with the present text and immediately available for review by judges, prosecutor or authorized agents of UNTAC. If no such file exists, these persons must be released on petition by their counsel, by any authorized representative of UNTAC civil administration, human rights or civil police components, by the judge or by the prosecutor.

2. Violations by public officials of the individual rights enumerated in Articles 10-21 of the present text will incur sanctions provided in Article 57.

## TITLE III: TRIAL

**Article 23: in camera hearings**

All proceedings must be public, unless the victim or his or her representatives request a closed hearing and the judges concur.

**Article 24: evidence**

1. Witnesses mentioned in the police file, including police officers, must be heard in court. Witnesses may be examined by the intervening party, the accused or their respective counsel, or by the prosecutor.

2. All evidence, including police reports, is rebuttable and may be challenged during the trial.

3. Confessions by accused persons are never grounds for conviction unless corroborated by other evidence. A confession obtained under duress, of whatever form, shall be considered null and void. Nullification of a confession must be requested from the judge by counsel for the accused prior to the sentencing hearing.

4. The defense may call its own witnesses, and present its own evidence to the court.

5. All witnesses, whether for the prosecution or for the defense, may be summoned to appear before the court by subpoena and are subject to a fine of 100,000 to 1,000,000 Riels for failure to appear.

**Article 25: presumption of innocence**

All suspects, indicted and accused persons benefit from the most complete presumption of innocence.

**Article 26: judgment**

1. All criminal judgments are rendered "In the name of the Cambodian Nation." They must indicate the acts held against the

accused and the witnesses or evidence on which the judge relies, as well as the explicit grounds of the conviction.

2. The judgment, containing the explicit grounds for the conviction and the order, must be read aloud at the trial. A copy of the judgment shall be given to the parties in the trial at their request.

**Article 27: intervention**

1. Victims or their beneficiaries may directly or through counsel bring a civil action in a criminal case during the preliminary investigation, or during the sentencing hearing in order to claim damages and costs against the offender, co-offender or the accomplices to the offense. Counsel for the intervening party shall have access to the file on the same terms as those of counsel for the accused.

2. Parties guilty of the offense and their accomplices are jointly liable for reparations or compensation, under conditions outlined in the Declaration of Basic Principles of Justice for Victims of Crime and Abuse of Power, adopted by the United Nations.

**Article 28: offenses based on opinion or belief**

1. No one may be prosecuted for political opinion, religious convictions, or membership in a race or ethnic group.

2. Penal texts currently in force anywhere in Cambodia may no longer refer to offenses based on opinion or ideology, and are accordingly abrogated.

**Article 29: review of certain trials**

Any convicted person may directly or through the counsel or an attorney, request a review of their trial to determine whether they have been convicted for their ideas, opinions, statements, or their membership or non-membership in a racial, ethnic, religious, political or social group.

**Article 30: statute of limitations**

The Statute of Limitations is three years for misdemeanors and ten years for crimes. The Statute of Limitations ceases to run as soon as any legal process has been initiated.

**TITLE IV: CRIMES**

**Article 31: murder**

1. Anyone who kills or attempts to kill another person after premeditating the crime, or by preparing an ambush, or who kills or attempts to kill another person in the course of theft or rape, is guilty of the murder, and shall be liable to a punishment of imprisonment for a term of ten to twenty years.

2. Premeditation is the process of conceiving and preparing an attack on another person before the actual execution of the attack. An ambush consists of lying in wait with the intention of committing an act of violence against another person.

**Article 32: voluntary manslaughter**

Anyone who voluntarily kills or attempts to kill another person without any of the aggravating circumstances mentioned in Article 31, whether or not a weapon is used, is guilty of the crime of voluntary manslaughter, and shall be liable to imprisonment for a term of eight to fifteen years.

**Article 33: rape**

1. Anyone who rapes or attempts to rape another person of either sex is guilty of rape and shall be liable to imprisonment for a term of five to ten years.

2. Rape is any sexual act involving penetration against a nonconsenting person. If rape is accompanied by fraud, violence or threats, or if it is committed by anyone in a position of authority over the victim, the punishment shall be a term of imprisonment of ten to fifteen years.

**Article 34: robbery**

1. Anyone who steals or attempts to steal from another person under the following aggravating circumstances is guilty of the crime of robbery and shall be liable to a term of imprisonment of three to ten years:

- if the theft is accompanied by force, whether of not a weapon is used or the victim sustains injury;
- or if the theft is committed by several persons or by breaking and entering.

2. Theft is the fraudulent taking of another person's property with the intent of appropriating it.

**Article 35: illegal confinement**

Anyone who, without orders from the judicial authority, arrests, detains or illegally confines anyone shall be liable to imprisonment:

- for ten years, if the illegal confinement lasts longer than one month;
- from three to five years, if the confinement lasts less than one month.

**Article 36: organized crime**

Any individual who has taken part in a formal or informal association set up for the purpose of planning one or more crimes or misdemeanors against persons or property, if specific acts of preparation of these offenses have taken place, shall be liable to a term of imprisonment of from three to fifteen years.

**Article 37: embezzlement by public officials**

1. Any elected official, civil servant, military personnel or official agent of any of the four Cambodian parties to the Paris Agreement, or any political official who, acting in an official capacity or while performing official duties, with a view to owning or using, misappropriates, sells, rents, embezzles for personal profit or for that of a third party, property, services, money, personnel, any advantage, document, authorization or any function belonging to any public authority, is guilty of the crime of embezzlement of public property and shall be liable to imprisonment for a term of three to ten years.

2. After serving the sentence, the person convicted of this crime may be removed from elective office and may also be prohibited for a period of two years from standing for election or from holding any position in the public administration.

3. The penalty for this crime shall also include a fine of double the sum of money or value of the property embezzled.

**Article 38: extortion**

1. Without prejudice to possible disciplinary action, any civil servant, military personnel or official agent of any of the four Cambodian parties to the Paris Agreement, or any political official who, acting in an official capacity or while performing official duties, solicits or attempts to solicit or who receives or attempts to receive property, a service, money, staff, a professional position, a document, an authorization or any benefit in exchange for any one of these same elements is guilty of the crime of extortion and shall be subject to a punishment of three to seven years in prison.

2. After serving the sentence, the person convicted of this crime may be removed from elective office and may also be prohibited for a period of two years from standing for election or from holding any position in the public administration.

3. The penalty for this crime shall also include a fine of double the sum of money or value of the property extorted.

**Article 39: illicit traffic in narcotic drugs**

1. Except for derogations for reasons of public health granted by public health authorities of each of the existing administrative structures, the production, transport, importation, exportation, possession, offering, transfer, acquisition and use of plants, narcotics and psychotropic substances, the list of which is appears in the United Nations Convention against *Illicit Traffic in Narcotic Drugs and Psychotropic Substances of 20 December 1988, the Protocol to the Single Convention of* 27 March 1972, Convention on Psychotropic Substances of 21 February 1971 and the Single Convention on Narcotic Drugs of 30 March 1961, are prohibited throughout Cambodian territory.

2. Any one who knowingly violates the present Article shall be liable to a punishment of five to fifteen years in prison. Furthermore, all illicit substances will be seized and the courts shall order their destruction after they have been analyzed.

## TITLE V: MISDEMEANORS

**Article 40: involuntary manslaughter**

Any person who through carelessness, negligence or other culpable behavior involuntarily kills another person is guilty of the misdemeanor of involuntary mans-laughter and shall be liable to a term of imprisonment of one to three years.

**Article 41: assault and battery**

1. Anyone who voluntarily strikes another resulting in injury leading to permanent disability or temporary disability lasting more than six months, is guilty of battery and shall be liable to a punishment of one to five years in prison.

2. If the disability lasts less than six months, the offence shall be punished by a term of imprisonment of six months to two years.

3. If there is no disability, the punishment shall be a term of imprisonment of two months to one year.

4. If any weapon is used to strike the blows, the period of imprisonment shall be doubled.

**Article 42: indecent assault**

1. Any person who sexually offends another, unconsenting, person of either sex by touching, caressing or any other sexual act not involving penetration, is guilty of the misdemeanor of indecent assault and shall be liable to a term of imprisonment of one to three years.

2. If the indecent assault is accompanied by fraud, violence or threat, or if it is committed by any person with authority over the victim, or if the victim is under 16 years of age, the duration of these sentences shall be doubled.

3. Any person who procures, entices or leads away, for purposes of prostitution, or exploits the prostitution of a minor, even with the consent of that minor, shall be liable to a term of imprisonment of two to six years.

**Article 43: theft**

Any person who steals or attempts to steal the property of any natural or artificial person, in the absence of any of the aggravating circumstances set forth in Article 34, is guilty of the misdemeanor of theft, and shall be liable to a term of prison of six months to five years.

**Article 44: misdemeanors concerning cultural property**

1. Any person who steals or attempts to steal cultural property belonging to the State or to natural or artificial persons, which is part of the Cambodian national heritage, shall be liable to a term of imprisonment of six months to ten years. Any person who illicitly exports or attempts to export or transfers or attempts to transfer ownership of cultural property shall be liable to the same punishment.

2. For the purposes of the present text, cultural property shall be as defined in the UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property of 14 November 1970,

ratified by Cambodia on 26 September 1972. Any element of cultural property that has not been the subject of an authorization to transfer ownership or to export, issued by the Supreme National Counsel or by the body designated for this purpose by the SNC, shall be deemed part of the Cambodian national heritage.

3. The voluntary damaging of cultural property belonging to the Cambodian national heritage, through unauthorized or clandestine excavations, vandalism or any other means, shall incur the same punishment.

**Article 45: fraud**

Any person who through deceit, use of a false name or impersonation persuades another person of an illusory authority, or by making another person fear or anticipate an event of any sort thereby receives or attempts to receive all or part of a tangible or intangible estate of that or any other person, is guilty of the misdemeanor of fraud and shall be liable to a term of imprisonment of one to five years.

**Article 46: embezzlement**

Any person who takes or wastes, against the interest of the owner, possessor or holder, any goods, money, merchandise, or document which contains or itself represents an obligation or release, which was entrusted to the person for rental, deposit, commission, loan or modification (paid or unpaid), with the responsibility to return it or to offer it back or to put it to an agreed upon use, is guilty of embezzlement and shall be liable to a punishment of a term of imprisonment of one to five years.

**Article 47: counterfeit of seals, bank notes, public documents, stamps and trademarks**

1. Any person who counterfeits seals of existing administrative structures or makes improper use of such seals

2. Any person who counterfeits or falsifies a bank note, postage stamp, validation sticker, fiduciary value, share, bond, currency that is legally exchangeable in Cambodia, passport or identity card of existing administrative structures, or who makes use of or brings the same into Cambodian territory;

3. Any person who counterfeits or falsifies a bank note, postage stamp, validation sticker, fiduciary value, share, bond, currency that is legally exchangeable in a foreign country, passport or identity card of a foreign country, or who makes use of or brings the same into Cambodian territory is guilty of the misdemeanor of counterfeit and is liable to a term of imprisonment of five to fifteen years.

**Article 48: misappropriation of intellectual property**

1. Any production of a writing, musical composition, drawing, painting, film, photograph, or any other printed or engraved representation which does not respect the intellectual property rights of its author(s) constitutes misappropriation of intellectual property.

2. Any importation, exportation, reproduction, public showing or distribution of a reproduction of a work with intent to disrespect the intellectual property rights of the author also constitutes misappropriation of intellectual property.

3. The copyright to which the present text refers is that which is protected by the Bern Convention of 9 September 1886, revised in Paris on 24 July 1971, and by the "International Copyright Convention" signed in Geneva on 6 September 1952, revised in Paris on 24 July 1971 (NB: exact English title of Convention required).

**Article 49: forgery of public document**

Any elected official, civil servant, military personnel, or official agent of any of the four Cambodian parties to the Paris Agreement or of any registered political party who, acting in an official capacity or while performing official duties, commits a forgery, either by false signature, or by alteration of a deed, writing or signature, or by impersonation, or by false entry into a registry or other public deed after its execution or closing, and any person who knowingly makes use of the same, is guilty of forgery of a public document and shall be liable to a term of imprisonment of five to fifteen years.

**Article 50: forgery of private commercial or bank document**

1. Any person who, by one of the means outlined in Article 49, forges or attempts to forge a private, commercial or bank document shall be liable to a term of imprisonment of five years or a fine of one million to ten million Riels.

2. Any person who knowingly makes use of a forged private, commercial or bank document shall be liable to the same punishment.

**Article 47: receiving and concealing stolen goods**

Any person who receives or purchases goods which he or she knows to have been obtained through theft or falsehood or a misdemeanor of any kind is guilty of the misdemeanor of receiving and concealing stolen goods, and faces a punishment of one to five years in prison. This is an ongoing offence, for which the Statute of Limitations does not toll until the receiving and concealing has terminated.

**Article 48: intentional defacement**

Any person who intentionally defaces or attempts to deface the property of others is guilty of the misdemeanor of intentional defacement and faces a punishment of one to three years in prison. If the defacement is minor or the property of little value the punishment shall be reduced to two months to one year. Defacement of elements of cultural heritage which form part of the Cambodian national patrimony is treated in Article 45.

**Article 49: intentional arson**

He or she who defaces or attempts to voluntarily deface through fire or explosive substance the property of another is guilty of the misdemeanor of voluntary arson and faces a punishment of one to three years in prison.

If the property burned is the dwelling of one or more persons, the duration of these prison terms is doubled.

**Article 50: carrying or transporting illegal arms**

Any person who carries or transports a firearm, explosives, or any artillery, without having been authorized to do so according to guidelines established by UNTAC which pertain to holding and carrying arms, is guilty of illegally carrying or transporting arms and faces a punishment of six months to three years in prison.

Any person without uniform who carries a weapon other than a hunting weapon must be able to prove to inquiring authorities, especially UNTAC representatives, his or her authorization to carry the weapon. In the event he or she is not able to do so, the weapon is to be immediately confiscated and a report forwarded to the competent judicial authority.

**Article 51: coercion of witnesses**

Any person who threatens, intimidates, or places pressure upon a witness in a judicial proceeding is guilty of the misdemeanor of coercion and thereby incurs a punishment of one to two years in prison.

**Article 52: false witness**

Any person who, in a judicial proceeding, bears false witness, in recounting to the Court facts which he or she knows to be erroneous or false, and which are recognized as such by the Court, is guilty of false testimony and faces a punishment of one to two years in prison.

**Article 53: infringement of individual rights**

Any public agents, including police or military agents, who deliberately infringe upon rights to be free from physical abuse and the sanctity of the home, protected by the present text, will be punished by one to two years in prison.

**Article 54: intentional corruption**

Any person who corrupts or attempts to corrupt any elected official, civil servant, military officer or representative of one of

the four Cambodian parties in attendance at the Paris Peace Accords, in the execution of his or her duties, by promising property, service, money, staff, professional position, document, authorization or any benefit whatsoever in exchange for any one of these same benefits has committed the misdemeanor of intentional corruption and faces a punishment of one to three years in prison.

***Article 55: instigating crimes and misdemeanors with consequences***

Punishment as accomplices to an action classified as a crime by the present text will apply to those who, by oration, shouts or threats made in public places, or by writings, printings, drawings, engravings, paintings, emblems, films or any other mode of writing, speech, or film which is sold, distributed, offered for sale or displayed in public places, either by signs or posters shown to the public, or by any other means of audiovisual communication, directly provokes perpetration of an aforesaid action, if the action has consequences. This shall also be the case when the provocation is followed merely by an attempted crime.

**Article 56: instigating crimes and misdemeanors without consequences**

Those who, through one of the means enunciated in the preceding Article, directly provoke a crime or misdemeanor outlined in the present text, will be punished, in the event that this provocation is without consequences, by one to five years in prison.

**Article 57: instigating discrimination**

Those who, by one of the means enunciated in Article 55, have provoked discrimination, hostility or violence against a person or a group of persons due to their national or social origin or their membership or non-membership in an ethnic, national, racial, economic, linguistic or recognized religious group, will be punished by imprisonment of one month to one year and a fine of one million to ten million Riels.

Any outrageous communication, scornful term or abusive language which does not verify or disprove an alleged fact is a libel.

Defamation or libel made through one of the means enunciated in Article 55 shall be punished by imprisonment of eight days to one year and/or a fine of one million to ten million Riel.

In the event of conviction for one of the deeds outlined in the preceding paragraphs, the court may direct that its decision be posted at locations which it specifies, at the expense of the convicted, or published in one or more periodicals, at the expense of the convicted, up to a maximum of ten million Riels. A public action concerning misdemeanors outlined in the present Article may also be commenced by any group comprised according to rules established by the Supreme National Counsel, upon depositing with the competent prosecutor a complaint representing the civil party.

In all cases, the employer, printer, editing house, printing agent and distribution agent are jointly liable for payment of damages accorded to the victim(s).

**Article 60: use of narcotics**

Those who use for their personal consumption narcotics or psychotropic substances addressed in United Nations conventions mentioned in Article 40 will be punished by imprisonment of one month to a year.

**TITLE VI: PUNISHMENTS**

**Article 61: equality of punishments**

The principle of equality of all persons under penal law necessitates that punishments applicable in Cambodia be the same in all provinces or zones. The present punishments are henceforth applicable throughout Cambodia.

**Article 62: death penalty**

The death penalty is abolished in Cambodia.

**Article 63: attenuating circumstances and exculpation of minors**

Judges must weigh attenuating circumstances to reduce below perhaps even the minimum prescription punishments outlined in the present text, notably:

- the age of the convicted;
- the personal background of the convicted which might lead him or her to abrogate his or her responsibilities
- the psychological or psychiatric state of an accused which is certified by a psychologist or psychiatrist;
- circumstances of the crime or misdemeanor which rendered absolutely necessary the actions of the convicted.

For any accused person of less than 18 years of age, punishments outlined in preceding Articles are to be reduced by half.

**Article 64: complicity**

He or she who supplies the modalities of an offence, orders that the offence be committed or facilitates commission of the offence shall be considered an accomplice and punished with the same punishment applicable to the principal instigator.

**Article 65: reprieve**

Prison sentences, but not those for criminal confinement, may in their entirety or in part always accommodate a reprieve. In such an instance the accused will not serve his or her sentence so long as he or she does not commit another offence outlined in preceding Articles for a period of five years after judgment.

**Article 66: conditional release**

Convicted persons who are serving a prison term or criminal confinement may benefit from a conditional release regime dictated by the court which convicted them, after having served half of their prison term or two thirds of their criminal confinement, upon the advice of penitentiary officials, if the court feels that this release will serve to facilitate rehabilitation. Any offence defined within preceding Articles which is committed during the period of conditional release immediately invokes completion of the sentence.

**TITLE VII: METHOD OF APPLICATION**

**Article 67: disregard of inconsistent rules**

Any text, any practice, any rule written or not written which goes against the letter or the spirit of the present text is purely and simply annulled.

**Article 68: international instruments**

Instruments of the United Nations which are mentioned in the present text will be applicable in Cambodia as soon as they are proclaimed by UNTAC.

Other pertinent international instruments may serve to interpret the present text.

**Article 69: entry into force**

This text takes effect exactly two months after the date of its approval by the Supreme National Counsel, except with respect to titles IV, V, VI and VII, which take effect immediately.

SEAN K. KENNEDY (No. 145632)
Federal Public Defender
(E-mail: Sean_Kennedy@fd.org)
CARLTON F. GUNN (No. 112344)
Deputy Federal Public Defender
(E-mail: Carlton_Gunn@fd.org)
CHARLES C. BROWN (No. 179365)
Deputy Federal Public Defender
(E-mail: Charles_Brown@fd.org)
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone (213) 894-1700
Facsimile (213) 894-0081

Attorneys for Defendant
MICHAEL PEPE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL PEPE,

Defendant.

NO. CR 07-168-DSF

**NOTICE OF MOTION; MOTION TO SUPPRESS EVIDENCE DISCOVERED AS RESULT OF COMPUTER MEDIA SEARCH WARRANT; MEMORANDUM OF POINTS AND AUTHORITIES**

Hearing Date: September 17, 2007
Hearing Time: 10:00 a.m.

TO: ACTING UNITED STATES ATTORNEY GEORGE CARDONA, AND ASSISTANT UNITED STATES ATTORNEY PATRICIA DONAHUE:

PLEASE TAKE NOTICE that on September 17, 2007, at 10:00 a.m., or as soon thereafter as counsel may be heard, defendant, Michael Pepe, will bring on for hearing the following motion:

MOTION

Defendant, Michael Pepe, through his counsel of record, Deputy Federal Public Defender Carlton F. Gunn and Deputy Federal Public Defender Charles Brown, hereby moves this Honorable Court for an order suppressing all evidence found on an additional computer and computer media which were searched pursuant to a search warrant issued on May 17, 2007. This motion is made pursuant to the Fourth Amendment to the United States Constitution and is based upon the attached memorandum of points and authorities, all files and records in this case, and such additional argument and evidence as may be presented at the hearing on the motion.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: July 31, 2007

By ______________________
CARLTON F. GUNN
Deputy Federal Public Defender

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: July 30, 2007

By ______________________
CHARLES C. BROWN
Deputy Federal Public Defender

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.

INTRODUCTION

Michael Pepe is charged with four counts of engaging in illicit sexual conduct with a minor in foreign places, in violation of 18 U.S.C. § 2423(c). As explained more fully in the previously filed Motion to Suppress Evidence, there was a search of Mr. Pepe's home in Cambodia when he was arrested in June, 2006, and various items of evidence were seized. Included in that evidence were two computers and various computer media. One of the computers, a thumb drive, and a digital camera media card were subsequently searched – without a search warrant – by a Bureau of Immigration and Customs Enforcement agent in Singapore, and that warrantless search is part of the subject of the previously filed Motion to Suppress Evidence.

The additional computer and computer media were not searched at the time the other computer, thumb drive, and digital camera media card were searched, but were searched more recently, pursuant to a search warrant which was issued on May 17, 2007 and is attached in Exhibit A. That warrant authorized the search of the second computer, twenty-seven pornographic CDs, thirty-one other CDs, and five 3.5-inch floppy disks. *See* Exhibit A (warrant),[1] at 1-5. Evidence found pursuant to that warrant included visual depictions of minors, some of which are the alleged victims

[1] Exhibit A is the search warrant with the affidavit in support of the search warrant attached. There are duplicate page numbers because the search warrant and the affidavit both have their own page numbering. The warrant and affidavit will be cited in this motion as either "Exhibit A (warrant), at [page or paragraph number]" or "Exhibit A (affidavit ), at [page or paragraph number]."

in this case, *see* Exhibit B, and at least some child pornography.[2] This second motion to suppress evidence seeks to suppress this evidence.

II.

ARGUMENT

A. THE EVIDENCE FOUND PURSUANT TO THE SEARCH WARRANT IS A FRUIT OF THE PRIOR UNLAWFUL COMPUTER MEDIA SEARCHES BECAUSE THE WARRANT WAS BASED ON THE EVIDENCE FOUND IN THOSE SEARCHES.

Describing evidence discovered in a prior unlawful search in the affidavit for a search warrant taints the search warrant and may make that warrant and the evidence found pursuant to the warrant a fruit of the prior unlawful search. What a court considering this question must do is "excise the tainted evidence and determine whether the remaining untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." *United States v. Heckenkamp*, 482 F.3d 1142, 1149 (9th Cir. 2007) (quoting *United States v. Reed*, 15 F.3d 928, 933 (9th Cir. 1994) and *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987)).

The search warrant affidavit here relied almost entirely on what was discovered in the prior, unlawful searches. Out of a little more than five pages and six paragraphs describing the substantive evidence against Mr. Pepe, *see* Exhibit A (affidavit), ¶¶ 9, 12-16, more than four pages and four paragraphs (with over twenty detailed subparagraphs) describe the evidence found in the prior computer media searches, *see* Exhibit A (affidavit), ¶¶ 12-15. All that remains when this part of the

---

[2] The report which is attached as Exhibit B does not reflect the discovery of any child pornography, but the prosecutor has informed defense counsel that child pornography was found on at least one of the CDs.

affidavit is stricken is the identification of Mr. Pepe as the abuser by four alleged victims, *see* Exhibit A, (affidavit) ¶ 9, and a summary of a letter to his sister in which he makes several arguably suggestive admissions, *see* Exhibit A (affidavit), ¶ 16. The only reference to photographs is a statement taken from the letter about Mr. Pepe "taking naked pictures, at SANG'S request, of her two nieces," but subsequently "eras[ing] those files from his computer." Exhibit A (affidavit), ¶ 16.d.

This is hardly sufficient to justify the search of what appears to be every item of computer media found in Mr. Pepe's home, including not just his computers but also diskettes and CDs no matter what the markings on them indicated they were for. And even were the letter's passing reference to photographs sufficient, "the government . . . ha[s] a further hurdle to surmount." *United States v. Duran-Orozco*, 192 F.3d 1277, 1281 (9th Cir. 1999). It must show that the agents in fact *would* have sought and obtained this additional warrant even without the earlier search. *See Murray v. United States*, 487 U.S. 533, 542 (1988); *Duran-Orozco*, 192 F.3d at 1281.

The government cannot surmount even the first hurdle here. The later search warrant is tainted by the prior unlawful searches, and so the evidence discovered on the additional computer media must be suppressed.

B.    THE SEARCH WARRANT DID NOT ESTABLISH PROBABLE CAUSE TO SEARCH THE CDS LISTED IN THE SEARCH WARRANT.

There are problems with the search warrant more troubling than just its extensive reliance on evidence uncovered in prior unlawful searches. One of those problems is the inclusion in the search warrant of what appears to be a general laundry list of every CD found in Mr. Pepe's home. Included in the list are not just unlabeled or manufacturer labeled CDs with no identifying information about the

contents, but CDs with content identification such as "the essential SIMON & GARFUNKEL"; "A Midsummer Night's Dream"; and "MASTERS OF CLASSICAL MUSIC," "BACH," "BRANDENBURG CONCERTO NO. 1," and "VIOLIN CONCERTO IN E MAJOR." Exhibit A (warrant), at 4. Other CDs have handwritten notes suggesting their content, including, inter alia, "VARIOUS VILLAGES & CHANRY"; "CHANRY," "BATTENBANG TRIP," "CHANRY," and "CHANRY ID"; and "SCH. & WEDDING." Exhibit A (warrant), at 2-3. Still other CDs have markings with references to computer software, such as "Norton," "Windowsxp," and "SAMSUNG CD-RW." Exhibit A (warrant), at 4.

The affidavit certainly does not establish probable cause to search items that are labeled in a way to indicate some other content. And in the absence of some further explanation, there is also a lack of probable cause as to CDs without any label regarding content. That some child pornography was found on one computer and a thumb drive does not mean that there was child pornography on separate CDs. Such a broad sweep of the search warrant might be defensible if there were some explanation in the affidavit of how and why people who possess child pornography store and preserve the pornography, such as there usually is in other child pornography search warrants, *see, e.g., United States v. Hay*, 231 F.3d 630, 635-36 (9th Cir. 2000) (discussing expert opinions contained in affidavit that there are usually other pornographic images found, how child pornography is traded and distributed over the Internet, how computer is an "ideal repository for child pornography" and is one of the preferred methods of distribution, that collectors and distributors of child pornography rarely if ever dispose of it and store it for long periods, and how even deleted files can be retrieved by a computer expert); *United States v. Lacy*, 119 F.3d 742, 746-47 (9th Cir. 1997) (noting expert opinions contained in affidavit that collectors and distributors of child pornography rarely if ever dispose of material and store it for long periods and that there was no way to

specify what hardware and software would have to be seized in order to retrieve images). Without some such explanation as to why to suspect every CD – or even some particular CD – the affidavit did not establish probable cause as to the CDs in the present case.

C. THE GOVERNMENT MUST SHOW THE COMPUTER SEARCH WAS PROPERLY LIMITED TO THOSE FILES WITH MIGHT REASONABLY BE EXPECTED TO CONTAIN THE ITEMS WHICH THE SEARCH WARRANT ALLOWED AGENTS TO SEARCH FOR.

As noted in *United States v. Walser*, 275 F.3d 981 (10th Cir. 2001):

> [O]fficers conducting searches (and the magistrates issuing warrants for those searches) cannot simply conduct a sweeping, comprehensive search of a computer's hard drive. Because computers can hold so much information touching on many different areas of a person's life, there is a greater potential for the "intermingling" of documents and a consequent invasion of privacy when police execute a search for evidence on a computer.

*Id.* at 986. There are methods of targeting searches of computer media so as to avoid intruding into every single personal document or file that may be on the media, moreover. Methods noted in *United States v. Carey*, 172 F.3d 1268 (10th Cir. 1999), include "observing files types and titles listed on the directory, doing a key word search for relevant terms, or reading portions of each file stored in the memory." *Id.* at 1276. Methods noted in another, district court, case include "limiting the search by date range; doing key word searches; limiting the search to text files or graphics files; and focusing on certain software programs." *In the Matter of the Search of 3817 W. West End, First Floor Chicago, Illinois 60621*, 321 F. Supp. 2d 953, 959 (N.D. Ill. 2004). *See also* Raphael Winick, *Searches and Seizures of Computers and Computer*

*Data*, 8 Harv. J. L. & Tech. 75, 108 (Fall 1994) ("[A]n investigator reasonably familiar with computers should be able to distinguish database programs, electronic mail files, telephone lists and stored visual or audio files from each other.").

Some courts have suggested that the search warrant itself should establish a protocol for the computer search, *see, e.g.*, *In the Matter of the Search of 3817 W. West End, First Floor Chicago, Illinois 60621*, 321 F. Supp. 2d at 957; *United States v. Barbuto*, No. 2:00CR197K, 2001 WL 670930, at *4-5 (D. Utah April 12, 2001), but the Ninth Circuit, while "look[ing] favorably upon the inclusion of a search protocol," has held that "its absence is not fatal," *United States v. Hill*, 459 F.3d 966, 978 (9th Cir. 2006). Still, that does not mean Fourth Amendment reasonableness limitations can be completely ignored, either by the agents or by a court reviewing the agents' search methodology. As explained by the Ninth Circuit:

> [E]ven though a warrant authorizing a computer search might not contain a search protocol restricting the search to certain programs or file names, the officer is always "limited by the longstanding principle that a duly issued warrant, even one with a thorough affidavit, may not be used to engage in a general, exploratory search." The reasonableness of the officer's acts both in executing the warrant and in performing a subsequent search of seized materials remains subject to judicial review.

*Hill*, 459 F.3d at 978.

This means the government must show the computer search was properly limited to computer files that the searching agent could reasonably believe might contain items which the search warrant allowed the agent to look for. Any evidence which was found in a different place or through some more sweeping search must be suppressed.

D. ANY EVIDENCE FOUND ON MEDIA ON WHICH THE GOVERNMENT DID NOT FIND EVIDENCE WITHIN THE SCOPE OF THE SEARCH WARRANT WITHIN THE SIXTY-DAY SEARCH PERIOD AUTHORIZED BY THE SEARCH WARRANT MUST BE SUPPRESSED.

The search warrant placed a sixty-day time limit on the search of the computer media, *see* Exhibit A (warrant), at 5-6, and specified certain items to be seized, including, inter alia, child pornography and non-pornographic visual depictions of minors, *see* Exhibit A (warrant), at 7. At least as of July 12, 2007 which was almost sixty days after issuance of the search warrant, the only material within the scope of the search warrant that had been found on the computer media was visual depictions of minors on eleven of the thirty-one CDS. *See* Exhibit B, at 5-6. As to the other items, there was "no derogatory information and no visual depictions of minors." *See id.*

Subsequent searches of the other items, unless within the sixty-day search period (which would have ended on July 15, 2007), would not have been authorized by the search warrant and so any evidence found in such subsequent searches would be the product of a warrantless search. The defense is not clear as to whether there is any such evidence,[3] but if there is, it should be suppressed.

---

[3] As noted *supra* p. 4 n.2, the prosecutor has indicated to defense counsel that there was child pornography found on a least one of the CDS. Defense counsel are not clear on whether this is included within the "visual depictions of minors" which had been found by July 12, 2007 or whether it is the product of some later search. Defense counsel is also not clear on what, if any, additional evidence may have been found after July 15, 2007.

III.

CONCLUSION

Initially, the evidence found in the search of the second computer and the computer media must be suppressed because it is the fruit of the prior unlawful search of the first computer, thumb drive, and digital camera media card. If the Court for some reason finds the prior search was not unlawful, the search of the CDs under the search warrant was unlawful because the search warrant did not establish probable cause for search of the CDs. Finally, the government must show the search of the computer media was conducted by reasonable means aimed at finding only the material which the search warrant authorized the agents to search for and must show that any evidence it intends to use was found on media on which evidence was found no later than July 15, 2007.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: July 31, 2007

By ______________________
CARLTON F. GUNN
Deputy Federal Public Defender

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: July 30, 2007

By ______________________
CHARLES C. BROWN
Deputy Federal Public Defender

GEORGE S. CARDONA
United States Attorney
THOMAS P. O'BRIEN
Assistant United States Attorney
Chief, Criminal Division
PATRICIA A. DONAHUE (SBN: 132610)
JOHN J. LULEJIAN (SBN: 186783)
Assistant United States Attorneys
Violent and Organized Crime Section
United States Courthouse
312 North Spring Street, 15th floor
Los Angeles, California 90012
Telephone: (213) 894-0640/8603
Facsimile: (213) 894-3713
E-mail: patricia.donahue@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL JOSEPH PEPE,<br><br>Defendant. | CR No. CR 07-168-DSF<br><br><u>GOVERNMENT'S CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS (1) TO SUPPRESS EVIDENCE AND (2) TO SUPPRESS EVIDENCE DISCOVERED AS A RESULT OF COMPUTER SEARCH WARRANT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF GARY PHILLIPS AND EDDY WANG</u><br><br>Hearing: September 17, 2007<br>Time: 10:00 a.m.<br>Place: Courtroom of the Honorable Dale S. Fischer |

Plaintiff United States of America, by and through its counsel of record, hereby submits its opposition to (1) the Motion to Suppress Evidence (Docket No. 21), and (2) the Motion to Suppress Evidence Discovered as a Result of Computer Search Warrant (Docket No. 33), filed by defendant Michael Joseph Pepe.

This opposition is based on the attached memorandum of points and authorities and declarations, the files and records of this case, and any additional argument and evidence presented at the hearing.

Dated: August 22, 2007

Respectfully submitted,

GEORGE S. CARDONA
United States Attorney

THOMAS P. O'BRIEN
Assistant United States Attorney
Chief, Criminal Division

PATRICIA A. DONAHUE
Assistant United States Attorney

JOHN LULEJIAN
Assistant United States Attorney

Attorneys for Plaintiff United States of America

TABLE OF CONTENTS

PAGE

Table of Authorities . . . . . . . . . . ii

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . 3

I INTRODUCTION . . . . . . . . . . 3

II STATEMENT OF FACTS . . . . . . . . . . 3

III ARGUMENT . . . . . . . . . . 9

A. THE FOURTH AMENDMENT DOES NOT APPLY TO THE SEARCH CONDUCTED BY THE CAMBODIAN NATIONAL POLICE . . . . . 9

B. NEITHER EXCEPTION TO THE RULE ADMITTING EVIDENCE FROM FOREIGN SEARCHES APPLIES HERE . . . . . . . . . . 9

1. The Search By The Cambodian National Police Did Not Shock The Judicial Conscience . . . . . . . . . . 9

2. The Search Conducted By The Cambodian National Police Was Not A "Joint Venture" With United States Law Enforcement . . . . . . . . 10

C. EVEN IF THE SEARCH WAS A "JOINT VENTURE" WITH UNITED STATES LAW ENFORCEMENT, THE SEARCH WAS REASONABLE AND THE GOOD FAITH EXCEPTION APPLIES . . . . . . . . . . 13

D. THE SEARCH OF PEPE'S COMPUTER MEDIA IS VALID . . . . . . . . . . 15

E. THE SEARCH WARRANT ESTABLISHED PROBABLE CAUSE FOR THE MEDIA LISTED IN THE SEARCH WARRANT . . . . . . . . . . 19

F. THE EXECUTION OF THE SEARCH WAS PROPER IN TIME AND SCOPE . . . . . . . . . . 21

IV CONCLUSION . . . . . . . . . . 25

## TABLE OF AUTHORITIES

**FEDERAL CASES** **PAGE(S)**

Birdsell v. United States,
346 F.2d 775 (5th Cir. 1965) . . . . . 11

Murray v. United States,
487 U.S. 533 (1988) . . . . . 16, 19

Pfeifer v. United States Bureau of Prisons,
615 F.2d 873 (9th Cir. 1980) . . . . . 11

Stonehill v. United States,
405 F.2d 738 (9th Cir. 1968) . . . . . 9, 10

United States v. Angulo-Lopez,
791 F.2d 1394 (9th Cir. 1986) . . . . . 21, 22

United States v. Barajs-Avalos,
377 F.3d 1040 (9th Cir. 2004) . . . . . 15, 16

United States v. Barona,
56 F.3d 1087 (9th Cir. 1995) . . . . . 9, 10, 13

United States v. Behety,
32 F.3d 503 (11th Cir. 1994) . . . . . 11

United States v. Benedict,
647 F.2d 928 (9th Cir. 1981) . . . . . 10, 12

United States v. Castillo,
866 F.2d 1071 (9th Cir. 1988) . . . . . 21

United States v. Clark,
435 F.3d 1100 (9th Cir. 2006),
cert. denied, ___ U.S. ____, 127 S. Ct. 2029 (2007) . . . . . 17

United States v. Duran-Orozco,
192 F.3d 1277 (9th Cir. 1999) . . . . . 16, 19

United States v. Fannin,
817 F.2d 1379 (9th Cir. 1987) . . . . . 21

**TABLE OF AUTHORITIES (Cont'd)**

**FEDERAL CASES** **PAGE(S)**

United States v. Gecas, 120 F.3d 1419 (11th Cir. 1997) . . . . . 12

United States v. Heckenkamp, 482 F.3d 1142 (9th Cir. 2007) . . . . . 15, 16

United States v. Hernandez, 183 F. Supp. 2d 468 (D.P.R. 2002) . . . . . 24

United States v. Hill, 459 F.3d 966 (9th Cir. 2006) . . . . . 20

United States v. Maher, 645 F.2d 780 (9th Cir. 1981) . . . . . 11

United States v. Marzano, 537 F.2d 257 (7th Cir. 1976) . . . . . 11

United States v. McQuisten, 795 F.2d 858 (9th Cir. 1988) . . . . . 21

United States v. Peterson, 812 F.2d 486 (9th Cir. 1987) . . . . . 11, 13

United States v. Reed, 15 F.3d 928 (9th Cir. 1994) . . . . . 15

United States v. Rose, 570 F.2d 1358 (9th Cir. 1978) . . . . . 11

United States v. Rosenthal, 793 F.2d 1214 (11th Cir. 1986) . . . . . 12

United States v. Schmidt, 947 F.2d 362 (9th Cir. 1991) . . . . . 21

United States v. Vasey, 834 F.2d 782 (9th Cir.1987) . . . . . 16

## TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES** **PAGE(S)**

United States v. Wanless, 882 F.2d 1459 (9th Cir. 1989) . . . . . . 15

**STATE CASES**

United States v. Habershaw, No. CR. 01-10195-PBS, 2002 WL. 33003434 (D. Mass. May 13, 2002) . . . . . . 24

**FEDERAL STATUTES**

18 U.S.C. § 2423(c) . . . . . . 3, 17, 18

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I**

**INTRODUCTION**

Defendant Michael Pepe ("Pepe") is charged with four counts of violating 18 U.S.C. § 2423(c), Engaging in Illicit Sexual Conduct in Foreign Places. Pepe is a United States citizen who traveled to Cambodia and raped and molested young girls. The Cambodian National Police ("CNP") executed a search warrant at defendant's residence in Cambodia and recovered substantial evidence that corroborates the statements made by the victims. That evidence has been turned over to United States Immigration and Customs Enforcement ("ICE") and brought to the United States.

Pepe's arrest, and the search of his residence, were conducted by the CNP. They were not done at the behest of the United States government. The Fourth Amendment and the exclusionary rule do not apply to the actions of foreign law enforcement. The fact that American law enforcement was present when the CNP conducted the search of defendant's residence in Cambodia does not transform the CNP's law enforcement activity into a joint venture. Accordingly, the evidence seized by the CNP is admissible. Moreover, even if the CNP search had been a joint venture, the search was lawfully conducted pursuant to a Cambodian search warrant. Compliance with foreign law renders the search reasonable, and the evidence seized admissible. In addition, since the good faith exception applies, even if the search violated Cambodian law, American law enforcement's good faith belief that Cambodian law was followed defeats defendant's suppression motion.

**II**

**STATEMENT OF FACTS**[1]

On or about June 14, 2006, the United States Embassy in Cambodia (the "Embassy") informed Gary J. Phillips, an Assistant Attache for U.S. Immigration and Customs Enforcement

---

[1] The facts set forth in this Statement of Facts are from the Declarations of Gary J. Phillips and Eddy Wang, both of which are attached hereto.

("AIA") in Bangkok, Thailand, that the Embassy had received the following information from World Hope International ("WHI"), a non-governmental organization: The International Justice Mission ("IJM"), another non-governmental organization, had learned that a 12-year old girl claimed she was purchased, tied up, and raped by an American teacher of English, and that the perpetrator had not yet been identified.

Later that day, IJM director Ron Dunne told AIA Phillips that an American citizen was allegedly involved in sexually abusing at least five females between the ages of 10 and 18, and that one of the victims was bound and raped. Dunne also told AIA Phillips that as a result of these allegations, the CNP had an American under surveillance. In addition to AIA Phillips, Dunne informed the CNP of the allegations of sexual abuse.

On or about June 15, 2006, Dunne told AIA Phillips that CNP and the municipal police in Phnom Penh, Cambodia, were conducting surveillance of the American, and that the American was inside his residence with victims. Dunne also provided AIA Phillips with information from an interview conducted by WHI on or about June 12, 2006 of the 12-year old victim, "I.T." In that interview, I.T. stated, among other things, that the man with whom she had "sex" was known as "Michael" and was from the United States. I.T. also described "Michael's" residence and stated that "some young girls" were being tied up for the purpose of having sex with "Michael."

On or about June 15, 2006, Dunne told AIA Phillips that an IJM investigator had located Michael Pepe's house and that the local police were surveilling that house. Dunne also provided AIA Phillips with a copy of an IJM report that related that Michael Pepe (identified in the report by his date of birth and his U.S. Passport number) was involved in "sexual trafficking." According to that IJM report, I.T. stated that while she was at Pepe's house, she was bound and sexually abused. In addition, the IJM report noted that a medical examination conducted at a Phnom Penh hospital showed injuries to I.T.'S vagina.

On or about June 16, 2006, at WHI, AIA Phillips interviewed I.T. in the presence of a guardian. Also present during the interview were Dunne, United States Embassy investigator

Suos Vansak, and WHI counselors. The CNP was not present when AIA Phillips interviewed I.T. AIA Phillips's purpose in interviewing I.T. was to memorialize her statements in the event that there would be a prosecution in the United States. Also, if an American had harmed I.T., the United States had an obligation to provide her with medical care.

In his capacity as an Assistant ICE Attache in Bangkok, Thailand, when AIA Phillips receives information that a United States citizen may be involved in child abuse within the jurisdiction of ICE Bangkok, he conducts a parallel investigation with whatever investigation is being run by the local police. When, as in this case, it appears that the child victim's family was involved in selling the victim to the perpetrator, a non-governmental organization becomes the legal guardian and caregiver of the child victim. As part of his investigation, AIA Phillips asks the non-governmental organization that has custody of the child victim for access to the child victim so that he can interview the child victims without the police present. AIA Phillips's investigation is parallel, not joint, with that of the local police.

On or about June 16, 2006, AIA Phillips met with CNP General Un Sokunthea. Dunne also attended that meeting, and he gave General Un Sokunthea a copy of the IJM report regarding the allegations against Michael Pepe. At that meeting, AIA Phillips informed General Un Sokunthea that ICE was conducting a parallel investigation. AIA Phillips also thanked General Un Sokunthea for the efforts of the CNP and he told her that if the CNP needed help, to please let me know. He made those statements to be courteous, diplomatic, and respectful to local law enforcement. He did not anticipate that the CNP would seek my help in its investigation. The CNP did not seek my help in its investigation until after the Cambodian search warrant was executed and the computer media was seized. As stated below, the CNP sought ICE assistance in forensically analyzing the seized media.

On or about June 17, 2006, at approximately 12:40 p.m., after observing Michael Pepe leave his residence and go to a tour business, the CNP arrested him for rape and debauchery in violation of Cambodian law. After arresting Pepe, the CNP transported him to his residence. AIA Phillips was not present when the CNP arrested Pepe. AIA Phillips learned of the arrest

from Dunne. AIA Phillips did not instruct or advise the CNP to arrest Pepe.

Before arresting Pepe, the CNP had obtained a search warrant for his residence. (A true and correct copy of that Cambodian warrant is attached to the Declaration of Gary J. Phillips.). At approximately 1:20 p.m. on June 17, 2006, the CNP began to execute the search warrant. AIA Phillips did not instruct or advise the CNP to obtain a warrant to search Pepe's residence, and he did not assist the CNP in obtaining the search warrant. AIA Phillips does not know the process by which a search warrant is obtained under Cambodian law. It is his understanding that the Cambodian prosecutor and the person whose house is being searched must be present.

AIA Phillips did not execute the Cambodian search warrant in Pepe's residence. AIA Phillips was present as an observer when the CNP executed the Cambodian search warrant on Pepe's residence. There were approximately twenty police officers searching Pepe's residence. The Cambodian prosecutor and Pepe were present when the CNP executed the search. There were officers searching in one room when Pepe was located in another room. During the search, AIA Phillips went inside the house and followed the CNP officers. AIA Phillips saw what items the CNP officers found, and he took photographs during the search for his parallel investigation. At one point, the CNP officers discovered rope in the closet. When the officers told AIA Phillips about the rope, he looked at it. AIA Phillips also observed many items that corroborated the information provided by I.T. During the search, AIA Phillips wore gloves so that he would not contaminate any of the evidence seized by the CNP.

On or about June 17, 2006, the CNP stopped the search. AIA Phillips does not know why they stopped the search. The CNP taped the door and sealed it shut. On or about June 19, 2006, the CNP returned to Pepe's residence, placed the seized items into burlap bags, put the bags into trucks, and drove all of the seized items to the CNP offices.

Among the items seized by the CNP were a computer and computer media, including a flashcard, memory card, and compact disks. The CNP does not have the forensic capability to analyze computer media. Because ICE has the capability to forensically analyze computer media, ICE offered to assist to the CNP in its analysis of the computer and media. This is the

same assistance that ICE offers to law enforcement agencies throughout the world who lack the technical resources and knowledge to analyze computers and computer media. After accepting ICE'S offer of assistance, the CNP turned over the hard drive, flashcard, memory card, and compact disks to AIA Phillips, who later sent those items to ICE Singapore for forensic analysis.

AIA Phillips believes that the search warrant obtained by the CNP for Pepe's residence complied with Cambodian law, and the search was executed in accordance with Cambodian law.

On or about November 16, 2006, ICE in the Central District of California received a number of items seized by the CNP from Michael Pepe's Cambodian residence. On or about April 17, 2007, ICE Special Agent Chris Kuzma received additional media. The items that Special Agents Eddy Wang and Kuzma received included one Hewlett-Packard CPU, twenty-seven pornographic compact disks, thirty-one miscellaneous compact disks, and five 3.5-inch floppy disks. These items had not previously been forensically examined by Special Agent David Galante of the ICE Attache Office in Singapore, or anyone else. Believing that these items might be evidence or an instrumentality of criminal activity, I prepared a search warrant. On or about May 17, 2007, after the warrant had been approved by Assistant United States Attorney Patricia Donahue, ICE Special Agent Wang presented a search warrant and affidavit to the Honorable Victor B. Kenton, United States Magistrate Judge for the Central District of California. After reviewing Special Agent Wang's affidavit, Magistrate Judge Kenton signed the search warrant. A true and correct copy of the search warrant affidavit is attached to Special Agent Wang's declaration.

In the search warrant affidavit, Special Agent Wang detailed some of the evidence discovered by the CNP that corroborated the victims' accounts of rape and abuse by Pepe. In the affidavit, Special Agent Wang also included descriptions of the images found by Special Agent Galante during the forensic analysis he performed at the request of the CNP. The images in the media that Special Agent Galante examined included child pornography and photographs of Pepe's victims in various states of undress. However, even if ICE was unaware of this evidence or was precluded from using this information, Special Agent Wang still would have sought a

search warrant for the computer media based on the nature of the crime. Based on Special Agent Wang's training and experience, he knows that pedophiles often photograph their victims, document and correspond with other pedophiles about their activities, and collect and store child pornography. Given the possibility that evidence might exist on the media that would corroborate the victims, Special Agent Wang still would have applied for a search warrant.

Between May 17, 2007, and July 12, 2007, ICE Computer Forensic Analyst Timothy Sullivan and Special Agent Wang examined the items enumerated in the search warrant. Analysis of the items revealed that approximately eleven compact disks that contained visual depictions of minors. After conducting a preliminary examination of the media, Special Agent Wang determined that the above disks contained evidence or an instrumentality of criminal activity and needed a more detailed analysis. Because the remaining items did not contain evidence or were instrumentalities of criminal activity, Special Agent Wang determined that those items could be returned to Pepe. A true and correct copy of the Report of Investigation documenting Special Agent Wang's findings is attached to his declaration as Exhibit B. Prior to July 15, 2006, Special Agent Wang sent his findings to the United States Attorney's Office and asked that the Assistant United States Attorney inform Pepe's counsel that the items that did not contain visual depictions of minors could be returned to Pepe. Although the United States Attorney's Office has furnished those findings to Pepe's attorneys, no one acting on Pepe's behalf has picked up this media.

On or about July 12, 2007, Bruce Pixley, Senior Director of Aon Consulting, copied one of the compact disks, and using forensic tools conducted a more detailed analysis of the compact disk. That analysis included an examination of the unallocated space on the disk. In the unallocated space of that compact disk, Mr. Pixley found child pornography and visual depictions of minors. On or about July 25 and 26, 2007, Mr. Pixley copied the remaining compact disks and conducted a similar examination. Mr. Pixley determined that at least two of the compact disks that he examined contained visual depictions of minors in the unallocated space.

## III

## ARGUMENT

### A. THE FOURTH AMENDMENT DOES NOT APPLY TO THE SEARCH CONDUCTED BY THE CAMBODIAN NATIONAL POLICE

The Ninth Circuit has recognized the "general and undisputed proposition" that "neither our Fourth Amendment nor the judicially created exclusionary rule applies to acts of foreign officials." United States v. Barona, 56 F.3d 1087, 1090-91 (9th Cir. 1995) (citations omitted). Thus, evidence obtained by foreign police officers from searches conducted in their own countries generally is admissible, regardless whether the search complied with the Fourth Amendment. See Stonehill v. United States, 405 F.2d 738, 743 (9th Cir. 1968) ("Neither the Fourth Amendment of the United States Constitution nor the exclusionary rule of evidence, designed to deter Federal officers from violating the Fourth Amendment, is applicable to the acts of foreign officials.").

### B. NEITHER EXCEPTION TO THE RULE ADMITTING EVIDENCE FROM FOREIGN SEARCHES APPLIES HERE

There are two "very limited exceptions" to the general rule admitting evidence resulting from foreign searches and arrests. Barona, 56 F.3d at 1091. Neither exception applies in this case.

#### 1. The Search By The Cambodian National Police Did Not Shock The Judicial Conscience

The first exception, inapplicable here, "occurs if the circumstances of the foreign search and seizure are so extreme that they shock the judicial conscience, so that a federal appellate court in the exercise of its supervisory powers can require exclusion of the evidence." Id. (citations omitted). Defendant has not alleged, nor is there any evidence, that the CNP engaged

in conduct that would "shock the judicial conscience." To the contrary, in compliance with Cambodian law the CNP obtained a search warrant for defendant's Phnom Penh residence. Thus, the first exception does not apply.

**2. The Search Conducted By The Cambodian National Police Was Not A "Joint Venture" With United States Law Enforcement**

The second very limited exception to the rule admitting evidence resulting from foreign searches applies "when United States agents' participation in the investigation is so substantial that the action is a joint venture between United States and foreign officials." Id.; Stonehill, 405 F.2d at 743 ("If Federal agents [have] so substantially participated in the raids so as to convert them into joint ventures between the United States and the foreign officials, then the exclusionary rule may apply").

Whether the involvement of United States agents rises to the level of substantial participation is a fact-specific inquiry, with no one factor being determinative. In United States v. Stonehill, 405 F.2d at 741-42, 745 (9th Cir. 1968), the Ninth Circuit found no joint venture when United States officials were present during the planning of searches in the Phillippines and a few days after the searches they obtained some of the seized evidence. The fact that the Supreme Court of the Phillippines ultimately found the raid to be illegal, and that the raid would also have been found to be illegal in the United States, did not render the evidence inadmissible in the United States. Id. at 746. In United States v. Benedict, 647 F.2d 928, 930 (9th Cir. 1981), the court found no joint venture where the search was initiated by the Thai police under Thai law, a search warrant was procured under Thai law, and the Drug Enforcement Administration ("DEA") agents were invited by the Thai police to accompany them during the search because

the heroin seized at the Bangkok Airport that initiated the investigation was marked for shipment to the United States. In United States v. Rose, 570 F.2d 1358, 1364 (9th Cir. 1978), the Ninth Circuit declined to find a joint venture where United States Customs officials did not direct or request the Canadians to search the defendant's luggage, did not participate in the search, and "[t]here is no evidence that United States agents were attempting to undermine the Fourth Amendment rights of a citizen by circuitous and indirect methods." (citations omitted). See also United States v. Maher, 645 F.2d 780, 783 (9th Cir. 1981) (no joint venture where investigation was initiated and controlled by Canadian police with limited support and assistance from American officials in the United States); Pfeifer v. United States Bureau of Prisons, 615 F.2d 873, 877 (9th Cir. 1980) (combination of treaty encouraging joint drug investigations and presence of American DEA agent with visible firearm in his jacket during interrogation by Mexican officials not sufficient to invoke joint venture doctrine). By contrast, in United States v. Peterson, 812 F.2d 486, 490 (9th Cir. 1987), the Ninth Circuit found substantial participation where the DEA agents themselves termed their actions a "joint investigation," were involved daily in translating and decoding transmissions intercepted as a result of a Philippine wiretap, and assumed a substantial role in the case that was not subordinate to the role of Philippine authorities.[2]

---

[2] See also United States v. Behety, 32 F.3d 503, 511 (11th Cir. 1994) (Fourth Amendment inapplicable because the search and seizure were conducted primarily by Guatemalan officials and the limited participation of U.S. officials did not constitute a joint venture sufficient to invoke the Fourth Amendment); United States v. Marzano, 537 F.2d 257, 269-70 (7th Cir. 1976) (finding no joint venture where United States law enforcement officers were merely present at scene of search and seizure); Birdsell v. United States, 346 F.2d 775, 782 (5th Cir. 1965) (holding although United States officers were "present and cooperating in some degree" with local officials, there was no joint venture sufficient to invoke the protections of

The cases where United States participation has been deemed enough to constitute a joint venture are where the evidence was obtained during an investigation that was essentially initiated and carried out by the United States law enforcement in a foreign country. In this case, AIA Phillips did not initiate and carry out a joint investigation with the CNP. The non-governmental organizations notified both AIA Phillips and the CNP about the allegations against a United States citizen in Cambodia. The CNP investigated. The CNP surveilled Pepe and his residence, obtained a search warrant, arrested Pepe, executed the search warrant, and seized substantial evidence corroborating the information provided by the 12-year old victim. AIA Phillips also conducted his own parallel investigation. He interviewed the victim without the CNP present. His investigation was not joint with that of the CNP. AIA Phillips was not present when the CNP arrested Pepe for violating Cambodian law, he did not instruct or advise the CNP to obtain a warrant to search Pepe's residence, he did not assist the CNP in obtaining the search warrant, he did not execute the warrant, and he did not seize the evidence. The fact that he was present when the CNP executed the warrant does not rise to the level of substantial participation. See Benedict, 647 F.2d at 930-31 (presence of DEA agents at search did not render the investigation joint where decision to search was made solely by Thai authorities and seizures and arrest of defendant were effected in furtherance of Thai prosecution). Unlike the DEA agents in

---

Fourth Amendment); United States v. Rosenthal, 793 F.2d 1214, 1231 (11th Cir. 1986) (no joint venture where United States agents helped plan raid of defendant's residence in Colombia, were present during the raid and arrest, and received all evidence obtained during the raid for use in defendant's prosecution in the United States); United States v. Gecas, 120 F.3d 1419, 1433-34 (11th Cir. 1997) (noting that cooperation with foreign governments, including sharing of information on specific cases, does not transform foreign governments into agents of the United States.

Peterson, AIA Phillips's involvement was subordinate to that of the Cambodian authorities.

In addition, the fact that AIA Phillips met with the CNP does not establish substantial participation. The United States Government enjoys close cooperation with numerous foreign governments in specific areas of law enforcement activity. Many of these cooperative relationships include specific obligations through treaty or agreement. There is no caselaw suggesting that a meeting or general agreement to share information transform foreign law enforcement authorities into agents of the United States and render all foreign activity in that area a "joint venture.

**C. EVEN IF THE SEARCH WAS A "JOINT VENTURE" WITH UNITED STATES LAW ENFORCEMENT, THE SEARCH WAS REASONABLE AND THE GOOD FAITH EXCEPTION APPLIES**

A foreign search is lawful under the Fourth Amendment if it is "reasonable." Barona, 56 F.3d 1087. Reasonableness is achieved if the foreign authorities either (1) followed their own law; or (2) the United States agents acted in the good faith belief that the interception was in compliance with foreign law. Id. at 1091-93. In Peterson, 812 F.2d at 492, the Ninth Circuit held that even if the Philippine wiretap was illegal under Philippine law, reliance on its legality was objectively reasonable by the United States authorities participating in the joint narcotics investigation. As the Ninth Circuit explained, "Permitting reasonable reliance on representations about foreign law is a rational accommodation to the exigencies of foreign investigation." Id.

Article 20 of the "Provisions Relating to the Judiciary and Criminal Law and Procedure Applicable in Cambodia During the Transitional Period, Decision of September 10, 1992," entitled "Searches", states:

In the case of flagrante delicto offenses police have the power to search.

Searches must be conducted in the presence of the suspect and two witnesses, preferably neighbors or owners of the building.

Except in cases of flagrante delicto offenses, searches must be authorized by one of the judges of the competent court or by the prosecutor. They may take place only between the hours of 6:00 a.m. and 6:00 p.m. They should take place in the presence of the suspect if possible, and two witnesses from among the suspect's family members. Proof obtained in violation of the present article is not admissible in court.

Article 20, Provisions Relating to the Judiciary and Criminal Law and Procedure Applicable in Cambodia During the Transitional Period.

A translation of the search warrant is attached as Exhibit A to Phillips' declaration. It is dated June 17, 2006. As Pepe concedes, the search was conducted in Pepe's presence, in accordance with Article 20. Article 20 also states that the search must be conducted in the presence of two witnesses, "preferably neighbors or owners of the buidling." (Exhibit "I" to defense suppression motion). The plain language suggests a preference, but not a requirement, that the two witnesses be neighbors or owners. In this case, as the property report states, one of the witnesses was a house owner, and there were ten other witnesses present. (Ex. "A" to Phillips Declaration). In addition, two of defendant's victims were present at his residence at the time of the search.[3]

[3] Article 20 also states that the search "should" take place in the presence of two members of the suspect's family. The only family member of defendant's of whom the government is aware who was in Cambodia at the time of the search was defendant's wife.

In this case, even if the search was a joint venture, it appears to have been conducted in compliance with Cambodian law. In addition, even if there was a technical violation of a provision of Cambodian law, Assistant ICE Attache Phillips acted in good faith belief that the search was legal under Cambodian law.

**D. THE SEARCH OF PEPE'S COMPUTER MEDIA IS VALID**

In his second suppression motion, Pepe contends that the search warrant of the computer media seized by the CNP must be suppressed for a number of reasons. As set forth in detail below, each of these reasons fails.

Pepe claims that the search warrant for the media discovered at his home was tainted, because it contains information about what the CNP seized during the search of his Cambodian residence. Although Pepe claims that the CNP'S search of his residence was "unlawful," as set forth above, nothing was inappropriate about that search. Therefore, because the CNP'S search of his residence was lawful, Pepe cannot move to suppress the search of the seized computer media. Nevertheless, even if this Court determines that the CNP'S search was unlawful, the subsequent search of the media still should not be suppressed.

The government does not dispute that "'evidence which is obtained as a direct result of an illegal search and seizure may not be used to establish probable cause for a subsequent search.'" United States v. Barajs-Avalos, 377 F.3d 1040, 1054 (9th Cir. 2004) (quoting United States v. Wanless, 882 F.2d 1459, 1465 (9th Cir. 1989)). Nonetheless, "the mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant." United States v. Heckenkamp, 482 F.3d 1142, 1149 (9th Cir. 2007) (citation and quotation omitted); see United States v. Reed, 15 F.3d 928, 933 (9th Cir. 1994);

United States v. Vasey, 834 F.2d 782, 788 (9th Cir.1987). Thus, "[w]hen an affidavit contains evidence illegally obtained, '[a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant.'" Barajs-Avalos, 377 F.3d at 1054 (quoting Vasey, 834 F.2d at 788); see Heckenkamp, 482 F.3d at 1149. If, after excising the warrant, the reviewing court determines that there is probable cause and that the agents would have sought the warrant without the excised information, then the warrant stands. See Murray v. United States, 487 U.S. 533, 542-43 (1988); United States v. Duran-Orozco, 192 F.3d 1277, 1281 (9th Cir. 1999).

In the instant case, if the Court were to excise information in the search warrant related to the Cambodian search, it only should excise Paragraphs 12, 14, and 15 of the search warrant.[4] The paragraphs of the search warrant that remain, detail the actions of pedophile and child pornographer sufficient to establish probable cause of the complained of crimes. For example, in Paragraph 9, the affiant, Special Agent Wang describes how ICE learned that Pepe sexually abused and/or raped at least four girls:

> 9. Beginning on or about June 14, 2006, ICE Bangkok received information from two Non-Governmental Organizations that a U.S. citizen, later identified as PEPE, had sexually abused and raped a number of children at his compound in Phnom Penh, Cambodia. During the course of the investigation, AIA Phillips interviewed four of the child victims (between the ages of 9 and 12 years-old) who identified PEPE as the individual who sexually abused them. Based upon

---

[4] In his motion to suppress the computer media, Pepe suggests that the Court to excise Paragraph 13 of the search warrant. (Def.'s Mot. to Suppress Evidence Discovered as Result of Computer Media Search Warrant ("Computer Media Suppression Mot."), at 4.) This paragraph describes how U.S. Customs and Border Protection tracked Pepe's international travels. Given that none of this information is related to the search, this paragraph should not be excised.

> their investigation, in June 2006, the Cambodian National Police ("CNP") arrested PEPE . . . .[5]

In Paragraph 13 of the search warrant, Special Agent Wang describes how law enforcement determined that Pepe traveled to Cambodia after the enactment date of the statute prohibiting persons from engaging in illicit sexual conduct in foreign places:[6]

> 13. On July 20, 2006, U.S. Customs and Border Protection ("CBP") Officer Tim Kirkham checked for PEPE'S most recent travel details through the CBP computer systems that query passenger, reservation, and travel itinerary information from all international flights that depart from, arrive at, or transit through the U.S. According to CBP computer systems, on September 1, 2005, PEPE departed Los Angeles International Airport for Manila, Philippines. On September 3, 2005, PEPE departed Manila, Philippines for Phnom Penh, Cambodia by way of Bangkok, Thailand.

In Paragraph 16 of the search warrant, Special Agent Wang details a letter that Pepe sent to the United States, in which he admitted to some of the conduct at issue in this case:

> 16. On September 12, 2006, one of PEPE's sisters provided Special Agent Carlos Ortiz and me with dozens of emails and letters received from PEPE while he was incarcerated in Cambodia that mostly detailed his requests and health. Also, included was a letter, written by PEPE and contained within an envelope postmarked August 15, 2006 that detailed some of PEPE's actions in Cambodia. The following is a summary of this letter:
>
> a. PEPE mentioned several of his child victims by name . . . .[7]

---

[5] For purposes of excising the search warrant, the final sentence of Paragraph 9 was truncated. The deleted portion of the sentence reads as follows: "and executed search warrants at PEPE's compound in Phnom Penh, where evidence of PEPE's sexual abuse of his child victims was seized."

[6] The enactment date for Title 18, United States Code, Section 2423(c) is April 30, 2003. See United States v. Clark, 435 F.3d 1100, 1109 n.13 (9th Cir. 2006), cert. denied, ___ U.S. ____, 127 S. Ct. 2029 (2007).

[7] Paragraph 16(a) has been excised to remove information about what was discovered during the CNP'S search and the subsequent analysis in Singapore of the computer hard drive. The deleted portion of the sentence reads as follows: "including one for which PEPE

b. PEPE stated that his daily routine usually included a massage from the girls after they returned from school and another later in the evening. Further, PEPE stated these massages led to "inappropriate touching, etc."

c. PEPE stated that on one occasion, after he was given Viagra, PEPE bound a known child victim and slapped her in the face. PEPE explained that the known child victim was given to him by her mother as a wife/girlfriend and described both his "sex drive" and "willpower" as "very low."

d. PEPE admitted taking naked pictures, as SANG's request, of her two nieces. Further, PEPE claimed that he erased these files from his computer.

These remaining portions of the search warrant affidavit establish probable cause that Pepe, an American citizen in Cambodia, engaged in illicit sexual conduct in foreign places, a violation of Title 18, United States Code, Section 2423(c). Several of the Pepe's victims came forward and detailed how he raped and sexually abused them. Pepe admitted that he not only knew at least one of his victims, but that he engaged in illicit sexual conduct with them, which including "inappropriate touching" and bondage. He also suggested that he had sexual relations with this minor. Finally, Pepe's admission that he took naked photographs of Sang's nieces, which he stored and later deleted on his computer, established probable cause that there might be digital evidence of this crime at his residence. When the Court considers the handwritten

---

had dozens of pornographic and sexually-explicit photographs on his computer."

notations and titles on a number of the compact discs, probable cause for the search becomes even stronger.[8]

Once probable cause is established, the only remaining issue that the Court must address is whether the ICE agents would have sought the search warrant for the computer media without the evidence discovered in the Cambodian search. See Murray, 487 U.S. at 542-43; Duran-Orozco, 192 F.3d at 1281. In this case, Special Agent Wang, the search warrant affiant, stated in his declaration that ICE would have sought a search warrant for the computer media, even if the agency did not have the knowledge of the depictions of minors and child pornography recovered in Singapore from Pepe's computer media. (See Decl. of Eddy Wang ("Wang Decl."), at ¶ 4.) Because of the nature of the crimes, ICE would have sought a warrant for any computer media at Pepe's residence to corroborate the victims' testimony. (See id.) Thus, had ICE been in possession of Pepe's computer media, it would have sought the warrant.

Because Pepe cannot offer any evidence to refute this, other than conjecture and speculation that ICE would not have sought a warrant, the warrant must stand. Consequently, any computer media seized pursuant to that warrant is valid and may be introduced against Pepe at trial.

**E. THE SEARCH WARRANT ESTABLISHED PROBABLE CAUSE FOR THE MEDIA LISTED IN THE SEARCH WARRANT**

Pepe also takes issue with the government's desire to search all of the computer media seized at his residence for evidence that he raped and abused children, and photographed his

---

[8] These titles and handwritten notes include "15 years old little girls with crazy sex event," "Tender Baby," "14 Years Old Unsensor," "HOME 111605," "4 GIRLS," "HOME 102805," and "SKV & NEW GIRL." (See Wang. Decl., Ex. A, at ¶¶ 6(b) & 6(c)(1).)

victims while in Cambodia. Pepe claims that the government should not have searched any media whose lacks a label or whose labels reflects that it might contain some content other than child pornography. (See Computer Media Suppression Mot., at 5-6.) Pepe insists that the only way that agents would be allowed to search that media is if the affidavit contained an explanation of how Pepe could have disguised child pornography in such a manner. (See id.) Such an assertion is not supported by the law. Moreover, it ignores the Ninth Circuit's recent holding in United States v. Hill, 459 F.3d 966 (9th Cir. 2006).

In Hill, a child pornography case, the appellate court upheld an warrant authorizing the seizure of a defendant's computer equipment. The defendant, like Pepe, claimed that "warrant was overbroad because it authorized seizure of storage media whether or not they contained child pornography. He suggests it should have authorized seizure only of media containing child pornography." Hill, 459 F.3d at 973. The Ninth Circuit rejected this claim, recognizing that "it is impossible to tell what a computer storage medium contains just by looking at it. Rather, one has to examine it electronically, using a computer that is running the appropriate operating system, hardware, and software." Id. Further, the Ninth Circuit held that although the search warrant did not explain why the wholesale seizure of computer equipment was necessary, suppression of the discovered child pornography was not appropriate. Id. at 977.

The search in the instant case was not a "broad sweep." Instead, the search was focused on a limited set of media, enumerated and described in the affidavit. The fact that it did not include a paragraph explaining how and why child pornographers, like Pepe, store and hide pornography on various media, is not fatal in light of the Hill holding. Moreover, by including the identifying information of the compact disks in the affidavit, the government ensured that the

reviewing magistrate was aware of what the agents planned to search. Thus, when Magistrate Judge Kenton issued the warrant, after considering the totality of the circumstances, he determined that there was probable cause to search all of the enumerated media. Because, that finding was not erroneous, the warrant must be upheld. See, e.g., United States v. Schmidt, 947 F.2d 362, 371 (9th Cir. 1991) (quoting United States v. McQuisten, 795 F.2d 858, 861 (9th Cir. 1988)) ("'In doubtful cases, preference will be given to upholding the validity of [a] search warrant.'"); United States v. Castillo, 866 F.2d 1071, 1076 (9th Cir. 1988) (quoting McQuisten, 795 F.2d at 861) ("'We may not reverse a magistrate's finding of probable cause unless it is clearly erroneous.'"); United States v. Fannin, 817 F.2d 1379, 1381 (9th Cir. 1987) (quoting United States v. Angulo-Lopez, 791 F.2d 1394, 1396 (9th Cir. 1986)) ("The magistrate's finding of a 'substantial basis' is given great deference.")

**F. THE EXECUTION OF THE SEARCH WAS PROPER IN TIME AND SCOPE**

Pepe also suggests, without any evidence, that the search may not have been proper because of the scope and timing of the execution of the warrant.

Pepe interprets dicta from Hill to require that the government affirmatively demonstrate that "the computer search was properly limited to computer files that the searching agent could reasonably believe might contain items which the search warrant allowed the agent to look for." (Computer Media Suppression Mot., at 8.) This claim fails because by the terms of the warrant, the search was limited to computer media. Therefore, given the nature of the media, it is not evident whether anything but computer/electronic files could have been searched. Further, by trying to limit the files which the government can search, Pepe ignores the Ninth Circuit's holding in Hill. In that case, the Ninth Circuit explained the ease in which child pornographers

can hide their contraband and the difficulty of searching computer media to discover the evidence of their crimes:

> Computer records are extremely susceptible to tampering, hiding, or destruction, whether deliberate or inadvertent. Images can be hidden in all manner of files, even word processing documents and spreadsheets. Criminals will do all they can to conceal contraband, including the simple expedient of changing the names and extensions of files to disguise their content from the casual observer. Forcing police to limit their searches to files that the suspect has labeled in a particular way would be much like saying police may not seize a plastic bag containing a powdery white substance if it is labeled "flour" or "talcum powder." There is no way to know what is in a file without examining its contents, just as there is no sure way of separating talcum from cocaine except by testing it.

Id. at 978 (quotation and citation omitted).

Thus, limiting the search as suggested by Pepe undermines the warrant and the Ninth Circuit's holding in Hill.

Pepe also claims that any "items" discovered after July 15, 2007, must be suppressed, because "[t]he search warrant placed a sixty-day time limit on the search of the computer media . . . ." (Computer Media Suppression Mot., at 9.) Without any law, Pepe opines that "[s]ubsequent searches of other items, unless within the sixty-day search period (which would have ended on July 15, 2007), would not have been authorized by the search warrant and so any evidence found in such subsequent searches would be product of a warrantless search." (Id.) However, it is not clear what Pepe hopes to suppress. In fact, Pepe concedes that whether such evidence actually exists is no more than pure speculation. (Id. n.3.) Nonetheless, if Pepe suggests that the government could not search the seized media after the sixty-day period set forth in the warrant, his motion must be denied.

In the instant case, the search warrant for the computer media dictates how the those

items must be searched:

> The ITEMS TO BE SEARCHED are already in the possession of United States Immigration and Customs Enforcement in the Central District of California. Consistent with the requirements of Rule 41, the ITEMS TO BE SEARCHED will be delivered to computer forensic technicians within 10 days of the effective date of this warrant to commence the search. For the reasons noted in paragraph 19 of the Affidavit, the search will not be completed during the 10-day period. However, the ITEMS TO BE SEARCHED will be preliminarily examined to determine whether they contain any evidence or are an instrumentality of the crime, within 60 days. If the computer forensic technicians determine that the data does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time not to exceed 60 days from the date of execution of the warrant. If the government needs additional time to determine whether the data of the items to be seized pursuant to this warrant, it must obtain an extension of the time period from the Court within the original sixty day period.

(Wang Decl., Ex. A, at 5-6 (emphasis added).) Contrary to Pepe's assertion, further analysis of the computer media need not be completed within sixty days. Instead, the government only needs to conduct a "preliminary examin[ation] to determine whether they contain any evidence or are an instrumentality of the crime, within 60 days." (Id.)

In this case, the ICE agents' preliminary examination of the media occurred between May 17, 2007, and July 12, 2007. (See Wang Decl., at ¶ 5.) During that time period, the ICE agents determined that only eleven of the seized compact disks contained evidence or were an instrumentality of a crime. (See id.) The government informed defense counsel that they could retrieve all of the computer media, except those disks that contained visual depictions of minors. (See id.) After fulfilling its obligations under the warrant, on July 12, 25, and 26, the government conducted a more detailed analysis of the disks that disks contained visual depictions of minors – evidence or an instrumentality of a crime. (See id. at ¶ 6.)

To the extent that Pepe complains that items discovered during the detailed analysis of the disks must be suppressed simply because the analysis took place after July 15, 2007, his motion must fail. "Neither [Federal Rule of Criminal Procedure 41] nor the Fourth Amendment provides for a specific time limit in which a computer may undergo a government forensic examination after it has been seized pursuant to a search warrant." United States v. Hernandez, 183 F. Supp. 2d 468, 480 (D.P.R. 2002). Asking the Court to limit the government ability to conduct additional analysis of computer media seized pursuant to a search warrant is the same as asking the Court to prohibit the government to review documents also seized by a search warrant after the initial review. See, e.g., United States v. Habershaw, No. CR. 01-10195-PBS, 2002 WL 33003434, *8 (D. Mass. May 13, 2002) ("Further forensic analysis of the seized hard drive image does not constitute a second execution of the warrant or a failure to 'depart the premises' . . . any more than would a review of a file cabinet's worth of seized documents."); Hernandez, 183 F. Supp. 2d at 480 ("In most cases the forensic examination of the computer will take place at a different location than where the computer was seized. The same principle applies when a search warrant is performed for documents. The documents are seized within the time frame established in the warrant but examination of these documents may take a longer time, and extensions or additional warrants are not required. The examination of these items at a later date does not make the evidence suppressible."). Such a proposition is absurd, unfounded in law, and been rejected by other courts. See Habershaw, 2002 WL 33003434, at *8 (denying defendant's motion to suppress evidence discovered fourteen days after issuance of search warrant); Hernandez, 183 F. Supp. 2d at 480 ("We find that it was perfectly reasonable for the Government to take a longer time to search and inspect the images in the floppy drives,

particularly after already having discovered child pornography in Defendant's hard disk. Therefore, the evidence recovered will not be suppressed.").

The government has not, nor does it intend to at this time, to reexamine those compact disks that do not contain visual depictions of minors. Should the government wish to reexamine those disks, it will seek a new search warrant. Because there appears to be nothing to which Pepe can object, his suppression motion should be denied.

## IV

## CONCLUSION

For the foregoing reasons, the government respectfully requests that defendant's motions to suppress be denied

**DECLARATION OF GARY J. PHILLIPS**

I, Gary J. Phillips, hereby declare:

1. I have been employed with the United States Customs Service, now known as United States Immigration and Customs Enforcement ("ICE"), since November 1988. For approximately 14 years, I was a Special Agent in the San Diego Office of the Special Agent-in-Charge, where I investigated and/or participated in over ten child exploitation investigations. Since May 2002, I have been assigned to ICE Bangkok, where I have participated in over 70 child exploitation cases. During my current assignment, I have investigated several cases charging Americans with violations of Title 18, United States Code, Section 2423(c) (Engaging in Illicit Sexual Conduct in Foreign Places), including United States v. Michael Lewis Clark (Case No. CR03-0406L) in the Western District of Washington and United States v. Kent Frank (Case No. 04-20778-CR-JORDAN) in the Southern District of Florida. I am an Assistant ICE Attache. In that position, I am responsible for investigating a wide variety of criminal activity, including but not limited to, crimes against children, human trafficking and smuggling, terrorism, counter-terrorism, drug trafficking, and money laundering.

2. This declaration is made in support of the government's consolidated opposition to Defendant's Motions (1) To Suppress Evidence and (2) To Suppress Evidence Discovered As A Result of

Computer Search Warrant.

3. On or about June 14, 2006, the United States Embassy in Cambodia (the "Embassy") informed me that the Embassy had received the following information from World Hope International ("WHI"), a non-governmental organization: The International Justice Mission ("IJM"), another non-governmental organization, had learned that a 12-year old girl claimed she was purchased, tied up, and raped by an American teacher of English, and that the perpetrator had not yet been identified.

4. Later that day, IJM director Ron Dunne told me that an American citizen was allegedly involved in sexually abusing at least five females between the ages of 10 and 18, and that one of the victims was bound and raped. Dunne also told me that as a result of these allegations, the Cambodian National Police ("CNP") had an American under surveillance. In addition to me, Dunne informed the CNP of the allegations of sexual abuse.

5. On or about June 15, 2006, Dunne told me that CNP and the municipal police in Phnom Penh, Cambodia, were conducting surveillance of the American, and that the American was inside his residence with victims. Dunne also provided me with information from an interview conducted by WHI on or about June 12, 2006 of the 12-year old victim, "I.T." In that interview, I.T. stated, among other things, that the man with whom she had "sex" was known as "Michael" and was from the United States.

I.T. also described "Michael's" residence and stated that "some young girls" were being tied up for the purpose of having sex with "Michael."

6. On or about June 15, 2006, Dunne told me that an IJM investigator had located Michael Pepe's house and that the local police were surveilling that house. Dunne also provided me with a copy of an IJM report that related that Michael Pepe (identified in the report by his date of birth and his U.S. Passport number) was involved in "sexual trafficking." According to that IJM report, I.T. stated that while she was at Pepe's house, she was bound and sexually abused. In addition, the IJM report noted that a medical examination conducted at a Phnom Penh hospital showed injuries to I.T.'S vagina.

7. On or about June 16, 2006, at WHI, I interviewed I.T. in the presence of a guardian. Also present during the interview were Dunne, United States Embassy investigator Suos Vansak, and WHI counselors. The CNP was not present when I interviewed I.T. My purpose in interviewing I.T. was to memorialize her statements in the event that there would be a prosecution in the United States. Also, if an American had harmed I.T., the United States had an obligation to provide her with medical care.

8. In my capacity as an Assistant ICE Attache in Bangkok, Thailand, when I receive information that a United States citizen may be involved in child abuse within the jurisdiction of ICE

Bangkok, I conduct a parallel investigation with whatever investigation is being run by the local police. When, as in this case, it appears that the child victim's family was involved in selling the victim to the perpetrator, a non-governmental organization becomes the legal guardian and caregiver of the child victim. As part of my investigation, I ask the non-governmental organization that has custody of the child victim for access to the child victim so that I can interview the child victims without the police present. My investigation is parallel, not joint, with that of the local police.

9. On or about June 16, 2006, I met with CNP General Un Sokunthea. Dunne also attended that meeting, and he gave General Un Sokunthea a copy of the IJM report regarding the allegations against Michael Pepe. At that meeting, I informed General Un Sokunthea that ICE was conducting a parallel investigation. I also thanked General Un Sokunthea for the efforts of the CNP and I told her that if the CNP needed help, to please let me know. I made those statements to be courteous, diplomatic, and respectful to local law enforcement. I did not anticipate that the CNP would seek my help in its investigation. The CNP did not seek my help in its investigation until after the Cambodian search warrant was executed and the computer media was seized. As stated below, the CNP sought ICE assistance in forensically analyzing the seized media.

10. On or about June 17, 2006, at approximately 12:40 p.m., after observing Michael Pepe leave his residence and go to a tour business, the CNP arrested him for rape and debauchery in violation of Cambodian law. After arresting Pepe, the CNP transported him to his residence. I was not present when the CNP arrested Pepe. I learned of the arrest from Dunne. I did not instruct or advise the CNP to arrest Pepe.

11. Before arresting Pepe, the CNP had obtained a search warrant for his residence. True and correct copies of the translated Cambodian warrant and residential search report are attached hereto as Exhibit A. At approximately 1:20 p.m. on June 17, 2006, the CNP began to execute the search warrant.

12. I did not instruct or advise the CNP to obtain a warrant to search Pepe's residence, and I did not assist the CNP in obtaining the search warrant. I do not know the process by which a search warrant is obtained under Cambodian law. It is my understanding that the Cambodian prosecutor and the person whose house is being searched must be present.

13. I did not execute the Cambodian search warrant in Pepe's residence. However, I was present as an observer when the CNP executed the Cambodian search warrant on Pepe's residence. There were approximately twenty police officers searching Pepe's residence. The Cambodian prosecutor and Pepe were present when the CNP executed the search. There were officers searching in

one room when Pepe was located in another room. During the search, I went inside the house and followed the CNP officers. I saw what items the CNP officers found and I took photographs during the search for my parallel investigation. At one point, the CNP officers discovered rope in the closet. When the officers told me about the rope, I looked at it. I also observed many items that corroborated the information provided by I.T. During the search, I wore gloves so that I would not contaminate any of the evidence seized by the CNP.

14. On or about June 17, 2006, the CNP stopped the search. I do not know why they stopped the search. The CNP taped the door and sealed it shut. On or about June 19, 2006, the CNP returned to Pepe's residence, placed the seized items into burlap bags, put the bags into trucks, and drove all of the seized items to the CNP offices.

15. Among the items seized by the CNP were a computer and computer media, including a flashcard, memory card, and compact disks. The CNP does not have the forensic capability to analyze computer media. Because ICE has the capability to forensically analyze computer media, ICE offered to assist to the CNP in its analysis of the computer and media. This is the same assistance that ICE offers to law enforcement agencies throughout the world who lack the technical resources and knowledge to analyze computers and computer media. After accepting ICE'S offer of

assistance, the CNP turned over the hard drive, flashcard, memory card, and compact disks to me. I later sent those items to ICE Singapore for forensic analysis.

16. To my knowledge, the search warrant obtained by the CNP for Pepe's residence complied with Cambodian law, and the search was executed in accordance with Cambodian law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 23 day of August, 2007, at Bangkok, Thailand.

GARY J. PHILLIPS

TOTAL P.008

The Kingdom of Cambodia
Nation Religion King
***********

Phnom Penh Municipal Court

Number 103 A.Y.Kh.

**Residential Search Warrant**

I, Nget Sarat, the District Attorney assigned to the Phnom Penh Municipal Court
-having seen the laws regarding the appointment and function of the Courthouse of the State of Cambodia, which was promulgated by Decree number 06 Kr., dated 08 February 1993.
-having seen the law regarding criminal legal procedure, which was promulgated by Decree number 21, dated 08 March 1993.
-having seen report number 449/06 R.M.K., dated 17 June 2006 [illegible] case of human sexual commerce in the residence at Number 83, Road 596, Subdistrict Boeng Kak II, District Tuol Kork, City of Phnom Penh, resided in by Michael Joseph, nationality American.

Do hereby judge that: To free the victims and suppress the above-mentioned acts, there should be a search made of the residence at Number 83, Road 596, Subdistrict Boeng Kak II, District Tuol Kork, City of Phnom Penh

It Is Therefore Decided

To search the residence at number 83, Road 596, Subdistrict Boeng Kak II, District Tuol Kork, City of Phnom Penh, with a resident named Michael Joseph.

to search for evidence to support the above-mentioned criminal matter.

Phnom Penh, 17 June 2006
**District Attorney**
[stamp]
[signature]

EXHIBIT A

Kingdom of Cambodia
Nation Religion King

------------------

Residential Search Report

Year two-thousand six, month of June, day seventeen, at twelve o'clock, at the residence at Number 83, Road 596, Subdistrict Boeng Kak II, District Tuol Kork, City of Phnom Penh.

I, Nget Sarat, District Attorney of the Phnom Penh Municipal Court, with Mr. Huot Chhuor, clerk [illegible] leading the combined force to search the above residence, in connection with the case of debauchery committed upon children, with a composition of participants as follows:

gnature] 1- Mr. Chhan Vuth Deputy Officer of the Department of Human Trafficking Prevention of the Ministry of Interior.

gnature] 2- Mr. Hin Sophal, Deputy Chief of the Department of Human Trafficking Prevention of the Ministry of Interior

gnature] 3- Mr. Iem Rotana, Deputy Chief of the Department of Human Trafficking Prevention of the Ministry of Interior

ignature] 4- Mr. Chin Da, Deputy Chief of the Department of Human Trafficking Prevention of the Ministry of Interior

humbprint] 5- Phlong Hephi, District Deputy Inspector

ignature] 6- Mr. Khat Khon Tit, Chief of Post of Boeng Kak II

7- Mr. Andy Simpson, embassy representative

8- Mr. Ron Dunne, representative of the NGO IJM.

9- Mr. Gary Phillips, representative of the American FBI

10- Mrs. Sin Samna, house owner

11- Mr. Van Saret, Subdistrict Chief. [signature]

When we [illegible] arrived at the above residence, entered and took *Michael Joseph Pepe,* male, American, [illegible] performed a search of his residence, in connection with debauchery committed upon children, having [illegible] residential search warrant, allowing Michael Joseph Pepe and the committee participate and [illegible] we entered and searched, seeing:

L.K.

1. Young girl named [redacted] age 11, [from Svay Rieng province.
2. Song Vy, female, age 20, from Prey Veng province.

[signature] 3. 43 pornographic CD's [illegible] – one diary

4. Three pornographic sex photographs

[signature] 5. Cambodian Passport, number 310061 belonging to Pet Chan Ry, female – driver's license number E0383375.

[signature] -document number 28714422, Pepe, Michael J.

-document number [redacted]4-document number 04099L28117

[signature] -document number 6234071, dated 2-12-04.

6. 36 photo albums – one computer (computer brand Compaq – CPU brand [illegible], printer

[signature] brand *hp.*)

7. A quantity of girls' clothing – bank book number 322112-100-226-003070-8.

[signature] 8. White Nylon rope, length approximately two meters – White nylon rope approximately 04 meters long.

[signature] 9. One cell phone, brand Nokia 3310

10. American dollars in the amount of $300 (three hundred U.S. Dollars) – Baht in the amount of 3140B (three thousand one hundred forty Baht) – Cambodian money in the amount of 100,000

[thumbprint] Riel

Samna

35

(one hundred thousand Riel) – American one-dollar bills in the amount of $95 (ninety five U.S. Dollars).

As for the above materials, we decided to turn them over to the representatives of the Department of Human Trafficking Prevention of the Ministry of Interior to control temporarily, and which we also decided to detain 05 individuals, named Thach Thing [sic], female, age 55; [redacted], male, age 14; [redacted] female, age 11; Song Vy, female, age 20; and Michael Joseph Pepe; and turn them over to the control of the Department of Human Trafficking Prevention of the Ministry of Interior for questioning. As for the residence at Number 83, Road 596, Subdistrict Boeng Kak II, District Tuol Kork, City of Phnom Penh, the committee decided to turn it over to the owner and the post authorities to control temporarily.

Aside from the above materials, we did not confiscate anything else.

This record was completed at the time of fifteen hours on the same date, and also [illegible] record for Michael Joseph Pepe and the observing committee and agreed to supply thumbprint(s) and sign with us.

Recorded By
Clerk
[signature]
Huot Chhuor

[signature]
Nget Sarat

[signature]

[signature]
Chin Da

[thumbprint]
Sin Samna

[signature]

[signature]
Iem Rotana

[signature]
hlong Hephi

[signature]

[thumbprint]
Sin Samna

**DECLARATION OF EDDY WANG**

I, Eddy Wang, hereby declare:

1. I am a Special Agent with the United States Department of Homeland Security, U.S. Immigrations and Customs Enforcement. ("ICE"), and have been so employed since March of 2003. I previously was employed with the Immigration and Naturalization Service as both a Special Agent and Immigration Enforcement Agent since July of 1998. I currently am assigned to the Public Safety/Smuggling Group of the Ventura County Office of the Resident Agent-in-Charge. In this capacity, I have attended training in the area of child exploitation and have investigated two other child exploitation cases.

2. This declaration is made in support of the government's consolidated opposition to Defendant's Motions (1) To Suppress Evidence and (2) To Suppress Evidence Discovered As A Result of Computer Search Warrant.

3. On or about November 16, 2006, ICE in the Central District of California received a number of items seized by the Cambodian National Police from Michael Pepe's Cambodian residence. On or about April 17, 2007, ICE Special Agent Chris Kuzma received additional media. The items that Special Agent Kuzma and I received included one Hewlett-Packard CPU, twenty-seven pornographic compact disks, thirty-one miscellaneous compact disks, and five 3.5-inch floppy disks. These items had not previously been forensically examined by ICE Special Agent

David Galante of the ICE Attache Office in Singapore, or anyone else. Believing that these items might be evidence or an instrumentality of criminal activity, I prepared a search warrant. On or about May 17, 2007, after the warrant had been approved by Assistant United States Attorney Patricia Donahue, I presented a search warrant and affidavit to the Honorable Victor B. Kenton, United States Magistrate Judge for the Central District of California. After reviewing my affidavit, Magistrate Judge Kenton signed the search warrant. A true and correct copy of the search warrant affidavit is attached hereto as Exhibit A.

4. In the search warrant affidavit, I detailed some of the evidence discovered by the Cambodian National Police that corroborated the victims' accounts of rape and abuse by Pepe. In the affidavit, I also included descriptions of the images found by Special Agent Galante during the forensic analysis he performed at the request of the Cambodian National Police. The images in the media that Special Agent Galante examined included child pornography and photographs of Pepe's victims in various states of undress. However, even if ICE was unaware of this evidence or was precluded from using this information, I still would have sought a search warrant for the computer media based on the nature of the crime. Based on my training and experience, I know that pedophiles often photograph their victims, document and correspond with other pedophiles about their activities, and

collect and store child pornography. Given the possibility that evidence might exist on the media that would corroborate the victims, I still would have applied for a search warrant.

5. Between May 17, 2007, and July 12, 2007, ICE Computer Forensic Analyst Timothy Sullivan and I examined the items enumerated in the search warrant. Analysis of the items revealed that approximately eleven compact disks that contained visual depictions of minors. After conducting a preliminary examination of the media, I determined that the above disks contained evidence or an instrumentality of criminal activity and needed a more detailed analysis. Because the remaining items did not contain evidence or were instrumentalities of criminal activity, I determined that those items could be returned to Pepe. A true and correct copy of the Report of Investigation documenting my findings is attached hereto as Exhibit B. Prior to July 15, 2006, I sent my findings to AUSA Donahue and asked that she inform Pepe's counsel that the items that did not contain visual depictions of minors could be returned to Pepe. Although I understand that the United States Attorney's Office has furnished my findings to Pepe's attorneys, no one acting on Pepe's behalf has picked up this media.

6. On or about July 12, 2007, Bruce Pixley, Senior Director of Aon Consulting, copied one of the compact disks, and using forensic tools conducted a more detailed analysis of the

compact disk. That analysis included an examination of the unallocated space on the disk. In the unallocated space of that compact disk, Mr. Pixley found child pornography and visual depictions of minors. On or about July 25 and 26, 2007, Mr. Pixley copied the remaining compact disks and conducted a similar examination. Mr. Pixley determined that at least two of the compact disks that he examined contained visual depictions of minors in the unallocated space.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 22nd day of August, 2007, at Los Angeles, California.

EDDY WANG

AFFIDAVIT FOR SEARCH WARRANT

| UNITED STATES DISTRICT COURT | DISTRICT<br>CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| D STATES OF AMERICA<br>vs. | DOCKET NO. MAGISTRATE CASE NO. 07-0731M |
| THE PREMISES KNOWN AS:<br><br>Computer media that was seized in June 2006 from the Cambodia residence of U.S. citizen Michael J. Pepe, that is currently in the custody of United States Immigration and Customs Enforcement in Los Angeles, California, and that is specifically described in Attachment A | NAME AND ADDRESS OF JUDGE OR U.S. MAGISTRATE JUDGE<br><br>HONORABLE VICTOR B. KENTON<br>UNITED STATES MAGISTRATE JUDGE<br>LOS ANGELES, CALIFORNIA |

The undersigned being duly sworn deposes and says: That there is reason to believe that

| ☐ on the person of ☒ on the premises known as | DISTRICT<br>CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

SEE ATTACHMENT A

FILED
CLERK, U.S. DISTRICT COURT
MAY 17 2007
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

The following property (or person) is concealed:

SEE ATTACHMENT B

t alleges the following grounds for search and seizure 1

Evidence of violations of Title 18, United States Code, Section 2423(c), Engaging in Illicit Sexual Conduct in Foreign Places, and Title 18, United States Code, Section 2260, Production of Sexually Explicit Depictions of Minor for Importation into the United States.

See attached affidavit which is incorporated as part of this affidavit for search warrant

ffiant states the following facts establishing the foregoing grounds for issuance of a Search Warrant

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED AS PART OF THIS AFFIDAVIT FOR EARCH WARRANT)

| SIGNATURE OF AFFIANT<br><br>ODY WANG | OFFICIAL TITLE, IF ANY<br><br>SPECIAL AGENT - DHS, Immigration and Customs Enforcement |
|---|---|

Sworn to before me, and subscribed in my presence:

| AY 17, 2007 | JUDGE, OR US MAGISTRATE JUDGE<br>VICTOR B. KENTON<br>HONORABLE VICTOR B. KENTON |
|---|---|

search is to be authorized "at any time in the day or night" pursuant to Federal Rules of Criminal Procedure 41(c), show reasonable cause therefor

ited States Judge or Judge of a State Court of Record

ris

EXHIBIT A

41
00919

## ATTACHMENT A

## ITEMS TO BE SEARCHED

The items listed below, all of which were found and seized during a June 2006 search warrant executed by the Cambodian National Police at the Phnom Penh, Cambodia residence of a United States citizen, MICHAEL JOSEPH PEPE. All of the items listed below are currently in the custody of United States Immigration and Customs Enforcement in the Central District of California :

1. An off-white, Hewlett Packard computer tower bearing serial number, US01811010.

2. Twenty-seven (27) pornographic Compact Discs ("CD"), with titles and markings that included: "15 years old little girls with crazy sex event", "Japanese Girls", "animal instinct 4: Animal World", "Tender Baby", and "14 Years Old Unsensor".

3. The following thirty-one (31) miscellaneous CD's:

1. A CD with red markings that read "TDK", "CD-RW80", "HIGH SPEED", and "700MB". This CD was found in a jewel case, which had an insert with handwritten notes in blue ink that read "HOME 111605", "4 GIRLS", "HOME 102805", "SKV & NEW GIRL". The following handwritten notes in blue ink had been crossed out: "HOME GIRLS 112605", "HOME GIRLS AUG4", "KIA", "NAP & KIA 1", "NAP & KIA 2", "NI 2", "NI 102905", and "HOME GIRLS AUG4 016".

2. A CD with markings that read "princo", "Rewritable", "CD-RW", "80min. 700MB", "High Speed", "4x-12x", and "Contents:". This CD's "Contents:" were handwritten and listed as "VARIOUS VILLAGES & CHANRY".

3. A CD with red markings that read "TDK", "CD-RW80", "HIGH SPEED", and "700MB". This CD had handwritten markings that read "VILLAGES" and "SOCRATES



FOUNDATION". This CD was found in a jewel case, which had an insert with handwritten notes in blue ink that read "SOCRATES FOUNDATION", "AREY KSAYH", "CULTURAL ORPH", "MONK FUNERAL", "OLD VILLAGE", "PURSAT 103005", "REAM 071405", and "REAM 2".

4. A CD with red markings that read "TDK", "CD-RW80", "HIGH SPEED", and "700MB". This CD had blue handwritten markings that read "MP".

5. A CD with markings that read "SONY", "CD-R", and "700MB". This CD had blue handwritten markings that read "DATA & PIC".

6. A CD with markings that read "maxell", "CD-R", and "700 MB". This CD had blue handwritten markings that read "PARTY", "PARTY 2", "PARTY USA".

7. A CD with red markings that read "TDK", "CD-RW80", "HIGH SPEED", and "700MB". This CD had handwritten markings that read "CHANRY". This CD was found in a jewel case, which had an insert with handwritten notes in blue ink that read "CHANRY", "BATTENBANG TRIP", "CHANRY", and "CHANRY ID".

8. A CD with markings that read "maxell", "XL-II 80", and "Music PRO". This CD was found in a jewel case, which had an insert with handwritten notes read "Suslainabale village", "25/12/04", and "Mr. Milchaek pepe".

9. A CD with markings that read "SAMSUNG" and "48x". This CD had handwritten markings that read "BRETT's PARTY" and "REAM".

10. A CD with markings that read "SONY", "DVD-RW", and "120min/4.7GB".

11. A CD with markings that read "maxell", "XL-II 80", and "Music PRO". This CD had black handwritten markings that read "school supply and village." and "class. 2004.oct.9".

This CD was found in a jewel case, which had an insert with handwritten notes read "VARIOUS UNKNOWN PROGRAMS".

12. A CD with red markings that read "TDK", "CD-RW80", "HIGH SPEED", and "700MB". This CD had handwritten markings that read "MISC. FUNCTIONS". This CD was found in a jewel case, which had an insert with handwritten notes in blue ink that read "BAT HOUSE", "BRETT's PARTY JULY 2005", "BETTS PARTY JULY 2005", "CLASS GROUP", ""HONG's PARTY", "HOUSE 061605", "PARTY", "PARTY 2", and "USA & PARTY".

13. A CD with markings that read "maxell", "CD-R", and "700 MB". This CD had markings that read "DR. LY".

14. A CD with markings that read "maxell", "CD-R", and "700 MB". This CD had blue markings that read "SCH. & WEDDING".

15. A CD with markings that read "SONY", "CD-RW", "CD ReWritable", "CD-RW650", and "650MB". This CD was found in a jewel case, which had an insert with handwritten notes in blue ink that read "GIRLS NOW", "MOM", "MOMS", "SCHOOL PARTY", "GIRLS 012206", "SCH GIRLS", "2006-01", "VALENTINE GIRLS", "CHRISTMAS 1", "CHRISTMAS 2005", and "GIRLS 121005".

16. A CD with markings that read "SONY", "CD-R", and "700MB". This CD had red markings that "NARY ALBUM".

17. A CD with markings that read "SONY", "CD-R", and "700MB". This CD had blue handwritten markings that read "MED. INFO."

18. A CD with markings that read "SONY", "CD-R", and "700MB". This CD was found in a jewel case, which had a blue insert with an orange circle displayed.

19. A CD with markings that read "webroot" and "Spy Sweeper".

20. A CD with markings that read "WEB BUILDER", "over 150 Tools & Tips to Build Better & Faster WEB SITES".

21. A CD with markings that read "Norton", "2002", and "Internet Security".

22. A green CD with markings that read "CD" and "Windowsxp".

23. A blue CD with markings that read "Software, Videos & Games" and "Windowsxp".

24. A CD with has blue markings that read "VCD-" and "VOL-217".

25. A CD with black markings that read "Sustainable Village Organization" and "VCD". This CD was found in a jewel case, which had an insert with a photograph of PEPE standing with several children.

26. A purple and white CD with markings that read "SAMSUNG CD-RW" and "User's Guide".

27. A red CD with markings that read "The Essential SIMON & GARFUNKEL".

28. A CD with markings that read "A Midsummer Nightis Dream", "Master", and "ISRC CN H09-99-443-00/A J6".

29. A CD with black markings that read "BEST CLASSICS". This CD was found in a jewel case, which had a red insert with markings that read "CLASSICAL MUSIC" and "BEST CLASSICS".

30. A CD with markings that read "MASTERS OF CLASSICAL MUSIC", "BACH", "BRANDENBERG CONCERTO NO.1", and "VIOLN CONCERTO IN E MAJOR".

31. A pink CD with markings that read "COLLECTOR'S EDITIO", "251", and "eGames".

4. The following five (5) 3.5-inch floppy disks:

1. A black Sony disk with a white label. This label has handwritten markings that read "CAMBODIA", "NAA", and "DRAFT PAPER".

2. A green maxell disk with a white label. This label has handwritten markings that read "PERSONAL".

3. A green maxell disk with a white label. This label has handwritten markings that read "CULTURAL ANTHROPOLOGY" and "ENGLISH". This label also has a handwritten note that was crossed out that reads "FINANCIAL MANAGEMENT".

4. A green maxell disk with a white label. The label has handwritten markings that read "MANAGEMENT PRINCIPLES".

5. A blue maxell disk.

## IV. TIMING OF SEARCH

The ITEMS TO BE SEARCHED are already in the possession of United States Immigration and Customs Enforcement in the Central District of California. Consistent with the requirements of Rule 41, the ITEMS TO BE SEARCHED will be delivered to computer forensic technicians within 10 days of the effective date of this warrant to commence the search. For the reasons noted in paragraph 19 of the Affidavit, the search will not be completed during the 10-day period. However, the ITEMS TO BE SEARCHED will be preliminarily examined to determine whether they contain any evidence or are an instrumentality of a crime, within 60 days. If the computer forensic technicians determine that the data does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time not to exceed 60 days from the date of execution of the warrant. If the government needs additional time to determine whether the data

of the items to be seized pursuant to this warrant, it must obtain an extension of the time period from the Court within the original sixty day period

ATTACHMENT B

**ITEMS TO BE SEIZED**

1. Visual depictions of I.T., L.K., S.S., S.R.

2. Visual depictions of minors, including all visual depictions of minors located at the Cambodia residence of Michael Pepe.

3. Visual depictions of minors engaging in sexually explicit conduct.

4. Correspondence pertaining to the possession, receipt, distribution and/or reproduction of child pornography.

5. Material containing names, addresses, and contact information for any minor visually depicted while engaged in sexually explicit conduct.

6. Material containing child erotica, which are materials that are sexually arousing to individuals who are sexually interested in minors, but which are not in and of themselves obscene and which do not necessarily depict minors in sexually explicit conduct. Child erotica are written materials dealing with sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, man-boy love, nudist publications, diaries, and fantasy writings.

7. As used herein, the terms visual depictions, material, files, records, programs, or correspondence includes visual depictions, material, files, records, programs, or correspondence created, modified or stored in any form including electronically.

# AFFIDAVIT

I, EDDY WANG, being duly sworn, do hereby depose and state:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE") and have been so employed since March of 2003. I was previously employed with the Immigration and Naturalization Service ("INS") as both a Special Agent and Immigration Enforcement Agent since July of 1998. I am currently assigned to the Public Safety/Smuggling Group of the Ventura County Office of the Resident Agent-in-Charge ("RAC").

2. This affidavit is made in support of a warrant to search for evidence of violations of Title 18, United States Code, Section 2423(c), Engaging in Illicit Sexual Conduct in Foreign Places, and and Title 18, United States Code, Section 2260, Production of Sexually Explicit Depictions of a Minor for Importation into the United States, specifically the items to be seized described in paragraph 7 below, from the items to be searched described in paragraph 6 below.

3. To the extent that any information in this affidavit is not within my personal knowledge, it was made known to me through reliable law enforcement sources, and I believe it to be true. In particular, I have spoken to Gary Phillips, the Assistant ICE Attaché ("AIA") of the ICE Attaché Office in Bangkok, Thailand ("ICE Bangkok"), and SA David Galante, of the ICE Attaché Office in Singapore ("ICE Singapore"), who are both familiar with the investigation described below.

a. AIA Gary Phillips has been employed with the United States Customs Service, now known as ICE, for over 17 years. For approximately 14 years, AIA Phillips had been assigned as a Special Agent to the San Diego Office of the Special Agent-in-Charge, where

he has investigated and/or participated in over ten child exploitation investigations. Since May of 2002, AIA Phillips has been assigned to ICE Bangkok, where he has participated in over 30 child exploitation cases. ICE Bangkok is responsible for investigating leads relating to violations of U.S. immigration and customs laws in the Southeast Asian-region.

b. SA David Galante has been employed with the United States Customs Service, now known as ICE, for 14 years and has been assigned to the Office of Investigations for the last ten years. In addition to being a criminal investigator, SA Galante is a Computer Investigative Specialist, who has participated in numerous child exploitation cases involving computers. SA Galante has received 80 hours of training for investigation of online child exploitation through the government and other vendors. Currently, SA Galante is an ICE Representative in Singapore.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other law enforcement officers. This affidavit is intended to show that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of, or investigation into, this matter.

5. The terms "minor," "visual depiction," "sexually explicit conduct," and "child pornography" as used herein and in Attachment B, are defined as set forth in Title 18, United States Code, Section 2256. The term "illicit sexual conduct," as used herein and in Attachment B, is defined as set forth in Title 18, United States Code, Section 2423(f).



## II. ITEMS TO BE SEARCHED

6. This affidavit is in support of an application to search the items listed below, all of which were found and seized during a June 2006 search warrant executed by the Cambodian National Police ("CNP") at the Phnom Penh, Cambodia residence of a United States citizen, MICHAEL JOSEPH PEPE ("PEPE"). All of the items to be searched are currently in the custody of United States Immigration and Customs Enforcement in the Central District of California :

a. An off-white, Hewlett Packard computer tower bearing serial number, US01811010.

b. Twenty-seven (27) pornographic Compact Discs ("CD"), with titles and markings that included: "15 years old little girls with crazy sex event", "Japanese Girls", "animal instinct 4: Animal World", "Tender Baby", and "14 Years Old Unsensor".

c. The following thirty-one (31) miscellaneous CD's:

1. A CD with red markings that read "TDK", "CD-RW80", "HIGH SPEED", and "700MB". This CD was found in a jewel case, which had an insert with handwritten notes in blue ink that read "HOME 111605", "4 GIRLS", "HOME 102805", "SKV & NEW GIRL". The following handwritten notes in blue ink had been crossed out: "HOME GIRLS 112605", "HOME GIRLS AUG4", "KIA", "NAP & KIA 1", "NAP & KIA 2", "NI 2", "NI 102905", and "HOME GIRLS AUG4 016".

2. A CD with markings that read "princo", "Rewritable", "CD-RW", "80min. 700MB", "High Speed", "4x-12x", and "Contents:". This CD's "Contents:" were handwritten and listed as "VARIOUS VILLAGES & CHANRY".

3. A CD with red markings that read "TDK", "CD-RW80", "HIGH SPEED", and "700MB". This CD had handwritten markings that read "VILLAGES" and "SOCRATES FOUNDATION". This CD was found in a jewel case, which had an insert with handwritten notes in blue ink that read "SOCRATES FOUNDATION", "AREY KSAYH", "CULTURAL ORPH", "MONK FUNERAL", "OLD VILLAGE", "PURSAT 103005", "REAM 071405", and "REAM 2".

4. A CD with red markings that read "TDK", "CD-RW80", "HIGH SPEED", and "700MB". This CD had blue handwritten markings that read "MP".

5. A CD with markings that read "SONY", "CD-R", and "700MB". This CD had blue handwritten markings that read "DATA & PIC".

6. A CD with markings that read "maxell", "CD-R", and "700 MB". This CD had blue handwritten markings that read "PARTY", "PARTY 2", and "PARTY USA".

7. A CD with red markings that read "TDK", "CD-RW80", "HIGH SPEED", and "700MB". This CD had handwritten markings that read "CHANRY". This CD was found in a jewel case, which had an insert with handwritten notes in blue ink that read "CHANRY", "BATTENBANG TRIP", "CHANRY", and "CHANRY ID".

8. A CD with markings that read "maxell", "XL-II 80", and "Music PRO". This CD was found in a jewel case, which had an insert with handwritten notes read "Suslainabale village", "25/12/04", and "Mr. Milchaek pepe".

9. A CD with markings that read "SAMSUNG" and "48x". This CD had handwritten markings that read "BRETT's PARTY" and "REAM".

10. A CD with markings that read "SONY", "DVD-RW", and "120min/4.7GB".

11. A CD with markings that read "maxell", "XL-II 80", and "Music PRO". This CD had black handwritten markings that read "school supply and village." and "class. 2004.oct.9". This CD was found in a jewel case, which had an insert with handwritten notes read "VARIOUS UNKNOWN PROGRAMS".

12. A CD with red markings that read "TDK", "CD-RW80", "HIGH SPEED", and "700MB". This CD had handwritten markings that read "MISC. FUNCTIONS". This CD was found in a jewel case, which had an insert with handwritten notes in blue ink that read "BAT HOUSE", "BRETT's PARTY JULY 2005", "BETTS PARTY JULY 2005", "CLASS GROUP", ""HONG's PARTY", "HOUSE 061605", "PARTY", "PARTY 2", and "USA & PARTY".

13. A CD with markings that read "maxell", "CD-R", and "700 MB". This CD had markings that read "DR. LY".

14. A CD with markings that read "maxell", "CD-R", and "700 MB". This CD had blue markings that read "SCH. & WEDDING".

15. A CD with markings that read "SONY", "CD-RW", "CD ReWritable", "CD-RW650", and "650MB". This CD was found in a jewel case, which had an insert with handwritten notes in blue ink that read "GIRLS NOW", "MOM", "MOMS", "SCHOOL PARTY", "GIRLS 012206", "SCH GIRLS", "2006-01", "VALENTINE GIRLS", "CHRISTMAS 1", "CHRISTMAS 2005", and "GIRLS 121005".

16. A CD with markings that read "SONY", "CD-R", and "700MB". This CD had red markings that "NARY ALBUM".

17. A CD with markings that read "SONY", "CD-R", and "700MB". This CD had blue handwritten markings that read "MED. INFO."

18. A CD with markings that read "SONY", "CD-R", and "700MB". This CD was found in a jewel case, which had a blue insert with an orange circle displayed.

19. A CD with markings that read "webroot" and "Spy Sweeper".

20. A CD with markings that read "WEB BUILDER", "over 150 Tools & Tips to Build Better & Faster WEB SITES".

21. A CD with markings that read "Norton", "2002", and "Internet Security".

22. A green CD with markings that read "CD" and "Windowsxp".

23. A blue CD with markings that read "Software, Videos & Games" and "Windowsxp".

24. A CD with has blue markings that read "VCD-" and "VOL-217".

25. A CD with black markings that read "Sustainable Village Organization" and "VCD". This CD was found in a jewel case, which had an insert with a photograph of PEPE standing with several children.

26. A purple and white CD with markings that read "SAMSUNG CD-RW" and "User's Guide".

27. A red CD with markings that read "The Essential SIMON & GARFUNKEL".

28. A CD with markings that read "A Midsummer Nightis Dream", "Master", and "ISRC CN H09-99-443-00/A".

29. A CD with black markings that read "BEST CLASSICS". This CD was found in a jewel case, which had a red insert with markings that read "CLASSICAL MUSIC" and "BEST CLASSICS".

30. A CD with markings that read "MASTERS OF CLASSICAL MUSIC", "BACH", "BRANDENBERG CONCERTO NO.1", and "VIOLN CONCERTO IN E MAJOR".

31. A pink CD with markings that read "COLLECTOR'S EDITION", "251", and "eGames".

d. The following five (5) 3.5-inch floppy disks:

1. A black Sony disk with a white label. This label has handwritten markings that read "CAMBODIA", "NAA", and "DRAFT PAPER".

2. A green maxell disk with a white label. This label has handwritten markings that read "PERSONAL".

3. A green maxell disk with a white label. This label has handwritten markings that read "CULTURAL ANTHROPOLOGY" and "ENGLISH". This label also has a handwritten note that reads "FINANCIAL MANAGEMENT", which was crossed out.

4. A green maxell disk with a white label. The label has handwritten markings that read "MANAGEMENT PRINCIPLES".

5. A blue maxell disk.

**III. ITEMS TO BE SEIZED**

7. Based upon the information set forth in this Affidavit, I respectfully submit that there is probable cause to believe that the following items, which constitute evidence of violations of Title 18, United States Code, Sections 2423(c) and 2260, will be found in the ITEMS TO BE SEARCHED:

a. Visual depictions of I.T., L.K., S.S., S.R.

b. Visual depictions of minors, including all visual depictions of minors located at the Cambodia residence of Michael Pepe.

c. Visual depictions of minors engaging in sexually explicit conduct.

d. Correspondence pertaining to the possession, receipt, distribution and/or reproduction of child pornography.

e. Material containing names, addresses, and contact information for any minor visually depicted while engaged in sexually explicit conduct.

f. Material containing child erotica, which are materials that are sexually arousing to individuals who are sexually interested in minors, but which are not in and of themselves obscene and which do not necessarily depict minors in sexually explicit conduct. Child erotica are written materials dealing with sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, man-boy love, nudist publications, diaries, and fantasy writings.

g. As used herein, the terms visual depictions, material, files, records, programs, or correspondence includes visual depictions, material, files, records, programs, or correspondence created, modified or stored in any form including electronically.

## IV. TIMING OF SEARCH

8. As noted above, the ITEMS TO BE SEARCHED are already in the possession of United States Immigration and Customs Enforcement in the Central District of California. Consistent with the requirements of Rule 41, the ITEMS TO BE SEARCHED will be delivered to computer forensic technicians within 10 days of the effective date of this warrant to commence the search. For the reasons noted in paragraph 19 below, the search will not be

completed during the 10-day period. However, the ITEMS TO BE SEARCHED will be preliminarily examined to determine whether they contain any evidence or are an instrumentality of a crime, within 60 days. If the computer forensic technicians determine that the data does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time not to exceed 60 days from the date of execution of the warrant. If the government needs additional time to determine whether the data falls within any of the items to be seized pursuant to this warrant, it must obtain an extension of the time period from the Court within the original sixty day period.

## IV. INVESTIGATION

9. Beginning on or about June 14, 2006, ICE Bangkok received information from two Non-Governmental Organizations that a U.S. citizen, later identified as PEPE, had sexually abused and raped a number of children at his compound in Phnom Penh, Cambodia. During the course of the investigation, AIA Phillips interviewed four of the child victims (between the ages of 9 and 12 years-old) who all identified PEPE as the individual who sexually abused them. Based upon their investigation, in June 2006, the Cambodian National Police ("CNP") arrested PEPE and executed search warrants at PEPE's compound in Phnom Penh, where evidence of PEPE's sexual abuse of his child victims was seized.

10. On June 17, 2006, after PEPE left his Phnom Penh compound at Street 596, House #83, Tol Kork, Phnom Pehn, Cambodia, the CNP arrested PEPE for rape and debauchery. Later, on June 17, 2006 and June 19, 2006, while accompanied by ICE Bangkok, the U.S. State Department (Diplomatic Security Service), and the two Non-Governmental Organizations, the CNP executed search warrants at PEPE's compound in Phnom Penh. Among the items seized were the following:

a. A blue Transcend JetFlash Drive 256MB. A JetFlash Drive is a small and portable data storage device.

b. A Maxtor Computer Hard Drive bearing number, E-H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;

c. A Lexar 16MB Compact Flash;

d. Thirty-one (31) CD's;

e. Five (5) 3.5-inch floppy disks;

f. An off-white, Hewlett Packard computer tower bearing serial number, US01811010, found in PEPE's massage room; and

g. Twenty-seven (27) pornographic CD's, with titles and markings that included: "15 years old little girls with crazy sex event", "Japanese Girls", "animal instinct 4: Animal World", "Tender Baby", and "14 Years Old Unsensor".

11. Subsequently, only the Maxtor Computer Hard Drive bearing number, E-H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; the blue Transcend JetFlash Drive 256MB; and the Lexar 16MB Compact Flash were sent by ICE Bangkok to ICE Singapore for a forensic examination. The thirty-one (31) CD's; five (5) 3.5-inch floppy disks; twenty-seven (27) pornographic CD's; and the off-white, generic computer tower bearing number, 264185-001, were not examined by the CNP or ICE.

12. On June 30, 2006, ICE Singapore SA David Galante, a trained forensic specialist, conducted a forensic examination of the Maxtor Computer Hard Drive bearing number, E-H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; the blue Transcend JetFlash Drive 256MB; and the Lexar 16MB Compact Flash previously sent by ICE Bangkok. The following is a summary of the examination:

a. The Maxtor Computer Hard Drive bearing number, E-H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, contained images of female minors engaging in sexually explicit conduct. Further, these images were found to be homemade and taken by a digital camera.

b. The blue Transcend JetFlash Drive 256MB contained images of explicit child pornography. Further, the images were found to be homemade and taken by a digital camera.

c. A search of the unallocated space on the Maxtor Computer Hard Drive bearing number, E-H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, and the blue Transcend JetFlash Drive 256MB revealed images of explicit child pornography and minors engaging in sexually explicit conduct. When computer files are erased or deleted, the content of the file is not actually erased. The data from the 'erased file' continues to exist in an area commonly referred to as "unallocated space." As a result, the data remains behind for discovery through the use of data recovery and/or computer forensic software.

13. On July 20, 2006, U.S. Customs and Border Protection ("CBP") Officer Tim Kirkham checked for PEPE's most recent travel details through the CBP computer systems that query passenger, reservation, and travel itinerary information from all international flights that depart from, arrive at, or transit through the U.S. According to CBP computer systems, on September 1, 2005, PEPE departed Los Angeles International Airport for Manila, Philippines. On September 3, 2005, PEPE departed Manila, Philippines for Phnom Penh, Cambodia by way of Bangkok, Thailand.

14. On July 21, 2006, I reviewed some of the computer information and images from the blue Transcend JetFlash Drive 256MB, which was seized during the June 2006 execution of the CNP search warrant at PEPE's Phnom Penh compound, and previously sent by SA Galante. The following is a summary of the review:

a. A folder labeled, "Girls 2," contained a set of 13 images of a young Asian girl ("JANE DOE 1"), approximately 15-17 years old, in PEPE's bedroom at his Phnom Penh

compound. JANE DOE 1 was photographed undressing, lying naked, and posing in a sexually explicit manner on PEPE's bed. There were also three images of a young Asian girl ("JANE DOE 2"), approximately 6-8 years old, undressing and showering naked in PEPE's bathroom.

b. A folder labeled, "GIRLS 3," contained a set of 35 images of JANE DOE 1 and JANE DOE 2 in PEPE's bedroom at his Phnom Penh compound. JANE DOE 1 and JANE DOE 2 were photographed undressing, lying naked, posing in a sexually explicit manner on PEPE's bed, and showering in PEPE's bathroom.

c. A folder labeled, "GIRLS 4," contained a set of 15 images of JANE DOE 2 in PEPE's bedroom at his Phnom Penh compound. JANE DOE 2 was photographed lying naked and posing in a sexually explicit manner on PEPE's bed.

d. A folder labeled, "Home girls 0705," contained a set of 19 images of a young Asian girl ("JANE DOE 3"), approximately 10-13 years old, in PEPE's bedroom at his Phnom Penh compound. JANE DOE 3 was photographed undressing, lying naked, and posing in a sexually explicit manner on PEPE's bed.

e. A folder labeled, "SPIDER," contained a set of 83 images of a young Asian girl ("JANE DOE 4"), approximately 10-13 years old, in PEPE's bedroom at his Phnom Penh compound. JANE DOE 4 was photographed undressing, lying naked, and posing in a sexually explicit manner on PEPE's bed.

f. A folder labeled, "Friend 111111," contained a set of 11 images of a young Asian girl ("JANE DOE 5"), approximately 5-8 years old, topless, undressing, changing outfits, naked, and posing for the photographs.

15. Also, on July 21, 2006, I reviewed some of the computer information and images previously seized from PEPE's computer, which was seized during the June of 2006 execution

of the CNP search warrant at PEPE's Phnom Penh compound, and previously sent by SA Galante. The following is a summary of the review:

a. The computer had folders that contained hundreds of suspected child pornography images depicting young children, approximately 7-16 years old, dressed in lingerie, undressing, naked, and posing in a sexually explicit manner. Further, many of the suspected child pornography images were kept in separate folders, labeled with the children's names, containing a series or set of images of the same young child.

b. A folder labeled, "Little 1," contained 13 viewable images of JANE DOE 2 in PEPE's bedroom at his Phnom Penh compound. JANE DOE 2 was photographed lying naked, posing in a sexually explicit manner on PEPE's bed, and showering in PEPE's bathroom. Further, five of the viewable images were of JANE DOE 2 performing oral sex, on PEPE's bed, upon a naked male who closely matches PEPE's physical description.

c. There were 80 separately labeled folders containing hundreds of thumbnail images. A thumbnail image is a small, low-resolution version of a larger image used for quick identification. PEPE's computer was being used as a virtual library of his images. Among those 80 folders are the following:

i. "19_Girls 2," contained the thumbnail image set of the images found in the "Girls 2" folder of PEPE's thumb-drive. JANE DOE 1 was photographed undressing, lying naked, and posing in a sexually explicit manner on PEPE's bed. There were also three thumbnail images of JANE DOE 2 undressing and showering naked in PEPE's bathroom.

ii. "20_GIRLS 3," contained the thumbnail image set of the images found in the "GIRLS 3" folder of PEPE's thumb-drive. JANE DOE 1 and JANE DOE 2 were

photographed undressing, lying naked, posing in a sexually explicit manner on PEPE's bed, and showering in PEPE's bathroom. There was also a thumbnail image of PEPE in this folder.

iii. "21_GIRLS 4," contained the thumbnail image set of the images found in the "GIRLS 4" folder of PEPE's thumb-drive. JANE DOE 2 was photographed lying naked and posing in a sexually explicit manner on PEPE's bed.

iv. "23_Little 1," contained the thumbnail image set of the images found in the "Little 1" folder. "23_Little 1" was a set of 43 thumbnail images of JANE DOE 2 in PEPE's bedroom at his Phnom Penh compound. JANE DOE 2 was photographed lying naked, posing in a sexually explicit manner on PEPE's bed, and showering in PEPE's bathroom. Further, 13 of the thumbnail images were of JANE DOE 2 performing oral sex, on PEPE's bed, upon a naked male who closely matches PEPE's physical description.

v. "26_Ni 102905," contained a set of 44 thumbnail images of a young Asian girl ("JANE DOE 6"), approximately 10-13 years old, in PEPE's bedroom at his Phnom Penh compound. JANE DOE 6 was photographed undressing, lying naked, and posing in a sexually explicit manner on PEPE's bed. Further, three of the thumbnail images were of JANE DOE 6 naked with her wrists bound to PEPE's bed.

vi. "27_Ni 2," contained a set 79 thumbnail images of JANE DOE 6 in PEPE's bedroom at his Phnom Penh compound. JANE DOE 6 was photographed undressing, lying naked, and posing in a sexually explicit manner on PEPE's bed. Several of the thumbnail images showed a naked JANE DOE 6 with her wrists bound to her ankles and her exposed buttocks in the air. There were also several of the thumbnail images, which depicted JANE DOE 6 performing oral sex, on PEPE's bed, upon a naked male who closely matches PEPE's physical description.

      vii. "28_Hen 1," contained a set of 52 thumbnail images of JANE DOE 4. JANE DOE 4 was photographed undressing, lying naked, and posing in a sexually explicit manner on a bed.

viii. "29_Hem 2," contained a set of 83 thumbnail images of JANE DOE 4 in PEPE's bedroom at his Phnom Penh compound. JANE DOE 4 was photographed undressing, lying naked, and posing in a sexually explicit manner on PEPE's bed.

ix. "31_Nap & Kia 1," contained a set of 17 thumbnail images of two young Asian Girls ("JANE DOE 7" and "JANE DOE 8"), approximately 10-13 years old, in PEPE's bedroom at his Phnom Pehn compound. JANE DOE 7 and JANE DOE 8 were photographed undressing, lying naked, posing in a sexually explicit manner on PEPE's bed, and showering in PEPE's bathroom.

x. "32_Nap & Kia 2," contained a set of 24 thumbnail images of JANE DOE 7 and JANE DOE 8 in PEPE's bedroom at his Phnom Penh compound. JANE DOE 7 and JANE DOE 8 were photographed undressing, lying naked, posing in a sexually explicit manner on PEPE's bed, and showering in PEPE's bathroom. Further, within this set, there were some thumbnail images of a fully clothed PEPE posing with a fully clothed JANE DOE 7 and JANE DOE 8, respectively. Also, included in this set were four thumbnail images of a naked PEPE posing with a naked JANE DOE 7 and JANE DOE 8, respectively.

xi. "33_Kia," contained 72 thumbnails of JANE DOE 7. JANE DOE 7 was photographed undressing, lying naked, and posing in a sexually explicit manner on a bed.

d. There were several photographs of PEPE's four alleged child victims: I.T., L.K., S.S., and S.R. The girls were photographed around PEPE's Phnom Penh compound, playing and posing in different outfits.

16. On September 12, 2006, one of PEPE's sisters provided SA Carlos Ortiz and me with dozens of emails and letters received from PEPE while he was incarcerated in Cambodia that mostly detailed his requests and health. Also, included was a letter, written by PEPE and contained within an envelope postmarked August 15, 2006 that detailed some of PEPE's actions in Cambodia. The following is a summary of this letter:

a. PEPE mentioned several of his child victims by name, including one for which PEPE had dozens of pornographic and sexually-explicit photographs on his computer.

b. PEPE stated that his daily routine usually included a massage from the girls after they returned from school and another later in the evening. Further, PEPE stated these massages led to "inappropriate touching, etc."

c. PEPE stated that on one occasion, after he was given Viagra, PEPE bound a known child victim and slapped her in the face. PEPE explained that the known child victim was given to him by her mother as a wife/girlfriend and described both his "sex drive" and "willpower" as "very low."

d. PEPE admitted taking naked pictures, at SANG's request, of her two nieces. Further, PEPE claimed that he erased these files from his computer.

17. On November 16, 2006, I received evidence seized during the CNP's June 2006 search warrant executed at PEPE's Phnom Pehn compound and sent by AIA Phillips, including nineteen (19) CD's and two (2) 3.5-inch floppy disks – all of which have not been forensically examined.

18. On April 17, 2007, SA Chris Kuzma received additional evidence seized during the CNP's June 2006 search warrant executed at PEPE's Phnom Pehn compound and sent by AIA Phillips, including: an off-white, Hewlett Packard computer tower bearing serial number,

US01811010; twenty-seven (27) pornographic CD's; twelve (12) miscellaneous CD's; and three (3) 3.5-inch floppy disks - all of which have not been forensically examined. The additional evidence received by SA Kuzma on 17, 2007, are all of those items listed in the ITEMS TO BE SEARCHED in paragraph 6 of this Affidavit.

## V. COMPUTER DATA

19. Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or

intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to



extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

**VI. CONCLUSION**

20. Based on the foregoing, I believe there is probable cause to believe that the items listed in paragraph 7 and Attachment B, which are evidence of violations of Title 18, United States Code, Sections 2423(c) and 2260, will be found in the ITEMS TO BE SEARCHED identified in paragraph 6 and Attachment A.

Eddy Wang
Special Agent
United States Immigration & Customs Enforcement

SUBSCRIBED TO AND SWORN BEFORE ME
THIS 17 DAY OF MAY 2007

VICTOR B. KENTON

VICTOR B. KENTON
UNITED STATES MAGISTRATE JUDGE

67

~~00945~~

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 1 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER [redacted] |
| | REPORT NUMBER: 011 |

DETAILS OF INVESTIGATION

On May 17, 2007, SA Wang obtained a search warrant for computer and electronic media evidence previously seized during the June 2006 search warrant executed by the Cambodian National Police (CNP). Among the items seized by the CNP and searched pursuant to this search warrant SA Wang obtained were the following:

One (1) CPU (Hewlett-Packard), Serial No. US01811010.

Twenty-seven (27) pornographic Compact Discs ("CD"), with titles and markings that included: "15 years old little girls with crazy sex event", "Japanese Girls", "animal instinct 4: Animal World", "Tender Baby", and "14 Years Old Unsensor".

The following thirty-one (31) miscellaneous CD's:

1. A CD with red markings that read "TDK", "CD-RW80", "HIGH SPEED", and "700MB". This CD was found in a jewel case, which had an insert with handwritten notes in blue ink that read "HOME 111605", "4 GIRLS", "HOME 102805", "SKV & NEW GIRL". The following handwritten notes in blue ink had been crossed out: "HOME GIRLS 112605", "HOME GIRLS AUG4", "KIA", "NAP & KIA 1", "NAP & KIA 2", "NI 2", "NI 102905", and "HOME GIRLS AUG4 016".

2. A CD with markings that read "princo", "Rewritable", "CD-RW", "80min. 700MB", "High Speed", "4x-12x", and "Contents:". This CD's "Contents:" were handwritten and listed as "VARIOUS VILLAGES & CHANRY".

3. A CD with red markings that read "TDK", "CD-RW80", "HIGH SPEED", and "700MB". This CD had handwritten markings that read "VILLAGES" and "SOCRATES FOUNDATION". This CD was found in a jewel case, which had an insert with handwritten notes in blue ink that read "SOCRATES FOUNDATION", "AREY KSAYH", "CULTURAL ORPH", "MONK FUNERAL", "OLD VILLAGE", "PURSAT 103005", "REAM 071405", and "REAM 2".

4. A CD with red markings that read "TDK", "CD-RW80", "HIGH SPEED", and "700MB". This CD had blue handwritten markings that read "MP".

5. A CD with markings that read "SONY", "CD-R", and "700MB". This CD had blue handwritten markings that read "DATA & PIC".

6. A CD with markings that read "maxell", "CD-R", and "700 MB". This CD had blue handwritten markings that read "PARTY", "PARTY

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

EXHIBIT B

O F F I C I A L U S E O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T O F I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE 2<br><br>CASE NUMBER [redacted]<br><br>REPORT NUMBER: 011 |
|---|---|

2", "PARTY USA".

7. A CD with red markings that read "TDK", "CD-RW80", "HIGH SPEED", and "700MB". This CD had handwritten markings that read "CHANRY". This CD was found in a jewel case, which had an insert with handwritten notes in blue ink that read "CHANRY", "BATTENBANG TRIP", "CHANRY", and "CHANRY ID".

8. A CD with markings that read "maxell", "XL-II 80", and "Music PRO". This CD was found in a jewel case, which had an insert with handwritten notes read "Suslainabale village", "25/12/04", and "Mr. Milchaek pepe".

9. A CD with markings that read "SAMSUNG" and "48x". This CD had handwritten markings that read "BRETT's PARTY" and "REAM".

10. A CD with markings that read "SONY", "DVD-RW", and "120min/4.7GB".

11. A CD with markings that read "maxell", "XL-II 80", and "Music PRO". This CD had black handwritten markings that read "school supply and village." and "class. 2004.oct.9". This CD was found in a jewel case, which had an insert with handwritten notes read "VARIOUS UNKNOWN PROGRAMS".

12. A CD with red markings that read "TDK", "CD-RW80", "HIGH SPEED", and "700MB". This CD had handwritten markings that read "MISC. FUNCTIONS". This CD was found in a jewel case, which had an insert with handwritten notes in blue ink that read "BAT HOUSE", "BRETT's PARTY JULY 2005", "BETTS PARTY JULY 2005", "CLASS GROUP", ""HONG's PARTY", "HOUSE 061605", "PARTY", "PARTY 2", and "USA & PARTY".

13. A CD with markings that read "maxell", "CD-R", and "700 MB". This CD had markings that read "DR. LY".

14. A CD with markings that read "maxell", "CD-R", and "700 MB". This CD had blue markings that read "SCH. & WEDDING".

15. A CD with markings that read "SONY", "CD-RW", "CD ReWritable", "CD-RW650", and "650MB". This CD was found in a jewel case, which had an insert with handwritten notes in blue ink that read "GIRLS NOW", "MOM", "MOMS", "SCHOOL PARTY", "GIRLS 012206", "SCH GIRLS", "2006-01", "VALENTINE GIRLS", "CHRISTMAS 1", "CHRISTMAS 2005", and "GIRLS 121005".

O F F I C I A L U S E O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

69

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>REPORT OF INVESTIGATION<br>CONTINUATION | PAGE 3<br><br>CASE NUMBER [redacted]<br><br>REPORT NUMBER: 011 |
|---|---|

16. A CD with markings that read "SONY", "CD-R", and "700MB". This CD had red markings that "NARY ALBUM".

17. A CD with markings that read "SONY", "CD-R", and "700MB". This CD had blue handwritten markings that read "MED.INFO"

18. A CD with markings that read "SONY", "CD-R", and "700MB". This CD was found in a jewel case, which had a blue insert with an orange circle displayed.

19. A CD with markings that read "webroot" and "Spy Sweeper".

20. A CD with markings that read "WEB BUILDER", "over 150 Tools & Tips to Build Better & Faster WEB SITES".

21. A CD with markings that read "Norton", "2002", and "Internet Security".

22. A green CD with markings that read "CD" and "Windowsxp". This CD does not appear to be a genuinely issued product.

23. A blue CD with markings that read "Software, Videos & Games" and "Windowsxp". This CD does not appear to be a genuinely issued product.

24. A CD with has blue markings that read "VCD-" and "VOL-217".

25. A CD with black markings that read "Sustainable Village Organization" and "VCD". This CD was found in a jewel case, which had an insert with a photograph of PEPE standing with several children.

26. A purple and white CD with markings that read "SAMSUNG CD-RW" and "User's Guide".

27. A red CD with markings that read "The Essential SIMON & GARFUNKEL". This CD does not appear to be a genuinely issued product.

28. A CD with markings that read "A Midsummer Nightis Dream", "Master", and "ISRC CN H09-99-443-00/A J6".

29. A CD with black markings that read "BEST CLASSICS". This CD was found in a jewel case, which had a red insert with

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 219 of 2133

O F F I C I A L U S E O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T O F I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE 4<br>CASE NUMBER [redacted]<br>REPORT NUMBER: 011 |
|---|---|

markings that read "CLASSICAL MUSIC" and "BEST CLASSICS". This CD does not appear to be a genuinely issued product.

30. A CD with markings that read "MASTERS OF CLASSICAL MUSIC", "BACH", "BRANDENBERG CONCERTO NO.1", and "VIOLN CONCERTO IN E MAJOR". This CD does not appear to be a genuinely issued product.

31. A pink CD with markings that read "COLLECTOR'S EDITIO", "251", and "eGames".

The following five (5) 3.5-inch floppy disks:

1. A black Sony disk with a white label. This label has handwritten markings that read "CAMBODIA", "NAA", and "DRAFT PAPER".

2. A green maxell disk with a white label. This label has handwritten markings that read "PERSONAL".

3. A green maxell disk with a white label. This label has handwritten markings that read "CULTURAL ANTHROPOLOGY" and "ENGLISH". This label also has a handwritten note that was crossed out that reads "FINANCIAL MANAGEMENT".

4. A green maxell disk with a white label. The label has handwritten markings that read "MANAGEMENT PRINCIPLES".

5. A blue maxell disk.

Between May 17, 2007 and July 12, 2007, CFA Timothy Sullivan and SA Wang reviewed the evidence. The following is a summary of the subsequent review of the computer, the pornographic CD's, and the floppy disks:

The CPU (Hewlett-Packard), Serial No. US01811010, contained no derogatory information and no visual depictions of minors.

The twenty-seven (27) pornographic CD's, with titles and markings that included: "15 years old little girls with crazy sex event", "Japanese Girls", "animal instinct 4: Animal World", "Tender Baby", and "14 Years Old Unsensor", appeared to be commercially produced adult pornographic movies, music videos, and other non-derogatory material [Agent's note: The CD contained within the cover marked, "15 years old little girls with crazy sex event", was unreadable]. Among these CD's, there was one bestiality film.

O F F I C I A L U S E O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

71

Pepe ER 204

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 220 of 2133

O F F I C I A L U S E O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 5 |
| --- | --- |
| R E P O R T O F I N V E S T I G A T I O N C O N T I N U A T I O N | CASE NUMBER [redacted] |
| | REPORT NUMBER: 011 |

The five (5) floppy disks contained no derogatory information and no visual depictions of minors.

The following is a summary of the subsequent review of the thirty-one (31) CD's (the following CD numbers correlate to the above-mentioned CD numbers):

1. Contained visual depictions of known minor victims at PEPE's Phnom Penh, Cambodia residence.

2. Contained visual depictions of minors.

3. Contained visual depictions of minors.

4. Contained no derogatory information and no visual depictions of minors.

5. Contained visual depictions of minors.

6. Contained no derogatory information and no visual depictions of minors.

7. Contained visual depictions of minors.

8. Contained visual depictions of minors.

9. Contained no derogatory information and no visual depictions of minors.

10. Contained no derogatory information and no visual depictions of minors.

11. Contained visual depictions of minors.

12. Contained visual depictions of minors.

13. Contained no derogatory information and no visual depictions of minors.

14. Contained no derogatory information and no visual depictions of minors.

15. Contained visual depictions of known minor victims at PEPE's Phnom Penh, Cambodia residence.

O F F I C I A L U S E O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

72

Pepe ER 205

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 6 |
| --- | --- |
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER [redacted] |
| | REPORT NUMBER: 011 |

16. Contained no derogatory information and no visual depictions of minors.

17. Contained no derogatory information and no visual depictions of minors.

18. Contained visual depictions of minors.

19. Contained no derogatory information and no visual depictions of minors.

20. Contained no derogatory information and no visual depictions of minors.

21. Contained no derogatory information and no visual depictions of minors.

22. Contained no derogatory information and no visual depictions of minors.

23. Contained no derogatory information and no visual depictions of minors.

24. Contained no derogatory information and no visual depictions of minors.

25. Contained visual depictions of minors.

26. Contained no derogatory information and no visual depictions of minors.

27. Contained no derogatory information and no visual depictions of minors.

28. Contained no derogatory information and no visual depictions of minors.

29. Contained no derogatory information and no visual depictions of minors.

30. Contained no derogatory information and no visual depictions of minors.

31. Contained no derogatory information and no visual depictions of minors.

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>REPORT OF INVESTIGATION<br>CONTINUATION | PAGE 7<br>CASE NUMBER [redacted]<br>REPORT NUMBER: 011 |
| --- | --- |

On July 11, 2007, CPA Timothy Sullivan using forensic software identified the emails that were found on PEPE's computer that was previously seized by the CNP. More specifically, the emails were found on PEPE's Maxtor 40 GB Hard Drive (6051# 2757128) in sub-folders in the following folder path:

C\Documents and Settings\Michael\Local Settings\Temporary Internet Files\Content.IE5

COLLATERAL REQUESTS: N/A

OFFICIAL USE ONLY

'HIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY 'F THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR ISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED O ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

SEAN K. KENNEDY (No. 145632)
Federal Public Defender
(E-mail: Sean_Kennedy@fd.org)
CARLTON F. GUNN (No. 112344)
Deputy Federal Public Defender
(E-mail: Carlton_Gunn@fd.org)
CHARLES C. BROWN (No. 179365)
Deputy Federal Public Defender
(E-mail: Charles_Brown@fd.org)
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone (213) 894-1700
Facsimile (213) 894-0081

Attorneys for Defendant
MICHAEL PEPE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>MICHAEL PEPE,<br>Defendant. | NO. CR 07-168-DSF<br>**REPLY TO GOVERNMENT'S CONSOLIDATED OPPOSITION TO MOTIONS TO SUPPRESS EVIDENCE** |

Defendant, Michael Pepe, through his counsel of record, Deputy Federal Public Defender Carlton F. Gunn and Deputy Federal Public Defender Charles Brown, hereby replies to the government's consolidated opposition to defendant's Motion to Suppress Evidence and Motion to Suppress Evidence Discovered as Result of Computer Media Search Warrant. This reply is based on the attached memorandum of points and authorities, all files and records in this case, and such additional

evidence and argument as may be presented at the hearing on the motions.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: August 31, 2007

By [signature]
CARLTON F. GUNN
Deputy Federal Public Defender

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: August 31, 2007

By [signature] (by CFG)
CHARLES C. BROWN
Deputy Federal Public Defender

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.

ARGUMENT

A. EVEN IF THE SEARCH OF MR. PEPE'S HOME DID NOT VIOLATE THE FOURTH AMENDMENT, THE WARRANTLESS SEARCH OF COMPUTER MEDIA BY AMERICAN AGENTS ALONE IN SINGAPORE VIOLATED THE FOURTH AMENDMENT.

The government makes only a passing attempt to justify the second – and arguably most invasive[1] – intrusion on Mr. Pepe's Fourth Amendment rights complained of in the defense Motion to Suppress Evidence – the search of the contents of Mr. Pepe's computer, the thumb drive, and the digital camera media card. All the government offers on this question is a suggestion in its statement of facts that the forensic examination of the computer media in Singapore was simply an "offer of assistance" to the Cambodian National Police. *See* Government's Opposition, at 6-7. But this does not save the government for two reasons.

---

[1] As recognized by the Supreme Court in *Andresen v. Maryland*, 427 U.S. 463 (1976) with respect to paper documents:

> [T]here are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized.

*Id.* at 482 n.11. And as noted specifically with respect to computers in *United States v. Walser*, 275 F.3d 981 (10th Cir. 2001): "Because computers can hold so much information touching on many different areas of a person's life, there is a greater potential for the 'intermingling' of documents and a consequent invasion of privacy when police execute a search for evidence on a computer." *Id.* at 986.

First, the government offers no authority or argument as to why a search conducted solely by American agents is not subject to the Fourth Amendment even if it is conducted for the purpose of assisting foreign officials. The foreign search joint venture cases suggest that whether foreign search law standards or American search law standards apply turn not on who *requests* a search but on who *conducts* it. *Cf. United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987) (looking to foreign search law standards even where search is joint venture between United States and foreign officials). The computer media search in Singapore was conducted solely by American agents, and so it is subject to American search law standards, not Cambodia search law standards.

Second, and in any event, the government's factual premise – that this was just an "offer of assistance" – is not supported by the evidence. The request for the computer media to be examined by American agents was made just one day after the evidence was seized – in a letter from the Acting Regional Security Officer at the United States Embassy in Phnom Penh. *See* Motion to Suppress Evidence, Exhibit G. And that letter was not an "offer of assistance" in response to a request by the Cambodian authorities. It was a request by American agents for "access to the evidence, specifically, Mr. Pepe's computer, hard drive, memory stick, and USB thumb drive so that they may be sent to the United States for computer forensic testing." *Id.* Further, what the forensic examiner produced was a standard Department of Homeland Security ICE "Report of Investigation" – with no reference to any Cambodian investigation. *See* Motion to Suppress Evidence, Exhibit H.

In sum, whatever the nature of the search of Mr. Pepe's home, the search of the computer media was an American search subject to the standards which govern American searches. That meant there should have been a warrant, and the absence of

a warrant made the search unlawful.

B. THE SEARCH OF MR. PEPE'S HOME WAS A JOINT VENTURE, DID VIOLATE CAMBODIAN LAW, AND SO WAS UNREASONABLE UNDER THE FOURTH AMENDMENT.

1. The Search Was a Joint Venture.

The government seeks to avoid the "joint venture" rule for foreign searches by drawing a distinction between a "joint" investigation and a "parallel" investigation. *See* Government's Opposition, at 5. But this is semantics, not substance. What this Court should look at is substance. *Cf.* Government's Opposition, at 10 (acknowledging that question of whether investigation is joint venture requires a fact-specific inquiry).

What the substance shows here is a joint venture. On each day, Agent Phillips was there during the entire search. He also participated in the search – by looking for and at evidence, if not actually taking it at that time; by looking through documents and taking his own photographs (both of which actions are in and of themselves searches or seizures of sorts); and by giving at least occasional direction when there was something that needed to be done and had not been done by the Cambodian officers on their own. In addition, it was Agent Phillips – or other American agents – who actually took most, if not all, of the evidence into custody within a matter of a few days. *See* Motion to Suppress Evidence, Exhibit D. Under these facts,[2] Agent Phillips can and should be viewed as not just some outside observer but as part of the

[2] The defense believes evidence at the hearing on the motions will establish the facts set forth to the extent they are not already established or admitted in the government's opposition and declarations.

"team." That he was not completely in charge as the team leader does not mean there was no joint venture.

None of the search cases cited by the government suggest a contrary conclusion, moreover. In only one of those cases were American agents even present during the search, and in that case they (1) were there only because they had been invited by the foreign officials and (2) played only "a passive role." *See United States v. Benedict*, 647 F.2d 928, 930-31 (9th Cir. 1981). *Compare United States v. Maher*, 645 F.2d 780, 783 (9th Cir. 1981) ("There is no evidence American officials participated in the alleged wiretap, . . . ."); *United States v. Rose*, 570 F.2d 1358, 1362 (9th Cir. 1978) (noting that agents did not participate in and were not present at time of search); *United States v. Stonehill*, 405 F.2d 738, 741-42 (9th Cir. 1968) (noting that agents remained in office across street from foreign law enforcment office while "raids" were conducted).

The earliest of the cases – *Stonehill* – actually provides a good contrast to the present case. The court there pointed to six factors suggesting that there was no joint venture: (1) that no United States agent selected any evidence and that the sole purpose of the raids was to obtain evidence for Philippine proceedings; (2) that all activities of the American agents took place before the raids began or after they ended; (3) that the American agents were given permission to copy documents only after the raids were completed and the documents catalogued; (4) that there was no evidence of American agents attempting to short-circuit American citizens' Fourth Amendment rights; (5) that the American agents affirmatively objected to the searches; and (6) that the American agents were not requesting any action whatsoever, much less instigating an unlawful search. *Stonehill*, 405 F.2d at 746.

The circumstances in the present case were very different. First, Agent Phillips

did select at least some evidence and the raids appear to have been designed to obtain evidence for his purposes as well as proceedings in Cambodia. Second, Agent Phillips' activities were not limited to before the searches began and/or after they ended and he did not object to the searches; to the contrary, he was present during the search process and participated in the examination of evidence. Third, and finally, Agent Phillips was not only allowed to examine and/or copy evidence, but was actually allowed to take evidence when it was still sitting loosely in the bags that were used to remove it from the house.

2. There Was a Violation of Cambodian Search Law.

The government's fallback argument that there was no violation of Cambodian search law also fails. First, the claim that the authorities obtained a search warrant prior to the search, as opposed to after the fact, is suspect. As noted in the defense's moving papers, the warrant, while dated June 17, 2006, appears to have been actually issued on some later date, because it is based on a report that is dated June 19, 2006 and refers to information obtained on June 18, 2006. *See* Motion to Suppress Evidence, at 5, 8.

Second, there was no apparent effort to satisfy the preference that there be neighbors present as witnesses. The exhibit which the government characterizes as showing that there were ten "witnesses" present, *see* Government's Opposition, at 14, refers not to "witnesses" but to "participants" and, with the exception of the owner of the house, lists only government officials and non-governmental organization investigators. *See* Government's Opposition, Exhibit A to Declaration of Gary J. Phillips. To characterize these sorts of individuals as the "witnesses" which Cambodian search law requires ignores the obvious purpose of the witness provision, which is to have *neutral* observers present.

C. THE SEARCH WARRANT FOR THE SECOND SET OF COMPUTER MEDIA WAS A FRUIT OF THE UNLAWFUL SEARCH OF THE FIRST SET OF COMPUTER MEDIA.

The Court should also reject the government's argument that the search warrant for the second set of computer media was not a fruit of the unlawful search of the first set of computer media. All that is left in the warrant affidavit once the information from the first unlawful search is excised is (1) an admission about two photographs of naked children, which may or may not have been child pornography[3] and which subsequently had been erased, and (2) suggestive labels on perhaps two of the CDs.[4] This does not establish probable cause to search *every single item* of Mr. Pepe's computer media.[5]

D. THE SEARCH WARRANT AFFIDAVIT DID NOT ESTABLISH PROBABLE CAUSE FOR ALL OF THE CDS LISTED IN THE SEARCH WARRANT.

The government's response to the argument that the search warrant affidavit

---

[3] A photograph of a naked child is not necessarily child pornography. It is child pornography only if the child is engaged in some specified sex act and/or there is "lascivious exhibition" of the genitals or pubic area. *See* 18 U.S.C. § 2256(2)(A), (8). And not every exhibition of the genitals or pubic area is necessarily "lascivious." *See United States v. Hill*, 459 F.3d 966, 968-69, 970-72 (9th Cir. 2006) (noting that "not all images of nude children are pornographic," listing factors to be considered in deciding whether exhibition of genitals or pubic area is "lascivious," and finding probable cause based on detailed description of images).

[4] The government notes in its opposition that titles on the CDs included "15 years old little girls with crazy sex event," "Tender Baby," "14 Years Old Unsensor," and several others which the defense does not read as particularly suggestive. *See* Government's Opposition, at 19 n.8.

[5] Perhaps, based on the labels, there would be probable cause to search the suspiciously labeled CDs. The Court need not address that question unless there was evidence found on those CDs.

did not establish probable cause for all of the CDs listed in the search warrant is an assertion that the case of *United States v. Hill*, 459 F.3d 966 (9th Cir. 2006) resolved that issue. The government reads *Hill* too broadly, however. The issue in *Hill* was not whether there was probable cause, but whether officers could remove computer media and search them off-site without explaining in the affidavit why that was necessary. *See Hill*, 459 F.3d at 973. And the court held this was not permissible, stating:

> We do not approve of issuing warrants authorizing blanket removal of all computer storage media for later examination when there is no affidavit giving a reasonable explanation, . . . . Without such individualized justification being presented to the magistrate, we cannot be sure that the judge was aware of the officers' intent and the technological limitations meriting the indiscriminate seizure – and thus was intelligently able to exercise the court's oversight function. An explanatory statement in the affidavit also assures us that the officers could not reasonably describe the objects of their search with more specificity. Accordingly, we hold that the warrant here was overbroad in authorizing a blanket seizure in the absence of an explanatory supporting affidavit, which would have documented the informed endorsement of the neutral magistrate.

*Hill*, 459 F.3d at 976-77 (citations and footnotes omitted).

The court did go on to hold that it would not apply the exclusionary rule, but it so held only because "the officers were 'motivated by considerations of practicality rather than by a desire to engage in indiscriminate "fishing."'" *Hill*, 459 F.3d at 977. But here, in contrast to *Hill*, there was "indiscriminate fishing." The officers did not limit themselves to just CDs with arguably suspicious labels such as "15 years old

little girls with crazy sex event," "Tender Baby," and "14 Years Old Unsensor," Government's Opposition, at 19 n.8, or even just unlabeled CDs, but included every CD Mr. Pepe had, including CDs with labels such as "the essential SIMON & GARFUNKEL"; "A Midsummer Night's Dream"; and "MASTERS OF CLASSICAL MUSIC," "BACH," "BRANDENBURG CONCERTO NO. 1," "VIOLIN CONCERTO IN E MAJOR," "Norton," "Windowsxp," and "SAMSUNG CD-RW." *See* Motion to Suppress Evidence Discovered as Result of Computer Media Search Warrant, Exhibit A (warrant), at 4.

In these circumstances, the Court should not extend *Hill*'s holding that the exclusionary rule should not be applied. Evidence found on the CDs in the present case should be suppressed.

E. THE GOVERNMENT DOES HAVE TO SHOW THAT THE SEARCH OF THE COMPUTER MEDIA UNDER THE SEARCH WARRANT WAS PROPERLY LIMITED TO THOSE FILES WHICH MIGHT REASONABLY BE EXPECTED TO CONTAIN THE ITEMS WHICH THE SEARCH WARRANT ALLOWED AGENTS TO SEARCH FOR.

The government's suggestion that its expert's search of the computer media under the search warrant could be unlimited simply because "the search was limited to computer media," Government's Opposition, at 21, sweeps too broadly. *Hill* does not permit an officer conducting a computer search to conduct a general exploratory search of any and all computer files with no limitation at all; it simply held that the search warrant itself need not set forth limitations. The opinion explained:

> [W]e look favorably upon the inclusion of a search protocol; but its absence is not fatal. . . . [E]ven though a warrant authorizing a computer search might not contain a search protocol restricting the

> search to certain programs or file names, the officer is always "limited by the long-standing principle that a duly issued warrant, even one with a thorough affidavit, may not be used to engage in a general, exploratory search." The reasonableness of the officer's acts both in executing the warrant and in performing a subsequent search of seized materials remains subject to judicial review.

*Hill*, 459 F.3d at 978 (citations omitted).

How the government's agents focused their searches within the computer media is therefore subject to judicial review. The government does have to show that the search was properly focused.[6]

II.

CONCLUSION

First, the evidence found in the warrantless search of the computer media in Singapore must be suppressed, because that search was conducted solely by American agents, without the warrant the Fourth Amendment generally requires for American searches. Second, even the evidence found in the earlier search of Mr. Pepe's home in Cambodia must be suppressed, because there was sufficient American agent participation to trigger the foreign search joint venture exception that makes the

[6] The other potential issue raised by the defense Motion to Suppress Evidence Discovered as Result of Computer Media Search Warrant – regarding searches more than sixty days after issuance of the warrant – appears to be moot. The defense argument is only that "any evidence found on media *on which the Government did not find evidence* within the scope of the search warrant within the sixty-day search period authorized by the search warrant must be suppressed." Motion to Suppress Evidence Discovered as Result of Computer Media Search Warrant, at 9 (emphasis added). The defense does not contend that there can be no additional search of the media on which evidence *was* found within the sixty-day period. More specifically, the defense is not claiming additional searches conducted after the sixty-day search period are unlawful if they were conducted only on the eleven CDs on which evidence had already been found.

Fourth Amendment's reasonableness requirement applicable; that reasonableness requirement requires compliance with at least the foreign country's law; and there was not compliance with the foreign country's law here. Third, the evidence found on the second set of computer media under authority of the search warrant must be suppressed because (1) that search warrant was a fruit of the prior unlawful searches and (2) that search warrant did not establish probable cause for searches of the CDs in any event.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: August 31, 2007

By [signature]
CARLTON F. GUNN
Deputy Federal Public Defender

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: August 31, 2007

By [signature] (by CFG)
CHARLES C. BROWN
Deputy Federal Public Defender

SEAN K. KENNEDY (No. 145632)
Federal Public Defender
(E-mail: sean_kennedy@fd.org)
CARLTON F. GUNN (No. 112344)
Deputy Federal Public Defender
(E-mail: carlton_gunn@fd.org)
CHARLES C. BROWN (No. 179365)
Deputy Federal Public Defender
(E-mail: charles_brown@fd.org)
321 East 2nd Street
Los Angeles, California 90012
Telephone (213) 894-4795
Facsimile (213) 894-0081

Attorneys for Defendant
MICHAEL PEPE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. MICHAEL PEPE, Defendant. | CASE NO. CR 07-168-DSF<br><br>NOTICE OF MOTION; MOTION TO DISMISS INDICTMENT<br><br>Hearing Date: October 29, 2007<br>Hearing Time: 10:00 a.m. |

TABLE OF CONTENTS

Page

MOTION . . . . . . . . . . 2

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . 4

I. INTRODUCTION . . . . . . . . . . 4

II. STATEMENT OF FACTS . . . . . . . . . . 5

III. ARGUMENT . . . . . . . . . . 6

A. The Nexus Between the Alleged Acts and Foreign Commerce In This Case is So Attenuated That Jurisdiction is Not Proper Under § 2423(c). . . . . . . . . . 6

1. *Clark* and *Jackson*: The Meaning of Time, Travel, and Foreign Commerce. . . . . . . . . . 6

a. Time and Intent . . . . . . . . . . 7

b. Travel . . . . . . . . . . 7

c. Nexus to Foreign Commerce . . . . . . . . . . 8

2. A Constitutionally Tenable Connection to Foreign Commerce No Longer Exists When Eight Months Separate Completed Travel and Act. . . . . . . . . . 11

3. The Alleged Acts Were Primarily Non-Commercial In Nature. . . . . . . . . . 12

4. Principles of Statutory Construction Requires That the Prohibited Conduct in § 2423(c) Occur Soon After the Travel. . . . . . . . . . 12

B. Mr. Pepe's Prosecution Based on His Alleged Conduct in Cambodia Violates International Law, and Therefore this Court Lacks Jurisdiction Over the Prosecution. . . . . . . . . . 16

1. The Exercise of Jurisdiction is Inappropriate Under Any of the Five Bases of International Law. . . . . . . . . . 16

2. Exercise of Jurisdiction Would Be Unreasonable. . . . . . . . . . 17

3. The Exercise of Jurisdiction Would Also Violate the Fifth Amendment's Due Process Clause. . . . . . . . . . 18

V. CONCLUSION . . . . . . . . . . 19

# TABLE OF AUTHORITIES

FEDERAL CASES Page

*City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304 (1981) . . . . . 14

*Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102 (1980) . . . . . 13

*Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964) . . . . . 9

*Hotel v. Virginia Surface Mining & Reclamation Association, Inc.*, 452 U.S. 264 (1981) . . . . . 9

*Japan Line, Ltd. v. Los Angeles County*, 441 U.S. 434 (1979) . . . . . 9

*Jones v. United States*, 529 U.S. 848 (2000) . . . . . 13

*McCulloch v. Sociedad Nacional deMarineros de Honduras*, 372 U.S. 10 (1963) . . . . . 17

*National League of Cities v. Usery*, 426 U.S. 833 (1976) . . . . . 9

*Perrin v. United States*, 444 U.S. 37 (1979) . . . . . 13

*Pioneer Insurance Services Co. v. Brunswick Associates Ltd. P'ship*, 507 U.S. 380 (1993) . . . . . 13

*United States v. Bowman*, 260 U.S. 94-98 (1922) . . . . . 18

*United States v. Cabaccang*, 332 F.3d 622 (9th Cir. 2003) . . . . . 14

*United States v. Clark*, 435 F.3d 1100 (9th Cir. 2006) . . . . . passim

*United States v. Cores*, 356 U.S. 405 (1958) . . . . . 15

*United States v. Corey*, 232 F.3d 1166 (9th Cir. 2000) . . . . . 14

*United States v. Cummings*, 281 F.3d 1046 (9th Cir. 2002) . . . . . 10

*United States v. Custis*, 511 U.S. 485 (1994) . . . . . 14

FEDERAL CASES Page

*United States v. Davis*, 905 F.2d 245 (9th Cir.), *cert. denied*, 498 U.S. 1047 (1991) . . . . . . . . . . . . . . 18

*United States v. Delaware & Hudson Co.*, 213 U.S. 366 (1909) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Hackett*, 311 F.3d 989 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Jackson*, 480 F.3d 1014 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8

*United States v. Juda*, 46 F.3d 961 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Khan*, 35 F.3d 426 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Klimavicius-Viloria*, 144 F.3d 1249 (9th Cir.), *cert. denied*, 528 U.S. 842 (1999) . . . . . . . . . . . . . . 18

*United States v. Lopez*, 514 U.S. 549 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Morales*, 11 F.3d 915 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Rincon-Jimenez*, 595 F.2d 1192 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Toussie*, 397 U.S. 112 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Vasquez-Velasco*, 15 F.3d 833 (9th Cir. 1994)

FEDERAL STATUTES

18 U.S.C. §157(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18 U.S.C. § 207(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18 U.S.C. § 551 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18 U.S.C. § 922(k) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18 U.S.C. § 1202(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18 U.S.C. § 2423(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

//
//

OTHER Page

*Report of the Special Rapporteur on the Sale of Children, Child Prostitution and Child Pornography*, United Nations Economic and Social Council, Commission on Human Rights, 52d Sess., n.6, ¶ 56, U.N. Doc.E/CN.4/1996/100 (1996) . . . . . . . . . . . . . . . . 14

Jonathan Todres, *Prosecuting Sex Tour Operators in U.S. Courts in an Effort to Reduce the Sexual Exploitation of Children Globally*, 9 B.U. Pub. Int. L.J. 1, 2-3(1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

SEAN K. KENNEDY (No. 145632)
Federal Public Defender
(E-mail: sean_kennedy@fd.org)
CARLTON F. GUNN (No. 112344)
Deputy Federal Public Defender
(E-mail: carlton_gunn@fd.org)
CHARLES C. BROWN (No. 179365)
Deputy Federal Public Defender
(E-mail: charles_brown@fd.org)
321 East 2nd Street
Los Angeles, California 90012
Telephone (213) 894-4795
Facsimile (213) 894-0081

Attorneys for Defendant
MICHAEL PEPE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>MICHAEL PEPE,<br>Defendant. | CASE NO. CR 07-168-DSF<br><br>NOTICE OF MOTION; MOTION TO DISMISS INDICTMENT<br><br>Hearing Date: October 29, 2007<br>Hearing Time: 10:00 a.m. |

TO: UNITED STATES ATTORNEY THOMAS O'BRIEN AND ASSISTANT UNITED STATES ATTORNEYS PATRICIA DONAHUE AND JOHN J. LULEJIAN:

PLEASE TAKE NOTICE that on October 29, 2007 at 10:00 a.m., or as soon thereafter as counsel may be heard, defendant Michael Pepe will make the following motion:

/

/

MOTION

Defendant Michael Pepe, through his counsel of record, Deputy Federal Public Defender Carlton F. Gunn and Deputy Federal Public Defender Charles C. Brown, hereby moves this Honorable Court for an order dismissing the indictment on the following grounds:

(1) Title 18 U.S.C. § 2423(c) exceeds Congress' authority to regulate the channels of foreign commerce under the Foreign Commerce Clause and is thus unconstitutional;

(2) The statute cannot otherwise be upheld under any Foreign Commerce Clause theory other than the theory advanced by Congress in passing the statute;

(3) Even if the statute could arguably be upheld, there is constitutional doubt about its validity and thus, the statute should be interpreted narrowly to a class which would not include Mr. Pepe;

(4) The United States does not have extra-territorial jurisdiction over the offenses alleged to have been committed in Cambodia and, therefore, this Court lacks subject matter jurisdiction over this prosecution;

(5) Application of the statute to Mr. Pepe violates principles of international law, is unreasonable; and

(6) The Statute Violates the Due Process Clause of the Fifth Amendment.

/

/

This motion is based upon the attached Memorandum of Points and Authorities, all files and records in this case, and any further evidence that may be adduced at the hearing on this motion.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: October 3, 2007

By ______________________
CHARLES C. BROWN
Deputy Federal Public Defender

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: October 3, 2007

By ______________________
CARLTON F. GUNN
Deputy Federal Public Defender

MEMORANDUM OF POINTS AND AUTHORITIES

I.

INTRODUCTION

The government has charged Michael Pepe in the Central District of California with acts alleged to have occurred while he resided in Cambodia. The charging statute, 18 U.S.C. § 2423(c), was recently enacted and grants United States district courts extraterritorial jurisdiction over American citizens who "travel" abroad and engage in illicit sexual conduct with minors. The few appellate cases addressing the constitutionality of this far reaching statute have upheld it on Foreign Commerce Clause grounds. The rationale in support of these decisions rests on an expansive and perhaps metaphysical definition of the meaning of "travel" and its tenuous connection to "foreign commerce."

The fundamental question that remains unanswered by these cases is at what point does the temporal nexus between "travel" and "act" become so attenuated that jurisdiction is no longer proper? In Mr. Pepe's case, almost eight months elapsed between the completion of his last "travel" and the time the acts are alleged to have occurred. Mr. Pepe contends that such a span of time between travel and act makes jurisdiction under § 2423(c) improper because (1) the alleged conduct had no rational connection to foreign commerce and (2) even if there arguably could be a sufficient connection, the statute requires a closer temporal connection between travel and act. Such an extensive time gap between travel and act also raises issues of fundamental fairness and other constitutional concerns that render the application of § 2423(c) unconstitutional.

/

/

## II.

## STATEMENT OF FACTS[1]

In March 2003, Michael Pepe left the United States and permanently relocated to Cambodia, flying there on a one way ticket. Prior to leaving the United States, he gave away his vehicle, computer, and other valuables. He arranged to maintain a mailing address in the United States through his parents and sisters as well as a bank account for receipt of his pension.

Soon after Mr. Pepe's arrival in Cambodia he obtained a job, moved into an apartment on a long term lease, and began to accumulate the time necessary to become a Cambodian citizen. Within a month of his arrival he registered himself with the U.S. Embassy in Cambodia, providing them with emergency contact information in the United States and his apartment address in Cambodia.

As Mr. Pepe's time as a Cambodian resident increased, he became more involved in local community activites. He joined the Phnom Penh Veterans of Foreign Wars Post (VFW) and became a lifetime member. As a new resident, he obtained a Cambodian driver's license and purchased a vehicle and registered it with Cambodian authorities, indicating his residence as Phnom Penh, Cambodia.

Mr. Pepe also met and married a Cambodian woman. With his marriage to a Cambodian citizen, Mr. Pepe became a joint owner in her personal property, including livestock. They also made substantial improvements to property owned by his wife's extended family. Mr. Pepe also moved to larger house with his wife where he lived for more than two years prior to his arrest.

Mr. Pepe would occasionally return to the United States to visit his family. His last visit was on August 25, 2005, when he flew from Phnom Penh to Los Angeles to

---

[1] The statement of facts is based on the discovery received in this case and/or evidence the defense could present at an evidentiary hearing. The defense requests an evidentiary hearing if the facts are contested by the government.

attend his daughter's wedding. After his visit, he returned to his residence in Cambodia. His flight departed from Los Angeles on September 1, 2005, and arrived in Phnom Penh on September 3.

Upon returning to Phnom Penh, Mr. Pepe continued to live and work in the local community. Nine months after his return, on June 17, 2006, Mr. Pepe was arrested by Cambodian authorities and was later handed over to U.S. authorities. He was subsequently removed from Cambodia and returned to the United States where he was ultimately charged with the instant offense. The indictment in this case alleges that Mr. Pepe engaged in illicit sexual conduct with four different minors in violation of § 2423(c). According to the discovery received to date, these acts are alleged to have occurred sometime in April or May 2006.

## III.

## ARGUMENT

### A.

### The Nexus Between the Alleged Acts and Foreign Commerce In This Case is So Attenuated That Jurisdiction is Not Proper Under § 2423(c).

#### 1. *Clark* and *Jackson*: The Meaning of Time, Travel, and Foreign Commerce.

In *Clark* and *Jackson,* the Ninth Circuit recently addressed the constitutionality of § 2423(c). *United States v. Clark*, 435 F.3d 1100 (9th Cir. 2006), and *United States v. Jackson,* 480 F.3d 1014 (9th Cir. 2007). In *Clark,* the Ninth Circuit found that extraterritorial jurisdiction under § 2423(c) was proper under Congress's Foreign Commerce Clause power. The Court analyzed the history of § 2423(c) and ruled that the statute only required the government prove two elements: (1) travel in foreign commerce and (2) illicit sexual conduct. *Clark,* 435 F.3d at 1105. The Court also

found that § 2423(c) did not require the government establish that the illicit conduct occurred *while* a defendant was traveling. *Id.* at 1107.

a. Time and Intent

Consistent with the legislative history of § 2423(c), *Clark* made it clear that a defendant need not form an intent to engage in illicit conduct at the time of his travel in order to be guilty under § 2423(c). *Id.* In other words, an individual can violate § 2423(c) by engaging in illicit sex *shortly after* traveling to and arriving at his destination. *Jackson*, 480 F.3d at 1100. As the legislative history suggested, the goal was to relieve the government of the perhaps difficult burden of proving a defendant's state of mind while in route to a particular destination. But, by divorcing intent from travel in its reading of the statute, the Ninth Circuit raised several unanswered questions: (1) when does the time gap between travel and act become so attenuated that jurisdiction is no longer proper? and (2) what is the meaning of "travel" and does it ever end? In addressing the first issue, the Court reasoned in *Clark,* that "the lapse of time between his most recent transit between the United States and Cambodia and his arrest was less than two months. [Therefore] we see no plausible reading of the statute that would exclude its application to Clark's conduct because of this limited gap." *Clark,* 435 F.3d at 1107. Thus, it was Clark's engagement in an illicit sex act *shortly after* his arrival Cambodia that made jurisdiction proper in that case. *Id.* at 1116. However, in an important footnote, the court opined "whether a longer gap between the travel and the . . . act . . .. would raise constitutional or other concerns is an issue we leave for another day." *Id.* at n.11.

b. Travel

The issue in *Jackson* was whether a United States citizen who permanently relocated to Cambodia in 2001 and never returned to the United States was subject to

prosecution under § 2423(c) for acts committed in Cambodia. The Court ultimately ruled that Jackson's conduct was not proscribed by § 2423(c) because Jackson was no longer "traveling in foreign commerce" prior to the enactment of the statute in 2003. *Jackson,* 480 F.3d at 1024. In reaching its conclusion, the Court attempted to provide a clearer definition of what it means to "travel in foreign commerce."

Ultimately, the Court rejected the government's "limitless interpretation of travel" and ruled that "travel can end for a United States citizen at *some* point while still abroad." *Id.* at 1022. The *Jackson* court proposed two equally viable definitions of travel: (1) a common sense definition of travel that "ends upon arrival" in a foreign land but contemplates a "future . . . return" to ones home country (visitors), or (2) travel that ends upon permanent resettlement in a foreign country, which contemplates a permanent intent to remain (residents or domiciliaries). *Id.* Under both definitions, the *Jackson* Court found that since 18 months had passed since the defendant had begun residing in Cambodia, he had both "arrived" and "resettled" in that country before § 2423(c) was enacted. The *Jackson* opinion did not address the jurisdictional question left open by *Clark* – whether the passage of more than two months between travel and act attenuates foreign commerce clause jurisdiction. *See Jackson*, 480 F.3d at 1017-18 n.6 ("Our resolution of this case also does not depend upon the length of time between the end of travel and the sex act. Instead, our focus is on the circumstance that the two-year gap between Jackson's travel and his illicit sex acts straddled the statute's enactment. We therefore do not consider whether a two-year gap lacking that characteristic would be a sufficiently "longer gap" to "raise constitutional or other concerns.")

c. <u>Nexus to Foreign Commerce</u>

Authority for the exercise of the far reaching extraterritorial jurisdiction found in § 2423(c) is derived from Congress's *foreign* commerce clause power which grants Congress power "to regulate Commerce with foreign Nations, and among the several

States, and with the Indian Tribes." Because Congress's power to regulate interstate commerce may be restricted by considerations of federalism and state sovereignty, which do not impact its authority under the Foreign Commerce Clause, Congress's power to regulate under the Foreign Commerce Clause, has been described as broader than its authority to regulate interstate commerce. *Nat'l League of Cities v. Usery*, 426 U.S. 833 (1976); *see also Japan Line, Ltd. v. Los Angeles County*, 441 U.S. 434, 448-450 (1979) (in international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power).

Yet, because this is a criminal case and not a commercial trade or foreign relations case the question presented here is whether Congress has the power to regulate the prohibited criminal activity – lawful travel using a channel of foreign commerce, and engaging in sex with a minor several months after the lawful travel has ceased. Whether a regulated activity falls within Congress's constitutional power under the Commerce Clause is "ultimately a judicial rather than a legislative question[.]" *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 273 (1964) (Black, J., concurring); *see also Hotel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 276-280 (1981) ("[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so") (Rehnquist, J., concurring in judgment); *see also United States v. Lopez*, 514 U.S. 549, 555 (1995) (Court must undertake task of determining whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate [or foreign commerce]).

Traditionally, the Supreme Court has identified three categories of activity that Congress may regulate under its commerce power: (1) the use of the *channels* of commerce, (2) the regulation and protection of the *instrumentalities* of commerce, and (3) activities having a *substantial relation* to interstate commerce. *Lopez*, 514 U.S. at 557. Thus, under *Lopez*, the statute must fall into one of the delineated

"categories" of activity that Congress may regulate under its commerce power to be constitutional. *Id.* at 558. Although *Lopez* was an interstate commerce case, its analysis applies equally to a foreign commerce challenge. *See United States v. Cummings*, 281 F.3d 1046, 1049 n.1 (9th Cir. 2002) (recognizing that *Lopez* was interstate commerce case, and applying *Lopez's* analytical framework to foreign commerce clause).

In *Clark,* the Ninth Circuit rejected the traditional commerce clause framework and created a new test that found jurisdiction proper so long as there was a "constitutionally tenable nexus with foreign commerce" and the regulated conduct was rationally related to Congress's authority under the Foreign Commerce Clause. *Clark*, 435 F3d at 1115. The Court reasoned that because Clark traveled in foreign commerce and engaged in conduct that was "economic" in character, jurisdiction was proper, even though § 2423 was a criminal statute. *Id.*

Judge Ferguson in his dissent urged the majority to adopt the more traditional *Lopez* and *Morrison* framework adopted in interstate commerce cases. Judge Ferguson reasoned that § 2423(c) lacks any tangible links to the channels of commerce that would justify upholding it under Congress's Foreign Commerce power. *Id.* at 1118. "This cannot mean that every act with a bare economic component that occurs downstream from that travel is subject to regulation by the United States under its Foreign Commerce power, or the Commerce Clause will have been converted into a general grant of police power." *Id.* Such a broad grant of jurisdictional authority was troubling, because, as Judge Ferguson predicted, the only U.S. citizen who could fall outside the reach of § 2423(c) would be a citizen by virtue of birth who "never set foot in the United States." *Id.* at 1120. Judge Ferguson also pointed out that the purpose of § 2423(c) was to regulate criminal conduct and although the proscribed conduct may contain an economic or commercial component, there was no "tenable link to commerce with *foreign nations*" to justify regulation under the Foreign Commerce Clause. *Id. (emphasis added).*

**2. A Constitutionally Tenable Connection to Foreign Commerce No Longer Exists When Eight Months Separate Completed Travel and Act.**

The issue left unanswered in *Clark,* "whether a longer gap between the travel and the . . . act . . . . would raise constitutional or other concerns . . .", is squarely raised in Mr. Pepe's case. Here, the alleged conduct occurred several months after Mr. Pepe's interaction with the proverbial stream of foreign commerce. It is fair to say that under the most recent definitions provided by the Ninth Circuit, Mr. Pepe was no longer "traveling" at the time the alleged acts occurred. Rather, he was indeed a resident of Cambodia who had demonstrated a "permanent intent to resettle" in that country well before the time of the alleged acts.

Mr. Pepe moved to Cambodia in 2003. He registered himself with the U.S. Embassy in Cambodia, he joined the Phnom Penh Veterans of Foreign Wars Post (VFW), he obtained a Cambodian driver's license, and he purchased a vehicle and registered it with Cambodian authorities. Finally, he met and married a Cambodian woman and leased a home: All this demonstrates his intent to "reside" in Phnom Penh, Cambodia.

In 2005, he returned to the United States for a brief period of time to attend his daughter's wedding. His return flight from Los Angeles to Cambodia was on September 3, 2005. This was his last contact with the stream of foreign commerce. The alleged acts are said to have occurred more than seven months later, in April and May of 2006.

Thus, it cannot be said that Mr. Pepe's connection to foreign commerce is "constitutionally tenable" to justify jurisdiction under § 2423(c). The lapse of time is far greater than the two months in *Clark* and calls into question the reasonableness of the application of § 2423(c) in this case. Even under the expansive test adopted by the majority in *Clark*, it cannot be said that conduct attributed to Mr. Pepe some eight months after his last "travel" has any tenable connection to foreign commerce to

make jurisdiction in this case a rational exercise of Congress's power under the Foreign Commerce Clause.

**3. The Alleged Acts Were Primarily Non-Commercial In Nature.**

Under § 2423(c) "illicit sexual conduct" is defined as (1) commercial sex acts and (2) non-commercial sex acts accomplished by use of force or threat. *Clark,* 435 F.3d. at 1110. The ruling in *Clark* addressing the constitutionality of 2423(c) was limited to its "commercial sex acts" component. *Id.* at 1110, n.16. This was explained as a situation where a U.S. citizen engages in a "commercial transaction through which money is exchanged for sex." *Id.* at 1114.

Here, although extremely serious, the gravamen of the charge against Mr. Pepe is that his conduct fell under the non-commercial component of § 2423(c)'s prohibition against illicit sexual conduct. In this case, the alleged acts are primarily non-commercial in nature and are based more on allegations of physical force and intimidation. As such, the connection to foreign commerce is even more attenuated.

Because the alleged activities in this case occurred so far downstream from Mr. Pepe's last international travel and lacked an economic component that is rationally related to Congress's Foreign Commerce power, jurisdiction under § 2423(c) in this case is not proper.

**4. Principles of Statutory Construction Requires That the Prohibited Conduct in § 2423(c) Occur Soon After the Travel.**

Even assuming Congress had authority under the Foreign Commerce Clause to enact this statute, several important fundamental maxims of statutory construction are relevant in construing § 2423(c). First, "'where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and

by other of which such questions are avoided, [the Court's] duty is to adopt the latter." *United States v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909); *see also Jones v. United States*, 529 U.S. 848, 857 (2000). Second, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Jones*, 529 U.S. at 858. Third, "the starting point for interpreting a statute is the language of the statute itself." *United States v. Hackett*, 311 F.3d 989, 991 (9th Cir. 2002) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980)). Fourth, with regard to the meaning of the words used, they "are to be construed according to 'their ordinary, contemporary, common meaning[s].'" *Hackett*, 311 F.3d at 992 (quoting *Pioneer Ins. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388 (1993), and *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

These important principles of statutory construction support the defense position that § 2423(c) does not apply when nearly eight months separate the alleged acts from the completed travel. A plain reading of the statute requires a closer temporal nexus between completed "travel" and "act." In plain terms, § 2423(c) punishes, "[a]ny United States citizen or alien admitted for permanent residence who travels in foreign commerce, ***and*** engages in any illicit sexual conduct . . ." 18 U.S.C. § 2423(c) (emphasis added).

The conjunctive use of "and" in the statute by definition creates a limited temporal connection between travel and act. This is because one ordinary meaning of the word "*and*" is "*then.*" *Webster's Encyclopedic Unabridged Dictionary of the English Language* (1996 ed.) at 77. The ordinary meaning of the word "*then*" is "*immediately soon afterward*" or "*next in order of time*." *Id.* at 1967.

Such a reading of the statute is necessary in order to reasonably limit the scope of prohibited conduct. Without a limited or temporal nexus between travel and act, § 2423(c) would have almost infinite reach and apply to conduct that occurred years after an American traveled or resettled abroad. Such unlimited reach was not intended by Congress because, as discussed above, the legislative history suggests

the primary purpose in enacting § 2423(c) was to target and prevent "sex tourism," an illicit activity that by definition occurs soon after travel to a foreign destination. [2]

Had Congress so intended, it certainly had the linguistic tools available to craft a statute that was broad in scope and time. *United States v. Custis*, 511 U.S. 485 (1994); *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304 (1981); *United States v. Cabaccang*, 332 F.3d 622 (9th Cir. 2003); *United States v. Corey*, 232 F.3d 1166 (9th Cir. 2000)(supporting the proposition that Congress knows how to draft a statute consistent with its intent when it so desires).

For example, if Congress had intended to create a statute that was far reaching in scope and time, it would have used the clause "at any time" in place of the conjunctive "and" in the statute. Thus, § 2423(c) would punish persons who travel "and at any time thereafter" engage in illicit sexual conduct. There are numerous

---

[2] 18 U.S.C. § 2423(c) went into effect on April 30, 2003 as part of the wide-sweeping "Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act" (PROTECT Act). *See* Pub.L. 108-21, § 105 (2003). Because the PROTECT Act covered a wide range of criminal justice and national security topics, there was little discussion regarding § 2423(c). But, the House Report suggests that the provision was designed to prevent "sex tourism." The goal was to design a provision that would eliminate the need for the government to prove that the "defendant traveled 'for the purpose' of engaging in the illegal activity." Under this bill the Government would only have to prove that the defendant engaged in illicit sexual conduct with a minor while in a foreign country." H.R. Rep. No. 107-525, at 2 (2002). Congress noted that "[t]his legislation will close significant loopholes in the law that persons who travel to foreign countries seeking sex with children are currently using to their advantage in order to avoid prosecution." *Id.* at 3. Although there is no statutory definition of "sex tourism," experts studying this problem define it as organized tourism, with the primary purpose of facilitating a commercial sex relationship. For example, the United Nations defines "child-sex tourism" as "tourism organized with the *primary purpose* of facilitating the effecting of a commercial-sexual relationship with a child." *Report of the Special Rapporteur on the Sale of Children, Child Prostitution and Child Pornography*, United Nations Economic and Social Council, Commission on Human Rights, 52d Sess., n.6, ¶ 56, U.N. Doc.E/CN.4/1996/100 (1996) (emphasis added). The World Tourism Organization has defined "sex tourism" as "'trips organized within the tourism sector, or from outside the sector but using its structures and networks, with the *primary purpose* of effecting a commercial sexual relationship by the tourist with residents at the destination.'" Jonathan Todres, *Prosecuting Sex Tour Operators in U.S. Courts in an Effort to Reduce the Sexual Exploitation of Children Globally*, 9 B.U. Pub. Int. L.J. 1, 2-3 (1999) (quoting WTO statement on the Prevention of Organized Sex Tourism, Gen'l Assembly of the World Tourism Congress, 11th Sess., Res. A/Res/338 (XI) (Oct. 17, 1995) (emphasis added)).

examples of statutes that contain such "at any time language." *See, e.g.,* 18 U.S.C. § 157(3), 18 U.S.C. § 207(f)(2), 18 U.S.C. § 551, 18 U.S.C. § 922(k), 18 U.S.C. § 1202(a).

A similar analogy can be made to the doctrine of continuing offenses that also requires explicit use of statutory terms of art in order to create offenses that are not bound by time. "A continuing offense . . . is an unlawful course of conduct that does perdure ..." *United States v. Morales,* 11 F.3d 915 (9th Cir. 1993). In such cases, explicit language is required to make an offense a continuing one. An offense should not be deemed continuous "unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Id.*

Section 2423(c) is not a statute whose language "clearly contemplates a prolonged course of conduct." *United States v. Toussie*, 397 U.S. 112,120 (1970). Examples in this category include statutes that punish: a foreign seaman who unlawfully "remains" in the United States, *see United States v. Cores*, 356 U.S. 405, 408 (1958) ( "the crucial word 'remains' permits no connotation other than continuing presence"); and a deported alien who "is at *any time found in*" this country, *see United States v. Rincon-Jimenez*, 595 F.2d 1192, 1194 (9th Cir.1979) ("This language explicitly makes it a crime for an alien to remain in this country after an illegal entry.") (emphasis added).

By contrast to the above examples, the language of § 2423(c) contains no express or explicit language that demonstrates a congressional intent to create a statute to punish acts occurring "any time" after completed travel. This is not a statute in which Congress has expressly commanded that the offense be deemed to continue in time. Here, construing the statute to reach Mr. Pepe whose alleged conduct occurred almost eight months after his return to place of residence in Cambodia, and did not travel as part of an organized tour or otherwise use any of the other networks or structures of the tourism sector, but rather to permanently resettle

there, creates serious constitutional doubt under existing Supreme precedent as well as violates the rule of lenity.

To avoid the serious constitutional problems the statute should be read to contain some temporal nexus between travel and act. The statute should be narrowly applied to individuals who engage in illicit sexual conduct relatively soon after travel ends, rather than individuals, such as Mr. Pepe, who have spent many years in the foreign country with no immediate plans to return permanently to the United States.

B[3]

**Mr. Pepe's Prosecution Based on His Alleged Conduct in Cambodia Violates International Law, and Therefore this Court Lacks Jurisdiction Over the Prosecution.**

Even assuming that this Court were to rule § 2423(c) a proper exercise of constitutional authority, this Court nonetheless lacks jurisdiction over the prosecution because the exercise of jurisdiction violates international principles and would be "unreasonable."

**1. The Exercise of Jurisdiction is Inappropriate Under Any of the Five Bases of International Law.**

Even assuming that this limit on the extraterritorial application of a federal statute is overcome by the inclusion of the "travels in foreign commerce" element, the jurisdictional reach of § 2423(c) extraterritorially violates international law

[3] Mr. Pepe understands that consideration of the remaining challenges to 18 U.S.C. § 2423(c) by this Court is foreclosed by the majority decision in *Clark*, which upheld the constitutionality of § 2423(c). The Supreme Court has not yet addressed the constitutionality of the statute. Mr. Pepe raises the following arguments to preserve them for further review.

principles. *See United States v. Vasquez-Velasco*, 15 F.3d 833, 839 (9th Cir. 1994) *citing McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21-22 (1963). International law recognizes several bases on which the exercise of extraterritorial jurisdiction may be appropriate. They are: (1) the "territorial principle," under which jurisdiction is based on the place where the offense is committed; (2) the "nationality principle," under which jurisdiction is based on the nationality or national character of the offender; (3) the "protective principle," which provides for jurisdiction over acts committed outside the country that harm the country's interests; (4) the "passive personality principle," which provides for jurisdiction based on the nationality of the victim; and (5) the "universality principle," which provides for jurisdiction over extraterritorial acts by a citizen or non-citizen that are so heinous as to be universally condemned by all civilized nations. *Id.* at 839.

Here, the alleged conduct, having sex with Cambodian minors, took place in Cambodia. Neither the territorial nor passive personality principle thus applies. Nor does the charged conduct harm the country's national security, political, or economic interests (protective principle).

**2. Exercise of Jurisdiction Would Be Unreasonable.**

Even assuming that this Court finds jurisdiction based solely on Mr. Pepe's citizenship, compliance with international law also requires a finding of "reasonableness." Factors that may be relevant to reasonableness include the "character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other [countries] regulate such activities, and the degree to which the desirability of such regulation is generally accepted," "the extent to which another [country] may have an interest in regulating the activity," "the link of the activity to the territory of the regulating state," and "the likelihood of conflict

with regulation by another [country]. *Vasquez-Velasco*, 15 F.3d at 840 (citing Restatement (Third) of Foreign Relations Law of the United States § 403(2)).

Here, the legislation deals with a criminal act against foreign nationals, which has no direct relation to the United States' security, economic, or national interests. Rather, the alleged conduct "affect[ed] the peace and good order" of the particular community in which it was allegedly committed, *i.e.*, Cambodia. *United States v. Bowman*, 260 U.S. 94, 97-98 (1922). Thus, there is every reason for Cambodia to exercise jurisdiction (which, in fact, it did), and not the United States. *See* H.R. Rep. No. 107-525, at 3.

**3. The Exercise of Jurisdiction Would Also Violate the Fifth Amendment's Due Process Clause.**

In addition, compliance with international law does not "conclusively determine whether due process is satisfied." *United States v. Davis*, 905 F.2d 245, 249 n. 2 (9th Cir.), *cert. denied*, 498 U.S. 1047 (1991). To comply with the "due process clause of the Fifth Amendment, extraterritorial application of federal criminal statutes requires the government to demonstrate 'a sufficient nexus between the defendant and the United States so that such application would not be arbitrary or fundamentally unfair.''' *Id.* at 248-49 (citation omitted); *United States v. Juda*, 46 F.3d 961, 966 (9th Cir.1995). The nexus requirement "serves the same purpose as the 'minimum contacts' test in personal jurisdiction. It ensures that a United States court will assert jurisdiction only over a defendant who 'should reasonably anticipate being haled into court' in this country." *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir.), *cert. denied*, 528 U.S. 842 (1999) (citation omitted); *see also United States v. Khan*, 35 F.3d 426, 430 (9th Cir. 1994) ("To meet the nexus requirement, the government must show that the plan for shipping drugs was likely to have effects in the United States."). Thus, there is a "notice" as well as a "sufficient

connection" with the United States component in the due process analysis.

Here, there is no nexus between the crime against a foreign national and the United States. While the United States may have a moral interest in aiding other countries with their sex tourism problems, sex acts with private individuals in those countries have no domestic effect on the United States' security, political, or economic interests. Especially given the almost eight month lapse of time in this case, the application of section 2423(c) would be arbitrary and fundamentally unfair and thus does not comport with due process.

V.

CONCLUSION

In Mr. Pepe's case, almost eight months elapsed between the completion of his last "travel" and the time the acts are alleged to have occurred. Mr. Pepe contends that such a span of time between travel and act makes jurisdiction under § 2423(c) improper because the alleged conduct had no rational connection to foreign commerce. Morever, fundamental principles of statutory construction require the statute to contain a reasonable time limit between travel and act. Further, this Court lacks jurisdiction over this prosecution because the exercise of jurisdiction violates international law, would be unreasonable, and violates the Due Process Clause of the Fifth Amendment.

Respectfully submitted,
SEAN K. KENNEDY
Federal Public Defender

DATED: October 3, 2007

By [signature]
CHARLES C. BROWN
Deputy Federal Public Defender

DATED: October 3, 2007

By [signature]
CARLTON F. GUNN
Deputy Federal Public Defender

FILED
CLERK, U.S. DISTRICT COURT
FEB 26 2008
CENTRAL DISTRICT OF CALIFORNIA
BY LAW DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

United States of America, )
Plaintiff, )
)
vs. ) Case No. CR 07-168-DSF
)
Michael Joseph Pepe, )
Defendant. )
________________________________ )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Monday, October 29, 2007

DOCKETED ON CM
FEB 28 2008
BY ___ 033

Pamela A. Seijas, CSR, FCRR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California 90012
(213) 687-0446

ORIGINAL

133

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
BY: PATRICIA DONAHUE
ASSISTANT UNITED STATES ATTORNEY
JOHN J. LULEJIAN
ASSISTANT UNITED STATES ATTORNEY
312 N. SPRING STREET
LOS ANGELES, CA 90012

FOR DEFENDANT: OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY: CARLTON GUNN
DEPUTY FEDERAL PUBLIC DEFENDER
CHARLES BROWN
DEPUTY FEDERAL PUBLIC DEFENDER
321 EAST SECOND STREET
LOS ANGELES, CA 90012

Los Angeles, California, Monday, October 29, 2007

10:07 a.m.

-oOo-

THE CLERK: Calling Item No. 7, CR 07-168-DSF, *United States of America vs. Michael Joseph Pepe*.

Counsel, please state your appearances.

MS. DONAHUE: Good morning, Your Honor. Patricia Donahue and John Lulejian on behalf of the Government.

MR. BROWN: Good morning, Your Honor. Charles Brown and Carl Gunn on behalf of Mr. Pepe, who is present.

THE COURT: Good morning. Good morning, Mr. Pepe.

MR. BROWN: Your Honor, would it be possible to have Mr. Pepe unshackled for the hearing this morning?

THE COURT: Well, it looks like it probably is. Any problem with that from the Marshal's service?

THE MARSHAL: On your order, ma'am.

THE COURT: Thank you.

MR. BROWN: Thank you, Your Honor.

THE COURT: The gentleman's name, would you spell it for me?

MS. DONAHUE: Yes, Your Honor. L-U-L-E-J-I-A-N.

THE COURT: We are here only now on the motion to suppress, as I understand it?

MS. DONAHUE: Yes, Your Honor. And thank you very much for accommodating us, given the Court's calendar. If the

Government would -- if the Court would like -- I apologize -- to only receive the testimony of Assistant Attache Phillips and put everything else over to another day or another time, whatever, at the Court's convenience. Your clerk contacted us, and I explained to him that Mr. Phillips is here from Cambodia, and we appreciate the Court accommodating us, but obviously -- or if the Court would like to put the entire matter over to another day, Mr. Phillips will be here for a couple more days.

THE COURT: Well, I had some questions about the motion and was going to just let you know what those were in advance and handle it all together, thinking that was easier for all of you. But that's -- it's not a problem. Why don't we just proceed with what we have here, and we will see how far we get?

MS. DONAHUE: Attache Phillips submitted -- we submitted a declaration of his in connection with the Government's opposition. We submit that declaration and the exhibit as his direct-examination. He is here in court available for cross-examination by defense counsel. The Government would ask if the Court is going to take the testimony from Attache Phillips, that the courtroom be cleared of people unconnected with the case under 18 U.S.C. 3509(d) which covers privacy rights of child victims. It -- I obviously can't know completely what Mr. Gunn is going to ask Attache Phillips, but it may be that it will cause him to discuss the identifying

information regarding the victims, and that is clearly protected under 3509(d).

MR. GUNN: I don't have any objection, Your Honor. I don't envision specific questions aimed at that, but of course you never know what answers might come out for sure. So I suppose it's a possibility.

THE COURT: All right.

MR. GUNN: I have no feeling one way or the other about it.

THE COURT: I don't like to close courtrooms unless there is a real reason to close courtrooms. You have stated a potential reason, and why don't you just advise Mr. Phillips what would fall into that category, and if he is about to say something that would fall within that category, we will seal the courtroom temporarily as opposed to just doing it.

MS. DONAHUE: Thank you, Your Honor.

THE COURT: All right.

MR. GUNN: I did, Your Honor, want to move to exclude witnesses, and I mentioned that to the Government, and they indicated that, well, there's three case agents in the matter and both witnesses are case agents. I think under the rule about exclusion of witnesses, the idea is that one case agent gets to remain in the courtroom, not however many they want to call case agents so I would ask to exclude all witnesses except one case agent.

THE COURT: Why don't you --

MS. DONAHUE: There are two case agents, but it's really not a big deal.

THE COURT: Why don't you designate one and --

MS. DONAHUE: That's fine.

MR. GUNN: I was thinking of questioning Agent Wang first, unless that is going to be a problem.

MS. DONAHUE: We have Attache Phillips here from Cambodia. Special Agent Wang is based in Los Angeles and can come to court any time. It's much more difficult with Phillips. So given the Court's schedule, we would propose --

THE COURT: Why don't we make sure we get Mr. Phillips done?

MR. GUNN: If we could have him designated as the case agent for today so it doesn't defeat the purpose of exclusion of witnesses, I would appreciate it.

THE COURT: I am not going to tell the Government who they have to designate for what so they can have one person in here. I don't know who you need for what.

MS. DONAHUE: It's no big deal. We have no objection, Your Honor. That's fine.

THE COURT: Whoever should leave, should leave.

THE CLERK: Please raise your right hand to be sworn.

<u>Gary Phillips, Government's witness, was sworn</u>

THE CLERK: Please be seated. Please state your full

name and spell your first and last name for the record.

THE WITNESS: Good morning, Your Honor. Good morning, everybody. My name is Gary Phillips. P-H-I-L-L-I-P-S.

THE COURT: You may proceed.

MR. GUNN: Thank you, Your Honor. If I could approach with some exhibits to be marked for identification?

THE COURT: Yes. Has Ms. Donahue seen them?

MR. GUNN: I just handed her a copy. They are materials I got in discovery from the Government. Does the Court want me to start with 101? That's what I normally do. If we could have 101, 102, 103 in the order I have given, and I have copies for the Court as well as for the witness. 101 would be the newspaper article, 102 would be the document with "Attachment," and 103 would be the document "Supplemental Warrant."

(Defendant's Exhibits 101, 102 and 103 were marked.)

CROSS-EXAMINATION

BY MR. GUNN:

Q. Agent Phillips?

A. Yes, sir.

Q. Among the items you found in Mr. Pepe's house were a number of *Cambodian Daily* newspapers; isn't that correct?

A. I did not find those articles.

Q. Among the items that were found in Mr. Pepe's house were a number of *Cambodian Daily* newspapers; correct?

A. A few.

Q. And *Cambodian Daily* is the name of the newspaper; right?

A. Yes.

Q. And that's an English language paper they publish in Cambodia; correct?

A. Dual.

Q. I'm sorry?

A. English and Khmer.

Q. And Defense Exhibit 101 is a page from one of those newspapers; correct?

THE COURT: From the Cambodia newspaper or one that was found --

MR. GUNN: I'm sorry. Let me be clear, Your Honor.

Q. Defense Exhibit 101 is a page from one of the *Cambodian Daily* newspapers that was found in Mr. Pepe's house; correct?

A. Is this 101, this paper you are referring to?

Q. Yes.

A. I can't really say I remember this article.

Q. So you're not sure?

A. I would have to look through the evidence.

Q. Does the fact that there is a Bates stamp number on the document suggest anything to you?

A. Yeah. It's part of the case.

MR. GUNN: I'll move on, Your Honor, and come back to that with the next witness then.

Q. Would you look at Defense Exhibit 102, the document that has "Attachment" in the center about a third of the way down?

A. I only have three pages here.

Q. And one of them is a Cambodian National Police document that has the word "Attachment" about a third of the way down?

A. Can you refer to which numbers?

Q. It should be 102, if the numbers are written on it.

A. Maybe, sir, I'm not seeing somebody.

THE COURT: 806.

MR. GUNN: The Bates number on the bottom would be 806.

THE WITNESS: 806. Yes, sir.

BY MR. GUNN:

Q. Do you have that in front of you?

A. I do.

Q. That's a translation of an attachment prepared by the Canadian prosecutor listing some of the evidence in the case; correct?

THE COURT: Canadian?

MR. GUNN: I'm sorry. Cambodia if I said Canadian, Your Honor.

THE WITNESS: I haven't seen this document.

BY MR. GUNN:

Q. So you don't know?

A. I don't know, sir.

Q. Would you look at Defense Exhibit 103. That's the document with a Bates page 10154 or Bates No. 10154 at the bottom of the document in the middle. Do you have that in front of you?
A. I do, sir.
Q. And that's a translation of a document prepared by the Cambodian police listing some of the evidence in this case, isn't it?
A. Sir, I didn't do the translation, so I don't know.
Q. So you don't recognize that document?
A. Not this particular document.

MR. GUNN: I will come back to this with the other witness, Your Honor.

THE COURT: Thank you.

BY MR. GUNN:
Q. You can set those aside, Agent Phillips.
A. Thank you.
Q. You talk in your declaration about two days the Cambodian police were at Mr. Pepe's house; correct?
A. Yes, sir.
Q. One was June 17th?
A. Yes, sir.
Q. The other was June 19th?
A. Yes, sir.
Q. Only one of the alleged victims was at the house when people went there on June 17th; correct?

A. There were two people there.
Q. Only one of the alleged victims?
A. I consider both victims.
Q. Only one of the alleged victims who is named in a count of the Indictment?
A. Yes. That's correct, sir.
Q. And the police found other alleged victims who are named in the counts of the Indictment living at the house on June 18th, the next day, didn't they?
A. No.
Q. Did the police at some point find or locate other alleged victims living at the house?
A. In the house?
Q. Yes. Let me rephrase the question. Did the police at some point locate other alleged victims at the house, meaning the police located them at the house?
A. I don't know where they were located.
Q. Do you recall your -- going back to your declaration in this matter, you attached a translation of a Cambodian police report to that declaration as an exhibit, didn't you?
A. I believe I did, yes, sir.
Q. Is it fair to say you consider that report to be accurate?
A. Yes.
Q. That report refers to a, quote, combined force, unquote, that conducted the search, does not it?

A. I would have to see the document.

Q. Okay. Would it refresh your memory if you saw the document?

A. Certainly.

Q. Do you have your declaration with you?

A. Yes, sir, I do.

Q. Would you pull it out and look at just your declaration with the exhibit attached?

A. What exhibit number, sir?

Q. I'm sorry?

A. Which exhibit number?

Q. Well, it's a report attached, I believe, as Exhibit A. We just -- agreed; right?

A. Yes, sir.

Q. Okay. Does that refresh your memory about whether the report refers to a combined force that conducted the search?

A. This is -- yeah. I see -- I see the words "combined force." I do see that.

Q. All right. And it then has a list of people, doesn't it?

A. Yes, sir, it does.

Q. And one of those people on the list is you; right?

A. Yes, sir.

Q. And another is an American official named Andy Simpson; right?

A. Yes, sir.

Q. It says "Embassy Representative" by his name?
A. Yes, sir.
Q. And he was a representative of the American embassy; correct?
A. Correct.
Q. And the report describes you and Mr. Simpson and the other people in the list as, quote, participants, doesn't it?
A. This report?
Q. Yes.
A. That's what this report says.
Q. And it doesn't describe you as just observers, does it?
A. I didn't write this report. It says "participants."
Q. Not observers; correct?
A. Correct.
Q. Now, you do agree you were present at the search, don't you?
A. Yes, sir, I was present.
Q. And you were -- you agree you were taking photos; correct?
A. That's correct.
Q. You took quite a few photos?
A. Yes, sir.
Q. You also used your participation to get detailed information about the layout of that house, didn't you?
A. I drew a blueprint, yes, sir.
Q. You made -- well, you made detailed notes about how the

house was laid out; right?

A. Yes, sir.

Q. And you made a detailed diagram; correct?

A. I'm talking about the diagram.

Q. Well, you made a list of note about things that were in the house; right?

A. Yes, sir.

Q. In text, in writing; right?

A. Yes, sir.

Q. And you also made a detailed diagram; right?

A. Yes, sir. That's correct.

MR. GUNN: Your Honor, could I have another exhibit marked for identification?

THE COURT: Yes.

MR. GUNN: If I could approach the clerk and if we could have this marked as 104. And there is an extra copy for the Court.

THE COURT: Thank you.

(Defendant's Exhibit 104 was marked.)

BY MR. GUNN:

Q. Do you have that in front of you, Agent Phillips?

A. I do, sir.

Q. That's a two-page document; correct?

A. That's correct.

Q. And the first page are some handwritten notes you made

about things you observed in the house, sort of geographically or logistically; right?

A. Yes, sir.

Q. And the second page is a diagram that you drew of the house; correct?

A. That's correct.

Q. And that's something you did while you were present at the searches; correct?

A. That's correct.

Q. You also selected at least some items to be seized, didn't you?

A. I -- yes, one of them, yes.

Q. In fact, there is a videotape of part of the search that shows that, isn't there?

A. Yes, sir.

MR. GUNN: Your Honor, I would like to, if we could, have it identified for the record as Defense Exhibit 105, and I will obviously give it to the clerk when we are done. I now have it in the computer. If I could play a portion from the CD that has that videotape on it?

THE COURT: If there is no objection, you may.

MS. DONAHUE: There is no objection.

THE COURT: Thank you.

(Defendant's Exhibit 105 was marked.)

THE COURT: Is there sound to this?

MR. GUNN: There is sound, Your Honor, and I can put on the record the time we start on the disk and the time we end so that will be in the record. I don't know if it needs to be transcribed. However the Court wants to proceed.

THE COURT: Ms. Donahue?

MS. DONAHUE: I believe some of the sound is a considerable conversation in Khmer, which I don't think the court reporter could transcribe anyway, so we see no reason to have it transcribed.

THE COURT: The court reporter will not report it.

MR. GUNN: I'm sorry. If I could have Mr. Brown go to Minute 16, Second 20 on the CD -- CD 3 of three CD's that are on the disk. If we could go to 16:20 and play from there through 16:30.

(Whereupon, the video was played)

MR. GUNN: Stop there.

Q. That was you tossing a stuffed animal into the pile to be taken; correct?

A. Yes.

MR. GUNN: If I could now have Mr. Brown go to 26:00 on the same CD. That should be fine. If we could play through 26:15.

(Whereupon, the video was played)

MR. GUNN: And stop there.

Q. That was you adding a paper to the pile to be taken, wasn't

it?

A. Yes. Toward the end, yes, sir.

Q. You also took a wooden carving of a fish that was in the house, didn't you?

A. I did not.

Q. Didn't you have to explain to the owner why you needed to take the wooden fish because she didn't want you to take it at first?

A. Yes, I did. But I did not take it.

Q. But you were the one who explained to her why it was needed?

A. Yes.

Q. And it was at your direction or desire that it was taken; correct?

A. It was not at my direction.

Q. But you were the one who explained to her why it needed to be taken?

A. Yes.

Q. You also personally looked through Mr. Pepe's -- or at least some of Mr. Pepe's papers during the search, didn't you?

A. That's correct.

MR. GUNN: Your Honor, could I have Mr. Brown go to 28:15 on the same CD, CD 3, on Defense Exhibit 105 and play through 28:40. I think 28:20 would be -- through 28:40 would be fine.

(Whereupon, the video was played)

MR. GUNN: If we could stop there, Your Honor.

Q. That was you looking through the papers in that folder; correct?

A. Yes, it was.

MR. GUNN: If I could have Mr. Brown go to 30:05 on CD 3 on Defense Exhibit 105, Your Honor, and play through 31:00. 30:06 would be fine.

(Whereupon, the video was played)

MR. GUNN: If we could stop there, Your Honor.

Q. That was you looking through papers on that table; correct?

A. Yes, it was.

Q. And you actually laid out particular papers to take individual photographs of them during the search; correct?

A. I did. I did take photos.

MR. GUNN: Your Honor, could I approach and have some exhibits marked for identification?

THE COURT: Yes.

MR. GUNN: These, Your Honor, would be 106 through 110, if that's all right. I've written the numbers just by hand for the time being.

(Defendant's Exhibits 106 through 110 were marked.)

BY MR. GUNN:

Q. Would you look at Defense Exhibit 106 through 110.

A. Okay.

Q. Those are photographs you took of individual papers during the search; correct?

A. Yes.

Q. You also gave instructions to others at times during the search, didn't you?

A. On one occasion.

MR. GUNN: Your Honor, if I could have Mr. Brown go to 2:40 -- Minute 2, Second 40 on the CD, CD 3 again, on Defense Exhibit 105, and I will tell Mr. Brown when to stop, if I may.

For the record, we are showing it at 2:30.

(Whereupon, the video was played)

MR. GUNN: Stop there.

Q. Did you hear the voice saying in English, "Before they move anything, I need to put the ruler down. Okay"?

A. If you could play it back?

MR. GUNN: If we could play it back, Your Honor --

THE COURT: All right.

MR. GUNN: From 2:30. I would like you to listen for those words, and if we could turn the volume up. 2:33 would be fine.

(Whereupon, the video was played)

BY MR. GUNN:

Q. Did you hear it that time?

A. Yeah, I did.

Q. That was your voice; correct?

A. Yes.

MR. GUNN: If I could have Mr. Brown go to Minute 8, Second 00 on Defense Exhibit 105, Your Honor, and I will tell Mr. Brown where to pause, if I may. I am going to be asking you something again about what was said and who said it, so if you could be listening to the voices, Agent Phillips.

(Whereupon, the video was played)

MR. GUNN: If you could stop there.

Q. Did you hear the words, "Let me look at it under alternate light"? Did you hear those words?

A. Yes.

Q. That was you speaking; correct?

A. Yes.

MR. GUNN: If I could continue playing, Your Honor, from here.

(Whereupon, the video was played)

MR. GUNN: If we could pause there, Mr. Brown.

Q. That was you telling people to close the curtains; correct?

A. Yes, yes.

MR. GUNN: If we could continue playing, Your Honor, through 9:10 on CD 3 on Defense Exhibit 105.

(Whereupon, the video was played)

BY MR. GUNN:

Q. That's you looking at the mattress with a special light; correct?

A. Yes, sir.

MR. GUNN: If we could stop it there, Your Honor. For the record, it was stopped at 9:14, I guess.

If I could now have Mr. Brown go to 36:00 on CD 3 of Defense Exhibit 105, that would be fine, 3557.

(Whereupon, the video was played)

MR. GUNN: I would like you to listen again, Agent Phillips, as well as watch.

THE WITNESS: Sure.

MR. GUNN: If we could stop there.

Q. The person saying, "This is what she described yesterday," that was you; correct?

A. Yes. But you need to play it a little more.

Q. I am going to play it a little bit more.

(Whereupon, the video was played)

MR. GUNN: If we could stop there.

Q. Did you hear the voice, "We need to take that"?

A. I heard was -- what I said was can -- "Can we take that?"

Q. You actually said, "We need to take that."

A. I think I said "can."

MR. GUNN: Can we back up and play it again, Your Honor?

THE COURT: Sure.

MR. GUNN: Probably if we start at 36:20, we'll catch it. If we could turn the volume up.

(Whereupon, the video was played)

BY MR. GUNN:

Q. You say, "We need to take that"; right?

A. What I heard was "can." "Can we take that?"

Q. You also heard the word "need," didn't you?

THE COURT: Okay. It is what it is.

MR. GUNN: All right, Your Honor.

Now, I would like you to look at one more part of this videotape of this day. If we could have Mr. Brown, Your Honor, go to 11:10 on CD 3 on Defense Exhibit 105.

(Whereupon, the video was played)

MR. GUNN: If we could play through 11:40, Your Honor.

(Whereupon, the video was played)

MR. GUNN: Stop there at 11:40.

Q. You are one of the people posing for those photos; correct?

A. At their request, yes.

Q. The other Caucasian is a man from the International Justice Mission named Ron Dunn; correct?

A. Yes.

Q. The men you are posing with are several of the Cambodian officials participating in the search; correct?

A. Yes.

MR. GUNN: All right. We can, I believe, blank the screen on the video, Your Honor, for now.

Q. You talked a little bit in your declaration about what

knowledge you have of Cambodian search rules; right?
A. Yes.
Q. And your understanding is that the Cambodian prosecutor and the person whose house is being searched have to be present; correct?
A. The prosecutor or the member of the courts.
Q. And the person whose house it is?
A. Yes, sir.
Q. And they have a search warrant requirement like we have a search warrant requirement?
A. No.
Q. Well, they have a search warrant requirement?
A. They do, sir.
Q. Different details --
A. Different style.
Q. You actually knew there wasn't a search warrant at the time of the original search; correct?
A. Say that again.
Q. You actually know that there wasn't a search warrant at the time of the original search; correct?
A. No. There was a search warrant.
MR. GUNN: Your Honor, could I have an exhibit marked for identification?
THE COURT: Yes.
MR. GUNN: If we can call this next in order. I

believe that would be 111.

(Defendant's Exhibit 111 was marked.)

BY MR. GUNN:

Q. Do you have Defense Exhibit 111 in front of you?

A. Yes.

Q. That is a slide from a PowerPoint presentation that you prepared about investigating these types of investigations, isn't it?

A. Yes.

Q. That presentation included a description of the investigation in this case, didn't it?

A. I'm sorry. Could you say that again?

Q. Yes. That presentation included a description of the investigation in this case, at least as part of the presentation; right?

A. Very brief details.

Q. And this slide is one of the slides about this case; correct?

A. Yes, sir.

Q. You have three little bullet points in that slide; right?

A. Yes, sir.

Q. The first one says, "After interviewing victims, ICE and other agencies coordinated in the execution of an arrest warrant for Pepe"; correct?

A. Yes.

Q. The second says, "Immediately after Pepe's arrest, ICE, Bangkok and NGO interviewed several other victims which corroborated statements from other victims"; correct?

A. Yes, sir.

Q. And the third bullet point says, "Based on additional interviews, CNP obtained a search warrant"; correct?

A. Yes, sir.

Q. By the way, you also state in that PowerPoint slide that ICE, quote, "coordinated with," unquote -- with the Cambodian police; right?

A. Yes, sir.

Q. You don't say you were only an observer; right?

A. No, sir.

Q. You don't say there was just a parallel investigation?

A. Not for a PowerPoint, no.

Q. Now, you said in your declaration that you knew there was a requirement about the prosecutor and the person whose home was being searched to be present?

A. Yes, sir.

Q. And you knew there was a search warrant requirement, but it was somewhat different than American search warrant requirements? Was that what your testimony from before was suggesting?

A. It's a different style.

Q. How did you know those things?

A. I have been in Cambodia for five years.
Q. And can you tell us how you knew those things?
A. I've observed several search warrants. I know the culture. I have been present during meetings with generals and prosecutors, and I have had meetings with judges.
Q. And they've talked about search warrant requirements and search requirements? How do you pick this up?
A. Through my personal experience of observing search warrants in Cambodia and speaking with my colleagues from the Cambodian National Police, speaking with my investigators from the U.S. embassy who were responsible for liaison -- liaisoning with the Cambodian National Police and the prosecution and the courts.
Q. There have been other searches where you observed?
A. Yes, sir.
Q. And you signed as a witness at one point in this case; right?
A. That's correct, sir.
Q. And had you signed as a witness in some of the other cases previously?
A. Yes, sir.
Q. So you knew there was a witness requirement of some sort?
A. That's correct, sir.
Q. And in this case, there were two spaces for witnesses to sign; right?
A. There was many spaces.

Q. Many spaces with just the word "witness," or spaces for other types of people like participants or prosecutors?

A. I think what I am saying is there was many people who signed. They were all witnesses.

Q. Well, you signed a paper that specifically had a space for witness, and that's the space you signed; correct?

A. That's where they told me to sign, yes.

Q. And there were two places on that document for a, quote, "witness," unquote; correct?

A. As I recall, you're correct, sir.

Q. Was that also true in the other search warrants that you had observed or participated in?

A. Sir, I would have to look through that, but to the best of my knowledge and recollection, that's correct.

Q. So you knew there was a witness requirement?

A. Yes, sir.

Q. And you knew there was a two witness requirement; correct? Or you believed that?

A. Yes.

Q. And you knew that the witnesses were someone different from the people doing the search; right?

A. The witnesses were people who the Cambodian National Police identified to be witnesses.

Q. And you knew that was supposed -- or assumed or believed that was supposed to be someone different from the people doing

the search; correct?
A. I don't know.
Q. Did you ever ask about why they were having you sign as a witness in this case or any other case?
A. Yes.
Q. And what did they tell you?
A. It's considered an honor.
Q. And why did they tell you it was considered an honor?
A. Well, we're in a third-world country, and the United States law enforcement is -- they consider the U.S. to be kind of the leaders of the police of the world, and when we go over there and observe or participate in any type of function, like you saw in the photograph, it's a very common cultural thing that happens in Cambodia and Asia, generally.
Q. So it was an honor for them or for you?
A. For both, actually.
Q. And -- but you knew the witnesses were supposed to be someone other than the police conducting the search; right?
A. I don't know, sir.

MR. GUNN: No further questions, Your Honor.

THE COURT: Ms. Donahue.

REDIRECT EXAMINATION

BY MS. DONAHUE:
Q. Good morning. Attache Phillips, starting with the videotape that you were shown some snippets of, have you

reviewed that videotape previously?

A. Yes, sir -- yes, ma'am.

Q. Were you present at the search when that videotape was taken?

A. Yes, I was.

Q. Can you please describe generally what that videotape depicts?

A. The videotape is generally about a three-hour search, spanning two days of the Cambodian National Police searching the house, putting evidence in certain areas, and me observing what evidence they took, me looking at some of the evidence and taking photographs.

Q. And do you recall approximately how many Cambodian National Police officers were present at the search?

A. There was quite a few. Probably between 15 and 20.

Q. Turning your attention to the first day of the search, June 17, 2006, in addition to yourself and the Cambodian National Police, who else do you recall was present?

A. IJM, the International Justice Mission, World Hope International, the Cambodian prosecutor, and the police, the landlords, the village chief, and the maid. There was a gate boy there who was confronted upon entry. And I may be missing one person, but I think that's everybody.

Q. Was the defendant present?

A. Oh, I'm sorry. That's who I'm missing. Yes, the defendant

was present.

Q. To your knowledge, was the defendant present during the entire time the search was executed on June 17th?

A. He was.

Q. And turning your attention to the second day of the search, that was June 19th of 2006; is that correct?

A. Yes, ma'am.

Q. Who was present on June 19th at the search?

A. All of those same people, in addition to Mr. Pepe's Cambodian defense attorney also showed up.

Q. And, in fact, on the video, can you see Mr. Pepe's Cambodian defense attorney looking through some of the documents?

A. Yes.

Q. I would like to turn your attention to a couple of the specific events that you were shown on that videotape, starting with the pink bottle.

Do you recall that?

A. Yes, I do, ma'am.

Q. Can you please explain under what circumstances the pink bottle was seized from the defendant's residence.

A. I'd be happy to.

What was not shown in the video was a couple seconds before the start of that video. If that would have been shown, that shows me talking with the Cambodian prosecutor and the

police asking permission to go and look for the pink bottle, and I was granted that permission, and I went downstairs, accompanied by one of the police officers and another person, and that's when I saw the bottle.

And I specifically requested that bottle because one of the victims had indicated to me that that -- the contents of that bottle was used as a -- as a lubricant prior to her being raped by the defendant.

Q. Why did you ask permission for the bottle to be taken?

A. Because it was not my search warrant, and I thought it was -- I should ask before I actually took something.

Q. Did you have the authority to seize that bottle?

MR. GUNN: Objection. Calls for a legal conclusion, speculation, Your Honor.

THE COURT: As phrased, sustained.

BY MS. DONAHUE:

Q. To your knowledge, did you believe you had authority to direct the seizure of that bottle?

A. No, I did not.

Q. Why not?

A. Because I wasn't operating as a law enforcement officer as I would in the United States. I was a guest in a host country where I would have -- I do not have that authority.

Q. Turning your attention to the scene that showed you standing in front of a table going through documents that were

spread out on that table, do you recall that scene?
A. Yes, I do.
Q. When did that take place?
A. That took place at the end of the search, the Cambodian search.
Q. By "the end of the search," do you mean on June 19th?
A. On June 19th, yes.
Q. Why were you going through those documents?
A. Because we were told that the Cambodian National Police were going to conclude their search of the residence, and I recall asking if I could go through some of the documents, and I went through the documents as quickly as I could in that little clip which lasted about 30 seconds before I had to stop to see if there was anything that I wanted to photograph, which I did to memorialize in my parallel investigation.
Q. The documents that were on the table that you were looking through, was it your understanding that the Cambodian National Police intended to seize those documents?
A. My belief at the time was they were going to leave all those documents there because they had finished.
Q. Turning your attention to Defense Exhibits 106 through 110, which are the -- appear to be photographs of documents, do you recognize these documents, Defense Exhibits 106 through 110?
A. Yes, ma'am.
Q. Can you tell us what they are?

A. They are handwritten notes. I don't recall from which specific binder, but they were -- I believe they were placed by the computer table, not the center table that you saw me in the video. Some are e-mail addresses, phone numbers.
Q. Did you take the photographs that are memorialized in Defense Exhibit 106 through 110?
A. Yes, I did.
Q. Why?
A. In the event that these items did not show up in the evidence later on, I wouldn't have had time to write every one of these things down in my rough notes.
Q. And why did you think that these items might not show up in the evidence seized?
A. In my experience, unfortunately, in Cambodia, evidence often disappears due to a wide variety of reasons.
Q. I would like to turn your attention to the scene, if you recall, where you were moving a stuffed animal.
Do you recall that scene?
A. Yes, I do.
Q. Can you please explain what was going on?
A. Yes. Again, if the defense would have shown maybe a minute or so prior to that, when we walked in the room, I observed a Cambodian National Police Officer -- there was a stuffed animal on the bed, and then there was another stuffed animal on the -- what do you call -- the dresser. He grabbed it and threw it on

the floor.

Then at some point later, when they were gathering up everything on the bed to take, I leaned over and I picked it up. And I can't remember exactly what I said, if they wanted to take this or not and threw it on the bed.

Q. You also saw another portion of the tape where you were shining a light across what appeared to be a mattress.

Do you recall that scene?

A. I do.

Q. Can you please explain what was going on there.

A. Yes. Part of my role as a police officer is a training role. The Cambodian police do not have really any sophisticated means to look for evidence such as biological evidence. I carry my black light all -- everywhere I go, essentially, and I thought it might be a good opportunity to show them how an alternative light source would work.

In this particular situation, because we thought there was a blood stain on the sheet which would have soaked through the mattress, so I thought it was a good opportunity to show them that.

Q. Did it, in fact, work and show them any stains?

A. No. Because when you look in the video, you have to shut the curtains. It was just too light, and it wasn't the greatest of environments to do that. That's why it only lasted about 38 seconds.

Q. Attache Phillips, I would like to turn your attention to Defense Exhibit 111 which is one page from your PowerPoint presentation.

A. Yes, ma'am.

Q. Are you one of the authors of this PowerPoint presentation?

A. I am one of many.

Q. Is this one slide from that presentation?

A. Yes, ma'am.

Q. What is the purpose of that PowerPoint?

A. This is generic training.

Q. Training for whom?

A. Primarily the Royalty Police, Cambodian National Police. I have sent this over to the Vietnamese Ministry of Public Safety, which are the police. I have used this presentation for the Indonesian police. Mostly the police throughout the Asian region.

Q. I would like to turn your attention to the first bullet point which reads, "After interviewing victims, ICE, BKK, NGO and CNP coordinated in the execution of an arrest warrant for Pepe."

Just for the record, ICE, BKK -- what does BKK stand for?

A. Bangkok.

Q. And NGO refers to non-governmental organizations; is that correct?

A. Yes, ma'am.

Q. Do the non-governmental organizations have any affiliation with ICE?

A. No. Except for sometimes they give us information.

Q. But they're not United States law enforcement, are they?

A. No.

Q. When you say, "Coordinated in the execution of an arrest warrant for Pepe," can you explain what you mean by that -- what you meant by that?

A. Basically we were made aware of the arrest warrants.

Q. And did you participate in the arrest of Pepe in this case?

A. I did not.

Q. Who arrested him?

A. Cambodian National Police arrested him.

Q. Did you advise the Cambodian National Police to arrest him?

A. No, I did not.

Q. Turning your attention to the second bullet point in the PowerPoint slide which is Defense Exhibit 111, immediately -- it states, "Immediately after Pepe's arrest, ICE, Bangkok and NGO interviewed several other victims which corroborated statements from other victims."

Are you referring there to your own interview with victims in this case?

A. Yes.

Q. Did you conduct those interviews with the Cambodian

National Police?

A. No, I did not.

MR. GUNN: Objection. Leading, Your Honor.

I will withdraw the objection.

THE COURT: Overruled.

BY MS. DONAHUE:

Q. The third point there which reads, "Based on additional interviews, CNP obtained a search warrant for his house and executed additional arrest warrants," did you mean to suggest that the CNP did not obtain a search warrant until sometime after June 17, 2006?

A. No, not at all.

Q. Did the CNP have a search warrant on June 17, 2006?

A. Yes, they did.

Q. How do you know that?

A. I know it from a number of reasons. Number 1, when they were executing the arrest of Mr. Pepe, I was informed by --

MR. GUNN: Objection, Your Honor. Hearsay. Move to strike -- well, I haven't gotten there yet, but objection is hearsay as to what he was informed.

MS. DONAHUE: Hearsay is admissible, Your Honor. It's a suppression motion. This is not trial.

MR. GUNN: The Court has discretion, and I think -- I would urge -- the courts can apply their discretion. I would urge the Court to do it, especially in this context where the

other witnesses aren't available, and I think that would be what I would suggest to the Court.

THE COURT: Go ahead and answer the question.

THE WITNESS: I received information that Ron Dunn was on the telephone. I was sitting next to him. He was talking to the police. He said that they had a warrant. In addition, once we were told that there was going to be a warrant, we went over to the residence, waited there until the prosecutor and the defendant showed up with the police. And I know, through being in Cambodia for five years, you cannot execute the warrant without the defendant there and the police, and when all those people arrived, including the prosecutor, that's when the warrant was executed. So by those people being there and the witnesses, I knew that they had a warrant.

BY MS. DONAHUE:

Q. Approximately what time did they begin executing the warrant on June 17th?

A. Approximately at 13:20 or 1:20 in the afternoon.

Q. Did the CNP finish executing the warrant that day?

A. No, ma'am, they did not.

Q. How did they stop on June 17th?

A. They just literally stopped and told everybody that we're going to stop and they did, and they sealed up the door and left.

Q. Did you leave as well?

A. Yes, ma'am, I did.
Q. Did you return to the defendant's residence?
A. Yes.
Q. When?
A. On the 18th.
Q. Why did you come back on the 18th?
A. Because I was told that they were going to continue the search warrant on the next day, which was the 18th.
Q. When you say "they," you mean the Cambodian National Police?
A. The Cambodian National Police.
Q. Did the Cambodian National Police continue executing the warrant on June 18th?
A. No, they did not.
Q. Did they show up at the house at all on that date?
A. I do not recall them showing up.
Q. What did you do on that date?
A. I took the opportunity to interview the landlords.
Q. Were the Cambodian National Police present when you interviewed the landlords?
A. I don't recall the police being there at that point.
Q. Did you return to the defendant's house on the 19th?
A. Yes, ma'am, I did.
Q. Did the Cambodian National Police return on that day as well?

A. Yes, they did.
Q. What happened on the 19th?
A. Once the defendant Pepe appeared and the prosecutor, and they also brought the defense attorney, Meng Theng Y -- and that's M-E-N-G, separate word T-H-E-N-G, third word the letter Y -- showed up along with the police, and they resumed the warrant.
Q. And on that day on the 19th, did you ever observe Pepe's lawyer objecting to the seizure of any evidence?
A. I did not observe that.
Q. To your knowledge, did Pepe's lawyer ever complain that the search warrant in any respect violated Cambodian law?
A. No.
Q. Did the search conclude on the 19th?
A. Yes, ma'am, it did.
Q. Who seized the evidence?
A. Cambodian National Police.
Q. Did you take any evidence into ICE custody?
A. No.
Q. Other than you, was anyone else from ICE present at the search either on June 17th or on June 19th?
A. From ICE, it was only me.
Q. Attache Phillips, during your five years as the ICE attache in Bangkok, have you ever conducted what you considered to be a joint investigation with foreign law enforcement?

A. Several times.

Q. And can you briefly describe what your role is in what you consider to be a joint investigation.

A. Yes. It's taking information and going directly to the police and sharing that information, developing a -- an operational plan, a course of action, conducting surveillance together, analyzing phone tolls together, obtaining phone numbers together.

Oftentimes when I run a joint investigation, I'm an undercover agent. I have actively participated in undercover operations on behalf of the Royalty Police and in conjunction with and being covered by Cambodian National Police during undercover operations.

MS. DONAHUE: I have no further questions, Your Honor.

If the defense is seeking to move the disk, the CD in, the Government would have no objection, provided that the entire portion -- the entire search go in, not just the selected snippets that the defense played for the Court. Otherwise, the Government would go through and play extensive portions of it. But I didn't think it was really necessary at this time.

THE COURT: Mr. Gunn?

MR. GUNN: Your Honor, I don't object to that. I think technically under the rules of evidence, it's only the parts that are played that come in, but I have no objection, in light of the Court being the Trier of Fact, to just letting the

Court receive it. That's fine.

THE COURT: For the record, the entire CD will be received.

MR. GUNN: For the record I think it's Defense Exhibit 105.

(Defendant's Exhibit 105 was received.)

MR. GUNN: I have just a couple brief questions.

RECROSS-EXAMINATION

BY MR. GUNN:

Q. Agent Phillips, you testified on what I will call redirect examination about a three-hour search being videotaped spanning two days?

A. The search was three hours, yes. I'm guessing.

Q. The videotape of the second day is less than 40 minutes; right?

A. I don't know. I don't know how long the videotape is.

Q. Would it refresh your memory if you saw the end of the videotape and the time counter?

THE COURT: No. It would show what the time counter says. It wouldn't refresh his memory.

MR. GUNN: All right.

Q. You have watched the videotapes; right?

A. Yes, sir, that's correct.

Q. And isn't it true that the videotapes for June 17th and June 19th fall well short of three hours total?

A. Yes, sir.

Q. So when you say it was a three-hour videotape search on re-direct examination, that was inaccurate. It's actually something less than that?

A. I didn't say it was a three-hour videotape search.

Q. You just meant the search was three hours?

A. And I'm just guessing, sir.

Q. So the entire search wasn't videotaped?

A. Well, if the video is less than three hours, the entire search isn't taped, no.

Q. You testified about other people who were present during -- at one point on your redirect examination you testified about other people who are present at one or both of the searches, and you included the maid and the gate boy and the village chief.

A. Yes, sir.

Q. That was just on June 17th?

A. The maid and the gate boy was on June 17th. And the -- who was the third person, sir?

Q. Village chief.

A. Village chief, I believe, was there on both days.

Q. But you don't remember for sure?

A. No, I don't remember for sure.

MR. GUNN: I don't believe I have any more questions. If I could just double-check my notes, Your Honor.

THE COURT: Yes.

MR. GUNN: No further questions, Your Honor.

THE COURT: All right. One of the things that I was going to ask for further information on was the Singapore aspect of the motion and the suggestion, I think, that there was no search warrant necessary because that investigation, if I'm understanding the Government's argument correctly, was conducted solely to aid the Cambodian investigation, and I'm not -- I don't know if that's the Government's argument and whether you have additional evidence or authority in that regard.

If it's evidence and it would come from Mr. Phillips, we ought to get it today. If it's not, if you have nothing further to add from Mr. Phillips, we can excuse him.

MS. DONAHUE: May I have just one moment, Your Honor?

THE COURT: Sure.

(Counsel confer off the record)

REDIRECT EXAMINATION

BY MS. DONAHUE:

Q. Attache Phillips, turning your attention to the Court's area of inquiry, are you familiar with a letter written on June 20th, 2006, from Andrew Simpson to His Excellency Hok Lundi which states: "Agents request that they have access to the evidence, specifically Mr. Pepe's computer, hard drive, memory stick and USB thumb drive so that they may be sent to the United States for computer forensic testing"?

A. Yes, ma'am.

Q. And do you know or were you involved in this request?

A. On the 20th, yes, ma'am.

Q. And can you explain why the request is phrased this way?

A. Primarily it's cultural. When we went over to the Cambodian National Police to speak with the primary agent in charge, CNP agent in charge, he had requested us, as they always do, to write a letter requesting exactly what you just read.

Q. And why had he -- if you know, why was that request made?

A. Because the Cambodian National Police do not have any forensic capabilities within their department to look at images or computer media, electronic media, at the same standard as the United States or most other developed countries. They don't have the equipment.

Q. And if the Cambodian National Police were asking for help from the United States then, if you know, why does the letter suggest that the United States is asking for help from the Cambodian National Police?

A. That's purely cultural. It's kind of hard to explain, but it's saving face in Asia. If you don't have the ability to do something, they're a little bit embarrassed that they don't have those capabilities, and those are basically kind of standard letters that go out. On other occasions, that's happened as well.

MS. DONAHUE: I have no further questions of this witness.

THE COURT: Mr. Gunn, would you like to follow up at all?

MR. GUNN: Yes.

RECROSS-EXAMINATION

BY MR. GUNN:

Q. You were conducting your own investigation; correct?

A. Separately, yes, sir.

Q. And your investigation had commenced; correct?

A. No. It's still ongoing.

Q. Well, it had commenced by June 20th; correct?

A. It was continuous.

Q. It had begun before June 20th, though; right?

A. Yes.

Q. It had begun at least on June 12th, June 14th, somewhere in there where you talked to the NGO; right?

A. June 14th.

Q. And you were then interviewing witnesses?

A. Yes, sir.

Q. And you were present at the search?

A. Yes, sir.

Q. Took lots of photos?

A. Yes, sir.

Q. Looked through documents to see if there were any documents you might not have photos of?

A. Yes, sir.

Q. Wanted to make sure that bottle was retrieved?

A. Yes, sir.

Q. And you had in mind that there was a potential for prosecution in the United States, possibility; right?

A. Pursuant -- upon agreement with the U.S. Attorney's office, yes, sir.

Q. And so your investigation was to gather evidence for that; correct?

A. In my investigation, correct.

Q. And you were basically at the very least paralleling what the Cambodians were doing; right?

A. Yes, sir.

Q. You wanted to develop evidence the same way they wanted to develop evidence?

A. Not the same way.

Q. They wanted to develop evidence; right?

A. Yes.

Q. And you wanted to develop evidence?

A. That's correct.

Q. And you know that computer evidence can be important in these types of cases?

A. That's correct.

Q. So you knew that a forensic computer evidence developed by an American forensic computer expert would be useful in a potential American prosecution; correct?

A. If they required that or requested it, yes, sir.

Q. And you know that that kind of evidence often is requested in these types of cases where a person has a computer; right?

A. That's correct, sir.

Q. In fact, it's almost pretty standard practice that the Government or the prosecutors want the computer analyzed; right?

A. In my experience, yes.

Q. Almost every case where there is a computer present; right?

A. I can't say every case, but, yes, generally.

Q. And so this forensic computer examination that was going to take place was going to be valuable to your parallel investigation; correct?

A. Potentially.

Q. Well, it definitely would be valuable to the investigation; right? Whether or not there was a prosecution was one issue, but you were conducting an investigation; right?

A. If there was something on there, yeah, it would.

MR. GUNN: No further questions.

THE COURT: All right. Thank you.

Ms. Donahue?

MS. DONAHUE: I have nothing further, Your Honor.

THE COURT: All right. Thank you, sir. Thank you very much for coming. You're excused.

THE WITNESS: Sir, do you want your exhibits back?

THE COURT: Just leave those there.

MR. GUNN: They are in evidence. I belive they're all in evidence; isn't that correct?

THE COURT: I don't think you offered them.

MR. GUNN: Actually three of them are not.

THE COURT: Well, I think it's a little late to continue today. Were you planning on having another witness?

MS. DONAHUE: Your Honor, the other witness is based in Los Angeles so he can come at the Court's convenience.

THE COURT: Why don't the two of you get together and talk to my CRD and find out what a good time is to do that.

MR. GUNN: We're actually going to be traveling to Cambodia, leaving on Friday, Your Honor, to conduct some investigation. Would it be -- does the Court feel a need to do it this week as opposed to when we return?

THE COURT: I don't have any such need. You can do it when it's convenient for you.

MR. GUNN: All right.

THE COURT: All right. Thank you.

MR. BROWN: Thank you, Your Honor.

(Proceedings concluded at 11:16 A.M.)

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 18, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Pamela A. Seijas
Pamela A. Seijas, CSR No. 3593
Official Reporter

2-26-08
Date

I N D E X

| WITNESSES FOR THE GOVERNMENT: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Gary Phillips | | 7 | 28, 44 | 42, 46 |

| WITNESSES FOR THE DEFENSE: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

| GOVERMENT EXHIBITS: | MARKED | RECEIVED |
|---|---|---|

| DEFENSE EXHIBITS: | MARKED | RECEIVED |
|---|---|---|
| 101 through 103 | 7 | |
| 104 | 14 | |
| 105 | 15 | 42 |
| 106 through 110 | 18 | |

THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
PATRICIA A. DONAHUE (SBN: 132610)
JOHN J. LULEJIAN (SBN: 186783)
Assistant United States Attorneys
Violent and Organized Crime Section
United States Courthouse
312 North Spring Street, 15th floor
Los Angeles, California 90012
Telephone: (213) 894-0640/8603
Facsimile: (213) 894-3713
E-mail: patricia.donahue@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL JOSEPH PEPE,<br><br>Defendant. | CR No. CR 07-168-DSF<br><br>DECLARATION OF DAVID NGUYEN-GALANTE<br><br>Hearing: December 3, 2007<br>Time: 10:00 a.m.<br>Place: Courtroom of the Honorable Dale S. Fischer |

Plaintiff United States of America, by and through its counsel of record, hereby submits the Declaration of United States Department of Immigration and Customs Enforcement Special Agent David Nguyen-Galante in connection with its opposition to (1) the Motion to Suppress

Evidence (Docket No. 21), and (2) the Motion to Suppress Evidence Discovered as a Result of Computer Search Warrant (Docket No. 33), filed by defendant Michael Joseph Pepe.

Dated: November 27, 2007

Respectfully submitted,

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

PATRICIA A. DONAHUE
JOHN J. LULEJIAN
Assistant United States Attorney

Attorneys for Plaintiff
United States of America

**DECLARATION OF DAVID NGUYEN-GALANTE**

I, David Nguyen-Galante, hereby declare:

1. I have been employed as a special agent with the Immigration and Customs Enforcement (ICE) Department of Homeland Security (DHS) since 2003. Prior to 2003, I was employed as a special agent with the United States Customs Service (USCS) Department of Treasury for eight years. I was also employed with the USCS as an Import Specialist and Customs Inspector approximately for three years from 1992 to 1995. I received and successfully completed the Computer Investigative Specialist training curriculum in computer evidence recovery in May 2000. The Computer Investigative Specialist training was provided by the Department of the Treasury at the Federal Law Enforcement Training Center, Glynco, Georgia.

2. This declaration is made in support of the government's consolidated opposition to Defendant's Motions (1) To Suppress Evidence and (2) To Suppress Evidence Discovered As A Result of Computer Search Warrant.

3. I am currently assigned to the Office of the ICE Attaché in Singapore.

4. On June 30, 2006, the ICE Attaché Singapore received a collateral request from Assistant ICE Attaché (AIA) Gary Phillips, ICE Attaché Bangkok, Thailand, to conduct forensic analysis of a computer hard disk drive, a USB JetFlash thumb drive, and a digital media card that were sized from defendant Pepe's premises in Phnom Penh, Cambodia, pursuant to a search warrant. On or about June 30, 2006, I spoke with AIA Phillips, and he told me that the Cambodian National Police (CNP) requested assistance in making a mirror image of and forensically analyzing media that had been seized from Pepe on or about June 17, 2006. AIA Phillips told me that the CNP had obtained a valid search warrant and that this computer evidence was seized pursuant to Cambodian law.

5. On June 30, 2006, I made a bit image copy of the above-mentioned seized items.

To my knowledge, the search warrant obtained by the CNP for Pepe's residence, pursuant to which I forensically analyzed the aforementioned computer media, complied with Cambodian law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 27th day of November, 2007, at 13:10, Singapore.

DAVID NGUYEN-GALANTE

FILED
CLERK, U.S. DISTRICT COURT
FEB 26 2008
CENTRAL DISTRICT OF CALIFORNIA
BY [illegible] DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

United States of America, )
Plaintiff, )
)
vs. ) Case No. CR 07-168-DSF
)
Michael Joseph Pepe, )
Defendant. )
______________________ )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Monday, December 3, 2007

DOCKETED ON CM
FEB 28 2008
BY [illegible] 033

Pamela A. Seijas, CSR, FCRR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California 90012
(213) 687-0446

ORIGINAL

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
BY: PATRICIA DONAHUE
ASSISTANT UNITED STATES ATTORNEY
JOHN LULEJIAN
ASSISTANT UNITED STATES ATTORNEY
312 N. SPRING STREET
LOS ANGELES, CA 9012

FOR DEFENDANT: OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY: CARL GUNN
DEPUTY FEDERAL PUBLIC DEFENDER
CHARLES BROWN
DEPUTY FEDERAL PUBLIC DEFENDER
321 EAST SECOND STREET
LOS ANGELES, CA 90012

Los Angeles, California, Monday, December 3, 2007

10:35 a.m.

-oOo-

THE CLERK: Calling Item No. 7, CR 07-168-DSF, *United States of America vs. Michael Joseph Pepe*. Counsel.

MS. DONAHUE: Good morning, Your Honor. Patricia Donahue and John Lulejian on behalf of the United States.

THE COURT: Good morning.

MR. BROWN: Good morning, Your Honor. Charles Brown and Carl Gunn on behalf of Michael Pepe, who is present, Your Honor. Your Honor, may Mr. Pepe's handcuffs be unlocked for the purposes of this hearing?

THE COURT: Sure.

MR. BROWN: Thank you.

(Whereupon, the Marshal removed the defendant's handcuffs.)

THE COURT: The calendar indicates we are here for the motion to dismiss, but we also actually were sort of in the middle of a motion to suppress. How did counsel want to proceed today?

MR. BROWN: We would defer to the Court as to how the Court wishes to proceed.

THE COURT: Do we have witnesses?

MS. DONAHUE: Your Honor, the Government submitted the declaration of Special Agent David Nguyen-Galante. He is present in court, should defense counsel wish to cross-examine

him. And due to an unanticipated family emergency, as it turns out, Attache Phillips is back in the United States, and so we had him come to court today, too, should the Court have any questions for him.

THE COURT: Because he had so much fun the last time, he is going to join us again?

MS. DONAHUE: Exactly right, Your Honor. And Special Agent Eddy Wang, whose declaration the Government submitted in connection with both motions, is also present in court.

THE COURT: All right.

MS. DONAHUE: The Government is happy to proceed with either motion.

THE COURT: Why don't we finish up and maybe the witnesses can go?

MR. GUNN: That's fine, Your Honor. I think that's my motion. I can -- I did want to renew my motion to exclude witnesses and can start with Agent Galante.

THE COURT: All right.

MS. DONAHUE: We will have Special Agent Galante come forward, and then we will have Agent Phillips and Special Agent Wang leave the courtroom.

David Nguyen-Galante, Plaintiff's witness, was sworn

THE CLERK: Please have a seat. Please state your full name and spell your full name for the record.

THE WITNESS: My name is David Nguyen-Galante.

N-G-U-Y-E-N hyphenated G-A-L-A-N-T-E.

THE COURT: You may proceed.

MR. GUNN: Thank you, Your Honor. If I could have an exhibit marked -- it's actually a copy of Exhibit H from the motion. I don't know if the Court wants me to re-mark it as 112 or refer to it as H. I could approach so that we can --

THE COURT: Let's refer to it as H.

MR. GUNN: That's fine, Your Honor. If I could approach the clerk -- maybe I can inquire as to whether the witness has a copy. Do you have a copy of a report you wrote in this case with a Report No. 001 and -- I'm not sure you have a date on it, Your Honor.

CROSS-EXAMINATION

BY MR. GUNN:

Q. Do you have a copy of the report you wrote in this matter?

A. Yes. It's dated November 16, '06, top left corner, first page.

MR. GUNN: Could I approach, Your Honor, because I don't see that date on the copy of the report I'm referring to.

THE COURT: I don't see it either.

BY MR. GUNN:

Q. Is this a copy of the report you're referring to, Agent Galante?

A. Yes. That is the second page. This is the first page of the report. That is really the second page.

Q. I didn't --

A. It is the same information. It's repeated.

MR. GUNN: All right. I -- Your Honor, may I look at his copy? It's Jencks material that I don't know if I received. So if I could look at the first --

THE WITNESS: Sure. It's the same information.

THE COURT: You don't answer questions when he is asking me.

Ms. Donahue, do you want to know what is going on? Do you want to look at it before Mr. Gunn takes a look at it?

MS. DONAHUE: It's a one-page summary of the case that is slapped on top of every report. Mr. Gunn has seen it many times and is certainly welcome to look at it again.

THE COURT: Okay. He is just not connecting it up with this document.

MR. GUNN: If I could look at it?

THE COURT: Go right ahead.

MR. GUNN: Thank you. Thank you, Your Honor.

Q. Agent Galante, the report that I have given you, which we will refer to as Exhibit H, is actually a little bit different than the report you have, correct, at least in terms of page numbering? Maybe I can be more specific. The report I have given you as Exhibit H begins with the first page as page 1; correct?

A. Correct.

Q. The report you are referring to that you were saying is the same report begins with the Page No. -- the same page that is numbered 1 in Exhibit 8 is Page 3 in your report; correct?
A. Correct.
Q. So the report I have given you that is marked as Exhibit H was actually separately prepared at a different time; correct?
A. No. It's the same report.
Q. Right. But it's -- it has the same text; correct?
A. Yes.
Q. But it's a different piece of paper; right?
A. I -- yes.
Q. It's, in fact -- it's not even an identical copy of the same piece of paper because it has a different page number in the upper right-hand corner; correct?
A. It is the same -- it's -- depending on the printer, which printer it printed out from, it gives you the same -- information is the same. The format might look different, but the content is the same.
Q. But it was printed at a different time, and that's why it has a different page number; correct?
A. Correct.
Q. It was printed at the time that you did the forensic examination; correct? Exhibit H, I'm referring to, the document I have given you.
A. Well, our report can be printed from any government ICE

computer.

Q. Okay. The report that I have given you, Exhibit H, that has a Page 1 that begins with the words "Details of investigation on June 30, 2006", that document?

A. Yes.

Q. That was a report you prepared at the time of the forensic examination; correct?

A. Yes.

Q. You didn't prepare it on the November 16th date that is on the cover sheet of the other report you're referring to; correct?

A. It's the same report.

Q. But it was prepared at the time of the forensic examination; correct?

A. No. The report was prepared after the examination.

Q. But within a day or two after; correct?

A. I am not clear.

Q. The examination was on -- sometime in late June or early July; correct?

A. Yes, sir.

Q. And after the examination, very soon after, you prepared a report; correct?

THE COURT: Mr. Gunn, I'm not sure I'm looking at the same document because the third paragraph says, "On September 19, 2006," so presumably it was prepared after September 19.

MR. GUNN: All right, Your Honor. All right.
Q. This document has a case number; correct?
A. Yes, sir.
Q. And that case number is SX07QR06BK0008; correct?
A. Yes, sir.
Q. And where did you get that case number?
A. The case number is generated by our office.
Q. And that's a standard case number for this case; correct?
A. It's standard but for my office.
Q. For your office?
A. In Singapore office.
Q. The "S" stands for Singapore; correct?
A. "SX" stands for Singapore.
Q. And the rest of the numbers is a standard number for the case, wherever the reports may be generated; correct?
A. Yes, sir.
Q. So if a report was generated in Bangkok, it would be "BK" and then all the same letters and numbers; right?
A. Right. The first two letters are representing the office where the report originated from.
Q. And then the rest of the numbers and letters are for the case, wherever the report may be generated; correct?
A. Yes.
Q. So on the report it has everything the same, except for the SX -- is all part of the same case; correct?

A. Yes, sir.

MR. GUNN: No questions, Your Honor -- no further questions.

THE COURT: Thank you. Ms. Donahue?

MS. DONAHUE: I have no questions, Your Honor.

THE COURT: All right. I guess you can step down then. Thank you.

THE WITNESS: Thank you, Your Honor.

THE COURT: Who would you like to speak to next, Mr. Gunn?

MR. GUNN: Agent Wang, Your Honor.

Eddy Wang, Defendant's witness, was sworn

THE CLERK: Thank you. Please be seated.

Please state your full name and spell your name for the record.

THE WITNESS: Eddy, E-D-D-Y. Last name is Wang, W-A-N-G.

THE COURT: You may proceed.

MR. GUNN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. GUNN:

Q. My first questions were going to be regarding three exhibits that were marked for identification at the last hearing. I brought extra copies of those which I can give to the witness. They are 101, 102 and 103. Should I just --

THE COURT: Please.

MR. GUNN: Thank you. If I could just handwrite the numbers for now, Your Honor?

THE COURT: Fine.

BY MR. GUNN:

Q. Would you first look at Defense Exhibit 101, Agent Wang.

A. Okay.

Q. Now, among the items that were taken from -- you received voluminous materials that were taken from Mr. Pepe's house; correct?

A. Yes.

Q. Those were provided to you as part of the investigation of this case for you to provide to the Government to provide in discovery; correct?

A. Yes, sir.

Q. And among the items that were taken from the house that you received were a number of issues of the *Cambodian Daily* newspaper; correct?

A. That's correct, sir.

Q. That is an English language paper they publish in Cambodia; correct?

A. I believe it's both language, but yes, English is part of it, correct.

Q. There is an English language version?

A. Correct, sir.

Q. And Defense Exhibit 101 is a copy of one of the issues that was found in Mr. Pepe's house; correct?

A. That's correct.

MR. GUNN: Your Honor, I would offer Defense Exhibit 101 into evidence.

MS. DONAHUE: No objection.

THE COURT: All right. Thank you. That will come in.

(Defendant's Exhibit 101 was received.)

BY MR. GUNN:

Q. Would you now look at Defense Exhibit 102. That's a translation of an attachment prepared by the Cambodian prosecutor listing some of the evidence in this case; correct?

A. That's correct, sir.

MR. GUNN: Your Honor, I would offer Defense Exhibit 102 into evidence.

MR. LULEJIAN: No objection, Your Honor.

THE COURT: Thank you. That will come in.

(Defendant's Exhibit 102 was received.)

BY MR. GUNN:

Q. Would you now look at Defense Exhibit 103. That's a translation of a document prepared by the Cambodian police listing some of the evidence in this case; correct?

A. That's correct.

MR. GUNN: Your Honor, I would offer Defense Exhibit 103 into evidence.

MR. LULEJIAN: No objection.

THE COURT: That will come in. Thank you.

(Defendant's Exhibit 103 was received.)

BY MR. GUNN:

Q. Now, you -- is it correct that you conducted an initial -- well, let me step back.

You were the one who applied for a search warrant in this case of a computer and a number of CD's, computer CD's; correct?

A. That's correct, sir.

Q. And is it correct that you conducted -- you personally -- an initial review of the various CD's that were listed in that search warrant after you got the warrant?

A. I, along with a digital forensics agent.

Q. The two of you together?

A. Correct.

Q. All right. And so you did an -- there were about 30 or 31 CD's; correct?

A. Approximately that number.

Q. And so it was you and this forensics agent that looked at those initially; is that right?

A. That's correct, sir.

Q. And how did you do that?

A. That was done with assistance from the digital forensic agent. He used software and his techniques in which to view

those documents and/or images.

Q. All right. So it was -- the first thing you did was put the CD in the computer? What exactly did you do?

A. I believe we made sure that the viewing instrument, whether it be the computer or not, couldn't be written to or did not have writing software. And then afterwards, we then viewed the CD's.

Q. And how did you go about viewing the CD's?

A. The digital forensics agent used software which brought up images within the CD.

Q. And did you -- well, let me start -- first of all, did you look at the CD's one-by-one? First you looked at one CD and then the second CD and so on?

A. That's correct, sir.

Q. So when you looked at a particular CD, what was the first step as far as what was done when you looked at that CD?

A. Well --

Q. Or the copy of it, as the case may be?

A. I'm sorry. Can you repeat the question?

Q. What was the first thing that was done when you looked at the files on a particular CD?

A. We viewed the images.

Q. And how did you select -- did you view every file on the CD?

A. We viewed every viewable file at that point on the CD.

Q. And when you say every viewable file, would you explain what you mean by that?
A. Whatever the software which the digital forensics agent used, whatever software that was, it pulled up a certain number of images, and we viewed those images.
Q. And did you look at just image files or also non-imaged files?
A. We looked at both.
Q. So you looked at some non-imaged files?
A. That's correct.
Q. What sort of non-imaged files did you look at?
A. There were letters typed. I believe there was -- and this would be on the -- if I recall correctly, on the three-and-a-half floppy disk, there was some writing. There was some written material on those disks.
Q. And how did you select what written material to look at?
A. We viewed -- we viewed all the written material.
Q. And was that true -- did you look for written material on all of the CD's?
A. I believe we looked for all data on the CD's.
Q. Meaning all computer files?
A. Correct.
Q. And you looked at every computer file?
A. I believe we did.
Q. And you did that for each CD one-by-one?

A. Correct.

Q. Now, I would like you to go to your affidavit, the affidavit you did for the search warrant. In Paragraph 16-D of your affidavit, you talk -- are you getting a copy of your affidavit in front of you?

A. Yes, sir.

Q. I would like you not to look at it unless you need to to refresh your memory.

A. I apologize.

Q. Maybe you can have it available in case you need it. In Paragraph 16-D of your affidavit or in one of the paragraphs of your affidavit, you talk about a place in a letter Mr. Pepe wrote where he talked about having taken pictures of two of Basang's nieces unclothed; correct?

A. That's correct, sir.

Q. He never said in his letters that those nieces were under 18, did he?

A. No, sir.

Q. You also talk in your affidavit about Mr. Pepe saying in that letter that he had tied up one of the known victims and slapped her in the face; correct?

A. That's correct, sir.

Q. That was a girl named S[redacted]?

A. That's correct, sir.

Q. He said elsewhere in the letter that he thought that girl

was 14 to 19 years old; correct?

A. I believe so.

Q. Not that he knew she was under 18?

A. I -- I don't understand the question.

Q. He didn't say anywhere in the letter that he knew she was under 18; correct?

A. No, he did not say --

Q. In fact, what he said was he thought she was 14 to 19 years old; correct?

A. That's correct.

Q. He also talked in the letter about how he had a great deal of trouble determining the age of people in Cambodia, didn't he?

A. That's correct, sir.

Q. You didn't put any of those qualifications in your affidavit, did you?

A. Did not.

MR. GUNN: No further questions, Your Honor.

THE COURT: Mr. Lulejian?

MR. LULEJIAN: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. LULEJIAN:

Q. Special Agent Wang, why did you look at all the files?

A. We looked at all the files because we were searching for evidence for a -- violations of the -- of the criminal statutes for which we were seeking the search warrant.

Q. And what were those statutes?

A. Title 18 United States Code Section 2260, production of child pornography for importation; and Title 18 United States Code 2423(c), engaging in illicit sexual conduct in foreign places.

Q. Special Agent, based on your experience, do pedophiles -- do individuals often try to disguise files by using different names?

A. They do.

MR. GUNN: Objection. Leading, Your Honor. No foundation.

THE COURT: Overruled.

MR. LULEJIAN: You can answer the question.

THE WITNESS: I'm sorry. They do.

BY MR. LULEJIAN:

Q. And when you were reviewing those files, were you aware of that background?

A. I was.

Q. Special Agent, a few moments ago Mr. Gunn asked you about a letter. Do you recall reading that letter?

A. I do.

Q. And in that letter, I believe Mr. Gunn said that Mr. Pepe wrote the individual who he tied up and beat was between 14 and 19 years old. Is that accurate?

A. I believe it is.

Q. Based on that letter, what would you be looking for in those documents -- I am sorry. What would you be looking for in the files?

A. In the files?

Q. Yes, sir.

A. I would be looking for possible written materials as far as diaries, fantasy writings, anything in which he might have documented his -- his own activities, as well as any possible visual depictions of what occurred, what he stated in the letter.

Q. If it was possible that the woman or the girl was over 18, why would you still look for those?

A. For identification purposes. We -- we would have to verify the identity of the victim once we identified -- we would have to have the picture to verify the identity of the victim.

Q. Is there anything else you would have to identify?

A. Any other victims that may possibly -- any -- any other of our known victims.

Q. What would identifying the victim do with respect to the charge of travel and foreign -- illicit sexual conduct in foreign places?

A. It would further substantiate their -- their allegations against the defendant. It would also allow us an opportunity to verify their ages to determine whether or not they were minors.

Q. So one of the things you are looking for then is to find

out whether or not she was a minor?

A. Absolutely.

MR. LULEJIAN: One moment, please, Your Honor.

No further questions, Your Honor. Thank you.

THE COURT: Thank you. Mr. Gunn?

MR. GUNN: Nothing further, Your Honor.

THE COURT: Thank you, sir. You can step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: Mr. Gunn, did you have any further inquiry you wished to make of Mr. Phillips as long as he is here?

MR. GUNN: No, Your Honor.

THE COURT: Anything further from the Government?

MS. DONAHUE: No, Your Honor.

THE COURT: All right. Anything further you wanted to do by way of presenting evidence, Mr. Gunn?

MR. GUNN: No, Your Honor.

THE COURT: All right. You may have your witnesses return, I suppose, or leave, whichever is more convenient for them.

MR. GUNN: Your Honor, I wonder if we can keep the witnesses excluded during argument just in case some reconsideration or renewal of the motion comes out at some point?

THE COURT: All right. That's fine. If anybody is interested in hearing the motion to dismiss the Indictment, we

can do that. And then I am going to continue to exclude the witnesses for any discussion on the motion to suppress.

MS. DONAHUE: Is Your Honor going to hear argument now on the dismissal motion then?

THE COURT: Yes.

MS. DONAHUE: So the witnesses can stay for that.

THE COURT: Yes. That's why I rearranged things.

MS. DONAHUE: Thank you, Your Honor.

THE COURT: All right. Mr. Gunn or Mr. Brown, I am -- it's a very interesting statute. I am not inclined to dismiss the Indictment so I will hear from counsel.

MR. BROWN: Thank you very much, Your Honor.

Your Honor, from the defense standpoint, we seek two important issues with respect to the statute. I think the first question is the question raised by the *Clark* decision that was unaddressed in *Jackson* and that has to do with whether the lapse in time in this case, eight months, between travel and act renders jurisdiction proper. And it's our argument that that's not a rational exercise of foreign commerce power and that there is no tenable nexus to foreign commerce and can we think that for that reason, the statute is unconstitutional as applied to Mr. Pepe.

The second really important argument that we are making is in terms of the statutory interpretation, does the statute implicitly contain some temporal limit, and that has to

do with how the word "and" is interpreted in the statute. And I can address both of those arguments, if the Court would like.

THE COURT: Well, I am interested in knowing whether your argument is that as a matter of law, there is a specific time frame that would -- in any as applied challenge, that would be, you know, if you're one side of it, you're fine, and if you're on the other side of it, you're not. Or are you suggesting that courts have to look on a case-by-case basis, which is generally how you look at as applied, but this concept of time doesn't seem to work quite in the usual way in that context.

MR. BROWN: Certainly, Your Honor. I think that is really the challenge with respect to the statute. There really is a line-drawing problem here, and the question really becomes where does the Court draw the line. When does the time frame become so attenuated that jurisdiction is no longer proper.

The *Clark* decision, I think it would be a case-by-case analysis, Your Honor, and I think looking at the facts in *Clark*, you have a two-month time gap, and the Court in *Clark* said that was soon after his travel or his, I guess, dipping his toe in the stream of foreign commerce.

The Court said there that two months was soon enough. I think the language of *Clark*, "soon enough after travel," kind of gives some clue as to perhaps what would be an appropriate time frame. And I think I guess the starting point of the

baseline would be two months.

And it's our argument that "soon after" I guess -- "soon after" is two to perhaps maybe three months, Your Honor, but in a case like this where eight months have gone by, it's not clear how -- how there can be any finding that there is a tenable nexus to commerce.

If there was a plane flight, eight months have gone by. There is certainly no impact on foreign commerce at that point. Any -- any impact on commerce has been attenuated by that lapse of time.

THE COURT: And is that then, where there are disputed issues of fact, a matter for the Court to decide as a matter of law since it's jurisdiction? Or is that something that the jury considers in some manner?

MR. BROWN: I think that that's a very good question, Your Honor, and that's one of the issues we addressed in our reply. If there are disputed facts, our position would be that they are questions for the jury to decide.

But in this case, although the Government has attempted to argue that the time frame is shorter by referencing photographs and other statements attributed to the alleged victims, there really -- there really does not appear to be a factual dispute. If the Court looks at the Government's exhibits, it's clear that according to the statements of the girls, the incidents occurred in the spring, March. If the

Court deduces the statements back from the time of the arrest, that puts us in that eight-month category. It certainly puts us beyond a rational time frame for which jurisdiction can be found in terms of connections to foreign commerce, Your Honor.

THE COURT: All right. Thank you. And your second point?

MR. BROWN: Your Honor, in terms of the statutory interpretation argument, I think that that's really an important issue. The Government interpreted our argument as attempting to rewrite the statute, and it's our position that is certainly not clear -- not true. I think it's --

THE COURT: But you would if you could.

MR. BROWN: Well, I think it's an important question in terms of how -- what the statute means in terms of whether there is a temporal nexus. It's clear that from the Congressional record, the purpose of the statute was geared to prohibiting or targeting sex tourism. And the language of the Congressional records indicates that the purpose in enacting the statute and getting rid of the intent requirement was to make the Government's burden easier in terms of proving cases against potential sex tourists.

But it's -- the statute in no way indicates that it's intended to broaden the scope to target people who were already residing in a foreign country and had demonstrated a no intent to return. So it's clear from the record that there was no

intent on the part of Congress to broaden the reach or the scope of 2423. So I think the rules and the canons of statutory interpretation really favor the defense argument in this case.

And as the Court is aware, avoiding constitutional doubt, ambiguity favors lenity, the starting point is the language of the statute itself and the words construed according to their ordinary meaning. I think all of those canons really support our argument that the statute in its -- in its plain language contains an implicit temporal limit because had Congress intended to broaden the reach of the statute or had -- have the statute reach out to people 20 years later, it -- it could have and should have used the language people who travel, quote, and at any time thereafter engage in this type of alleged conduct. But that language is not in the statute, and I think the case law is pretty clear that Congress knows how to write a statute that it wants to write, and they did not write that kind of statute. They just said travel and engage in some specific act. And according to the dictionary, clearly indicates some -- some temporal limit.

For example, Your Honor, I went to Starbuck's this morning and had a Chai tea latte. Implicit in there -- I mean, it seems overly simplistic, but I think -- and we take it for granted that that's what "and" means. But if you look at it in that sense, Your Honor, I think it raises an important question.

I went to court and made an argument this morning. In

any common sense conversation when you use the word "and," you're -- you're limiting the scope of the time -- the time frame at issue.

And in this case, the Congressional -- the language of the statute says "Travel and engage in illicit conduct." Clearly, that is targeting people who are, quote, unquote, traveling with the intent to engage in sexual tourism, but the Congress was simply eliminating that -- that -- the -- eliminating the Government's burden of having to prove that person traveled with the intent to engage in -- did not expand into infinity the type of situations or the factual scenarios that can be prosecuted. I think that any other reading of the statute would result in really absurd prosecution, Your Honor.

And certainly not -- would not -- perhaps there is some important governmental interest in these types of prosecutions, but I think that there are limits, and I think this case clearly falls outside the limit of what is reasonable and rational, Your Honor, and we would submit on that.

THE COURT: We all know there are limits on Congress's, power but in this particular circumstance, I am relatively confident that Congress meant to cover as much conduct as it possibly could constitutionally cover, and I don't think it meant to limit the scope of the statute by using that term. But you did make an excellent argument on your client's behalf.

Is there anything the Government would like to add?

MR. LULEJIAN: Your Honor, unless you have any questions, no.

THE COURT: I don't. Thank you.

I am going to deny the motion to dismiss the Indictment. I would like to hear argument on the motion to suppress, but for that we will ask the witnesses to leave. So you can wait in the hall, if you like, for counsel or you can head off.

Mr. Gunn, make whatever arguments you think are appropriate, but I am especially interested in -- and mostly the Government would probably want to address this -- I am especially -- I haven't yet firmly decided what I am going to do with the Singapore aspect of this. So as I said, address whichever points that you'd like.

MR. GUNN: That is actually what I wanted to start off addressing, Your Honor, because I think -- defense attorneys think all their arguments are strong, but I think that is the strongest one here. I really, do, Your Honor. Let me address it in a couple different ways.

First of all, I think it's important that the additional exhibits I just put in through Eddy Wang -- and the reason I put them in is they clearly establish that the Cambodian authorities can get evidence off computers and, in fact, in this case did before there was any forensic

examination.

The newspaper article, if you read it, talks about them finding hundreds of child pornography images on the computer in another case.

The two attachments, Defense Exhibits 102 and 103, are dated before there was any forensic examination in this case, I think like June 19th, and they refer to attached exhibits or attachments that include computer photographs.

Now, the agents have testified that there was this Cambodian request for assistance. There is three different reasons that doesn't save the Government. First, I think it's factually questionable. There is absolutely no documentation consistent with the computer search being done to assist the Cambodians or even that being the main purpose.

The language of the quest for the computer media in the letter that I attached to my motion suggests the opposite, that you have no letter or notes or anything about a request by the Cambodians. You have no evidence of any report back to the Cambodians. The only report that exists is a standard ICE report form with this ICE case number on it. If you compare the case number on Exhibit H, Your Honor, to the case number on, I believe, Exhibits A and B -- it's either B or C -- it's the exact same case number except for those first two letters at the beginning that signify it came from Bangkok in one case. In the other case, it's an "O" and I didn't ask what "O" meant, but it

obviously means some other location. So that's the first reason that this argument that is a request for Cambodian assistance doesn't save the Government.

The second reason is, Your Honor, even if there was a Cambodian request, there was certainly an equal or greater American interest in the evidence from the computer. Whether we call it a parallel investigation or a joint investigation or whatever we are going to call it, we know from Agent Phillips' declaration that he was considering the possibility of an American prosecution and he was conducting his own investigation. He admitted on cross-examination that he knew the computer evidence would be valuable to American investigation -- to the American investigation, and he admitted that it's basically a standard practice, a standard investigative technique.

And, again, the report we have is a standard ICE report form with this case's official ICE case number on it. There is no way to argue that that's not part of the American investigation, regardless of whether it was maybe also for the Cambodians.

And third, Your Honor, it doesn't matter who the search was done for or why it was done because it was still an intrusion into an American citizen's privacy by the American government. You know, I think we sometimes -- in criminal cases we get caught up in the exclusionary rule and it's all about

suppressing evidence, and we start thinking, well, the Fourth Amendment means they can't use illegally-obtained evidence against our clients in court. But Your Honor has to remember that's not what the Fourth Amendment means. That's just an enforcement mechanism.

What the Fourth Amendment means is that the American government can't invade an American citizen's privacy without a warrant and probable cause, with some exceptions, of course, you know for the warrant requirement when there is a search incident to arrest. That is what the Fourth Amendment is about. And it doesn't matter to whether there is a violation of the Fourth Amendment. It doesn't matter what the Government is doing it for or what they are going to use what they find.

If they search my house to get attorney-client records about Mr. Pepe to use against him, that doesn't mean they didn't violate my Fourth Amendment rights. If they search my computer just because they want to know what sort of emails I'm sending out to the world, just because they want to build a file on me, that doesn't mean they are not violating my Fourth Amendment rights.

If some government official gets rambunctious and decides he just wants to know what sort of things a person is writing in a person's diary and so invades their computer, that doesn't mean they are not violating the Fourth Amendment rights. If there is no criminal prosecution, we have to fall back on

other remedies that may not mean a whole lot, like suing somebody or something like that, but it doesn't mean there is not a violation of the Fourth Amendment rights.

So when the American government searches an American citizen's property, without a warrant, probable cause, that violates the Fourth Amendment. That's question no. 1. There is a violation of the Fourth Amendment. And then what the exclusionary rule says is you can't use that in a criminal prosecution if there happens to be a criminal prosecution. It doesn't matter whether that is what the Government planned when they did the search.

If they come into my house searching for tax records for a civil tax situation and they find drugs and then they prosecute me for drugs but they never planned on that when they did the search, that doesn't mean that they can't -- that there is no Fourth Amendment violation and they can all of a sudden use the evidence in court.

So I think that's the real key here, Your Honor, is you got to remember the difference between the Fourth Amendment and the exclusionary rule. The Fourth Amendment is about American government searching American citizen's property and the limits on that, and those limits were violated here, and it really doesn't matter whether they did it for the Cambodians or whether they did it for themselves or whether they did it for both. Frankly, I think the evidence is very strong that at very

least they did it for both, but it doesn't save them regardless. You don't really have to address that factual question.

I had some other arguments on the other issues. It sounds like the Court had come to some pretty firm conclusions on those maybe already. Maybe --

THE COURT: Well, I usually do because the briefing is so good, but that doesn't mean I can't be persuaded otherwise if there is something you want to address.

MR. GUNN: Well, I hope and think that at the very least on the joint venture issue, the Court would recognize that this really is -- go into the joint venture exception cases. I mean, you have Agent Phillips being right there, you have Agent Phillips saying in his PowerPoint that it was coordinated with Cambodians.

Only one of the cases that you are cited to by the Government involved a situation where the agents were actually present at the search. And there was nowhere near the level of coordination and participation there was here. They were described as having a passive role, in quotes. So I don't think -- I just think given this evidence -- it doesn't matter whether Agent Phillips was in charge or whether he led the team or whether he was just part of the team. If he was part of the team, that's enough, but I think that photo, I displayed that photo where they are all posing together, that was the team. And it was the team of participants. It was the combined force.

And those words "participants" and "combined force" comes right out of the Cambodian reports that Agent Phillips admitted, when he was on the stand, was accurate. So I think they don't get around that, Your Honor.

On the -- on the fruits issue, I did want to note one point that I think I misspoke on the fruits issue. I don't -- I argued that even as -- I am getting disorganized here. Let me -- on the fruits issue, the point -- the additional point I want to make to the Court, I would submit, just the way I argue in my papers, there is not enough. Because the way there is probable cause in this case is because of everything they found on the computer. There is no explanation of why and how they find something on the computer, otherwise. The only thing they do have is this reference to two naked photographs of Sang's or Basang's nieces that were then deleted. Well, one, it says they were deleted.

Two, the point I didn't make in my papers and I overlooked is there is no indication that those nieces were minors. So not only do you have the fact that it's pictures of just two people, you have the fact that they were deleted, and you have the fact that there is no indication at all that that was child pornography.

When you sweep out all the evidence discovered from the computer search, I don't think there is any way you can argue it's not a fruit. And then I think Eddy Wang's testimony

that we just heard raises an additional concern that was one I wondered about, and the evidence has born out, that there is a problem. He didn't look -- if they had probable cause for anything, it was to look for child pornography images. But that's not what he looked for. He looked at every single file on the computer, including written documents. And the search warrant certainly did not -- even if everything else before it was legal, the search warrant didn't establish probable cause for written documents. And so I think there is an issue there. I don't think you need to get to it if we -- if we prevail on the original computer search issue, I think the later one is a fruit and you don't need to go there, but I wanted to make that note.

THE COURT: All right. Thank you.

Ms. Donahue?

MS. DONAHUE: Thank you, Your Honor.

From the Government's perspective, from law enforcement, here is a United States citizen who travels over there and abuses children in Cambodia which essentially is a third-world country. Badly abuses them. One of those children came forward to a non-governmental organization, non-governmental, not affiliated at all with the United States government, and told them what had happened to her. The non-governmental organization reported that conduct to the Cambodian national police, which had jurisdiction, and it

conducted its own investigation.

When it was determined that the person who was abusing these children was an American citizen, the non-governmental organization also told U.S. law enforcement, ICE, and ICE then, as it is obligated to do, conducted its own investigation. And if you look at Gary Phillips' declaration, before the search warrant he was doing his investigation and the Cambodian National Police were doing theirs. They arrested Pepe for debauchery, for violation of their local laws. Phillips wasn't present at the time of the arrest, didn't encourage or ask them to arrest this U.S. citizen. They got a search warrant pursuant to their own law. He didn't ask them to get a warrant, didn't advise them to get a warrant, didn't tell them to.

When they said they had a warrant for the premises occupied by this U.S. citizen, he showed up and, as you saw from the video and as the record demonstrates, he was the only representative of ICE there. There was not a team of U.S. law enforcement present. There was one ICE agent, as well as a substantial number of Cambodian National Police, and Mr. Dunn, who -- Mr. Dunn is from the International Justice Mission. That's the non-governmental -- one of the non-governmental organizations in this case. Mr. Dunn is not a U.S. law enforcement.

The defense sort of excerpted the video sort of to try to hone in on areas where Phillips walked over and looked at

evidence or picked up something or pointed out something. If you look at the video sort of in its entirety, Cambodian National Police Officers were going all through the defendant's house. Phillips is there. He is watching what they are doing, and because he had interviewed one of the victims and she had said that Pepe tied her up, when the Cambodian National Police found rope in the closet in his bedroom, of course Phillips pointed to it because that, as well as a lot of the other evidence in the house, very strongly corroborated the information that was coming from these victims.

But the fact that he is present and pointing at things under the case law does not transform the investigation into a joint investigation. The defense makes much of the correspondence and the letters. ICE is over in a third-world country attempting to obviously work with law enforcement over there. They don't have the authority to run around and conduct their own investigation. So within those parameters, they have to be, as Phillips points out in his declaration, polite, follow protocol. But the presence of one agent under the case law the Government would submit does not turn the search into a joint investigation. And if it was not a joint investigation, then that evidence clearly is admissible.

THE COURT: Tell me about the Singapore aspect.

MS. DONAHUE: If the Court -- and the -- the computer evidence was seized, seized by the Cambodian National Police

pursuant to a valid Cambodian warrant. The search was conducted at the request of the CNP by ICE. The fact that the CNP is able to pull up a disk or print pictures from a disk, which is what happened in this case, in no way suggests that they have the capacity to go in and do a full-fledged forensic examination. So the issue then becomes CNP asks ICE to do it.

The computer itself is not located within the United States. There is no magistrate judge sitting -- U.S. magistrate judge sitting in Phnom Penh to whom ICE could go and seek a search warrant the way that obviously it does in the United States.

This is evidence that was seized in a foreign country by foreign law enforcement. Foreign law enforcement has asked ICE for assistance because they can't do it themselves.

The defense argues that -- at that point -- prior to that, the Government would submit there is absolutely no way this was a joint investigation. From that point forward, the defense argues there is a joint investigation because ICE is acting at the behest of Cambodian law enforcement.

And, yes, this is a U.S. citizen. If he has contraband on his computer, of course U.S. law enforcement is going to be interested, particularly with the passage of this statute under the Protect Act.

If it was a joint venture, that does not, as the defense suggests, however, automatically render the computer

evidence inadmissible. Then you look at was it seized in compliance with local law and -- or -- excuse me, or was there good faith. Did U.S. law enforcement act in the good faith belief that this computer evidence was seized in compliance with foreign law. And if they were in good faith, the evidence that comes from the computer is admissible.

Both Phillips -- and Phillips, who was present at the search warrant, and Galante, the forensic examiner, testified that they believed that this computer evidence had been validly seized by the Cambodian authorities pursuant to a validly issued search warrant under Cambodian law. So clearly under the good faith exception, all of that computer evidence is admissible.

In addition, we would submit if the Cambodian -- Cambodian law on search and seizure is certainly far, far, far from well-developed, but as the Court could see from the video and from the declarations, the warrant was executed at the proper time of day, the defendant was present, there were other witnesses present. It appears to have been in compliance with Cambodian law, and certainly that is what both -- that is what Phillips believed and that is what Galante believed. So the Court is well within the law in admitting all of the computer evidence under the good faith exception.

And the Government would submit that the remainder of the physical evidence that was seized was validly seized pursuant to Cambodian law and likewise is admissible.

THE COURT: All right.

MS. DONAHUE: And, Your Honor, I should also -- I -- the defense has mentioned regarding the search warrant that was executed in the United States for the media that was shipped here that had not previously been searched.

The probable cause was included -- looked for violations of 18 U.S. Section 2260 and 2423(c). That's a travel statute. Certainly correspondence and written documents are -- yes. Correspondence and written documents would certainly be something that the ICE agents would be looking for in determining whether or not there is evidence of a violation of the travel statute. And the items to be deceived -- to be seized, excuse me -- in fact, include correspondence pertaining to the possession, receipt, distribution and a reproduction of child pornography, as well as materials pertaining to travel.

THE COURT: Thank you.

Mr. Gunn?

MR. GUNN: Just one quick note on the joint venture thing before I get back to the computer, Your Honor. The exhibits, Exhibit A to Phillips' declaration and Exhibit C to my motion, show there were at least two other Americans there, Suos Vansak from the U.S. Embassy and a Simpson from, I believe, the Diplomatic Security Service at the Embassy.

But let me go to a couple quick points on the computer, Your Honor. I think this computer not in the U.S. is

a red herring for a couple of reasons. First of all, I don't think that means the American government can intrude upon Americans' privacy interests anyway.

Second of all, if they are worried about how to get a warrant for it in Singapore -- and I think they probably could have gone to an L.A. magistrate and gotten it anyway -- but they could have sent it to L.A. In fact, if you read the letter requesting it, they originally say to send to the United States. I don't think they get around the Fourth Amendment by just choosing to send it to Singapore instead of Los Angeles or wherever else in the United States they might send it.

This joint venture -- we are out of the joint venture land now. We are talking about a search by American agents alone at an American facility for, at the very least, a parallel American investigation. We can go back and forth about how much of it was American and how much of it was Cambodian, etc., etc., but Agent Phillips testified that there was an American investigation going on. It was a search by an American representative, an American agent at an American facility. And it's an American facility the Government chose. If they are worried about getting a warrant there, they could have sent it to somewhere else. So I would submit that they've not saved, Your Honor.

THE COURT: Okay. Thank you. Mr. Gunn, Mr. Brown, I would like to speak to you ex parte for a moment with the

reporter.

(Sidebar conference commenced without the Government.)

(Sidebar conference ended.)

THE COURT: All right, I am going to deny the motion to dismiss the Indictment. I am going to need to assimilate the testimony and look at the briefing again on the motion to suppress, so I will get a decision on that as soon as possible.

Thank you very much for coming in. Your briefing was excellent as usual.

MR. BROWN: Your Honor, there was one issue with

**Certificate of Service**

I hereby certify that on May 28, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *James H. Locklin*

By: JAMES H. LOCKLIN
Deputy Federal Public Defender

No. 14-50095

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

MICHAEL JOSEPH PEPE,
*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
The Honorable Dale S. Fischer, Presiding
No. CR-07-00168-DSF

## Appellant's Excerpts of Record

**[Volume 3 of 12]**

HILARY L. POTASHNER
Acting Federal Public Defender
JAMES H. LOCKLIN
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012
213-894-2929

*Counsel for Defendant-Appellant*

# Table of Contents

## Volume 1

Order Denying Defendant's Motion to Dismiss Indictment....................................1
[Filed December 3, 2007; Docket No. 57]

Order Denying Defendant's Motions to Suppress Evidence...................................9
[Filed December 5, 2007; Docket No. 60]

Order Denying Defendant's Motion to Suppress Evidence ..................................20
[Filed February 7, 2008; Docket No. 129]

Transcript – Sentencing (Excerpts)...........................................................26
[Dated February 28, 2014; Filed April 17, 2014; Docket Nos. 491, 512]

## Volume 2

Defendant's Motion to Suppress Evidence* ..................................................42
[Filed June 26, 2007; Docket No. 21]

Defendant's Motion to Suppress Evidence (Excerpts)......................................120
[Filed August 1, 2007; Docket No. 33]

Government's Consolidated Opposition to Motions to Suppress Evidence* ........130
[Filed August 22, 2007; Docket No. 39]

Defendant's Reply re Motions to Suppress Evidence .........................................208
[Filed September 4, 2007; Docket No. 40]

Defendant's Motion to Dismiss Indictment.......................................................220
[Filed October 4, 2007; Docket No. 43]

Transcript – Motion Hearing ..........................................................................244
[Dated October 29, 2007; Filed February 26, 2008; Docket Nos. 50, 133]

* Documents marked with an asterisk have been redacted pursuant to Federal Rule of Appellate Procedure 25(a)(5) and Federal Rule of Criminal Procedure 49.1(a).

Government's Declaration re Motions to Suppress Evidence ..............................295
[Filed November 27, 2007; Docket No. 53]

Transcript – Motion Hearing (Excerpts)* ..........................................................299
[Dated December 3, 2007; Filed February 26, 2008; Docket Nos. 58, 134]

Volume 3

Defendant's Supplemental Memorandum re Motion to Suppress Evidence.........340
[Filed December 20, 2007; Docket No. 71]

Government's Supplemental Memorandum re Motion to Suppress Evidence .....350
[Filed December 20, 2007; Docket No. 72]

First Superseding Indictment ..............................................................................372
[Filed December 20, 2007; Docket No. 83]

Government's Supplemental Declaration re Motion to Suppress Evidence (Excerpts) ..........................................................................................................374
[Filed February 5, 2008; Docket No. 127]

Transcript – Motion Hearing (Excerpts)* ..........................................................380
[Dated February 6, 2008; Filed February 26, 2008; Docket Nos. 136]

Transcript – Trial – Day 2 (Excerpts) ...................................................................460
[Dated May 9, 2008; Filed May 18, 2010; Docket Nos. 259, 410]

Volume 4

Transcript – Trial – Day 3 (am) (Excerpts) .........................................................635
[Dated May 13, 2008; Filed May 18, 2010; Docket Nos. 260, 411]

Transcript – Trial – Day 3 (pm) .............................................................................766
[Dated May 13, 2008; Filed June 17, 2014; Docket Nos. 260, 532]

Volume 5

Transcript – Trial – Day 4 (Excerpts) ...................................................................805
[Dated May 14, 2008; Filed May 18, 2010; Docket Nos. 261, 412]

Transcript – Trial – Day 5 (Excerpts) ......942
[Dated May 15, 2008; Filed May 18, 2010; Docket Nos. 262, 413]

Volume 6

Transcript – Trial – Day 6 (Excerpts) ......1022
[Dated May 16, 2008; Filed May 18, 2010; Docket Nos. 263, 414]

Volume 7

Transcript – Trial – Day 7 (Excerpts)* ......1192
[Dated May 20, 2008; Filed May 18, 2010; Docket Nos. 264, 415]

Transcript – Trial – Day 8 (Excerpts) ......1343
[Dated May 21, 2008; Filed May 18, 2010; Docket Nos. 269, 416]

Volume 8

Transcript – Trial – Day 9 (Excerpts) ......1423
[Dated May 22, 2008; Filed May 18, 2010; Docket Nos. 270, 417]

Volume 9

Transcript – Trial – Day 10 (Excerpts) ......1538
[Dated May 23, 2008; Filed May 18, 2010; Docket Nos. 293, 418]

Transcript – Trial – Day 11 (Excerpts) ......1739
[Dated May 27, 2008; Filed June 2, 2010; Docket Nos. 294, 435]

Volume 10

Transcript – Trial – Day 12 (Excerpts) ......1805
[Dated May 28, 2008; Filed May 18, 2010; Docket Nos. 295, 419]

Transcript – Trial – Day 13 (Excerpts) ......1930
[Dated May 29, 2008; Filed May 18, 2010; Docket Nos. 296, 420]

Stipulation to Correct/Modify Record re Jury Instructions (Excerpts)[†] .............1941
[Filed February 27, 2015; Docket No. 543]

Order Correcting/Modifying Record re Jury Instructions ..................................1961
[Filed March 2, 2015; Docket No. 545]

Order Correcting/Modifying Record re Video Testimony .................................1963
[Filed March 2, 2015; Docket No. 546]

Government's Sentencing Memorandum (Excerpts) ........................................1965
[Filed September 17, 2008; Docket No. 318]

Transcript – Victim Statements ..........................................................................1977
[Dated September 25, 2008; Filed June 18, 2014; Docket Nos. 333, 533]

Defendant's Supplemental Filing re Restitution.................................................1998
[Filed March 25, 2009; Docket No. 348]

Judgment ............................................................................................................2006
[Filed February 28, 2014; Docket No. 492]

Notice of Appeal ................................................................................................2012
[Filed March 3, 2014; Docket No. 493]

Docket ................................................................................................................2013

Volume 11 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 1)...................2053
[Filed March 3, 2015; Docket No. 547]

Volume 12 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 2)...................2309
[Filed March 3, 2015; Docket No. 547]

[†] Although this document and the two orders that follow were not filed until after the judgment and notice of appeal were filed, they are placed here in the excerpts because they relate to the trial proceedings.

Exhibit No. 101 .......... 2399

Exhibit No. 102 .......... 2401

Exhibit No. 103 .......... 2403

Exhibit No. 104 .......... 2405

Exhibit No. 106 .......... 2408

Exhibit No. 107 .......... 2410

Exhibit No. 108 .......... 2412

Exhibit No. 109 .......... 2414

Exhibit No. 110 .......... 2416

Exhibit No. 111 .......... 2418

Exhibit No. 114 .......... 2420

Exhibit No. 123 .......... 2423

Exhibit No. 2007 .......... 2428

Exhibit No. 2009 .......... 2454

Exhibit No. 2010 .......... 2456

Exhibit No. 2011 .......... 2458

Exhibit No. 2093 .......... 2460

Exhibit No. 2096 .......... 2462

Exhibit No. 2200A .......... 2464

Exhibit No. 2201A .......... 2467

Exhibit No. 2202A ....................2477

Verdict ....................2480
[Filed May 29, 2008; Docket No. 299]

Presentence Report ....................2488
[Dated July 30, 2008; Filed March 25, 2009; Docket No. 346]

Probation Office Letter to District Court ....................2517
[Dated September 3, 2008]

Government's Submission of Victim Impact and Restitution Information ....................2523
[Filed September 19, 2008; Docket No. 329]

Supplement to Presentence Report ....................2559
[Filed March 25, 2009; Docket No. 347]

Government's Response to Defendant's Filing re Restitution ....................2562
[Filed April 21, 2009; Docket No. 355]

Government's Supplemental Submission re Restitution ....................2583
[Filed February 28, 2014; Docket No. 490]

SEAN K. KENNEDY (No. 145632)
Federal Public Defender
(E-mail: Sean_Kennedy@fd.org)
CARLTON F. GUNN (No. 112344)
Deputy Federal Public Defender
(E-mail: Carlton_Gunn@fd.org)
CHARLES C. BROWN (No. 179365)
Deputy Federal Public Defender
(E-mail: Charles_Brown@fd.org)
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone (213) 894-1700
Facsimile (213) 894-0081

Attorneys for Defendant
MICHAEL PEPE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL PEPE,

Defendant.

NO. CR 07-168-DSF

**SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE**

Defendant, Michael Pepe, through his counsel of record, Deputy Federal Public Defender Carlton F. Gunn and Deputy Federal Public Defender Charles C. Brown, hereby files the attached supplemental memorandum of points and authorities

///

///

///

///

in response to the Court's minute order dated December 5, 2007.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: December 20, 2007

By [signature]
CARLTON F. GUNN
Deputy Federal Public Defender

SEAN K. KENNEDY
Federal Public Defender

DATED: December 20, 2007

By [signature]
CHARLES C. BROWN
Deputy Federal Public Defender

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.

INTRODUCTION

On June 26, 2007, the defense filed a motion to suppress evidence in which it argued, inter alia, that a warrantless search of Mr. Pepe's computer violated the Fourth Amendment. The government filed an opposition to the motion, the defense filed a reply, and the Court held a hearing on the motion on October 29, 2007 and December 3, 2007.

On December 5, 2007, the Court filed a minute order denying the motion in part but ordering further briefing on the computer search issue. This supplemental memorandum of points and authorities is filed in response to that order.

II.

ARGUMENT

A. THE COURT SHOULD RECONSIDER ITS CONCLUSION THAT THE FOCUS SHOULD BE ON COMPLIANCE WITH FOREIGN LAW.

Initially, the defense asks the Court to reconsider its conclusion that the focus in analyzing the constitutionality of the initial warrantless computer search should be on compliance with foreign law. *United States v. Barona*, 56 F.3d 1087 (9th Cir. 1995) and the other joint venture foreign search cases involve searches done *jointly* by American and foreign officials, not searches done by American officials alone at the request of foreign officials. Extending the joint venture case law to searches done by Americans alone would lead to absurd results; for example, a foreign official's request that American officers search the home of an American citizen in Los

Angeles, while the American citizen is still living there, would become subject to foreign search standards rather than American search standards. In addition, the rationale underlying the joint venture search standard – that American courts cannot and should not control the conduct of foreign law enforcement officers – does not apply when the search is conducted solely by American officers. American courts can and should control the conduct of American officers.

The *Barona* case cited in the Court's order is actually the mirror image of the present case. In *Barona*, Danish authorities conducted a search – specifically, a wiretap – at the request of American authorities, *see Barona*, 56 F.3d at 1094, and the Court held that Danish law is what set the Fourth Amendment standard, *see id.* at 1094. Here, there is the opposite scenario: American authorities conducting a search at the request of foreign authorities.[1] It follows that the controlling standard should also be the opposite, *i.e.*, American search requirements should set the Fourth Amendment standard.

B. EVEN IF THE FOCUS IS CAMBODIAN LAW, THE WARRANTLESS COMPUTER SEARCH MUST BE FOUND INVALID.

Even if the Court adheres to its conclusion about the Fourth Amendment standard to be applied, it should grant the motion as to the initial warrantless computer search. The first reason for this is that there was no Cambodian search

---

[1] This is even assuming the correctness of the Court's conclusion that the forensic computer examination was undertaken in order to aid Cambodian officials, with which conclusion the defense respectfully disagrees. The additional report of investigation prepared by Agent Phillips that is attached as Exhibit A provides further evidence that there was at the very least a dual purpose underlying the forensic computer examination. That report contains a directive to the forensic computer examiner to "conduct forensic analysis on all electronic media and make two copies of all of the images for ICE Bangkok and the AUSA." Exhibit A, at 2.

warrant authorizing the search of the computer. To begin, the only search warrant that the Cambodian police ever got was obtained after the searches and retroactively dated June 17, 2006, as evidenced by the exhibits which are discussed in more depth in the original memorandum of points and authorities submitted with the Motion to Suppress Evidence. *See* Motion to Suppress Evidence, at 5, 8 & Exs. E, F. And even the search warrant obtained after the fact authorized officers to search only "the *residence* at number 83, Road 596, Subdistrict Boeng Kak II, District Tuol Kork, City of Phnom Penh, with a resident named Michael Joseph." Motion to Suppress Evidence, Exhibit E (emphasis added). It did not authorize the additional search of a computer and computer media. It certainly did not authorize such a search weeks later, or even months later in September, which was when the search of the computer here appears to have actually taken place.[2]

Then there is a second reason the search of the computer violated Cambodian law, somewhat related to the first. That is that under Cambodian law, searches "must be authorized by one of the judges of the competent court or by the prosecutor." Motion to Suppress Evidence, Exhibit I, art. 20, § 2. The request for the search of the computer here, according to Agent Phillips's testimony, was from the police.

Then there is a third reason the initial warrantless computer search violated Cambodian law. That is that Mr. Pepe was not present. A special provision of Cambodian law that goes beyond American search law requirements is that "[s]earches must be conducted in the presence of the suspect." Motion to Suppress Evidence, Exhibit I, art. 20, § 1. That this requirement applies not only to the initial

---

[2] The report prepared by the forensic computer analyst indicates that the computer was received on June 30, 2006 and that an initial duplicate image was made then, but that the actual forensic analysis took place on September 19, 2006, when the analyst discovered that a second duplicate image had to be made due to computer failure. *See* Motion to Suppress Evidence, Exhibit H.

search in which items are taken from a house but also to subsequent searches is evidenced by a portion of the CD of the searches which was introduced into evidence at the hearing as Defense Exhibit 105.[3] This CD shows that Mr. Pepe was present not only at the initial searches of his house but also when agents looked through his property at the Cambodian police station. *See* Def. Ex. 105, CD1, time counter 11:48. Yet Mr. Pepe was not present during any part of the search of his computer.[4]

Finally, Agent Philips cannot claim some sort of good faith belief that there was no problem, because he knew about the foregoing requirements of Cambodian law. Indeed, he so testified at the hearing. First, he testified that he knew Cambodian law required a search warrant. Second, he testified that he knew Cambodian law required the defendant to be present during a search.[5]

* * * * * * * * *

---

[3] This exhibit was retained by defense counsel after the hearing but can be returned to the Court if the Court wishes.

[4] A second section of the article of the Cambodian code which requires the defendant to be present during the search does add the caveat "if possible," Motion to Suppress Evidence, Exhibit I, art. 20, § 2, and the government could argue that it was not possible to have Mr. Pepe in Singapore. Even assuming this qualification can override the unqualified requirement in section 1 of the same article, it does not save the government here. The search took place in Singapore only because of the government's choice of location. To argue that the government can avoid Cambodian limitations by moving the property to an American facility in another country but not have to accept American limitations is the grossest example of allowing a party to have its cake and eat it too.

[5] If the government attempts to offer a supplemental declaration containing some sort of equivocation by Agent Phillips on these points, the Court should not accept that declaration. It would be unfair to accept additional self-serving evidence only after the Court's request for supplemental briefing and/or defense counsel's response have pointed out weaknesses in the government's presentation.

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 369 of 2133

III.

CONCLUSION

The Court should grant the defense motion as to the initial warrantless computer search.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: December 20, 2007

By [signature]
CARLTON F. GUNN
Deputy Federal Public Defender

SEAN K. KENNEDY
Federal Public Defender

DATED: December 20, 2007

By [signature]
CHARLES C. BROWN
Deputy Federal Public Defender

P:\Gunn\PEPE\PLDSuppSuppress.wpd

7

Pepe ER 346

# EXHIBIT A

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY<br>ICE | PAGE 1 |
| --- | --- |
| REPORT OF INVESTIGATION<br>CONTINUATION | CASE NUMBER BK07QR06BK0006 |
| | REPORT NUMBER: 003 |

On June 16, 2006, Assistant ICE Attache (AIA) Gary Phillips received information that the Cambodian National Police (CNP) were conducting surveillance on Michael Joseph PEPE's residence located at Street 596, House 83, Tol Kork, Phnom Penh, Cambodia. PEPE was placed under surveillance based on a complaint from a 12-year-old girl, which she said she was raped by PEPE.

At approximately 1240 hours, after PEPE departed his residence and was observed at a tour business located on Norodom Street, Phnom Penh, CNP officers arrested him for rape and debauchery. Prior to arresting PEPE, CNP officers obtained a search warrant for his residence, described above.

At approximately 1320 hours, several CNP officers, accompanied by IJM, WHI, the Cambodian Prosecutor, the Diplomatic Security Service (DSS) and ICE Bangkok, executed the search warrant.

Discovered in PEPE's compound were several items of evidentiary value. The following is a partial list of the items discovered at his house:

* Located in the driveway was a white Jeep bearing Cambodia license 01-417
* Located in the living area was a carved wooden fish (as described by the victims)
* Several photographs located in a cabinet in the living area
* A large bag of candy in the kitchen area
* Located in the maids room was a pink plastic bottle containing baby oil
* Located in the Pool room was several baggage tags from Eva Air including a luggage tag with PEPE's name
* Several clear plastic envelopes containing school supplies for young children, entitled the Socrates Foundation
* Located at the top of the stairs was a red towel
* In PEPE's bedroom officers discovered the following items, including but not limited to: KY Jelly, condoms, psychiatric type medicines (such as Lithium Carbonate), generic Viagra, unknown round and oval white pills, several other unknown types of purported prescription drugs, a wooden stick, books that were sexual in content, sheets that appeared to be stained (blood, semen or another unknown substance), a yellow bag containing white and black rope as well as duct tape. Other items included ointments, long strips of cloths that were tied in slip knots, clothes, and documents
* Adjacent to PEPE's bedroom was a room dedicated for massage. The room only had one piece of furniture, a massage table. Located on top of the table were children's books, a "Fun Spell" game, tampons, "Phonics for Kids", and a notebook. Located in the corner of the room was an old computer, absent the hard drive
* Located in the victims room were several stuffed animals, children's

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 372 of 2133

O F F I C I A L U S E O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T O F I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE 2<br><br>CASE NUMBER BK07QR06BK0008<br><br>REPORT NUMBER: 003 |
|---|---|

clothes, toothpaste for kids and stained sheets and a stained curtain

* Located in PEPE's computer workroom was a computer, flashcard, memory card, pornographic CD's (adult and what appears to be suspected child pornography), a bestiality CD, documents, books, photographs, emails, email accounts, business cards, articles from the Cambodian Daily regarding pedophiles, a map cover entitled "Sex With Children is a Crime", calendar diaries, games, a night vision scope, a photograph of PEPE and the King of Cambodia, a game entitled "Body Parts", medicines, pornographic photographs, PEPE's California drivers license, a copy of PEPE's passport, and other miscellaneous items.

The preceding is only a partial list of the items that were seized from PEPE's residence. The hard drive, flashcard and memory card will be turned over to ICE Singapore, SS/A David Galante for forensic analysis.

Investigation will continue.

Collateral Request:

ICE Singapore, SS/A David Galante: As discussed earlier, please conduct forensic analysis on all electronic media and make two copies of all of the images for ICE Bangkok and the AUSA.

O F F I C I A L U S E O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

Pepe ER 349

THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
PATRICIA A. DONAHUE (SBN: 132610)
JOHN J. LULEJIAN (SBN: 186783)
Assistant United States Attorneys
Violent and Organized Crime Section
United States Courthouse
312 North Spring Street, 15th floor
Los Angeles, California 90012
Telephone: (213) 894-0640/8603
Facsimile: (213) 894-3713
E-mail: patricia.donahue@usdoj.gov
john.lulegian@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. MICHAEL JOSEPH PEPE, Defendant. | CR No. CR 07-168-DSF<br><br>GOVERNMENT'S SUBMISSION IN RESPONSE TO COURT'S ORDER DATED DECEMBER 5, 2007; DECLARATIONS OF KOEUT RUTH, SAMBO LY, AND GARY J. PHILLIPS |

Plaintiff United States of America, by and through its counsel of record, hereby submits its additional briefing in response to the order of this Court dated December 5, 2007. This response is based on the attached memorandum of points and authorities and declarations, the government's consolidated oppositions to defendant's suppression motions and the declarations attached thereto, the Declaration of Special Agent

Nguyen-Galante, the files and records of this case, and any additional argument and evidence presented at the hearing.

Dated: December 20, 2007 Respectfully submitted,

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

Patricia A. Donahue

PATRICIA A. DONAHUE
JOHN J. LULEJIAN
Assistant United States Attorneys

Attorneys for Plaintiff
United States of America

## MEMORANDUM OF POINTS AND AUTHORITIES

### I

### INTRODUCTION

In the December 5, 2007 Order, this Court required additional briefing regarding three topics. As set forth below, the additional information requested by the court supports the government's position that the search of the computer media seized by the Cambodian National Police from defendant's Phnom Penh residence pursuant to a search warrant was authorized by that warrant, and Assistant ICE Attache Gary Phillips and ICE Special Agent Nguyen-Galante had a good-faith belief that the search of the computer media complied with Cambodian law. For the reasons set forth herein and in the government's prior briefing in opposition to defendant's motion to suppress evidence, the government respectfully requests that the court deny the motion.

### II

### ARGUMENT

#### A. The Cambodian Warrant Authorized the Search of Computers and Computer Media Contained Within Defendant's Home

The first issue the Court ordered the parties to address was whether the Cambodian warrant, which authorized the search of Defendant's home, also authorized the search of computers and computer media within it. As set forth in the attached Declaration of Koeut Rith, who is the Under Secretary of State at the Ministry of Justice in Cambodia, provides training for judges and court officers on the new code of criminal procedure in

Cambodia, and has co-authored books on Cambodian Law, under Cambodian law, all search warrants authorize the police to search and seize all suspected items inside a suspect's residence, including computers and computer media. (Rith Decl. ¶ 2, Ex. A). In Cambodia, when the police seize computers or computer media, officers trained in computer technology automatically are allowed to search that computer and computer media for evidence in connection with the crime. (Id.) The officers may either search the computer and media at the search location or remove the computer and media for forensic analysis. Prior to trial, the prosecutor will decide whether or not to admit the materials found on a seized computer or media in court. If the police discover child pornography on the computer and/or the media, that will be strong evidence in court. (Id.)

In this case, because the police obtained a warrant issue by the prosecutor, any evidence in connection with the crime, including computers and computer media seized from defendant's residence, was accomplished in accordance with Cambodian law. (See Rith Decl. ¶ 3). In addition, the police would have been allowed to send the computers and computer media to an outside source, such as another law enforcement agency, for forensic analysis. (Id.) Accordingly, the Cambodian warrant authorized the search of the computers and computer media.

**B. The Warrant Was Obtained Before the Search was Conducted**

In its order, the Court also asked for additional briefing regarding "Defendant's evidence that the warrant was obtained after the Cambodian Search was conducted establishes that the

warrant was not valid for the purpose of the Singapore search."

Defendant claims in his motion that the "Summary Report" accompanying the search warrant was prepared on June 19, 2006, two days after the initial execution of the search. (Def.'s Mot. to Suppress, at 5.) In addition to the date of the document, Defendant points to a statement indicating a June 18, 2006, interview of one of the child victims to suggest that the preparation of this report was an afterthought. (Id.) As set forth below, this claim is without merit.

The government asked another interpreter, Sambo Ly, to examine the Summary Report and compare it to the original translation. According to Ms. Ly, the original interpreter incorrectly translated several of the dates and numbers in his translation. (See Decl. of Sambo Ly, dated 12/20/07 ("Ly Decl."), ¶ 2.) For example, at the top right hand corner of the first page of the document, the interpreter incorrectly translated the date of this document as "19 June 2006." (See id.) Ms. Ly notes that the correct date is "17 June 2006." (See id.) This date corresponds with the date that the Cambodian National Police obtained the Residential Search Warrant for Defendant's residence. (See Decl. of Gary J. Phillips, dated 8/23/07 (Docket No. 39-2) (Phillips Decl. I"), Ex. A.)

Ms. Ly also noted that the interpreter translated the number of the Summary Report as "450/06" instead of "449/06" (See Ly Decl. at ¶ 2.) This number is important because in the Residential Search Warrant, the prosecutor says that he saw "report number 449/06 R.M.K., dated 17 June 2006 . . . . " (See

Phillips Decl. I, at Ex. A.) In other words, the prosecutor reviewed the Summary Report before the search warrant was obtained on June 17, 2006.

Another ambiguity cleared up by Ms. Ly is the date of the child victim's interview. In the translated Summary Report, the interpreter translated the this date as "18 June 2006." However, Ms. Ly notes that the correct date is "15 June 2006." (See Ly Decl., at ¶ 2.) Further, in the Khmer Summary Report, the numbers "15" and "2006" are written in Arabic numbers approximately half-way down the page in approximately the same position as they are in the translated Summary Report. (See Ly Decl. Ex. A).

Finally, Ms. Ly points to the authorization of the prosecutor at the bottom of the second page of the Summary Report and notes that the interpreter correctly translated the date next to the prosecutor's signature as "17/6." (See Ly Decl., at ¶ 3.) The fact that the prosecutor chose to include the date (in Arabic numerals) next to his signature on a court document (a practice also followed by American lawyers) reinforces that the Summary Report was prepared on June 17, 2006, and not June 19, 2006, as alleged by Defendant.

Accordingly, Defendant's claim that the preparation of the Summary Report somehow invalidates the Singapore search fails.

**C. Assistant Attache Phillips and Special Agent Nguyen-Galante Had, and Continue to Have, a Good-Faith Belief that the Search of Defendant's Computer and Computer Media Complied with Cambodian Law**

As the Ninth Circuit explained in United States v. Barona, 56 F.3d 1087, 1091 (9th Cir. 1995), if a joint venture is found to have existed, "'the law of the foreign country must be consulted at the outset as part of the determination whether or not the search was reasonable.' If foreign law was not complied with, 'the good faith exception to the exclusionary rule becomes part of the analysis. The good faith exception is grounded in the realization that the exclusionary rule does not function as a deterrent in cases in which the law enforcement officers acted on a reasonable belief that their conduct was legal.'" Id. at 1092-93 (quoting United States v. Peterson, 812 F.2d 486, 490, 492 (9th Cir. 1987). In Peterson, the Ninth Circuit held that even if the Philippine wiretap was illegal under Philippine law, reliance on its legality was objectively reasonable by the United States authorities participating in the joint narcotics investigation. As the Ninth Circuit explained, "Permitting reasonable reliance on representations about foreign law is a rational accommodation to the exigencies of foreign investigation." Id. at 492. In United States v. Juda, 46 F.3d 961, 968 (9th Cir. 1995), the Ninth Circuit held that the good faith exception to the exclusionary rule applied because the Drug Enforcement Administration agent reasonably relied on the representations by an Australian official that no warrant was required to place a

transmitter on a vessel in an Australian port.

In this case, as set forth above, the government submits that the search of the computer media was legal under Cambodian law. However, even if it was not, Assistant Attache Phillips and Special Agent Nguyen-Galante believed in good faith that it was. Attach Phillips has been assigned to ICE Bangkok for five and one-half years, where he has participated in over 70 child exploitation investigations. He has observed several searches conducted by the Cambodian National Police, and he has observed the CNP seize computers and computer media on several occasions. To his knowledge, there is no requirement under Cambodian law that a separate showing or a separate warrant is required to search and seize computers or computer media. (Phillips Decl. ¶ 3). Based on his extensive experience working with law enforcement in Cambodia, he believed that the search of the computers and computer media were lawful under Cambodia law, and he conveyed that information to Special Agent Galante, who conducted the forensic analysis. (Phillips Decl. ¶ 3; Galante Decl. ¶¶ 5,6).

The government therefore respectfully submits that the warrant authorized the search of the computers and computer media, and that even if it did not, the good-faith exception to the exclusionary rule applies.

**DECLARATION OF SAMBO LY**

I, SAMBO LY, hereby declare:

1. I was born in Cambodia and am a native speaker of Khmer. I currently am employed by the Alameda County Medical Center where I am the Director of the Interpreter Services Department and the Program Coordinator for the Refugee Health Program. I have been interpreting between Khmer and English since 1979. I have served as an interpreter for the Khmer language in Superior and Family Courts of Alameda County, California, and served as a translator and interpreter for a number of attorneys, including the United States Attorney's Office for the Northern District of California. I am not a certified court interpreter, because Khmer is not a certified language. I also am a contractor with Accent on Languages and have been translating documents associated with United States v. Michael J. Pepe, Case No. CR 07-168-DSF, since October 2007.

2. I have examined a Khmer document which bears Bates Nos. 00044 and 00045. A true and correct copy of this document is attached hereto as Exhibit A. I also have examined another interpreter's translation of this document, which bears Bates Numbers 00786 and 00787. A true and correct copy of this translation is attached hereto as Exhibit B. After reviewing the other interpreter's translation, I note that the interpreter incorrectly translated several of the dates and numbers in this translation. For example, at the top right hand corner of the first page of the document, the other interpreter translated the date of this document as "19 June 2006." The correct date is "17 June 2006." Also, the interpreter translated the number of this document on the first page as "450/06." The correct number of this document is "449/06." In addition, on the first page, the translator interpreted the date associated with the victim child's information as "18 June 2006." The correct date is "15 June 2006."

\\

\\

\\

3. At the bottom of the second page of the document, the interpreter correctly translated the day and month after the prosecutor's handwritten authorization and signature as "17/6."

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 20 day of December, 2007, at OAKLAND, California.

SAMBO LY

# EXHIBIT A

ព្រះរាជាណាចក្រកម្ពុជា

ជាតិ សាសនា ព្រះមហាក្សត្រ

ក្រសួងមហាផ្ទៃ

អគ្គស្នងការដ្ឋាននគរបាលជាតិ

នាយកដ្ឋានកណ្តាលនគរបាលយុត្តិធម៌

នាយកដ្ឋានប្រឆាំងការជួញដូរមនុស្ស

និងការពារអនីតិជន

លេខ......បក

រាជធានីភ្នំពេញ ថ្ងៃទី១៧ ខែ...... ឆ្នាំ ២០០៦

**របាយការណ៍ សំយោគ**

ស្តីពី [illegible]

**គោរពជូន**

លោកព្រះរាជអាជ្ញា អមតុលាការ រាជធានីភ្នំពេញ

កម្មវត្ថុ : [illegible] 83 [illegible] 576 [illegible]

យោង : [illegible] (IJM) [illegible] 16-06-2006

[illegible] 16 [illegible] 2006

[illegible]

[illegible] 831 [illegible]

ហេតុការ : [illegible] 16 [illegible] 2006 [illegible] IJM [illegible]

ការស្នើសុំ : [illegible] (IJM) [illegible]

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 385 of 2133

[illegible]

លទ្ធផលការវាយតំលៃសន្និដ្ឋានៈ [illegible]

[illegible]

ប្រធាននាយកដ្ឋាន

[illegible]

ឧត្តមសេនីយ៍ត្រី.អ៊ុង_សុគន្ធា

[illegible] 17/6

[illegible]

00045

Pepe ER 362

# EXHIBIT B

**Kingdom of Cambodia**
**Nation Religion King**
----

**Ministry of the Interior**
**General Commissariat of the National Police**
**Central Department of the Justice Police**
**Department of Human Trafficking Prevention and Protection of Minors**

Phnom Penh 19 June 2006

Number 450/06

**Summary Report**

Regarding: A case of sexual trafficking of children and torture, threatening "life puppets", as well as rape.

**Submitted**
**to the District Attorney of the Phnom Penh Municipal Court**

**Objective:** to request a residential search warrant for house number 83 Road 596, Subdistrict Boeng Kak II, District Tuol Kork, which is the residence of Michael Joseph, male, American, to free the victim children who are being imprisoned and tortured by Michael, and search for some evidence relating to the crimes.

Referencing: The report of the NGO International Justice Mission *(IJM)* dated 16-06-2006.
-the report of the representative of the American Embassy 6-16 June 2006.
-information from the victim child named [redacted] dated 18 June 2006. IT
-the responses of the suspect named Nguyen Thi Ling, aka Tam.
-Summary Report number 133/006.
-Detainer number 831 A.Y.K of the Phnom Penh Municipal Court.

Facts: On 16 June 2006, the department received a report from the NGO International Justice Mission (IJM) and the American embassy about the activities of an American buying victim children and imprisoning them, torturing them, and forcefully raping them.

Investigation: After receiving the report of the NGO International Justice Mission (IJM), in cooperation with the American embassy, and information from the victim child named [redacted] IT [redacted]; according to the confession of the suspect named Nguyen Thi Ling, aka Tam; according to the report of the Specialist Bureau of the Phnom Penh Police Commissariat, and the Detainer from the Phnom Penh Municipal Court, our department investigated and achieved the following results:

IT

-The victim child named [redacted], age 12, was tricked by the female named Nguyen Thi Ling, age 49, into being turned over to her faction. Another person named Sang and her husband, on day (forgotten), May, 2006, and the female named Sang and her husband promised to take her to perform lawful work as a masseuse, but instead Sang and her husband took her to be sold to an American named Michael Kostik [sic], male,, age approximately 40 years old, who resides at number 83 Road 596, Subdistrict Boeng Kak II, District Tuol Kork. After purchasing them for sex, about four days later the suspect named Michael Kostik tortured and tied the hands and feet of the victim child named [redacted] and also threatened her life. Then he raped her [illegible]. The victim child had sustained injuries to her vagina and was bleeding profusely. Afterward, Michael telephoned to come and bring the victim child back home, and Sang gave $100 (one hundred dollars) to her mother, then her mother took her back home. Aside from the above victim child, Michael forced 4 other victim children, including Khmer and Vietnamese children, ages from 8 to 13 years old, keeping them in his house and tying their hands and feet and torturing them, and forcing them to suck on his penis, then raping them in an inhuman fashion. Separately, Nguyen Thi Ling, aka Tam, was detained by the authorities of the Phnom Penh Bureau of Human Trafficking Prevention and Protection of Minorities on 28 May 2006. As for Sang and her husband, they got away because they did not have criminal records.

IT

**Balance and Conclusions:** Relying on the report of the NGO International Justice Mission (IJM), in cooperation with the American embassy; on information from the victim children; on the responses of the suspects; on the report of the Phnom Penh Police Commissariat and the Detainer of the Municipal Court

- Sang and her husband did indeed trick a victim child into being trafficking sexually sexually [sic].

-Michael Joseph did indeed purchase the victim children and tortured and raped them.

Request: I request that the District Attorney issue a residential search warrant on the above residence in order to free the victims as well as find evidence connected with the above crimes.

-I request the detainment of Michael Joseph and Sang and her husband to be brought in for questioning to build a case for prosecution according to the law.

**Department Chief**
[signature]
Brigadier General Un Sokunthea

Permission to detain the suspects
[illegible]
[signature] 17/6
**Nget Sarat**
**District Attorney**

# DECLARATION OF KOEUT RITH

I, KOEUT RITH, hereby declare:

1. I am Under Secretary of State, Ministry of Justice of the Kingdom of Cambodia. A true and correct copy of my curriculum vitae is attached hereto as Exhibit A.

2. Under Cambodian law, all search warrants authorize the police to search and seize all suspected items inside a suspect's residence, including computers and computer media, which are considered to relate to the suspect's case. When the police seize computers or computer media, officers trained in computer technology automatically are allowed to search that computer and computer media for evidence in connection with the crime. The officers may either search the computer and media at the search location or remove the computer and media for forensic analysis. Prior to trial, the prosecutor will decide whether or not to admit the materials found on a seized computer or media in court. If the police discover child pornography on the computer and/or the media, that will be strong evidence in court.

3. I am informed and believe that on or about June 17 and 19, 2006, Cambodian law enforcement executed a search warrant on Michael J. Pepe's Phnom Penh residence. If the police had obtained a warrant which was issued by the prosecutor, any evidence in connection with the crime, including computers and computer media seized from the residence, would have been accomplished in accordance with the Cambodian law. Further, the police would have been able to send the computers and computer media to an outside source, such as another law enforcement agency, for forensic analysis.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed this 20 day of December, 2007, at Phnom Penh, Kingdom of Cambodia.

[signature]

KOEUT RITH

# EXHIBIT A

# CURRICULUM VITAE

| | | |
|---|---|---|
| **Name** | : | **Rith KOEUT** |
| **Sex** | : | Male |
| **Nationality** | : | Cambodian |
| **Date of birth** | : | [redacted] |
| **Place of birth** | : | Kompong Cham, Cambodia |
| **Mobile phone** | : | (855) 12 60 85 85 |
| **Email** | : | rkoeut@yahoo.fr |

## EDUCATION

- 2004-2007: PhD Candidate at University Jean Moulin Lyon 3, France
- 2001-2002: DEA (Master) of Criminal Law and Criminal Sciences, University Jean Moulin Lyon 3, France
- 2000-2001: Maîtrise (Pre-Master) in Private Law, University Lyon 2, France
- 1999-2000: French Bachelor of Law, University Lyon 2, France
- 1995-1999: Cambodian Bachelor of Law, Faculty of Laws and Economics, Phnom Penh
- 1994-1995: High School Graduate

## PROFESSIONAL EXPERIENCES

- 2007-Current: Under Secretary of State, Ministry of Justice
- 2005-Current: Research Assistant and Political Analyst for Supreme National Economics Council (SNEC)
- 2005-Current: Member of the Permanent Coordination Body, Council for the Legal and Judicial Reform
- 2007-Current: Trainer on new code of criminal procedure for judges and court officers
- 2002-2006: Professor of laws at Royal University of Laws and Economics, lecturing on general and special criminal law, criminal procedure, criminology, business crime, introduction to law, private international law, legal methodology and research
- Dec. 2002 : Facilitator of the French Team in charge of the fine-tuning of cambodian criminal code
- Oct. 2002 : Taking part in the conference of the experts on the International Criminal Court, held in Cambodia
- July 2002 : Interpreter from Khmer into French for Juvenile Division of the Appeal Court in Lyon, France

## INTERNSHIP

- 1999 & 2002: Intern at Phnom Penh Municipal Court (five months)
- June 2000: Intern at Law Firm of Mr. Frederic DOYEZ, member of Lyon Bar (one month)

## PUBLICATION

- Co-author, Book on "Introduction to Cambodian Law", under the supervision of Professor Maurice GAILLARD and Mr. Denis SAINTE-MARIE, 1st edition 2003 and 2nd edition 2005
- Commentator of Commentary on the Draft of New Cambodian Criminal Code, collection FUNAN 2005
- Co-author, Book on "Legal Methodology – Cambodian Law", 1st edition 2006

## LANGUAGES

- French: Perfect
- English: Conversational level

**DECLARATION OF GARY J. PHILLIPS**

I, GARY J. PHILLIPS, hereby declare:

1. I have been employed with the United States Customs Service, now known as United States Immigration and Customs Enforcement ("ICE"), since November 1988. For approximately 14 years, I was a Special Agent in the San Diego Office of the Special Agent-in-Charge, where I investigated and/or participated in over ten child exploitation investigations. Since May 2002, I have been assigned to ICE Bangkok, where I have participated in over 70 child exploitation cases. During my current assignment, I have investigated several cases charging Americans with violations of Title 18, United States Code, Section 2423(c) (Engaging in Illicit Sexual Conduct in Foreign Places), including United States v. Michael Lewis Clark (Case No. CR03-0406L) in the Western District of Washington and United States v. Kent Frank (Case No. 04-20778-CR-JORDAN) in the Southern District of Florida. I am an Assistant ICE Attache. In that position, I am responsible for investigating a wide variety of criminal activity, including but not limited to, crimes against children, human trafficking and smuggling, terrorism, counter-terrorism, drug trafficking, and money laundering.

2. This declaration is made in support of the government's Supplemental Memorandum in Response to Court Order, dated December 5, 2007.

3. When the Cambodian National Police ("CNP") seized the computer and computer media pursuant to the search warrant from Defendant Michael J. Pepe's Phnom Penh residence, I believed that the warrant authorized the lawful seizure and search of those items. I have observed several searches conducted by the CNP and I have observed the CNP seize computers and computer media on several occasions. To my knowledge, there is no requirement under Cambodian law that a separate showing or a separate warrant is required to seize and search computers or computer media. At the time Defendant's computer and computer media were

\\

\\

seized, I believed, and continue to believe, that the search warrant authorized the seizure and search of that computer and computer media.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed this 20 day of December, 2007, at Bangkok, Thailand.

GARY J. PHILLIPS

FILED
2007 DEC 20 AM 11:44
CLERK U.S. DISTRICT COURT CENTRAL DIST. OF CALIF. LOS ANGELES

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

December 2007 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. MICHAEL JOSEPH PEPE, Defendant. | CR No. 07-168(A)-DSF <br> F I R S T S U P E R S E D I N G I N D I C T M E N T <br> 18 U.S.C. § 2423(c): Engaging In Illicit Sexual Conduct With A Minor In Foreign Places |

The Grand Jury charges:

COUNTS ONE THROUGH SEVEN

[18 U.S.C. § 2423(c)]

Between on or about September 1, 2005, and on or about June 12, 2006, defendant MICHAEL JOSEPH PEPE, a citizen of the United States with a last known address in Ventura County, within the Central District of California, knowingly traveled in foreign commerce, from Los Angeles, California, to Cambodia, and engaged in illicit sexual conduct, as defined in Title 18, United States Code, Section 2423(f), with the following girls, all of whom were

under 18 years of age at the time that defendant engaged in illicit sexual conduct with them.

| Count | Victim |
|---|---|
| One | I.T. |
| Two | L.K. |
| Three | S.R. |
| Four | S.S. |
| Five | K.S. |
| Six | N.T.D. |
| Seven | T.C. |

A TRUE BILL

/s/
Foreperson

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

ELIZABETH R. YANG
Assistant United States Attorney
Deputy Chief, Violent & Organized Crime Section

PATRICIA A. DONAHUE
JOHN J. LULEJIAN
Assistant United States Attorneys
Violent & Organized Crime Section

THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
PATRICIA A. DONAHUE (SBN: 132610)
JOHN J. LULEJIAN (SBN: 186783)
Assistant United States Attorneys
Violent and Organized Crime Section
United States Courthouse
312 North Spring Street, 15th floor
Los Angeles, California 90012
Telephone: (213) 894-0640/8603
Facsimile: (213) 894-3713
E-mail: patricia.donahue@usdoj.gov
john.lulegian@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. MICHAEL JOSEPH PEPE, Defendant. | CR No. CR 07-168(A)-DSF<br><br>SUPPLEMENTAL DECLARATION OF KOEUT RITH; Attachments<br><br>Hearing Date: Feb. 6, 2008<br>Time: 10:00 a.m.<br>Place: Courtroom of the Hon. Dale S. Fischer |

Plaintiff United States of America hereby submits the Supplemental Declaration of Koeut Rith in connection with the evidentiary hearing on the portion of defendant's motion to suppress as to which the Court ordered additional briefing.

Koeut Rith will be at the evidentiary hearing on February 6, 2008.

Dated: February 4, 2008

Respectfully submitted,

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

[signature]
PATRICIA A. DONAHUE
JOHN J. LULEJIAN
Assistant United States Attorneys

Attorneys for Plaintiff
United States of America

**DECLARATION OF KOEUTH RITH**

1. I am Under Secretary of State, Ministry of Justice of the Kingdom of Cambodia.

2. Attached hereto as Exhibit A is a true and correct copy of a statement that I signed on November 20, 2007. My November 20, 2007 declaration refers to the "Khmer version of the criminal law relating to search warrants." Specifically, the "Provisions Relating to the Judiciary and Criminal Law and Procedure Applicable in Cambodia During the Transitional Period" (herein the "Provisions") sets forth the law governing searches in criminal cases for the period October 1992 until August 2007. The Provisions apply to crimes that were committed between October 1992 and August 2007.

3. In December 2007, I obtained from the National Archives in Phnom Penh a true and correct official copy, in Khmer, of the Provisions that apply to criminal cases, which is attached hereto as Exhibit B. I will bring to the evidentiary hearing a book entitled "Compilation of Some Khmer Laws Applicable in the Kingdom of Cambodia" prepared by the United Nations Cambodia Office of the High Commissioner for Human Rights" that contains the Provisions at pages 2197 to 2233.

4. Article 20 of the Provisions sets forth the search procedures that apply to two types of crime: (1) Crimes that are in flagrante delicto; and (2) Crimes that are not in flagrante delicto. The definition of flagrante delicto is set forth in Article 18 of the Provisions. The police may arrest anyone who is found committing a crime that is in flagrante delicto. A

crime is in flagrante delicto when the suspect is observed committing the crime, or when the suspect is chased by a public outcry right after committing the crime, or when a witness or victim points out the suspect at the scene of the crime, or when the suspect is trying to escape from the crime scene. All other crimes that do not fall into the situations described above are not in flagrante delicto.

6. Article 20 provides that if a crime is in flagrante delicto, then no search warrant is needed to conduct a search of the suspect's residence.

7. Article 20 provides that if a crime is <u>not</u> in flagrante delicto, then a search warrant is required to conduct a search of the suspect's residence. The search warrant must comply with the following 3 requirements:

(a) It must be authorized by a judge or prosecutor;

(b) The search must be completed between 6:00 a.m. and 6:00 p.m.

(c) If possible, the search should be completed in the presence of the suspect and two witnesses among the family.

8. Regarding the third requirement, any English language translation of the Provisions that places the clause "if possible" in the middle of the sentence, rather than at the beginning of the sentence, is not accurate. The courts in

Cambodia only apply the official Khmer version. According to Article 5 of the Constitution of the Kingdom of Cambodia, the official language of the Kingdom of Cambodia is Khmer. Therefore all official documents must be in Khmer.

I declare under penalty under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 4th day of February, 2008, at Los Angeles, California.

KOEUT RITH

## DECLARATION OF KOEUT RITH

I, KOEUT RITH, hereby declare:

1. I am Under Secretary of State for the Ministry of Justice.

2. On or about November 19, 2007, Phov Samphy, Director General, General Department of Research and Judicial Development within the Ministry of Justice, and I met with United States Immigration and Customs Enforcement ("ICE") Assistant Attaché Gary Phillips and ICE Special Agent Pauli Carbone to discuss the law of search warrants in the Kingdom of Cambodia.

3. I have reviewed the Khmer version of the criminal law relating to search warrants. The relevant law states that, "If possible, the search should be completed in the presence of the defendant and two witnesses among the family."

4. I understand that on or about June 17 and 19, 2006, Cambodian law enforcement executed a search warrant on Michael J. Pepe's Phnom Penh residence. If that search was completed between 6:00 a.m. and 6:00 p.m., in the presence of the police and the defendant, and the police had obtained a warrant from the court which was issued by the prosecutor, the search of the residence would have been valid and any evidence would have been seized in accordance with Cambodian law.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed this 20th day of November, 2007, at Phnom Penh, Kingdom of Cambodia.

[signature]

KOEUT RITH

EXHIBIT A

FILED
CLERK, U.S. DISTRICT COURT
FEB 26 2008
CENTRAL DISTRICT OF CALIFORNIA
BY LAW DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

United States of America, )
Plaintiff, )
)
vs. ) Case No. CR 07-168-DSF
)
Michael Joseph Pepe, )
Defendant. )
_________________________ )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Wednesday, February 6, 2008

DOCKETED ON CM
FEB 28 2008
BY MO 033

Pamela A. Seijas, CSR, FCRR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California 90012
(213) 687-0446

ORIGINAL

136

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
BY: PATRICIA DONAHUE
ASSISTANT UNITED STATES ATTORNEY
JOHN LULEJIAN
ASSISTANT UNITED STATES ATTORNEY
312 N. SPRING STREET
LOS ANGELES, CA 9012

FOR DEFENDANT: OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY: CARL GUNN
DEPUTY FEDERAL PUBLIC DEFENDER
CHARLES BROWN
DEPUTY FEDERAL PUBLIC DEFENDER
321 EAST SECOND STREET
LOS ANGELES, CA 90012

Los Angeles, California, Wednesday, February 6, 2008

10:01 a.m.

-oOo-

THE CLERK: Calling Calendar Item No. 2, CR 07-168(A)-DSF, *United States of America vs. Michael Joseph Pepe*.

Counsel, please state your appearances for the record.

MS. DONAHUE: Good morning, Your Honor. Patricia Donahue and John Lulejian on behalf of the United States. Also present in court are witnesses whom the Government has brought to court pursuant to this Court's order in connection with the evidentiary hearing.

THE COURT: Okay. Thank you.

MR. BROWN: Good morning, Your Honor. Charles Brown and Carl Gunn on behalf of Mr. Pepe. Also present is Godwin See from our office. He is our computer specialist.

THE COURT: Thank you. And good morning, Mr. Pepe.

MR. BROWN: Your Honor, may Mr. Pepe be uncuffed for the purposes of today's hearing?

THE COURT: Deputy, is there any reason we can't uncuff Mr. Pepe?

THE MARSHAL: No, Your Honor.

MR. BROWN: Thank you very much.

(The Marshal removed Mr. Pepe's handcuffs)

THE COURT: All right. How are we going to proceed?

MS. DONAHUE: Your Honor, the witnesses whom the Court had ordered to be present are here. We spoke with defense counsel and suggested a witness order. I believe the defense would like one of the -- is amenable to having one of the interpreters proceed first. The Government is flexible.

MR. GUNN: That's correct, Your Honor. I am handling the suppression motion so that would be me. I wanted to move to exclude witnesses, though, and then we could begin the cross-examination.

THE COURT: All right. Is there any reason we shouldn't exclude all the witnesses?

MS. DONAHUE: No. That's fine. We are just waiting to see which one it is the defense would like to put on the stand first, and we can ask the other folks to leave.

MR. GUNN: I can start with the one that needs to catch a plane.

MS. DONAHUE: Mr. Madden.

THE COURT: All right. Mr. Madden, you may remain. Please approach. Everyone else step outside of the courtroom until you are called to be a witness in this matter.

Matthew Madden, Government's witness, was sworn

MR. GUNN: Before I begin, Your Honor, perhaps I could have an exhibit marked for identification?

THE COURT: You may.

THE CLERK: Please state your first and last name and

spell your name for the record.

THE WITNESS: Matthew Madden, M-A-T-T-H-E-W, M-A-D-D-E-N.

THE CLERK: Thank you.

MR. GUNN: If I could approach, Your Honor?

THE COURT: Yes.

MR. GUNN: I think we ended with 111 at last hearing. I have it in my notes anyway. If we could mark this as Defense Exhibit 112 so we won't have any duplicative numbers and if it can only be placed in front of the witness when I request.

THE COURT: All right. You may proceed.

MR. GUNN: Thank you.

CROSS-EXAMINATION

BY MR. GUNN:

Q. Mr. Madden, what is your relationship with Sambo Ly or Ly? I am not sure which way to pronounce it.

A. I am not familiar with him or her.

Q. What is your employment or occupation?

A. Currently I am a linguist in the translation division of the Church of Jesus Christ of Latter Day Saints.

Q. Where exactly do you work?

A. Salt Lake City, Utah.

Q. How did you come to be involved in translation of documents in this case?

A. It's unrelated to my current employment, but I am also a

translator, and previously I was a full-time translator from Khmer to English and English to Khmer.

Q. During what period of time were you a fulltime translator?

A. I was fulltime between about June 2005 through June 2006, and then subsequent to that, only part time.

Q. And what is your knowledge of Khmer? Are you fluent in Khmer?

A. Yes.

Q. How did you develop that fluency?

A. Originally as a missionary living in Cambodia and then additionally living there for a longer period of time as a volunteer, as a translator. Also being married to a Cambodian-speaking -- Khmer is spoken almost exclusively in the home, and then working as a translator either part time or full time for a period of 18 years.

Q. Okay. Let me step back then. So you're married to someone who speaks Khmer?

A. I am.

Q. Who is ethnic Cambodian?

A. No. She is ethnic Vietnamese, but she grew up in Cambodia.

Q. All right. And if I understood you correctly, you speak Khmer virtually full time in the home?

A. Yes.

Q. And over -- for how long a period of time was that?

A. Four years in the United States.

Q. And what about in Cambodia?
A. In Cambodia for an additional three years.
Q. And you read and write Khmer also?
A. Yes.
Q. And you consider yourself fluent in that as well?
A. Yes.
Q. All right. Khmer can be either typed or preprinted or it can be hand-printed or handwritten; correct?
A. Yes.
Q. Is it true that it can be either hand-printed or handwritten, or in the Khmer language is there just one version? Do you understand my question?
A. Not completely, no.
Q. In English we have cursive handwriting and printing; right?
A. Yes.
Q. Is there a similar dichotomy in Khmer or is it just one --
A. Not necessarily, but of course there is a whole range of different styles of handwriting, depending on the individual.
Q. The same way different people print differently in English?
A. Yes.
Q. All right. Now, you did a --

Your Honor, could I have Defense Exhibit 112 placed in front of Mr. Madden, but if I could have it turned before it's placed in front of him so he doesn't look at the preceding declaration. If I could have it turned to the page marked as

Exhibit A?

THE COURT: Do you have a copy for the Court?

MR. GUNN: I'm sorry. I gave the clerk two copies.

THE COURT: Okay. Let me --

MR. GUNN: It's the declaration of Sambo Ly with the two other attachments.

THE COURT: And the clerk is doing as you asked.

BY MR. GUNN:

Q. Now, Mr. Madden, you have a document in front of you. I am going to ask you to only look at the pages I ask you to look at when I ask you to look at them. You have a page in front of you right now marked Exhibit A in big letters in the middle?

A. Yes.

Q. And it has a Cambodian language document following it; correct?

A. Shall I check?

Q. Yes.

A. Yes.

Q. And then -- and that's a two-page document; correct?

A. Yes.

Q. And then there is a second -- another page that says Exhibit B in big letters in the middle after that; correct?

A. Yes.

Q. And that has an English language document; correct?

A. Yes.

Q. And that's an English language translation that you prepared of the Cambodian language document in Exhibit A; correct?

A. Let me compare and check. Yes.

Q. And you translated -- the date at the top of the document is 19 June 2006; correct?

A. Yes.

Q. And you translated a number of a document as -- near the upper left, as 450/06; correct?

A. On the English one, yes.

Q. Yes. And then you -- there is a reference to a date associated with a victim child's information sort of in the middle of the text that you translated as 18 June 2006; correct?

A. Yes.

Q. And why did you translate those dates and numbers that way?

A. Can I approach -- can I handle those one by one?

THE COURT: Yes.

BY MR. GUNN:

Q. Sure.

A. The date at the top is simply a typo. It's not correct. I can see looking at the Cambodian it should be 17, and I put 19. I have no explanation for why that happened. I can see that it did happen, though.

The number also is not correct -- I'm not sure why -- the document number. The date down the middle of the page where

it says 18 June, that number is not written in Cambodian numerals. It's written in Arabic or Western numerals, and the 8 looks like -- or the 5, rather, looks like it could be an 8 or a 5. I could see how it could be either.

Q. And you read it as an 8?

A. I read it as an 8, yes.

Q. You weren't reading all 5's in this document as 8's, were you?

A. I am not aware whether there are other 5's in this document.

Q. Well, there is a -- on the second page, there is a number that you did translate or take over as a 5; is there not? About the sixth line down, 83 Road 596?

A. I see that, yes.

Q. So you weren't just reading every 5 as an 8; correct?

A. I am trying --

THE COURT: We are not going to take the time to review the document now. If you have other things you want to point him to, you may.

BY MR. GUNN:

Q. All right. You see the sixth line down on the second page of that Exhibit B?

A. Yes. I am looking for it in Khmer.

Q. You are going back to Exhibit A?

A. Yes.

Q. And in the Khmer it's on the sixth line, about three-quarters or two-thirds of the way over; right?

A. I see it. I see it now, yes.

Q. And that 5 you -- that number was a 5 that you read as a 5; right?

A. Correct.

Q. So you weren't just reading every 5 as an 8; right?

A. No.

Q. Now, going back, you said it was a typographical error, you thought, the 19th instead of the 17th?

A. I didn't say I thought that. I said that I typed that.

Q. All right. And you -- when you say it was a typographical error, are you saying that you knew -- you meant to put the 17th and you accidentally put the 19th?

A. I don't know.

Q. In fact, you thought it was the 19th, didn't you?

A. No.

Q. Well, you had in the text a reference to something on the 18th; right?

A. Yes.

Q. So it wouldn't have made sense to have the 17th at the top, would it?

A. I wasn't checking consistency, I was only translating and typing.

Q. Well, when you interpret a document, you have to look at

context and things like that; right?

A. Yes.

Q. And in this document, part of the context was it had a reference to information provided on June 18th, at least as you read it at the time; right?

A. Yes.

Q. And date at the top pretty clearly in context is the date the report, or whatever the document was, was prepared; right?

A. Yes.

Q. So it wouldn't make sense for that date to be earlier than a document it refers to in the text; right?

A. The date at the top?

Q. Yes.

A. Yes. That's correct.

Q. So, in fact, isn't it true that you put the 19th at the top because you thought it was the 19th?

A. I don't know. The number -- the 17 in the Khmer is very clearly a 7. It's a Khmer 7. It's not -- unmistakable from a 9.

Q. It's a hand-printed Khmer number; right?

A. Yes.

Q. It's not a preprinted or typed number; correct?

A. That's correct.

Q. So it depends on how you read the Khmer printing; right?

A. Not in this case. It's unmistakably a 7.

Q. Khmer printing, like English printing, can sometimes be difficult to read; right?

A. It can sometimes, yes.

Q. And in this case you read that as the 19th for some reason initially; right?

A. I -- I don't know the reason why that -- it's possible that the header of this document was copied and pasted from another header and I forgot to change the details because much of the documents have the same header.

Q. But the 19th didn't make sense -- the 17th -- well, strike that.

The 450/06, that is also hand-printing in Khmer?

A. It doesn't say that in Khmer. It says 449.

Q. All right. The --

A. And it's clearly --

Q. -- the printing or the text that you translated as 450/06 is hand-printing in Khmer as opposed to typing or pre-printing; correct?

A. Yes.

Q. And at the time you read that as 450/06; correct?

A. I typed -- I typed it as 450/06. I don't know that I read it. Again it's possible that it was copied and pasted from the header of another document and I forgot to change the details for this particular page. Many of the documents have the same header so it makes no sense to translate them over and over

again.

Q. But you typed it or retained it as 450/06 --

A. Yes. That's correct.

Q. -- correct?

THE COURT: Mr. Madden, please wait until Mr. Gunn completely finishes his answer because the court reporter can't take the two of you at the same time.

THE WITNESS: Okay.

THE COURT: Let me make sure I understand. Are you saying that within this same document, Exhibit A, certain numbers are written in Khmer but as numbers as opposed to spelling out the word, and other numbers are written in Arabic?

THE WITNESS: There are two ways to write numerals in Khmer. There are Khmer numerals, 0 through 9 with different shapes, and they also use Arabic numerals, and sometimes in the same document they will move back and forth between them.

THE COURT: Thank you.

Mr. Gunn.

BY MR. GUNN:

Q. And here some of the numbers are in Khmer numerals and some are what we call Roman or Western numerals; correct?

A. Yes.

Q. There were other 8's in this document; correct? In Roman Western numerals?

THE COURT: Wait a minute. Roman numerals is an

entirely different thing.

MR. GUNN: From Western, Your Honor?

THE COURT: I don't know what you mean by Western. I have never heard --

MR. GUNN: I am sorry. According to Wikipedia, which I checked last night, the Roman numerals, Western numerals are standard numerals --

THE COURT: Don't refer to Wikipedia, please. Roman numerals are the I's and the X's -- the I's and the X's and the V's --

MR. GUNN: You are right. I meant Arabic numerals, Your Honor.

THE COURT: That's what I thought.

MR. GUNN: That was my mistake. My mistake, Your Honor.

THE COURT: Do you have another question then?

MR. GUNN: My question was whether there were other -- whether there were 8's in this Cambodian language document in Arabic numeral form that he translated as 8's.

THE WITNESS: Yes.

MR. GUNN: If I could have one moment, Your Honor, to be consult my esteemed co-counsel.

THE COURT: Yes.

MR. GUNN: No further questions of this witness, Your Honor.

THE COURT: Ms. Donahue?

REDIRECT EXAMINATION

BY MS DONAHUE:

Q. Mr. Madden, if you could turn to Exhibit A --

A. Okay.

Q. -- which you have before you, and I just am putting on the screen -- is the section that I'm pointing to the date?

A. Yes.

Q. Thank you. What language is that date written in?

A. Khmer.

Q. Are those Arabic numerals or Khmer numerals?

A. Khmer numerals.

Q. In Khmer, what does that say?

A. It says, "Phnom Penh, 17 June, 2006."

Q. Is there any doubt at all in your mind that that says 17 June rather than 19 June?

A. No.

Q. Looking again at Exhibit A, the first page on the upper left, am I pointing now to numbers?

A. Yes.

Q. Are those numbers in Khmer or in English?

A. They're in Khmer.

Q. What are those numbers in Khmer?

A. 449.

Q. Is, in fact, that number 449 and then a slash 06?

A. I believe so, yes.

Q. Is there any doubt in your mind that in Khmer that reads 449, not 450?

A. No. It cannot say 450. It clearly does not say 450.

Q. And finally I'd like to turn your attention to almost halfway down the page. You were asked a number of questions about whether something was a 5 or an 8. Am I pointing to the number in question right now?

A. Yes.

Q. And is that number -- does that number appear to you to be written in Khmer or in Arabic?

A. It's an Arabic numeral.

Q. And when you interpreted this document, you read that as one-eight, 18; is that correct?

A. Yes.

Q. And today as you look at it, is it your view that that could be either one-five or one-eight?

MR. GUNN: Objection. Leading, Your Honor.

THE COURT: Well, actually if it's an Arabic numeral, I can figure it out myself, but you can go ahead and answer the question.

THE WITNESS: Will you ask that again, please?

BY MS DONAHUE:

Q. Sure. Looking at it today, is it your opinion that it could be a one-five, 15, or a one-eight, 18?

A. Yes.

Q. Setting aside the documents, when -- when you did this interpretation, you were employed for a company that was retained by the Department of Homeland Security to conduct translations; is that correct?

A. Yes.

MS. DONAHUE: I have no further questions.

THE COURT: Mr. Gunn?

MR. GUNN: Nothing further, Your Honor.

THE COURT: May the witness be excused?

MS. DONAHUE: Yes, Your Honor. Thank you.

MR. GUNN: Yes, Your Honor. Your Honor, we would want him available for trial, and we don't have a subpoena with us because we didn't know his name. Would the Court order him -- I mean, obviously I can apply to the Court for a separate subpoena if I need to, but if the Court would order him to return or be subject to subpoena on April 8th. I don't know if the Court would be open to doing that or not. We could obviously place him on call.

MS. DONAHUE: Your Honor, the Government is happy to consult with Mr. Madden and make -- see if it's possible to make arrangements for him to travel to Los Angeles for the -- to testify at trial. Obviously, not to sit here on April 8th, the first day of trial. But --

MR. GUNN: Actually, Your Honor, maybe it's better for

me to file an application because you need an order for the travel expenses for the marshals, and I will just handle it that way.

THE COURT: Okay.

Thank you, sir. You are excused for now.

MS. DONAHUE: Thank you, Your Honor.

MR. GUNN: If we could have -- I think it makes sense to go with the next interpreter next, Your Honor.

THE COURT: All right.

MR. GUNN: Your Honor, 112 just got handed back to me, but we may need it for the next witness.

THE COURT: Okay. You may return it to our CRD.

Sambo Ly, Government's witness, was sworn

THE CLERK: You may be seated. Please state your first and last name and spell your first and last name for the record.

THE WITNESS: Sambo Ly, S-A-M-B-O, L-Y.

THE COURT: You may proceed.

CROSS-EXAMINATION

BY MR. GUNN:

Q. Is it Ms. Ly or Ms. Sambo?

A. Ms. Ly or Ms. Sambo is fine.

THE COURT: No, no. Sambo is not fine. Ms. Ly.

BY MR. GUNN:

Q. I want to make sure I have the last name correct. I know

sometimes the . . .

Ms. Ly, you submitted a declaration in this matter in which you suggest several corrections to an English language translation of a Cambodian language document; correct?

A. Yes.

Q. And one of those corrections is not actually a translation issue because it's just reading an Arabic numeral; correct?

A. Yes.

Q. You thought an Arabic numeral was one-five where it had been translated as one-eight?

A. Yes.

THE COURT: Do you know what he's talking about? We are not trying to trick you here. Do you remember that specific --

THE WITNESS: Yes. I remember that specific date.

MR. GUNN: Maybe we could have Defense Exhibit 112 placed in front of her, Your Honor. We will have it for reference.

Q. That's your declaration with the exhibits, Ms. Ly, so if you need to look at it to refresh your memory about anything, please just tell me you need to look at it. But if you would tell me that or tell the Court that before you look at it, I would appreciate it.

THE COURT: In other words, don't look at it yet.

THE WITNESS: Okay.

BY MR. GUNN:
Q. Now, there were two other items in the document that you corrected, in your opinion; correct?
A. It's not in my opinion. It's the correct date.
THE COURT: In legal terms, that's your opinion.
THE WITNESS: Okay.
BY MR. GUNN:
Q. Someone else had translated it differently; right?
A. Yes.
Q. So according to them, the correct version was different; right?
A. Yes.
MS. DONAHUE: Objection. That calls for speculation.
THE COURT: It's a bench trial so, yes, that was an improper question, not pejoratively speaking, but I think I can filter out the irrelevant stuff.
BY MR. GUNN:
Q. One of the things you changed was you changed 19 June 2006 to 17 June 2006; correct?
A. Yes.
Q. And another thing you changed was 450/06 to 449/06; correct?
THE COURT: The witness is looking at the document, which is perfectly fine with me because I don't have any problem with it. If you have a problem with it and you want her to

testify in the abstract to what she remembers, then let's make sure she's doing what you want her to do.

BY MR. GUNN:

Q. I would prefer you turn it over, Ms. Ly, and don't look at it unless you need to look at it to remember something and then tell me or the Court before you do.

All right. Will you do that?

A. Okay.

Q. Okay. Thank you.

Your Honor, could I have a blank piece -- I have lined paper, and I will use that if there is nothing else. Do we have any blank paper that could be placed in front of the witness? Otherwise --

THE COURT: I don't keep supplies up here.

MR. GUNN: Could I approach and have a blank piece of paper placed in front of the witness?

THE COURT: You may.

MR. GUNN: A lined blank piece of paper.

Q. Is the -- what I would like you to do on -- I have just handed -- you have been handed a blank lined piece of paper; correct?

A. Yes.

Q. What I would like you to do is on the first line of that piece of paper, I would like you to write 19 June 2006 in Khmer.

THE COURT: Do you have a pen?

THE WITNESS: Yes, I do.

MR. LULEJIAN: Your Honor, I am going to object to this line of questioning. She has been retained and her declaration says she is just translating it. What Mr. Gunn is to asking her to do is to put it in her own handwriting, which may be separate from the other handwriting, as we have just heard.

THE COURT: It may, indeed, and if this were a jury trial, I might have different thoughts on the way this whole this thing is going, and I am sure you would have been popping up a lot more already, and I appreciate the fact that you haven't.

However, since this is a motion to suppress, as I recall, I think it may or may not, but it may be helpful to the Court to have her, in her own handwriting, recognizing that everybody's handwriting is different in every language, to write out the numerals for me. So I am going to allow it, and it may -- it may or may not help me, and I will determine that after I see it.

Do you have a pen, ma'am?

THE WITNESS: Yes.

THE COURT: Okay, great. Would you do what Mr. Gunn asked you to do.

THE WITNESS: Could you repeat that again?

BY MR. GUNN:

Q. On the first line of this paper I would like you to write 19 June 2006 in Khmer.

THE COURT: Well, Khmer words or Khmer numerals?

BY MR. GUNN:

Q. I am sorry. Using Khmer numerals for the numbers and Khmer words for the word "June."

I would then like you to skip one line down so you are on the third line of that piece of paper and write 17 June 2006 using Khmer numerals and the Khmer word for "June."

Then just so it's clear separately, I would like you to skip down to the tenth line of that piece of paper and write in Khmer numerals 450/06.

MR. LULEJIAN: Excuse me, Your Honor. If I could suggest, so we have a clean record, perhaps she can, off to the side, write what she is writing in English just so we can track it later on.

MR. GUNN: That's fine, Your Honor.

MR. LULEJIAN: It should have the Khmer and then the English.

THE COURT: That's fine.

MR. GUNN: Then we don't have to add lines in the record.

Q. Did you do that -- oh. Did you do the 450/06 on the tenth line?

A. Yes.

Q. All right. Two lines below that, so you skip one line and then write on the next line, I would like you to write in Khmer numerals 449/06.

And, Your Honor, could I have what she has written marked as Defense Exhibit 113.

THE COURT: Yes.

MR. GUNN: And if I could offer it into evidence.

THE COURT: Any objection?

MR. LULEJIAN: No objection from the Government, Your Honor.

THE COURT: Thank you. Take will be entered.

(Defendant's Exhibit 113 was marked and received)

MR. GUNN: Could I retrieve it, Your Honor, so, one, I can see it and, two, I can put it on the ELMO so everyone else can see it. I don't think I have any questions about this. I just would have argument so I don't think I need to put it on the screen unless --

THE COURT: Then return it, please, to the clerk so it doesn't get lost.

MR. GUNN: If the clerk would mark it as 113.

THE COURT: I am sure the clerk will do her job.

MR. GUNN: I have no further questions.

THE COURT: Ms. Donahue or Mr. Lulejian?

REDIRECT EXAMINATION

BY MR. LULEJIAN:

Q. Ms. Ly, I am going to ask you to take a look at the document that has been marked as Defense Exhibit 112, please, and I am going to put a copy up on the ELMO.

MR. GUNN: If the record could reflect which part of the document so the record is clear, Your Honor.

BY MR. LULEJIAN:

Q. Ms. Ly, I am going to ask you to take a look at the right-hand corner where the first date in question is. I am going to point to it on the screen.

A. It says June 17, 2006.

Q. Is there any doubt in your mind that is the correct date?

A. Could you repeat that?

Q. Is there any doubt in your mind that that is the correct date?

A. That is the correct --

THE COURT: The question doesn't work.

BY MR. LULEJIAN:

Q. I'm sorry. Is June 17th the correct date?

A. Yes.

THE COURT: "Correct date" doesn't have a meaning. You mean is it a correct translation of the date written on the document? She doesn't know when the document was actually prepared.

MR. LULEJIAN: That is correct, Your Honor. Let me rephrase the question so we have a clear record.

Q. Is June 17th the correct translation of that date?

A. Yes.

Q. And going to the left-hand portion of the top of page where there is a number, is the correct translation of that date 449/06?

A. Yes.

Q. And going to the middle of the document -- as that is an Arabic number, Your Honor, I will let the Court make the decision on that.

THE COURT: Thank you. Mr. Gunn?

MR. LULEJIAN: I have no further questions.

MR. GUNN: Nothing further.

THE COURT: May the witness be excused?

MR. GUNN: Your Honor, could she remain just in case, based on my next cross-examination of the other witnesses, I need to ask her about another Cambodian language document that we translated? Unless the Government will let me put those documents into evidence without needing an interpreter to check them.

MR. LULEJIAN: Your Honor, I have no clue what Mr. Gunn is talking about. She is here simply to testify about this one document. I think we would have some objection if Mr. Gunn is going to show her a document that she may or may not have translated or seen before today.

THE COURT: Perhaps further explanation would be in

order.

MR. GUNN: Well, Your Honor, the Government has provided me with a number of Cambodian language documents in discovery. I may use one or two or three of those documents in cross-examining the other witnesses.

THE COURT: The other witnesses today or the other witnesses at trial?

MR. GUNN: The other witnesses today.

THE COURT: Okay.

MR. GUNN: So if there is some issue about one of those documents and the translation of it, then I would like to have her available, unless there is not going to be -- I mean, the Government provided the documents obviously in discovery.

MR. LULEJIAN: Your Honor, we have a Cambodian translator here for the other witnesses. And she was going to be sworn in as the interpreter. I think this is asking Ms. Ly to go beyond what she is here for today.

MR. GUNN: That would be all right, Your Honor. That would be all right, assuming the documents weren't translated by her. I don't know which documents were translated by which translator but that would be all right.

THE COURT: I think that means you're excused.

THE WITNESS: Thank you.

MS. DONAHUE: Your Honor, the remaining witness is Undersecretary -- the Undersecretary Koeut Rith, who submitted

a -- who submitted declarations in this case. He is here from Cambodia. He speaks conversational English and is obviously fluent in Khmer.

The Government has retained a Khmer interpreter for him because since he is testifying, he is more comfortable testifying in his native language than he is in English. Although having spoken with him, I can tell you his English is fairly good.

He traveled with another minister from the Cambodian Ministry of Defense who is fluent in both Khmer and English. He has explained to me that some of the legal terms are terms which a court-certified interpreter here may or may not be familiar with, and so we thought it might be prudent, if the Court would allow it, to allow the other gentleman from Cambodia to listen to the testimony solely for the purpose of ensuring that our interpreter is accurately interpreting any legal terms that may come up.

And if he hears something which he believes has just been inaccurate, we would place him under oath obviously and ask him and allow the defense to question him. We just want to ensure that the testimony is accurately conveyed to the Court. And so we would ask if the second minister could remain in the courtroom.

THE COURT: He is not a witness, is he?

MS. DONAHUE: He is not a witness.

THE COURT: He certainly can remain --

MS. DONAHUE: Should he tell us that he heard something translated improperly, we might ask to present that to the Court, which technically would make him a witness, which is why I wanted to raise this with you.

THE COURT: He would be an expert witness --

MS. DONAHUE: Yes.

THE COURT: -- and it would be required for his expertise to be implemented to be in the courtroom at this time, so I don't see a problem. Mr. Gunn, do you?

MR. GUNN: The only concern I have, Your Honor, is I think the general rule is for better or for worse the Court interpreter's translation of the testimony is binding. That is certainly what we tell juries all the time. So I'm not sure his testimony would be admissible. I guess we can address that if and when the question arises.

THE COURT: Well, I think the court interpreter's testimony is the testimony unless the judge says otherwise. I don't have any concern at all about what Ms. Donahue has said, and it occasionally does happen, in my experience, that court interpreters will disagree, and then the Court has to resolve the issue. I have no concern at all about that procedure, especially since it's only me.

MR. GUNN: Fine. Well, I will just note my objection if and when it arises.

MS. DONAHUE: Thank you, Your Honor.

Koeut Rith, Government's witness, was sworn

THE CLERK: Please be seated.

THE COURT: We don't have another chair there for the interpreter?

THE INTERPRETER: That's okay, Your Honor. I can just kind of stand by.

THE COURT: Are you one of our court panel?

THE INTERPRETER: I'm sorry?

THE COURT: Are you a member of our court panel?

THE INTERPRETER: No, I am not.

THE COURT: We need to swear in the interpreter.

Interpreter sworn by Courtroom Deputy Clerk

THE COURT: That doesn't sound quite right.

Interpreter sworn by the Court

THE COURT: Any objection to the oath, Mr. Gunn?

MR. GUNN: No, Your Honor. I trust the Court.

THE COURT: Thank you. Did we get the appearance of the interpreter?

THE INTERPRETER: My name Mory Vann Paigne. Would you like me to spell that?

THE CLERK: Yes, please.

THE INTERPRETER: M-O-R-Y, V-A-N-N, last name is P -- as in "Paul" -- A-I-G-N-E.

THE COURT: Thank you. And would the witness please

state and spell his name?

THE WITNESS: Koeut, K-O-E-U-T. Last name R-I-T-H.

THE COURT: Thank you. You may proceed.

CROSS-EXAMINATION

BY MR. GUNN:

Q. So I know how to correctly address you, your family name is Rith?

A. No. Koeut.

Q. So I should address you as Mr. Koeut?

A. Yes.

Q. Thank you. Mr. Koeut, you talk in your declaration about your training in Cambodian law; correct?

A. Yes.

Q. Am I correct that the Cambodian law system is what we call a civil law system as opposed to a common law system?

A. Correct.

Q. And in that system, there are laws that are passed by a legislative body or some executive entity; correct?

A. Yes.

Q. And if there is something in those laws that is unclear or something in those laws that's left out, what body or entity interprets the laws and decides what they mean?

A. The judge -- the Court.

Q. All right. And are there published decisions by the Court that people look to to decide in future cases what something

means, or does the Judge just decide on his own in every case?

A. I don't understand.

Q. Perhaps I could give you an example from our system and ask you if that's the way it works in Cambodia. In our system, if a law is unclear, a court or a judge -- usually a higher court or a higher judge -- interprets what the law means and writes something called an opinion that people then use in future cases to judge what the law means.

Is anything like that done in Cambodia?

A. In Cambodian justice, when it is not clear, the judge decide -- decide on his own when there is a complaint in each individual cases.

THE INTERPRETER: I apologize, Your Honor. May the Court inquire as a technical term?

THE WITNESS: In Cambodian justice, when there is not enough, the Court will decide properly what it is. The Court will fill in.

THE COURT: Mr. Koeut, let me ask you to do two things. I understand that you are really speaking for the interpreter to hear, but I think we also have someone else who we want to hear you speak in Cambodian as well.

And let me try to ask the question. Once the judge makes the decision, does he write it down so that other people in a different case will know what it is?

THE WITNESS: Yes. Yes.

THE COURT: Once the judge makes the decision and writes it down, do other judges have to follow it?

THE WITNESS: Not -- it doesn't take every other judges to decide. Most of the decision sometimes are being decided by lower judge below, not the superior. Sometimes it is the Superior Court judge who decide.

THE COURT: And when the Superior Court judge decides, do all the lower court judges have to decide the same way in the next case?

THE WITNESS: Yes.

THE COURT: Mr. Gunn.

MR. GUNN: Thank you, Your Honor.

Q. And those decisions by the Superior Court are written down somewhere so lower judges and other people like prosecutors and defense attorneys can look at them?

A. Just look at them.

MR. GUNN: Your Honor, I am having a little trouble hearing the interpreter. If the Court could ask her to speak a little louder.

THE COURT: Please. We can get you a chair. I'm not sure it will help.

THE INTERPRETER: That's okay, Your Honor. For now.

BY MR. GUNN:

Q. There is a requirement that a defendant be present at a search in Cambodian law; correct?

THE INTERPRETER: I'm sorry. Can you repeat the question?

BY MR. GUNN:

Q. Yes. There is a requirement that the defendant be present -- I'm sorry. There is a requirement that the defendant be present at a search under Cambodian law; correct?

A. Who is the defendant?

Q. The owner of property that's being searched or the processor of the property that's being searched.

A. Yes. But there are certain circumstances that are different.

Q. That's in Article 20 of the Code of Criminal Procedure; correct?

A. Yes.

Q. And it says if possible; correct?

A. Yes.

Q. And -- but that applies to any search, if possible; correct?

THE INTERPRETER: I'm sorry. Can you repeat that?

BY MR. GUNN:

Q. But that article applies to any search, if possible; correct?

A. Can you clarify that?

Q. Well, Article 20 is the article that requires that the owner or possessor of property be present at a search; correct?

A. Like I told you, the defendant, according to Article 20, it depends on certain circumstances.

Q. Well, actually Article 20 does use the words "if possible"; right?

THE COURT: I doubt there is an article in Cambodia or any other country that says nothing but "if possible," so I think you really need to make your questions more clear, especially when we're using the services of an interpreter.

BY MR. GUNN:

Q. What Article 20 says is, "If possible, they" -- referring to searches -- "should take place in the presence of the suspect and two witnesses from among the suspect's family members"; correct?

A. Yes.

Q. And except for the words "if possible," Article 20 doesn't have any other exceptions language, does it?

A. No.

Q. And there is no court decision that you have referred to in your declaration, no Superior Court decision, that adds any exceptions, other than the words "if possible," is there?

A. In that -- in that article, it is recognized by everyone, including the Court.

Q. What is recognized by everyone, including the Court?

A. When the judge decide about that article, it is through the evidence. When he decided to prosecute -- to prosecute or

punish the defendant, meaning that he is -- he accepted it that it is the evidence. Okay. Yeah.

Q. In Paragraph 8 of your --

I'm sorry, could I have one moment, Your Honor?

THE COURT: Yes.

BY MR. GUNN:

Q. You filed a second declaration in this case just recently; correct? Or signed a second declaration in this case just recently?

A. I don't understand. Can you clarify the question again?

THE COURT: I don't think he filed it.

BY MR. GUNN:

Q. You signed a second statement in this case just recently, didn't you?

A. What date?

Q. February 4th.

A. Correct.

Q. And you talk in Paragraph 8 of that declaration about the correct placement of the words "if possible" in a translation of Article 8; correct?

A. Yes.

Q. You're not a professional translator; right?

A. I am not a professional, but I know the meaning.

Q. You know the meaning in Cambodian; correct?

A. Correct.

Q. But your English isn't perfect; correct?
A. I can understand.
Q. Right. You speak it at what you describe as a conversational level; correct?
A. I can read. But not as a conversational.
Q. All right. And you're not an expert about the meaning of Article 8 in English; right?
MS. DONAHUE: Objection, Your Honor. I know -- Article 8 is incorrect. And "expert" is vague.
MR. GUNN: I'm sorry. Let me withdraw the question.
Q. Because your English isn't perfect, you don't know the exact perfect translation of Article 20 from Cambodian into English, do you?
A. If I read in English, I can understand what it really means in Cambodian.
Q. You do agree -- well, strike that.
You do agree the words "if possible" are in Article 20; correct?
A. Yes. Yes.
Q. You just disagree about where they should be placed in the English translation?
MS. DONAHUE: Objection to the word "disagree."
THE COURT: Sustained.
BY MR. GUNN:
Q. There is a search warrant requirement in Cambodian law;

correct?

A. Yes. Under certain circumstances.

Q. And what are those circumstances when a warrant is required?

THE COURT: I don't want an explanation of Cambodian law on search warrants. If one were to do that for American law, it would take probably -- at least weeks. So if you have a specific question, go ahead and ask it.

MR. GUNN: I'm sorry. I want to -- did I interrupt the interpreter?

THE INTERPRETER: No. Go ahead.

BY MR. GUNN:

Q. How much evidence is needed to get a search warrant under Cambodian law?

A. When there is a person that's under suspicion, in order to identify -- I apologize -- commit a crime --

THE INTERPRETER: Can you repeat the question again?

BY MR. GUNN:

Q. Maybe I can rephrase the question. Some suspicion is needed for a search warrant to be issued under Cambodian law; correct?

A. Correct.

Q. How much suspicion is needed? Is there a way to describe that?

A. It depends on the prosecutor -- the discretion of the

prosecutor.

Q. Are there any limits at all on that discretion?

A. When there is a crime that's committed or he knows something about it, he examine the fact. If he thinks that there is a search required, he is able to decide without any limits.

Q. Is there a requirement -- strike that.

Is there anything in the Cambodian Code of Criminal Procedure that says that?

A. Clarify it again.

Q. You have a copy of the Cambodian Code of Criminal Procedure that was in effect in 2006 attached to your declaration; correct?

A. Correct.

Q. Is there anything in that code about the prosecutor not having any limits on his discretion to issue a search warrant?

A. In the Cambodian justice law, the prosecutor is the law.

THE INTERPRETER: I apologize --

MR. GUNN: One thing I like about their system and one thing I don't, Your Honor.

THE INTERPRETER: Strike that. I apologize, Your Honor. There is technical term that I may have to inquire.

THE COURT: And we may have someone who can assist us, Mr. Gunn. I don't know how you want to approach this. But now we have an interpreter who is admitting she doesn't understand

the technical term. I don't know if this witness is able to explain it. If you want to try that and then we can see alternatively whether we have another person who can assist us.

THE WITNESS: In the Cambodian justice, the prosecutor decide -- the prosecutor decide -- decides the charges. All prosecution.

BY MR. GUNN:

Q. Is there a requirement under Cambodian law that the search warrant be read to the person whose home is being searched?

A. What do you mean being read?

Q. Most of the time or at least in many circumstances, there needs to be a search warrant for there to be a search of someone's property; right?

A. Yes. Under certain circumstances.

Q. When there has to be a search warrant or when there is a search warrant, does it have to be read to the person whose house is being searched at the time of the search?

A. Yes.

Q. Is there a requirement that the prosecutor be present during the search?

THE INTERPRETER: The prosecutor? I'm sorry. Could you --

BY MR. GUNN:

Q. You said search warrants are issued by prosecutors; correct?

A. Yes. Yes. At certain circumstances. Sometimes.

Q. When the prosecutor issues a search warrant, is there a requirement that the prosecutor be present during the search?

A. There is no reason why he cannot be there. There is no -- there is nothing in the law that says he cannot be there.

Q. In fact, Cambodian law says he does have to be there; correct?

A. He doesn't have to.

THE INTERPRETER: May the interpreter inquire?

THE COURT: Yes.

(The witness and interpreter confer in Cambodian)

THE WITNESS: He doesn't have to. Sometimes he can, though. Sometimes he doesn't have to be there.

MR. GUNN: Could I have one moment, Your Honor?

THE COURT: Yes.

MR. GUNN: No further questions, Your Honor.

MS. DONAHUE: Your Honor, may I have just a moment to see if the -- there is any issue --

THE COURT: Why don't we take a ten minute break.

(Recess taken)

THE COURT: Thank you. Mr. Koeut, you are still under oath. Ms. Donahue.

MS. DONAHUE: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. DONAHUE:

Q. Sir, you were asked some questions about whether or not the prosecutor has to be present when a search warrant is executed.

A. Yes.

Q. Is the prosecutor's presence required by Cambodian law?

A. No. But at his own discretion, he can decide whether he should or should not be there. There is no law that -- obligation -- there is no obligation that required him to be there.

Q. And does Cambodian law permit a representative or deputy from the prosecutor's office to be present when a search warrant is being executed?

A. Represent from where?

Q. My question is is it permissible to have a deputy or representative from the prosecutor's office present when a search warrant is executed?

A. When there is a search warrant, Ministry of Justice -- the official police, judicial police, they can -- they can issue a search warrant, but on their own, they can search without -- without the presence of the prosecutor.

THE INTERPRETER: I apologize, Your Honor.

MS. DONAHUE: I have no further questions.

THE COURT: Mr. Gunn?

MR. GUNN: No, Your Honor.

THE COURT: May the witness be excused?

MS. DONAHUE: Yes, Your Honor.

MR. GUNN: Yes, Your Honor.

THE COURT: Thank you, sir. You're excused.

MR. GUNN: Yes, Your Honor. I believe Mr. Phillips is the last.

MS. DONAHUE: Your Honor, since he is the last witness, can the other witnesses and ICE agents be present in the courtroom?

MR. GUNN: I would rather not, Your Honor, just in case --

THE COURT: Yes. Is there any possibility they will be testifying at some other proceeding? If they are not witnesses, this is a public courtroom. If they might be witnesses, let's not cause any problems we don't need to cause.

MS. DONAHUE: That's a good point, Your Honor.

Gary Phillips, Government's witness, was sworn

THE CLERK: You may be seated. Please state your first and last name and spell your last name for the record.

THE WITNESS: Good morning, everybody. My name is Gary Phillips, P-H-I-L-L-I-P-S.

THE COURT: You may proceed.

CROSS-EXAMINATION

BY MR. GUNN:

Q. Agent Phillips, you were the investigating agent in this case in Cambodia; correct?

A. Yes, sir.

Q. You have testified; previously in these proceedings actually; correct?

A. Yes, sir.

Q. You were present during -- you were present at the house Mr. Pepe rented on several occasions; correct?

A. Not several. Two.

Q. Well, you were present on the day he was arrested and there was a search conducted; correct?

A. Yes.

Q. And then you were present the next day expecting the Cambodian authorities to be there, but it ended up they didn't show; correct?

A. Yes, sir.

Q. And then you were there a third time when they searched the house again; correct?

A. Yes.

Q. So three times?

A. Yes.

Q. And the first of those occasions, the occasion on which Mr. Pepe was arrested and a search was conducted was actually June 16th; correct?

A. No.

MR. GUNN: Your Honor, could I have an exhibit marked for identification?

THE COURT: Yes.

MR. GUNN: Thank you. I have an extra copy for the Court. If we could have this marked as -- I think next in order would be 114.

THE COURT: Okay.

THE CLERK: Yes.

(Defendant's Exhibit 114 was marked)

MR. GUNN: If I could have 114 placed in front of Agent Phillips, Your Honor.

Q. Agent Phillips, Defense Exhibit 114 is a report you prepared in connection with the investigation in this case; correct?

A. Yes.

Q. It's an official ICE or Immigration and Customs Enforcement report; correct?

A. Yes.

Q. It's part of the formal record in this case?

A. Yes, sir.

Q. It's important -- you are actually trained to write reports like this; correct?

A. Yes, sir.

Q. And it's formal policy that you prepare reports like this to document and memorialize events?

A. Yes, sir.

Q. Important that they be accurate?

A. Yes.

Q. Important that they be complete?
A. Yes, sir.
Q. And this is a report that talks about the arrest and -- of Mr. Pepe and the search of his house the first time; right?
A. May I read it?
Q. Yes. Maybe in -- yes.
A. Yes, sir. Go ahead.
Q. And it talks about receiving information on June -- the first paragraph talks about you receiving information about surveillance on Michael Pepe's residence on June 16th; correct?
A. It does, but it's wrong.
Q. That wasn't my question.
A. I'm sorry. What was your question?
Q. My question was the report talks about you receiving information on June 16th about Mr. Pepe's house being placed under surveillance; correct?
A. Yes. But my answer is the same, though.
Q. But the report says that; right?
A. Yes, it does.

THE COURT: He answered it, Mr. Gunn, and I heard it. So there is no jury so let's move on.

BY MR. GUNN:
Q. And then the report talks about Mr. Pepe -- the second paragraph then talks about Mr. Pepe being arrested; correct?
A. May I read the second paragraph, sir?

Q. Yes.
A. Yes, sir.
Q. And then the third paragraph talks about Mr. Pepe's house being searched; right? The third and fourth paragraph; correct?
A. Yes, sir, it does.

MR. GUNN: Your Honor, I would offer defense Exhibit 114 into evidence.

THE COURT: Any objection?

MS. DONAHUE: No objection.

THE COURT: That will come into evidence. Thank you.

(Defendant's Exhibit 114 was received)

BY MR. GUNN:

Q. You took a number of photos in the investigation -- in this case; correct?
A. Yes, sir.
Q. And that included photos of the house on the occasions when you were there; correct?
A. Yes, sir, it did.
Q. It included photos from the first search of the house; correct?
A. Yes, sir.

MR. GUNN: Your Honor, I have a --

Q. And you would recognize those photos if you saw them?
A. I would have to see them, sir.

MR. GUNN: Your Honor, I have a CD in our laptop

computer here that's a folder that was copied from a discovery CD provided by the Government. If I could have it identified as Defense Exhibit 115, but I have it in the computer right now so we can show photos. If I could --

THE COURT: Any objection?

MR. GUNN: -- provide it to the clerk at a later time.

MS. DONAHUE: No objection. And I probably missed it. If you could just identify for the record which CD it is?

MR. GUNN: It is -- it is from a discovery CD provided by the Government of scanned evidence, and it's specifically a folder with the name "2007, 271300001601 LI 3," which I believe refers to an ICE custody property form.

THE COURT: All right.

(Defendant's Exhibit 115 was marked)

MR. GUNN: Your Honor, if I could have our computer technician, Mr. -- if I could put it on the screen.

If I could have him proceed -- if I could have him go to pics from Photo Album 2 on the screen and open up that subfolder. And if I could have him go to -- if I could have him just scroll down to Pic 616093 with the cursor. 616093. Go up a little bit. And if you would highlight that.

Q. Okay. Do you see a file there -- it's called P6160093, Agent Phillips?

A. Yes, sir, I do.

Q. With a date taken of 6/16/2006?

A. Yes, sir. I do.

MR. GUNN: Your Honor --

MS. DONAHUE: Objection to the characterization of it as date -- I guess the characterization of "date taken."

BY MR. GUNN:

Q. It's a file that has a quote, date taken, unquote, attached to it on computer of 6/16/2006, correct, Agent Phillips, whatever that means?

A. I guess.

MR. GUNN: Your Honor, could I have that photograph opened?

THE COURT: Yes.

BY MR. GUNN:

Q. That's a photograph -- actually, could we move back and go down to the arrow -- that's a photograph from the search of Mr. Pepe's house on June 7th -- on the first search of Mr. Pepe's house; correct?

A. I don't know.

MR. GUNN: Would you move to the -- could I have Mr. See, our computer technician, move to the next photograph, Your Honor?

THE COURT: Yes.

BY MR. GUNN:

Q. That's a photograph from the first search of the house; correct?

A. I don't know if it's from the first search or not.

Q. It's a photograph from a search of the house; correct?

A. Yes.

Q. Could I have Mr. See go to the next photograph. That's a photograph from the search in Mr. Pepe's house; correct?

A. Yes, sir.

Q. And for the record, that photograph has a name in the upper left-hand corner of "P6160095.JPG"; correct?

A. Maybe it's me, but this is a bit blurry. If I can play with this a little bit. But P6160093, it looks like, or 95, can't tell.

Q. Either 93 or 95?

A. It's a bit blurry. I'm sorry.

Q. But it's either 93 or 95?

A. Yeah.

MR. GUNN: Could I have Mr. See go to the next photograph, Your Honor?

THE COURT: Yes.

BY MR. GUNN:

Q. This is another photograph from the search of Mr. Pepe's house; correct?

A. Yes, sir.

Q. With "P6160096.JPG" is the name; correct?

A. Yes.

MR. GUNN: Could I have Mr. See go to the next

photograph, Your Honor?

THE COURT: Yes. You don't need to ask, Mr. Gunn.

MR. GUNN: I'm sorry?

THE COURT: You don't need to ask.

MR. GUNN: Very good, Your Honor.

Q. The next photograph has the name "P6160097.JPG"; correct?

A. Yes.

Q. It's another photograph of Mr. Pepe's house; correct?

A. Yes.

Q. During a search; correct?

A. I don't see anyone in the photo, but it's the same bed, yes.

Q. It's a photo you took; correct?

A. I don't know if I took this particular photo.

MR. GUNN: Would you go to the next photo, Mr. See?

Q. And this is a photo named "P6160099.JPG"; correct?

A. Yes.

Q. It's another photograph from the search of Mr. Pepe's house; correct?

A. Again, there is a closet there but no people in this.

Q. You took a photograph like this; right?

A. I do not know if I took this particular photo, but that's consistent with what his house looked like.

MR. GUNN: Your Honor, could I have Mr. See close out this photo and go back to the file listing?

THE COURT: Yes.

MR. GUNN: And could I have -- then have him go -- let me ask some questions first.

Q. You were also at the house the next day after Mr. Pepe was arrested and his house was searched; correct?

A. On the 17th. The 17th was the first day that I was there.

Q. Whichever day you were there --

A. Uh-huh.

Q. -- that's the day your report describes as the 16th; correct?

A. The report date is wrong.

Q. But the report has the 16th; correct?

A. Yes. And that was corrected.

Q. In any event, whatever day that was, you were at the house the next day; correct?

A. Yes, sir, I was.

Q. And you were expecting the Cambodian authorities to show up?

A. Yes, sir, I was.

Q. And they didn't?

A. No, they did not, sir.

Q. But you were there -- at least while you were there?

A. I'm sorry. Can you say that again?

Q. They didn't show up, at least while you were there?

A. You know, I don't remember. I would have to look through

some of my notes to make certain.

Q. All right. You were there with some other people; correct?

A. Yes, sir.

Q. One of those people was Ron Dunn from the National -- from the non-governmental organization that helped with the investigation in this case?

A. I believe that's correct, sir. Again, I would have to look to make sure.

Q. And then there were several other people associated with the investigation?

A. Not several. I don't think several. But, again, I would like to look at my notes.

Q. You didn't just wait outside the property; correct? You didn't just wait outside the gate?

A. No, sir, we didn't.

Q. You actually went inside the compound?

A. Yes. That's true.

Q. And you walked around the compound taking photographs?

A. I don't believe I did that.

Q. You sat up or at least other people sat up on the balcony?

A. We sat on the balcony, yes, sir.

Q. And you took some photographs, though?

A. I don't remember taking photographs that particular day.

Q. You would recognize photographs of that day if you saw them?

A. Well, there were several photos taken by several people.

Q. And you would recognize photos from that day if you saw them?

A. On that particular day?

Q. Yes.

A. I don't know. I would have to see.

MR. GUNN: Your Honor, could I have Mr. See scroll down to 6170234?

THE COURT: Yes.

BY MR. GUNN:

Q. And if I could have -- do you see on the cursor there on P6170234?

A. Yes.

Q. On the far right it says, "Date taken: 6/17/2006"?

A. I do, sir.

MR. GUNN: Could I have Mr. See open that photograph, Your Honor?

THE COURT: Yes.

BY MR. GUNN:

Q. That's a photograph of the balcony at Mr. Pepe's house; correct?

A. Yes, it is.

Q. And that's several people who were there the day after the arrest and search sitting on the balcony; correct?

A. Yes, sir.

Q. And one of those people is Ron Dunn?

A. Well, there is another Caucasian male there, but with his head to me. It could be Ron.

Q. The man with the red hat, that is Ron Dunn; right?

A. I can't tell with -- maybe it's my computer, but I can't tell.

MR. GUNN: Your Honor, perhaps I could have Mr. See zoom in on that head a little bit.

THE COURT: Sure.

BY MR. GUNN:

Q. Does that help you identify him?

A. That's not Ron.

MR. GUNN: Okay. Could I have Mr. See zoom out, Your Honor?

THE COURT: Yes.

BY MR. GUNN:

Q. Ron Dunn was there that day, too?

A. Yes, sir.

Q. And all those other people, are those -- are all those people part of your investigating team that were there that day or just some of them?

A. No. We were just observers. We weren't investigating anything that day.

Q. I didn't say -- but you had an investigating team in the case; right?

A. I had members from the embassy.
Q. And are all those people there part of that group or just some of them?
A. No, sir.
Q. How many people there are part of that group?
A. Of which group are you referring?
Q. Your group of -- what I would call the investigating team, what you would call the group of people from the embassy and the NGO's, etc.
A. Okay. I believe I see Suos Vansak, Andy Simpson. I don't know if that's Ron on the right or not. So it would be those three.
Q. Is the person with the hat also a part of the group or is that just some random person who was there?
A. No. He's part of the embassy.

MR. GUNN: Could I have Mr. See close that photo and go to 237, Your Honor?

THE COURT: Yes.

BY MR. GUNN:

Q. That's a photo of the patio taken from on the balcony; correct?
A. Yes, it is.

MR. GUNN: Could I now have Mr. See close that photo and go to 240, Your Honor?

THE COURT: Yes.

BY MR. GUNN:

Q. Do you see -- now you have in front of you P6170240.JPG; correct?

A. Yes, sir.

Q. And that's a photo of one of the back doors or doors to the house? Down the corridor?

A. Can Mr. See rotate it?

Q. It looks like he can.

A. Yes.

Q. The answer to my question was "yes"?

A. Yes, sir.

Q. And that's the way it looked or is a photo that was taken on the day you were out there, the day of the first search?

A. That's what this -- that's what his house looks like from that angle.

Q. And that's what it looked like that day?

A. Yes.

MR. GUNN: Your Honor, could I have Mr. See go to 244?

THE COURT: Yes.

BY MR. GUNN:

Q. This is another picture of one of the doors to Mr. Pepe's house; correct?

A. Yes.

Q. And which door is that? Do you know? Is that on an upper floor or bottom floor?

A. It may be the door to the kitchen, if I recall. I would have to see an overall shot of the house to see.

Q. But it's one of the doors to the house?

A. From the outside.

Q. And that's the way it looked on the day after the day Mr. Pepe was arrested and the day of the first search?

A. The day after he was arrested, did you say?

Q. Yes. The day you were there and the Cambodian authorities didn't show up.

A. I -- I can't -- I don't remember that. I mean, I -- this is consistent with what the house looks like, but to -- that specific, I don't know.

Q. It's consistent with the way it looked like that day?

A. Any day.

Q. And, in fact, this is a picture you took of the house that day?

A. Again, I don't know if I took this picture, sir.

Q. Did anyone else take pictures that day that were provided to the prosecutor to provide to us in discovery?

A. I don't remember.

MR. GUNN: Your Honor, could I go to -- have Mr. See close that photo and go to 262?

THE COURT: Yes.

BY MR. GUNN:

Q. And just highlight that to start with. Do you see the

highlighted "P6170262.JPG"?

A. Yes, sir.

Q. By the way, it also has a date taken at the end of 6/17/2006; correct?

A. On this particular program, yes, it does.

MR. GUNN: And could I have Mr. See open that, Your Honor?

THE COURT: Yes.

BY MR. GUNN:

Q. And that's another of the doors to the house; correct?

A. Yes, sir.

Q. And that's the way it looked on the day after Mr. Pepe was arrested when you showed up at the house but the Cambodian authorities didn't?

A. It's consistent with every time that I have been there.

MR. GUNN: And, Your Honor, could I have Mr. See close that -- just go to the next photo would be fine. Just pop over.

Q. Now, this is a photo with the name "P6170263.JPG"; correct?

A. Yes, sir.

Q. And it's another door to the house; correct?

A. It appears so, yes, sir.

Q. And that's the way the door to the house -- that door to the house looked on the day after Mr. Pepe was arrested when you were there and the Cambodian authorities didn't show up?

A. Again, on all three times that I was there, yes, sir.

MR. GUNN: If I could have Mr. Pepe -- Mr. See close that, Your Honor?

THE COURT: Yes.

MR. GUNN: Actually, I'm sorry. If I could -- yes. If you could go to 265 -- I'm sorry. 248 -- I'm sorry. 260, Your Honor. My apologies to Mr. See.

Q. You were taking photos this day; right? At least some photos; correct?

THE COURT: What day?

BY MR. GUNN:

Q. On the day after Mr. Pepe was arrested when you were at the house and the Cambodian authorities didn't show up, you did take some photographs; correct?

A. I really can't remember. I may have. Someone else may have. Someone else may have used my camera. I just don't remember.

Q. Do you see the photo on the screen that has the name "P6170260.JPG"?

A. Yes.

Q. That is a close-up of a piece of clothing with some blood stain on it; correct?

A. Yes.

Q. That was taken at the house that day, correct, hanging on a clothesline?

A. Yes, sir.

Q. You remember that being taken; correct?
A. I do remember this because of what appeared to be blood. I do remember that.
Q. And you took it?
A. Again, sir, I don't know if I did or not.
Q. You directed that it be taken?
A. I don't remember if I directed anybody to do it.
MR. GUNN: Could I have Mr. See skip to the next photograph, Your Honor?
THE COURT: Yes.
BY MR. GUNN:
Q. That's another photograph of the same piece of clothing; correct?
A. Yes, sir.
MR. GUNN: Could I have Mr. See skip --
Q. For the record, it's P6170261.JPG; correct?
A. Yes, sir.
MR. GUNN: Could I have Mr. See skip to the next photograph, Your Honor?
THE COURT: Yes.
MR. GUNN: Could I have him skip back to 259?
THE COURT: Whatever you want him to do, just tell him to do. You don't have to ask.
MR. GUNN: All right, Your Honor.
Q. That's a picture of clothes that were hanging on a

clothesline that were taken in the compound; correct?

A. Yes, sir.

Q. And that photograph or photographs like it were taken on the day after Mr. Pepe was arrested when you went to the house and the Cambodian authorities didn't show up; correct?

A. I don't know. I don't know which day it was taken.

Q. But photos like that of clothes on a clothesline were taken; correct?

A. Yes, sir. That's correct.

MR. GUNN: Your Honor, could I have Mr. See -- Mr. See, could you close that photograph and go to 246? Just highlight it for now.

Q. Do you see highlighted there on the screen a photo or file with the name "P6170246.JPG"?

A. I do, sir.

Q. And it has a date taken of 6/17/2006?

A. That's what is listed on here, yes, sir.

MR. GUNN: Could I have Mr. See open that photograph, Your Honor?

THE COURT: Yes.

BY MR. GUNN:

Q. That's a picture that was taken the day after Mr. Pepe was arrested when the police didn't show up at the house but you were there?

A. I don't know if it was taken that day or the day before or

the day after, sir.

Q. It looks like the house looked that day; right?

A. Yes.

Q. Any differences that you can see?

A. Other than the water.

Q. What do you mean "other than water"?

A. Because there was a flood on the second day -- third day, I believe.

Q. I'm asking about the second day. There was no flood on the second day, was there?

A. I don't recall, so, no.

Q. The day when the Cambodian police didn't show up there was no flood; right?

A. Not that I recall, no, sir.

Q. So this is consistent with the way the house looked on the day the Cambodian police didn't show up that you were there?

A. Yes. And the first time.

Q. And it shows the house from the front; correct?

A. Yes, sir.

Q. And the kitchen door on the right is ajar and open, isn't it?

A. Maybe it's me, but I can't tell.

MR. GUNN: Your Honor, could I have Mr. See zero in on the door underneath the canopy on the right of the photograph?

THE COURT: Yes.

BY MR. GUNN:

Q. That photograph shows there in the expanded portion a door that is ajar; correct?

A. It could be, but, again, I can't tell.

MR. GUNN: I am going to ask if Mr. See can blow it up even a little more, Your Honor.

THE COURT: Sure.

MR. GUNN: All right. And I will stop there. And I will just leave that for the Court's view, Your Honor.

Q. And for the record, that's P6170246.JPG?

A. Yes.

MR. GUNN: If I could have one moment, Your Honor?

THE COURT: Sure.

BY MR. GUNN:

Q. You mentioned a flood in your prior testimony; correct?

A. Yes, sir.

Q. There was a flood or a lot of water present on a third day that you were at the house when the Cambodian police were there and they did a second search on their part; correct?

A. That's correct, sir.

Q. You interviewed an alleged victim named I[redacted] T[redacted] prior to the arrest of Mr. Pepe and the search; correct?

A. Yes, sir.

Q. And during that interview, you showed her a photograph of Mr. Pepe?

A. I'd have to look at the video, as I really don't remember.

MR. GUNN: Your Honor, could I have an exhibit marked for identification?

THE COURT: Yes. I'm sort of missing what is going on here. Are we way off point or have I forgotten what we are here for? I'm not sure --

MR. GUNN: I don't -- I obviously don't think we are way off point, Your Honor.

THE COURT: But we have been going on for almost two hours so if you don't convince me that we are on point very shortly, then we are going to do something else.

MR. GUNN: I am almost done. I have probably five more minutes. If I could have this marked for identification to refresh his memory. If we could have this marked as 116 since the CD was 115.

(Defendant's Exhibit 116 was marked)

BY MR. GUNN:

Q. Look at the bottom part of Page 25 in this transcript, Agent Phillips, and see if that refreshes your memory about whether you showed a photograph.

THE COURT: Technically, just for future reference when trying cases in my court, I think you have to ask him first whether there is anything that would refresh his recollection, etc., but for these purposes I will allow him to do that.

MR. GUNN: All right.

THE WITNESS: I'm sorry, sir. I apologize. What was your question?

BY MR. GUNN:

Q. Does this refresh your recollection about whether you showed a photograph of Mr. Pepe to one of the alleged victims who goes by the initials "IT" before he was arrested, Mr. Pepe was arrested?

MS. DONAHUE: Your Honor, objection. This appears to be outside the scope of the entire suppression motion and certainly is well outside the scope of the Court's order as far as what we're supposed to be here about today.

THE COURT: It certainly goes to impeachment. I have no clue what this has to do with this motion.

MR. GUNN: Your Honor, what I'm about -- I believe the transcript reflects that he did show a photo. Assuming he agrees with that, my next question was going to be whether he told the Cambodian authorities that, which I think goes to his good faith. Because she did not identify the photo. Said that was not the man.

THE COURT: Well, I, frankly, don't see how that would do that, but I don't recall enough about what is going on, so I will allow him to answer the question.

BY MR. GUNN:

Q. Does this refresh your memory about whether you showed a photograph of Mr. Pepe to the alleged victim, IT, during that

interview?

A. Yes, sir.

Q. That was before the day Mr. Pepe was arrested; correct?

A. If I may take a second and see the date?

Q. Sure.

A. Okay. 6/16.

Q. And you did show her the photograph?

A. Yes, sir.

Q. And she said that was not the man; correct?

A. I need to read it a second.

Q. All right.

THE COURT: Well, the question is not what this says, sir. The question is what you recall. If you don't recall, then the question would be whether this refreshes your recollection.

THE WITNESS: I don't remember what she said that day.

BY MR. GUNN:

Q. Would it refresh your recollection if you read the transcript?

A. Probably.

Q. Would you read the bottom part of Page 25 and the upper part of Page 26?

A. Okay, sir.

Q. Does that refresh your recollection about whether you showed her a photograph of Mr. Pepe and she said that was not

the man?

A. Yes, sir.

Q. And you did show her such a photograph; correct?

A. A very old photo.

Q. And she said that was not the man?

A. Very old photo, and that's correct, she did say that.

Q. Did you tell the Cambodian authorities that fact?

A. I don't remember that, sir.

Q. Would it or would it not have been your practice to tell the Cambodian authorities that fact if you were conducting a parallel investigation with them?

A. Like I said, I don't know what I would have said two years ago. I don't remember saying that.

Q. I'm not asking what you would have said two years ago. I am asking your practice. If you are conducting a parallel investigation with a foreign government and an alleged victim says a photograph of the suspect is not the man, is it your practice to tell the other authorities that fact or is it your practice not to tell them that fact?

A. I guess it depends on the circumstances. I don't know how to answer that question because every -- everything -- it's different every single time.

Q. Sometimes you would not tell them that fact?

A. I don't know. I don't -- it depends on the circumstances.

Q. Are there circumstances where you would not tell them that

fact?

A. I'm just speculating. I don't know.

Q. Well, you just said it would depend on the circumstances. Are there circumstances where you would not tell them that fact?

A. I don't remember --

MS. DONAHUE: Objection. This is asked and answered.

THE COURT: He hasn't answered it yet, Ms. Donahue.

THE WITNESS: I don't remember, is my answer. I don't --

THE COURT: As you are sitting here today, can you think of circumstances under which you would not tell the authorities that fact?

THE WITNESS: No.

BY MR. GUNN:

Q. So did you call -- do you believe you told the Cambodian authorities that fact in this instance?

A. I don't think I did. I just don't know. If I knew the answer, I would be happy to tell you.

MR. GUNN: No further questions, Your Honor.

THE COURT: How much do you have, Ms. Donahue?

MS. DONAHUE: Very brief, Your Honor.

THE COURT: All right.

REDIRECT EXAMINATION

BY MS DONAHUE:

Q. Special Agent Phillips, you were shown a series of

photographs that -- images that are on a disk. Do you know whether the dates on that disk that are associated with each of those photographs is accurate?

A. No.

Q. Just to be clear, there are three dates at least associated with each photograph -- date taken, date created, date modified.

Do you know whether those, in fact, accurately reflect when those photographs were taken, created and modified?

A. I don't think they do.

Q. Why not?

A. Because depending on where their camera was bought, if there is a time difference --

MR. GUNN: Objection, Your Honor. Calls for speculation and expert opinion from someone who is not an expert.

THE COURT: Well, if he has something connected with this case that makes him think that they don't, that's fine, but otherwise, it is speculation.

BY MS DONAHUE:

Q. Special Agent Phillips, Cambodia is approximately 15 hours ahead in time; isn't that correct? From here in Los Angeles?

A. That is correct.

Q. So sometimes when it's Monday in Los Angeles, it's Tuesday in Cambodia; right?

A. That's correct.

Q. After you had conducted the interview that was shown to you by the defense of Victim IT, had you reached a conclusion whether or not the individual who had victimized her was the defendant in this case?

A. Not a definitive conclusion.

MS. DONAHUE: I have no further questions.

THE COURT: Mr. Gunn?

MR. GUNN: May I have one moment to consult with counsel?

(Counsel confer off the record)

MR. GUNN: Nothing further, Your Honor.

THE COURT: May the witness be excused?

MR. GUNN: Yes, Your Honor.

MS. DONAHUE: Yes, Your Honor.

THE COURT: You are excused.

MR. GUNN: Your Honor -- I'm sorry. I will wait until the witness steps down.

Your Honor, I could probably -- I could put Mr. See on to testify to this, but I will proffer it and perhaps it won't be disputed, that Defense Exhibit 115 is a copy of the folder whose name I read earlier, copied directly from a CD of discovery provided by the Government without anything done to change any of the information. Mr. See could testify to that, but I would proffer it. And he did the copying.

In addition, that the information -- the date

picture -- I think it's "Picture Taken," that line, is viewable from the CD only in Windows Vista, so Windows Vista needs to be used to look at it, if it's looked at later in the case, though it's also viewable when the folder in question is copied onto a hard drive -- at least the hard drive in our office -- it can be viewed with Windows XP. So that I would proffer. I could put Mr. See on to testify to that if it's necessary. But I guess the Government can decide.

MS. DONAHUE: Your Honor, the Government is not asking the defense to put Mr. See on. It is not suggesting that the defense has somehow modified the dates.

MR. GUNN: And I didn't take it that way.

MS. DONAHUE: The dates are what they are. The dates were embedded by either the camera or the computer. Whether that camera or that computer accurately embedded those dates or whether it didn't is not evidence that's before the Court or necessarily needs to be.

Obviously, whatever date that camera put on is what we have and what we have produced to the defense. I don't think Mr. See can tell us whether the camera that took it was accurate or not. So his other technical testimony about the viewing software, etc., I don't think is relevant.

THE COURT: All right. Any other witnesses?

MR. GUNN: No, Your Honor. If I haven't already offered into evidence, I would offer Defense Exhibit 115 into

evidence and Defense 114 into evidence, which is the report. I think the others were just necessary for identification in refreshing memory.

THE COURT: All right.

(Defendant's Exhibit 115 was received)

THE COURT: Any witnesses from the Government?

MS. DONAHUE: No, Your Honor, there are no additional witnesses. The Court -- or the Government was wondering if the Court -- if the interpreter could be excused. We have asked her to stay because the defense had indicated that she had some documents, but she apparently has to be in another court this afternoon.

MR. GUNN: We are not going to end up putting in any documents.

THE COURT: All right. She can be excused.

MS. DONAHUE: Thank you, Your Honor.

THE COURT: Maybe it's my lack of memory. I'm not at all sure that I now have the information that I need to rule on this motion, so I am going to have you do some further briefing so that you can explain to me how the evidence that I have heard today addresses the issues that I requested, and whatever further briefing you think is necessary on the motion to suppress, the single issue that was left after my previous ruling. So I don't know when you'll be able to do that.

MS. DONAHUE: Would the Court entertain a very short

argument?

THE COURT: Sure.

MS. DONAHUE: The Government would respectfully submit that nothing that the defendant elicited today at all addressed the issues that the Court had asked.

The Court wanted to know whether the seizure of the computer media was valid under Cambodian law and whether the subsequent ICE search was valid under Cambodian law. And the Government, not having Cambodian case law to submit to the Court, flew over here someone who is knowledgeable about Cambodian law. We submitted his declaration. His declaration said quite clearly that the seizure of computer media and the subsequent provision of that to ICE is authorized by Cambodian law.

The defense didn't cross-examine him about it at all. The Government submits his declaration is clear on that point. He wasn't crossed on it. If the defense has any intention of re-raising this in the future -- at all, we would ask that they do it now while we have the man here from Cambodia and not submit a brief in two weeks that says he needs to come back.

THE COURT: You know what? That was the missing link. I was forgetting the content of the previous declaration, and I apologize for not having had time to go back and read all of your stuff before today.

MS. DONAHUE: It's the computer issue. The defense is

trying to relitigate what the Court has already decided. They are trying to argue that the search was really on the 16th instead of the 17th and, therefore, the warrant and re-raising the issue would be -- the Court had asked to hear from the interpreter on the issue of the document where the first interpreter made a mistake and dated the report the 19th. As he himself said this morning, it was the 17th. As the second interpreter said this morning, it was the 17th. So there is really no issue in and around that. A mistake was made, and the defense has sought to capitalize on it, but that's --

THE COURT: As all good defense lawyers do.

MS. DONAHUE: No question about it, Your Honor. That's why we brought the witnesses in. You know, people make mistakes and they -- the defense seizes on it, and that's why we are here litigating. But that's all it is, is a mistake. The search was the 17th. The reports are consistent with that. There is no issue surrounding that.

Secondly, regarding the computer media, its seizure and its -- by the Cambodian National Police and the turning it over to the -- to ICE for examination was legal under Cambodian law. And as he said in his declaration, Assistant Attache Phillips certainly thought it was legal, and he in good faith accepted it from the Cambodians and provided it to the ICE analyst.

So we would submit our pleadings did address the issue

the Court asked, and we would submit the Court can rule on it at this time. And if there are any additional questions, certainly for the folks who are here from Cambodia, we would certainly make them available again. We would like the defense to be able to wrap that up so we don't have to bring these people back.

THE COURT: Mr. Gunn?

MR. GUNN: Well, Your Honor, a couple of points, I guess. First of all, I guess the Court has to decide factually whether it was just a mistake in the interpretation or whether now it's being spun a little differently. You have sample writing that you can compare. I will leave that in the Court's judgment. You can do that without any argument from me.

But there is a couple points that I think come out of this that don't make it so cut and dried. First of all, there is not just the issue of there not being a separate warrant for the search of the computer. There is also the fact that Mr. Pepe wasn't present during that search. And there is -- Article 20 concededly has the caveat "if possible," but I don't think you get around that by sending the computer somewhere else to make it not possible.

It was certainly possible to do that forensic examination in Phnom Penh with Mr. Pepe there. And I would submit that the Cambodian Article 20 requires that -- did require that.

There is also, I think, some concern here about the --

the claim that the computer was taken and so on only after there was a warrant, which I think was one of the issues still posed by the Court. You asked about the sort of dating of the searches and all that stuff.

This report that Phillips wrote says it happened on June 16th. The photograph "Picture Taken" dates for -- you know, granted, you know, maybe there's something weird about the computer, I suppose, but they just coincidentally match up with that. And if you look at that CD, they are consistent.

So I think there is some significant evidence here that the search took place on the 16th, not the 17th, and that meant no matter what the date was in the warrant, that the search was warrantless without the warrant required by Cambodian law.

With respect to good faith, I think there's some issues here.

THE COURT: Could you --

MR. GUNN: I'm sorry. With respect to good faith, I think there's some issues here. You have Agent Phillips, not just showing up at the house and waiting outside the gate to see if the Cambodian authorities get there, but you have him sort of hanging out at the house on the balcony, going all over, taking photographs of everywhere outside. And then you have this very suspicious circumstance of one of the doors being wide open. And, you know, what does that suggest?

So I think that raises just some general issues about good faith and what was going on here.

But I don't know if you totally need to get there. I mean, if the search happened on the 16th, he knew there wasn't any warrant on the 16th because at the earliest, even if you believe the interpreters about having made a mistake, the warrant was on the 17th. And I just ask the Court -- you have the Khmer written out there to compare side-by-side. The question is could the printing of one be mistaken for the other, and is maybe the first one the correct interpretation rather than the second one.

I guess if the Court has any other questions, I will try to respond.

THE COURT: I don't. I think I -- based on Ms. Donahue having refreshed my recollection, I will -- I should say not having refreshed my recollection but simply having told me something that I had completely forgotten and will look at -- and if by chance I need something further, after having looked at what I do have, that I feel I need more briefing -- not more evidence. I think everybody seems to agree that they have done the best they can with the evidence -- and based on what I have, if I need further legal briefing, then I will let you know. Otherwise we will get our decision out as soon as we can.

MR. GUNN: Two requests on that, Your Honor. I am trying to squeeze in a quick ski vacation next week. Since the

trial got put off, I was going to do it after; now I am going to do it before.

Also I think it would be helpful to have a transcript, I think, if we were going to do further briefing. So if there is any way to schedule or we could try to do that, that would be helpful --

THE COURT: I will let you know by tomorrow whether I need further briefing at all.

MR. GUNN: All right. I may have to get Mr. Brown --

THE COURT: I am sure Mr. Brown is fully capable of addressing any issues I may have.

Anything further on this issue?

MS. DONAHUE: No, Your Honor.

THE COURT: All right. Then I would like to excuse the Government and anybody related to the Government because I have a question for the defense.

(Transcript sealed from Page 80, Line 17 to Page 82, Line 13)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

United States of America, )
Plaintiff, )
)
vs. ) Case No.
) CR 07-168(A)-DSF
Michael Joseph Pepe, )
Defendant. )
_________________________________ )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

Day 2

Los Angeles, California

Friday, May 9, 2008

Pamela A. Seijas, CSR, FCRR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California 90012
(213) 687-0446

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
BY: PATRICIA DONAHUE
ASSISTANT UNITED STATES ATTORNEY
JOHN LULEJIAN
ASSISTANT UNITED STATES ATTORNEY
312 N. SPRING STREET
LOS ANGELES, CA 90012

FOR DEFENDANT: OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY: CARL GUNN
DEPUTY FEDERAL PUBLIC DEFENDER
CHARLES BROWN
DEPUTY FEDERAL PUBLIC DEFENDER
321 EAST SECOND STREET
LOS ANGELES, CA 90012

ALSO PRESENT: ATTACHE GARY PHILLIPS
ICE SPECIAL AGENT EDDY WANG

MR. BROWN: Just seat an alternate?

MR. GUNN: It's up to you.

MR. BROWN: I think we should just seat the first alternate.

MS. DONAHUE: I don't think we have much alternative.

THE COURT: Okay.

(Sidebar conference ended)

THE COURT: All right. Our missing juror is -- is that the only one that is missing Paul?

THE CLERK: Yes, Your Honor.

THE COURT: He just called and says he is a mile out. We will start as soon as he gets here.

(Recess taken)

(Jury In)

THE COURT: Ms. Nixon, I am going to ask you to sit in Seat No. 9, between those two ladies there. Do we need to re-swear the jury? We don't need to re-swear them?

Sir, take either one of those empty seats now, and you may be seated.

All right. Good morning. Thank you all for being here and our furthest juror got here on time so now you all know how long it takes in downtown L.A. traffic and where the parking is and how long the elevators take, so in future, let's try to get here at 8:00 as I indicated so that we can get started and get this trial finished in the time that I estimated.

 Sit back and relax.

Ladies and gentlemen, you have been selected and sworn as the jurors and alternate jurors in this case. And I am going to take a few minutes to tell you about your basic duties and conduct. At the end of the trial I will give you more detailed instructions. All of the Court's instructions, whether given before, during or after the taking of testimony, are of equal importance. You must base the decisions you make on the facts and the law.

First, you must determine the facts from the evidence received in the trial and not from any other source. Evidence is the sworn testimony of witnesses, the exhibits that are admitted into evidence, and any stipulations by the parties.

A stipulation is an agreement about the facts. If the parties do stipulate to a fact in this case, I will let you know specifically what that is.

Second, you must apply the law as I state it to you to the facts as you determine them and in this way, arrive at your verdict and any questions that you are instructed to answer.

In evaluating the testimony of witnesses, consider the following questions.

How well could the witness see or hear or otherwise sense the things about which the witness testified. How well was the witness able to remember and describe what happened.

What was the witness's behavior while testifying. Did

the witness understand the questions and answer them directly? Did the witness have a reason to lie such as bias or prejudice or a personal interest in how the case is decided. What was the witness's attitude about the case or about testifying.

How reasonable is the testimony when you consider all the other evidence in the case. Did other evidence in the case prove or disapprove any fact about which the witness testified.

Use your common sense and good judgment to evaluate the testimony based on all the circumstances.

There are two kinds of evidence, direct and circumstantial. Direct evidence is direct proof of a fact such as testimony of a witness about what that witness saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could conclude that other facts exist. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

Please understand that no statement, ruling, remark or comment that I may make during the course of the trial is intended to indicate my opinion as to how the jury should decide the case or to influence the jury in any way in its determination of the facts.

At times, I may find it necessary to direct one or both of the attorneys, one or all of the attorneys, to do or not

to do certain things. I might even find it necessary to make some criticism of an attorney's conduct.

If I do so, you must not show prejudice toward the attorney or the side the attorney represents simply because I have found it necessary to say something to the attorney.

Statements or arguments by attorneys are not evidence. You must accept and follow the law as I state it to you whether or not you agree with the law. If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions.

Questions are not evidence. Do not assume to be true any insinuation suggested by a question asked a witness.

A question may be considered only as it helps you to understand the answer. If a question is objected to and the objection is sustained, which means the witness may not respond, you must not guess about what the answer might have been or the reason for the objection. Of course, if the objection is overruled and the witness is allowed to answer, you may consider that answer as you would any other evidence in the case. And please remember that it's an attorney's duty to object to questions that the attorney believes are not proper and you should not show prejudice toward the attorney or the side the attorney represents because the attorney makes an objection.

Sometimes I may order that evidence be stricken and

that you disregard or ignore the evidence. That means that when you are deciding the case, you must not consider that evidence for any purpose. Treat it as though you had never heard of it.

Some evidence may be admitted only for a limited purpose. When I tell you that certain evidence has been admitted for a limited purpose, you may consider it for that purpose only and not for any other purpose.

You must not independently investigate the facts or the law or consider or discuss facts as to which there is no evidence. This means, for example, that you may not visit or view any place that you hear described in this case. You may not conduct experiments or consult the Internet, reference works or persons for additional information. You can't ask anyone for information relating to the case, even if you don't mention that it has anything do with the case and even if you don't tell them that you're on a jury. You cannot even look up a word in the dictionary if you don't know or don't all agree on the meaning of a word.

Anything like that happens, just send out a note to me and I will try to help you resolve your issues. You cannot consider as evidence anything you may see or hear when the Court is not in session, even if what you see or hear is done or said by one of the parties or one of the witnesses.

You must not read any news stories or articles or listen to any radio or television reports about the case or

about anyone who has anything to do with it.

You must not visit or view the premises or place where the crime or crimes charged were allegedly committed or any other premises or place mentioned in this case. You will be given notebooks and pencils. Leave them on your seat each day when you leave and at each recess. You will be able to take them into the jury room when you deliberate.

You may take notes; however, you should not permit note-taking to distract you or prevent you from listening to other testimony. Remember, you are the judges of the believability of the witnesses.

Notes are only an aid to memory and should not take the place of your memory. A juror who does not take notes should rely on his or her recollection of the evidence and not be influenced by the fact that other jurors do take notes.

By the way, you may see me taking a lot of notes during the trial, but I take notes for completely different reasons. So when you see me writing something down, it doesn't necessarily mean that you should write it down.

Should a discrepancy exist between a juror's recollection of the evidence and a juror's note or between a juror's recollection and that another of another juror on an issue that is important to your decision, you may request that the reporter read back the relevant testimony, which must prevail. Sometimes there is a tendency on the part of juries

immediately to request that the testimony of every witness be read back or that all of the testimony of a particular witness on every subject be read. As you can see, Ms. Seijas is taking down everything that we say while we are on the record. I am advised that she does have a life, though, and she doesn't take this home every night and prepare it into a transcript that could be given to you. So if you ask for something to be read back, she has to go through all of her notes, find what you ask for, take out any objections or sidebar conferences we may have, and she only reads back the testimony that was actually heard back in court. As I said, she is terrific, but it does take a lot of time to do that even though computers speed things up. If there is any disagreement among you as to specific testimony, we will try to comply with your request, but please don't ask for testimony to be read if it's not necessary for your decision.

You will be permitted to separate at recesses. You must return following the recesses at such times as I instruct you.

During recesses, you must not discuss with anyone any subject connected with this trial. Not anyone at home, at work, or even among yourselves. When you are sitting together in the hall or the jury room or at lunch, you must speak only of matters entirely unrelated to the trial.

You are also ordered not to have any conversation at

all with the attorneys, the interpreters, the parties or any witness called in this proceeding. This means that when you see any of these people in the hall or anywhere else, you are not to greet them, don't ask for directions to anywhere, don't ask for a good place to eat. Don't ask how much longer this trial is going to take. There should be no conversation of any kind.

Now, you probably won't know who the witnesses are so it's best not to talk to anyone who isn't wearing a juror's badge. And please wear your juror's badge where everyone can see it so no one accidentally talks to you.

If you're in the hall or restroom and you hear someone talking about the case, please ask them not to talk about it in your presence or simply walk away. No one will be offended if you ignore them, and please don't be offended if they ignore you because they're also under orders not to speak to you.

If any of these people try to speak to you, tell them you will not speak to them. Then immediately inform the bailiff or Mr. Pierson or Ms. Silence of this conduct. Don't be concerned, however, if you see witnesses talking to each other or to the attorneys. That is permissible. Please just stay far enough away from them that you won't overhear any of their conversation.

I have just read all that stuff to you and I could see that you were listening but it's really important. One of my colleagues was three weeks into a four-week trial not too long

ago and the jurors were out in the hall discussing the case and she had had to send them all home and start all over again. So this is really a legal requirement that we must ask you to comply with, as hard as it might be.

During the course of the trial and before you begin your deliberations, you must keep an open mind on this case and all the issues that you will be asked to decide. In other words, you must not form or express any opinion on the case until the matter is finally submitted to you.

If you need to communicate with me at any time, just give a signed note to the bailiff, if we have one, or Mr. Pierson or Ms. Silence. And by the way, as you may know, all of our courtrooms are public courtrooms. People sometimes like to come and watch trials. Apparently we have quite a few people who wanted to come and watch this one.

They may be from some of our offices here and want to watch and see what kind of work lawyers actually do. They could be members of the public. There are some people that generally are referred to as court watchers. They just like to come and watch trials, and this is a good place to do that. It's perfectly all right.

You shouldn't let it distract you if people come in and out. Also, sometimes my law clerks come in and watch, but I see their table is occupied over there so they may just come in the other door.

Please be sure, though, that none of your friends or relatives are present in the courtroom unless we know about it. They are certainly welcome but it's particularly important that you don't hear from them anything that happened during those times when the jury is not in the courtroom and also that you do not discuss with them what happened when you were present. If at any time you see a friend or relative come into the courtroom, you should be sure to send a note to me, again through Ms. Pierson, Ms. Silence or a bailiff, if we have one at that time, as soon as you can.

As for our alternate juror, you are also bound by all of these admonitions. You must not talk to anyone about any subject connected with this trial and you must not form or express any opinion on it until the case is submitted to you, which means until such time as you are substituted in for one of the 12 jurors and begin deliberating on the case.

I am going to order you all to stay healthy because as you've noticed we have already had one alternate substituted in as a regular juror. You're the only alternate for a four-week trial. So everybody just hang in there with me. I'd appreciate it. And, sir, that means you must not decide how you would vote if you were deliberating with the other jurors and not form or express an opinion about the case unless you have been substituted in.

That's enough from me. The next phase of the trial

will now begin. First, each side will make an opening statement. Then the Government will present evidence and the Defense may cross-examine the witnesses called by the Government. Then the defendant may present evidence and the Government may cross-examine those witnesses.

Witnesses don't necessarily testify about things in the order in which they happened. Sometimes I will allow witnesses to testify out of order to accommodate their schedules, so you should be sure to keep an open mind until you have heard all the evidence. After the evidence has been presented, I will instruct you on the law that applies to the case and the attorneys will make their closing arguments. Then you will begin your deliberation by going into the jury room to deliberate on your verdict.

At this time the lawyers will be permitted to make an opening statement, if they choose to do so. Neither side is required to make an opening statement. An opening statement is not evidence. It is also not an argument. Counsel are not permitted to argue the case at this point in the proceedings. An opening statement is simply an outline by counsel of what he or she expects the evidence will show in this trial. Its purpose is to assist you in understanding the case as it's presented to you.

Would the Government like to make an opening statement?

MS. DONAHUE: Yes, please, Your Honor.

Government's Opening Statement

MS. DONAHUE: Thank you, Your Honor. Good morning, ladies and gentlemen of the jury.

Your Honor, could I ask if we could move this screen? I can't see one of the jurors.

THE COURT: If you want to get somebody to move it, you certainly may. You break it, you pay for it.

MS. DONAHUE: That's a deal.

Thank you.

Good morning, ladies and gentlemen. The evidence at this trial is going to show that that man, the defendant, Michael Pepe, tied up, drugged, beat, gagged, and then raped little girls. More than once and to more than one girl.

He committed these acts not here in California, not here in the United States, but in the country of Cambodia.

Now, the defendant is a United States citizen. He was born in the United States. It is against the law for a United States citizen to go to another country and rape little children. It is against the law for a United States citizen to go to another country and require little girls to perform oral sex on him for money.

In September of 2005, the defendant traveled from Los Angeles to Cambodia. Cambodia is located in Southeast Asia, and it is literally halfway around the world from Los Angeles.

He flew 7,000 miles to Manila and the Philippines, changed planes twice and landed in Phnom Penh. Phnom Penh is a city. Phnom Penh is the capital of Cambodia.

Defendant was not traveling to Cambodia on business. He didn't go and rent a hotel room. He was renting a house. A house in Phnom Penh surrounded by a wall and a gate.

The house that defendant chose to rent was located right around the corner from an elementary school. You will hear about it. The Newton Thilay schools.

Defendant's house had two stories. The living room, the dining room, the kitchen and one bedroom were on the first floor. His bedroom, the defendant's bedroom, was on the second floor. There was another bedroom on the second floor. Inside this bedroom was a bed. On the bed there were flowered sheets and stuffed animals and there were clothes inside the closets. Little girls clothes, pants, shirts, skirts, robes, and school uniforms.

The defendant does not have young children, but the evidence will show that the defendant did not live alone in this house. He lived there with other people's children. He lived there with the victims in this case and you will meet them.

I will refer to them by their first name. I.T., who was between 11 and 12 years old at the time she was in defendant's house.

L.K.xxx, who was between 12 and 13 years old.

S.R.xxx, who was 10 years old at the time that she was at defendant's house.

S.S.xxx. She is S.R.xxx's sister. She is about a year older than S.R.xxx.

K.S.x. if you focus, you can see. That's K.S.x.

That is a photograph taken inside of defendant's house in Phnom Penh. This little girl's name is NTDx. It's pronounced "NTD." She was between 13 and 14 years old.

And finally, T.C.xx. T.C.xx was between 13 and 14 years old.

All of these girls are Cambodian or Vietnamese and they all come from very poor families.

At the time they had very little education. Even though, as you can see, they are between the ages of 10 and 14, most of them had only reached the first or second grade in school, if they had been to school at all. And the girls who come to court to testify will tell you they were brought to the defendant's house. Several of them will tell you they were brought to the house by a woman whose name is Basang. And that she arranged to have them brought from their homes to the defendant's house. And the defendant provided them with a nice place to live. A very nice place to live by comparison to the slums where their families lived.

And the defendant gave them food. He gave them clothes. And for some, he gave them an education.

As I said, the defendant gave them a nice place to live. L.K.xxx, who was one of the victims that you will meet, lived in this house in Cambodia with her family. And a woman named Basang had her brought from her house to the defendant's house.

Defendant gave them food, he gave them clothes and for some of them he gave them an education, he sent them to that school that was right around the corner from his house. On top of all of that, defendant gave them money, a dollar, sometimes maybe a little bit more, and he would give money to some of their parents.

But there was a price. There was a price for all of this. The parents did not pay that price. The girls did. And that price was sex.

One of the requirements for living at defendant's house was giving defendant sexual massages. The girls who would go to school would come home from school but instead of maybe grabbing a snack, playing with their friends or doing their homework, the girls were required to go to defendant's bedroom or upstairs to his massage table and they were required to take off all of their clothes. And he would take all of his clothes and he would lay on the bed or on the massage table on his back naked and the little girls were required to stand around him and to rub him, to massage him with oil, to massage his penis and to perform oral sex on him until he ejaculated on them. Several of

them will tell you it made them throw up.

But this was the price they had to pay to be in this house. And that's not all that the defendant required. From some of the girls he required more than oral sex. And you will hear from several of them about what the defendant did to them in his bedroom. They will tell you that he tied them up. That he used cloth strips and rope. That he would bind their wrists and their ankles or he would tie them to the bed.

They will tell you that he gave them something or he had Basang give them something that made them feel groggy. They would swallow a pill. They were required to swallow a pill and they felt drowsy. If they screamed in pain, he stuffed a towel into their mouth. Sometimes he hit them. And you will hear that he raped them. They will tell you he penetrated them with his penis. Some of them will tell you that at least the first time they passed out.

When they woke up, they were in great pain, some of them lying in a pool of blood. And this happened more than once to more than one girl.

One of those girls was I.T.. she is the girl in the lower right-hand corner. At the time I.T. was about four feet tall and she weighed about 60 pounds. He bound her, he blindfolded her, he gagged her. And he raped her.

I.T. fought back. And he didn't like that. So he kicked her out of his house. But I.T. did not just disappear

back into the slums of Phnom Penh. I.T. came to the attention of law enforcement in Cambodia and on June 17th of 2006, the Cambodian National Police went to defendant's house with a search warrant. And you will hear what they found at the defendant's house.

In his bedroom, inside his closet, they found essentially his rape kit. They found a plastic bag with rope and masking tape.

Besides the bag, they found long strips of cloth with slip knots tied at the end. On the other closet shelves they found Viagra; Kamagra, which is the foreign equivalent of Viagra; Rohypnol, the date rape drug; plus a number of other drugs that you will hear have the effect -- will have a sedative effect when given to a child; baby oil for the massages; KY jelly; condoms, and children's books and work books. And all the little girls' clothes.

And articles cut out from Phnom Penh newspapers about men who travel to Cambodia and have sex with children and get caught.

The Cambodian National Police also found computer media in the office in defendant's house. One of the victims in this case, L.K.xxx, was actually at the defendant's compound at the time of the search and you will hear her testify and she will tell you what the defendant did to her in his bedroom. She will also tell you that he took naked pictures of her, pictures

of her naked. And you will hear from computer experts who took a look at the computer media that came out of the defendant's office, and you will hear that they found a photograph of the defendant naked, standing next to L.K.xxx, naked in his bedroom.

You will see photographs of defendant's bedroom and his bed, both in the photographs of L.K.xxx with the defendant, L.K.xxx who was 12 to 13 years old at the time, and in the photographs that were taken by law enforcement during the search. As I said, the search was done by the Cambodian National Police but there were representatives from American law enforcement at that search because, as I said, he is a United States citizen and as a U.S. citizen, he is bound by our laws.

One of those representatives from the United States law enforcement was Gary Phillips. He is a special agent with the United States Immigration and Customs Enforcement, and he is assigned to work in Southeast Asia.

He took photographs during the search of the house, photographs of the bedroom, the defendant's bedroom, photographs of the girls' bedroom, and you will see those photos. And you will see the physical evidence that was seized. The Viagra, the Rohypnol, the sedatives that the girls were forced to take, the baby oil that they were forced to use to massage the defendant. You will see photographs of the massage table.

We have the rope, we have the cloth strip that the

defendant used to tie them up. The things that the girls described, law enforcement found in his house in his bedroom.

You will also hear that the girls were examined by a doctor. The girls who said that the defendant had penetrated them with his penis in fact had vaginal injuries consistent with forced penetration. Girls of this age having no hymen visible at all. Medical evidence showing that obviously these girls had been penetrated. That's for the girls who had been raped.

And, ladies and gentlemen, you will see and hear from some of these girls yourselves and you are going to see how very difficult it is for them to talk about what he did to them, how very difficult it is for children --

MR. GUNN: Objection, Your Honor. This is argumentative.

THE COURT: Ms. Donahue.

MS. DONAHUE: You will hear from the girls that the defendant built a relationship with some of these victims. And Jim Clemente, who is an FBI agent who has some expertise on child victims of sexual crimes, is going to testify and he is going to explain a concept that is strange to a lot of us and it's a concept known as grooming. And grooming is a way that an adult who has a sexual interest in a child acquires access to that child and maintains access to that child over a period of time for sexual purposes.

And he will talk to you about how grooming is behavior

that can appear to be very innocent. In fact, it's behavior that can appear to be very altruistic. Sending a child to school, buying clothes for a child, buying stuffed animals for a child, those are behaviors that obviously can be motivated by very good intentions. But grooming does not arise from any good intention at all. Grooming has only one goal and that goal is to gain access to a child for sexual purposes.

Now, the victims in this case lived in the defendant's compound for varying periods of time. Some for a short period of time, a week or two, and some for many months. And you are going to see photographs of the victims that -- at his house. Photographs of the victims wearing clothes bought with his money, holding stuffed animals bought with his money.

In some of the photographs, the victims are smiling. In some of the photographs, they are not. And you will learn that, as I said, not all of the victims were required to stay in this house 24 hours a day. Some of the girls were -- would leave, walk around the corner to the school, and come back. The defendant also allowed some of the girls to go and visit their parents. Maybe for the weekend, go and visit the same parents who brought these girls from the slums to this house. And at the end of the weekend or at the end of the visit, the girls would be brought back from the slums to this house.

Now, as I said earlier, I.T. fought back. She got out. Some of the others you will hear -- you will hear from

them, at least initially did not fight back. And you are going to hear from an expert, Dr. Wendy Freed, she has a lot of experience working with victims of sexual abuse, particularly victims from Southeast Asia, from Cambodia, and she is going to talk to you in general about reasons why victims don't always fight back. She will explain how sometimes shame, loss of value within your own society, feelings of duty, loyalty to family, all sometimes work together to keep a victim compliant.

The girls will come in, they will tell you what he did to them. You will see their shame and you will hear their pain. And after you have heard from the victims and after you have heard and seen all of the evidence, we are going to have an opportunity to talk with you again and at that time, we are going to ask that you return verdicts of guilty on all counts of the Indictment for what he did to them. Thank you.

THE COURT: Thank you.

Mr. Gunn, would you like to give an opening statement?

MR. GUNN: Yes, Your Honor. May I inquire as to whether we have the ELMO working now?

THE COURT: Apparently we do.

MR. GUNN: It looks like we do. Thank you. Miracles of technology.

Defense Opening Statement

MR. GUNN: Ladies and gentlemen, I would like to talk about some other photos you are going to see. They were taken

on June 12th, 2006, just five days before Mr. Pepe was arrested and six months after he had supposedly been abusing all these girls, including three girls who were living in his house for those six months.

The photographs are of a birthday party at Mr. Pepe's house. It wasn't a birthday party for him. It wasn't a birthday party for any other adults. It was a birthday party for one of the girls who was living there. The girl named L.K.xxx. And you will see photographs. You will see her looking very happy, along with the other girls who are living at the house at the time. You will see photographs like that. That's L.K.xxx's mother standing in the middle of the pictures, S.R.xxx playing around, putting cake on her face, one of the other girls sitting at the table with cake on her face and L.K.xxx in the corner. Actually, that's L.K.xxx's mother standing next to L.K.xxx already with cake on her face.

You will see that L.K.xxx has a pointed birthday hat at this party and she's smiling. And this is after Mr. Pepe supposedly had been abusing her for six months, not the first day she was there or something like that.

You will see she has a cake with candles being presented to her by her mother. You will see she is opening gifts and smiling.

This is the girls at the house and their mother just five days after this had supposedly being going on for a long

time.

You will also see other photos of the girls who are saying Mr. Pepe abused them at the house. You will see those photos show them smiling, playing around, getting ready to go off to school in their school uniforms.

Then you will hear testimony from witnesses who had contact with the girls while they were living in Mr. Pepe's house. You will hear that L.K.xxx's mother actually lived at the house for three months working there before she left because she and Mr. Pepe had a disagreement about how she was doing. And it's not like L.K.xxx is going to be saying that this just started after her mother left. L.K.xxx is going to claim this started right away almost. But L.K.xxx's mother was living there for three months, and you will see a videotaped deposition of her that was taken in Cambodia. She will tell you that nothing was ever said to her by L.K.xxx. She will tell you that L.K.xxx didn't act like she was being abused. One of the things she will tell you, when she left, she said to L.K.xxx so why don't you come with me. And L.K.xxx said no, I want to stay so I can keep going to school.

You will also hear from the mother of the two other girls who lived at that house for that long period of time and went to school. S.R.xxx and S.S.xxx. And their mother didn't live at the house but she visited frequently and they went home to see her almost every weekend. Maybe an exception here and

there but most weekends they went home for the weekend and they acted perfectly normal. They acted fine.

You will also hear from a teacher from the school and you will not just hear about him seeing the girls at school, you will hear about how he came over to the house on a regular basis for several months tutoring the girls in English. So he saw them like two or three times a week for an hour or two while he was tutoring them. And he will say that they acted perfectly happy. And you will hear him say that they even acted affectionate toward Mr. Pepe.

Now, you are going to hear this supposed expert, Dr. Freed, testify about how and why girls might not say anything, and it will be up to you to evaluate that and decide whether you accept that and whether it fits this case. She's definitely someone who has an agenda and a focus on working with Cambodian girls. But one of the things even she will say is that while the girls may not always say something about this type of abuse, they're not walking around seeming happy. They tend to be fairly sad and withdrawn. So they may not affirmatively say anything, but they're not acting like nothing's wrong. Especially, I would say, not when they're not with the supposed abuser, when, say, they're home with their parents, when their parents are right around there.

And in case you think -- you will hear that Mr. Pepe sent the girls to school. In case you think, well, that's just

his grooming thing, that's just for him to get access, you will hear that he had an independent interest in education of children in Cambodia. You will hear that he had a program where he would go out and distribute school supplies to children. And lest you think that is just some sort of sophisticated plan for grooming or getting access to children, you will hear that some of the places he did that in were hours away, almost all the way across the country from Phnom Penh and on at least a few occasions he gave the school supples to other people to distribute without him even being there.

You will hear this expert who will testify about this grooming theory and, again, you are going to get to decide and be the ones to decide whether to accept what he has to say, but I'm assuming that even he will admit that just if you are nice to kids and want to help kids out, that doesn't automatically mean you're grooming them for sexual abuse.

If he does claim that it automatically means that, then ladies and gentlemen, you will be the ones to decide whether to accept what he says.

Another thing you are going to hear testimony about and evidence about is the interview process these girls are taken through. First they were interviewed by representatives of a non-governmental organization whose main mission, if not its only mission, is to rescue children it thinks are being abused and make sure that people it thinks are doing the abusing

get punished. Then at least in some cases they were interviewed by a Cambodian National Police officer. After that, they were interviewed by an American law enforcement agent. Either just before or just after that, they were not only examined by a doctor, but interviewed by a doctor about this.

Then again, at least for some of them, they were interviewed by a Cambodian prosecutor or a Cambodian judge, because you will hear that there were charges pending in Cambodia for some time before Mr. Pepe was brought here. More recently they were interviewed once or twice by one or more of these prosecutors, and probably mixed in throughout that, they were interviewed, at least in the form of counseling, by people with a non-governmental organizations that are sheltering them right now.

Now, most of these interviews unfortunately weren't videotaped. But the American agent interviews were videotaped with people from the non-governmental organizations that were sheltering the girls interpreting. And you will hear things in those videotapes such as one of the girls describes whoever abused her as having cat eyes. And the Cambodian interpreter, perhaps knowing that Mr. Pepe's eyes are blue, says blue eyes.

You will hear the agents encouraging the children, "You don't have to be afraid to tell me because our job is to never let this happen again to anybody else." The adults are expected to protect the children. It should never allow

children to be tricked into that kind of situation.

You will hear in one of the interviews an interpreter saying to the girl in Cambodian or Vietnamese, I forget which it is -- and forgive my language but I want you to hear exactly what is said to the little girl -- "so you sucked his cock? Speak frankly. The mister is hear to help. Other girls have told the mister the true stories about this man."

At another point in one of the interviews, a picture of Mr. Pepe is shown but I.T. says it's not the man. But the interviews don't settle for that.

"Do you know who that is?"

"He is not the one."

"That's not the man? Daughter" -- this is the interpreter, "Daughter. Look carefully. Is he the one?"

"No. His nose is longer."

Interpreter: "Have you seen this man?"

Other interpreter -- because they are now going from English to Cambodia to Vietnamese -- "do you know this man? Don't forget to look closely."

"No."

"No? Keep in mind people may change a bit."

Interpreter: "Think. Some people change a little bit." That's the Cambodian interpreter.

Vietnamese interpreter: "Daughter, take time and look carefully to see if this is the man. Does he look familiar

without the mustache?"

The NGO's and law enforcement had their minds made up and they wanted to get the answers that they needed. Convict someone they thought was guilty.

It's not necessarily that these girls are evil, malicious people setting up Mr. Pepe. Maybe they were abused. There is medical evidence in the case of several of them. But they weren't abused by Mr. Pepe.

You will hear some additional testimony in a deposition of this woman named Basang. She is a prostitute that Mr. Pepe knew. You will hear that she had access to Mr. Pepe's house whenever she wanted. Including when he wasn't even there. She had a key. And you will hear that she took other men there, including a boyfriend named David who was jealous of Mr. Pepe, she says.

And you know this photo of Mr. Pepe standing naked with L.K.xxx. You are going to see that photo. You will hear where it was found in the computer materials that were found in Mr. Pepe's house. Now, I think what the Government wants you to think or people want you to think is well that photo was taken so he could then look at it. Well, you will hear where it was found in the computer material. It wasn't found in one of the photo program albums where a person would normally keep photos that they wanted to look at. It was found in places where you wouldn't keep stuff you wanted to look at. Or stuff that

someone else had taken that they didn't want you to see.

They were in these tinny little thumbnail images that the photo software program automatically creates and sort of puts in this other directory or folder in the computer that isn't accessed by the actual photo software itself. And on the CD -- they were found on one of these portable CD's that we stick in the side of computers, for those of you who are partially computer literate, like me, but not very. It was found in what's called the unallocated space. That's where things go when they are deleted from the CD. That's where things go where, for example, when someone who doesn't live in the house took the photograph, put it on a CD to transfer it to something else and then deleted it so no one else would see it.

And the only way you can see photos on that deleted space on the CD is by having some special forensic recovery software that these computer experts use that the average person doesn't have.

And the other place these were found was in what's called the recycle. I don't know how many of you know the recycle on a computer but that's where photographs go when they are deleted. Until you empty the recycle bin, I think the term is called, you can go back and look at them but it's not the place that you keep things that you have to look at.

You are going to see how Mr. Pepe looks in this photo. He looks, the way I put it, totally zoned out. He looks like he

doesn't even really know what's going on.

So that's -- I was about to say all the evidence, ladies and gentlemen, it's not all of the evidence but it's more of the evidence. It's not quite as simple as the prosecutor wants to make it sound.

These are horrible charges. They are the kind of charges where if someone is guilty of them, you want to convict them and see them punished. They are also the kind of charges where if someone is not guilty and you are not convinced beyond a reasonable doubt, you don't want to see someone convicted and branded with this. And at the end of this case, we are going to come back to you and we are going to ask you to return a verdict of not guilty. Thank you very much for listening to me.

THE COURT: Thank you. Ladies and gentlemen, we will take a 15 minute break. Don't talk about the case or form or express any opinions about the case until it's finally submitted to you.

Pam, do you want to show the jurors our jury room. And that's where you will be waiting at your breaks. And later we will show you how to get in there in the morning so you don't have to be waiting out in the hall.

(Recess taken)

(Jury In)

THE COURT: Is the Government ready to proceed?

MR. LULEJIAN: Yes, Your Honor.

THE COURT: You may call your first witness.

MR. LULEJIAN: Your Honor, the United States of America calls Laura Watson.

Laura Watson, M.D., Government's witness, was sworn

THE CLERK: Thank you very much. Please be seated. Please state your full name for the record and spell your last name.

THE WITNESS: I am Dr. Laura Watson, W-A-T-S-O-N.

THE COURT: You need to speak into the microphone so we can all hear you.

THE WITNESS: Dr. Laura Watson, W-A-T-S-O-N.

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MR. LULEJIAN:

Q. Good morning, Doctor.
A. Good morning.
Q. What is your occupation?
A. I am a medical doctor.
Q. Where do you practice medicine?
A. At the International SOS clinic in Phnom Penh, Cambodia.
Q. And where are you licensed to practice medicine?
A. With the General Medical Counsel in the UK.
Q. And when you say UK, what do you mean?
A. Great Britain.
Q. How long have you held a license to practice medicine in

Great Britain?

A. Since 1996.

Q. And what medical college did you attend?

A. Southampton Medical School in England.

Q. What is your specialty?

A. I am a specialist in general practice or family medicine.

Q. What is general practice?

A. General practice is -- it's like family medicine in the U.S. It's a little different in the UK. When a child is sick or there is a medical problem, you don't have immediate access to a specialist, so a GP in England would see a lot of children as the bulk of their work.

Q. When you say GP, what do you mean?

A. A general practitioner, sorry.

Q. From a general practitioner's point of view, what is the result of being the first person who screens these patients?

A. You would make a general assessment and then you would manage it as far as you could. For very serious things you would refer the patient on to a specialist.

Q. And what category, if any, of patients would a general practitioner in the United Kingdom most frequently see?

A. The bulk of the GP's work in the UK would be children, as well as adults and the elderly.

Q. What did your general practice training involved?

A. General practice training involved a two-year rotation in

hospital medicine. That would include pediatrics, obstetrics and gynecology, psychiatry and emergency medicine. Following that you spend a year in a general practice clinic in the community.

Q. What other medical experience do you have?

A. I also have a diploma in tropical medicine and I spent an year in Laos in Southeast Asia working in the pediatric hospital.

Q. When you say diploma, what do you mean?

A. A diploma is postgraduate qualification.

Q. And what other diplomas do you have, if any?

A. I also have a diploma in obstetrics and gynecology, a diploma in child health, and a diploma in family planning.

Q. After you completed your general practice training, where did you practice?

A. I then moved to Phnom Penh and Cambodia and practiced at the International SOS Clinic.

Q. During your 12 years of practice, approximately how many children do you believe you have examined?

A. Thousands. Thousands of children.

MR. LULEJIAN: Your Honor, the United States moves that Dr. Laura Watson be declared as an expert in the field of general practice and family medicine.

THE COURT: Any objection?

MR. BROWN: No objection, Your Honor.

THE COURT: All right. She is an expert in that field.

BY MR. LULEJIAN:

Q. Dr. Watson, how did you become involved in this case?

A. I was asked by my clinic manager, Brian Ritchie, if I would see some girls that were suspected of sexual abuse.

Q. And what were you asked to do?

A. I was asked to see the children, take a history, make an assessment and perform any tests or treatment that I thought they needed.

Q. During the course of that treatment, did you happen to examine a girl by the name of I.T.?

A. Yes, I did.

Q. And how many times did you examine her?

A. I saw her twice.

Q. And what was the first time you examined her? When was the first time you examined her?

A. On the 20th of June, 2006.

Q. And where did you examine her?

A. At the International SOS Clinic in Phnom Penh.

Q. When you first met I.T., how would you describe her appearance, her general appearance and demeanor?

A. She was alert, she -- she had some rather defensive body language. She found it very difficult to relax during the consultation. I couldn't really put her at ease. She would sit

on the edge of her chair with her eyes kind of staring forward, not really making eye contact with me. Very kind of hunched over, a little bit like this.

Q. She was hunched over like you are demonstrating in the court right now?

A. Correct. Yeah.

Q. Were you able to develop a rapport with her?

A. It was very difficult. Usually I can put children at ease quickly. I speak a little bit of Khmer so that usually helps with Cambodian children, but I.T. did not relax at all.

Q. What did you do after you met I.T.?

A. I introduced myself. I went through the usual procedure that I would go through in a consultation. I took a history. I explained to her what I would do and that I would talk to her and then I would make an examination. Tell her not to be afraid. And then once I have taken the history, I would then ask her to sit on the table and perform an examination.

Q. And what would that examination entail?

A. I would ask her to remove all of her clothing and put on a gown. I would then do a top-to-toe examination, and finally at the end I would perform a genital examination.

Q. And how did you examine her genitals?

A. Through direct inspection with a bright light.

Q. What tools, if any, did you use to perform the genital examination?

A. I didn't actually use any tools in this case. I would have liked to have performed a speculum examination, but in this case it was impossible.
Q. What is a speculum examination?
A. A speculum is a metal or plastic device that is used for examining the inside of a vagina.
Q. Why didn't you use one in this case?
A. It was just impossible. She -- she would barely allow me to examine her lying down on the table, let alone allow an internal examination. It would have felt like I was assaulting her to continue with an examination.
Q. When you say "she" and "her," who do you mean?
A. I.T..
Q. Doctor, I am going to show you a drawing that has been marked as Government Exhibit No. 2042 for purposes of identification.
What does this image depict?
A. This is a photograph of a normal adult female vulva or female genitalia.
Q. And if you could describe for the Court and the members of the jury, would you explain what you look for on this diagram when you perform a general exam. And I am happy to point it out on the screen.
A. So I would look for the distribution of pubic hair. I would look for any bruising around the labia or the inner

thighs. I would look at the vaginal opening to see whether there was a hymen present or not and whether there was any evidence of any tears or other evidence of trauma.

Q. What is a hymen?

A. The hymen is a -- it's a piece of tissue that is mucous membrane so it's like a very thin piece of skin that in a normal healthy child partially covers the vaginal opening.

Q. So if I point to -- I think what you said --

A. On this picture you can't see the hymen.

Q. Where would it be if it was present?

A. It would be partially obscuring the vaginal opening.

Q. Is that where I am pointing right now?

A. Correct.

Q. What did you observe when you examined I.T.'s genitals?

A. I observed that she had an obviously disrupted hymen. She had a small vaginal tear in her vaginal opening. At the left on the bottom, bottom left of the vaginal opening. That's right. She also had bruising around the vaginal opening and there was a little bit of bleeding from the bottom edge of the vaginal tear.

Q. When you say bruising, I am pointing to what has been marked in this picture as labia majora?

A. Right. Just around the base and around the inner tissues and the labia minora.

Q. You said an obviously disrupted hymen. What did you mean by that?

A. The hymen was visible but it looked sort of raggedy as if it had been torn.

Q. What do these observations tell you?

A. These examination findings are consistent with vaginal trauma.

Q. And what is trauma?

A. Trauma is damage to tissues.

Q. And how would vaginal tissues be damaged or subject to trauma?

A. This kind of damage is consistent with forced penetration.

Q. And you base this conclusion on?

A. On my clinical experience as a physician and on my knowledge of normal female anatomy.

Q. When did you next see I.T.?

A. I saw I.T. again on the 6th of June, 2007.

Q. And where was that?

A. At the International SOS Clinic, Phnom Penh.

Q. And when you met I.T. on June 6th of 2007, what did you observe about her general appearance and demeanor?

A. Again, her behavior seemed very similar. She was -- she was in -- she had the same body language. She had the same staring eyes. She once again was very difficult to put at her ease. She really couldn't relax during the consultation.

Q. What was her body position like?

A. The same as before. She again sitting on the edge of her

chair, staring forward, kind of very abnormal and frightened looking.

Q. Where were her shoulders relative to her head?

A. She was hunching her shoulders forward and kind of making herself as small as possible.

Q. And did you have a difficult time establishing rapport this time?

A. That's correct. The same as last time.

Q. What kind of examination did you perform on that date?

A. I again performed a general physical examination and a genital examination.

Q. And did you use a speculum --

A. No.

Q. -- when you examined the genitals?

A. No. I did examine her genitals but with direct inspection.

Q. And what did your examination reveal?

A. It showed that she had a wide opening to the vagina with an absent hymen -- a hymen that was not visible. Excuse me.

Q. Did you have an opportunity to examine a girl by the name of L.K.xxx?

A. Yes, I did.

Q. How many times did you examine her?

A. I examined her twice.

Q. When did you first see L.K.xxx?

A. On the 20th of June, 2006.

Q. Where was that?
A. At the International SOS Clinic in Phnom Penh.
Q. What kind of examination did you perform on L.K.xxx?
A. I performed a full general physical examination and a genital examination.
Q. And how did you perform this genital examination?
A. Direct inspection using a bright light and also a speculum examination.
Q. What did you observe when you examined L.K.xxx's genitals?
A. She had a wide, a gaping vaginal opening. She had no visible hymen, and I did not see a tear.
Q. Doctor, you have used that term twice wide -- I'm sorry, wide vaginal opening or gaping vaginal opening. What do you mean by that?
A. Her vagina had a more -- a very open appearance, a little bit like the picture that you showed earlier.
Q. For the record, I am putting Exhibit 2042 on the overhead again.
A. Normally with a child I would expect to see a narrow more slit-like vagina with a visible hymen. Her vagina was very wide and open.
Q. Based on your training and experience, what did this finding suggest to you?
A. Based on my experience, it's consistent with repeated penetration.

Q. Why do you say repeated penetration?

A. Well, because if the -- if it had been recent penetration in a person of this size, I would expect to see evidence of recent trauma such as a tear or bleeding or ragged hymen edges. The appearance of this vagina looked more like an vagina that had gotten used to repeated penetration.

Q. Did you see scarring as well?

A. I did not.

Q. Would you see scarring as well with recent penetration?

A. You might see scarring.

Q. When did you next examine L.K.xxx?

A. I examined her again on the 6th of June, 2007.

Q. And what did you do when you saw her on that date?

A. I did the same as the previous time. I took a history and performed a general physical examination and a genital examination.

Q. And what did your genital examination reveal?

A. That she had a wide gaping vagina and no visible hymen.

Q. Did you examine a girl by the name of T.C.xx?

A. Yes, I did.

Q. How many times did you examine her?

A. Once.

Q. And on what date and where?

A. On the 6th of June, 2007 at the International SOS.

Q. And what kind of examination did you perform on T.C.xx?

A. A general physical exam and a genital examination.

Q. And how did you examine her genitals?

A. Through direct inspection and with a speculum.

Q. And what did you observe when you examined T.C.xx's genitals?

A. She had a wide vaginal opening with no visible hymen. There was some evidence of previous trauma with a small healed tear just inside the vaginal opening.

Q. And what is the significance of the small healed tear?

A. Suggestive of previous trauma.

Q. To the vagina?

A. Correct.

Q. Did you have an opportunity to examine a girl by the name of K.S.x?

A. I did.

Q. And how many times did you examine her?

A. Just once.

Q. And on what date and where?

A. On the 6th of June, 2007 at SOS clinic.

Q. And what did that examination entail?

A. General physical examination and genital examination.

Q. And when you examined her genitals, how did you do it?

A. Through direct inspection and with a speculum.

Q. And what did you observe when you examined K.S.x's genitals?

A. K.S.x had -- also had a wide open vaginal opening with no visible hymen. With the speculum examination, she had evidence of previous trauma through -- with some splitting and healing of the vaginal skin just inside the vaginal opening.

Q. Based on your experience and training, what is the significance of that small healed -- I'm sorry -- of the splitting and healing of the vaginal skin inside the opening?

A. That it's again suggestive of vaginal trauma.

Q. Did you examine a girl by the name of NTDx?

A. I did.

Q. And when did you examine her?

A. On the 6th of June, 2007.

Q. And did you go through the same type of examination procedure?

A. Yeah. Exactly the same.

Q. And how did you examine her genitals?

A. Through direct inspection and with the speculum.

Q. And what did you observe when you examined NTDx's genitals?

A. She had a slightly inflamed vaginal opening. Also a wide opening with no visible hymen.

MR. LULEJIAN: One moment, Your Honor.

Your Honor, we have no further questions at this time.

THE COURT: Thank you.

Cross-examination?

MR. BROWN: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. BROWN:

Q. Good morning, Dr. Watson.

A. Good morning.

Q. You testified on direct examination that you performed a general physical examination of the alleged victims in this case?

A. That's correct.

Q. Are you familiar with the term forensic examination?

A. I am.

Q. What is a forensic examination?

A. A forensic examination would be an examination -- in my view would be an examination that takes place in a law enforcement capacity and would be one that takes DNA samples, that kind of thing.

Q. When you say forensic examination, is the forensic examination undertaken when there is a possibility of suspected rape?

A. That's correct.

Q. Is a forensic examination taken when there is law enforcement involvement when a patient is brought to a hospital or clinic?

A. It may be, yes.

Q. With respect to the goals of -- did you perform a forensic examination in this case?

A. I performed a general physical examination and a genital examination.
Q. At the time that you were conducting your examination, were you contemplating what your findings might be used for?
A. At the time I was instructed to -- I was asked to do whatever was necessary for these girls medically.
Q. And who instructed you to do that?
A. The NGO's, the NGO staff that came with the girls, and also the law enforcement agent.
Q. Okay. And that's Agent Phillips?
A. Correct.
Q. With respect to your procedure, is it fair to say that one of the goals was treatment?
A. That's correct.
Q. One of the goals was just to perform a general examination; correct?
A. Yes.
Q. One of the goals in -- as an expert in this field, one of the goals is to obtain an accurate medical history; correct?
A. That's correct.
Q. And to identify all of your physical findings?
A. Yeah.
Q. And you said on direct that you performed a top-down examination; correct?
A. That's correct.

Q. So you were trying to be accurate and capture as much information as you could; correct?
A. As far as I could.
Q. Is it also fair to say that one of your objectives was to collect and preserve evidence?
A. No -- well, I'm not sure I would agree with that.
Q. But it's fair to say that you were attempting to document as much information as you could?
A. That's correct. I was taking a history.
Q. Okay.
Are you familiar with the concept of a sexual assault kit?
A. I've heard of it through my training, that's right.
Q. And does the -- you work at a clinic in Phnom Penh?
A. Yes.
Q. And that's the SOS Clinic?
A. Yes.
Q. Does the SOS Clinic have the ability to take DNA swabs?
A. We have dry swabs that can be used as cheek swabs to collect DNA samples.
Q. Did you do that in this case?
A. Yes, we did.
Q. Is that information documented in your reports?
A. No, I believe it isn't.
Q. In terms of collecting and preserving evidence, in your

training and experience, have you learned that when you are performing a physical examination of a suspected rape victim, that it's important to take photographs of your examination and your observations?

A. Sorry. Could you just repeat the question?

Q. In the course of your training and experience, have you learned that it's important to take photographs of your examinations and findings?

A. Not in the course of my training, no.

Q. Based on your experience, do you think it was important to take a photograph of your observations for future reference?

A. I would not normally take photographs of children as part of my general examination.

Q. Are you familiar with some protocol that suggests that it's a good idea to take photographs of suspected injuries?

MR. LULEJIAN: I am going to object on the grounds that this is calling for information which the -- calls for facts not in evidence.

THE COURT: Overruled.

If you are familiar with that, please tell us about it.

THE WITNESS: During my general practice training, we had a day's training on forensic medicine. During that training, those kinds of techniques were certainly discussed.

BY MR. BROWN:

Q. But did you not take any photographs of your observations in this case?
A. I don't have access to that kind of equipment.
Q. Okay.
During the course of your examination, did you learn that one of the girls was suspected to have been drugged?
A. Yes, I did.
Q. Did you take any blood samples or order a toxicology report?
A. No, I did not.
Q. And, Dr. Watson, in terms of how you saw your role in this investigation, as a medical doctor, it's your job to be objective; correct?
A. That's correct.
Q. And it's your job to be neutral as much as possible; correct?
A. My job is to be an advocate for the child that I'm taking care of.
Q. So it wasn't -- you don't think it was your job to be neutral in terms of your findings?
MR. LULEJIAN: I am going to object to this, Your Honor, it mischaracterizes --
THE COURT: I don't know what that means.
MR. LULEJIAN: Vague and ambiguous.
MR. BROWN: I will rephrase it.

THE COURT: Thank you.

BY MR. BROWN:

Q. As a medical doctor, it's your job to observe and treat; correct?

A. That's right.

Q. You're not an advocate for either side; correct?

A. I'm sorry, I don't really understand the question.

Q. Well, you just said that you feel that it's your job to be an advocate?

A. As a child's physician, when that child is with me in the room, I would be there, I am there to act in their best interests as regards their health.

Q. With respect to their health?

A. That's correct.

Q. And you testified that the initial interview was arranged at the request of Agent Phillips -- I'm sorry -- the initial examination?

MR. LULEJIAN: Objection. Assumes facts not in evidence.

THE COURT: It's just a question.

You can answer.

THE WITNESS: I was asked actually by my clinic manager who had been contacted by Agent Phillips, that's correct. It was also by request of the child's guardian who was present at the time.

BY MR. BROWN:

Q. Because at the time the children were in the care of a guardian of an NGO?

A. That's correct.

Q. And on June -- was it the 21st or June 20th; do you recall?

A. It was June 20th.

Q. That's 2006?

A. Correct.

Q. You interviewed four of the alleged victims; correct?

A. That's right.

Q. Okay.

That was S.S.xxx; right?

A. That was L.K.xxxxx, I.T., S.R.xxx, and S.S.xxx.

Q. And then almost a year later, you conducted another examination?

A. That's right.

Q. Okay.

And whose idea was it to conduct another examination in June of 2007?

A. The request again came from Agent Phillips and the children's guardians.

Q. And was that examination in anticipation of litigation in this case?

A. I don't think I can answer that question.

Q. Did you find that it was unusual that a -- that you will be

requested to perform another examination a year after the alleged incident?

A. Not really. I often see children repeatedly.

Q. But it wasn't a follow-up checkup; correct?

A. I was asked to do the same thing again. Was asked to make an assessment, find out if the girls have any health problems, conduct a full examination and make an assessment.

Q. Do you recall in November of 2007 being contacted by Mr. Pepe's defense team?

A. I do.

Q. And do you recall the Defense team attempting to arrange an interview with you or a meeting?

A. Yes, I do.

Q. And you refused to meet with the Defense team; is that correct?

A. May I explain what happened?

Q. If you could just, please, answer the question, Dr. Watson.

A. Can you repeat the question?

Q. Did you refuse to meet with the Defense team?

A. I did.

Q. With respect to your examination of I.T. on June 20th, you said you did a top-down examination?

A. Yes.

Q. Did you use an alternative light source to conduct that -- to aid in your ability to examine?

A. Yes, I have a lamp.
Q. And you -- before examining her private parts, you conducted a general physical assessment; correct?
A. That's right.
Q. And you learned that there was no bruising to I.T. in terms of her external -- external condition; correct?
A. She had bruising around her vaginal opening. She did not have bruising on her torso or arms.
Q. You did not observe any bruising on her face?
A. I did not.
Q. You did not observe any bruising on her wrists or ankles; correct?
A. That's correct.
Q. Or her torso?
A. That's correct.
Q. You learned that -- or you testified that she had a disrupted hymen; correct?
A. Yes.
Q. And there was slight bleeding at the distal edge.
What is the distal edge?
A. It's the bottom edge.
Q. When you interviewed I.T., when you were conducting your evaluation, did you attempt to ascertain the date of the alleged incident?
A. I didn't go into a lot of detail with her over that.

She -- I think I have written in the report she said it was on Saturday. She used the word "Saturday."

Q. But your examination was in late June; correct?

A. That's right.

Q. Did you attempt to ascertain a specific month that these injuries were allegedly inflicted?

A. It can be very difficult sometimes to get children to give you a precise timing.

Q. Did you attempt to?

A. What often happens with Cambodians and time, when you ask a question, they'll be quite vague. They'll say oh, yes, one or two weeks or one or two days. I attempted to, but I couldn't get a clear, accurate answer from her.

Q. Did you learn from Agent Phillips when the law enforcement thought that the incidents may have occurred or did you learn from the NGO when they thought the incident may have occurred?

A. In actual fact, I did not.

Q. If I told that you that the alleged injuries occurred in May, early May, or a month prior to your examination, would you have thought it unusual to find that she was still bleeding at the time of her examination? A month?

A. You know, vaginal skin heals very well. To have found a tear with bleeding at this stage if it was a month previously that the trauma had happened, it would have been -- for me this would have been a reflection of very serious trauma to have

still been bleeding a month later.

Q. So in the situation where there is very serious trauma -- we are talking about a deep, deep injury to the vaginal wall; correct?

A. Correct.

Q. When you examined I.T. the following year in June of 2007 -- correct?

A. Correct.

Q. You found that there were no abnormal vaginal developments. You used the term, the code VAD?

A. NAD.

Q. I'm sorry. NAD. I misspoke. And what does NAD mean?

A. It means no abnormal detected.

Q. Okay.

So when you examined I.T. a year after the fact, you observed no abnormalities; correct?

A. No. Because I observed that she had an absent hymen.

Q. Okay.

But in terms of you didn't observe any scars to her?

A. That's correct.

Q. You didn't -- are you familiar with the term tags?

A. Yes.

Q. What is a tag?

A. A tag is a small piece of skin.

Q. And you did not observe any tags; correct?

A. I did not.
Q. You ordered a wrist X-ray?
A. That's correct.
Q. And that was to try to ascertain her age?
A. Yes.
Q. But you did not take any photographs to document your findings?
A. No. I don't have access to that kind of equipment.
Q. You talked about the absence of a hymen as a factor that led you to the conclusion that there was forced vaginal trauma.
Is that fair to say?
A. Yes, that's correct.
Q. As an expert in this field, are you familiar with research and findings that find that the absence of a hymen itself is not really a determining factor as to whether there has been vaginal intercourse?
A. I'm aware of what happens during normal puberty and with normal female anatomy.
Q. But are you aware that there have been some findings that conclude that the absence of a hymen is not determinative?
A. What would normally happen during puberty is under the influence of estrogen, the hymen thins and gets more stretchy so towards the end of puberty in some girls, the hymen is not always visible.
Q. And is it true that some people are born without a hymen?

A. According to my reading, the existence of congenital absence of a hymen, it doesn't exist, no.

Q. Is it fair to say that in addition to the absence of a hymen, it's important to document or examine other physical indicators that might support allegations of rape or abuse such as bruising?

A. Yes, that's correct.

Q. Such as difficulty walking?

A. Yes, that's correct.

Q. Stained and torn clothing?

A. Yes.

Q. And the presence of sexually transmitted diseases is also a factor; correct?

A. Yes, that would be correct.

Q. And there were no STD's in this case; right? In terms of the girls that you examined? None of them had STD's?

A. In terms of genital examination, I did not see any evidence of STD's.

Q. Okay.

With respect to L.K.xxx, you examined her also on June 20th or June 21st, 2006?

A. June the 20th, 2006.

Q. And she reported to you things that she said occurred; correct?

A. She did.

Q. And those were very graphic, is it fair to say?

A. Yes.

Q. She told you that she had been raped 20 or 30 times?

A. She did.

Q. She said that she had been beaten unconscious?

A. She did.

Q. She said that the last rape occurred two to three days before the police arrived on June 17th.

A. She said it had occurred two to three days before the police arrived. I was not aware of what day the police had arrived.

Q. But it was soon before your examination; is that fair to say? Within a week?

A. I don't actually know what day the police arrived.

Q. Did you learn at some point in the course of your preparation when L.K.xxx was removed from the home?

A. I believe it was fairly soon before I saw her.

Q. So fairly soon before you saw her, she claimed that she had recently been raped?

A. Yes.

Q. And according to L.K.xxx, she had reported bleeding in the course of her -- in the course of being raped?

A. She reported bleeding the first time and the second time that it happened. That's what she told me.

Q. And you performed a vaginal examination of L.K.xxx?

A. I did.
Q. And you used the bright light?
A. Yes.
Q. And you found that L.K.xxx had no vaginal tears; correct?
A. That's correct.
Q. You also did a speculum examination of L.K.xxx?
A. I did.
Q. And that's a more detailed, and for lack of a better word, intrusive examination?
A. It's an internal examination, correct.
Q. When you did the speculum examination of L.K.xxx, you also observed no vaginal tears; correct?
A. That's correct.
Q. You did not observe any external bruising to L.K.xxx; right?
A. That's correct.
Q. Okay.
She had no bruises on her face.
A. She did not.
Q. She did not have any bruises on her wrists?
A. She did not.
Q. Her torso?
A. No.
Q. Or her ankles?
A. Correct.

Q. Or her inner thighs?
A. That's correct.
Q. And so the basis for your opinion that L.K.xxx -- of the force -- that there had been forced penetration, was simply the fact that she had a wide vaginal opening and no hymen?
A. Yeah. Gaping was the word I used because it wasn't just wide, it was very wide.
Q. Okay.
But you didn't use the word gaping in your medical report, did you?
A. I don't believe I did, no. But I can remember it.
Q. Okay.
But if it was gaping -- in your mind is there a difference between gaping and wide?
A. This girl looked like she had a much more adult vagina.
Q. When you interviewed L.K.xxx, did you attempt to obtain her sexual history?
A. Yes, I did.
Q. When you examined her the following year, you learned -- there were no significant -- any additional significant findings; correct?
A. Nothing additional, correct.
Q. Okay.
Were you aware that L.K.xxx had been examined four days or three days prior to your examination of her by another

doctor at another hospital?

A. No, I was not.

Q. Do you know Dr. Phaly?

A. I met her for the first time in connection with this case.

Q. So you did not know that she had been seen by another doctor --

A. No, I did not.

Q. -- three days before your examination?

And you have not reviewed Dr. Phaly's findings?

A. I have seen one page of her medical report.

Q. And Dr. Phaly claims that L.K.xxx had scratches on her vulva; correct?

A. I am not aware of that.

Q. But you did not observe any scratches on L.K.xxx?

A. I did not see any scratches.

Q. Again, you examined the person K.S.x; is that -- KS are her initials -- on June 6th, 2007?

A. I'm sorry. I don't know who you mean by KS.

Q. K.S.x. K.S.x.

A. K.S.x. okay, yes, I did see K.S.x.

Q. And you did not document those -- your observations with photographs?

A. No. I don't have access to photographic equipment in my clinic.

Q. But you do have the ability to diagram in -- with a pencil

or a pen -- the location of specific injuries that you observed; correct?

A. That's correct.

Q. So with respect to all of the alleged victims in this case, you had the ability to sketch out what you say you observed?

A. I could have done that, that's correct.

Q. You did not do any sketches or diagrams as to the location of the specific injuries or bruising that you saw; correct?

A. I made some sketches in my notes. I did not sketch the location of the tears or scars that I saw.

Q. Again, with respect to -- and please excuse my language -- the alleged victim named NTDx?

A. Yes.

Q. You saw her on June 6th, 2007; correct?

A. That's correct.

Q. And you concluded that there are no -- aside from the absence of a hymen, that there was no significant findings. You did not observe any scars, tags or bruising; correct?

A. No. She had a little inflammation but there was no scars. There were no scars that I saw.

MR. BROWN: Your Honor, I have no further questions at this time.

THE COURT: Any redirect?

MR. LULEJIAN: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. LULEJIAN:

Q. Doctor, you stated earlier that when a child comes for an examination, you speak with them first.

A. That's right.

Q. Why do you do that?

A. I find it puts them at ease. Children are often nervous when they come to see the doctor. I usually smile, introduce myself, ask them their name, how old they are.

Q. What else do you do besides -- in speaking with them, besides getting familiar with them?

A. I would explain what I'm going to do and who I am, maybe have a little bit of a chat. You just try to put them at ease.

Q. Do you take a history of the child?

A. Yeah. Take a full --

Q. Why do you that?

A. The history gives a lot of information that is relevant for both your examination and your treatment.

Q. And what does that tell you with respect to how you are going to treat the patient?

A. It allows you to form an overall opinion, not just based on examination. If you take a history, you get a lot of background and you can then -- it can help you to make an assessment.

Q. When you examined L.K.xxx, did she give you a history?

A. She did.

Q. What was her demeanor when she gave you that history?

A. It was very difficult for her. She was telling me the story through her translator. And in some ways she was quite matter of fact, but there would be long pauses as it was difficult for her to tell the story.

Q. Let's talk a bit about that story.

Where was L.K.xxx -- did L.K.xxx tell you where she was living prior to -- actually, did L.K.xxx tell you where she was living?

A. She -- she had been living in a foreigner's house.

Q. And how did she get there?

A. She told me that about three months ago somebody came and told her that if she went to work in a foreigner's house as a cleaner, that he would give her food and pay for her to go to school.

Q. And who was the person who brought her to the house?

MR. BROWN: Objection, Your Honor. Beyond the scope. 403 and hearsay.

THE COURT: Sustained.

BY MR. LULEJIAN:

Q. What was the name of the foreigner whose house she went to?

MR. BROWN: Same objection, Your Honor.

THE COURT: Sustained.

BY MR. LULEJIAN:

Q. What did she tell you she was asked to drink prior to having sex?

MR. BROWN: Again, Your Honor. This line of questioning is beyond the scope.

THE COURT: Is that relevant to your medical diagnosis?

THE WITNESS: It could potentially be relevant.

THE COURT: Overruled.

THE WITNESS: She told me that she was given a powder, a white powder to drink, mixed with water, and that the powder made her feel sleepy and dizzy.

BY MR. LULEJIAN:

Q. What did she say happened after she felt sleepy and dizzy?

A. She told me that he -- the foreigner that she was living with tied her up, tied her wrists and ankles together and tied her ankles to her wrists and that he tried to rape her.

Q. What, if anything, did she say she did?

A. She said she struggled and then he hit her with his hands until she was unconscious.

Q. What happened when she woke up?

A. She told me that when she woke up, she was sore and that she was bleeding from her vagina.

Q. Did she say anything else happened after she woke up?

A. She said when she woke up, that they untied her and that she bled a lot.

Q. And how many times did she say this happened?

A. She said it happened to her two or three times a week. She

said the second time that this happened, that she was raped, that she was awake and tied in the same way.

Q. Did she say whether she was -- what was she asked to drink prior to being raped the second time?

A. The second time he did not give her any -- any white powder. He gave her a white pill after the rape and he told her that it was an antibiotic. She bled again after the second time.

Q. Approximately how many times -- did she say whether she was tied up again after that second time?

A. She said after that he stopped tying her up and just raped her.

Q. Approximately how many times did she say he raped her?

A. She told me that she couldn't count because there were too many, but maybe 20 or 30 times.

Q. What, if anything, did L.K.xxx say about a woman who lived in the house?

A. She told me there was a woman who lived in the house and she taught her how to --

MR. BROWN: Your Honor, I am going to object to this line of questioning as hearsay.

THE COURT: Sustained.

BY MR. LULEJIAN:

Q. How old did L.K.xxx say she was?

A. L.K.xxx told me she was 11.

Q. And when did she say the last rape occurred?
A. She said it was about two to three days before the police arrived.
Q. Did she tell you whether she had started menstruating?
A. She said she had not yet started menstruating.
Q. Did she say whether she had ever had sex prior -- actually let me rephrase that.
When had she had sex prior to being raped?
A. I asked her some sexual history. She said she had never had sex before this happened.
Q. Doctor, you testified earlier that the vagina, especially in young people, heals fairly quickly; is that correct?
A. That's correct.
Q. And you were asked about the absence of vaginal tears when you went and examined L.K.xxx.
A. That's right.
Q. Based on your training and experience, what would the absence of vaginal tears in somebody that young suggest?
A. It would suggest certainly the possibility that this trauma had happened a long time previously or several months previously. That this -- the vagina has had a chance to heal. The trauma had happened -- if the trauma had happened several months previously, then it wouldn't necessarily surprise me not to see any trauma, any bleeding or bruising still present several months later.

Q. Would you expect to see repeated trauma so it would heal and then bleed, heal and then bleed?
A. You might initially for the first few times, you would expect to see repeated trauma but ultimately vagina skin is quite stretchy and the appearance of her vagina as stretched and open would be consistent with basically a vagina that had got used to being penetrated.
Q. You said earlier that her vagina looked like that of an adult. What did you mean by that?
A. Well, normally in a child, as I said at the beginning, you would expect to see a more slit-like vagina, a narrow opening, partially covered with the pale membrane of a hymen. Her vagina was large and open.
Q. When you were in the examination room with the children, what was your primary concern?
A. My primary concern was to make an assessment of what might have happened to these children, to perform -- to come to a conclusion and perform any tests or treatment that they might need.
Q. What did you hope -- let me strike that.
Did you prescribe any medication to any of the children?
A. I did. The first -- when I saw the four children the first time, I gave them antibiotics to cover them for common sexually transmitted diseases.

Q. Did you give anybody anything else?
A. We also performed blood tests to test for HIV and hepatitis and syphilis.
Q. Why would you do that?
A. Because if they had been sexually abused, they may have been exposed to some of these infections.
Q. I want to ask you about your examination of I.T.. Did you have -- did you get her sexual history as well?
A. Yes, I did.
Q. And what was her sexual had history?
A. She told me that she had never had sex before.
Q. How old did I.T. say she was?
A. She told me she was 12.
Q. And for purposes of her medical diagnosis, what did I.T. tell you about what happened to her?
A. She told me that she had been -- that she had been raped.
Q. Did she tell you what she was specifically -- what she specifically had to do?
A. She told me that she was tied up, that her wrists and ankles were tied together. That she was hit on her head, hit on -- hit with the hands on her head and then she was turned over on to her front and then lifted up and then raped.
Q. Did she say whether she was asked to do anything with her mouth?
A. She was also -- the first few days when she got to the

house, she was shown how to perform oral sex.

Q. What, if anything, did she say about other ways she was hit?

A. Excuse me. I just need to consult my notes.

That's right. She said that she was downstairs in the house and that she was told to go upstairs where -- where he was. She didn't want to go so the woman who was taking care of the girls in the house hit her on her hands and her legs with a stick.

Q. Did she tell you what she was -- what she ingested prior to having sex or being raped?

A. She told me that before she was raped, she was given a white tablet to swallow, and after taking this white tablet, she felt sleepy and dizzy.

Q. The person who raped her, did she say whether or not he used any protection?

A. She said he did not use a condom.

Q. Did she say whether the man who raped her did anything to himself prior to the act?

A. She told me that he put some liquid on his penis beforehand.

Q. How did she physically feel after being raped?

A. She said afterwards that she had a lot of pain and bleeding.

Q. Did she say whether she was raped again after this first

time?

A. Yes. She said the second time she was raped was two days later. That he didn't give her any medicine this time and he did not tie her up but that she had a lot of pain and bleeding afterwards.

Q. Doctor, how resilient are children to injuries?

A. Pretty resilient. Children heal pretty quickly.

Q. You were asked on cross-examination whether or not the absence of a hymen indicated -- was a sole indicator of virginity.

Do you remember that?

A. Yeah.

Q. In making your assessment, did you look at other factors other than the presence of the hymen?

A. I did.

Q. And what were those other factors?

A. Do you mean with regard to virginity?

Q. I'm sorry. Let me rephrase that. To determine whether or not a girl had had sex.

A. I'm sorry. I don't really understand the question. Can you rephrase it?

Q. If somebody had had sex, what else would you see besides the absence of a hymen?

A. You might see a widened vaginal opening.

Q. Would you see scarring or bruising?

A. You might if the sex had been traumatic or forceful.

MR. LULEJIAN: I have no further questions, Your Honor.

THE COURT: Recross?

MR. BROWN: I have no further questions, Your Honor.

THE COURT: Thank you very much, ma'am, you're excused.

Does the Government have another witness?

MR. BROWN: Your Honor, I'm sorry. With respect to Dr. Watson, if we could have her subject to recall for the Defense because I think it's something we discussed with Government counsel prior to her testimony.

MR. LULEJIAN: Your Honor, our only concern is Dr. Watson is returning back -- I'm sorry. We will deal with this outside the presence of the jury. I apologize.

MR. BROWN: Very well.

THE COURT: All right. Discuss this later.

MR. GUNN: Your Honor, we may need this as an impeachment witness.

THE COURT: All right. Stop. Sit down.

Does the Government have another witness?

MS. DONAHUE: Yes, Your Honor. We call James Clemente. He should be right in.

MR. GUNN: Your Honor, could I consult with counsel for the Government?

THE COURT: You may.

James Clemente, Government's witness, was sworn

THE COURT: Thank you. Be seated. Please state your first and last name and spell them for the record.

THE WITNESS: Thank you, Your Honor. My name is James Clemente, C-L-E-M-E-N-T-E.

DIRECT EXAMINATION

BY MS. DONAHUE:

Q. Can you tell us where you are employed.

A. I am employed with the FBI in the National Center for the Analysis of Violent Crime in the Behavioral Analysis Unit.

Q. And are you a special agent?

A. I am a supervisory special agent with the FBI.

Q. And how long have you been employed with the FBI?

A. A little over 20 years.

Q. And before you joined the FBI, tell us a little bit about your background.

A. I have a degree in chemistry and philosophy and I went to law school. I became a prosecutor for the City of New York, and I led the sex crimes prosecution team in the Bronx before I was admitted to the FBI academy and became an FBI agent.

Q. And you said that you are with the National Center for the Analysis of Violent Crime and the Behavioral Analysis Unit?

A. Yes.

Q. And can you tell us what that is?

A. Well, the National Center is an entity created by Congress in -- it's housed in the FBI -- in the FBI academy, and it is an entity created to study violent and sexual crimes across the country and around the world.

The Behavioral Analysis Unit is one component of that. And in the Behavioral Analysis Unit, we do criminal investigative analysis and behavioral analysis related to violent crimes and sexual crimes.

Q. And can you tell us, what is your position at the National Center?

A. So I'm a supervisory special agent. I've been there for ten years. I specialize in child sex crimes. Our unit, Behavioral Analysis Unit 3 covers crimes against children, sex crimes against children, child abduction and Internet-related sex crimes against children and also child pornography.

Q. Were there any qualifications that were necessary for you to obtain this -- your current position at the Behavioral Analysis Unit?

A. Yes. Basically to get into the FBI, you have to have a college degree and three years of work experience. To get into the Behavioral Analysis Unit -- there's about 12,600 agents in the FBI. There are 24 members of the Behavioral Analysis Unit in the country.

The unit requires at least ten years of law enforcement experience, an advanced degree, above college

degree, so graduate level degree, either Masters or Doctorate degree. And a tremendous amount of experience working violent and sexual crimes. So that's basically the requirement -- the basic requirements.

Q. Can you just describe your experience working sexual crimes.

A. Well, when I got into the FBI, I worked on the child sexual victimization task force in New York. It's a joint task force with the NYPD and the FBI. And we worked sexual and violent crimes. I did that for a couple of years. I did a number of undercover operations in that area and then other areas.

I worked other crimes as well after that. I worked some white collar crimes and cold case homicides before I was -- came back to working sexual victimization cases and was promoted to the rank of supervisor and promoted to the Behavioral Analysis Unit.

Q. And during the course of your professional law enforcement career, can you estimate the number of violent and sex crimes that you have investigated?

A. Well, personally investigated several hundred over the course of my career.

Q. And can you estimate how many violent and sex crimes cases you have consulted on over the course of your career?

A. Yeah, it's in the thousands. Probably averages about 200 a year for the last ten years that I have been in the Behavioral

Analysis Unit. We consult on cases, we do research and we do training, we teach across the country and around the world.

Q. Is that training limited to law enforcement?

A. No, it isn't. We do law enforcement audiences. We also do academic, universities. We do professionals in fields that relate to child sexual victimization, psychologists, medical doctors, defense attorneys, prosecutors.

Q. And have you ever been sworn in as an expert on child sexual victimization in the past?

A. Yes, I have. I have testified about a dozen times in different cases, mainly federal court, but also some state and military courts.

MS. DONAHUE: Your Honor, I would ask that Supervisory Special Agent Clemente be designated an expert in child sexual victimization.

THE COURT: Any objection?

MR. BROWN: No objection, Your Honor.

THE COURT: All right. He will be designated as an expert. Thank you, you may proceed.

BY MS. DONAHUE:

Q. Special Agent Clemente --

THE COURT: Or is this a good place to break? I have a question from the jury. We are about five minutes from a break time anyway. So do you want to go for five minutes or do you want to break now?

MS. DONAHUE: This is actually a good time to break.

THE COURT: Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We will try to keep it to 15 minutes but, as I said, I have another question from my jury so I am going to try to deal with that, and I will get back to you as soon as I can. And there is nobody here to lead you to the jury room so you can find your own way, and we will call you out when we are ready.

(Recess taken)

(Jury In)

THE COURT: Thank you for being patient. The witness is back on the stand. Sir, you are still under oath.

Ms. Donahue?

MS. DONAHUE: Thank you, Your Honor.

Q. Special Agent Clemente, have you examined the facts of this particular case?

A. No, I haven't.

Q. That being the case then, what is the purpose of your testimony here today?

A. The purpose is as an education witness. Basically there are particular factors in the behavior of sex offenders that may be confusing to the average person. It's much the same as in drug cases where drug dealers have particular codes and procedures that they use to try to ply their trade and avoid

detection. It's the same with sex offenders. There are particular methodologies that they use to accomplish the crimes that they commit, and some of those things may be interpreted differently by the general public. If you take them individually, they may seem totally unrelated or innocent behavior, but when you look at them together, you can see more of a pattern and understand that pattern, and I'm just here to explain some of those patterns.

Q. Over the course of your career, have you studied that pattern?

A. Yes. I have studied those patterns over the course of my investigating career and also the -- my career in the Behavioral Analysis Unit on thousands of cases related to this topic.

Q. I would like to turn your attention to what -- the PowerPoint slide that has been placed in front of you, but I believe the jury -- the projector is not -- is not operating and so maybe what we will do is have you turn your screen and we'll just talk through it.

A. I don't know if this is going to help them. Is this too far for you?

THE COURT: It would be too far for me, much less too far for them.

MS. DONAHUE: We will make this work.

Q. Special Agent Clemente, have -- over the course of your work with the Behavioral Analysis Unit, have you come to --

THE COURT: The screen is on now.

MS. DONAHUE: Oh, good. Thank you.

Q. Have you come to see a spectrum in compliance level of child sex victims?

A. Yes. Typically, we see a range of behavior in the victims -- the behavior of the victims of child sexual crimes. With respect to compliance level, what I have done here is laid out sort of a spectrum across which you will see on the left-hand side, non-compliant and on the right-hand side, compliant. And on the bottom you will see various points along there defined as we move from cases where, like, in abduction where there is an overwhelming amount of force used to actually physically take a child and on the other -- and as we move to the other end, there is less actual physical force used; however, more manipulation programs and grooming is used to gain compliance of a child.

Q. And can you please explain what you mean by the term grooming?

A. Well, grooming is basically -- we call it a constellation of behaviors, and that's really just a fancy word for a group of behaviors that taken together shows that there are goals for this behavior.

Individually, these behaviors may look very innocent or, as I said earlier, unrelated to child sex crimes; however, they are methods that offenders can use to get access, authority

and control over a child to accomplish sex crimes with that child.

They're aimed at both the child and the parent or caregiver of that child because the offender needs to get access. They're also aimed at getting access for sex and also to delay or prevent disclosure of that sex act.

Q. When you say these activities are aimed at the parent, can you explain what you mean by that?

A. Well, when someone grooms a parent, it's typically by building some sort of either personal relationship or outward community relationship that shows that they're a trustworthy person, somebody who is responsible, somebody who is willing to help out children and so forth. They may do that by their profession that they choose, maybe a teacher, for example or a coach. They may do it by volunteer activities that they engage in, you know, Boy Scouts or youth groups or choirs or something like that. And they may do it in their free time or in their personal relationships in their neighborhood.

But in a way what they do is -- their goal is to accomplish access to children for sex, and so they use these things, these jobs, hobbies, volunteer work in order to get -- to sort of hold themselves out as a person who is trustworthy around children.

Q. Now, are you saying that everyone who takes a job as a teacher or a coach or the other examples you gave is --

A. Absolutely not.
Q. -- doing it for this purpose?
A. No, not everyone. Certainly not anyone -- certainly not everyone who does that does it for that purpose but what I'm saying is if you look at the group of behaviors, not just taking the work or volunteer work or community access to kids in isolation, when you look at it together, you may see a pattern, which is what I'm talking about, with respect to grooming.
Q. What are the grooming behaviors that you have seen that are directed toward children?
A. Well, the easiest way to boil that down is -- is attention, affection and assets.

Basically children are human beings and they respond to these things and, in fact, children have a great need for attention and affection as they are growing up. So these are tools that offenders can use by providing them with the time of an adult, the affection of an adult, or giving them gifts.

Sometimes -- and a lot of it depends. There is some risk factors and so forth that we'll talk about in a little bit, but the most important thing is that offenders typically will look for the thing that the child most needs and is not getting. And that could be not enough parental supervision, it could be something to do with poverty, it could be something to do with their -- their lifestyle and so forth that they're not able to get. So the offenders are very adept at picking out the

 children who are needy and then satisfying those needs. Which in any other situation would be great. But if the goal of that is actually to get access to a child for sex, that is part of a grooming process.

Q. Are there -- have you based on your training and experience identified any factors that seem to place some children more at risk of being groomed than other children?

A. Sure. Lack of parental supervision, poverty, are two -- are two external factors.

The internal factors could be self-consciousness or poor self-image, questioning someone's sexuality or just sexuality in general. Curiosity about sex. These things are internal factors that can affect someone's propensity to be victimized.

Q. Does the relationship, if any, between the offender and the victim impact grooming or the amount of grooming --

A. Certainly.

Q. -- that takes place?

A. Certainly. The more control and authority a person has over the victim to begin with, the less the amount of grooming has to take place. So, for example, in a situation where a parent were to groom a child, that person already has from birth the authority and access and control over the child. So the grooming that they would have to initiate to accomplish a sex crime against a child is probably very minimal, whereas someone

who is a perfect stranger in the beginning would have to build sort of a relationship and build some kind of trust and use a lot of those grooming techniques and -- in order to get that.

And then there's sort of a spectrum in between of different areas. Incrementally, it goes up as you go away from being parenting to a total stranger.

So in the middle somewhere is what we would call an acquaintance offender. Someone who has some sort of passing knowledge to the victim and of the victim. And they very commonly use grooming to a great extent, the offenders who are acquaintances use grooming to a great extent.

Q. And why is that?

A. Well, because they have to build, they have to establish that relationship. Since the child is not completely under their control to begin with, they would have to sort of establish the ground rules. They would have to make sure that the child trusted them so they could take advantage of them. But also they want to make sure that the child isn't going to go running back and tell what happened. So the grooming not only gives them access to a child for sex but it also kind of controls their behavior so that they're not going to or they are least likely to actually disclose the victimization.

Q. And why is it that grooming reduces chances of disclosing victimization?

A. Well, it's a number of factors. First of all, because they

build a relationship by giving attention and affection and gifts, the child feels indebted to that person. That person is satisfying a need that child has and it may be the only person in the world who has taken the time, the only adult who has taken the time to spend time with them, to make them feel special, to make them feel like their needs are going to be satisfied. So there is sort of a debt of gratitude there to beginning with.

Also during the course of victimization, children can take on the guilt for it. They take on their own blame. They feel shame about it and don't want to tell anyone about what's going on. They don't want anyone to find out what's going on.

They can also feel that they are responsible for it. That something is wrong with them and that's why this is -- this happened to them and, therefore, they just feel very, very bad so their self-image can go down.

Those are some of the reasons why -- why that's the case.

Q. Keeping your attention focused for a minute on children who have been or are in the process of being groomed, you know, based on your experience, are they necessary -- do they necessarily appear sad?

A. There's a whole range of behaviors as a result of grooming or victimization.

MR. BROWN: Your Honor, I am going to object as

 outside the scope of his expertise.

THE COURT: Overruled.

THE WITNESS: I'm sorry. Could you repeat the question again then?

BY MS. DONAHUE:

Q. Yes. Based on your experience, do children who have been groomed necessarily always appear to be sad?

A. Quite the contrary. If they're in the process of being groomed, then at this point they typically -- typically a need they have is being met. There is some reason why -- the things that this person is providing to them is actually satisfying something and there may be -- there is a whole broad spectrum of things. If they are very poor, it could be something as little as a pair of sneakers. It could be just helping someone, tutoring someone after school, helping coach someone in a sport. It could be spending time doing activities, very simple activities to very extravagant activities or extravagant gifts. So it spans a spectrum of behaviors.

But typically during that process, they are actually being -- they are actually in certain ways better off because this person is paying attention to him, showing them affection. They may feel that this person really cares about them or even loves them.

Q. And turning your attention back to your compliance level spectrum, after groomed, moving to the right, you have seduced?

A. Yes. Well, the difference between --

Q. Can you explain what the difference between groomed and seduced and why seduced -- just explain the difference.

A. Yeah. They're very similar concepts, but seduced is a little bit of a higher order in terms of making the child believe that they're actually in love with the child. And in some cases, they do, in fact, fall in love with the child. And the child falls in love with an offender. But they use similar tactics that adults use when they are seducing an age appropriate lover. They also show them affection and give them gifts and spend time with them.

But it's more of a -- instead of simply building a relationship that is based on friendship and interaction, they are actually trying to build a relationship that is based on sexual love and closeness that way.

As -- what's important, I think, to note also -- oh, we got it over here now. Great. What's important to note is that at any time a child may -- an offender may start with behaviors on the left side of the screen but move along that continuum, that spectrum, across the board at any time. It's time and circumstance dependent. So over time it may be originally that the child was forced but over time because of the deterioration of their self-image, because of the shame and guilt they feel, because of the power of the grooming and the effectiveness of satisfying a child's needs in one area while

taking advantage of a child's needs in another area, they -- we lost it again -- they can move along that -- they can move along the arrow to the right or move back and forth at different times, depending on the circumstances, depending on whether -- because at times a child may become more difficult. At times there may be more parental supervision around so more grooming needs to be used. There may be times when something happens that creates a -- that takes a cooperative child who has been compliant and now they don't want to be compliant anymore and they move back -- back along that spectrum and more force is used to accomplish the sex act.

But as you see, all the way on the right I have child initiated, and that covers situations in which children who are, for example, sexualized early, they may actually -- that covers, for example, child prostitutes. Child prostitutes may have been pimped out by adults or even family members. They may have become addicted to drugs and need a way to get money for drugs and they have become prostitutes themselves without anybody else initiating it.

So there are instances in which that occurs; however, the laws are there to protect children from themselves, from their decisions because children are legally incapable of consenting to sexual acts at that age.

So it's -- it's -- it simply covers the whole spectrum of behaviors from someone who is very violently physically

forced into a sex act to someone who actually voluntarily engages in a sex act with an adult.

Q. And can -- does a -- can you tell from a child's outward appearance like if a child is -- appears happy or appears sad, is that necessarily indicative of where along this spectrum that child might be, assuming the child is a victim?

A. It's very difficult to tell from their outward appearance because the results of victimization can be also very varied.

Some children engage in immediate outcry. They have been victimized and they immediately run and tell.

Typically that doesn't happen with groomed children or children who are in a relationship with the offender where that offender has authority and control over them typically you have delayed disclosure. And during that time period, children are many times trying to prevent anybody from finding out what happened because of the inner turmoil, the inner guilt and shame they feel about what they are going through.

And also one of the best grooming practices is to get a child to engage in some kind of conduct that they know is wrong. That they know their parents or their teachers or their guardians will feel is wrong, and once you can get a child to engage in that kind of behavior, then the child is much less likely to disclose because they would not want to get in trouble during the process of disclosure.

So for all those reasons, a child may hide those --

any outward signs that they're being victimized or being groomed. And they may actually deliberately deny it if somebody asks them about it because it is something again that is a very difficult thing for them to deal with themselves. They're developmentally immature. It's a difficult topic to discuss.

Q. You mentioned the term delayed disclosure.

A. Uh-huh.

Q. Can you explain what that means.

A. Well, typically children who are sexually victimized do not self-report immediately. And as I said a minute ago, that is particularly the case when you have groomed victims or victims who are in relationships with the offender. If there is some sort of parental/guardian type relationship. Because the people that you would normally go to for help are the very people that are causing the problem in that situation.

So we see delayed disclosure. And there has been a number of studies and so forth in which, for example, in recent disclosures with offenders from the Catholic church, there is an average of 20 year delay between the time of victimization and the time someone comes forward to report that kind of victimization. And that's a long time and that's not the case in every case. But many cases children will not report the victimization and something outside, some outside factor actually opens up information about the case and then there is an investigation. And then after being interviewed, those kids

may disclose.

Of course, even after they are interviewed, we find many times what we call incremental disclosure which means they don't sort of climb every step of the ladder the first time someone asked them questions. Many times they take a little step to test the water, to see how -- what the reaction is going to be, to see if they are going to be believed, to see if they are going to get in troubles. And so they will tell you a little bit at a time as you disclose more and as you show that you are not going to blame them or bad things aren't going to happen to them as a result of it.

Q. Now, Special Agent Clemente, does the interview process, questioning about what happened to a child victim -- can that affect how the victim discloses?

A. Certainly. Yes.

Q. And how is that?

A. Well, there is a number of factors. I mean, the age and development of the child are going to be important with respect to when they talk -- they're talked to.

The age and development at the time of victimization is going to be an important factor. And the type of interview format is going to be important, as well as the interview protocol. And the format would basically be there is a therapeutic-type interview which is someone, a psychologist or a doctor who is trying to treat a child, and during the process of

that, a disclosure might be made.

There is forensic settings when a child might be interviewed in the course of an investigation. And then there is interrogation settings when a child might be thought to be the -- the -- you know, offender in a crime. So the format is different for each one. Typically in investigative settings the format is a forensic interview.

There are protocols, a number of different protocols, which are basically standards or best practices in terms of interviewing children, because what we want to do is maximize the amount of accurate information that we get from anyone that we're interviewing, especially a child, and we want to minimize any kind of contamination. So those protocols are set up to give you the best possible methods of getting accurate information from children.

Q. Is there one set protocol for a forensic interview of a child victim?

A. No. Actually, there is a number of protocols. Many of them are similar but the FBI has developed its own protocol and there are other child advocacy centers that have their own protocols, but there are several different schools of thought, and the FBI's protocol is based on our experience in doing hundreds of thousands of interviews and interrogations over the decades so it may be more -- it's more forensically aimed and the -- there are other protocols that are more aimed at

therapeutic, for example, reasons.

Q. You mentioned minimizing contamination. What does that mean?

A. Well, you want to get pure information from them. You don't want to lead children, you don't want to suggest to them what the answer is, and you don't want to judge them. You don't want to make them close down by telling them, you know, or making them believe that you judge them for what they did or what they were involved with or what was happening to them.

So contamination would be sort of changing answers or making -- you know, lowering the believability of the -- those answers. Or the accuracy of those answers.

Q. And based on your experience, if a child is asked leading questions, does that necessarily mean what the child is -- that nothing happened to that child?

A. No, it doesn't necessarily mean that. I mean, if you ask leading questions, you raise the risk of contamination or inaccurate or incomplete answers. But it doesn't guarantee that. I mean, it's a possibility.

THE COURT: Does anybody want to explain what a leading question is?

MS. DONAHUE: Thank you, Your Honor. Yes. The Court has a very good question.

Q. What is a leading question?

A. A leading question, is, for example, if I was investigating

a bank robbery and I said to the witness, "You saw the two guys leave the bank and jump into that red car, right," that would be a leading question because I gave them the answer and I'm just asking them to confirm it; whereas the kind of questions we like to see are basically looking for a narrative answer. For example, "Tell me what happened," "Would you let me know what happened to you," "What happened next," and those kinds of questions don't tell the witness where to go.

Now, if you ask a leading question, "Did you see those two guys jump into the red car," certainly the witness is capable of saying, "No, I didn't see two guys and I didn't see any red car. I saw one guy jump into a white car." So it doesn't create a negative answer but it can open up the possibility of an inaccurate answer.

So certainly the younger the victim, the more likelihood or the more suggestibility a victim can have. And one of the things that we test in our protocol is whether or not children, when we are interviewing them, are competent, whether they understand the meaning between the truth and a lie and whether they understand that this is -- we're talking about serious things. We are not talking about fantasy things.

And we also test their suggestibility. Whether we can say, "You see that blue butterfly that's flapping through the room?" And they may say, "Oh, yeah, and there's a clown running after him." You know, those kinds of things. We tell them --

we go through this in the interview and we tell them, "Okay, well, that's fantasy, that's not real. What we are going to talk about today is only the real things, the things that really did happen." And we basically set the ground rules for that interview to try to avoid those kinds of things.

Q. When you use the term suggestibility, can you explain what that means?

A. Well, it's the ability to suggest an answer to the witness and the witness basically adopts it as their own. So again if you go back to that red car, "Did you see the red car?" Well, the witness, if they're suggestible, will just say, "Oh, yeah, I saw the red car," even though they didn't see the red car. That would be a suggestible witness.

But a witness who says, "No, I didn't see it," or "I saw the white -- a white car," that would be someone who would avoid suggestibility.

So you can test a child's suggestibility during the interview process by asking questions unrelated to the crime or the allegations and to test their suggestibility and their competency to tell the truth and understand the difference between the truth and a lie.

Q. Does the age of a child affect how suggestible the child is?

A. Not only the age, but their development as well. So the younger and the less developed, their suggestibility is probably

higher, and again that should be tested. But, for example, we ask our kids to engage in fantasy all the time, reading fairy tales and watching television and so forth. But as you grow older, as kids age, they can discern the difference between the truth and a lie, fantasy and reality. It's just something that you can test both in the interview and by watching them and discussing things with them and watching them, you know, interact in life.

Q. Is there any age, sort of cutoff point or a point which children appear to be less suggestible?

A. Well, I mean certainly courts have rules on at what age you can testify and become a fact witness and so forth. I think it varies from state to state. But certainly, you know, when you're two or three or four years old, it's pretty difficult to get past that suggestibility. But once you get into school age, it starts to be -- they start to develop better and step away from very concrete thinking and they can actually think and their vocabulary increases dramatically and the nuance that they can explain and the different degrees of experiences that they have had that they can talk to you about increases as age increases. It's an individual thing and it really should be based on that individual child.

But as you get closer to 10's and 12's and teens, they have a much higher ability to tell you accurately and not be suggestible.

Q. Does education level affect how suggestible a child victim can be?

A. Well, I would say development rather than education level, but education can be a factor. But someone who can't read or write or do math can still distinguish between something they saw and something they didn't see. So it's not an absolute factor. It could be one of the things that we look at, but people who are uneducated certainly can differentiate between truth and lies, fact and fiction.

Q. Does culture affect suggestibility, in your experience?

A. Yeah. Well, in my experience, I have certainly seen certain situations in which culture can affect -- there are certain cultures that are very paternalistic, they are very male-focused. And if a male adult tells a child something to do, they may follow that and take it as fact.

There are situational issues also, you know. In a particular situation a child may be told you always listen to this person, always follow what they say and so forth.

So it can happen. I mean, it's a -- it depends on the child, it depends on the situation, it depends on the culture.

Q. And if you have a situation where a child has been asked leading questions, what do you do to follow up?

A. Well, the way to resolve that, to make sure that it is not an issue, that the child has not been led to say inaccurate or incomplete answers, is to look for corroboration. And

corroboration is nothing more than something that shows that what they said actually happened. So you could look for that in other witnesses, you could look for that in physical evidence, you could look for that in forensic evidence.

And so if you see that the forensic, physical and other witness evidence is the same, then that tends to corroborate the original testimony. If you start to see differences between the original testimony and the forensics or other interviews, then it would tend to refute the original testimony.

MS. DONAHUE: I have no further questions.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MR. BROWN:

Q. Agent Clemente, good morning.
A. Good morning.
Q. I just want to talk to you a little bit about your background.
A. Sure.
Q. You have a JD in law?
A. Yes.
Q. And you have a Bachelor of Science in chemistry; correct?
A. Yes.
Q. You do not have a degree in psychology?
A. No, I don't have a degree. I have taken graduate courses

and undergraduate courses in psychology.

Q. Do you have a degree in child psychology?

A. No, I don't.

Q. You work for the national center, the behavioral unit?

A. Yes. It's the National Center for the Analysis of Violent Crime, the Behavioral Analysis Unit.

Q. And that's a law enforcement agency; correct?

A. It is.

Q. It's not an independent organization; correct?

A. No.

Q. You talked about the consultation that you did. You said you did thousands of consultations?

A. Yes.

Q. And most of the time when you consult, you consult for prosecutors; correct?

A. For investigators most of the time. I would say prosecutors three or five percent of the time.

Q. And the terminology that you have been using today, those are not psychological terminologies; correct? Those are terminologies developed by the national -- the national center; correct?

A. Well, they are used by both psychologists and law enforcement. There are a number of aspects of this terminology that we have developed in our unit but there are also terms that have been developed by forensic psychiatrists, forensic

psychologists.

Q. Is it fair to say that most of what you testified today with respect to this spectrum was developed by your colleagues at the national center, referring to Ken Lanning and Park Dietz?

A. Yes, certainly, but Park Dietz is a forensic psychiatrist, he is on our board at the national center. But he is one of many experts from around the world that are on our board that advise us and teach us. But it is -- the format that you see is definitely -- has been developed by our unit for applications in law enforcement settings.

Q. Okay.

And in terms of published studies, does the national center publish these concepts for peer review or psychological advanced study?

A. There are a number of -- for example, the -- you mentioned Ken Lanning. He was my mentor at the Behavior Analysis Unit. He has since retired in 2002. He published the *Child Molesters Behavioral Analysis.* And that was -- 196,000 copies were distributed to law enforcement across the country and around the world. That was before they went online and since then we have no idea how many more. But it has been presented in front of -- I've presented it and Ken has presented it in front of the National -- the American Psychological Association, national and international meetings, it's been presented before Congress and so forth.

The peer review take it gets, that particular article, is through law enforcement officers and prosecutors and defense attorneys and treatment providers around the world.

There are also empirical studies on the subject of grooming, for example, out of the United States, out of Canada, out of the UK, that are traditionally peer-reviewed -- academic peer-reviewed articles in the traditional sense.

Q. Now, Agent Clemente, when I am talking about the basis for -- I want to ask you about the basis for this -- for your opinions.

A. Uh-huh.

Q. And your -- these opinions and these conclusions are really based on your -- your department's anecdotal research and interviews; correct? They aren't based on general psychological studies that are out there, right?

A. No, that's not accurate. They are based on both. I mean, first of all, we -- the training we go through as behavioral analysts is from psychologists and psychiatrists. Dr. Park Dietz talks about forensic psychology. Dr. Hare talks about psychopathy. Dr. Collin Shan from Scotland taught us about neurolinguistic programming.

They are based on concepts that are examined extensively in academic and empirical studies. They are enhanced by our -- by our anecdotal work on cases and by the institutional knowledge that has built up over the last 30 years

in our unit.

Q. Agent Clemente, do you recall testifying in 2003 in a case in Maryland in *United States vs. Gordon Elliott Thomas*?

A. I believe so, yes.

Q. And do you recall being asked similar questions regarding the basis for the opinions that have been reached by the national center?

A. I recall there being questions -- I believe that was a detention hearing and it had to do with risk assessment and that was a narrow area of testimony that I was discussing back then.

Q. Okay. So in 2003, you testified at a detention hearing in federal court?

A. Yes.

Q. Correct?

A. Yes.

Q. And you were asked some similar questions about the background and bases for your opinions; correct?

A. Right, but limited in this -- in that hearing to detention hearing issues which have to do with risk assessment and danger to community. And in that particular area, it is a limited -- it was a limited scope.

Q. And do you recall being asked whether there were published studies regarding the findings or the conclusions of the national center?

A. Well, again, in the limited area of risk assessment, yes.

Q. And your testimony then was that there were not published studies regarding those issues; correct?
A. Risk assessment and dangers to the community, yes.
Q. In terms of how you do your research, do you recall -- strike that.
In terms of how you do your research, is it fair to say that you like to interview people who have already been convicted of offenses to lay the groundwork for your understanding?
A. There is certainly a number of research projects that are -- that our unit has conducted over the last three decades that focus solely on convicted offenders; however, there are additional ones that are based on interviews. For example, Dr. Able. I think that was an accident. Sorry.
Q. Let me just stop you there, Agent Clemente, and really if you could just listen to my question.
A. Okay. I'm sorry.
Q. What I want to ask is --
THE COURT: Excuse me. Take that off the screen.
MS. DONAHUE: I will, Your Honor. I apologize. We will get our technical issues resolved. I apologize.
THE COURT: Thank you. Mr. Brown.
BY MR. BROWN:
Q. Agent Clemente, when you testified in 2003 you told the Court that the interview was the best technique to gather

information.

Do you recall that testimony?

A. You are giving to me out of context. You have to put it in the context. Interviews are definitely a very good and -- and many times the best, the most effective method of getting information and, you know, if you just tell me which area that you are asking about, I will be able to answer that more definitively.

Q. Just in terms of the general principle in terms of the best way to gather information and conduct analysis, the interview is a superior technique in terms of reaching your opinions and conclusions; correct?

A. It certainly is one of the main foundations of doing that, yes.

Q. And you never interviewed Michael Pepe in this case, did you?

A. No, absolutely not.

Q. And you never spoke to spoke to any of the alleged victims in this case; correct?

A. That's correct.

Q. And fact in terms of how you arrive at your conclusions and your opinions, you use the term reverse engineering process.

Do you recall that phraseology?

A. Well, that is in a particular area, but not one that I'm testifying in today.

Q. Okay.

But in terms of the general principles that you are testifying to today when you are talking about grooming and you're talking about the methodology of a groomer, in terms of how you render those opinions, your -- strike that.

Your opinions do not have a predictive quality; correct? They are -- you start at the end result normally and work backwards in time and analyze the conduct looking at it from the perspective of a person who has already been convicted; right?

A. Well, I think you are confusing two areas. One is when we have a case where it's being investigated and they have no idea who the offender is. And in that case, we look at the behavior and reverse engineer back to the type of offender would committed that crime. The other is a different consideration altogether, and that is when we study over time the general behavior of many thousands of offenders and come to conclusions about that behavior. In other words, that there is a range of behavior that can be exhibited.

So today what I'm doing is talking about that second thing so that it gives the jury some background and foundation about those topics that may be confusing.

Q. You testified on direct examination that just because a person joins the Boy Scouts doesn't mean he is a child molester?

A. Absolutely.

Q. And just because a person might be altruistic towards children does not mean that they're a child molester?

A. Of course not. Right.

Q. You have to look at the totality of the circumstances?

A. Very much -- yes.

Q. In terms of interview protocol, if we could talk about that?

A. Uh-huh.

Q. You testified that the FBI has a standard interview protocol?

A. Yes.

Q. And is that with respect to the interviewing of children who are alleged victims of offenses? Is there special protocol for children --

A. Yes, I was going to say, there are protocols for -- there are protocols for interviewing adults and there are protocols for interviewing children, yes.

Q. And one of the reasons that there is an interview protocol for interviewing children is that you used this word children are susceptible to contamination?

A. Well, all individuals are susceptible to contamination. What I said is children may be susceptible, and we want to minimize that by setting up a best practices protocol.

Q. Okay.

And what are some of the best -- strike that.

In terms of a best practice protocol, in terms of interviewing children, it's better to not ask leading questions if you can; correct?

A. That's correct.

Q. And in terms of a best practice, it's better to interview a child in a quiet setting if you can, correct?

A. Yes, it is.

Q. With not a lot of distractions?

A. Correct.

Q. When interviewing a child, it's important to not -- to use language that is child appropriate; correct? Age appropriate for the child?

A. You want to make sure -- if what you're suggesting is -- you want to make sure the child understands what you're saying.

Q. And in terms of an interview protocol, if it's possible, it's better to have less people in a room than more, if possible?

A. Well, the -- you know, it depends on the circumstances, but certainly too many would be a problem. Having -- in some circumstance it's better to have more than one, or if there are going to be a number of interviews conducted, it's better to have it done at one time. So it depends what your facilities are. It depends what your -- what you have available to you. But certainly over a certain number it would be distracting.

Q. And why -- why is it from a developmental standpoint, if

you know, why is it that children -- there is a higher risk of contamination in interviewing children?

A. Well, I think one of the -- one of the major issues is developmental. Children again are -- they come into a world of adults and they are taught to listen to adults and behave and so forth. Respect adults, maybe.

So if adults are involved in a situation and they are improperly led, they may be susceptible to going along with that leading. It's -- it's a potential problem.

Q. It's a problem because children want to please sometimes people who are asking them questions?

A. Yeah. It can be, yes.

Q. And if children receive either verbal or non-verbal cues with respect to the kind of answers that are expected of them then they tend to comply; right?

A. They may, but again that is all subject to testing. It's all subject to is this person very susceptible -- excuse me, to suggestibility or is this person not. So it's an individual thing. It can happen and it may and it may not.

Q. Does it increase the risk of contamination if a person who was asking the question asked questions like, "We know what happened to you was really, really bad. Tell us what happened so we can punish this man." Is that a leading question?

A. Well, it's a number of things. When using the technique of "we know what happened" may or may not influence it. It

 actually can happen -- it actually can be a good thing so that the person, the victim or the person making the allegations or the person being interviewed actually then doesn't feel, "All right, well, then I don't have to worry about disclosing."

So that first part seems okay.

Can you tell me again what the second part was because I want to answer this accurately.

Q. That's fine. Let me move on to the next question.

In terms of the form of a question when interviewing a child, and I use the example of something like was it a red car or a blue car, the color of the car is a suggestive fact; correct?

A. Yes, it is.

Q. So a better question, is it fair to say, would be, "Tell us what happened"?

A. That would be a good open-ended question.

Q. Versus "Tell us how he raped you." That is a leading question, correct?

A. That would be a leading question unless it came after a disclosure of rape and then it seems it wouldn't be leading. You would have to put it in the context of the questioning, but if it was just out of the blue, it seems like a leading question.

Q. Okay.

And in terms of suggestibility, there is certain

factors and you indicated that culture is sometimes a factor?

A. It can be, yes.

Q. Language is sometimes a factor?

A. I don't -- if you're talking about -- if you're talking about not speaking the same language as the victim? Is that what you're saying?

Q. Yes.

A. Or use of language?

Q. Both. Let's talk about the first in terms of not speaking the same language.

A. Well, there can be misunderstanding there, but I don't know how -- I don't see that as a suggestibility issue.

Q. Have you ever seen a situation where the victim speaks, for example, Vietnamese and the questioner speaks English. Okay?

A. Yeah, I mean . . .

Q. But there are two interpreters in between the questioner and the alleged victim, one who speaks Vietnamese and Cambodian and the other who speaks Cambodian and English. So to make a complicated scenario simple, the questions are asked in English to a Cambodian interpreter. The Cambodian interpreter asks the Vietnamese interpreter. And the Vietnamese interpreter asks the alleged victim. And then the answers work their way back up the chain.

Does that sound like that could raises the risk of contamination?

A. It's not the best situation certainly because I think the higher risk is that you have what they commonly refer to as a game of telephone going where the questions may have changed or the answers may have changed. Obviously, the best thing would be to have that taped or videotaped so that somebody could look that over and discern whether or not the right question was asked and what the actual answer that was given was.

But, yeah, it certainly is not -- I wouldn't choose that as the best possible way to get that information.

Q. And in terms of -- in terms of the language, in terms of the type of questioning used, if an adult is questioning a young person, suspected victim, in terms of the appropriate language to use while questioning, would an agent use words like, for example, "oral sex" versus, you know, for lack -- excuse my crudeness -- but "sucking a dick"?

A. Well, that -- the proper way to do that is to norm the child. In other words, find out what circumstances the child was in and how that child would refer to those things. And so what you might -- the best possible way to do it is it find out how the child refers to those things and then use those terms throughout.

Certainly in cases of sexual victimization there are instances in which children, very young children use what we would consider as adults very graphic language. If that is the case in a very particular case that the children are used to

that type of graphic language because of their victimization, it's perfectly fine to use it. So you would have to give me the context for that individual child before I could say yes or no.

Q. Okay.

Let me give you a hypothetical -- let me ask you one other question before I go on to my hypothetical question. You have an interpreter who does not work for law enforcement agency. The interpreter works for a non-governmental entity with a stake in the outcome of the prosecution.

Is that an ideal situation or would you prefer to have an interpreter who works specifically for, for example, the FBI?

A. Well, again, you made a statement that seems kind of internally inconsistent. If you're saying that the person works -- he -- it's an independent interpreter as opposed to one that works for the FBI; is that what you are saying?

Q. Yes. The interpreter does not work for the FBI. The interpreter works for the shelter where the girls are being --

A. Okay, I see.

Q. -- housed?

A. It made it a little confusing.

Q. I apologize for the inartfulness of my question.

A. Obviously it depends on the professionalism of the interpreter and their skills as an interpreter. I can't say just because they work for Organization A as opposed to Organization B that it would be a bad interview. But, you know,

certainly you want to get -- in the best of all worlds, you want to get professionally trained individuals who have done this kind of work before.

Q. Okay.

Now in terms of the skill and professionalism of an interpreter -- and it relates to my question about language -- language -- you can sometimes suggest an answer to a young child by the type of language used; correct?

A. By the type of language or the specific words? I don't --

Q. Specific words.

A. Specifically with specific words, yes.

Q. So we have a situation where a young girl describes her vagina as a birdie. Okay?

A. Uh-huh.

Q. When the interpreter is talking about the young girl's vagina, she calls it a birdie.

A. Okay.

Q. But when the interpreter is describing the alleged conduct of the suspect, she does not use the more polite language to describe the sexual genitalia. She uses words like dick and cock. Is that -- is that somehow coding an answer?

A. You know, in this -- totally out of context, I can't really say. I mean, I would have to look at it to see. And again, it really would fall onto how exposed is that child, is that particular child to that kind of language in advance.

If that's everyday language, it may not have any effect at all.

Q. Let's assume for the sake of this hypothetical that it's not. That the young girl uses polite words to describe her private parts and the interpreter insists on using crude, vulgar language to describe sexual conduct.

Is that in and of itself suggestive, sir?

A. Well, it can't be -- I don't see it as suggestive. It doesn't denote activity. It denotes a body part. And it's just -- in that context or so taken out of context, I don't see it as suggestive.

Q. Okay.

A. It could be shocking to the child. It could be not.

Q. So you're interviewing a child and you say, "Did you engage in oral sex?" And your interpreter says, "Did you suck his dick" to the child.

Would you want the interpreter translating your words, your questions with that type of language when you specifically asked a polite neutral language? Is that a situation you find conducive to a non-contaminated response?

A. Well, you asked me two questions in a row and I will answer your first one first. I certainly wouldn't like that. I would like the interpreter to use the exact language that I use.

Whether the interpreter's changing from a clinical term to a slang term suggests an answer, I can't say that it

does. Not in that example that you gave me.

Q. Okay.

In terms of other factors that increase the risk of suggestibility, is it fair to say that there is -- the presence of a group -- a group setting is a factor that increases the risk of suggestibility?

A. It depends on whether that group, that entire group is doing the questioning or whether the questioning is focused on one person or two people. There is a lot of factors. But again, that is a very generic question. It may. It may not. I haven't seen the interview. I don't know.

Q. So you haven't seen any of the interviews in this case?

A. No, I haven't.

Q. Have not read any of the transcripts in this case?

A. No. I have deliberately not because I am testifying about generic education testimony, not about this specific case.

Q. Okay.

In terms of your testimony about grooming, Agent Clemente, you testified that on the spectrum there is a difference between a child who is groomed versus a child who is seduced?

A. Yes.

Q. You said that seduction of a child is almost the same type of courting behavior that an adult would engage in with an age appropriate person. It's just that it is illegal because it's a

child?

A. Yes. There is a lot of similarities between grooming and seduction, but the difference where they start to separate is where they begin to use those kinds of adult sort of age appropriate, you know -- well, I try not to use the same word in the definition, but the same age appropriate courting gestures and so forth.

Q. But in terms of your time continuum, a person who is engaged in this kind of illegal courting or seduction or grooming, these activities are activities that are prior to the accomplished goal, correct, which is sex?

A. In some cases, they are. In other cases they continue throughout or begin after. It really depends on the circumstances. As I said, if you remember, the offender may start with activity on the left side or abduction or forcing a child into sex, but may then, once this has been accomplished, may then begin grooming gestures. Grooming not only gets them access, it can be the methodology for access, but it is also how they get control over a victim and keep them from disclosing. So it can be initiated at any time during the process, continue at any time or stop at any time.

Q. So it's your testimony if a person -- strike that.

You testified that a young person's response to either being groomed or any activity along this continuum that you described, the response could -- could differ, depending on the

activity leading up to the act?

A. Absolutely. It differs based on the activity, based on what type of grooming or seduction is used or force. It differs on the child and their circumstances. It differs on the level of parental or other outside adult interference or communication, so there is a whole number of factors that it can depend on.

Q. And the basis for your opinion that a child would not be sad after being brutally raped is based on your research in child psychology?

A. Well, you just posed something that I did not say. I was asked if during the process a child would necessarily be sad. Now, if you're talking about somebody being brutally raped and whether or not they would be sad, obviously there are -- there are certain, you know, instances where that is going to happen. And it's time dependent. They may be very sad while it's going on and for a time afterwards. It depends when you're talking about that.

Are you talking about minutes or are you talking about hours or days? It all depends on when it is and what the circumstances are.

Q. So you're saying that the response is really you have to look at the circumstances?

A. Certainly, yeah, and the time and the child.

Q. But is it fair to say that if a child is brutally raped,

you would expect them to be depressed and withdrawn?

A. Well, again, depression is a -- is something that can develop over time. Depression doesn't necessarily kick in immediately. I mean, you would have to do a clinical interview of this child to tell me whether or not they were depressed. They may have outward -- what I had said earlier was you may have outward signs that something horrendous is going on. You may have no outward signs. Some children become very adept from a very young age at covering up these kind of things because the of the factors I was talking about earlier. About their shame, they don't want to be exposed in public about this stuff. They don't want their parents or their friends to know about it so they cover it up.

We have all seen children fall down and scrape their knee and cry, you know, like crazy but two seconds later they are laughing and running around. They are capable of switching. It depends on their age, it depends on their development. It depends on an array of other circumstances.

Q. But the basis for that opinion, sir, have you done -- you don't have a background in child psychology, right?

A. No, I don't.

MR. BROWN: No further questions, Your Honor.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MS. DONAHUE:

Q. Special Agent Clemente, just to -- just a couple questions about interviewing victims. Based on your experience, if an interviewer asks leading questions, does that necessarily mean the information provided by the child is not true?

A. No, it doesn't necessarily mean that. It could open up the possibility, as I said, of contamination where you get an inaccurate or incomplete answer, but it doesn't absolutely mean that. You would have to look at the child and you would have to look for corroboration.

Q. You were asked about your testimony in *United States versus Thomas,* and you said it was in connection with a detention hearing.

A. Yes.

Q. What is a detention hearing?

A. When -- in that case the defendant was arrested and they were trying to determine whether or not to release the defendant pending trial and whether or not that defendant posed a danger to the community. It's a very limited scope of testimony. And that is, does this particular person pose a danger, risk to the the community or to his family if he was released back home pending trial. And so my testimony in that case was very limited in terms of what I could talk about.

Q. Were you testifying about grooming in that case?

A. No, I wasn't.

Q. On the subject of grooming, if a child is being groomed,

can that occur before, during or after sexual activity between the offender and the child?

A. Yes, it's very much dependent on the circumstances, the type of relationship that the -- that exists between the offender and the victim and the results of the victimization, how does the child respond. Is there anybody else who may intervene. All those things can require an offender to initiate or increase grooming in order to continue to control the child, especially if an offender would like to have this child come back and victimize them again. Grooming can be a very effective tool to create that situation.

Q. Have you ever seen grooming in a case where a child has been brutally raped?

A. Certainly. There are cases in which children will submit to that, will return to that, because of the other needs that are being satisfied, things that they feel are very important in their life, things that they don't have in their life are being taken care of because they submitted to this kind of activity.

It -- grooming can work in any of those. It's -- it's very common in cases where -- as I said earlier, it's extremely common in cases where there are acquaintance offenders, in other words not a parent or guardian, not a complete stranger but somebody they kind of know, you know, whether from the community or some other situation.

MS. DONAHUE: I have no further questions.

THE COURT: Recross?

MR. BROWN: No further questions, Your Honor.

THE COURT: Thank you, sir, you are excused.

THE WITNESS: Thank you, Your Honor.

THE COURT: Good time for a break. Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We will take a 15 minute break.

(Recess taken)

(Jury In)

THE COURT: You probably don't realize it but you have been given special privileges already just by walking through there. That area is what we call the well. I believe it comes from old English law. No one is allowed to walk in the well except the Court staff. So we made a special exception for you so you don't have to go through that obstacle course out there. But generally if you hear the lawyers for special permission to walk in the well, that's what that means, that area there.

Mr. Lulejian, does the Government have another witness?

MR. LULEJIAN: Yes, Your Honor. The United States calls Jason Bordelon.

THE COURT: And presumably he is psychic and knows that you are calling him.

MR. LULEJIAN: I just sent somebody out. I just sent

the supervisor out. I think he is coming, Your Honor.

Jason Andrew Bordelon, Government's witness, was sworn

THE CLERK: Please be seated. I will need you to state and spell your full name for the record.

THE WITNESS: Jason Andrew Bordelon. Last name is spelled B-O-R-D-E-L-O-N.

THE COURT: You may proceed.

MR. LULEJIAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. LULEJIAN:

Q. Good afternoon, sir.

A. Hello.

Q. What is your occupation?

A. Senior forensic chemist.

Q. Who is your employer?

A. The DEA Southwest Laboratory.

Q. What is the DEA?

A. The DEA is the Drug Enforcement Administration.

Q. How long have you been with the Drug Enforcement Administration?

A. A little over five years.

Q. How long have you been a senior forensic chemist?

A. Just over a year.

Q. What were you prior to that?

A. Forensic chemist.

Q. What are your duties in that position?
A. Primarily to analyze seized drug evidence, testify in court as necessary and to assist in clandestine laboratory operations.
Q. What training must you have to qualify for a position in the DEA laboratory?
A. You need a Bachelor's degree either in chemistry or with a certain number of credit hours in chemistry.
Q. And do you possess such degree?
A. Yes, I do.
Q. What do you possess?
A. I have Bachelor's degree in environmental chemistry and a Master's degree in chemistry.
Q. And where did you go to school?
A. Furman University.
Q. Was that for both degrees?
A. Yes, it was.
Q. What specialized training, if any, have you received?
A. I received about nine months on-the-job training at my laboratory in different instrumentations in controlled substance analysis, as well as a week in Quantico, Virginia, for clandestine laboratory operation training, and different courses in various instrumentation since I started at the job.
Q. Have you had the occasion to chemically analyze substances to determine whether the substance is or contains a narcotic or narcotic-type substance?

A. Yes, I have.

Q. How many times?

A. Approximately 1,500.

Q. Have you had the occasion to qualify as an expert in the field of chemistry in the analysis of narcotics and dangerous drugs in state court?

A. Yes, I have.

Q. Which courts?

A. In El Cajon, California; in Bisbee, Arizona or Cochise County. El Cajon is in San Diego county. And also in Los Angeles County.

Q. And how many times have you been an expert in state court?

A. Three in total.

Q. Did you actually testify?

A. Yes, I did.

Q. Have you had the occasion to qualify as an expert in the field of chemistry in the analysis of narcotics and dangerous drugs in federal court?

A. Yes.

Q. Which courts?

A. In Los Angeles, San Diego, Las Vegas, and Tucson, Arizona.

Q. Did you actually testify?

A. Yes, I did.

MR. LULEJIAN: Your Honor, the United States moves Jason Bordelon be declared an expert in the field of chemistry

and the analysis of narcotics and dangerous drugs.

THE COURT: Any objection?

MR. GUNN: No, Your Honor.

THE COURT: I will declare him an expert. Thank you.

BY MR. LULEJIAN:

Q. Mr. Bordelon, would you please turn behind you and look inside the box that is back there. You can put the box down. What is the contents that you removed from the box?

A. There are several heat-sealed evidence envelopes.

Q. And are you familiar with those envelopes?

A. Yes, I am.

Q. All right.

Would you please read aloud the Government exhibit numbers contained in this box?

A. The Government exhibit numbers are 1251, 1252, 1253, 1254, 1255, 1256, 1257, 1258, 1259, 1260, 1263, 1264, 1265, 2037, 2038, and 2039.

Q. When did you last examine the contents of that box?

A. I last examined the contents earlier today and yesterday evening.

Q. And what did your examination consist of?

A. It consisted of inspecting my seals on the bottom as well as visual inspection of the contents.

Q. And how can you identify these exhibit as yours?

A. I recognize my seals on the bottom of all of the envelopes

as well as some of the case numbers on the label.

Q. How did these exhibits come into your possession?

A. I received them from our evidence vault at the southwest laboratory.

Q. And who submitted this evidence to the DEA laboratory?

A. They were submitted by ICE agents via courier.

Q. From the time you received the exhibits from the evidence vault to the time that you checked them back in, who had continuous care, custody and control of those exhibits?

A. I did.

Q. Are the exhibits in the same condition now as they were when you first received them?

A. Yes. With the exception of the repackaging and the consumption of some of the drugs for analysis as well as some new seals on the side.

Q. And for what purposes did these exhibits come into your possession?

A. For the chemical analysis of the substances inside.

Q. And, Mr. Bordelon, I am sleeping on the job. You've used an acronym called ICE. What does that mean?

A. Excuse me. It stands for Immigration and Customs Enforcement.

Q. Could you please take a look at what has been marked for purposes of identification as Government Exhibit No. 1251.

A. Yes.

Q. Based upon your past experience and training, do you have an opinion as to what this substance is?
A. Yes, I do.
Q. What is this?
A. It contains the drug flunitrazepam.
Q. And is there a common or trade name for that drug?
A. The common trade name is Rohypnol.
Q. How do you recognize this exhibit?
A. I recognize my seal on the bottom.

MR. LULEJIAN: Your Honor, the United States offers 1251 for admission into evidence.

THE COURT: Any objection?

MR. GUNN: Subject to foundation tying it to this case, Your Honor, no.

THE COURT: All right. It will be conditionally admitted.

(Government's Exhibit 1251 was received)

BY MR. LULEJIAN:
Q. What was the total amount of flunitrazepam or Rohypnol found in that exhibit?
A. There were three tablets in total.
Q. What do the tablets look like?
A. The tablets were oval and dark green.
Q. How were they packaged?
A. They were packaged in a blister pack which is commonly used

to dispense pills, medicine.

Q. When did you test these exhibits?

A. I tested this exhibit starting on the 8th of January this year.

Q. From these tests were you able to -- were you able to form an expert opinion as to what the substance is or contains?

A. Yes, I was.

Q. Would you please state your opinion.

A. The exhibit contained the drug flunitrazepam.

Q. You can put that in the box now.

Would you please examine Government Exhibits No. 1252, 1253, and 1254.

A. Yes.

Q. Based upon your past experience and training, do you have an opinions as to what these substances are?

A. Yes, I do.

Q. How can you identify these exhibits?

A. I recognize my seals on the bottom of all three exhibits.

Q. And your opinion is, please?

A. That the exhibits contain the drug diazepam.

Q. And does diazepam have a common trade name?

A. The common trade name is Valium.

MR. LULEJIAN: Your Honor, the United States conditionally offers exhibits -- I'm sorry -- the United States offers Government Exhibit Nos. 1252, 1253, and 1254 for

admission into evidence.

MR. GUNN: Same -- no objection subject to foundation. And my position will be the same as to all these exhibits, Your Honor.

THE COURT: Thank you. Then they will be conditionally admitted.

(Government's Exhibits 1252, 1253 and 1254 were received)

BY MR. LULEJIAN:

Q. What was the total amount of diazepam that you found?

A. Total there were 17 tablets.

Q. What did the tablets look like?

A. They were round and light blue.

Q. When did you test these exhibits?

A. I tested them starting on the 8th of January this year.

Q. From these tests were you able to form an expert opinion as to what the exhibits contain or are?

A. Yes, I was.

Q. What is that opinion?

A. That the exhibits contained diazepam.

Q. You can put those in the box now, sir.

Would you please examine Government Exhibit Nos. 1255 and 1256 for purposes of identification.

A. Yes.

Q. Based on your past experience and training do you have an opinion as to what these substances are?

A. Yes, I do.

Q. How can you identify these substances?

A. I recognize my seals on the bottom of both.

Q. What are the substances?

A. Both exhibits contain the drug morphine.

MR. LULEJIAN: Your Honor, the United States conditionally offers -- let me rephrase. The United States offers Government Exhibits 1255 and 1256 for conditional admission as evidence.

THE COURT: Mr. Gunn has agreed that all of the exhibits will be conditionally admitted so you don't need to offer them.

MR. LULEJIAN: Thank you, Your Honor.

Q. How many tablets of morphine were there?

A. In total there were 27 tablets.

Q. I am sorry. How many?

A. Twenty-seven.

Q. What did the tablets look like?

A. There were two different types. One type is oval and pink and the other type is round and white, off white.

Q. And when did you test these exhibit?

A. I tested them starting on the 9th of January of this year.

Q. From these tests were you able to form your expert opinion that these drugs were morphine?

A. Yes, I was.

Q. Would you please look at Exhibit Nos. 1257, 1258, 1259 and 1260?

A. Yes.

Q. Based on your past experience and training do you have an opinion as to what these substances are?

A. Yes, I do.

Q. What are they?

A. These four exhibits contain codeine and acetaminophen.

Q. How can you identify these exhibits?

A. I recognize my seals on the bottom of all four.

Q. What was the total amount of codeine and acetaminophen in those exhibits?

A. In total there were 127 tablets.

Q. Would you please describe what the tablets look like.

A. Again, there were two different types. One type is oval and white and the other type is round and white.

Q. And when did you test these exhibits?

A. I tested them starting on the 11th of January of this year.

Q. Did this testing help form your expert opinion that the exhibits contained codeine and acetaminophen?

A. Yes.

Q. Would you please now look at Government Exhibit Nos. 1263 and 1264.

A. Yes.

Q. Based on your past experience and training do you have an

opinion as to what these substances are?

A. Yes, I do.

Q. What is Exhibit No. 1263?

A. 1263 contains the drug Temazepam.

Q. Would you please describe what is in Exhibit No. 1264. Only discussing the relevant drug.

A. In 1264 there is a pill-dispensing plastic unit that had several types of drugs in it. The analyzed portions contain Temazepam.

Q. And how do you identify these exhibits?

A. I identify by my seals on the bottom.

Q. And what was the total amount of Temazepam in those exhibits?

A. Twenty-five capsules.

Q. And would you please describe what the capsules look like.

A. The capsules were half dark green, half white.

Q. And when did you test these exhibits?

A. I tested them starting on the 25th of February of this year.

Q. From these tests were you able to form an expert opinion as to what these exhibits actually contain?

A. Yes, I was.

Q. Would you please state that opinion.

A. That the exhibits contain Temazepam.

Q. Would you please take a look at Government Exhibit

No. 1265.

A. Yes.

Q. Based on your past training and experience, do you have an opinion as to what this substance is?

A. Yes, I do.

Q. What is that?

A. It is the drug Alprazolam.

Q. What is the common name for Alprazolam?

A. Xanax.

Q. How do you identify this exhibit?

A. I recognize my seal on the bottom.

Q. What is the total amount of Xanax in that exhibit?

A. There were three and a half tablets.

Q. Would you please describe to the Court and the jury what the tablets look like.

A. The tablets were oval and pink, light pink. Excuse me. Light pink.

Q. When did you test the exhibits?

A. I tested them starting on the 26th of February.

Q. And from your tests, were you able to form an expert opinion as to what the exhibit was or contained?

A. Yes, I was.

Q. From your testing, what did you ultimately determine that the exhibits contained?

A. I determined that the exhibits contain Alprazolam.

Q. Finally, would you please look at Government Exhibits No. 2037, 2038, and 2039.
A. Yes.
Q. Based on your past experience and training, do you have an opinion as to what this substance is?
A. Yes, I do.
Q. What is that?
A. That these three exhibits contain the drug sildenophil.
Q. What is the common or trade name for sildenophil?
A. The most common trade name is Viagra.
Q. Are there other names that you are aware of?
A. There is a name on the box of one of these of Kamagra.
Q. How can you identify these exhibits?
A. I recognize my seals on the bottom of all three.
Q. What was total amount of sildenophil that you analyzed?
A. In total there were six tablets.
Q. Would you please describe what the tablets looked like?
A. Again, there were two different types. Both of them were diamond-shaped and blue.
Q. And was there any difference between the two?
A. There were different markings on the pills.
Q. How were the tablets packaged?
A. In one type, there was a blister pack which was inside of a box. Another type was a loose pill inside a box. And then a third type was just inside of a blister pack.

Q. Did you test these exhibits?

A. Yes, I did.

Q. Based on your tests, would you please state your opinion to what they contained.

A. That the three exhibits contained sildenophil.

Q. What was the basis and opinion for the conclusion or the opinion that you reached for this and all the other exhibits that you testified this afternoon?

A. My training and experience in addition to the chemical analyses performed.

MR. LULEJIAN: I have no further questions, Your Honor.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MR. BROWN:

Q. Mr. Bordelon, Government Exhibit 1257 -- Government Exhibits 1257, 1258, 1259 and 1260 you said were codeine and acetaminophen?

A. That's correct.

Q. Is that what would commonly be known as Tylenol with Codeine?

A. Tylenol with Codeine does contain both of those drugs.

Q. So that is either Tylenol with Codeine or a version of it?

A. There is many preparations which contain codeine and/or acetaminophen. Tylenol is one trade name.

Q. These exhibits are in these large heat-sealed bags, right, with the various medications inside of them; correct?

A. That's correct.

Q. There is also some small Ziploc baggies with some crushed-up material inside; right?

A. That's correct.

Q. Is it correct that those Ziploc baggies with the crushed-up material inside are crushed-up material that you created for purposes of analyzing the medications?

A. That's correct.

Q. That wasn't the way it was given to you?

A. Right. The -- the tablets were crushed by me for the purposes of analysis.

Q. So all the medications you were given were either capsules or tablets in a blister pack or some other sort of container?

A. With the exception of one exhibit, which was the purple pill dispensers, there were some crushed tablets in that exhibit, but everything else was intact form.

Q. And what were those crushed tablets?

A. Those were not analyzed.

Q. Was there a reason you didn't analyze them?

A. I performed a logo index search, which is a reference guide we have for pill identification. There were several tablets in that dispenser that I was able to look up using a reference guide. And I only analyzed the Temazepam, which is

the only controlled substance in that batch.

MR. GUNN: No further questions, Your Honor.

THE COURT: Any redirect?

MR. LULEJIAN: One question, Your Honor.

REDIRECT EXAMINATION

BY MR. LULEJIAN:

Q. Ziploc baggies that contained the crushed pills or the open capsules that you examined, is there anything unique about those versus the baggies where the pills were crushed ahead of time?

A. I'm sorry, can you rephrase the question?

Q. I'm sorry, it was an inartful question.

The baggies that you -- that contained the drugs that you crushed, did you do anything to those baggies to designate that they were from your sample?

A. Yes. All the bags inside the heat seal have my initials on them.

MR. LULEJIAN: I have no further questions, Your Honor.

THE COURT: Any recross?

MR. GUNN: No, Your Honor.

THE COURT: Thank you, sir. You are excused.

Does the Government have another witness?

MS. DONAHUE: Yes, Your Honor. The Government calls Gary Phillips.

Gary Phillips, Government's witness, was sworn

THE COURT: Thank you. You may take the stand. Would you state and spell your name, please.

THE WITNESS: Yes. Good morning everybody. My name is Gary Phillips, P-H-I-L-L-I-P-S.

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MS. DONAHUE:

Q. Sir, can you tell us how are you employed?

A. I am a supervisory special agent with the Department of Homeland Security Immigration and Customs Enforcement.

Q. How long have you been a supervisory special agent with Immigration and Customs Enforcement?

A. With Immigration and Customs Enforcement, or the acronym ICE, since March of 2003.

Q. And that's as a supervisor. How long have you been employed by ICE?

A. By ICE since 2003.

Q. Or its predecessor --

A. U.S. Customs.

Q. -- agency?

A. I was employed formally with U.S. Customs, Office of Investigations, since November 7th, 1988.

Q. And starting in November of 1988, can you describe your various assignments? First with U.S. Customs and then with ICE.

A. Yes. I had, as all agents, approximately four months

 training in the Federal Law Enforcement Training Academy in Brunswick, Georgia, and from there I was assigned to the Special Agent in Charge, San Diego division of U.S. Customs.

My primary duties as a young agent in 1989 was investigating narcotics violations, smuggling operations. And as I progressed through my career, I became heavily involved in undercover -- I'm sorry, undercover narcotics operations. And I have also been in several groups that focused on high technology merchandise that has been smuggled and exported into the United States, crimes against children, child pornography, weapons violations. I have been assigned to the Air Marines smuggling group and the fraud group.

Q. What is your current assignment?

A. Currently I serve as the assistant attache for the ICE office in Bangkok, Thailand.

Q. And what are your duties and responsibilities as the assistant attache in Bangkok?

A. I have many, many duties. Primarily it's to oversee all operational matters involving criminal investigations in my area of responsibility, in addition to being attached to the U.S. embassy in Bangkok and four other countries.

Q. You mentioned your area of responsibility. What countries are your area of responsibility?

A. In my office, we cover Thailand, Laos, Cambodia, Burma and Vietnam.

Q. How long have you been the assistant ICE attache in Bangkok covering those five countries?

A. Actually it was a U.S. Customs assistant attache beginning in May of 2002 and then we transitioned into ICE in March of '03 so all in all, six years.

Q. And over the past six years, have you specialized in investigating any particular type of case?

A. Yes, I have.

Q. What type of case is that?

A. Crimes against children involving the violations of the U.S. Protect Act.

Q. When you say the U.S. Protect Act, can you say very briefly what you mean by that?

A. Yes. It's basically --

MR. GUNN: I would object. This is irrelevant.

THE COURT: Well, it's not irrelevant, but I don't know that he should be explaining the law.

MS. DONAHUE: All right. That's fine.

Q. Special Agent Phillips, in your work in Southeast Asia, have you come across the acronym NGO?

A. Yes, I have.

Q. What does that stand for?

A. NGO is an acronym for non-government organization.

Q. And are you familiar with functions that non-governmental organizations perform in Cambodia?

A. Yes, I am.
Q. Can you describe those functions?
A. There are several functions of NGO's but in this context, the NGO's that I primarily deal with are NGO's that are involved in either investigation or after-care facilities for children who have been physically, mentally and sexually abused.
Q. Are there several different NGO's in Cambodia?
A. Yes, there are.
Q. Are the victims in this case currently housed at NGO's when they live in Cambodia?
A. Yes, these particular victims are housed in an NGO facility.
Q. Can you give the names of those two NGO facilities?
A. I can. The names are Hagar, H-A-G-A-R, and secondly Agape, A-G-A-P-E.
Q. And can you describe generally what services Hagar and Agape provide for the victims?
A. These two particular NGO's are primarily focused on long term after-care facilities for children who have been sexually exploited, physically exploited, and mentally exploited. And they provide education, food, clothing, love, care, healthcare, compassion, all at no cost.
MR. GUNN: Objection, Your Honor. Move to strike reference to things like love and compassion. It's prejudicial.
THE COURT: Overruled.

BY MS. DONAHUE:

Q. Now, Special Agent Phillips, I would like to turn your attention to June 17th of 2006. You were the assistant attache in Bangkok at that time; is that correct?

A. Yes, ma'am.

Q. And what country were you actually physically located in on June 17th of 2006?

A. In Cambodia.

Q. And why were you in Cambodia?

A. Because I had received information on -- on another investigation. I was involved in two other investigations.

Q. And specifically at about 12:30 in the afternoon on June 17th, where were you?

A. I was in Phnom Penh, Cambodia.

Q. Who were you with?

A. I was with the NGO's, International Justice Mission, World Hope International, the Cambodian National Police.

Q. And what were you doing with them?

A. I was at a residence waiting for the police to arrive and the Cambodian prosecutor or clerk.

Q. If I can have you take a look at Government's Exhibit 1073, which is in the binder in front of you.

A. May I move this?

THE COURT: Sure.

BY MS. DONAHUE:

Q. Government's Exhibit 1073, do you recognize that?

A. Yes, ma'am, I do.

Q. Did you take that photograph?

A. Yes, ma'am.

Q. What is it?

A. It's the photograph of the front gate and wall of a residence.

Q. Is that the residence in Phnom Penh that you were surveilling at -- on June 17th of 2006?

A. I arrived at that residence, yes.

MS. DONAHUE: Move 1073 into evidence.

MR. GUNN: No objection.

THE COURT: That will be admitted. Thank you.

(Government's Exhibit 1073 was received)

BY MS. DONAHUE:

Q. Would you please describe what happened after you arrived and took the photograph of this gate.

A. Yes. After I arrived, we waited for a few minutes and then a contingent of Cambodian National Police officers arrived along with other individuals and subsequently -- shortly thereafter, a vehicle, a blue vehicle arrived. And we then waited for a few minutes and the Cambodian National Police executed a search warrant.

Q. When the Cambodian National Police executed the search warrant, did they open that gate?

A. Yes, ma'am, they did.

Q. Can you please take a look at Government's Exhibit 1074.

THE COURT: Any objection to 1074?

MR. GUNN: No, Your Honor.

THE COURT: 1074 is in.

(Government's Exhibit 1074 was received)

BY MS. DONAHUE:

Q. Please take a look at Government's Exhibit 1077.

THE COURT: Any objection, Mr. Gunn?

MR. GUNN: No, Your Honor.

THE COURT: 1077 is in.

(Government's Exhibit 1077 was received)

BY MS. DONAHUE:

Q. Did you take that photograph?

A. Yes, ma'am, I did.

Q. What is that a photograph of?

A. Once you open the gate, it exposes the exterior of the residence and what you're looking at there is the main entranceway to the residence.

Q. You said that a blue car pulled in. Did you see who was inside the blue car?

A. Yes, ma'am, I did see who was in the vehicle.

Q. Can you explain who you saw?

A. I saw the defendant, Mr. Pepe, inside the vehicle in a -- in the left seat, handcuffed.

Q. Who was he with?

A. At the time he was with the Cambodian National Police.

Q. And for the record, in the courtroom today do you see the individual who was in the car with the Cambodian National Police on June 17th of 2006?

A. Yes, ma'am.

Q. Can you please just point to him and state what he is wearing.

A. He is sitting next to Mr. Brown with the -- I guess that's black or blue blazer, blue tie, blue shirt.

THE COURT: Indicating Mr. Pepe.

BY MS. DONAHUE:

Q. And did the Cambodian National Police get him out of the car?

A. Eventually, yes.

Q. After that, can you explain what you observed?

A. After he got out of the car, we walked over to the entrance -- I guess that would be called the porch area here where the pillars are -- and they then began to go through what I believe to be his personal effects from a black canvas bag.

Q. Did you go into this house?

A. Yes, I did.

Q. Did you go upstairs inside this house?

A. Yes, ma'am, I did.

Q. Did you see any bedrooms upstairs?

A. Yes, I did.

Q. Were you able to just walk right into any bedrooms that you wanted to go into up there?

A. No, I was with the Cambodian National Police.

Q. Were the doors to the bedrooms open?

A. Some of them -- most of them were.

Q. Was the bedroom to the -- the door to the master bedroom open?

A. No, it was not.

Q. How do you know that?

A. Because the Cambodian National Police attempted to gain access to the bedroom but it was locked.

Q. Were you able to conclude whether -- did the Cambodian National Police, in fact, gain access to that bedroom?

A. Yes, they did.

Q. And did you see what they did?

A. They popped the door and they went into the master bedroom.

Q. Can you please take a look at Government's Exhibit 1089.

THE COURT: Any objection to 1089?

MR. GUNN: No, Your Honor.

THE COURT: All right. That will come in.

(Government's Exhibit 1089 was received)

BY MS. DONAHUE:

Q. Did you take this photograph?

A. Yes, ma'am, I did.

Q. Can you please explain what is this a photograph of.

A. This is a photograph as you look into the master bedroom from kind of like where the foyer is or a little landing, looking directly at 180 degrees through the door.

Q. When you say the door, do you mean the door to the master bedroom in this house?

A. Yes, ma'am.

Q. Please take a look at Government's Exhibit 1090.

A. Yes, ma'am.

Q. Do you recognize that?

A. Yes, I do.

Q. What is it?

A. This is a stick about one inch in diameter. It was propped up between the nightstand and the little corner by the bed. Like a little outpost.

Q. And it's actually a photograph of that; is that right?

A. Yes.

MS. DONAHUE: Move Government's Exhibit 1090 into evidence.

THE COURT: Any objection?

MR. GUNN: No, Your Honor.

THE COURT: All right. That will come in.

(Government's Exhibit 1090 was received)

MS. DONAHUE: I would ask if Government's Exhibit 1171, which is physical evidence, could be handed to the

witness and if we can actually have the agent bring the cart of physical evidence up. Can you hand him Government's Exhibit 1171.

Q. Can you tell us if you recognize it and what it is?

A. I do.

Q. What is it?

A. It's the -- an accurate depiction of this photograph. This is the original stick.

Q. Is this the stick that came out of that room?

A. Yes.

Q. Is it in the same physical condition you saw it on June 17, 2006?

A. Yes.

MS. DONAHUE: Move 1171 into evidence.

THE COURT: Any objection?

MR. GUNN: No, Your Honor.

THE COURT: That will come in.

(Government's Exhibit 1171 was received)

BY MS. DONAHUE:

Q. Going back to Government's Exhibit 1089 for a moment, the bed entranceway, was this stick just around the corner to the right as you come into the bedroom?

MR. GUNN: Objection, leading, Your Honor.

THE COURT: Sustained.

BY MS. DONAHUE:

Q. Where was the stick?

A. If you walk into that bedroom and if you can see the little door that's open, that's kind of like a little vanity thing with a mirror, and then next to the bed so far is a little nightstand and a little alcove. And that stick is propped up basically in between the vanity and the nightstand but near the bedside.

Q. Approximately how long had you been inside the house when you found this stick?

A. Approximately 15, 20 minutes. I'm sorry. That's at the time of the execution of the warrant.

Q. What do you mean by that?

A. Basically once I -- once I started snapping pictures, which was fairly close to the actual execution of the warrant, that's what I'm basing my start time on. And then as we went -- as they looked through his personal effects, that took a few minutes, and then when I took these pictures, this -- other pictures, I looked at the times and figured that's how long we went. How long the -- how long the amount of time was -- transpired.

Q. Were you actually conducting this search?

A. No, I wasn't.

Q. Why not?

A. I have no authority to execute search warrants in other countries.

Q. So what was your role?

A. My role was a law enforcement agent with the United States, as an observer in the host country that I'm responsible for.

Q. Going back to that room, could you take a look at Government's Exhibit 1091 and tell us if you recognize it.

A. Yes, I do.

THE COURT: Any objection to 1091?

MR. GUNN: Probably, not. Can I hear the testimony about it first.

THE COURT: All right.

BY MS. DONAHUE:

Q. Did you take this photograph?

A. Yes, ma'am, I did.

Q. Where did you take this photograph?

A. In the master bedroom.

Q. What does it depict?

A. It depicts the vanity that I just described a moment ago.

Q. I guess where is the stick that you just described in relation to this vanity?

A. As you are looking at this vanity, the stick is to the left by a smaller nightstand.

Q. And is this a true and accurate depiction of how -- of what you saw in the master bedroom on June 17th of 2006?

A. Yes, ma'am, it is.

MS. DONAHUE: Move Government's Exhibit 1091 into evidence.

MR. GUNN: No objection.

THE COURT: That will be admitted.

(Government's Exhibit 1091 was received)

BY MS. DONAHUE:

Q. I would like you to take a look at Government's Exhibit 1095.

A. Yes, ma'am.

Q. Did you take this picture?

A. Yes, I did.

Q. Can you tell us what it is?

A. This is a photograph of an 82-gram lubricant, KY jelly, that was found on the nightstand by the stick.

MS. DONAHUE: Move Exhibit 1095 into evidence.

THE COURT: Any objection?

MR. GUNN: No, Your Honor.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1095 was received)

BY MS. DONAHUE:

Q. Can you take a look at Government's Exhibit 1096.

A. I have it. I have the exhibit.

Q. Do you recognize that photograph?

A. Yes, I do.

Q. What is that?

A. This is a photograph of the bed and the little alcove that I was describing earlier where the stick was propped up against,

with the flowers on the nightstand and the KY jelly.

MS. DONAHUE: Move Government's Exhibit 1096 into evidence.

THE COURT: Any objection?

MR. GUNN: No objection.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1096 was received)

BY MS. DONAHUE:

Q. When you were referring to the stick and the KY jelly, can you just explain, now that the photograph is up, where those were located in photograph?

A. Yes, ma'am. If you're looking at the bed and you see a little -- I don't know what to call it -- a little alcove, a little like two by four's that jut out with drywall over it, just to the right of that you will see the stick propped up against -- in the corner. To the right of that is a smaller nightstand, flowers in the left-hand corner and the KJ jelly just in front of that.

Q. Can you please take a look at Government's Exhibits 1097 and 1098 both.

A. I have reviewed 1097 and 98.

Q. Did you take both of these photographs?

A. Yes, I did.

MS. DONAHUE: Move them into evidence.

MR. GUNN: No objection.

THE COURT: They will be admitted. Thank you.

(Government's Exhibits 1097 and 1098 were received)

BY MS. DONAHUE:

Q. First looking at 1097, can you please explain what that is?

A. That's the headboard of the master bed in the master bedroom, which shows carvings.

Q. Putting 1098 up, Government's Exhibit 1098, can you please explain what that is?

A. That's just a -- an extreme close-up of the carvings on the master bedroom headboard.

Q. Now, Special Agent Phillips, when you were in this bedroom, did you notice whether there was a closet?

A. Yes, I did.

Q. Was there?

A. Yes, there was.

Q. And can you describe the closet?

A. It was dark brown. It was at the foot of the bed, a few feet at the foot of the bed. It was fairly large, multi-tiered in some sections, drawers in some sections, and open in some sections as to hang clothing such as suits, pants, towels.

Q. Was it a built-in closet or like an armoire?

A. Like an armoire.

Q. Did you take a photograph of portions of that armoire?

A. Yes, I did.

Q. Can you take a look at Government's Exhibit 1099.

A. I have reviewed 1099.

Q. Did you take that photograph?

A. Yes, ma'am, I did.

MS. DONAHUE: I move it into evidence.

MR. GUNN: No objection.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1099 was received)

BY MS. DONAHUE:

Q. Can you tell us what 1099 depicts?

A. 1099 is part of the closet armoire that has the open section for hanging clothes such as shirts and suits, etc.

Q. Did you also take a photograph of the shelving unit to the right of this?

A. Yes, ma'am, I did.

Q. Turning your attention back to Government's Exhibit 1099, you mentioned men's clothes. Do you know if there were women's clothes hanging in that closet?

A. I did not see any women's clothes in that closet.

Q. Now turning your attention back, sorry, to Government's Exhibit 1100. Did you take that photograph?

A. Yes, I did.

Q. Move 1100 into evidence.

MR. GUNN: No objection.

THE COURT: Admitted. Thank you.

(Government's Exhibit 1100 was received)

BY MS. DONAHUE:

Q. Starting at the top, can you describe what Government's Exhibit 1100 shows?

A. Once you open the doors to this particular section of the closet, what one first sees starting from the top is a yellow plastic bag of various types of medications. If you look to the extreme left, you will see a green cap which turned out to be like baby oil. There is some various personal effects, miscellaneous items on the top shelf.

Then as you go down to the second tier, finding miscellaneous clothing, sheets, toothbrushes, soap, Q-tips, deodorant, I believe it was cologne, pill boxes for medications, and at the very bottom, cloth strips. You can't see it in this particular picture, but there is rope underneath the cloth strips.

Q. If two items of physical evidence, Government's Exhibit 1174 and 1175, could be placed before the witness.

Starting first with 1174, do you want to go ahead and take that out of the bag?

A. May I stand or shall I sit?

THE COURT: Sure.

BY MS. DONAHUE:

Q. Do you recognize that?

A. I do.

Q. You can go ahead and move the microphone up if you want.

How do you recognize it?

A. This is the same type of cloth strip. This is the same cloth strip that we found underneath the -- I'm sorry -- on the bottom tier of the closet.

Q. Are these the cloth strips in the photograph, Government's Exhibit 1170 -- 1100 on the bottom?

MR. GUNN: Objection. Leading.

THE COURT: Overruled.

You can answer.

THE WITNESS: 1100? May I look again?

THE COURT: Yes.

THE WITNESS: Yes. It would be underneath that.

BY MS. DONAHUE:

Q. Can you also open up the bag for Government's Exhibit 1175.

Do you recognize that?

A. Yes, I do.

Q. How do you recognize it?

A. This is the same cloth strips with the knots that I saw on June 17, 2006, in the closet.

Q. Does it appear to be in the same condition as it was when you saw it on June 17th of 2006?

A. Yes, ma'am. Pretty much.

MS. DONAHUE: Move Government's Exhibits 1174 and 1175 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: Admitted.

(Government's Exhibits 1174 and 1175 were received)

BY MS. DONAHUE:

Q. Go ahead and have a seat and take a look at Government's Exhibit 1101.

A. 1101.

Q. Did you take that photograph?

A. Yes, ma'am, I did.

MS. DONAHUE: Move 1101 into evidence.

THE COURT: Any objection?

MR. GUNN: No, Your Honor.

THE COURT: Admitted.

(Government's Exhibit 1101 was received)

BY MS. DONAHUE:

Q. What does Government's Exhibit 1101 depict?

A. 1101 is just a close-up shot of the former slide, which I believe is Exhibit 1100, showing a little more detail of the first two shelves of the closet.

Q. Turning your attention to the top shelf, the bottle with the green cap, did the Cambodian National Police seize that?

A. Yes, they did.

Q. Could I have a physical exhibit, Government's Exhibit 1185, before the witness.

Do you recognize Government's Exhibit 1185?

A. Yes, I do.

Q. What is it?
A. It's a Johnson's baby oil.
Q. How do you recognize it?
A. It's the same bottle as -- that I observed on June 17th in the closet of the master bedroom.
Q. Move Exhibit 1185 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: Admitted. Thank you.

(Government's Exhibit 1185 was received)

BY MS. DONAHUE:
Q. Take a look at the photograph please, Government's Exhibit 1104.
A. I'm looking at 110.
Q. Did you take that photograph?
A. Yes, I did.

MS. DONAHUE: Move 1104 into evidence.

THE COURT: Any objection?

MR. GUNN: No, Your Honor.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1104 was received)

BY MS. DONAHUE:
Q. What is depicted in Government's Exhibit 1104?
A. This exhibit depicts the yellow bag on the top shelf of the closet in the previous exhibits. The only difference is it was opened in order to observe what was inside the bag at the time.

Q. What does that bag contain?

A. This bag contained brown masking tape, white rope, about three-eights inch diameter, and olive drab green cord, rope.

Q. Did you open this bag?

A. No, I did not.

Q. Do you know who opened this bag?

A. The Cambodian police.

Q. How long, approximately, after the Cambodia police opened this bag did you take the photograph?

A. Well, if you refer to the previous exhibit -- I apologize. I forget which number where the bag was closed -- it was taken just a few seconds after. They were both taken at the same time, 1124 -- I'm sorry -- 1324. 1:24 p.m.

Q. So the prior exhibit, which is Government's Exhibit 1101, is that the exhibit that you were referring to just a moment ago in your testimony?

A. Yes, ma'am.

Q. And what time did you say you took this picture?

A. Approximately 1:24 p.m.

Q. How do you know that?

A. Because that was on the time/date stamp of the image.

Q. Government's Exhibit 1104, what time did you take that?

A. The same time, 1324 or 1:24.

Q. I guess just for accuracy, does that necessarily mean the photograph was taken precisely at 1:24?

A. No.

Q. Is the time stamp on both of those photographs the same?

A. No, I believe it's divided up into seconds. I just rounded it off to minutes.

Q. So did you take this photograph within a minute of when the bag was removed from the closet?

MR. GUNN: Objection. Leading. Asked and answered.

THE COURT: Overruled.

THE WITNESS: Yes, I did.

BY MS. DONAHUE:

Q. Did the Cambodian National Police, in fact, seize that bag?

A. Yes, they did.

Q. I would ask if Government's Exhibit 1172, which is a physical exhibit, could be placed before the witness.

THE COURT: All right.

BY MS. DONAHUE:

Q. If you could take it out of the ICE packaging and tell us if you recognize it.

A. And I failed to mention one other item. My apologies.

Q. What is the other item?

A. Wire.

Q. Are these items in the same condition as they were when you saw them on June 17th of 2006?

A. Yes, they are.

MS. DONAHUE: Move Government's Exhibit 1104 into

evidence -- I'm sorry -- 1172 into evidence.

THE COURT: Any objection?

MR. GUNN: No, Your Honor.

THE COURT: Admitted.

(Government's Exhibit 1172 was received)

BY MS. DONAHUE:

Q. I have a couple more physical exhibits. Government's Exhibit 1178. And 1181 is next. If you want to go ahead and start with 1178. Take that out of the ICE packaging and tell us if you recognize it.

A. Yes, I do.

Q. What is it?

A. It's a shaving kit, black, the Jock, J-O-C-K.

Q. How do you recognize it?

A. I remember seeing this in the closet in the master bedroom.

Q. Is it in the same condition that it was when you saw it on June 17th of 2006?

A. Yes, it is.

Q. Can you please open that shaving kit. What's inside?

A. In the rear pocket, KY Jelly. In the middle pocket, just a toothbrush holder, dental floss, old razor, toothbrush and some miscellaneous personal items.

MS. DONAHUE: Move Government's Exhibit 1178 into evidence.

THE WITNESS: There is one more thing, ma'am. And in

the front pocket a blister pack of Kamagra.

THE COURT: Any objection?

MR. GUNN: No objection, Your Honor.

THE COURT: Admitted. Thank you.

(Government's Exhibit 1178 was received)

BY MS. DONAHUE:

Q. I think you have Government's Exhibit 1181 up there, which is also physical evidence.

A. Yes, ma'am.

Q. If you could take a look at that. And we're also going to be looking at Government's Exhibits 1205 and 1246 which are physical exhibits.

Going back to Government's Exhibit 1181, do you have that in front of you, Special Agent Phillips?

A. Yes, ma'am, I do.

Q. Do you recognize that?

A. I do.

Q. What is it?

A. It's two Trojan Ultra Texture condoms.

Q. How do you recognize them?

A. I saw these in the bedroom as well.

Q. Move Government's Exhibit 1181 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1181 was received)

BY MS. DONAHUE:

Q. Can you take a look at Government's Exhibit 1205. Go ahead and take that out of the package and tell us if you recognize it.

MR. GUNN: Could I get the exhibit number again?

MS. DONAHUE: I'm sorry. It's 1205.

THE WITNESS: I do recognize it.

BY MS. DONAHUE:

Q. How do you recognize it?

A. Because this was very distinctive. It had little monkeys on a moon on the master bedroom bed, the sheet that covers the mattress.

Q. Does that appear to be in the same condition as when it was seized on June 17th of 2006?

A. Yes, ma'am.

MS. DONAHUE: Move Government's Exhibit 1205 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: Admitted.

(Government's Exhibit 1205 was received)

BY MS. DONAHUE:

Q. Do you have Government's Exhibit 1246 up there, which is also physical evidence? Do you want to take that out of the ICE packaging and tell us if you recognize that.

A. I do recognize these.

Q. What is it?

A. These are the peach-colored pillowcases that was part of the bed when we encountered the bed, the same colored sheet was matching this as well.

Q. Is that in the same condition as you saw it on June 17th of 2006?

A. Yes, ma'am.

MS. DONAHUE: Move Government's Exhibit 1246 into evidence.

MR. GUNN: No objection.

THE COURT: Admitted.

(Government's Exhibit 1246 was received)

BY MS. DONAHUE:

Q. Two more pieces of physical evidence, 1187 and 1252, which is in the box that had all the -- the prior witness was looking at, if you want to locate that.

In the meantime going back to Government's Exhibit 1187, can you take that out of the ICE packaging and tell us if you recognize that?

A. I do recognize it.

Q. How do you recognize it?

A. This is a dream catcher that was above the bed in the master -- located in the master bedroom above the headboard on the wall.

MS. DONAHUE: Move Government's 1187 into evidence.

MR. GUNN: No objection.

THE COURT: Admitted.

(Government's Exhibit 1187 was received)

BY MS. DONAHUE:

Q. If I can have you take a look at Government's Exhibit 1252.

Do you have that in front of you, Government's Exhibit 1252?

A. Yes, ma'am, I do.

Q. Do you recognize that?

A. Yes, I do.

Q. What is that?

A. This is Valium.

Q. And how do you know that?

A. It's a blister pack that says "Valium."

Q. How do you recognize it?

A. I recognize it because I recall seeing it in the bedroom.

Q. When you say the bedroom, do you mean the master bedroom?

A. The master bedroom. There was actually two places that this was found.

Q. 1252 is already in conditionally.

THE COURT: That will be admitted.

(Government's Exhibit 1252 was received)

MR. GUNN: I won't -- we don't object.

THE COURT: Thank you.

BY MS. DONAHUE:

Q. Special Agent Phillips, you can go ahead and have a seat.

Was there --

THE COURT: He is sitting down.

MS. DONAHUE: He is already in his seat. Sorry. One of us is standing.

Q. Can I have you take a look at Government's Exhibits 1106 and 1107. They are both photographs.

A. I have 1106 in front of me.

THE COURT: Any objection to 1106 or 1107?

MR. GUNN: No, Your Honor.

THE COURT: Those are admitted.

(Government's Exhibits 1106 and 1107 were received)

BY MS. DONAHUE:

Q. Taking a look at 1106, can you tell us what that is?

A. That's a view looking from the master bedroom into the master bath.

Q. You can take a look at the other photograph. What is that, 1107?

A. Exhibit 1107 is a photograph in which I took of the bathroom -- I'm sorry -- the bath and the shower and the sink area.

Q. In what bathroom?

A. In the master bath.

Q. And where is that master bathroom located?

A. It's upstairs, connected to the master bedroom.

Q. I would like you to take a look at Government's

Exhibit 1108.

THE COURT: Any objection to 1108?

BY MS. DONAHUE:

Q. Did you take that photograph?

MR. GUNN: Sorry. I am a little behind. I would like to hear the testimony about that.

BY MS. DONAHUE:

Q. Did you take this photograph?

A. Yes, I did.

Q. What does it depict?

A. This is a towel rack where some towels and some other miscellaneous clothing, articles, was found just outside of -- excuse me -- on top of the landing of the stairs in -- next to the master bedroom, outside the master bedroom.

Q. Is this photograph a true and accurate depiction of that towel rack as you saw it in that house on June 17th of 2006?

A. Yes, ma'am, it is.

MS. DONAHUE: Move 1108 into evidence.

MR. GUNN: No objection.

THE COURT: Admitted.

(Government's Exhibit 1108 was received)

BY MS. DONAHUE:

Q. And Special Agent Phillips, did the Cambodian National Police seize any of the towels from this towel rack?

A. Yes, they did.

Q. Take you take a look at physical evidence which is Government's Exhibit 1207. Do you want to go ahead and take it out of the ICE packaging and tell us if you recognize it.

A. I do.

Q. What are they?

A. Two red towels.

MR. GUNN: Could I get that exhibit number again?

MS. DONAHUE: Government's Exhibit 1207. And we move it into evidence.

MR. GUNN: No objection.

THE COURT: Admitted.

(Government's Exhibit 1207 was received)

BY MS. DONAHUE:

Q. Special Agent Phillips, was there another bedroom upstairs in this house in addition to the master bedroom that we were looking at a moment ago?

A. Yes, ma'am, there was.

Q. Did you take photographs inside that bedroom?

A. I did.

Q. Can you please take a look at Government's Exhibit 1079. It's a photograph in the binder.

A. I have 1079 before me.

Q. And did you take Government's Exhibit 1079?

A. Yes, ma'am, I did.

MS. DONAHUE: Move it into evidence.

MR. GUNN: No objection.

THE COURT: Admitted.

(Government's Exhibit 1079 was received)

BY MS. DONAHUE:

Q. Special Agent Phillips, what does Government's Exhibit 1079 depict?

A. It's the children's room which --

MR. GUNN: Objection, Your Honor. Move to strike the characterization as the children's room.

THE COURT: Sustained. That will be stricken.

THE WITNESS: It's a bedroom that has a carved headboard, footboard and footers with a blue flowered sheet, a pillow at the foot of the footboard --

THE COURT: I don't think you need to describe it. We're looking at the picture.

THE WITNESS: Okay.

MS. DONAHUE: Can I have physical exhibits 1188, 89 and 90, which I am standing in front of. I'm sorry.

Q. Starting with the first box that is handed to you and just tell me the number.

A. Exhibit 1188.

Q. 1188. Do -- what is it? Do you recognize it, and where did it come from?

A. This is the white teddy bear that came from the bedroom upstairs located on a table -- or a chair, my apologies.

MS. DONAHUE: Move 1188 into evidence.

MR. GUNN: No objection.

THE COURT: It will be admitted.

(Government's Exhibit 1188 was received)

BY MS. DONAHUE:

Q. Can you take a look at 1189 and answer the same questions. Do you recognize it, what is it and where did it come from?

A. 1189 is a blue bunny rabbit located in the upstairs bedroom on a table.

MS. DONAHUE: Move 1189 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: Admitted.

(Government's Exhibit 1189 was received)

BY MS. DONAHUE:

Q. Government's Exhibit 1190. Do you recognize it, what is it and where did it come from?

A. 1190 is a white Siberian tiger stuffed animal located in the upstairs bedroom.

MS. DONAHUE: Move 1190 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1190 was received)

BY MS. DONAHUE:

Q. I would ask you to take a look at -- at another photograph, Government's Exhibit 1080.

THE COURT: Any objection to 1080?

THE WITNESS: I have 1080 before me.

MR. GUNN: No, Your Honor.

THE COURT: That's admitted.

(Government's Exhibit 1080 was received)

BY MS. DONAHUE:

Q. If you could take a look at physical exhibits 1209 and 1212. Do you recognize it, what is it and where did it come from?

A. Exhibit 1209 are two blue flowered pillowcases and the accompanying sheets which came from the upstairs bedroom.

MS. DONAHUE: Move Government's Exhibit 1209 into evidence.

MR. GUNN: No objection.

THE COURT: Admitted.

(Government's Exhibit 1209 was received)

BY MS. DONAHUE:

Q. Can you go ahead and pull 1212 out of the package and tell us if you recognize it.

A. I do.

Q. What it is and where did it came from?

A. 1212 -- Exhibit 1212 is a red pillow at the foot of the bed in the upstairs bedroom.

MS. DONAHUE: Move Government's Exhibit 1212 into evidence.

MR. GUNN: No objection.

THE COURT: Admitted.

(Government's Exhibit 1212 was received)

BY MS. DONAHUE:

Q. If you could please have a seat and take a look at a photograph which is Government's Exhibit 1083.

Did you take that photograph?

A. Yes, ma'am, I did.

MS. DONAHUE: Move Government's Exhibit 1083 into evidence.

MR. GUNN: I think there should be testimony about what the photograph is first, Your Honor.

BY MS. DONAHUE:

Q. Special Agent Phillips, can you tell us what Government's Exhibit 1083 which is a photograph -- what it depicts?

A. Exhibit 1083 is a front-view photograph of a closet located in the upstairs bedroom.

Q. Just so we're clear, when you say the upstairs bedroom, is this the master bedroom or the second bedroom?

A. The second bedroom.

MR. GUNN: No objection.

THE COURT: All right. That will come in.

(Government's Exhibit 1083 was received).

THE COURT: Is that what's being wheeled up here? Because this is not a good use of time. If counsel has seen all these, then why don't you talk about whether they can come in,

but to keep pulling things out of the bag I don't think is a very good use of time.

MS. DONAHUE: We're going to pull -- represent very few things and move through.

THE COURT: You have five more minutes.

BY MS. DONAHUE:

Q. Special Agent Phillips, are you familiar with physical -- 1204, which are a whole stack of boxes?

A. Yes, I am familiar with 1204.

Q. Okay.

And without going through them, can you tell us what the boxes which are labeled as Government's Exhibit 1204 contain?

A. I can. They have children's clothes, small size, school uniforms, skirts and accompanying blouse, pajamas, party dresses, tank tops, T-shirts, very small size jeans, red and blue in color, a mask with Little Kitty on it, like a filter mask, a red school uniform tie and several other miscellaneous clothing articles that are very small in size.

Q. Where were those items taken from?

A. In the closet and in the upstairs secondary bedroom.

Q. And have you recently reviewed that evidence?

A. I have reviewed the evidence, yes, ma'am.

Q. And is it in the same condition as it was on June 17th of 2006?

A. Yes, it is.

MS. DONAHUE: Move Government's Exhibit 1204 into evidence.

MR. GUNN: No objection.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1204 was received)

BY MS. DONAHUE:

Q. If you can take a look at Government's Exhibit 1084.

A. I have 1084 before me.

Q. Did you take that?

A. Yes, ma'am, I did.

MS. DONAHUE: Move 1084 into evidence.

MR. GUNN: If we could have testimony.

BY MS. DONAHUE:

Q. What does it depict?

A. It's a close-up view of the upper section of the closet in the secondary bedroom upstairs.

MS. DONAHUE: Move 1084 into evidence.

MR. GUNN: No objection.

THE COURT: Admitted.

(Government's Exhibit 1084 was received)

BY MS. DONAHUE:

Q. And, Special Agent Phillips, did the Cambodian National Police seize sheets and towels and books that were on that shelving unit in that closet in that second bedroom?

A. Yes, they did.

Q. And were those subsequently given to ICE?

A. Yes, they were.

Q. And are those, based on your recent review, contained in Government's Exhibits 1198, 1199, 1211, and 1213 which are physical exhibits, based on your recent review of those physical exhibits, without your having to go through all of it?

A. Yep, they are.

MS. DONAHUE: Move those exhibits which are 1198, 1199, 1211 and 1213 into evidence.

MR. GUNN: No objection.

THE COURT: All right. That will come in. Thank you.

(Government's Exhibits 1198, 1199, 1211 and 1213 were received).

THE COURT: And whenever it's a good time to wrap up, Ms. Donahue because it's time for our break.

MS. DONAHUE: Yes. We are just going to move to another area.

THE COURT: Okay. Ladies and gentlemen, don't talk about the case. Don't form or express any opinions about the case until it's finally submitted to you. Remember, I have other things to do on Monday but we will be back here again on Tuesday at 8:00 a.m. You're ordered to return at that time and you are ordered to have a great three days.

(Jury Out)

THE COURT: Thank you, sir. You can step down.

**Certificate of Service**

I hereby certify that on May 28, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

           /s/ *James H. Locklin*

By:    JAMES H. LOCKLIN
        Deputy Federal Public Defender

No. 14-50095

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

MICHAEL JOSEPH PEPE,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
The Honorable Dale S. Fischer, Presiding
No. CR-07-00168-DSF

## Appellant's Excerpts of Record

**[Volume 4 of 12]**

HILARY L. POTASHNER
Acting Federal Public Defender
JAMES H. LOCKLIN
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012
213-894-2929

*Counsel for Defendant-Appellant*

# Table of Contents

## Volume 1

Order Denying Defendant's Motion to Dismiss Indictment....................................1
[Filed December 3, 2007; Docket No. 57]

Order Denying Defendant's Motions to Suppress Evidence...................................9
[Filed December 5, 2007; Docket No. 60]

Order Denying Defendant's Motion to Suppress Evidence ...................................20
[Filed February 7, 2008; Docket No. 129]

Transcript – Sentencing (Excerpts)........................................................................26
[Dated February 28, 2014; Filed April 17, 2014; Docket Nos. 491, 512]

## Volume 2

Defendant's Motion to Suppress Evidence* ..........................................................42
[Filed June 26, 2007; Docket No. 21]

Defendant's Motion to Suppress Evidence (Excerpts).........................................120
[Filed August 1, 2007; Docket No. 33]

Government's Consolidated Opposition to Motions to Suppress Evidence* ........130
[Filed August 22, 2007; Docket No. 39]

Defendant's Reply re Motions to Suppress Evidence ..........................................208
[Filed September 4, 2007; Docket No. 40]

Defendant's Motion to Dismiss Indictment........................................................220
[Filed October 4, 2007; Docket No. 43]

Transcript – Motion Hearing ..............................................................................244
[Dated October 29, 2007; Filed February 26, 2008; Docket Nos. 50, 133]

* Documents marked with an asterisk have been redacted pursuant to Federal Rule of Appellate Procedure 25(a)(5) and Federal Rule of Criminal Procedure 49.1(a).

Government's Declaration re Motions to Suppress Evidence ..............................295
[Filed November 27, 2007; Docket No. 53]

Transcript – Motion Hearing (Excerpts)* ..........................................................299
[Dated December 3, 2007; Filed February 26, 2008; Docket Nos. 58, 134]

Volume 3

Defendant's Supplemental Memorandum re Motion to Suppress Evidence.........340
[Filed December 20, 2007; Docket No. 71]

Government's Supplemental Memorandum re Motion to Suppress Evidence .....350
[Filed December 20, 2007; Docket No. 72]

First Superseding Indictment ..............................................................................372
[Filed December 20, 2007; Docket No. 83]

Government's Supplemental Declaration re Motion to Suppress Evidence (Excerpts) ..........................................................................................................374
[Filed February 5, 2008; Docket No. 127]

Transcript – Motion Hearing (Excerpts)* ..........................................................380
[Dated February 6, 2008; Filed February 26, 2008; Docket Nos. 136]

Transcript – Trial – Day 2 (Excerpts).................................................................460
[Dated May 9, 2008; Filed May 18, 2010; Docket Nos. 259, 410]

Volume 4

Transcript – Trial – Day 3 (am) (Excerpts) .......................................................635
[Dated May 13, 2008; Filed May 18, 2010; Docket Nos. 260, 411]

Transcript – Trial – Day 3 (pm)..........................................................................766
[Dated May 13, 2008; Filed June 17, 2014; Docket Nos. 260, 532]

Volume 5

Transcript – Trial – Day 4 (Excerpts).................................................................805
[Dated May 14, 2008; Filed May 18, 2010; Docket Nos. 261, 412]

Transcript – Trial – Day 5 (Excerpts)....942
[Dated May 15, 2008; Filed May 18, 2010; Docket Nos. 262, 413]

Volume 6

Transcript – Trial – Day 6 (Excerpts)....1022
[Dated May 16, 2008; Filed May 18, 2010; Docket Nos. 263, 414]

Volume 7

Transcript – Trial – Day 7 (Excerpts)* ....1192
[Dated May 20, 2008; Filed May 18, 2010; Docket Nos. 264, 415]

Transcript – Trial – Day 8 (Excerpts)....1343
[Dated May 21, 2008; Filed May 18, 2010; Docket Nos. 269, 416]

Volume 8

Transcript – Trial – Day 9 (Excerpts)....1423
[Dated May 22, 2008; Filed May 18, 2010; Docket Nos. 270, 417]

Volume 9

Transcript – Trial – Day 10 (Excerpts)....1538
[Dated May 23, 2008; Filed May 18, 2010; Docket Nos. 293, 418]

Transcript – Trial – Day 11 (Excerpts)....1739
[Dated May 27, 2008; Filed June 2, 2010; Docket Nos. 294, 435]

Volume 10

Transcript – Trial – Day 12 (Excerpts)....1805
[Dated May 28, 2008; Filed May 18, 2010; Docket Nos. 295, 419]

Transcript – Trial – Day 13 (Excerpts)....1930
[Dated May 29, 2008; Filed May 18, 2010; Docket Nos. 296, 420]

Stipulation to Correct/Modify Record re Jury Instructions (Excerpts)[†] ..............1941
[Filed February 27, 2015; Docket No. 543]

Order Correcting/Modifying Record re Jury Instructions ..................................1961
[Filed March 2, 2015; Docket No. 545]

Order Correcting/Modifying Record re Video Testimony .................................1963
[Filed March 2, 2015; Docket No. 546]

Government's Sentencing Memorandum (Excerpts) ........................................1965
[Filed September 17, 2008; Docket No. 318]

Transcript – Victim Statements .........................................................................1977
[Dated September 25, 2008; Filed June 18, 2014; Docket Nos. 333, 533]

Defendant's Supplemental Filing re Restitution................................................1998
[Filed March 25, 2009; Docket No. 348]

Judgment ...........................................................................................................2006
[Filed February 28, 2014; Docket No. 492]

Notice of Appeal ...............................................................................................2012
[Filed March 3, 2014; Docket No. 493]

Docket ..............................................................................................................2013

Volume 11 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 1)...................2053
[Filed March 3, 2015; Docket No. 547]

Volume 12 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 2)...................2309
[Filed March 3, 2015; Docket No. 547]

[†] Although this document and the two orders that follow were not filed until after the judgment and notice of appeal were filed, they are placed here in the excerpts because they relate to the trial proceedings.

Exhibit No. 101 ........................................................................................2399

Exhibit No. 102 ........................................................................................2401

Exhibit No. 103 ........................................................................................2403

Exhibit No. 104 ........................................................................................2405

Exhibit No. 106 ........................................................................................2408

Exhibit No. 107 ........................................................................................2410

Exhibit No. 108 ........................................................................................2412

Exhibit No. 109 ........................................................................................2414

Exhibit No. 110 ........................................................................................2416

Exhibit No. 111 ........................................................................................2418

Exhibit No. 114 ........................................................................................2420

Exhibit No. 123 ........................................................................................2423

Exhibit No. 2007 ......................................................................................2428

Exhibit No. 2009 ......................................................................................2454

Exhibit No. 2010 ......................................................................................2456

Exhibit No. 2011 ......................................................................................2458

Exhibit No. 2093 ......................................................................................2460

Exhibit No. 2096 ......................................................................................2462

Exhibit No. 2200A ...................................................................................2464

Exhibit No. 2201A ...................................................................................2467

Exhibit No. 2202A ........................................................................................2477

Verdict ..........................................................................................................2480
[Filed May 29, 2008; Docket No. 299]

Presentence Report ..........................................................................................2488
[Dated July 30, 2008; Filed March 25, 2009; Docket No. 346]

Probation Office Letter to District Court ..........................................................2517
[Dated September 3, 2008]

Government's Submission of Victim Impact and Restitution Information .........2523
[Filed September 19, 2008; Docket No. 329]

Supplement to Presentence Report ....................................................................2559
[Filed March 25, 2009; Docket No. 347]

Government's Response to Defendant's Filing re Restitution ...........................2562
[Filed April 21, 2009; Docket No. 355]

Government's Supplemental Submission re Restitution ...................................2583
[Filed February 28, 2014; Docket No. 490]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

United States of America, )

Plaintiff, )

)

vs. ) Case No.

) CR 07-168(A)-DSF

Michael Joseph Pepe, )

Defendant. )

_________________________________ )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

Day 3 (A.M. Session)

Los Angeles, California

Tuesday, May 13, 2008

Pamela A. Seijas, CSR, FCRR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California 90012
(213) 687-0446

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
BY: PATRICIA DONAHUE
ASSISTANT UNITED STATES ATTORNEY
JOHN LULEJIAN
ASSISTANT UNITED STATES ATTORNEY
312 N. SPRING STREET
LOS ANGELES, CA 90012

FOR DEFENDANT: OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY: CARL GUNN
DEPUTY FEDERAL PUBLIC DEFENDER
CHARLES BROWN
DEPUTY FEDERAL PUBLIC DEFENDER
321 EAST SECOND STREET
LOS ANGELES, CA 90012

ALSO PRESENT: ATTACHE GARY PHILLIPS
ICE SPECIAL AGENT EDDY WANG

it fairly and accurately depicts the way it looked on that day. Either one is sufficient so let's stick to the shortest --

MR. GUNN: I was trying to use my judgment, Your Honor, in a couple of cases I wanted the witness to explain a little bit more about it and in many I didn't.

THE COURT: Great. Thank you.

(Recess taken)

MR. GUNN: I have gone through a list of exhibits very quickly that the Government gave me. About half or a little bit more I am willing to not have any questions asked about. The others I would like some -- I mean, I doubt I will be objecting -- moving to exclude them on chain of custody grounds but I would like some foundation established.

THE COURT: Okay.

MR. GUNN: Something similar to the other day.

THE COURT: All right. We'll see how that goes. Does the Government know which are which so they can just say that you have agreed to these?

MR. LULEJIAN: I'm sorry, Your Honor:

MR. GUNN: I don't think they do, Your Honor, because I just went through the list. I haven't had a chance to go over it with them.

MS. DONAHUE: If you will just mark them.

(Jury In)

THE COURT: Good morning. We are back on the record

with everyone present. Mr. Lulejian, do you want to call a witness out of order.

MR. LULEJIAN: Yes, Your Honor. The Government calls Cynthia Morris-Kukoski.

THE COURT: Thank you.

Cynthia Lynne Morris-Kukoski, Government's witness, was sworn

THE CLERK: Please have a seat. Please state and spell your full name for the record.

THE WITNESS: My name is Cynthia Lynne Morris-Kukoski. Last name M-O-R-R-I-S, hyphen, K-U-K-O-S-K-I.

THE COURT: We don't want to guess so would you tell your first and middle names.

THE WITNESS: C-Y-N-T-H-I-A. My middle name is Lynne, L-Y-N-N-E.

DIRECT EXAMINATION

BY MR. LULEJIAN:

Q. Dr. Morris-Kukoski, if you would speak into the microphone it would be easier for us to hear.

A. Sorry about that.

Q. What is your occupation?

A. I am a forensic examiner at the FBI laboratory, and I am a clinical pharmacist/toxicologist.

Q. And in addition to the FBI, are you employed by anybody else?

A. Yes, by the United States Navy Reserve.

Q. What is your rank in the Naval Reserve?

A. I am a lieutenant commander.

Q. How long have you been employed at the FBI?

A. I've been employed at the FBI laboratory for just about four years now.

Q. Prior to joining the FBI laboratory what did you do?

A. I was on active duty for the United States Navy.

Q. What are your duties at the FBI laboratory?

A. At the FBI laboratory I am a forensic examiner in toxicology. As such, I receive biological specimens like blood, urine, body organs, and tampered food substances. I analyze these substances for the presence of poisons and toxins. I then interpret the findings that I come up with, write reports, and testify to those results, if needed, in court.

Q. And what are your duties with the United States Naval Reserve?

A. With the United States Navy Reserve, I am a clinical pharmacist and clinical toxicologist. My duties take place in the in-patient pharmacy. I receive orders from physicians from the wards.

I round in the pediatric intensive care unit and give input and comments to the attendings and to the nurses.

I round on patients in the intensive care unit, in the step-down intensive care unit, on cardiology patients, and when asked to, I serve as a clinical toxicology consultant where I

consult with physicians on overdose patients and detox patients and occasionally actually a pain patient.

Q. What do you mean by rounds?

A. When a medical team rounds, you meet in the morning and you all gather together as an interdisciplinary group. You have a nurse, a doctor, a respiratory therapist, pharmacist, and you go through each patient in the medical area and discuss what their problems are, what medicines there are, and what's the goal and plan for the patient.

Q. What education and training do you have to qualify as a forensic examiner with the FBI?

A. As a -- in order to be a forensic examiner at the FBI laboratory, you first have to have a college degree, be it in chemistry, biochemistry, pharmacy. You then have to undertake an extensive training program that takes about two years.

You have to take a bunch of written examinations and pass -- and successfully pass those written tests. You have to get unknown samples to analyze and come up with the right answer and interpret things properly.

Once you have done that, you have to sit through an oral board where your peers check with you to see what your response is on specific information to check your knowledge base. You then have several moot courts that you also have to go through.

Q. Where did you go to school?

A. I have a Bachelor's of Science from the Massachusetts College of Pharmacy in Boston, Massachusetts, and a Doctor of Pharmacy from the Massachusetts College of Pharmacy in Boston, Massachusetts.
Q. Is the Massachusetts College of Pharmacy affiliated with any other university?
A. It's a Harvard affiliate university, yes.
Q. Where did you serve your residence?
A. I have my residency in clinical toxicology from the Hennepin Regional Poison Center, Hennepin County Medical Center, Minneapolis, Minnesota.
Q. Where are you board certified?
A. I am a licensed registered pharmacist in the State of Connecticut, Massachusetts and a national diplomat of the American Board of Applied Toxicology which is a clinical toxicology board.
Q. How long have you been practicing pharmacology?
A. I have been a licensed pharmacist for almost 20 years.
Q. Have you written any articles in the areas of pharmacy and toxicology?
A. I have written numerous pharmacology and toxicology articles, yes.
Q. Do you serve on the faculty of any universities and colleges?
A. Yes. I have served on faculties for pharmacology and

toxicology programs across the country.

Q. Have you ever testified in court as an expert in the fields of pharmacology and toxicology?

A. Yes, I have.

Q. Approximately how many times?

A. I have testified approximately over a hundred times.

Q. And what courts were those in?

A. Those were in all different military tribunals.

Q. And on which side did you testify as an expert witness in those military tribunals?

A. I've been asked to serve as consultant for the Defense, as an expert for the prosecution, and to come in as a neutral party to the Court.

MR. LULEJIAN: Your Honor, the United States moves that Cynthia Morris-Kukoski be declared an expert in the field of pharmacology and toxicology.

MR. GUNN: No objection.

THE COURT: All right. She's an expert in that field.

BY MR. LULEJIAN:

Q. Dr. Morris-Kukoski, would you take a look at the boxes behind you on the stand.

A. Yes, sir.

Q. What is inside that box?

A. These are various tablets that were seized from the defendant's property.

Q. And when did you last look at the contents of that box?

A. I looked at these contents last evening.

Q. What did your examination consist of?

A. What I did was I looked at each packet, I looked at the number up on the top, I looked at the laboratory number, I looked at what the contents said they were, I looked at the markings of the pills, the colors of the pills, and the contents.

Q. When you say the number at the top, is the Government's exhibit number?

A. Yes, it is.

Q. Prior to seeing these drugs, what, if any, information did you review for this case?

A. I looked at all the laboratory reports from the DEA laboratory and the medical records from Dr. Watson.

Q. What did you do after receiving those -- I'm sorry. What did you do after reviewing those documents?

A. After reviewing the documents from the DEA and the medical reports, I was asked to provide some basic pharmacology information on what some of the drugs in -- that were seized were.

Q. Did you do anything else at the Government's request?

A. Yes, I wrote two written reports based on the information that was seized and I also was asked to provide a drug interaction summary statement from a bunch of lists from an

email that were given to me.

Q. Okay.

Turning back to the tablets and pills that are inside that box, what types of drugs are they? What categories?

A. If you look at the categories of drugs that are in the box here today there are a couple different types. The major type would be called -- they would all be considered sedative drugs. There are also some sexual arousing drugs.

Q. And what categories of sedating drugs did you find?

A. There are opiate analgesics in this box. And benzodiazepine sedative hypnotics.

Q. We will get to what those mean in a minute.

Do you know whether those drugs are controlled?

A. Yes. The opiate analgesics and benzodiazepine sedative hypnotics in this country are all controlled substances.

Q. Doctor, I am going to ask you to please take a look at what has been marked as Government Exhibit No. 1273 for identification.

THE COURT: Perhaps we could have an explanation of what a controlled substance means.

MR. LULEJIAN: Thank you, Your Honor.

Q. Doctor, would you please explain to the Court and to the jury what a controlled substance is.

A. Sure. A controlled substance is a category that we use when we look at prescription medicines. We have prescription

medicine that would require a licensed physician to write an order. When you get to a controlled substance, they list the category based on the abuse potential and the potential harm.

So that -- what that would tell a pharmacist and the lay public is something like a controlled substance, C-2, would require a written prescription. You can't give it over the phone and this prescription is only good for a certain period of time, period. They are very highly addictive medicines.

And as you go down the class, you also need written prescriptions but they can be called in by the doctor's office but they are only good for a finite period of time because they do have an abuse potential.

Q. Are those drugs regulated here in the United States?

A. Yes, they are regulated by the FDA.

Q. Are you aware whether those drugs are regulated in other countries?

A. That I am not sure.

Q. Doctor, did you get a chance to take a look at a chart last night?

A. Yes, I did.

Q. Do you have that chart handy by chance?

A. No, I do not.

MR. LULEJIAN: Your Honor, may I approach?

THE COURT: Yes.

BY MR. LULEJIAN:

Q. Doctor, I have handed you what has been marked as Government Exhibit 1273 for identification. Do you recognize that chart?

A. Yes, I do.

Q. What does that chart show?

A. This is a chart of the sedative drugs that were seized from the defendant's place.

Q. Will you please explain to the Court and jury what is on that chart without showing it to them?

A. Sure. This chart has pictures of the opiate analgesic pills that were in this box and the benzodiazepine sedative hypnotic drugs that are in this box.

Q. Would this chart be helpful to your explanation in court today of what these drugs do?

A. Yes, and it would be easier to see instead of looking at the little teeny things in the box.

MR. LULEJIAN: Your Honor, the Government offers Exhibit 1273 for admission into evidence.

MR. GUNN: No objection.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1273 was received)

MR. LULEJIAN: May I publish it, Your Honor?

THE COURT: You may.

BY MR. LULEJIAN:

Q. Doctor, are we looking at the chart that you examined on

the screen right now?

A. Yes.

Q. Doctor, I am going to ask you to start talking about each of the drugs. Let's start with the first category of drugs, opiate analgesics. And if I mispronounce these words, I apologize.

What is an opiate analgesic?

A. An opiate analgesic is a painkiller.

Q. How does it work?

A. Opiate analgesics work and relieve pain by stimulating opiate receptors in the brain. And when it does this, it increases your threshold or tolerance for pain.

Q. Let's start with the first opiate analgesic on your chart. I am going to ask you to take a look at Government Exhibit 1255 and 1256.

Do you have those handy?

A. Yes, I do.

Q. Do you recognize what those drugs are?

A. Yes, I do.

Q. What is it?

A. These are morphine tablets.

Q. And what are the trade names or generic names associated with those tablets?

A. The one morphine tablet has a brand name of Sevredol, which is not known in this country. And the other one is a generic

morphine which is morphine sulfate.

Q. What is morphine used for?

A. Morphine is used for moderate to severe pain, and it is given to people as a pre-medicine before surgery.

Q. And what would happen if you gave this medicine to somebody prior to surgery?

A. You are giving it to someone before surgery to help put them to sleep.

Q. And how does one obtain morphine?

A. One obtains morphine from a written prescription from their physician.

MR. GUNN: Objection, Your Honor. More to strike. Vague as to time and vague as to place.

THE COURT: Sustained.

MR. LULEJIAN: I will rephrase it, Your Honor.

Q. How does one obtain morphine here in the United States?

A. In the United States it requires a written prescription from your physician.

Q. How quickly after oral ingestion does morphine work?

A. The peak effect of morphine occurs about an hour after you take the medicine orally.

Q. And how long do the effects last?

A. The effects last for about three to five hours.

Q. Did you examine the strength of the tablets in Exhibit 1255 and 1256?

A. Yes, I did.
Q. Starting with the pink tablet, what is the strength of that tablet?
A. The pink tablet, the Sevredol, says 20 milligrams of morphine on the package.
Q. And the white tablet, please?
A. The white tablet, you need a magnifying glass to see, but it's 30 milligrams.
Q. Based upon the morphine in those two exhibits, were you able to form an opinion about the pediatric dosing for a preoperative anesthesia?
A. Yes. A pediatric preoperative dose for morphine in a child would be less than one tablet.
Q. Based on your training and experience, would you dispense either of these two tablets to a child?
A. No, I would not.
Q. Why not?
A. Couple of reasons. One is these are too potent when you start to deal with something that is less than a tablet. In a child you would use a liquid form so you could dose it very, very carefully and very, very exact.
Q. Would you please take a look at Government Exhibit Nos. 1257, 1258, 1259 and 1260.
A. (Witness examines exhibits).
Okay. I have.

Q. Do you recognize what those drugs are?

A. Yes, I do.

Q. What are they?

A. These are codeine tablets.

Q. Is there a binder with them --

A. Is there what?

Q. I am sorry. Is there another substance combined with the codeine?

A. Yes. These are codeine tablets that also contain acetaminophen. And on here, the European or out-of-United-States version of acetaminophen is called paracetamol.

Q. And what are the trade names associated with these two exhibits?

A. In these the trade names are Codalgin FORTE and Codalgin. And in this country you may know this as Tylenol with codeine.

Q. What is codeine?

A. Codeine is painkiller used for moderate to severe pain.

Q. Is it used for anything else?

A. Yes. It's also given before surgery as a general anesthetic.

Q. How does one obtain codeine here in the United States?

A. One obtains it with a written prescription from your physician.

Q. How quickly after ingesting codeine orally would it work?

A. It starts to work or have an onset effect in about 30 to 60 minutes. The peak or most intense effect that you experience is about 60 to 90 minutes, and those effects last about four to six hours.

Q. What is the strength of the codeine tablets that you have in front of you?

A. There are two strengths of codeine tablets. The codeine or Coldagin FORTE are 30 milligrams.

Q. Could you describe the pill, please, the tablet.

A. It is the one, if you look up on the screen, that looks like a caplet. It's the round, oblong-type shape. That's the FORTE.

Q. How much codeine was in that one?

A. Thirty milligrams of codeine.

Q. And the second tablet, the white tablets, round tablets?

A. Those are Codalgin. And again you need very good eyes. But it looks like it says eight milligrams of codeine.

Q. Based upon the codeine seized, were you able to opine about the pediatric dosing for preoperative anesthesia?

A. Yes.

Q. And please state your opinion.

A. Okay. If you look at the Codalgin FORTE and you only concentrate on the codeine component alone, you would give a child approximately one tablet 60 to 90 minutes before the surgery procedure.

If you look at the codeine component in the Codalgin being a lower concentration and only focus on the codeine compound, it would take about four of those tablets, about 60 to 90 minutes before surgery.

Q. And that would knock the child out?

A. Yes.

Q. Based on your training and experience, would you dispense either of these tablets to a child?

A. No, I would not.

Q. Why not?

A. These tablets contain way too much paracetamol or acetaminophen in them which is why I said focus only on the codeine component. If and when we use Tylenol with codeine or codeine for a child before surgery, we use Tylenol with codeine elixir or a liquid form so we can tightly control how much we give.

Q. If you were to use it in pill form, would you have to do?

A. What do you mean?

Q. I mean if you wanted to control the amount of codeine given to a child through the pill form, how would you go about doing that?

A. We would use a liquid form.

Q. You just would never use the pill form?

A. Not in a child, no.

Q. I want to turn to the second family of drugs now, the

benzodiazepine sedative hypnotics. What does that family of drugs do?

A. Benzodiazepine sedative hypnotics are known as several things. They are known as sleeping pills, they are known as muscle relaxants, they are known as drugs that are used when someone is having a fitful seizure or what's called a tonic chronic seizure. They are also used to treat anxiety and calm people down.

Q. How do they work?

A. They work by simulating the benzodiazepine receptor in the brain, which this one they happen to call GABA, and when you simulate this, it has a calming and sedating effect in people.

Q. When you say calming and sedating effect, what would happen to someone who took these drugs?

A. You are using them to put someone to sleep.

Q. Would you please take a look at Government Exhibit No. 1251.

A. Sure.

Q. Do you recognize this drug?

A. Yes, I do.

Q. What is that drug?

A. This drug is Flunitrazepam.

Q. What is the trade name for Flunitrazepam?

A. The trade name for Flunitrazepam is Rohypnol.

Q. What does that drug do?

A. Rohypnol is a very potent sleeping pill or drug used before surgery to put someone to sleep.
Q. How quickly after somebody ingesting it would the Flunitrazepam work?
A. It starts to work in about 20 to 30 minutes after swallowing the pill and can last for eight to twelve hours.
Q. Did you have -- what is the strength of the Flunitrazepam tablets in that exhibit?
A. This is a one milligram tablet.
Q. And that's the green pill that's over in the left-hand corner?
A. Yes, it is.
Q. And based on the Flunitrazepam seized or in the evidence bag in front of you, were you able to form an expert opinion about the pediatric dosing for preoperative anesthesia?
A. Yes, the preoperative dose used outside the United States is one tablet of one milligram, 90 minutes before surgery.
Q. Why do you say outside the United States?
A. This drug is not approved for use in the United States.
Q. Would you please take a look at the Exhibit Nos. 1252, 1253 and 1254.
A. Yes.
Q. Do you recognize those drugs?
A. Yes, I do.
Q. What are those?

A. These are Diazepam tablets.
Q. Does Diazepam have a trade name?
A. Yes, it does. It's called Valium.
Q. What is Diazepam used for?
A. Diazepam has many uses. It's used as a muscle relaxant. It's used to treat those fitful seizures that I talked about. It's used before surgery to put patients to sleep and used to calm them down.
Q. How does one obtain Diazepam here in the United States?
A. From a written prescription from your physician.
Q. How quickly after somebody took Diazepam orally would it work?
A. It starts to work in about 30 minutes.
Q. And how long do the effects last?
A. And it can last for six to eight hours.
Q. What is the strength of the tablets in front of you?
A. These are ten milligram tablets.
Q. Based upon the Diazepam tablets that you have in front of you, were you able to form an opinion about the pediatric dosing for preoperative anesthesia?
A. Yes. The pediatric preoperative anesthetic dose for children is one ten-milligram tablet given 45 to 60 minutes before surgery.
Q. Would you please examine Government Exhibits No. 1263 and 1264.

A. Yes, sir.

Q. Do you recognize those drugs?

A. Yes, I do.

Q. What are they?

A. These are Temazepam capsules.

Q. What is Temazepam?

A. Temazepam is a sleeping pill used to manage insomnia or inability to sleep at night.

Q. And what color are the tablets?

A. These are a greenish blue and white, kind of hard to see the greenish blue. It looks more blue on the screen, but here it is a little bit more green than blue.

Q. How does one obtain Temazepam in the United States?

A. These are filled with a written prescription from your physician.

Q. And how soon after somebody orally ingested the Temazepam would it begin to work?

A. They begin to work in about 30 to 60 minutes, which is why you take them about half an hour to an hour before you want to go to bed.

Q. How long does the effect work for?

A. They last for about four hours.

Q. What is the strength of the Temazepam tablets in front of you?

A. These are 15 milligram capsules.

Q. Based upon the amount of Temazepam seized, were you able to form an expert opinion about the pediatric dosing for preoperative anesthesia?

A. These doses are not indicated for preoperative anesthesia.

Q. Would they ever be given to a child?

A. No, these doses are not indicated by the FDA for use in children.

Q. Why not?

A. They are only used for the treatment of insomnia, and pediatricians do not treat insomnia with this particular medicine or benzodiazepine in children.

Q. What would you use if you had a child with insomnia?

A. You would have to speak to the pediatrician. You may want to start with a cough/cold type medicine with sedating properties. Something like diphenhydramine.

Q. For the court reporter, I would ask you to spell that last drug.

A. Diphenhydramine, which is Benadryl, is D-I-P-H-E-N-H-Y-D-R-A-M-I-N-E.

Q. Thank you very much, doctor.

A. You're welcome.

Q. Would you please take a look at Government Exhibit 1265.

Do you recognize this drug?

A. Yes, I do.

Q. What is it?

A. This is Alprazolam.

Q. And what is the trade name for Alprazolam?

A. The trade name for Alprazolam is Xanax.

Q. And what is Alprazolam used for?

A. It's used to treat anxiety and manage anxiety disorders, to calm them down.

Q. And what is the effect on somebody if they were to take that drug?

A. Hopefully, since you're using it for anxiety, is to calm them down, and part of calming someone down is making them sedate or sleep.

Q. What would happen if somebody didn't have anxiety that took that drug?

A. Then they wouldn't have that basis to help calm them down and would go to sleep.

Q. How does one obtain Alprazolam in the United States?

A. This drug is obtained with a prescription from your physician.

Q. How quickly after oral ingestion does Alprazolam work?

A. Alprazolam works in about 60 to 90 minutes after swallowing it.

Q. And how long does it last?

A. We usually dose it every six to eight hours and in children every eight hours so it lasts about six to eight hours.

Q. The Alprazolam that is in that exhibit, what is the

strength of the tablets?

A. These are .5 milligram tablets.

Q. Based on the amount of -- based on the Alprazolam seized, were you able to form an opinion as to the pediatric dosing for anxiety?

A. Yes. The management --

Q. Please state your opinion.

A. The management of anxiety would use one quarter of these tablets, .0125 milligrams in a child every eight hours as needed for anxiety.

Q. Would it be safe to give a child a caplet like that, even a broken-up one?

A. Not unless you want to put them to sleep.

Q. All right, Doctor, I am going to ask you to turn to Government Exhibits 2037, 2038, and 2039.

A. Yes, sir.

Q. Do you recognize these drugs?

A. Yes, I do.

Q. What types of drugs are those?

A. These are sexually arousing drugs.

Q. Do you know the type of drug it is?

A. Yes. This is called Sildenafil.

Q. What are the trade names for Sildenafil?

A. Sildenafil in this country is knowing as Viagra and in another country it's called Kamagra.

Q. What is Sildenafil used for?
A. It's used to maintain an erection.
Q. And in the United States, how does one obtain this drug?
A. With a prescription from a physician.
Q. How soon after somebody taking it does the drug work?
A. It works within about 10 to 40 minutes after you take the pill.
Q. How long does it last?
A. Usually up to about four hours.
Q. And what is the strength of the tablets seized?
A. These are 100 milligram tablets.
Q. Do you know what the dosing normally is for these or -- let me rephrase that.
What are the strengths that these drugs usually come in in the United States?
A. The strength in this country are 25 milligrams, 50 milligrams and 100 milligrams.
Q. And based on this drug, were you able to form any opinion about pediatric dosing for it?
A. Yes. There are -- there is no pediatric dosing of this drug for use in children.
Q. One moment, please, Your Honor.
Doctor, I neglected to ask you something. What would one normally -- if you were to dose an adult male, how much Viagra would you dispense?

A. Anywhere from 25 milligram, 50 milligram or 100 milligram tablets.

Q. What factors would it depend on?

A. That would be up to -- between the patient and the physician.

Q. And are their problems if you take -- are there drugs you should not take with Sildenafil?

A. Yes, there are.

Q. What types of drugs?

A. Some heart medicines should not be taken with Sildenafil.

Q. Why?

A. Because you're at risk for dropping --

MR. GUNN: Objection, Your Honor. Irrelevant.

THE COURT: Is there any relevance to this, Mr. Lulejian?

MR. LULEJIAN: I will withdraw the question. It may become relevant after cross-examination.

I have no further questions, Your Honor.

THE COURT: Thank you. Cross-examination?

CROSS-EXAMINATION

BY MR. GUNN:

Q. Is it Dr. Morris-Kukoski?

A. Yes, it is.

Q. Lots of legitimate drugs make people drowsy or sleepy; correct?

A. That is correct.

Q. For example, ordinary over-the-counter prescription -- or I'm sorry -- over-the-counter, non-prescription medication like Contact can make people drowsy; right?

A. Yes, they do.

Q. That is often the side effect of using medications for legitimate purposes; right?

A. Yes.

Q. And, in fact, some medications are intended to make you drowsy; right?

A. Yes, that's their sole purpose.

Q. For example, sleep medications or sleeping pills, that is their whole purpose; correct?

A. Correct.

Q. They are intended not to just to make you drowsy but they are intended to make you go to sleep?

A. Yes, or they wouldn't be a very good sleeping pill.

Q. In fact, each of the medications that you have testified about here today -- I want to talk about these ones on the -- on the screen there.

A. Sure.

Q. Each of those has a legitimate medical use; correct?

A. Absolutely.

Q. Each of them is manufactured by a legitimate multi-national pharmaceutical corporation?

A. Yes.
Q. And they are all sold by pharmacies in at least some countries, right?
A. Yes.
Q. For example, codeine is sold as either just codeine or, for example, under the brand name Codalgin; correct?
A. Correct.
Q. And it's used for the management of pain; correct?
A. Correct.
Q. Now, it's used -- I believe you testified on direct that it's used for moderate to severe pain?
A. Yes.
Q. It's actually, according to the treatises that you cite in one of the reports that you wrote, used for mild to moderate pain, isn't it?
A. Mild to moderate if you consider the Acetaminophen content in them. If you consider only codeine by itself, you would use that for severe pain.
Q. But Tylenol with codeine is for mild to moderate pain; correct?
A. Correct. When you have the Acetaminophen in there, yes.
Q. And these were all Tylenol with codeine or Acetaminophen with codeine pills; right?
A. Yes.
Q. So these pills would have been for mild to moderate pain?

A. That's correct.

Q. And morphine is sold as either just morphine or, for example, under the brand name Sevredol; right?

A. Yes.

Q. And it's also used for the management of pain; correct?

A. Yes. Severe pain.

Q. Actually it's for moderate to severe pain; right?

A. Moderate to severe, but being a Schedule II controlled substance, you kind of have to work your way up to that.

Q. If codeine wasn't working, you might try morphine; right?

A. Wouldn't be my next logical step, but, yes.

Q. At some point, if codeine wasn't working, you might try morphine; right?

A. I would go from codeine probably to a hydrocodone and an oxycodone and eventually to morphine, but sure. Probably from a codeine-type product to a hydrocodone-type product like Vicodin, to then work my way up to an oxycondone-type product like Percocet and then eventually to morphine.

Q. But in any event, codeine is for mild to moderate pain, at least when it's combined with Tylenol; right?

A. Yes.

Q. And morphine is for moderate to severe pain?

A. That is correct.

Q. And one of the drugs is called Alprazolam?

A. Yes. That's a benzodiazepine.

Q. And that's sold under the trade name Xanax; right?
A. Yes, it is.
Q. And the legitimate medical use for that is for the management of anxiety disorders; correct?
A. Yes.
Q. And then there's Diazepam, which is also known or sold under the brand name of Valium; right?
A. Yes, it is.
Q. And it's also used for the management of anxiety; right?
A. Yes.
Q. And it's sometimes used for insomnia also; correct?
A. Yes.
Q. And then there is this drug called Temazepam; right?
A. Yes.
Q. That's marketed also under a brand name of Restoril or Restoril; correct?
A. Restoril in this country, yes.
Q. And it's used for the management of insomnia or sleep problems; right?
A. Yes, it helps you sleep.
Q. And finally Flunitrazepam -- let me get the pronunciation right. Flunitrazepam?
A. Yes. Flunitrazepam.
Q. It's also sold under a brand name and manufactured by a major pharmaceutical company; correct?

A. Yes, outside the United States.

Q. It's sold under the brand name Rohypnol; right?

A. Yes.

Q. And it's sold in pharmacies and countries outside the United States?

A. Yes.

Q. And it also has legitimate medical use, doesn't it?

A. Yes, it's used to help people sleep.

Q. And that's actually the same medical use as Temazepam, isn't it?

A. Yes, it is.

Q. So if Temazepam wasn't working for someone who had insomnia, they might try Rohypnol; right?

A. Yes.

Q. In fact, Rohypnol and Temazepam come from the same class of drugs, don't they?

A. Yes, they are both benzodiazepine.

MR. GUNN: Your Honor, I would like to have an exhibit marked -- actually premarked as Defense Exhibit 610 if I could approach.

THE COURT: You may.

MR. GUNN: We seem to be missing a clerk here if I could --

THE COURT: Just go.

MR. GUNN: And there is an extra copy for the Court.

THE COURT: Thank you.

BY MR. GUNN:

Q. Would you look at Defense Exhibit 610, Doctor.

Does that appear to be a set of medical records from the VA administration for Michael Pepe?

A. This says it is a progress note and the title is from Ventura Primary Care Clinic.

Q. In the lower left does it have a patient name?

A. For Michael Pepe.

Q. And there are actually several progress notes stapled together here; right?

A. Yes.

MR. GUNN: Your Honor, the Government has stipulated that these are -- satisfy the foundation for business records. I would offer them into evidence, Defense Exhibit 610.

THE COURT: Any objection?

MR. LULEJIAN: None, Your Honor.

THE COURT: They will be admitted.

(Defendant's Exhibit 610 was received)

BY MR. GUNN:

Q. These records reflect that Mr. Pepe was prescribed Temazepam here in the United States, don't they?

A. I don't know. I didn't read through all 21 pages that quickly.

Q. Well, would you look at the top of the second page.

A. Sure. Yes. He was prescribed Temazepam.

Q. For sleep; correct?

A. Correct.

Q. And they also reflect that he was at least at times receiving Acetaminophen with codeine for pain, don't they?

A. Yes, they do.

Q. That was to be taken as needed; correct?

A. That was to be taken two tablets by mouth every four hours as needed for pain.

Q. "As needed" means you take it if you are feeling the pain and you don't take it if you are not feeling the pain; correct?

A. Absolutely.

Q. So that would mean you wouldn't necessarily be taking it on a regular basis; you might just take it when you needed it?

A. Correct.

Q. Now morphine is also a pain management drug; correct?

A. Yes, it is.

Q. It is for higher levels of pain than Tylenol with codeine or Acetaminophen with codeine; correct?

A. Correct.

Q. So if someone was feeling real frustrated with his pain, he might take morphine if he was in a country where he could get it more easily and the codeine wasn't working?

A. Potentially, yes.

MR. LULEJIAN: Objection. Calls for speculation.

THE COURT: Overruled.

MR. GUNN: No further questions, Your Honor.

THE COURT: Cross-examination? I am sorry. Redirect?

REDIRECT EXAMINATION

BY MR. LULEJIAN:

Q. Doctor, why does one get a prescription for these sedating drugs?

A. It depends on --

MR. GUNN: Objection. Vague, calls for speculation, Your Honor.

THE COURT: Sustained.

MR. LULEJIAN: Let me rephrase that. That was a poor question.

Q. Doctor, when somebody gets a prescription, is the prescription directed at one person?

A. Yes. When you get a prescription, it's intended to be used by the person whose name is written on the prescription.

MR. GUNN: Vague as to place or country, Your Honor, and move to strike.

THE COURT: That will be stricken. You need to narrow your question, Mr. Lulejian.

MR. LULEJIAN: Certainly.

Q. Doctor, I am going to ask you a series of questions now about medical practices here in the United States.

A. Okay.

Q. Doctor, in the United States, does a prescription bear the name of the person obtaining the drug?
A. Yes.
Q. And how does one go about getting the prescription? What do you have to do first?
A. You have to go be seen by a physician.
Q. And why?
A. To make sure that the medication would be appropriately used. That you don't have any allergies to the medicine. It would be dosed properly and used properly.
Q. And a pharmacist will check that prescription as well?
A. Yes. A pharmacist would enter it into the database, they would ask you if you have any allergies. They would ask you what your age is, if you have had any problems with the medicines in the past.
Q. So the dosing of that drug would then be based on what factors?
A. What a normal typical person would be using.
Q. Is a prescription intended to go to be used by somebody else?
A. No, a prescription should only be used by the person whose name bears on the prescription.
Q. Why is that?
A. Because that's the person who sought the medical attention and that's the person who the physician intended to use the

medicine properly.

Q. So in other words it was -- it was that -- that drug was dosed and prescribed to that person for that specific reason?

A. Yes.

Q. Doctor, is it appropriate -- Doctor, if I had -- if an adult had a prescription for, say, one of these sedating drugs, the six that are on the screen, could one simply just give it to a child and expect the same effects?

A. No. Adults are -- children are not little adults and you shouldn't think that you can dose a child like you can an adult. They don't act like adults. They are not little adults.

Q. When you say they don't act like adults what do you mean?

A. When you look at the dosing of pills, they are formulated for adults, one tablet, two tablets, to be taken every so many hours.

Children's dosing is based on weight. And that's usually why you use liquid forms so you can use exact amounts to get the results that you're looking for in children. Less wiggle room like you do with an adult.

Q. Why do you have less wiggle room?

A. Because of the potential of side effects.

MR. GUNN: I would object to this line of questioning as irrelevant.

THE COURT: Overruled.

Go ahead.

BY MR. LULEJIAN:

Q. You can answer the question, Doctor.

A. Sorry.

Q. I will rephrase it. Why is there less wiggle room?

A. Because you potentially can have serious side effects.

Q. Doctor, I am going to ask you to take a look at the first page of Defense Exhibit No. 610.

A. Is that this progress note? I am sorry.

THE COURT: Yes.

BY MR. LULEJIAN:

Q. Yes. Do you see Line Item 7 there?

A. Yes.

Q. What is Line Item 7?

A. Line 7 is lisinopril. It's medicine used to treat high blood pressure.

Q. And would you look at Line Item 5, please. What is that drug?

A. That is hydrochlorothiazide, which is a water pill used to eliminate water when you retain water as part of the reason of your high blood pressure.

Q. And Line Item 3, please?

A. Line Item 3 is atenolol, which is another blood pressure medicine that not only lowers blood pressure, but can also decrease your heart rate.

Q. And Line Item 9, please.

A. Line Item 9 is nitroglycerin tablets used for chest pain.
Q. Doctor, the drugs that you just listed, would they have any negative interactions if combined with Sildenafil?
A. Yes. When you look at filling a prescription for Sildenafil, you have to make sure that the person does not have a history of chest pain and does not have a history of uncontrolled high blood pressure.
Q. What would happen if somebody had high blood pressure or chest pain and took Sildenafil.
A. You can --
Q. Let me rephrase that. That was a poor question.
What is the potential for somebody who took Sildenafil that suffered from either high blood pressure or cardiac disease of some sort?
A. What it does is it actually lowers your blood pressure and can increase your heart rate so you could actually get a precipitous drop much more than you would expect in your blood pressure. And you could also get chest pain and a stimulation of your heart rate.
Q. Doctor, you talked a little bit about how one doses. You recall cross-examination. Mr. Gunn asked you whether or not one could start with codeine and then work their way up -- excuse me. Let me rephrase that.
Mr. Gunn asked you whether or not if you could start with codeine and work your way up to morphine. Do you recall

that?

A. Yes, I do.

Q. In the United States, how would one go about that process? Would one just do it on his own?

A. No, you need to be seen by a physician.

MR. GUNN: Objection. Irrelevant, Your Honor.

THE COURT: Overruled.

THE WITNESS: You need to be seen by a physician and/or you would be part of a pain service where a pharmacist or a nurse or anesthesiologist would see you to help manage your pain.

BY MR. LULEJIAN:

Q. Why would you do that?

A. Because you want to make sure that you carefully titrate the side effects and the complications that may arise from taking too much pain medicine too quickly.

Q. Does one develop a tolerance for pain medication over time?

A. Yes, you do, which is why you need to take more and more after time.

MR. LULEJIAN: One moment, please.

I have no further questions, Your Honor.

THE COURT: Recross?

RECROSS-EXAMINATION

BY MR. GUNN:

Q. You don't know the rules and practices for getting these

medications in Cambodia, do you?

A. No, I do not.

Q. As far as you know, someone might be able to just walk into a pharmacy and buy Rohypnol without any prescription, for example?

MR. LULEJIAN: Objection, calls for speculation.

THE COURT: Overruled.

BY MR. GUNN:

Q. You don't know?

A. I am not licensed outside the United States, no.

Q. You also don't know about practices and going up from one pain drug to another in Cambodia, do you?

A. Not in a foreign country, no.

MR. GUNN: No further questions.

THE COURT: Any redirect?

MR. LULEJIAN: None, Your Honor.

THE COURT: Thank you very much. Doctor, you are excused.

Does the Government want Agent Phillips back on the stand?

MS. DONAHUE: Yes, please, Your Honor.

THE COURT: Sir, you may retake the stand. You're still under oath.

THE WITNESS: Your Honor, may I take two trips?

MR. GUNN: I believe I did introduce that into

evidence, did I not.

THE COURT: It is in evidence. It's Defense Exhibit 610.

DIRECT EXAMINATION RESUMED

BY MS. DONAHUE:

Q. Good morning, Special Agent Phillips.

A. Good morning.

Q. If you can take a look at a photograph which is Government's Exhibit 1113.

A. Yes, ma'am.

Q. Did you take that photograph?

A. Yes, I did.

Q. Move 1113 into evidence.

MR. GUNN: No objection.

THE COURT: All right. 1113 is in evidence.

(Government's Exhibit 1113 was received)

BY MS. DONAHUE:

Q. Can you tell us what is in that photograph?

A. This is located in the center room of the upstairs, a massage table.

Q. Can you take a look at Government's Exhibit 1114.

A. 1114.

Q. Did you also take that photograph?

A. Yes, ma'am, I did take it.

MS. DONAHUE: Move 1114 into evidence.

MR. GUNN: No objection.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1114 was received)

BY MS. DONAHUE:

Q. Special Agent Phillips, can you describe what is on that table.

A. There is a few -- a game and some books and tampons. And a -- two photo albums.

Q. And did the Cambodian National Police seize those items from the defendant's residence when they did the search in June of 2006?

A. Yes, they did.

Q. And have you reviewed Government's Exhibits 1197, 1202, and 1217, and those are physical exhibits -- have you previously reviewed those?

A. Yes, I have.

Q. When did you take a look at those?

A. At various stages when they were first seized and again recently.

MS. DONAHUE: Your Honor, I would move those into evidence. It's 1197, 1192, and 1217.

MR. GUNN: No objection.

THE COURT: You have used two different numbers. You said 1202.

MS. DONAHUE: I'm sorry. And 1202.

MR. GUNN: I'm sorry. Maybe I missed it. Were those exhibits that are depicted in these photograph?

BY MS. DONAHUE:

Q. Are those exhibits that are either depicted in this photograph or that were found near the massage table?

A. Yes, ma'am.

MR. GUNN: No objection.

THE COURT: Those will come in. Thank you.

(Government's Exhibits 1192, 1197, 1202 and 1217 were received)

BY MS. DONAHUE:

Q. And Special Agent Phillips, Government's Exhibit 1197, which are children's books, can you describe where children's books were found in the house?

A. They were primarily throughout the house, upstairs, in the bedroom.

Q. And can you take a look at Government's Exhibit 1115, please.

A. I have 1115.

Q. Did you take that photograph?

A. Yes, ma'am, I did.

Q. Move 1115 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: That's admitted. Thank you.

(Government's Exhibit 1115 was received)

BY MS. DONAHUE:

Q. Turning your attention to 1115, do you see that open book -- photo album?

A. Yes, I do.

Q. What is that?

A. It's a photograph of one of the children from the house, S.R.xxx, S-R-x-x-x-x-x.

Q. And did the Cambodian National Police seize that photo album?

A. Yes, they did.

Q. And, in fact, that is Government's Exhibit 1192, isn't that correct, that you previously reviewed?

A. Yes, ma'am, it is.

Q. I would like you to take a look at a photograph, Government's Exhibit 1118.

A. I have 1118.

Q. Did you take this photograph?

A. Yes, I did.

MS. DONAHUE: Move 1118 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1118 was received)

BY MS. DONAHUE:

Q. Can you tell us what is depicted in Government's Exhibit 1118.

A. Yes. This is the upper floor, the second floor of the

defendant's residence. The large window is the kids' room where the things that were found -- that the kids had in their room were contained. And this is the corner balcony just prior to reaching the work office. And that far door in the middle of the screen is the entrance to the massage room.

Q. Did you, in fact, go into the office or work room?

A. Yes, ma'am, I did.

Q. I would like you to take a look at a photograph, Government's Exhibit 1122.

A. I have 1122.

Q. Did you take that photograph?

A. Yes, I did.

MS. DONAHUE: Move 1122 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1122 was received)

BY MS. DONAHUE:

Q. What is that a photograph of?

A. That's the back of the computer showing how the connections were plugged into the computer, as well as stack of papers on top of the computer.

Q. I would like you to take a look at Government Exhibit 1124.

A. I have 1124.

Q. Did you take that photograph?

A. I can't tell if I took this particular photograph or not. I believe I did not.

Q. Okay.

And do you know how this photograph was taken?

A. This photograph was taken by a camera from another organization.

MR. GUNN: Objection. Move to strike. No foundation, Your Honor.

THE COURT: Why don't you lay some foundation.

MS. DONAHUE: Sure.

Q. Do you recognize this photograph?

A. Yes, I do.

Q. Can you tell us how you recognize it?

A. This is a photo that I recall seeing after I received some CD's, and this is a photo that is consistent with what I saw --

MR. GUNN: Objection. Move to strike. No foundation. Personal knowledge, Your Honor.

THE COURT: Overruled.

THE WITNESS: Which I saw the day of the seizure.

BY MS. DONAHUE:

Q. Going back to June 17, 2006, do you recall seeing these items in the office in the defendant's residence?

A. Yes, I do.

MS. DONAHUE: Move Government's Exhibit 1124 into evidence.

MR. GUNN: No objection.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1124 was received)

BY MS. DONAHUE:

Q. Specifically, Special Agent Phillips, do you remember the stack of money, the $1 bills?

A. Yes, I do.

Q. Special Agent Phillips, I would like you to take a look at some physical exhibits that you have in front of you, Government's Exhibit -- starting with 1177. They are physical evidence.

A. I have 1177.

Q. Do you recognize it?

A. Yes, I do.

Q. What is it?

A. It's a map of Phnom Penh and on the back it's got --

MR. GUNN: Objection. Non-responsive, Your Honor. From here on is nonresponsive.

THE COURT: The question is what is it.

THE WITNESS: It's a map.

BY MS. DONAHUE:

Q. Do you recollect -- how do you recognize it?

A. I saw it in the office.

Q. In the office in the defendant's residence on June 17th of 2006?

A. Yes.

MS. DONAHUE: I move it into evidence. It's 1177.

MR. GUNN: No objection, Your Honor.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1177 was received)

BY MS. DONAHUE:

Q. Did this map catch your attention?

A. Yes, it did.

Q. On the day of the search?

A. Yes, it did.

Q. Why is that?

MR. GUNN: Objection. Irrelevant why it caught his attention.

THE COURT: Overruled.

THE WITNESS: Because on the back of this map it says, "Sex with children is a crime."

BY MS. DONAHUE:

Q. I would like to turn your attention to Government's Exhibit 1179 which is also physical evidence.

A. I have 1179.

Q. How do you recognize that?

A. This I also saw in the defendant's work room in the -- on the second floor of his residence.

Q. On June 17th of 2006?

A. On June 17th, '06.

MS. DONAHUE: Move 1179 into evidence.

MR. GUNN: No objection.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1179 was received)

MR. GUNN: Actually no objection beyond what I made previously in a motion, I should say.

THE COURT: All right.

BY MS. DONAHUE:

Q. I would also have you take a look at 1180. Government's Exhibit 1180. It's in a folder in front of you.

A. 1180?

Q. That's all right, we will go back to 1179.

What is 1179?

A. 1179 is a box saying "Kamagra."

Q. And is that -- was the box empty or full when you saw it, if you recall?

A. I believe it was empty.

Q. Is it in the same condition now?

A. Yes, ma'am.

Q. I would like you to take a look at Government's Exhibit 1238 which is a document -- I'm sorry. It's in the folder. You have 1180 now in front of you, too. Great.

Take a look at Government's Exhibit 1180.

A. I have 1180.

Q. Do you recognize that?

A. Yes.
Q. Where have you seen that?
A. This was also in the office.
MS. DONAHUE: Move 1180 into evidence.
MR. GUNN: No objection.
THE COURT: It will come in. Thank you.
(Government's Exhibit 1180 was received)
BY MS. DONAHUE:
Q. What is 1180?
A. It's the insert for the box, Exhibit 1179, the information about Kamagra and the directions on how to use it.
Q. And now turning your attention back to 1238.
A. 1238 I have.
Q. Yes. Do you recognize Government's Exhibit 1238?
A. I do.
Q. Where did it come from?
A. That also came from the office upstairs in the defendant's residence in Phnom Penh.
MS. DONAHUE: I move 1238 into evidence.
MR. GUNN: No objection.
THE COURT: That will come in. Thank you.
(Government's Exhibit 1238 was received)
BY MS. DONAHUE:
Q. What is 1238?
A. It's a 2006 planner, calendar.

Q. Okay.

And now I would like to turn your attention back to the binder with the photographs and have you take a look at Exhibit 1143 from the binder. It's a photograph.

A. I have 1143.

Q. Did you take that photograph?

A. Yes, I did.

MS. DONAHUE: Move 1143 into evidence.

MR. GUNN: No objection, Your Honor, subject to reserving an objection regarding the writing, depending on the testimony.

THE COURT: All right. That will come in. Thank you.

(Government's Exhibit 1143 was received)

BY MS. DONAHUE:

Q. Can you tell us what Government's Exhibit 1143 is?

A. It's a flash drive or thumb drive.

Q. Where did this come from?

A. In the computer room.

Q. And is that in the defendant's residence on June 17th of 2006?

A. Yes.

Q. And do you see the handwriting beneath that blue thumb drive?

A. Yes, I do.

Q. Whose handwriting is that?

A. That's my handwriting.

Q. When did you write that?

A. On the following day. I believe it was -- I would have to look at picture and the properties, but I believe it was on the 18th.

Q. Did the Cambodian police take this from the defendant's office?

A. They did.

Q. The thumb drive?

A. Yes, they did.

Q. Now, Special Agent Phillips, did you observe a digital camera in the defendant's office at the time that you were observing this search?

A. No, I did not.

Q. Did you see any evidence to suggest that he owned a camera?

A. Yes, I did.

Q. What evidence was that?

A. In the office --

MR. GUNN: Objection, Your Honor. Move to strike. This calls for the witness's speculation and opinion.

THE COURT: Why don't you ask him what he saw.

BY MS. DONAHUE:

Q. What did you see?

A. I saw an empty camera box.

Q. And was a video taken of this search that the Cambodian

National Police conducted of the defendant's residence?

A. Yes, there was a video.

Q. Who took that video?

A. An NGO by the name of International Justice Mission.

Q. And have you -- have you reviewed that video?

A. Yes, I have.

Q. Several times?

A. Several times, yes.

Q. Does that video show the seizure or show the camera box?

A. Yes, it does.

Q. And have you reviewed Government's Exhibit 1285, which is a copy of that video?

A. I have.

MS. DONAHUE: Your Honor, we would ask permission to just play the snippet from that video.

THE COURT: A short snippet?

MS. DONAHUE: It's an extremely short snippet.

THE COURT: Okay. And then we will take our break.

(Whereupon, the video was played for the jury)

BY MS. DONAHUE:

Q. Special Agent Phillips, what room are we seeing there?

A. This is the computer or the work room area on the second floor of the defendant's residence. Right there.

Q. And earlier when you mentioned a box, can you just describe where that is on the screen and what we're looking at?

A. It's -- the box is a blue and black box that says "Minolta," and it's kind of like in the corner area of the office.

Q. And when Immigration and Customs Enforcement received the evidence in this case from the Cambodian National Police, was the box that we see in that video included in that evidence?

A. No, it was not.

THE COURT: Is this a good time for a break?

MS. DONAHUE: That's the only snippet.

THE COURT: Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We will take a 15 minute break. I will try to get back to you as soon as I can but my other jury has a question.

(Recess taken)

THE COURT: Agent Phillips, you are still under oath. Ms. Donahue, you may continue.

MS. DONAHUE: Thank you, Your Honor.

I believe before the break I neglected to move Exhibit 1179, which was the empty Kamagra box, into evidence. I move it in at this time.

THE COURT: Any objection?

MR. GUNN: Only the prior objection.

THE COURT: That was in.

MS. DONAHUE: Oh, thank you.

Q. Special Agent Phillips, if you can take a look at some documents starting with the Government's Exhibit 1222, twelve-twenty-two.

A. I have 1222.

Q. What is that?

A. This is an application form for the Newton Thilay School, elementary school.

Q. Where did it come from?

A. It came from the defendant's office located upstairs in Phnom Penh.

MS. DONAHUE: Move 1222 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1222 was received)

BY MS. DONAHUE:

Q. Special Agent Phillips, do you know who this application is for?

A. Yes, I do.

Q. Who is this application for?

A. This is for S.R.xxx.

Q. How do you know that?

A. Because I recognize the year, the date of birth year, the place of birth in Kiensbay, which is in Cambodia, and the phonetic spelling of her mother's name on the bottom, Kumlang.

Q. Take a look at Government's Exhibit 1223, please.

A. I have 1223.

Q. What is that document?

MR. GUNN: Objection. Your Honor. No foundation.

BY MS. DONAHUE:

Q. Do you recognize this document?

A. Yes, I do.

Q. How?

A. I saw this on the -- in the work room, the computer room at the defendant's house in Phnom Penh, Cambodia.

MS. DONAHUE: Move 1223 into evidence.

MR. GUNN: No objection subject to a relevance objection, Your Honor.

THE COURT: That will come in.

(Government's Exhibit 1223 was received)

BY MS. DONAHUE:

Q. What is Government's Exhibit 1223?

A. This is also an application form for the Newton Thilay elementary school.

Q. Do you know who this application is for?

A. I do.

Q. Who is it for?

MR. GUNN: Objection. No foundation. Personal knowledge, Your Honor.

THE COURT: Lay a foundation, please, Ms. Donahue.

BY MS. DONAHUE:

Q. Based on your review of the document and your own personal knowledge in this case, were you able to determine who this application is for?

A. Yes.

Q. How were you able to determine that?

A. By looking at the applicant information. It's handwritten on the form.

Q. And were you familiar with that information based on your investigation?

A. Yes.

Q. And based on your investigation and the information on the form, were you able to conclude who this application is for?

A. Yes.

MR. GUNN: No foundation -- I'm sorry.

THE COURT: Overruled.

BY MS. DONAHUE:

Q. And who was it for?

MR. GUNN: No foundation of personal knowledge. Calls for opinion based on hearsay, Your Honor.

THE COURT: Overruled.

THE WITNESS: This is for one of the children named S.S.xxx. S-S-x-x-x-x-x.

BY MS. DONAHUE:

Q. How were you able to determine that?

A. There are a couple of reasons. It's phonetically spelled

on this particular form, but I do recognize the date of birth, the year of the date of birth as her year of birth, and the place of birth in Kiensbay, K-I-E-N-S-B-A-Y, and again the phonetic spelling of the mother, Kumlang.

BY MS. DONAHUE:

Q. I would like you to take a look at a photograph, Government's Exhibit 1801.

A. I have 1801.

Q. Do you recognize what's in that photograph?

A. Yes, I do.

Q. What is it?

A. This is a photograph of a portion of the Newton Thilay school in Toulkork region district of Phnom Penh.

MS. DONAHUE: And move 1801 into evidence.

MR. GUNN: No objection.

THE COURT: That will come in, thank you.

(Government's Exhibit 1801 was received)

BY MS. DONAHUE:

Q. And Special Agent Phillips, how far is this branch of the Newton Thilay school from the defendant's residence in June of 2006?

A. It's approximately a hundred yards, give or take a few yards.

Q. How do you know that?

A. Because I walked the distance off.

Q. I would like you to take a look at Government Exhibit 1224, which is a document. And actually you can take a look at the entire group, 1224 through 1233.

A. Okay. I have 1224 through 1233.

Q. Do you recognize those exhibits?

A. Yes, I do.

Q. And what are they?

A. These are receipts from the Newton Thilay school in the Toulkork region district of Phnom Penh.

Q. And where did those receipts come from?

A. I observed these receipts in the office in the defendant's house in Phnom Penh on the second floor.

MS. DONAHUE: I move Government's Exhibits 1224 through 1233 into evidence.

MR. GUNN: No objection.

THE COURT: Those will come in. Thank you.

(Government's Exhibits 1224 through 1233 were received)

BY MS. DONAHUE:

Q. Special Agent Phillips, when you say the Toulkork region of Phnom Penh, what do you mean by that?

A. The Toulkork -- and I apologize, it's T-O-U-L-K-O-R-K. It's a district within Phnom Penh. It's a geographical district, area.

Q. And was the defendant's residence in June of 2006 located in that area?

A. Yes, it was.

Q. If I could just have you take a look at one of those receipts, which is Government's Exhibit 1224.

A. I have 1224.

Q. You said you were able to determine that this was for the Toulkork branch of the Newton Thilay school. How were you able to figure that out?

A. Toulkork is abbreviated on the branch TK to Toulkork.

Q. And is the abbreviation TK on that document?

A. Yes.

Q. Do each of these receipts 1224 through 1233 contain the name of the student?

A. Yes, they do.

Q. And this particular one, 1224, who is this receipt for?

A. This is for L.K.xxxxx, L-K-x-x-x-x-x-x-x.

Q. Does each of the receipts look like this one where it says "Full Name" and then the name of the student?

A. Yes, they do.

Q. I am going to ask you to take a look now at Government's Exhibits 1234 through 37.

A. I have 34 through 37 before me.

Q. What are those?

A. These are various articles, newspaper clippings from, I believe, two different Cambodian newspapers, referring to pedophiles in Cambodia.

Q. Where did these clippings come from?

A. These clippings came from the defendant's office on the second floor of his residence located in Phnom Penh.

MS. DONAHUE: Move 1234 and 37 into evidence subject to an objection that counsel has -- Defense counsel has raised.

MR. GUNN: Yes, Your Honor. I made one general objection previously but also may have objections to some of the content, and counsel and I will consult regarding that.

THE COURT: Thank you. Those will be admitted.

(Government's Exhibits 1234 through 1237 were received)

BY MS. DONAHUE:

Q. Special Agent Phillips, were these in the same format when you saw them in the defendant's office?

A. They were cut-out clippings, yes.

Q. You didn't cut them out; is that right?

A. No, I did not.

Q. And you didn't see the police cut them out?

A. No, I did not.

Q. I would like you to take a look at Government's Exhibit 1238. I'm sorry. I already moved that one into evidence, I apologize.

1241.

A. I have 1241.

Q. Do you recognize this?

A. Yes, I do.

Q. What is it?

A. This is the family book, a copy of the family book.

Q. Where did this document come from?

A. It came from the second floor computer work room of the defendant's residence in Cambodia. Phnom Penh, Cambodia.

MS. DONAHUE: Move 1241 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1241 was received)

BY MS. DONAHUE:

Q. Showing you the first page, even though it's not written in English, Special Agent Phillips, how did you recognize this as a family book?

A. Through the course of six years of working in Cambodia, I have seen many family books, and this is an accurate depiction of what the typical family book looks like.

Q. And essentially what is a family book?

A. Basically it's a registry of your family members when they're born, they enter the -- they are supposed to enter their date of birth and a business of the family members within your -- that respective family.

Q. Does it operate a little bit like a birth certificate in the United States?

A. In Cambodia it does, yes.

Q. In Cambodia.

I would like you to take a look at Government's Exhibits 1275 and 76.

A. I have 1275 and 76.

Q. What are those?

A. 1275 is the hard drive from the computer that was found in the computer work room on the second floor.

MR. GUNN: Objection, Your Honor. Move to strike. No foundation of personal knowledge.

THE COURT: Would you lay some foundation, Ms. Donahue.

MS. DONAHUE: Sure.

Q. Could you take a look at Government's Exhibit 1275. Do you recognize that?

A. I do.

Q. Can you explain how?

A. My initials are on the hard drive. This is the hard drive that was taken out of the computer.

Q. When you say taken out of the computer, which computer are you referring to?

A. The computer that was located on the second floor of the defendant's residence in Phnom Penh, Cambodia.

Q. And your initials are on it?

A. My initials, date, and the time and who it was received from.

MS. DONAHUE: Move Government's Exhibit 1275 into

evidence.

MR. GUNN: Still not sufficient foundation, Your Honor.

THE COURT: I'll allow it.

(Government's Exhibit 1275 was received)

BY MS. DONAHUE:

Q. I would like you to take a look at Government's Exhibit 1276.

A. I have 1276.

Q. Do you recognize that?

A. I do.

Q. How do you recognize it?

A. This is the thumb drive that I saw at the defendant's residence on June 17, 2006, second floor, computer work room.

Q. Is this inside a plastic bag?

A. Yes it is.

Q. Is that bag labeled?

A. Yes.

Q. Is this the -- is this the thumb drive that the Cambodian National Police ultimately turned over to Immigration and Customs Enforcement?

A. Yes, it is.

Q. Move Government's Exhibit 1276 into evidence.

MR. GUNN: No objection.

THE COURT: Admitted. Thank you.

(Government's Exhibit 1276 was received)

BY MS. DONAHUE:

Q. And Special Agent Phillips, now I would like you to take a look at a series of documents, 1277 through 1284. That's Government's Exhibit 1277 through 1284.

A. I have 1277.

THE COURT: Go ahead and look at all of them, sir.

THE WITNESS: I have reviewed all the documents.

BY MS. DONAHUE:

Q. Do you recognize those documents, 1277 through 1284?

A. Yes, I do.

Q. And can you tell us generally what they are and specifically where they came from.

A. There is a book, computer software applications. There is a CD for Windows XP.

Q. Do they pertain generally to the operation of computer software -- do 1277 through 1282 pertain generally to the the operation of computer software?

A. Yes. Including some emails.

MS. DONAHUE: Move 1277 through 1284 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: Those will come in, thank you.

(Government's Exhibits 1277 through 1282 were received)

BY MS. DONAHUE:

Q. I would like you to take a look at 1283, which you just had

in front of you.

A. 1283?

Q. 1283, yeah. It's one of the documents.

A. I have 1283.

Q. Specifically what is that?

A. This is the warranty card for the Minolta camera associated with the box.

Q. And specifically if you can take a look at Page 3 of that warranty.

Near the bottom where it says "Dealer Record," what is the product number?

A. Dimage, D-I-M-A-G-E, S414.

Q. Is that the same model camera as for the box that we saw in the search warrant video?

A. Yes.

Q. I would like you to take a look now at Government's Exhibit 1286.

A. I have 1286.

Q. Do you recognize that?

A. I do.

Q. What is it?

A. This is a computer CD insert that was found in the computer room.

Q. When you say a CD insert, what do you mean?

A. CD's sometimes come in plastic, hard plastic inserts -- I'm

sorry -- the hard plastic coverings to protect a CD, and this was the insert which labeled what the CD could have been.

Q. Where did this come from?

A. This came from the second floor computer work room of the defendant's residence in Phnom Penh.

MS. DONAHUE: Move 1286 into evidence.

MR. GUNN: No objection.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1286 was received)

BY MS. DONAHUE:

Q. Is there a reason why this CD insert or CD cover caught your eye?

A. Yes.

Q. Why is that?

MR. GUNN: Objection, Your Honor. Irrelevant.

THE COURT: Sustained.

BY MS. DONAHUE:

Q. In addition to this disk, did the Cambodian National Police find any DVD's in the defendant's residence?

A. Yes, they did.

Q. Where did they find DVD's?

A. There were two locations. Primarily.

One location was the computer work room upstairs on the second floor, and then there were a few others downstairs by the television where the DVD player was in the open living

space.

Q. Focusing first on the DVD's that were upstairs in the office, generally what kind of disks were those, based on your observations of the labels?

MR. GUNN: Objection, Your Honor. Irrelevant. Rule 403.

THE COURT: Overruled.

THE WITNESS: They were pornographic DVD's.

MR. GUNN: Objection, Your Honor. Move to strike, Rule 403. It's irrelevant.

THE COURT: What kind of disks? That's not even responsive. Maybe your question was irrelevant. That will be stricken.

MS. DONAHUE: I asked --

THE COURT: That will be stricken. Ask another question.

BY MS. DONAHUE:

Q. Did the Cambodian National Police also find DVD's downstairs?

A. Yes, they did.

Q. Generally what kinds were those?

A. Like movies, action movies.

Q. And now I would like to turn your attention back to a photograph from the first binder, Government's Exhibit 1128.

A. 1128?

Q. Yes. 1128.
A. I have 1128.
Q. Did you take that photograph?
A. Yes, I did.
Q. I move 1128 into evidence.
MR. GUNN: No objection.
THE COURT: That will come in. Thank you.
(Government's Exhibit 1128 was received)
BY MS. DONAHUE:
Q. What does this photograph show?
A. This is a view of the first set of stairs leading up to the second story of the residence.
Q. Does that lead up to the landing?
A. Yes, it does.
Q. Can you take a look at Government's Exhibit 1127.
A. I have 1127.
Q. Did you take that?
A. Yes, I did.
MS. DONAHUE: Move 1127 into evidence.
MR. GUNN: No objection, Your Honor.
THE COURT: Admitted. Thank you.
(Government's Exhibit 1127 was received)
BY MS. DONAHUE:
Q. What does 1127 show?
A. That's a view from the landing looking down the stairs.

And if you walk down to the right, it would be the second set of stairs that the prior exhibit was, I believe, 1128. They connect.

Q. Now I would like you to take a look at 1129.

A. I have 1129.

Q. What is that?

A. This is a -- kind of an aerial view, for lack of better words, of the open living space, what I guess we would formally call a living room area, the first floor of the defendant's residence in Phnom Penh.

MS. DONAHUE: Move 1129 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: That's admitted. Thank you.

(Government's Exhibit 1129 was received)

BY MS. DONAHUE:

Q. I would like you to take a look at Government's Exhibit 1131.

A. I'm sorry. I have 1131.

Q. What is that?

A. This is a close-up view of the TV and DVD that I just spoke about a few minutes ago in the open space of the living room on the first floor.

MS. DONAHUE: Move 1131 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: Admitted. Thank you.

(Government's Exhibit 1131 was received)

BY MS. DONAHUE:

Q. I would like you to take a look at 1134.

A. I have 1134.

Q. What is that a photograph of?

A. This is a photo of the entrance to the downstairs bedroom of the defendant's residence in Phnom Penh.

Q. Move 1134 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: Admitted. Thank you.

(Government's Exhibit 1134 was received)

BY MS. DONAHUE:

Q. Same thing, if you can take a look at Government's Exhibit 1135 and tell us, did you take that photograph?

A. Yes, I did.

Q. Move 1135 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: Admitted. Thank you.

(Government's Exhibit 1135 was received)

BY MS. DONAHUE:

Q. When did you take Government's exhibits -- the photographs that are Government's Exhibits 1134 and 1135?

A. On June 17th, 2006.

Q. And is there anything in that photograph that is of particular significance to you?

A. Yes.

MR. GUNN: Objection. Calls for opinion, Your Honor.

THE COURT: Why don't you just lead him and ask him, point him to whatever you want him to identify.

MS. DONAHUE: Okay.

Q. Is there a small or shiny object on the right-hand side of the photograph sort of the light is catching on it near the curtain?

A. Yes, there is.

Q. And did you subsequently take a photograph of that object?

A. Yes, I did.

Q. Did you do that on June 17th?

A. Well, it's shown in these two picture -- this picture a little bit, but I took a full shot of the photograph -- I'm sorry -- a full photograph of this object on June 20th, 2006.

Q. And if you can take a look at Government's Exhibit 1138. Is Government's Exhibit 1138 that object?

A. Yes.

MS. DONAHUE: Move 1138 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: Admitted. Thank you.

(Government's Exhibit 1138 was received)

BY MS. DONAHUE:

Q. Did the Cambodian National Police seize the baby oil that is in that photograph?

A. Yes, they did.

Q. Can you take a look at Government's Exhibit 1183.

A. I have 1183.

Q. Do you recognize it?

A. I do.

Q. What is it?

A. This is the same baby oil bottle that was just shown in the previous exhibits.

MS. DONAHUE: Move 1183 into evidence.

MR. GUNN: No objection.

THE COURT: Admitted. Thank you.

(Government's Exhibit 1183 was received)

BY MS. DONAHUE:

Q. Can you take a look at the photograph that is 1139.

A. I have 1139.

Q. Did you take that photograph?

A. Yes.

MS. DONAHUE: Move 1139 into evidence.

MR. GUNN: No objection.

THE COURT: Admitted. Thank you.

(Government's Exhibit 1139 was received)

BY MS. DONAHUE:

Q. Where is that?

A. This is located in -- on the first floor of the residence. It's kind of -- not recessed but comes out in the L shape. It's

when you drive right into the residence, this is the first room you would drive into. It would be like a garage if there wasn't a pool table in there on our standards. It really isn't a garage but that's the best I can describe it.

Q. Can you take a look at 1140.

A. I have 1140.

Q. Did you take that photograph?

A. Yes, I did.

MS. DONAHUE: Move 1140 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: Admitted. Thank you.

(Government's Exhibit 1140 was received)

BY MS. DONAHUE:

Q. What are we looking at in 1140?

A. This is view of the front yard of the residence and the clotheslines, fruit trees.

Q. I would like you to take a look at Government's Exhibit 1141.

A. I have 1141.

Q. Do you recognize that?

A. I do.

Q. Did you take that picture?

A. I believe I did, yes.

MS. DONAHUE: Move 1141 into evidence.

MR. GUNN: No objection.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1141 was received)

BY MS. DONAHUE:

Q. Can you tell us what 11 -- Government's Exhibit 1141 is a picture of?

A. This is a detailed carving of a fish from wood.

Q. Where is this carving or where was this carving at the time that you took the photograph?

A. This was located on a table in the open living space on the first floor of the defendant's residence in Phnom Penh.

Q. If you can take a look at Government's Exhibit 1142.

A. I have 1142.

Q. What does that depict?

A. This is the stairwell leading down from the balcony of the second floor or leading up to the balcony from the first floor, down into the common area of the residence. You can get to the main gate from there, the yard area.

MS. DONAHUE: Move 1142 into evidence.

MR. GUNN: No objection.

THE COURT: Admitted.

(Government's Exhibit 1142 was received)

BY MS. DONAHUE:

Q. Special Agent Phillips, is there a gate at the bottom of these stairs?

A. Yes, there is a gate there but I don't know if it's exactly

at the very bottom or up a little bit.

Q. And do you know whether or not that gate locks?

A. I believe it did lock.

Q. And now Special Agent Phillips, the -- I would like you to take a look at the box or the package of the various drugs that were -- you should have all of them up there. We're not going to go through each one.

I just want to ask you where did the Valium, Rohypnol, morphine, codeine and Xanax and Temazepam all come from?

A. Most all of those particular drugs came from the defendant's bedroom on the second floor. There were a few drugs that I observed in the computer work room area as well, and a smaller packet of drugs in a little Ziploc bag in one of the other bedrooms.

Q. Where did the Viagra come from?

A. It came from the bedroom, the master bedroom on the second floor.

Q. Now, Special Agent Phillips, on what dates did the Cambodian National Police execute this search warrant at the defendant's residence in Phnom Penh?

A. On June 17th, 2006 and June 20th, 2006.

Q. Now, when you prepared a report about the search in this case, what date did you write down for the first date of the search?

A. Initially I mistakenly wrote June 16th but I corrected

that.

Q. And was June 16th correct?

A. No.

Q. What was the first day of the search?

A. June 17th, 2006.

Q. Now, on June 17th of 2006, did the Cambodian National Police take away all of this evidence that we have seen out of -- take it away from the defendant's house?

A. No, ma'am, they did not.

Q. What did they do?

A. They took some of the evidence out on June 17th, 2006, and then upon executing a second phase of the warrant on June 20th, '06, then they took the rest of the evidence out of the residence.

Q. So were you back at the residence on June 20th of 2006?

A. Yes, I was.

Q. And what did you -- generally, what did you observe the Cambodian National Police do on June 20th of 2006?

A. On June 20th, '06 they resumed the second phase of the search warrants, and they gathered their evidence and took it out of the house and then transported it back to the CNP headquarters, Cambodian National Police headquarters.

Q. When you say CNP do you mean Cambodian National Police?

A. Yes.

Q. Previously in this case did you testify at a hearing about

this search?

A. Yes, I did.

Q. And what day did you say it that it was conducted on?

A. On June 17th and by mistake I said June 19th. My error.

Q. And was the search conducted on June 19th?

A. No, it was not.

Q. Now, was the house secured in any way between the time the Cambodian National Police left on June 17th and the time they returned on June 20th?

A. Yes, it was.

Q. How do you know that?

A. I was -- I went back there on the 18th. I also saw the way that the Cambodian National Police secured the residence was intact.

Q. Now, I would like to turn your attention to July 6th of 2006. And on that date, did you have an opportunity to observe the defendant in this case?

A. Yes, I did.

Q. At that time, did you observe any distinguishing marks on his body?

A. Yes, I did.

Q. Can you please describe what you observed.

A. I observed some scars on his forehead and his hands, and I observed a round red pea-size mark on his left upper thigh, inner thigh.

Q. Finally I would like to turn your attention back to some photographs, Government's Exhibit 2073, the first page only.

A. 2073. I have 2073.

Q. Do you recognize that?

A. Yes, I do.

Q. What is that?

A. That is a photograph of one of the children that was seen in the house on June 17th, 2006.

MS. DONAHUE: Move 2073 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: That will come in, thank you.

(Government's Exhibit 2073 was received)

BY MS. DONAHUE:

Q. Special Agent Phillips, who is that?

A. That is L.K.xxxxx or also known as L.K.xxx, L-K-x-x-x-x-x.

Q. Was she at defendant's residence on June 17, 2006 when you arrived?

A. Yes, she was.

Q. I would like you to go back to the first binder and take a look at Government's Exhibit 1072.

A. I have 1072.

Q. What is that?

A. It's a photograph of myself and one of the other children that was involved in this investigation.

MS. DONAHUE: Move 1072 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: Admitted. Thank you.

(Government's Exhibit 1072 was received)

BY MS. DONAHUE:

Q. Who is that?

A. A child -- the child is I.T., I-T-x-x.

Q. I would like you to take a look at Government's Exhibit 1151.

MS. DONAHUE: I'm sorry. I move 1050 into evidence, if I didn't already do that.

THE COURT: 1050?

MS. DONAHUE: I didn't look at my notes. 1072. I apologize, Your Honor.

THE COURT: That's in.

BY MS. DONAHUE:

Q. Can you take a look at Government's Exhibit 1149.

A. I have 1149.

Q. What is that?

A. That's a photograph of myself and another child that was involved in this investigation.

MS. DONAHUE: I move 1149 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: Admitted. Thank you.

(Government's Exhibit 1149 was received)

BY MS. DONAHUE:

Q. Who is that?
A. This child's name is S.S.xxx, S-S-x-x-x-x-x.
Q. Can you take a look at Government's Exhibit 1151.
A. I have 1151.
Q. What is that?
A. This is a photograph of myself and U.S. Embassy Senior Investigator, Suos Vansak -- S-U-O-S V-A-N-S-A-K -- and another child involved in this investigation.

MS. DONAHUE: Move Government's Exhibit 1151 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: Admitted.

(Government's Exhibit 1151 was received)

BY MS. DONAHUE:
Q. When you said the other child involved in this investigation, who is that?
A. This is L.K.xxxxx, better known as L.K.xxx, L-K-x-x-x-x-x.
Q. And finally, if you can take a look at Government's Exhibit 1145.
A. I have 1145.
Q. What is that?
A. This is a photograph of myself and U.S. Embassy Senior investigator Suos Vansak and another child involved in this investigation.

MS. DONAHUE: Move Government's Exhibit 1145 into

evidence.

MR. GUNN: No objection.

THE COURT: Admitted.

(Government's Exhibit 1145 was received)

BY MS. DONAHUE:

Q. Who is that?

A. This is S.R.xxx, S-R-x-x-x-x-x.

Q. And finally, Special Agent Phillips, if I can have Government's Exhibit 2089, which is just a large overhead put on the easel.

Your Honor, I would ask permission to have him step down and write on this diagram.

THE COURT: Any objection?

MR. GUNN: I don't believe so, Your Honor. Subject to specific --

THE COURT: I can't see it. If there is no objection, go right ahead.

THE WITNESS: Thank you.

BY MS. DONAHUE:

Q. Special Agent Phillips --

THE COURT: Let's make sure all the jurors can see it. I don't need to see it unless there is a problem.

MR. GUNN: If I need to, may I step around, Your Honor?

THE COURT: You certainly may.

MR. GUNN: Right now I am all right. There may be parts that may be problematic.

BY MS. DONAHUE:

Q. Do you have a marker in your hand?

A. Yes, I do.

Q. Can you tell us what is -- 2089 is a sketch of -- or diagram, at this point?

A. Yes. This is the first floor of the residence in Toulkork, Phnom Penh, Cambodia.

Q. And just starting at the bottom of the diagram, there is a large square, can you tell us what -- inside the building. Can you tell us what that is and go ahead and label it.

A. This would be the -- like a storeroom. And this was the pool table.

Q. Is that the pool table that we saw the photograph of?

A. Yes, ma'am.

Q. Can you show and label the front door to the house?

A. This is the front door.

Q. And can you show and label the living area that we saw the photograph of earlier?

A. Yes. This is the living area.

Q. And can you show us where was the carved fish that we -- you saw the photograph of earlier? Where is that located?

A. The carved fish was right here.

Q. Can you label the television?

A. Television here.

Q. And to the left of the television, what is that room?

A. This was the downstairs quarters, bedroom quarters.

Q. And then turning your attention to the lines that immediately go all the way down to the right of the bedroom, what do those represent?

A. These are the stairs that we saw in one of the exhibits leading from the balcony down to the driveway area adjacent to the storeroom.

Q. And then going all the way over on the right-hand side of the diagram, can you please label the kitchen and the dining room?

A. Yes. This would be the kitchen and this would be the dining room -- dining room.

Q. And Special Agent Phillips, does this house, when you were there in June of 2006, have a fish pond?

A. Yes, it did.

Q. Where was that?

A. The fish pond was about right here.

Q. Could you please label that.

Your Honor, I would move Government's Exhibit 2089 into evidence.

MR. GUNN: No objection.

THE COURT: That will come in. Thank you.

(Government's Exhibit 2089 was received)

BY MS. DONAHUE:

Q. If you could put the other large diagram, Government's Exhibit 290 up on the easel, please.

THE COURT: Is that 2090?

MS. DONAHUE: I'm sorry, Your Honor. Thank you, 2090.

THE WITNESS: 2090 is up.

BY MS. DONAHUE:

Q. What --

A. Sorry. Upside down.

Q. Upside down. Thank you.

A. My apologies.

Q. Now that it's right side up, what does that sketch -- what does that represent?

A. This is the upstairs section of the residence in Toulkork, Phnom Penh, Cambodia.

Q. Starting over on the right-hand side of that diagram, what is that room?

A. This is the master bedroom.

Q. Can you please label the closet and the bed and the nightstand and the other table or desk that was in that room and the bathroom.

Can you also, please, show the jury and label the entrance to that room.

And can you also label the stairs.

A. Yes.

Q. And earlier you mentioned a massage table and we saw a photograph that had some books, children's books on top of that. Where is that table located?
A. The massage table was in the center.
Q. Can you also label where the rack was that had the red towel on it.
Where is the second bedroom that was on the second floor?
A. The second bedroom is located here.
Q. And where is the closet in that second bedroom?
And can you show where that wraparound balcony is located?
A. Yes. The wraparound balcony is the dotted line.
Q. And finally going around, can you show where the office or work room, as you refer to it, was located?
A. Yes.
Q. And what is the open area that's right in front of that office?
A. This is part of the balcony.
Q. And was there any furniture on that balcony?
A. Yes. There was a table. And a hammock somewhere. I don't remember exactly where the hammock was but I am just going to write down "Hammock."
Q. And then finally can you label the lines that are over on the far left of that diagram?

A. These are the stairs.

MS. DONAHUE: Your Honor, we move Government's Exhibit 2090 into evidence.

MR. GUNN: No objection.

THE COURT: Admitted. Thank you.

(Government's Exhibit 2090 was received)

MS. DONAHUE: At this time we have no further questions for Special Agent Phillips.

THE COURT: Thank you. Cross-examination?

MR. GUNN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. GUNN:

Q. You testified about searches at Mr. Pepe's house on June 17th, 2006 and June 20th, 2006?

A. Did you say through or -- I'm sorry.

Q. No. "And."

A. Yes, sir, I did.

Q. And Mr. Pepe was arrested on June 17, 2006; correct?

A. Mr. Pepe was arrested on the 17th of June.

Q. So he was in custody from that point?

A. Yes, he was.

Q. I would like you to look at one other Government Exhibit. Would you look at Government Exhibit 1076. If I could get my copy out, Your Honor.

THE COURT: Sure.

BY MR. GUNN:

Q. Do you have that in front of you?

A. Yes, sir, I do.

Q. Do you recognize that?

A. Yes, sir, I do.

Q. That's another photograph you took, correct?

A. I would have to look at the properties, but I believe it was.

Q. And that's a photograph of Mr. Pepe's SUV or vehicle that he had at the house; correct?

A. Yes, it is.

MR. GUNN: Your Honor, I would offer it into evidence.

MS. DONAHUE: No objection.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1076 was received)

BY MR. GUNN:

Q. That's the vehicle there; right?

A. Yes, sir.

Q. You were also at the house on June 18th, 2006, weren't you?

A. I was there on the 18th of June.

Q. You were there with a number of other American agency representatives and representatives of one or more of the non-governmental organizations which had been involved in the investigation; correct?

A. I was -- I was there with a couple other people, yes.

Q. Some of those were other American representatives; correct?
A. Yes, there was one -- two.
Q. And some of them were NGO representatives; correct?
A. I believe one. I believe.
Q. And your understanding was that the Cambodian police were going to be back that day to complete the search; right?
A. That was my initial belief, yes.
Q. They had sealed the house the day before and they told you they were going to come back the next day; right?
A. Yes, they did.
Q. But they never showed up that day, did they?
A. No, they did not.
Q. At least while you were there they didn't show up; correct?
A. That's correct.
Q. You weren't there the whole day, though?
A. No, sir, I wasn't.

MR. GUNN: Your Honor, I would like to have some exhibits which I have premarked placed before the witness.

THE COURT: All right.

MR. GUNN: They are Defense Exhibits 1010 through 1015 -- I'm sorry -- 510 through 515.

THE COURT: Okay.

MR. GUNN: If I could approach with the originals and a set of copies for the Court.

THE COURT: You may. Does the Government have copies?

MR. GUNN: I just handed them to them.

Q. Agent Phillips, first I would like you to look at Defense Exhibit -- strike that.

First of all, look at all six photos there. Do you have them in front of you?

A. I do, sir.

Q. Those were all photos that were taken at the house on June 18th, correct?

A. Yes, sir.

Q. And --

MR. GUNN: Your Honor, I would offer Defense Exhibits 510 through 515 into evidence.

MS. DONAHUE: No objection.

THE COURT: Those will come in. Thank you.

(Defendant's Exhibits 510 through 515 were received)

BY MR. GUNN:

Q. Is this Exhibit 510? There are exhibit tags on the back.

A. Yes. This is Exhibit 510.

Q. For the record, Your Honor, that is the one with "P-6170234" at the bottom.

THE COURT: All right. I don't want to interrupt you, so do you want to break now or five minutes from now?

MR. GUNN: Probably now is better than five minutes, Your Honor.

THE COURT: Okay, ladies and gentlemen, don't talk

about the case or form or express any opinions about the case until it's finally submitted to you. We will take a 15 minute break.

(Recess taken)

(Jury Out)

MS. DONAHUE: Your Honor, before the jury comes back, we would ask if after Special agent Phillips' testimony is completed, if the Court could take a break regardless of the time. The next witness after him will be a child and we need to set up with our video as required by the statute. And we would also wonder if the Court might ask the or tell the jury that the law requires the adult attendant who is accompanying the child be videotaped, lest otherwise the jury wonder why there is someone sitting in the corner with a video camera, which is unusual.

THE COURT: Okay.

(Jury In)

THE COURT: I apologize again. During the break I got another question from my jurors. I am sorry this is so choppy. If it makes you feel any better -- and I hope it doesn't -- this is stressing me out. And it's also problematic for my clerk and my court reporter, but we are doing the best we can and I appreciate your patience.

Mr. Gunn, you may continue.

Sir, you are still under oath.

MR. GUNN: Thank you, Your Honor.

Q. Going back to Defense Exhibits 510 through 515, do you still have those in front of you?

A. I do.

Q. And this is Defense Exhibit 510, is it not?

A. Yes, sir.

Q. That's a photo of you and other people who went with you sitting on the balcony of the house on June 18th, 2006; is that correct?

A. That's not a photo of me but it is a photo of other people.

Q. The ones who went with you to the house; correct?

A. Only a few of them went to the house with me.

Q. You were waiting for the Cambodian police; correct?

A. Yes.

Q. Going to Defense Exhibit 511, that's another photo of some of the people on the balcony; correct?

A. Yes.

Q. And it shows one of the doors with the type of seal that the Cambodian police put on it; right?

A. Yes, it does.

Q. That's where my pen is pointing; correct?

A. Yes.

Q. Going to Defense Exhibit 512, that's a photo of one of the other doors to the house; right?

A. Yes, it is.

Q. And it also shows one of the doors with the same type of seal on it where my pen is pointing; correct?
A. Yes, it does.
Q. Then going to Defense Exhibit 513, that's a photo of the house, sort of most of the front of the house from back a ways in the yard; right?
A. From the front yard, yes, sir.
Q. And it shows several of the doors in the house; correct?
A. Yes, it does.
Q. And it shows two of those doors, the one I'm pointing to with my pen now and the one I'm now pointing to above it, have that same type of seal on it; correct?
A. Yes, it does.
Q. But there is another door to the right under the awning, isn't there?
A. Yes, to the storeroom.
Q. The storeroom is connected to the house; correct?
A. I'm sorry. I looked at the wrong one. What exhibit are you looking at?
Q. Actually do you see where I zoomed in now on Defense Exhibit 513?
A. Yes, I do.
Q. There is another door there where I'm pointing my pen; correct?
A. Yes.

Q. And that door doesn't have a seal on it, does it?
A. No, it doesn't.
Q. In fact, it's completely open, isn't it?
A. It looks like it is, yes.
Q. And this picture was also taken on June 18, 2006; correct?
A. If you give me the P number, I would be happy to make sure of that.
Q. It has a P number on it, right, on your copy there?
A. Can you give me the exhibit number, please?
Q. Exhibit 513.
A. This was taken on June 18th, yes, sir.
Q. Then going to Defense Exhibit 514, that's a photo of another door to the house, isn't it?
A. Yes. That's to the storeroom.
Q. Also taken on June 18, 2006; correct?
A. Yes, sir.
Q. And that door also doesn't have a seal on it; correct?
A. It does not, no.
Q. Then going to Defense Exhibit 515, that's another door to the house; correct?
A. Yes, sir.
Q. And it also doesn't have a seal on it, does it?
A. I don't see a seal, no.
Q. And all these photographs, Defense Exhibits 510 through 515, were taken on June 18, 2006; correct?

A. Yes, they were.
Q. That was the day you were waiting for the Cambodian National Police; right?
A. Yes.
Q. But they didn't show up?
A. Well, there was one officer there guarding the house, but the -- the contingent of people that I was waiting for did not show up.
Q. But you weren't there the whole day?
A. No, I was there in the morning.
Q. Now, a number of medications were found in the search; correct?
A. Yes, sir.
Q. You took those medications as evidence?
A. I did not take any evidence.
Q. They were taken as evidence?
A. The Cambodian National Police took them as evidence.
Q. And they were later given to you for use as evidence; correct?
A. Not originally. They were given to me to see if he needed medication while in Prasa Prison.
Q. They eventually were given to you to take as evidence; right?
A. Yes, they were.
Q. And you passed them all to the agents who were handling the

case here in the United States; correct?
A. Yes, sir.
Q. Now, you identified on direct examination a pink-colored bottle of baby oil that you found in the house on direct examination, did you not?
A. Yes, I did.
Q. That is shown in Government Exhibit 1138; correct?
A. Yes, it is.
Q. And this is that exhibit; correct?
A. Yes, sir.
Q. And you actually requested that this be taken during the search; right?
A. I asked if it was permissible to take it, yes, sir.
Q. And it wasn't in Mr. Pepe's bedroom, though, was it?
A. No, it wasn't.
Q. It wasn't even on that floor, was it?
A. No, sir, it was not.
Q. It was in the downstairs bedroom; correct?
A. It was in the downstairs bedroom.
Q. Would you look at Government Exhibits 1152 and 1153. Those are photographs of a bag that was found in Mr. Pepe's house; correct?
A. Yes, sir.
Q. The same bag as is shown in Government Exhibit 1104; correct?

Actually, Your Honor, I would offer 1152 and 1153 into evidence.

MS. DONAHUE: No objection.

THE COURT: Those will come in. Thank you.

(Government's Exhibits 1152 and 1153 were received)

THE WITNESS: Yes, sir.

BY MR. GUNN:

Q. This is Government Exhibit 1152; correct?

A. Yes.

Q. And the bag has some things inside it; right?

A. Yes.

Q. That includes two ropes or pieces of cord?

A. Yes.

Q. And a roll of tape?

A. Yes.

Q. And a red-and-white box sort of hidden there under the ropes?

A. That's true.

Q. And then some sort of little green-and-yellow thing sort of right in here; right?

A. Yes.

Q. Would you now look at Government Exhibit 1153. That's this, correct?

A. Yes.

Q. That's another photo of the bag?

A. Yes, it is.
Q. And it has the ropes in it?
A. Yes.
Q. And the roll of tape?
A. Yes.
Q. Now it also has a condom in it; correct?
A. Yes.
Q. And a plastic Ziploc bag with some pills of some sort; is that true?
A. That's also true.
Q. The condom wasn't in the bag when it was first found, was it?
A. That's true.
Q. And the plastic Ziploc bag with the pills wasn't in it when it was first found, was it?
A. That's correct also.
Q. And the little yellow-and-green thing that was in Government photograph, 1152, the prior photograph, wasn't in the bag when it was first found either, was it?
A. That's true.
Q. Finally, the red-and-white box that was in the bag in 1152 wasn't in it when it was first found, was it?
A. That's true.
Q. In fact, you took a photo that -- that red-and-white box is actually medication, isn't it?

A. Is that the Codalgin?

Q. Would it refresh your memory if you saw a photograph?

A. Yes, sir, it would.

MR. GUNN: Your Honor, could I mark an exhibit as 517?

THE COURT: You may.

(Defendant's Exhibit 517 was marked)

MR. GUNN: Your Honor, I am handing Government counsel a copy and if I could approach with the original and a copy for the Court.

Q. Would you look at Government Exhibit 517. Do you have that in front of you?

A. Yes.

Q. That's a photograph you took of this Codalgin Forte medication in the house; correct?

A. Is it a P number?

Q. Did you take a photograph like that of the medication?

A. I did take photos, but I need to know -- to answer your question thoroughly, I need to know if it was a P number.

Q. Let me rephrase the question.

Is this a photograph of Codalgin Forte medication that you saw in the house?

A. Yes, sir.

Q. And that box is the same as the box that is in Government Exhibit 1152; correct?

THE COURT: Are you asking if the boxes look the same

or whether this is the identical type --

MR. GUNN: Same type of box. Thank you.

THE WITNESS: Both the box and the bag is red and white in color.

BY MR. GUNN:

Q. And it has the word "medicine" in the same place; right?

A. That's correct.

Q. So it appears to be the same type of box; correct?

A. It appears that's so, yes.

MR. GUNN: Your Honor, I would offer Government Exhibit -- Defense Exhibit 517 into evidence.

MS. DONAHUE: No objection.

THE COURT: I will admit that. Thank you.

(Defendant's Exhibit 517 was received)

BY MR. GUNN:

Q. Going back to your testimony yesterday, you testified about this yellow bag; right?

A. Yes, I did.

Q. And you testified that there were two types of rope or cord, the tape, and a piece of wire in the yellow bag; right?

A. Yes, I did.

Q. You actually volunteered the part about the wire on your own when you happened to see it in there, didn't you?

A. Yesterday, yes.

Q. That evidence wasn't in American custody during the whole

time after it was seized, was it?

A. No, it was not.

Q. It was in the custody of the Cambodian police, wasn't it?

A. That's true.

Q. You don't have any personal knowledge of what they added to the bag or took out, do you?

A. I only know what I saw on the day of the warrants.

Q. And what you didn't see in the bag was any wire; isn't that correct?

A. I don't recall seeing any wire on that day.

Q. In fact, there was no wire in the bag on that day, was there?

A. I don't know. There could have been. I just didn't see it.

Q. Would it refresh your memory if you saw part of the search warrant video where the bag was found?

A. Yes.

MR. GUNN: Your Honor, I have Defense Exhibit 105 already in our computer. It's a copy of the same search video as the Government Exhibit. If I could just play that one, that would be quicker.

THE COURT: You may.

MR. GUNN: I am going to switch over to your computer, Your Honor.

THE COURT: Good luck.

MR. GUNN: Bingo. If I could, Your Honor, for the record, we will start this video at 34:45 and I am going to ask Mr. Brown to play it through 35:30. It's CD 2 on Defense Exhibit 105, which is the June 17th search video.

THE COURT: All right.

(Whereupon, the video was played for the jury)

MR. GUNN: Could we pause it please, Mr. Brown.

Q. That's the same yellow bag; correct?

A. Yes, it was.

Q. If we could continue, Mr. Brown.

(Whereupon, the video was played for the jury)

MR. GUNN: Can we pause it Mr. Brown.

Q. There is no wire anywhere there; correct?

A. I don't see it from this angle.

Q. And people are adding in condoms and KY jelly to be taken in a photograph; correct?

A. Well, I don't know if that was their purpose.

Q. Well, they are throwing the condoms and the KY jelly in there with the rope and the tape; right?

A. That's what I saw. I saw condoms and KY jelly on the bed.

Q. And Government's Exhibits 1152 and 1153 someone put additional items in the bag for a photograph; correct?

A. I assume so. I don't know. But they're there.

Q. Either you took those photographs or someone you designated to take them took them; right?

A. No. I took the photos.
Q. So those items were put in there for you to take the photos; correct?
A. They weren't put in there for me to take the photos. I took the photos.
Q. Different items were moved in and out from one photo to the next when you took those photos; correct?
A. I guess so, yes.
MR. GUNN: By the way, if we could finish playing the video, Your Honor, just so it's all the way through. We will stop at 3530, Your Honor, for the record.
(Whereupon the video was played for the jury)
MR. GUNN: That's all for the video, Your Honor.
THE COURT: All right.
MR. GUNN: Why don't we skip back to the ELMO.
Q. By the way, this bag didn't say "rape kit" on it, did it?
A. No.
Q. And this tape doesn't look any different than any other masking tape or duct tape of that type, does it?
A. No. It's tape that you can buy anywhere.
Q. And the rope or cord doesn't look any different than any other rope or cord, does it?
A. No.
Q. By the way, this bag had been in the custody of the Cambodian National Police for several days before you took

custody of it; correct?

A. Yes. That's true.

Q. You testified about the hard drive of the computer that is identified as Government Exhibit 1275 on direct examination; correct?

A. Yes, I did.

Q. And you identified that as the hard drive because it had your initials on it?

A. That's true.

Q. And it had a date on it?

A. Yes, it did.

Q. And it had who you received it from on it?

A. Yes, it did.

Q. And who you received it from was the Cambodian National Police; correct?

A. That's true.

Q. It was in their sole custody before you received it; right?

A. That's true.

Q. Would you look at Government Exhibit 1124. That's the stack of $1 bills that you testified on direct examination; correct?

A. Yes, sir.

Q. There is a lot of poverty in Cambodia; correct?

A. Yes, there is a lot of poverty in Cambodia.

Q. If you are an American and you are on the streets of

Cambodia, people often approach asking for money; correct?

A. That's very true.

Q. So it's very common for someone to have a number of $1 bills so they can give people a dollar if they're approached correct?

A. It's more common to give in riel, but you can give dollar bills, too.

Q. In fact, you suggested to us before we went over to Cambodia on an investigation that we have a number of $1 bills so that we could have those to give people if we were approached; right?

A. Or riel, yes.

Q. Would you now look at Government -- actually not look at. Do you have Government Exhibit 1177 up in front of you? It's a map of Phnom Penh.

A. It must be back in the exhibit area.

MR. GUNN: Could I have it placed in front of Agent Phillips, Your Honor?

THE WITNESS: I have 1177.

BY MR. GUNN:

Q. That's the map of Phnom Penh; right?

A. Yes.

Q. Right?

A. Yes.

Q. And this is a copy of the back of the map; right?

A. Yes, it is.
Q. You testified about how it says "Sex with children is a crime"; right?
A. That's correct.
Q. And this is actually about a number to call if you have information to give the police; right?
A. When it works, yes.
Q. Well, that wasn't my question. This section or this ad on the map is about a number to call the police when you have information; right?
A. Yes, that is true.
Q. But it's not the only thing on this map; right?
A. On the back side of the map?
Q. It's not the only thing on the map; right?
A. No. It's a map.
Q. Well, and there is a number of other different advertisements and things on the map; right?
A. You asked me not to open it so I haven't opened it.
Q. Well, have you looked at it before, Agent Phillips? Don't open it now. You've looked at this before; right?
A. Yes, I have.
Q. You know what's on it; right?
A. There are advertisements on it, I believe, for restaurants maybe.
Q. So you can answer my question without opening it, can't

you?

A. I can but not thoroughly.

Q. Well, I didn't ask you -- I'll withdraw that, Your Honor.

Now that we have established that, will you open the map and show it to the jury.

A. May I stand?

(Witness shows map to the jury)

Q. So that sex-with-children advertisement or whatever we wanted to call it that you testified about is one out of probably 50 on the map, isn't it?

A. That's true.

Q. You also testified on direct examination -- you can put that away now -- about several newspaper clippings that were found in Mr. Pepe's house, didn't you, that had to do with pedophilia or sex trafficking issues in Cambodia; right?

A. Yes.

Q. Those are Government Exhibits 1234 through 1237?

A. Would you like me to look?

Q. If you don't remember, please look.

A. 1234?

Q. Through 1237.

A. I do remember the exhibits. And they do begin with 1234.

Q. There are four newspaper clippings, right -- 1234, 1235, 1236 and 1237?

A. Yes.

Q. Those weren't the only newspaper clippings found in Mr. Pepe's house, were they?

A. No.

MR. GUNN: Your Honor, could I have marked an original evidence bag in the Government's possession Defense Exhibit 520?

THE COURT: It's in the Government's possession and it's Defense 520?

MR. GUNN: I believe it's right here. Mr. Wong just pointed to it, Your Honor.

THE COURT: Okay.

BY MR. GUNN:

Q. That's an evidence bag containing evidence that was found in Mr. Pepe's house in this case; correct?

A. That's true.

Q. It's the same evidence bag that you retrieved or someone retrieved, Government's Exhibit 1234, 1235, 1236 and 1237 out of; correct?

A. That's also true.

Q. And that same bag has several other newspaper clippings in it, doesn't it?

A. Yes, it does.

Q. Would you open the bag and pull those out. One of those is a newspaper clipping that's just a, quote, police blotter, unquote; correct?

A. Which one?

Q. Tell me if there is one in there like that.

A. I see 1, 2, 3, 4, 5 clippings.

Q. That wasn't my question. My question just now is one of those is a police clipping -- is a clipping that says "Police Blotter" on it; right?

A. Police blotter? I'm not seeing police blotter. If you can help me out and direct me to which one, I would be happy to answer you.

MR. GUNN: Could I approach, Your Honor?

THE COURT: Sure.

THE WITNESS: Is it in this bag? I don't see it.

BY MR. GUNN:

Q. It should be in there.

A. I'm not seeing it, sir. I'm sorry.

Q. All right. Now it's missing, so . . .

There are five newspaper clippings in there, though, correct?

A. Yes, sir, there are.

Q. One of them is about seven officials convicted under iron fists acquitted?

A. Yes, sir.

Q. That's about some Cambodian police officers who were convicted of taking bribes for letting robbery suspects go?

A. Police or the Court? I'm not sure which one it was. There was some judges involved as well and prosecutors.

Q. This one was about police; correct?

A. A judge as well.

Q. And then there is one about a waitress being shot by police officers?

A. Yes. For serving too slowly.

Q. And then there is one about how bar guards should police the police?

A. Yes, sir, there is.

Q. And then this is one with an article about prostitutes not liking NGO shelters?

A. That's correct.

Q. And then there is one about the hazards for beer girls; correct?

A. That's true as well.

Q. And these were in the same evidence bag as Government's Exhibits 1234 through 1237; correct?

A. That's true.

Q. And that's because those newspaper clippings were all found together; correct?

A. I don't know if they were all found together or not.

Q. Taken together, it's a set of newspaper clippings about crime and police problems in Cambodia, isn't it?

A. Amongst other paperwork in here.

Q. These weren't the only newspaper clippings, in fact, that were found in the house, were they, the ones in this evidence

bag?

A. Clippings or complete papers?

Q. Clippings.

A. Clippings. I don't recall how many more clippings there were.

MR. GUNN: Your Honor, could I -- first of all, Your Honor, could I offer Defense Exhibit 520 -- could I offer this exhibit as Defense Exhibit 520, just the newspaper clippings in it and the evidence bag?

MS. DONAHUE: No objection.

THE COURT: All right. That will come in.

(Defendant's Exhibit 520 was received)

MR. GUNN: Your Honor, if I could approach and have marked Defendant's Exhibit 521 through 523.

THE COURT: All right.

(Defendant's Exhibits 521 through 523 were marked)

MR. GUNN: With an extra copy for the Court and originals with exhibit tags.

Q. Would you look at Defense Exhibits 521, 522 and 523.

A. Okay.

Q. Those are copies of three other newspaper clippings; correct?

A. Yes.

Q. And those also were found in Mr. Pepe's house; correct?

A. I don't remember seeing these, but they came out of the

bag.

Q. They were in the evidence that was produced to the Defense by the Government in this case; correct?

A. Yes.

Q. And there were even complete newspapers found in Mr. Pepe's house that were seized; isn't that true?

A. That is true.

MR. GUNN: Your Honor, if I could offer first of all 521 through 523 into evidence.

MS. DONAHUE: No objection.

THE COURT: Admitted. Thank you.

(Defendant's Exhibits 521 through 523 were received)

MR. GUNN: Your Honor, if I could have another exhibit marked for identification, if I could approach, as 524?

THE COURT: You may.

(Defendant's Exhibit 524 was marked)

MR. GUNN: It's in file folders because it's somewhat thick, Your Honor. A copy for the court. An original.

Q. Would you look at Defense Exhibit 524.

A. Yes.

Q. That's a group of complete newspapers that were found in Mr. Pepe's house, isn't it?

A. Yes, sir, it is.

Q. And it's not just the most recent dates that maybe hadn't been thrown away, was it?

A. Do you want me to go back and see how far it goes?

Q. There is -- why don't we go through them? There is one for February 20th; correct?

A. Yes.

Q. And there is one for February 22nd; correct?

A. Yes.

Q. There is one for February 27th?

A. Correct.

Q. There is one for February 28th?

A. True.

Q. One for March 1st?

A. Yes.

Q. One for March 2nd?

A. Yes.

Q. One for March 3rd?

A. Yes.

Q. One for March 6?

A. Yes.

Q. One for March 7th?

A. Yes.

Q. One for March 8th?

A. Yes.

Q. One for March 9th?

A. Yes.

Q. One for April 6th?

A. Correct.

Q. One for April 12th?

A. Yes.

MR. GUNN: Your Honor, I would offer Defense Exhibit 524 into evidence.

MS. DONAHUE: Object on relevance grounds.

THE COURT: I'll admit it.

MR. GUNN: I'm sorry, Your Honor?

THE COURT: Admitted.

(Defendant's Exhibit 524 was received)

BY MR. GUNN:

Q. These are just the newspaper clippings in newspapers that you selected out of what the Cambodian police had at their office after the search; correct?

A. These were the papers that were contained in the evidence that they seized.

Q. The evidence -- well, you didn't look at the evidence that they seized right after they seized it, did you?

A. No, I didn't.

Q. You looked at the evidence that they seized several days later; correct?

A. I looked at it on -- some of it on June 18th, the day after. I believe some of it possibly on the 19th. And then again after it was seized on the 20th.

Q. And so you don't know what the Cambodian police kept;

right?

A. They kept whatever I saw when I went through it.

Q. But you don't know what they kept and what they originally seized?

A. It was not my warrant, so that's true.

Q. And you didn't actually see them seize every single thing they seized, did you?

A. No. I couldn't -- I could not have seen every single item that was seized at the time they were seizing it.

Q. Now, you also testified on direct about observing a red pea-shaped mole on Mr. Pepe's inner thigh, you claimed, when you met with him on July 6th?

A. That's true.

Q. That was after interviews during which at least three of the girls who said Mr. Pepe had abused them said he had a mole on his thigh; right?

A. That's true.

Q. So you believed at that point in the investigation that a mole on the thigh was important, didn't you?

A. I thought it was relevant.

Q. Did you ever take a photo of the mole you're saying you observed?

A. We're not allowed to take cameras into the prison.

Q. Did you ever ask the Cambodian authorities if you could take a photo of it?

A. We were told that prior to coming into the prison, we were not allowed to bring electronic devices or cameras into the prison.
Q. Did you ever tell them that there was important evidence that you needed to take a photo of and you would like to take a photo of?
A. No. Because I know those rules and they do not bend the rules.
Q. Did you ever ask them to take a photo of it?
A. No, I did not.
Q. Were you at court appearances where Mr. Pepe was sometimes in Cambodia?
A. I'm sorry. Say that again.
Q. Did you ever go to any court appearances where Mr. Pepe was present in Cambodia?
A. No.
Q. Were there court appearances in Cambodia for Mr. Pepe?
A. I never participated in that so I would imagine there were.
Q. Could you have gone to those?
A. I guess I could have if I wanted to, yes.
Q. Did you think about going there to take a photo of this mole that you claim you saw?
A. I'm not claiming I saw it. I did see the mole.
Q. You have testified about a couple of mistake you made about dates previously in this case; correct?

A. That's true. I did.
Q. You have also left things out of reports when it was helpful to leave them out, haven't you?
A. No.
Q. Well, on June 16th, 2006, you interviewed one of the alleged victims in this case named I.T.; correct?
A. That's true.
Q. You showed her a photograph of Mr. Pepe; correct?
A. That's true.
Q. And she said that wasn't the man; correct?
A. That's true.
Q. Now, in this photo, Mr. Pepe had a mustache; right?
A. That's true as well.
Q. But that wasn't the only reason I.T. gave that he wasn't the man, was it?
A. I would have to go through the transcript.
Q. She also said his nose was longer, didn't she?
A. I believe she said a sharp nose.
Q. And then you wrote a report about that interview; right?
A. I did.
Q. That's an official government report?
A. It was a government report and it was official.
Q. It was several pages long?
A. Yes.
Q. It's intended to be a complete and accurate report to sort

of lay out what happened or what was said?

A. Yes, it is.

Q. You didn't put anything in that report about I.T. being shown a picture of Mr. Pepe and saying that wasn't the man, did you?

A. I did not, no.

MR. GUNN: Your Honor, I don't have any further questions for Agent Phillips at this time subject to possibly recalling him depending on what additional testimony from other witnesses there may be.

THE COURT: I'm sure he'll be around.

MR. GUNN: I expect so, Your Honor.

MS. DONAHUE: He will be.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MS. DONAHUE:

Q. Special Agent Phillips, do you have in front of you the Defense Exhibits 510 through 13, that initial set of photos?

A. I do.

Q. If you could take a look at Defense Exhibit 510.

A. I have 510.

Q. What date is this taken?

A. This photo was taken on June 18th, 2006.

Q. Can you identify the people who are in this photograph; and I will try and zoom in a little more.

A. I'm sorry. Yes, I can.
Q. Let's start with the man in the red ball cap. Who is that?
A. That is Andrew Simpson. He is the Assistant Regional Security Officer of the U.S. Embassy.
Q. Is that the U.S. Embassy in Phnom Penh, Cambodia?
A. Yes, it is.
Q. To his left, who is the gentleman here with the dark hair that I'm pointing to?
A. That's Senior Investigator Suos, S-U-O-S, Vansak, V-A-N-S-A-K of the U.S. Embassy Regional Security office.
Q. And moving to the right, who is the man I'm pointing to here in the blue T-shirt?
A. I believe that is the representative from the International Justice Mission, Ron Dunne, D-U-N-N-E.
Q. Is the International Justice Mission a non-governmental organization?
A. Yes, it is.
Q. Who is the man in the white shirt with the dark hair in front of Mr. Dunne?
A. I'm not sure of his name but I believe he was the contingent of the Cambodian National Police assigned to be at that residence.
Q. And then there are -- there is a woman immediately to his left who appears to be sitting at that table. Who is that?
A. I believe that is the -- if it's the elder of the two --

which is why I'm wearing glasses -- is Sin, S-I-N, S-A-M-A-N-A, and she is the house owner. I'm sorry.

Q. Who is Sin Samana?

A. She is the house owner.

Q. And who is the woman seated next to her to the left in the photograph?

A. He I believe that her daughter Muth Piseth, M-U-T-H P-I-S-E-T-H.

Q. When you returned to the defendant's house on June 18th, what did you do?

A. I was waiting for the police, but I took the opportunity to interview Sin Samana and Muth Piseth, the landlords, the owners of the house.

Q. And those are two individuals who are seated at the table there on the balcony?

A. Yes.

Q. If you can take a look at Defense Exhibit 511.

A. I have 511.

Q. What portion of the house is this a photograph of?

A. That's the entranceway to the computer room or the work room on the upstairs balcony area.

Q. And is the door that has a seal over it the seal to that work room?

A. That's one of the seals, yes.

Q. And do you know who are the people who are depicted or

partially depicted in the photograph?
A. It's my belief they are part of the contingent that was assigned to guard the house.
Q. When you say a contingent assigned to guard the house, what do you mean?
A. Representatives from the Cambodian National Police who were assigned to ensure that there was no people coming or going into that house where the evidence was contained.
Q. If you could take a look at Defense Exhibit 513, which is also a photograph.
If I could also have Government's Exhibit 2090, the large diagram of the first floor -- 2089, I am sorry -- put on the easel.
A. Defense 513?
Q. Defense 513.
A. I have 513.
Q. I am zooming in on the door that you were shown on cross-examination. Referring to -- referring to the diagram, Government's Exhibit 2089, which is now on the easel, can you show the jury what door is depicted in this photograph, Defense Exhibit 513?
A. It would be this door.
Q. Is that the door that leads into the kitchen?
A. Yes.
Q. If you can go ahead and have a seat. Take a look at

Exhibit 514.

A. I have 514.

Q. Do you know what that is the door to?

A. It's the door to the storage room, I believe.

Q. Where is that storage room located?

A. It's as you go in the door to the left.

Q. And can you show the jury on the diagram? Government's Exhibit 2089.

A. That would be right here.

Q. Is that right behind the fish pond?

A. Yes.

Q. And is that also the door -- is there a door, just for accuracy, that leads into that room where the pool table was located?

A. Yes. These double doors.

Q. All right.

And if you want to go ahead and take a look at Defense Exhibit 515.

A. I have 515.

Q. Do you know where in the house that door is?

A. Actually that's kind of hard for me to tell on this particular shot. I can't really tell on this shot. I know it's by the balcony.

Q. You're not sure based on this photograph where that was taken?

A. Right.

Q. And -- okay.

You don't know whether -- you don't know whether that's a door leading into the office area?

A. The office? May I look at the other photos?

Q. Yes. Yes.

A. No. It's not to the office.

Q. It's not into the office area?

A. No.

Q. Okay.

Now I would like you to take a look at Government Exhibits 1152 and 53. They're photographs that are in a binder.

A. I have 1152 and 3.

Q. Starting with 1152, what does that show?

A. It shows a yellow bag with rope, two different types of rope, medicine and masking tape and some yellow-and-blue color item.

Q. And 1152, you were asked about this photograph on cross-examination.

Do you know when this photograph was taken?

A. I'll have to look in my sheets. Do you have the P number by -- perhaps? The photograph number?

Q. No. But if you take a look at 1153 and maybe also answer the same question, when that was --

A. May I take a moment and figure it out?

Q. Yes. Yes.
A. Okay.
Q. When was Government's Exhibit 1152 taken?
A. It was taken on June 19th, 2006 at about 9:30 in the morning.
Q. And when was Government's Exhibit 1153 taken?
A. June 19th, 2006, approximately 9:31 in the morning.
Q. Do you know where these photographs were taken?
A. Yes, I do.
Q. Where is that?
A. At the Cambodian National Police headquarters.
Q. These were not taken at the defendant's residence; is that correct?
A. No, they were not.
Q. Now, I want you to go back and look at Government's Exhibit 1104.
A. I have 1104.
Q. Is this the photograph you testified to on direct examination?
A. Yes, it is.
Q. When was this photograph taken?
A. This was taken on June 17th, 2006 approximately 11:20 -- 1:34 in the afternoon -- 1:24 in the afternoon. My apologies.
Q. You took this photograph; is that right?
A. Yes, I did.

Q. Can you explain when during the course of the search you took this photograph?

A. During the beginning of the search.

Q. Do you recall approximately how long after the bag was removed from the closet did you take this photograph, Exhibit 1104?

A. I took two photos. One -- I don't understand the question.

Q. Let's take a look at another photograph. Can you take a look at Government's Exhibit 1100.

A. Okay.

Q. Do you see the yellow bag in 1100?

A. Yes, I did.

Q. Did you take this photograph?

A. Yes, I did.

Q. And then can you please describe what happened after you took this photograph which is Government's Exhibit 1100?

A. After I took this particular photograph, then a few seconds later, about 20 seconds later, it actually -- it was opened so I could take a photograph of the original contents of the bag before the police moved it.

Q. When you say it was opened, are you referring to the yellow bag?

A. Yes.

Q. The other two photographs, 1152 and 1153 that we saw earlier, those were taken a day later or two days later at the

Cambodian National Police; is that correct?

A. That's correct.

Q. Do you know what other items the Cambodian National Police may or may not have put into the bag?

A. Just from the pictures is all I could tell you.

Q. Going back to Government's Exhibit 1104, is that the condition the bag was in when you saw it taken out of the closet?

A. This is how it was when I seen it in the closet.

Q. When you say "this," what are you referring to?

A. Exhibit 1104, the yellow bag with the masking tape and the rope.

Q. And just I would like you to go back briefly to Government's Exhibit 1124, which is a photograph, which is in the binder.

A. I have 1124.

Q. On cross-examination, you mentioned the word "riel"?

A. Yes.

Q. Can you spell that?

A. It's R-I-E-L.

Q. What are riel?

A. Riel is the money that is distributed in Cambodia, the Cambodian money.

Q. Does this Exhibit 1124 also, besides showing U.S. dollars, show riel?

A. Yes, it does.

Q. I would like you to get that map, 1177 out. Don't unfold it. Just hold it up.

A. (Witness holds up map.)

Q. When it's folded what does it have on one side?

A. "Phnom Penh, 3D map."

Q. What does it have on the other side?

A. "Sex with children is a crime."

Q. You can put the map away.

And I would like to turn your attention to the interview of I.T. that you were asked about on cross-examination on June 16th of 2006.

Do you recall that interview?

A. Yes, I do.

Q. What photograph did you show her?

A. It was a photo taken over 20 years ago.

Q. A photo taken over 20 years ago of who?

MR. GUNN: Move to strike, Your Honor. No foundation of personal knowledge.

THE COURT: Sustained. That will be stricken.

BY MS. DONAHUE:

Q. Did you show her a photograph of the defendant?

A. Yes, I did.

Q. And where did you get that photograph?

A. I received it from a colleague from another agency.

Q. Who did you receive it from?

A. The Naval Criminal Investigative Service.

Q. Can I have you take a look at Government's Exhibit 2085.

A. I have it.

Q. Do you recognize that?

A. Yes.

Q. What is that?

A. It's a photograph of Michael Pepe.

Q. Is that the same photograph that you showed to I.T.?

A. Yes.

Q. And does that photograph contain a date?

A. November 20, 1986.

MS. DONAHUE: Move Government's Exhibit 2085 into evidence.

MR. GUNN: Your Honor, object. At least in its present form.

THE COURT: Let me see that, please.

Can you show the photograph without the writing, Ms. Donahue?

MS. DONAHUE: Yes.

Q. What did I.T. say about that photograph?

A. That she didn't recognize that particular photo.

Q. Did she make any comment about that photo?

A. It wasn't the best photo, but she did say that he had a sharp nose and no mustache.

Q. And why didn't -- and was that particular interview where she made those statements videotaped?

A. Yes, it was.

Q. Why didn't you include her misidentification on this photograph in your report?

A. That was a very old photo. That's the only one I had at the time. And I usually don't report negative findings.

Q. Did she subsequently make an identification in this case?

A. Yes, she did.

MS. DONAHUE: I have no further questions.

THE COURT: Recross?

RECROSS-EXAMINATION

BY MR. GUNN:

Q. At the time you wrote your report about the June 16th interview, she hadn't made identification; correct?

A. I'm sorry. I can't hear you.

Q. At the time you wrote your report of the June 16th interview, she hadn't made an identification, had she?

A. No. Oh, wait. No.

MR. GUNN: No further questions, Your Honor.

THE COURT: All right. I think it's time for our break then and you can set up.

MS. DONAHUE: I think the witness didn't finish answering the question.

THE COURT: He answered the question.

MS. DONAHUE: May I inquire on redirect?

THE COURT: Briefly.

REDIRECT EXAMINATION

BY MS. DONAHUE:

Q. Did you finish answering that question?

A. I did not. I am sorry.

MR. GUNN: I object.

THE COURT: He did finish. He said no.

MR. GUNN: He wants to change his answer.

BY MS. DONAHUE:

Q. At the time you wrote a report, had an identification been made?

A. Yes.

Q. What is your answer based on?

A. Because I wrote the report, I believe, two weeks later.

MS. DONAHUE: I have no further questions.

THE COURT: Mr. Gunn?

MR. GUNN: Nothing further.

THE COURT: All right.

We will take a 15 minute break. Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. This one should be 15 minutes because I think my other jury is gone.

(Recess taken)

(A. M. Proceedings adjourned at 12:30 p.m.)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THE HON. DALE S. FISCHER, JUDGE PRESIDING

UNITED STATES OF AMERICA, )
)
PLAINTIFF, )
vs. ) CR 07-168(A)-DSF
)
MICHAEL JOSEPH PEPE, )
)
DEFENDANT. )
)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

- REDACTED -

LOS ANGELES, CALIFORNIA

TUESDAY, MAY 13, 2008

AFTERNOON SESSION

LYNNE SMITH
OFFICIAL COURT REPORTER
ROYBAL FEDERAL BUILDING
EAST TEMPLE STREET
ROOM 181-A
LOS ANGELES, CALIFORNIA

APPEARANCES:

FOR THE PLAINTIFF: OFFICE OF THE UNITED STATES ATTORNEY
BY: PATRICIA DONAHUE and JOHN LULEJIAN
ASSISTANT UNITED STATES ATTORNEYS
UNITED STATES COURTHOUSE
312 N. SPRING STREET
LOS ANGELES, CALIFORNIA 90012

FOR THE DEFENDANT: SEAN KENNEDY
FEDERAL PUBLIC DEFENDER
BY: CARL GUNN AND CHARLES BROWN
DEPUTY FEDERAL PUBLIC DEFENDERS
321 EAST SECOND STREET
LOS ANGELES, CALIFORNIA 90012

I N D E X

-oOo-

WITNESS INDEX

T.C. DIRECT EXAMINATION - PAGE 5

CROSS-EXAMINATION - PAGE 26

EXHIBIT INDEX

| EXHIBIT NUMBER | RECEIVED INTO EVIDENCE |
| --- | --- |
| 1397 | 8 |
| 1398 | 8 |
| 1402 | 11 |
| 2067 | 23 |

TUESDAY, MAY 13, 2008; LOS ANGELES, CALIFORNIA

-oOo-

(JURY PRESENT)

THE COURT: Ladies and gentlemen, we're going to have a child witness next. As I indicated, we're going to refer to the child only by the first name.

And, in addition, the law requires that a videotape be made of the adult who will be coming in with the child during the entire course of the proceedings; so that's why we're doing that. The law says we have to.

Ms. Donahue.

MS. DONAHUE: Thank you, Your Honor.

The government calls T.C.xx.

**INTERPRETER SWORN**

THE COURT: What language do you speak, ma'am?

THE INTERPRETER: Cambodian, Your Honor.

THE CLERK: If you could please state your first name and spell your first name for the record.

THE WITNESS: T.C.xx.

THE COURT: You may proceed.

MS. DONAHUE: Thank you, Your Honor.

And if the interpreter wants to move the microphone closer to her, that might make it more convenient.

THE INTERPRETER: Thank you.

**T.C, GOVERNMENT'S WITNESS, SWORN**

BY MS. DONAHUE:

Q Good afternoon, T.C.xx.

A Good afternoon.

Q Can you tell us how old are you.

A I'm 15 years old.

Q T.C.xx, what country do you live in?

THE COURT: Ms. Donahue, you're actually speaking to the interpreter; so I don't think you have to go quite so slowly.

MS. DONAHUE: Okay.

THE WITNESS: Cambodia.

BY MS. DONAHUE:

Q Does your family live in Cambodia?

A Yes.

Q Where in Cambodia does your family live?

A Phnom Penh.

Q And does your father have a job in Phnom Penh?

A Yes.

Q What does he do?

A Construction.

Q Does your mother have a job in Phnom Penh?

A Yes.

Q What does she do?

A Sells bakery.

Q Do you have any brothers and sisters?
A Yes.
Q How many brothers and sisters do you have?
A I have three older brothers, four sisters.
Q Do you live with your family right now?
A No.
Q In Cambodia, where do you live?
A At the center.
Q What is the center?
A Agape.
Q And is Agape a place where children stay?
A Yes.
Q Do you go to school?
A Yes.
Q What grade are you in?
A Fourth.
Q What subjects do you study?
A Cambodian class, English, computer.
Q What is your favorite class?
A Computer.
Q What do you want to do when you grow up?
A Computer.
Q T.C.xx, I would like you to take a look at the photograph, Government's Exhibit 1077.

MS. DONAHUE: If you can put it on the overhead,

maybe that will help. There's a screen right in front of her.

BY MS. DONAHUE:

Q T.C.xx, do you know what that is a picture of?

A A house.

Q Do you know whose house it is?

A That's Michael's house.

Q How do you know that that is Michael's house?

A Because I used to live there.

Q About how long ago did you live there?

A Two years ago.

MS. DONAHUE: Can I have Government's Exhibit 1397 placed in front of the witness. And it's not in evidence.

BY MS. DONAHUE:

Q T.C.xx, what is that a picture of?

A That's my picture.

Q Is that you?

A Yes.

Q Who took that picture?

A Michael.

MS. DONAHUE: Move Government's Exhibit 1397 into evidence.

THE COURT: Any objection?

MR. BROWN: No objection.

THE COURT: All right. That will come in.

*(Exhibit 1397 received in evidence.)*

BY MS. DONAHUE:

Q T.C.xx, where was that picture taken?

A At his house.

Q And when you say "his," do you mean Michael's?

A Yes.

Q Was that upstairs on the balcony?

A Yes.

Q Can you take a look at another picture for me, Exhibit 1398.

(Government's Exhibit Number 1398 marked for identification.)

BY MS. DONAHUE:

Q What is that a picture of?

A That's my picture.

MS. DONAHUE: Move 1398 into evidence.

THE COURT: Objection?

MR. BROWN: No objection, Your Honor.

THE COURT: That will come in.

Thank you.

*(Exhibit 1398 received in evidence.)*

BY MS. DONAHUE:

Q Who took that picture?

A Michael.

Q T.C.xx, are you smiling in that picture?

A Yes.

Q Why are you smiling?

A Michael told me to.

Q Did you speak English?

A No.

Q Did Michael speak Khmer when he told you to smile?

A No.

Q So how did he tell you to smile in the picture?

A I looked at him and he just told me to smile. He showed me on his face.

Q Did you want to smile?

MR. BROWN: Objection, Your Honor. 403.

THE COURT: Overruled.

BY MS. DONAHUE:

Q Did you want to smile?

A No.

Q Why not?

A I was not happy.

Q Why not?

A I was afraid.

Q What were you afraid of?

A I was afraid that he might hurt me.

Q When you say "he," who do you mean?

A Michael.

Q Why were you afraid that Michael might hurt you?

A Because I have seen him hurt other children.
Q Now, T.C.xx, in this picture you are holding something; is that right?
A Yes.
Q What are you holding?
A Rose.
Q Where did you get the rose?
A Michael gave it to me.
Q And was this a special occasion?
A Yes.
Q What was it?
A It was on a Valentine's Day.
Q Had you ever received a rose on Valentine's Day before?
MR. BROWN: Objection 403.
THE COURT: Overruled.
BY MS. DONAHUE:
Q Had you ever received a rose on Valentine's Day before?
A No.
Q Now T.C.xx, did you give anything to Michael for Valentine's Day?
A Yes.
Q What did you give him?
A Rose.
Q Did you buy the rose?
A Yes.

Q Where did you get the money to buy the rose for Michael?

A Michael gave it to me.

Q Why did you give him a rose for Valentine's Day?

A I was afraid he might be upset.

Q Why were you afraid he might be upset?

A He was sitting alone, quiet.

Q Why did that make you think he might be upset?

A Because he bought it for me and I didn't buy that for him.

MS. DONAHUE: Can I have Government's Exhibit 1402.

BY MS. DONAHUE:

Q T.C.xx, do you know what that is a picture of?

A My picture and other children.

Q Who took that picture?

A Michael.

MS. DONAHUE: Move 1402 into evidence.

MR. BROWN: No objection, Your Honor.

THE COURT: Admitted.

*(Exhibit 1402 received in evidence.)*

BY MS. DONAHUE:

Q T.C.xx, starting with you the girl who is standing in the back, can you tell us who these girls are.

A S.S.xx, L.K.xx, S.R.x, Nok, and myself.

Q Where did Michael take this picture?

A Upstairs on a balcony.

Q Is that upstairs on the balcony at his house?

A Yes.

Q Was this picture also taken on Valentine's Day?

A Yes.

Q T.C.xx, did you ever see any rooms in Michael's house besides the balcony?

A His bedroom.

Q Did you see the inside of Michael's bedroom?

A Yes.

MS. DONAHUE: Ask if Government's Exhibit 1096 could be placed in front of the witness.

BY MS. DONAHUE:

Q Have you ever seen that bed before, T.C.xx?

A Yes.

Q Did you see that when you were at Michael's house?

A Yes.

Q Did something happen to you in the bedroom that's in that picture?

A He hurt me.

Q Did he hurt you more than once?

A Yes.

Q Let's talk about the first time.

When you say "he," do you mean Michael?

A Yes.
Q Do you remember what happened the first time that Michael hurt you?
A Yes.
Q What happened?
A He put a pill in the soft drinks. He took off my clothes.
Q Did you drink the soft drink after he put the pill into it?
A Yes.
Q How did that make you feel?
A I was tired.
Q When Michael took off your clothes what was he wearing?
A He didn't wear anything.
Q What happened after Michael took off your clothes?
A He tied my arms, my legs.
Q Can you remember what he did to tie your arms?
A A rope.
Q What color was the rope?
A White.
Q Can you show how he tied your arms with the white rope.
A Show?
Q Yes.
Can you show with your arms.
A He tied my wrists this way, separately.

THE COURT: She's holding her wrists out away from the side of her body.

BY MS. DONAHUE:

Q What did he attach the other end of the rope to?

A To the bed -- attached, tied to the bed.

Q Did he also tie your legs?

A Yes.

Q What did he use to tie your legs?

A The same color white rope.

Q What did he -- did he tie your legs to something?

A The bed.

Q Do you remember what happened after Michael tied your arms and legs to the bed?

A And then he raped me.

Q Were you tired?

A Yes.

Q Did you feel him rape you?

A Yes.

Q When you say he raped you, can you say what he did.

A He inserted his penis in my vagina.

Q What happened after that?

A Later he untied me.

Q Did you feel groggy or tired?

A Yes.

Q Do you know whether or not you fell asleep?

A No.

Q You did not fall asleep?

A No.

Q How did you feel?

A Despair.

Q Did you feel any pain?

A Yes.

Q Where?

A In my private.

Q In your private part?

A Yes.

Q And Michael untied you; is that right?

A Yes.

Q Did you say anything to him?

A No.

Q Did you make any noise?

A No.

Q How come?

A I screamed, but no one would help me.

Q When did you scream?

A During the time when he was raping me.

Q Did you bleed at all?

A Yes.

Q Where were you bleeding?

A My private.

Q Was this the only time that Michael put his penis into your vagina?
A No. More times. Four times.
Q Do you remember the second time?
A It was the same thing, like the first time, but he did not tie my arms or my legs.
Q So he tied your arms and legs the first time?
A Yes.
Q And not again; is that right?
A Yes.
Q The first time did you see Michael take any medicine before he put his penis into your vagina?
A Yes.
Q Can you describe what you saw him take?
A Yes.
Q What was it?
A The color was green, long.
Q The color of the pill?
A Yes.
Q The second time, did that also happen on the bed that's in the picture?
A Yes.
Q And can you say what happened the second time.
A The second time would be like the first time, but he did not tie my arms or my legs.

Q The second time did you scream?
A No.
Q How come?
A I did not scream, but I was crying.
Q Why were you crying?
A It was painful.
Q What was painful?
A My private was painful.
Q Did Michael ever hit you?
A Yes.
Q What did he hit you with?
A His hand.
Q Was his hand open or closed when he hit you?
A Open.
Q Where did he hit you?
A My back.
Q What were you doing when Michael hit you on the back?
A I wouldn't sleep with him.
Q When you say, "I wouldn't sleep with him," what do you mean?
A I meant that I wouldn't let him insert his penis in my vagina.
Q How did you tell him that you did not want him to do that?
A "No."

Q Did you show him that you did not want him?
A No.
Q What was going on when Michael hit you?
A Hit me?
Q Yes.
What was going on?
A Because I wouldn't sleep with him.
Q The second time you said he did not tie you up and he did not give you any medicine; is that right?
A Yes.
Q And it happened two more times after that; is that right?
A Yes.
Q And were both of those times on the bed that is in the picture?
A Yes.
Q Was anybody else in the room during any of those four times?
A When I was with him, no.
Q So the first time it happened was anybody in the room besides you and Michael?
A No.
Q How about the second time?
A No.
Q How about the third time?

A No.

Q How about the fourth time?

A No.

Q Besides putting his penis into your vagina, did Michael have you put his penis anyplace else?

A He asked me to suck on his penis.

Q Did you suck on his penis?

A Yes.

Q How did he ask you to suck on his penis?

A He took his pants off and he pointed to his bottom.

Q Did you do anything else?

A No.

Q Was this in his house?

A Yes.

Q What room was that in?

A In the same room.

(Witness crying.)

THE COURT: Paul, can we get some water.

T.C.xx, can you continue?

THE WITNESS: Yes, I can.

THE COURT: Thank you.

Ms. Donahue.

MS. DONAHUE: Thank you, Your Honor.

BY MS. DONAHUE:

Q Was anyone else there when you sucked on Michael's

penis?

A Yes.

Q Who else was there?

A L.K.xx, S.R.x, S.S.xx, and sister-in-law.

Q What were L.K.xx S.R.x, S.S.xx, and Nok doing when you were sucking on Michael's penis?

A They would do the same that I was doing.

Q Did all of those other girls suck on his penis too?

A Yes.

Q Did that happen more than one time?

A More than once.

Q When you sucked on Michael's penis did anything come out?

A Yes.

Q What came out?

A His sperm.

Q What did you do?

A I stopped.

Q Did you taste it?

A No.

Q What did you do with it?

A I spit it out.

Q T.C.xx, did Michael ever give you any money?

A Yes.

Q When did he give you money?

A After he raped me.

Q Did he give you money every time after he raped you?

A Yes.

Q How much money did he give you each time after he raped you?

A One dollar.

Q Did you get money from Michael at any other time?

A Yes.

Q When?

A When he told me to go buy clothes.

Q How much money did Michael give you to buy clothes?

A Five dollars.

Q What did you do with the $5?

A I would buy clothes and some bakery.

Q After you sucked on Michael's penis did he give you any money?

A Yes.

Q Did he give you money every time you did it?

A Yes.

Q How much did he give you?

A One dollar.

Q T.C.xx, do you remember about how long you were at Michael's house?

A About two to three weeks.

Q How did you get to Michael's house?

A Song.
Q Did Song bring you to Michael's house?
A Yes.
Q Who is Song?
A I know her through Michael.
Q And did Song bring you from your house to Michael's house?
A Yes.
Q When Song brought you to Michael's house, what did you think you were going to do at Michael's house?
A That I would be able to go to school.
Q When you lived at your house before you were at Michael's did you go to school?
A Sometimes.
Q How come only sometimes?
A Some days I have money and some other days I did not have money.
Q Does it cost money to go to school in Cambodia?
A Yes.
Q I'm going so show you a picture, Government's Exhibit 2067.
Do you know who the lady in that picture is?
A That's Song.
MS. DONAHUE: Move 2067 into evidence.
THE COURT: Any objection?

MR. BROWN: No objection, Your Honor.

THE COURT: Admitted.

*(Exhibit 2067 received in evidence.)*

BY MS. DONAHUE:

Q T.C.xx, how did you leave Michael's house when you left and went away?

A She took me away.

Q When you say "she," do you mean Song?

A Yes.

Q Did you ask her to take you away?

A No.

Q Do you know why she took you away?

A She said that other places would be better than that house; that they -- they won't -- they're probably not going to hurt you.

Q Did you ever run away from Michael's house?

A No.

Q How come?

A I was afraid that he might hit me.

Q T.C.xx, can you stand up and look around the courtroom and tell me if you see Michael in the courtroom.

You can have a seat.

MS. DONAHUE: May the record reflect she's identified the defendant.

THE COURT: I don't know who she identified.

MS. DONAHUE: Would you like for her -- okay.

BY MS. DONAHUE:

Q T.C.xx, can I have you stand up one more time. Can you point one more time.

THE COURT: T.C.xx, you can sit down.

T.C.xx, you pointed at someone. Would you describe the man you pointed at or tell me where he's sitting.

THE WITNESS: Sitting right over there.

THE COURT: Are you pointing to one of the tables over there?

THE WITNESS: That table.

THE COURT: There are three people sitting at that table. Is it the man closest to you, the man in the middle, or the man farthest away?

THE WITNESS: The first one.

THE COURT: Indicating the defendant.

MS. DONAHUE: Thank you, Your Honor.

BY MS. DONAHUE:

Q T.C.xx, when you were at Michael's house did any visitors ever come over?

A No.

Q Did you ever see any visitors?

A No.

Q Were you ever upstairs when any visitors came over?

A Can you ask the question again?
Q Sure.
At the house were you ever upstairs when you heard people downstairs at the front door?
A Yes.
Q And what would happen when people would come to the front door?
A He would tell me to go and hide.
Q Who would tell you to go and hide?
A Michael.
Q What would you do?
A I would do as he said. I would hide.
Q Where did you hide?
A In a closet.
Q How would you know when to come out?
A He called me out.
Q And when you came out were there any visitors in the house?
A No.
Q T.C.xx, at Michael's house did any man besides Michael put his penis inside of your vagina?
A No.
Q At Michael's house did any man besides Michael have you suck on his penis?
A No.

Q At Michael's house did any man besides Michael hurt you?
A No.
MS. DONAHUE: I have no further questions.
THE COURT: Thank you.
Cross-examination.

**CROSS-EXAMINATION**

BY MR. BROWN:
Q Good afternoon, T.C.xx.
A Good afternoon.
Q My name is Charles Brown, and I'm Michael Pepe's attorney. I have to ask you a few questions.
Is that okay?
A Yes.
Q Thank you.
You're 15 years old?
A Yes.
Q And you were born in Phnom Penh?
A Yes.
Q And how many brothers and sisters do you have?
A Three brothers, four sisters.
Q And you were raised by your mom and your dad?
A Yes.
Q Do you speak Vietnamese?
A Yes.

Q You also speak Khmer?
A Yes.
Q Are you more comfortable speaking Vietnamese or more comfortable speaking Khmer?
A Cambodian.
Q Where are you living now, T.C.xx?
A At this moment?
Q Yes.
A I'm in the courtroom.
Q Okay.
(LAUGHTER)
BY MR. BROWN:
Q You don't stay with your parents, though; right?
A Correct.
Q You live at a place called Agape?
A Correct.
Q How long have you lived at Agape?
A Two years.
Q And Agape has a house in the city of Phnom Penh?
A Yes.
Q In the two years that you have lived at Agape have you had a chance to visit your family?
A Yes.
Q How often do you see your family?
A Often.

Q How often is often?

A Once a month.

Q And do you see your mother and your father and your brothers and sisters?

A Yes.

Q One time per month?

A Yes.

Q Do you like living at Agape?

A Yes.

Q What is it like there? What do you like about it?

A I like to study.

Q They have a school there?

A Yes.

Q How often do you go to school? Every day?

A Through Friday.

Q Do you have a lot of friends at Agape?

A Yes.

Q Who are some of your friends?

A I don't remember a whole lot.

Q Does L.K.xx live at Agape with you?

A Yes.

Q Does S.S.xx?

A Yes.

Q Does S.R.x live at Agape with you?

A Yes.

Q Does NTDx live at Agape with you? The girl named NTDx, does she live at Agape with you?
A No.
Q Do you play with L.K.xx and S.R.x and S.S.xx at Agape?
A Yes.
Q Do you talk to them a lot?
A Yes.
Q Do you guys go to counseling together also at Agape?
A Yes.
Q So you all meet together as a group sometimes?
A No.
Q Do you remember speaking with a person named Gary Phillips two years ago and they videotaped you when you were interviewed? Do you remember that?
A In a disc?
Q Yes.
A Yes.
Q In a disc.
Have you seen a copy of the disc -- of the interview?
A At the time of the interview I did not realize there was a video.
Q Did you ever see the video later on?
A Yes.
Q Who showed you the video later on?

A Patty.
Q Is that when you met with her earlier this year?
A Yes.
Q Did you see the entire video?
A Yes.
Q All five parts of the video?
A Yes.
Q How many times did you meet with Patty?
A I don't really remember.
Q Was it more than one time?
A Yes.
Q How many times did you meet with Gary, T.C.xx, if you remember?
A Once.
Q When they made the video you spoke in Vietnamese.
Do you remember that?
A Yes.
Q Why did you speak in Vietnamese when the video was made, do you know?
A Because the lady told me to speak Vietnamese.
Q And the lady is the lady who works for World Hope International? The Center?
A Yes.
Q And she was your counselor at the time; right?
A No.

Q Did you know her from before?

A No.

Q You had never seen her before?

A You mean inside the organization or outside?

Q Either/or.

A I saw her in a center.

Q What center was that?

A World Hope.

Q Before you went to the Agape center you were at the World Hope Center?

A Yes.

Q And you saw that lady at the World Hope Center?

A Yes.

Q How long were you at the World Hope Center?

A About two and a half months.

Q It seems like your Khmer is very good, T.C.xx.

A Thank you.

Q You didn't really need a Vietnamese interpreter the first time, did you?

A No.

Q The lady -- well, there was a person who spoke Khmer at the interview; right?

A Yes.

Q Did you think it was kind of funny that the lady was interpreting what you were saying from Vietnamese to Khmer

and then the person was translating it from Khmer to English? Did you think that was kind of funny?

A No.

Q The lady who spoke Vietnamese, she used a lot of bad words, didn't she?

A No.

Q You said that Basang took you to Michael's house?

A Yes.

Q How did you meet Basang?

A I was playing, and she just came and asked me.

Q She spoke to your mother; right?

A No.

Q Basang never spoke with your mother?

A No.

Q Okay. Do you remember when you spoke with Gary that you told him that Basang spoke with your mother first?

A I don't remember.

Q Okay. Would it help you if I played a part of the video?

A I don't want to see.

Q T.C.xx, it's important that everything you say today is accurate. Okay? And I want to play the video to make sure you're remembering everything correctly.

A Yes.

Q Is that okay with you? Please?

A Go ahead.

MR. BROWN: Your Honor, may I please play a portion.

MS. DONAHUE: We identified for the record what portion of the record he's going to play.

MR. BROWN: The portion from Volume II of the August 2006 T.C.xx interview.

MS. DONAHUE: What page?

MR. BROWN: I'm starting on counter -- it's Page 6. And the counter on the video is 1140.

MS. DONAHUE: Your Honor, the Government is willing to stipulate, but he wants to play it anyway.

THE COURT: That's not how you refresh recollection. Well, as long as the Government is willing to stipulate, you want to state the stipulation?

MR. BROWN: Your Honor, I guess for the record, the Government and the defense stipulate that when T.C.xx was interviewed in 2006 she told Agent Phillips that Basang spoke to her Mom; that Basang spoke to her Mother about selling her virginity.

Her Mom chastised her for making such a suggestion. Then Basang left. And then she came -- Basang came to the house again when Mom was not home, and she asked me to go with, and she left with Basang at that time.

THE COURT: Thank you.

Accept the stipulation?

MR. BROWN: Yes.

THE COURT: All right. Ladies and gentlemen, you are to accept that as true.

You may proceed, Mr. Brown.

BY MR. BROWN:

Q T.C.xx, you said that you were at Michael's house for about two to three weeks.

A Yes.

Q And isn't it true that -- well, strike that.

When you left -- when Patty was questioning you, T.C.xx, right now, you said that Basang took you -- I'm sorry. Basang took you from Michael's house.

THE INTERPRETER: Can you repeat that, please?

MR. BROWN: Yes. I'm sorry.

BY MR. BROWN:

Q Earlier T.C.xx said that Basang picked her up from the house.

A I did not say she.

Q Okay. Who picked you up from the house -- from Michael's house?

A She did not kicked me out. She took me.

Q I said picked her up from the house. I'm sorry. I didn't say "kicked."

MS. DONAHUE: Objection. That's vague.

MR. BROWN: I will rephrase, Your Honor.

THE COURT: Thank you.

BY MR. BROWN:

Q When you left the house, T.C.xx, did Basang -- did you leave with Basang or did you leave with your mother?

MS. DONAHUE: Objection. Vague. Left which house?

THE COURT: Sustained.

BY MR. BROWN:

Q When you left Michael's house who did you leave with?

A Song.

Q T.C.xx, when you spoke with Gary Phillips, that's not what you told him; right?

A Not true.

Q You didn't tell Gary that your Mother came to pick you up from the house?

A Excuse me?

Q You didn't tell Gary that your Mother came to pick you up from Michael's house, T.C.xx?

A Not true.

MR. BROWN: Your Honor, if I could just play the portion of the video from October -- from August 6th.

THE COURT: Indicate the portion for the government.

MR. BROWN: Yes, Your Honor.

I would be playing Volume V. If we could go to Counter 2425.

THE COURT: Ms. Donahue.

MS. DONAHUE: All right. You may.

MR. BROWN: Thank you.

Your Honor, if we can play that portion for the witness.

THE COURT: Yes.

(Video played but not reported per stipulation.)

BY MR. BROWN:

Q T.C.xx, were you able to hear that portion of the video? I know the volume was low.

A I can hear some.

Q Would you like me to play it again?

A No.

Q So do you remember now telling Agent Phillips that your Mother came to pick you up?

A I think I remember, but at the time I don't really remember what was going on.

Q You didn't remember what was going on two years ago?

A Yes.

Q You remember better now?

A About what happened?

Q About who picked you up.

A Song.

Q Okay. After you left -- strike that.

Do you remember Gary asking you about a -- do you remember the agent asking you about a person name Babo, T.C.xx?

A Babo?

Q Do you remember talking about a person named Babo?

A No.

MR. BROWN: Your Honor, I have no further questions at this time.

THE COURT: Redirect.

MS. DONAHUE: No questions, Your Honor.

THE COURT: Thank you very much, T.C.xx. You're finished.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. You're ordered to return tomorrow at 8:00 a.m., and you're ordered to have a good evening.

THE CLERK: All rise.

(JURY EXCUSED)

THE COURT: Is there anything we need to discuss before tomorrow morning?

MS. DONAHUE: No, Your Honor.

THE COURT: What witnesses does the government intend to call tomorrow?

MS. DONAHUE: L.K.xx, I.T., NTDx. They are all

children.

THE COURT: They're going to take the whole day?

MS. DONAHUE: Well, I had thought so. But if not, we'll -- it -- we'll keep going, and it will be S.R.x probably, then Thomas -- well --

THE COURT: I assume they must be substantially longer than this witness because she took barely an hour.

MS. DONAHUE: I think two of them will probably be longer than this witness. And the other will probably be about the same length.

THE COURT: Okay. Make sure you identify for the defense any exhibits you intend to use tomorrow.

MS. DONAHUE: I will do that right now, Your Honor.

THE COURT: All right. You're ordered to return at 7:45.

MS. DONAHUE: Thank you.

MR. GUNN: Your Honor, one request. I think there's a way to hook up the computers to the sound system. I wonder if we can have the IT person here at 7:45.

THE COURT: I doubt the IT person is going to be here at 7:45. You might be able to get him here this afternoon.

MR. GUNN: We could try to meet the person here this afternoon.

THE COURT: I don't know either. I'm not in charge of that. You can discuss it with Mr. Pierson.

MR. GUNN: All right.

THE CLERK: All rise. This court stands in recess.

*(PROCEEDINGS WERE ADJOURNED)*

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: June 6, 2008

/S/ Lynne Smith
LYNNE SMITH
OFFICIAL COURT REPORTER

**Certificate of Service**

I hereby certify that on May 28, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *James H. Locklin*

By: JAMES H. LOCKLIN
Deputy Federal Public Defender

No. 14-50095

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

MICHAEL JOSEPH PEPE,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
The Honorable Dale S. Fischer, Presiding
No. CR-07-00168-DSF

## Appellant's Excerpts of Record
**[Volume 5 of 12]**

HILARY L. POTASHNER
Acting Federal Public Defender
JAMES H. LOCKLIN
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012
213-894-2929

*Counsel for Defendant-Appellant*

## Table of Contents

### Volume 1

Order Denying Defendant's Motion to Dismiss Indictment....................................1
[Filed December 3, 2007; Docket No. 57]

Order Denying Defendant's Motions to Suppress Evidence ....................................9
[Filed December 5, 2007; Docket No. 60]

Order Denying Defendant's Motion to Suppress Evidence ....................................20
[Filed February 7, 2008; Docket No. 129]

Transcript – Sentencing (Excerpts)...........................................................26
[Dated February 28, 2014; Filed April 17, 2014; Docket Nos. 491, 512]

### Volume 2

Defendant's Motion to Suppress Evidence* ..................................................42
[Filed June 26, 2007; Docket No. 21]

Defendant's Motion to Suppress Evidence (Excerpts).........................................120
[Filed August 1, 2007; Docket No. 33]

Government's Consolidated Opposition to Motions to Suppress Evidence* ........130
[Filed August 22, 2007; Docket No. 39]

Defendant's Reply re Motions to Suppress Evidence ..........................................208
[Filed September 4, 2007; Docket No. 40]

Defendant's Motion to Dismiss Indictment.......................................................220
[Filed October 4, 2007; Docket No. 43]

Transcript – Motion Hearing .........................................................................244
[Dated October 29, 2007; Filed February 26, 2008; Docket Nos. 50, 133]

* Documents marked with an asterisk have been redacted pursuant to Federal Rule of Appellate Procedure 25(a)(5) and Federal Rule of Criminal Procedure 49.1(a).

Government's Declaration re Motions to Suppress Evidence ............................... 295
[Filed November 27, 2007; Docket No. 53]

Transcript – Motion Hearing (Excerpts)* ........................................................ 299
[Dated December 3, 2007; Filed February 26, 2008; Docket Nos. 58, 134]

Volume 3

Defendant's Supplemental Memorandum re Motion to Suppress Evidence......... 340
[Filed December 20, 2007; Docket No. 71]

Government's Supplemental Memorandum re Motion to Suppress Evidence ..... 350
[Filed December 20, 2007; Docket No. 72]

First Superseding Indictment ........................................................................ 372
[Filed December 20, 2007; Docket No. 83]

Government's Supplemental Declaration re Motion to Suppress Evidence (Excerpts) ................................................................................................ 374
[Filed February 5, 2008; Docket No. 127]

Transcript – Motion Hearing (Excerpts)* ........................................................ 380
[Dated February 6, 2008; Filed February 26, 2008; Docket Nos. 136]

Transcript – Trial – Day 2 (Excerpts) .............................................................. 460
[Dated May 9, 2008; Filed May 18, 2010; Docket Nos. 259, 410]

Volume 4

Transcript – Trial – Day 3 (am) (Excerpts) ...................................................... 635
[Dated May 13, 2008; Filed May 18, 2010; Docket Nos. 260, 411]

Transcript – Trial – Day 3 (pm) ......................................................................... 766
[Dated May 13, 2008; Filed June 17, 2014; Docket Nos. 260, 532]

Volume 5

Transcript – Trial – Day 4 (Excerpts) .............................................................. 805
[Dated May 14, 2008; Filed May 18, 2010; Docket Nos. 261, 412]

Transcript – Trial – Day 5 (Excerpts).....942
[Dated May 15, 2008; Filed May 18, 2010; Docket Nos. 262, 413]

Volume 6

Transcript – Trial – Day 6 (Excerpts).....1022
[Dated May 16, 2008; Filed May 18, 2010; Docket Nos. 263, 414]

Volume 7

Transcript – Trial – Day 7 (Excerpts)* .....1192
[Dated May 20, 2008; Filed May 18, 2010; Docket Nos. 264, 415]

Transcript – Trial – Day 8 (Excerpts).....1343
[Dated May 21, 2008; Filed May 18, 2010; Docket Nos. 269, 416]

Volume 8

Transcript – Trial – Day 9 (Excerpts).....1423
[Dated May 22, 2008; Filed May 18, 2010; Docket Nos. 270, 417]

Volume 9

Transcript – Trial – Day 10 (Excerpts).....1538
[Dated May 23, 2008; Filed May 18, 2010; Docket Nos. 293, 418]

Transcript – Trial – Day 11 (Excerpts).....1739
[Dated May 27, 2008; Filed June 2, 2010; Docket Nos. 294, 435]

Volume 10

Transcript – Trial – Day 12 (Excerpts).....1805
[Dated May 28, 2008; Filed May 18, 2010; Docket Nos. 295, 419]

Transcript – Trial – Day 13 (Excerpts).....1930
[Dated May 29, 2008; Filed May 18, 2010; Docket Nos. 296, 420]

Stipulation to Correct/Modify Record re Jury Instructions (Excerpts)[†] .............1941
[Filed February 27, 2015; Docket No. 543]

Order Correcting/Modifying Record re Jury Instructions ..................................1961
[Filed March 2, 2015; Docket No. 545]

Order Correcting/Modifying Record re Video Testimony .................................1963
[Filed March 2, 2015; Docket No. 546]

Government's Sentencing Memorandum (Excerpts) ........................................1965
[Filed September 17, 2008; Docket No. 318]

Transcript – Victim Statements ........................................................................1977
[Dated September 25, 2008; Filed June 18, 2014; Docket Nos. 333, 533]

Defendant's Supplemental Filing re Restitution................................................1998
[Filed March 25, 2009; Docket No. 348]

Judgment ..........................................................................................................2006
[Filed February 28, 2014; Docket No. 492]

Notice of Appeal ...............................................................................................2012
[Filed March 3, 2014; Docket No. 493]

Docket ..............................................................................................................2013

Volume 11 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 1)..................2053
[Filed March 3, 2015; Docket No. 547]

Volume 12 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 2)..................2309
[Filed March 3, 2015; Docket No. 547]

[†] Although this document and the two orders that follow were not filed until after the judgment and notice of appeal were filed, they are placed here in the excerpts because they relate to the trial proceedings.

Exhibit No. 101 ........................................................................................2399

Exhibit No. 102 ........................................................................................2401

Exhibit No. 103 ........................................................................................2403

Exhibit No. 104 ........................................................................................2405

Exhibit No. 106 ........................................................................................2408

Exhibit No. 107 ........................................................................................2410

Exhibit No. 108 ........................................................................................2412

Exhibit No. 109 ........................................................................................2414

Exhibit No. 110 ........................................................................................2416

Exhibit No. 111 ........................................................................................2418

Exhibit No. 114 ........................................................................................2420

Exhibit No. 123 ........................................................................................2423

Exhibit No. 2007 ......................................................................................2428

Exhibit No. 2009 ......................................................................................2454

Exhibit No. 2010 ......................................................................................2456

Exhibit No. 2011 ......................................................................................2458

Exhibit No. 2093 ......................................................................................2460

Exhibit No. 2096 ......................................................................................2462

Exhibit No. 2200A ...................................................................................2464

Exhibit No. 2201A ...................................................................................2467

Exhibit No. 2202A ....................2477

Verdict ....................2480
[Filed May 29, 2008; Docket No. 299]

Presentence Report ....................2488
[Dated July 30, 2008; Filed March 25, 2009; Docket No. 346]

Probation Office Letter to District Court ....................2517
[Dated September 3, 2008]

Government's Submission of Victim Impact and Restitution Information .........2523
[Filed September 19, 2008; Docket No. 329]

Supplement to Presentence Report ....................2559
[Filed March 25, 2009; Docket No. 347]

Government's Response to Defendant's Filing re Restitution ....................2562
[Filed April 21, 2009; Docket No. 355]

Government's Supplemental Submission re Restitution ....................2583
[Filed February 28, 2014; Docket No. 490]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

United States of America, )
Plaintiff, )
)
vs. ) Case No.
) CR 07-168(A)-DSF
Michael Joseph Pepe, )
Defendant. )
________________________________ )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

Day 4

Los Angeles, California

Wednesday, May 14, 2008

Pamela A. Seijas, CSR, FCRR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California 90012
(213) 687-0446

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
BY: PATRICIA DONAHUE
ASSISTANT UNITED STATES ATTORNEY
JOHN LULEJIAN
ASSISTANT UNITED STATES ATTORNEY
312 N. SPRING STREET
LOS ANGELES, CA 90012

FOR DEFENDANT: OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY: CARL GUNN
DEPUTY FEDERAL PUBLIC DEFENDER
CHARLES BROWN
DEPUTY FEDERAL PUBLIC DEFENDER
321 EAST SECOND STREET
LOS ANGELES, CA 90012

ALSO PRESENT: ATTACHE GARY PHILLIPS
ICE SPECIAL AGENT EDDY WANG

VIETNAMESE INTERPRETER: ANN SPIRATOS
KHMER INTERPRETER: MORYVANN PAIGNE

witnesses in the restroom just as we're leaving because the jurors are going to stop there before they leave the building and head home.

MS. DONAHUE: Thank you, Your Honor. I will be sure and let people know.

THE COURT: Is there anything else we need to discuss before the jury hopefully comes in on time?

MS. DONAHUE: No, Your Honor.

THE COURT: Mr. Gunn?

MR. GUNN: No.

(Recess taken)

(Jury In)

THE COURT: Good morning. Everyone is present. Ms. Donahue, does the Government with another witness?

MS. DONAHUE: Yes, Your Honor. The Government calls L.K.xxx.

THE COURT: Our interpreter is still under oath.

L.K.xxx, Government's witness, was sworn

THE CLERK: Would you please have a seat. Please spell your first name for the record.

THE WITNESS: My name is L.K.xxx.

THE COURT: Interpreter spelling, please.

THE INTERPRETER: L-K-x-x-x-x-x.

MR. GUNN: Your Honor, before we start, I have one issue about one matter. It might be better to address at

sidebar.

(Sidebar conference commenced)

MR. GUNN: Your Honor, I noticed yesterday --

THE COURT: Then why didn't you bring it up at 7:45? That's why you are here early. Don't do this again, Mr. Gunn.

MR. GUNN: I didn't remember if it would happen again. I am troubled by the case agent who is here to help the Government standing directly up close to the witness as another sort of form of morale support when she already has her attendant.

THE COURT: Your objection is overruled.

(Sidebar conference ended)

DIRECT EXAMINATION

BY MS. DONAHUE:

Q. Thank you, Your Honor.

Good morning, L.K.xxx.

A. Good morning.

Q. Can you tell us how old are you?

A. I am 14 years old.

Q. And is your birthday next month in June?

A. Yes.

Q. What country do you live in?

A. Kampuchea.

Q. Is Kampuchea another name for Cambodia?

A. Yes.

Q. Is your family in Cambodia?

A. Yes.

Q. Can you tell us, do you have any brothers and sisters?

A. I have one younger brother. That's it.

Q. And does your mother live near Phnom Penh?

A. Yes.

Q. Does your mother have a job?

A. Yes.

Q. What does your mother do?

A. She sewed.

Q. How about your stepfather? Does he have a job?

A. I don't know.

Q. I would like you to take a look at a photograph which is Government's Exhibit 1020 for identification.

Do you know what that is a picture of?

A. It's not clear to me.

Q. Have you seen that before?

A. Maybe this is the picture of a house around my house.

Q. Does that look like part of your house in Cambodia?

MR. GUNN: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: I'm not clear.

BY MS. DONAHUE:

Q. That's okay. That's okay.

Now, L.K.xxx, in Cambodia, do you live with your

family?
A. I live in an organization.
Q. And is the organization where you live called Agape?
A. Yes.
Q. At Agape do you go to school?
A. Yes.
Q. What grade are you in?
A. 6th.
Q. What subjects do you study?
A. English, Cambodian, sociology -- sociology and I guess history.
Q. Which one is your favorite?
A. Math.
Q. L.K.xxx, what do you like to do for fun?
A. I like to go to the beach.
Q. Now, L.K.xxx, I'd like you to take a look at another photograph. This is Government's Exhibit 1077.
Do you know what that is a picture of?
A. Yes.
Q. What is that a picture of?
A. Michael's house.
Q. How do you know that that is a picture of Michael's house?
A. I used to live there.
Q. Do you remember about when you used to live there?
A. During the festival of water, Water Festival.

Q. You went to live there during the Water Festival; is that right?
A. At the beginning, yes. It started at the time Water Festival celebration.
Q. Is the Water Festival celebration in Cambodia in November?
A. I -- I don't know. All I know is the Water Festival.
Q. I would like you to take a look at another photograph, Government's Exhibit 1344.
Can you tell us what that is a picture of?
A. That's my picture.
Q. That's you?
A. Yes.
Q. Who took that picture?
A. Michael.
MS. DONAHUE: Move 1344 into evidence.
THE COURT: Any objection?
MR. GUNN: No, Your Honor.
THE COURT: That will come in. Thank you.
(Government's Exhibit 1344 was received)
BY MS. DONAHUE:
Q. Where was that picture taken?
A. In front of his office.
Q. And when you say "his office" who do you mean?
A. Where he usually work at and his computer there.
Q. Was that at his house?

A. Yes.

Q. Do you remember the white stuffed animal that you're holding?

A. Yes. That is a bear.

Q. Did somebody give that to you?

A. Michael gave it to me.

Q. Had you ever had a stuffed animal like that before?

A. No. Never.

Q. I would like you to take a look at another picture, Government's Exhibit 1364.

Do you know what that is a picture of?

A. During -- this is the picture on Christmas.

Q. Is that a picture of you?

A. Yes.

Q. Was that taken at Michael's house?

A. Yes.

MS. DONAHUE: Move 1364 into evidence.

THE COURT: Any objection?

MR. GUNN: No, Your Honor.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1364 was received)

BY MS. DONAHUE:

Q. L.K.xxx, can you tell us who are the people in that photograph?

A. Myself, my mother, and my little brother.

Q. What is your little brother's name?

A. David.

Q. I'd like -- did you celebrate Christmas at Michael's house?

A. Yes.

Q. I would like you to take a look at another exhibit, Government's Exhibit 1372.

What is that a picture of?

A. That's the gift from Michael.

Q. Is that a picture of you?

A. Yes.

MS. DONAHUE: Move 1372 into evidence.

THE COURT: That will come in. Thank you.

MR. GUNN: No objection.

(Government's Exhibit 1372 was received)

THE COURT: I am going to assume they are coming in unless you state otherwise.

MR. GUNN: That's fine, Your Honor. If I just get two seconds to react.

BY MS. DONAHUE:

Q. What is the present from Michael in that picture?

A. Shirt.

Q. Did you receive any other Christmas presents from Michael?

A. Yes.

Q. Do you remember what he gave you?

A. I can remember a little bit but I'm not quite sure.

Q. If you remember any of the things that he gave you, could you tell us?

A. A watch, a ring, a hat, and that's all I remember.

Q. Now, at Christmas, did Michael give gifts to anybody else?

A. Yes.

Q. Who did he give gifts to?

A. S.R.xxx, S.S.xxx, Ngoc.

Q. Did you see any of the presents that he gave it to S.R.xxx, or S.S.xxx or Ngoc?

A. Would -- would be the same like mine.

Q. And L.K.xxx, had you ever celebrated Christmas before the Christmas that's in the picture that is in front of you?

A. No.

Q. Now, had you ever received Christmas gifts from anybody before?

A. No.

Q. I'd like you to take a look at another picture, Government's Exhibit 1390.

Who are the people in this picture?

A. Sang and my mother.

MS. DONAHUE: Move 1390 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1390 was received)

BY MS. DONAHUE:

Q. Can you show us the one that I'm pointing to, what lady is

that?

A. My mother.

Q. That's your mother on the left.

And who is the lady on the right?

A. Sang.

Q. I would like you to take a look at another photograph. This is Government's Exhibit 1353. I'm sorry. 1351. I apologize. I misspoke.

Can you tell us what this is a picture of?

A. That's my birthday picture.

MS. DONAHUE: Move 1351 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1351 was received)

BY MS. DONAHUE:

Q. Was that picture taken at a birthday party?

A. Yes.

Q. Where was the birthday party?

A. Inside Michael's house.

Q. And your birthday is in June; is that right?

A. Yes.

Q. So this was a birthday party in June of 2006; is that right?

A. I'm not sure.

Q. L.K.xxx, can you see what is the name on the birthday cake?

A. Yes.

Q. What does that say?

A. L.K.xxxxx.

Q. When you lived at Michael's house, what names did he call you?

A. At first he called me LKx. And later he called me L.K.xxxxx.

Q. Who bought the birthday cake for you?

A. Michael.

Q. Had you ever had a birthday party before?

A. Never.

Q. I would like you to take a look at Government's Exhibit 1353.

What is that a picture of?

A. That's my picture opening the gift.

Q. Where is that picture taken?

A. In the living room.

Q. In the living room of whose house?

A. Michael's house.

Q. Who is sitting on the couch with you?

A. My mother, S.S.xxx, and myself.

MS. DONAHUE: Move 1353 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1353 was received)

BY MS. DONAHUE:

Q. What are you opening?

A. I'm not clear. I can't really see.
Q. Do you remember what Michael gave you for your birthday?
A. I think it was a bracelet.
Q. Is the lady seated on the couch two people to your right your mother?
A. Yes.
Q. At the time of your birthday party, did your mother live at Michael's house?
A. No. She just came and celebrated my birthday.
Q. Who invited her?
A. Sang.
Q. And how do you know that?
A. I asked permission from Michael, and he told Sang to ask my mom to come.
Q. Now, L.K.xxx, did you live in Michael's house from before Christmas until the police came to Michael's house in June?
A. Yes.
Q. Did you stay there every day, or were there times that you went back home to see your mother?
A. I visited her once.
Q. Do you remember when that was?
A. I don't recall.
Q. How did you come to live at Michael's house?
A. Sang took me there.
Q. When you first got to Michael's house, did your mom and

your little brother David live there, too?

A. Yes.

Q. Did your mom have any jobs at Michael's house?

A. She cleans inside the house.

Q. Where inside the house did your mother clean?

A. The living room, the kitchen, and sometime in front of his office.

Q. Did you ever see your mother clean in Michael's room?

A. No.

Q. Who cleaned in Michael's room?

A. Myself.

Q. Was your mother ever allowed to clean in Michael's room?

MR. GUNN: No foundation of personal knowledge, Your Honor.

THE COURT: Sustained.

BY MS. DONAHUE:

Q. Do you know whether your mother was allowed to clean in Michael's room?

MR. GUNN: No foundation unless the --

THE COURT: Overruled. The answer is either yes or no.

THE WITNESS: No.

BY MS. DONAHUE:

Q. L.K.xxx, did -- do you know whether your mother got paid for cleaning at Michael's house?

A. Yes.
Q. How much did she get paid?
A. I'm not sure. I would -- I think it was $35.
Q. $35 for every month; is that right?
A. I don't know.
Q. L.K.xxx, when your mother lived in Michael's house, where did your mother and your little brother David sleep?
A. Bedroom downstairs.
Q. Where did you sleep?
A. The bedroom upstairs.
Q. I'd like you to take a look at Government's Exhibit 1079.
Do you know what that is a picture of?
A. That would be the bedroom that we all sleep -- slept in.
Q. When you say "we all," who do you mean?
A. S.R.xxx, S.S.xxx and other girls that just came.
Q. When you say "other girls that just came" do you mean girls who came to Michael's house?
A. Yes.
Q. At Michael's house, did you have any jobs?
A. I change his pillowcases, his bed sheets. I made tea and coffee for him. And sometime I would take food for him.
Q. Where would you take the food?
A. After the food was cooked, I would bring the food to the -- the TV -- television area.
Q. Besides doing those jobs, L.K.xxx, did you go to school

when you lived at Michael's house?

A. Yes.

Q. Where did you go to school?

A. There was a school nearby the house.

Q. How did you get to the school?

A. I walked there.

Q. Do you know who paid for you to go to school?

A. Michael.

Q. L.K.xxx, did you have any other jobs in the house?

A. Do you want to ask me about the bad thing that had happened to me?

Q. Did bad things happen to you at Michael's house?

A. Yes.

Q. Let's start with the first time that something bad happened to you at Michael's house.

Do you remember what room it happened in?

A. My bedroom.

Q. What happened the first time something bad happened to you in Michael's house in your bedroom?

A. I usually go clean his room and after Sang gave me the soft drink. After I drank the soft drinks, I came back to my room, I felt a little sleepy.

When I came to my room, I tried to lied on my bed and then I tried to open my eyes, and I saw Michael's naked.

Then he came and he tied me. At the time when he tied

me, I tried to come down -- come off the bed and Sang tried to beg him. I spoke in Cambodian. I said to him that, "Let me clean your house but please don't rape me."

But he -- but he couldn't understand me. But he was talking to Sang and then Sang left the room. And then he continue tie me down. I started screaming and he slapped me. And I scream again and he slapped me.

And then after that, I stop screaming. At the time he was hitting me, I -- I saw someone try to look through the window. That was Sang. After I realize I woke up, I saw blood on the bed. And then there was another girl who took me into the restroom and help me clean up.

And she took me to the watch TV with him.

Q. Were you in pain?

A. Yes.

Q. Where did it hurt?

A. At the private sex part.

Q. Were you bleeding?

A. Yes.

Q. Did you bleed for a couple of days?

A. I don't remember.

Q. Did anyone take you to a doctor?

A. No.

Q. L.K.xxx, what did he use to tie you up?

A. It was soft. Soft strings.

MS. DONAHUE: Could I have Government's Exhibits 1174 and 75, physical exhibits.

Q. Can you just --

A. It is soft silky like this, but I'm not sure about the color.

MS. DONAHUE: Could I have Government's Exhibit 1175.

MR. GUNN: For the record, Your Honor, could they reflect which exhibit that was that they she just testified about?

THE COURT: Was that 1174?

AGENT PHILLIPS: 1174, Your Honor.

THE WITNESS: I don't remember the color, but as far as the material, the texture and everything is the same.

BY MS. DONAHUE:

Q. L.K.xxx, can you explain what he did when he tied you up?

A. At first he came and he took off my clothes. After he took off my clothes, he tied me.

Q. How did he tie you?

A. My legs together and my wrist was tied together. And then he lift up my legs and then he raped me.

Q. L.K.xxx, was that the only time that Michael raped you?

A. No. Many times.

Q. I want you to think for a minute about the second time that he raped you.

Where did that happen?

A. In his bedroom.
Q. That second time, did Michael give you any medicine first?
A. Maybe.
Q. Do you remember?
A. I don't remember.
Q. Now, the second time, did Michael tie you up?
A. No.
Q. What did he do?
A. He put a pillow on my face.
Q. Did he do anything else?
A. There was another girl there, told me to bite on the pillow. And he took his -- both of his hands and hold down both of my wrists, and then he just raped me.
Q. When he took his hands and held down your wrists, did it hurt?
A. Yes. And I didn't have any energy to fight back.
Q. Now, L.K.xxx, do you remember talking to Gary Phillips about this back in June of 2006?
A. Yes.
Q. Do you remember telling him that the second time Michael raped you, he did tie you up?
MR. GUNN: Objection. Hearsay, Your Honor.
THE COURT: Sustained.
BY MS. DONAHUE:
Q. Let me ask a question.

Do you remember now clearly what happened the second time that Michael raped you?

A. Yes.

Q. And can you describe how you felt when he put his hands on your wrists?

A. When he hold down my wrist tightly and he covered my face also at the time, and I felt like he was tying me down.

Q. After that second time, did he rape you again?

A. Yes.

Q. Do you remember what happened the third time?

A. I was -- I'm not clear.

Q. L.K.xxx, do you know how many times Michael put his penis inside your vagina during the time that you lived at his house?

A. I cannot recall how many times, but many times.

Q. Do you remember about how many times a week it would happen?

A. Sometimes every day; sometimes two, three days.

Q. Now, besides putting his penis inside your vagina, did he also have you give him massages?

A. Yes.

Q. What would you do when you gave him a massage?

A. After the massage, sometimes he would ask me to suck on his private part.

Q. Did you do that?

A. Yes.

Q. When you say his private part, do you mean his penis?
A. Yes.
Q. About how many times did he have you suck on his private part?
A. I don't recall.
Q. Was it more times than he put his penis into your vagina?
A. Okay. I think sucking his private sex part was more.
Q. When you would suck on his penis, where were you?
A. I would be on his bed in his bedroom.
Q. And what would you wear?
A. Nothing.
Q. Do you remember whether Michael had any marks or spots anywhere on his body?
A. Yes. There was a growth.
Q. Where?

MR. GUNN: I'm sorry, Your Honor, I did not hear that word. There was a --

THE COURT: Growth.

THE WITNESS: It was near by his private sex part.

BY MS. DONAHUE:

Q. Can you describe what that growth looked like?
A. Small, the color is like skin color.
Q. What shape was it?
A. About this size (indicating). Small.

THE COURT: I can't see how far her fingers are.

MS. DONAHUE: I can't see either.

THE COURT: Does it look like a quarter inch, half an inch?

THE INTERPRETER: Just about, Your Honor, yes.

THE COURT: Just about what?

THE INTERPRETER: A quarter inch.

THE COURT: Thank you.

BY MS. DONAHUE:

Q. L.K.xxx, was anyone else in the bedroom when you would suck on Michael's penis?

A. Yes. Sometime there is; sometime no.

Q. Thinking about sometimes when other people were there, who else was there?

A. S.R.xxx, S.S.xxx, TCx, and there is another girl I cannot recall her name.

Q. When you say TCx, do you mean T.C.xx?

A. Yes.

Q. What were the other girls doing when you all were in the bedroom and you would suck Michael's penis.

A. Sometime other girls would suck on him and I watched and sometimes would be my turn and they watched.

Q. Did you ever see S.R.xxx suck on his penis?

A. Yes.

Q. Did you ever see S.S.xxx suck on his penis?

A. Yes.

Q. Did you ever see T.C.xx suck on his penis?
A. Yes.
Q. What would happen when you sucked on his penis?
A. The sperm came out.
Q. What would you do?
A. We would all ran to the restroom.
Q. What would you do in the restroom?
A. We washed our mouth. Rinse off our mouth.
Q. L.K.xxx, did Michael ever give you any money?
A. Yes.
Q. When did he give you money?
A. Whenever he -- after he raped me and after he asked me to suck him.
Q. Did he give you money every time after he raped you?
A. Yes.
Q. How much money did he give you?
A. $1.
Q. Did he give you money after you sucked on his penis?
A. Yes.
Q. How much would he give you?
A. $1.
Q. In addition to the money after he raped you and the money after you sucked on his penis, did he give you more money?
A. Yes.
Q. What was that money for?

A. He said that that's the money for my salary and also for what he was doing to me.
Q. What did you do with the money?
A. Sometimes I would spend the money for the food at school and to buy clothes. And sometimes I would give it to my little brother.
Q. Now, L.K.xxx, did Michael rape you during the time that your mother was living at Michael's house?
A. No.
Q. Did there come a time when your mother and your younger brother David left Michael's house?
A. Yes.
Q. Why did they leave Michael's house?
A. My brother was crying all the time and he didn't like that. He told her to go.
Q. When you say he didn't like that, who do you mean?
A. Michael.
Q. Did you leave with your mother and your little brother?
A. No.
Q. Why not?
A. I liked the house and I wanted to go to school.
Q. When you lived with your mother, did you go to school?
A. Yes.
Q. Before you came to Michael's house when you were at your mother's house, did you go to school every day?

A. Yes.
Q. Could your mother afford to send you to school?
A. No. You mean at the time when I was living with my mother?
Q. Before you got to Michael's house.
A. No.
Q. Okay. Just so we're clear, I'll ask you the question again. Please tell me if you want me to repeat a question.

I'm talking about the time before you came to live at Michael's house.
A. Yes.
Q. Did your mother have enough money to send you to school?
A. No.
Q. L.K.xxx, do you like school?
A. Yes.
Q. L.K.xxx, did Michael ever say anything to you about getting married to you?
A. Yes.
Q. What did he tell you?
A. He told Sang and Sang told me that --

MR. GUNN: Your Honor, objection. Hearsay.

THE COURT: Sustained.

MR. GUNN: Move to strike the prior answer, lack of personal knowledge and hearsay.

THE COURT: That will be stricken.

MS. DONAHUE: It's offered for effect --

THE COURT: I can't hear you.

MS. DONAHUE: It's offered for effect on the listener, not truth of the matter asserted, Your Honor.

THE COURT: All right. I will allow it.

Ladies and gentlemen, this testimony is offered only for the effect that it has on this witness, not for the truth of the matter and -- in other words, not for what Michael may or may not have said but only for what impact what Sang said had on this witness.

MR. GUNN: Objection for that purpose on relevance ground, Your Honor.

THE COURT: Go ahead.

BY MS. DONAHUE:

Q. L.K.xxx, did Michael ever say anything to you about getting married?

A. Yes.

Q. What did he say?

A. He said he would marry me when I turn 18.

Q. And did you believe him?

A. Some.

Q. Now, L.K.xxx, after your mother left Michael's house, you stayed; is that right?

A. Yes.

Q. Did you ever tell your mother about the bad things that Michael was doing to you?

A. No.

Q. How come?

A. If I were to tell her, she couldn't help me.

Q. What do you mean?

A. I was thinking that Michael was a powerful man, someone important because I saw him taking picture with -- if I were to tell my mom and she didn't believe me -- if she didn't believe me, Sang would take me away and would sell me in other places.

Q. Now, L.K.xxx, going back, when Michael would put his penis inside you, did he ever rub anything on himself?

A. He used like some sort of oil.

Q. What kind of a container was that oil in?

A. Like a tube, plastic tube.

Q. Was it a clear oil or a cream?

A. Clear. Clear.

Q. Did he -- do you remember where he kept that oil?

A. Sometime he kept it in his room, and sometimes someone would take it and put it in the maid's room.

Q. Do you remember where that bottle of oil was located on the day that the police came to Michael's house?

A. I believe it would -- was inside the bedroom of the cook lady.

Q. Can you take a look at a photograph which is Government Exhibit 1138.

What is that a photograph of?

A. That's the -- that's the bottle. That's the bottle.
Q. Is that the bottle of oil that you were just talking about?
A. Yes.
Q. Now, L.K.xxx, after the police came to Michael's house, and after you left Michael's house, did there come a time when you talked in court in Cambodia?
A. After the police took me?
Q. Yes.
A. Yes.
Q. When you were in court in Cambodia, did you ask if Michael could pay money to you?
A. During the Court in Cambodia, I did not say that.
Q. Did the Court if Cambodia, did somebody ask you if you wanted money from Michael?
A. At the Court, no one asked me, but at the police station, someone asked me.
Q. What were you asked?
A. They asked me if I wanted money from Michael. They said that the money would be for what he had done to me and to buy a house to live in.
Q. What did you say?
A. Yes. I said yes.
Q. And did you say how much money you wanted?
A. At first, I don't remember the amount, and later on somebody mention about five something. Five million riel.

Something like that.
Q. Do you remember somebody mentioning $50,000?
A. Yes. I think so. Yes. That's right.
Q. What did you want that money for?
A. For the pain he had caused me and for my mother that he told the police that my mother sold me and -- and they took my mother, put her in prison.
Q. Did you want the money for your mother?
A. I don't know.
Q. Now, L.K.xxx, going back to the time that you were staying at Michael's house, did Michael ever take any photographs of you when you were naked?
A. Yes.
Q. And did he do that more than once?
A. Yes.
Q. Do you remember where you were when he took the pictures?
A. Sometimes in my bedroom. Sometimes in the restroom and sometimes on his bed.
Q. Did you want him to take pictures of you naked?
A. No.
Q. I would ask if Government's Exhibit 1017 could be placed before the witness.
What is that a photograph of?
A. My picture.
Q. Where are you?

A. Right here.

Q. I'm sorry. I asked a bad question. Where are you in that photograph? What room are you?

THE INTERPRETER: I'm sorry, counsel?

BY MS. DONAHUE:

Q. What room are you in in that photograph?

A. That's in Michael's bedroom.

Q. Who took that photograph?

A. Michael.

Q. Who are you with?

A. Ngoc.

MS. DONAHUE: Move 1017 into evidence.

THE COURT: It will be admitted.

(Government's Exhibit 1017 was received)

BY MS. DONAHUE:

Q. L.K.xxx, are you smiling in that picture?

A. Yes.

Q. Were you happy?

A. No. He showed me that -- to smile, to pull my cheek.

Q. Who showed you to pull your cheek to smile?

A. Michael.

MS. DONAHUE: Could Government's Exhibit 1016 be placed before the witness.

Q. L.K.xxx, who is in that picture?

A. Myself.

Q. Are you with another girl?

A. Yes.

Q. What is her name?

A. Ngoc.

Q. Who took that photograph?

A. Michael.

MS. DONAHUE: Move 1016 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1016 was received)

BY MS. DONAHUE:

Q. L.K.xxx, did somebody pose you that way for the camera?

A. Michael helped me.

Q. What did Michael do?

A. He came and instructed me what to do and positioned my legs in certain way.

Q. Did he position your legs that way for the camera?

A. Yes.

Q. L.K.xxx, this picture is taken in Michael's bedroom; is that right?

MR. GUNN: Objection. Leading.

THE COURT: Overruled.

BY MS. DONAHUE:

Q. Did Michael take pictures of you in other rooms in the house?

A. Yes.

Q. Do you remember what other rooms?

A. The restroom and my bedroom.

MS. DONAHUE: I would ask if Government's Exhibit 2086 could be placed before the witness.

Q. L.K.xxx, what are those pictures of?

A. That's my picture.

Q. Who took those pictures?

A. Michael.

MS. DONAHUE: Move 2086 into evidence.

THE COURT: Admitted.

(Government's Exhibit 2086 was received)

BY MS. DONAHUE:

Q. Now, L.K.xxx, I would like you to take a look around the courtroom and tell me if you see Michael in the courtroom.

THE INTERPRETER: Pointing.

THE COURT: Tell me where you are pointing, please, L.K.xxx. Are you pointing to the table over there?

THE WITNESS: The one holding the glasses.

THE COURT: Indicating Mr. Pepe --

THE WITNESS: And he's looking at me. And he's sitting next to the gentleman putting his hand on his mouth.

THE COURT: Thank you. The witness has identified Mr. Pepe.

BY MS. DONAHUE:

Q. L.K.xxx, during the time that you were at Michael's house,

did any man, other than Michael, put his penis inside your vagina?

A. No.

Q. During the time that you were at Michael's house, did any man, other than Michael, have you suck on his penis?

A. No. Just Michael.

Q. During the time that you were at Michael's house, did any man other than Michael hurt you?

A. No. Just Michael alone.

MS. DONAHUE: I have no further questions.

THE COURT: Thank you.

Ladies and gentlemen, we will take our 15 minute break. Don't talk about the case or form or express any opinions about the case until it's finally submitted to you.

(Recess taken)

(Jury In)

THE COURT: All right. Everyone is present. The interpreter is still under oath.

L.K.xxx, remember you swore to tell the truth. You have to keep doing that. Okay.

You may proceed.

CROSS-EXAMINATION

BY MR. GUNN:

Q. L.K.xxx, my name is Carl Gunn, and I'm one of Michael Pepe's attorneys. And I need to ask you some questions.

Michael did send you to school while you were living at his house; correct?

A. Yes.

Q. And he even had one of your teachers come over to give you tutoring in English; right?

A. Yes.

Q. That teacher came over three days a week, didn't he?

A. I don't remember.

Q. He tutored both you and the other girls who were living in the house; correct?

A. The teacher?

Q. Yes.

A. Yes.

Q. And speaking of the other girls in the house, two of them were named S.R.xxx and S.S.xxx; correct?

A. Yes.

Q. And they were sisters; right?

A. I don't know.

Q. Well, their mother came over to visit them at the house; right?

A. Yes.

Q. Her name was Cum Lang; right?

THE INTERPRETER: I am sorry, counsel. Can you say the name again?

MR. GUNN: Yes. I am sorry for the pronunciation. I

can spell it, if you like. Cum Lang.

THE WITNESS: I don't know.

BY MR. GUNN:

Q. But she was the mother of both of them; right?

A. Yes.

Q. So they were sisters.

A. I know they're siblings but I don't know if it's first blood siblings or not. I don't know.

Q. In fact, their mother came over quite often, didn't she?

A. Their mother?

Q. Yes. The mother of S.R.xxx and S.S.xxx.

A. Two, three times.

Q. Well, do you remember when Gary Phillips, the man who is sitting here at the table, interviewed you soon after the police came to the house?

A. Yes.

Q. You told him that S.R.xxx's and S.S.xxx's mother came over quite a lot, didn't you?

A. The mother would just come and pick up her daughters from the gate outside the gate quite often, but not come into the house.

Q. Well, didn't you tell Gary Phillips, quote, I saw her mom come visit very often, unquote? Referring to S.R.xxx and S.S.xxx?

A. I don't remember.

Q. Would it refresh your memory about what you told Gary Phillips if you were able to listen to a part of the interview on videotape? Actually, let me rephrase that question.

Would it help you remember if you were able to listen to part of the videotape of that interview?

A. I don't know. I just remember she came inside the house two, three times, but -- but she usually waited outside the gate and -- and took her kids with her.

Q. That's not quite what I'm asking right now, L.K.xxx. Right now I'm asking about what you told Gary Phillips about that just a few days after the police came.

So let me explain a little more carefully what I'm asking right now and listen to what I'm saying. I will try to be as clear as I can.

I believe you told me you don't remember exactly what you told Gary Phillips about that; right?

A. Yes.

Q. And what I'm asking you is just not what you remember now. I'm asking you if you were able to listen to a videotape of that interview by Gary Phillips whether that would help you remember what you told him about this. If you listened to the actual interview, would that help you remember what you told him?

A. Yes.

MR. GUNN: All right. What I would ask to do, Your Honor, is to play the first tape or first section of the

recording called CD 1 on my materials from minute 18:55 through minute 19:26. Those are minutes and seconds. And I believe the prosecutor had indicated there is a mechanism for the witness to listen alone.

THE COURT: All right. Let's do that.

MR. GUNN: And I can repeat those minute numbers if I need to.

AGENT WANG: Which part, Counsel?

MR. GUNN: Starting at minute 18, seconds 55 and going through minute 19, seconds 26.

AGENT WANG: First CD, which part?

MR. GUNN: There should be CD 1, CD 2, and CD 3, and this would be No. 1.

AGENT WANG: Okay. And then you say 18:55; right?

MR. GUNN: Yes. Through 19:26.

AGENT WANG: 19:26.

MR. GUNN: Could you stop it at 19:26, please.

AGENT WANG: Sure.

(Whereupon, the CD was played for the witness)

MR. GUNN: If the witness could take the headphones off, Your Honor.

Q. L.K.xxx, does that help you remember what you told Gary Phillips just a few days after the police came? L.K.xxx, right now I am just asking "yes" or "no" whether that helps you remember. Does that help you remember what you said to Gary

Phillips about that?

A. I cannot -- no.

Q. Listening to the actual interview does not help you remember what you said?

A. I just heard that I said that she came often.

Q. Does that help you remember that that's what you said to Gary Phillips?

A. Yes.

Q. And you did say that to him; right?

THE INTERPRETER: Sorry, counsel?

BY MR. GUNN:

Q. You did say that to him; right?

A. Yes.

MR. GUNN: Thank you. I would now like -- Your Honor, may I inquire as to whether Government Exhibit 1007 is in evidence already?

Your Honor, could I have Government Exhibit 1007 placed in front of L.K.xxx?

THE COURT: Does the Government have any objection to that exhibit coming it in?

MS. DONAHUE: No, Your Honor.

THE COURT: All right. That will be admitted. You may show it.

(Government's Exhibit 1007 was received)

MR. GUNN: I can just put my copy up rather than

giving it to the witness, Your Honor.

THE COURT: Please.

BY MR. GUNN:

Q. L.K.xxx, would you look at the photograph up on the screen or on your screen.

And that's a photograph that was taken at the house; right?

A. Yes.

Q. And you're in that photograph; correct?

A. Yes.

Q. That's you on the right?

THE COURT: Why don't you point, Mr. Gunn.

BY MR. GUNN:

Q. That's you where my pen is pointing?

A. I'm in the white dress.

Q. Is that S.R.xxx?

A. S.S.xxx.

Q. And that's S.R.xxx?

A. Yes.

Q. And this is the girl that you call Ngoc?

A. Yes.

Q. And did Mr. Pepe or Michael also call her Nap?

THE INTERPRETER: I am sorry. Can you say that name again?

MR. GUNN: Nap. The way I have it spelled is N-A-P.

THE WITNESS: I don't remember.

BY MR. GUNN:

Q. I think you testified also, when the prosecutor asked you questions, that you were 14 years old, about to turn 15?

A. Yes.

Q. You actually don't know exactly how old you are, do you?

A. I do know. I looked in the family book. My grandmother told me I was born in 1993.

MR. GUNN: Move to strike, Your Honor, as hearsay.

THE COURT: Overruled.

BY MR. GUNN:

Q. When you were interviewed by Gary Phillips, you told him you didn't know what year you were born in; right?

A. Yes. But when I came to live in the center, my grandmother --

MR. GUNN: Objection, Your Honor, hearsay, and I believe the witness has answered.

THE COURT: You don't need to translate the rest of the answer.

MR. GUNN: Your Honor, I would like to place an exhibit in front of the witness who -- which has been premarked as 102. If I could approach.

THE COURT: All right.

MR. GUNN: I am sorry. 302.

THE COURT: All right. Does Government have a copy?

MR. GUNN: Yes. And there is an extra copy for the Court. I have shown this previously to the Government, Your Honor, so they know I am going to be showing it to her.

Q. Don't look at that yet, L.K.xxx, for now.

You testified earlier you said that -- well, I guess you said Michael abused you; right?

A. Yes.

Q. And you talked about a mark or something that he had on his thigh?

A. Yes.

Q. That mark was -- you said before it was red; right?

A. Yes. Reddish like the skin. Red.

Q. I need to show you a photograph that may embarrass you and I apologize for that. But I need to ask you a couple of questions about it. All right? I would like you to look at Defense Exhibit 302.

Your Honor, with the Court's permission so the jury --

THE COURT: Paul, turn off the --

MR. GUNN: I can't really cover so -- I'm sorry. The screen.

THE COURT: Now only the jury can . . .

BY MR. GUNN:

Q. That's a photo of part of a man's body; right?

THE INTERPRETER: What's your question, counsel?

BY MR. GUNN:

Q. I'm sorry. L.K.xxx, I am sorry, that is a photo of part of a man's body, right?
A. Yes.
Q. And it shows his inner legs; right? His thighs?
A. Yes.
Q. And on the inside of one of the legs is a red mark; right?
THE COURT: Why did you turn that off, Mr. Lulejian?
MR. LULEJIAN: I am sorry, Your Honor.
THE INTERPRETER: Can you ask the question again, counsel?
MR. GUNN: Yes. If I could, I'll point.
Q. On the inside of his thigh where I'm pointing my pen is a red mark; right?
A. That's not it.
Q. How certain are you that that's not it? Are you positive that's not the man?
A. That's -- that piece of skin is like a growth.
MR. GUNN: Your Honor, I would offer Defense Exhibit 302 into evidence -- I won't offer it at this time, Your Honor. I will offer it later.
THE COURT: All right.
BY MR. GUNN:
Q. You testified earlier that you were given some sort of medicine the first time you were -- you say you were abused by Michael; right?

A. Sang gave me the soft drink.
Q. And you saw some sort of medicine or something put in it?
A. I saw like a powder or something and she put it in there. She said it was white sugar.
Q. So it was a powder, not a pill; is that right?
A. It's like in a package, white package, small.
Q. So it was in a white package?
A. Yeah. I don't exactly recall.
Q. And it was a powder; right?
A. Yes. Something like powder.
Q. In fact, you told Gary Phillips when he interviewed you a few days after the police that it was a package of powder; right?
A. Yes.
Q. And you told him that the powder was sort of white, kind of gray; right?
A. I don't know.
Q. Would it help you remember if you were able to listen to a part of the videotape where you talked to him about that like you did before to my questions?
A. Yes.

MR. GUNN: Your Honor, if I could have played, I guess on the headphones again, it would be the same first session of the interview from minutes -- let's see. It would be 58 -- minute 58, second 14 through minute 59, second 10. And if I

could ask the agent to watch the time carefully and stop it on his own when he gets to 59:10, rather than checking with me.

THE COURT: All right.

MR. GUNN: If the Government wants to look in transcripts, it's on Pages 28 and 29.

(Whereupon, the CD was played for the witness)

THE COURT: You may proceed.

BY MR. GUNN:

Q. Does that help you remember what color you said the powder was?

A. Yes.

Q. And you said it was, quote, white comma -- I'm sorry. Quote, white, kind of gray; right?

A. Yes.

Q. Did the agents ever show you any packages of that color powder that they found in the house for you to identify as this medicine you say you were given?

A. Who? Who would show me?

Q. Did any officer, either Cambodian police officer or American police officer, show you any package of that color powder --

A. No.

Q. Now, there was a massage table in the house; correct?

A. Yes.

MR. GUNN: Your Honor, I would like to put that

Government exhibit in front of the witness, and if the Government could help me identify it, the number, that would speed things up. I apologize. 1154, Your Honor. If I could have -- actually, is that the massage table or just the -- actually it would be 1116, Your Honor. If I could have the witness look at 1116.

THE COURT: We need the screen back on, Paul.

MR. GUNN: I'm sorry, Your Honor. That's -- it would be 1113, Your Honor. 1116 is a close up.

THE COURT: Thank you.

BY MR. GUNN:

Q. L.K.xxx, do you have that photograph in front of you and do you see it on the screen? It's called Defense Exhibit 1113.

A. Yes.

Q. And that's a photograph of a massage table that was in the house; right?

A. Yes.

Q. You and the other girls did at times give Michael massages on this massage table, didn't you?

A. Yes.

Q. But Michael had his clothes on during those massages, didn't he?

A. Sometimes, yes. Sometimes no.

Q. Well, actually, L.K.xxx, isn't it true that he always had his clothes on when you gave him massages?

A. Not true.

Q. Isn't it true that they really weren't sex or sexual massages?

THE INTERPRETER: I am sorry. Can you repeat the question?

BY MR. GUNN:

Q. Isn't it true that they really weren't sex or sexual massages?

A. You mean not sexual?

Q. They were just massaging his muscles with his clothes on, weren't they, on this massage table?

A. Yes.

Q. In fact, on at least one occasion when you and the other girls living in the house were giving Michael a massage, there was another girl at the house named I.T., wasn't there?

A. You mean just massaging?

Q. No. Let me break the question up.

At one time at the house briefly there was another girl named I.T.; right?

A. Yes.

Q. And there was a time when you and the other girls were giving Michael a massage on the massage table and she did not want to help; right?

A. I don't know. I forgot.

Q. Do you remember you and the other girls once telling her

she was dumb for not helping with the massage because Michael would give you a dollar if you did these massages on the massage table?

A. No.

Q. Didn't you try to get I.T. to join you on at least one occasion in giving Michael a massage on this massage table?

A. No.

Q. You identified or said there was a rope, you called it, in the house that was made out of that material that you identified on direct examination.

Do you remember that?

A. Yes.

Q. And you claim that Michael used that rope to tie you up to abuse you; right?

A. The same as that one?

Q. If not that one, one like it was what you said; right?

A. It's not exactly the same.

Q. But one like that you're saying?

THE INTERPRETER: Sorry. Can you repeat --

BY MR. GUNN:

Q. You're saying it was one like that; is that right?

A. It's been a long time. I don't really remember exactly what the tie looked like, but similar.

Q. That rope or one similar to it you girls also used when you were playing to tie each other up; right?

A. No.

Q. Isn't it true that that's all that rope got used for, at least as far as you know?

THE INTERPRETER: Sorry?

MR. GUNN: I'll withdraw the question, Your Honor.

Q. You're staying at a shelter right now; correct?

A. Right now?

Q. Yes.

A. No.

THE COURT: She is in the courtroom right now, Mr. Gunn.

MR. GUNN: I'm sorry.

Q. The place you're living in Cambodia before you flew over here is a shelter or an organization with a home called Agape; right?

A. Yes.

Q. And you have been there -- have you been there ever since the police came to the house?

A. No.

Q. When did you start staying there?

A. After I left the police, I went to World Hope. After World Hope, I went to Agape.

Q. About how long was that after the police came to Michael's house that you went to Agape?

A. Since when?

MR. GUNN: I'm sorry, I didn't hear the English.

THE INTERPRETER: Since when?

BY MR. GUNN:

Q. That's what I'm asking you. How long were you at World Hope before you went to Agape?

A. Maybe two months.

Q. And ever since then, you have been living at Agape?

A. Yes.

Q. And they're letting you stay there or having you stay there because of what you have told them about being abused; right?

A. I don't know. The police took me and I told my story to them.

Q. You know it's because of your story that they are letting you or having you stay at a place like Agape; right?

A. I don't know. I'm not sure.

Q. Well, there are other girls who have been abused or been the victims of sex trafficking and those kinds of things; right?

A. Yes.

Q. And there is lots of other girls in Cambodia who live in poor circumstances who don't get to stay at a place like that; right?

A. I know.

Q. I'm sorry?

THE INTERPRETER: I know.

BY MR. GUNN:

Q. By the way, the person who is up there with you right now standing behind you, is she from the center, the Agape?

A. Yes.

Q. And one of the -- one of the head people at Agape is also here sitting in back; right?

A. Yes.

Q. Is the shelter a pretty nice place?

A. Very nice.

Q. Is it a lot nicer than where you lived before you went to Michael's house?

A. There are some places that are better than that. There are some places that are the same.

Q. I'm sorry, it's better than the house you had lived in with your family before you went to Michael's house; right?

THE INTERPRETER: I am sorry. You meant --

MR. GUNN: I'm sorry. Let me withdraw the question and ask some other question.

Q. There is a lot of benefits you get at this shelter; right?

A. Yes.

Q. They send you to school?

A. Yes.

Q. And you didn't get to go to school before you went to Michael's house, did you?

A. Before?

Q. Yes.

A. Yes.

Q. And the rooms are nicer at the shelter than where you lived with your family; right?

A. Which room?

Q. The rooms you stay in at the shelter and, in fact, the whole building is nicer than the house you lived in with your family before Michael; right?

A. Better than my home?

Q. Yes.

A. Yes.

Q. And the food that you get there is better and more complete than when you lived with your family before going to Michael's house; right?

A. Before I go to Michael's house?

Q. Yes.

A. Yes.

Q. And it's fair to say, isn't it, that your understanding is the only reason you're getting to stay there is because they believe you were abused by Michael; right?

THE INTERPRETER: Can you repeat that last sentence?

MR. GUNN: Yes, let me withdraw the question and rephrase it maybe simpler.

Q. You wouldn't get to stay at the shelter if you said it wasn't really true that you were abused by Michael, would you?

MS. DONAHUE: Objection. Calls for speculation.

THE COURT: Just whatever she believes. So --

MR. GUNN: That's --

THE COURT: -- go ahead and -- did you interpret the question?

THE INTERPRETER: No, I did not.

THE COURT: Why don't you rephrase the question.

MR. GUNN: Rephrase it or repeat it?

THE COURT: Either one.

BY MR. GUNN

Q. You wouldn't get to stay at Agape if you said it wasn't true that you were abused by Michael, would you?

A. I don't know.

Q. Well, isn't it true that you know that you only get to stay -- that girls only get to stay there if they are people who have been abused by someone or in some other way victimized?

A. Yes.

Q. And, in fact, four of the other girls who are testifying in this case are living at the same shelter at Agape also, aren't they?

A. Living in Agape like me?

Q. Yes.

A. Yes. Yes.

Q. So you and they have been able to talk about the case and your testimony, haven't you?

A. Yes.

Q. Now, the police came to Michael's house. It was almost two years ago now; right?

A. I'm not sure.

Q. It was a long time ago, though, right?

THE INTERPRETER: I'm sorry?

BY MR. GUNN:

Q. It was a long time ago, though, right?

A. Yes.

Q. And you were interviewed several times by several different people; right?

A. What do you mean different people?

Q. Okay.

Well, you were interviewed by a person from the -- I'm sorry. You were interviewed by a person from the International Justice Mission or a non-governmental organization that took you from the house when the police came; right?

THE INTERPRETER: That took? I am sorry. What's that?

MR. GUNN: I'm sorry.

Q. You were interviewed by a person from the International Justice Mission or a non-governmental organization that took you from the house; right? The same day or the next day after you were arrested -- I'm sorry. After you were taken from the house?

A. To come to interview me?

Q. When the police came to the house that day, they took you with them or some people took you with them away from the house; right?

A. Yes.

Q. And it wasn't just the police. They were people who worked for another agency or -- what's called a non-governmental organization; right?

A. I don't know who came from the organization.

Q. But some organization took you initially that first day; right?

A. I don't know.

THE COURT: Mr. Gunn, she is a child. Organizations don't come do things.

MR. GUNN: I am trying to . . .

THE WITNESS: Take me away from the police? Took me from the police station?

THE COURT: I am going to make him ask another question. So we will just wait for the next question. Okay?

BY MR. GUNN:

Q. You didn't actually sleep at the police station the first night, did you?

A. The first night?

Q. They didn't actually have you sleep at the police station itself?

A. Yes, I did. I slept there.

Q. Either that day or the next day you were interviewed by some people -- well, let me stop. You were interviewed soon after that by a police colonel, correct, or a police officer?

A. I don't remember.

Q. You were interviewed by a person from a private group as well; right? That's concerned about children?

A. I don't remember.

Q. Would it -- well, you were interviewed -- going back to being interviewed by the police, you were interviewed by the Cambodian police; right?

A. Yes.

Q. And you were interviewed by a doctor named Dr. Watson or Dr. Laura when she did an examination of you a few days after you were arrested; right?

A. No. At first when I arrived to the police station, they took me to the clinic.

Q. All right.

You saw a doctor at the clinic; right?

A. Yes.

Q. And she did an examination?

A. Yes.

Q. And she also asked you questions about your history and what had happened; right?

A. Yes, she did.

Q. And then you were interviewed by a Cambodian police

officer; right?

A. You mean interview they asked me questions?

Q. Yes.

A. Yes.

Q. And then you were asked questions by -- at a meeting that was videotaped actually by Gary Phillips who is sitting here? Right?

THE INTERPRETER: I am sorry. Can you repeat?

BY MR. GUNN:

Q. And you were also a few days after that asked questions by Gary Phillips who is sitting at the end of this table; right?

A. I don't recall how many days but I do remember that he asked me some questions.

Q. And then somewhere around that -- this -- that same time period, you were also interviewed by people who weren't police officers from what is called the International Justice Mission; right?

A. I don't know who.

Q. But someone else; right?

A. Yes.

Q. And then a few months after all those interviews or questions, you were asked questions by a Cambodian judge; right?

A. When I was in the Court, someone asked me.

Q. And you have been asked questions or told your story or been asked to tell your story to people at the shelter you

stayed at; right?

THE INTERPRETER: Can you repeat that question, please?

BY MR. GUNN:

Q. You have also been asked questions or asked to tell your story by people at the shelter where you are staying at; right?

A. Where I'm living right now?

Q. Yes.

A. Yes.

Q. And at the shelter, the World Hope place that you were at for two months before that, you were asked questions; right?

A. Yes.

Q. And finally, you were interviewed by one of the Government attorneys, Patty Donahue who is sitting here beside me, at least two or three times; right? This woman right here.

A. In Cambodia?

Q. Well, once she interviewed you in Cambodia and then she has also interviewed you one or two times here; right? By interview, I mean ask questions.

A. Yes.

Q. And you didn't get your story the same every time you were asked questions, did you?

A. No.

Q. Well, one important thing you said different things about was the first -- was when the first time was that Michael raped

you; isn't that true?

THE INTERPRETER: Can you repeat that question?

MR. GUNN: Yes.

Q. Isn't it true that one thing you said different things about was when the first time Michael raped you was?

A. What do you mean the first time?

Q. Okay.

Well, when you testified on direct examination earlier today -- let me make sure I understand you correctly -- you testified about the first time Michael raped you; right?

A. Yes.

Q. And one of the things you testified about was when you say that happened; right?

A. I don't understand your question.

Q. Well, you said that the first time you say he raped you didn't happen until after your mother left; right? That's what you said earlier today; right?

A. Yes.

Q. But when the people from the organization interviewed you in those first few days after you were arrested, you told them that Michael raped you on the first night you were at his house, didn't you?

A. I did not say that.

Q. Are you positive you didn't say that to them?

A. I don't know.

Q. Would it help you remember if the interpreter read to you part of a report they wrote about what you said?

A. The last story?

Q. Not the last story. This is the first story. Would it help -- I'm sorry.

Would it help you remember what you told these organization people about the first time you were raped, when it was, if the interpreter read to you part of a report they wrote about that? Just would it maybe help you remember what you told them?

A. I don't know.

Q. But it might help? It might help you remember? Because if it would, I would like to have the interpreter read it to you. That's why I'm asking.

A. I don't know.

MR. GUNN: Your Honor, may I attempt to refresh her recollection?

THE COURT: Any objection?

MS. DONAHUE: There is not really a failure of recollection shown here, Your Honor.

THE COURT: I don't think there has been a convincing failure of recollection.

BY MR. GUNN:

Q. You also -- you told Dr. Watson, the doctor who saw you, that the first time Michael raped you was after being in the

house for just -- let me step back.

First of all, your mother was at the house for several months; right?

A. Yes.

Q. And what you told Dr. Watson about the first time you were raped and when it was, was that it was after being in the house for just one week; right?

THE INTERPRETER: How many weeks? I'm sorry, counsel.

MR. GUNN: One week.

THE WITNESS: I don't know.

BY MR. GUNN:

Q. Would it help you remember if I had the interpreter read part of Dr. Watson's report? Would that help you remember what you told her?

A. Maybe.

MR. GUNN: Your Honor, could I --

THE COURT: You may.

MR. GUNN: With the Court's permission, Your Honor, I'll mark this as 130.

(Defendant's Exhibit 130 was marked)

MR. GUNN: If I could approach, Your Honor.

THE COURT: Yes.

MR. GUNN: There is also an extra copy for the Court. I neglected to write a number on it if the clerk . . .

Your Honor, with the Court's permission, I would ask

the interpreter to read -- at least to start with the first -- the second paragraph in history -- well, yes, the second paragraph in history. The first four sentences to start, at least.

THE COURT: Please do that.

THE INTERPRETER: Do you want me to read out loud?

THE COURT: I don't think any of your jurors speaks Cambodian. Okay. We won't understand what you are saying.

The reason we are doing this and the reason we are putting the headphones on is because something used in refreshing memory is not evidence, and so it's not something that you should see or hear, and so that's why we are doing it this way.

(Whereupon, the interpreter read the document to the witness)

MR. GUNN: Has the interpreter read those four sentences?

THE INTERPRETER: I did.

BY MR. GUNN:

Q. L.K.xxx, does that help you remember what you told Dr. Watson about when the first time Michael raped you was?

A. I don't remember when I told her.

Q. You still don't remember after having that read to you?

A. No. I don't know.

Q. Okay.

You also told the police officer who interviewed you

that the first time Michael raped you was a week or about one week after you got to the house; correct?

A. When I first arrived? You mean when I first arrived there?

Q. Okay.

You said you were interviewed soon after the police came to the house by a Cambodian police officer who asked you questions; right?

A. Yes.

Q. And one of the questions he asked or one of the things you talked to him about was when the first time Michael raped you was; right?

THE INTERPRETER: Can you repeat that last statement?

MR. GUNN: I don't know if I can. Let me ask the question again.

THE COURT: You really need to shorten your questions and break them up, Mr. Gunn. This is just not working.

MR. GUNN: I'm sorry. All right.

Q. One of the questions the Cambodian police officer asked you was when the first time was that Michael raped you; right?

A. Yes.

Q. And you told him it was about one week after you got to the house; right?

A. No.

Q. Are you positive about that? Positive about what you told him?

A. Yes.

Q. Another thing you talked about the different times people asked you questions was how often Michael supposedly raped you; right?

A. I don't understand talk.

Q. One of the things that people asked you questions about the different times you were asked questions was how many times Michael raped you; right?

A. Yes.

Q. And you told the organization people who interviewed you soon after the police came that Michael had sex with you every night; didn't you say that?

A. Not true.

Q. It's not true that you told them that or it's not true that that happened?

A. No.

Q. I'm sorry?

THE INTERPRETER: "No."

MR. GUNN: Bad question.

Q. You told -- you told the doctor who saw you, Dr. Watson, that it was two or three times a week, didn't you?

A. Two or three weeks?

Q. No. Two or three times each week, that's what you told Dr. Watson, wasn't it?

A. I don't know.

Q. Would it help you remember if the interpreter read a part of Dr. Watson's report to you about what you said about that?

MS. DONAHUE: Objection. This calls for hearsay.

THE COURT: He is just asking if it would refresh her recollection.

Would it help you remember, do you think, L.K.xxx?

THE WITNESS: Are you asking me that I told the doctor I was raped two or three times per week?

BY MR. GUNN:

Q. That was my first question, yes, and I think you said --

A. Yes.

Q. But you told the Cambodian police officer and the Cambodian judge that it was a total of about 20 times; correct?

A. I don't remember.

Q. Would it help you remember if you saw a copy of a statement in Cambodian that the police officer wrote up for you and put your fingerprint on?

A. I don't know.

Q. Would it possibly help you remember?

A. I don't know.

MR. GUNN: Your Honor, may I attempt to refresh?

THE COURT: Let's take a break. Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We will take a 15 minute break.

(Recess taken)

(Jury Out)

THE COURT: Mr. Gunn, this is beginning to get excruciating, and I compliment you and thank you for your approach to the child witnesses, I think you're being entirely appropriate in your tone and your manner of questioning, and as I said, I thank you.

But I have seen this and I have had many of these cases, many with interpreters. It's really difficult to deal with a child witness and an interpreter. And I can't ask you -- I probably could, but I'm not going to ask you not to ask leading questions, but they really tend to be incredibly confusing, both to the interpreter and to the witness. And I know that's what Defense lawyers are used to doing, but I don't think you need to do it for every question. And it will move more quickly.

I don't know anything about the Cambodian language. I frankly don't even know if it's coming out in a leading manner in that language so it may be defeating the purpose. But your questions are too long, they're convoluted, they start off with clauses that oftentimes don't really connect up with the end. They're compound.

And I know it's because you're trying to sort of get all the information in, but if you need to ask two or three questions, I still think that will be easier for the interpreter

and the child than doing it the way you're doing it.

MR. GUNN: I understand, Your Honor. I'm sort of trying to do that. Maybe I'm just not doing it very well, and I will try harder. I do feel a need to ask leading questions in this area because if I don't, I think she is just going to say the same thing she already said where I am trying to get her to admit, as it's reflected in the reports that I have, that she said something different. So I do think I need to make them leading in some way. I will try to break them up. I have sort of been thinking about that a little bit. I will look at it again.

I understand what the Court is saying, and I feel the same way, but I think it's something -- I don't particularly want to do it, but I think I have to do it. There are some things there to bring out, and, of course, we will be calling the impeachment witnesses when we get to our case, which it looks like we will have to do for most of them.

THE COURT: All right. And maybe that's just the better way to go.

MR. GUNN: All right. Though I -- yeah. Though I do -- I understand.

(Recess taken)

(Jury In)

THE COURT: Everyone is present. The interpreter and L.K.xxx are still under oath. Translate.

THE WITNESS: Yes.

THE COURT: You may proceed.

MR. GUNN: Thank you, Your Honor.

Q. L.K.xxx, when we stopped, I was asking you about different things you said about how often you said Michael raped you.

Do you remember that?

A. Yes.

Q. And I asked you what you told the Cambodian police officer about that.

Do you remember that?

A. Yes.

Q. And what I'm wondering now is whether it would help you remember what you told him about that if you saw a copy of a report he wrote. The -- I'm sorry. I didn't mean to interrupt.

A report that you also put your fingerprint on. Would that help you remember what you told him?

A. Yes.

MR. GUNN: Your Honor, could I have an exhibit marked?

THE COURT: All right.

MR. GUNN: This would be 131, Your Honor.

THE COURT: For identification?

MR. GUNN: I am providing a copy to counsel. I am providing an English -- one English translation, Your Honor, and the Cambodian original.

Q. L.K.xxx, what I would like you to look at -- I'm afraid I

can't read the Cambodian, so I'm just estimating based on the English, but I would like you to find a place in that report where you see the words -- find the place in that report where you see the words "in the period of about one week." Can you find that? It's probably about halfway down on the page that has 10078 at the bottom.

MR. GUNN: Maybe the interpreter could help her find it, Your Honor.

THE COURT: That would be fine.

THE INTERPRETER: I'm sorry?

MR. GUNN: Help her find the words that says "in the period of about one week."

THE INTERPRETER: Yes. The English portion as well.

THE COURT: Can you read Cambodian, L.K.xxx?

THE WITNESS: I can.

THE COURT: Can?

THE INTERPRETER: Yes.

THE COURT: Then let's have her look at the Cambodian version.

THE WITNESS: It's hard to read, Your Honor.

THE COURT: Okay. Why don't we ask the interpreter to translate for you. Not translate because you are going to be reading from the Cambodian. So just read the Cambodian, please.

THE INTERPRETER: Do you want me to read out loud, Your Honor, or just find the spot?

THE COURT: Yes. Because we won't understand you. Just find the spot where Mr. Gunn mentioned.

MR. GUNN: I am realizing that was the prior questions that I was attempting to ask, I think. This topic is actually a sentence beginning, "While I was living in this house" near the bottom. It would be the last -- the beginning of the last -- it's the second to the last English sentence on Bates Page 10078. If the interpreter could read the Cambodian equivalent.

THE INTERPRETER: I apologize. This is very difficult to read.

THE COURT: The handwriting is difficult to read?

THE INTERPRETER: Yes. It's not clear.

THE COURT: Does anybody have any objection to her translating from the English?

MR. GUNN: No, Your Honor. If she would translate the sentence beginning with the words, "while I was living in this house."

THE INTERPRETER: Yes.

THE COURT: Thank you.

(Whereupon, the interpreter translates document for the witness)

BY MR. GUNN:

Q. Actually my question for you first, L.K.xxx, is does hearing that and the statement that you fingerprinted for the Cambodian police officer help you remember what you told him

about how many times you claim Michael raped you? Does it help you remember what you told him about that?

A. Very little.

Q. I'm sorry?

THE INTERPRETER: "I can remember little."

BY MR. GUNN:

Q. But, in fact, you did tell him that the total number of times Michael raped you was about 20 times; right?

THE COURT: L.K.xxx, the question is not what the interpreter just read but the question is what you now remember about what you said to the police officer. Do you understand the difference?

THE WITNESS: I can remember some.

BY MR. GUNN:

Q. Of what you told him?

A. Yes.

Q. And one of the things you told him was that the number of times Michael raped you was about 20; right?

A. Right now?

Q. I'm asking if you remember now that that's what you told him then.

A. Yes.

Q. You didn't tell him it was every night; right?

A. I did not.

Q. And you didn't tell him it was two or three times a week,

did you?

A. Yes, I did.

Q. Well, what you told him is it was about 20 times total; right?

A. Yes.

Q. You did not tell him it was two or three times a week?

A. I did.

Q. You told Agent Phillips, when he interviewed you, that the total number of times was, quote, many times more than 20 times, unquote, didn't you?

THE INTERPRETER: Can you repeat that last statement, "how many times"?

BY MR. GUNN:

Q. You told him the total number -- you told Agent Phillips, when he asked you questions, that the total number of times was, quote, many times more than 20 times, unquote; right?

A. No.

Q. Are you positive about that?

A. Yes.

Q. And then when Ms. Donahue met with you in Cambodia a few months ago, you told her it happened once, and then a second time a week later, and then two to three weeks after that it started happening every day; right? That's what you told Ms. Donahue?

THE INTERPRETER: Can you break down "happened once"?

MR. GUNN: Yes.

Q. When you met with Ms. Donahue, you told her that after -- that it was every day after the first two or three weeks; right?

A. What lady? I don't know.

Q. This lady who's sitting right here, the prosecutor who asked you questions earlier, Patty.

A. Okay. So what did I say?

Q. You told her that after the first two times, it started happening every day; correct?

A. I would not remember. I don't remember.

Q. Would it help you remember if the interpreter read a report they wrote about that meeting?

A. Okay.

MR. GUNN: Your Honor, can I have an exhibit marked?

THE COURT: Yes.

MR. GUNN: If we could call this 132, Your Honor.

THE COURT: All right.

MR. GUNN: If could approach. Extra copy for the Court.

(Defendant's Exhibit 132 was marked)

THE COURT: Mr. Gunn, would you point out for the interpreter what you want.

MR. GUNN: Yes, Your Honor. One moment, Your Honor.

It would be, Your Honor, on the page with Bates stamp 6745, the last full paragraph. Perhaps the interpreter could

just read the whole paragraph.

THE INTERPRETER: Yes. The last paragraph, Counsel?

MR. GUNN: The last full paragraph. Beginning with the words "approximately one week."

(Whereupon, the interpreter read the document to the witness)

BY MR. GUNN:

Q. Does that help you remember about what you told Patty Donahue about how often it happened?

A. Yes.

Q. And you told her that after two or three weeks, it happened every day; right?

A. Did you ask me if I had said that?

Q. Yes.

A. Yes.

Q. You also were asked questions about how often you were tied up; right?

A. Yes.

Q. And you told the organization people who interviewed you soon after the arrest that it was every time; right?

A. I did not say that.

Q. Another thing you said -- strike that.

Another thing you were asked questions about or talked about was who decided you should be tied up; right?

THE INTERPRETER: Counsel, can you repeat that question, please?

MR. GUNN: Yes.

Q. Another thing you were asked questions about or talked about was how often or who decided you should be tied up; correct? Your Honor, I will withdraw this question.

You were also asked questions about how Michael supposedly made you take some sort of medicine or medication before he raped you; right?

MS. DONAHUE: Objection. Vague as to when the questions were asked.

THE COURT: Sustained.

BY MR. GUNN:

Q. In the different interviews, you talked about what you say about Michael giving you medication before he abused you; right?

MS. DONAHUE: Objection. Vague.

THE COURT: Well, I don't think that's what happened on direct, so I'm not sure -- I don't know what you're trying to do. So far you haven't articulated a question that I'll allow.

BY MR. GUNN:

Q. You told the organization people who interviewed you soon after the police came to the house that you were -- that you were given medication or medicine every time; right?

A. I do not remember.

Q. You also made statements -- strike that. Let me step back.

Do you remember a man named James Pond at Agape?

THE INTERPRETER: I am sorry. James what?

MR. GUNN: Pond, like a fish pond, who worked at Agape in Cambodia?

THE WITNESS: Yes.

BY MR. GUNN:

Q. And you made statements to him about Michael; right, or said things to him -- let me rephrase the question.

You said things to him about Michael; right?

A. No.

Q. Well, didn't you tell him that Michael was good to you?

A. No.

Q. You never told even your own mother about this thing you're saying now about Michael abusing you, did you?

Let me withdraw the question and rephrase it, Your Honor.

Did you ever tell your mother about what you're saying now about Michael abusing you?

A. No.

Q. And for the first three months that you were at Michael's house, you saw your mother every day because she was working there, didn't you?

A. Sometimes yes. Sometimes she would go back home.

Q. But most of the time she was there; right?

A. Yes.

Q. And you went home with her for the Cambodian new year, didn't you?

A. No.

Q. When she stopped working there, you told her that you wanted to stay at the house; right?

A. Yes.

Q. When Agent Phillips interviewed you after Michael was arrested, did you tell him that you didn't like living at Michael's house?

A. Yes.

Q. Well, that wasn't really true, was it, L.K.xxx?

A. The truth.

Q. Actually, you were happy at the house, weren't you?

A. Sometimes no; sometimes yes.

MR. GUNN: Your Honor, could I -- I would like to approach with a set of exhibits, if I could.

THE COURT: All right.

MR. GUNN: One set of originals, Your Honor, and one set for the Court.

THE COURT: Thank you.

BY MR. GUNN:

Q. L.K.xxx, I would like you to look at Defense Exhibit 320.

If the interpreter could help find it for her, Your Honor.

THE COURT: Sure.

MR. GUNN: If they are face up they are probably if the right order. If the interpreter turns them over face up, I

believe that would be easier and I believe 320 would be on top with a sticker on the back.

THE INTERPRETER: Yes.

BY MR. GUNN:

Q. If that could be placed in front of L.K.xxx, Your Honor.

Is Defense Exhibit 320 a set of photographs?

THE INTERPRETER: What is the question, counsel?

BY MR. GUNN:

Q. Is exhibit, Defense Exhibit 320, a set of photographs, L.K.xxx?

A. Yes.

Q. And are they photographs from the birthday party you had?

A. Yes.

Q. That was just a few days before Michael was arrested; right?

A. I don't recall how many times.

Q. But it was close?

A. Yes.

MR. GUNN: And, Your Honor, I would offer Defense Exhibit 320 into evidence.

MS. DONAHUE: No objection.

THE COURT: Admitted.

(Defendant's Exhibit 320 was received)

BY MR. GUNN:

Q. This is the first photograph in that exhibit; right?

A. Yes.
Q. And that's your mother presenting you with a birthday cake?
A. Yes.
Q. And would you turn to the third page, this page.
That's you and the others playing around putting cake on each other's faces; right?
A. Yes.
Q. That's your mother there on the screen where I'm pointing?
A. Yes.
Q. And that's you next to her; right?
A. Yes.
Q. Your mom has cake on her face?
A. Yes.
Q. And you're smiling and laughing; right?
A. Yes.
Q. And that's S.R.xxx where I'm pointing -- that's S.R.xxx over there playing around putting cake on her mother's face; right?
A. S.S.xxx.
Q. Okay.
Is that S.R.xxx down there with cake on her face?
A. Yes.
Q. So you were all playing around there having fun; right?
A. Yes.
Q. And the next page, that's you, too, with a little pointed

birthday hat on? Right?

A. Yes.

Q. And you're smiling there?

A. Yes.

Q. Because you were happy, right?

A. Yes.

Q. And the next page is you receiving a present; right?

A. Yes.

Q. And you're smiling there; right?

A. Yes.

Q. And then the next pictures are you opening the present and smiling; right?

A. Yes.

Q. Would you now look at Defense Exhibit 325.

THE COURT: Any objection to 325?

MS. DONAHUE: No, Your Honor.

THE COURT: All right. That will come in.

(Defendant's Exhibit 325 was received)

BY MR. GUNN:

Q. Defense Exhibit 325 is a set of photographs; right?

A. Yes.

Q. And this is the first page that I have got here on the screen; right?

A. Yes.

Q. And is that you standing up there with someone with a

microphone?
A. Yes.
Q. And were you getting an award there or what was going on?
A. I was receiving an award.
Q. And then the other photographs in this set basically sort of go in order showing you getting the award; right?
A. Yes.
Q. This, by the way, was at your school; right? It was an award for school?
A. Yes.
Q. Would you now look at Defense Exhibit 330.
THE COURT: Any objection to 330?
MS. DONAHUE: No, Your Honor.
THE COURT: Admitted.
(Defendant's Exhibit 330 was received)
BY MR. GUNN:
Q. Do you have that in front of you L.K.xxx?
A. Yes.
Q. This is a set of photographs of you performing in a school show; correct?
A. Yes.
Q. What kind of show was it?
A. Model. It was fashion show.
Q. This is you with some of the other girls at the school; right?

A. Yes.

Q. Did a lot of the girls at the school participate in that show?

A. Yes.

Q. Now I would like you to look at Defense Exhibits 335 and 336.

THE COURT: Any objection?

MS. DONAHUE: No objection, Your Honor.

THE COURT: Admitted.

(Defendant's Exhibits 335 and 336 were received)

BY MR. GUNN:

Q. This is the first one of those; right?

A. Yes.

Q. That's you there in the house with your mother and your little brother David; right?

A. Yes.

Q. And you were happy there; right?

A. Yes.

Q. And then this is the other picture, isn't it?

A. Yes.

Q. Taken right after the other one; right?

A. I wouldn't know.

Q. But it looks -- it has you and your mom and David again; right?

A. Yes.

Q. And you were happy there; right?
A. Yes.
Q. Would you now look at Defense Exhibit 337.
THE COURT: Any objection?
MS. DONAHUE: No objection.
THE COURT: Admitted.
(Defendant's Exhibit 337 was received)
BY MR. GUNN:
Q. That's another picture of you at the house; right?
A. Yes.
Q. And you're sitting there on the balcony?
A. Yes.
Q. And you're smiling?
A. Yes.
Q. And that's because you were happy again?
A. I don't know.
Q. Would you look at Defense Exhibits -- or the interpreter get, Your Honor, Defense Exhibits 338 and 339.
THE COURT: Any objection?
MS. DONAHUE: No objection.
THE COURT: All right. Those will come in.
(Defendant's Exhibits 338 and 339 were received)
BY MR. GUNN:
Q. Those are two more photographs of you at the house; right?
A. Yes.

Q. This is the first one showing you having a picture -- you're up on the balcony?

A. I don't know what -- which photograph.

Q. But that's you in the photograph; right? Where I'm pointing my pen?

A. Yes.

Q. And this is the balcony of the house?

A. Yes.

Q. And you're smiling here or smiling or laughing here; right?

A. Yes.

Q. And then the next one is you in the same place and you're waving; right?

A. Yes.

Q. Would you now look at Defense Exhibits 340 -- if the interpreter, Your Honor, could get 340 and 345?

THE COURT: Any objection?

MS. DONAHUE: No objection.

THE COURT: Those will come in.

(Defendant's Exhibits 340 and 345 were received)

BY MR. GUNN:

Q. The first one, 340, is a set of photographs of people eating at the house; right?

A. Yes.

Q. And is that you where I'm pointing my pen there?

A. Yes.

Q. And that's your mother, sort of a little over from you?
A. Yes.
Q. And are these S.R.xxx and S.S.xxx?
A. Yes.
Q. And you and everybody else was happy there; right?
A. I don't know.
Q. Well, there is a series of photographs -- the rest of that exhibit is more photographs of all of you eating there; right?
A. Yes.
Q. Would you look at Defense Exhibit 350.
THE COURT: Any objection?
MS. DONAHUE: No objection.
THE COURT: That will come in.
(Defendant's Exhibit 350 was received)
BY MS. DONAHUE:
Q. That's a set of pictures of you and the other girls in your school uniforms; right?
A. Yes.
Q. And you're -- this is the first photograph in that set; right?
A. Yes.
Q. And is that you there in the front?
A. Yes.
Q. And who is that behind you?
A. S.R.xxx.

Q. So you and S.R.xxx are sort of clowning around and playing and enjoying yourselves?
A. I don't know what I was doing.
Q. Well, you're smiling; right?
A. Yes.
Q. Or maybe even laughing?
A. You mean what laugh?
Q. And then the rest -- look at the fourth photograph. This is the fourth photograph in that set, isn't it?
A. Yes.
Q. And is that you smiling and laughing where I'm pointing my pen on the screen?
A. Yes.
Q. And this is -- is that Ngoc?
A. Ngoc.
Q. Will you turn to the next photograph. That's the four of you again playing around?
A. Yes.
Q. And there is more photographs like that in this set; right?
A. Yes.
Q. Would you look at Defense Exhibits 360 through 362.

THE COURT: Any objection?

MS. DONAHUE: No objection.

THE COURT: Those are admitted.

(Defendant's Exhibits 360 through 362 were received)

BY MR. GUNN:

Q. This is one of those photographs; right?

A. Yes.

Q. And that's all of you sitting there laughing or smiling; right?

A. Yes.

Q. That's you there on the right?

A. Yes.

Q. And then the other two are similar photographs; right?

A. Yes.

Q. 362 -- who is -- one girl sticking out her tongue?

A. S.R.xxx.

MR. GUNN: If the interpreter could put 363, Your Honor.

THE COURT: It's in evidence. You can just put it on the screen.

MR. GUNN: 363 is?

THE COURT: Yes.

MR. GUNN: All right.

Q. That's you lounging in the hammock at the house; right?

A. Yes.

Q. You're making a sign with your left hand?

A. I don't know.

Q. Well, do you know what you're doing with your left hand?

A. I don't know. I didn't realize what I was doing.

MR. GUNN: If I could have the interpreter, Your Honor, take 365 and 366.

MS. DONAHUE: No objection.

THE COURT: Those will come in.

(Defendant's Exhibits 365 and 366 were received)

BY MR. GUNN:

Q. These are two more photographs of you down in the patio or yard area with the other girls in your school uniforms, along with your mom and your little brother; right?

A. Yes.

Q. And this is a more close-up picture of you in the same place?

A. Yes. The same.

Q. And that's you where I'm pointing my pen; right?

A. Yes.

Q. And you're smiling there?

A. Yes.

Q. Finally, would you look at Defense Exhibit 367.

MS. DONAHUE: No objection.

THE COURT: Admitted.

MR. GUNN: Actually I don't know if I provided that one, Your Honor.

THE COURT: The one I have is marked 368.

MR. GUNN: 367, Your Honor, is for another witness.

THE COURT: Okay.

MR. GUNN: 368 is also for another witness.

THE COURT: Admitted -- oh, that's for another witness?

MR. GUNN: Yes.

Q. By the way, going back to when you told Agent Phillips that you didn't like living at the house, he asked you -- strike that.

He asked you why after you told him that, didn't he?

A. Yes.

MS. DONAHUE: Objection. Calls for hearsay.

THE COURT: Well, not the question.

MR. GUNN: Not yet.

Q. And what you told him in response to that --

MS. DONAHUE: Objection. Calls for hearsay.

MR. GUNN: Your Honor, I think it's -- it's significant not for -- it has relevance circumstantially, aside from any hearsay issue. I -- I mean, you have to hear, I guess, what it is.

May I ask the question, Your Honor?

THE COURT: No.

(Sidebar conference commenced)

MR. GUNN: Your Honor, what I intend to ask and what I then intend to ask -- ask her if she recognizes in the videotape and play that part of the videotape is that when the agent asked her why she didn't like living at the house, what she said was,

quote, it's quiet and I miss my home, unquote. She didn't say, "Because I was being raped," and she gave rape as a reason only after he suggested it.

I think two reasons that's admissible, Your Honor. First of all, even if it were offered for the truth, I think it's arguably under the state of mind exception because it's talking about her state of mind.

Second, I think it has circumstantial relevance. It's basically comparable to a lack of protest type of thing where she is saying -- if someone --

THE COURT: The relevance isn't the issue so circumstantial relevance does not get hearsay in. It's not hearsay. I will allow it.

MR. GUNN: Your Honor, related to that, this would be a place where I would like to play the videotape for the jury so they can see exactly the exchange. I will ask her if she would recognize it and have her identify it and then play it for the jury.

THE COURT: It's admissible. He can play the videotape.

MS. DONAHUE: Okay. Doesn't he have to ask her first if she said yes and if she says yes, the videotape is still m--

THE COURT: No. Because I'm finding it's not hearsay.

(Sidebar conference ended)

MR. GUNN: I'm sorry, Your Honor. I was trying to

help Mr. Brown find something.
Q. Anyway, I think I just asked you, L.K.xxx, about you remember Agent Phillips during that interview asking you why you didn't like living at the house; correct?
A. Yes.
Q. And the first thing you said in response to that was, quote, it's quiet and I miss my home, unquote; right?
A. I don't remember.
MR GUNN: Does Your Honor want me to refresh memory first or --
THE COURT: Ms. Donahue?
MS. DONAHUE: I think, yes.
THE COURT: All right. Yes?
You can't mumble out there.
MS. DONAHUE: I apologize. Yes, Your Honor.
MR. GUNN: Let me ask one more question first, Your Honor, and then we can refresh memory as to both, probably.
Q. You only gave being raped as a reason to Agent Phillips after he suggested that as a reason; isn't that true?
THE INTERPRETER: Can you repeat the question?
BY MR. GUNN:
Q. You only gave rape as a reason for not liking the house after Agent Phillips suggested that; isn't that true, L.K.xxx?
A. Not true.
Q. Well, would it refresh your memory about the exchange with

Agent Phillips and what you said first and what you said next and when if you were able to listen to the videotape with those headphones again?

A. Okay.

MR. GUNN: Your Honor, if I could -- if we are going to do it with the headphones first, I guess perhaps the agent can help with that. If we could play -- it would be the second section, what I call CD 2, of minute 58, second 40 to minute 59, second 32.

AGENT WANG: One more time, the time marker?

MR. GUNN: Minute 58, second 40.

AGENT WANG: And stop?

MR. GUNN: Stop at 59:32.

(Whereupon, the CD was played for the witness)

BY MR. GUNN:

Q. Does that help you remember what the first thing you said to Agent Phillips was when he asked why you didn't like living at the house?

A. Yes.

Q. And what you said was, "It's quiet and I miss my home"; isn't that right?

A. Yes.

Q. And you only gave being raped as a reason when he asked you, "But did you like it there because you were getting raped or because you missed home"; right?

THE INTERPRETER: Can you ask the question again, please?

MR. GUNN: Actually, if I could, I would just play the videotape at this point.

THE COURT: It would be easier. You did not state the question properly.

MR. GUNN: If I could just play, Your Honor, the videotape and if we could have the CD I have identified as Defense Exhibit 132 and we will play that same portion, the second CD or second tape, from minute 58, second 40 through minute 59:32.

THE COURT: All right.

MR. GUNN: If I can switch to our computer. If Mr. Brown can first blow up the photo. And I believe our sound is tied in, Your Honor.

(Whereupon, the video was played for the jury)

MR. GUNN: I believe that's where we stopped. Actually, Your Honor, that should be Defense Exhibit 133. I think 132 was already used.

THE COURT: All right.

MR. GUNN: And I have no further questions.

THE COURT: Redirect?

MS. DONAHUE: Your Honor, I do have a couple questions on redirect.

THE COURT: Okay.

MS. DONAHUE: Could I ask if she needs to take a break?

THE WITNESS: No.

MS. DONAHUE: Okay. Thank you.

REDIRECT EXAMINATION

BY MS. DONAHUE:

Q. I would ask first if Government's Exhibit 1019 could be placed before the witness.

L.K.xxx, what is that a picture of?

A. That's Michael and me.

Q. Is that in Michael's bedroom?

A. Yes.

MS. DONAHUE: I move 1019 into evidence.

THE COURT: Paul, would you turn off the screen.

Admitted.

(Government's Exhibit 1019 was received)

BY MS. DONAHUE:

Q. L.K.xxx, part of this picture is blocked out, but are you wearing any clothes in this picture?

A. No.

Q. Is Michael wearing any clothes in this picture?

A. No.

Q. Can you take a look at Michael's leg just for a moment. Do you see that mark on his leg?

A. It's not clear.

Q. Can you take one more look for me and then we will put the picture away.

MR. GUNN: Objection, Your Honor. Asked and answered.

THE COURT: Overruled.

THE WITNESS: I see it right around there, but I'm not really clear.

BY MS. DONAHUE:

Q. When you say "right around there," do you mean by his penis?

A. Yes.

Q. Was that the only picture that Michael took of you naked?

A. Many more.

Q. Where did he take those pictures?

A. In his bedroom.

Q. What was he wearing when he took the pictures of you?

A. He did not wear clothes.

Q. I would like to ask you a couple of questions. If I could have Government's Exhibit 1096.

Can you tell me what that is a picture of?

A. That's his bed.

Q. When you say "his," do you mean Michael's?

A. Yes.

Q. When Michael had you and the other girls suck on his penis, where would he do that?

A. On that bed.

Q. Does Michael's bedroom have curtains on the window?
A. Yes.
Q. I would like you to take a look at another photograph, Government's Exhibit 1113.
Does that show the massage table?
A. Yes.
Q. Did you and the other girls give Michael massages when he laid down on that table?
A. Yes.
Q. When Michael was lying down on that table, would you ever touch him sexually?
A. No.
Q. If you look at that picture, are there curtains on the windows to that room?
A. No.
Q. Okay.
L.K.xxx, you were at Michael's house for a little over six months; is that right?
A. No.
Q. Was it longer than six months?
A. No.
Q. Were you there at Christmastime?
A. Yes.
Q. And were you there at your birthday party the following June?

A. Yes.

Q. Do you remember about how long your mom lived at Michael's house?

A. Maybe around three months.

Q. Did you tell Gary Phillips when he interviewed you in June that Michael had started raping you about three months earlier?

MR. GUNN: Objection. Hearsay, Your Honor.

THE COURT: Overruled.

THE INTERPRETER: I'm sorry, counsel. Can you repeat that last statement?

MS. DONAHUE: Sure.

Q. In June when Gary Phillips talked to you, did you tell him the first time Michael raped you was about three months earlier?

A. Yes.

Q. L.K.xxx, I would like you to take a look at another photograph. It's on the big screen. 2093 for identification, Your Honor.

Can you take a look at that big screen just for a minute.

Do you know what that is a picture of?

A. That's -- that's in front of my grandmother's home.

Q. Who lives at your grandmother's home?

A. My mother.

Q. Who else lives at your grandmother's home?

A. My father, my little brother, my aunt maybe. I don't know.

Q. When you lived at Michael's house for part of the time Michael gave your mother a job; is that right?

A. Yes.

Q. And even after your mom left the house, would she come back to visit?

THE INTERPRETER: I am sorry, what was the last one?

BY MS. DONAHUE:

Q. After your mom left Michael's house, would she come back to visit?

A. Just on my birthday.

Q. Was your mom happy on your birthday?

A. Yes.

MS. DONAHUE: I don't have any more questions.

THE COURT: Recross?

MR. GUNN: No, Your Honor.

MS. DONAHUE: I move 2093 into evidence.

THE COURT: Any objection?

MR. GUNN: No objection.

THE COURT: That will come in.

(Government's Exhibit 2093 was received)

THE COURT: Thank you L.K.xxx. You're finished now.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We will take a 15 minute break.

(Recess taken)

(Jury In)

THE COURT: I see the Government has another witness.

MS. DONAHUE: Yes, we do, Your Honor. Her name is NTDx.

THE COURT: Let's first swear in the Vietnamese interpreter.

Ann Spiratos, Vietnamese Interpreter, was Sworn

THE COURT: Now would you swear in the witness.

NTDx, Government's witness, was Sworn

THE CLERK: Thank you. Please be seated. Please state and spell your first name for the record.

THE INTERPRETER: The interpreter's name?

THE COURT: No. Actually we should have gotten your name as well. Would you state your name?

THE INTERPRETER: Yes, Your Honor. Ann Spiratos, S-P-I-R-A-T-O-S.

THE COURT: And the witness's first name, please.

THE WITNESS: My name is NTDx.

THE COURT: Interpreter spelling, please.

THE INTERPRETER: N-T-D-x.

THE COURT: Thank you. You may proceed.

MS. DONAHUE: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. DONAHUE:

Q. Good afternoon, NTDx. Can you tell us how old you are?

A. I am 14.

Q. What country are you from?

A. I'm from Cambodia.

Q. Does your family live in Cambodia?

A. Yes.

Q. I would like you to take a look at a picture. This is Government's Exhibit 1159.

NTDx, do you know what that is a picture of?

A. This is my house.

Q. Is this your house in Cambodia?

A. Yes.

MS. DONAHUE: Move 1159 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1159 was received)

BY MS. DONAHUE:

Q. NTDx, can you tell us who is in your family?

A. My older brother, my mom, my dad, my maternal grandfather, my sister-in-law, my aunt, my niece and nephew -- and my younger sibling.

Q. Do all of them live in the house that is in this picture?

A. Yes.

Q. Does your mom have a job?

A. Yes.

Q. What is her job?

A. She is selling fruits.

Q. Where does she sell fruits?
A. At the market.
Q. Now, in Cambodia, do you live in this house -- the house that is in the picture?
A. Yes.
Q. Right now when you are in -- that's a bad question.
Do you live every day with your family in this house?
A. Yes.
THE COURT: You may lead, Ms. Donahue.
MS. DONAHUE: Okay.
Q. You also live at a center called Hagar; is that right?
A. Yes.
Q. And you stay at Hagar; is that right?
A. Yes.
Q. And can you tell us what -- a little bit about the center where you live?
A. I don't understand.
Q. Okay.
Do you go to school at Hagar?
A. Yes.
Q. What grade are you in?
A. 4th grade.
Q. And what do you study in 4th grade?
A. I study Cambodian language, English, and computer. Computer.

Q. Do you also study dancing and working with beads?

A. Yes.

Q. And do you like to make jewelry?

A. Yes, I do.

Q. What is one of your favorite things to do for fun?

A. I like to play with -- I like to do jump -- I like to play with jump rope.

Q. Are you a little bit nervous?

A. No.

Q. Okay. That's good.

If you don't understand a question, please tell me.

A. Yes.

Q. I would like you to take a look at another picture, Government's Exhibit 1077.

THE COURT: It's on the screen.

BY MS. DONAHUE:

Q. Why don't you take a look up there at the screen.

Do you know what that is a picture of?

A. A house.

Q. Do you know whose house that is?

A. Michael.

Q. Have you ever been to that house before?

A. Yes.

Q. Did you stay at that house for a little while?

A. Yes.

Q. And do you remember about how long did you stay at that house?
A. One week.
Q. Do you remember what time of the year it was when you stayed at that house?
A. I know that it was in 2005. I don't remember the month. But I know it was around Vietnamese new year.
Q. It was around the Vietnamese new year?
A. Yes.
Q. And you think it was in 2005?
A. Yes.
Q. I would like you to take a look at another photograph. It's Government's Exhibit 1332.
A. Yes.
Q. What is that a picture of?
A. This is my picture and Tai Linh.
Q. Who took this picture?
A. Michael.

MS. DONAHUE: Move 1332 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1332 was received)

BY MS. DONAHUE:
Q. You said -- is that you in the flowered outfit on the couch?
A. Yes.

Q. Who is the other girl?
A. Tai Linh.
Q. Can you spell that?

THE INTERPRETER: Interpreter spelling. T-A-I. Second word L-I-N-H.

THE COURT: Thank you.

BY MS. DONAHUE:

Q. NTDx, what are you and Tai Linh doing in that picture?
A. Watching TV.
Q. And was this in Michael's house?
A. Yes.
Q. Is this picture downstairs or upstairs at Michael's house?
A. Downstairs.
Q. When you were at Michael's house, did you go upstairs?
A. Yes.
Q. What room upstairs did you go into?
A. I don't understand.
Q. Did you go into a bedroom upstairs?
A. Yes.
Q. If you take a look at another photograph, which is Exhibit 1096. What is that a picture of?
A. This is the bed of Michael.
Q. And were you ever on that bed?
A. Yes.
Q. Did something happen to you on that bed?

A. Yes.
Q. Can you tell us what happened to you on the bed that's in that picture?
A. On this bed Michael harmed me.
Q. When you say Michael harmed you, what did he do to harm you?
A. He used rope to tie my hands and my legs. He used tape to cover my mouth. He hit me. He used a pillow and push on my face. And then he take his penis, put it inside my vagina.
Q. You said he used ropes to tie you. What -- can you tell us what did he do with the ropes? Where did he put them?
A. Well, with this arm, this hand, he tied it down with this leg, and the other hand, he tied the other hand with the other leg.
Q. So he tied your right hand to your right leg and your left hand to your left leg; is that right?
A. Yes.
Q. Did you make any noise when he did this?
A. Yes.
Q. What noise did you make?
A. I struggled and then I screamed.
Q. What happened when you screamed?
A. When I screamed, Michael hit me.
Q. What did he hit you with?
A. His hand.

Q. Was his hand open or closed?
A. Open.
Q. Where did he hit you?
A. On my face.
Q. Did he hit you on your face more than one time?
A. Yes.
Q. Did he put anything on your face?
A. No.
Q. Did he use tape at all?
A. Yes.
Q. What did he do with the tape?
A. Cover my mouth.
Q. Did he put anything else over your face?
A. No.

MS. DONAHUE: I would ask for Government's Exhibit 1104, which is physical evidence, a bag.

Q. If you could just take a look in that bag, does anything in there look familiar?
A. Tape.
Q. How come that looks familiar?
A. Because Michael used tape to cover my mouth.
Q. If you look in that bag, there is some rope in there. Does that look like the rope that he used?
A. No.
Q. You can put the bag away now.

After he put the tape on your mouth, what did he do?
A. Then he took his penis and put inside my vagina.
Q. Did anything come out of his penis?
A. A white fluid.
Q. What happened after the white fluid came out of his penis?
A. Then he removed the tape and the ropes.
Q. Did he take them off you?
A. Yes.
Q. How did you feel?
A. I felt pain.
Q. What happened next?
A. Then I went inside to the bathroom to clean up, to take a shower.
Q. If you could take a look at a photograph, Government's Exhibit 1106. What is that a picture of?
A. This picture is Michael's bathroom.
Q. If you could also take a look at 1107, Government's Exhibit 1107. Do you know what is in that picture?
A. Bathroom.
Q. Do you recognize that bathroom?
A. Yes.
Q. What bathroom is that?
A. This bathroom is upstairs inside Michael's room.
Q. When you went into that bathroom, did you take a shower?
A. Yes.

Q. What happened after you took the shower?

A. After I took the -- a shower, then I put clothes on.

Q. What clothes did you put on?

A. A set of clothes. It's flowers -- flowery.

Q. Were those your clothes that you had brought with you?

A. No.

Q. Where did you get the clothes that you put on?

A. Michael gave me.

Q. Was anybody else in the room when Michael put his penis into your vagina?

A. Yes.

Q. Who else was in the room?

A. Tai Linh.

Q. Is Tai Linh the other girl --

A. Yes.

Q. -- who is on the couch with you in that photograph?

A. Yes.

Q. That's Government's Exhibit 1332.

Was anybody else in the room with you besides Tai Linh when Michael did this to you?

A. No.

Q. Was anybody else in the house when Michael did this to you?

A. No.

Q. During the time that you were in Michael's house, were there any girls there besides you and Tai Linh?

A. No.
Q. And what happened after you put your clothes on?
A. After I put clothes on, I went downstairs to lie down on the couch.
Q. Did you try to leave the house?
A. Yes.
Q. What did you do?
A. I went outside, look for a place to run out, but I couldn't find a way to go out.
Q. Had you ever been at that house before?
A. No.
Q. Who brought you to the house?
A. Ms. Kia.
Q. Was this the only time that Michael put his penis inside your vagina when you were at the house?
A. Yes.
Q. So he did -- did he do it more than one time?
MR. BROWN: Objection, Your Honor. Leading. Asked and answered.
THE COURT: Overruled.
THE WITNESS: Yes.
BY MS. DONAHUE:
Q. Did you count how many times he put his penis inside your vagina?
A. Would you ask the question again, please?

Q. Okay. I'll try a little bit different question.

Do you remember about how many times he put his penis into your vagina?

A. Yes.

Q. About how many times did he do that?

A. I don't know how many times. I know it was many times.

Q. Were you there for a week?

A. Yes.

Q. And during the time that you were at the house, did Michael ever have you lick his penis?

A. No.

Q. Did anybody else come over to the house, to Michael's house, during the week that you were there?

A. No.

Q. Who prepared food, or did someone prepare food when you were there?

A. There was nobody, but there was a driver who went out and buy food for him and he brought it over for me to eat.

Q. You said earlier that Ms. Kia brought you to Michael's house; is that right?

A. Yes.

Q. Could you take a look at Government's -- a photograph, Government's Exhibit 2067.

Do you know the lady in that picture?

A. Yes.

Q. Who is that lady?
A. Ms. Kia.
Q. How did Ms. Kia come to bring you to Michael's house?
A. Ms. Kia came to my house and took me.
Q. How did she take you?
A. She took me on a Honda and we sat on a Honda to go straight to the house.
Q. And what did you think was going to happen at Michael's house?
A. I did not think about anything.
Q. Now, when you were at Michael's house, did he give you any money?
A. He did not hand the money to me, but he gave the money to Kia.
Q. Did you see him hand money to Kia?
A. Yes.
Q. Do you know what Kia did with that money?
A. No.
Q. Do you know how much money Michael handed to Kia?
A. I don't know.
Q. Now, when you were at Michael's house back then, did you know L.K.xxx?
A. No.
Q. And right.

Now do you stay at the same center where L.K.xxx

stays?

A. I don't understand.

Q. In Phnom Penh, does L.K.xxx stay at Hagar with you?

A. No.

Q. Does S.R.xxx stay at Hagar with you?

A. No.

Q. Does S.S.xxx stay at Hagar with you?

A. No.

Q. Does T.C.xx stay at Hagar with you?

A. No.

Q. Does K.S.x stay at Hagar with you?

A. No.

Q. Does I.T. stay at Hagar with you?

A. Yes.

Q. Going back to when you were at Michael's house --

A. Yes.

Q. -- was I.T. there at the same time that you were?

A. No.

Q. Was T.C.xx there at the same time that you were?

A. No.

Q. Were S.S.xxx and S.R.xxx there at the same time that you were there?

A. No.

Q. You -- did you try to leave Michael's house after he put his penis into your vagina the second time?

A. Yes.

Q. What did you do?

A. I went out of the gate. I tried to look for a place to run out, but I couldn't find any way.

Q. Every time that Michael put his penis inside of your vagina, did he also hit you?

A. He hit me the first time.

Q. And after that, did he hit you?

A. No.

Q. Okay. After the first time, did you scream?

A. No.

Q. After the first time -- bad question. Sorry.

The second time, did he tie you up?

A. No.

Q. After the second time, did he tie you up again?

A. No.

Q. After the first time, did you struggle?

A. No.

Q. Now, other than the clothes that he handed you after the first time, did Michael give you any presents?

A. No.

Q. NTDx, can you look around the courtroom and tell us if you see Michael?

A. Yes.

Q. Can you tell us where he is?

A. (No response.)

Q. Over here at this table, is he the man who is sitting closest to me, in the middle, or farthest away from me at this table?

A. The one that sit close to me.

THE COURT: Indicating the defendant, Mr. Pepe.

BY MS. DONAHUE:

Q. Now, NTDx, when you were at Michael's house, did any man, other than Michael, put his penis into your vagina?

A. No.

Q. When you were at Michael's house, did any man, other than Michael, hurt you?

A. Could you ask again, please?

Q. Sure. When you were at Michael's house, did any man besides Michael hurt you?

A. Yes.

Q. Who was that?

A. I don't know.

Q. When you were at Michael's house --

A. Yes.

Q. -- who else was there?

A. There was nobody.

Q. Michael was there?

A. Yes.

Q. And you were there?

A. Yes.

Q. And Tai Linh, the other girl in the picture was there; is that right?

A. Yes.

Q. And a driver brought food to the house; is that right?

A. Yes.

Q. Was -- did anybody else come to the house during the week that you were there?

A. No.

Q. Okay.

Did the driver who came to the house hurt you?

A. No.

Q. So besides Michael, not Michael, did anybody else hurt you when you were at Michael's house?

A. No.

MS. DONAHUE: I don't have any more questions.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MR. BROWN:

Q. Good afternoon, NTDx. When the prosecutor just asked you if someone else hurt you at Michael's house, you answered yes. Do you remember that just now?

A. Inside Michael's house, right?

Q. Yes.

A. I could not hear the question clearly back then.

Q. Okay.

Do you know a man by the name of Mr. Oh?

A. Yes.

Q. Who is Mr. Oh?

A. Mr. Oh is an American.

Q. And please excuse me for asking these personal questions, but isn't it true that you had sex with Mr. Oh?

MS. DONAHUE: Objection, 403, 412.

THE COURT: Sidebar.

(Sidebar conference commenced)

THE COURT: Tell me about Mr. Oh.

MR. BROWN: Your Honor, the witness, when she was interviewed by the agents, admitted to being abused by a person by the name of Mr. Oh prior to going to Michael Pepe's house. I think it's relevant especially with respect to Dr. Watson's testimony in terms of possible explanation for the missing hymen that Dr. Watson testified about with respect to this witness.

MS. DONAHUE: Rule 412 requires pretrial notice. The federal rape shield statute.

MR. BROWN: I think that's voluntary refreshing, Your Honor. I don't --

THE COURT: What's voluntary? Offer to prove any alleged victim engaged in any sexual behavior?

MR. GUNN: I think that's voluntary.

THE COURT: It doesn't say voluntary sexual behavior.

MR. GUNN: I think it's aimed at intruding on victim's private sexual conduct, not other abuse.

MR. BROWN: I think it goes to the source of --

THE COURT: No.

(Whereupon, the Judge reads the statute)

THE COURT: Well, I will allow this single question of whether anyone else had inserted a penis into a vagina, if that is all you are trying to establish.

(Sidebar conference ended)

BY MR. BROWN:

Q. NTDx, has anyone -- has anyone else put a penis in your vagina?

A. Yes.

Q. I would just like to ask you a few questions about your background.

A. Yes.

Q. You live in Cambodia?

A. Yes.

Q. But your family is Vietnamese; is that true?

A. Yes.

Q. So the language that you speak that you're most comfortable with is Vietnamese?

A. Yes.

Q. Do you -- are you fluent in Khmer?

A. Yes.

Q. How long have you lived at the Hagar Center?
A. Two years.
Q. What's it like there?
A. I don't understand.
Q. Is it a nice place to be?
A. Yes.
Q. You have lots of -- you have lots of friends there?
A. Yes.
Q. And you go to school there; right?
A. Yes.
Q. Do you have a lot of free time also to play?
A. Yes.
Q. What else do you like about Hagar?
A. Could you ask me again?
Q. Are there other things about Hagar that you like?
A. Yes.
Q. Could you tell us, please, if you don't mind?
A. I like to make jewelry.
Q. Do you get to see your family?
A. Yes.
Q. How often do you see your family?
A. Sometimes once a month. The other time every two weeks.
Q. Do you want to go back to your family?
A. No.
Q. You'd rather stay at Hagar?

A. Yes.

Q. Why?

A. I like to go to school.

Q. And when you're with your family, you don't get to go to school; right?

A. Right.

THE INTERPRETER: I'm sorry. Interpreter correction. "Yes."

BY MR. BROWN:

Q. How long have you been in the United States?

A. Three weeks.

Q. And where do you stay here in the United States?

A. I don't know.

Q. Have you met with the lady -- the woman here next to me, have you had a chance to speak with her before today?

A. Yes.

Q. How many times have you seen her before today?

A. I don't know how many times but I know it's a few.

Q. And how long did you meet with her?

A. Are you asking me about a time?

Q. Yes.

A. It's around half an hour, an hour.

Q. And it's -- did she tell you the questions that she was going to ask you today in court?

A. No.

Q. Have you -- did you have -- did the people at Hagar help you prepare for coming to court?
A. Yes.
Q. Did they have courtrooms or pretend to ask you questions?
A. Yes.
Q. Did they tell you how to answer those questions?
A. No.
Q. You said that I.T. is also at Hagar?
A. Yes.
Q. Are you friends with I.T.?
A. Yes.
Q. How often do you see I.T.?
A. I don't understand.
Q. Do you play with I.T. every day?
A. Yes.
Q. Do you talk to her every day?
A. Yes.
Q. I.T. speaks Vietnamese also; right?
A. Yes.
Q. Do you talk to her in Vietnamese?
A. Yes.
Q. Have you seen I.T. since you have been in the United States?
A. Yes.
Q. Was I.T. sitting in on the meetings that you had with the

lady sitting here next to me?

A. No.

Q. Was I.T. at the practice court when you were practicing? Was I.T. there?

A. Would you ask me again?

Q. Was I.T. there when you had practice court?

THE COURT: Why don't you rephrase that? I don't know what practice court means, sir.

BY MR. BROWN:

Q. Remember, you just said that the people from Hagar had -- strike that.

Do you remember when you said that the people from Hagar had meetings with you to tell you what it was going to be like in court? Do you remember that? We just talked about it.

A. Yes.

Q. At those -- at those meetings, did they have you sit on a witness chair like you're sitting now?

A. Yes.

Q. And they had people pretend to ask you questions; right?

A. Yes.

Q. Did they tell you that Michael Pepe was going to have a lawyer who was going to ask you questions about what happened?

A. No.

Q. When you had these -- when you had these meetings, was I.T. there?

A. No.

Q. You said that you know a lady named Kia?

A. Yes.

Q. And Kia is also known as Basang; right?

A. I don't know.

Q. How did you meet Kia?

A. She told me her name.

Q. Where were you when you met her?

A. I was at home.

Q. You weren't at a market?

A. I was at home and then I went to the market and saw her.

Q. She came to your house the first time?

A. Yes.

Q. Did she talk to your mother?

A. Yes.

Q. Do you remember being questioned by the gentleman standing there to your right sometime last year? His name is Gary.

A. Yes.

Q. Okay.

And before that, do you remember being interviewed by another person who spoke Vietnamese?

A. Yes.

Q. When you met with those two people, you were trying to tell them what you say happened to you; right?

A. Yes.

Q. Okay.

You never mentioned to them that a person named Tai Linh was there the week that you say you were at Michael Pepe's house; right?

THE INTERPRETER: Counsel, could you repeat the question, please?

BY MR. BROWN:

Q. You never told Gary or the other man that Tai Linh was at the house, did you?

A. No.

Q. So why didn't you say that Tai Linh was there?

A. I said that to the Vietnamese person.

Q. You're certain you told that to the Vietnamese man?

A. Yes.

MR. BROWN: Your Honor, I have no further questions.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MS. DONAHUE:

Q. NTDx, I would like to show you another picture. It's Government's Exhibit 1129.

What is that a picture of?

A. This -- this one is the picture of the area downstairs in Michael's house.

Q. And do you see the TV in that picture?

A. Yes.

Q. Is that the TV that you were watching?
A. Yes.
Q. When you were at Michael's house, did you go into any other rooms besides Michael's bedroom and this room with the TV?
A. I went one time.
Q. Where did you go?
A. I went to this room.
Q. When you say one time, do you mean that you were at Michael's house just that one week?
A. Are you asking me about Michael's room or the other room?
Q. I'll ask a different -- I'll ask a different question. That's okay.

When you were at Michael's house, where did you sleep?
A. Downstairs.
Q. Where downstairs?
A. Downstairs by the TV area.
Q. Did you sleep in a bed?
A. I slept on a couch.
Q. Why did you sleep on the couch?
A. Because I did not want to go inside a bedroom.
Q. Why not?
A. Just because I did not want to go inside a room.
Q. How did you feel when you were at Michael's house?
A. I felt I could not -- I just can't say it. I don't know how to say it.

Q. That's okay.

Kia brought you from your house to Michael's house; is that right?

A. Yes.

Q. Did -- and Kia talked to your mom before she brought you to Michael's house; is that right?

A. Yes.

Q. Do you know what Kia and your mom talked about?

A. No. I do not know.

Q. When you went to Michael's house with Kia, did you know how long you were going to stay there?

A. Will you ask again, please?

Q. Sure.

Did you know how long you were going to stay at Michael's house?

A. Yes.

Q. How long?

A. One week.

Q. Who told you that you were going to stay one week?

A. Ms. Kia.

Q. What happened at the end of the week?

A. After a week, I went home.

Q. How did you go home?

A. Ms. Kia took me.

Q. Ms. Kia picked you up at Michael's house and brought you

home; is that right?

A. Yes.

MS. DONAHUE: I have no more questions.

THE COURT: Any recross?

MR. GUNN: No further questions, Your Honor.

THE COURT: Thank you. You're finished.

Does the Government have another witness?

MS. DONAHUE: Yes, we do, Your Honor.

THE COURT: The name of the witness, Ms. Donahue?

MS. DONAHUE: Yes, Your Honor. The Government calls I.T..

THE COURT: Thank you.

THE CLERK: We will be using the same interpreter?

THE INTERPRETER: Yes.

MS. DONAHUE: Yes.

I.T., Government's witness, was sworn

THE CLERK: Please have a seat.

I will need you to state and spell your first name for the record.

THE WITNESS: My name is I.T..

THE COURT: Interpreter spelling.

THE INTERPRETER: I-T-x.

THE COURT: Thank you. You may proceed.

DIRECT EXAMINATION

BY MS. DONAHUE:

Q. Good afternoon, I.T.. how are you?
A. I'm good.
Q. Can you tell us how old you are?
A. I'm 13.
Q. What country do you live in, I.T.?
A. I live in Cambodia.
Q. Have you lived in Cambodia your whole life?
A. Yes.
Q. Does your family live in Cambodia?
A. Yes.
Q. And who is in your family?
A. My maternal grandmother and my mom.
Q. Anybody else besides your maternal grandmother and your mom?
A. Yes. My younger sibling.
Q. Your younger sister?
A. Yes.
Q. And do they all live together?
A. Yes.
Q. Do you live with them?
A. Yes.
Q. When you are in Cambodia, do you live at a center called Hagar?
A. Yes.
Q. Do you visit? Do you get to talk to members of your

family?

A. Yes.

Q. Do you visit members of your family?

A. Yes.

Q. Do you get to visit with your grandmother?

A. Yes.

Q. I want you to take a look at a photograph. It's Government's Exhibit 1158.

A. Yes.

Q. I.T., what is that a picture of?

A. This is a picture of my house.

MS. DONAHUE: Move 1158 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1158 was received)

BY MS. DONAHUE:

Q. Who all lives at this house?

A. My parents and my grandmother.

Q. And does your grandmother have a job?

A. No.

Q. Does your mom have a job?

A. No.

Q. Does anybody who lives in the house have a job?

A. Yes.

Q. Who is that?

A. My father and also my --

THE INTERPRETER: O-U-T? May the interpreter inquire?

THE COURT: Yes.

(Interpreter confers with witness)

THE WITNESS: My uncle.

BY MS. DONAHUE:

Q. What job does your uncle have?

A. He sells ice cream.

Q. He sells ice cream?

A. Yes.

Q. What job does your father have?

A. He also sells ice cream.

Q. Let's talk about the Hagar center.

A. Yes.

Q. Do you go to school there?

A. Yes.

Q. What grade are you in?

A. I am in second grade.

Q. What subjects do you study in second grade?

A. I study Cambodian language.

Q. What else do you study?

A. English.

Q. Do you study -- what else do you study besides English and Cambodian language?

A. I study Vietnamese language, how to write it.

Q. What is your favorite subject to study?

A. I like English.
Q. What do you like to do for fun?
A. I like to swim.
Q. Are you learning how to swim?
A. Yes.
Q. Do you also like to dance?
A. Yes.
Q. What do you want to do when you grow up?
A. I want to be a singer.
Q. What kind of songs do you like to sing?
A. I like to sing songs about love of my mom and God.
Q. I would like show you a photograph, Government's Exhibit 1077. Sorry, Your Honor. Now I have misplaced it.

I.T., what is in that photograph?
A. This is Michael's house.
Q. How do you know that that is Michael's house?
A. Because I used to live in there.
Q. Do you remember about when you lived in Michael's house?
A. I don't remember.
Q. That's okay.

Did anybody live with you at Michael's house?
A. Yes.
Q. Who lived at Michael's house at the same time that you did?
A. No.
Q. Did other girls live at Michael's house at the same time

that you did?

A. Yes.

Q. Can you tell us what their names are?

A. Yes.

Q. What are their names?

A. S.S.xxx, L.K.xxx, S.R.xxx.

Q. Did Michael live there, too?

A. Yes.

Q. How did you come to live at Michael's house?

A. Because Ms. Sang, she brought me there.

Q. Ms. Sang?

A. Yes.

Q. If you could take a look at a photograph. It's Government's Exhibit 2067.

THE COURT: It's in evidence. Just put it on the screen.

MS. DONAHUE: I will just put it on the screen. Thank you, Your Honor.

Q. I.T., can you take a look at the screen. Who is the lady in that picture?

A. Ms. Sang.

Q. Is this the lady that brought you to Michael's house?

A. Yes.

Q. How did she bring you to Michael's house?

A. She took me there.

Q. Did she take you there on a motor bike?
A. Yes.
Q. Did she talk to you before she brought you to Michael's house?
A. No.
Q. Who did she talk to before she brought you to Michael's house?
A. She spoke with Ms. Batam.
Q. Who is Ms. Batam?
A. I know Ms. Batam, but I don't know who she is.
Q. Is she a lady in your neighborhood?
A. Yes.
Q. A lady who lived near you?
A. Not too close.
Q. When you were at Michael's house, did he ever take your picture?
A. Yes.
Q. I'm going to show you a photograph, Government's Exhibit 1335. Who is that a picture of?
A. Me.

MS. DONAHUE: Move 1335 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1335 was received)

BY MS. DONAHUE:

Q. Who took this picture?

A. Mr. Michael.
Q. Where were you when he took this picture?
A. I was standing upstairs.
Q. Where did you get the stuffed bunny rabbit that you're holding?
A. He bought it for me.
Q. When you say "he," do you mean Michael?
A. Yes.
Q. Did you have any stuffed bunnies like this at -- bad question. I'm sorry.

Had you ever had a stuffed bunny before?
A. No.
Q. Did you like the bunny?
A. No.
Q. Why?
A. Because the stuff that he bought, I don't like them.
Q. Are you smiling in this picture?
A. No.
Q. Why not?
A. Because I was angry at him.
Q. Why were you angry at Michael?
A. Because I did not like him taking picture of me.
Q. I would like you to take a look at another picture, Government's Exhibit 1336.
A. Yes.

Q. What is that a picture of?

A. These are picture.

Q. Who took that picture?

A. Mr. Michael.

Q. Are you in that picture?

A. Yes.

MS. DONAHUE: Move 1336 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1336 was received)

BY MS. DONAHUE:

Q. Is that you in the white outfit with the purple in the center?

A. Yes.

Q. If I start over on the right-hand side of the picture, who is that girl?

A. The name is S.S.xxx.

Q. Who is the girl to her left?

A. L.K.xxx.

Q. And that's you?

A. Yes.

Q. Who is next to you?

A. S.R.xxx.

Q. And do you remember this girl's name, the girl on the far left?

A. I remember her but she did not tell me her name.

Q. What is in front of you in this picture?
A. The umbrellas and the rabbit.
Q. And is that the rabbit that you were holding in the other picture?
A. Yes.
Q. Where did the umbrellas come from?
A. He bought those.
Q. Who bought those?
A. Mr. Michael.
Q. Did he give them to you?
A. Yes.
Q. It's kind of hard to tell. Are you smiling in this picture?
A. No.
Q. How come?
A. Because I didn't like it.
Q. What didn't you like?
A. I did not want to have my picture taken.
Q. Why not?
A. Because I hate him taking my picture.
Q. Why do you hate Michael taking your picture?
A. Because I did not want him to take my picture.
Q. Can you take a look just a couple more pictures. Government's Exhibit 1341.

Who is that a picture of?

A. This is my picture.

MS. DONAHUE: Move 1341 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1341 was received)

BY MS. DONAHUE:

Q. Who took this picture?

A. Mr. Michael.

Q. One more picture. Government's Exhibit 1342. What is that a picture of?

A. This is a picture of us.

MS. DONAHUE: Move 1342 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1342 was received)

BY MS. DONAHUE:

Q. When you say "a picture of us," who do you mean?

A. The picture that -- the sisters and I are in there.

Q. When you say the sisters, are the other girls in that picture in your family?

A. No.

Q. How come you call them sisters?

A. Because they are older.

Q. Because they are older?

A. Yes.

Q. Are all of them older than you?

A. Yes.

Q. Are you sure that S.R.xxx is older than you are?
A. No.
Q. Is "sisters" a word that you use to talk about other women who are friends, other girls who are friends?
A. No, that's not right.
Q. Tell me what "sisters" means.
A. Only when they older than me, then I will call sister.
Q. Only when they're older than you?
A. Yes.
Q. Okay.

But when you call these girls sisters, you don't mean that all of you have the same mother; is that right?
A. Yes.
Q. These pictures were all taken on the second floor of Michael's house; is that right?
A. Yes.
Q. And when you stayed in Michael's house, where did you sleep?
A. I slept inside his house.
Q. Take a look at this photograph, Government's Exhibit 1079. What is that a picture of?
A. This the picture inside my room.
Q. Is that the room where you slept when you were at Michael's house?
A. Yes.

Q. And did the other girls who were at Michael's house sleep there, too?

A. Yes.

Q. When you were at Michael's house, did you ever go into his bedroom?

A. Yes.

Q. Can you please take a look at a photograph, Government's Exhibit 1096.

I.T., do you know what is that a picture of?

A. Yes.

Q. What is that a picture of?

A. Inside his room.

Q. When you say "his room," who do you mean?

A. His bedroom.

Q. Is that Michael's bedroom?

A. Yes.

THE COURT: Ms. Donahue, whenever it's a good time to break, let me know because it's almost 2:00 and I have the other jury to deal with, ten minutes, five minutes or so.

MS. DONAHUE: This is probably a really good time, Your Honor. Thank you.

THE COURT: Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. You are ordered to return tomorrow at 8:00 a.m. and you are ordered to have a good evening.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

United States of America, )
Plaintiff, )
)
vs. ) Case No.
) CR 07-168(A)-DSF
Michael Joseph Pepe, )
Defendant. )
_________________________________ )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

Day 5

Los Angeles, California

Thursday, May 15, 2008

Pamela A. Seijas, CSR, FCRR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California 90012
(213) 687-0446

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
BY: PATRICIA DONAHUE
ASSISTANT UNITED STATES ATTORNEY
JOHN LULEJIAN
ASSISTANT UNITED STATES ATTORNEY
312 N. SPRING STREET
LOS ANGELES, CA 90012

FOR DEFENDANT: OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY: CARL GUNN
DEPUTY FEDERAL PUBLIC DEFENDER
CHARLES BROWN
DEPUTY FEDERAL PUBLIC DEFENDER
321 EAST SECOND STREET
LOS ANGELES, CA 90012

ALSO PRESENT: ATTACHE GARY PHILLIPS
ICE SPECIAL AGENT EDDY WANG

THE INTERPRETERS: MORYVANN PAIGNE, CAMBODIAN
ANN SPIRATOS, VIETNAMESE

THE COURT: All right. Mr. Pierson is going to check and see how we are doing with the jurors.

MS. DONAHUE: Would Your Honor like us to have the witness here on the witness stand? The interpreter is here, but --

THE COURT: Yes, please.

MS. DONAHUE: Okay.

THE COURT: Which page and line number are we talking about?

MR. GUNN: Your Honor, it's Page 137, Line 14 and then the questions above to which it refers. It would be dealt with at a later recess, Your Honor. I guess we are preparing the redacted version.

(Jury In)

THE COURT: Good morning. Everyone is present, our witness is back on the stand. The interpreter is still under oath.

I.T., you still have to tell the truth.

THE WITNESS: Yes.

THE COURT: You may proceed.

MS. DONAHUE: Thank you, Your Honor.

DIRECT EXAMINATION RESUMED

BY MS. DONAHUE:

Q. Good morning, I.T..

A. Yes.

Q. The Judge just told you you are still are under oath to tell the truth, and I am going to ask you a few more questions today.
A. Yes.
Q. I think when we left off yesterday, you were looking at a photograph, Government's Exhibit 1077.
A. Yes.
Q. Do you know what that is a picture of?
A. I do.
Q. And can you tell us what is that a picture of?
A. This is the picture of Mr. Michael's house.
Q. And how do you know that this is a picture of Mr. Michael's house?
A. Because I used to live in there.
Q. Now I am going to show you a couple of other pictures and ask you if you know what they show. Government's Exhibit 1073.
Do you know what that picture shows?
A. I do.
Q. What does that picture show?
A. This is a picture of Mr. Michael's house.
Q. And is this the gate in front of his house?
A. Yes.
Q. And I have another picture to show you.
A. Yes.
Q. I.T., do you know what that is a picture of?

A. Yes.
Q. What is that a picture of?
A. This is his car.
Q. When you say "his car," do you mean Michael's car?
A. Yes.
Q. Was that his car that was parked in the driveway of his house?
A. Yes.
Q. I.T., when you were at Michael's house, were there other girls there?
A. Yes.
Q. Who were some of those girls?
A. Sister L.K.xxx, S.S.xxx, S.R.xxx.
Q. I am going to show you another picture, Government's Exhibit 1129.
Do you know what that picture shows?
A. Yes.
Q. What does that picture show?
A. This is a picture of his house.
Q. Is it a picture of a room inside of his house?
A. Yes.
Q. Do you remember whether that room was upstairs or downstairs?
A. Downstairs.
Q. Now, when you were at Michael's house, did you sleep there?

A. Yes.
Q. I am going to show you another picture, Government's Exhibit 1079.
Do you know what that is a picture of?
A. Yes.
Q. What's that a picture of?
A. This is our room where we slept.
Q. When you say "our room," who do you mean?
A. The room where we slept.
Q. When you say "you," do you mean you and the other girls?
A. Yes.
Q. Now, is this room in this picture, Government's Exhibit 1079, the only bedroom in Michael's house?
A. Yes.
Q. Is there another bedroom in Michael's house?
A. Yes.
Q. I am going to show you another picture, Government's Exhibit 1096.
A. Yes.
Q. I.T., do you know what that is a picture of?
A. Yes.
Q. What is that a picture of?
A. This is inside his bedroom.
Q. Were you ever inside Michael's bedroom?
A. Yes.

Q. Were you inside Michael's bedroom more than one time?
A. Yes.
Q. I want you to think about the first time you were in Michael's bedroom. Do you remember what happened?
A. Yes.
Q. Can you tell us what happened the first time that you were in Michael's bedroom?
A. The first time when I was his room, he gave me medications or drugs to take and then he asked me to go on the bed to go to sleep.
Q. How did he give you medications?
A. He gave the medication to the lady boss, and he asked the lady boss to give it to me to take.
Q. And when you say "the lady boss," do you remember her name?
A. Yes.
Q. What was her name?
A. Her name is Basang.
Q. I will show you a picture, Government's --
A. Yes.
Q. -- Exhibit 2067.
Do you know who is the lady in that picture?
A. Yes.
Q. Who is that lady?
A. Basang.
Q. Now, going back to the first time that you were in

Michael's bedroom --

A. Yes.

Q. -- did Michael have Basang give you some medicine?

A. Yes.

Q. What did the medicine look like?

A. That one looks a little rounded.

Q. Was it a pill?

A. Yes.

Q. Did you drink anything?

A. No.

Q. Did you swallow the pill?

A. No.

Q. What did you do with the pill?

A. He asked me to take it so he took water and give it to me.

Q. Did you drink the water?

A. Yes.

Q. When you drank the water, did you swallow the pill?

A. Yes.

Q. What happened after you swallowed the pill?

A. After I took the pill, then I began to feel sleepy.

Q. And what did you do when you began to feel sleepy?

A. I slept, so he asked me to go to the bed to sleep, and then he used ropes to tie my hands and my legs.

Q. Which bed did you go to?

A. His bed.

Q. Is that the bed in this picture?

A. Yes.

Q. You said he used ropes to tie you.

Can you describe what he did?

A. Yes.

Q. Tell us what he did when he had the rope in his hand.

A. He tied my hands like this and then he tied my legs, too.

THE COURT: The witness is describing her wrists touching one another with her hands up.

BY MS. DONAHUE:

Q. Did he also tie your legs?

A. Yes.

Q. How did he tie your legs?

A. He took a rope out and he tied my legs.

Q. Which part of your legs did the rope touch?

A. At the ankles.

Q. And did he wrap the rope around your ankles?

A. Yes.

Q. After that, what did he do?

A. And then he took his penis out and then he put that one inside my vagina and then he raped me and I bled.

Q. Did you make any noise?

A. Yes, but -- no, but I cried.

Q. Did he put anything on your face?

A. Yes.

Q. What did he put on your face?

A. He took a string or a rope, black color, and he covered my eyes, and he took another piece of cloth or rag, red, and put in my mouth.

Q. Did it feel like it was gagging you?

A. Yes.

Q. Did you pass out for a little while?

A. Yes.

Q. And when you woke up, what did you see?

A. When I woke up, I saw myself being tied up and then blood everywhere.

Q. Where were you bleeding from?

A. From my mouth.

Q. Were you bleeding from anyplace else besides your mouth?

A. No.

Q. Do you remember any blood on the sheets, on the bed?

A. Yes.

Q. Did you have any pain?

A. Yes.

Q. Where did you have pain?

A. At my vagina.

Q. And what did you do after you woke up?

A. When I woke up, he removed the ropes.

Q. After the rope was gone, what did you do?

A. When he take off the ropes, I fainted.

Q. Can you describe what happened after you woke up?
A. When I woke up again, I saw inside my body has all blood.
Q. Did you go to the bathroom and wash yourself?
A. Yes.
Q. And at -- did this happen a second time at Michael's house?
A. Yes.
Q. I want you to think about the second time.
A. Yes.
Q. Was it also in Michael's bedroom?
A. Yes.
Q. What happened the second time?
A. The second time he asked me to go to sleep with him again.
Q. How did you know that he was asking you to sleep with him again?
A. He asked me to go take a shower, and then he took some medication or whatever to put on my vagina.
Q. I.T., do you speak English?
A. No. But Ms. Sang, she spoke English.
Q. Did Michael speak -- I'm sorry. Did Michael speak Khmer?
A. No.
Q. So how did you know that Michael wanted you to take a shower?
A. Because he spoke in English and Basang translated for me.
Q. What did you do when Basang told you to take a shower?
A. She asked me to take my clothes off and go take a shower

and then after that I could sleep with him.

Q. Did you want to do that?

A. No.

Q. When you went to take a shower, what bathroom did you use?

A. I used his bathroom.

Q. I am going to show you a picture. It's Government's Exhibit 1107.

I.T., do you know what that is a picture of?

A. Yes.

Q. What is that a picture of?

A. Inside his bathroom.

Q. When you took a shower inside his bathroom, were you by yourself?

A. No. I took a shower with him also.

Q. So was Michael in the shower with you?

A. No. He was standing inside the bathtub and outside.

Q. He was standing inside the bathtub?

A. Yes.

Q. Looking at the picture, can you tell us where you were? Government's Exhibit 1107.

A. I was standing right here.

Q. Were you standing inside the bathtub?

A. No.

Q. Were you standing outside the bathtub?

A. Yes.

Q. When you were in the bathroom, did Michael touch you?
A. No.
Q. What happened after you finished taking a shower?
A. After I took a shower, he asked me to go outside to dry myself, and then he put some medication on me.
Q. When you say he put some medication on you, can you describe what he did?
A. He used medication and he applied on my vagina.
Q. Was it a cream or an oil?
A. Cream.
Q. Did the cream come out of a tube?
A. Yes.
Q. How did it feel when he rubbed it on your vagina?
A. I felt pain.
Q. What happened after he rubbed the cream on your vagina?
A. And then he also put it on his own penis, too.
Q. He rubbed the cream on his penis?
A. Yes.
Q. Did you see him do that?
A. Yes.
Q. What happened after he rubbed the cream on his penis?
A. And then he took his penis, put it inside my vagina.
Q. Were you on the bed?
A. Yes.
Q. Did he use -- did he tie you up?

A. No.

Q. Did he give you a pill to take like he had the first time?

A. No.

Q. Did you say anything to him when he was doing this?

A. I told him don't do it anymore because I'm still a child.

Q. Was anybody else in the room when this happened?

A. No.

Q. What did he do with his penis?

A. He took his penis, put inside my vagina.

Q. I'm going to show you a picture.

A. Yes.

Q. It's Government's Exhibit 1095.

I.T., do you know what that is a picture of?

A. Yes.

Q. What is that a picture of?

A. That's a tube of cream.

Q. Is that the cream -- the tube that had the cream that he rubbed on your vagina and on his penis?

A. Yes.

Q. The second time, did you have any bleeding?

A. Yes.

Q. During the time that you were at Michael's, did he put his penis into your vagina ever again?

A. Yes.

Q. Did he do it a third time?

A. No. He just did a second time only.
Q. So he did it two times; is that right?
A. Yes.
Q. When you were at Michael's, did he also have you give him massages?
A. Yes.
Q. Where was he when you gave him a massage?
A. He was also there.
Q. When you say there, do you mean in his bedroom?
A. Yes.
Q. When you gave him a massage, what was he wearing?
A. He wore sleeping clothes.
Q. He wore sleeping clothes?
A. Yes.
Q. Did he wear sleeping clothes every time that you gave him a massage?

MR. BROWN: Objection, Your Honor. Assumes facts not in evidence.

THE COURT: Overruled.

MR. BROWN: Leading.

THE WITNESS: No. He took them off.

BY MS. DONAHUE:
Q. What did you wear when you gave him a massage?
A. I wore my sleeping clothes.
Q. Did you always keep your sleeping clothes on?

A. Yes.
Q. Were you the only girl who gave him a massage?
A. Yes.
Q. Were there other girls there at the same time that you were there when you gave Michael a massage?
A. Yes.
Q. Can you explain what happened when you gave Michael a massage?
A. While I'm giving him the massage, he asked another one to suck his penis.
Q. When you say "asked another one," do you mean another girl?
A. Yes.
Q. Who was the other girl who sucked his penis?
A. Sister L.K.xxx.
Q. Did you see sister L.K.xxx suck on Michael's penis?
A. Yes.
Q. Did you see any other girl suck on Michael's penis?
A. Yes.
Q. Who?
A. S.R.xxx.
Q. Did you see any girl besides S.R.xxx and L.K.xxx suck on Michael's penis?
A. S.S.xxx.
Q. Is that S.S.xxx, S.R.xxx's sister?
A. Yes.

Q. Did you also suck on Michael's penis?
A. Yes.
Q. What happened when you sucked on his penis?
A. When I suck on his penis, he said that if I did not suck out the water, that he would not give me the money.
Q. How much money did you think he was going to give you?
A. I don't know.
Q. Did you suck out the water?
A. No.
Q. What did you do?
A. I was afraid to suck.
Q. Did you also touch Michael with your hands?
A. No. Only massage.
Q. What did you do to massage him?
A. I squeezed his back.
Q. The massage where you and the other girls sucked on his penis, did that happen more than one time?
A. Yes.
Q. Did it happen more than two times?
A. Yes.
Q. Do you remember how many times it happened?
A. I remember it was a week.
Q. When you say it was a week, what do you mean?
A. I remember in the week he asked me to come up to massage for him every day.

Q. How would he ask you to come up for massage?
A. He called me. I heard "massage, massage," so I knew.
Q. And then when you heard "massage," would you go up to his room?
A. Yes.
Q. How come?
A. Because he asked me to.
Q. I.T., how did you come to live at Michael's house?
A. Because Ms. Sang, she brought me there.
Q. How did she bring you there?
A. Because I went out and I bought some ice for Batam, and she called Basang over and Ms. Sang brought me -- took me away.
Q. What did you think you were going to do at Michael's house?
A. I heard that when I went to his house, I would be sending to school.
Q. Who told you that?
A. Ms. Sang, Basang.
Q. Now, I.T., I want you to take a look around the courtroom and tell me if you see Michael.
A. Yes.
Q. Can you point to where you see him?
A. He's right there.
Q. Over here there are three men at the table. Is he the man who is closest to me? Or is he the man in the middle? Or is he the man at the end of the table?

A. The man who sits the end of the table.

THE COURT: Indicating the defendant, Mr. Pepe.

BY MS. DONAHUE:

Q. I.T., did you ever get any money when you were at Michael's house?

A. Yes. A little.

Q. Where did you get the money?

A. He gave to me.

Q. Michael gave you money?

A. Yes.

Q. When did he give you money?

A. After I was asked to suck his penis, then he gave me the money.

Q. How much money did he give you?

A. He gave me a dollar.

Q. And did he give you a dollar every time that you sucked his penis?

A. Yes.

Q. How about after he put his penis into your vagina, did he give you any money after that?

A. No.

Q. How about the second time?

A. He gave the money the second time.

Q. And who did he give the money to?

A. He gave the money to Basang.

Q. Do you know how much money he gave to Basang?
A. Yes.
Q. How much?
A. One hundred.
Q. Is that $100 or one hundred riel?
A. $100.
Q. Do you know what Basang did with that $100?
A. I don't know.
Q. Now, did there come a time when you left Michael's house?
A. Yes.
Q. How did you leave Michael's house?
A. I left. She took me away. She was the one who took me home.
Q. Who took you home?
A. Basang.
Q. Did you want to go home?
A. Yes.
Q. Did you like staying at Michael's house?
A. No.
Q. Did you tell anybody that you wanted to go home?
A. Yes.
Q. Who did you tell?
A. I told Basang.

MS. DONAHUE: I have no further questions.

THE COURT: Thank you. Cross-examination?

CROSS-EXAMINATION

BY MR. BROWN:

Q. Good morning, I.T..

A. Yes.

Q. My name is Charles, and I'm one of Michael's attorneys. And I have to ask you a few questions, okay?

A. Yes.

Q. I want to ask you a few questions about your background. Okay?

A. Yes.

Q. How old are you?

A. I am 13.

Q. You were raised in Cambodia?

A. Yes.

Q. And you grew up with your mother; right?

A. With my grandmother.

Q. With your grandmother. Okay. And your stepfather; right?

A. Yes.

Q. Where do you live now?

A. Now I'm living in Cambodia.

Q. Where in Cambodia do you live?

A. I live at Saigon Bridge.

Q. Do you live at Hagar, the Hagar Center?

A. Yes.

Q. How long have you lived there?

A. I living there a long time.
Q. More than a year?
A. No.
Q. Do you get to see your grandmother when you're living at Hagar?
A. Yes.
Q. How often do you get to see her?
A. Once a month.
Q. Do you like living at Hagar?
A. Yes.
Q. You said yesterday that it's fun there; right?
A. Yes.
Q. You like to swim and play; right?
A. Yes.
Q. Before living at Hagar, where did you live?
A. I lived in Bottatong (phonetically).
Q. You said earlier that a lady named Batam introduced you to the person named Basang; do you remember that?
A. Yes.
Q. And do you know who Batam, the lady Batam, was?
A. Yes.
Q. Who was Batam?
A. Batam, she was a person who introduced me to that boss, the lady boss.
Q. And how did you know Batam?

A. Because I know her.

Q. From where?

A. Because my mom knows her. My mom hang out with her every day.

Q. You said that Basang, the lady Basang, took you to Michael's house?

A. Yes.

Q. And you said that you didn't like living at Michael's house; right?

A. Yes.

Q. Do you remember when that was that you were taken to Michael's house?

A. No.

Q. Was it in May -- May of 2006?

A. Yes.

Q. Okay.

And do you know how long you were at Michael's house?

A. I know it's a long time, but I don't know what month.

Q. Do you remember how long you were there?

A. Long.

Q. And is it -- is it true, I.T., that you went back and forth to Michael's house a couple of times?

A. No.

Q. Do you remember telling the person standing there, Gary, that you were at Michael house for three to four days?

A. I don't understand.
Q. Did you -- do you remember when Gary asked you some questions a couple of years ago? Do you remember meeting with Gary and some other people and them asking you questions?
A. Yes.
Q. There were a few people in the room; right?
A. Yes.
Q. It was Gary and a lady who spoke Vietnamese; right?
A. Yes.
Q. The lady who spoke Vietnamese, did you know her?
A. Yes.
Q. She was a lady who worked at World Hope; right?
A. Yes.
Q. Was she a friend of yours from World Hope?
A. She was my mother.
Q. What do you mean by that?
A. What I mean is that when I was in World Hope, she was my mother.
Q. So she was the one who was interpreting Gary's questions into Vietnamese; right?
A. No.
Q. Was she asking you questions when Gary was asking you questions?
A. No. Uncle Tom translated the meaning.
Q. So do you remember -- when they were asking you questions,

do you remember telling them that you were only there for -- only at Michael's house for about three to four days?

A. No. That's not true.

Q. Do you remember yesterday when the prosecutor showed you some pictures at Michael's house?

A. Yes.

Q. And you said you weren't happy because you didn't like Michael taking pictures of you?

A. Yes.

Q. I would like to show you a couple of pictures, and I want to talk about them. Okay?

A. Yes.

MR. BROWN: Your Honor, I have what has been remarked as Defense Exhibit 368. I believe that might have been provided to the Government already. And to the Court. And I also have Defense Exhibit 369, which I am providing a copy to the Government and I have a copy for the Court and for the witness. If I may approach, Your Honor?

THE COURT: Yes.

MR. BROWN: Your Honor, I would like --

THE COURT: Any objection to 368 or 369?

MS. DONAHUE: No objection.

THE COURT: All right. Those are admitted.

(Defendant's Exhibits 368 and 369 were received)

MR. BROWN: May I publish?

THE COURT: Yes.

BY MR. BROWN:

Q. I.T., if you could look at 368, is that you in the picture?

A. Yes.

Q. And who is that with you?

A. That was me, S.S.xxx and S.R.xxx.

Q. And you're smiling in that picture; right?

A. He asked me to smile.

Q. And if I could show you the next picture which is 369, is that you in the picture there on the right, I.T.?

A. Yes.

Q. And it looks like you're playing with S.R.xxx and S.S.xxx.

A. Yes.

Q. And you're -- it looks like you're having fun there.

A. I was playing with these sisters. I did not know that he was taking pictures.

Q. I.T., do you remember -- if we could talk again about when you were being interviewed by Gary.

A. No.

Q. We were just talking about when you were in a room and Gary was asking you questions and there was an interpreter there and they had a video camera.

Do you remember that?

A. Yes.

Q. Okay.

And do you remember Gary showing you a photo of a person that he thought might have been the person who you say hurt you?
Do you remember that?
A. Yes.
Q. Do you remember being shown a photo of a person and you saying that that's not the man?
A. Yes.
Q. When you -- when you were staying with Michael, you never saw a mark on his leg, did you?
A. Yes.
Q. You never saw -- you never saw a mark?
A. Yes.
Q. The prosecutor asked you some questions about massaging Michael.
Do you remember those questions?
A. Yes.
Q. Do you remember telling Gary that the other girls that were there forced you or teased you about not wanting to massage Michael?
A. Yes.
Q. So L.K.xxx and the other girls were teasing you about that; right?
A. Yes.
Q. What did they say when they were teasing you?

A. Those sisters, they told me that how come I'm so stupid I didn't massage him.

MR. BROWN: Your Honor, may I have one moment?

THE COURT: Yes.

(Mr. Brown and Mr. Gunn confer off the record)

BY MR. BROWN:

Q. I.T., before going to -- going to Michael's, you used to work at a place; right? At a massage parlor?

A. I don't understand.

Q. Did you work at a bad place before going to Michael's?

A. That's not true.

Q. With respect to the dates that you say that these happened, do you recall telling Gary that it happened on May 23rd and May 26th of 2006?

A. Yes.

MR. BROWN: Your Honor, I have no further questions. Thank you.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MS. DONAHUE:

Q. I.T., when you were at Michael's house, did any man, other than Michael, put his penis inside your vagina?

A. No.

Q. When you were at Michael's house, did any man, other than Michael, have you suck on his penis?

A. No.

MS. DONAHUE: I have no further questions.

THE COURT: Any recross?

MR. BROWN: No further questions, Your Honor. Thank you.

THE COURT: I.T., you're finished.

Does the Government have another witness?

MS. DONAHUE: Yes, Your Honor. The Government calls K.S.x.

Your Honor, for the record, we are changing to the Cambodian interpreter.

THE COURT: Are you the same one we had before?

MS. DONAHUE: Yes.

THE COURT: You have your hair back.

THE INTERPRETER: Yes.

THE COURT: You are still under oath.

K.S.x, Government's witness, was sworn

THE CLERK: If you could have a seat, please. I just need you to state your full name and spell your first name for the record.

THE WITNESS: K.S.x.

THE COURT: Interpreter spelling, please.

THE INTERPRETER: Sure. K-S-x-x-x.

THE COURT: You may proceed.

MS. DONAHUE: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. DONAHUE:

Q. Good morning, K.S.x.

A. Good morning.

Q. K.S.x, how old are you?

A. Fourteen.

Q. What country do you live in?

A. Khmer.

Q. Is that Cambodia?

A. Yes.

Q. Have you lived in Cambodia your whole life?

A. Yes.

Q. Does your family live in Cambodia?

A. Yes.

Q. And can you tell us who are your family members?

A. My mother, my father, my older brother, my two younger sisters.

Q. K.S.x, does your mother have a job?

A. Yes. She sells.

Q. What does your mother sell?

A. Fruits.

Q. Where does your mother sell fruits?

A. Chhambor Pho.

Q. Is that a village.

A. Market.

Q. Is that a market near Phnom Penh?
A. I don't know.
Q. K.S.x, does your father have a job?
A. No.
Q. Now, K.S.x, back when you were living with your family, did you go to school?
A. Yes. A little.
Q. How come just a little?
A. I had to watch my sibling.
Q. When you watched your sibling, you did not go to school; is that right?
A. Yes.
Q. Did your mom always have enough money to send you to school?
A. Just a little.
Q. Now, K.S.x, right now do you live at a center called Agape?
A. Yes.
Q. Who else lives at Agape?
A. Me.
Q. Do other girls live there, too?
A. Yes.
Q. At Agape, do you go to school?
A. Yes.
Q. What grade are you in?
A. Third.

Q. In third grade, what do you study?
A. Math, Cambodian, sociology, history, math, sociology.
Q. K.S.x, what do you like to do for fun?
A. Play with my friends.
Q. K.S.x, I'm going to show you some pictures. Government's Exhibit 1077. Can you look up here on that screen.

K.S.x, do you know what that is a picture of?
A. Michael's house.
Q. How do you know that picture is of Michael's house?
A. I used to live there.
Q. Do you remember when you lived there?
A. No.
Q. I'm going show you a couple more photographs. Government's Exhibit 1301.

Do you recognize anybody in that photograph?
A. I only recognize myself.
Q. That's you in that picture?
A. Yes.

MS. DONAHUE: 1301. Move 1301 into evidence.

THE COURT: Have you had a chance to look at that, Mr. Gunn?

MR. BROWN: No objection.

THE COURT: All right. That will come in, thank you.

(Government's Exhibit 1301 was received)

BY MS. DONAHUE:

Q. K.S.x, are you this girl that I'm pointing to on the left side of that photo?
A. Yes.
Q. Is that you? Okay.
Now, do you know the name of the girl who is standing next to you?
A. I don't know.
Q. Do you remember her name?
A. No.
Q. I'm going to show you a couple more photos. Government's Exhibit 1302.
What is in that photograph?
A. Myself.
Q. Do you recognize yourself in that picture?
A. Yes.
MS. DONAHUE: I move 1302 into evidence.
THE COURT: Admitted.
(Government's Exhibit 1302 was received)
BY MS. DONAHUE:
Q. K.S.x, which girl is you in that picture? Are you the girl in front or the girl behind?
A. In the front.
Q. I would like you to take a look at another picture, 1303.
Do you know any of the people in that photograph?
A. Myself and the other lady.

MS. DONAHUE: Move 1303 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1303 was received)

BY MS. DONAHUE:

Q. In this picture, K.S.x, do you know where you are sitting?

A. I'm right in front of the door.

Q. When you say "the door," the door to which house?

A. That's the door going into Michael's house.

Q. I would like you to take a look at another picture, Government's Exhibit 1304.

Do you know anybody in that picture?

A. Myself and the other lady.

MS. DONAHUE: Move 1304 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1304 was received)

BY MS. DONAHUE:

Q. Are you this girl that I'm pointing to with my pen on the screen on the left?

A. Yes.

Q. K.S.x, do you know what room that is in that picture?

A. I don't remember.

Q. Can you take a look at another photograph, Government's Exhibit 1305.

Who is in that picture?

A. Myself, a little boy, and the lady.

MS. DONAHUE: I move 1305 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1305 was received)

BY MS. DONAHUE:

Q. K.S.x, when you look at that picture, do you remember the room where that picture was taken?

A. Maybe downstairs.

Q. When you say "downstairs," what house do you mean?

A. Michael's house.

Q. Can you take a look at another picture, Government's Exhibit 1306.

Who is in this picture?

A. Myself, the lady and the little boy.

MS. DONAHUE: Move 1306 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1306 was received)

BY MS. DONAHUE:

Q. In this picture, is that you holding the little boy?

A. Yes.

Q. K.S.x, do you know where this picture was taken?

A. Outside in front of the house.

Q. Is that outside in front of Michael's house?

A. Yes.

Q. One more. Can you take a look at Government's Exhibit 1307.

Who is in that picture?
A. Myself, the lady and the little boy.
MS. DONAHUE: Move 1307 into evidence.
THE COURT: Admitted.
(Government's Exhibit 1307 was received)
BY MS. DONAHUE:
Q. What are you doing in this picture?
A. Taking pictures.
Q. Are you waving?
A. Yes.
Q. K.S.x, do you remember who took this picture?
A. Maybe Michael.
Q. Maybe Michael, but you're not sure; is that right?
A. Yes.
Q. Do you remember the name of the lady who is standing next to you?
A. No. I cannot.
Q. Did she live at Michael's house at the same time that you did?
A. Yes.
Q. Besides that lady and the little boy and Michael and you, did anybody else live at Michael's house?
A. There was a maid. Maybe is the father of the little boy.
Q. Were there any other girls at Michael's house when you were there?

A. Yes. But I don't remember their names.
Q. Was L.K.xxx at Michael's house at the same time that you were at Michael's house?
A. No.
Q. Was S.R.xxx at Michael's house at the same time that you were at Michael's house?
A. No.
Q. Was S.S.xxx at Michael's house at the same time that you were there?
A. No.
Q. Was T.C.xx at Michael's house at the same time that you were there?
A. No.
Q. Was I.T. at Michael's house at the same time that you were there?
A. No.
Q. Was NTDx at Michael's house at the same time that you were there?
A. No.
Q. The other girls who you said were at Michael's house at the same time that you were there, do you remember any of their names?
A. Only one.
Q. And what is that name?
A. Heang.

Q. Is that Heang? The girl in this picture, is that girl Heang? 1107.

A. No.

Q. Okay.

K.S.x, when you were at Michael's house, did you ever go into his room.

A. Heang?

Q. No. When you were at Michael's, did you ever go into his room?

A. Yes.

THE COURT: This would be a good time for a break, Ms. Donahue.

MS. DONAHUE: Okay.

THE COURT: Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We will take a break. I have another question so I will try to get back to you as soon as I can.

(Recess taken)

THE COURT: Everyone is back. You still have to tell the truth.

Ms. Donahue.

MS. DONAHUE: Thank you, Your Honor.

Q. K.S.x, I have another picture that I'm -- Government's Exhibit 1089. Can you take a look at that picture.

Do you know what that is a picture of?

A. Michael's room.
Q. And have you been in Michael's room?
A. Yes.
Q. I'm going to show you another picture, 1096.
Do you know what that is a picture of?
A. That's Michael's bed.
Q. K.S.x, have you ever been on Michael's bed, the bed in that picture?
A. Yes.
Q. Did something happen to you on that bed?
A. He hurt me.
Q. When you say "he," do you mean Michael?
A. Yes.
Q. What did he do to hurt you?
A. He told me to massage him and suck on his private sex part.
Q. When you say his private sex part, what do you mean?
A. His penis.
Q. What did Michael do to tell you to suck on his penis?
A. Basang was in there.
Q. Basang; is that right?
A. Yes.
Q. Did Basang do something?
A. She taught me.
Q. What did Basang teach you to do?
A. She taught me how to suck on the private sex part with her.

Q. Did Basang suck on Michael's private sex part first?
A. Yes.
Q. After she did that, what did you do?
A. I would suck on his private sex part the same way she showed me.
Q. Now, did Michael do something to tell you that he wanted you to suck on his private sex part?
A. Showed.
Q. What did he do to show you?
A. He told me to go to the room and suck on his private sex part.
Q. Now, K.S.x, do you speak English?
A. No.
Q. And did Michael speak in Khmer to you?
A. No.
Q. So if he didn't say the words, what did he do to show you what he wanted?
A. Gestures.
Q. And what gestures did he make?
A. He pulled my head and -- towards his private sex part.
Q. What did you do?
A. I just followed through.
Q. Did something come out of his penis?
A. Yes.
Q. What came out?

A. Sperm.
Q. And did you taste it?
A. No.
Q. How come?
A. I don't want to.
Q. Now, did Michael have you suck on his penis more than one time?
A. Every day.
Q. Did Michael give you any money after he had you suck on his penis?
A. Yes. If I would -- were to perform, then he would give me a dollar.
Q. I want you to take a look at another picture. This is Government's Exhibit 2067.
Do you know who is in that picture?
A. Basang.
Q. Is that the lady that you talked about earlier who showed you what to do with Michael's penis?
A. Yes.
Q. K.S.x, did Michael have you do other things besides sucking on his penis?
A. Put his private sex part into my private sex part.
Q. Where did he do that?
A. Michael's bed.
Q. And did that happen one time?

A. About three times.
Q. The first time that Michael put his private sex part into your private sex part, did -- what did that feel like?
A. I was not happy.
Q. Did he put his penis all the way inside?
A. No.
Q. Did he put it in just a little bit?
A. Yes.
Q. Did you say anything to him?
A. No.
Q. Did you tell him to stop?
A. No.
Q. Did he ever put his penis inside your vagina again?
A. Yes.
Q. The second time, did he put his penis in just a little bit?
A. No. All the way.
Q. What did that feel like?
A. Right away, it was blood.
Q. Did you feel pain?
A. Yes.
Q. Did you tell him to stop?
A. No.
Q. Did anything come out of his penis?
A. Yes.
Q. Now, K.S.x, either the first time or the second time, did

Michael tie you?

A. No.

Q. Did he ever tie you?

A. No.

Q. Did he put his penis into your vagina more than two times?

A. Three times.

Q. Did you tell him that you wanted him to stop any of those three times?

A. No.

Q. Did you try to leave Michael's house?

A. Yes.

Q. What did you do?

A. I don't understand.

Q. When you tried to leave Michael's house, what did you do?

A. I don't -- I didn't know what to do.

Q. How did you come to Michael's house?

A. Sang.

Q. Basang brought you; is that right?

A. Yes.

Q. Did Basang talk to you before she brought you to Michael's house?

A. I don't remember.

Q. Did Basang talk to your mother before she brought you to Michael's house?

A. I don't know.

Q. Did you tell your family that you were living at Michael's house?
A. No.
Q. K.S.x, did you think that you were supposed to stay at Michael's house?
A. Yes.
Q. K.S.x, when you were at Michael's house, where did you sleep?
A. Sometimes in Michael's room. Sometimes downstairs.
Q. When you slept in Michael's room, did you sleep next to him?
A. Yes.
Q. Did you stay in the bed all night when you slept next to him?
A. Sometimes yes; sometimes no.
Q. How come sometimes no?
A. I don't know.
Q. K.S.x, did there come a time when Michael left and you and the maid were at the house by yourselves?
A. Yes.
Q. And then after that, did Michael come back to the house?
A. Yes.
Q. After he came back to the house did he have you suck on his penis?
A. Yes.

Q. K.S.x, can you look around the room and tell me if you see Michael?

A. He's sitting right over there.

Q. Can you point to where you see him?

A. (Witness indicates).

Q. Over here in the direction you pointed, there are three men. There is a man who is closest to me --

A. Towards this side.

THE COURT: Where is she motioning? Tell me again, please. Which end of the table? Closer to me or farther away?

THE WITNESS: No.

THE COURT: Why don't you continue, Ms. Donahue.

BY MS. DONAHUE:

Q. What color jacket is he wearing?

A. Black.

Q. Not based on my eyesight.

K.S.x, listen to my question. Over here at this table, is he the man who is sitting closest to me or in the middle, or the farthest away from me?

A. Closest.

Q. Closest to me or closest to you?

A. On your side.

Q. Okay.

THE COURT: The witness appears to have identified Mr. Gunn.

MS. DONAHUE: I know.

Q. K.S.x, did you mean to say --

THE COURT: Go stand behind the men, Ms. Donahue.

MS. DONAHUE: You want me to stand behind them?

THE COURT: Go right ahead.

BY MS. DONAHUE:

Q. K.S.x, I am standing over here. I am standing behind this man wearing the glasses.

Is this the man who is Michael?

A. No.

Q. How about the man I'm standing next to right now?

The man in the middle, Mr. Brown?

A. No.

Q. How about the man I'm standing behind right now?

A. Yes.

THE COURT: Indicating the defendant, Mr. Pepe.

BY MS. DONAHUE:

Q. K.S.x, did you ever see Michael give Basang any money?

A. No.

Q. When you left Michael's house, who did you go with?

A. At that time, I don't remember.

Q. Did somebody come to pick you up?

A. My mother.

Q. And where did your mother take you?

A. Home.

Q. Did you go anyplace with your mother before you went home?

A. I don't understand.

Q. When your mother picked you up, did she take you to a hospital?

A. Yes.

Q. What happened at the hospital?

A. They sewed me.

Q. Where did they sew you?

A. My bottom.

Q. K.S.x, when you were at Michael's house, were there any men there other than Michael?

A. I don't understand.

Q. When you were at Michael's house, there were -- you were there and there were other girls there --

A. No -- yes.

Q. And Michael was there; is that right?

A. Yes.

Q. Other than Michael, did anybody hurt you?

A. No.

MS. DONAHUE: I have no further questions.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MR. BROWN:

Q. Good morning, K.S.x.

A. Good morning.

Q. I just want to ask you a few questions. Okay?
A. Yes.
Q. How old are you?
A. Fourteen.
Q. What languages do you speak?
A. Cambodian, Vietnamese.
Q. You speak Vietnamese; right?
A. Yes.
Q. You're fluent in Vietnamese; right?
A. Not really.
Q. Your family is Vietnamese?
A. Yes.
Q. So you speak Vietnamese growing up in the home?
A. Yes.
Q. Okay.

In fact, when you were interviewed -- do you remember being interviewed by some people two years ago?
A. Where?
Q. In Cambodia in a room with a video camera?
A. Yes.
Q. And there was a lady there, right, who spoke Vietnamese to you?
A. Yes.
Q. And a man was speaking to her in English and she was speaking to you in Vietnamese; right?

A. Yes.

Q. And that lady worked for World Hope International; right?

A. Yes.

Q. And you knew that lady?

A. Yes.

Q. You guys -- you stayed at World Hope International for some time; right?

A. Yes.

Q. How long did you stay at World Hope International?

A. I don't remember.

Q. How long had you known that lady?

A. About maybe two months or so.

Q. Was her name Sister Kim?

A. The translator?

Q. Yes.

A. What's her name?

Q. Kim?

A. I call her Kim.

Q. T.C.xx, we -- I'm sorry. K.S.x. K.S.x, we spoke about a person named Basang. Do you remember the prosecutor showed you a picture of her?

THE COURT: Why don't you use a word other than prosecutor.

MR. BROWN: I'm sorry.

Q. Patty showed you a picture of her?

A. Yes.
Q. You know Basang; right?
A. Yes.
Q. In fact, Basang is related to you; right?
A. I don't know.
Q. Is Basang your auntie?
A. No. I don't know that.
Q. Do you remember telling the people you spoke to two years ago that Basang was your Auntie?
A. No.
Q. You didn't say that?
A. I don't remember.
Q. K.S.x, you're 14 years old; right?
A. Yes.
Q. And you know the difference between a truth and a lie; right?
A. No.
Q. You don't know the difference between telling the truth and telling a lie?
A. No.
Q. After -- strike that.
Have you ever lived anywhere other than Cambodia?
A. Thailand.
Q. You lived in Thailand?
A. Yes.

Q. Did bad things happen to you in Thailand?
A. Yes.
Q. Please excuse me for asking this, I don't mean -- I'm not trying to be mean, but we need to get some answers. Okay. So I have to ask you this question.
When you were in Thailand, did a man put his penis in your vagina?
A. Yes.
Q. When -- I want to talk about when you were being videotaped two years ago by the police officers and there was the lady who was the interpreter in Vietnamese. Okay?
A. Okay.
Q. By the way, the lady who is interpreting now is not speaking Vietnamese; right?
A. No.
Q. What language is she speaking to you?
A. Cambodian.
Q. Why -- why didn't they speak to you in -- strike that.
Why -- why didn't you talk Khmer to the people two years ago? Why did you use a Vietnamese interpreter?
A. During that time, I wasn't -- I didn't really speak some Cambodian.
Q. So you learned Cambodian in two years?
A. Yes.
Q. The Vietnamese lady, when they were asking you questions,

the Vietnamese lady was telling you what to say; right?

A. I don't understand.

Q. Do you remember them asking you questions and you not knowing the answer and the lady told you what to say?

A. What do you mean telling me?

Q. Do you remember the lady telling you -- do you remember the lady telling you -- do you remember the lady telling you, "Don't be afraid, tell this mister," right before the camera went off?

Do you remember that?

A. No.

Q. Would it refresh your recollection --

THE COURT: That was not an intelligible question.

MR. BROWN: I'll rephrase, Your Honor.

THE COURT: Thank you.

BY MR. BROWN:

Q. Do you remember the lady telling you to -- strike that.

Do you remember the lady telling you to tell the mister what happened, tell the mister about the bad things that happened to you?

A. No. I don't remember.

Q. Would it help you to remember if we played that portion of the tape for you so you could listen to it?

A. Go ahead.

MR. BROWN: Your Honor, if we could queue up the K.S.x interview, I think it was just one volume at counter 47:59 and I

am referring to Page 25 of the transcript.

THE COURT: If you have no objection, Ms. Donahue.

MS. DONAHUE: No objection.

THE COURT: All right.

MS. DONAHUE: If the agent could help.

AGENT WANG: What was the counter again, counselor?

MR. BROWN: 47:59. It's just a little snippet. I think it's probably 10 or 15 seconds.

(Whereupon, the audio was played for the witness)

BY MR. BROWN:

Q. K.S.x, did you have a chance to listen to that part of the tape?

A. I was afraid.

Q. Okay.

Do you recall -- did you hear what the lady said, "Tell him, tell him"?

A. Oh, I just heard that, "Daughter, don't be afraid." That's what I heard.

Q. And do you remember during that same interview when the mister told you -- asked you how many times -- how many times did you have sex, and you said, "Who knows"?

A. No. I don't remember.

Q. Would it refresh your recollection if we played that part of the video for you?

A. Sure.

MR. BROWN: If we could just queue up at 1:03 on that same tape.

AGENT WANG: What's that?

MR. BROWN: 1:03.

AGENT WANG: One minute, 30 seconds?

MR. BROWN: Yes. It's Page 31. I'm sorry. One hour and three minutes.

AGENT WANG: For how long?

MR. BROWN: Ten seconds.

(Whereupon, the audio was played for the witness)

THE WITNESS: I couldn't really understand.

BY MR. BROWN:

Q. You couldn't understand because of volume -- was the volume too low or you didn't understand the language?

A. Yes.

MR. BROWN: Your Honor, is there any way we could --

THE COURT: No. Just move on.

BY MR. BROWN:

Q. K.S.x, if I told you that you said "who knows" during that interview when they asked you how many times did you have oral sex, would that refresh your recollection as to what you said?

A. No.

THE COURT: By the way, that was a different question from the one you asked her before.

MR. BROWN: Okay.

Q. The interpreter is the person who said four times; isn't that true?

MS. DONAHUE: Objection. This calls for hearsay.

THE COURT: Overruled.

Do you understand the question?

THE WITNESS: No.

THE COURT: I didn't either.

MR. BROWN: I'll back up a little, Your Honor. I apologize. I know this is a little awkward and inartful.

Q. K.S.x, when you were being interviewed a few years ago, there were a few people asking you questions; right?

A. Two, three people?

Q. You were in a small room?

A. Ask again, please.

Q. Okay.

Where were you when you were interviewed in 2006?

A. In a room.

Q. That was -- was that at the embassy?

A. What's embassy?

Q. It was in a small --

THE COURT: Stop. Is there some dispute? If you want to know what she knows or do you want to know where she was? If you want to know where she was, the two of you talk and let's just tell the jury where she was. If you're testing her recollection about what embassy was, then you may proceed.

 MR. BROWN: I'm not testing her recollection. I'm just trying to --

THE COURT: Okay. Why don't you see if you agree on where she was so that we can tell the jury where she was.

BY MR. BROWN:

Q. K.S.x, you were at the embassy being interviewed by an agent; right? A man?

A. Yes.

Q. That man was asking you questions; right?

A. Yes.

Q. But you didn't understand the man's questions because you don't speak his language; right?

A. Yes.

Q. But there was a lady sitting next to you who was telling you what the man was saying; right?

A. Yes.

Q. And you gave answers in Vietnamese; right?

A. Yes.

Q. And the Vietnamese lady was telling the man what you said; right?

A. Yes.

Q. But there were times when the man didn't ask you a question and the Vietnamese lady asked you questions; right?

A. I don't remember that.

Q. Okay.

Do you remember the Vietnamese lady asking you did he penetrate your vagina with a penis and you said no.

THE INTERPRETER: I apologize, counsel. Did you say "he" or "she"?

MR. BROWN: "He." She asked the question.

THE INTERPRETER: I am sorry?

THE COURT: Rephrase your question.

MR. BROWN: I'm sorry.

Q. The lady from World Hope asked you a question.

A. Okay.

Q. And the question was did he penetrate your vagina with his penis.

Do you recall your first answer to that question?

A. No, I don't remember.

Q. Okay.

Can we play the tape for you? Would that help you remember?

A. Okay.

MR. BROWN: Your Honor, if we could have the audio just double-checked for the witness, the counter is at an hour six and ten seconds. Page 33 of the transcript.

THE COURT: Why don't you check, Agent, and make sure that the volume is fine.

AGENT WANG: How long?

MR. BROWN: Five seconds.

(Whereupon, the audio was played for the witness)

THE WITNESS: I didn't hear anything yet.

THE COURT: Agent, you need to check the volume.

BY MR. BROWN:

Q. Okay.

K.S.x, were you able to hear your first answer to that question?

A. Well, it didn't get to my part yet.

Q. Okay. Okay.

Did it not get to your part because the Vietnamese lady was talking?

A. He -- she was talking.

Q. Do you remember the agent asking you, the man asking you what color the car was, Michael's car?

A. I'm not sure. Probably black.

Q. Do you remember the man asking you to describe the bed?

A. You know, during that time, I really don't remember.

Q. And that's kind of what you were saying back then, right, but it was the Vietnamese lady who said that the bed had a flower carving on it. That wasn't your answer, was it? It was the Vietnamese lady's answer.

A. I don't know.

MR. BROWN: Okay. Your Honor, I have no further questions at this time. Thank you.

THE COURT: Redirect.

REDIRECT EXAMINATION

BY MS. DONAHUE:

Q. K.S.x, I'm going to ask you a question about the time when you talked to the man on the videotape.

A. Yes.

Q. Do you remember whether the man asked you if you knew the difference between telling the truth and telling a lie?

A. I don't remember.

Q. Would it help your memory if you listened to that part of the tape?

A. I don't want to listen anymore.

Q. I know that you don't want to listen --

THE COURT: I don't think that's helpful anyway, Ms. Donahue.

MS. DONAHUE: Okay. Okay.

Q. K.S.x, what color is the piece of paper that I'm holding?

A. I don't know what it's called.

Q. You don't know what this color is?

A. Ocean color.

Q. If I said this piece of paper is red, would that be the truth or would that be a lie?

A. Not true.

Q. K.S.x, is it true or not true that you were at Michael's house?

A. The truth.

Q. Are the things that you are remembering today the truth or a lie?

THE INTERPRETER: I'm sorry, Counsel. Can you repeat that question?

BY MS. DONAHUE:

Q. The things that you remember today as you sit here that you have told us, is that the truth?

A. The truth.

MS. DONAHUE: I have no more questions.

THE COURT: Recross?

MR. BROWN: Your Honor, I have no further questions at this time.

THE COURT: All right. Let's take a 15 minute break. Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you.

(Recess taken)

(Jury Out)

THE COURT: Before we bring the witness in, Mr. Lulejian, I don't know what you are doing over there with your computer, but stop it. The jurors have complained that you're pulling up things that is either distracting or they don't want to see or whatever.

MR. LULEJIAN: I will stop immediately, Your Honor.

THE COURT: All right.

(Jury In)

S.R.xxx, Government's witness, was sworn

THE CLERK: Thank you. Thank you. If you would all please have a seat.

THE COURT: I don't know why we did that with you standing.

THE CLERK: Oh, I am sorry.

I am going to need you to state your first name and spell your first name for the record.

THE WITNESS: S.R.xxx.

THE INTERPRETER: S-R-x-x-x-x-x.

THE COURT: You may proceed.

MS. DONAHUE: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. DONAHUE:

Q. Good morning, S.R.xxx.

A. Yes.

Q. S.R.xxx, can you tell us how old you are?

A. Twelve.

Q. And are you celebrating your birthday tomorrow?

A. Yes.

Q. Are you going to be 12 years old tomorrow?

A. Yes.

Q. S.R.xxx, what country do you live in?

A. Khmer.

Q. Is Khmer Cambodia?
A. Yes.
Q. Have you lived in Cambodia your whole life?
A. Yes.
Q. Does your family live in Cambodia?
A. Yes.
Q. Who are the members of your family?
A. Who?
Q. Do you have brothers and sisters?
A. Two younger sibling and one older sister.
Q. How about your mom? Does she live in Cambodia, too?
A. Yes. My father and my mother.
Q. Does your mother have a job?
A. Yes.
Q. What is her job?
A. She grew mushrooms.
Q. How about your dad. Does he have a job?
A. Yes.
Q. What is his job?
A. With my mother.
Q. Is that also growing mushrooms?
A. Yes.
Q. Right now in Cambodia, do you live at the Agape Center?
A. Yes.
Q. At the Agape Center, S.R.xxx, do you go to school?

A. Yes.
Q. What grade are you in?
A. Third.
Q. What are you studying in third grade?
A. Cambodian, history, sociology, math. And English.
Q. Do you have a favorite subject to study?
A. Yes.
Q. What is that?
A. Sociology and Cambodian.
Q. What do you want to do when you grow up?
A. Secretary.
Q. S.R.xxx, I am going to show you some pictures.
A. Yes.
Q. The first picture, Exhibit 1078. That's on the screen.
Do you know what that is?
A. A house.
Q. Do you know whose house that is?
A. Michael's house.
Q. How do you know that?
A. I used to live there.
Q. Who did you used to live there with?
A. L.K.xxx, S.S.xxx, and myself.
Q. Is S.S.xxx your sister?
A. Yes.
Q. I want to show you a couple more pictures. The first one,

Government's Exhibit 1362.

S.R.xxx, who are the people in that picture?

A. My family.

MS. DONAHUE: Move 1362 into evidence.

MR. GUNN: No objection.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1362 was received)

BY MS. DONAHUE:

Q. S.R.xxx, where was this picture taken?

A. Michael's house.

Q. Now I'm going to point on the screen and can you tell me who each of these people are, starting with the man on left?

A. My father.

Q. Who is that?

A. Myself.

Q. Who is this?

A. My sister.

Q. Is that S.S.xxx?

A. Yes.

Q. Is S.S.xxx older than you?

A. Yes.

Q. How much older?

A. One.

Q. Is that one year?

A. Yes.

Q. Who is this?

A. My younger sibling.

Q. Who is this?

A. My mother.

Q. Do you know who took this picture?

A. Maybe Michael.

Q. I would like you to take a look at Government's Exhibit 1363, another picture. Government's Exhibit 1363.

Who is that a picture of?

A. My mother.

MS. DONAHUE: Move 1363 into evidence.

MR. GUNN: I have no objection.

THE COURT: I was distracted for a moment. Just a moment.

MS. DONAHUE: Oh, I'm sorry.

THE COURT: That's okay.

That's admitted.

(Government's Exhibit 1363 was received)

BY MS. DONAHUE:

Q. Where is that picture taken?

A. That's Michael's house.

Q. I would like you to take a look at another picture. Government's Exhibit 1368.

Who is in that picture?

A. Myself and my sister.

MS. DONAHUE: Move 1368 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1368 was received)

BY MS. DONAHUE:

Q. Where is that picture taken?

A. At Michael's house.

Q. Was that picture taken around Christmastime?

A. Yes.

Q. I would like you to take a look at another picture, Government's Exhibit 1376.

Who is in that picture?

A. Myself, Sang, the husband, my mother, my father.

MS. DONAHUE: Move 1376 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1376 was received)

BY MS. DONAHUE:

Q. When you say yourself, are you the girl in the blue hat?

A. Yes.

Q. And who is the woman right behind you in the blue jacket?

A. My mother.

Q. And who is the man behind your mother?

A. My father.

Q. Who is this woman in the pink shirt and white pants?

A. Sang.

Q. Is that Basang?

A. Yes.
Q. Who is the man in the white shirt next to her?
A. Her husband.
Q. When you say "her husband," you mean Basang's husband?
A. Yes.
Q. I just have a couple more pictures to show you. Government's Exhibit 1392. 1391 and 1392 both.

Who is that a picture of?
A. Myself.

MS. DONAHUE: Move 1391 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1391 was received)

BY MS. DONAHUE:
Q. Is that taken at Christmastime?
A. Yes.
Q. Do you know who took that picture?
A. Michael.
Q. Can you take a look at another photograph, Government's Exhibit 1392.

Who is that a picture of?
A. My oldest sister.

MS. DONAHUE: Move 1392 into evidence.

THE COURT: Admitted.

(Government's Exhibit 1392 was received)

BY MS. DONAHUE:

Q. Is that S.S.xxx?

A. Yes.

Q. Was that picture taken at Michael's house?

A. Yes.

Q. One more picture, Government's Exhibit 1404. Can you take a look at that picture. Who are the people -- I'm sorry. I move 1404 into evidence. I apologize.

Who are the people in that picture?

A. Myself, my older sister, and my mother.

MS. DONAHUE: Move 1404 into evidence.

THE COURT: It will be admitted.

(Government's Exhibit 1404 was received)

MS. DONAHUE: I apologize.

THE COURT: Just so you know, we are going to have to break around noon or so and we are going to break for the day because, as I said, I have verdicts in my other case. That one will take quite a while. So when you think it's a good time for you to stop between 12:00, 12:10 or so, let me know.

MS. DONAHUE: Thank you, Your Honor.

Q. Looking at this photograph, Government's Exhibit 1404, is that you in the white dress?

A. Yes.

Q. And your sister, S.S.xxx?

A. Yes.

Q. And your mom?

A. Yes.
Q. Who took this picture?
A. Maybe Michael.
Q. Were you and S.S.xxx living at Michael's house?
A. Yes.
Q. Was this picture taken at Michael's house?
A. Yes.
Q. S.R.xxx, did you like living at Michael's house?
A. At the beginning, yes. After a while, no.
Q. Why did you like it at the beginning?
A. I saw his house was nice.
Q. Had something happened to the house that you lived in with your family before you moved to Michael's house?
A. Yes. My family's burned -- got burned.
Q. Got burned down?
A. Yes.
Q. How did you come to live at Michael's house?
A. At first my sister -- my in-law brought me there to visit.
Q. Who was your in-law?
A. Ngoc.
Q. What happened when you came to visit at Michael's house?
A. I went to visit there at first and I thought I saw the house was nice and all that.
Q. Did you meet Michael?
A. Yes.

Q. Did he give you anything?
A. Yes.
Q. What did he give you that first time that you met him?
A. Money, soap, powder.
Q. Okay.
And then a couple of days later, did you move to Michael's house?
A. Yes.
Q. Before you moved to Michael's house, did Basang and Ngoc talk to your mother?
MR. GUNN: Objection, Your Honor, no foundation for personal knowledge.
THE COURT: Lay some foundation, Ms. Donahue.
BY MS. DONAHUE:
Q. Before you moved to Michael's house, did you see Basang talk to your mother?
A. Before I moved in?
Q. Yes.
A. Yes.
Q. Did your mother tell you that you could go to live at Michael's house?
A. Yes.
Q. Did you want to go and live at Michael's house?
A. Yes.
Q. When -- were you going to school when your house burned

down?

A. Yes.

Q. Did you go to school all the time when you lived at home with your mom?

A. Sometimes yes; sometimes no.

Q. Did your mom always have enough money to pay for school?

A. No.

Q. Did you go to Michael's house with your sister, S.S.xxx?

A. Yes.

Q. You said at first you liked it at Michael's house and later you did not; is that right?

A. Yes.

Q. How come you did not like to live at Michael's house?

A. Because of what he was doing.

Q. Let's talk a little bit about that.

A. Yes.

Q. When you were at Michael's house, did you ever go into his bedroom?

A. Yes.

Q. Did you take a look at a picture for me, Government's Exhibit 1096.

S.R.xxx, do you know what that is a picture of?

A. Michael's bedroom.

Q. Were you ever in Michael's bedroom?

A. Yes.

Q. Were you in Michael's bedroom on more than one time?
A. Yes. Many.
Q. And on those many times that you were in his bedroom, what did you do?
A. Sometimes massage; sometimes clean up his bedroom.
Q. When you say "massage," who would give the massage?
A. Myself, S.S.xxx, L.K.xxx.
Q. And would the three of you give a massage to Michael?
A. Yes.
Q. What did Michael wear when you gave him a massage?
A. No clothes at the time.
Q. How about you? What would you wear when you gave him a massage?
A. No. No clothes.
Q. How come you were not wearing any clothes?
A. He told me to take it off.
Q. How did Michael tell you to take your clothes off?
A. Sometimes he would take them off me.
Q. How about L.K.xxx and S.S.xxx, what were they wearing when they were giving Michael a massage?
A. Nothing also.
Q. When you gave Michael a massage, S.R.xxx, what would you do?
A. Massage.
Q. Where would you rub him?

A. Everywhere.
Q. Did Basang show you how to do something?
A. Yes.
Q. What did she show you how to do?
A. To suck on him.
Q. Where would you suck on him?
A. Penis.
Q. Where would you put your hands when you were sucking on his penis?
A. Next to his penis.
Q. After you sucked on his penis, did anything come out?
A. Yes.
Q. What came out?
A. Fluid.
Q. Where would that fluid go?
A. Sometimes in my mouth.
Q. What did it taste like?
A. Fishy.
Q. Did you swallow it?
A. No.
Q. What did you do?
A. I spit it out.
Q. Where did you spit it out?
A. His -- Michael's bathroom.
Q. What did you do after you spit it out?

A. I brushed my teeth.

Q. Did you see anyone else suck on his penis?

A. L.K.xxx, S.S.xxx.

Q. S.R.xxx, did Michael ever give you money?

A. Yes.

Q. When did he give you money?

A. After the massage.

Q. How much money would he give you?

A. $1.

Q. S.R.xxx, did Michael ever put his penis inside of your vagina?

A. No.

Q. Did Michael ever put his tongue on your body?

A. Yes.

Q. Where were you when he did that?

A. In his bedroom.

Q. What were you wearing?

A. Nothing.

Q. What did he do?

A. I sat on him and he licked me.

Q. When you say you sat on him, where -- what part of his body did you sit on?

A. His mouth.

Q. How did that feel?

A. Painful and embarrassed.

Q. Did you tell him to stop?
A. No.
Q. Did you think that you could tell him to stop?
A. I don't know.
Q. S.R.xxx, did Michael ever give you any medicine?
A. Yes.
Q. What did he give you?
A. I don't know.
Q. Was it a pill?
A. I don't remember.
Q. Do you remember whether or not he ever gave you any medicine?
A. Yes.
Q. How did you feel after he gave it to you?
A. Normal.
Q. Did he do anything after he gave you the medicine?
A. He put something in my anus.
Q. Do you know what it was?
A. No.
Q. Did it hurt?
A. I don't know. I don't remember anymore.
Q. S.R.xxx, let's talk a little bit about money. You said that Michael gave you money after you sucked on his penis; is that right?
A. Yes.

Q. What did you do with the money?
A. Save.
Q. Did you ever tell your mother that Michael was having you suck on his penis?
A. No.
Q. How come?
A. I did not want to.
Q. How come you did not want to?
A. I wanted to save money so I can help my siblings to go to school.
Q. S.R.xxx, do you remember when Michael was lying on his bed and he had no clothes on, did you see any marks or bumps on his body?
A. Yes.
Q. What did you see?
A. A mole.
Q. Where was that mole?
A. In his thigh.
Q. How big was it?

THE COURT: She is making a sign at the very end almost of her pinkie.

BY MS. DONAHUE:

Q. S.R.xxx, what color was it?
A. Reddish.
Q. S.R.xxx, when you rubbed Michael's body, did he ask you to

put anything -- any cream or anything like that on it?

A. Yes.

Q. What did you rub on him?

A. Oil on his private.

Q. Did that oil come out of a bottle?

A. Yes.

Q. Did you remember what the bottle looked like?

A. Yes.

Q. What did it look like?

A. This size (indicating).

Q. You're holding up your hands about three inches apart and maybe about -- about three inches apart. And what, about eight inches tall?

THE COURT: That looks about right.

BY MS. DONAHUE:

Q. Okay. What color was it?

A. Pink.

Q. Can you take a look at a picture for me, Exhibit 1138.

Do you know what that is?

A. Yes.

Q. What is that?

A. Bottle.

Q. In that picture, where is that bottle in Michael's house?

A. The -- in the maid's room.

Q. Did you ever see that bottle in the maid's room?

A. Yes. I have.

Q. What did you see the maid doing with that bottle?

A. Coin herself.

Q. What does it mean to coin yourself?

A. Coin means when you sick, you coin it so you get better, you get well.

Q. Do you take oil and rub it on a coin and then rub it on your skin?

A. Yes.

Q. That's something that people in Cambodia do sometimes when they're sick, isn't it?

A. Yes.

Q. Now, S.R.xxx, when you used that oil to rub it on Michael's penis, where in the house was that bottle?

A. Next to his bed.

Q. When you say "his bed," do you mean Michael's bed?

A. Yes.

Q. S.R.xxx, can you look around the room and tell me if you see Michael?

A. Yes.

Q. Can you point to him?

A. Yes.

Q. Could you point to him right now?

A. Yes. (Witness indicates). He is sitting right there.

Q. At this table, is he the man who is closest to me or the

man who is sitting in the middle or the man who is closest to you?

A. My side.

THE COURT: Indicating the defendant, Mr. Pepe.

BY MS. DONAHUE:

Q. S.R.xxx, when you lived at Michael's house, did he call you by your name, S.R.xxx?

A. He used to call me Smiley.

Q. Smiley was his name for you?

A. Yes.

Q. S.R.xxx, when you were at Michael's house, did he ever have people come over to visit him?

A. Inviting somebody?

Q. Yes. Would he have people come over that he had invited?

A. I don't know.

Q. Did you ever see any people come over to visit Michael?

A. Sometimes I would see people who works with him come over.

Q. Where were you when those people came to the house?

A. I hide.

Q. Where did you hide?

A. My bedroom.

Q. Why did you hide in your bedroom?

A. Michael told me to.

Q. S.R.xxx, when you were at Michael's house, did you suck on the penis of any man other than Michael?

A. No.

MS. DONAHUE: I have no further questions.

THE COURT: Would the defense like to wait until tomorrow?

MR. GUNN: I'm sorry, Your Honor?

THE COURT: Would you like to wait until tomorrow?

MR. GUNN: That would probably make sense. I am going to be more than ten minutes.

THE COURT: Ladies and gentlemen, as I indicated, I have a verdict in my other case, but starting tomorrow, I will be all yours. It will take quite some time. We will recess for the day.

Don't talk about the case or form or express any opinions about the case until it's finally submitted to you. You are ordered to return tomorrow at 8:00 a.m. You are ordered to have a good evening.

(Jury Out)

(Proceedings adjourned at 11:51 a.m.)

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 18, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

_____________________________ _________________
Pamela A. Seijas, CSR No. 3593 Date
Official Reporter

**Certificate of Service**

I hereby certify that on May 28, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *James H. Locklin*

By: JAMES H. LOCKLIN
Deputy Federal Public Defender

No. 14-50095

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

MICHAEL JOSEPH PEPE,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
The Honorable Dale S. Fischer, Presiding
No. CR-07-00168-DSF

## Appellant's Excerpts of Record
**[Volume 6 of 12]**

HILARY L. POTASHNER
Acting Federal Public Defender
JAMES H. LOCKLIN
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California  90012
213-894-2929

*Counsel for Defendant-Appellant*

# Table of Contents

## Volume 1

Order Denying Defendant's Motion to Dismiss Indictment....................................1
[Filed December 3, 2007; Docket No. 57]

Order Denying Defendant's Motions to Suppress Evidence...................................9
[Filed December 5, 2007; Docket No. 60]

Order Denying Defendant's Motion to Suppress Evidence ..................................20
[Filed February 7, 2008; Docket No. 129]

Transcript – Sentencing (Excerpts)........................................................................26
[Dated February 28, 2014; Filed April 17, 2014; Docket Nos. 491, 512]

## Volume 2

Defendant's Motion to Suppress Evidence* ......................................................42
[Filed June 26, 2007; Docket No. 21]

Defendant's Motion to Suppress Evidence (Excerpts)........................................120
[Filed August 1, 2007; Docket No. 33]

Government's Consolidated Opposition to Motions to Suppress Evidence* ........130
[Filed August 22, 2007; Docket No. 39]

Defendant's Reply re Motions to Suppress Evidence ..........................................208
[Filed September 4, 2007; Docket No. 40]

Defendant's Motion to Dismiss Indictment.........................................................220
[Filed October 4, 2007; Docket No. 43]

Transcript – Motion Hearing ...............................................................................244
[Dated October 29, 2007; Filed February 26, 2008; Docket Nos. 50, 133]

---

* Documents marked with an asterisk have been redacted pursuant to Federal Rule of Appellate Procedure 25(a)(5) and Federal Rule of Criminal Procedure 49.1(a).

Government's Declaration re Motions to Suppress Evidence ..............................295
[Filed November 27, 2007; Docket No. 53]

Transcript – Motion Hearing (Excerpts)* ..........................................................299
[Dated December 3, 2007; Filed February 26, 2008; Docket Nos. 58, 134]

Volume 3

Defendant's Supplemental Memorandum re Motion to Suppress Evidence.........340
[Filed December 20, 2007; Docket No. 71]

Government's Supplemental Memorandum re Motion to Suppress Evidence .....350
[Filed December 20, 2007; Docket No. 72]

First Superseding Indictment ................................................................................372
[Filed December 20, 2007; Docket No. 83]

Government's Supplemental Declaration re Motion to Suppress Evidence (Excerpts) ...................................................................................................................374
[Filed February 5, 2008; Docket No. 127]

Transcript – Motion Hearing (Excerpts)* ..........................................................380
[Dated February 6, 2008; Filed February 26, 2008; Docket Nos. 136]

Transcript – Trial – Day 2 (Excerpts)...................................................................460
[Dated May 9, 2008; Filed May 18, 2010; Docket Nos. 259, 410]

Volume 4

Transcript – Trial – Day 3 (am) (Excerpts) .........................................................635
[Dated May 13, 2008; Filed May 18, 2010; Docket Nos. 260, 411]

Transcript – Trial – Day 3 (pm).............................................................................766
[Dated May 13, 2008; Filed June 17, 2014; Docket Nos. 260, 532]

Volume 5

Transcript – Trial – Day 4 (Excerpts)...................................................................805
[Dated May 14, 2008; Filed May 18, 2010; Docket Nos. 261, 412]

Transcript – Trial – Day 5 (Excerpts) .......... 942
[Dated May 15, 2008; Filed May 18, 2010; Docket Nos. 262, 413]

Volume 6

Transcript – Trial – Day 6 (Excerpts) .......... 1022
[Dated May 16, 2008; Filed May 18, 2010; Docket Nos. 263, 414]

Volume 7

Transcript – Trial – Day 7 (Excerpts)* .......... 1192
[Dated May 20, 2008; Filed May 18, 2010; Docket Nos. 264, 415]

Transcript – Trial – Day 8 (Excerpts) .......... 1343
[Dated May 21, 2008; Filed May 18, 2010; Docket Nos. 269, 416]

Volume 8

Transcript – Trial – Day 9 (Excerpts) .......... 1423
[Dated May 22, 2008; Filed May 18, 2010; Docket Nos. 270, 417]

Volume 9

Transcript – Trial – Day 10 (Excerpts) .......... 1538
[Dated May 23, 2008; Filed May 18, 2010; Docket Nos. 293, 418]

Transcript – Trial – Day 11 (Excerpts) .......... 1739
[Dated May 27, 2008; Filed June 2, 2010; Docket Nos. 294, 435]

Volume 10

Transcript – Trial – Day 12 (Excerpts) .......... 1805
[Dated May 28, 2008; Filed May 18, 2010; Docket Nos. 295, 419]

Transcript – Trial – Day 13 (Excerpts) .......... 1930
[Dated May 29, 2008; Filed May 18, 2010; Docket Nos. 296, 420]

Stipulation to Correct/Modify Record re Jury Instructions (Excerpts)[†] .............1941
[Filed February 27, 2015; Docket No. 543]

Order Correcting/Modifying Record re Jury Instructions ..................................1961
[Filed March 2, 2015; Docket No. 545]

Order Correcting/Modifying Record re Video Testimony .................................1963
[Filed March 2, 2015; Docket No. 546]

Government's Sentencing Memorandum (Excerpts) ........................................1965
[Filed September 17, 2008; Docket No. 318]

Transcript – Victim Statements ........................................................................1977
[Dated September 25, 2008; Filed June 18, 2014; Docket Nos. 333, 533]

Defendant's Supplemental Filing re Restitution................................................1998
[Filed March 25, 2009; Docket No. 348]

Judgment ...........................................................................................................2006
[Filed February 28, 2014; Docket No. 492]

Notice of Appeal ...............................................................................................2012
[Filed March 3, 2014; Docket No. 493]

Docket ...............................................................................................................2013

Volume 11 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 1)..................2053
[Filed March 3, 2015; Docket No. 547]

Volume 12 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 2)..................2309
[Filed March 3, 2015; Docket No. 547]

[†] Although this document and the two orders that follow were not filed until after the judgment and notice of appeal were filed, they are placed here in the excerpts because they relate to the trial proceedings.

Exhibit No. 101 ....................................................................................2399

Exhibit No. 102 ....................................................................................2401

Exhibit No. 103 ....................................................................................2403

Exhibit No. 104 ....................................................................................2405

Exhibit No. 106 ....................................................................................2408

Exhibit No. 107 ....................................................................................2410

Exhibit No. 108 ....................................................................................2412

Exhibit No. 109 ....................................................................................2414

Exhibit No. 110 ....................................................................................2416

Exhibit No. 111 ....................................................................................2418

Exhibit No. 114 ....................................................................................2420

Exhibit No. 123 ....................................................................................2423

Exhibit No. 2007 ..................................................................................2428

Exhibit No. 2009 ..................................................................................2454

Exhibit No. 2010 ..................................................................................2456

Exhibit No. 2011 ..................................................................................2458

Exhibit No. 2093 ..................................................................................2460

Exhibit No. 2096 ..................................................................................2462

Exhibit No. 2200A ...............................................................................2464

Exhibit No. 2201A ...............................................................................2467

Exhibit No. 2202A ....................2477

Verdict ....................2480
[Filed May 29, 2008; Docket No. 299]

Presentence Report ....................2488
[Dated July 30, 2008; Filed March 25, 2009; Docket No. 346]

Probation Office Letter to District Court ....................2517
[Dated September 3, 2008]

Government's Submission of Victim Impact and Restitution Information ....................2523
[Filed September 19, 2008; Docket No. 329]

Supplement to Presentence Report ....................2559
[Filed March 25, 2009; Docket No. 347]

Government's Response to Defendant's Filing re Restitution ....................2562
[Filed April 21, 2009; Docket No. 355]

Government's Supplemental Submission re Restitution ....................2583
[Filed February 28, 2014; Docket No. 490]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

United States of America, )
Plaintiff, )
)
vs. ) Case No.
) CR 07-168(A)-DSF
Michael Joseph Pepe, )
Defendant. )
________________________________ )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

Day 6

Los Angeles, California

Friday, May 16, 2008

Pamela A. Seijas, CSR, FCRR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California 90012
(213) 687-0446

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
BY: PATRICIA DONAHUE
ASSISTANT UNITED STATES ATTORNEY
JOHN LULEJIAN
ASSISTANT UNITED STATES ATTORNEY
312 N. SPRING STREET
LOS ANGELES, CA 90012

FOR DEFENDANT: OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY: CARL GUNN
DEPUTY FEDERAL PUBLIC DEFENDER
CHARLES BROWN
DEPUTY FEDERAL PUBLIC DEFENDER
321 EAST SECOND STREET
LOS ANGELES, CA 90012

ALSO PRESENT: ATTACHE GARY PHILLIPS
ICE SPECIAL AGENT EDDY WANG

THE INTERPRETERS: CHANDARA HAC, VIETNAMESE
MORYVANN PAIGNE, CAMBODIAN

portions of the CD of the video interview, not so much to impeach or refresh with the witness but to show demeanor and/or the way questions were posed and asked. Not even for the truth of the matter so much as showing a bias or problem with the interview context. So I assume that will be permissible. And we won't have to do the headphone thing since it will be offered for the purpose of showing the jury how the demeanor and the question and answer --

THE COURT: Well, if that's appropriate. I don't know that it necessarily needs to be done with the witness present.

MR. GUNN: I believe it would be appropriate during the cross-examination of the witness and she will be able -- I will be asking her questions about whether she did such-and-such and then I will say is the place where that happened or is this the place where they asked this that way.

THE COURT: I guess I will wait and see.

MR. GUNN: All right, Your Honor.

(Jury In)

THE COURT: Good morning. Everyone is back. And the witness is back on the stand. The interpreter is still under oath.

Promise to tell the truth?

THE WITNESS: Yes.

THE COURT: Mr. Gunn.

MR. GUNN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. GUNN:

Q. S.R.xxx, my name is Carl Gunn and I'm one of Michael's attorneys, and I need to ask you some questions about your testimony yesterday. All right?

A. Yes.

Q. First of all, Michael did send you to school while you were living at his house; correct?

A. Yes.

Q. And he even had one of his teachers come over to give you tutoring in English, didn't he?

A. Yes.

Q. And that teacher came over three days a week; right?

A. Yes.

Q. And he tutored both you and the other girls who were living in the house, didn't he?

A. Yes.

Q. And there is another girl living at the house named Ngoc, wasn't there?

A. Yes.

Q. She was your sister-in-law?

A. Yes.

Q. And so she was your older brother's wife?

A. Yes.

Q. And which brother was that? What was that brother's name?

A. Ben.

Q. Ben?

A. Yes.

Q. Ben was born on June 9th, 1987; is that right?

A. I don't know.

Q. Would it refresh your memory if you saw a copy of your family book?

MS. DONAHUE: Objection. No failure of recollection.

THE COURT: Sustained. She said she didn't know, not she didn't remember.

BY MR. GUNN:

Q. Is it that you never have known how old he is or that you don't remember now how old he is?

THE COURT: You didn't ask how old he was. You asked what date he was born.

MR. GUNN: All right.

Q. Let me rephrase my question then, S.R.xxx. The judge made a good point.

How old is Ben? Do you remember how old Ben is?

A. I don't know.

Q. Is it that you never knew or you don't know or you just don't remember right now?

A. I never knew.

Q. Did you also have an older brother or relative who worked at the house as a gate guard when you first came?

A. No.
Q. You said no?
A. Correct.
Q. Your mother came over to visit at the house, didn't she, sometimes?
A. Yes.
Q. And, in fact, she came over quite a lot, didn't she?
A. I don't know.
Q. You don't know if she came over a lot?
A. I think, yes, it's possible that she came often.
Q. And you went home to your parents' house on most weekends, didn't you?
A. Yes.
Q. And no one forced you to stay at the house; right?
A. What do you mean "forced"?
Q. Well, no one kept you from going home to your mother's house for weekends, for example; right?
A. No.
Q. And no one forced you to go back at the end of the weekends, did they?
A. No.
Q. You never told your mother, "I don't want to go back to the house," did you?
A. No.
Q. You testified about this mole that you claim Michael has on

his thigh; is that right?

A. Yes.

Q. You said it was red?

A. Reddish pink.

MR. GUNN: Your Honor, I would like an exhibit placed in front of the witness. It will be Defense Exhibit 302.

THE COURT: All right.

MR. GUNN: If it could be kept down until I ask her about it.

THE COURT: Well, ask her about it and then we will place it in front of her then.

MR. GUNN: That's fine.

Q. S.R.xxx, I need to show you a photograph that may embarrass you but I need to ask you a couple of questions about it. Okay?

A. Yes.

Q. If we can have it placed in front of S.R.xxx, Your Honor. It would be 302, Defense.

S.R.xxx, that's a photo of part of a man's body, isn't it?

A. Yes.

Q. And it shows his inner legs; right?

A. Inner legs?

Q. His thighs, right? The inside of his legs?

A. Yes. I can see his thigh but not everything.

Q. And on the inside of one of the thighs is a red mark;

right?

A. Yes.

Q. Have you seen that mark before?

A. I don't recall.

Q. Is that the mark you're talking about on Michael's leg or is it not the mark you're talking about on Michael's leg?

A. I was talking about the mole.

Q. And is that the mole you're -- is that the mole you're talking about on Michael's leg or is it not the mole you're talking about on Michael's leg?

A. That's not it.

Q. You testified -- let me step back. You talked about that mole that you say you saw in an interview with Agent Phillips, this man Gary here at the table; right?

A. Yes.

Q. I want to talk a little bit about how that came up in the interview. He started off asking you just a general question -- actually, let me rephrase that question.

He started off just asking you what Michael looks like; right?

A. Yes.

Q. And you replied -- what you said first was -- the first thing you said was Michael was fat; right?

A. Correct.

Q. And then he asked you just another general question, "Okay,

what else?"; right?

A. What else?

Q. He said -- you said Michael was fat; right?

A. Yes.

Q. And then he said "Okay, what else?"; right? Or something like that.

A. What else? I don't understand.

Q. Would you recognize the part of the interview where you talked about the mole if I played that part of the video for you?

A. I don't know.

Q. Well, if you saw a video of you talking to Mr. Phillips and talking about the mole, you'd be able to tell us that that was you; right?

A. You mean if I can remember that I said that?

Q. No. No. Right now I'm just asking if we played a video of that interview for you and you watched it, you'd be able to recognize whether it was you and recognize that it was Agent Phillips; right?

THE COURT: I'm not sure how she knows what she would know, Mr. Gunn. That doesn't make sense.

MR. GUNN: Your Honor, may I play part of the video?

THE COURT: Discuss it with Ms. Donahue.

MS. DONAHUE: Objection. There is no failure of recollection. It's not hearsay. It's not impeachment.

MR. GUNN: I am not offering it to impeach or for hearsay, Your Honor, I'm offering it to show --

THE COURT: Sidebar.

(Sidebar conference commenced)

MR. GUNN: Your Honor, what I want to play this part of the video for is what happens is Gary Phillips asks her, "What does Michael look like?" General question. She says, "He's fat." Then Gary Phillips says, "Okay. What else?" She says, "Oh, and he has a mole." And I think that is not -- it's really not even offered for the truth so much. We're probably going to say it's not true.

It's offered to show -- we are going to argue she was basically programmed to volunteer or say there was a mole. Because that's not the first thing someone would normally say is --

THE COURT: It sounds like the first thing I would say.

MS. DONAHUE: Me, too.

MR. GUNN: Well, I guess that's for argument, Your Honor. I just want to play it so the jury sees it and then we can argue it --

THE COURT: You know, why take any chances?

MS. DONAHUE: Yes.

THE COURT: Go ahead.

(Sidebar conference ended)

MR. GUNN: Your Honor, I have -- I have, Your Honor, what with the Court's permission we will identify as 134, and it's already in my computer. If we could go to -- it would be CD 1 on our CD, the first section of the interview. It would be minute -- minute 22:43 through 23:45.

Q. S.R.xxx, I am going to play part of this video for you and I would like you to watch it and listen to it. It will be on the screen beside you.

Minute 22, second 43, through minute 23, second 45.

MR. GUNN: And if Mr. Brown could blow up the picture.

(Whereupon, video was played for the witness)

BY MR. GUNN:

Q. Did you see that, S.R.xxx?

A. Yes.

Q. That was you answering Agent Phillips' questions, right?

A. Yes.

Q. And he asked you what Michael looked like; right?

A. Yes.

Q. The first thing you said was he was fat.

A. Yes.

Q. And then he just asked you generally what else? Right?

MS. DONAHUE: Objection. It speaks for itself. I don't know why we are asking her what happened on the tape.

THE COURT: Overruled.

MR. GUNN: Do you want me to reask it?

THE INTERPRETER: Yes.

BY MR. GUNN:

Q. He asked you generally what else after you said fat; right?

A. Correct.

Q. And you immediately said, "Oh, and then there is a mole"; right?

A. Yes. Correct.

Q. Someone had told you it was important to say Michael had a mole, hadn't they?

A. No.

Q. You at first said it was -- you at first when asked where it was pointed over here; correct?

Can I step out, Your Honor, so she can see me.

THE COURT: And describe for the record what you are doing.

MR. GUNN: Yes, I was going to do that. I will let her answer first, though, Your Honor.

Q. S.R.xxx, when you first were asked where it was, you first pointed over here; right? On the video? That's where you first pointed, right, on the video?

A. I was pointing towards -- I meant to say that side. That's what I meant to say. Not exactly where that mole is. On that side, the legs.

Q. What you first did though was you patted here; right?

A. Yes.

MR. GUNN: For the record, Your Honor, I am patting the outside of my left thigh.

THE COURT: Yes.

BY MR. GUNN:

Q. And then when the agent started pointing here or there or there, that's when you moved around and pointed to the inner thigh; right?

THE INTERPRETER: Can you repeat that last question, Counsel?

BY MR. GUNN:

Q. When the agent sort of said here or here or there and then here and he pointed to the inner thigh, you then said it was on the inner thigh, right, and pointed there?

A. It's in the inside. It's on the inside.

Q. That wasn't where you first pointed, though; right?

A. Correct. I did not.

Q. You didn't point to the inside until Gary Phillips suggested that as a possibility; right?

A. What do you mean?

Q. Well, what I mean is you didn't point -- you pointed to the inside of the thigh after Gary Phillips pointed to that as a possibility on the video; right?

A. He did not show me.

Q. By the way, you couldn't tell anyone anything about any other moles on Michael's body, could you?

A. I don't know. I don't remember.

Q. Well, you actually told the agent, Agent Phillips, that Michael didn't have any other moles on his body that you remembered; isn't that true?

A. Can you ask the question again?

Q. Sure. When Agent Phillips asked you questions in that same interview, one of the things he asked about was whether Michael had any other moles anywhere else on his body; right?

A. Can you explain that again?

Q. Gary Phillips asked you questions at this interview, right? This meeting? And one of the questions he asked you was whether Michael had moles on any other part of his body; right?

A. You mean he asked me that?

Q. Yes. Right? Is that right? Do you remember that?

A. I don't recall that he asked me that.

Q. Would it help you remember if you heard part of the interview on headphones?

A. Okay.

MR. GUNN: Your Honor, this would be more for refreshing so if we could use the headphones and play, it would be the first section of the interview, what I would call CD 1. And it would be from minute 22:43 -- I'm sorry. It would be from minute 30, second 40, through minute 30, second 54, and if Agent Wang could watch it and stop it when we get to that stopping point. It's on the transcript at 15.

AGENT WANG: 30:40?

MR. GUNN: Start at 30:40 and go through 30:54.

(Whereupon video was played for the witness).

BY MR. GUNN:

Q. Does that help you remember if Agent Phillips asked you if Michael had moles anywhere else on his body?

A. Yes.

Q. And you said you couldn't remember any; right?

A. Yes.

Q. During the interview, the agent and the interpreter encouraged you to say things that would help, didn't they?

A. What do you mean?

Q. Well, for example --

A. Okay.

Q. -- there was a place where the agent was trying to get you to say Michael's eyes were a lighter blue; right?

A. No. He did not encourage.

Q. There was a place where he told you not to be afraid and for you to tell him things, and you said you wanted to tell other great answers; isn't that true?

THE INTERPRETER: I am sorry, Counsel --

MR. GUNN: That's a bad question.

Your Honor, I think I would ask to play a part of the interview, not for the truth but for the circumstances of the interview and the influence of the interview again. That would

be a portion of CD 1, Defense Exhibit 134, 41:30 to 42:06. Then I would ask the witness questions about it. That's probably an easier way to do it and I think it's admissible --

THE COURT: Okay. Stop talking.

MR. GUNN: Sorry.

THE COURT: Ms. Donahue?

MR. GUNN: It would be transcript at 20, 21.

MS. DONAHUE: What are the time markers?

MR. GUNN: 41:30 through 42:06. Transcript pages 20 -- bottom of 20 to the top 21.

MS. DONAHUE: No objection.

THE COURT: All right.

MR. GUNN: If I could have Mr. Brown go to that marker, 41:30 through 42:06.

Q. S.R.xxx, I would like you to look at this video again and watch it.

(Whereupon, video was played for the witness).

BY MR. GUNN:

Q. That was the agent telling you not to be afraid and to tell him the story because other kids told him similar stories; right?

A. Yes.

Q. And you telling him you want to give other great answers; right?

A. What do you mean "other great answers?"

Q. Well, that's what you said you wanted to do; right?
A. Can you replay the tape again?
Q. If you'd like, yes. Again the counters are 41:30 through 42:06.

(Whereupon, video was played for the witness).

THE WITNESS: I said I told the other gentleman all of it already. Like I meant the police and all that.

BY MR. GUNN:
Q. The agent and the interpreter also were trying to -- told you to try to remember other things; right? Try to remember things; right?
A. I don't recall.

MR. GUNN: Your Honor, I would ask to play, for some of the reasons, 43:35 through 45:35 on the same CD. It's transcript page 22, I believe.

MS. DONAHUE: No -- no objection.

THE COURT: Okay. Thank you.

(Whereupon, video was played for the witness).

BY MR. GUNN:
Q. There at the end the interpreter is saying to you in Cambodian: "Is there anything else? Try to remember," isn't he?

THE INTERPRETER: What's your question, Counsel?

BY MR. GUNN:
Q. There at the end of that section, the interpreter is saying

to you in Cambodian, "Is there anything else? Try to remember," isn't he?

A. Yes.

Q. And you say, "That's all," but he says, "Try to remember, are there pictures, what kind of pictures, downstairs are there pictures"; right?

A. What do you mean "pictures downstairs"?

Q. He said to you, "Is there anything else, try to remember"; right?

A. Yes.

Q. And then you said "that's all"; right?

A. Yes.

Q. But he didn't stop. He said, "Try to remember whether there are pictures"; right?

A. (No response).

Q. Let me ask the question another way.

He was trying to tell you to remember things even after you told him that's all; right?

A. Ask me?

THE COURT: Can we get a stipulation that that is what the person said? I don't see the point of this.

MS. DONAHUE: Provided we can get a stipulation for the next two, lines, too, so it's appropriately in context.

MR. GUNN: That's fine, Your Honor.

THE COURT: All right.

MR. GUNN: I will just read exactly what it would be, Your Honor. It's stipulated that the transcript reads:

"Male interpreter: Is there anything else? Try to remember?" This in Cambodian.

"RS: That's all." That's also in Cambodia.

"Male interpreter: That's all?" In English. And then in Cambodian, "Try to remember. Are there pictures? What kind of pictures? Downstairs are there picture?

And then RS, in Cambodian, "Downstairs there are pictures."

Then male interpreter, in English, "Photos."

And then if we read the next four lines:

RS in Cambodian, "It has cabinets."

Male interpreter in English, "And the photo inside the cabinet."

THE COURT: Okay.

MS. DONAHUE: Just for the record, "RS" refers to S.R.xxx.

THE COURT: Right.

MR. GUNN: Correct.

Q. By the way, S.R.xxx, you at first said no when the agent asked if this interview could be videotaped, didn't you?

A. Yes.

Q. You didn't really want it videotaped, did you?

A. No.

Q. You only let them videotape it when they told you it was only for them and no one else would see it; right?
A. I don't remember.
Q. Now, you knew this interview that you had with Mr. Phillips, Gary, was about Michael having supposedly sexually abused you; right?
A. Yes.
Q. And I assume you're saying that's something that upset you, that you were unhappy about? Am I right?
A. During the interview?
Q. Well, I'm not talking about during the interview, at least yet.
THE COURT: Your question was poorly phrased. Please rephrase your question.
MR. GUNN: All right, Your Honor. I sometimes do that.
THE COURT: It's not clear what you're asking upset her, the interview or --
MR. GUNN: Right.
Q. I am just asking about the sexual abuse you said Michael did.
This may be obvious, but did that make you happy or unhappy?
A. No.
Q. Do you mean it made you unhappy?

A. No. I wasn't happy.
Q. And you were unhappy instead; is that right?
A. Correct.
Q. You're saying you were upset by it?
A. Upset. What do you mean upset by who?
Q. You felt like it was a bad thing that had happened to you; is that right?
MS. DONAHUE: Objection. Vague.
THE COURT: Overruled.
THE WITNESS: Correct.
BY MR. GUNN:
Q. And you knew this interview was about that bad thing; right?
A. I -- I did not know what the interview was about, but whatever they ask, I respond.
Q. Well, S.R.xxx, you knew that the interview was supposed to be about whether Michael did something to you and what you did. You knew that; right?
A. The interview about Michael, yes, I did know.
Q. And you knew it was about what Michael supposedly did to you; right?
A. Yes.
Q. But you didn't act unhappy during the interview, did you?
A. How did you -- what did you mean? My mother is on the other side.

Q. At the very beginning of the interview, you told a joke about a doctor you had seen saying you had a broken leg, didn't you?
A. What do you mean a doctor?
MR. GUNN: Your Honor, could I play CD 1 of minute zero, second 43, through minute 1, second 20?
MS. DONAHUE: No objection.
THE COURT: Thank you.
MR. GUNN: It will be transcript No. 1 at Page 1, Your Honor.
I would like you to again listen and watch, S.R.xxx.
(Whereupon, video was played for the witness).
BY MR. GUNN:
Q. That was you telling a joke to them about the doctor saying you had a broken leg; right?
A. I don't recall that, what I had -- what happened.
Q. Well, that was you talking on the video; right?
A. Yes. That was my picture, but right now I don't remember whether my leg was broken or not.
Q. Well, you told them at the end there that you were just kidding; right?
A. Yes.
Q. And are you telling us you don't remember whether your leg was broken? You would remember that, wouldn't you?
A. No.

Q. Later on -- a little later in this interview, you told the agent a riddle or puzzle, didn't you?

A. Can you ask the question again, please.

MR. GUNN: Actually, Your Honor, if I could play CD 1, 1702 through 1802.

MS. DONAHUE: The witness asked him to ask the question again. Maybe he could pose his question again.

MR. GUNN: I'll do that, Your Honor. I still have my request but I will ask the question.

THE COURT: No comments, just ask the question.

MR. GUNN: I'm sorry.

Q. A little later in the same interview, you told the agents and the interpreter a riddle; right?

THE INTERPRETER: I'm sorry?

MR. GUNN: A riddle.

THE WITNESS: Okay. Can you repeat? What do you mean by that?

BY MR. GUNN:

Q. You told the agents, "I give you a riddle, three got stuck, one go forward, one back up."

What is that? Sort of a puzzle?

A. I go forward, backward. What do you mean?

Q. Would it help you remember if I showed you a videotape of that part of the interview?

A. Yes.

MR. GUNN: Your Honor, could I play it? And I would like to play it in open court because I think it is admissible for other reasons such as discussed at sidebar --

THE COURT: Stop talking Mr. Gunn so I can hear from Ms. Donahue.

MR. GUNN: I was just going to . . .

MS. DONAHUE: The Government does not object; however, it should be played in context, which means it should be started before --

THE COURT: Tell Mr. Gunn where you want to start it and where you want to finish it.

MS. DONAHUE: It should start at 15:54 and go --

MR. GUNN: To 18:02?

MS. DONAHUE: Yes.

MR. GUNN: That would be fine, Your Honor.

Q. I would like you to listen carefully, S.R.xxx. Try to listen for the whole time because I am going to ask you the question again after you listen.

(Whereupon, video was played for the witness).

MR. GUNN: I just want to ask her to listen. This is the part I wanted to ask about, S.R.xxx, the part that is coming up. Now I would like you to listen very carefully to this part especially. Okay?

(Whereupon, video was played for the witness).

BY MR. GUNN:

Q. That was you telling the agent and the interpreter a riddle; right?

A. Yes.

Q. And you were laughing there at the end, weren't you?

A. Yes.

Q. In fact, there was a time even when you were talking about the abuse you claim Michael had done where you laughed or giggled? Wasn't there such a time?

A. Yes.

MR. GUNN: Your Honor, I would ask to play another portion. It would be CD 2, from 57:55 through 59:16. It's the transcript at Page 30, second transcript. Unless the Government wants me to add more at the beginning or at the end.

MS. DONAHUE: What are the times?

MR. GUNN: 57:55 through 59:16, Page 30 of the transcripts. Second transcript.

MS. DONAHUE: No objection.

THE COURT: All right. Thank you.

MR. GUNN: That would be, Your Honor, CD 2 on Defense Exhibit 134, counter minute 57:55 through counter minute 59, second 16.

THE COURT: Thank you.

(Whereupon, video was played for the witness).

BY MR. GUNN:

Q. That was talking about what you claimed about Michael tying

your sister up and him licking her vagina; right?

A. Yes.

Q. And you were laughing and you were giggling, weren't you?

A. You understand, I was so embarrassed, I didn't want to speak.

Q. You were laughing and giggling, weren't you?

A. Yes. I did.

Q. About this terrible thing you said happened?

A. Terrible things happened.

Q. Now, at the beginning of that last segment there was talk about being tied up with a cloth rope or tying up with a cloth rope; right?

A. Yes.

Q. There was a cloth rope in the house that was sort of some torn up sheets that were tied together or something like that?

A. Yes.

Q. You and the other girls played with that rope tying each other up; right?

A. Yes.

MR. GUNN: Your Honor, I would like to have the witness look at some photos now. It will be perhaps not all but many in the 300 set, so maybe we could just put all those up there in front of her and they will be there readily as I go through. I believe most, if not all, are marked -- are in evidence or marked.

THE COURT: You can just show them on the screen.

MR. GUNN: That's fine, Your Honor. I would like you to -- actually I would like to show more than one at a time to the witness and so it would probably be better to have them in front of her and then I will put them on the screen and ask her --

THE CLERK: Do you have the specific numbers?

MR. GUNN: 340, 345, 350, 360, 361 and 362, 365, 366, 368, 369, and 320.

THE COURT: Does the Government have all those?

MS. DONAHUE: Yes, Your Honor. No objection.

THE COURT: Any of those that isn't already in evidence is now admitted.

THE CLERK: And 320, Counsel?

MR. GUNN: Yes.

THE CLERK: I believe all the requested exhibits are before the witness.

BY MR. GUNN:

Q. If the interpreter could first place 340 and 345 before S.R.xxx. The exhibit tags should be on the back.

S.R.xxx, I would like you to look at those -- those are two sets of photographs; right?

A. Yes.

Q. They're pictures of you and others in the house eating a meal; right?

A. Yes.

Q. And I would like you to look at the second picture in 345 as an example. That's it; correct?

THE INTERPRETER: Sorry, Counsel, what is your question?

BY MR. GUNN:

Q. The second photograph in 345. Is that -- where I am pointing my pen on the screen -- is that you?

A. No.

Q. Who's that?

A. My sister.

Q. That's your sister; right?

A. Yes.

Q. And she is smiling in that picture; right?

A. Yes.

Q. And you're also in some of the pictures in these two exhibits; right?

A. I don't know.

Q. Well, would you look through them and tell us.

THE COURT: I am not going to have the witness search through exhibits. If you want to ask her a question, ask her a question.

MR. GUNN: I thought -- I was having trouble -- I will move on to the next exhibit, Your Honor.

Q. Would you look at Defense Exhibit 350. If the interpreter

can place that in front of her.

That's a set of several pictures of you and L.K.xxx and S.S.xxx in your school uniforms; correct?

A. Yes.

Q. Are you one of the girls in this picture which I am putting on the screen, which for the record, Your Honor, is the first one in Exhibit 350?

THE COURT: Thank you.

THE WITNESS: Yes.

BY MR. GUNN:

Q. Which one is you?

THE INTERPRETER: Pointing to the one standing.

BY MR. GUNN:

Q. The one where I am pointing my pen right now?

A. Correct.

Q. And you're smiling and laughing in that picture; right?

A. Yes.

Q. What about this picture? That's one of the later ones in that set. Which one is you in this picture?

THE INTERPRETER: The witness is pointing to the one --

BY MR. GUNN:

Q. Is this you?

A. Yes.

Q. So you're playing around with this other girl there; right?

A. Yes. I was with my sister.

Q. And then the other photographs also show you playing around with the other girls and your sister; right?

A. Yes.

Q. Would you now look at -- if the interpreter could get Defense Exhibits 360 through 362, Your Honor?

THE COURT: Okay.

BY MR. GUNN:

Q. Do you see those three pictures, S.R.xxx?

A. Yes.

Q. Those are also pictures of you with the other girls at the house; right?

A. Yes.

Q. This is the first one or one of them; right?

A. Yes.

Q. Which one is you in that picture?

A. I was wearing yellow shirt and a red pants.

Q. Are you -- are you then the one I am pointing my pen at?

A. Correct.

Q. You're smiling there; right?

A. Yes.

Q. This is one of the other pictures; right? This was taken around the same time and the same place and the same group; right?

A. Yes.

Q. And is that you sticking out your tongue there?

A. Yes.

Q. Why are you sticking out your tongue?

A. I was playing.

Q. Michael was the one taking that picture?

A. I don't know.

Q. Did anyone else take pictures of you at the house besides Michael?

A. I don't know.

Q. Well, let me ask you this: Did you see anyone else taking pictures of you at the house besides Michael?

A. I don't know.

Q. Was there anyone else living at the house who might have taken pictures of you or who could have taken pictures of you?

A. Who? Who do you mean?

Q. You said you don't know if Michael took that picture. I guess what I'm asking is whether there were any other people at the house who could have taken that picture or who could take pictures?

A. I don't know.

MR. GUNN: Your Honor, could I have the interpreter get 365 and 366 in front of S.R.xxx.

THE COURT: Yes.

BY MR. GUNN:

Q. These two photographs are photographs of you and the other

girls standing down on the patio in your school uniforms along with, I guess, L.K.xxx's mom and little brother; right?

A. What -- what yard?

Q. It's in the yard at the house; right? Michael's house?

A. Yes.

Q. And this is one of those photographs; right? You're in both these photographs first of all; right?

A. My picture on both of them?

Q. You're in both these pictures; right?

A. Yes.

Q. Including this one on the screen? This is one of them; right?

A. Yes.

Q. And do I have it right that that's you there?

A. That's not right. I have the -- like a headband on.

Q. That's you there. Okay.

And you were taking a picture with the other girls in your school uniforms; right?

A. Yes.

MR. GUNN: And if we could now have 368 and 369 placed before S.R.xxx.

THE INTERPRETER: I don't have 369.

THE COURT: I am not sure you ever handed up 369.

MR. GUNN: I thought they were -- oh, from Mr. Pierson. That's possible. If I missed it, I apologize. I

think they are in evidence, 368 and 369. I thought they were used with I.T..

THE COURT: I don't think so.

THE INTERPRETER: I am sorry. It was numbered in the front instead of the back.

MR. GUNN: Oh, that's my mistake. Actually it's Mr. Brown's mistake.

BY MR. GUNN:

Q. Do you see those two pictures, S.R.xxx?

A. Yes.

Q. You're in both those pictures?

A. Yes.

Q. And who are the other two people in the pictures?

A. S.S.xxx and I.T..

Q. And this was in either -- this was around in April, wasn't it? The second part of April?

A. I don't remember.

Q. That's one of the pictures; right?

A. Yes.

Q. And which one of -- is you in that picture?

A. Red shirt and blue pant.

Q. Right here?

A. Yes.

Q. And you're playing around and smiling with the other two girls; right?

A. Yes.

Q. You were happy in that picture?

THE INTERPRETER: I am sorry, Counsel?

BY MR. GUNN:

Q. You were happy in that picture?

A. I don't know.

Q. What about the next picture, 269. That's the next picture, right? In that picture the three of you were playing and dancing sort of; right?

A. I don't know.

Q. What do you think you're doing?

A. I think I was playing.

Q. So you were happy in that picture; right?

A. In that picture?

Q. Yes.

A. Maybe I was.

Q. Now, I think on direct examination, when Patty Donahue here was asking you questions, you said -- you admitted you were happy at first, but then you started being unhappy later on.

Is that what you said?

A. Yes.

Q. Would you look at Defense Exhibit 320. It's a set of pictures, probably one of the thicker ones with the birthday cake picture on top.

That's a set of pictures --

THE COURT: I don't think you're looking at it. You're talking about the stack of pictures?

MR. GUNN: Yes. It's the thicker set. It has the mother presenting a birthday cake on top.

THE COURT: That's it. Thank you.

BY MR. GUNN:

Q. S.R.xxx, I would like you to look through those pictures.

THE COURT: Do you have more than a minute or two, Mr. Gunn? We are going to take a break.

MR. GUNN: Yes, more than one or two.

THE COURT: Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We will take a 15 minute break.

(Recess taken)

(Jury In)

THE COURT: Everyone is present. The witness is back on the stand. The interpreter is still under oath.

Remember, you promised to tell the truth.

THE WITNESS: Yes.

THE COURT: You may continue, Mr. Gunn.

BY MR. GUNN:

Q. S.R.xxx, if I recall correctly, you testified on direct -- let me rephrase that.

If I recall correctly, when Patty Donahue was asking you questions, you said you were happy part of the time you were

at the house earlier on but not happy later.

Do I remember that correctly about what you said?

A. Yes.

Q. And do you have that Defense Exhibit 320 that I asked you to look through just before we broke? Just before we stopped?

THE INTERPRETER: Counsel, would you like me to show all these pictures to her?

MR. GUNN: Yes. If she would look through the set of exhibits if she hasn't already.

THE INTERPRETER: Yes.

BY MR. GUNN:

Q. This Defense Exhibit 320 is a set of photographs from L.K.xxx's birthday party; right?

A. Yes.

Q. And this is -- you were there; right?

A. Yes.

Q. You're in some of the photographs; right?

A. Yes.

Q. In fact, you're in most of them; right?

A. I don't know.

Q. Well, you -- all right.

This is one of the photographs; right?

A. Yes.

Q. And you're in that photograph; right?

A. Yes.

Q. And which one is you?
A. I'm in the orange dress.
Q. Sitting down?
A. Yes.
Q. Is that your mother behind you?
A. No.
Q. Who is that behind you?
A. The maid.
Q. And all of you are playing around putting cake on each other's faces; right?
A. Yes.
Q. And you were happy there; right?
A. I don't know.
Q. You don't know whether you were happy there?
A. I don't know.
Q. Do you remember the birthday party?
A. What am I supposed to remember?
Q. Well, starting off, do you remember being at L.K.xxx's birthday party at Michael's house?
A. I remember that you showed me the picture right now.
Q. I know. That wasn't quite my question. Why don't you put the pictures aside for a second.

Do you remember being at a birthday party for L.K.xxx at the house? You do remember, don't you, S.R.xxx --

THE COURT: One question at a time, Mr. Gunn.

THE WITNESS: Do you mean if I remember if I was happy or not?

BY MR. GUNN:

Q. Well, let me take it one step at a time, one question at a time.

First of all, do you remember being at birthday party?

A. Being in it?

Q. Being at the house, at the birthday party with cake.

A. Yes.

Q. And do you remember eating cake?

A. No.

Q. Do you remember people putting cake on each other's faces?

A. Yes.

Q. And that was sort of playing around; right?

A. Yes.

Q. And you were participating in the playing around; right?

A. I think I did.

Q. And you were happy, weren't you?

A. I do not know how I felt at the time.

MR. GUNN: I am sorry, is the screen off, Your Honor, up there? The main screen? But the jury, I assume, had it over here, Your Honor? Am I correct about that? I mean --

THE COURT: That screen is on, yes.

BY MR. GUNN:

Q. Let me ask you questions about something else, S.R.xxx;

okay?

There was a massage table in the house, wasn't there?

A. Yes.

MR. GUNN: Your Honor, could I have Government Exhibit 1113 put in front of S.R.xxx.

THE COURT: Paul, do you have the exhibits?

MR. GUNN: Actually, I can put it up, Your Honor. I have got a copy. That will work just as well.

Q. On the screen there, S.R.xxx, that's the massage table that was in the house; right?

A. Yes.

Q. And you and the other girls did at times give Michael massages on this massage table, didn't you?

A. Yes.

Q. And he would give each of you a dollar; right?

A. Yes.

Q. But Michael had his clothes on during those massages, didn't he?

A. Wrapped with a towel.

Q. Those weren't really sexual massages, were they?

A. Massage.

Q. On at least one occasion -- let me rephrase that.

At least one time when you and the other girls living in the house were giving Michael a massage, there was I.T. living at the house; right? Or visiting?

A. I.T. used to live there.

Q. Well, I.T. stayed there for a few days; right?

A. Yes.

Q. And there was a time when I.T. was there when you and the other girls were giving Michael a massage on the massage table; right?

A. Yes.

Q. And she didn't want to help, did she?

A. I don't know.

Q. Well, you and the other girls told her she was dumb for not helping, didn't you?

A. What do you mean dumb?

Q. Well, you teased her about not helping with the massage of Michael; right?

A. I did not say that if she doesn't help, she's dumb.

MR. GUNN: I didn't hear the English answer.

THE INTERPRETER: I did not say that if she didn't help, she is dumb -- she was dumb. I did not say that.

BY MR. GUNN:

Q. Did you tease her about not helping?

A. Correct.

Q. So you were not only willing to give these massages yourself, but you tried to get this other girl, I.T., to join; right?

THE INTERPRETER: I am sorry, Counsel. Can you

repeat?

MR. GUNN: Yes.

Q. So you were not only willing to give the massages yourself, but you tried to get I.T. to help; right?

A. Ask the question again, please.

Q. Let me make it a little shorter and simpler, maybe.

You tried to get I.T. to help with the massages that you and the other girls were willing to do; right?

A. No.

Q. You just said you teased I.T. for not helping; right?

A. I did not say anything about I.T.. I said anything to I.T..

Q. You have enter -- we talked already about how you were interviewed in this case and it was videotaped with Gary here; right?

A. Interview?

Q. I'm sorry. You were asked questions at a meeting here by Gary; right?

THE COURT: It wasn't here, was it?

MR. GUNN: Let me withdraw the question and rephrase it.

Q. You were asked questions at a meeting in Cambodia by Gary here; right?

A. Yes.

Q. You were also asked questions by other people in Cambodia

at other times; right?

A. Yes.

Q. You were asked questions by a Cambodian police officer?

A. Yes.

Q. And you were asked questions by a doctor named Dr. Watson who did an examination of you?

A. I don't know who asked me but I know someone asked me.

Q. There was a doctor who did an examination of you soon after the police came; right?

A. Ask me?

Q. Let me ask the question again.

After the police got you at the house, they took you to a doctor; right?

A. Yes.

Q. And that doctor asked you questions about what happened also; right?

A. Yes.

Q. And then another time you were asked questions by one of the attorneys sitting at this table here, this Patty Donahue here; right?

A. Yes.

Q. She has gone over questions with you several times; right?

A. She asked me several times.

Q. You didn't tell each of those people the same thing every time they asked you questions, did you?

MS. DONAHUE: Objection. Vague.

THE COURT: Sustained.

BY MR. GUNN:

Q. Well, you told the doctor -- remember, you agreed the doctor asked you questions; right?

A. Yes.

Q. You told the doctor that Michael, he made you give him oral sex every day, didn't you?

A. Yes.

Q. You told the Cambodian police officer that Michael made you give him oral sex twice a day but sometimes he just wanted a massage; right?

A. Yes.

Q. You told Gary here that it was 30 times total over the whole time you were there; right?

A. I said maybe.

Q. Maybe 30 times?

A. Yes.

Q. And the prosecutor here, Patty, you told her just that it was, quote, lots of times, unquote, and you couldn't remember how many; right?

A. Yes.

Q. There were also statements you made or at least a statement you made to a man named James Pond who worked at Agape; right?

A. Yes.

Q. He was a director, sort of a head person at Agape, at the shelter?
A. I don't know. I just know that he works there.
Q. Okay.
You told him that Michael was good to you, didn't you?
A. I don't remember.
Q. So you're saying you might have told him that?
MS. DONAHUE: Objection.
THE COURT: Overruled.
THE WITNESS: I want to say no.
BY MR. GUNN:
Q. But you can't say no because you really did tell him that, didn't you?
A. I -- I don't remember.
Q. Now, I want to go back to the questions that Gary asked you when he asked you questions in Cambodia. All right? Can I ask you another question about that?
A. Yes.
Q. Thank you.
One of the things he asked you was who the boss in the house was; right?
A. I don't remember.
Q. Would it help you remember if you could listen on the headphones to that part of the video?
A. Maybe.

MR. GUNN: Your Honor, could I have her listen on the headphones to -- it would be the first transcript, the first section, CD 1, 35:25 through 35:45. Do we need Agent Wang?

THE COURT: All right. Go ahead.

MR. GUNN: It would be starting at minute 35, second 25.

(Whereupon, audio was played for the witness)

MR. GUNN: If the agent can make sure and stop it, Your Honor, at 35:45.

BY MR. GUNN:

Q. Does that help you remember whether Gary asked you who the boss was in the house?

A. Yes. I said Sang.

Q. You didn't say Michael; you said Sang?

A. Yes.

Q. Now, you're staying at a shelter right now called Agape; right?

A. Yes.

Q. And you have been there for almost two years now?

A. Yes. Close to two years.

Q. And they're keeping you there because of what you told them about being abused; right?

A. The center is helping victims like me.

Q. And they wouldn't keep you there if you said you weren't a victim and Michael hadn't done anything to you, would they?

A. I wouldn't know. I wouldn't know because all those children were all victims.
Q. And there is no one there who is not at least -- there is no one there who is not a victim; right?
A. They're all victims.
Q. So if you weren't a victim, you wouldn't get to stay there; right?
A. I wouldn't know.
Q. By the way the lady who is up there behind you is someone who works at the shelter; right?
A. Yes.
Q. And one of the head people of the shelter is sitting back here in the audience; right?
A. Yes.
Q. They're watching and hearing what you say?
A. Yes.
Q. There is a lot of benefits you get at the shelter, aren't there?
A. Yes.
Q. They send you to school?
A. Yes.
Q. The rooms are nicer than the house you lived in before Michael's house?
A. Can you ask the question again?
Q. You have a room you sleep in at the shelter; right?

A. Yes.

Q. And there is a room where you eat your meals with the other girls?

A. Yes.

Q. And there is other rooms where you study or watch TV or do things like that?

A. Yes.

Q. And all those rooms -- that building is a lot nicer than the house you lived in before you went to Michael's house; right?

A. The room there at the center, not that nice, but a lot better than Michael's home.

Q. And better than the home you lived in with your parents before Michael's home; right?

A. Can you ask the question again?

Q. Before you lived in Michael's house, you lived in another house with your parents; right?

A. Correct.

Q. The rooms and building at the shelter is a lot nicer than that house you lived in with your parents; right?

A. Yes.

Q. And the food at the shelter is better than where you lived with your family?

A. Yes.

Q. It's -- in fact, it's so nice at the shelter that you have

told them you want to stay there until you're 18, haven't you?

A. Yes, I did.

MR. GUNN: No further questions, Your Honor.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MS. DONAHUE:

Q. S.R.xxx, when you were at Michael's house, did you suck on the penis of any man besides Michael?

A. No.

MS. DONAHUE: I have no further questions.

THE COURT: Recross?

MR. GUNN: No, Your Honor. None.

THE COURT: Thank you, S.R.xxx. You're finished.

Is the defense going to call a witness?

MR. BROWN: Yes, Your Honor. We would call Father Son. Your Honor, if I may just have a moment, I think he's outside.

THE CLERK: Where is the interpreter? He checked in this morning.

MR. BROWN: Yes. I believe he's in the restroom. May I have one moment?

THE CLERK: Would the interpreter please come forward? First let me swear in the interpreter.

Please state and spell your name for the record.

THE INTERPRETER: Chandara Hac. C-H-A-N-D-A-R-A.

Last name H-A-C.

Cambodian Interpreter Sworn

THE CLERK: Now if the witness would please raise his right hand.

Un Son, Defendant's witness, was sworn

THE CLERK: For the witness, I need you to state and spell your full name for the record.

THE WITNESS: I'm Un Son. U-N, S-O-N.

THE INTERPRETER: U-N, Un last name. First name S-O-N.

THE COURT: Was the witness spelling that in English?

THE INTERPRETER: That was English.

THE COURT: Mr. Son, do you speak some English?

THE WITNESS: Yes.

THE COURT: You're using an interpreter.

THE WITNESS: Yes.

THE COURT: Please let the interpreter ask the questions before you answer.

THE WITNESS: Yes.

THE COURT: And then answer in your language.

THE WITNESS: Yes.

THE COURT: Thank you.

You may proceed.

MR. BROWN: Thank you very much, Your Honor.

DIRECT EXAMINATION

BY MR. BROWN:

Q. Good morning, Father Son.

Father Son, could you please just tell the jury a little bit about your background.

A. I am Father Un Son. I am working in Phnom Penh in the church named Saint Joseph.

Q. Father Son, how large is the Saint Joseph church?

A. Saint Joseph is the largest church in Phnom Penh.

Q. What are your responsibilities at the church?

A. I'm working the church. I'm helping the church. There was three priests in that church.

Q. Are you one of the priests at the church?

A. Yes. But now I was transferred to Kampot Province.

Q. Is that in Cambodia also?

A. Yes.

Q. Father Son, in the course of your work, had you met a person named Michael Pepe?

A. Yes.

Q. How did you meet Michael Pepe?

A. Michael Pepe came to visit me in the church.

Q. And what was the purpose of that visit, if you know?

A. He asked me at the Catholic church and asked me if I ever need any help -- that I can help you with.

Q. And when he said help, was he talking about just helping with school supplies?

A. At that time, I told him that it's -- in our church we have school to teach some children, and if you willing to, you can supply us some school supply. The kindergarten.

Q. Okay.

It was your suggestion that Michael help provide school supplies?

A. Yes.

Q. And were there specific schools that you suggested?

A. It's the place that I work at.

Q. And at some point, did you distribute school supplies?

A. I took him to look at the location.

Q. Okay.

And which locations were those?

A. I took him to the church in Svay Pak.

Q. Anywhere else?

A. And the other place, Bang Toum Pong. And also another one called Muat Krosat.

Q. And those three areas are towns outside of Phnom Penh?

A. Yes.

Q. And what happened when you went -- well, when you went -- did you go on three different days to distribute school supplies?

A. Yes. Because I brought him there different times.

Q. How long did these distributions last?

A. Two to three hours.

Q. Did Michael take pictures of these events?
A. Yes. Took some picture and also have a conversation with children. I was the interpreter at the time.
Q. And where did these conversations with the children take place?
A. In the classroom.
MR. BROWN: Your Honor, I have a few defense exhibits I would like to present to the witness. I have one marked for the Court and one providing a copy to Government counsel. It's previously been marked as Defense Exhibit 375.
THE COURT: All right.
MR. BROWN: May I approach, Your Honor?
THE COURT: You may.
THE CLERK: 375 is before the witness.
BY MR. BROWN:
Q. Father Son, if you could just take a look at those photographs and tell us if you recognize them.
A. Yes. These are the pictures at the church.
Q. And which church was this?
A. Mary Magdalen in Svay Pak. At the 11 kilometers.
Q. Svay Pak is 11 kilometers outside of Phnom Penh?
A. Yes.
MR. BROWN: Your Honor, may Defense 375 be admitted into evidence.
THE COURT: Any objection?

MS. DONAHUE: No objection.

THE COURT: That's admitted.

(Defendant's Exhibit 375 was received)

MR. BROWN: May I publish, Your Honor?

Q. Looking at the first page of Defense 375, do you recognize that photo?

A. Yes, I do.

Q. Is that you in the photograph?

A. Yes. It is my picture.

Q. Okay.

Who are the -- are those the school children?

A. Yes.

Q. Who took that photograph?

A. I think it's Mr. Pepe's group. Because he went there with -- with another individual.

Q. Okay.

And what were the nature of the school supplies that were distributed or provided by Mr. Pepe?

A. Some book, pencil, eraser, and also some kind of folder. And some cookies and candies.

MR. BROWN: Your Honor, I have no further questions at this time.

THE COURT: Cross-examination?

MR. BROWN: Thank you, Father Son.

CROSS-EXAMINATION

BY MS. DONAHUE:

Q. Good morning, Father.

A. Good morning.

Q. How long have you been in Cambodia?

A. Seventeen years.

Q. And your parish is in Phnom Penh?

A. Yes.

Q. And you have an outreach program in an area called Svay Pak; is that right?

A. Yes.

Q. And Svay Pak is also called Kilo 11 because it's located about 11 kilometers outside of Phnom Penh; is that right?

A. Yes.

Q. Svay Pak is a village; is that right?

A. Yes.

Q. There is extreme poverty in Svay Pak, isn't there?

A. Yes.

Q. That's one reason why your church has an outreach program there?

A. Because over there you have some church-going Christian in that area. Most of them some Vietnamese.

Q. It's a Vietnamese village; right?

A. Yes.

Q. Vietnamese immigrants to Cambodia live there?

A. Yes.

Q. And people in Svay Pak live in crowded shacks, would that be fair to say?

A. Yes. Mostly. Yes.

Q. And Svay Pak is well-known as a destination for people who want to have sex with children, isn't it?

A. Yes.

Q. Svay Pak has brothels where children are locked in rooms and required to have sex with adults, doesn't; it?

A. That I do not know. But I do know that it's a brothel in that area.

Q. There are brothels in Svay Pak, aren't there?

A. A lot.

Q. A lot of brothels; right?

A. Yes.

Q. In fact, your parish center in Svay Pak is located right next door to House No. 5, which used to sell very young children for sex; isn't that right?

A. I do not remember is No. 5, but we was at the end.

Q. And you know that there are brothels in Svay Pak that sell children for sex?

A. Yes.

Q. In fact, the sale of children for sex is a big problem in Cambodia, isn't it?

MR. BROWN: Your Honor, I am going to object on relevance ground. Beyond the scope. 403.

THE COURT: Sustained.

BY MS. DONAHUE:

Q. Father Son, you met the defendant, Mr. Pepe, in this case, when he came to your church; is that right?

A. Yes.

Q. And he asked you what outreach programs to the community your church had; is that right?

A. Yes.

Q. What programs did you tell him the church has?

A. I told him about the class that we have, kindergarten.

Q. Did you tell him about any other programs that your church offers?

A. I only told him about the school. Because of another thing that I told him that we concentrate on school and we try to educate them because in Svay Pak area, you heard a lot of bad things happen like brothel.

Q. You also told him that your church has an outreach program to sick people; isn't that right?

A. No. Only the people who was ill. Only the sick people.

Q. You told the defendant that your church has a program to help ill people; is that right?

A. Yes.

Q. You also told him your church has a program that reaches out to older people; is that right?

A. I don't recall that I did say that.

Q. And the defendant was interested only in the programs for children; is that right?

MR. BROWN: Objection, Your Honor. Misstates the testimony, assumes facts not in evidence.

THE COURT: Overruled.

MR. BROWN: Calls for speculation.

THE COURT: Overruled.

THE WITNESS: Well, because I only proposed to him for that reason.

BY MS. DONAHUE:

Q. You proposed to him that he help children; is that right?

A. Yes.

Q. And he told you he loves so much to visit the children, didn't he?

MR. BROWN: Objection, Your Honor, argumentative, 403, assumes facts not in evidence.

THE COURT: Overruled.

THE WITNESS: Because I explained to him about the program of the children, that's why he visit that particular . .

BY MS. DONAHUE:

Q. And, Father, in February of this year, you met with Special Agent Phillips from Immigration and Customs Enforcement, the man sitting on the edge of this table, didn't you?

A. Yes, I did.

Q. You told Special Agent Phillips that the defendant said he,

the defendant, loves so much to visit the children?

A. Yes. Because each time he went there, he saw the program, he saw the children, he was very excited and happy.

Q. The defendant was very excited and happy every time he saw the children; is that right?

A. Well, what I meant was that he loved to have a conversation with the children and allow the children to ask questions such as how the soap was made.

Q. Did you see the defendant having conversations with children?

A. Yes. I'm there. In the same room. The children sat on the floor, we sat on the chair.

Q. And tell us what happened.

A. Just question and answer. That's all.

Q. And you acted as the interpreter?

A. Yes. And also another lady was with us; and also another sister was there, too.

Q. And that sister --

A. She is also a teacher there.

Q. The sister is also a teacher; is that right?

A. Yes. She is in charge.

Q. And she works directly with the children; is that right?

A. She is in charge with the teacher.

Q. And you introduced the defendant to that sister, didn't you?

A. Yes.

Q. How many times did you go with the defendant to Svay Pak?

A. I think twice.

Q. And both times did Michael sit down and meet with the children?

A. Yes. And I also was there to interpret.

Q. And he spent two to three hours with the children; is that right?

A. Yes.

Q. And he brought -- the defendant brought his digital camera with him, didn't he?

A. Yes.

Q. And he used --

A. Yes. Because I do not have camera with me.

Q. And the defendant used his digital camera to take photographs of the children; is that right?

A. Yes.

Q. When the defendant was around the children, he acted very happy, loved and liked the children; is that right?

MR. BROWN: Objection, Your Honor. Asked and answered.

THE COURT: Overruled.

THE WITNESS: He's just happy to see that the children happy to see him. That he visit them.

BY MS. DONAHUE:

Q. The children looked very happy to see him, didn't they?

A. And also because I was there because those children are very close to me.

Q. In fact, Father, it would be fair to say those children in Svay Pak are starved for attention, aren't they?

A. Yes.

Q. It would also be right to say those children are starved for affection?

A. Well, they are very happy to see people who are interested in helping them because you can see some of them are 10 years old, haven't even been to school.

Q. Their families are very poor; isn't that right?

A. Yes. Because of that reason, that's why we have outreach program to that area.

Q. Right.

And in that community in Svay Pak, a lot of those children are expected to bring money home for their families, aren't they?

MR. BROWN: Objection, Rule 403, beyond the scope.

THE COURT: I think it lacks foundation, but otherwise, overruled.

Do you want to lay some foundation?

BY MS. DONAHUE:

Q. Father Son, you have been in Cambodia for 17 years; is that right?

A. Yes.

Q. You have been to Svay Pak many times, haven't you?

A. I was in charge in ten church in Phnom Penh. Svay Pak is just one of them.

Q. And you are, after 17 years, very familiar with Cambodian culture; would that be fair to say?

A. Yes.

Q. You're also very familiar with the culture of the Vietnamese immigrant community in Cambodia, aren't you?

A. Yes.

Q. A lot of the Vietnamese immigrants in Cambodia live in abject poverty; isn't that right?

A. Yes.

Q. In both of those communities, children are required to obey their parents; isn't that correct?

MR. BROWN: Same objection, Your Honor. 403.

THE COURT: Overruled.

THE WITNESS: Yes. But it's a little bit different between Cambodian and Vietnamese.

BY MS. DONAHUE:

Q. What's the difference?

A. What I meant was that the Vietnamese children are more open than the Cambodian kid.

Q. When you say open, do you mean less obedient?

A. I meant that they not shy.

Q. But in the poor community in Cambodia, the family structure is very hierarchal; would that be fair to say?

A. I do not understand the question.

Q. Oh, okay.

In your work in Cambodia over the last 17 years, have you met a lot of families?

A. Yes. Yes. Because I am the priest and I have to reach out.

Q. Yes.

A. To those families.

Q. And those families have parents and children; right?

A. Yes.

Q. And in the Cambodian culture, the children are required to respect their parents; is that right?

A. Yes. Yes. But nowaday, we have a problem with the children kidnapped, addicted to drug. It's very difficult to -- kind of like --

Q. My question is about the children. Children are required to respect especially the mother; isn't that right?

MR. BROWN: Objection, Your Honor. Relevance.

THE COURT: I will allow this question but then we are getting way beyond anything I can figure out.

Answer that question.

THE WITNESS: Yes. Because they're parent.

BY MS. DONAHUE:

Q. And in Cambodia, children often are expected to bring home money for the family; isn't that right?

MR. BROWN: Same objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: No.

BY MS. DONAHUE:

Q. You're not familiar with that?

A. No.

Q. Isn't that why the children are sold for sex in the brothels in Svay Pak?

A. Well, that is the business, but in general, people -- the children doesn't have to bring anything.

Q. Now, Father, when you -- you never went to Mr. Pepe's house, did you?

A. No.

Q. You have never been there?

A. That's correct.

Q. You don't know who else lived in his house, do you?

A. Yes. I don't know. That's correct.

Q. He never told you that he had children living at his house, did he?

A. No.

MS. DONAHUE: I have no further questions.

THE COURT: If it's going to be short, Mr. Brown. Otherwise, we will take our break.

MR. BROWN: It would be short, Your Honor.

THE COURT: Okay.

REDIRECT EXAMINATION

BY MR. BROWN:

Q. Father Son, just talking about Svay Pak, just briefly, you indicated that there was a specific need at Svay Pak for outreach; correct?

A. Yes. Need some supply for the school. This is to encourage the children.

Q. And there is a lot of poverty in Svay Pak; correct?

A. Yes.

Q. And could you talk about briefly the significance of the fact that the area is largely Vietnamese? Is there just discrimination in Cambodia between the Vietnamese and the Cambodian people sometimes?

A. Well, you see, in Svay Pak area, it's the place that has a lot of brothel and that's why they gave the idea that that area is not respectable.

Q. Had there been an effort to clean up Svay Pak by Cambodian authorities prior to the outreach that you did with Michael Pepe?

A. No. Only our church that we care enough to get involved, to help those children. Because church does have support from some of the community and also different -- different group that help.

Q. So when Michael Pepe came to you, it wasn't his idea to go to Svay Pak, was it?
A. That is correct. It's I the one that propose to him.
Q. And why did you propose that to him?
A. Because I felt that the children needs some support and also something that they can be proud of.
Q. And when you went to Svay Pak, you went as a group; correct?
A. Yes. I and sister and we went there to meet another teacher in that area. Mr. Pepe also have another person accompany him.
Q. And these outings lasted only a couple of hours; right?
A. Yes.
Q. And they were a classroom setting?
A. Yes. It's in the surrounding areas of school, either in the classroom or outside in the school yard when they are having a recess, that's how we took the picture.
Q. Did you ever -- was Mr. Pepe ever alone with the children, to your knowledge?
A. No.
Q. Did he ever make an effort to be alone with the children, to your knowledge?
A. No. I did not see anything different beside that we all together there.
Q. You said that one of the sisters worked at the school as a

teacher?

A. She is in charge in all the teacher.

Q. And do you speak with her often?

A. Yes.

Q. So do you have a lot of information about if Mr. Pepe returned to Svay Pak, would you have heard of that?

A. That's true.

Q. You never heard that after these meetings Mr. Pepe returned to Svay Pak on his own?

A. No. If he did showed up in Svay Pak, the teacher will inform me.

MR. BROWN: Thank you, Your Honor. I have no further questions.

THE COURT: Brief recross? Don't feel compelled.

RECROSS EXAMINATION

BY MS. DONAHUE:

Q. Father Son, you told Special Agent Phillips the defendant was only interested in children's programs; right?

A. I just felt that for that kindergarten program, if have someone interested to help, it will be benefit for the children.

Q. Father, I'm not asking you what you felt. I am asking you what you told Special Agent Phillips when you met with him in Phnom Penh on March 4th of this year.

My question is you told Special Agent Phillips --

A. Yes.

Q. -- that Mr. Pepe was only interested in children's programs?

A. Well, it's true, but it's not only the children in Svay Pak, it's also in Bang Toum Pong and also at a different area, Muat Krosat.

MS. DONAHUE: I have no further questions.

THE COURT: Mr. Brown?

MR. BROWN: I have no further questions.

THE COURT: Thank you, sir. You are excused.

And we will take a 15 minute recess. Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you.

(Recess taken)

(Jury Out)

MR. LULEJIAN: Your Honor, we would like to call Dr. Berkowitz out of order.

THE COURT: There is no order. Call whoever you want. I don't care.

MR. LULEJIAN: The only issue that comes up is the two photographs that are part of the 404(b) order that the judge ruled -- that you ruled on that are coming in through a later witness, I have spoken with Mr. Brown, he seems to be agreeable to allowing us to use it for Dr. Berkowitz's testimony.

MR. BROWN: We object, Your Honor -- just joking.

(Jury In)

THE COURT: Mr. Lulejian, does the Government have another witness?

MR. LULEJIAN: Yes, Your Honor. The United States of America calls Dr. Carol Berkowitz.

THE CLERK: Would you please come forward.

Carol Berkowitz, Government's witness, was sworn

THE CLERK: Would you please have a seat. Please state and spell your full name for the record.

THE WITNESS: It's Carol, C-A-R-O-L, Berkowitz, B-E-R-K-O-W-I-T-Z.

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MR. LULEJIAN:

Q. Good morning.

A. Good morning.

Q. What is your occupation?

A. I am a pediatrician.

Q. Dr. Berkowitz, who is your employer?

A. I work at Harbor UCLA Medical Center.

Q. And do you specialize in anything?

A. In pediatrics.

Q. And how long have you been a physician?

A. Thirty-nine years.

Q. And how many of those have been at UCLA?

A. Nearly 30 years. 30 years on August 1st.

Q. Where did you attend medical school?
A. At Columbia University, College of Physicians and Surgeons.
Q. And where did you do your residency and internship?
A. At the Roosevelt Hospital in New York City.
Q. Are you board certified, doctor?
A. I am.
Q. In which fields?
A. I am board certified in pediatrics and I have sub boards in pediatric emergency medicine.
Q. What does it mean to be board certified?
A. It means that you have had specialized training in an area and then sat for a certifying examination.
Q. And do you regularly have to be re-certified?
A. Actually for pediatrics, I don't, but I have been. But for peds emergency medicine, yes.
Q. Have you published anything, Doctor?
A. I have.
Q. Approximately how many articles do you believe you have published during the course of your career?
A. In terms of peer-reviewed articles, probably about 50. Book chapters, probably about 75. And articles that we would say are not peer-reviewed in that they're -- they're invited articles, probably about 20.
Q. Do you currently serve on the faculty of any university or medical school?

A. I do. What is now called the David Geffen School of Medicine at UCLA.
Q. During the course of your 39 years as a pediatrician --
A. Yes.
Q. -- about how many children do you think you have examined?
A. Probably 50 to 60,000.
Q. Have you ever testified as an expert before?
A. I have.
Q. Approximately how many times?
A. Probably about seven to 800 times.
Q. What type of proceedings were those?
A. The majority are -- have been in dependency court.
Q. Have you ever testified in federal court before?
A. I have.
Q. Which one?
A. I think the one On Hill Street.
Q. So it would be here in the Central District of California?
A. Yes.
Q. Approximately how many times have you testified here in the central district?
A. About a half a dozen times.

MR. LULEJIAN: Your Honor, the Government offers Dr. Carol Berkowitz as an expert in the area of pediatrics.

THE COURT: Any objection?

MR. BROWN: No objection, Your Honor.

THE COURT: All right. She is an expert in that field.

BY MR. LULEJIAN:

Q. Dr. Berkowitz, I am going to put an image up on the screen for you to look at, if I can get my computer to work.

A. Okay.

Q. For the record, I am showing the witness 1423. My apologies.

Dr. Berkowitz, before coming to court today, have you seen this picture?

A. I have.

Q. Was this part of a series of photographs that you reviewed?

A. Yes, it was.

Q. Based on your training and experience as a pediatrician, were you able to form an expert opinion as to the age of this girl?

A. I did.

Q. Would you please state your opinion for the Court?

A. My opinion was that this girl was under the age of 17 years for sure. Under the age of 18.

Q. Were you able to come up with as opinion as to what age her appearance was consistent with?

A. It would be consistent with that as an upper limit, and I felt more consistent with an age of about 15 to 16 years -- 15 years.

Q. Doctor, would you please explain to the Court the bases on which you based your opinion?

A. Right. So the basis of my opinion is related to her level of sexual maturity.

Q. When you say -- I'm sorry. When you say level of sexual maturity, what do you mean?

A. That is the level of development of her what we refer to as secondary sexual characteristics, particularly the breast development, the pubic hair development and the development of the external genitalia.

Q. Let's start with the breast development. What were you able to determine by looking at this and the other photographs about the development -- sexual maturity with respect to the breasts of this girl?

A. My determination was that her breast development would have a sexual maturity rating of No. 4 or an SMR of 4.

Q. Doctor, I went to law school instead of medical school.

Could you tell us what a sexual maturity rating is and what the numbers mean?

A. So the notion of the sexual maturity rating relates to the fact that individuals go through puberty, and they go through puberty in a predictable manner in terms of the way -- the breasts' development, the way the genitals develop. So a sexual maturity rating of a 1 is before you have even started puberty. That would be consistent with prepubescent.

As one goes through the different stages, development progresses and there are characteristics that define those periods.

So a sexual maturity rating for the breasts of a 2, when that happens, the breasts are small and a little bit of a mound. And the area around the nipple called the areola gets a bit larger.

By the time that you are a sexual maturity rating for breasts of a 3, there is -- there is further enlargement, and the areola and nipple are more pronounced, but they do not stand away from the breast tissue.

By a sexual maturity rating 4, the breasts are still lateral on the chest, but you can see a separate mound from the areola and the nipple that together form one structure but separate from the breast tissue.

And the sexual maturity rating 5 which is basically the adult appearance, okay, that mound, the difference between the areola and the breast is no longer present and the nipple stands away.

Q. Doctor, with respect to the girl who is in this exhibit, Exhibit 1423, what led you to conclude with respect to the breasts that she had a level of 4, SMR 4?

A. Right. So I was able to see that the areola and the nipple stood away from the breast tissue themselves. So that would be consistent with a 4 and not a 5.

And in addition, the breast tissue is laterally placed and not yet moving medially so that it covers her sternum. So it was by the appearance of the areola and the nipple and the location of the breasts that led me to conclude that her breast development would have a sexual maturity rating of a 4.

Q. When you say laterally, what do you mean by that?

A. The -- the breasts are over the rib cage as opposed to covering some of the sternum.

Q. Where on the body would the sternum be located?

A. In the middle portion of the chest.

Q. So right about here?

A. Yes. Under your tie.

Q. Under my tie. Okay.

In looking at this girl, can you tell -- can you tell what type of ethnic group she belongs to?

A. She appears to be Asian.

Q. Have there been any studies with respect to SMR and girls and boys who are Asian?

A. There have been.

Q. And if looking at southeast Asian girls, what is the median age of sexual maturity for a girl of this nature?

A. The median age for sexual maturity rating, I would go to the next level. In other words, the median age for sexual maturity rating of a breast development of a 5 was about 13 and a half years. 13.46 years.

Q. And would you just look at the next level or would you look to something called standard deviations?

A. Right. So that you would be -- would be to look to the next level which would mean if the median age of a sexual maturity rating for breast development of a 5 is 13.46, that would mean 50 percent of girls would have achieved that by 13.46. Let's say 13 and a half years.

If you take into account the standard deviation, which is about 1.2 years, based on the studies that have been done, then you could say 84 percent of girls would have achieved a sexual maturity rating of 5 in this southeast Asian population that was studied by 14 plus years. And 99 percent, that is, two standard deviations above the mean, would have achieved it by about 16 and a half years. So just adding 1.2 to one standard deviation and two standard deviations.

So you could say, based on the medical literature, 99 percent of the southeast Asian girls that were in this study had achieved a sexual maturity rating for their breast development of a 5 by 16.8 years.

So if you could say then that if she's at a 4, she hasn't gotten to her 99 percent of girls of her background would have been, which would be 16 and a half years.

Q. Okay.

Besides the breasts, you said there were two other factors that you looked at. What were those?

A. Okay. So her pubic hair. And her pubic hair -- again, the pubic hair development is staged in terms of a sexual maturity rating.

Sexual maturity rating 1: No pubic hair. Sexual maturity rating 2: Fine, downy pubic hair. Sexual maturity rating 3: Coarse, curly pubic hair that's just over the mons. The mons is really the structure that is really right on top of the girl's genital area. Sexual maturity rating 4: The pubic hair has gone down the labia. And a sexual maturity rating 5, which is, again, an adult level, the pubic hair has gone down to the thighs.

Q. With respect to this girl, what did you determine her sexual maturity rating was for purposes of pubic hair?

A. Right. Based on the materials I reviewed, her pubic hair maturity rating was 3. There was no pubic hair really down her labia. It was coarse, curly pubic hair, so not a 2, but it was confined to her mons.

Q. And if you were to associate ages with that level and go through the standard deviation or moving along the bell curves you have talked about, what would those ages be for pubic hair?

A. Right. So again if we did one stage greater, a sexual maturity rating of a 4, and used that same methodology, the mean age is -- if I'm remembering right -- about 14 years. So by about 15 and a half years, 84 percent of girls of southeast Asian background would have achieved a sexual maturity rating of

4, and 99 percent by the time they're 17 years old would have had a more advanced sexual maturity rating. So they would have already had hair down the labia.

She had not gotten to that stage, so you could say that her age would have been under 17 based on the fact that 99 percent of girls would have had more advanced pubic hair from the same background.

Q. Doctor, let's turn to the third factor, the labia.

What did your observations reveal about that?

A. Right. So there are not sexual maturity ratings applied to the labia but the labia do change over the course of puberty. So in prepubescent girls, the labia majora, which is basically what I'm looking at, they're thick and full and have fatty tissue present.

As one goes through puberty, the labia majora becomes thinner and more elongated. That's a gradual progression and not as clearly defined by the literature as the breast and pubic hair development.

And so when I looked at her labia, her labia really are not elongated. They are more immature in appearance which would be consistent with being in an earlier phase of one's pubertal development.

Q. Once again your opinion of the age range of this girl is?

A. About 15 years of age.

Q. Maybe as high as 17?

A. It could be as high as 17, based on the published information about girls from that background.

Q. And your analysis also involved your experience -- let me rephrase that question.

Actually, I will move on. I am going to show you another picture now, doctor. This is Exhibit No. 1314.

Doctor, had you seen this picture before you came into court today?

A. I did.

Q. Was this picture also a part of a series of photographs that you examined?

A. It was.

Q. Based on your training and experience in pediatrics, what is your opinion as to the age of the girl to right? And I think you referred to her as LK.

A. I'm sorry, which?

Q. I'm sorry, LK.

A. Well, the girl to the right has pubic --

Q. I am sorry. I have got dyslexia. The girl to the left. I can't read.

A. So just to make certain we're talking about the same girl, the girl -- disappeared from my screen. Okay. The girl on the left does not have pubic hair and that's the girl that we're talking about.

Q. She is the one who is facing away from the camera?

A. Right. So that girl really would be a sexual maturity rating of 1 for both breast development and pubic hair in that she really has no evidence of any breast development, she has no pubic hair. Her labia are also full and thick, and really prepubescent, so I would say she -- she hasn't even started her pubertal development in terms of having any evidence of the effect of her female hormones on any changes in her body.
Q. What, if any, effects did you see on her hips?
A. Her body contour is also consistent with someone who has not gone through puberty.
Q. And the numbers you gave, those would be estimated ages; is that correct?
A. Yes. And I gave an estimated age that she was about nine or ten years old.
Q. Is it possible she's a little older?
A. It is possible.
Q. By how much do you think?
A. A year or so older.
Q. I am going to ask you to take a look at the other girl. This one is on the right. She is facing the camera.
Did you form an opinion based on your training and experience of her age?
A. I did.
Q. And what is that opinion?
A. Her -- I would estimate her age to be about 12 or 13 years.

Q. What are the bases of your opinion?

A. Her breast development is consistent with a sexual maturity rating of a 2. Her pubic hair is really more like a 2 to 3 or about a 3 because she appears to have some hair that has tracked down onto the -- to the -- I'm sorry. A 3 to 4. Excuse me. She has hair over her -- over her mons but also hair that's tracked down to the labia. So her pubic hair development is a bit more advanced than her breast development.

Q. From this picture were you able to make an observation about her labia?

A. Her labia also seemed to be full, fleshy, again consistent with being earlier in the pubertal development.

MR. LULEJIAN: I have no further questions, Your Honor.

THE COURT: Cross-examination?

MR. BROWN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BROWN:

Q. Good morning, Dr. Berkowitz.

A. Good morning.

Q. You prepared a brief letter outlining your findings for the Government; correct?

A. Yes.

Q. And you used some terminology in the letter. You talked about published standards for the sexual maturation of cross

cultures.

Do you recall that?

A. Yes.

Q. And in your letter, you indicated that there was some degree of variation between studies.

Do you recall that?

A. Yes.

Q. Okay.

What are the factors that affect variation in those studies?

A. So some of the factors relate to when the studies were done. Some studies were done in the '60s. Some of them more recent. Some studies were cross-sectional. In other words, they took a whole group of girls and examined them. And others studies were longitudinal. They followed the same child over time.

Q. And that was in a specific ethnic group or across racial lines?

A. The studies that I was referring to were studies that were conducted specifically in certain ethnic groups, and there's probably, oh, maybe 12 or 15 studies that have been specifically done in certain ethnic groups.

Q. But most of your -- your opinion is based on a Singapore study; is that correct?

A. That's correct.

Q. Okay.

So it was a study of people who are ethnically Singaporees or ethnically from the country of Singapore?

A. They were people from the country of Singapore.

Q. There were no studies of women from Cambodia; correct?

A. That's correct.

Q. And ethnicity and race is a factor, wouldn't you say, in terms of development?

A. It's a factor, except that among the 15 studies that were done, the variation was quite minor and would be maybe about a half a year to eight months in terms of the variation that was shown for different stages of sexual maturity rating.

Q. When you talk about the term sexual maturity rating, that was a concept that was developed by a doctor named Tanner; correct?

A. Actually it antedated Dr. Tanner and was first described in 1901 by Dr. Stutz and in the 1940's was further elaborated on by a Dr. Whitehouse and a co-author. So it's over a hundred years old.

Dr. Tanner popularized the notion and expanded. Dr. Whitehouse's ratings had only four groups. Dr. Tanner expanded to -- to five. So I guess if we used a name, we should use Dr. Stutz's name because he was the first person who reported it.

Q. But it's known in medical circles as the Tanner scale;

correct?

A. We don't use that term anymore because Dr. Tanner actually didn't have the same level of refinement and description that has since been put into the evaluation. Dr. Tanner never really described about the changes in the areola and the nipple. He really focused more on breast and location. There was a study that was done by the American Academy of Pediatrics, and that came out with a much greater refinement. And really almost all reports nowadays use the term "sexual maturity rating" or "sexual maturity index."

Q. Okay.

But those indices are functional or expanded on the concepts that Dr. Tanner and his predecessors developed in terms of trying to determine a person's sexual maturity based on physical features; correct?

A. Right. It was really developed to assess how someone was progressing through puberty and whether their development was progressing at an expected rate or not.

Q. So you are familiar with Dr. Tanner's critique of the use of the scales to predict age based on physiological factors? You're aware that he was highly critical of expert testimony based on these types of studies? Right?

A. I'm aware he wrote one letter to a pediatric journal and then retracted some of what he said, actually.

Q. Have you read the letter that Dr. Tanner wrote?

A. I have.

Q. So you're aware that Dr. Tanner basically said the sexual maturity rating or the use of his scale was designed to predict or to ascertain a person's level of -- a woman -- or a girl's level of sexual maturity when the age was already known, correct?

A. Right. But I don't use his scale.

Q. But the scale that you use is based on his research; correct?

A. But it's not his scale.

Q. Dr. Tanner was highly critical of the error rate in the ability to predict age based on a lot of independent variables; correct?

A. He -- he spoke about that as one of the reasons why he was opposed to using his scale.

Q. And there are a lot of independent variables that go into the determination of a person's age based on their physical appearance; right?

A. Yes.

Q. For example, a person's nutrition could affect how they develop sexually?

A. That's correct.

Q. A person's genetic makeup could affect how they develop?

A. Yes.

Q. Some people have larger breasts and some people have

smaller breasts; correct?
A. Right. But breast size is not the determinant that is used for sexual maturity rating. Dr. Tanner used it but it's no longer used that way.
Q. But I guess my point is that there are -- there are ethnic factors that go into sexual development?
A. Right. And so we try to use the ethnic guidelines specific to any group where that assessment is being made.
Q. But your opinions are not based on any study of Khmer people and their sexual development?
A. That's true.
Q. And you did not do any longitudinal studies of Khmer women's development over time; correct?
A. That's correct.
Q. And you did not do any -- I forget the term you used -- cross-sectional studies of Khmer women in terms of how they developed over time?
A. That's correct.
Q. So in terms of a cross-sectional study, you said that was a study where you analyzed different people from the same ethnic group; correct?
A. Right. At different ages.
Q. Right. And the longitudinal study would analyze a particular group of girls as they matured through time; correct?
A. That's right.

Q. You did not do that with respect to Khmer?
A. No.
Q. Did you do that with respect to Vietnamese?
A. No.
Q. In this case, you never -- you never saw the people in question in the photos; correct?
A. That's correct.
Q. You did not do face-to-face physical measurements or anything like that?
A. That's correct.
Q. So your opinion is based only on your observations of these particular photographs; correct?
A. I'm -- and not just the two that were shown, but there was a series of photographs.
Q. Certainly. Certainly. But it was a group of photographs that you looked at?
A. That's correct.
Q. Okay.
When you looked at the photographs, did you look at those -- did you analyze those photographs in a clinical -- did you use a specific clinical methodology to examine the photographs?
A. I did.
Q. Okay.
With respect to pubic hair, I mean, it's fair to say

that sometimes people shave their pubic area?
A. That's absolutely true.
Q. And in one of your findings you found that the person had actually shaved; correct? Or there was evidence of shaving?
A. The first photograph in that photo, the young lady had pubic hair but there were additional photographs of her where she had no pubic hair.
Q. So it was evidence of --
A. That she had shaved.
Q. You couldn't tell from the -- strike that.
Your Honor, I have no further questions at this time.
THE COURT: Redirect?
MR. LULEJIAN: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. LULEJIAN:
Q. Doctor, just so we're clear, were your -- was your opinion based on one photograph or the entire group?
A. It was based on the entire group.
Q. Now, what year was Dr. Tanner's study?
A. I think Dr. Tanner first published in 1969.
Q. Since that time have other studies come out?
A. Yes.
Q. And those were the studies you were talking about earlier?
A. Yes.
Q. Okay.

I want to ask you about one particular study, the Singapore study. Will you please tell us why that study came about and what it focused on?

A. That was a study of both boys and girls in Singapore. Dr. Wong was the main author. It came out in 1977 in the Journal of the Singapore Pediatric Society, and it was focusing on looking at that particular population to determine their progress through puberty, the age of menstruation in the girls so it was specific to look at that population.

Q. And with respect to that study, how did it compare with the other 14 or 15 studies you talked about?

A. Again, pretty -- pretty comparable in terms of the age of the sexual maturity achievement of the different levels of sexual maturity with differences that ranged really in maybe a half a year or months in terms of the achievement. So it spoke to greater uniformity of cross cultures.

Q. Doctor, when you looked at those pictures, did you base it on when the photographs were taken, your opinion?

A. I'm sorry. I didn't --

Q. The -- one second --

I have no further questions, Your Honor.

THE COURT: Mr. Brown?

RECROSS-EXAMINATION

BY MR. BROWN:

Q. Dr. Berkowitz, you indicated that Dr. Tanner practiced or

developed his opinions in the '60s?

A. His first -- the article that I'm most familiar with appeared in 1969.

Q. But his critique of the use of this type of methodology appeared in 1998 in the Journal of Pediatric --

A. That's correct.

Q. It was not 1960?

A. No. His initial studies were 1969. He had subsequent studies in the '70, '80s. And the letter was in the late '90s.

Q. So his critique is less than ten years old of this particular methodology?

A. Of -- yes.

MR. BROWN: Thank you. I have no further questions.

THE COURT: Mr. Lulejian?

MR. LULEJIAN: Nothing further, Your Honor.

THE COURT: Thank you, doctor. You're excused.

Does the Government have another witness?

MR. LULEJIAN: Yes, Your Honor. The United States calls Dave Stubblefield.

Dave Ross Stubblefield, Government's witness, was sworn

THE CLERK: Please have a seat. Please state and spell your full name for the record.

THE WITNESS: Dave Ross Stubblefield.

THE COURT: Spell that, please.

THE WITNESS: Ma'am?

THE COURT: Would you spell that, please.

THE WITNESS: Oh, sure. S-T-U-U-B-B-L-E-F-I-E-L-D.

THE COURT: You may proceed.

MR. LULEJIAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. LULEJIAN:

Q. Good morning, sir.

A. Good morning.

Q. Are you familiar with the defendant, Michael Joseph Pepe?

A. Yes, sir, I am.

Q. How are you familiar with?

A. I am married to his ex-wife.

Q. For how many years?

A. Fifteen, 16.

Q. Would you please look around the courtroom and tell me whether or not you see the defendant here today?

A. Yes, I do.

Q. Would you please identify an article of clothing that he is wearing?

A. Dark charcoal coat.

Q. What kind of tie is he wearing?

MR. BROWN: Your Honor, we will stipulate.

THE COURT: Thank you.

Indicating the defendant Michael Pepe.

BY MR. LULEJIAN:

Q. During the time you have been married to his ex-wife, the defendant's ex-wife, how many times have you interacted with the defendant?
A. Fifteen, 20, something like that.
Q. Where have you interacted with the defendant?
A. At family events, graduations, weddings, things like that.
Q. Okay.
I want to talk about some of those events now.
Back in 2005, was there a family event or function the defendant attended where you were present?
A. Yeah. Two of them.
Q. What was the first one?
A. His son's graduation from high school.
Q. When did his son's graduation take place?
A. Friday, May the 20th.
Q. And where was the graduation held?
A. It was held at the -- in Albuquerque at the pit. It's like an arena thing for the university.
Q. Is that part of the University of New Mexico?
A. Yes, sir.
Q. And what, if anything, did the defendant do during the graduation ceremony of his son?
A. He was up where we were for a little bit, and then he went down lower to get better pictures. We were pretty far up.
Q. And how do you know that he was taking pictures?

A. He had a camera with him.
Q. Would you describe the camera?
A. It was a digital camera.
Q. Would you please take a look at what has been marked as Government Exhibit 2098.
A. Yes.
Q. Is this camera similar to the one you saw him have?
A. Yes.
Q. You said there was a second event in 2005 in which you saw Mr. Pepe -- the defendant at?
A. Yes, sir.
Q. And what was that?
A. That was his daughter's wedding.
Q. And what date was his daughter's wedding?
A. That was Saturday, August the 27th.
Q. Of 2005?
A. 2005, yes, sir.
Q. And what, if anything, did you see the defendant do during the wedding?
A. We both had cameras and were taking lots of pictures. And just eating and hanging out at the wedding and the reception.
Q. With respect to taking the pictures, did you see the defendant take pictures?
A. Yes, sir.
Q. And what kind of camera was he using?

A. Digital one similar to that one.
Q. And did the two of you discuss anything about photography at the wedding?
A. The wedding in general, and also we both talked about how we liked digital cameras, because I had one, too, and they were much cheaper to use than regular film.
MR. LULEJIAN: No further questions, Your Honor.
THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MR. GUNN:
Q. Mr. Stubblefield, you don't recognize that exact camera; right?
A. No. A camera like that.
Q. In fact, your recollection was that you thought the one that Mr. Pepe had might have possibly be made by Kodak; correct?
A. Might have been.
Q. And you recall it being silver and black; right?
A. Yes, silver predominantly.
Q. And you recalled it being about the size of a pack of cigarettes?
A. Well, a little bigger than that, but digital camera size, yes.
MR. GUNN: No further questions.
THE COURT: Redirect?
MR. LULEJIAN: No.

THE COURT: Thank you, sir, you're excused.

Does the Government have another witness?

MR. LULEJIAN: We do, Your Honor. The Government calls Bruce Pixley.

Bruce William Pixley, Government's witness, was sworn

THE CLERK: Please have a seat. Please state and spell your full name for the record.

THE WITNESS: Bruce William Pixley. P-I-X-L-E-Y.

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MR. LULEJIAN:

Q. Good morning, sir.

A. Good morning.

Q. What is your occupation?

A. I am a senior director for Aon Consulting, and I conduct computer forensic examinations.

Q. What is a computer forensic examiner?

A. A computer forensic examiner is someone that analyzes -- for the most part we're probably known for analyzing computer hard drives. Looking for evidence of files that have been deleted. We also analyze optical media, thumb drives, pretty much any type of electronic evidence that stores data.

Q. And at Aon Corporation -- Aon Consulting, what are your responsibilities in addition to doing the things you just described?

A. Well, I run the computer forensic unit for the western United States.

Q. Okay.

And what does that entail?

A. Well, we have offices here in California -- Los Angeles, Irvine, San Jose. We also have some examiners over on the East Coast as well, but I primarily handle over here on the western U.S. So engagements here in the western United States.

Q. And how long have you been employed at -- by Aon Consulting?

A. It's been a little bit over two years now.

Q. Prior to joining Aon Consulting, what did you do?

A. Well, I was a master instructor -- well, prior to Aon, I was with Kroll and conducted computer forensic examinations while I was there.

Q. And before that?

A. Prior to that, I was a master instructor at Guidance Software where I taught corporate and law enforcement investigators how to conduct computer forensic examinations.

Q. What kind of software does Guidance Software produce?

A. Well, they are well-known for EnCase software, which is the primary -- it's the primary forensic software that most examiners, both law enforcement and corporate use around the world.

Q. Did you have to go through some training to become a senior

instructor, master instructor?
A. Well, my training has mostly been through my experience. I have attended classes prior to working for them full time. I attended classes with the California Department of Justice. I attended classes that Guidance Software put on where I attended there as a student. But that's probably been -- my primary training has been either through Guidance Software, California Department of Justice, which are -- I was with the Santa Barbara Sheriff's Department so I attended classes as a California peace officer.
Q. How many years were you a California peace officer?
A. A little bit over 16.
Q. And what rank did you retire at?
A. I left the Sheriff's Department as a lieutenant.
Q. And when you were at the Sheriff's Department, did you have the opportunity to do computer forensic analysis?
A. I did. I started in 1999 as a sergeant and we put together our first computer crime unit, computer forensic unit as a sergeant and handled looking for evidence of different types of crimes, whether it be fraud or if a computer was involved in a homicide investigation or a rape investigation. Any time that computer evidence was involved in a crime, we were involved.
Q. Where did you go to school, sir?
A. I attended -- while I was at the Sheriff's Department I attended classes through the University of Phoenix and I

finished my Bachelor's degree in Business Management.

Q. Since graduating from college, have you held any certifications related to computers?

A. I do. I have -- as far as EnCase goes, I am an EnCase certified examiner. I also have completed another certification called the CISSP.

Q. What does that stand for?

A. Certified Information Systems Security Professional. And I also have a certification as a Microsoft certified professional.

Q. You mentioned EnCase earlier. What do you have to do to become a certified EnCase examiner?

A. Well, there's two parts. The first part is a written exam. It's about 180 questions. And once you pass that, then there is a practical exercise that takes about anywhere from 40 to 60 hours to complete.

Q. And when did you become certified in those?

A. I think it was back in 2002.

Q. Have you served on the faculty of any forensic training programs?

A. I did. While I was at the Sheriff's Department as a sergeant I started teaching for a California Department of Justice. So when I started taking classes and building up my skill set, I was asked to actually come in and teach. So what I did was while I was working for the Sheriff's Department, I taught sometimes maybe one to two times a month for the

California Department of Justice. And they're primarily designed to teach California law enforcement computer forensics, high-tech crime investigations and Internet investigations.

Q. Have you developed any recent classes?

A. I have. I still continue to teach for California Department of Justice and develop classes for them in computer forensics, network intrusion. And also when I was with Guidance Software I developed courses and wrote training manuals for them.

Q. Have you done any training or written anything in the area of the forensic of optical media?

A. I have. With California Department of Justice, I recently put together a new training program. It was about a -- a six-hour training block on teaching California peace officers who are forensic examiners how to conduct analysis of CD ROM evidence, of optical disks.

Q. Have you ever testified in court in the field of -- as an expert in the field of computer forensic?

A. I have. In the last five years I've testified about five times. In federal court here in California, about three times. And in federal court in the state of New York twice.

Q. Have you ever testified for the defense?

A. No, I have not.

Q. Why not?

A. I haven't been asked.

MR. LULEJIAN: Your Honor, the United States moves Bruce Pixley be declared an expert in the field of computer forensics.

MR. GUNN: No objection.

THE COURT: All right. I find he is an expert in that field.

BY MR. LULEJIAN:

Q. Mr. Pixley, you told us a few minutes ago what a forensic computer examiner does.

What kind of tools do you use when you analyze computer media?

A. Well, there is a couple of forensic software programs such as EnCase. AccessData also makes a forensic software package as well. And there's some other tools. So we use different tools. It's kind of like a mechanic where you have many tools in your toolbox. Not one tool fits all. And so we use different software programs to analyze electronic evidence.

Q. When you do an analysis, is it common to use only one or do you use multiple tools?

A. Oh, I often use multiple tools.

Q. Do you have to improvise as you go along the way, sometimes writing programs?

A. There are times where I will write different scripts, but usually those scripts are designed within the software program themselves to extract data.

Q. Now, when you analyze computer data, what steps do you take to protect the integrity of the media that you're examining?

A. Well, the first thing we do when we go to image -- we use a hard drive from a computer. The first thing we will do is take the hard drive and attach it to a write block device because the first rule of forensic evidence is cause no harm. You can't make any kinds of alterations to the original evidence. So we'll write-protect that evidence and then we'll make a forensic image of that drive or whatever piece of media it is.

Q. And when you do the analysis, what do you work off of?

A. We work off the image, not the original evidence.

Q. Why is that?

A. Well, because if -- one, you never want anything to happen to the original evidence. You want to put that away back in -- into evidence storage. So if something went wrong, you're working off the image and, again, not the original.

Q. Have you been asked to analyze any computer media in connection with this investigation?

A. I have. There were a couple of pieces of evidence.

Q. What did you examine?

A. One of had them was a 40-gigabyte hard drive from the defendant's computer.

One of them was a thumb drive.

And then there were several optical disks that were also involved.

MR. LULEJIAN: One moment, please, Your Honor.

At this point, Your Honor, I would like to read a stipulation entered in by both the defense and the Government.

THE COURT: You may do that.

MR. LULEJIAN: "Plaintiff" --

THE COURT: Ladies and gentlemen, this is one of those stipulations that you must accept as true.

MR. LULEJIAN: "Plaintiff, United States of America, by and through its counsel of record, the United States Attorney, and the defendant, Michael Joseph Pepe, by and through his counsel of record, the Federal Public Defender's Office, hereby stipulate they are using and have examined exact copies of the following:

"One, an EnCase image of a Maxtor 40-gigabyte hard drive in the computer taken from defendant Michael Joseph Pepe's residence in Phnom Penh, Cambodia. This is Government Exhibit Number 1275, and later prepared by U.S. Immigration and Customs Enforcement Special Agent David Nguyen-Galante on or about September 19th of 2006.

"Two, an EnCase image of a Transcend USB JetFlash thumb drive provided to ICE by the Cambodia National Police after the Cambodian National Police seized it from defendant Michael Joseph Pepe's residence in Phnom Penh, Cambodia. This is Government Exhibit No. 1276. And later prepared by ICE Special Agent David Nguyen-Galante on or about September 19th of

2006.

"And No. 3, EnCase and/or ISO images of ten optical disks designated by parties as CD1, CD2, CD3, CD5, CD7, CD8, CD11, CD12, CD15, and CD18, seized from defendant Michael Joseph Pepe's residence in Phnom Penh, Cambodia, designated as Government Exhibit No. 1274, and later prepared by Bruce Pixley on or about July 25th, 2007.

"The parties further stipulate that the exhibits should be admitted into evidence."

THE COURT: All right. They will be admitted.

(Government's Exhibits 1274 through 1276 were received)

BY MR. LULEJIAN:

Q. Mr. Pixley, I have asked the agent to bring you Government Exhibit No. 1274.

Do you recognize what is in that bag?

A. These would be the optical disks that I made images of.

Q. When you analyzed the hard drive, the thumb drive and the CD's, where did you understand that the items came from?

A. From the defendant's residence.

Q. Okay.

And when you analyzed the -- those three groups of media, what types of files, if any, did you discover on them?

A. Well --

MR. GUNN: Objection. Overbroad, vague and ambiguous.

THE COURT: Sustained.

MR. LULEJIAN: I will try to narrow it down.

THE COURT: I think you can ask a few leading questions if will move things along.

BY MR. LULEJIAN:

Q. Okay.

Mr. Pixley, did you find digital photographs on that media?

A. I did.

Q. Did you find electronic messages known as emails on that media?

A. I did.

Q. Did you find an operating system on the email -- on the computer?

A. I did.

Q. Did you find any software to download photographs on that media?

A. I did.

Q. Okay.

At any point in time, did you reconstruct the defendant's computer?

A. I did.

Q. Why did you do that?

A. Well, sometimes during an exam, it's -- you want to actually test the computer for functionality. So what we'll do is we'll take the image that we made of his hard drive and

restore it to a like hard drive, like making a working copy, and taking that working copy hard drive, connect that to his computer and then start up his computer. Again, we are using a copy of the evidence but that way we can actually use his computer in realtime and test the functionality.

Q. And did you do that in this case?

A. I did.

Q. And did you ultimately set it up so the defendant could use that as well?

A. Yes, I did.

Q. All right.

Mr. Pixley, I am going to ask you to start with the optical media -- and before we go into that, let's just cover the basics.

What is optical media?

A. Well, most people know optical media as a CD ROM disk.

Q. What else is optical media?

A. Well, an optical media would be CDRW where -- there is CD ROM where you can write one time to a disk. There is a CDRW where you can read or write and delete files off of that disk. And then a DVD would be an optical disk. So pretty much a compressed piece of plastic that is used in your computer or that you play music from is considered -- it's an optical disk.

Q. And Mr. Pixley, before coming to court today, did you prepare some overheads to help you explain about optical disks

and other concepts?

A. I did.

MR. LULEJIAN: Your Honor, with the Court's permission, I would like to display the pages that I have gotten no objection from the defense.

THE COURT: We are about five minutes from a break. Should we do now?

MR. LULEJIAN: Your Honor, it might be better if we break now and then start fresh.

THE COURT: Ladies and gentlemen don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We will take a 15 minute break.

(Recess taken)

(Jury In)

THE COURT: Everyone is present. The witness is back on the stand. Sir you are still under oath.

You may continue.

MR. LULEJIAN: Would the Court ask Mr. Pierson, please, to turn on the screen.

THE COURT: Sure.

BY MR. LULEJIAN:

Q. Mr. Pixley, right before the break I had asked you whether you prepared a series of overheads to help talk about some of the concepts that you are -- you are going to testify about today.

Is this one of the overheads that you prepared?
A. Yes, it is.
Q. I think we were just talking about what an optical disk was. Just so we are back on the same page, quickly tell us what an optical disk is.
A. For what we are going to talk about here an optical disk is a compact disk. And a compact disk is basically a -- it's covered in plastic, and there's a reflective layer in the middle. And a laser will read that reflective powder as a reflective layer. And it's looking for pits inside of there.

And the best way to describe that is kind of how someone who is -- who has a vision impairment that reads Braille and reads the bumps on a piece of paper, the laser is reading the bumps on that reflective layer.

And so what an optical disk has is, it's kind of just an old record player -- the old record, the old LP's, where you put the needle on the outside and it spins, and eventually it ends in the middle. Well, an optical disk works in the opposite way. It starts from the middle and spirals out. And there's a single track that starts from the middle and spirals out. And just to get an idea, that spiral -- if you were to stretch out that spiral, it's about three miles long. So it holds a significant amount of data.
Q. And what kind of data can you store on there?
A. Well, you can store anything from music to maybe a movie

file, depending on the format, or digital photographs, Word documents, Excel.

Q. What does the term CDRW mean?

A. That stands for what is a -- what's known as a compact disk that's rewriteable. And that means that not only can you -- you can reuse that disk, and it works kind of like a hard drive where you can write files to it and you can delete files from it.

Q. How does one write to the CD? You are talking about the laser. How does the actual data go and how is it stored?

A. Well, in this example here, what will happen is let's say you want to copy multiple files onto this disk. And so I represented here is you are copying files and it starts from the middle and it starts writing data as it starts spiraling out and keeps adding one file after the next in succession.

Q. How does it -- how do you know where the files are?

A. Well, and part of what a compact disk does is it maintains a table of contents, just like a book has a table of contents. And in the table of contents there is the name of the file, the date of the file, and exactly where is that -- where is that file located. Just like in the table of contents. If I want to go to Chapter 7, it will tell me Chapter 7 starts at page 57, so I can jump ahead to Page 57 and start.

Q. If I am looking for a specific file, say I am looking for Vacation 4, the computer will look at the table of contents and

look at where that table points to and then go to that file?

A. Absolutely. That happens behind the scenes. You are interested in "I want a specific file." The computer just knows where to look. It reads the -- it reads the table of contents.

Q. Sorry. I will try not to step on top of you again.

So if it happens behind the scenes -- for example, I opened up a document in, say, Word and I saw the listing there and I clicked on a file, would this table of contents then tell the computer where to go to retrieve my documents?

A. If you were using Word and you told Word to read that disk, it would read the table of contents and it would know where to find that file.

Q. What happens if I delete the file? What happens then?

A. Well, because it's a CDRW, you have the option of deleting files because it -- you can read and write to it multiple times. So in this example, what I did here -- and the last table of contents I show vacation pictures, Vacation 1 through 5.JPG, as digital photographs, and that's just as a representation.

So in this example, what I did here is I deleted the first four files. But when you delete a file on a CDRW disk, you're not deleting the file itself. All you're really doing is going to the table of contents and erasing that. Just as if you were to go to a book and say Chapter 1 is not there. Chapter 2, not there. You're deleting the pointers to where that stuff is. However, those files still exist.

So what we see on the screen up there is where we see one file is left, Vacation 5, it's in green. The previous four files, which are in the wide yellow band, those files are still there. Just as in a book. Just because you go to the table of contents and you erase Chapter 1 out of the table of contents, if you flip ahead you could still find Chapter 1 in that book.

Q. So what can you as a forensic examiner do to locate those files?

A. Well, forensic software gives us the -- we have the ability to actually go in and start searching for Chapter 1 and Chapter 2. And so it's equivalent of if you were just to open that book and you flipped through and you looked for Chapter 1 and you turned to Page -- say it started at Page 5 -- and you turned to Page 5 and it said at the top Chapter 1 and you kind of flipped ahead and you go, oh, there is Chapter 2. Well, I bet between Chapter 1 and the page right before Chapter 2, that looks like I have all of Chapter 1, and you can take those pages out.

Well, we do the same thing in computer forensics. We find the beginning of the file, the end of the file -- and again this is deleted, a deleted file -- and we extract that out.

Now, there's one thing that you're going to hear later, and when you delete files from a hard drive or from an optical disk, those files are then considered in the unallocated space. And basically what that means is there's nothing in the table of contents that points to those files. The data is still

there but now it's unallocated.

Q. Is there a certain point in time where data on unallocated space is gone forever?

A. Well, eventually with a CDRW, is if you were to continue to add files to this disk, the files don't start over-writing where the yellow is. If you were to add more files, like Vacation 6 and 7 and maybe some other documents, it would continue on that spiral. When the disk was full, then it would go back and start using the first part of the area where you deleted those files. Once you overwrite that data with new data, then we cannot recover the data once it's been overwritten.

Q. Mr. Pixley, when you examined CD 1, what type of files did you find on there?

A. Digital photographs.

Q. Let's talk about digital photography a little bit.

A. Okay.

Q. What is a digital photograph?

A. Well, a digital photograph, you use a digital camera, it takes a digital photograph. So instead of where it would store it on film, it's actually storing it on a media card instead that's attached to the camera or plugged into the camera.

So in this example here, I used a digital -- I used a Minolta digital camera to take a photograph. Now, inside that photograph, when you take that picture, there's a couple of things that are actually stored in that picture.

One, the picture stores information about the make and model of that camera, the date and time of when that picture was taken, and there's some other settings. There's also a thumbnail image of the full-size picture and then the full-size picture itself.

Q. Let's break that down a little bit. You have thrown a lot at us. When you say it's stored on certain type of digital media, what are the common types of media that one would store the photograph on after you take it on the camera?

A. Well, there's -- one of them would be a compact flash card. There's SD cards, there's XD cards. There's different types of media cards and it really depends on the camera manufacturer what type of media card you used for that camera.

Q. Do the media cards all do the same thing though?

A. In essence, yes, they do. They are just different sizes but they still store data.

Q. Now, you used the term "thumbnail" a few minutes ago.

What is a thumbnail?

A. Well, just like in this representation here, you have a full-size picture, which is the picture on the bottom, and then a thumbnail image, which is the same photograph but much smaller. And so the thumbnail image, and the reason why it's there on a digital camera -- and for those of you who have digital cameras, if you ever look in the LCD view screen in the back, you can actually look at the pictures you took. Well,

that's because the camera is looking at the smaller thumbnail version instead of the full-size version.

Q. Who took this photograph?

A. I took that photograph.

Q. And what kind of camera did you use?

A. I used a Minolta Dimage S414 camera.

Q. Would you please take a look at Government Exhibit No. 2096. It's a physical exhibit.

THE COURT: I don't think -- he is looking in book --

BY MR. LULEJIAN:

Q. Mr. Pixley, the agent will bring it up to you. I'm sorry. Is there a bag with a camera up there by chance?

A. Yes.

Q. Sorry. Okay.

A. This is 2098.

Q. 2098? I'm sorry.

Okay. And what is 2098?

A. 2098 is the -- is the Minolta digital camera that I used to take this picture.

MR. LULEJIAN: Your Honor, the Government would move 2098 into evidence.

MR. GUNN: I would look for the foundation about where it came from, Your Honor. The objection is to --

THE COURT: Based on what I have heard so far, I don't see why you would put it into evidence.

MR. LULEJIAN: All right.

Q. Mr. Pixley, you took a number of pictures with that camera?

A. I did.

Q. And is this one of those photographs?

A. Yes, it is.

Q. Okay.

I notice on this photograph there is a date and a time stamp associated with it.

How's that date and time set?

A. Well, the camera sets that date and time, which means that the user has to set the date and time. In this case, when I took this picture, I intentionally set the date wrong. I took this picture on February 17th of this year. But if you look at the picture, the camera is doing exactly what it was supposed to do. I set the camera date to August 16th of '07. So the camera will embed the date and time of whatever the user sets on that camera.

Q. Okay.

I also notice that next to the title "Digital Photograph" there is a phrase "PICT 0001.JPG."

What does that mean?

A. Well, that's the first picture that this camera took. And that's the way Minolta -- this specific camera stores pictures. Each digital camera has to give the picture a file name so it can be retrieved. And so this camera uses this naming

convention to store the pictures. So the next picture would be PICT 0002.JPG.

Q. What is JPG?

A. That is for -- for JPEG, and I -- I can't remember the acronym that's used for JPEG right off the top of my head.

Q. What is a JPEG?

A. A JPEG is a digital image such as in the case of this, a digital photograph. It's the format and the way that the picture is stored. So a digital camera uses a specific format and that format that's standard that was created by the -- by the -- by the community, because it is a standard that all camera manufacturers will use, says that inside this file, which is framed by the box that you see up there, it says that you will embed this information and a thumbnail and the full-size picture in this format.

Q. So in other words the type of extension, the type of format it is tells the computer how to read the data so it can display the picture?

A. Exactly. So it knows how to handle that picture.

Q. Okay.

And what other types of formats would we have heard of?

A. Well, primarily with digital pictures, you're using JPEG is the standard.

Q. Is the time on that camera in military time or is it in

civilian time?
A. I believe it's done in military time.
Q. Now, you said a few minutes ago that if you don't set the time right, pictures will be off, similar to the one you have got there.
A. Exactly. So what happened here is I took some pictures on February 17th. I took some pictures on February 19th. And the date was still off on pictures on both of those days.
Q. So if you went back to review those picture, say, a year later, what would you find?
A. Well, you would go back and you would see the date that the camera stored in there.
Q. So the date that is on the photograph may not actually be the date the photograph was taken?
A. Correct.
Q. Now, you testified earlier that prior to -- before you came to court today, you examined the hard drive.
A. Yes.
Q. Thumb drive, and a number of compact disks or optical disks that came from the defendant's residence in Phnom Penh. And you also talked about the kind of information that you pulled off of those.
What I would like to ask you is approximately how many photographs did you come across? In the hard drive, the thumb drive, and -- I am only talking about two of the compact disks,

Compact Disk 1 and 15.

A. Well, we would be into the hundreds, if not thousands, of images.

Q. And if you were to classify those types of images, what categories of images would they be?

A. Well, I have seen everything from regular photographs or I've seen photographs that were -- would be considered pornography. I've seen images that would be non-pornography. I've seen images that were pictures that were from the Internet.

Q. What I would like to focus on today, Mr. Pixley, is the pictures that are pornographic and non-pornographic.

When you take the pictures and they're stored on the media at the compact flash card, how does it get from the compact flash card to one's computer?

A. Well, there's a couple different methods that you can use. One is somebody could remove the compact flash card and insert it into a reader in their computer to transfer the pictures.

Another method is just to take a cable, like a USB cable, and attach that to the computer and hook that cable directly to the camera itself and transfer the pictures that way.

Q. And how does the computer know to transfer the pictures?

A. Well, there's -- typically, if you have it set up right, you will have software installed on your computer so when you attach a media card or you attach a camera, the software detects

that the card or the camera has been attached and then prompts the user, what do you want me to do with these pictures.

Q. And did you find any such software when you examined the hard drive of the Mr. Pepe's -- of the defendant's computer?

A. I did.

Q. What was that program?

A. This program was called Nero PhotoShow Express.

Q. Mr. Pixley, would you please look at Government Exhibit 1277.

A. Yes.

Q. What is that?

A. It is the quick start guide for Nero 6 Ultra Edition.

Q. And is that the same program that you found on Mr. Pepe's -- on the defendant's computer?

A. I did. This is -- this is the software.

Q. Now, have you had an opportunity before coming to court today to try out Nero PhotoShow Express?

A. I did.

Q. And would you please explain to us the steps in which the photographs are transferred from the time you plug it into the computer, the camera into the computer?

A. Again, what I used is this digital camera that I previously had in my hands here. And then using the defendant's computer with the restored hard drive that I attached there, I connected the memory card, the compact flash card, to the computer and

Nero PhotoShow Express popped up and said, "I detected pictures on this card. Do you want to put them into PhotoShow now?"

Q. And what did you do, sir?

A. At this point you would click "Yes."

Q. What happens next?

A. What happens here is that the software program reads the memory card, the thumbnail images, and displays them in this software. And then at this point, you can choose to select all the images. In this case, they're already all selected. And it's prompting you to add these photos to either a new album or an existing album. So what I did in this case, I would click "Go" to select -- I want these added to a new album.

Q. Is this the screen you were prompted with?

A. It is. Now, in this case you are then prompted to name the album. Now, to be consistent with some of the folders that I saw on the defendant's hard drive, I used the same naming convention that I saw, and since I took pictures of a ranch, I called my album Ranch 021708, because that's when I took the first part of the pictures.

But you will also notice that the PhotoShow Express, as it reads that first picture and kind of displays it there, it gives an album date of 8/16/2007. It's because it's actually reading the first picture, reading the information embedded in there saying, hey, the date of this picture is August 16th, 2007.

Q. All right.

What did you do to go to the next screen?

A. At this point you just click "Okay."

Q. Then what do you see?

A. Then what it does is it copies all the pictures off the media card to the hard drive and then displays not only the album that you just added, but the other albums that you have on the hard drive.

Q. All right.

Let's talk about that copying process, Mr. Pixley.

A. Okay.

Q. When you say the pictures are copied off the camera onto the computer, where do they go?

A. Well, they are transferred to a folder on the hard drive. So in this case, on -- just to kind of lay the foundation, this computer was running Windows XP as the operating system. And every user on that computer has a user profile. So in this case on the defendant's computer, the name of the profile was Michael.

Q. And is this what the file structure looks like in basic terms on the 40-gigabyte hard drive?

A. Well, yes, but it's not listing all the folders that are there. It's specific to what we're talking about here. As far as the first folder structure, if we read down where it says, "Michael, application data, ahead, PSD image database, cache"

and then "albums."

Q. And what does "cache" mean?

A. Cache is just a folder name that PhotoShow Deluxe or PhotoShow Express uses to store all of the thumbnail images that we saw in the previous screen. So all those thumbnails that we can quickly identify pictures are stored in the "Albums" folder.

Q. Thumbnails again are the little versions of the pictures?

A. Are the small pictures. So underneath the cache "Albums" folder it will create a new sub-folder that's consistent with whatever you name the album. Like I named my album Ranch 021708, so there will be a thumbnail folder that will have all the thumbnail images in there.

Q. And is a folder created with just the name of the album you have or does the PhotoShow Deluxe add something else to the file name?

A. Well, every album that you add to PhotoShow Deluxe, it -- it pre-pens the name of your album with a number. So if you had 21 albums, you're going to have albums listed 1 through 21 and then after the number would be the name of the album.

Q. Are those numbers sequential?

A. They are sequential. So every album gets a new number. The next incremental number is added.

Q. So it would be the number and then the name of the album?

A. Yes.

Q. And it will be sequential from the time you started at the

beginning until you ended?

A. Correct.

Q. Where else -- well, you explained how the thumbnails get to the computer.

How about the actual pictures themselves?

A. If we look down a little bit below that, we see the "My Documents" folder. Now, people who use a Windows computer are probably familiar with the "My Documents" folder. And within the "My Documents" folder there is a "My Pictures" folder. PhotoShow Express takes all of the full-size pictures, creates a new sub-folder underneath "My Pictures," names the folder whatever you named the album and puts all of the full-size pictures into that folder.

Q. So we have got the full-size pictures in a folder under "My Pictures" with the album name, and we've got the thumbnails in a sub-directory of the PSD image database cache "Albums" structure with that name?

A. Correct. In addition to the thumbnail album folder, there is also a text file in there that lists -- inside this text file it lists the names of all the images, of all the thumbnail images and the full-size images, and the date and time that those pictures were taken, to keep track of this stuff.

Q. All right.

Now, you said in the thumbnails folder, the "Albums" folder, there's a number that the computer program generates

before the name of the album.

Do you see that same number in the folder that appears for the full-size ones in my pictures?

A. No. It will actually be the name of whatever you name the album. So in my example, I had Ranch 021708. That will be the name of the folder underneath "My Pictures."

Q. All right.

Mr. Pixley, I always run out of space on my computer and have to delete programs. If I wanted to delete pictures using this program or using this structure, where would I go to clear up some space?

A. If you wanted to clear up pictures, you would actually go into the "My Pictures" folder, and from there you would start deleting pictures. You can delete the entire folder or just individual pictures.

Q. So let's say I wanted to get rid of the ranch folder that you created. It's taking up too much space or I just don't want it anymore.

What would I do to get rid of the folder in "My Documents" or "My Pictures" directory?

A. You would highlight that folder inside of "My Pictures" and click "delete" which would then move that folder to your recycle bin.

Q. What is the recycle bin?

A. Well, Windows uses a recycle bin that when you delete

files, it's a temporary place that Windows will store those files in case you accidentally delete something. So in this example -- and although it looks kind of cryptic, we see a folder down below called Recycler. Now, that's the name of the folder that Windows uses.

Now, as a Windows user, you're not normally going to see a Recycler. It's hidden folder. You will see it called Recycle Bin. And then there is two sub-folders below that. One is N Protect and the other is a very long string of numbers. Every user -- that long string of numbers is associated to the user. So as a user, you wouldn't see that either. That's kind of a hidden folder. You just see it as Recycle Bin.

Q. So when I drag my files into the trash can that's on my desktop, the Recycler is where it goes?

A. Yes, it is.

Q. Okay.

What happens if I make a mistake and I realize oh, I need to get them back? Can I do so?

A. You can. You can go into the Recycle bin. You can then right click on that folder and select "Restore," and it will put it back into the "My Pictures" folders, because the operating system keeps track of where was it when you deleted it.

Q. What happens if I empty the trash and the Recycler is emptied? Can I still get my pictures back?

A. Well, not without some special software, and also not if

those pictures have been overwritten.

Q. Okay.

Just assume that I don't overwrite. I just delete them. Where do the pictures go?

A. Well, in this case, now that you've deleted them, now they're on unallocated spice. So just like when we talked about on the CD ROM where you delete pictures that are unallocated, again, all we are saying is that the table of contents no longer has a pointer to those files. They can still be recovered possibly if they haven't been overwritten, but unallocated just means there is no longer a table of contents entry saying where they are.

Q. So I delete the Ranch folder, I put it in the Recycler, I empty the Recycler, and those photographs no longer appear in the "My Pictures" directory; they go to unallocated space?

A. They would then be in the unallocated space of the drive, yes.

Q. Have I gotten rid of all the pictures from that file then?

A. No. Just because you go into the "My Pictures" folder and delete the actual folder containing the full-size images, the thumbnails are still in the "Albums" folder. And really unless you knew where to look, you're probably not even going to know that they are there to drill down into that folder structure, find it and delete them there as well.

Q. So the second copy of those pictures still exists?

A. The thumbnail version of those pictures exist along with the info text file that keeps track of when those pictures were added.

Q. Now, as a forensic examiner, what does that fact allow you to do?

A. Well, if I was to go -- like in this case I would go look at the cache "Albums" folder and all the thumbnail images and look at all the albums. From there, now that I can see all the albums that are there, I would then look at the "My Pictures" folder to see if those albums are still there.

I can also use those thumbnail images if I find the pictures someplace else to get an idea of when did they first come on the hard drive, what was the date and time stamp of those pictures as well.

Q. If you could explain to us what you do if you manually want to get rid of pictures through DOS. Does the Photoshop Deluxe -- does the photo program NERO allow you to delete within?

A. It does. It does have a trash can function. But I found that if you delete the thumbnails -- like if you say I do not want this album anymore, it will delete the album, although I found it doesn't do it very well because I can still see the album if I go and look for it. But it does not touch the "My Pictures" folder. So they're completely independent of each other.

Q. So if you wanted to completely wipe it off the hard drive, you would have to either delete the album in the "Albums" folder and then delete the folder in the "My Pictures" folder or run the NERO program, delete the albums; the album within that program, then manually remove the pictures using DOS from the "My Pictures" folder?

A. Right. You would have to go to both places. Then you would have to go to the recycle bin and empty that. Another option, too, when you delete images -- when you click -- like in the example we used where you deleted a whole folder, when you hit "delete," it will send that folder to the recycle bin.

Another way to delete is if you hold down the shift key and hit "delete," it will delete it and it bypasses the recycle bin. So then you wouldn't -- then you would not, as a user, be able to say, "Oh, I need to restore that." You have bypassed the function of the recycle bin.

Q. But it still puts it in the unallocated space?

A. It is still in the unallocated space of the hard drive, yes.

Q. So even though you have gone through these steps of removing thumbnails, removing pictures, the digital fingerprints of what you did still remain?

A. The data of those files still remain.

Q. And as a forensic examiner, what can you do with that information?

A. Well, what I would do is I can go through the hard drive and try to recover deleted pictures from the hard drive, finding those Chapters 1, 5, 7, because I know what the beginning of a picture looks like. It has a unique signature. I know what the end of that picture looks like so I can go through and find that and extract it out of the hard drive and restore it.

And then from there -- and as we saw in this CD ROM, when we delete a file and we don't have an entry in the table of contents, when it's an unallocated space, I don't know what the name of that file is anymore.

So what I would do in that case is I would probably go -- like in the example here, I could go find the thumbnail, the matching thumbnail that goes with it, using that info text file that says this is the camera, this is the date. And then from there I could find the name of that picture and what file it was originally stored in the "My Pictures" folder.

Q. Mr. Pixley, I'm going to now shift away from the abstract and actually turn to the files that you recovered from Mr. Pepe's computer and from his CD's. Let's start with the non-pornographic images.

Before you came to court today, did you examine Exhibits No. 1299 through 1308, Exhibits 1332 through 1356 and 1358 through 1404?

A. I did.

Q. And what were you able to learn by looking at all of these

photographs?

A. Well, those pictures --

Q. Let me first -- that is a very broad question.

A. Okay.

Q. Were you able to tell what camera or cameras took those pictures?

A. Oh, from -- yes, I was.

Q. And what camera was that?

A. All of those pictures were taken with the same camera, a Minolta Dimage S414 camera.

Q. That's the same camera that you purchased for your experiment?

A. Yes, it is.

THE COURT: You mean the same model or the same --

MR. LULEJIAN: Same model. Thank you, Your Honor.

Q. And what else did you discover about the photographs, specifically with respect to the dates?

A. Well, what I found is -- and again, looking at those pictures and some of the other references from the hard drive, that the dates appeared to be off.

Q. How did you reach that conclusion?

A. Well, what I did is I started looking at the dates of the pictures and looked at names of the folders. I started looking for known events and names of the folders where these pictures may have been stored, and trying to do a comparison between the

dates of the folders or these known events to try to figure is the date off and if it is off, by how much is that date off.

Q. And what did you find?

A. That the average, based on looking at several folders -- I've looked at, I want to say, more than 12, 13 folders, and kind of built this out -- that the average offset of the date was by 185 days.

Q. Mr. Pixley, specifically what types of events were you looking for?

A. Well, you would look for known events. Where it might be a graduation ceremony, a wedding, Christmas, Valentine's day, where I could see the date of the -- the name of the folder itself where the user would have named the folder, just like I created that folder Ranch 021708. So I would use that date as a reference to try to get an idea of the offset.

Q. Okay.

You mentioned graduations. Did you find any graduation pictures on the computer?

A. I did.

Q. Okay.

And do you remember what the date that the camera put with those pictures for the graduation was?

A. Not off the top of my head am I going to remember that.

Q. Did you actually at one point learn when the actual graduation ceremony was?

A. I did.
Q. And did that graduation ceremony take place in 2005?
A. It did.
Q. And did you also see photographs of a wedding that took place in 2005?
A. I did.
Q. And at a later time, did you learn the dates of those -- the date the wedding actually took place?
A. I did.
Q. And did that go into your determination that the photographs were off by 185 days?
A. That was part of it, yes.
Q. You mentioned about Christmastime.

Did you find any photographs that appeared to be taken at Christmas?
A. I did. There was one folder that sticks with me as a folder identified as "Christmas 2005."
Q. I am going to show you a photograph. This has already been admitted into evidence so with Your Honor's permission I will put it up on the overhead.

THE COURT: Sure.

MR. LULEJIAN: This is Exhibit No. 1372.

Is this one of the photographs that you found?
A. Yes, it is.
Q. Where did you find it?

A. This looks like the one that came from the "Christmas 2005" folder.

Q. And is this one of the photographs you used to determine that the camera was off?

A. Yes.

Q. Approximately how many days off was it, based on this photograph?

A. Well, 185 days.

Q. Do you remember the date that the camera associated with photograph?

A. I don't remember the date but I know when I did the calculation and added 185 days, it would show that this picture was actually taken on December 25th, 2005.

MR. LULEJIAN: Your Honor, at this point the Government would move Exhibits 1299 through 1308, Exhibits 1332 through 1356, and 1358 through 1404 into evidence.

MR. GUNN: No objection at this time, Your Honor, subject to possibly raising individualized issues later as they arise.

THE COURT: All right. Admitted.

(Government's Exhibits 1299 through 1308; 1332 through 1356; 1358 through 1404 were received)

BY MR. LULEJIAN:

Q. That was a large body of exhibits.

And you personally analyzed or examined all of those

exhibits?

A. I did. I went through each of those individually.

Q. And have you done anything to condense the information, specifically with respect to dates and locations of those files -- let me rephrase. It's a very poor question.

Have you summarized the information on any document?

A. I did.

Q. I am going to show you what has been marked as Government's Exhibit 2093? Do you have that in front of you?

A. Yes, I do.

Q. And what is this document?

A. This is titled "Summary of non-pornographic digital photographs."

Q. And what did you do to put this document together?

A. What I did is I went through all the exhibits and listed where were those exhibits located, whether they were on the compact disk or they came from the hard drive.

I looked at the camera date embedded in each of these photographs, and then I also added the calculation of 185 days to show the -- what I believed to be the actual date that those photographs were taken.

Q. And did you cross-reference that with the exhibit numbers?

A. I did. And the third column shows the exhibit numbers.

MR. LULEJIAN: Your Honor, the Government would offer this as summary exhibit.

THE COURT: Any objection?

MR. GUNN: No, objection, Your Honor.

THE COURT: That comes in.

(Government's Exhibit 2093 was received)

MR. LULEJIAN: May I publish?

THE COURT: Yes.

BY MR. LULEJIAN:

Q. Mr. Pixley, is this the chart?

A. Yes, it is.

Q. Now that the jury has it in front of them, let's talk about the first column, "Media Folders."

What were the three pieces of media that -- that have the -- that you used to create this chart?

A. Well, there's three here. One is CD 1, which is one of these CD's up here in this stack. Another is CD 15, which would also be in this stack. And then below that would be the album which would have been from the hard drive, from the -- this would be from the "My Pictures" folder.

Q. Okay.

And the second column, that's the "Camera Date."

Is that the embedded date or is that another date?

A. That's the embedded date that the camera stored inside each picture.

Q. And the third column, is that the adjusted date based on your calculations?

A. Yes. That is taking -- like in the first example here of June 2nd, 2005, adding 195 days, which would make it December 4th, 2005.

Q. And does this correspond with an exhibit number?

A. It does. With the range of exhibit numbers that fit. So in this first one where it shows on CD 1 there was folder called "Four Girls" and so in there were two exhibits, 1299 and 1300. And so those two exhibit numbers are the range of exhibit numbers -- or if there's just one -- refer to everything that was found in that folder that's listed as an exhibit.

Q. So if we were to put a photograph out there for you, would you be able to use this chart to determine where it came from, what its exhibit number was and what the date was?

A. Yes. And that's why I built this.

Q. Okay.

Let's try with an example. I am going to show you what's been already been admitted into evidence as Government's Exhibit 1332.

Do you recognize this picture?

A. Oh, yes, I do.

Q. Let's put your chart up. If I wanted to know when this photograph was -- actually where the photograph came from, where do I go?

A. You would go down the last column under "Exhibit Number" --

Q. Right here?

A. Yes. And you will actually see towards the bottom there is an individual Exhibit 1332. Then as you go across to the first column, you would see that that picture came from a folder called "New Year Girls." The camera, when it took that picture, was set to October 14th, 2005. Then in the next column, if you add 185 days, the actual date of that picture was taken on April 17th, 2006.
Q. And we could do that with any photograph that is in this exhibit list?
A. Yes.
Q. Now, did you prepare another chart entitled Government's Exhibit 2094?
A. Yes, I did.
Q. Okay.
And what is that chart?
A. Well, this is taking the same exhibit numbers but breaking it down by month in a more chronological order. So this will show the month that the -- that the pictures were actually taken based on the 185 day offset and then the exhibit number associated with it.
Q. Okay.
And again this is from a summary of all the information from those exhibits?
A. Yes. It is built as an extension to this summary that you -- that we have up in front of us now.

MR. LULEJIAN: Your Honor, the Government would offer 2094 into evidence.

MR. GUNN: No objection.

THE COURT: That will come in.

(Government's Exhibit 2094 was received)

BY MR. LULEJIAN:

Q. Mr. Pixley; is this the chart that you prepared?

A. Yes, it is.

Q. So if I -- the -- if I wanted to, say, find that Picture 1332, the one I just displayed for you, I could look on this chart and determine what?

A. Well, you would go down the exhibit number and you would see that exhibit by itself and then you would see that that would fit into the range of April 2006.

Q. This chart is basically a tool to help you organize the pictures chronologically?

A. Yes.

Q. Let's do that with a real life example.

MR. LULEJIAN: Your Honor, I have just conferred with counsel. I would like to display Exhibits No. 13 -- actually, let me ask Mr. Pixley first.

Q. Mr. Pixley, have you examined Government's Exhibit Nos. 1339 and 1340?

A. Yes, I have.

Q. And were those photographs retrieved as part of your

analysis?
A. Yes.
MR. LULEJIAN: Okay. Your Honor, I would ask permission -- I would move to offer Exhibits 1339 and 1340 into evidence.
THE COURT: Any objection?
MR. GUNN: No, Your Honor.
THE COURT: Those are admitted. Thank you.
(Government's Exhibits 1339 and 1340 were received)
BY MR. LULEJIAN:
Q. Is this one of these pictures you examined?
A. Yes, it is.
Q. This is Exhibit No. 1339? 1339; is that correct?
A. I don't see a number, but if you're telling me.
Q. I will tell you. This is Exhibit No. 1340.
A. Okay.
Q. So if I wanted to know when these pictures were taken using the two summary charts you prepared, what would I do?
A. Well, you would go down the exhibit number again and find the matching exhibit number to the month range that that fits into.
Q. Let's start with the month range first.
So we're looking for 1339 and 1340. Down here, Mr. Pixley.
A. There we go. Thank you. This would be in April 2006 in a

folder named "Girls 042706."

Q. And if I wanted more detail, what could I learn from the other chart?

A. Well, by looking at the other chart, I guess you could from there tell that this was an "Albums" folder. As I mentioned earlier, the "Albums" folder was in the "My Pictures" folder on the hard drive.

Q. And then I also could tell the date that the photograph was taken; is that correct?

A. Right. Then it would actually give you the specific date that those pictures were taken.

Q. So using these two charts we could learn A, the photograph was taken in April of 2006 and B, the date of that photograph?

A. Correct.

Q. And in this case, what is date of that photograph?

A. The date is April 21st, 2006.

Q. Mr. Pixley, did you prepare a third summary chart?

A. You did.

Q. I am going to ask you to take a look at Government Exhibit 2095 for purposes of identification.

What does this chart depict, Mr. Pixley?

A. Well, this was a chronology of the digital photographs of the victims, and what it was was a -- like the earliest representation or the earliest finding of a -- of each victim that was found on defendant's hard drive. So these would be

non-pornographic images of the victims.

Q. And did you have to cull through all the photographs in evidence in order to find these pictures?

A. I have gone through all of them.

MR. LULEJIAN: Okay. Your Honor, the Government would move Exhibit 2095 into evidence. The summary exhibit.

MR. GUNN: I would object to this exhibit as argumentative. Rule 403.

THE COURT: May I see it? It's argument. It's not a chart.

BY MR. LULEJIAN:

Q. Mr. Pixley, we just talked about the non-pornographic photographs.

Did you find photographs that might constitute pornography or child pornography on the computer as well?

A. Yes, I did.

Q. And by computer, I should say computer media.

A. Yes.

MR. LULEJIAN: Your Honor, I would ask the Court to please turn off the projector.

THE COURT: You can ask him yourself.

MR. LULEJIAN: I'm sorry.

Q. Mr. Pixley, did you find child pornography on the defendant's hard drive?

A. I did.

Q. And did you find it on CD 1?

A. I did.

Q. And Mr. Pixley, did you prepare a summary of where the pornography was located?

A. I did.

Q. Would you please take a look at 2096.

MR. GUNN: Your Honor, may I consult with counsel to make sure I am looking at the right --

THE COURT: Yes.

MR. LULEJIAN: Your Honor was right. I got ahead of myself. You may want the projector back on.

Q. Mr. Pixley, how did you go about preparing this chart?

A. Well, this is based on where I found evidence of pornographic digital photographs using the embedded camera date of these pictures, adding 185 days, just as I did in the other chart, and then associating the exhibit number or range of exhibit numbers and then -- and where were these pictures located.

MR. LULEJIAN: Your Honor, the Government would offer Government Exhibit 2096 as evidence.

MR. GUNN: No objection.

THE COURT: Admitted. Thank you.

(Government's Exhibit 2096 was received)

BY MR. LULEJIAN:

Q. Mr. Pixley, on the overhead is this a chart you prepared?

A. It is.

Q. If one was to look for pornographic images, would this chart allow you then to find out where they were recovered and when they were taken?

A. Yes.

Q. Let's talk about the first in the exhibit here, Exhibit 1357.

What is 1357?

A. 1357 would be a -- a collection of the thumbnail images found in the PhotoShow Express database. So the identified as 33 underscore Kia, where in this case, 33 indicating this is the 33rd album added to the PhotoShow Express software, and then Kia being the name of the album.

Q. Okay.

So just so we're clear, going back to the chart you prepared earlier about the structure of the hard drive, where did you find 33 underscore Kia?

A. This would be in the top level of the folder structure that we see up there underneath the cache "Albums" sub-folders. Then 33 underscore Kia would be a sub-folder underneath "Albums."

Q. And the fact that that sub-folder within "Albums" exists, what does that tell you as a forensic examiner?

A. Well, it tells me it was part of the -- it was added based on the PhotoShow Express software. Also within that folder there's an info text file that tells me about those pictures,

and that these pictures and the -- the background of these pictures and when they were introduced.

Q. So somebody loaded these pictures from a computer, that computer, using the PhotoShow Express program?

A. Yes, they were added to the computer using that software.

Q. Now, you testified earlier when you load up pictures, in addition to the small versions, the thumbnails, the actual pictures come across as well?

A. Yes.

Q. Where would they be?

A. Well, they would -- they would originally go into as a sub-folder, the "My Pictures" folder.

Q. When you examined the sub-folder of "My Pictures," did you find a folder called "Kia"?

A. No.

Q. Did you find the pictures that were in the album, the thumbnails, in the unallocated space?

A. There is many. I don't remember if I saw those right now or not.

Q. But within the sub-folder "My Pictures," you didn't find what would normally be associated with the uploading process?

A. I'm sorry, one more time?

Q. I am sorry. So in the -- in the directory entitled "My Documents," "My Pictures," you did not find a folder containing full-size images that corresponded with the thumbnail images you

found in the sub-directory for "Albums"?

A. Correct.

Q. What does that tell you as a forensic examiner?

A. Well, when you look -- as I mentioned earlier, when you look in the folder 33 underscore Kia, the text file that's there told me that the full-size images were actually originally located in the -- in a folder underneath "My Pictures" called Kia and that they're not there, which would lead me to believe that somebody had deleted those pictures.

Q. That's based on your training and experience as a forensic examiner?

A. Yes.

Q. And were you able to determine the camera time associated with that photograph?

A. I was. Based on the info text file that was still in the thumbnail folder, 33 Kia, told me that the camera date was May 5th, 2005.

Q. When you adjusted it for 185 days, what did that turn out to be?

A. That came out to be November 9th, 2005.

Q. As represented here on the chart?

A. Yes.

Q. Do you have Exhibit No. 1357 in front of you?

A. I do.

Q. Glancing through it, could you describe very briefly what

it contains photographs of?

A. It shows a young girl standing in clothes. It then shows pictures over time of her disrobing herself down to where she's completely nude. It then shows her laying on a bed, spreading her legs and her -- exposing her vaginal area, and then posing in different poses such as kneeling down on all fours, sitting, squatting on a stool, and again just exposing herself completely nude and then at the end, getting dressed again.

MR. LULEJIAN: Your Honor, with the Court's permission the Government would request to publish these images to the jury alone.

THE COURT: Mr. Pierson, would you turn off the screen, please.

MR. LULEJIAN: A moment, please, Your Honor.

Q. Mr. Pixley, I am going to show you an exhibit now that's previously been admitted into evidence. I am going to put the non-pornographic images previously admitted as 2086 on the overhead.

Can you see that?

A. I can.

Q. Mr. Pixley, I would ask you to take Exhibit 1357, the printouts that you have in front of you --

A. Yes.

Q. -- and compare the photograph and the thumbnail number with the pictures you have in front of you.

A. Okay. One more time.

Q. Let me give you the color ones. They might be easier to see.

A. Okay.

Q. Mr. Pixley, on the overhead there are eight photographs that bear thumbnails -- thumb identification numbers underneath them.

Do you see that?

A. Yes.

Q. Do you see those thumbnails on the Exhibit 1357?

A. Do I see the -- I see the thumbnails on the exhibit.

Q. Okay.

Is there a file name associated with it?

A. Oh, here where it shows underneath it.

Q. Okay.

Is there -- let's start with the first one, thumbnail 01379.9.JPG.

A. Yes.

Q. Is there a corresponding image on Exhibit No. 135i7 with that number?

A. Well, you handed me 1357. I see that here.

Q. 1357 is three pages with a number of thumbnails on it.

A. Correct.

Q. Do you see this first thumbnail, 1379.JPG on the 1357 exhibit?

A. Yes, I do.
Q. Okay.
Turning to the next thumbnail, 01448.JPG. Is this picture also in 1357?
A. Yes, it is.
Q. Turning to the next picture, thumbnail 01385.JPG.
Is the redacted version in No. 2086 there in the full-size version on 1357?
A. Yes.
Q. Turning to the next photographs, thumbnails 1417, 143 -- 1434.JPG, are both of those redacted photographs on Exhibit No. 2086 also present in full-size form -- I'm sorry -- in unredacted form in 1357?
A. Yes.
Q. Turning to thumbnail 1440.JPG, is the redacted version of that picture in 1357?
A. Yes.
Q. And thumbnail No. 1376 through 1377, are both of those thumbnails in Exhibit No. 1357?
A. I see 1377, but I do not see 1376.
Q. Okay.
So several of these photographs are on there?
A. Yes.
Q. Mr. Pixley, I'm going to ask you now whether you had chance to examine Government Exhibits 1309 through 1326 before you came

to court today?
A. Yes.
Q. And where did you locate those photographs?
MR. GUNN: Can we get those numbers again?
MR. LULEJIAN: I'm sorry. 1309 through 1326.
Q. Where did you locate -- we will put the chart back up. Where --
A. Can I -- I'm sorry. I was going to ask you a question.
Q. Please do.
A. As shown on the chart you can see these exhibits were recovered from the unallocated space of CD No. 1.
Q. And is there a corresponding camera date and adjusted date with those photographs?
A. There is.
Q. Okay.
And what is that?
A. This is May 7th, 2005 is the camera date and November 8th, 2005 is the adjusted date.
Q. And the photographs that you found in the unallocated space of CD 1, were you able to find a corresponding album in the thumbnails directory on the hard drive?
A. Yes. On the chart there, these were part of Album No. 32, which was entitled "Nap and Kia 2."
Q. And what camera, make and model, took those photographs?
A. The Minolta Dimage S414 camera.

MR. LULEJIAN: With the Court's permission, I would like to publish -- I would like to move Exhibit No. 1309 through 1326 into evidence.

MR. GUNN: Subject to prior objections, Your Honor.

THE COURT: Admitted.

(Government's Exhibits 1309 through 1326 were received)

MR. LULEJIAN: May I publish them for the jury, Your Honor?

THE COURT: You may.

MR. LULEJIAN: I will slide through the pictures very quickly, Your Honor.

Q. Mr. Pixley, did I just display the photographs in 1309 through 1326 on the monitor?

A. Yes.

Q. Okay?

And briefly would you summarize what the photographs depicted?

A. Well, starting off that series, which were taken on -- again, May 7th, 2005 was the camera date with adjusted date of November 8th -- it starts off with the photograph of the defendant. I believe there may have been about four or five pictures of the defendant. And then what I recall when you actually looked at the time frame within about a minute is when the girls start disrobing and continue that series there.

Q. Mr. Pixley, when you looked and compared those photographs,

1309 through 1326, with the album that you found in "32 Nap and Kia," what, if anything, did you discover?

A. Well, looking back, one, corresponding those pictures back to the thumbnail images. And --

Q. Were there any pictures missing?

A. There were. What I recall seeing is that there were -- by going back and looking at the thumbnail images, I could see the entire series.

When I looked at what was recovered from CD 1, I did not see the entire series recovered from CD 1, whether they were allocated space or unallocated space. But I did see pictures that were part of that series that were in the user's recycle bin.

Q. That was on the hard drive?

A. On the hard drive.

Q. And were those pictures that have been designated as Exhibits 1327 through 1331?

A. Yes.

Q. And were those thumbnails or were they full-size in the recycle bin?

MR. GUNN: I'm sorry, Your Honor, could I get those numbers again?

MR. LULEJIAN: 1327 through 1331.

THE WITNESS: They were full-size pictures.

BY MR. LULEJIAN:

Q. And this indicated here at the bottom of the chart, is that the hard drive?

A. They are.

Q. And you put on there, but does it say, you know, when the album was first created on the computer?

A. The album was created on November 8th, '05, at 5:37 p.m.

Q. And when were those five images deleted?

A. Well, they were deleted six minutes later at 5:43 p.m., because when you delete pictures on a Windows computer and they go to the recycle bin, not only does Windows keep track of the names and where they came from, it keeps track of the time that those pictures were deleted.

MR. LULEJIAN: Your Honor, the Government would move Exhibits 1327 through 1331 into evidence.

MR. GUNN: No objection.

THE COURT: Admitted.

(Government's Exhibits 1327 through 1331 were received)

MR. LULEJIAN: With the Court's permission I would like to publish them for the jury.

THE COURT: You may.

BY MR. LULEJIAN:

Q. Mr. Pixley, as a forensic examiner what can you tell us about what happened in this series of photographs?

MR. GUNN: Objection, Your Honor.

THE COURT: What happened in them?

MR. LULEJIAN: I'm sorry?

THE COURT: What happened in them?

MR. LULEJIAN: I'm sorry, Your Honor. Let me restate it.

Q. As a forensic examiner, Mr. Pixley, could you please tell us what happened to the photographs from when they were loaded up to the computer to the time you did the analysis?

MR. GUNN: Objection. Overbroad, vague ambiguous.

THE COURT: Do you understand that, sir?

THE WITNESS: I do.

THE COURT: You may answer.

THE WITNESS: From doing some date/time analysis seeing when the pictures were added is that the entire series from the cameras was added at 5:37.

Then those exhibits that you just displayed on the screen, 1327 to 1331, were intentionally deleted from the "My Pictures" folder. And that's why they ended up in recycle bin.

Then what would happen is all the pictures, the remaining pictures, were then copied to CD 1. Then at some point later, which there is no date/time to know when they were deleted from CD 1, other than knowing that they are deleted, is that somebody intentionally deleted them from CD 1, where then I found them in the unallocated space of CD 1.

BY MR. LULEJIAN:

Q. Mr. Pixley, I am going to ask you now to turn to another of

group of pornographic photographs that were recovered from Mr. Pepe's computer.

Did you review Exhibits 1410 through 1534 before you came to court today?

A. I did.

Q. Where did you locate these photographs?

A. These were -- all of those were recovered from the unallocated space of CD 1.

Q. Are these listed on your chart?

A. Yes.

Q. Where would that be?

A. Well, down below in the middle there underneath "Recovered from CD 1 unallocated space," where it says, "Recovered 134 through 180," and that's for Exhibits 1410 through 1456. And then "Recovered 52 through 129."

Now, one thing to understand, when I'm naming these as recovered 134 through 180 is that when I find these pictures in unallocated space, they don't have a name because the table of contents is gone. So I have to give them some type of identifier.

So what I did is I named the photos incrementally just as recovered No. 1, recovered No. 2, recovered No. 3. So that's what the -- 134 through 180 indicates that those are pictures 134 through 180 that I recovered from the unallocated space of the CD.

Q. And were you able to match those photographs with albums that appeared on the hard drive?
A. I did. Then I started -- as I recovered those pictures, I went to the PhotoShow Express thumbnail folder structure and started looking for matching and I found them. And they associated with the Album No. 26 which was entitled NI of 102905. That would be the album name. And then the other one would be Album No. 27, which the album name was just NI 2.
Q. Let's start with the first group of pictures, Exhibits No. 1410 through 1456.
What photo album do these photographs correspond to?
A. This would be the Album No. 26 entitled 102905.
Q. So 26 being it's the 26th album created on the hard drive?
A. Yes.
Q. And what is the camera date associated with those photographs?
A. Well, the imbedded date that was in each of these pictures was April 26th, 2005.
Q. Were you able to adjust for the time difference?
A. I did. You mean the date difference; and that came out as October 28th, 2005.
MR. LULEJIAN: The Government would offer and move Exhibits 1410 through 1456 into evidence.
MR. GUNN: Just the prior objection.
THE COURT: Those will be admitted.

(Government's Exhibits 1410 through 1456 were received)

BY MR. LULEJIAN:

Q. Mr. Pixley, rather than show you all -- rather than show --

Your Honor, with the Court's permission we would like to publish a sample of photographs from that series to the jury.

THE COURT: Sure.

MR. LULEJIAN: Approximately, I think, ten.

Q. Mr. Pixley, the second folder that you found, the second album folder that you found, 27 underscore NI 2, what were the exhibits associated with those photographs?

A. That would be 1457 through 1534.

Q. And when were they prepared -- when were they -- those photographs taken?

A. Well, the camera date showed April 27th, 2005. When you add 185 days, that's October 29th, 2005.

MR. LULEJIAN: And the -- the Government would move 1457 through 1534 into evidence.

MR. GUNN: Just the prior objection.

THE COURT: Those will be admitted.

(Government's Exhibits 1457 through 1534 were received)

MR. LULEJIAN: With the Court's permission I would like to publish a small sampling of those photographs.

THE COURT: You may.

BY MR. LULEIJAN:

Q. Mr. Pixley before we turn away from CD 1, I would like you

to take a look at Government Exhibit 1286.

A. I have it in front of me.

Q. Mr. Pixley, what is that?

A. This is a sleeve from a compact disk jewel case.

Q. And specifically which disk does it go to?

A. This one goes to CD 1.

MR. LULEJIAN: Your Honor, the Government would move 1286 into evidence.

THE COURT: Any objection?

MR. GUNN: No, Your Honor.

THE COURT: That will come in. Thank you.

(Government's Exhibit 1286 was received)

BY MR. LULEJIAN:

Q. I see some handwritten notes on the jewel case?

A. Yes.

Q. And I see a number of things that are crossed out, scratched out.

Do you see that?

A. I do.

Q. Having reviewed CD 1, do these names mean anything of import to you?

A. Well, they do. If you look at the bottom where it says, "Four girls, home, 10/28/05" and then "SKV" and "New Girl," those are actually folders that were located on CD 1 that had a table of contents entry for each of these folders.

The ones that are crossed off, the names match to what I found and what we just went through to the actual albums. So we see where I found photographs on some of these exhibits that matched an album called NI 102905. You can see that on the jewel case cover where it's crossed off. You also see where it's crossed off NI 2. That is an album that I matched recovered photographs back to.

Q. In fact, NI 2 was the one we just displayed; isn't that right?

A. Yes.

Q. And Nap and Kia 2 was displayed earlier today as well, wasn't it?

A. Yes. That was also part of the pornographic images that were shown.

Q. I am going to show you what has been marked -- I am going to ask -- I would like to show you what has been marked as Government Exhibit No. 2036. I'm not sure you have that in front of you, Mr. Pixley. I'm showing it to counsel.

Your Honor, the Government would move -- let me show it -- to the witness. May I approach?

THE COURT: Yes.

Any objection?

MR. GUNN: I have no objection.

THE COURT: Thank you. That will come in.

(Government's Exhibit 2036 was received)

BY MR. LULEJIAN:

Q. Mr. Pixley, take a look at government 2036 which is up on the ELMO.

Do you recognize this?

A. I do. I recognize those names.

Q. Okay.

And where are those names from?

A. These names are from folders that were on CD No. 15.

Q. And did you see any of these folders when you examined the -- did your forensic work?

A. On CD No. 15 I did.

Q. And I am going to put next to this your summary chart, Mr. Pixley, which I think was Government Exhibit No. 29-3.

And do we see, for example, the name "Mom" and "Mom's" appearing both on the computer media you found as well as on the CD cover?

A. Yes.

Q. Do we see "Girls 1 2" -- I'm sorry. Strike that.

Do we see "Christmas 1" appearing on that?

A. Yes.

Q. Do we see "2006-month" appearing on both documents?

A. Yes.

Q. Do you see "Valentine's Girls" appearing on those documents?

A. Yes.

Q. Mr. Pixley, the chart you made that summarizes the non-pornographic exhibits, is that all of the directories you examined?

A. No, that's not all of them.

Q. So there may be other directories that correspond to CD 15 that are not on this list?

A. Absolutely.

Q. Mr. Pixley, I'd like to switch subjects now.

During the course of your examination of the defendant's computer media, did you examine the thumb drive?

A. I did.

Q. And where did that thumb drive come from?

A. Well, my -- --

MR. GUNN: Objection. Lack of personal knowledge.

THE COURT: Sustained.

BY MR. LULEJIAN:

Q. Mr. Pixley, do you --

THE COURT: Does the stipulation not go to that? I'm sorry.

MR. LULEJIAN: Actually the stipulation did go to that.

MR. GUNN: In part, at least with respect to the images, Your Honor. I just don't think it's --

MR. LULEJIAN: We will move to the stipulation, Your Honor.

THE COURT: Thank you.

BY MR. LULEJIAN:

Q. Mr. Pixley, did you -- when you examined that thumb drive, did you understand that it was seized as part of this investigation?

A. Yes.

Q. And did you understand it was seized during the search warrant?

A. Yes.

Q. Did you find anything unusual on that thumb drive when you examined it?

A. I did.

Q. What did you find?

A. What I found, and based on date and time analysis, is that normally when you seize evidence like electronic media such as a thumb drive, you want to write-protect that so you don't make any changes. But what I was finding on there was activity on that drive, meaning folders and some files that were copied to that thumb drive after it was seized. But -- and before it was imaged.

Q. Let's be very specific. Did you find any digital photos?

A. I did.

Q. I should say digital photos that were copied after the date that you understood that the thumb drive had been seized?

A. I did. For example, I saw a copy of the defendant sitting

in handcuffs on the thumb drive.
Q. Did you see any other photos that were added that may have appeared after the day of the arrest?
A. I may have seen one.
Q. Did you see -- you said you saw some folders.
Do you remember the names of any of the folders?
A. Yeah, I believe it was called "Pepe Case 008."
Q. What did this tell you when you saw it?
A. That somebody had accessed this thumb drive without using a write-block device to protect writes from occurring on that drive, on the thumb drive, that created the folder and then somebody deleted that folder.
Q. Could you tell whether or not any other files on that thumb drive had been -- had been added to or deleted?
A. I saw some files being added, like one that I remember was a JPEG, I don't remember the exact name, but it said "rotation of" and it was a rotation of a picture.
Q. But for the most part -- let me rephrase that.
With the exception of those few things you pointed out, was there any tampering, for lack of a better word, of the data that was on that thumb drive?
A. Right. Then I looked at did -- was there alterations of some of the photographs that I was looking at, and I did not find alterations of the photographs.
Q. What did you look for to determine whether there was

alterations?

A. Well, from the date/time analysis, what we look for on this specific thumb drive, the thumb drive tracks when files are added, when files are last written to, being updated, and when files are last accessed. And so I looked at these three date and time stamps to get an idea of the scope of what was touched after this thumb drive was seized.

Q. And what did you ultimately conclude?

A. Well, that I didn't find -- of the pictures that I was looking at, I did not find any alterations of those pictures. On some of the pictures that I was looking at had been -- they were deleted, they were sitting in unallocated space.

Q. So what did that tell you?

A. That they were deleted prior to the seizure and that they were untampered with. They were intact the way they were prior to the seizure.

Q. Okay.

Were any of the photographs that I have shown you today on that thumb drive?

MR. GUNN: I didn't hear that question.

THE COURT: Would you repeat that?

MR. LULEJIAN: Certainly.

Q. Were any of the photographs that I have shown you today on that thumb drive?

THE COURT: You mean from that thumb drive or also on

that thumb drive?

MR. LULEJIAN: Also on that thumb drive. Actually, you are right. From that thumb drive. Meaning it originated from the thumb drive.

THE WITNESS: One more time, please.

BY MR. LULEJIAN:

Q. Let me try to rephrase it.

I have shown you a number of photographs today that we have walked through. Those photographs, I think you testified to, came from the hard drive?

A. Yes.

Q. Came from CD 1?

A. Yes.

Q. And CD 15.

Have you -- have we talked about -- have we displayed any photographs from the thumb drive today?

A. No.

Q. And were those photographs of the -- were those photographs from the hard drive?

A. Yes.

Q. Were they from CD 1?

A. No. I'm thinking where they were on the hard drive.

Q. Did you find photographs from CD 1 that was shown today in court?

A. I'm just -- I'm drawing a blank.

Q. Let me rephrase the question.

The photographs that you have been shown today, they came from CD 1 --

A. Yes.

Q. -- and 15 of the hard drive; is that correct?

A. Correct.

Q. None came from the thumb drive?

A. Correct.

MR. LULEJIAN: All right. We have a couple of minutes left, Your Honor, and I think I can finish up with Mr. Pixley pretty close to time.

THE COURT: Okay.

BY MR. LULEJIAN:

Q. Mr. Pixley, in addition to looking for photographs, did you find any mail messages on the defendant's computer?

A. I did.

Q. Okay.

And were you able to determine what kind of mail program the defendant used?

A. It was -- yes, I did.

Q. Okay.

And what kind was it?

A. It was a web-based mail program called Hotmail.

Q. Is that the one I can access just by going on the Internet?

A. Yes.

Q. Okay.

And were you able to recover mail messages that were sent or received from that -- sent or received through the Hotmail?

A. Yes.

Q. How did you go about doing that?

A. What you would look for is since it's web-based email, you would first look in the user's Internet cache, which is where I looked, to see if there were any Hotmail messages still cached on the hard drive, meaning that these are allocated files. And I found email messages there.

Q. And were you able to go back and reconstruct them in their native format? In other words, how they appeared to the user when he or she accessed the Hotmail account?

A. Yes.

Q. Okay.

I would like to show you what has been marked as Government's Exhibit No. 2097 for purposes of identification.

Do you recognize that document?

A. I do.

Q. What is it?

A. This is a Hotmail message that's being created using the defendant's Hotmail account and being sent to a person with a first name of Mack.

MR. LULEJIAN: Your Honor, the Government would move

Exhibit 2097 into evidence.

MR. GUNN: Your Honor, that's fine.

THE COURT: That comes in, thank you.

(Government's Exhibit 2097 was received)

MR. GUNN: I do object but I think it's a previously noted objection. I object under 403 and relevance.

BY MR. LULEJIAN:

Q. Who is this message going to, Mr. Pixley?

A. Well, this is going to -- well, based on the text, it's going to someone named Mack. It's being addressed to a Yahoo mail account. It's Khunkcm@yahoo.com.

Q. What is the subject of that message?

A. "Girls."

Q. Is there text that the user wrote in there as well?

A. Yes.

Q. Can you read that out loud?

A. It says, "Dear Mack: Thank you for the email with pictures. It helps me to make up my mind and continue to stay here longer. The sweet things I have with me have the most perfect little bodies and attitudes. Take care of yourself. I am thinking about you. Best wishes, Michael."

Q. Were you able to determine when that message was sent?

A. Within a couple of seconds after I located this, I found a message indicating that this message had been sent.

Q. And what was the date?

A. This would have been, I believe, on March 30th of '06.
Q. In addition to this message, did you recover any other messages?
A. I did.
Q. I am going to ask you to take a look at Government Exhibit No. 2009.
Do you have that in front of you?
A. I do.
Q. What is 2009?
A. This is a summary chart of the Hotmail messages I located.
Q. I'm sorry. You must be looking at the wrong exhibit.
A. Oh.
Q. Do you have 2009 in front of you?
A. Yes. 2009 we just went through, I believe.
Q. So this is a copy of the text of that message?
A. Yes. Text only.
Q. Would you please take a look at 2010 and 2011.
A. Yes.
Q. What are those?
A. These are two other messages where it just contains the text only and not the graphics that we saw in the exhibit you had displayed earlier.
Q. The email address on those messages -- the email address on 2009, 2010 and 2097, the recipient, is it the same?
A. Yes, it is.

Q. And that's Khunkcm -- that would be Khunkcm@yahoo.com?
A. Yes.
Q. And in 2010, what does the subject line read?

MR. GUNN: Objection, Your Honor, no foundation. It's not admitted yet, I don't believe.

THE COURT: Sustained.

BY MR. LULEJIAN:

Q. Were you able to find out who the person that message was addressed to based on these messages?
A. Yes.
Q. Did you find out who the person who typed the messages signed his or her named as?
A. Yes.
Q. Were you able to associate dates and times of transmission or creation with those messages?
A. Yes.

MR. LULEJIAN: Your Honor, the Government would move Exhibits 2009, 10 and 11 into evidence.

MR. GUNN: Still no foundation as to 10 and 11.

THE COURT: Let me see those, please.

Did he say where he found these?

MR. LULEJIAN: That is what I realized I forgot.

Q. Mr. Pixley, where did you find these messages?
A. These were in the "Internet" cache folder.
Q. Is that the same place where you found Exhibit 2097?

A. Yes.

Q. That was where the Hotmail messages were from?

A. Yes.

MR. LULEJIAN: Your Honor, the Government would move Exhibits 2009, 2010, 2011 and if I haven't, 2097 into evidence.

MR. GUNN: I previously noted objections to these.

THE COURT: They are admitted. Thank you.

(Government's Exhibits 2009 through 2011 were received)

BY MR. LULEJIAN:

Q. Very briefly, the title in the "Subject" line of 2010, what does it read?

A. The subject line is: "Re: Thanks for the advice."

Q. And 2011, what does the title read?

A. "Hello."

Q. Mr. Pixley, were you able to put dates and times with the transmission of those photographs?

A. I did.

Q. Or the creation of those photographs?

THE COURT: Not photographs.

MR. LULEJIAN: I'm sorry. Thank you, Your Honor. Long week.

THE COURT: You are getting no sympathy from me, Mr. Lulejian.

BY MR. LULEJIAN:

Q. Mr. Pixley, were you able to associate a date and time of

creation with these Hotmail messages?

A. Yes.

Q. And did you memorialize those in a document?

A. I did.

Q. Would you please take a look at Government Exhibit 2099.

A. I have it in front of me.

Q. Okay.

And is that the memorialization of that information?

A. Yes.

Q. And does it tell you also who the message was addressed to?

A. Yes.

Q. And the subject matter?

A. Yes.

MR. LULEJIAN: The Government would move 2099 into evidence, Your Honor.

MR. GUNN: I object. I don't think this is particularly complex to file a written summary.

THE COURT: Well, I will allow you to show it. I don't know why this needs to be in evidence if this information is in the documents.

BY MR. LULEJIAN:

Q. Just to lay a foundation then, the mail message 10 -- 2010 -- 2010, with the "Subject" line, "Thanks for the advice," when was that message sent?

A. That was sent on May 14th, 2006.

Q. And the last message, 2011, when was that message sent?
A. On June 3rd, 2006.

MR. LULEJIAN: One moment, please, Your Honor.

Your Honor, the Government has no further questions.

THE COURT: Good timing.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. You're ordered to return Tuesday at 8:00 a.m. and you're ordered to have a great three days.

(Jury Out)

THE COURT: Mr. Pixley, you are ordered to return Tuesday at 7:45. You are excused.

Ms. Donahue, where are my jury instructions?

MS. DONAHUE: We have several disagreements that I am trying to work out.

THE COURT: Okay.

MS. DONAHUE: I will -- we will work some of them out and I will have the unworked out ones to you on Monday.

THE COURT: Excellent. Thank you. Anything else we need to discuss before Tuesday?

MS. DONAHUE: No, Your Honor.

THE COURT: From the defense perspective?

MR. BROWN: No, Your Honor.

MR. LULEJIAN: Your Honor, would you like me to retain the child pornography before you go off to chambers?

## Certificate of Service

I hereby certify that on May 28, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *James H. Locklin*
By: JAMES H. LOCKLIN
Deputy Federal Public Defender

No. 14-50095

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

MICHAEL JOSEPH PEPE,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
The Honorable Dale S. Fischer, Presiding
No. CR-07-00168-DSF

## Appellant's Excerpts of Record
**[Volume 7 of 12]**

HILARY L. POTASHNER
Acting Federal Public Defender
JAMES H. LOCKLIN
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012
213-894-2929

*Counsel for Defendant-Appellant*

# Table of Contents

## Volume 1

Order Denying Defendant's Motion to Dismiss Indictment....................................1
[Filed December 3, 2007; Docket No. 57]

Order Denying Defendant's Motions to Suppress Evidence....................................9
[Filed December 5, 2007; Docket No. 60]

Order Denying Defendant's Motion to Suppress Evidence ....................................20
[Filed February 7, 2008; Docket No. 129]

Transcript – Sentencing (Excerpts)..........................................................................26
[Dated February 28, 2014; Filed April 17, 2014; Docket Nos. 491, 512]

## Volume 2

Defendant's Motion to Suppress Evidence* .........................................................42
[Filed June 26, 2007; Docket No. 21]

Defendant's Motion to Suppress Evidence (Excerpts)........................................120
[Filed August 1, 2007; Docket No. 33]

Government's Consolidated Opposition to Motions to Suppress Evidence* ........130
[Filed August 22, 2007; Docket No. 39]

Defendant's Reply re Motions to Suppress Evidence ..........................................208
[Filed September 4, 2007; Docket No. 40]

Defendant's Motion to Dismiss Indictment........................................................220
[Filed October 4, 2007; Docket No. 43]

Transcript – Motion Hearing ...............................................................................244
[Dated October 29, 2007; Filed February 26, 2008; Docket Nos. 50, 133]

* Documents marked with an asterisk have been redacted pursuant to Federal Rule of Appellate Procedure 25(a)(5) and Federal Rule of Criminal Procedure 49.1(a).

Government's Declaration re Motions to Suppress Evidence ..............................295
[Filed November 27, 2007; Docket No. 53]

Transcript – Motion Hearing (Excerpts)* ..........................................................299
[Dated December 3, 2007; Filed February 26, 2008; Docket Nos. 58, 134]

Volume 3

Defendant's Supplemental Memorandum re Motion to Suppress Evidence.........340
[Filed December 20, 2007; Docket No. 71]

Government's Supplemental Memorandum re Motion to Suppress Evidence .....350
[Filed December 20, 2007; Docket No. 72]

First Superseding Indictment ..............................................................................372
[Filed December 20, 2007; Docket No. 83]

Government's Supplemental Declaration re Motion to Suppress Evidence (Excerpts) ..........................................................................................................374
[Filed February 5, 2008; Docket No. 127]

Transcript – Motion Hearing (Excerpts)* ..........................................................380
[Dated February 6, 2008; Filed February 26, 2008; Docket Nos. 136]

Transcript – Trial – Day 2 (Excerpts)...................................................................460
[Dated May 9, 2008; Filed May 18, 2010; Docket Nos. 259, 410]

Volume 4

Transcript – Trial – Day 3 (am) (Excerpts) .........................................................635
[Dated May 13, 2008; Filed May 18, 2010; Docket Nos. 260, 411]

Transcript – Trial – Day 3 (pm)...........................................................................766
[Dated May 13, 2008; Filed June 17, 2014; Docket Nos. 260, 532]

Volume 5

Transcript – Trial – Day 4 (Excerpts)...................................................................805
[Dated May 14, 2008; Filed May 18, 2010; Docket Nos. 261, 412]

Transcript – Trial – Day 5 (Excerpts) ........ 942
[Dated May 15, 2008; Filed May 18, 2010; Docket Nos. 262, 413]

Volume 6

Transcript – Trial – Day 6 (Excerpts) ........ 1022
[Dated May 16, 2008; Filed May 18, 2010; Docket Nos. 263, 414]

Volume 7

Transcript – Trial – Day 7 (Excerpts)* ........ 1192
[Dated May 20, 2008; Filed May 18, 2010; Docket Nos. 264, 415]

Transcript – Trial – Day 8 (Excerpts) ........ 1343
[Dated May 21, 2008; Filed May 18, 2010; Docket Nos. 269, 416]

Volume 8

Transcript – Trial – Day 9 (Excerpts) ........ 1423
[Dated May 22, 2008; Filed May 18, 2010; Docket Nos. 270, 417]

Volume 9

Transcript – Trial – Day 10 (Excerpts) ........ 1538
[Dated May 23, 2008; Filed May 18, 2010; Docket Nos. 293, 418]

Transcript – Trial – Day 11 (Excerpts) ........ 1739
[Dated May 27, 2008; Filed June 2, 2010; Docket Nos. 294, 435]

Volume 10

Transcript – Trial – Day 12 (Excerpts) ........ 1805
[Dated May 28, 2008; Filed May 18, 2010; Docket Nos. 295, 419]

Transcript – Trial – Day 13 (Excerpts) ........ 1930
[Dated May 29, 2008; Filed May 18, 2010; Docket Nos. 296, 420]

Stipulation to Correct/Modify Record re Jury Instructions (Excerpts)[†] .............1941
[Filed February 27, 2015; Docket No. 543]

Order Correcting/Modifying Record re Jury Instructions ..................................1961
[Filed March 2, 2015; Docket No. 545]

Order Correcting/Modifying Record re Video Testimony .................................1963
[Filed March 2, 2015; Docket No. 546]

Government's Sentencing Memorandum (Excerpts) ........................................1965
[Filed September 17, 2008; Docket No. 318]

Transcript – Victim Statements ..........................................................................1977
[Dated September 25, 2008; Filed June 18, 2014; Docket Nos. 333, 533]

Defendant's Supplemental Filing re Restitution................................................1998
[Filed March 25, 2009; Docket No. 348]

Judgment ...........................................................................................................2006
[Filed February 28, 2014; Docket No. 492]

Notice of Appeal ................................................................................................2012
[Filed March 3, 2014; Docket No. 493]

Docket ...............................................................................................................2013

Volume 11 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 1)..................2053
[Filed March 3, 2015; Docket No. 547]

Volume 12 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 2)..................2309
[Filed March 3, 2015; Docket No. 547]

[†] Although this document and the two orders that follow were not filed until after the judgment and notice of appeal were filed, they are placed here in the excerpts because they relate to the trial proceedings.

Exhibit No. 101 ........................................................................................2399

Exhibit No. 102 ........................................................................................2401

Exhibit No. 103 ........................................................................................2403

Exhibit No. 104 ........................................................................................2405

Exhibit No. 106 ........................................................................................2408

Exhibit No. 107 ........................................................................................2410

Exhibit No. 108 ........................................................................................2412

Exhibit No. 109 ........................................................................................2414

Exhibit No. 110 ........................................................................................2416

Exhibit No. 111 ........................................................................................2418

Exhibit No. 114 ........................................................................................2420

Exhibit No. 123 ........................................................................................2423

Exhibit No. 2007 ......................................................................................2428

Exhibit No. 2009 ......................................................................................2454

Exhibit No. 2010 ......................................................................................2456

Exhibit No. 2011 ......................................................................................2458

Exhibit No. 2093 ......................................................................................2460

Exhibit No. 2096 ......................................................................................2462

Exhibit No. 2200A ...................................................................................2464

Exhibit No. 2201A ...................................................................................2467

Exhibit No. 2202A ....................................................................................2477

Verdict..............................................................................................2480
[Filed May 29, 2008; Docket No. 299]

Presentence Report..........................................................................2488
[Dated July 30, 2008; Filed March 25, 2009; Docket No. 346]

Probation Office Letter to District Court........................................2517
[Dated September 3, 2008]

Government's Submission of Victim Impact and Restitution Information.........2523
[Filed September 19, 2008; Docket No. 329]

Supplement to Presentence Report .....................................................2559
[Filed March 25, 2009; Docket No. 347]

Government's Response to Defendant's Filing re Restitution ...........................2562
[Filed April 21, 2009; Docket No. 355]

Government's Supplemental Submission re Restitution ...................................2583
[Filed February 28, 2014; Docket No. 490]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

United States of America, )
Plaintiff, )
)
vs. ) Case No.
) CR 07-168(A)-DSF
Michael Joseph Pepe, )
Defendant. )
_________________________________ )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

Day 7

Los Angeles, California

Tuesday, May 20, 2008

Pamela A. Seijas, CSR, FCRR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California 90012
(213) 687-0446

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
BY: PATRICIA DONAHUE
ASSISTANT UNITED STATES ATTORNEY
JOHN LULEJIAN
ASSISTANT UNITED STATES ATTORNEY
312 N. SPRING STREET
LOS ANGELES, CA 90012

FOR DEFENDANT: OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY: CARL GUNN
DEPUTY FEDERAL PUBLIC DEFENDER
CHARLES BROWN
DEPUTY FEDERAL PUBLIC DEFENDER
321 EAST SECOND STREET
LOS ANGELES, CA 90012

ALSO PRESENT: ATTACHE GARY PHILLIPS
SPECIAL AGENT EDDY WANG

Los Angeles, California, Tuesday, May 20, 2008

7:46 a.m.

-oOo-

(Jury Out)

THE COURT: Good morning.

MS. DONAHUE: Good morning.

MR. LULEJIAN: Good morning, Your Honor.

MR. GUNN: Good morning.

THE COURT: Hopefully Mr. Pepe will be here momentarily, but I think we can discuss one or two matters without him.

It looks like there is going to be testimony by way of deposition. How did counsel want to handle that with the court reporter?

MS. DONAHUE: We were going -- we have the deposition loaded onto the computer, and we are going to play it. Since there is already a transcript prepared, redacted pursuant to this Court's order, it would seem duplicative to have the court reporter sit here and take down what is on it, especially since it's a videotape, and we can just enter the videotape into evidence. We don't see a reason to require her to transcribe what is on the tape.

MR. GUNN: I think that is right. There is just the caveat that I am not sure -- the transcript we have now was just prepared sort of for us to make redactions. I don't know if

it's quite as reliable and accurate as a transcript by your reporter would be. On the other hand, I guess if we have the DVD or video, it can always be checked. I guess it depends on how --

MS. DONAHUE: We can put the video into evidence and it will speak for itself as this is the exhibit that was played in court.

MR. GUNN: I was simply going to say it depends maybe on how hard or how much work or inconvenient it is for the reporter to take it down. If that's a big difficulty or significant difficulty I don't want to --

THE COURT: I don't want to speak for my court reporter who is absolutely the best. I probably mentioned that she started reporting for me when I was a brand new lawyer 28 years ago when she worked for a deposition firm. So I've known Pam longer than we both want to remember. But it is really difficult. I suspect this one will be extraordinarily difficult so --

MR. GUNN: I don't have a problem with that, Your Honor. I mean, it can always be checked later if there's an issue. I mean, I know I noticed a couple things but it's probably okay.

THE COURT: Okay. So we will have the excerpted transcripts or videos attached as exhibits or marked as exhibits.

MS. DONAHUE: Yes. We'll mark a disk and then we'll just play it off the computer and we will set it up at the break.

THE COURT: If for some reason the jury needs to re-hear it, we'll simply play -- because we would have to play the whole thing anyway.

MR. GUNN: I did have one related question regarding the deposition or depositions. At times there are exhibits shown to the witness. I was wondering if it would make sense and if we could at least, where counsel wanted to put, pause the deposition and put the exhibit up on the Elmo so the jury knows what exhibit the witness is looking at.

THE COURT: I think we probably should.

MS. DONAHUE: We have the deposition exhibits in the binders.

THE COURT: Okay.

MR. GUNN: In my case, Your Honor, what I used was exhibits shown on a computer screen, but I have hard copies of those that are marked under a different exhibit number, the S.S.xxx birthday set. So with the Court's permission, I would just use those instead of the computer.

THE COURT: That's fine.

MR. GUNN: Although I actually have my computer hooked up so I might be able to do it either way.

I have one other issue to bring up with the Court

when you are ready.

THE COURT: All right. Mr. Gunn.

MR. GUNN: Yes, Your Honor. I just wanted to flag a potential scheduling problem with the Court that involves one of our experts and the depositions, two of which are being prepared in the redacted form.

I don't have a good feel for how long our Defense witnesses are going to take. There is a fair number of them, but they may all be short and quick enough that we get them done in a day. I don't have a good feel for it.

Dr. Maloney, our expert, is not available on Thursday morning because he's a consultant for the county jail. He is available Friday morning. There is -- and we're still -- the Government is working on getting the redactions done to the Ly Kim Eng depo. It is hoped that will be available by Thursday morning. I think it's important for the parties to then review it to make sure everybody is on the same page about the redactions.

So hopefully -- I guess where I'm going is there is a slight possibility that we may not be able to fill the day on Thursday if the depositions aren't ready. And Dr. Maloney is our last witness. And I just wanted to flag that for the Court and I hope the Court would work with us on that if that's the case.

THE COURT: Well, I'll work with you, but I don't know

 what fill the day means. If fill the day means you are done at 9:00 and you have nothing to do, I will not be a happy camper. If fill the day means you are done at 12:00 or 12:30, I don't have a problem with that.

MR. GUNN: Well, the deposition of Ly Kim Eng when -- if and when it's ready -- when it's ready, will be about two or three hours. The deposition of Koeung Lang is probably about the same. I think it's probably going to be a long shot for the Koeung Lang deposition to be ready by Thursday.

THE COURT: Well, who is doing it?

MR. GUNN: The Government.

THE COURT: Tell them to work overtime. I don't care.

MS. DONAHUE: One thing I proposed to Mr. Gunn is given that these are two Defense depositions, would it be possible for someone from the federal public defender's office to do the technical work on one. And he pointed out to me under the Administrative Courts Act, it is the Government's -- the Department of Justice's responsibility to do this for the Defense depos, which we are.

But in the interests of time, if the public defender's have someone with the editing program, there's no reason they couldn't start and maybe we can try and work something like that out.

MR. GUNN: I am not sure we do, Your Honor. Apparently the process of downloading them onto whatever system

our tech person uses is a very time-consuming process and we have not done that because we had assumed the Government was handling it under the AO guidelines. I will certainly look further into that but I --

THE COURT: All right.

MS. DONAHUE: We're moving on it, Your Honor, and working overtime on it.

THE COURT: Okay.

MR. GUNN: Perhaps, we can obviously have better information and better feel for this at the last recess or the end of the day on Wednesday obviously. I just wanted to run it by the Court.

THE COURT: Okay.

MR. GUNN: We may be calling our dermatologist as a witness and we will do that Thursday but I don't know for sure, it will depend on the Government dermatologist, the testimony.

THE COURT: Okay.

MR. LULEJIAN: A couple things from the Government, Your Honor. Last week I finished rapidly at the end of the day, I realized that I missed a topic and a couple of small points. With the Court's permission, I would ask respectfully to reopen direct. I think I can get through it probably in about 20 or 30 minutes.

THE COURT: With Mr. Pixley?

MR. LULEJIAN: With Mr. Pixley.

The second thing, Your Honor, Special Agent Wang has exhibits for the day that he is handing up -- he's about to hand up to you. There is one exhibit on top that has do with chart of the emails. We had presented a chart -- and maybe it would be better if Your Honor takes a look at it so you know exactly what I'm talking about.

On top of the stack, Your Honor, is Exhibit 2099 which was a summary chart of three emails. The reason the Government wanted to introduce that, Your Honor, as you can see from the three underlying emails that are attached to it, Exhibits 2009, ten and eleven, that the date and time stamps for those emails did not come across when they were recovered. Mr. Pixley had to do some extra investigation in order to determine that.

It's our position that those dates are important and will be very informative to the jury. And while we can certainly present that to Mr. Pixley orally, we think it would be helpful for them to have it on an exhibit. So I would like to lay the foundation on that exhibit, Your Honor, and move it in again. I know the Court is loathe to revisit rulings but in this case I would ask it to.

THE COURT: Mr. Gunn.

MR. GUNN: Your Honor, I just don't think when we are talking about basically three pieces of testimony that it needs to be or should be summarized in writing. I mean, there's lots of important testimony we would like to have a written

memorialization of, too.

THE COURT: Well, there is no legal basis for introducing a chart just because I guess you think the jury is not going to pay attention or write it down or whatever.

MR. LULEJIAN: Yes, Your Honor.

THE COURT: That is not grounds to introduce a chart.

All right. I have the joint jury instructions. Those aren't actually the ones I need. I need the ones you're disputing so I can figure out what I am going to do with them.

MS. DONAHUE: They're in one pleading. The Defense has them. If -- provided the Defense approves my having collated everything properly, we have them this morning. I also have the proposed verdict form with the Defense.

THE COURT: Okay. So those need to be emailed to the chambers email box in addition to being docketed because I can't manipulate them from the docket.

MS. DONAHUE: Okay.

THE COURT: Anything else before the jury comes in?

MR. LULEJIAN: Nothing from the Government, Your Honor.

THE COURT: All right. It looks like we can start in about five minutes, then.

(Recess taken)

(Jury In)

THE COURT: Good morning. I hope you had a great

three days. Our witness is back on the stand.

Mr. Pixley, you are still under oath.

Mr. Lulejian.

MR. LULEJIAN: Thank you, Your Honor.

DIRECT EXAMINATION RESUMED

BY MR. LULEJIAN:

Q. Mr. Pixley, last week during your testimony you were shown a series of overheads and a PowerPoint to talk to the jury about how the optical disk worked, how the camera worked and a number of other things; is that correct?

A. Yes.

Q. And who prepared that PowerPoint?

A. I did.

Q. And you used it to aid the jury?

A. Yes.

MR. LULEJIAN: Your Honor, at this time the Government would move Mr. Pixley's PowerPoint, which is Exhibit 2100, into evidence.

MR. GUNN: If I could have one moment, Your Honor, to make sure I am clear on which exhibit -- may I consult with counsel, Your Honor, so I am clear on which exhibit we are talking about?

THE COURT: You may.

MR. GUNN: If I could have just one moment, Your Honor.

THE COURT: Okay.

MR. GUNN: No objection.

THE COURT: All right, that will come in. Thank you.

MR. GUNN: 2000?

THE COURT: 2100.

(Government's Exhibit 2100 was received)

BY MR. LULEJIAN:

Q. Mr. Pixley, you had mentioned last week that as part of your analysis, you took photographs using a Minolta DImage camera, Model S-414.

Where did you get that camera?

A. I purchased it on eBay.

Q. And why did you purchase it?

A. Well, I noticed that the defendant's computer and the photographs I was analyzing were associated with that make and model of camera and what I wanted to do was test the functionality of that camera and basically use the purchased camera as a controlled environment to test what I was seeing, as far as dates and times and how the camera functioned and how the software functioned.

Q. And were you able to do so?

A. I was.

Q. And the -- did you take photographs that we showed in court last week?

A. Yes.

Q. And was this camera used as part of your analysis of this case?
A. Yes, it was.
MR. LULEJIAN: Your Honor, the Government would move Government Exhibit 2098 into evidence.
MR. GUNN: No objection.
THE COURT: That will come in. Thank you.
(Government's Exhibit 2098 was received)
BY MR. LULEJIAN:
Q. Another thing we talked about last week, Mr. Pixley, was a thumb drive that was seized from the defendant's residence.
Did you analyze this advice -- this device?
A. I analyzed a forensic image of that device.
Q. What is a forensic image?
A. A forensic image is a complete sector copy of that piece of media. So everything that's on that thumb drive is what I analyzed.
Q. And what is a thumb drive?
A. A thumb drive is a small portable storage device that you can connect to a computer and store anything from digital photographs and files, any type of electronic media or computer files.
Q. Is it stationary or is it portable?
A. It is portable. You put it in your pocket.
Q. Okay.

Is there a limitation on what kind of computer can accept a thumb drive, a personal computer?

A. No. A thumb drive would work on a Windows-based computer or a Macintosh-based computer.

Q. If one purchases a thumb drive and plugs it into his or her computer, are you limited to only use it on the owner's computer or can you take it elsewhere?

A. Oh, you can use it on any computer that has a USB port.

Q. And a USB port is what?

A. It is a -- it's a plug on the side of the computer that you would connect the portable storage device to.

Q. Mr. Pixley, have you had an opportunity to examine the forensic image of the thumb drive seized from the defendant's residence?

A. Yes.

Q. And I am going to ask you to please take a look at Government Exhibit No. 2102.

A. Okay.

Q. Do you recognize this exhibit?

A. I do.

Q. What is it?

A. This is a representation of the folder structure that is on that thumb drive.

Q. When you say "folder structure," what do you mean?

A. Well, that thumb drive has multiple folders on it where

files can be stored within those folders, like a filing cabinet. And this lists the folders that are on that thumb drive.

It also lists some additional items here that I found that had been copied to that thumb drive.

Q. We'll talk about that in a second.

Who prepared this exhibit?

A. I did.

Q. And would this exhibit be helpful in explaining the thumb drive and what happened to it to the jury?

A. Yes.

Mr. LULEJIAN: Your Honor, the Government would move Exhibit No. 2102 into evidence.

MR. GUNN: No objection, Your Honor.

THE COURT: All right. That will come in, thank you.

(Government's Exhibit 2102 was received)

MR. LULEJIAN: May I publish, Your Honor?

THE COURT: Yes.

BY MR. LULEJIAN:

Q. Is this a chart you prepared, Mr. Pixley?

A. Yes, it is.

Q. Let's start with the file structure of the thumb drive.

Could you please explain it.

A. Well, starting at the very top is the name of the thumb drive image. In this case it was named Pepe TD 256 MB, which stands for thumb drive, 256 megabytes, which is how much --

well, the storage capacity that thumb drive was.

Right below that is -- represented is "C" which is the root folder. That is the beginning folder of that thumb drive.

Below that you see a number of folders and different symbols next to those folders. Those symbols represent the state of the folders. For example, the first one where it says Pepe Case 008, that folder has been deleted. Not only has it been deleted, it's overwritten, which means that this is where the table of contents, as we talked about last week, this thumb drive has a table of contents. That entry is still in the table of contents but it doesn't point to anything any more, other than it just being an entry in the table of contents.

Q. What are the folders underneath the Pepe Case 008?

A. Well, then you see one that shows underscore P-I-D-D-R. Same thing, that is a deleted overwritten file or overwritten folder.

Below that is a folder named Boy. Now, that folder is a deleted folder, meaning that there are files still in that. Using forensic software, I can see those files that are still there.

So this is where -- this one -- same thing with Girls 3 and Girls 4 -- this is where using forensic software, when somebody deletes a folder, as a user you would not see that folder anymore. But the entry still exists and the contents within those folders still exist. So I can still see the files

that are in there.

Q. Without describing -- let me ask a leading question.

Did you find digital images in those folders, Boy, Girls 2, Girls 3, Girls 4?

A. Well, the Girls 2 that you just referred to is a deleted overwritten folder so I did not see anything in there.

The Boy, Girls 3 and Girls 4, those folders contained digital photographs.

Q. What about the next folder, Hen with the 2 and the funny character behind it?

A. Right. That is also a deleted overwritten folder.

Q. And then Hen 1 with a box next to it?

A. That is a also -- that is a deleted folder.

Q. What about Home 11 -- I'm sorry. Home 111605?

A. That is a deleted folder.

Q. Home Girls 0705?

A. Deleted folder as well.

Q. And Nary 2?

A. That's a deleted overwritten folder.

Q. So let me see if I understand this. There are a number of folders in this structure that have been deleted. The deleted overwritten ones you cannot access the contents. The deleted ones you can access the contents?

A. That is correct.

Q. And that's using forensic tools?

A. Yes.

Q. Would that be visible to me, just a user who plugged it into my computer?

A. No. If you plugged that thumb drive into your computer, the first folder you would see is down below, called Up North. And you would see those -- the sub folders underneath Up North with the exception of Pepe Case 008.

Q. And we know that because -- what's happened to that file?

A. That's a deleted overwritten folder.

Q. So in Up North I would see one, two, three -- four folders, not counting Pepe 008?

A. Yes.

Q. In addition to the Girls 3 and Girls 4 folders, did you find digital images in any of the other folders?

A. Yes. I found digital images in -- or digital photographs in the majority of these folders.

Q. Let's talk about the Up North folders.

Actually before I go there, were you able to determine what type of camera took these pictures?

A. There was two cameras that were used to take photographs that were stored on this thumb drive. One was the Minolta DImage S 414 camera that we talked about last week. And then there was another one that was a Canon PowerShot SD100 camera used to take those pictures.

Q. And where were the Canon PowerShot SD100 photographs found?

A. Those were in the Friends 111111 folder.

Q. Were there any other photographs, digital photographs, that you discovered on the thumb drive other than the Friends 111111 folder that were taken with a camera, a Canon PowerShot SD100?

A. No. But there is one other photograph that is different than the others as well.

Q. And what is that, Mr. Pixley?

A. That's the one that I have displayed in the top right corner. The name of that image is IMGP 1234.JPEG.

Q. What is that, Mr. Pixley?

A. This is a digital photograph of the defendant sitting in custody.

Q. Why don't we jump ahead and talk about that a little bit and then we will come back to the folders.

At the very top you have a box of three things. Pepe Case 008, this image file that you discussed and something called DOC.EXE.

Why have those been segregated?

A. Well, one of the things I noticed when I examined the image of the thumb drive is activity that occurred on this thumb drive after it was -- what I understand, after it was seized from the defendant's residence.

Q. And that would have been on June 17th of 2006?

A. Yes.

Q. Okay.

And were you able to tell which files or folders were added to the thumb drive after that date?

A. Yes, I was.

Q. And which ones were those?

A. Well, that's what I have notated in the box in the top right corner, Pepe Case 008, the digital photograph, and a file called DOC.EXE.

Q. What is that DOC.EXE file?

A. Well, that's a deleted file that the only thing that's left of that file is a fragment of the file that it is an executable -- meaning it is some type of software program -- but I don't know what the functionality of that program is.

Q. Were there any files on this thumb drive accessed, as opposed to added, after June 17th of 2006?

A. Yes, quite a few files were accessed on the thumb drive. The folders where -- down below on the chart from Up North that's checked in blue, Friends 111111, Girls 2, Nary 2 and Spider, those folders contain files that were accessed after it was seized.

Q. And were there files on the thumb drive that were not accessed after June 17th, 2006?

A. Yes.

Q. And which ones were those?

A. Well, the files that were not accessed would be digital photographs that are in the deleted folders above such as Boy,

Girls 3, Girls 4, and then the two other folders, Home 111605 and Home Girls 0705.

Q. How do you know this?

A. Well, one of the things that the thumb drive keeps track of in the table of contents -- and I'm just -- is the date and time stamps, such as when the file was created, when it was last written to, meaning that the file was edited and saved, and also when was the file last accessed, meaning that it was opened or something -- some program touched that file but not edited.

Q. Is there any evidence that the hard drive of Mr. Pepe's computer was accessed after June 17th, 2006?

A. No.

Q. And how do you know that?

A. Well, I went through doing date/time analysis of the defendant's hard drive from his computer and looked for activity after it was seized and I did not find any activity after it was seized.

Q. Did you find out when it was last shut down?

A. Yes. When you shut down a Windows computer, such as the defendant's computer, Windows logs that shutdown activity as a normal shutdown. And I believe that was on June 16th.

Q. All right.

Mr. Pixley, I would like to go back -- I would like to go back to the Up North folder and talk about that a little bit.

In addition to the four directories that were visible

underneath that folder, were there any other files in the Up North folder?

A. Yes. There were some files and digital photographs in the Up North folder.

Q. What did you learn about those digital photographs in the Up North folder for the root level?

A. Those photographs were taken with a -- the Minolta DImage camera.

Q. That's the S414 model?

A. Yes.

Q. You said that in the Friends 111111 directory, there were Canon PowerShot photographs; is that correct?

A. There were photos taken with a Canon PowerShot camera.

Q. Did any of the digital images in the Friends 111111 directory correspond with images that you found on the hard drive?

A. No.

Q. Were there any photographs in the Friends 111111 series that corresponded with any photographs that you found in the Cache directory of the hard drive where the albums are kept by the PhotoShow Deluxe?

A. No.

Q. And, by the way, how many album files were in the PhotoShow Deluxe directory?

A. There was 81 albums there.

Q. Let's talk about the contents of Friends 111111.

Did you find homemade, for lack of a better word, digital images in this folder?

A. Yes.

Q. Approximately how many digital images or photographs were in the Friends 1111 folder?

A. There was approximately 130, 134 digital photographs.

Q. And what camera or cameras were used to take the images in the Friends 111111 folder?

A. Well, of those -- of those images, the only indicator that I found was the Canon PowerShot SD100.

Q. Were there any other programs that you found that accessed any of those digital images?

A. Yes.

Q. What did you find?

A. Well, in analyzing those digital photographs, when you edit a photograph using other software and, as we showed last week with the digital camera, the -- a digital photograph, inside that photograph is information about the make and model and date and time of the camera that took that picture.

If you use software to edit that picture, a couple things happen. One is the software that's used to edit that picture will often imbed information about that editing software within the digital photograph. In some cases, it will completely replace the camera information. So in some cases,

you'll see where -- not only will you still see the original camera information in that software, in the photograph --

MR. GUNN: Excuse me, Your Honor. I have an objection to this testimony on Rule 16 grounds.

THE COURT: Well, I can understand but I can't rule on it. Mr. Lulejian, do you need to move on to another topic?

MR. LULEJIAN: I think it's certainly relevant --

THE COURT: Well, relevance has nothing to do with Rule 16. Discuss it with Mr. Gunn and see if you can resolve this or otherwise I would have a sidebar.

MR. LULEJIAN: If the Court would give me one moment.

THE COURT: Yes.

(Mr. Lulejian and Mr. Gunn confer off the record)

MR. GUNN: We can't resolve it, Your Honor.

(Sidebar conference commenced)

MR. LULEJIAN: What Mr. Pixley is going to testify to, Your Honor, is about the properties of the files found in this Friends directory. He is going to testify that the camera information was stripped out of a number of these programs -- out of a number of these files because they were edited with an image processing software. The reason that's relevant --

THE COURT: I don't care why it's relevant. The Rule 16 objection doesn't go to relevance, does it?

MR. GUNN: No, Your Honor.

MR. LULEJIAN: Well, we talked about we would disclose

him as very broad, what he was going to find. He was going to look at the folders. Mr. Gunn, in fact, has even told us that he wants to be able to have Mr. Pixley available to call up individual files, presumably not only to look at those files and identify the location but to document other properties associated with those files. I don't think this is much of a stretch, given the fact that he is looking at the media and analyzing it. He is simply pulling up a property associated with the file that the Defense has had on their hard drive and could certainly do the same thing.

THE COURT: That is not the point of Rule 16. The point of Rule 16 is what did you disclose to him that your expert was going to testify to, if I am understanding your objection correctly.

MR. GUNN: My understanding is he is going to testify about this Friends 111111 directory having a different camera. That was not disclosed, frankly. I wasn't going to object to that.

Now he is going to testify that some of those images were PhotoShopped. There is nothing in any report about that. There may be some general reference that he is going to testify about characteristics of the photos, but they have to say what he is going to say. And this a surprise. I don't know where it's going, but, frankly, in the exercise of caution, I feel a need to object because I haven't been able to talk to my expert

about it. My expert wasn't able to read a report about this and then look at the computer to see what she thought and give me feedback about how and why it's important and not important, what implications it might have for our theory of defense. That's the kind of thing I should know --

THE COURT: Where was it in your report?

MR. LULEJIAN: Where was it in my report?

THE COURT: Where was it in the report of Mr. Pixley's testimony?

MR. LULEJIAN: Mr. Pixley did not describe all the cameras associated with every single file. He talked about the Minolta --

THE COURT: Did he talk about PhotoShopping?

MR. LULEJIAN: No, he did not.

THE COURT: Then he is not going to testify.

(Sidebar conference ended)

BY MR. LULEJIAN:

Q. Mr. Pixley, were you able to determine when the Friends 111111 folder was created on the thumb drive?

A. This would be on July -- I believe it was on July 8th.

Q. What year?

A. This would be in 0 --

Q. Do you need to refer to your notes, sir?

A. Yeah. I do need to refer to my notes, please.

THE COURT: You may do that.

THE WITNESS: Thank you.

2005.

BY MR. LULEJIAN:

Q. Were there any other folders created on that date?

A. Yes, there was. This was also the Nary 2 folder was created on that date.

Q. Did you have an opportunity to examine the Applications program folder on the hard drive?

A. Yes.

Q. And did you find any viewing software for a Minolta DImage camera?

A. Yes, I did.

Q. And when were -- and were you able to determine when the camera was first connected to the computer?

A. That was on June 4th.

Q. And were you able -- and when was the software for the Minolta DImage camera installed on that computer?

A. Also on June 4th.

Q. Does the viewing software for the Minolta DImage camera come with the camera itself?

A. Yes, it does.

Q. Is it part -- is it standard with Windows XP?

A. No, it's not.

Q. Mr. Pixley, you said it was installed on June 4th. June 4th of what year?

A. This would be 2005.

Q. When you say June 4th of 2005, do we add 185 days to that?

A. No. The clock on the computer is different than the camera clock.

Q. Why is that?

A. Well, the clock -- or the camera has a clock which is maintained by a battery, just like the computer has a clock that is maintained by a battery as well. And they are completely independent of each other.

Q. When you inspected the clock on the computer, were you able to determine how accurate it was?

A. Yes.

Q. And how accurate was it?

A. It was off by seven minutes.

Q. And what time zone was it set for?

A. It was set to Cambodia, which is GMT plus seven hours.

Q. And were there any albums created in the Cache directory before June 4, 2005?

A. No, there was not.

Q. And when was the Nero PhotoShow software installed on the computer? Let me rephrase that. I'm sorry.

I'm sorry. Again, when was the viewing software installed on the computer?

A. Which viewing software?

Q. The Minolta DImage.

A. June 4th.

Q. When did the albums first start appearing on -- in the Cache directory of the hard drive?

A. I believe that was not until towards the end of September.

Q. What year?

A. 2005.

Q. I asked you a few minutes ago about the last time the hard drive was accessed. And you testified that there was a normal shutdown on June 16th of 2005. Could you -- I'm sorry. June -- I've got 2005 in the front of my brain, Mr. Pixley. I apologize. Let me rephrase the question.

You testified a few minutes ago that the computer that Mr. Pepe had was operating on June 16th of 2006 and there was a normal shutdown that took place.

Were you able to determine whether or not the computer was operating on June 17th of 2006, the date it was seized?

A. Yes.

Q. What did you find that led you to that conclusion?

A. Well, I still saw files being created and accessed on June 17th. So -- and then there was no activity after that time. That would be consistent with somebody just pulling the power from the computer or the computer just losing power.

Q. On the hard drive did you find any viewing software for a Canon PowerShot camera?

A. No, I did not.

Q. Last week, Mr. Pixley, we talked about a number of emails that you located on the defendant's computer. Approximately how many were you able to find that were -- that were sent through Hotmail?
A. Well, an exact count of how many messages were sent through Hotmail, I couldn't tell you the exact number. I could tell you that there were hundreds of files associated with Hotmail, but not complete intact messages in all of those.
Q. Did you have to -- did you have to reconstruct those messages in order to view them?
A. Yes.
Q. And, again, where were the email fragments, for lack of a better word, located that you were able to use to reconstruct the emails?
A. These are web pages that are located in the user's Cache folder.
Q. Mr. Pixley, I am going to ask you to take a look -- actually last week, Mr. Pixley, I showed you three emails, Exhibit Nos. 2009, 2010, and 2011.
Do you have those handy?
A. Yes.
Q. I believe you testified last week or -- last week that you put together a chart which you had identified as Exhibit 2099 that listed the time and dates associated with each of those emails; is that correct?

A. Yes, it is.

Q. Okay.

I'm going to show you Exhibit No. 2009. Can you see that?

A. Yes. I have it in front of me as well.

Q. Were you able to determine when this email message was sent?

A. Yes.

MR. GUNN: Objection, Your Honor. Asked and answered yesterday, I believe.

THE COURT: Not yesterday but I think we heard it last week, didn't we?

MR. LULEJIAN: You're probably right, Your Honor. I'll move on.

Q. Let me move on to the second email then, Mr. Pixley. This is Exhibit No. 2010.

Were you able to recover a date associated with this email?

MR. GUNN: Objection. Asked and answered.

THE COURT: I think we did that, Mr. Lulejian, and I allowed you to show the chart, even though I didn't allow it into evidence. So I think this subject has been covered. If I'm wrong, you can go into it again, but I seem to recall it.

MR. LULEJIAN: I am trying to remember. We were rushing at the end of the day, Your Honor. I just wanted to

just elicit the information orally since the chart is not coming in.

THE COURT: All right.

MR. LULEJIAN: I will be very brief, Your Honor.

Q. What was the date that you determined that the email 2010 was created? Or sent?

A. May 14th, 2006, at 5:36 p.m.

Q. Showing you Exhibit No. 2011, were you able to determine the time and date of that email?

A. Yes.

Q. And when was that message sent?

A. June 3rd, 2006, at 6:15 p.m.

Q. I notice that there is no time or date headers on any of these emails.

How were you able to determine when they were sent?

A. This is based on the file-created times of these web pages stored on the defendant's hard drive.

Q. Mr. Pixley, I am going to ask you to take a look at Government Exhibit No. 2101 for purposes of identification.

A. I need to get up since it fell.

THE COURT: Okay.

THE WITNESS: I have it in front of me.

BY MR. LULEJIAN:

Q. Mr. Pixley, what is Exhibit No. 2101?

A. These are thumbnail images that were stored in a -- one of

the photo albums.

Q. Which -- I'm sorry. Which album was that?

A. I believe this is album No. 32 or 33 entitled Kun, K-U-N. I'm sorry. Kia.

Q. Let's get a clear record.

The thumbnails in that -- in -- the thumbnails you are looking at, Exhibit 2101, what album were they from?

A. This would be in the Kia album.

Q. And that was stored where?

A. This was on the defendant's hard drive in the PhotoShow Deluxe album.

Q. And did you have an opportunity to compare that exhibit to the Kia album located on the defendant's -- the image of the defendant's hard drive?

A. Yes.

Q. How do you know -- and does that -- and does that Exhibit 2101 contain all the photographs for the thumbnails that were in the Kia album on the hard dive?

A. Yes, it does.

Q. How do you know?

A. Well, I went through each one of these and compared it to the album itself on the hard drive.

MR. LULEJIAN: Your Honor, the Government would move Exhibit 2101 into evidence.

MR. GUNN: Just our prior objection, Your Honor.

THE COURT: All right. That will be admitted.

(Government's Exhibit 2101 was received)

MR. LULEJIAN: One moment, Your Honor.

Your Honor, I think I can safely say I have no further questions.

THE COURT: All right, thank you. Mr. Gunn?

MR. GUNN: Thank you, Your Honor. If I could get a little more organized here.

CROSS-EXAMINATION

BY MR. GUNN:

Q. Mr. Pixley, just touching on that last topic before going to a couple of other things, you said that 32 or 33 Kia album was on the computer's hard drive?

A. Yes.

Q. But it wasn't -- it was not on the hard drive in My Pictures; right? It was on the hard drive in this sort of Cache album thumbnail area; right?

A. That's correct.

Q. It was only there in the thumbnail form?

A. Yes.

Q. Going to some other topics first, and we'll come back to that, you testified, I believe on direct, about how the physical computer items you examined were not the actual original computer items?

A. Meaning that they are a forensic image?

Q. Correct.

A. Yes.

Q. You didn't examine the actual hard drive; you examined what's called an EnCase image of it?

A. Correct.

Q. You didn't examine the actual thumb drive, you examined what was called an EnCase image of it?

A. Correct.

Q. EnCase image is an image created by this EnCase software, without changing anything, with what is called a write-block on the original device; right?

A. Correct.

Q. You examined either EnCase, or what are called ISO images of the CD's, rather than the original CD's; right?

A. No, I made images of the CD's.

Q. All right.

And were those also EnCase images or ISO images?

A. Some of each.

Q. Okay.

So you examined -- you didn't examine the original CD's but you examined either EnCase images or ISO images of the CD's?

A. Correct.

Q. And it's standard forensic computer examination procedure to use images like that for forensic analysis rather than the

original items; correct?

A. Correct.

Q. And there's a reason for that procedure; right?

A. Yes.

Q. And the reason is to keep the computer, the original computer item, from being changed either accidentally or on purpose; right?

A. Correct.

Q. It's important to make sure that the original item isn't tampered with or changed in any way; right?

A. Correct.

Q. You also testified about images that you recovered from what you called the unallocated space of the computer and other items?

A. Yes.

Q. You used special computer software to do that?

A. Yes.

Q. One example is a computer software program called EnCase?

A. Yes.

Q. And that's a software program that's very commonly used by forensic computer experts; correct?

A. Correct.

Q. Did you find any EnCase software on Mr. Pepe's computer?

A. No.

Q. Did you find any other type of forensic recovery software?

A. No.

Q. So there wasn't anything you found on his computer that would have let him recover things from unallocated space?

A. No.

Q. You also testified about several images you recovered from what's called the recycle bin; did I hear that correctly?

A. Correct.

Q. The recycle bin is where files or folders go when they're deleted; right?

A. Yes.

Q. People usually don't store things in the recycle bin that they want to keep; correct?

A. Not normally.

Q. That's because things eventually disappear from even the recycle bin; right?

A. Correct.

Q. They either all disappear when a person does what's called empty the recycle bin?

A. Yes.

Q. Or when it gets too full, it just starts emptying itself; right?

A. That is correct.

MR. GUNN: Your Honor, could I step over and get some water?

Q. You also testified about dates you attached to the various

digital photographs or images you found on the computer; correct?

A. Yes.

Q. There's a date that is embedded in the image or with a file, computer file, by the camera; right?

A. Yes.

Q. And then there's the date that you ended up estimating was the actual date the photograph was taken; right?

A. That is correct.

Q. And you concluded that there was basically a 185-day difference?

A. Yes.

Q. And, for example, you found a folder with photos called Girls 031606 and you assumed from the name of that folder that those were photos taken on March 16th, 2006; right?

A. Or in that time frame, yes.

Q. And you found that the embedded camera date was 185 days earlier than that; right?

A. If that's the exact one. I don't have --

Q. You found several like that; correct?

A. Yes.

Q. And you consistently found a 185-day differential; right?

A. That was the average.

Q. Well, that was what it was in most cases; right?

A. Yes.

Q. The few times there was a little bit of difference; right?
A. That is correct.
Q. But in at least some, if not all of those cases, there were multiple photos in the folder and for some of them it was the 185 days and for others it was a little different; right?
A. That is correct.
Q. So that would be consistent with a person taking photographs on several days and then making the album on the 185th day; right?
A. Yes.
Q. One of the folders you found in the My Pictures directory on Mr. Pepe's computer was called Disabled Children 052606; correct?
A. Yes.
Q. Now, are you looking at your computer to check that?
A. No.
Q. If you need to, feel free. Just let us know if you need to, all right?
A. I will.
Q. Okay. Your Honor, could I have approach and have an exhibit marked?

THE COURT: You may.

MR. GUNN: It's premarked but I will submit it. I have an original, Your Honor, with an original exhibit tag and a copy for the Court. And this would be Defense Exhibit 380, if I

didn't already indicate.

THE COURT: Thank you.

Any objection to this exhibit?

MR. LULEJIAN: Not to the pictures, Your Honor, but I would argue that it's 608.

THE COURT: Pardon?

MR. LULEJIAN: No, Your Honor.

THE COURT: All right. That's in evidence.

(Defendant's Exhibit 380 was received)

MR. GUNN: Thank you, Your Honor.

Q. The Disabled Children 52606 folder had a number of photos in it; correct?

A. Yes.

Q. Can you compare Defense Exhibit -- you have -- you have your EnCase images up there on a laptop computer; right?

A. I do.

Q. What I would like you to do is compare Defense Exhibit 380 to the EnCase image you have on your computer for the Disabled Children 052606 folder and tell us if Defense Exhibit 380 appears to be hard copy printouts of all the photographs in the Disabled Children 052606 folder in the EnCase image.

THE COURT: Well, I am going to allow him to take a quick look and give his thoughts on that. I'm not going to take the time to have him compare side-by-side each one of these many photographs, sir.

MR. GUNN: Maybe we can do it this way, Your Honor.

Q. Does Defense Exhibit 380 have a series of sequential numbers on each photo, starting with Pict 0001 and going through Pict 0046?

A. Yes.

Q. And is that the same number of photos in the Disabled Children folder on the EnCase image?

A. Yes.

Q. And can you tell you us, if, for example, Picture 1 and Picture 46 at least match up?

A. Yes.

Q. And why don't you randomly check No. 20 and tell us if that matches up.

A. Yes.

Q. So it at least appears that the hard copies there are the same as the ones on the computer; correct?

A. Correct.

Q. Now, on the computer in the EnCase image you can find dates attached to those images or digital photographs the way you did for others; right?

A. Yes.

Q. And the date that's attached to those photos is November 23, 2005; correct? 11/23/05?

A. That's embedded?

Q. Yes.

A. Yes.

Q. And 11/23/05 is 185 days before 5/26/06; isn't it?

THE COURT: Are you representing that that's what it is?

MR. GUNN: I will represent that, if the Government and the Court is willing to accept my representation, Your Honor.

THE COURT: Close enough.

MR. GUNN: I did it with my fingers. Actually I do want it to be exact, Your Honor, if there's any doubt.

THE COURT: Well, I am not having him count 185 days.

MR. GUNN: All right. Well, I guess the jury can always do that if it wants.

Q. Is it fair to say that your conclusion would be that the photos in the Disabled Children 52606 folder were taken on May 26th, 2006?

A. Yes.

MR. GUNN: Your Honor, I would like -- actually, I think these exhibits are already in evidence, Defense Exhibits 368 and 369. If I could have those placed before Mr. Pixley.

THE CLERK: They are.

THE COURT: Do we have them? Who has them?

MR. GUNN: 368 and 369. I will put 369, if I could, on the ELMO, Your Honor.

THE COURT: Okay. If you're going to show it, I don't

think we need to worry about giving it to him.

MR. GUNN: Actually, I am just going to show the one, though I could show both -- actually, I can start asking him questions but I would like him to eventually look at both.

Q. This is a photo of three girls on a balcony; correct?

A. Yes.

Q. And it has a file number on it of Pict 00014; correct?

A. Yes.

MR. GUNN: And, Your Honor, I will represent, if I can, that 368 has three girls in a different position on a balcony and has Pict number of 0013.

THE COURT: All right, Thank you.

BY MR. GUNN:

Q. You got that, Mr. Pixley?

A. I see that.

Q. No, no, the second one, Defense Exhibit 368, has Pict 0013?

A. I have it.

Q. Now I'd like you to compare those photographs, those Defense exhibits, to the photos with those same Pict numbers in the My Pictures directory on your EnCase image of Mr. Pepe's computer that has the name of Girls 042706.

Could you compare those and tell if Defense exhibits 368 and 369 match Pict 0013 and Pict 0014 in that folder, Girls 042706, in your EnCase image?

A. Yes.

Q. And those photos have a date -- a camera-embedded date attached to them; correct?

A. Yes.

Q. And that date is 10/18/05; correct?

A. Yes.

Q. So using your 185 difference conclusion, that would mean these photos were taken on 4/21/07; correct?

Again, Your Honor, I will represent that is the case.

THE COURT: All right.

BY MR. GUN:

Q. But let me just represent that to you. And --

MS. DONAHUE: '07?

MR. GUNN: If I said 07, Your Honor, I meant '06.

THE COURT: Be careful what you're representing, Mr. Gunn.

MR. GUNN: I should.

Q. And do you have Government Exhibit 13 -- well, do you have your chart that shows dates -- your chart or charts that shows dates for photographs? I think it would be Government Exhibit 2094, if I'm reading this -- Mr. Lulejian's correctly. Chronology of selected non-pornographic digital photographs?

I'm sorry, let me take that back.

Look at 2093.

A. I don't have that.

Q. This is it, correct? Do you want me to zoom in?

A. Please.
Q. That's the summary you prepared; right?
A. Yes.
Q. And you included dates for some photographs in Girls 042706; right?
A. Yes.
Q. And Government Exhibits 1338 through 1346 you have concluded when you added 185 days to 10/18/05, were taken on April 21, 2006; right?
A. Correct.
Q. Now, that's a little different than the 4/27/06 date in the title of the folder; right?
A. Yes.
Q. But there's some additional photographs in that folder later on that have a camera-embedded date six days later of 10/24/06; correct?
A. I could refer to my notes, if you would like.
Q. Please do or refer to your EnCase image, whatever is easiest.
A. There are three camera dates in that folder.
Q. And some of the dates are 10/24/06; correct?
A. Yes.
Q. Which is six days later than 10/18/06?
A. Yes.
Q. Or '05 it's actually; right?

A. Yes.

Q. And so it would make sense that the -- adding the 185 days to those would then give you the 4/27/06 date, six days later than the 4/21/06 date; right?

A. Yes.

Q. So some of the photographs -- the last photographs, in fact, in that folder are consistent with 04/27/06 date; right?

A. Yes.

Q. So again that's consistent with your opinion about the 185-day differential?

A. Yes.

Q. And so your opinion would be that Defense exhibits 368 and 369 were taken on April 21st, 2006; correct? Remember Defense exhibits 368 and 369 you agreed were six days earlier?

A. Yes. I guess I'm showing that those -- those days, based on the folder date, would be 191 days off.

Q. Well, but actually -- by the folder date you mean the date and the name of the folder?

A. Yes.

Q. But those pictures, in fact -- all the pictures in the folder we know, in fact, were not taken on the same day; right?

A. That is correct.

Q. We know that some of them were taken on a date that the camera had down as 10/18/05, albeit that date was wrong; right?

A. Yes.

Q. And some of them were taken on a date that the camera had down as 10/24/06; right? Or '05.
A. Yes.
Q. So the ones that were taken on 10/18/05 were taken six days before the ones that were taken on 10/24/05; correct?
A. Yes.
Q. And 185 days from 10/24/05 would be 4/27/06; right?
A. Yes.
Q. So the actual date for the 10/24/05 photos would be 4/27/06?
A. Which photographs?
Q. The ones that the camera dated as 10/24/06.
A. I'm following you, yes.
Q. So the ones that were taken -- that the camera dated as 10/18/06 would have been actually taken on 4/21/06 -- I'm sorry.
The ones that the camera dated as 10/18/05 would actually have been taken six days earlier on 4/21/06; correct?
A. Correct.
Q. So Defense exhibits 368 and 369, which are Pict 0013 and Pict 0014, have a camera embedded date of 10/18/05; right?
A. Yes.
Q. So they were taken, in your opinion, on April 21st, 2006; correct?
A. Correct.
Q. So the girls in that picture, all of them, were at that

location on that date; correct?

A. Correct.

Q. They weren't there -- that girl wasn't there on only May 23rd or May 26th; correct? I'm sorry, I will withdraw that question, Your Honor.

You testified also about the computer photo software that Mr. Pepe used; right?

A. Yes.

Q. It was a software program called Nero PhotoShow Express?

A. Yes.

Q. If you use that program to put photos on a computer, you first attach the camera with the photos on it; right?

A. Correct.

Q. And the program then prompts you with a question about where you want to put the photos?

A. As far as creating an album? Yes.

Q. There is also a default that the album goes into a folder called My Pictures or a directory called My Pictures; right?

A. Yes.

Q. All right. The program then asks you -- it actually asks you sort of what directory or what area you want to put them in first and then it asks you whether you want to put them in a new album; right? Or an existing album?

A. It prompts you for an album name.

Q. Or it gives you the option of putting them into an album

that already exists; right?
A. Correct.
Q. So first it asks you do you want to put them in a new album or one that already exists; right?
A. Yes.
Q. Then it prompts you to name the album if it's a new album?
A. Yes.
Q. Then there is a default that goes into My Pictures which is sort of a general larger folder of the computer; right?
A. It goes into a sub folder of My Pictures.
Q. Or becomes a sub folder of My Pictures, if it's a new album; right?
A. Yes.
Q. And the program then saves -- well, strike that.
And in going through the process, the photo software program also creates another folder with what you've called the thumbnail versions of the photographs; right?
A. Yes.
Q. And thumbnails are basically small, miniature versions; right?
A. Yes.
Q. They're about probably less than two inches by two inches?
A. Correct.
Q. And whereas a photograph in My Pictures fills the whole screen unless you decide to narrow it down; right?

A. Yes.

Q. And the thumbnail versions aren't stored in the My Pictures folder, are they?

A. No.

Q. They're stored in another location on the computer; right?

A. Yes.

Q. In what's called the Windows profile?

A. In the user's profile?

Q. Is that what it's called?

A. Well, I'm referring to it as the user's profile.

Q. Okay.

And so basically in a chain of folders or sub folders, they're in a sub folder called Albums, there's a sub folder called Cache, there's a sub folder of another sub folder, and there is sort of a chain you would go down to get to that Cache album sub folder; right?

A. Right.

Q. Now, you can also delete albums that you put in My Pictures, can't you?

A. Yes.

Q. Or you can move them to another location; right?

A. Yes.

Q. That could include moving them to another folder or location on the computer?

A. Yes.

Q. Or it could include moving them to another computer storage device like a thumb drive or a -- what we commonly a CD, what you have called an optical disk?

A. Correct.

Q. You could stick a thumb drive or CD in the computer and transfer them onto that; correct?

A. You could copy them on there.

Q. Or you could actually move them or cut-and-paste them or transfer them; right?

A. Yes.

Q. And one way of doing -- either deleting or cutting and pasting and moving is to go directly to the My Pictures directory without using the photo software program; right?

A. Yes.

Q. And you could basically do that in three or four easy steps on the computer; right?

A. I would agree with that.

Q. You click on the Start button that's in the lower left-hand of the computer?

Let me -- let me have an exhibit marked, Your Honor, if I could.

THE COURT: Okay.

MR. GUNN: If we could call this 225, Your Honor.

THE COURT: All right.

(Defendant's Exhibit 225 was marked)

MR. GUNN: If I could approach, Your Honor.

THE COURT: Yes.

MR. GUNN: There is an original in color and, with the Court's permission, a black-and-white photocopy for the Court.

Q. Would you look at Defense Exhibit 224 -- or it's actually 225, I believe. And actually, Your Honor, I'm sorry, can I give him the original with the exhibit tag? I gave him the wrong one.

THE COURT: Okay. Any objection to this exhibit?

MR. LULEJIAN: No, Your Honor.

THE COURT: This is in evidence.

(Defendant's Exhibit 225 was received)

BY MR. GUNN:

Q. Let me go to the first page of Defense Exhibit 225 on the screen here. Let's see if we can make sure I have it right as to how one would delete a photo in My Pictures.

Is that better screen wise?

Is this the first page of Defense Exhibit 225?

A. Yes.

Q. And to delete a photograph from My Pictures, the first thing you do is you click on the Start button down here; right?

A. This is one way. So I'll follow along here.

Q. All right.

One way you could do is click on the Start button here; right?

A. Yes.

Q. And then you'd get something like the second page of Defense Exhibit 225; right?

A. Yes.

Q. And then you'd go up here to My Pictures and click on it; right?

A. Yes.

Q. First you would click on Documents and then you would click on My Pictures?

A. Correct.

Q. And then you'd get the third page of Defense Exhibit 225; right?

A. Yes.

Q. And you would highlight whatever you wanted to delete; right?

A. Yes.

Q. And you would right-click on it?

A. Yes.

Q. And you'd click Delete; right?

A. Yes.

Q. And then you'd -- at least on some computers -- get something asking you basically are you sure that's what you want to do?

A. Correct.

Q. Like this page in Defense Exhibit 225?

And you would click Yes; right?

A. Yes.

Q. And then in your My Pictures directory, the folder that you deleted would no longer show?

A. That is correct.

Q. Now, another option you would have going through that same process, instead of Delete, you could choose Cut; correct?

A. Yes.

Q. And if you chose cut -- actually, Your Honor, if I could have another exhibit marked, 224.

THE COURT: All right.

(Defendant's Exhibit 224 was marked)

THE COURT: Any objection to 224?

MR. LULEJIAN: No, Your Honor.

THE COURT: 224 is in evidence.

(Defendant's Exhibit 224 was received)

BY MR. GUNN:

Q. 224 shows the same initial steps but then shows Cut selected on the third or fourth page; correct?

A. Yes.

Q. So you would click on Cut; right?

A. Yes.

Q. If you wanted to move it.

And then it would show you the different places you could put it; right?

A. You would have to choose this.

Q. Right. But it would show you these options like on the page we have in front of us now; right?

A. Yes.

Q. And you could choose someplace on the C drive, which would basically be the computer hard drive; right?

A. Yes.

Q. Or you could choose someplace on the E drive, which might be a thumb drive?

A. Yes.

Q. Or if you had a CD in the computer, it might show an option for the CD drive; right?

A. Yes.

Q. And then you would select one of those and you would get a screen somewhat like we have on this page that would say, for example, Removable Disk E at the top; right?

A. Correct.

Q. And then you'd right-click on it and choose Paste; right?

A. Correct.

Q. And then that would move or put the folder on the thumb drive or CD or whatever you're working with?

A. Yes.

Q. And it would show up now on the directory for that drive; right?

A. Correct.

Q. And it would no longer be in My Pictures, right, if you had cut-and-pasted as opposed to copied?
A. That is correct.
Q. And if you delete -- either delete or cut-and-paste an album like that, the photo software program no longer displays the album any more; right?
A. That is correct.
Q. When you go into the -- it's not in My Pictures; right? Once you have done that?
A. Correct.
Q. And also you can go into the photo software to look at your albums; right?
A. Yes.
Q. And you get a list of albums?
A. Yes.
Q. And it would no longer be in that list of albums if you had done one of those things; correct?
A. Correct.
Q. And that's true even though the folder of thumbnails in the Cache album sort of sub folder that we talked about is still there; right?
A. Correct.
Q. That's still out there in the computer somewhere?
A. Yes.
Q. But to find them, you would have to first know they're

still out there somewhere, and second, know where in the user profile to look for them; right?

A. Correct.

Q. And even if you did find them, they would be in this tiny miniature form instead a regular picture form; right?

A. That is correct.

Q. Now, a number of albums on Mr. Pepe's computer fit this pattern, didn't they?

MR. LULEJIAN: Objection. Vague.

THE COURT: Sustained.

MR. GUNN: All right. I'll --

Q. There were a number of albums that you found in this sort of thumbnail Cache albums sub folder out there in another part of the computer; right?

A. Yes.

Q. That were not in My Pictures; right?

A. That is correct.

Q. So that could mean that they had been deleted; right?

MR. LULEJIAN: Calls for speculation.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. GUNN:

Q. It could also mean -- another possibility would have been that they had been moved or cut-and-pasted to another computer storage device like a CD or thumb drive the way we just showed;

right?

A. Correct.

Q. And if something -- by the way, if something is deleted, it usually goes into the recycle bin; right?

A. Yes.

Q. If something is cut-and-pasted or moved, it doesn't go into the recycle bin, does it?

A. No.

Q. And only one of the albums that was missing from Mr. Pepe's My Pictures directory was in the recycle bin; correct?

A. I believe that's correct.

Q. So that would suggest that all the other albums were moved or cut-and-pasted to some other storage device not on the computer; right?

A. No. There is another way that you can delete.

Q. Right. You can do it by hitting the Shift key and then Delete; right?

A. Yes.

Q. But if someone didn't uses that special method, then the other explanation would be that the items had been cut-and-pasted and moved instead of being deleted; right?

A. Correct.

Q. You did find some of the missing albums on a CD that was found in Mr. Pepe's house, didn't you?

A. Yes.

Q. That would -- to start, there was a CD which you and the agents called CD 1?

A. Yes.

Q. And on that CD you found there was an album in Mr. Pepe's Cache album sub folder out there on that space on the computer called Home 102805; correct?

A. Correct.

Q. You found that also on the -- on CD 1; right?

A. Correct.

Q. Then there was an album out in that Cache albums list of folders called Four Girls; right?

A. Yes.

Q. That was also on CD 1; right?

A. Yes.

Q. And then there was an album out there on the Cache albums area called SKD and New Girl; correct?

A. Correct.

Q. That was also on CD 1; right?

A. Correct.

Q. And those were all found in what is called the allocated space of CD 1; right?

A. Correct.

Q. That means they were on the CD in a way where a regular person with regular photo viewing software could open the folders and look at the photos; right?

A. Yes.

Q. But you also found photos from other albums that you have testified about, at least some of which were child pornography, in what's called the unallocated space of CD 1; right?

A. Correct.

Q. The unallocated space of a CD is things that can be viewed only by using special forensic recovery software; right?

A. Correct.

Q. Like the EnCase software that you use?

A. Yes.

Q. So it's not -- you used this analogy of a book without a table of contents, but you can still thumb through and see the pages, the chapters?

A. Yes.

Q. It's not quite right because it's more like -- isn't it -- because here it's more like you need a special thumb to see the pages; would that be fair?

MR. LULEJIAN: Objection, Your Honor. Vague.

MR. GUNN: Let me try to rephrase it, Your Honor.

THE COURT: Okay.

Q. You used an analogy on direct, I think, that when something is deleted from the CD, it's just like taking something out of the table of contents but it's still there in the book and you can thumb through and read it; is that correct?

A. Yes.

Q. But to carry your analogy a little bit further, in the case of deleted items on a CD, you can actually only read the pages if you've got sort of a special thumb, if you have sort of special forensic recovery software; right?
A. Special thumb?
Q. Okay.
Well, on a CD when things are deleted from the table of contents --
A. Yes.
Q. -- and you say you can still go through and read them; right?
A. Correct.
Q. That's only if you have special forensic recovery software; right?
A. Correct.
Q. You can't just read them with a regular computer or computer program?
A. Correct.
Q. Whereas a book without a table of contents you could read through and read the pages with your regular eyes; right?
A. Yes.
Q. You wouldn't need any special eyes?
A. Correct.
Q. So it's a little bit different?
A. Yes.

THE COURT: Let's take a break, Mr. Gunn.

Ladies and gentlemen don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We will take a 15 minute break.

(Recess taken)

(Jury In)

THE COURT: Everybody is back. The witness is back on the stand.

Sir you are still under oath.

Mr. Gunn, you may continue.

MR. GUNN: Thank you, Your Honor.

Q. Mr. Pixley, you testified a little bit on direct about a thumb drive that you analyzed?

A. Yes.

Q. A thumb drive is called a thumb drive -- at least that's one name for it -- because it's about the size of a thumb; is that right?

A. Correct.

Q. And it's typically used as something that people carry around so they can move computer data from one computer to another computer or to a CD on another computer or something like that?

A. To transport data, yes.

Q. And it's usually used to transport it from one computer to another computer or one computer to another form of computer

media like a CD or -- which you would have to use on another computer, I guess?

A. I have seen them used as backup devices.

Q. Okay.

But commonly they're used to transfer -- as a sort of transfer device?

A. I don't know if there is a common use for it. Everybody has different reasons or different ways of how they use it.

Q. I would now like you to look, if I could, at Defense Exhibit 226.

Your Honor, I am not going to be offering this into evidence. I am just having it marked for identification.

THE COURT: All right.

MR. GUNN: There is an extra copy for the Court.

(Defendant's Exhibit 226 was marked)

Q. Exhibit 226 is a list you prepared of all the albums you found in this Cache albums folder out there in the user profile on the computer, right?

A. Correct.

Q. And that's the one with the thumbnails in it; right?

A. Yes.

Q. And each album has a number and then an underline and then a name; right?

A. Yes.

Q. And this -- this -- this list you prepared has a column

indicating which ones of those albums you found on CD 1; correct?

A. Yes.

Q. It indicates that by the word Match in that column; right?

A. Yes.

Q. And then it says either Allocated or Recovered; correct?

A. Correct.

Q. And Allocated means it was in the allocated space where it could be viewed without any special forensic recovery software?

A. Yes.

Q. And Recovered means it could only be viewed after you used special forensic recovery software to recover it from the unallocated space; correct?

A. Yes.

Q. And then this table also indicates which of the albums in this Cache albums folder out there were still in the My Pictures folder; correct?

A. Yes.

Q. There is a column that says Status of Imaged Folder?

A. Yes.

Q. And you put either Missing or Allocated?

A. Yes.

Q. Missing means it was not in the My Pictures folder any more; correct?

A. Correct.

Q. And Allocated means it was still in the My Pictures folder?
A. Yes.
MR. GUNN: Your Honor, could I approach with another exhibit?
THE COURT: Yes.
MR. GUNN: If we could call this 251, Your Honor.
(Defendant's Exhibit 251 was marked)
BY MR. GUNN:
Q. Would you now look at Defense Exhibit 251. Do you have that in front of you?
A. Yes.
Q. Is that a table with one column headed Cache Albums and another column headed Other Location?
A. Yes.
Q. And does it also list all the albums found in the Cache albums folder on Mr. Pepe's computer?
A. They're -- they're out of order, so --
THE COURT: Is this a document he prepared?
MR. GUNN: No, it's one I prepared, Your Honor. I am asking him if it's accurate.
THE COURT: I am not going to make him do that. It would take him a long time to do that.
MR. GUNN: Your Honor, may I represent to the Court or seek the stipulation from the Government?
THE COURT: Well, you can represent to the Court if

that's helpful, but I'm not having this witness just spend lots of time here analyzing things that he wasn't given in advance.

You can talk to the Government.

MR. GUNN: All right. And actually if I could ask him one question first.

Q. You mentioned that the list was out of order, correct?

A. It appears out of order.

Q. That's because the one is at end of the double digit number starting with one and the two is at the double digit number starting with 20 and the three is at the end of the double digit number starting with 30; correct? And so on?

A. Hang on a second, please. It appears this way, yes.

Q. That's actually the order they come up in when you look at them on a list in the EnCase folder image; right?

A. No, not necessarily.

Q. Well, when you go into EnCase, they'll at least sometimes come up that way; right?

I will withdraw the question.

(Whereupon Mr. Gunn and Mr. Lulejian confer off the record)

BY MR. GUNN:

Q. Does that -- does that exhibit have in the Other Location column entries for My Pictures, CD 1 Allocated and CD 1 Allocated in various locations?

A. You said CD 1 Unallocated and CD 1 allocated?

Q. Correct. There are some entries that say CD 1 Allocated

and some entries that say CD 1 Unallocated?

A. Correct.

Q. And there is some that say My Pictures?

A. Yes.

Q. And do the CD 1 Allocated and the CD 1 Unallocated entries correspond to your table, Defense Exhibit 226?

A. Let me go through this.

Yes.

Q. And there are several columns -- there are several entries for My Pictures in the right-hand column of this table; correct?

A. Yes.

Q. The folder -- the Cache albums folder 13_Oh So Extra has an entry for My Pictures; correct?

A. Yes.

Q. And that matches what you found in your list in Defense Exhibit 226; right?

A. Yes.

Q. And 18_Wedding 082705 is also listed as having an Other Location in My Pictures; correct?

A. Yes.

Q. And that matches with your list in Defense Exhibit 226; correct?

A. Yes.

Q. And the Cache albums folder called 35_Water Festival has an entry in Defense Exhibit 251 for My Pictures; correct?

A. Yes.

Q. And that matches up with your list in Defense Exhibit 226; correct?

A. Yes.

Q. And the album in Cache albums called 41_Girls 121505 is listed as having another location in 251 of My Pictures; correct?

A. Yes.

Q. And that matches up with your list in Defense Exhibit 226; correct?

A. Yes.

Q. And the same is true for the albums -- the Cache albums folders 55_Invitations and 58 Girls 020906? Those you found in My Pictures, and this table, Defense Exhibit 251, list, is in My Pictures; correct?

A. Yes.

Q. And the folders in Cache albums 59_Girls 022 -- 022006 and 60_Bat and Thea in Defense Exhibit 251 are listed as having Another Location in My Pictures; correct?

A. Correct.

Q. And that corresponds to what you indicated in your list that is marked as Defense Exhibit 226; right?

A. Yes.

THE COURT: Mr. Gunn, if you plan on going through each of these, would you please discuss with the Government for

a moment what you are going to do so we can get a stipulation. This is a waste of time.

MR. GUNN: All right.

(Whereupon, Mr. Gunn and Mr. Lulejian confer off the record)

MR. GUNN: Your Honor, subject to confirming my representation, the Government has agreed to let me offer this into evidence.

THE COURT: All right. That's 251 is conditionally in evidence, thank you.

(Defendant's Exhibit 251 was received)

MR. GUNN: If I could consult with the Government about publishing just part of this exhibit, Your Honor.

THE COURT: Thank you.

(Whereupon, Mr. Gunn and Mr. Lulejian confer off the record)

BY MR. GUNN:

Q. Mr. Pixley, I am going to publish just a part, just the left-hand column on my list for now. This is Defense Exhibit 251. I would like -- you can look at your hard copy exhibit if you want. Subject to the Government confirming.

This is the way -- the folders in Cache albums are listed in this format of a number and then an underline and then the name of the album; right?

A. Correct.

Q. For example, 10_house 061605; correct?

A. Yes.

Q. Or 11_Mack's friends?

A. Correct.

Q. And the number symbolizes the order in which the albums were created; correct?

A. Yes.

Q. So you know that Mack's Friends was created after House 061605?

A. Correct.

Q. And on this list here -- and actually on your list itself, Defense Exhibit 226, there's, among other folders, one called 32_Kia and one called 33_Nap and Kia; correct?

THE COURT: That doesn't sound right. You may --

MR. GUNN: I am sorry. I reversed the numbers.

Q. There is one called 32_Nap and Kia and one called 33_Kia; correct?

A. 32 is Nap and Kia 2. And 33 is Kia.

Q. And the actual name in the Cache albums is 32_Nap and Kia 2 and 33_Kia; right?

A. Correct.

Q. And then there is one called 35_water festival; right?

A. Yes.

Q. And we know from the numbering convention that 35_water festival would have been created after 32_Kia and 33_ -- I'm sorry -- 32_Nap and Kia 2 and 33_Kia; correct?

A. Yes.

Q. And am I correct in understanding that you would be able to tell us the dates the photos in 35_water festival were taken using your -- using the camera-embedded date and your 185-day adjustment?
A. Yes.
Q. And could you tell us, using your EnCase images if you need to, what that date would be? Start off with the camera-embedded date.
A. The first picture in that series has a camera date of May 15th, 2005.
Q. And would you look at Government Exhibit 2096. That's your summary of pornographic digital photographs.
A. I don't believe I have a copy of that up here any more.
Q. If we could have it handed to the witness, Your Honor. Or if it's in evidence, we could have the . . .
That has camera dates for the 33_Kia photos and the 32_Nap and Kia 2 photos of May 8, 2005 and May 7, 2005 respectively; correct?
A. Correct.
Q. So the 35_water festival photographs were taken at least eight days -- seven or eight days after the 33_Kia and 32_Nap and Kia 2 photographs; correct?
A. Well, there is -- the first picture in the water festival series is dated May 15th, 2005.
Q. So that would be seven days after and eight days after,

depending on which of these other two folders we're talking about; right?

A. Right. But the last picture in that series of water festival is dated May 21st, 2005.

Q. So that would be even more. That would be like almost two weeks later, correct?

A. Correct.

Q. So the 35 -- the photos in 35_water festival were taken between seven -- between one and two weeks, depending on the photo -- after the photos in 33_Kia and 32_Nap and Kia 2; correct?

A. Yes.

Q. And using your 185-day adjustment, you concluded that the 33_Kia photos and the 32_Nap and Kia 2 photos were taken on November 9th and November 8th of 2005; correct?

A. Correct.

Q. So the water festival photos would have been taken, using that same adjustment, between November 16th and about November 23rd; correct?

A. That's approximate.

Q. So if someone moved into the house during or after the water festival photos, that would have been after the photos in 33_Kia and 32_Nap and Kia 2 were taken; correct?

MR. LULEJIAN: I am going to object, Your Honor.

THE COURT: Sustained.

MR. GUNN: I believe I have no further questions at this time, Your Honor. I believe 251 was conditionally admitted subject to the Government reviewing it.

THE COURT: Correct.

Mr. Lulejian?

MR. LULEJIAN: A couple quick questions, Your Honor.

REDIRECT EXAMINATION

BY MR. LULEJIAN:

Q. Mr. Pixley, would you please look at Defense Exhibit No. 380.

A. I have it.

Q. What camera took those photographs?

A. The Minolta DImage S 414 camera.

Q. Would you please take a look at Defense Exhibit No. 368.

A. I need a reference as to what folder this picture was in.

Q. I think it's in Girls 42706.

A. I found it.

Q. And what camera took that photograph?

A. The Minolta DImage S414.

Q. And the next photograph in the series, 369, I think it's number -- Picture No. 0014 in that same directory.

A. The picture name again, please?

Q. It would be 00014.

A. Minolta DImage S414.

Q. I would ask you to take a look at Defense Exhibit No. 224

which I am going to put on the overhead.

Mr. Pixley, is this the same desktop that Mr. Pepe had on his computer?

A. Yes.

Q. Were all the same programs on that desktop?

A. From what I recall, this is an accurate representation.

MR. LULEJIAN: One moment please, Your Honor.

THE COURT: Sure.

BY MR. LULEJIAN:

Q. Mr. Pixley, would you please take a look at Government Exhibit 1339, which I'm putting up on the overhead. And I would ask you to take a look at 1340 on the overhead.

Do you know when those photographs were taken?

A. Not without having a reference to go back to, no.

Q. If I put up your chart, Government Exhibit No. 2093, would that assist you?

A. Yes, it would.

Q. 1339 and 1340.

A. All right. I see it.

Q. When were those pictures taken?

A. Well, the camera date was October 18th, 2005, with an adjusted date of April 21st, 2006.

Q. Mr. Pixley, a few minutes ago Defense counsel outlined two different ways of deleting files -- or folders. They were represented in the Exhibits 224 and 225.

 Do you recall that?

A. Yes.

Q. Are there other -- is there other ways somebody else could delete a file or folder off the computer other than what the Defense outlined?

A. Yes.

Q. Would you please explain how that would take place.

A. Well, one of the methods would be to highlight the file or folder and using Shift/Delete as a function. Another method would be to actually open up a command prompt, a DOS window and you could delete files that way and that would delete files.

MR. LULEJIAN: I have no further questions, Your Honor.

THE COURT: Mr. Gunn?

MR. GUNN: Nothing further.

THE COURT: Thank you, sir. You're excused.

MR. LULEJIAN: Your Honor, the United States would call Noah Craft.

THE COURT: All right. Let's let Mr. Pixley put away his gear first.

THE CLERK: Please stand next to the court reporter and raise your right hand to be sworn.

Noah Craft, Government's witness, was sworn

THE CLERK: Thank you. Please take the witness stand. Please state your full name and spell your last name for the

record.

THE WITNESS: My name -- good morning. My name is Noah Craft. That's C-R-A-F-T.

THE COURT: You may proceed.

MR. LULEJIAN: Thank you, Your Honor.

DIRECT EXAMINATION

Q. Good morning, sir.

A. Good morning.

Q. What do you do for a living?

A. I'm a dermatologist.

Q. Dr. Craft, what is a dermatologist?

A. Dermatologist is a physician who is an expert in skin and diseases of the skin.

Q. Would you please explain to the jury what you do as a dermatologist.

A. I am an assistant professor at UCLA, and I function in many roles. As an assistant professor, I'm the course chair of the medical student course in dermatology. Also in direct care of patients, taking care of their skin and skin problems. And I'm the associate program director for the residency program at my hospital, training the residents in dermatology.

Q. Dr. Craft, I am going to ask you to speak into the microphone, speak slowly so the court reporter can hear everything that you say.

A. Okay.

Q. How long have you been at UCLA Medical Center?
A. I've been there since 2000.
Q. And have you had to attend medical school to become a dermatologist?
A. I did.
Q. Where did you go?
A. I was at UCLA as well.
Q. And what degrees do you hold, sir?
A. I have an MD, medical degree, and a Ph.D. in molecular biology.
Q. And where are you licensed to practice medicine?
A. In the State of California.
Q. Are you board certified?
A. Yes, I am.
Q. What does it mean to be board certified?
A. The American Board of Dermatology certifies dermatologists who have trained in an approved residency program for four years and have taken the Board of Dermatology, which is a written examination.
Q. So you're board certified in the field of dermatology?
A. That's correct.
Q. Do you hold any other diplomas?
A. I also have a diploma in tropical medicine and hygiene from the London School of Hygiene and Tropical Medicine.
Q. When did you receive that?

A. In 2005.
Q. Have you published any articles or books?
A. I have published several.
Q. During the course of your career, approximately how many patients have you examined?
A. Hard to quantify, but thousands. Certainly.
Q. Dr. Craft, are you familiar with the use of digital photography in dermatology?
A. I am very familiar with the use of digital photography in dermatology. I am the editor in a company called Logical Images which is based on using digital images of the skin to help train physicians to identify skin lesions.
Q. So how does that work, Doctor?
A. Basically physicians who are having trouble making a diagnosis can compare actual skin to digital images of skin and improve their diagnostic accuracy that way.
Q. Are you familiar with the term called teledermatology?
A. I am, yes.
Q. What does that term mean?
A. Teledermatology is a practice where one physician takes a photograph, a digital image of a patient's skin, and emails that or sends it to a dermatologist to ask for a diagnosis of that skin lesion and assistance with the patient care.
Q. And, Dr. Craft, have you had any experience in reviewing digital images that were sent to you by other physicians?

A. Yes, I have.
Q. Approximately how many images have you looked at over the course of your career?
A. Dozens or hundreds, certainly.
MR. LULEJIAN: Your Honor, at this point the United States would offer Dr. Noah Craft as an expert in the area of dermatology.
THE COURT: Mr. Gunn?
MR. GUNN: No objection.
THE COURT: All right. He is an expert in that field.
BY MR. LULEJIAN:
Q. Dr. Craft, in January of this year, did you physically examine the defendant in this case?
A. Yes.
Q. And where did you examine -- and where did you examine the defendant?
A. In the courthouse here.
Q. Here in the Roybal building?
A. Yes.
Q. And on what date was that?
A. January 31st, this year.
Q. And why did you examine the defendant?
A. I was asked to examine the defendant to determine if I could identify skin markings on the defendant and compare them to evidence or images that were obtained from the suspect's

computer.
Q. Who asked you to do that?
A. Initially Special Agent Eddie Wang.
Q. It was the Government that asked you?
A. It was the Government, exactly.
Q. Do you see the defendant in court today?
A. I do.
Q. Could you please point to him and identify an article of clothing he is wearing?
A. He is seated at the table over here. He has a dark suit coat on.
Q. There are three people sitting at the table. He is closest or farthest away from you?
A. He is closest to me. He is holding glasses in his hand.
THE COURT: Indicating the defendant, Mr. Pepe.
MR. LULEJIAN: We will get it right one of these times, Your Honor.
Q. Dr. Craft, I am going to show you what has been admitted as Government Exhibit 1327.
Have you seen this photograph before?
A. Yes.
Q. What does this photograph depict?
A. This photograph depicts a middle -- Mr. Pepe or a middle-aged --
Q. Sorry. This is 1327. I apologize.

A. Right. Mr. Pepe, the defendant standing naked next to a young girl.
Q. And, Dr. Craft, what lesions or markings on the defendant are prominent in this photograph?
A. At this resolution, you can see on his left upper inner thigh a fleshy growth near the base of his penis.
Q. Dr. Craft, I am zooming in on the region near the defendant's groin.
Where is that lesion or mark?
A. On my screen, it's about halfway between your cursor and the scrotum. I don't know if you can point to it.
Q. Am I pointing to it?
A. That's correct.
Q. Dr. Craft, I am going to ask you now to take a look at another photograph that has been admitted into evidence, Government Exhibit No. 1328.
Do you recognize this photograph?
A. I do.
Q. What does this photograph depict?
A. This is the defendant standing naked next to a young girl.
Q. And are there any markings or prominent lesions in this photograph?
A. There is. There is the same fleshy growth on the left upper inner thigh close to the penis.
Q. Dr. Craft, I am going to zoom in once again into the region

of the inner thigh.

Dr. Craft, is the growth visible there?

A. It is.

Q. I am moving my cursor about an inch or so away from the penis.

Is this where the lesion is?

A. That's correct.

Q. Dr. Craft, I am now going to show you what has been marked as Government Exhibit -- been admitted as Government Exhibit No. 1329.

Do you recognize this photograph?

A. Yes, I do.

Q. What does this photograph depict?

A. This is the defendant, Mr. Pepe, standing naked next to a different young girl.

Q. What lesions or markings on the defendant are prominent in this photograph?

A. On the left upper inner thigh you can see the same fleshy growth.

Q. Zoom in now.

Dr. Craft, is the cursor near where that -- that fleshy growth that you described was?

A. Yes.

Q. Dr. Craft, I am now going to show you what has been admitted as Government Exhibit No. 1330.

Have you seen this photograph before?

A. Yes, I have.

Q. What does this photograph depict?

A. This photograph also depicts Mr. Pepe standing naked next to the same young girl.

Q. What lesions or markings are prominent on the defendant in this photograph?

A. Again, on the left upper inner thigh you can see the fleshy growth near the scrotum.

Q. Let me zoom in again, Doctor.

Is the fleshy growth visible in this close-up?

A. Yes, it is.

Q. Is it at or near where the cursor is, approximately one, one and a half inches from the penis?

A. Yes.

Q. On January 31st of 2008, did you have the opportunity to examine the defendant's left inner thigh?

A. Yes, I did.

Q. What did you see when you examined the defendant's left inner thigh?

A. On the subject -- on the defendant's left upper inner thigh, in the area where I expected to find a fleshy growth, I find a firm pink papule that I felt was consistent with a scar.

Q. You have used some words that are beyond me.

What is a firm pink papule?

A. Pink is obvious. Papule means a firm bump.

Q. And what did you do with that firm pink papule other than look at it?

A. I also stretched the skin around it and felt it for its texture.

Q. And what were you able to tell about that pink papule from the texture?

A. From feeling it and moving the skin around it, you could tell it was firm and it also had a central groove to it.

Q. Did you take a photograph of that scar?

A. Yes, I did.

Q. I'm going to show you what has been marked as Government Exhibit No. 2103. It should be in front of you.

A. I have it.

Q. What does this photograph depict?

A. This is a photograph I took on January 31st of the defendant's left upper inner thigh. Right in the center of it you can see the area that I thought was a scar.

MR. LULEJIAN: Your Honor, the Government would move 2103 in evidence and ask to publish.

THE COURT: Any objection?

MR. GUNN: No, Your Honor.

THE COURT: Admitted.

(Government's Exhibit 2103 was received)

BY MR. LULEJIAN:

Q. Dr. Craft, where was the scar located in this photograph?
A. It's pretty much right in the center of the picture there.
Q. When you say center of the picture --
A. Basically as he is pulling the scrotum to the side, it's a couple of inches -- exactly. Right there.
Q. Is my cursor, which is approximately three inches in from the inside of the -- inside of the thigh, where the -- where you saw the scar tissue?
A. Yes, it is.
Q. And I'm going to show you now -- ask you to take a look at what has been marked as Government Exhibit 2104 for purposes of identification.
What does this photograph depict?
A. This is a photograph of the defendant I took on January 31st. It's a close up of the same area of the left upper inner thigh depicting the same scar.
MR. LULEJIAN: Your Honor, the Government would move 2104 into evidence and ask to publish it.
THE COURT: Any objection?
MR. GUNN: Your Honor, may I review the --
THE COURT: Sure.
MR. GUNN: If I could confer with counsel.
(Mr. Gunn and Mr. Lulejian confer off the record)
MR. GUNN: No objection, Your Honor.
THE COURT: 2104 is admitted.

(Government's Exhibit 2104 was received)

BY MR. LULEJIAN:

Q. Dr. Craft, where is the scar tissue in this photograph?

A. Again, it's pretty much right in the center of the photograph. If you move your cursor to the left, it's right there.

Q. Dr. Craft, based on your review of the paragraphs that I showed you earlier, Government's Exhibits 1327, 28, 29, and 30 -- that's the one with the defendant with the two girls -- where did you expect the fleshy growth to be?

A. I expected to find the fleshy growth exactly in the area of the scar where your cursor is now on the left upper inner thigh.

Q. And the -- what, if anything, did you do to further analyze this photograph?

A. Well, when I was examining the defendant, I stretched the skin and palpated it, as I mentioned, and to further analyze this photograph, I enlarged it and cropped it.

Q. You zoomed in on it?

A. Exactly.

Q. Did that help you reveal the scar?

A. It did.

Q. I am going to ask you to please take a look at what has been marked for identification as Government Exhibit 2105.

Do you recognize that photograph?

A. I do.

Q. What is it?

A. This is a cropped close-up of a picture I took on January 31st that shows centrally the scar identified previously.

MR. LULEJIAN: Your Honor, the Government would move 2105 into evidence.

THE COURT: Any objection?

MR. GUNN: No, Your Honor.

THE COURT: All right. That's admitted.

(Government's Exhibit 2105 was received)

BY MR. LULEJIAN:

Q. Dr. Craft, what are we looking at in this photograph?

A. This is a close-up of the scar identified on physical examination and you can see the outline of it. It's a pink bump and it's firm when you touch it. You can see going from the right upper side to the left lower side the linear groove that I spoke about earlier.

Q. Is this the groove that you're describing right here?

A. It is.

Q. How do you know it's scar tissue, Doctor?

A. Scar tissue is typically firm to the touch and can have a central indentation as I described.

Q. What would lead to a scar like this forming?

MR. GUNN: I have a Rule 16 objection to this testimony. May I consult with counsel?

(Mr. Gunn and Mr. Lulejian confer off the record)

MR. GUNN: Your Honor, I don't think we have an agreement.

(Sidebar conference commenced)

MR. LULEJIAN: Your Honor, this is Dr. Craft's initial report. In his report he outlined his findings, he outlined -- he outlined the fact that he did a physical examination at which Defense counsel was present. He talked about the photographs he used. He talked about circling the lesion of growth. He talked about where the lesion was, which is now identified with a red circle. At this site the suspect was found to have what appeared to be a linear pink scar. It showed -- is shown at higher magnification in the PowerPoint.

THE COURT: Where in his report does he opine as to the causes of the scar?

MR. GUNN: Or the characteristics, Your Honor.

MR. LULEJIAN: I don't -- he did not actually come out and say in his report exactly what caused the scar, but I think as a fact that he is talking about the scar, and the fact that he is --

THE COURT: There is nobody on that jury who doesn't think the scar was from the mole coming off. You don't need it.

MR. LULEJIAN: All right, Your Honor.

MS. DONAHUE: That's just describing the scar.

MR. GUNN: Your Honor, I actually -- I think I should

have objected earlier, frankly. I move to strike everything --

THE COURT: I am not striking anything.

(Sidebar conference ended)

BY MR. LULEJIAN:

Q. Dr. Craft, on January 31st of this year, did you also examine the defendant's body for skin markings?

A. Yes.

Q. Was it your understanding that the purpose was so that you could compare the markings on the defendant with photographs that were seized from his computer media?

A. Yes.

Q. What type of markings were you looking for?

A. I was looking for any easily identifiable skin markings but in particular, markings that are considered relatively permanent.

Q. What do you mean by relatively permanent?

A. I mean skin markings that wouldn't change very much over time, over years.

Q. Could you give an example to the Court and the jury of what a marking wouldn't change over time would be?

A. Birthmarks is an example. A nevus -- or a synonym for nevus is mole -- common term for a mole -- are relatively permanent over time.

Q. And what is a mole?

A. A mole is a collection of cells that make pigment or the

dark color in your skin, and they're typically well-demarcated tan or brown circles or ovals on the skin.

Q. And when do moles form?

A. Moles can form at any time over a person's life, but you typically have all of the moles you're going to have by age 40 or 50.

Q. Do you lose moles over time?

A. You can lose moles very slowly over time as well.

Q. How rapid is that process?

A. Excuse me?

Q. Excuse me. My apologies.

How rapid is that process?

A. Typically you might expect someone to gain or lose one to two moles per year.

Q. So why would you seek out and use moles in your comparison?

A. Moles are --

MR. GUNN: Objection. Irrelevant.

THE COURT: Sustained.

BY MR. LULEJIAN:

Q. I am going to show you what has been marked as Government's Exhibits No. 2106 through 2110 which are in front of you.

MR. GUNN: Your Honor, I don't know that -- I need other copies or identification of the exhibits. . .

MR. LULEJIAN: Does Counsel have them?

MR. GUNN: Yes, Your Honor.

THE COURT: Okay.

BY MR. LULEJIAN:

Q. Doctor, what are Exhibits 2106 to 2110?

A. These are pictures of Mr. Pepe that I took on January 31st.

MR. LULEJIAN: Your Honor, at this point the Government would move Exhibits 2106 to 2110 into evidence.

THE COURT: Any objection?

MR. GUNN: No objection.

THE COURT: Those are admitted. Thank you.

(Government's Exhibits 2106 to 2110 were received)

BY MR. LULEJIAN:

Q. Doctor, what effect does weight gain or loss have on moles?

A. Weight gain or loss has very little effect on moles. The biggest effect would be it may change slightly the distance they are from each other. The example might be if you have a balloon and you mark five dots on the balloon and then you blow it up slightly further the dots would be in a similar position but they would be slightly further from each other.

Q. Okay.

Now, going back to Exhibits 2106 to 2110, were you asked to compare the skin markings that you observed on the defendant to the skin markings on several photographs recovered from the defendant's computer media?

A. Yes, I was.

MR. GUNN: Objection, Your Honor. Beyond the scope of

the Court's ruling on this issue.

THE COURT: Overruled.

BY MR. LULEJIAN:

Q. Doctor, I am going to show you on the computer a number of photographs that are in evidence. Would you please tell the Court whether you have examined these photographs as part of your comparison.

This is Exhibit No. 1522. Do you recognize this?

A. Yes.

Q. Did you use this photograph as part of your examination and comparison?

A. Yes, I did.

Q. Showing you what has been admitted as Government No. 1524.

Do you recognize this photograph?

A. Yes, I do.

Q. Is this one of the photographs you used in your examination -- used in your comparison?

A. Yes.

Q. Showing you what has been marked as Government Exhibit No. 1531.

Is this one of the photographs that you used in your comparison?

A. Yes.

Q. Showing you what has been marked as Government Exhibit No. 1327.

Is this one of the photographs that you recognize?
A. Yes.
Q. Was it one of the photographs used in your comparison?
A. Yes.
Q. Showing you what has been marked -- admitted as Government Exhibit No. 1328.
Do you recognize this photograph?
A. Yes.
Q. Is this one of the photographs that you used in -- as part of your comparison?
A. Yes.
Q. Showing you what has been marked as Government Exhibit No. 1330.
Do you recognize this photograph?
A. Yes.
Q. Is this one of the photographs you examined as part of your comparison?
A. Yes.
Q. And showing you what has been marked as Government Exhibit No. 1329.
Do you recognize this photograph?
A. Yes.
Q. Is this one of the photographs that you used as part of your comparison?
A. Yes.

Q. Doctor, did you prepare a PowerPoint presentation reflecting the results of your comparison?

A. Yes, I did.

Q. Would this presentation be helpful to you in explaining your findings to the jury?

A. Yes, it would.

Q. Would you please take a look at Government Exhibit No. 2111.

What is this document?

A. This is the PowerPoint presentation of my comparisons --

Q. And --

A. -- of examinations.

Q. And who prepared this?

A. I prepared this.

Q. Does it accurately reflect your findings?

A. Yes, it does.

MR. LULEJIAN: Your Honor, at this point the Government would move the PowerPoint presentation, which has been marked as 2111, into evidence.

MR. GUNN: I would object to it being received in evidence. If the witness -- as opposed to being used to illustrate testimony subject to a slide-by-slide reservation of rights.

THE COURT: All right.

MR. LULEJIAN: May I then publish it to the -- may I

show it to the jury then, Your Honor?

THE COURT: Yes.

BY MR. LULEJIAN:

Q. Dr. Craft, what is the first photograph that we're looking at?

A. This is a photograph of the defendant, Mr. Pepe, standing next to a young girl. I used this as a baseline for identifying moles on the defendant.

MR. GUNN: Objection, Your Honor. No question pending. Move to strike.

THE COURT: Sustained. That will be stricken.

BY MR. LULEJIAN:

Q. Why did you use this photograph?

A. I used this photograph because it's known to be the defendant.

Q. What did you hope to do with this photograph?

A. Identify skin markings on his body.

Q. And what did you hope to do once you found those skin markings on his body?

THE COURT: Mr. Lulejian, we need to approach.

(Sidebar conference commenced)

THE COURT: I think you are going beyond my ruling. I don't care what he hoped to do. I only want to know if he saw markings on Pepe and markings on the other photographs.

MR. LULEJIAN: Okay. I am trying not to go beyond the

ruling.

THE COURT: Then don't ask him what he hoped to do. I don't care what he hoped to do.

MR. LULEJIAN: Yes, Your Honor.

MR. GUNN: As I understood the Court's ruling, he shouldn't refer to or talk about comparing.

THE COURT: That's -- I don't want the word "compare" in there. If you need to take a break and tell him -- he is pointing things out -- he is not to compare.

MR. LULEJIAN: We need to take a break to revise the PowerPoint to do that, Your Honor.

(Sidebar conference ended)

THE COURT: Ladies and gentlemen, we are going to take our 15 minute break. Don't talk about the case or form or express any opinions about the case until it's finally submitted to you.

(Recess taken)

(Jury Out)

THE COURT: Have you talked and resolved this now?

MR. LULEJIAN: We're getting there, Your Honor. First of all, I did not mean --

THE COURT: You don't need to apologize. I just want to make sure you and Mr. Gunn are on the same page.

MR. LULEJIAN: Mr. Gunn and I have gone through the PowerPoint. We have made revisions that both of us are

comfortable with. Is that right, Carl?

MR. GUNN: Yes. There is one additional one.

MR. LULEJIAN: Which one?

MR. GUNN: No. 12. I think the word "comparison" should not be in there either.

What we were talking about, Your Honor, is some of the photos, the first sort of set -- if we can call it that -- is clearly Mr. Pepe and the computer photograph. There is not any dispute about that. But the Government is suggesting that a comparison of those is still all right. And my position is it should -- it really isn't. I mean, for one thing, it's not really relevant if it's not disputed who it is anyway. And the only other relevance it has is to basically start suggesting that this is a way to identify people, which goes into the whole issue. So that's what we were talking about just before the Court came. I don't know if I am being clear.

THE COURT: Well, I did say that the doctor could point out moles and the location of moles in the pictures.

MR. GUNN: Right. It would just be saying that he can make a comparison of this one to that one.

THE COURT: He is not going to conclude that they are the same person.

MR. LULEJIAN: No, Your Honor. The comparison that Mr. Gunn is talking about is a photograph of Mr. Pepe with L.K.xxx and then a photograph that Dr. Craft took of Mr. Pepe.

We just put them side by side so the jury can see that -- they see the moles in the photograph, moles on a real person. Just sort of as a benchmark.

And then with the next series of photographs goes to the three photographs, the two oral copulation photograph and then the ejaculation photographs and then just side-by-side of what the doctor found with Mr. Pepe and then what he found in those pictures, without any discussion of comparison whatsoever.

THE COURT: Is there an objection to that?

MR. GUNN: Well, my objection, of course, is to everything. My understanding, the Court's ruling is that it would probably allow that. It's going to allow the photographs to be placed side-by-side in one exhibit. I mean that, I think, is sort of getting on the line. My understanding was the Court was going to allow that.

THE COURT: To the line but not over.

MR. LULEJIAN: And we have tried to excise the word "comparison," Your Honor, as much as possible. When we use -- if it's still there when we have used it, it is just simply comparing Photograph A with Photograph B without drawing any conclusion.

THE COURT: All right.

MR. GUNN: As long as the witness knows he should not talk about comparing the two images or identifying -- I guess he can identify a mole as a mole but --

THE COURT: Right. Exactly. Okay. Are we set?

MR. LULEJIAN: Yes, Your Honor.

(Jury In)

THE COURT: Everyone is back. The witness is back on the stand. Dr. Craft, you are still under oath.

Mr. Lulejian?

MR. LULEJIAN: Thank you, Your Honor.

Q. Dr. Craft, what is on this first slide?

A. This is the defendant, Mr. Pepe, standing next to a young girl. Naked.

Q. On the next slide, what do we see?

A. These red boxes identify areas that were cropped for enlargement.

Q. What did you do on the third slide?

A. On the third slide you can see the contrast has been enhanced to identify dark lesions on a white background. And additionally you can see black circles and black lines which on future slides will identify moles.

Q. What is this slide?

A. This is a cropped area of the chest, so the upper red square from the previous slide.

Q. This is Mr. Pepe's upper torso?

A. This is the defendant's upper torso.

Q. What have you done in this slide, Doctor?

A. In this slide I have circled moles or nevi with black

circles and connected with them with dash lines so the relationship between them can be appreciated.

Q. And how many moles do you see in this photograph?

A. In this photograph, I have identified the five that are easily identifiable.

Q. And do they form a pattern of any sort?

A. The pattern is identified by the dash lines so you can see the angles and distances between the moles.

Q. Turning to next slide, what is this?

A. This is a photograph I took of Mr. Pepe on January 31st.

Q. Would have you done in this slide?

A. This is similar area of the upper torso of Mr. Pepe that I cropped.

Q. And in this slide?

A. The image was enhanced with contrast to identify dark lesions on the skin.

MR. GUNN: Your Honor, for the record, could we have Mr. Lulejian refer to a slide number. I know my hard copy has slide numbers.

THE COURT: That would be helpful, thank you.

BY MR. LULEJIAN:

Q. The one on the overhead now is Slide No. 9.

Turn to Slide No. 10. What have you done in this photograph?

A. In this slide, side-by-side, the two images taken from the

upper torso of Mr. Pepe, one on January 31st by me, which is on the right side as you look at it.

Q. And where is -- and the one on the left side, where is that from?

A. That's from the image taken from the defendant's computer.

Q. Turn to Slide No. 11.

What do you see in this photograph or slide?

A. In this slide, I have rotated the image I took which is on the right.

Q. Why did you do that?

MR. GUNN: Objection. Irrelevant, Your Honor.

THE COURT: Sustained.

BY MR. LULEJIAN:

Q. Turn to Slide No. 12.

What does this slide depict?

A. This slide depicts the pattern of moles taken from the right side of the image, which is the defendant, on January 31st, and overlays that pattern of moles on the left image which is the -- taken from a picture of the defendant taken from the defendant's computer.

Q. Turn now to Slide 13.

Again, what is this slide, Doctor?

A. This is a photograph of Mr. Pepe standing next to a young girl.

Q. Turning to Slide 14, what does the red box represent?

A. This is an area I cropped for enlargement.

Q. Turning to Slide 15, what are we looking at here?

A. This is the area that was within the red box on the prior slide that's been enlarged.

Q. What do you see in this slide?

A. In this slide, you can identify the fleshy growth --

MR. GUNN: Objection to "fleshy growth." Asked and answered, Your Honor.

THE COURT: Overruled.

THE WITNESS: You can identify the fleshy growth that we discussed earlier near the scrotum, and you can identify several moles in the middle of the frame and to the upper right.

BY MR. LULEJIAN:

Q. Turn to Slide 16.

What have you done in this slide?

A. Here I have just used arrows to identify the things I just discussed, the fleshy growth and the pattern of moles.

Q. Turning to Slide 17.

A. Here I have used the same type of contrast enhancement and circled the moles with black circles and circled the fleshy growth with a red circle.

Q. Where is the fleshy growth?

A. It's near the scrotum on the left upper inner thigh. In this picture, it's in the left lower corner.

Q. How many moles do you see?

A. In this image I have identified five moles.

Q. Is there anything unusual about the cluster of moles in the center?

A. The cluster of moles in the center there is nothing unusual about it except that there are four moles in a certain position to each other, and they form a pattern that looks like the number 7.

Q. Let's turn to slide 18, Doctor.

What does this slide depict?

A. This is an image I took of the defendant's left upper inner thigh on January 31st.

Q. Turning to Slide 19, what is in the red box?

A. The red box identifies an area I cropped for enlargement.

Q. Turning to Slide 20, what do we see here?

A. This is the area from the prior slide that was within the red box. So this is the image from January 31st I took of the defendant up close.

Q. And are you able to see markings in this photograph?

A. Yes. In this photograph you can see in the left lower corner the scar I previously identified in testimony. And in the middle of the photograph you can see the four moles that look in the pattern like the number 7. And in the right upper corner you can see another mole.

Q. I notice right underneath the box where it says "From Exhibit 2000 -- 2103," there's some red marks there.

Why didn't you select those?
A. These marks most likely represent inflammation or infected hair follicles. That would be a temporary skin marking.
Q. And again what were you looking for?
A. Permanent or relatively permanent skin markings.
Q. Turning to Slide No. 21, what have you done in this slide?
A. Here I have identified the skin lesions I previously discussed. In the lower left corner is the scar circled with a red circle. And then in the middle are the four moles circled with black circles making a shape like the number 7. And in the right upper corner is another mole.
Q. Turning to Slide 22.
What do we see in this slide?
A. This is a close-up of the same area of the defendant's left upper inner thigh showing the scar and the four moles in more close proximity.
Q. I notice to the left of the red circle there's a number of darker marks. Blotches, one might say. What are those? Can you tell?
A. Yeah. These appear to be post-inflammatory hyperpigmentation. I know that's a technical term but it means just pigment changes or darkening of the skin that you typically find after you have infected hair follicles. And in this image you can also see an infected hair follicle just below one of the other markings.

Q. And how long do those post-inflammatory pigmentations last?
A. Typically on the order of weeks to months.
Q. Turning to Slide No. 23, what does this slide depict?
A. This is, again, another image of the scar that's been enlarged and circled with a red circle. This is the same scar from the left upper inner thigh of the defendant.
Q. Let's turn to Slide No. 24 now.
What have you done in this slide?
A. Slide 24 are two images. The left image is from the media taken from the defendant's computer and shrunken down. But it's the same moles identified with black circles and scar identified with a red circle.
The right image is a photograph I took of the defendant shrunken down in the similar way, showing moles on the left upper inner thigh of the defendant on January 31st.
Q. One moment, please, Your Honor.
Let's now turn to Slide No. 25.
What does this photograph depict?
A. This photograph depicts what looks like a young girl and a man's knees who has ejaculated onto into the young girl.
Q. And what, if any, markings are on the man's knees?
A. In this image, you can appreciate relatively permanent skin markings or moles on both knees.
Q. Let's turn to Slide No. 26.
What do the red boxes represent?

A. The red boxes, again, are areas I enlarged for further examination.

Q. Slide No. 27, Doctor.

What have you done here?

A. In Slide No. 27, in a similar way, I have identified the moles with black circles on both the left and right thigh or knee. And on the left thigh I also identified varicose veins or superficial close-to-the-skin veins with red curved lines, and these will be shown again in enlarged images.

Q. Why would you highlight varicose veins, Doctor?

A. Varicose veins are also easy to identify as veins and they're also relatively permanent over the period of several years.

Q. Let's turn to Slide No. 28, Doctor.

What is depicted in this slide?

A. This is a close-up of the area of the left leg from the previous photograph.

Q. Is this one of the seized photographs?

A. Exactly. From the defendant's computer.

Q. Now, can you see the moles and the varicose veins that you described in this photograph?

A. I can.

Q. Let's turn -- did you mark them on another slide?

A. I do. On the next slide.

Q. Turning to Slide No. 29, what do we see here?

A. Here I have identified the most prominent moles on the left leg with black circles and the specific pattern of the vein or veins here with red curved lines.

Q. How many moles do you see in that photograph, Doctor?

A. There are six moles identified.

Q. Do they form any types of appearance?

A. In the lower half of the photograph, which would be further up the thigh, as you're looking at it, you can see the three arranged in a linear fashion. And the three in the further part of the leg or the upper part of this photograph, you can see they're in more of an arched shape and they all surround this group of veins.

Q. Let's turn to Photograph -- Slide No. 30, Doctor.

What does this slide depict?

A. This is a photograph of the defendant taken by me on January 31st in which I had him pose in a similar position to other photographs.

Q. And the -- did you take any close-ups of either the left or the right thigh of the defendant?

A. I did. From this positioning in the next slide you'll see I took closer photographs of both the left and the right thigh individually.

Q. Let's turn to 31 then.

What is this a close-up of?

A. This is an image of the left thigh.

Q. And 32?

A. This red square depicts an area that I enlarged for further examination.

Q. What is 33, Doctor?

A. 33 is the area within the red square from the prior photograph. And to remind you, these are from the images I took of the subject on January 31st.

Q. Okay.

Doctor, do you see moles or varicose veins in this photograph?

A. I do.

Q. Did you identify them later?

A. I did. In the next slide they're identified in a similar fashion.

Q. Turn to Slide No. 34. What are in the circles, Doctor, the black circles?

A. Here the moles are identified with black circles and the veins are again identified with red curved lines.

Q. If you would look at the bottom two circles, going from the left to the right, there are some red markings about 45 degrees up.

Do you see those?

A. I see those.

Q. Why didn't you use those, doctor?

A. Those again represent inflammation or what we call crusting

which is usually a picked-at hair follicle, something that is temporary, would go away within days or weeks.

Q. Doctor, are there other markings in here that are not as prominent or dark as the ones you circled?

A. There are. I only identified the easily identifiable moles.

Q. Why did you pick those?

A. I felt they were the most reliable. And when I examined Mr. Pepe, they were the obvious moles.

Q. Let's turn to Slide No. 35.

What does this slide depict?

A. This slide depicts -- on the left is the close-up previously seen of the image taken from the defendant's computer with moles identified and veins identified.

On the right is an image I took of Mr. Pepe on January 31st of the same region on the left thigh with moles identified with black circles, veins with red lines.

Q. Let's turn to Slide No. 36, Doctor.

Dr. Craft, you just talked about the left thigh of the person in this photograph. Did you do anything with the right thigh?

A. I did. I also cropped an area from the right thigh which I identified in the next slide with a red box.

Q. That's Slide No. 37 that we're seeing?

A. Yes.

Q. What did you do with the -- let me go to Slide No. 38 then.
What is Slide No. 38?
A. Slide 38 is the area from the prior slide within the red box with contrast enhanced to identify the moles. And you can see which I identified in the next slide with black circles.
Q. You have used this term a couple of times, doctor, "contrast enhanced."
What do you mean?
A. Contrast enhancing an image we do all the time to highlight different features of the image. Basically applies contrast to the entire image so you can see darker things more easily.
Q. Did it help you identify moles and varicose veins?
A. It helped identify them for the purposes of a PowerPoint, easier to see.
Q. Let's turn to Slide No. 39 then, Doctor.
What does Slide No. 39 show?
A. Slide 39 is the same image with the moles identified with black circles.
Q. And how many moles do you identify in this image?
A. Here there are four.
Q. Where are they located?
A. There is one on the upper thigh or closer to the groin, which is on the bottom of this photograph. There's a white box behind it so you can see the entire circle. And there are three on the lower thigh, closer to the knee, that form a bit of a

triangle.

Q. And these are from the photograph that we saw a few moments ago?

A. They are.

Q. Seized from the defendant's computer media?

A. Yes.

Q. Let's take a look now at Slide No. 40.

What does this slide depict?

A. Slide No. 40 is from the defendant -- taken from the defendant's right thigh on January 31st in a position that I tried to approximate the bent knee in the prior photograph.

Q. Looking at Slide No. 41, what is inside the red box?

A. The red box is an area I cropped to enlarge for further examination.

Q. Did you enlarge it?

A. I did on the next slide.

Q. Looking at Slide No. 42, what do we see here, Doctor?

A. This is the enlarged area from the prior side with the moles identified with black circles again.

Q. And how many moles are there in this photograph?

A. Again, there are four. You can see in the proximal thigh or the thigh closer to the groin, which is the lower part of this photograph --

Q. That would be the lower left, Doctor?

A. The lower left, there is one prominent mole. And then on

the further from the groin, closer to the knee, there are three moles that form a somewhat of a triangle. In the next slide I have rotated it to more approximate the subject's position.

Q. And is Slide No. 43 that rotation?

A. It is.

Q. Turn to Slide No. 44.

What is the image on the left?

A. The image on the left is the image shown previously from the image taken from the defendant's computer with moles identified with black circles again, and on the right is the close-up of the defendant's right thigh taken on January 31st with the moles identified.

Q. I forgot to ask, Doctor, in the photograph on the right there are some red markings down here near the bottom circle.

Can you tell what those are?

A. Again, these are inflammation or temporary skin changes, usually an infected hair follicle.

Q. Let's turn to Slide 45.

Dr. Craft, what does Slide 45 depict?

A. Slide 45 is a middle-aged Caucasian man receiving oral copulation from a young girl.

Q. Turn to Slide 46.

What have you done in this slide?

A. In this slide I have placed a red box to highlight an area I cropped for further examination.

Q. Were you able to locate moles or markings in this box?
A. Yes, I was.
Q. Let's turn to Slide 47 then.
What does Slide 47 show?
A. Slide 47 uses black circles to identify the easily identifiable moles on this man's right abdomen and right outer thigh.
Q. So how many moles were you able to identify on the abdomen?
A. There is one prominent mole on the abdomen.
Q. How many on the right upper thigh?
A. Three prominent moles on the right upper thigh.
Q. Do they form a pattern of any sort?
A. They form a triangular shape.
Q. Turning to Slide No. 48, what have you done in this photograph?
A. Slide 48 is the area from the prior slide within the red box that has been contrast enhanced to show the dark skin lesions.
Q. And Slide 49, what have you done here?
A. Here I have identified the same moles with black circles.
Q. Again, how many moles are on the abdomen?
A. There is one mole on the abdomen and three on the right thigh that form a triangular shape on the thigh.
Q. Let's now look at Slide No. 50.
Dr. Craft, what does this slide depict?

A. This slide depicts a middle-aged Caucasian man receiving oral copulation from a young girl.

Q. Did you see any identifiable marks in this photograph?

A. I did.

Q. Turn to Slide no 51.

What is in the red box?

A. Slide 51 shows a red box identifying an area cropped for further enlargement and examination.

Q. Let's turn to Slide 52 then.

A. In slide 52 I have identified the moles with black circles. You can see there's one mole on the right abdomen and three on the right thigh, again forming a triangular shape. And in the next slide I have enlarged this area again.

Q. This is Slide No. 53?

A. This is.

Q. Did you do anything else to the photograph to help you identify the moles better?

A. Here I have contrast enhanced it again to demonstrate the dark skin lesions or moles, and I have identified them in the next slide with black circles again.

Q. Let's turn to Slide 54 then.

What are the black circles?

A. The black circles are the moles identified. There is one on the right abdomen and then there are three in a triangular formation on the right thigh.

Q. Let's look at Slide 55, Doctor.

What is this a slide of?

A. Slide 55 is an image I took of Mr. Pepe on January 31st lying on the floor in a similar position.

Q. What is visible in this photograph?

A. On this photograph there are moles that are identifiable as well.

Q. Let's start with Slide 56.

Is this the -- what does this box represent?

A. Slide 56 has a red square identifying an area that I cropped for enlargement in the next slide.

Q. Slide 57?

A. 57, the area is enlarged and the contrast is slightly enhanced.

Q. And with the contrast enhanced, were you able to identify moles?

A. I was.

Q. Turning to Slide No. 58, what do we see here?

A. Slide 58 I have used black circles to demonstrate the moles. There is one on the -- on Mr. Pepe's right abdomen and then there are three on the right thigh forming a triangular pattern again.

Q. I notice in this picture, Doctor, there are some lighter marks, one below the mole on the right and then a couple lighter marks in the middle.

Why didn't you select those?

A. Again, I only chose moles that were what I felt were the most reliable so the darkest, the most prominent moles.

Q. I am going to show you Slide No. 59, Doctor. There appear to be three photographs in this slide, Doctor.

What is the photograph at the top?

A. The image at the top is the cropped area from Exhibit 1522 of the image taken from the defendant's computer.

Q. The middle photograph, Doctor, what does that represent?

A. It's a cropped area of Exhibit 1524, another image taken from the defendant's computer.

Q. And the bottom photograph, what is that?

A. That's the cropped image from the picture I took of the defendant on January 31st showing the right abdomen and thigh.

Q. And the circles, what are those, Doctor?

A. The circles again are the moles. There is one on the right abdomen and three on the right thigh in each of the photographs.

Q. Let's turn to Photograph or Slide No. 60, Doctor. This is Exhibit No. 1522 which you have described earlier.

What does the red box here represent?

A. Here the red box is an area I cropped for enlargement on the left lower inner thigh.

Q. Turning to Slide No. 61, what is this?

A. This is that area that was identified with the red box in the previous slide. The contrast has been enhanced again and

you can see centrally the two easily identifiable moles.
Q. And on Slide No. 62, what have you done?
A. I have identified those moles with black circles.
Q. Let's turn to Slide No. 63, Doctor. Is Slide No. 63, Doctor, what are you -- what is in the red box?
A. The red box identifies an area that I cropped for further enlargement.
Q. And Slide No. 64?
A. Slide No. 64 is the area from the previous slide within the red box that's been enlarged and the contrast has been enhanced.
Q. From this photograph that's been contrast enhanced, are you able to see whether there are any moles?
A. You can see the two easily identifiable moles in the center of the picture. And in the next slide I identified them again with black circles.
Q. Slide 65 is up on the screen, Doctor.
Are these the circles you were just talking about?
A. These are the circles I placed over the moles.
Q. Let's turn to Slide No. 66 now, Doctor.
Slide No. 66, what is in the box in the upper right corner?
A. Slide No. 66, there is a red box identifying an area I cropped for further enlargement on the left lower inner thigh.
Q. And what is this photo of?
A. Again, this is a photograph of Mr. Pepe I took on

January 31st when he is lying on the floor.

Q. Turning to Slide No. 67.

What is this?

A. This is the enlarged area from within the red square from the previous photograph of the contrast enhanced.

Q. And from the contrast-enhanced photograph on Slide 67, are you able to identify the marks or moles?

A. Yes. You can identify two moles on the left lower inner thigh which in the next slide I identified with black circles again.

Q. And the black circles in Slide 68, is that what you -- the moles you just described?

A. These are the moles I identified with black circles, yes.

Q. Doctor, I am going to put up Slide No. 69. Let's start with the photograph on the left, Exhibit No. 1522.

What is that?

A. The image further to the left is the cropped area of the left lower inner thigh taken from the defendant's computer.

Q. And Exhibit No. 1524 in the middle, what is that?

A. This is the left lower inner thigh of the image -- another image taken from the defendant's computer.

Q. And the slide on the far right, Exhibit No. 2110, what is that?

A. That's a cropped area of the defendant's left lower inner thigh that I took on January 31st while he was lying down. And

in all three of these images, again I have circled the moles with black circles.

Q. How many moles are on each of these images?

A. There are two identifiable moles in each of these images.

Q. Let's take a look at Slide No. 70.

Have we seen these pictures before?

A. Yes, I have.

Q. The picture on the -- the two pictures on the left, what is that?

A. The two pictures on left --

MR. GUNN: Your Honor, I object to this exhibit. The arrow I think is inappropriate.

THE COURT: Sustained.

MR. GUNN: Move to strike the exhibit from the screen.

THE COURT: Take it off the screen, thank you.

BY MR. LULEJIAN:

Q. Turning to the last exhibit, Doctor, Exhibit No. 71, what does it depict? Let's start with the top box.

A. The top box represents two separate areas that were examined. The left area of the box is the left thigh or left knee.

MR. GUNN: Your Honor, I have an objection to this exhibit. If we could remove it from the screen so I could be heard? All right.

If I could consult with counsel.

THE COURT: Yes.

(Mr. Lulejian and Mr. Gunn confer off the record)

BY MR. LULEJIAN:

Q. All right, Dr. Craft, let's move away from your slide show.

A. Okay.

Q. Dr. Craft, I am going to show you what has been admitted in evidence as Defense Exhibit No. 302.

MR. GUNN: Actually, I don't think 302 has been admitted. It's been identified. That's my recollection.

THE COURT: I don't know. Do you want to submit it?

MR. LULEJIAN: One second, Your Honor.

THE COURT: 302 is not admitted yet.

BY MR. LULEJIAN:

Q. Dr. Craft, do you have Defense Exhibit 302 in front of you?

A. Yes, I do.

Q. Would you please take a look at that and tell me what it depicts?

Actually, have you seen this photograph before, Doctor?

A. Yes, I have.

Q. Are there any distinguishing marks visible in this photograph?

A. There is one mole identifiable on the right thigh. And there is a hazy tan patch on the left inner thigh.

Q. And based on your training and experience as a

dermatologist, what is that hazy tan patch?

A. The hazy tan patch again represents post-inflammatory hyperpigmentation, which is the skin discoloration you see after you have infected hair follicles which, if you look closely, he also has infected hair follicles below the scrotum there.

MR. LULEJIAN: No further questions, Your Honor.

THE COURT: Mr. Gunn?

CROSS-EXAMINATION

BY MR. GUNN:

Q. Good morning, Dr. Craft.

A. Good morning, Mr. Gunn.

Q. You testified about your education and you're a doctor; correct?

A. That's correct.

Q. Dermatologist?

A. I'm a dermatologist.

Q. You have been a practicing doctor for less than ten years; right?

A. That's correct.

Q. Up until 2005, in fact, you were just a resident or fellow who was supervised by more experienced doctors; correct?

A. That's correct.

Q. And am I also correct that you have never testified as an expert before this Court proceeding?

A. That's correct.

Q. You have testified about moles on certain areas of two bodies; right? One from some -- well, actually you have testified about two -- two sets of -- two sets of photographs; right?
A. Yes.
Q. The first one was a man who appeared to be Mr. Pepe standing with a young girl naked?
A. Yes.
Q. And then you compared that to some photographs you took of Mr. Pepe standing; right?
A. Yes.
Q. The second set of photographs was a set of photographs of a man having oral sex from a young girl; correct?
A. Yes.
Q. And then the other set -- in that set was a set of photographs you took of Mr. Pepe; correct?
A. Correct.
Q. And then you blew up selected areas in these sets of photographs and you testified about those areas just now; correct?
A. That's correct.
Q. I want to focus on the second set of two sets, if that makes sense to you. The one with the set of the photographs with the man having oral sex from a girl.
A. Uh-huh.

Q. And a set with Mr. Pepe.

MR. LULEJIAN: Your Honor, perhaps defendants could refer to the exhibit numbers to keep it clean.

THE COURT: Keep it clean?

MR. LULEJIAN: I am sorry. To keep it straight.

MR. GUNN: The PowerPoint slides does Counsel mean, Your Honor?

THE COURT: I don't know. Whatever you want to do is fine.

BY MR. GUNN:

Q. In the photographs -- in the two sets of photographs -- you understand what I am saying about the second set of two sets versus the first set of two sets?

A. Not exactly. You better tell me which set you want me to talk about.

Q. All right.

Let's refer to your PowerPoint slides, if I can get mine.

A. That would be easier.

Q. Actually probably a simple way to do it is PowerPoint Slide -- the last PowerPoint slide, 71, do you have a hard copy of that in front of you?

A. Slide 71?

Q. Yes.

A. Yes, I do.

Q. That basically shows the areas -- it has selected photographs from both an individual and Government Exhibit 1531, portions of his skin and portions of skin from photographs you took of Mr. Pepe from Government Exhibit 2108; correct?
A. That's correct.
Q. As well as other Government exhibits; right?
A. Yes.
Q. And those are the areas of skin surface that you selected to try to identify moles on the two different sets of photographs; correct?
A. That's correct.
Q. And your estimate of the total skin surface -- well, let me step back.
You selected those areas to examine more closely; right?
A. Yes.
Q. And you looked for moles in those areas; correct?
A. I did.
Q. Now, you didn't look at other areas and blow those up?
A. I examined his whole body but didn't blow up any other areas, that's correct.
Q. And that includes you didn't blow up any other areas of the photographs of the man having oral sex either; right?
A. I looked at areas where the images were high enough quality to identify moles.

Q. And you basically selected these areas; correct?
A. That's correct.
Q. And those areas constitute probably less than five percent of the body area or skin surface of, in one instance, Mr. Pepe, and in the other instance this person having oral sex with a minor?
A. That's correct. It's approximately five percent.
Q. And now some people have very few moles and some people have a lot of moles; right?
A. That's true.
Q. Some people can have as much as a hundred moles?
A. Yes.
Q. Some people can have several hundred moles?
A. That's true.
Q. There's reason to believe that Mr. Pepe is on the high end of that spectrum, isn't there?
A. What's your reason to believe that?
Q. Well, he had 16 months in less than five percent or about five percent of his skin surface; correct?
A. That's correct. But because moles are randomly distributed, you can't extrapolate that to the rest of the body.
Q. Well, actually if, in fact, moles were randomly distributed, you could extrapolate and get a rough idea that if 1-20th of the body had 16 moles, the whole body would probably have in the area of 300 or so, 320; right?

A. I think that's an incorrect assumption because if they are randomly distributed, you shouldn't be able to assume anything else about the rest of the body.

Q. Well, statistically over the whole body -- if a person -- if moles are randomly distributed and a person had only 16 moles, how often would those 16 moles be in just five percent of the body surface?

A. It would be infrequent to have none on the rest of the body.

Q. And, in fact, if they were randomly distributed, you would tend to see them sort of about the same proportion all over the body roughly; right?

A. You would have to make the assumption, which I think is incorrect, that five percent you're looking at is representative of every area of the body, but I think that's an incorrect assumption.

Q. So Mr. Pepe could have more than 320 moles?

A. He could have as many moles as he has. I don't think you can extrapolate from looking at one area of the body how many he would have on the rest of his body.

Q. You have no idea how many moles he has?

A. I do because I have examined him, but I didn't count them all up.

Q. You have no idea how many moles the person in -- having oral sex with the minor has?

A. I do not.

Q. With respect to the random distribution of moles over the body, there actually aren't any studies of that, are there?

A. The distribution of moles has been studied.

Q. But there's no studies that shows they are randomly distributed over the body, are there?

A. There are studies describing the frequency on body locations.

Q. But there's no studies that show that they are randomly distributed on the body; right?

A. If you mean randomly distributed pattern-wise, it's commonly accepted medical knowledge that moles are randomly distributed.

Q. It actually doesn't really matter for medical treatment and knowledge whether moles are randomly distributed; right?

A. It doesn't.

Q. As a dermatologist, all you're concerned of is -- generally, is whether there is a mole, what kind of mole it is and whether it's changing; correct?

A. Well, that's not quite correct because certain pigmented lesions do come in patterns, and so if a particular pattern of pigmented spots or brown spots shows up, then it would represent something else. But we do think of them being randomly distributed because there is no pattern to them.

Q. But no one has ever actually studied the issue of whether

there are patterns; right?
A. It's common medical knowledge.
Q. It's common medical assumption; correct?
A. It's in textbooks and that's what we teach medical students.
Q. Most of the time when dermatologists identify moles, they look at the actual mole, don't they?
A. Can you repeat the question? Sorry.
Q. Most of the time when dermatologists identify moles, they look at the actual mole, don't they?
A. We normally examine patients in person and look at the actual moles.
Q. And they what is called palpate the mole, don't they?
A. Sometimes.
Q. That means they feel it; correct?
A. That's correct.
Q. Because sometimes moles are raised off the skin and sometimes they're not raised; right?
A. That's true.
Q. And you can't palpate a mole in a photograph; right?
A. That's true.
Q. You testified that there is a field -- did you testify on direct examination about teledermatology?
A. Teledermatology.
Q. That's where a doctor takes a photo of a skin lesion and

sends it to a dermatologist for a dermatologist to look at the photo?

A. That's correct. That's what I said.

Q. The purpose of a teledermatology photograph is to identify and diagnose what something on a single person is; correct?

A. That's correct.

Q. Like is it a mole?

A. Correct.

Q. Or what kind of mole is it?

A. That's correct.

Q. It's not -- strike that.

And even for that purpose, teledermatology is not perfect; correct?

A. It's reliable and accurate.

Q. There have been studies about the error rate; right?

A. That's correct.

Q. And one study you cited in a report you prepared found there was agreement between the teledermatology diagnosis and the actual in-person diagnosis only 81 percent of the time, didn't it?

A. That study that you're citing includes all kinds of skin problems relating to skin cancer, but the accuracy was between 80 and 90 percent, that's correct.

Q. That's a study you cited in a report; correct?

A. That's correct.

Q. That study cites another study where the agreement was only 48 percent; isn't that true?

A. That's correct.

Q. And both the study you cited and the study that it cited suggested a possible reason for that was the quality of the photographs; correct?

A. Yeah, one thing you're not taking into account is that within that study --

Q. Actually, that study, the one you cited in your report, both it and the study it referred to with the 48 percent error rate --

A. Actually -- do you mind if I refer to my notes so I can see what study you are referring to?

Q. Please do. Do you want a copy of the article or do you have a copy?

A. I have a copy. Which study are you referring to? Which page?

Q. The study you cited in your report was *Store and Forward Teledermatology and Skin Cancer Triage*, was it not?

A. I have that, yes.

Q. That's the one you cited in your report?

A. Exactly. And where is the other study cited within that?

Q. Well, first of all, on Page 42 of that study, it said agreement between the teleconsultation diagnosis and the gold standard -- meaning the in-person diagnosis -- was 81.81; right?

A. That's correct. It increases if you take subsets of that.

Q. And on the next page it refers to another study that reported a 48 percent agreement? A 40 percent accuracy rate; correct?

A. Where are you referring?

Q. Page 43.

A. Uh-huh. In the middle of the page?

Q. On the left-hand column.

A. Right.

Q. And this article suggests that it's the difference -- the different accuracy rate is because of poorer images; correct?

A. Exactly. It's up to the dermatologist to decide if the image are of sufficient quality.

Q. And the study itself that had the 48 percent error rate pointed out that there was a problem because you didn't have medical people or dermatologists who were trained to take good medical photographs; correct?

A. I haven't reviewed that exact study, so the . . .

MR. GUNN: Your Honor, could I have an exhibit marked?

THE COURT: Sure.

MR. GUNN: If we could mark this as 281, Your Honor. With the Court's permission, I will put the exhibit tag on it at a recess.

THE COURT: Okay.

(Defendant's Exhibit 281 was marked)

BY MR. GUNN:

Q. First of all, is this the article that is cited in the other article?

A. Yes, it is.

Q. And would you look at Page 212 of the second article, the one that is cited in the article you cite. And would you look at the last full paragraph in the right-hand column on that page that begins with the words "Considering that the GP's"?

A. Yeah. I think I want time to review the whole article before I comment on any of the science or discussion on it.

Q. The article does indicate though that it believes factors were overcome in other studies by employing a medical photographer to take the images, correct?

A. Again, I would like to read the whole article before I comment on anything.

Q. Well, could you read that paragraph and just tell us if the article says that?

THE COURT: I don't think that's appropriate.

BY MR. GUNN:

Q. The photographs of Mr. Pepe that you looked at were taken by a medical photographer -- at least in a sense -- namely you; right?

A. That's correct.

Q. You have no information that the other photographs of the man having oral sex were taken by a medical photographer;

correct?

A. I have my clinical judgment, which is they were good quality photographs.

Q. That wasn't my question, Dr. Craft.

I move to strike, Your Honor, as non-responsive.

THE COURT: All right. I will strike the answer.

BY MR. GUNN:

Q. You have no information that the photographs in -- the man having oral sex photographs that you looked at were taken by a medical photographer; correct?

A. The exact question you want to know is were they taken by a medical photographer?

Q. You don't have any indication or information that they were; correct?

A. I don't have that indication.

Q. In fact, they appear to be taken by a man in the midst of sexual activity, don't they?

A. They appear to be.

Q. And teledermatology is actually not used at some major hospitals in Los Angeles; correct?

A. It's used at our hospital.

Q. It's not used at UCLA Medical Center in West L.A.; correct?

A. People refer teledermatology cases to each other digitally all the time at UCLA.

Q. It's not used at USC Medical Center, is it?

A. I am not familiar with USC, but there is an expert in teledermatology who is the associate director there who has done many studies on teledermatology at USC.

Q. It was abandoned at the Children's Hospital in Boston, wasn't it?

A. I'm not sure about that.

MR. GUNN: No further questions, Your Honor.

THE COURT: Redirect?

MR. LULEJIAN: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. LULEJIAN:

Q. Doctor, a few minutes ago during cross-examination you were asked some questions about quality of photographs. And at one point you were going to state something about that -- Mr. Gunn had asked you a question about the survey or the article. And you had remarked that it had something to do dependent on the quality of the photograph, but you weren't allowed to complete that answer.

What were you trying to say?

A. Exactly. When we receive teledermatology consultations or when a physician sends an image to us and asks us for our opinion, the essential quality that we need to address is the image quality, and that's the personal decision of the physician. It doesn't matter the pixels or not. It's your personal decision. And that's discussed at length, both in this

study and elsewhere. Even within this study they have a hierarchy of whether the image was excellent, sufficient or insufficient. And that's up to the dermatologist who makes that decision whether it's sufficient quality.

Q. Doctor, I am showing you what has been marked as Government -- admitted as Government Exhibit No. 1522.

Can you see that on the screen?

A. Yes, I can. Yes, I can.

Q. How would you describe the quality of that photograph for purposes of an analysis by a dermatologist?

A. This photograph has high enough resolution that you can pick out easy-to-identify pigmented spots or moles. You can see one on the girl's neck. You can see several in the foreground that I described. And on the left thigh you can also see them if you enlarge the image, which we have that ability on a computer. Some areas are out of focus which we don't analyze.

Q. I can -- I have the ability to enlarge the image. Is there a portion you would like me to enlarge, Doctor, to illustrate your point?

A. Yes. As I have done in my PowerPoint presentation, if you enlarge the right thigh, for example, you can you see right there under the cursor is the triangle of moles that I described in my PowerPoint presentation.

Q. Right here?

A. Exactly. So by being able to enlarge it, that means the

resolution is good.

Q. Let's take a look at Exhibit No. 1524, Doctor.

How would you rate that photograph for purposes of your review as a dermatologist?

A. Again, the quality is sufficient to diagnose the moles in the foreground and on the right inner thigh -- left inner thigh, excuse me.

Q. In fact, I am going to enlarge the right-hand portion again.

Is this sufficient -- is the enhancement or magnification three or four times sufficient for your purpose as a dermatologist?

A. Yes.

Q. Let's take a look at Government Exhibit No. 1531.

How would you rate the quality of that photograph for purposes of your analysis as a dermatologist?

A. This is very good quality.

Q. Why do you say it's very good quality?

A. The resolution appears to be high and almost all of the image is in focus. Good lighting.

Q. Why is it important that the entire image be in focus?

A. The more area that is in focus, the more area of skin you can evaluate.

Q. Is this photograph a good candidate for magnification?

A. It is.

Q. Is there a portion of this photograph you would like me to magnify?

A. If you enlarge the left knee or left thigh of the man, you can see the moles I identified previously. You can also see the varicose vein centrally.

Q. Right here, Doctor, are the moles?

A. Those are the three moles in a line and the varicose vein. You can see a nice resolution.

Q. The varicose vein being right here in the center?

A. That's correct.

Q. And the moles being in the top.

Doctor, this field of teledermatology, the pictures you are submitted -- the picture that is submitted to you to analyze, who usually takes that picture?

A. That picture is usually taken by a non-dermatologist physician or nurse.

Q. And what does the quality of those photographs range from?

A. Some people send them from cell phones asking for advice and some people have eight or ten-megapixel cameras. It's a very wide range.

Q. Those photographs here, would those be sufficient for you to do an evaluation?

A. Of the lesions that I'm looking at, yes.

Q. Doctor, are you trying to determine exactly what type of mole or lesion is on those photographs?

A. No. There's dozens of sub-types of moles. I'm just trying to identify them as common moles or relatively permanent pigmented skin markings.

MR. LULEJIAN: One moment, please, Your Honor.

I have no further questions, Your Honor.

THE COURT: Thank you. Recross?

MR. GUNN: Nothing, Your Honor.

THE COURT: Thank you, sir, you are excused.

Does the Government have another witness?

MS. DONAHUE: Your Honor, we have some stipulations to read and then a deposition to play which will take a moment to set up.

THE COURT: All right. Ladies and gentlemen, counsel is going to read some stipulations. As I previously indicated, these are things you must accept as true.

MS. DONAHUE: The first stipulation states, "Stipulation regarding testimony of Maureen O'Hara."

And the stipulation reads:

"Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, and defendant, Michael Joseph Pepe, individually and through his counsel of record, hereby stipulate that if Maureen O'Hara were called to testify as a witness at trial in this case she would testify to the following facts:

"One, defendant Michael Joseph Pepe is her brother.

"Two, Elaine Pepe Williams is her sister, and Richard Williams is the husband of Elaine Pepe Williams.

"Three, between June 2006 and February 2007, Elaine Pepe Williams gave Maureen O'Hara the handwritten letter identified as Government Exhibit No. 2007.

"Four, Maureen O'Hara recognizes the handwriting of the author of Government Exhibit 2007 as that of her brother, defendant Michael Joseph Pepe. Maureen O'Hara's recognition of the handwriting is based on her written correspondence with her brother for the past 30 years.

"And, five, defendant Michael Joseph Pepe's last address in the United States was in Ventura County, California."

At this time the Government would move to admit Government's Exhibit No. 2007, which is the letter referred to in that stipulation.

THE COURT: Any objection?

MR. BROWN: No objection, Your Honor.

THE COURT: All right. That is admitted. Thank you.

(Government's Exhibit 2007 was received)

MS. DONAHUE: Your Honor it's a number of pages. Would it be all right if I published portions of it to the jury at this point?

THE COURT: Sure.

MS. DONAHUE: Page 1 begins, "Dear Richard and

Elaine."

The reference -- as I said, it's a lengthy letter. I am referring to Page 12. States, "I will try to cut this short and not be too graphic but there may be some things that you need to understand" --

MR. BROWN: Your Honor, we would object to reading of portions of the letter.

THE COURT: The letter is in evidence. You can refer to it in closing, if you like.

MS. DONAHUE: And then the second stipulation just states stipulation regarding children's names, and that reads:

"Plaintiff, United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, and defendant Michael Pepe, through his counsel of record, Deputy Federal Public Defenders Charles Brown and Carlton Gunn, hereby stipulate to the following:

"In the seven counts in the First Superseding Indictment, each child witness is referred to by initials. Those initials correspond to each child as set forth below:

"Count One, I.T. is I.T..

"Count Two, L.K. is L.K.xxx.

"Count Three, S.R. is S.R.xxx.

"Count Four, S.S. is S.S.xxx.

"Count Five, K.S. is K.S.x.

"Count Six, N.T.D. is NTDx.

"And Count Seven, T.C. is T.C.xx."

And the next one states:

"Stipulation regarding accuracy of Government Exhibit No. 1242.

"Plaintiff, United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, and defendant Michael Pepe, through his counsel of record, Deputy Federal Public Defender Charles Brown and Deputy Federal Public Defender Carlton Gunn, hereby stipulate to the following:

"Government Exhibit 1242 is an accurate and correct translation of Government Exhibit No. 1241, the family book for SS and SR."

And with that, the Government moves Exhibit No. 1242, the translation, into evidence.

THE COURT: Any objection?

MR. BROWN: No objection.

THE COURT: Admitted. Thank you.

(Government's Exhibit 1242 was received)

MS. DONAHUE: "Stipulation regarding defendant's travel from the United States of America to the Kingdom of Cambodia.

"Plaintiff, United States of America, by and through its counsel of record, the United States Attorney for the

Central District of California, and defendant Michael Pepe, through his counsel of record, Deputy Federal Public Defender Charles C. Brown and Deputy Federal Public Defender Carlton F. Gunn, hereby stipulate to the following:

"One, on or about September 1, 2005, defendant, Michael Joseph Pepe, traveled from Los Angeles International Airport, Los Angeles, California to Manila, Philippines on Philippine Airlines Flight PR103.

"Two, on or about September 3rd, 2005, defendant, Michael Joseph Pepe, traveled from Manila, Philippines to Bangkok, Thailand on Philippine Airline Flight No. PR730.

"And, three, on or about September 3rd, 2005, defendant, Michael Joseph Pepe, traveled from Bangkok, Thailand to Phnom Penh, Cambodia on Bangkok Air Flight No. PG926."

Finally, the last stipulation. It says:

"Stipulation regarding defendant's citizenship.

"Plaintiff, United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, and defendant Michael Pepe, through his counsel of record, Deputy Federal Public Defender Charles C. Brown and Deputy Federal Public Defender Carlton Gunn, hereby stipulate that defendant Michael Joseph Pepe was born on [redacted] 1953 in Suffolk County, Massachusetts, and by virtue of his birth was and is a citizen of the United States of America. Defendant has not renounced his citizenship."

Your Honor, those are all of the stipulations.

We have a deposition to play and some exhibits to show during the deposition. It might take a couple of minutes to set it up.

THE COURT: Okay. Do you have a time estimate of how long it takes to --

MS. DONAHUE: The depositions runs for a little bit over three hours.

THE COURT: Okay. So we will start it and finish it tomorrow.

MS. DONAHUE: Yes.

THE COURT: Okay. Go ahead and set it up.

MS. DONAHUE: Your Honor, for the record, this is a deposition of Basang, B-A-S-A-N-G, that was taken on February 29th of this year, 2008 in Phnom Penh, Cambodia.

THE COURT: All right.

(Whereupon, the video was played for the jury)

THE COURT: Ladies and gentlemen, are you able to hear that? The reason I'm asking is that -- one of the many reasons is our court reporter is not going to be transcribing this and so we need to make sure that you are able to hear it. She won't be able to read it back to you.

Where is the speaker?

MR. LULEJIAN: The speaker is in the front.

THE COURT: Just in the computer?

MR. LULEJIAN: Yes, Your Honor.

THE COURT: Do we need to take a break?

MS. DONAHUE: I am afraid we do. We played it and it was perfect.

THE COURT: It's always perfect until the jury comes into the room. That's the rule.

All right. Ladies and gentlemen, we will take a 15 minute break. Don't talk about the case or form or express any opinions about the case.

(Recess taken)

(Jury In)

THE COURT: All right. Everybody cross your fingers. You may proceed.

MS. DONAHUE: Thank you, Your Honor.

(Whereupon, the video was played for the jury)

THE COURT: Mr. Lulejian, you are showing 1002 to the jurors.

MR. LULEJIAN: Yes, Your Honor, this is Government Exhibit 1002.

THE COURT: Thank you.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

MR. LULEJIAN: Your Honor, for the record, I am putting Government Exhibit No. 1030 on the overhead.

THE COURT: Thank you.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

MR. LULEJIAN: Your Honor, the Government will publish Exhibit No. 1031.

THE COURT: All right.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

MR. LULEJIAN: The Government will publish Exhibit No. 1032.

THE COURT: Thank you.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

MR. LULEJIAN: Your Honor, the Government will first publish Exhibit 1003.

THE COURT: Okay.

(Photograph published for the jury)

MR. LULEJIAN: The Government will now publish Exhibit 1004.

THE COURT: Thank you.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

MR. LULEJIAN: The Government will publish 1033 on the overhead, Your Honor.

THE COURT: Thank you.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

MR. LULEJIAN: Your Honor, the Government will publish Exhibits 1034 and 1035.

THE COURT: Thank you.

MR. LULEJIAN: This is Exhibit 1034, Your Honor.

(Photograph published for the jury)

MR. LULEJIAN: This is Exhibit 1035.

(Photograph published for the jury)

THE COURT: Thank you.

(Whereupon, the video was played for the jury)

MR. LULEJIAN: Your Honor, the Government will publish 1036 and 1037.

THE COURT: You may.

MR. LULEJIAN: Your Honor, this is Government 10 -- Exhibit No. 1036.

(Photograph published for the jury)

MR. LULEJIAN: This, Your Honor, is Government Exhibit No. 1037.

THE COURT: Thank you.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

MR. LULEJIAN: Your Honor, may we publish 1018?

THE COURT: Yes.

(Photograph published for the jury)

THE COURT: Thank you.

(Whereupon, the video was played for the jury)

MR. LULEJIAN: May we publish 1019, Your Honor.

THE COURT: Yes.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

MR. LULEJIAN: May the Government publish 1017, Your Honor.

THE COURT: Yes.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

MR. LULEJIAN: With the Court's permission, the Government will publish 1008.

THE COURT: You may.

(Photograph published for the jury)

THE COURT: Thank you.

(Whereupon, the video was played for the jury)

MR. LULEJIAN: Your Honor, the Government would show Exhibit No. 1002. It was misnamed on the tape.

THE COURT: You may.

MR. LULEJIAN: Showing 1002, Your Honor.

THE COURT: All right. Thank you.

(Photograph published for the jury)

(Whereupon, the video was played for the jury )

THE COURT: Is this a good time to break, Mr. Lulejian?

MR. LULEJIAN: Yes, Your Honor, it is.

THE COURT: Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. You are ordered to return tomorrow at 8:00 a.m. and you are ordered to have a good evening.

(Jury Out)

THE COURT: All right. Is this the last thing the Government is doing, or do you have further witnesses tomorrow?

MS. DONAHUE: This is going to be our last witness, Your Honor, so we will rest once this deposition is completed.

THE COURT: That's maybe another hour or so?

MS. DONAHUE: Maybe a little more than an hour.

THE COURT: And the Defense will then be prepared to begin with its witnesses?

MR. GUNN: Yes, Your Honor.

THE COURT: And your estimate is?

MR. GUNN: We are still trying to figure out, Your Honor. Without the depositions, we're thinking three to six hours but we're not positive. That's without the depositions and without Dr. Maloney and without our dermatologist, who I am going to decide about calling tonight. So hopefully we will have the depositions -- at least one of them, ideally both of them, that may be a stretch -- to play on Thursday because, as I was indicating to the Court earlier this morning. But I do want to add the caveat but I don't -- I don't know if Mr. Brown has a

real good feel for how long it will be so. . .

THE COURT: Okay.

MS. DONAHUE: Your Honor, I should just note when we were playing that depo, I received in court a marked-up copy of the Kumlang depo for Defense counsel to review, based on the Judge's order, so I will give that to them. And it looks like there are two -- there may be two questions that the people who were doing the mark-up had. We will confer with Defense counsel and have those questions for you in the morning, but it sounds like the Kumlang depo is close to completion.

THE COURT: Great.

MR. GUNN: I'm sorry. That's just the marking up of it. Then, of course, it needs to be physically --

MS. DONAHUE: They have started physically.

MR. GUNN: Redacting?

MS. DONAHUE: Yes.

MR. GUNN: Oh.

THE COURT: Great. I need the jury instructions then because we are going to be giving those relatively quickly.

MS. DONAHUE: Defense counsel has the set that includes everything we're proposing, everything they're proposing, our respective positions. I incorporated their positions and ours all into one document. They have it.

I also have given them a proposed verdict form. The Government is proposing a special verdict form because the Ninth

Circuit has upheld only the commercial prong of the definition of illicit sexual conduct. It's our position we have clearly commercial but we also have non-commercial, so we thought if the jury found -- any counts as to which the jury found guilty, we would ask them to specifically check the box for commercial.

THE COURT: They would have to be unanimous as to one or the other anyway, right?

MS. DONAHUE: Yes. And if we have unanimous findings on commercial, then regardless of what the Ninth Circuit does down the road, there would not be an issue. We are concerned without the special verdict form, should the Circuit down the road say the non-commercial prong violates the commerce clause, then a general verdict potentially could have an issue. So we put together a special verdict form which I have given to the Defense.

THE COURT: Okay. I understand your argument but it may or may not be relevant.

MS. DONAHUE: Right.

THE COURT: If the jury must be unanimous on the type anyway, then you need a special verdict anyway or I suppose you don't need one. If the Defense were willing to agree that I would just instruct them that they had to be unanimous.

MS. DONAHUE: Yes. So that's --

THE COURT: All right. Well, don't wait for the Defense to do whatever it's going to do. I want the jury

instructions in whatever form you have them emailed to me --

MS. DONAHUE: I will do it as soon as I get back to my office.

MR. GUNN: I will look at them right now, Your Honor. I'm guessing I can look at them fairly quickly because if it incorporates what I sent to them, and I can't tell them what to say in their objections.

THE COURT: Great. All right. Anything else we need to discuss before tomorrow?

MS. DONAHUE: No, Your Honor.

THE COURT: I haven't seen them obviously. I was starting to look through yours. Do we have proposed instruction on accomplice testimony and on convictions?

MS. DONAHUE: Accomplice is in there. Convictions may not be.

MR. GUNN: I don't know if accomplice is in there, Your Honor. I think it should be, as the Court has brought something to my attention that I didn't think of. I was handling the instructions.

THE COURT: You will be thinking about that this evening then. All right. We will see you tomorrow at 7:45.

(Proceedings adjourned at 2:05 p.m.)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

United States of America, )
Plaintiff, )
)
vs. ) Case No.
) CR 07-168(A)-DSF
Michael Joseph Pepe, )
Defendant. )
________________________________ )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

Day 8

Los Angeles, California

Wednesday, May 21, 2008

Pamela A. Seijas, CSR, FCRR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California 90012
(213) 687-0446

APPEARANCES:

| | |
|---|---|
| FOR THE GOVERNMENT: | OFFICE OF THE UNITED STATES ATTORNEY<br>BY: PATRICIA DONAHUE<br>ASSISTANT UNITED STATES ATTORNEY<br>JOHN LULEJIAN<br>ASSISTANT UNITED STATES ATTORNEY<br>312 N. SPRING STREET<br>LOS ANGELES, CA 90012 |
| FOR DEFENDANT: | OFFICE OF THE FEDERAL PUBLIC DEFENDER<br>BY: CARL GUNN<br>DEPUTY FEDERAL PUBLIC DEFENDER<br>CHARLES BROWN<br>DEPUTY FEDERAL PUBLIC DEFENDER<br>321 EAST SECOND STREET<br>LOS ANGELES, CA 90012 |
| VIETNAMESE INTERPRETER: | CHANDARA HAC |
| ALSO PRESENT: | ATTACHE GARY PHILLIPS<br>ICE SPECIAL AGENT EDDY WANG |

THE COURT: Okay.

MS. DONAHUE: We will get the deposition queued up, Your Honor, from where we left off yesterday.

THE COURT: Okay. I looked at the jury instructions last night and came up with a proposed set. There are tabs on some of the ones where I either made notes or changes. I -- the one that it stuck in there cross wise has to do with deposition testimony so I don't know whether you wanted me to give that one.

The verdict form that you sent me I haven't looked at thoroughly. I see that you did tailor the specific findings to the specific witness. The one you sent me doesn't have a signature page. I assume you want the foreperson to sign it at some point.

MS. DONAHUE: That would be nice. I apologize. Signature page, Your Honor. Yeah. My mistake.

THE COURT: I didn't have a chance to thoroughly look at the venue issue. I guess my question would be is the Government concerned that it can't or hasn't established that the last known address of the defendant in the United States --

MS. DONAHUE: No. We stipulated to it. We have established -- there is venue both ways. There's one case in the country that has addressed this. It's that District Court in Texas. Who knows if the Ninth Circuit will address this. And so it's really just an abundance of caution approach. We

have both -- we are happy to do either. Among people who fancy themselves as experts in this area, there is a split of opinion so we submitted both. But we're fine on both, especially if the Court chooses one or another. I see the argument made -- the logic followed by the District Court in Texas. But 2423(b), which is the other travel statute, makes it a crime to travel in interstate or foreign commerce with the intent to engage in sexual acts with children. A number of those cases, the venue provision cited is 18 U.S.C. 3237.

THE COURT: That's not -- my issue.

MS. DONAHUE: We have it both ways.

THE COURT: I know you have it both ways.

MS. DONAHUE: Okay.

THE COURT: My question is does the defendant contend that venue isn't proper if the defendant merely traveled from, through or into the central district?

MR. GUNN: Yes, Your Honor. We're -- our contention is there has to be proof that his last known residence was in --

THE COURT: And do you contend that there's an argument that his last known residence was not within the central district?

MR. GUNN: Well, there's a stipulation to that effect.

THE COURT: I don't need to give a venue instruction if the parties stipulate to venue.

MR. GUNN: I think the jury still has to find it, like

they do any stipulated fact.

THE COURT: I don't think that's right. I'm not sure. But in any event, if there is a stipulation to venue, a stipulation to that fact, why do you want to put in an element that arguably doesn't work? That's my question.

MS. DONAHUE: That's a good point.

THE COURT: You can think about that. We're not there yet. That's my question for you.

MS. DONAHUE: I see what you're saying, Your Honor. I see what you're saying. Let me think about that a little bit. You're right.

THE COURT: Okay.

MR. GUNN: There is one other sort of quasi discovery issue which I was trying to work out with Mr. Lulejian. Maybe I can approach him and see if we worked it out.

THE COURT: Okay. You have got about five minutes.

MR. GUNN: If not, then we will need Your Honor briefly.

(Recess taken)

(Jury In)

THE COURT: Good morning. Everyone is present.

Are we ready to continue?

MS. DONAHUE: We are, Your Honor. We are going to continue with the deposition of Basang from where we left off yesterday.

THE COURT: All right. You may proceed.

(Whereupon, the video was played for the jury)

MR. LULEJIAN: With the Court's permission, Your Honor, the Government would like to display Government Exhibits No. 1039 and 1040.

THE COURT: You may.

(Photographs published for the jury)

MS. DONAHUE: This is Exhibit 1039. This is Exhibit 1040.

THE COURT: Thank you.

(Whereupon, the video was played for the jury)

MR. LULEJIAN: Your Honor, with the Court's permission we would hike to publish 1041.

THE COURT: You may.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

MR. LULEJIAN: With the Court's permission, we would like to publish 1042.

THE COURT: You may.

(Photograph published for the jury)

THE COURT: Thank you.

(Whereupon, the video was played for the jury)

MR. GUNN: May we have one moment, Your Honor. We may have lost our place. If I could approach counsel?

THE COURT: Sure. All right. Continue.

(Whereupon, the video was played for the jury)

MR. LULEJIAN: Your Honor, the Government would seek permission to publish 1049.

THE COURT: You may.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

THE COURT: You may publish all of those, Mr. Lulejian.

MR. LULEJIAN: Thank you, Your Honor. This is 1052.

(Photograph published for the jury)

MR. LULEJIAN: Exhibit 1053.

(Photograph published for the jury)

MR. LULEJIAN: Exhibit 1054.

(Photograph published for the jury)

MR. LULEJIAN: Exhibit 1055.

(Photograph published for the jury)

MR. LULEJIAN: Exhibit 1056.

(Photograph published for the jury)

MR. LULEJIAN: And, Your Honor, 1057.

THE COURT: Thank you.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

MR. LULEJIAN: May the Government publish 1058, Your Honor?

THE COURT: Yes.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

MR. LULEJIAN: May the Government publish 2006, Your Honor?

THE COURT: Yes.

(Photograph published for the jury)

THE COURT: Thank you.

(Whereupon, the video was played for the jury)

MR. BROWN: Your Honor, may I publish Defense Exhibit 120?

THE COURT: You may.

(Photograph published for the jury)

THE COURT: Thank you. Does anyone know how much more time we have in this segment?

AGENT WANG: No, Your Honor. It's a little longer.

MR. GUNN: It looks like about 30 pages in the transcript.

THE COURT: Why don't we take a break now.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We will take our 15 minute break.

(Recess taken)

(Jury In)

THE COURT: All right. I think -- would you like to show that exhibit again, Mr. Brown?

MR. BROWN: Yes, Your Honor.

(Photograph published for the jury)

THE COURT: All right. Thank you.

MR. BROWN: Thank you, Your Honor.

THE COURT: You may continue.

(Whereupon, the video was played for the jury)

MR. BROWN: Your Honor, may I publish Defense Exhibit 121?

THE COURT: You may.

MR. BROWN: Thank you.

(Photograph published for the jury)

MR. BROWN: Thank you, Your Honor.

(Whereupon, the video was played for the jury)

MR. GUNN: May I have a moment to consult with counsel, Your Honor?

THE COURT: You may.

(Mr. Gunn, Mr. Lulejian and Ms. Donahue confer off the record)

MR. GUNN: Your Honor, there were three lines that were mistakenly redacted and Mr. Brown is going to read them into the record and we have stipulated to that.

THE COURT: That's fine. Thank you.

MR. BROWN: Question by Mr. Brown to Ms. Sang:

"You also told the Court that you never bring children to sell to Michael; right?

"Ms. Sank: Correct."

(Whereupon, the video was played for the jury)

MR. BROWN: Your Honor, just for the record we would ask for a limiting instruction with respect to this next portion of the testimony.

THE COURT: Do you want to show me what it is so I'm sure we are on the same --

MR. BROWN: Yes, Your Honor, may I approach?

THE COURT: Yes. For the witness's state of mind and not for the truth?

MR. BROWN: Yes, Your Honor. I think it's the line recorded towards the bottom.

THE COURT: Ladies and gentlemen, the witness is asked some questions about what someone said to her about who he was representing. This testimony is offered not for the truth of the matter; that is, not for who the man was actually representing, but for the impact it had on Ms. Sang's state of mind.

MR. BROWN: Thank you, Your Honor.

THE COURT: You may continue.

MR. BROWN: Thank you.

(Whereupon, the video was played for the jury)

MR. LULEJIAN: Your Honor, with the Court's permission I will now exhibit Exhibit 1058.

THE COURT: All right.

(Photograph published for the jury)

THE COURT: Thank you.

Is that the end of that testimony?

MS. DONAHUE: Yes, Your Honor.

THE COURT: Does the Government have any further witnesses?

MS. DONAHUE: The Government has no further witnesses.

THE COURT: Does the Government rest?

MS. DONAHUE: We need to move -- officially move into evidence the exhibits, the Government Exhibits that were shown during the deposition, to which I believe there was no objection.

THE COURT: Many of them are already in evidence.

MS. DONAHUE: Yes.

MR. BROWN: No objection, Your Honor.

THE COURT: All right. Those will all come in and you will work with Steve or Paul and make sure that all those mentioned are noted as being in evidence.

Anything further from the Government?

MS. DONAHUE: No. With that, Your Honor, the Government rests.

THE COURT: Thank you.

MR. BROWN: Your Honor, the Defense would make a Rule 29 motion for the record and would ask that the Defense exhibits be received as well, 120 and 121, if they are not already in.

THE COURT: Any objection to the Defense exhibits?

MS. DONAHUE: No, Your Honor.

THE COURT: Those are admitted.

(Defendant's Exhibits 120 and 120 were received)

THE COURT: The motion will be taken under submission.

Does the Defense wish to call any witnesses?

MR. BROWN: Yes, Your Honor.

MR. GUNN: Your Honor, our first witness would be Sun Ro.

MS. DONAHUE: He needs an interpreter.

MR. GUNN: Oh, yes, Your Honor. I'm sorry.

THE COURT: The interpreter has already been sworn.

Sir, you are still under oath.

Would you swear in the witness.

Sun Ro, Defendant's witness, was sworn

THE CLERK: Thank you. Please take the witness stand. Please state your full name and spell your full name for the record.

THE WITNESS: My name is Sun Ro.

THE COURT: Interpreter spelling, please.

THE WITNESS: S-U-N, R-O. Sun Ro.

THE COURT: You may proceed.

MR. GUNN: Thank you, Your Honor. I would ask to question the witness as an adverse witness in light of the fact that he was the lead investigator in Cambodia.

THE COURT: You may.

DIRECT EXAMINATION

BY MR. GUNN:

Q. It is Mr. Sun? I am asking is it Mr. Sun as opposed to Mr. Ro?

A. Either one.

Q. Mr. Sun, do you recall that one of the victims or alleged victims in this case was a girl named I.T.?

A. I.T.?

Q. Yes.

A. This is national police that took care of that case. I do not know.

Q. But do you recall -- you were involved in the investigation of Michael Pepe; correct?

A. Yes. I did look at the file before I proceed the investigation.

Q. And you interviewed witnesses and participated in getting a search warrant; correct?

A. Is that the case of I.T. or it's my personal investigation?

Q. Do you recognize Michael Pepe who is sitting over here at our counsel table?

A. Yes.

Q. And you participated or even led the investigation that resulted in his arrest; correct?

A. Yes.

Q. And that investigation was sort of started, at least for you, when Gary Phillips, sitting at the end of the prosecutor's table here, provided you with information; correct?

A. Yes.

Q. And when Mr. Phillips provided you with information, did he tell you that a photograph of Michael Pepe had been shown to one of the alleged victims and she had said that was not the man?

A. Who show the picture?

Q. Did Gary Phillips, who is sitting here at the end of the prosecutor's table -- he provided information for you for the investigation; right?

A. Yes. Yes. Just information. No picture involved.

Q. When he provided you that information, did he also tell you that he had shown a picture of Michael Pepe to I.T. -- to one of the -- strike that.

Actually, Your Honor, if I could withdraw and rephrase the question?

THE COURT: No. It's as if the witness is here in English, so the translation continues and then you can ask another question.

MR. GUNN: All right.

THE WITNESS: Can you please repeat again?

BY MR. GUNN:

Q. Yes. When Gary Phillips provided you with information before Michael Pepe was arrested, did he tell you that a

photograph of Michael Pepe had been shown to one of the alleged victims and the alleged victim has said that's not the man?

A. I -- I do not know, you know, the picture that he showed. I don't know what picture.

Q. So he never told you anything about that?

A. Only the report of the case. The activity of the victim I.T..

Q. And he didn't tell you that I.T. had been shown a picture of Michael Pepe and said that's not the man, did he?

MS. DONAHUE: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: That I do not recall. I only did receive the report. I took that information and proceed with the investigation.

BY MR. GUNN:

Q. You examined -- after the search warrant, after the search in this case, you examined some photographs on a thumb drive that was seized; is that correct?

A. At the time I did receive a report from the city regarding the investigation to control the activity which has led to the arrest of Mr. Michael.

Q. That wasn't quite my question. It's a little more specific.

After the search of Michael Pepe's house, you examined some photographs from a thumb drive that was seized; correct?

A. Yes.
Q. And one of the things you were looking for was a mole on the inner thigh of Mr. Pepe; correct?
A. Yes.
Q. And did you find a photograph that you believed showed such a mole?
A. Yes. It was in the -- on the picture. Yes.
Q. Would you look at Defense Exhibit 302.
Could I have Defense Exhibit 302 placed in front of the witness, Your Honor?
THE COURT: Yes.
MR. GUNN: I have an extra copy, Your Honor, I believe in the file folder over here.
THE COURT: Please.
BY MR. GUNN:
Q. Is Defense Exhibit 302 the photograph that you found that you believed showed such a mole?
A. I don't think this is the picture.
Q. Are you certain? Or you just don't think so?
A. Yes. Because this picture doesn't show the whole thigh.
Q. If I could get my copy back.
THE COURT: Sure.
MR. GUNN: I will also need, Your Honor, Defense Exhibit 131 placed in front of the witness and Defense Exhibit 117. If I could step over, I can get that.

THE COURT: Okay.

MR. GUNN: Is 131 hopefully available?

THE CLERK: 131 and 117?

MR. GUNN: Yes. Do you have 117? I'm not sure you have 117 yet.

THE CLERK: I only have 131.

THE COURT: Go ahead and give the witness 131.

MR. GUNN: If I could approach with 117, Your Honor.

THE COURT: You may.

MR. GUNN: Here is both a Cambodian version and an English version.

Q. I'd like you first -- you took statements from a number of people in connection with this case; correct?

A. In this case, I did not interview the witness myself. I did order someone who worked for me to do the work.

Q. Would you --

THE COURT: Mr. Sun, this will go much more quickly if you'll just listen to Mr. Gunn's questions and answer only the question that he is asking you.

THE WITNESS: Okay.

THE COURT: Thank you.

BY MR. GUNN:

Q. Would you look at Defense Exhibit 117, the Cambodian portion.

That's a report which describes taking a statement

from a woman named Ly Kim Eng; correct?

A. Yes.

Q. And it's a statement you took or at least signed off on; right?

A. Yes. My colleague that work did the interview.

Q. And you actually signed off on the statement at the end; correct?

A. Yes.

Q. So this is an official Cambodian police document that you approved; correct?

A. Yes.

Q. And it reflects that you -- that Ly Kim Eng made a statement; correct?

A. Yes.

Q. And it reflects in the last paragraph or so that she came back to --

MS. DONAHUE: Objection. This is going to call for hearsay.

MR. GUNN: Your Honor, it's a prior inconsistent statement with respect to something said in the deposition, which of course hasn't been played yet.

THE COURT: And I'll guess we'll wait.

MR. GUNN: All right.

THE COURT: You have the document.

MR. GUNN: Then I would need to recall Sun Ro at that

time.

THE COURT: You have the document.

MR. GUNN: All right. As long as we can reflect it from the document, that would be fine.

Q. Would you now look at Defense Exhibit 131, Mr. Sun.

That is another official report of an interview in connection with this case; right?

A. Yes.

Q. And it reflects an interview of a girl named L.K.xxx; correct?

A. Yes.

Q. And it reflects that one part of the statement she made was about when Mr. Pepe allegedly first raped her; correct?

A. Yes.

Q. And she said it was about one week after she was brought to the house or came to the house; correct?

A. Yes. That's the report.

MR. GUNN: If I could have just one moment, Your Honor.

THE COURT: Sure.

MR. GUNN: I don't believe I have any further questions of this witness. As I understand the Court's ruling, we can elicit what's in the report without the witness afterwards, if it's inconsistent.

THE COURT: Assuming I otherwise find it's

appropriate.

MR. GUNN: All right. As long as we don't have to re-call him.

THE COURT: Does the Government want to cross-examine?

MS. DONAHUE: I have no questions.

THE COURT: Thank you, sir. You are excused.

MR. GUNN: Next I would like to read a stipulation into the record regarding two witnesses testimony.

THE COURT: All right. You may do that.

MR. GUNN: Ladies and gentlemen, this is a stipulation entered into by the parties.

"It is hereby stipulated by and between plaintiff, United States of America, through its counsel of record, Assistant United States Attorney Patricia Donahue and Assistant United States Attorney John Lulejian, and defendant Michael Pepe, through his counsel of record, Deputy Federal Public Defender Charles Brown and Deputy Federal Public Defender Carlton F. Gunn as follows:

"One, Dr. Laura Watson shall be deemed to have been recalled as a witness and testified that the report identified as Defense Exhibit 130 accurately reflects what L.K.xxx told her about being raped."

And, Your Honor, I would offer Defense Exhibit 130 into evidence.

THE COURT: All right.

MS. DONAHUE: No objection.

THE COURT: That will be admitted.

(Defendant's Exhibit 130 was received)

MR. GUNN: "Two, James Pond shall be deemed to have been called as a witness and testified as follows:

"A, he formerly worked as a director of the Agape Restoration Center in Phnom Penh, Cambodia.

"B, he was working in that position when L.K.xxx and S.R.xxx arrived at the center in August 2006 and continued to work there through June 2007.

"C, on the eve -- on the eve of a Cambodian court proceeding for Basang, Ly Kim Eng and Cum Lang, S.R.xxx and L.K.xxx said Pepe had been good to them."

THE COURT: All right. Thank you.

MR. GUNN: That stipulation is signed by counsel and Mr. Pepe, Your Honor.

THE COURT: All right. Thank you.

MR. GUNN: Our next witness, Your Honor, would be Taekuk Cho, if I am pronouncing that correctly.

THE COURT: All right. Does this witness need an interpreter?

MR. GUNN: No, Your Honor. This is an American agent.

Taekuk Cho, Defendant's witness, was sworn

THE CLERK: Please take the witness stand. Please; state your full name and spell your full name, please.

THE WITNESS: My first name is Taekuk, one word. T-A-E-K-U-K. Last name is Cho. C-H-O.

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MR. GUNN:

Q. Mr. Cho, you interviewed two of the alleged victims in this case, K.S.x and T.C.xx; correct?

A. Yes, sir. That's correct.

Q. When you interviewed K.S.x, you talked to her about the allegations; correct?

A. Yes, sir. That's correct.

Q. And some of what she claimed the underlying facts were; correct?

A. Can you repeat the question?

Q. Some of what she claimed the underlying facts were?

THE COURT: I don't even understand that.

MR. GUNN: I will withdraw the question, Your Honor.

Q. You interviewed her about what she said happened; right?

A. That's correct, sir.

Q. And one of the things she told -- one of the people involved in the case, as you understood it, was a woman named Basang or Sang; correct?

A. That's correct, sir.

Q. And she told you that Sang was her Auntie; correct?

A. She called her Auntie, yes, sir.

Q. She told her -- she was an Auntie; right? That's what she said?
A. That's correct.
Q. She also indicated that when she was at the house, L.K.xxx, S.R.xxx and S.S.xxx were there; correct?
A. I believe that's correct, sir.
Q. Would you like to look at a transcript --
A. Do you mind if I refer to a transcript?
THE COURT: You may do that.
BY MR. GUNN:
Q. Please. Do you have it with you?
A. Yes, I do.
Q. That would be fine. If you would look at Page 21.
A. Yes, sir.
Q. She did say that; correct?
A. L.K.xxx, S.S.xxx, S.R.xxx.
Q. And she said those girls were living there at the time that she was there; correct?
A. That's correct, sir.
Q. Now, going to your interview of T.C.xx, you also interviewed her; correct?
A. I did, sir.
Q. And she also talked to you about what she said happened; right?
A. That's correct, sir.

Q. And there is also a transcript and that interview was videotaped; right?
A. Yes.
Q. And she told you that her mother did speak to Sang or Basang before she went to Michael's house; correct?
A. That's correct, sir.
Q. She also told you that the way she got home was her mother came to pick her up at Michael's house; correct?
A. May I refer to the transcript, sir?
Q. Yes. There are five transcripts in that case, that interview, right? If you would look at No. 5, Pages 11 through 12.
A. Sir, do you mind repeating the question?
Q. Yes. My question was she told you that her mother came to Michael's house to pick her up and that's how she left; correct? If you look on Page 11, about eight lines down from the top.
A. Yes. I'm just reading it, sir.
Okay, sir, can you repeat your question?
Q. Yes. She told you that her mom came and took her out of the house; correct?
A. She advised that her mother went to the house, her mother followed Basang, went inside the house and took her child out from the house, yes, sir.
Q. More directly and specifically at one point she was asked, "How did you get out of the house" and she said, "My mom took me

out"; right?

A. That's correct, sir.

Q. And finally she also told you not that there was someone else in the room when she was raped, but that there was no one else in the room when she was raped; correct?

A. Can you please refer to the transcript?

Q. If you'd look at the second transcript at Page 14, about four or five lines down.

A. Okay. Your question was, sir?

Q. She told you not that there was someone else in the room when she was raped, but that there was no one else in the room when she was raped; correct?

A. The question I asked, sir, was was there anyone else in the room, and her response was no.

Q. Her response was?

A. No.

Q. No. Thank you.

If I could consult with co-counsel for a moment, Your Honor?

THE COURT: Yes.

(Mr. Brown and Mr. Gunn confer off the record)

MR. GUNN: No further questions, Your Honor.

THE COURT: Any cross, Ms. Donahue? Will it be brief because it's about time for a break. Or should we take our; break first.

MS. DONAHUE: It's pretty short. It's up to you.

CROSS-EXAMINATION

BY MS. DONAHUE:

Q. Special Agent Cho, you are actually a special agent with Immigration and Customs Enforcement; is that right?

A. Yes, ma'am, that's correct.

Q. And you are not the case agent in this case; is that correct?

A. That's correct, ma'am, I am not.

Q. You were asked to interview T.C.xx and K.S.x in connection with this investigation; is that right?

A. That's correct, ma'am.

Q. You interviewed T.C.xx on August 25th of 2006; is that right?

A. That's correct, ma'am.

Q. You interviewed K.S.x about a month later on September 27 of 2006; is that right?

A. That's correct, ma'am.

Q. And at each of those interviews, there were four people present; is that right?

A. That's correct, ma'am.

Q. You, the child --

MR. GUNN: I object to leading in light of the fact that this is an adverse Defense witness.

THE COURT: Overruled. Let's just get to it.

BY MS. DONAHUE:

Q. You, the child and a Vietnamese interpreter and someone from the U.S. State Department who spoke Khmai; is that right?

A. That's correct, ma'am. He was a state department investigator.

Q. In each of these interviews, the -- both T.C.xx and K.S.x spoke Vietnamese rather than Khmai to you; is that correct?

A. That's correct, ma'am.

Q. Why did you choose a Vietnamese interpreter?

A. We did not choose the interpreter. When the State Department investigator and I went there, we assumed that the interview was going to be conducted in the Khmer language which is Khmai.

We were, prior to the commencement of the interview -- we were advised by the Vietnamese interpreter, along with the child, that the -- the native tongue of both T.C.xx and K.S.x was Vietnamese and that's the language that they understood and wished to conduct the interview in. That's why we conducted the interview in Vietnamese.

Q. Are both of those girls Vietnamese?

A. That's correct, ma'am.

Q. There is another term for it, I think it's called Kampucheakrom; is that correct? Or am I mispronouncing it?

A. There is Kampucheakrom, but my understanding is that these girls are actually ethnic Vietnamese that immigrated into

Cambodia.

Q. Do you know whether two years later their Khmai improved to the point where they now speak Khmai?

A. My understanding --

MR. GUNN: Objection. No personal knowledge.

THE COURT: Overruled. You can answer -- if you know, you can answer.

THE WITNESS: My understanding is --

THE COURT: No. If you know.

BY MS. DONAHUE:

Q. Do you know what their language preference is today?

A. No, ma'am, I do not.

MS. DONAHUE: I have no further questions.

MR. GUNN: Could I have one moment, Your Honor?

THE COURT: Yes.

(Mr. Brown and Mr. Gunn confer off the record)

REDIRECT EXAMINATION

BY MR. GUNN:

Q. These interviews were conducted, agent, at, where? World Hope International?

A. Negative, sir. It was at the U.S. Embassy in Phnom Penh, Cambodia.

Q. But they were brought there by World Hope International?

A. By a representative from World Hope International, that's correct, sir.

Q. The people who interpreted or the Vietnamese person who interpreted was a World Hope International representative?

A. That's correct, sir, along with a State Department investigator.

Q. The State Department investigator, though, spoke the Khmer?

A. That's correct.

Q. The Vietnamese was the World Hope investigator -- interpreter?

A. That's correct, sir.

MR. GUNN: No further questions.

THE COURT: Ms. Donahue?

MS. DONAHUE: Nothing further.

THE COURT: Sir, you are excused after you spell anything that my court reporter needs spelled.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We will take a 15 minute break.

(Recess taken)

(Jury Out)

MR. GUNN: We have one exhibit that I may be offering during the next period of time. The Government is objecting to it. I have a copy. I will give the original right now to the Court along with a copy. 126.

THE COURT: Thank you.

MR. GUNN: I will explain to court when the Court is

ready.

THE COURT: Yes.

MR. GUNN: Your Honor, this record is relevant and we wish to admit it because it shows that the girl Ngoc, who is probably also the girl Nap, was over 18. It shows she was 19.

There is two reasons -- first of all, I think it's relevant for a non-hearsay purpose in terms of Mr. Pepe's state of mind about her age. This document was found in his house.

Second, if it weren't -- I think it should be substantively admitted, Your Honor, because this is an example of where due process concerns are raised by the case from Cambodia being prosecuted in this country.

If it were in the United States, obviously we could subpoena the entity that this record was from and put it into evidence. We can't do that because we don't have subpoena power over Laboratoire D'Analyse in Cambodia. So we would first ask to offer it for the non-hearsay purpose and Mr. Pepe's state of mind, and second, we think it should be substantively admitted in any event. We would lay the foundation or get a stipulation from the Government that it was found in the house.

MR. LULEJIAN: Your Honor, we don't dispute that this document was found inside Mr. Pepe's house. The problem is it's classic hearsay within hearsay. The issue is we don't know who this Ngoc is. We don't know if it's the same Ngoc that's -- is; that Nap. In addition, we don't know how they found out what

her age was. Was a medical test done, did they ask her, did somebody else tell her. We don't know any of these things. There is no reliability to it. It's classic hearsay.

THE COURT: The document will be admitted.

MR. GUNN: Thank you, Your Honor.

(Defendant's Exhibit 126 was received)

(Jury In)

THE COURT: Steve, we have another witness. Who are you going to call, Mr. Gunn?

MR. GUNN: Your Honor, agent Hung Nguyen.

Hung Nguyen, Defendant's witness, was sworn

THE CLERK: Thank you. Please take the witness stand. Please state your full name and spell your full name, please.

THE WITNESS: My name is Hung Nguyen. First name spelled H-U-N-G. Last name is spelled N-G-U-Y-E-N.

THE COURT: You may proceed.

MR. GUNN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. GUNN:

Q. Mr. Nguyen, you also interviewed one of the alleged victims in this case, did you not?

A. Yes, sir.

Q. That was a girl named NTDx?

A. Yes, sir.

Q. And you interviewed her about what she claimed had happened

to her at Michael Pepe's house; is that correct?

A. That's correct, sir.

Q. And she told you that there were four children living in the house when the things that happened to her happened to her but that they were not there at the time; correct?

A. That's what the woman who lured her into the house told her, sir, actually related back it to me.

Q. Okay.

Well, she told you that was, in fact, the case; right?

A. Yes, sir.

Q. She told you that at the time she was supposedly abused, there were no other girls in the house?

A. That's correct, sir.

Q. That she thought they were living there because their things were there but they weren't there; correct?

A. That's correct, sir.

MR. GUNN: No further questions, Your Honor.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MS. DONAHUE:

Q. Special Agent Nguyen, you're with Immigration and Customs Enforcement; is that correct?

A. That's correct.

Q. And was it in your capacity as a special agent with Immigration and Customs Enforcement that you were assigned to

conduct this interview?

A. Yes, ma'am.

Q. And this interview was NTDx, N-T-D-x; is that correct?

A. That's correct.

Q. And this interview took place on November 3rd of 2006; is that right?

A. That's correct.

Q. What language was the interview conducted in?

A. The language was conducted in Vietnamese.

Q. Did you use an interpreter?

A. No, I did not.

Q. Why not?

A. I am fluent in Vietnamese and I asked NTDx if she spoke -- what language she spoke. She told me she spoke Khmer and Vietnamese and told me that she was stronger in Vietnamese, so I conducted the interview in Vietnamese.

MS. DONAHUE: I have no further questions.

THE COURT: Redirect?

MR. GUNN: Could I have one moment, Your Honor?

THE COURT: Yes.

(Mr. Brown and Mr. Gunn confer off the record)

REDIRECT EXAMINATION

BY MR. GUNN:

Q. Mr. Nguyen, were you stationed in Phnom Penh or that area at the time?

A. I'm stationed at the time in -- still in Bangkok, Thailand but we covered Cambodia and --

Q. And you work with Gary Phillips here?

A. Yes, sir.

Q. That was true during the period -- how long have you been stationed there?

A. Since September 3rd, 2006, sir.

Q. September 3rd, 2006?

A. That's correct.

MR. GUNN: No further questions.

THE COURT: Ms. Donahue.

RECROSS EXAMINATION

BY MS. DONAHUE:

Q. You were assigned to -- first assigned to Bangkok in September of 2006; is that right?

A. That's correct, ma'am.

MS. DONAHUE: I have no further questions.

THE COURT: All right. Thank you, sir. You're excused.

Does the Defense have another witness?

MR. GUNN: Yes, Your Honor. Our next witness would be Keith Williams. If I could get some exhibits out of my box.

THE COURT: Sure.

E. Keith Williams, Defendant's witness, was sworn

THE CLERK: Please take the witness stand. Please

state your full name and spell your last name for the word.

THE WITNESS: E Keith Williams. W-I-L-L-I-A-M-S.

THE COURT: You may proceed.

MR. GUNN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. GUNN:

Q. Mr. Williams, how are you employed?

A. With the Federal Public Defender's Office in Los Angeles.

Q. What is your position there?

A. I'm the chief investigator of the trial unit.

Q. What are your duties as the chief investigator of the trial unit?

A. To supervise a number of trial investigators, to assign cases, to work cases myself. And generally help to supervise in the office.

Q. How long have you worked in the federal public defender's office as investigator?

A. Approximately 18 years.

Q. How were you employed before that?

A. As a private investigator.

Q. Were you assigned or did you assign yourself as the investigator in this case of the United States versus Michael Pepe?

A. I assigned myself.

Q. And was one of the things we asked you to do to take some

photographs of Mr. Pepe's inner thigh?
A. Yes, I did.
Q. Would you recognize those photographs if you were shown a copy?
A. Yes, I would.
MR. GUNN: Your Honor, if I could approach with an exhibit.
THE COURT: If the Government has seen them.
MR. GUNN: Yes. It's been previously disclosed. I am also giving them a copy.
THE COURT: Thank you.
MR. GUNN: If I could approach. I have an exhibit and a copy for the Court. This would be -- if we could have it as 310, Your Honor.
THE COURT: All right.
(Defendant's Exhibit 310 was marked)
MR. LULEJIAN: Your Honor, for the record, this is the first time the Government is seeing this.
THE COURT: Okay.
MR. GUNN: I believe I disclosed it, Your Honor, so --
THE COURT: Don't -- just ask a question.
MR. GUNN: All right, Your Honor.
Q. Mr. Williams, would you look at Defense Exhibit 310.
A. Yes.
Q. And are those photographs of Mr. Pepe's inner thigh that

you took?

A. Yes.

Q. And now there's a date down there of 2008, 01-04. Is that an accurate date?

A. Yes, it is.

Q. Are you certain of that?

A. Yes, I am.

MR. GUNN: Your Honor, I would offer Defense Exhibit 310 into evidence.

THE COURT: Any objection?

MR. LULEJIAN: No objections.

THE COURT: All right. Those will come in. They are all 310?

MR. GUNN: Yes, Your Honor. It's a set.

THE COURT: That's fine.

(Defendant's Exhibit 310 was received)

MR. GUNN: Could I publish, Your Honor, so the jury can see 310?

THE COURT: You may.

MR. GUNN: Should we maybe shut off the upper screen.

THE COURT: Okay.

MR. GUNN: This is the first photograph, Your Honor.

THE COURT: All right.

MR. GUNN: This is the second photograph. And this is the third photograph.

THE COURT: I have four.

MR. GUNN: That's my mistake. I think the one I just showed was the fourth photograph, Your Honor -- I'm sorry. This would be fourth photograph.

THE COURT: All right. Thank you.

BY MR. GUNN:

Q. Mr. Williams, did you also accompany us -- and I did move 310 into evidence, I believe?

THE COURT: You did.

BY MR. GUNN:

Q. Did you also accompany myself and Mr. Brown on an investigation trip to Cambodia?

A. Yes, I did.

Q. And when was that?

A. One was November of '07 and once in February of '08.

Q. When we went to Cambodia in November, was one of the things we did or we asked you to do, try to make a purchase of a drug or medication called Rohypnol?

A. Yes.

Q. What did you do?

A. We were in our van that was being driven by the driver that we hired to get us around Phnom Penh and I saw a kiosk for a pharmacy company that I recognized from reading in our discovery, and we stopped and we went inside and through our interpreter that we had who spoke Khmer, we asked the pharmacist

behind the counter if he had in stock the drug Rohypnol, and after the translator and the person behind the counter spoke for a few seconds, the person behind the counter went to his shelving and came back with a box and asked if this is what we were looking for.

Q. And was it -- did the box say Rohypnol?

A. Yes, it did.

Q. What happened then?

A. We paid for the Rohypnol and I took a business card and we kept -- kept it with us.

Q. Did the pharmacist ask for a prescription of any sort?

A. No, he did not.

MR. GUNN: Your Honor, if I could have another exhibit marked.

THE COURT: You may.

MR. GUNN: If I could hand one to counsel and approach with the original and with a copy for the Court. If we could call this 602, it's premarked.

(Defendant's Exhibit 602 was marked)

BY MR. GUNN:

Q. Would you look at Defense Exhibit 602, Mr. Williams.

A. Okay.

Q. Do you recognize that?

A. Yes, I do.

Q. What is it?

A. It is an -- I opened up the box so I could place it flat and take a photograph of it.

Q. You're talking about the first page?

A. Yes.

MR. GUNN: Your Honor, I am going to eventually set a foundation for the other pages but if I could at least offer the first page in evidence now and publish it.

THE COURT: Does the Government have any objection to any of these pages?

MR. LULEJIAN: None of these pages.

THE COURT: All right. Then they will all come in, Mr. Gunn.

(Defendant's Exhibit 602 was received)

BY MR. GUNN:

Q. Mr. Williams, is this --

A. Yes.

Q. The -- that's the box flattened out?

A. Yes.

Q. Or a picture of it?

A. Yes.

Q. And what's the second page --

THE COURT: We don't have the screen on; I don't think there is any reason to have it off so. . .

MR. GUNN: Correct, Your Honor. I'm sorry.

THE COURT: Except that we can't turn it back on. But

other than that.

THE CLERK: One moment, Your Honor.

THE COURT: There we go. Thanks.

BY MR. GUNN:

Q. Would you look at the second page, Mr. Williams?

A. Yes.

Q. What's that?

A. The second page --

Q. First of all, is this the second page that is on the screen now?

A. Yes, it is. This is a photograph of the document that came inside the box of Rohypnol.

Q. Does it appear to be instructions but in French rather than English?

A. Yes, it does.

Q. And after you purchased the Rohypnol or after you purchased the Rohypnol and went back to the hotel, did we ask you to conduct an experiment of any sort or take some additional photographs?

A. Yes, you did.

Q. What did we ask you to do and what did you do?

A. I opened up the box, I took the Rohypnol out. The pills themselves were contained in -- pardon me -- like aluminum foil -- individual aluminum foil package -- packages. I opened up one -- I took photographs of the entire pack.

Q. Showing you the fourth page of Government Exhibit -- Defense Exhibit 602, first of all, are those photographs of the pills?
A. Yes.
Q. The way they came out of the box?
A. Yes.
Q. Go ahead.
A. I placed them on the coffee saucer to give an idea of how large the package was, and I also placed a regular coffee spoon there to further give an idea how large the package was. And I took a close-up also.
I took one of the pills out of the -- excuse me -- out of the aluminum foil individual packs and placed it on top of a folded piece of legal paper, yellow paper to --
Q. Is that what is shown on the next page?
A. Yes. And I did that to demonstrate its color and size as best I could.
Q. What was that color?
A. It was a bluish green.
Q. And so what did you do after you put the complete -- the single pill on the yellow piece of paper there?
A. I took the back end of the spoon and tried to crush it using it like a pestle -- not a gun -- but a pestle that grinds up, say, foods and pills.
Q. And what did you do then? Is that reflected on the next

page?

A. It's on the next page, yes. The next thing I did was I took the crumbled pill and poured it into the bottom of a drinking class that was in the hotel, empty.

Q. By the way -- I'm sorry, go ahead.

A. It was empty. The glass was empty at that point and I poured the dry pill in the bottom of the dry glass.

Q. What was the color when you ground it up? Did the color change at all?

A. No, it did not.

Q. All right.

And then what did you do after you had done this step?

A. I kind of poured some water on -- on the top of it and without stirring it or anything, took another photograph.

Q. And is that reflected on the next page here?

A. It's actually reflected on -- with the -- the page in -- the other one, yes. The larger -- yes. The close-up is it.

Q. That's after you poured water in it?

A. Yes.

Q. After you poured the water in, what did you do?

A. I took a photograph from the side to demonstrate what it looked like -- what the pill looked like after pouring water on it. So shooting, I guess, straight through the glass from the side. And then I stirred it up with --

Q. Before you talk about that, let me ask you a question.

Did you let it sit in the water for a while to see if it dissolved on its own?

A. Yes, I did.

Q. Did it?

A. Not much.

Q. Then what did you do?

A. I took the spoon and stirred up the pill in the water and that is reflected in the bottom photograph or the left photograph there as it is on the screen.

Q. And the water then turned blue green?

A. Yes.

Q. Same color as the pill?

A. Yes.

MR. GUNN: Your Honor, I am sorry. I have some Jencks material I should give to the Government.

THE COURT: All right.

MR. GUNN: I have no further questions, Your Honor.

THE COURT: Any cross-examination?

MR. LULEJIAN: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. LULEJIAN:

Q. Mr. Williams, what kind of a camera did you use to take the pictures of Mr. Pepe's inner thigh?

A. I used a digital Canon camera.

Q. What resolution?

A. I'm sorry. On Mr. -- on the -- I don't know how to answer that question.
Q. What model number is it?
A. Don't know how to answer that question either.
Q. How good is the quality of that camera?
A. I don't know how to compare it to -- to what, in terms of quality.
Q. Did you use the same camera to take the pictures of the Rohypnol that you dissolved?
A. Yes.
Q. With respect to Defense Exhibit 310, the -- in total, how many photographs did you take of Mr. Pepe's inner groin?
A. All totaled?
Q. Yes, sir.
A. I would have to guess. I can't remember.
Q. What is that guess?
A. I would say 10 to 14.
Q. This exhibit that you presented only has four pages?
A. Yes.
Q. This exhibit doesn't contain all the photographs that you took of Mr. Pepe's groin?
A. At this juncture -- during this set of photography, no.
Q. In fact, if you take a good look at this, the pictures -- much of the portion of Mr. Pepe's inner groin is blurry; isn't it?

A. Yes.
Q. It's hard to make out what is there?
A. Yes.
Q. In fact, you don't have any formal training as a dermatologist, do you?
A. No.
Q. Let's talk about the Rohypnol a little.
When you purchased the Rohypnol, you said you took it back to the room and then ground it up; is that correct?
A. Yes.
Q. You ground it up using the spoon?
A. Yes.
Q. Was it easy to break up?
A. No.
Q. What did you have to do? Apply some force?
A. Yes.
Q. But once you applied the force, the pill broke up?
A. Yes.
Q. Then you said you put it in a glass?
A. Yes.
Q. And you poured some water into it?
A. Yes.
Q. And you stirred it up and it turned blue?
A. Yes.
Q. You didn't pour any other liquid in there, did you?

A. No, I did not.
Q. You didn't pour any coke in there, did you?
A. No.
Q. You didn't put any Pepsi in there?
A. No.
Q. You didn't pour anything that was opaque color in there?
A. No.
Q. So you don't know what the effects would be of the change of color of say a dark or black liquid, do you?
A. No, I don't.
Q. Did you perform any of the same tests on any of the other sedatives found at the defendant's residence?
A. Say that again.
MR. GUNN: Objection. No foundation that he had access to any of those.
THE COURT: Overruled.
BY MR. LULEJIAN:
Q. Did you perform the same tests on codeine?
A. No, I did not.
Q. Did you perform the same tests on morphine?
A. No, I did not.
Q. Did you perform the same tests on Temazepam?
A. No, I did not.
Q. Did you perform the same tests on Alprazolam?
A. No, I did not.

Q. The only drug you actually tested was the Rohypnol?
A. Yes.

MR. LULEJIAN: No further questions.

THE COURT: Redirect?

MR. GUNN: No further questions.

THE COURT: Thank you. Thank you, sir. You are excused.

Does the Defense have any other witnesses?

MR. GUNN: Yes, Your Honor. We call Paul Carbone.

Paul Carbone, Defendant's witness, was sworn

THE CLERK: Please take the witness stand. Please state your full name and spell your last name for the record.

THE WITNESS: Paul Carbone, C-A-R-B-O-N-E.

THE COURT: You may proceed.

MR. GUNN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. GUNN:

Q. Mr. Carbone, how are you employed?
A. By the Department of Immigration and Customs Enforcement Investigations.
Q. You are an ICE agent?
A. Yes.
Q. You are one of the agents who has at least helped with the investigation in this case; correct?
A. Yes, I am.

Q. And you have been familiar with some of the facts of the case; correct?

A. Yes, I have.

Q. You have been on several trips to Cambodia to participate in investigations or run a camera at a deposition, for example?

A. Yes.

Q. One of the medications you understood was found in Mr. Pepe's house in this case was a medication called Rohypnol; correct?

A. Yes.

Q. So as part of the investigation in this case, you and Agent Gary Phillips went out to see if you could buy Rohypnol in Cambodia; correct?

A. Yes.

Q. And you were able to buy it at a major pharmacy called Pharmacy De La Gere, weren't you?

A. Yes.

Q. The pharmacist there did not ask for a prescription when you asked for it; right?

A. No.

Q. And you didn't tell her you were law enforcement agents; right?

A. No, we did not tell her.

Q. You were just acting like a regular person?

A. Yes.

Q. And she gave you the Rohypnol or sold you the Rohypnol?
A. Yes.
Q. Charged you five dollars for it?
A. Yes.
Q. And she didn't ask any other questions, did she?
A. No.

MR. GUNN: Your Honor, if I could mark an exhibit, if I could get an exhibit tag, as 603.

THE COURT: Okay.

(Defendant's Exhibit 603 was marked)

MR. GUNN: If I could approach, Your Honor.

THE COURT: Yes.

MR. GUNN: Here is an original with an original exhibit tag and an extra copy for the Court.

Q. Would you look at Defense Exhibit 603, Mr. Carbone.
A. Okay.
Q. That's a copy of the Rohypnol box that you bought; correct?
A. Yes, it is.

MR. GUNN: No further questions, Your Honor.

THE COURT: Would you like that in evidence, sir? Mr. Gunn?

MR. GUNN: Actually, Your Honor, could I consult with counsel for a minute?

(Mr. Brown and Mr. Gunn confer off the record)

MR. GUNN: I would offer it into evidence, Your Honor.

603.

THE COURT: Admitted.

(Defendant's Exhibit 603 was received)

CROSS-EXAMINATION

BY MR. LULEJIAN:

Q. Special Agent Carbone, was this the first pharmacy you attempted to buy Rohypnol at?

A. No.

Q. How many did you try to buy it at before?

A. There was one pharmacy previously.

Q. Would they sell it to you?

A. No, they would not.

Q. Did they say why?

MR. GUNN: Objection. Hearsay, Your Honor.

THE COURT: Sustained.

MR. LULEJIAN: No further questions.

THE COURT: Anything else, Mr. Gunn?

MR. GUNN: No, Your Honor.

THE COURT: Thank you, sir, you're excused.

Does the Defense have another witness?

MR. GUNN: Yes, Your Honor. We would call Richard Williams. If I could send Mr. Brown out to get him?

THE COURT: Yes.

THE CLERK: Please stand next to the court reporter and raise your right hand to be sworn.

Richard Terrell Williams, Defendant's witness, was sworn

THE CLERK: Please state your full name and spell your last name for the record.

THE WITNESS: Richard Terrell Williams, W-I-L-L-I-A-M-S.

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MR. GUNN:

Q. Mr. Williams, do you know Michael Pepe?

A. Yes, sir, I do.

Q. How do you know him?

A. I am married to his sister, and I have known him since we were in high school together.

Q. Where do you live, by the way?

A. In Port Hueneme, California.

Q. Did Mr. Pepe used to live there before he went to Cambodia?

A. Not in Port Hueneme he didn't. He lived in Oxnard, the city next to it.

Q. And how are you employed?

A. I'm a deputy probation officer for the County of Ventura.

Q. How long have you been doing that?

A. Seventeen years. I just recently retired. I'm working part time now.

Q. Now, was there a time sometime in the past few years -- well, were you aware that Mr. Pepe was living in Cambodia for a

period of time?

A. Yes, sir.

Q. And was there a time in the last few years when you and your wife went to visit had him?

A. Yes, sir.

Q. And what was the purpose of that visit?

A. Just to visit -- to visit Mike while he was teaching in Cambodia.

MR. GUNN: Your Honor, could I have Government Exhibit 1124 placed before Mr. Williams.

THE COURT: All right. I think the Government has the exhibits.

MR. GUNN: It's a photograph. Is it in the notebooks up there, Your Honor?

THE COURT: I don't know.

MR. GUNN: Actually, Your Honor, I think it's in evidence. Perhaps I could just publish my copy.

THE COURT: Why don't you do that.

BY MR. GUNN:

Q. Mr. Williams, can you see Government Exhibit 1124 on the screen there?

A. Yes, sir, I do.

Q. Do you see a rubber banded package of American bills that at least on the outside has a $1 bill?

A. Yes, sir.

Q. Did you have any conversation with Mr. Pepe about $1 bills in Cambodia before you took your trip there?

A. Yes, sir.

Q. And would you describe that? What did he tell you? What -- describe that conversation.

A. Well, Cambodia is kind of a rural country and they don't have a lot of ATM's and -- or banks, except in the major cities, and he suggested that we bring small amounts of money, dollar bills, $5 bills, $10 bills, and -- because there is no ATM's or anything. So when we left the United States, I think I had like six or $700 --

THE COURT: Sir, the question is the conversation that you had.

THE WITNESS: I guess I covered it then. I'm sorry, Your Honor.

THE COURT: That's okay.

BY MR. GUNN:

Q. And what, if anything, did he tell you specifically about $1 bills?

MR. LULEJIAN: Objection. Self-serving hearsay.

THE COURT: Overruled.

THE WITNESS: The amount. He said to bring a couple hundred dollars.

BY MR. GUNN:

Q. In $1 bills?

A. In $1 bills.
Q. Why did he say $1 bills specifically? Was there a purpose as to $1 bills versus $5 bills or $10 bills?
A. Just for the -- the cost of living there is quite a bit cheaper so you don't need large amounts of money, and there's beggars, bell hops, cap drivers. It's a cash society more than a credit card society like we are.
Q. Did he describe the types of people you just described are people you would give $1 bills to?
A. That's correct.
Q. And when you got to Cambodia, did you find yourself doing that?
A. Yes, sir.
Q. Would you describe that.
A. It seems like almost anywhere you went outside of Mike's compound, for lack of a better word, where he lived, you seemed to be inundated by beggars everywhere.
Q. And shoe shine boys?
A. Shoe shine boys.
Q. What would you give them?
A. Well, normally you would give them a dollar.
Q. Did you see Mr. Pepe himself doing anything with $1 bills while you were there visiting him?
A. Yes.
Q. What was that?

A. Well, when we were in Phnom Penh, almost every morning we went to a restaurant and there was a Vietnamese -- excuse me -- Cambodian girl that was a shoe shine girl. She always shined his shoes and he always gave her a dollar.

Q. Did you see him use dollar bills on other occasions as well?

A. Yes, sir.

Q. What were some of those?

A. Same thing when we would go shopping at the market or at the stores, the people would come up and he would have them do something for a dollar, like wash the car or wash the windows or carry their bags or whatever.

Q. Now I would like to move to another topic.

Did Mr. Pepe ever send gifts from Cambodia to members of your family and/or his family that you know of?

A. Yes, sir.

Q. And did those gifts ever include silk ropes?

A. Yes, sir.

Q. Have you brought any of those to court with you as examples of what he'd send?

A. Yes, I did.

Q. Do you have them with you there on the witness stand?

A. Yes, I do, in my bag.

MR. GUNN: Your Honor, if I could have Mr. Williams get out two items.

Q. Two is what you brought?

THE COURT: You may do that.

BY MR. GUNN:

Q. Holding -- you have two items there; correct?

A. Correct.

Q. Would you -- let me ask you about them one at a time.

Would you first hold up the darker one and tell us what that is.

A. This is a rope that Michael sent me I think it's been about three years ago.

Q. What's it made out of?

A. It's silk.

Q. And he sent you that while he was in Cambodia?

A. Yes.

Q. That was a gift of some sort?

A. Yes.

Q. For when?

A. He just arbitrarily sends stuff.

Q. Okay.

A. Through the mail.

MR. GUNN: Your Honor --

Q. And what is the second item?

A. This is a -- it's a child's -- girl's rope also silk that he sent to my oldest granddaughter.

MR. GUNN: Your Honor, I would offer these two items

into evidence. I would propose they be marked as 400 and 401. Defense Exhibits 400 and 401.

THE COURT: I don't know that he is ever going to get them back. Is he willing to give them up?

MR. GUNN: He actually is. Perhaps when the case is over we can work something out. But he is willing to give them up, if necessary, and certainly for now.

THE COURT: Mr. Lulejian?

MR. LULEJIAN: No objection.

THE COURT: All right. Thank you. Those will come in.

(Defendant's Exhibits 400 and 401 were received)

MR. GUNN: May I consult with co-counsel for a moment, Your Honor?

THE COURT: Yes.

(Mr. Gunn and Mr. Brown confer off the record)

MR. GUNN: No further questions, Your Honor.

THE COURT: Cross-examination?

MR. LULEJIAN: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. LULEJIAN:

Q. Good morning, sir.

A. Good morning.

Q. You testified a moment ago that you are Mr. Pepe's brother-in-law?

A. That's correct.
Q. And you testified that you also went to Cambodia for a visit?
A. That's correct.
Q. Was your trip limited to Phnom Penh or did you go outside of Phnom Penh?
A. We started in Bangkok, went to Phnom Penh, we went to Siem Reap and we went to quite a few communities around the Phnom Penh area.
Q. On your trip, did the defendant accompany you each step of the way?
A. Every minute, no. Most of the major attractions, yes.
Q. And when you were in Phnom Penh, did you stay with the defendant?
A. Yes, I did.
Q. You stayed at his house?
A. That's correct.
Q. Which room did you sleep in?
A. The upstairs right by the outside balcony.
Q. That's the one near the master bedroom?
A. Correct. There is a large hallway that separates the two, but . . .
Q. Was your wife with you on that trip?
A. Yes, she was.
Q. Her name is Elaine?

A. That's correct.

Q. Was anybody else there besides you, Elaine and the defendant?

MR. GUNN: Objection, Your Honor. Ambiguous as to "there."

THE COURT: Overruled. You can answer, if you understand that, sir.

THE WITNESS: I don't -- you mean living in the house that we saw there?

BY MR. LULEJIAN:

Q. Let's start with this. Was a woman by the name of Chanry with you?

A. I don't know anybody by the name of Chanry.

Q. Anybody by the name of Nary?

A. Yes.

Q. Okay.

Who is Nary?

A. She is Michael's wife.

Q. And was she with you the whole time while you were staying in Phnom Penh?

MR. GUNN: I object. This is beyond the scope.

THE COURT: Overruled.

THE WITNESS: Except for the major -- all the major attractions she was, yes.

BY MR. LULEJIAN:

Q. And what room does she sleep in?
A. I believe she had her own room downstairs.
Q. What were the dates of your trip?
A. Pardon me?
Q. What was the date of your trip?
A. It was in July 2004. I don't have the exact dates with me.
Q. Now, when you were at the defendant's house, did you see any children there?

MR. GUNN: Objection. Beyond the scope, Your Honor.

THE COURT: It is beyond the scope, Mr. Lulejian.

MR. LULEJIAN: All right.

Q. Did you -- since returning from your trip, you said that you received gifts from the defendant; is that correct?
A. Correct.
Q. You have also received letters, haven't you?
A. I personally?

MR. GUNN: Objection. Beyond the scope, Your Honor.

THE COURT: It sounds like it's beyond the scope, Mr. Lulejian.

MR. LULEJIAN: One moment, please, Your Honor.

(Mr. Lulejian and Ms. Donahue confer off the record.)

BY MR. LULEJIAN:

Q. I am going to show you what has been marked as Government's Exhibit No. 1031. I think it's been admitted.

Do you recognize the woman in that photograph, sir?

A. No, I don't.

Q. You didn't meet her?

A. I don't recognize her.

Q. Have you been back to Cambodia since?

A. No.

MR. LULEJIAN: I have no further questions then.

THE COURT: Redirect?

MR. GUNN: No, Your Honor.

THE COURT: Thank you, sir. You're excused.

THE WITNESS: Thank you, Your Honor. Do you want me to leave these here?

THE COURT: Please.

Do you have another witness, Mr. Gunn?

MR. GUNN: Yes, Your Honor, our next witness is Mao Chann Thorn. If the interpreter could step out and get him since he speaks some English but mostly Cambodia. He will testify in Cambodian.

While he is coming in, Your Honor, may I step over and get an exhibit?

THE COURT: You may. Step forward, please --

MR. GUNN: I'm sorry, Your Honor. That's not the witness.

THE COURT: That's not your witness? Okay.

(Whereupon, interpreter went out in the hall to get the witness.)

Mao Chann Thorn, Defendant's witness, was sworn

THE CLERK: Please take the witness stand.

THE COURT: Our interpreter is still under oath.

THE CLERK: Please state your full name and spell your full name for the record, please.

THE WITNESS: My name is Mao Chann Thorn.

THE COURT: Interpreter spelling, please.

THE WITNESS: M-A-O, C-H-A double N, T-H-O-R-N. Mao Chann Thorn.

DIRECT EXAMINATION

BY MR. GUNN:

Q. Mr. Mao, what country do you live in?

THE INTERPRETER: Pardon me, Counsel?

BY MR. GUNN:

Q. What country do you live in?

A. Cambodia.

Q. Were you born in Cambodia?

A. Yes.

Q. What part of Cambodia are you living in now?

A. Present time in Phnom Penh.

Q. And how are you presently employed?

A. I am working for the company named Bodel.

Q. What is your position with them?

A. Administrations.

Q. How were you employed in 2005 and 2006?

A. 2005 to 2006, I was a teacher teaching in English class.
Q. And where did you teach?
A. Newton Thilay School.
Q. And what subject did you teach?
A. English.
Q. What ages children did you teach?
A. From three years old to 18 years old.
Q. And that was all at the same school? At Newton Thilay school?
A. Yes.
Q. So is it correct to assume you speak some English?
A. Yes. Some.
Q. Do you speak it well enough to teach it to other Cambodians?
A. Yes.
Q. Would you explain to the jury why you are using an interpreter here in court.
A. I have to say that English is not my mother tongue. If I speak in English, I might not have a full understanding or a full explanation that I want to.
Q. Now, do you know Michael Pepe?
A. Yes.
Q. Do you see him here in court today?
A. Yes.
Q. Would you point him out for us?

A. (Indicating).

Q. Is he -- you are pointing at a table with one man farther away from me and one man closer to me. Which one, just for the record?

A. In the black suit.

THE COURT: Indicating the defendant, Mr. Pepe.

MR. GUNN: Thank you, Your Honor.

Q. How did you meet Mr. Pepe, Mr. Mao?

A. At that time, he came to visit my school.

Q. And when was that?

A. Mid 2005.

MR. GUNN: Your Honor, if I could have Defense Exhibit 366 placed in front of Mr. Mao. It's already in evidence. I can publish it actually if that's easier for the clerk.

THE COURT: Thank you. That's much easier.

BY MR. GUNN:

Q. Mr. Mao, do you recognize -- do you see three girls here with little red ties on?

A. Yes. I know three of them.

Q. Before we get into that, they also have white shirts and blue skirts; correct?

A. I can't tell exactly the color of the skirt.

Q. All right.

But -- what you see there, is that the school uniform

for your school?

A. Yes. White shirt, red tie, and I can't tell you exactly, blue or black skirt in the picture.

Q. Do you recognize the girls in the photograph?

A. Yes. I know all three of them.

Q. And who are they? What are their names? Do you remember their names?

A. The tall one named L.K.xxx. The one in the middle is S.R.xxx. And the other one is S.S.xxx.

Q. How do you know them? What do you know them from? Actually let me ask you another question first.

Do you know where Mr. Pepe's house, the house he was living in in Cambodia, is?

A. Yes. He lived next door to the school.

Q. Now going back to the girls, how do you know the girls in Defense Exhibit 266?

A. Because at the time Mr. Pepe send all three of them to my school.

Q. How did you meet them the first time? Was it at the school?

A. First he went there by himself. And then he took them there.

Q. Did you teach L.K.xxx, S.R.xxx and S.S.xxx at school?

A. No. In school we have another teacher. Taught them.

Q. Did you have any contact with the three girls outside

school?

A. Yes.

Q. And what -- where was that, first of all?

A. At Michael's home.

Q. And what contact -- for what purpose did you have contact with them at Michael's home?

A. When they first start school, they are not too fluent, so they need some tutor at home.

Q. When you saw fluent, fluent in what language?

A. English.

Q. They needed some tutoring in English at home? Is that what you're saying?

A. Yes. Because that was the request from their teacher.

Q. And so what did you then do?

A. At that time, I went there to teach them myself.

Q. When you say you went there, you mean you went to the home, to Michael's home where they were staying?

A. Yes.

Q. How many times a week did you go to the home to tutor the girls?

A. Three times.

Q. For how many months did you do that?

A. I don't remember exactly, but I know it was before they arrest Michael.

Q. Was it for a period of just one or two weeks or for a

period of like two or three months?

A. I think it's about six week. But during that six weeks, it's spread out within six month period.

Q. How did the girls act when you were over at the house tutoring them?

A. They very happy. They felt like they acting like they were in school.

Q. Did they ever act unhappy or upset in any way that you recall?

A. No.

Q. Did you have ever eat at the house when you were there tutoring?

A. Yes.

Q. And did Mr. Pepe sometimes eat at the same time?

A. Yes.

Q. How did the girls act toward Mr. Pepe?

A. They ate all together. The servant brought out some food just like everybody else for him -- for Mr. Pepe.

Q. Did the girls act like they were afraid of Mr. Pepe?

A. No. They behave and act treating Mr. Pepe like a father.

Q. Did they act like he made them unhappy in any way?

A. No. I think they were just happy to be there.

Q. Did they act like they didn't want to be around Mr. Pepe?

A. No. I saw them ran over to hug Mr. Pepe.

MR. GUNN: Your Honor, could I speak with co-counsel

for one minute?

THE COURT: You may.

(Mr. Brown and Mr. Gunn confer off the record).

MR. GUNN: No further questions, Your Honor.

THE COURT: Cross-examination?

MS. DONAHUE: Thank you, Your Honor.

THE WITNESS: May I have some water, please?

THE COURT: Steve, give him some water.

CROSS-EXAMINATION

BY MS. DONAHUE:

Q. Good afternoon, Mr. Mao.

A. Good afternoon.

Q. Now, you do not work as a teacher any more; is that right?

A. That's correct.

Q. Back in 2005 and 2006, you worked as a teacher at the Newton Thilay school in Phnom Penh; is that right?

A. Yes.

Q. Did the school pay you a salary?

A. Yes.

Q. How much did the school pay you to teach?

A. I think it was $300 a month. A month.

Q. You were paid $300 every month?

A. Yes.

Q. What classes did you teach?

A. I was vice-principal.

Q. You were the vice-principal of the school?
A. I was just kind of like in charge to some part of it.
Q. So you were like the No. 2 person in charge of the whole school; is that right?
A. Yes.
Q. And did you teach the children in addition to being the No. 2 person in charge of the school?
A. Yes.
Q. But you did not teach L.K.xxx, S.S.xxx and S.R.xxx at the school; is that right?
A. I was just in charge teachers.
Q. You were in charge of their teachers; is that right?
A. Yes.
Q. And you met Mr. Pepe, the defendant in this case, in 2005; is that right?
A. Yes.
Q. And you met him at the Newton Thilay school; right?
A. Yes.
Q. He had come to the school; is that right?
A. Yes.
Q. What are the age -- what is the age range of the children at Newton Thilay school when you were there?
A. Three years old for the kindergarten to six years old. Kindergarten. And then from six to 18.
Q. And the -- Mr. Pepe, the defendant, hired you to tutor

children who lived at his house; is that right?

A. Yes.

Q. And he paid you $35 every month to tutor the children; is that right?

A. I think he paid me weekly.

Q. Mr. Pepe paid you every week; is that right?

A. Yes.

Q. How much did he pay you every week?

A. Well, you can divide it.

Q. But it worked out to be about $35 a month; is that right?

A. We just kind of add up each hours. He paid $3.

Q. Basically he paid you $3 an hour; is that right?

A. Three point five.

Q. $3.50 an hour?

A. Yes.

Q. Would he pay you in dollars or in Cambodian riel?

A. Sometimes dollars, sometimes in riel.

Q. Now, you would go over to Mr. Pepe's house, which was right around the corner from the school; is that right?

A. Yes. I walked there.

Q. And you were there for an hour, from 1:00 until 2:00 in the afternoon; is that right?

A. Yes. Between that.

Q. This was for a period of about six weeks; is that right?

A. Yes.

Q. And that six weeks was not every week consecutively; right?
A. No.
Q. Some weeks you might not -- you wouldn't go to Mr. Pepe's house at all; is that right?
A. That is correct. Sometimes I postpone it.
Q. And this was -- the total time in which you did the tutoring was between June and December of 2005; isn't that right?
A. Yes.
Q. When you were at Mr. Pepe's house, did you ever go upstairs?
A. Yes.
Q. What room did you go into?
A. His work -- his office.
Q. You went into his office; is that right?
A. Yes.
Q. Did you ever go into any of the bedrooms?
A. No.
Q. When you were at Mr. Pepe's house, did Mr. Pepe ever tell you that the girls would give him a massage at 12:00 and then you would come at 1:00?
A. Can you please repeat the question?
Q. Did Mr. Pepe ever tell you that he had L.K.xxx, S.S.xxx and S.R.xxx give him a massage right before you came over?
A. No.

MS. DONAHUE: I have no further questions, sir.

THE COURT: Redirect?

MR. GUNN: No redirect, Your Honor.

THE COURT: Thank you, sir. You're excused.

Any other witnesses?

MR. GUNN: Our next witness would be to play the deposition of Ly Kim Eng.

THE COURT: Why don't we take a break.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We will take a 15 minute break.

(Recess taken)

(Jury Out)

THE COURT: Just to clarify, on the Exhibit 126 that I indicated I would admit, I don't think there is any due process concerns, Mr. Gunn. You have brought witnesses over here at government expense that I ordered. You could have brought a witness to authenticate this document. You have taken depositions out of the country that I authorized.

So it's being admitted not substantively, but only for the fact that Mr. -- it was in Mr. Pepe's home and for his state of mind.

MS. DONAHUE: Your Honor, I raised one potential scheduling issue with the Defense. It probably won't be an issue but the Defense is calling Dr. Michael Maloney to testify,

I believe, to his opinion that the interviews conducted of the victims were impermissibly suggestive.

Dr. Maloney, according to the Defense, is not available Thursday so will be testifying here Friday morning.

I have given the Defense notice that we have an expert to testify in rebuttal to rebut on exactly that topic.

She is a professor who is required to attend a graduation ceremony in San Diego on Friday morning. The Defense is not sure that they will rest or that we will be to the rebuttal case or what time Maloney will end, so it's a little bit difficult to predict. But in the event that we get to the Government's rebuttal case on Friday morning, would it be possible to put it over until Tuesday? And I realize --

THE COURT: That becomes very difficult. First of all, I don't know why the witness can't be here tomorrow.

MS. DONAHUE: That's their witness.

THE COURT: I understand. That's the one I'm talking about. We have jurors driving, as you know, great distances, and it's just unfair to have them driving for an hour or 15 minutes or whatever this testimony is going to take. So I'll --

MS. DONAHUE: If -- I will press her to be here if it looks like it's actually going to work itself out that she would testify on Friday. At this point we may be playing depositions.

THE COURT: What are we doing tomorrow?

MR. GUNN: Tomorrow we'll finish this deposition. If

we're lucky, we will play the Koeung Lang deposition. We will finish up our other witnesses who are relatively short. That would be tomorrow. Dr. Maloney was not available tomorrow. That's why I raised that with the Court yesterday morning.

THE COURT: You raised it with me. I didn't say it was okay. We can't just leave these gaps.

MR. GUNN: There is -- if I call our dermatologist, he would be tomorrow. I am going to make that decision after talking to him late this afternoon or this evening.

THE COURT: How much time is your case going to take tomorrow?

MR. GUNN: Well, this deposition is, I think total, going to be over three hours. The Koeung Lang deposition I believe will be -- my recollection in terms of the time it took, I mean I -- obviously not building in the redactions but we were there from sometime between 8:00 or 9:00 until 2:00. So my guess is both these depositions are in the area of three hours. That's my recollection.

So I think there is actually a good -- if we can get the Koeung Lang deposition, I think there is a good chance we will fill up tomorrow without Dr. Maloney and I don't know --

THE COURT: You need to get your witness here, Ms. Donahue. Try subpoena. Try subpoena.

MS. DONAHUE: It usually works.

THE COURT: Send a marshal.

Are we ready?

MR. GUNN: I believe so, Your Honor. Maybe I can check with Mr. Lulejian on whether he . . .

THE COURT: All set?

MR. GUNN: Maybe we should make sure Mr. Brown acclimates to the computer.

(Jury In)

THE COURT: All right. Everyone is back.

Mr. Brown, are you in charge now?

MR. BROWN: Just the mouse, Your Honor.

THE COURT: Whatever you can handle, that's okay. Go ahead.

MR. BROWN: Thank you.

(Whereupon, the video was played for the jury).

MR. BROWN: I don't think I am doing a very good job with the mouse, Your Honor.

THE COURT: We may have to call a replacement.

(Whereupon, the video was played for the jury).

MR. GUNN: Your Honor, may I publish?

(Photograph published for the jury).

THE COURT: Thank you.

(Whereupon, the video was played for the jury).

MR. GUNN: Your Honor, for the record I have inserted Defense Exhibit 119 into the record and this is Pict 0016 on the screen which we will flip over to.

THE COURT: Okay.

MR. GUNN: Actually, Your Honor, I need to -- there we go.

(Photograph published for the jury).

THE COURT: Okay. Thank you.

(Whereupon, the video was played for the jury).

MR. GUNN: I will publish that, Your Honor.

(Photograph published for the jury).

THE COURT: Thank you.

(Whereupon, the video was played for the jury).

MR. GUNN: Your Honor, may I publish?

THE COURT: You may.

(Photograph published for the jury).

(Whereupon, the video was played for the jury).

MR. GUNN: Your Honor, may I publish that?

THE COURT: Yes.

(Photograph published for the jury).

(Whereupon, the video was played for the jury).

MR. GUNN: May I publish that, Your Honor?

THE COURT: You may.

(Photograph published for the jury).

(Whereupon, the video was played for the jury).

MR. GUNN: May I publish that, Your Honor?

THE COURT: You may.

(Photograph published for the jury).

(Whereupon, the video was played for the jury).

MR. GUNN: Your Honor, may I publish that series?

THE COURT: You may.

MR. GUNN: For the record, Your Honor, this is 64, 65, 66, 67, 68, 69, 70, 71, 72.

(Photographs published for the jury).

(Whereupon, the video was played for the jury).

MR. LULEJIAN: Your Honor, may I publish 1001, please?

THE COURT: You may.

(Photograph published for the jury).

Whereupon, the video was played for the jury).

MR. LULEJIAN: May I publish 1020, Your Honor?

THE COURT: You may.

(Photograph published for the jury).

(Whereupon, the video was played for the jury).

MR. LULEJIAN: May the Government publish 1002, Your Honor?

THE COURT: You may.

(Photograph published for the jury).

(Whereupon, the video was played for the jury).

MR. LULEJIAN: Your Honor, this may be a good place for us to stop.

THE COURT: Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. Your ordered to return tomorrow at

8:00 a.m. and you are ordered to have a good evening.

(Jury Out)

THE COURT: All right. Ms. Donahue will provide a complete copy of the verdict form and counsel will try to take a look at the pages that I've tabbed. I made a couple of other minor changes that I didn't note. They're all grammatical. So I changed a few "which's" to "that's" and added "apostrophe S" after "witness's" because that's the way I think it should be. But obviously sooner or later we are going to need to talk about these and it sounds more like sooner.

Ms. Donahue, you are going to find out about getting your other witness here on Friday?

MS. DONAHUE: Yes. I am going to do that this afternoon and will tell her essentially that she needs to be here Friday morning. And I anticipate perhaps Special Agent Phillips for a couple very short rebuttal points, Dr. Dallenberg, and that's it for rebuttal.

THE COURT: Who is Dr. Dr. Dallenberg?

MS. DONAHUE: That's the expert to rebut what I anticipate Dr. Maloney will say.

THE COURT: I assume that will be relatively short. We will probably be doing instructions and closing on Friday as well.

MS. DONAHUE: Probably. I'm not sure -- I don't have a good sense for how long the other deposition redacted is, but

probably.

THE COURT: Okay. All right.

MR. GUNN: My guess is they are both probably about three to four hours total. Each. Each one individually.

THE COURT: We are finishing up this one and there is one more.

MR. GUNN: And this one I'm pretty sure has one and a half hours to two hours left at least. And the other one is probably comparable total length to this unless the redactions are real different. I don't recall that they are but I haven't compared them.

THE COURT: All right. We will see you tomorrow at 7:45.

(Proceedings adjourned at 2:02 p.m.)

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 18, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

______________________________ __________________

Pamela A. Seijas, CSR No. 3593 Date

Official Reporter

**Certificate of Service**

I hereby certify that on May 28, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *James H. Locklin*

By: JAMES H. LOCKLIN
Deputy Federal Public Defender

No. 14-50095

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

MICHAEL JOSEPH PEPE,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
The Honorable Dale S. Fischer, Presiding
No. CR-07-00168-DSF

# Appellant's Excerpts of Record
**[Volume 8 of 12]**

HILARY L. POTASHNER
Acting Federal Public Defender
JAMES H. LOCKLIN
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012
213-894-2929

*Counsel for Defendant-Appellant*

# Table of Contents

Volume 1

Order Denying Defendant's Motion to Dismiss Indictment....................................1
[Filed December 3, 2007; Docket No. 57]

Order Denying Defendant's Motions to Suppress Evidence....................................9
[Filed December 5, 2007; Docket No. 60]

Order Denying Defendant's Motion to Suppress Evidence ...................................20
[Filed February 7, 2008; Docket No. 129]

Transcript – Sentencing (Excerpts)..........................................................26
[Dated February 28, 2014; Filed April 17, 2014; Docket Nos. 491, 512]

Volume 2

Defendant's Motion to Suppress Evidence* .....................................................42
[Filed June 26, 2007; Docket No. 21]

Defendant's Motion to Suppress Evidence (Excerpts)........................................120
[Filed August 1, 2007; Docket No. 33]

Government's Consolidated Opposition to Motions to Suppress Evidence* ........130
[Filed August 22, 2007; Docket No. 39]

Defendant's Reply re Motions to Suppress Evidence ..........................................208
[Filed September 4, 2007; Docket No. 40]

Defendant's Motion to Dismiss Indictment........................................................220
[Filed October 4, 2007; Docket No. 43]

Transcript – Motion Hearing .........................................................................244
[Dated October 29, 2007; Filed February 26, 2008; Docket Nos. 50, 133]

* Documents marked with an asterisk have been redacted pursuant to Federal Rule of Appellate Procedure 25(a)(5) and Federal Rule of Criminal Procedure 49.1(a).

Government's Declaration re Motions to Suppress Evidence ................................295
[Filed November 27, 2007; Docket No. 53]

Transcript – Motion Hearing (Excerpts)* ..........................................................299
[Dated December 3, 2007; Filed February 26, 2008; Docket Nos. 58, 134]

Volume 3

Defendant's Supplemental Memorandum re Motion to Suppress Evidence.........340
[Filed December 20, 2007; Docket No. 71]

Government's Supplemental Memorandum re Motion to Suppress Evidence .....350
[Filed December 20, 2007; Docket No. 72]

First Superseding Indictment ..............................................................................372
[Filed December 20, 2007; Docket No. 83]

Government's Supplemental Declaration re Motion to Suppress Evidence (Excerpts) ....................................................................................................374
[Filed February 5, 2008; Docket No. 127]

Transcript – Motion Hearing (Excerpts)* ..........................................................380
[Dated February 6, 2008; Filed February 26, 2008; Docket Nos. 136]

Transcript – Trial – Day 2 (Excerpts)..................................................................460
[Dated May 9, 2008; Filed May 18, 2010; Docket Nos. 259, 410]

Volume 4

Transcript – Trial – Day 3 (am) (Excerpts) ........................................................635
[Dated May 13, 2008; Filed May 18, 2010; Docket Nos. 260, 411]

Transcript – Trial – Day 3 (pm)...........................................................................766
[Dated May 13, 2008; Filed June 17, 2014; Docket Nos. 260, 532]

Volume 5

Transcript – Trial – Day 4 (Excerpts)..................................................................805
[Dated May 14, 2008; Filed May 18, 2010; Docket Nos. 261, 412]

Transcript – Trial – Day 5 (Excerpts) .......... 942
[Dated May 15, 2008; Filed May 18, 2010; Docket Nos. 262, 413]

Volume 6

Transcript – Trial – Day 6 (Excerpts) .......... 1022
[Dated May 16, 2008; Filed May 18, 2010; Docket Nos. 263, 414]

Volume 7

Transcript – Trial – Day 7 (Excerpts)* .......... 1192
[Dated May 20, 2008; Filed May 18, 2010; Docket Nos. 264, 415]

Transcript – Trial – Day 8 (Excerpts) .......... 1343
[Dated May 21, 2008; Filed May 18, 2010; Docket Nos. 269, 416]

Volume 8

Transcript – Trial – Day 9 (Excerpts) .......... 1423
[Dated May 22, 2008; Filed May 18, 2010; Docket Nos. 270, 417]

Volume 9

Transcript – Trial – Day 10 (Excerpts) .......... 1538
[Dated May 23, 2008; Filed May 18, 2010; Docket Nos. 293, 418]

Transcript – Trial – Day 11 (Excerpts) .......... 1739
[Dated May 27, 2008; Filed June 2, 2010; Docket Nos. 294, 435]

Volume 10

Transcript – Trial – Day 12 (Excerpts) .......... 1805
[Dated May 28, 2008; Filed May 18, 2010; Docket Nos. 295, 419]

Transcript – Trial – Day 13 (Excerpts) .......... 1930
[Dated May 29, 2008; Filed May 18, 2010; Docket Nos. 296, 420]

Stipulation to Correct/Modify Record re Jury Instructions (Excerpts)[†] .............1941
[Filed February 27, 2015; Docket No. 543]

Order Correcting/Modifying Record re Jury Instructions ..................................1961
[Filed March 2, 2015; Docket No. 545]

Order Correcting/Modifying Record re Video Testimony .................................1963
[Filed March 2, 2015; Docket No. 546]

Government's Sentencing Memorandum (Excerpts) ........................................1965
[Filed September 17, 2008; Docket No. 318]

Transcript – Victim Statements ..........................................................................1977
[Dated September 25, 2008; Filed June 18, 2014; Docket Nos. 333, 533]

Defendant's Supplemental Filing re Restitution...............................................1998
[Filed March 25, 2009; Docket No. 348]

Judgment ............................................................................................................2006
[Filed February 28, 2014; Docket No. 492]

Notice of Appeal .................................................................................................2012
[Filed March 3, 2014; Docket No. 493]

Docket .................................................................................................................2013

Volume 11 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 1)...................2053
[Filed March 3, 2015; Docket No. 547]

Volume 12 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 2)...................2309
[Filed March 3, 2015; Docket No. 547]

[†] Although this document and the two orders that follow were not filed until after the judgment and notice of appeal were filed, they are placed here in the excerpts because they relate to the trial proceedings.

Exhibit No. 101 .......... 2399

Exhibit No. 102 .......... 2401

Exhibit No. 103 .......... 2403

Exhibit No. 104 .......... 2405

Exhibit No. 106 .......... 2408

Exhibit No. 107 .......... 2410

Exhibit No. 108 .......... 2412

Exhibit No. 109 .......... 2414

Exhibit No. 110 .......... 2416

Exhibit No. 111 .......... 2418

Exhibit No. 114 .......... 2420

Exhibit No. 123 .......... 2423

Exhibit No. 2007 .......... 2428

Exhibit No. 2009 .......... 2454

Exhibit No. 2010 .......... 2456

Exhibit No. 2011 .......... 2458

Exhibit No. 2093 .......... 2460

Exhibit No. 2096 .......... 2462

Exhibit No. 2200A .......... 2464

Exhibit No. 2201A .......... 2467

Exhibit No. 2202A ....................2477

Verdict ....................2480
[Filed May 29, 2008; Docket No. 299]

Presentence Report ....................2488
[Dated July 30, 2008; Filed March 25, 2009; Docket No. 346]

Probation Office Letter to District Court ....................2517
[Dated September 3, 2008]

Government's Submission of Victim Impact and Restitution Information ....................2523
[Filed September 19, 2008; Docket No. 329]

Supplement to Presentence Report ....................2559
[Filed March 25, 2009; Docket No. 347]

Government's Response to Defendant's Filing re Restitution ....................2562
[Filed April 21, 2009; Docket No. 355]

Government's Supplemental Submission re Restitution ....................2583
[Filed February 28, 2014; Docket No. 490]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

United States of America, )
Plaintiff, )
)
vs. ) Case No.
) CR 07-168(A)-DSF
Michael Joseph Pepe, )
Defendant. )
_________________________________ )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

Day 9

Los Angeles, California

Thursday, May 22, 2008

Pamela A. Seijas, CSR, FCRR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California 90012
(213) 687-0446

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
BY: PATRICIA DONAHUE
ASSISTANT UNITED STATES ATTORNEY
JOHN LULEJIAN
ASSISTANT UNITED STATES ATTORNEY
312 N. SPRING STREET
LOS ANGELES, CA 90012

FOR DEFENDANT: OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY: CARL GUNN
DEPUTY FEDERAL PUBLIC DEFENDER
CHARLES BROWN
DEPUTY FEDERAL PUBLIC DEFENDER
321 EAST SECOND STREET
LOS ANGELES, CA 90012

CAMBODIAN INTERPRETER: CHANDRA HAC

ALSO PRESENT: ATTACHE GARY PHILLIPS
ICE SPECIAL AGENT EDDY WANG

day today.

MR. GUNN: All right. So the Government might want to let their expert know that that is a possibility for their expert.

THE COURT: Let's see where we are.

MS. DONAHUE: Thank you, Your Honor.

MR. LULEJIAN: Your Honor, I apologize. I have no excuse. I was well aware of the Court's order. Other than to say I am sorry. I apologize.

THE COURT: I would have started without you. I wasn't going to wait.

MR. LULEJIAN: I have no doubt about that, Your Honor.

MS. DONAHUE: We know.

(Jury In)

THE COURT: Good morning. Everyone is present. We are going to continue with the deposition testimony.

Agent?

(Whereupon, the video was played for the jury)

MR. GUNN: Your Honor, this has already been played.

(Video stopped)

MR. GUNN: I would be happy to have the Defense portion played again, Your Honor.

THE COURT: No, thank you.

MS. DONAHUE: Not a chance.

(Whereupon, the video was played for the jury)

MS. DONAHUE: Your Honor, I think the jury has seen both the exhibits a million times. I don't think we need to pause.

THE COURT: Fine.

(Whereupon, the video was played for the jury)

MS. DONAHUE: Your Honor, may I publish that briefly?

THE COURT: You may.

(Photograph published for the jury)

MS. DONAHUE: Thank you.

(Whereupon, the video was played for the jury)

MS. DONAHUE: May I publish this one briefly, Your Honor?

THE COURT: You may.

(Photograph published for the jury.)

(Whereupon, the video was played for the jury)

MS. DONAHUE: May I publish that, Your Honor?

THE COURT: You may.

MS. DONAHUE: It's already in evidence.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

MS. DONAHUE: May I publish that, Your Honor?

THE COURT: You may.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

MS. DONAHUE: Your Honor, may I publish 1013 as well?

THE COURT: You may.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

THE COURT: Is this a good place to break?

MS. DONAHUE: Yes, Your Honor.

THE COURT: Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until its finally submitted to you. We will take a 15 minute break.

(Recess taken)

(Jury In)

THE COURT: All right. Everyone is back.

You can continue.

(Whereupon, the video was played for the jury)

MR. GUNN: Your Honor, may I approach the clerk about a witness related matter?

(Whereupon, Mr. Gunn and the clerk confer off the record)

MR. GUNN: Thank you.

(Whereupon, the video was played for the jury)

MS. DONAHUE: Your Honor, this is an exhibit. Actually it's 2007 which is in evidence. Can you publish just that portion?

MR. GUNN: Actually, Your Honor, I think this is an exhibit that should not be published, based on what I was raising earlier.

THE COURT: Is it in evidence?

MS. DONAHUE: Yes.

THE COURT: Was it shown to the witness?

MS. DONAHUE: Yes.

MR. GUNN: Yes, but the witness didn't --

THE COURT: You can publish it.

MR. GUNN: Okay.

(Photograph published for the jury)

MR. GUNN: My understanding is the witness ends up saying she wasn't aware of it.

THE COURT: Yes. I think that is relevant information.

All right. Thank you, Ms. Donahue.

(Whereupon, the video was played for the jury)

MS. DONAHUE: This is previously admitted.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

MS. DONAHUE: May I publish? This is also in evidence, Your Honor.

THE COURT: You may.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

MS. DONAHUE: May I publish, Your Honor?

THE COURT: Yes.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

MS. DONAHUE: May I publish, Your Honor?

THE COURT: Yes.

(Photograph published for the jury)

(Whereupon, the video was played for the jury)

THE COURT: I don't know if that's it but it's time to take a break.

MR. GUNN: Actually, Your Honor, there is five minutes more.

THE COURT: Let's go ahead and finish the five minutes.

(Whereupon, the video was played for the jury)

THE COURT: Is that it?

All right. Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We will take a 15 minute break.

(Recess taken)

THE COURT: Next time I shall insist on transcripts and make and sustain my own 403 objections. This is really, really long. It's probably too late to do anything about it with the last one, but --

MS. DONAHUE: We were thinking -- Mr. Gunn said he is going to put witnesses on for the rest of today.

THE COURT: Okay.

MS. DONAHUE: So before the -- before playing the Koeung Lang depo, we may go through with the eye towards any

portions we can stip. They are in chapters.

THE COURT: I don't why it's so choppy.

MS. DONAHUE: The looping sometimes worked and sometimes didn't and so that's why we just put it in segments. So we -- sometimes it loops beautifully, and for reasons that no one has been able to explain to me, sometimes it doesn't loop beautifully and so we decided to err on the side of --

MR. GUNN: The next one does loop directly from segment to segment.

THE COURT: That will help.

MS. DONAHUE: I think so. Yes. Apparently we're trying.

MR. GUNN: Your Honor, I have two evidentiary issues to raise with the Court that will be quick.

THE COURT: Okay.

MR. GUNN: One is the Government has agreed to a translation of Defense Exhibit 122, which is the prior inconsistent statement we impeached Ms. Basang with in her deposition. We would want to offer that into evidence as an exhibit. The statement pursuant to what is I believe sort of standard Cambodian practice in its courts is adopted by the witness by a fingerprint, if not a signature, so it's actually her statement even though it's written out by someone else. It's a statement that she adopted, so I think it's her statement and it's, therefore, admissible as a prior inconsistent

statement in addition to the questions we asked of her. So we would want to put that in evidence as Defense -- we want to offer Defense Exhibit 122, which is the Cambodian version, and the translation which we would call Defense 123.

THE COURT: Does the Government have an objection?

MS. DONAHUE: We did but I think Mr. Gunn is right, she did fingerprint it, so she -- I believe that means -- although he didn't specifically ask her, I believe that means under their system it was read to her and she adopted it. So I think that's right.

MR. GUNN: I will offer that at the appropriate point, probably today. Maybe tomorrow morning.

THE COURT: All right.

MR. GUNN: Second, Your Honor, we now have Ly Kim Eng's deposition and there was at least one prior inconsistent statement in her statement to Sun Ro. There is also some prior consistent statements in parts of it. So I would want to put that into evidence. It's Defense Exhibit 117.

THE COURT: And prior consistent statements have a whole different admissibility requirement from inconsistent statements.

MR. GUNN: Right, but the Government cross-examined her about this money she got and the people that came to visit her --

THE COURT: The jury is waiting. We are not going to

discuss that now. We will discuss it later.

MR. GUNN: Except that I was going to do that early in my -- what I was going to ask the Court, whether the proper way to proceed would be to read it to the jury.

THE COURT: You don't need to do it now with the jury waiting.

MS. DONAHUE: The first witness -- he wouldn't tell us. The only purpose we know of for the first agent he is calling is about his interview with Ly Kim Eng. So I'm assuming the first thing out the gate is he is going to elicit what she said to him.

MR. GUNN: That will be the second agent. I am going to call Gary Phillips first. That is not related to this. That is a prior consistent statement.

THE COURT: I am getting annoyed. The jury is waiting. Stop babbling. What do you need to tell me?

MR. GUNN: Your Honor, I am going to call Agent King and elicit from him that Ly Kim Eng told him in an interview of June 26th, 2007, that it was her idea to bring L.K.xxx with her when she got the job with Michael.

THE COURT: Okay. Fine.

MS. DONAHUE: That's the first we have been told.

THE COURT: Well, fine. Okay, Steve, please get the jurors.

(Jury In)

THE COURT: Everyone is present.

Does the Defense have another witness?

MR. GUNN: Yes, Your Honor. We would call Gary Phillips to the witness stand.

THE COURT: Sir, you are still under oath.

THE WITNESS: Yes, ma'am.

DIRECT EXAMINATION

BY MR. GUNN:

Q. Agent Phillips, you heard testimony just now, did you, about Ly Kim Eng being cross-examined about receiving amounts of money in the amount of 100,000 riels? Did you hear that?

A. Yes, sir, I did.

Q. You and other agents have given money for food to at least one witness in this case, haven't you?

A. I did.

Q. That was I.T.'s grandmother; correct?

A. That is true.

Q. And you gave her three cases of noodles.

A. I did that.

Q. And that was at a cost of about $14?

A. Yes, I did.

Q. And that's about 60,000 riels?

A. $25 is 100,000 riels -- yeah, about.

Q. You didn't intend to bribe her or influence her testimony did you?

A. Absolutely not.

Q. You just felt bad for her because it seemed like she didn't have enough to eat; right?

A. She was very emaciated.

Q. Now, going to Ly Kim Eng again -- actually both Ly Kim Eng and Kumlang met with you and answered your questions in this case; right?

A. Yes, they did.

Q. Ly Kim Eng, the mother of L.K.xxx, met with you or prosecutors six times, didn't she?

A. Don't know how many times it was. It was a few times.

Q. She met with you on June 5th, 2006; right?

A. June -- no.

Q. July 5th, 2006.

A. July 5th, 2006, that's correct.

Q. Then she met with you on June 27th, 2007?

A. I would have to look up my notes and everything, but if it's in the report, yes.

Q. She had a meeting with you and Agent King sometime in the summer of '07; right?

A. '07, I'm sorry, I thought you said '06. Yes, sir, that's true.

Q. And she met with you again on or about November 15th, 2007?

A. That's true as well.

Q. And then she met with you again on February 27th, 2008?

A. Was that for the deposition?
Q. A little before the deposition?
A. Yes, sir. That's true.
Q. And then she met with you again on March 13th, 2008; right?
A. I would have to look at the note.
Q. But she did meet with you again a couple weeks after the deposition, you and Mr. Lulejian; right?
A. Yes, that's true.
Q. In fact, it was you and another American agent who drove her to and from the deposition that was taken; right?
A. Yes. She didn't have a way there.
Q. And Kumlang, the mother of S.R.xxx and S.S.xxx, also met with you several times; right?
A. Probably about the same amount of times, yes, sir.
Q. And in the last meeting you had with her, she said she would agree to meet with prosecutors if and when they came to Cambodia; right?
A. Yes, she did say that.
Q. One of the girls you interviewed in this case who claims she was raped by Mr. Pepe was a girl named I.T.; right?
A. That's true.
Q. And she claims she was raped twice; correct?
A. That's true as well.
Q. She told you the first time was on May 23rd, 2006; right?
A. No. That was my words.

Q. Okay.

That was the understanding you got out of the interview; correct?

A. Based on my conversation with her and the World Hope International folks, yes, it is.

Q. And the second time was May 26th, 2006; correct?

A. Again, that date was extrapolated -- that date was extrapolated by me, not I.T..

Q. She also in the interview, I.T. said the hair of the man was blond, didn't she?

A. I think -- no, I think she said it was light, but I would have to look at the transcript.

Q. Would it refresh your memory if you saw the transcript?

A. Yes, sir, it would.

MR. GUNN: Your Honor, could I step over and get an exhibit?

THE COURT: Sure.

MR. GUNN: If we could mark this, Your Honor, as I think next in order in the 100 series would be 135.

THE COURT: For identification.

(Defendant's Exhibit 135 was marked)

BY MR. GUNN:

Q. Do you have Defense Exhibit 135 in front of you?

A. Yes, sir. If you could tell me the page, I would be happy to look.

Q. Page 19.
A. Yes, you are correct, sir. That was my mistake. She said his hair is blond.
MR. GUNN: No further questions, Your Honor.
THE COURT: Ms. Donahue?
MS. DONAHUE: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. DONAHUE:
Q. Special Agent Phillips, approximately when did you give money to I.T.'s grandmother?
A. It was after the initial interview, about 30 minutes afterwards I gave her three cases of noodles.
Q. When you say the initial interview, what year are you talking about?
A. Several months ago.
Q. Recently?
A. Yes. It was recently.
Q. Why did you give her several cases of noodles?
A. When I went out to interview -- originally when you saw the picture of her house, that was only -- that was a major structure of many people's houses. She lived in the end structure which was literally about eight-by-ten feet in a wooden shack. She was sitting there and one of the neighbors had brought her some noodles because she appeared to be very hungry. She told us that she had no money and she had no food.

So after the interview, we felt bad for her. She only weighed about 70 or 80 pounds. So we gave her noodles.

Q. Turning your attention to Ly Kim Eng, she is the mother of L.K.xxx; is that correct?

A. That's true.

Q. And you have spoken with her on several occasions over the course of this investigation; is that correct?

A. Yes.

Q. What has been the purpose of your conversations with Ly Kim Eng?

MR. GUNN: Irrelevant, Your Honor.

THE COURT: Sustained.

BY MS. DONAHUE:

Q. You have also spoken with, you said, Kumlang; is that right?

A. Yes.

Q. And Kumlang is the mother of S.S.xxx and S.R.xxx; correct?

A. That's correct.

Q. Now, you were asked about your interview in June of 2006 with I.T., specifically June 16 of 2006, regarding the May 23rd date.

You said, "That was my words." What did you mean by that?

A. Interviewing children, as you see, is difficult. And one of the things that we have to do is we try to establish --

MR. GUNN: Objection, Your Honor. Non-responsive.

THE COURT: Overruled.

THE WITNESS: -- a timeline of when things occurred. One of the things that we're taught is to try and find a common date or something that they remember so we can start the process of interviewing.

So basically what I determined through the translators is that she rescued on or about May 28th. And through the interview process, she told -- she gave us a time span of she was last raped two or three days prior to the rescue, which would have been about May 23rd or 24th. And then prior to that, because she was raped two times, she said it was another two or three days span, so I extrapolated the dates. Those -- and that's my what my words were. It was kind of deductive reasoning to get a timeline or start date when this incident occurred.

BY MS. DONAHUE:

Q. Do you know how much education I.T. had had when you were interviewing her in June of 2006?

A. Yes.

MR. GUNN: Objection. No foundation. Personal knowledge, Your Honor.

THE COURT: If you know, you can -- well, I guess he has already answered the question.

Do you want to ask the next question?

BY MS. DONAHUE:

Q. How much education had I.T. had at that point in June of 2006?

A. At the time she was 11 years she had first grade --

MR. GUNN: Objection. No foundation of personal knowledge.

THE COURT: Sit down, please. I haven't heard a foundation.

BY MS. DONAHUE:

Q. Had you asked I.T. whether or not she had been to school?

A. Yes.

MR. GUNN: Objection. Hearsay.

THE COURT: Overruled.

BY MS. DONAHUE:

Q. And based on what she had told you, did you know approximately how much education I.T. had as of June of 2006?

A. Yes, I did.

Q. And how much was that?

MR. GUNN: Objection.

THE WITNESS: One year.

MR. GUNN: Objection. Hearsay, Your Honor.

THE COURT: Overruled.

THE WITNESS: She was in first grade.

BY MS. DONAHUE:

Q. When you interviewed her in June of 2006, did I.T. have a

diary or other written document displaying the precise dates on which the defendant had raped her?

A. She did not.

MS. DONAHUE: I have no further questions.

THE COURT: Redirect or cross something?

MR. GUNN: Nothing further.

THE COURT: Thank you, sir. You can step down.

Does the Defense have another witness?

MR. GUNN: We call Agent Robert King, Your Honor and I also at this point going to offer that exhibit.

THE COURT: Talk to Ms. Donahue.

Robert Lee King, Jr., Defendant's witness, was sworn

THE CLERK: Thank you. Please take the witness stand.

MR. GUNN: We may have resolved it, Your Honor, but I will finish with this witness first because it's unrelated to him.

THE CLERK: Please state your full name and spell your last name for the record.

THE WITNESS: Robert Lee King, Jr., last name K-I-N-G.

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MR. GUNN:

Q. Mr. King, how are you employed?

A. I am a special agent with the U.S. Customs and Border Protection.

Q. Were you in that position back on June 27th, 2007?

A. No, sir, I was not.

Q. What was your position back on June 27th, 2007?

A. I was in Immigration and Custom Enforcement representative in Bangkok, Thailand.

Q. And did you participate on that date in the interview of a witness named Ly Kim Eng or Sok Eng?

A. Yes, sir.

Q. And she was the mother of a girl who had lived in Mr. Pepe's house named L.K.xxx; correct?

A. That's correct.

Q. And she and L.K.xxx had lived at the house for three months or so?

A. From what I recall in my report, six months.

Q. Ms. Eng told you that this woman named Basang offered her a job at Mr. Pepe's house as a maid; correct?

A. Yes, sir.

Q. And she said that she told Basang that if she took the job, she would have to take her daughter there to live as well, didn't she?

A. Yes, she did.

Q. She didn't say it was Mr. Pepe's idea or Basang's idea to have the daughter come with her, did she?

A. No, sir. I don't recall that.

MR. GUNN: No further questions.

THE COURT: Ms. Donahue or Mr. Lulejian?

MR. LULEJIAN: No questions.

THE COURT: Thank you, sir. You're excused.

Does the Defense have another witness?

MR. GUNN: Yes, Your Honor. It would be this document, if we've worked it out, as I believe.

With the Court's permission, if the Government does not oppose this, I would offer Defense Exhibit 117 into evidence. It's the Cambodian version and the English language translation of a statement made by Ly Kim Eng to Police Chief Sun Ro of the Cambodian National Police.

THE COURT: That will be admitted.

(Defendant's Exhibit 117 was received)

MR. GUNN: If I could read it to the jury, Your Honor. And my preference would be -- well, I will just read it to the jury in whole. It's two paragraphs, Your Honor. I will not read -- the statement -- the statement is dated June 19th, 2006. And in the question/answer section it reads as follows:

"I would like to inform the law enforcement that I met Sang, female, Vietnamese, about 30 years old through a Khmer lady about 36 years old who lives around Roast Chicken Market after the boat race festival in 2005. The lady brought me to meet Sang at her house located at Kandal Market. Sang told me to go work at Michael's house and I would receive $30 a month. At that time Sang brought Michael to come and see me and my

daughter L.K.xxx" -- we should perhaps redact this document, Your Honor -- "14 years old, and said when living in this house, we should speak softly and that for my daughter L.K.xxx, he would help find a school. After reaching an agreement, Sang took me and my daughter and another young boy to live in Michael's house. Michael hired an English teacher to come to the house teaching English to my daughter and me. After living there for about four to five months, I left the house because Michael kept giving me a hard time, so I left the house. I didn't take my daughter with me because I left her there for her to get an education and to live with Michael. While my daughter was living in Michael's house, I came to visit her often, and Michael gave me some money for me to go back home, about 2 to $3 each time. As far as the money that Sang said she gave to me in amount of $300, I didn't know anything about it happened."

THE COURT: All right.

MR. GUNN: We have offered that into evidence.

THE COURT: It's admitted.

(Defendant's Exhibit 117 was received.)

THE COURT: Any other witnesses?

MR. GUNN: Yes, Your Honor. Our next witness would be Eddy Wang. I have to get two exhibits out.

THE COURT: Okay.

Eddy Wang, Defendant's witness, was sworn

THE CLERK: Please state your full name and spell your

last name for the record.

THE WITNESS: Eddy. E-D-D-Y. Last name is Wang, W-A-N-G.

THE COURT: You may proceed.

MR. GUNN: Thank you, Your Honor. If I could approach with an exhibit.

THE COURT: Yes.

MR. GUNN: Does the Court -- the Court should already have 126. May I confirm that, though?

THE CLERK: One moment, Your Honor.

MR. GUNN: It was an exhibit that was discussed outside the presence of the jury and I believe admitted before the Court.

THE COURT: I have it, yes.

MR. GUNN: Is there a copy for the clerk?

THE COURT: I don't think you gave the clerk one. You just showed it to me.

MR. GUNN: If I could approach with 125, Your Honor.

THE COURT: Yes.

MR. GUNN: Does the clerk not have 126?

THE CLERK: No.

MR. GUNN: I have an extra copy of 126.

DIRECT EXAMINATION

BY MR. GUNN:

Q. Agent Wang, would you look at Defendant's -- Defense

Exhibit 125.
A. I have 125 in front of me.
Q. That's a copy of the front and the back of a page from a photo album that was in the materials taken from Mr. Pepe's house; correct?
A. These are copies of photos recovered from the defendant's house, correct.
Q. And this particular exhibit has both the front and the back of a set of photos; correct?
A. That is correct.
Q. And at the bottom of the page, there is a photo with some people in it, including a girl who also appeared in photos in a folder on Mr. Pepe's computer media that was named Nap and Kia; correct?
A. That's correct.
Q. And on the back of that photo was written, quote, Nap, (Ngoc) on right of photo family fish business, unquote; correct?
A. That's correct.
MR. GUNN: Your Honor, I would offer Defense Exhibit 125 into evidence.
MR. LULEJIAN: No objection.
THE COURT: Admitted.
(Defendant's Exhibit 125 was received)
BY MR. GUNN:
Q. Would you now look at Defense Exhibit 126.

A. I have 126 in front of me.

Q. That is a medical record that was in the materials that was found in Mr. Pepe's house, isn't it?

A. I don't recall this exact one.

MR. GUNN: Your Honor, could I speak to the Government?

THE COURT: You may.

(Mr. Gunn and Government counsel confer.)

MR. GUNN: Your Honor, the Government will stipulate it was one of the documents found in the house.

THE COURT: Thank you.

BY MR. GUNN:

Q. This medical record has the name Ngoc on it; right?

A. It does.

Q. It has an age of 19, doesn't it?

A. It does.

MR. GUNN: No further questions, Your Honor. I believe 126 was already admitted.

THE COURT: It was not.

MR. LULEJIAN: Your Honor, the Government would ask the Court give the limiting instruction we discussed.

THE COURT: Ladies and gentlemen, Exhibit 126, which you will have with you in the jury room, contains various different sorts of information in it. The document is not being admitted, and you should not accept it for the truth of any of

the information in the document itself. It's being submitted to you for the impact that it may have had on the defendant's state of mind. To the extent that you think state of mind is relevant, you should accept it for that purpose only.

MR. GUNN: Thank you, Your Honor. Now I would like to read a stipulation into the evidence --

THE COURT: Are we relieving Mr. Wang?

MR. GUNN: I am sorry. Mr. Wang can be excused, Your Honor.

THE COURT: Thank you. You are excused.

You may read your stipulation.

MR. GUNN: Thank you, Your Honor.

"It is hereby stipulated by and between plaintiff, United States of America, through its counsel of record, Assistant United States Attorneys Patricia Donahue and John Lulejian, and defendant Michael Pepe, through his counsel of record, Deputy Federal Public Defender Charles Brown and Deputy Federal Public Defender Carlton F. Gunn as follows:

"One, Defense Exhibit 261 is an Excel spreadsheet which lists the files found on the CD found in defendant's residence in Phnom Penh, Cambodia, which is denominated as CD 3. These files are located in the following folders in the allocated space of CD 3: 'Arey Ksayh,' 'Cultural orph,' 'Monk Funeral,' 'Old Village,' 'Pursat 100305,' 'Ream 071405,' 'Ream 2'.

"Two, Defense Exhibit 262 is an Excel spreadsheet which lists the files found on the CD found in the defendant's residence in Phnom Penh, Cambodia, which is denominated as CD 7. Theses files are located in the following folders in the allocated space of CD 7: 'Battenbang Trip,' 'Chanry 121105,' 'ID Chanry,' 'ID Chanry 2,' 'ID Chanry 3,' and 'ID Chanry 4'.

"Three, Defense Exhibit 263 is an Excel spreadsheet which lists the files found on the CD found in defendant's residence in Phnom Penh, Cambodia which is denominated as CD 12. These files are located in the following folders in the allocated space of CD 12: 'Bat house,' 'Bretts Part,' 'July 2005,' 'Brett's Party July 2005,' 'class group,' 'Hong's Party,' 'party,' 'party 2,' 'USA and party,' and 'House 061605'.

"Four, Defense Exhibit 264 is an Excel spreadsheet which lists the files found on the CD found in defendant's residence in Phnom Penh, Cambodia, which is denominated as CD 12. These files are located in the following folders in the allocated space of CD 12: 'New Folder'" --

I'm sorry. Your Honor. Let me consult with Counsel. I believe there is a typo here, and it's my fault.

I am going to correct the stipulation in Paragraph 4, Your Honor. CD 12 should be CD 15. And I will read that sentence again for the record.

"Defense Exhibit 264 is an Excel spreadsheet which lists the files found on the CD found in defendant's residence

in Phnom Penh, Cambodia which is denominated as CD 15. These files are located in the following folders in the allocated space of CD 15: 'New Folder,' 'Mom,' 'Moms,' 'School Party,' Girls 012206,' 'sch girls'" -- S-C-H abbreviated -- "'2006-01 (Jan)-22,' Valentine Girls,' 'Christmas 1,' 'Christmas 2005,' and 'Girls 121005'."

Your Honor, I would offer Defense Exhibits 261 through 264 into evidence. I have reached an agreement with the Government that we will slightly modify them, but they won't be shown to the jury at this time in any event.

THE COURT: All right. Those are admitted.

MR. GUNN: Thank you, Your Honor.

(Defendant's Exhibits 261 through 264 were received.)

THE COURT: Does the Defense have any further witnesses?

MR. GUNN: Yes, Your Honor. I believe the next witness is also mine and that would be David Nguyen-Galante. Mr. Nguyen-Galante will need his computer with for the Encase access as Mr. Pixley had.

David Nguyen-Galante, Defendant's witness, was sworn

THE CLERK: Please take the witness stand. Sir, please state your full name and spell your full name as well.

THE WITNESS: My name is David Nguyen-Galante. N-G-U-Y-E-N hyphenated G-A-L-A-N-T-E.

THE COURT: You may proceed.

MR. GUNN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. GUNN:

Q. Mr. Nguyen-Galante, is it Mr. Nguyen or Galante or Nguyen-Galante?

A. Galante will be fine.

Q. Mr. Galante, I'm in -- a little later in my examination I am going to be asking you some questions about your Encase images and analysis.

Do you need to boot up your computer or anything?

A. Yes.

Q. Okay.

Why don't you get that going while I ask you some of these other questions.

Sorry, Your Honor. I didn't realize it would take this much time.

If there is a place where you are waiting for it to do something and you can answer some questions while you are doing that, let me know.

A. Sure.

Q. All right.

How are you employed, Mr. Galante?

A. I am employed with the United States Department of Homeland Security with Immigration and Customs Enforcement.

Q. And you're based in Singapore, are you not?

A. Yes.
Q. And your position there is as a forensic computer examiner?
A. No.
Q. What is your position?
A. My full-time position there is a special agent.
Q. And one of the things you do though is forensic computer analysis?
A. Forensic analysis is part of my duty.
Q. All right.
And you actually conducted a forensic computer analysis of some computer media in this case; correct?
A. Yes.
Q. You were actually the first American representative to analyze the media or -- correct?
A. Yes.
Q. And the three items, one of the items was a Maxtor computer hard drive from a regular desktop computer; correct?
A. Yes.
Q. That's the thing in the computer where all the computer files and software and so on are sort of stored, right, is the hard drive?
A. Yes.
Q. And another item you examined was a Transcend USB jet flash thumb drive; correct?
A. Yes.

Q. That's a portable storage device that can be attached to a computer and used to copy things off of a computer or copy things onto the computer?
A. Yes.
Q. It's called a thumb drive because it's about the size of a thumb; right?
A. Correct.
Q. You stick it into one of the ports of your computer just like you were sticking some other things back there just now; right?
A. Yes.
Q. And thumb drives are typically used to transfer data or information from one computer to another computer or something like that; would that be fair to say?
A. Yes.
Q. And this third item of computer media that you analyzed was a digital camera media card; correct?
A. Yes.
Q. That's the little computer chip or little chip you stick in a digital camera?
A. Correct.
Q. And then you transfer images from that little media card or chip onto a computer when you want to put them on a computer; right?
A. Yes.

Q. I would like to start with the digital camera media card. You analyzed that; right?
A. Yes.
Q. You did a forensic analysis of it?
A. Correct.
Q. And you didn't find any child pornography on that, did you?
A. I did not.
Q. And you checked what is called the unallocated space, right, as well as readily viewable files?
A. Yes.
Q. And you can do that with special forensic computer software?
A. Correct.
Q. So there -- strike that.

On the thumb drive -- going to the thumb drive, there were a number of photos stored on the thumb drive; correct?
A. Yes.
Q. And the photos were grouped in what are called folders or sub folders; right?
A. Yes.
Q. And each folder -- each photo in a folder has a file name; right?
A. Yes.
Q. Usually it's a number followed by the suffix .JPG?
A. No.

Q. How is it usually --
A. A photo can be a name. It doesn't have to be a number.
Q. But it's some name or number followed by the suffix .JPG; right?
A. Yes.
Q. JPG generally is what signifies that something is a photo type of file; right?
A. Yes.
Q. There was a folder on the thumb drive that was called Friends 111111; right?
A. Yes.
Q. And can you pull that up on your computer and pull up a file with a name 017.JPG?

If I could approach with an exhibit, Your Honor?

THE COURT: You may.

BY MR. GUNN:

Q. Would you look at Defense Exhibit -- if could park -- it's premarked as 315, Your Honor.

THE COURT: All right.

BY MR. GUNN:

Q. Would you look at Defense Exhibit 315 and tell us if that matches up with what is on your image of the computer or the thumb drive with 017.JPG in the Friends 111111 directory?
A. Yes, it does.

MR. GUNN: Your Honor, I would offer Defense

Exhibit 315 into evidence.

THE COURT: Any objection?

MS. DONAHUE: Relevance.

THE COURT: I'll admit it.

(Defendant's Exhibit 315 was received)

MR. GUNN: Your Honor, I would like to publish it for the jury. If the screen's not off -- I don't know if the witness wants the screen on for this or not. It doesn't necessarily need to be.

THE COURT: Let's not have the screen on.

BY MR. GUNN:

Q. And that's the image you have on your computer screen?

THE COURT: Okay. Take it off the screen.

THE WITNESS: Yes.

THE COURT: I don't know who has the control, but somebody needs to --

MR. GUNN: Oh, I'm sorry, Your Honor.

THE COURT: I think we've seen it.

MR. GUNN: That's fine, Your Honor. I didn't realize it was up there.

THE COURT: That's all right.

BY MR. GUNN:

Q. You also did a forensic examination of this thumb drive; right?

A. Yes.

Q. But it was an Encase image that you examined rather than the original thumb drive; right?
A. That is correct.
Q. And an Encase image is -- would you explain to the jury what an Encase image is?
A. An Encase image, forensic image, is a mirror image of a -- of the -- Mr. Pepe's hard drive, so when we do our analysis --
Q. Let me stop you.
We are talking about the thumb drive though now; right?
A. Yes.
Q. So you just said an image of the hard drive.
A. I'm sorry.
Q. It would be an image of the thumb drive in this instance?
A. Correct.
Q. Go ahead.
A. So basically we never make an analysis of the original media in the case, Mr. Pepe's thumb drive. We make a forensic image using Encase software to make a -- a mirror image of that thumb drive to where we can make -- conduct analysis of it.
Q. And that's standard procedure for doing -- when you do a forensic computer analysis; right?
A. Yes.
Q. And there is a reason for that procedure; right?
A. Yes.

Q. The reason is to keep the computer item from being changed either accidentally or on purpose; right?
A. Correct.
Q. It's important to make sure the item isn't tampered with in some way?
A. Yes.
Q. And that's because computer items are easy to either change deliberately or mess up accidentally; right?
A. Correct.
Q. Important dates attached to computer files can get changed?
A. Yes.
Q. Files can be put on that weren't on the item before?
A. Yes.
Q. Other things can happen too, right?
A. I'm sorry. What other things?
Q. Well, I will withdraw the question.

In fact, there were changes made and things added to this particular thumb drive after Mr. Pepe was arrested and it was taken from his house, weren't there?
A. Yes.
Q. First of all, someone added at least one photograph to the thumb drive after Mr. Pepe was arrested; isn't that correct?
A. Yes.

MR. GUNN: Your Honor, could I approach and have an exhibit marked?

THE COURT: You may.

MR. GUNN: If we could call this 201, Your Honor.

(Defendant's Exhibit 201 was marked)

BY MR. GUNN:

Q. Do you still have your Encase image of the thumb drive open?

A. Yes, I do.

Q. Would you find a file that is named, I believe, IMGP1234.JPG?

A. Yes.

Q. That's a photograph of Mr. Pepe in handcuffs, isn't it?

A. Yes.

Q. Your Honor -- and does it match Defense Exhibit 201?

A. Yes.

MR. GUNN: Your Honor, I would offer 201 into evidence.

THE COURT: Any objection?

MS. DONAHUE: No.

THE COURT: Admitted.

(Defendant's Exhibit 201 was received)

BY MR. GUNN:

Q. This is Defense Exhibit 201 and also what you have on your screen that was on the thumb drive?

A. Yes.

Q. So that photograph was added after Mr. Pepe was arrested;

correct?

A. Yes.

Q. You can also tell that someone opened up the files on the thumb drive and looked at them after they were taken from Mr. Pepe's home, can't you?

A. Yes.

MR. GUNN: Your Honor, could I have Defense Exhibit 2002 -- could I approach with it?

THE COURT: Sure.

THE CLERK: 202?

MR. GUNN: Yes.

Q. I would like you to look at Defense 2002. Do you have that in front of you?

THE COURT: 202 or 2002?

MR. GUNN: It's 02.

Q. Do you have that in front of you?

A. Yes.

Q. That's an official U.S. Customs form; isn't it?

A. Yes.

Q. It's called custody receipt for seized property in evidence; right?

A. Yes.

Q. It's intended to list evidence that's seized, when it's seized and when and to whom it's transferred; correct?

A. Yes.

Q. It's kept because agents who seize evidence have a duty to keep a record of how it's handled?
A. Yes.
Q. It's kept in the regular course of ICE's business and practices; right?
A. Correct.
Q. And the dates and the description of the evidence that are written on it are written in at or near the time of the seizure or transfer in question; right?
A. Yes.
Q. And in fact, the form is signed by the people who take the evidence when it's transferred; correct?
A. Yes.
Q. This one is even signed by you as taking some of the computer evidence on June 30th, 2006; correct?
A. Sorry. My copy is pretty blurred. I can't see.
THE COURT: Can you point us to some place, Mr. Gunn?
BY MR. GUNN:
Q. Is this one not signed by you -- do you recall signing a form like this?
A. Yes.
Q. For the computer evidence?
And this is a form for the computer evidence in question, isn't it?
A. I can't see on this form, sir.

Q. Would you look at Item 9 on the second page?

That refers to the thumb drive that you analyzed; correct?

A. I believe the chain of custody was on the different form, sir. Not this one.

Q. All right.

But the thumb drive is reflected on this document correct? As Item 9?

A. Yes.

Q. And that's the thumb drive you analyzed; correct?

A. According to this form, chain of custody, I did not sign for this -- for that particular thumb drive.

Q. Right.

But the thumb drive is listed on here is the same thumb drive you examined; right?

A. I don't know. I didn't sign for this particular form.

Q. Do you have another chain of custody form where you did sign for the thumb drive?

A. Yes.

Q. Do you have that with you?

A. I have to check.

MR. GUNN: I'll deal with it at a recess, Your Honor.

THE COURT: Okay. Great.

THE WITNESS: Give me one second. I can look for it.

THE COURT: That's all right.

 MR. GUNN: We can address it at a recess later.
Q. In any event, you took and analyzed this thumb drive; correct?
A. Yes.
Q. And your Encase software let's you look at dates that are attached to files on the thumb drive, doesn't it?
A. Yes.
Q. And one of the dates attached to each file is the date called last accessed?
A. That's correct.
Q. That usually means the date the file was last opened UP AND looked at; right?
A. Yes.
Q. When you open up the -- well, do you still have the Encase image of the thumb drive open?
A. Yes.
Q. Would you look at the last accessed dates for the files in a folder called Friends 1111.
A. Dated June 23rd, 2006.
Q. So that was after Mr. Pepe was arrested; correct?
A. Yes.
Q. Would you look at the last access dates for a folder called Nary 2?
A. It is also the same date, June 23rd, 2006.
Q. Would you look at last access dates for Picture Nos. 1

through 5 in a folder called Spider?

A. Also the same date, June 23rd, 2006.

Q. And would you look at the last access dates for pictures numbered 1 through 13 in a folder called Up North? Not the sub folders within that folder but the folder itself.

A. Still on the same date, June 23th, 2006.

Q. So the last access dates on all of those files are after the date the thumb drive was taken from Mr. Pepe's home; correct?

A. Yes.

Q. Which means someone was examining the original thumb drive after it was seized; right?

A. Correct.

Q. There was also a whole folder added to the thumb drive after Mr. Pepe was arrested, wasn't there?

A. Yes.

Q. Would you look for a folder in the Encase image of the thumb drive that's named Pepe Case 008?

A. Yes.

Q. Do you have that there?

A. Yes.

Q. What is the last access date for that folder?

I am getting an exhibit while he's looking, Your Honor.

A. Is June 18th, 2006.

Q. And does it also have two other dates called File Created and Last Written?

A. Yes.

Q. And what are those dates?

A. June 18th, 2006.

Q. And what does the File Created date mean?

A. It's the date the file was written into the thumb drive.

Q. What does the Last Written date mean?

A. That's the last date that it was created.

Q. So this folder was actually created on the thumb drive after Mr. Pepe was arrested; correct?

A. Yes.

MR. GUNN: No further questions, Your Honor.

THE COURT: From the Government?

CROSS-EXAMINATION

BY MS. DONAHUE:

Q. Good morning, Special Agent Galante.

A. Good morning.

Q. Special Agent Galante, I would like to show you what has previously been admitted as Government's Exhibit 2102. It's a page from Mr. Pixley's PowerPoint. If you can just take a look at the screen.

Special Agent Galante, do you see at the top where it says Pepe TD 256 MB? To your knowledge, that stands for thumb drive, 256 megabytes; is that correct?

A. Yes.
Q. You were asked about some files that were created after this thumb drive was seized.
Are those the three items listed in the large box on the right on this slide?
A. Yes.
Q. And you worked for US Immigration and Customs Enforcement; is that right?
A. Yes.
Q. Did you create these three files on the defendant's thumb drive after the seizure?
A. I did not.
Q. These were on the thumb drive when you received it from Cambodia on June 30th of 2006; isn't that correct?
A. That is correct.
Q. Looking down the left column where you see the blue checks, do those blue checks -- are those -- excuse me -- blue checks next to folders that contain files that were accessed after June 17th of 2006?
A. Correct.
Q. Did you access or write to any of those folders after June 17th of 2006?
A. I did not.
Q. That had already been done by the time you received this piece of media on June 30th of 2006; is that right?

A. That is correct.

MS. DONAHUE: I have no further questions.

THE COURT: Mr. Gunn?

MR. GUNN: Could I have one moment, Your Honor?

THE COURT: Sure.

(Mr. Gunn and Mr. Brown confer off the record)

MR. GUNN: No questions, Your Honor. No further questions.

THE COURT: Thank you, sir. You're excused.

THE WITNESS: Thank you.

THE COURT: While the witness is packing up his gear, do we have another witness, Mr. Gunn?

MR. BROWN: Your Honor, the Defense calls Sander De Montero.

MR. GUNN: I will step out and get her, Your Honor.

THE COURT: Thank you.

Sander De Montero, Defendant's witness, was sworn

THE CLERK: Please take the witness stand. Please state your full name and spell your full name.

THE WITNESS: Sander De Montero. S-A-N-D-E-R, space D-E, space M-O-N-T-E-R-O.

THE COURT: Thank you. Before we proceed, I am going to ask our Cambodian interpreter to state your name again and spell it so it's closer in the record than we had it before and remind you that you're still under oath.

THE INTERPRETER: C-H-A-N-D-R-A, last name H-A-C.

THE COURT: You may proceed.

MR. BROWN: Thank you very much, Your Honor.

DIRECT EXAMINATION

BY MR. BROWN:

Q. Good afternoon, Mr. De Montero. I want to talk a little bit about your background.

Of what country are you a citizen?

A. Australian.

Q. Are you also a Cambodian national?

A. I was born in Cambodia.

Q. Were you raised in Cambodia?

A. I was born in Cambodia and raised in Cambodia until 24 years old before I went to Australia.

Q. When did you leave for Australia? What year was that?

A. At the end of 1970.

Q. And why did you go to Australia?

A. I was there because I did receive a scholarship from Colombo Plan.

Q. So you received a scholarship to study in Australia?

A. Yes.

Q. That was the University in Australia?

A. Yes.

Q. What did you study?

A. Information technology.

Q. And did you work in a place called Victoria, Australia?
A. Yes. I worked as a government employee in the area called Victoria.
Q. What did you do in that capacity?
A. Assistant analyst.
Q. Was that for the Ministry of Education?
A. Yes. In the state of Victoria.
Q. At some point, did you return to Cambodia in the mid '90s, Mr. De Montero?
A. In '94 I went back to Cambodia.
Q. Why did you return to Cambodia in 1994?
A. Because I was invited to join or invited to Cambodia by the Minister of Education.
Q. Who was the Minister of Education?
A. Mr. Ung Huot.
Q. What did you do when you returned to Cambodia in 1994?
A. I worked under the aid from Australia, is called the examination project.
Q. And that was an educational project sponsored by the Australian government to work in Cambodia?
A. Yes.
Q. And that was in 1994. Did something significant happen in July of 1997, Mr. De Montero, while you were in Cambodia?
A. Yes. During '97, around the 5th or the 6th, it was a coup, so it did change the structure of the politics a little bit.

Q. There was a change in the political structure in 1997; is that right?

A. Yes. At the time they have the acting Prime Minister for that period.

Q. And at that point, did Ung Huot, who was the Minister of Education, become Prime Minister of Cambodia?

A. Yes.

Q. And how did that affect your duties and responsibilities?

A. I became the vice under the Secretary of State in education.

Q. You became the Under Secretary of State in education for the country of Cambodia?

A. Yes.

Q. Did you have any other duties and responsibilities?

A. I also the vice on the Human Rights Committee of Cambodia.

Q. Mr. De Montero, at some point did you come to know a person named Michael Pepe?

A. Yes.

Q. How did you meet Michael Pepe?

A. His wife took him to my home.

Q. And what was -- how was Mr. Pepe employed at that time?

A. He's a teacher in the University of Pannasastra.

Q. And Pannasastra is a university in Phnom Penh?

A. It's a private university.

Q. So Mr. Pepe was a professor at Pannasastra University?

A. Yes. He taught management.
Q. And did Mr. Pepe -- is that the circumstances of your meeting him? Did you have a shared interest in education with Mr. Pepe? Is that why?
A. Yes. Because of that we make it an interesting meet with him.
Q. At some point, Mr. De Montero, did you discuss with Mr. Pepe the idea of educational outreach to the poor communities of Cambodia?
A. Yes. We did discuss about how to make a plan in order to further our outreach to the children in the suburb.
Q. Whose idea was that originally?
A. It's Mr. Michael Pepe's idea.
Q. And at some point, did you make arrangements or -- to go out and distribute school supplies to some of the poor communities?
A. Yes. I did have a program so Mr. Pepe can distribute some gift and school supply for those children.

MR. BROWN: And, Your Honor, I believe Defense Exhibit 380 has already been received into evidence. If I could just publish a couple of pictures from that series to the jury, Your Honor.

THE COURT: If it's in evidence, that's fine.

MR. BROWN: Your Honor, we are showing No. 13 from that series.

Q. Mr. De Montero, there is a picture on the screen.
Can you see that?
A. Yes.
Q. Okay.
Is that you in the photo?
A. Yes.
Q. And what are you doing there?
A. That is the place that we distributing some gift to the handicapped children's in Phnom Penh.
Q. This was a handicap -- was it a school or a church?
A. It's in church.
Q. Who else do you recognize in that photo?
A. The picture in there with the black shirt and the khaki trousers is Mr. Pepe.
Q. Who is the woman there in black?
A. That's my wife.
MR. BROWN: Your Honor, if we could publish No. 43 from that series.
THE COURT: Yes.
BY MR. BROWN:
Q. It's a little dark, but is that you in that photo, Mr. De Montero?
A. Yes. I can see.
Q. Is that the same location?
A. Yes.

THE COURT: Don't worry about the exhibit. He can just look at it on the screen.

BY MR. BROWN:

Q. Mr. De Montero, on how many occasions did you distribute -- you and Michael Pepe distribute school supplies?

A. Over ten times.

Q. Were there times that you distributed school supplies and Mr. Pepe was not present?

A. Yes.

Q. And were there times that you distributed supplies to places that -- for example, to a naval base where there were no children present?

A. Yes.

Q. What were the circumstances of that?

A. It's the area that's a lot of the Navy -- naval spouse -- the Navy's --

Q. Wives?

A. Wife that live there is quite a few of them, a few hundred. Yes. A few hundred of them there.

Q. That was at the Ream Naval Base?

A. Yes.

Q. What were the circumstances of that outreach program?

A. It's the program that Mr. Pepe fill that is a democracy program so they can enjoy that.

Q. At some point, Mr. De Montero, did you introduce Michael

Pepe to higher ranking government officials in Cambodia?
A. Yes.
Q. Did you introduce Mr. Pepe to a person named Ung Huot?
A. Yes.
Q. Who is Ung Huot again?
A. At the time that Mr. Pepe -- that I introduce him to Mr. Ung Huot, he was a vice in the political party called Funcinpec.
Q. Was he the former Prime Minister at that point?
A. Yes.
Q. Did you introduce Mr. Pepe to a person named Khieu San?
A. Yes.
Q. Why did you introduce Mr. Pepe to those individuals?
A. Because I felt that those people can introduce him and open doors that he reach out to a wider area.
Q. Mr. De Montero, after Mr. Pepe was arrested, did you go to Prey Sar Prison at some point?
A. Yes, the next day I went there and tried to look for him right away.
Q. Okay.
And did you talk to any of the mothers of the children that were -- yes -- did you talk to Ly Kim Eng at Prey Sar Prison?
A. Yes. I met her there.
Q. Okay.

And did you talk to Kumlang at Prey Sar Prison?
A. Yes.
Q. Okay.
Why did you go to Prey Sar Prison?
A. First I want to visit Michael.
Q. Michael was at Prey Sar Prison also?
A. Yes.
Q. And were you concerned about Michael's well-being at Prey Sar Prison?
A. It's horrible living in that prison.
Q. Can you describe for the jury what Prey Sar Prison is like?
MR. LULEJIAN: Objection, Your Honor. Relevance.
THE COURT: Sustained.
BY MR. BROWN:
Q. Based on what you know of the conditions at Prey Sar Prison, for people to get basic care, they need outside assistance?
THE COURT: The objection was relevance. The objection was sustained.
BY MR. BROWN:
Q. Why did you go to Prey Sar Prison?
A. To visit him.
Q. And what else?
A. I also want to deliver a letter. To talk to Michael because he did receive a letter from the inmate asking for help.

Q. Okay.

And what did you do next?

A. I went to see all those four lady that was arrested and kept there.

Q. Were you going to bribe those people or influence their testimony, Mr. De Montero?

A. No, I did not have the intention to go there and bribe them. I went there because they request me to go there so they can ask me to help.

Q. Help in what way?

A. First of all, they do not receive proper food and also they was ill. They need some medication. And the mother of Ly Kim Eng she has some problem and she want he kindly to pass some word.

Q. At some point, Mr. De Montero, did you meet again with the mother of Ly Kim Eng?

A. I met with her mother-in-law.

Q. I'm sorry. Her mother-in-law.

A. Yes.

Q. And what -- why?

A. Because she want me to ask her mother-in-law to take care of one of her children that she left with her.

Q. Was that her young son David?

A. Yes.

THE COURT: Mr. Brown, whenever it's a good time to

 break.

MR. BROWN: Your Honor, I just have a few more questions.

THE COURT: Okay.

BY MR. BROWN:

Q. And what happened when you went to see the mother-in-law of Ly Kim Eng?

A. When I spoke to her for a short period of time, she informed me that -- we call it Angkor which is the group or something, the organization, offer her $50,000, and she asked me, "How much can you offer?"

Q. And what was your response to that?

A. I told her that I have nothing to discuss about money. I came here just to tell you about the son -- her son's David -- her grandson.

Q. When you say the organization offered $50,000, was she referred to the NGO where L.K.xxx was residing?

MR. LULEJIAN: Objection. Calls for speculation. Lack of personal knowledge.

THE COURT: Lay some foundation for that, Mr. Brown.

BY MR. BROWN:

Q. Mr. De Montero, you mentioned that it was an organization that the mother-in-law referred to.

Do you know what organization she was referring to?

A. That's -- she did not reveal the name of that organization,

but that is the organization that took her daughter away, L.K.xxx.

MR. LULEJIAN: Your Honor, I would move to strike everything after "that is the organization."

THE COURT: I am going to strike it for now and you can ask another question and see if you can lay any foundation for that knowledge.

BY MR. BROWN:

Q. Mr. De Montero, were you aware that Ly Kim Eng --

THE COURT: That is not how you lay the foundation. He either knows it from something or he doesn't.

BY MR. BROWN:

Q. How do you know that L.K.xxx was at an organization?

A. Because the mother-in-law told me that the organization took her to take care of her.

Q. And is that the organization that -- that the $50,000 was in reference to, if you know?

THE COURT: Sustained. That's not -- the testimony remains stricken.

MR. BROWN: No further questions, Your Honor.

THE COURT: All right, we will take a break. Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you.

(Recess taken)

(Jury Out)

MR. GUNN: Real quickly, Agent Galante found the next step in the chain of custody form that he signed, so I would like to offer Defense Exhibits 202 and 204 into evidence. And I believe the Government does not object.

THE COURT: All right. Fine.

(Defendant's exhibits 202 and 204 were received)

(Jury In)

THE COURT: All right. Everyone is back. The witness is back on the stand. The witness and the interpreter are still under oath.

Mr. Lulejian?

MR. LULEJIAN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. LULEJIAN:

Q. Good afternoon, sir. Mr. De Montero, you testified earlier that you and the defendant are friends; is that right?

MR. BROWN: Objection. Misstates the evidence, Your Honor.

THE COURT: I don't know that I heard that, Mr. Lulejian. Why don't you just ask him.

MR. LULEJIAN: I will just ask him.

Q. You and the defendant are friends, aren't you?

A. Kind of, yes.

Q. In fact, you're pretty good friends; isn't that right?

A. A friend in work.

Q. In fact, you're related to Mr. Pepe through marriage, aren't you?
A. Yes. His wife is my -- the sister of my wife.
Q. And your wife's name is again?
A. Borat.
Q. And Borat is Mr. Pepe's wife whose name is Chanry; isn't that right? I'm sorry, the sister of Mr. Pepe's wife Chanry?
A. Yes.
Q. So there is a familial tie other than just friendship?
A. I don't know what kind of tie you're talking about.
Q. There is a tie through marriage? You're related?
A. In a way, yes. But he's a foreigner and we are just Cambodian among ourself. We have a different culture.
Q. But when a foreigner marries into a Cambodian family, he becomes part of that family, doesn't he?
A. Yes. Become a family but it's not a close knit family.
Q. Well, when one becomes a family there is certain obligations in Cambodian culture that one as to follow; isn't that right?
A. I do not understand how close you meant.
Q. Under Cambodian culture one family member helps out another family member because they are part of the family; right?

MR. BROWN: Objection. Vague, broad as to Cambodian culture, Your Honor. No foundation.

THE COURT: Overruled.

THE WITNESS: Well, I feel that's not Cambodian but any other nationality will feel the same.

BY MR. LULEJIAN:

Q. And in the culture of Cambodia, when one -- when one has a family member, one feels an obligation to help out that family member?

A. In a way, yes.

Q. And in this case, you helped out the defendant, didn't you?

A. I'm here. It's not because Michael is a part of our family. It's that is my job and he also, you know, trying to help in the human rights.

Q. You helped out Michael because you have an obligation because he was a member of your family, didn't you?

MR. BROWN: Objection. Asked and answered, Your Honor.

THE COURT: Overruled.

THE WITNESS: No. Because I'm just an in-law. It's not a blood relative.

BY MR. LULEJIAN:

Q. Well, even though you are not a blood relative, you introduced the defendant to some pretty powerful people in Cambodia; isn't that right?

A. Yes.

Q. In fact, you introduced him to the former Prime Minister of that country?

A. Yes.
Q. That was Ung Huot; right?
A. Yes.
Q. And Ung Huot is currently a Senator in Cambodia, isn't he?
A. Yes.
Q. Even though the Funcinpec party isn't in power, Ung Huot still has powerful political connections, doesn't he?
A. Yes.
Q. And you also introduced him to another member of the Funcinpec party, Khieu San, didn't you?
A. Yes.
Q. And Khieu San is a member of the National Assembly in Cambodia, isn't he?
A. Yes.
Q. He holds a position of power as well?
A. Yes.
Q. In fact, Khieu San is known all over Cambodia for his work in human rights and his radio broadcasts, isn't he?
A. Yes.
Q. And it's fair to say that by -- that Khieu San could open doors for Mr. Pepe; isn't that right?
A. Yes. But to expand his program that he wanted to distribute throughout Cambodia.
Q. And it's fair to say that Ung Huot could open up doors that would normally be closed for Mr. Pepe; isn't that right?

A. Yes.
Q. And Mr. Pepe didn't have contact with Khieu San before you introduced him, did he?
A. Yes.
Q. And Mr. Pepe didn't have access to Ung Huot before you introduced him, did he?
A. Yes.
Q. So it's fair to say that you were the one who helped your brother-in-law get access to the top levels of Cambodian government; isn't that right?
A. I introduced him to those high rank officer. It's not because it's my brother-in-law. Because we share a common project.
Q. The question, sir, was you introduced Mr. Pepe to those people?
A. Yes.
Q. And he is brother-in-law?
A. Yes.
Q. And he is family?
A. Yes.
Q. And in Cambodia, one has obligations to family members?
A. It's not just Cambodian. Every family tree. It's just helping out human race.
Q. Have you been in Mr. Pepe's house?
A. I lived there also.

Q. When did you live there?
A. When Pepe came to visit United States.
Q. When was that?
A. I -- I don't remember exactly the date but when he came back to visit United States and I went there to live there in order to take care of that house also.
Q. Mr. Pepe has been back and forth between Cambodia and the United States a number of times, hasn't he?
A. Yes.
Q. And was it the last trip before his arrest that you went to stay at his house?
A. No. Not the last trip.
Q. So it was the one before that?
A. Probably.
Q. So it wasn't in the fall of 2005 that you stayed at the house?
A. That I don't know for sure.
Q. Have you been to his house after August 2005?
A. It's quite often to discuss about the project.
Q. But you have been at his house after August of 2005?
A. Yes. I did.
Q. Did you spend the night there?
A. No. I did not stay there overnight.
Q. And when you were there, was Chanry, his wife, there each time?

A. Well, I visit there, his house, during the daytime, you know, but sometime she wasn't there.
Q. So sometimes Chanry wasn't at the house?
A. I did not see her there. During the daytime.
Q. When you were there -- actually let me ask you this:
In fact, Chanry moved out of the house in 2005, didn't she?
MR. BROWN: Objection. Lack of personal knowledge, no foundation.
THE COURT: Do you want to lay some foundation?
MR. LULEJIAN: I will lay some foundation.
Q. During the times that you were there -- the times that you were at Mr. Pepe's house in August of 2005, you didn't see Chanry there, did you?
A. Yeah. I went there mostly in the day, during the daytime.
Q. When you were there, Chanry wasn't around?
A. I don't know because sometimes she might went to the market or something. I don't know.
Q. Did you ever see her when you were at the house after August of 2005?
A. I don't recall.
Q. Did you ever learn from your wife that Chanry had left her husband's home?
MR. BROWN: Objection. Calls for hearsay, Your Honor.
THE COURT: I can't think of a non-hearsay purpose,

Mr. Lulejian.

MR. LULEJIAN: I'll withdraw the question.

Q. When you were at the house, did you see children there?

A. Sometime I did.

Q. Boys or girls?

A. Some girls, some boy.

Q. I'm going to show you what has been marked as Government Exhibit No. 1008 and has been admitted into evidence.

Mr. De Montero, starting on the left-hand corner, did you see this girl at the defendant's house when you were there?

A. No.

Q. The girl in the orange, did you see her at the defendant's house when you were there?

A. I do not recognize their face.

Q. The girl in the green holding the dog, do you recognize her as being present at the house when you were there?

A. Well, I just know that some girl, but I do not recognize the face because I never did pay any attention.

Q. Looking at the girl here on the right, in the red holding the flowers, did you see her at Mr. Pepe's house?

A. I don't recognize her.

Q. Looking at the girl who is kneeling here in the back, did you see her at the house when you visited Mr. Pepe?

A. No.

Q. Do Chanry and Mr. Pepe have children?

A. No.

Q. Do you know if they have adopted children formally?

MR. BROWN: Objection. Relevance, Your Honor.

THE COURT: Sustained.

BY MR. LULEJIAN:

Q. Showing you now what has been marked as Government Exhibit No. 1359.

Do you recognize the girl on the left as being at the defendant's house when you visited him?

A. I don't remember. Like I said, I never pay any attention and try to look at them because I went there just to discuss some business.

Q. Showing you what has been marked as Government Exhibit No. 1341, did you see this girl when you were at Mr. Pepe's house?

A. I don't recognize her.

Q. Showing you now what has been admitted as Government Exhibit 1332, do you recognize the girl at the lower end of the couch as being at Mr. Pepe's house when you were there to visit?

A. Like I told you, that I did not pay any attention on anybody was there. And I don't know whether it's just the Vietnamese parent that just dropped them there, I don't know.

Q. Were you present in Cambodia for the Cambodian New Year in 2006?

A. Yes.

Q. And where did you -- did you celebrate the new year in Bang Toum Pong Province?
A. My wife went.
Q. Did you go with your wife to Bang Toum Pong?
A. No, I did not.
Q. Do you know if Chanry was present at Bang Toum Pong for the Cambodian New Year in 2006?
MR. GUNN: Objection, Your Honor. No personal knowledge, no foundation.
THE COURT: Do you know, sir?
THE WITNESS: I never pay any attention.
BY MR. LULEJIAN:
Q. Do you know, though?
A. I don't know.
Q. Showing you what has been admitted as Government Exhibit No. 1023.
Do you recognize the girl on the left as being someone present at the defendant's house when you were there?
MR. BROWN: Your Honor, I am going to interpose a 403 objection to this line of questioning. The witness has already stated --
THE COURT: Overruled.
MR. BROWN: Outside the scope.
THE COURT: Overruled.
THE WITNESS: I don't recall at all because I told

you, I never pay any attention.

BY MR. LULEJIAN:

Q. Showing you the girl in the middle between the woman and the girl on the end, did you see her at defendant's house?

A. I don't recognize her.

Q. The woman who is standing next to the defendant, have you seen her at the defendant's house?

A. When I went there, I saw the housekeeper brought some water for me.

Q. My question, sir, is when you were at Mr. Pepe's house, did you see this woman in Exhibit No. 1023 at the house?

A. Yes. She's the one that brought the water for me.

Q. Did you see this woman again after June 17th, 2006?

A. I saw had her in Prey Sar Prison.

Q. And you have seen her since that one visit in Prey Sar, haven't you?

A. You mean after she was released?

Q. Yes, sir.

A. She asked for my help.

Q. So the answer is you have met her after she has been out of jail?

A. Yes.

Q. How many times have you met with her since -- and for the record, this is Kumlang -- since Kumlang has been released from prison?

A. I saw her only once or twice, but I also saw her after the Defense team arrive, want to get deposition.
Q. She doesn't live in Phnom Penh any more, does she?
A. When was that, did you want to know?
Q. Currently. Kumlang doesn't live near Phnom Penh any more, does she?
A. Present time, yes, she's not.
Q. She currently lives near the Vietnam border, doesn't she?
A. Yes.
Q. When you saw her, you saw her up near the Vietnam border, didn't you?
A. No. I never met her again over there.
Q. You testified a moment ago, sir, that you met her when the Defense team came to Cambodia, didn't you?

MR. BROWN: Objection, Your Honor. Vague as to time.

THE COURT: He testified just a moment ago. Overruled.

THE WITNESS: I met her in Phnom Penh.

MR. LULEJIAN: I am going to show you now what has been marked as Government Exhibit No. 1009. It's been admitted.

Q. Do you recognize the girl in the yellow blouse as being someone at the defendant's house when you visited?
A. I never recognize any one of them, as I told you.
Q. Did you see the woman in the beige blouse at the defendant's house?

A. No. I never saw her there.

Q. Where did you see her, sir?

A. Who is she?

Q. Are you saying that you have never seen this woman before?

A. Well, from the picture in that screen, I don't think I do know or ever seen her.

Q. In fact, you testified, when Mr. Brown asked you, that you met her when she was at Prey Sar Prison, didn't you?

MR. BROWN: Objection, Your Honor. I don't think there is a foundation as to who that person is.

THE COURT: Mr. Lulejian may have reason not to lay one yet so I am going to allow him to proceed.

THE WITNESS: Well, the lady that I met at Prey Sar Prison doesn't look like the one in this picture.

BY MR. LULEJIAN:

Q. Did the lady at Prey Sar Prison have a mother or mother-in-law who you visited?

A. Are you talking about Ly Kim Eng?

Q. Yes.

A. Yes.

Q. I will represent to you that that is Ly Kim Eng.

A. If that's the case, the picture and the actual person that I saw at the prison not the name.

Q. You met Ly Kim Eng at Prey Sar Prison on the day after Mr. Pepe was arrested; isn't that right?

A. No. Months after.
Q. I thought you said that -- never mind.
I am going to show you now what has been marked as Government's Exhibit 1032. It's been admitted.
Have you seen the woman in red when you visited the defendant's house?
A. Well, I saw some fair girl but I don't know which is which. Like I said, I never pay any attention on that.
Q. Have you ever seen that woman before, sir?
A. I don't think so.
Q. Has your friend, the defendant, told you about somebody by the name of Basang?
A. What's the name?
Q. Basang or Sang?
A. Yes.
Q. Have you ever met Sang?
A. Before I never met her, only in the prison.
Q. The first time you met her was when she was in jail?
A. Yes.
Q. I will you now show you what has been marked as a Government exhibit and admitted as 1002.
Have you seen the woman on the far left in the blue blouse with the tan jacket?
MR. BROWN: Your Honor, objection.
THE COURT: Overruled.

THE WITNESS: The one on the left?

BY MR. LULEJIAN:

Q. Yes, sir.

A. The picture is not clear. I don't know.

Q. So you -- so you have never met Sang until she was in prison; is that right?

A. That is correct.

Q. Mr. De Montero, since the defendant has been arrested, you have spoken to him, haven't you?

A. Yes, I did.

Q. In fact, you speak with him fairly regularly on the telephone, don't you?

A. Yes.

Q. And, in fact, you have talked over two dozen times between August of 2007 and the spring of this year; isn't that right?

A. Yes.

Q. And when he calls you, you're often in Australia; isn't that right?

A. Yes. After they extradite him to United States, I went back to Australia.

Q. But you have gone back to Cambodia at the defendant's request, haven't you?

A. No.

Q. You have gone back to Cambodia since the defendant's request though; right?

A. No. The attorney request me to go back to Cambodia, not Mr. Pepe.
Q. When you go to Cambodia, you do things that Mr. Pepe has asked you to do, don't you?
A. No. The attorney that asked me to help.
Q. In fact, one of the things that you and Mr. Pepe talk about quite frequently on the telephone is his desire to get the girls, the victims in this case, out of the shelters and put them back with their families; isn't that right?
A. No. It's her mother after they release her, she asked the custody to be -- to return to her.
Q. I am going to state my question again, sir.
During your telephone calls with the defendant, the two of you have talked about you working to reunite the victims with their families and take them out of the shelters?
A. Yes.
Q. And, in fact --
A. At that time because of the mother ask me to help to arrange or to do what I can to bring the kid out from there.
Q. In fact, Mr. Pepe had a special name for what he wanted you to do, didn't he?
A. No. I don't know anything about that.
Q. Didn't he refer to your efforts to get the girls away from the shelters as "the project"?
A. No. To get the kid out from the shelter is the mother's

idea. She beg me a few times.
Q. Which mother?
A. Kumlang.
Q. So just one mother?
A. The other one, the organization never allowed me to see them. And the organization never allowed the other mother to meet with the attorney, Defense attorney.
Q. So the answer to my question is only one mother, Kumlang, asked you to get her daughters?
A. Yes.
Q. But the two of you talked about the importance of getting L.K.xxx reunited with her mother; isn't that right?
A. What about L.K.xxx? I do not quite follow.
Q. That's Ly Kim Eng's daughter, isn't it?
A. Yeah. I think the mother have the right to have her kid back.
Q. My question was Mr. Pepe and you talked about reuniting L.K.xxx with her family or taking her out of the shelter?
A. Well, I did arrange with the human rights organization to have those three mother released out of the prison.
Q. So you're the one who orchestrated the mothers being released from the prison?
MR. BROWN: Objection, Your Honor, as to orchestrated. 403.
THE COURT: Why don't you use another word.

BY MR. LULEJIAN:

Q. You're the one who helped get the mothers released from prison?

A. Yes. As is part of my job as the Vice Chair of the Human Rights Organization before, that is my job to help anybody that need help.

Q. Part of your conversations with Mr. Pepe -- let me rephrase that.

When you call Mr. Pepe, those calls are recorded, aren't they?

MR. BROWN: As to Mr. De Montero calling Mr. Pepe?

MR. LULEJIAN: I'll rephrase it.

THE COURT: Thank you.

BY MR. LULEJIAN:

Q. When Mr. Pepe needs to speak with you, he has to call you; is that right?

A. Yes.

Q. And those telephone calls are recorded?

A. Yes. I think so.

Q. And, in fact, during your conversations with Mr. Pepe, he's told you to be very careful what you say because the Government may be listening?

A. I never pay any attention on that part because I don't have anything to hide from the Government.

Q. Mr. De Montero, isn't it -- Mr. De Montero, Mr. Pepe's very

concerned about the victims in this case traveling to the United States to testify against him; isn't that correct?

MR. BROWN: Objection, Your Honor. Calls for speculation. Lack of personal knowledge.

THE COURT: It sounds like it may be, depending on what you have. Either rephrase it or --

MR. LULEJIAN: I'll rephrase the question, Your Honor.

Q. Mr. De Montero, Mr. Pepe has told you that he is concerned about the victims coming to the United States and testifying against him; isn't that right?

A. No. I never heard of that.

Q. In fact, Mr. Pepe has been pushing you very hard to reunite the victims with their families and take them out of the shelters; isn't that right?

A. No. I was in Australia. I cannot do anything.

Q. In fact, on October 11th of last year, Mr. Pepe told you, quote, in referring to the girls, that's going to be the key for my opponent's case; isn't that right?

A. I don't remember.

Q. In fact, in other telephone calls, Mr. Pepe talked about having money sent to Chanry for travel expenses related to the girls, didn't he?

A. I don't recall because the conversation on the phone I never keep that in mind all the time.

Q. In fact, Chanry has been receiving large sums of money from

the defendant while he's incarcerated?

MR. BROWN: Speculation, lack of personal knowledge, Your Honor, no foundation.

THE COURT: Can you lay a foundation, Mr. Lulejian?

BY MR. LULEJIAN:

Q. On September 28th of last year, Mr. Pepe told you, quote, I sent Chanry a bunch of money, I guess about a month ago; is that right?

A. I don't recall.

Q. In fact, right after that, Mr. Pepe says, "And I just sent some more to cover expenses that you are able to travel"; isn't that right?

A. I don't recall.

Q. And he goes on to say there is money to cover the expenses?

A. I don't recall.

Q. When you traveled to Cambodia to help out your brother-in-law, who pays for that trip?

MR. BROWN: Objection, Your Honor. Beyond the scope.

THE COURT: Overruled.

THE WITNESS: Chanry send me the money.

BY MR. LULEJIAN:

Q. Do you know what Chanry does for a living?

A. I never ask.

Q. In fact, the family is not very wealthy, are they?

A. I know that.

Q. In fact, Chanry and her sisters had to do some pretty deplorable things in order to make money, haven't they?

MR. BROWN: Objection. 403, Your Honor.

THE COURT: That sounds like we're pushing the envelope.

MR. LULEJIAN: I am going to stop right there, Your Honor.

Q. What was the answer, sir?

A. What was the question?

Q. The question was, in fact, Chanry and her sisters --

MR. BROWN: I am going to object.

THE COURT: I am not going to allow the question.

MR. LULEJIAN: I'll move on then.

Q. Mr. De Montero, a few moments ago you said that you couldn't remember whether the defendant told you about sending money to Chanry; is that right?

A. That's correct.

Q. If you saw a transcript of that call, would it help refresh your recollection?

A. You're going to play the tape?

Q. I have a transcript that is the writing of what has been on the call.

A. Yeah. I can look.

THE COURT: Do you read English, sir?

THE WITNESS: Just some.

MR. BROWN: I'm sorry, Your Honor. I don't think the Defense has seen a copy of this transcript.

THE COURT: All right. If you have any trouble reading the portions of the transcript to which Mr. Lulejian directs you, I will have the interpreter interpret it for you, so just let us know.

MR. LULEJIAN: May I approach, Your Honor?

THE COURT: Show a copy to . . .

(Mr. Lulejian and Mr. Brown confer off the record.)

MR. BROWN: Your Honor, may we briefly approach?

(Sidebar conference commenced)

MR. BROWN: Your Honor, the Government intends on impeaching Mr. De Montero -- the Government intends on impeaching Mr. De Montero with a transcript of a recorded conversation that we have got the conversation but we don't have the Government's transcript and I think it puts us in a little awkward position. I am not even going -- going to be able to put this in context. I don't have a copy.

THE COURT: Do you have the tape?

MS. DONAHUE: We turned over the tape months ago.

MR. GUNN: Your Honor, the transcript --

THE COURT: He is just refreshing his recollection.

MR. GUNN: The transcript should have been --

THE COURT: He is refreshing his recollection.

MR. GUNN: We are complaining about Rule 16 --

THE COURT: I understand. Overruled.

(Sidebar conference ended)

MR. BROWN: Your Honor, I am just asking for a copy of what the witness --

THE COURT: Mr. Brown?

(Witness reviews document)

THE COURT: Don't speak.

THE INTERPRETER: I just said that this is the conversation on the phone --

THE COURT: You are only interpreting what we say; you're not assisting the witness.

Have you had an opportunity to read that, sir?

THE WITNESS: Yes.

THE COURT: Were you able to read it, even though it's in English?

THE WITNESS: Yes.

THE COURT: Mr. Lulejian, you may ask your next question.

BY MR. LULEJIAN:

Q. May I have the transcript, sir?

Having read the portion of the transcript that was handed to you, is your memory now refreshed as to what you and Mr. Pepe discussed?

A. Well, at the time because that the Defense attorney --

THE COURT: Sir, the question is do you now remember

the conversation?

THE WITNESS: Yes.

BY MR. LULEJIAN:

Q. And during that conversation, Mr. Pepe told you he had sent Chanry a bunch of money, didn't he?

A. Yes.

Q. And he said that he sent -- he just sent some more to cover expenses, didn't he?

A. Yeah. According to the transcript.

Q. And on that telephone call on September 28th, 2007, Mr. Pepe also told you that you if you were able to travel, there is money to cover the expenses; isn't that right?

A. Yes. According to the transcript.

Q. And your expenses to Cambodia are paid by Chanry; isn't that right?

A. Yes.

Q. And Chanry gets money from her husband, Michael Pepe, doesn't she?

A. She never told me where she got it from.

Q. During one of your conversations with Michael Pepe, you told him that you were going to get a lawyer to see a judge to get an order to get the kids back with the parents; isn't that right?

A. Well, that is just the continuance from the time that the three lady has been released, it's -- now it's for them to

reunite with their children.

Q. The answer is you said that, didn't you?

A. Yes, I did.

Q. And Michael told -- the defendant told you, "But there's seven of them now"; isn't that right?

A. I don't recall.

Q. Would seeing a transcript refresh your recollection, sir?

A. If you have it in the transcript, maybe it is. I don't know right now.

MR. LULEJIAN: May I approach, Your Honor?

THE COURT: After you show Counsel.

MR. LULEJIAN: Of course.

(Mr. Lulejian shows Defense counsel document)

MR. LULEJIAN: May I approach, Your Honor?

THE COURT: Yes.

MR. BROWN: Your Honor, could we have a date and time for a point of reference with respect to that?

THE COURT: Mr. Lulejian?

MR. LULEJIAN: As soon as I get it back -- I'm sorry. December 30? December 30th, 2007.

THE COURT: Thank you.

(Witness reviews document)

BY MR. LULEJIAN:

Q. Are you done, sir?

THE COURT: Are you finished reading, sir?

THE WITNESS: Yes.

THE COURT: You may take that back, Mr. Lulejian.

MR. LULEJIAN: Thank you very much, Your Honor.

Q. Mr. De Montero, after you told the defendant that you were going to contact the judge to get an order for the kids to go back with their parents, he replied that there's seven of them now, isn't that right?

A. He probably mentioned seven, but I never pay any attention. My concentration was on the four girl.

Q. Well, the next thing you said to him was, "Yeah, that's what I heard"; isn't that right?

A. That's because the attorney told me. But I never consider as seven people.

Q. You later go on to talk about trying to get S.R.xxx and S.S.xxx out of the shelter so they could be reunited with Kumlang; isn't that right?

A. Yes.

Q. And you also talked about getting L.K.xxx, Ly Kim Eng's daughter, out of the shelter and back with her parents?

A. I do not have any discussion but just probably did mention because L.K.xxx, the organization never let me see her or her mother to see her.

Q. In fact, Mr. Pepe was very concerned about L.K.xxx coming to the United States to testify, wasn't he?

MR. BROWN: Objection. Form of the question, lack of

personal knowledge.

THE COURT: Do you want to rephrase your question, Mr. Lulejian.

BY MR. LULEJIAN:

Q. Mr. Pepe told you he was very concerned about L.K.xxx in particular coming to testify at this trial, wasn't he?

A. I never heard that.

Q. Mr. De Montero, going back to the September 28th call, that's the one that talks about your expenses being paid by Mr. Pepe through his wife, during that call, Mr. Pepe said, "So I guess" -- I'm sorry -- "So what it comes down to, I guess, the sequence. One thing is the girls, if they're with their families, are not coming out here, then there is no case."

A. I don't recall. He might said. I don't know.

Q. Mr. De Montero, would you like me to show you the transcript again to help refresh your recollection?

A. Well, if it's in the transcript, probably it is. I don't remember everything.

Q. In fact, during that telephone call, Mr. Pepe was very critical of a woman lawyer who was working on the case, wasn't he? And, in fact, even though he praised her, he was concerned that she doesn't know how to get things done; isn't that right?

A. I don't recall. I never saw the ladies attorney and I was far away. I don't know.

Q. In fact the one thing that Mr. Pepe did tell you was

clearly the family's together, then there is no case, it all goes away; isn't that right?

A. I don't recall if he mentioned that. Probably he did. I don't know.

Q. Mr. Pepe conveyed to you during your telephone conversations that if there were no girls, there'd be no case, didn't he?

A. I don't recall, but to me I don't think you know what is the nature of that -- that remark.

MR. LULEJIAN: I have no further questions, Your Honor.

THE COURT: Mr. Brown?

REDIRECT EXAMINATION

BY MR. BROWN:

Q. Mr. De Montero, last fall, the Defense, Pepe's defense team, contacted you; correct?

A. Yes.

Q. And that was with respect to having you help the Defense team -- as a guide for the Defense team in Cambodia; right?

A. Yes.

Q. You were living in Australia?

A. Yes.

Q. And you were told that we had never been to Cambodia; isn't that true?

A. Yes.

Q. And we needed someone and we didn't have any contacts in Cambodia whatsoever; isn't that true?
A. Yes.
Q. We didn't have an office in Cambodia?
A. Yes.
Q. We didn't have agents in Cambodia?
A. Yes.
Q. We didn't have any law enforcement contacts in Cambodia?
A. Yes.
Q. It was a foreign land to us; right?
A. Yes.
Q. And we didn't know anyone there?
A. Yes.
Q. And the Defense team asked if as a courtesy you could help be an informal guide; isn't that true? And to help us make contact to investigate this case; is that fair to say?
A. Yes.
Q. Because Cambodia is thousands of miles away from the United States?
A. Yes.
Q. And isn't it true that as a courtesy, Mr. Pepe helped pay your travel expenses? Isn't that what those conversations were about?
A. Yes.
Q. And what Mr. Pepe told you was that his defense team had

hired a Cambodian attorney who wasn't very helpful in terms of gathering information; isn't that true?
A. Yes.
Q. And to put that conversation in context, what Mr. Pepe told you was, "If not for your help, my defense team would not have been able to get anything done in Cambodia because the lady that they hired wasn't worth a damn"?
A. Yes.
Q. With respect to -- and you met the Defense team in Cambodia during our investigation; correct?
A. Yes.
Q. That was in November of last year; right?
A. Yes.
Q. And you met us again in February of this year when we had to return for depositions?
A. February '08? I don't think so.
Q. I apologize. I misspoke. I misspoke.
You weren't present in February, were you?
A. That is correct.
Q. In the course of -- did you learn that the girls' mothers -- and I'm referring to Ly Kim Eng and Kumlang -- did you learn that they were upset because they had not been able to see their daughters on a regular basis?
A. Yes. And also before I came here, the parent also express to me how unhappy they were that they transport the children

that they never met.

And S.S.xxx, she want to talk to that kid. The mom, S.S.xxx's and L.K.xxx's mother, want to speak to them while they here.

Q. So just to make things clear, Mr. De Montero, when Mr. Pepe was arrested in 2006, the girls' parents were also arrested; right?

A. At the time of the arrest of Michael, the mother has not been arrested yet.

Q. But at some point they were arrested?

A. They trick her, they told them, said that come to visit your kid. Then they just grabbed them.

MR. LULEJIAN: Objection, Your Honor. Foundation.

THE COURT: Sustained. Would you like to lay a foundation.

MR. BROWN: Yes, Your Honor.

Q. How do you know what happened to the parents of the girls?

A. At what time period?

Q. After Mr. Pepe's arrest.

A. When I went to Prey Sar prison when I met them.

Q. And the parents asked you for help specifically; isn't that true?

A. Yes. Over and over again asked me to help.

Q. And you indicated on cross-examination that you were able to contact the human rights people in Cambodia to help the

parents get released?

A. Yes. Because of that, that's why I request the Human Rights Committee help in order to get them released, three of them.

Q. And do you know when the parents were released if their children were returned to them?

A. According to the court document, they were released and asked them to return the children to them, but the organization never did.

Q. What organization are you referring to?

A. The organization that took those girls away, they never mention the group's name.

Q. And you still speak to the parents, correct?

A. Yes. Because it's still want to talk to me, ask me to help them.

Q. And the parents are still seeking your help in getting the children returned from the organizations that they have been at since 2006?

A. Yes.

Q. Just briefly and I'll wrap it up, Your Honor.

Mr. De Montero, there are some questions about Mr. Pepe's wife and I just want to have you identify a couple of photos. They are part of Defense Exhibits 380. If you could show No. 20.

Okay, Mr. De Montero, this is the series of

photographs from the disabled children's place. Do you see a woman sitting behind Michael Pepe in a white shirt in the center of the picture?

A. Yes.

Q. And if Mr. Gunn could just put the arrow -- okay.

Do you know who that person is, Mr. De Montero?

A. That's Chanry.

Q. And who is Chanry?

A. Mr. Pepe's wife.

Q. And how old is Chanry, if you know?

A. I'm not sure. 22, -3, -4. I don't know.

Q. And there is a little boy in the foreground of that picture.

A. That's the one right there?

Q. Yes. Do you know who that is?

A. The white shirt?

Q. Yes.

A. Jason. Jason De Montero.

Q. Who is Jason De Montero?

A. My son.

Q. And do you know who the person is that's -- it looks like playing with his hair?

A. Lee Da Sang.

MR. BROWN: Your Honor, may I have one moment?

THE COURT: Yes.

(Mr. Brown confers with Mr. Gunn and the defendant off the record)

MR. BROWN: Your Honor, no further questions. Thank you.

THE COURT: Mr. Lulejian?

MR. LULEJIAN: Yes, Your Honor.

RECROSS-EXAMINATION

BY MR. LULEJIAN:

Q. Mr. De Montero, when you went to Cambodia to help the Defense team travel around the country, they didn't --

MR. BROWN: Objection, Your Honor, misstates the evidence.

MR. LULEJIAN: I will rephrase the question.

THE COURT: Thank you.

BY MR. LULEJIAN:

Q. You testified a moment ago that you went to Cambodia to assist Mr. Pepe's defense team throughout the country.

MR. BROWN: Your Honor, misstates the testimony with respect to "throughout the country."

THE COURT: Just --

MR. LULEJIAN: I will rephrase it.

THE COURT: Thank you.

MR. LULEJIAN: Sorry, Your Honor.

Q. Mr. De Montero, you testified a few moments ago that you went to Cambodia to assist Mr. Pepe's lawyers when they were in

Cambodia; is that right?
A. Yes.
Q. And as part of your efforts to assist them -- let me rephrase that.
Mr. Pepe's American defense team didn't tell you to reunite the victims with their families, to take them out of the shelters, did they?
A. That is correct.
Q. Mr. Gunn didn't tell you to do that?
A. No.
Q. Mr. Brown didn't tell you to do that?
A. No.
Q. In fact, the one person who told you that he wanted to reunite the children with their families so they didn't come to the United States to testify was the defendant, Michael Pepe; isn't that right?
A. No. I also want them to be united with the parents.
Q. And that's because of your commitment to human rights; is that right?
A. Yes.
Q. In fact, human rights are a big problem in Cambodia, aren't they?
A. Yes.
Q. And you dedicated yourself to help the Cambodian people with those human rights problems; is that correct?

MR. BROWN: Objection. Argumentative, Your Honor.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. LULEJIAN:

Q. In fact, one of the problems, human rights problems in Cambodia, is the trafficking of persons; isn't that right?

MR. BROWN: Objection. Beyond the scope.

THE COURT: Mr. Lulejian.

MR. LULEJIAN: I will narrow it, Your Honor.

Q. One of the problems of human rights abuse in Cambodia is the sexual exploitation of children; isn't that right?

MR. GUNN: Objection.

THE COURT: I don't think that helped, Mr. Lulejian. I think you're done.

BY MR. LULEJIAN:

Q. Let me try one last question, then. Two, actually.

You testified a second ago that you contacted the mothers because you were concerned -- I'm sorry.

You contacted human rights organizations on behalf of the mothers in this case; is that right?

A. Yes.

Q. What human rights organization did you contact for S.R.xxx in this case?

A. Cambodian Human Rights Committee.

Q. I will withdraw the question and rephrase it.

Did you contact any human rights committees to help the victims in this case?

A. Yes.

Q. Which committee?

A. The same one, Cambodian Human Rights Committee.

Q. And by victims -- and by victims, you're talking about the children who were sexually abused?

A. Yes.

Q. When did you contact the committee?

A. The same time when I request for help for the mother.

Q. And what steps have you taken to help the victims in this case?

MR. BROWN: Your Honor, I am just going to object to assume facts not in evidence.

THE COURT: It doesn't assume anything. It's a question.

MR. BROWN: With respect to victims, Your Honor.

THE COURT: Overruled.

THE WITNESS: Cambodian Human Rights Committee, they try to contact the children but the other organization refuse and never even told them where the children were.

BY MR. LULEJIAN:

Q. In fact, those other organizations you're talking about, the non-governmental organizations, they work with the Cambodian government to take care of children that are the subject of

sexual abuse, aren't they?

A. To me, those group is just group that exist trying to making money for the Government. For the organizations.

Q. You were a senior member of -- in the -- Under Secretary of the Cambodian government; isn't that right?

A. I'm the Secretary of State of education.

Q. But even in that capacity, you were privy to what was going on in the human rights realm, weren't you?

A. Yeah. I was the Vice Chair of the Cambodian Human Rights committee since 1997.

Q. And --

A. '98. '97 and '98.

Q. And as Vice Chair of the Cambodian Human Rights Committee, you would know that the infrastructure in Cambodia relies on the non-governmental organizations to help with the problem of abused children; isn't that right?

A. Because I am in the Government, I also know they do help. At the same time they also gave the Government a headache.

Q. The fact is that the non-governmental organizations help rescue children, don't they?

A. I don't see a whole lot of result from that.

Q. And the non-governmental organizations work hand-in-hand with the police and the Government to take care of the children once they have been rescued; isn't that right?

A. Yes, they do, but at the same time they neglect to obey the

rule and the decisions of the Cambodian judicial court to allow the court to order and they never did listen.

Q. And many of the children who are at these non-governmental organizations are there because their parents sold them into sexual servitude; isn't that right?

A. It's not the whole truth.

Q. In fact, what you did when dealing with human rights is rather -- let me rephrase that.

So let me ask you again, sir, what did you do to help the victims in this case with respect to the human rights committees?

A. In Cambodia, my main concern is to help them build up the human right and to help the parent employ. If the parent get employed, have a job, there will be less problem.

Q. What did you do --

THE COURT: Wrap it up, Mr. Lulejian.

MR. LULEJIAN: I have no further questions, Your Honor.

THE COURT: Thank you.

MR. BROWN: No further questions, Your Honor.

THE COURT: Thank you, sir, you're excused.

Ladies and gentlemen, don't talk about the case, don't form or express any opinions about the case until it's finally submitted to you. You are ordered to return tomorrow at 8:00 a.m. and you are ordered to have a good evening.

(Jury Out)

THE COURT: You may be seated.

Why are you guys here?

MR. SAUNDERS: If we could be let into the courtroom next door, we would clear out our remaining carts. We got a call from Mr. Pierson.

THE COURT: Steve, can you go next door -- the CSO is here. Thank you.

Mr. Lulejian, if you plan on playing any of those tapes -- I don't know that you do -- but certainly you should have transcripts for the jurors and Counsel.

MR. LULEJIAN: Yes, Your Honor.

MR. GUNN: Your Honor, I had an issue about that also. There can be arguments back and forth, it seems to me, about whether a transcript is not a Rule 16 or is Rule 16 even when the other side already has a tape.

My position is it's a written record and still disclosable. I can see the arguments the other way. I don't see any justification for us not getting a copy of a document that is shown to the witness. I mean, it seems to me if something is shown to a witness to refresh recollection, the other side ought to have a copy of it.

If Counsel doesn't want -- thinks it's entitled to and does not want to disclose that up front, you know, under Rule 16 then they can try to make that argument, I suppose. But if

something gets shown to a witness and used -- even if it's only for refreshing, the other side ought to get a copy of it.

THE COURT: You can refresh somebody's recollection with a plate of spaghetti, as my evidence professor used to say. And while I certainly would have preferred that there had been copies here for both the Court and opposing counsel, I don't consider it a violation. Even if it were, it would be so inconsequential in light of the fact that you had the tapes, that I would not have done anything different. And I don't know whether you had your own transcripts or not. But that was the basis of my finding. It was totally inconsequential. It was shown to you before it was presented to the witness. He wasn't asked to read from it. There is just simply no prejudice at all.

I assume there's nothing more that is going to be done along those lines, and if there is, I expect that even though courtesies might not have been extended by the Defense, you are two different sides here and you will in future extend all appropriate courtesies to the defendant, whether he is legally entitled to them or not.

MR. LULEJIAN: Your Honor, we would be happy to do that. We had no idea that they were going to open the door. And had we known that or thought it through, we would have brought copies. We'll make sure that we have extra copies, just in case, next time.

MR. GUNN: For the record, Your Honor, every time I have used a document with the witness, I make sure and have four copies and I have given one to the Government so -- and the same for Mr. Brown, I believe.

THE COURT: I understand.

All right. What are we doing tomorrow?

MR. GUNN: I was sort of the person keeping track of the witnesses. We have four or five more witnesses that we think -- non-expert witnesses who we think will be relatively short, though we thought Mr. De Montero would be short, too. But I think it's more likely to be the case with these witnesses.

We have Dr. Maloney. I'm going to decide this evening about whether to bring in Dr. Bennett. And then we have the deposition, which I am told is four hours.

THE COURT: We have at least a full day tomorrow.

MR. GUNN: Yes.

And one other thing, Your Honor. We will probably seek to play some excerpts and have transcript excerpts for the jury of some portions of the interview tapes that we think show interview technique problems or suggestiveness issue and things like that. So probably about -- Mr. Brown is handling that. I don't know if he has an idea about how much time. Maybe half an hour for that. I think we have a full day.

THE COURT: For use in connection with the expert?

MR. GUNN: No, I think offered as independent evidence. The Government has agreed that we don't need to have the translator testify. We are just going to stipulate to the accuracy of the transcript and the tapes and we will play them for jury. The jury will have them -- the jury will have a copy of the transcript to follow along with the excerpt.

MR. LULEJIAN: One other thing, Your Honor. There has been some discussion about -- and I think it's going to be in some of the transcripts -- about the Cambodian zodiac for purposes of aging.

We prepared a request for judicial notice for the Court. There is no need to rule on it today. We just wanted to bring it to the Court's attention.

THE COURT: When was it given to the Defense?

MR. LULEJIAN: I believe I gave it to them about a week ago.

MR. GUNN: We have no objection to it.

THE COURT: All right. Then you will want me to advise the jury that I am taking judicial notice of these facts?

MR. LULEJIAN: Yes, Your Honor.

THE COURT: So we need to add a judicial notice instruction to the jury instructions.

MR. LULEJIAN: Thank you.

THE COURT: Ms. Donahue?

MS. DONAHUE: Regarding the -- the transcripts that

Mr. Gunn was referring to are the transcripts of the interviews of the victims, and we told him it's the Government's position he certainly does not need to call the interpreter to say this is an accurate interpretation from the Vietnamese or from Khmai.

I anticipate that we will have instructions regarding hearsay depending -- I don't know what tapes the Defense seeks to play but what we stipulated away was putting an interpreter to say it's accurate, but we certainly haven't entered into an agreement as to which portions are admissible. I am happy to work with counsel to see if we can do that. But that is sort of where we are with that.

Secondly, in light of the fact that we haven't even started the Kumlang depo -- even if we can agree to limit it -- I don't imagine there is any way we are going to get to our rebuttal case tomorrow in light of the number of hours alone it takes to play the depo. So I think I may tell my doctor she can go to her graduation tomorrow and be here Tuesday.

THE COURT: It sounds even if you cut it down so it's three hours that we've got a substantial portion of the day taken up, so I think that makes sense. We will be wrapping up on Tuesday hopefully.

MR. GUNN: I am going to be hesitant to sort of at this last minute try to adjust the transcript.

THE COURT: Well, it is the Government that has the transcript and if the Government wants to take out the

Government's questions, especially in light of what I saw -- I would have cut out so much of that on my own if I had looked at it other than I was only, unfortunately, focusing on the things to which you made specific objections, but if those questions had been asked in court, even without the objection of the other side, I would have made, as I said, and sustained my own 403 objection because -- and it's just excruciating. So based on my power to control the proceedings, if the Government -- but I mean, you can't take out anything for which the Defense then builds on it in its further questioning. So I'm not sure if it's really worth the time it would take you while you're, you know -- that may be best for the next trial to do that.

MR. GUNN: I am thinking even if we didn't build on it in questioning, we might not have done redirect because it was in the Government -- I will flag the Court the basic reasons we are using the excerpts will be one of two things. I don't think there is going to be any hearsay objection. There might be a limiting instruction --

THE COURT: That is what I was going to suggest. First of all, you need to let the Government know -- whenever you are done with this tonight, if you just email them whatever the excerpts are -- whatever, see if you can agree on a limiting instruction. I do think for all of the reasons I have explained before that the Defense is going to be allowed substantial leeway in showing the videotapes of the interviews, for obvious

reasons. And so if there's some portions of them that otherwise wouldn't be admissible and you can come up with the limiting instruction, then I think that's the best way to handle it.

MR. GUNN: Frankly, most of the hearsay content in there to the extent it's for the truth, is damning to the Defense. But of course --

THE COURT: I assume so.

MR. GUNN: -- we need it in to let the jury see some things for other reasons.

THE COURT: Yes. And you really don't -- I don't know, maybe it's just me, Mr. Brown, but you really don't want to state in open court that use of the word victims is an assumption not supported by the evidence. Because I had to bite my tongue. So just not --

MR. BROWN: Understood, Your Honor.

THE COURT: Let's just address a few of my questions. I think they are easy ones on the instruction. There is one instruction that has three aspects to it. A witness who received immunity, admitted being an accomplice and was convicted of a crime --

MR. GUNN: I'm sorry. Can I get my copy of the instructions? I am a little discombobulated. All right.

THE COURT: It's on Page 11 of what I gave you. And the question at the bottom of that page is whether the next instruction is necessary. It seems duplicative.

MS. DONAHUE: It is duplicative, Your Honor.

THE COURT: Except for the fact that 11, as you presented it, says view the testimony with greater caution, and 12 -- and I didn't look at this as correct transcription of the Ninth Circuit instruction says with great caution which is different from greater caution. I don't know if it's better or worse but it's different.

MS. DONAHUE: I looked to see if the Ninth Circuit requires or both instructions given under the circumstances. It -- it recommends sort of each is recommended independently, but not in conjunction, so I think the answer to your question is that the second instruction is not necessary.

MR. GUNN: I'm a little -- what I think we -- I guess I'm getting mixed up about which is first and --

THE COURT: 11 is the first one which has all three categories.

MR. GUNN: Okay. Thank you. I think what I -- what I was going to propose to the Court is that we have an instruction with focusing on the one with three categories. We have an instruction with the first and second category and then we have your Page No. 12 instruction, which basically covers the third category.

THE COURT: Is that a correct -- did you type that correctly, Ms. Donahue, or whoever? Is there a --

MS. DONAHUE: The greater caution?

THE COURT: Yes.

MS. DONAHUE: Yes.

THE COURT: That's kind of bizarre.

MS. DONAHUE: But the instruction with three categories adequately -- I mean, covers the subject.

MR. GUNN: The reason I like them broken out, Your Honor, is convicted of a crime has two aspect issues involved in it. One is consider the testimony with caution. The other is don't assume something about that as far as the defendant being guilty; whereas, the first two categories are just about being cautious about the testimony. So I think you -- that's why I think they are appropriately broken out.

MS. DONAHUE: The witness who has pleaded guilty, Your Honor, in this case would be the witness who has been convicted. It says -- because it's one category is you should consider this witness's testimony with great caution, giving it the weight you feel it deserves.

THE COURT: But that instruction refers to a plea?

MS. DONAHUE: Its -- it says witness who has pleaded guilty. So I altered it in this case because she didn't plead guilty, she was convicted by a court.

THE COURT: So it's not really the instruction that applies. The one that applies is in the multiple --

MS. DONAHUE: Yes.

THE COURT: Well, I would give one instruction or

three. I'm not going to lump two and then the other one separately. If you want it broken up --

MR. GUNN: You mean one on immunity and one on accomplice and one on -- that would be fine. That certainly works.

MS. DONAHUE: That's fine.

THE COURT: Okay. And then I proposed or at least gave you a copy of the instruction relating to the deposition of a witness that I already modified to some degree. And I was thinking that we might add some language about -- because there were so many objections that were just sort of floating out there on both sides so I don't think inured to anybody's benefit or detriment but something about ignoring the objections or the Court has already considered the objections or whatever you can agree to is fine with me.

Any comments from anybody?

MS. DONAHUE: I think a statement that the Court has ruled on the objections and that the jury should not give them any consideration is the appropriate instruction.

MR. GUNN: Except in some instances the objections were withdrawn. Maybe the Court could say either the Court has ruled on the objection or the objections were withdrawn and so the jury should not place any weight on them or something.

THE COURT: How about just the jury should not place any weight on the objections?

MS. DONAHUE: That's fine.

MR. GUNN: That's fine. Maybe some -- does the Ninth Circuit have any language on an instruction about attorneys have an obligation to object and --

MS. DONAHUE: That's in --

THE COURT: I've already given that once. I don't know if it's in the later ones.

MS. DONAHUE: Yes, it's in there.

MR. GUNN: Right.

THE COURT: So you think that's enough or do you want to add something here?

MR. GUNN: You mean in the language we just talked about that they shouldn't --

THE COURT: Well, the language is at Page 6.

MR. GUNN: Oh, right. I would add something to your deposition such as we just went over.

THE COURT: I'll draft something and give it to you tomorrow.

And then the other acts instructions at 17 and 18.

MR. GUNN: Your Honor was letting the 404(b) evidence in for -- at one point you were talking, when we ruled on a pretrial, you were talking about identity, I believe.

THE COURT: Well, that but also by the time I heard all the other evidence and attempts to impeach the children about what actually happened and cross-examination of the doctor

about whether there were certain signs that the victims had, I think it's substantive evidence. So I don't know -- my first question is do I need to give 18 if I'm giving Page 17, and if I need to give both of them, what language do you want me to put in 18?

MR. GUNN: I think the court should give both. As far as the language in 18, I mean the evidence is still 404(b), at least some of it, because it's about other girls than the alleged victims.

THE COURT: Well, and so the last sentence on 17 says "You should consider the evidence about other acts of the defendant only as they relate to the charges against this defendant," which is, I think, where we are.

MR. GUNN: Right.

THE COURT: I wasn't limiting it after I heard the testimony.

MR. GUNN: Right. But it still is -- the evidence that he, for example, tied up some other girl, which is one of the sets of photos, that's admitted under 404(b) to show, for example, identity, was one that the Court most clearly --

THE COURT: Well, I don't really know how to phrase it, but it's not just to show identity, it's to show that these little girls are telling the truth. You have tried to impeach them and suggest that none of this ever happened, and those photographs are substantive evidence that those little girls are

telling the truth.

MR. GUNN: The photograph of another girl having it happen to her?

THE COURT: Yes. In that home, in that bedroom, yes.

MR. GUNN: I guess -- I think that's -- well, I guess the Court has to figure out how to put that in the instruction. I don't think --

THE COURT: That's why I am suggesting that you can come up with some language or otherwise, it's just considering that evidence as it relates to the charges against this defendant, which is really what I'm saying. Relates to the charges.

MR. GUNN: Right. I guess my concern is I think what the Court is saying -- it really then is saying because he did it to one other girl, that makes it more likely he did it to this girl and this girl is telling the truth.

THE COURT: No. I'm saying that because you tried to impeach these little girls by saying no such thing ever happened, that the Government was entitled to and did present substantive evidence that those things happened in that house, which has some tendency to prove that they're telling the truth.

MR. GUNN: Oh, you see, I don't -- I guess -- I guess I'm noting an objection or an argument. I don't think that the fact that it happened in the same house to another girl -- I mean that -- I mean I think -- I mean, I think that still has to

fit into some theory of relevance, like identity --

THE COURT: If you want me to focus on the fact that they -- I mean, I'm not sure that helps you, but if you want to come up with some language by tomorrow, then -- then --

MR. GUNN: My proposal --

THE COURT: -- be my guest.

MR. GUNN: I mean, I obviously have objected to it and said it shouldn't come in for any reason.

THE COURT: I know.

MR. GUNN: So I'm -- in a way, I am not the person to say what the reason is. On the other hand, what the Court was articulating earlier that I disagree with was that it tends to show the defendant's identity. That was --

THE COURT: No. No. I said that depending on what I heard -- at the very least it was identity, but depending on what I see at trial --

MR. GUNN: I agree.

THE COURT: -- you did exactly what I thought you were going to do that caused me to say that. If you can think of something that is narrowly tailored, I will certainly consider it. But I'm not sure narrowly tailoring it is helpful to your client. It may be more harmful for me to point out that that is why they can consider it to figure out whether it is him. It may not be --

MR. GUNN: My position is what you ought to put in

there is the word "identity."

THE COURT: Well, to say "defendant's identity" doesn't make any sense.

MR. GUNN: I guess that's -- that's what I would suggest. I think the Court has to give some limiting instruction. That's what I think --

THE COURT: If you come up with something, I will consider it. Otherwise, as far as I can see, the one on Page 17 is entirely appropriate and addresses my concerns, addresses my reasons for introducing this evidence as it relates substantively to the charges against this defendant.

As I said, if you want to come up with something else, I will certainly consider it. Don't ask me to come up with something else, because in my view the something else I would come up with would be more harmful to your client by focusing the jury on specific issues. But I'm not a Defense attorney, never have been.

So what I'm saying to you, in your client's best interests if you think there's something that's -- knowing that I have let the evidence in and understanding my reasoning, if you think there's something that you want to propose to tailor it that's better, I am certainly willing to seriously consider it.

MR. GUNN: At this point what I am proposing is you insert the word "identity."

THE COURT: Okay. And my point is not -- not the concept of identity. My point is "You may consider that evidence only as it bears on defendant's identity and for no other purpose" is not a sentence that makes sense. He's not a masked man, we are not trying to figure out whether it's Superman or Clark Kent. What is identity in that sentence wouldn't make any sense.

MR. GUNN: Identity as to --

THE COURT: Whether the defendant is the person that committed that -- you know --

MR. GUNN: Only as it bears on whether the defendant -- well --

THE COURT: That's what I am saying. It starts to sound worse for your client.

MR. GUNN: I think Your Honor, in the 404(b) instruction in brackets, that's precisely one of the words the Ninth Circuit has.

THE COURT: I understand that. But the Ninth Circuit does not have it, sir. A group of judges and lawyers that are not Ninth Circuit judges have it.

MR. GUNN: I'm sorry?

THE COURT: The Ninth Circuit did not prepare those instructions. The Ninth Circuit has not --

MR. GUNN: You mean the Ninth Circuit judges?

THE COURT: Right. So somebody took a line out of a

statute and stuck it in there. They didn't think that district judges would just by rote and without thinking about their case stick it in there. That sentence makes no sense to me, as I said.

If -- I'm certainly willing to -- and I think -- you know, I am asking you to think on your feet and it's not fair. Think about it tonight. I am willing to consider a limited concept, even though I introduced it for -- allowed it to be introduced for a somewhat broader concept. If you can come up with something that sounds more appropriate or safer, I mean -- and I say safer advisedly -- I don't think I -- I don't think the jury is going to have any trouble with this case and I don't want the Ninth Circuit to have any trouble with the way we handled it.

MR. GUNN: All right. If I think of something -- some difference suggestion, but right now that is my suggestion based on the Ninth Circuit bracketed language and I understand that that is what the Court is saying, it's not the Court, it's an advisory committee obviously, but that's true of all the Ninth Circuit instructions.

THE COURT: Not necessarily. Many of them have been approved by the Ninth Circuit --

MR. GUNN: It's true of many of the -- I should say many of the Ninth Circuit.

THE COURT: Yes.

And I changed 19 because the Indictment doesn't say "on or about." It says "between on or about." So I changed that language to make more sense.

I'm not sure if this is correct legally but on the bottom of Page 22, do you know if they have to be unanimous as to which conduct?

MS. DONAHUE: I saw that. There is nothing that says they do and there is nothing that says they don't. I -- I -- I have looked. I -- the reason that the Government proposed this special verdict form was going to the issue of commercial.

THE COURT: And the special verdict form would suggest that they would have to be unanimous as to each one that they checked, so it seems to me that this is appropriate language.

MS. DONAHUE: Yeah. And it -- it's probably the safest thing to do rather than to -- without that language and without a special verdict, it's more vulnerable. That's why we proposed it the way we did.

THE COURT: Okay. And instruction No. 23, I assume the Defense is going to argue that Exhibit 126 suggests that I should give that last paragraph?

MR. GUNN: Yes. Exhibit 126 is not one of the charged victims. So I don't know --

THE COURT: Okay.

MR. GUNN: Pardon me?

THE COURT: It doesn't seem to have any relevance

then.

MR. GUNN: Well, it is because there are references to Nap in other places and potential sexual activity with Nap. And Nap is probably one of the people in the Nap and Kia set of photos, so I think -- I think it -- the jury may -- for example, there is a letter where Mr. Pepe says, "My usual partners were Nap and Ni," so I think it makes a difference for the jury to know that Nap is an adult, and the Exhibit 125 suggests Nap and Ngoc are the same people. So I think it's relevant for that reason.

But I think that in this letter that I'm talking about also, Mr. Pepe talks in the letter about how he couldn't tell how old Sokunthea was. So I think that certainly justifies it.

THE COURT: Again, in the interests of safety --

MS. DONAHUE: Yes. It's an incredibly weak argument.

THE COURT: Incredibly weak on the Defense side works.

MS. DONAHUE: That's why it's in there in brackets because I couldn't resist it.

THE COURT: I'm taking the brackets out.

MS. DONAHUE: I know, but I couldn't resist putting it in brackets.

THE COURT: Okay.

What did you decide about venue?

MS. DONAHUE: 3238 is fine and I will modify it.

THE COURT: I have got it all on my system. We are

just going to say the last known address.

MS. DONAHUE: And I'll stipulate to that and that's that. We're done.

THE COURT: Okay. And on Page 28, I just changed that so that it refers to verdicts, more than one, instead of verdict. Those are the changes I made so far. So I will add the judicial notice, I'll work on this other instruction and try to give you a more closer to complete set tomorrow so that we're ready whenever we have to give them.

Did I get another verdict form from you?

MS. DONAHUE: Yes. I emailed you one that actually has a signature on the bottom, signature line and date.

THE COURT: All right.

Anything else we should discuss before tomorrow?

MS. DONAHUE: No, Your Honor, thank you.

(Proceedings adjourned at 2:33 p.m.)

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 18, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

_______________________________ __________________
Pamela A. Seijas, CSR No. 3593 Date
Official Reporter

**Certificate of Service**

I hereby certify that on May 28, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *James H. Locklin*

By: JAMES H. LOCKLIN
Deputy Federal Public Defender

No. 14-50095

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

MICHAEL JOSEPH PEPE,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
The Honorable Dale S. Fischer, Presiding
No. CR-07-00168-DSF

## Appellant's Excerpts of Record
**[Volume 9 of 12]**

HILARY L. POTASHNER
Acting Federal Public Defender
JAMES H. LOCKLIN
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012
213-894-2929

*Counsel for Defendant-Appellant*

## Table of Contents

Volume 1

Order Denying Defendant's Motion to Dismiss Indictment....................................1
[Filed December 3, 2007; Docket No. 57]

Order Denying Defendant's Motions to Suppress Evidence...................................9
[Filed December 5, 2007; Docket No. 60]

Order Denying Defendant's Motion to Suppress Evidence ...................................20
[Filed February 7, 2008; Docket No. 129]

Transcript – Sentencing (Excerpts)..........................................................26
[Dated February 28, 2014; Filed April 17, 2014; Docket Nos. 491, 512]

Volume 2

Defendant's Motion to Suppress Evidence* .........................................................42
[Filed June 26, 2007; Docket No. 21]

Defendant's Motion to Suppress Evidence (Excerpts)........................................120
[Filed August 1, 2007; Docket No. 33]

Government's Consolidated Opposition to Motions to Suppress Evidence* ........130
[Filed August 22, 2007; Docket No. 39]

Defendant's Reply re Motions to Suppress Evidence ..........................................208
[Filed September 4, 2007; Docket No. 40]

Defendant's Motion to Dismiss Indictment........................................................220
[Filed October 4, 2007; Docket No. 43]

Transcript – Motion Hearing ..............................................................................244
[Dated October 29, 2007; Filed February 26, 2008; Docket Nos. 50, 133]

* Documents marked with an asterisk have been redacted pursuant to Federal Rule of Appellate Procedure 25(a)(5) and Federal Rule of Criminal Procedure 49.1(a).

Government's Declaration re Motions to Suppress Evidence ..............................295
[Filed November 27, 2007; Docket No. 53]

Transcript – Motion Hearing (Excerpts)* .........................................................299
[Dated December 3, 2007; Filed February 26, 2008; Docket Nos. 58, 134]

Volume 3

Defendant's Supplemental Memorandum re Motion to Suppress Evidence.........340
[Filed December 20, 2007; Docket No. 71]

Government's Supplemental Memorandum re Motion to Suppress Evidence .....350
[Filed December 20, 2007; Docket No. 72]

First Superseding Indictment ...........................................................................372
[Filed December 20, 2007; Docket No. 83]

Government's Supplemental Declaration re Motion to Suppress Evidence (Excerpts) ...........................................................................................374
[Filed February 5, 2008; Docket No. 127]

Transcript – Motion Hearing (Excerpts)* .........................................................380
[Dated February 6, 2008; Filed February 26, 2008; Docket Nos. 136]

Transcript – Trial – Day 2 (Excerpts)...............................................................460
[Dated May 9, 2008; Filed May 18, 2010; Docket Nos. 259, 410]

Volume 4

Transcript – Trial – Day 3 (am) (Excerpts) .......................................................635
[Dated May 13, 2008; Filed May 18, 2010; Docket Nos. 260, 411]

Transcript – Trial – Day 3 (pm)........................................................................766
[Dated May 13, 2008; Filed June 17, 2014; Docket Nos. 260, 532]

Volume 5

Transcript – Trial – Day 4 (Excerpts)...............................................................805
[Dated May 14, 2008; Filed May 18, 2010; Docket Nos. 261, 412]

Transcript – Trial – Day 5 (Excerpts) ....................................................................942
[Dated May 15, 2008; Filed May 18, 2010; Docket Nos. 262, 413]

Volume 6

Transcript – Trial – Day 6 (Excerpts) ....................................................................1022
[Dated May 16, 2008; Filed May 18, 2010; Docket Nos. 263, 414]

Volume 7

Transcript – Trial – Day 7 (Excerpts)* ....................................................................1192
[Dated May 20, 2008; Filed May 18, 2010; Docket Nos. 264, 415]

Transcript – Trial – Day 8 (Excerpts) ....................................................................1343
[Dated May 21, 2008; Filed May 18, 2010; Docket Nos. 269, 416]

Volume 8

Transcript – Trial – Day 9 (Excerpts) ....................................................................1423
[Dated May 22, 2008; Filed May 18, 2010; Docket Nos. 270, 417]

Volume 9

Transcript – Trial – Day 10 (Excerpts) ..................................................................1538
[Dated May 23, 2008; Filed May 18, 2010; Docket Nos. 293, 418]

Transcript – Trial – Day 11 (Excerpts) ..................................................................1739
[Dated May 27, 2008; Filed June 2, 2010; Docket Nos. 294, 435]

Volume 10

Transcript – Trial – Day 12 (Excerpts) ..................................................................1805
[Dated May 28, 2008; Filed May 18, 2010; Docket Nos. 295, 419]

Transcript – Trial – Day 13 (Excerpts) ..................................................................1930
[Dated May 29, 2008; Filed May 18, 2010; Docket Nos. 296, 420]

Stipulation to Correct/Modify Record re Jury Instructions (Excerpts)[†] ..............1941
[Filed February 27, 2015; Docket No. 543]

Order Correcting/Modifying Record re Jury Instructions ..................................1961
[Filed March 2, 2015; Docket No. 545]

Order Correcting/Modifying Record re Video Testimony .................................1963
[Filed March 2, 2015; Docket No. 546]

Government's Sentencing Memorandum (Excerpts) ........................................1965
[Filed September 17, 2008; Docket No. 318]

Transcript – Victim Statements ..........................................................................1977
[Dated September 25, 2008; Filed June 18, 2014; Docket Nos. 333, 533]

Defendant's Supplemental Filing re Restitution................................................1998
[Filed March 25, 2009; Docket No. 348]

Judgment .............................................................................................................2006
[Filed February 28, 2014; Docket No. 492]

Notice of Appeal ..................................................................................................2012
[Filed March 3, 2014; Docket No. 493]

Docket .................................................................................................................2013

Volume 11 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 1)...................2053
[Filed March 3, 2015; Docket No. 547]

Volume 12 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 2)...................2309
[Filed March 3, 2015; Docket No. 547]

[†] Although this document and the two orders that follow were not filed until after the judgment and notice of appeal were filed, they are placed here in the excerpts because they relate to the trial proceedings.

Exhibit No. 101 .......... 2399

Exhibit No. 102 .......... 2401

Exhibit No. 103 .......... 2403

Exhibit No. 104 .......... 2405

Exhibit No. 106 .......... 2408

Exhibit No. 107 .......... 2410

Exhibit No. 108 .......... 2412

Exhibit No. 109 .......... 2414

Exhibit No. 110 .......... 2416

Exhibit No. 111 .......... 2418

Exhibit No. 114 .......... 2420

Exhibit No. 123 .......... 2423

Exhibit No. 2007 .......... 2428

Exhibit No. 2009 .......... 2454

Exhibit No. 2010 .......... 2456

Exhibit No. 2011 .......... 2458

Exhibit No. 2093 .......... 2460

Exhibit No. 2096 .......... 2462

Exhibit No. 2200A .......... 2464

Exhibit No. 2201A .......... 2467

Exhibit No. 2202A ........................................................................................2477

Verdict.........................................................................................................2480
[Filed May 29, 2008; Docket No. 299]

Presentence Report.......................................................................................2488
[Dated July 30, 2008; Filed March 25, 2009; Docket No. 346]

Probation Office Letter to District Court ........................................................2517
[Dated September 3, 2008]

Government's Submission of Victim Impact and Restitution Information.........2523
[Filed September 19, 2008; Docket No. 329]

Supplement to Presentence Report ...............................................................2559
[Filed March 25, 2009; Docket No. 347]

Government's Response to Defendant's Filing re Restitution ...........................2562
[Filed April 21, 2009; Docket No. 355]

Government's Supplemental Submission re Restitution ...................................2583
[Filed February 28, 2014; Docket No. 490]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

United States of America, )
Plaintiff, )
)
vs. ) Case No.
) CR 07-168(A)-DSF
Michael Joseph Pepe, )
Defendant. )
_________________________________ )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

Day 10

Los Angeles, California

Friday, May 23, 2008

Pamela A. Seijas, CSR, FCRR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California 90012
(213) 687-0446

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
BY: PATRICIA DONAHUE
ASSISTANT UNITED STATES ATTORNEY
JOHN LULEJIAN
ASSISTANT UNITED STATES ATTORNEY
312 N. SPRING STREET
LOS ANGELES, CA 90012

FOR DEFENDANT: OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY: CARL GUNN
DEPUTY FEDERAL PUBLIC DEFENDER
CHARLES BROWN
DEPUTY FEDERAL PUBLIC DEFENDER
321 EAST SECOND STREET
LOS ANGELES, CA 90012

ALSO PRESENT: ATTACHE GARY PHILLIPS
ICE SPECIAL AGENT EDDY WANG

THE INTERPRETER: CHANDRA HAC

Los Angeles, California, Friday, May 23, 2008

7:50 a.m.

-oOo-

(Jury Out)

THE COURT: Good morning. I have provided you with a set of revised jury instructions and some notes on the changes and additions that I made.

I didn't actually get a verdict form emailed to me, but I just added a signature block.

MS. DONAHUE: You didn't?

THE COURT: No.

THE CLERK: We have received one and I remember --

THE COURT: I know. But that one doesn't have the signature page. I have now just done it myself.

MS. DONAHUE: Thank you, Your Honor. It's in my outbox -- okay. Thank you. I did it myself so I must have --

THE COURT: That's what happens when you do it yourself.

MS. DONAHUE: There is a lot of truth in that. Someone has received a verdict form from me.

THE COURT: I have the Government's request for judicial notice and as I understand it, the Defense doesn't object to it but I'm not sure what I am supposed to do with it. It's not in a form that I can just read it to the jury and it's not in a form that it can be given to the jury.

MR. LULEJIAN: We will convert it then, Your Honor, by Tuesday.

THE COURT: Okay. What do we need to discuss before the jurors come in?

MR. GUNN: The Court will discuss the instructions at the end of the day. I saw the Court's note here. I am just quickly skimming through.

THE COURT: Yes, I think we can do that.

MR. GUNN: Then I will set those aside.

THE COURT: Did Mr. Brown complete his work on the video excerpts?

MR. BROWN: Yes, Your Honor. We have transcripts of the excerpts. I have portions of the excerpts on my laptop computer and I also have them on CD. With the Court's permission I would like to just play the excerpt from the laptop, probably easier than moving the CD's in and out.

THE COURT: That's fine with me, so long as the Government has seen them.

Is there some limiting instruction that you wanted to give?

MR. BROWN: Your Honor, the Government and I discussed removing one of the portions of the transcripts which we have agreed on. We have not discussed limiting instructions but it's probably not a bad idea, Your Honor. Perhaps we could come up with something after Dr. Maloney -- we anticipated playing the

portions after Dr. Maloney testifies and Dr. Maloney's here in court now.

THE COURT: Okay. Is he going to be your first witness then?

MR. BROWN: Yes, Your Honor.

THE COURT: And the Government knows who else you are going to be calling today?

MR. BROWN: I believe so, Your Honor.

THE COURT: Anything else we need to discuss or should we just veg out until the jury comes? Okay. I will see you in about ten minutes.

MR. BROWN: Thank you very much, Your Honor.

(Recess taken)

(Jury In)

THE COURT: Good morning. Everyone is present. Does the Defense have another witness?

MR. BROWN: Yes, Your Honor. The Defense calls Dr. Michael Maloney to the stand.

Michael Paul Maloney, Defendant's witness, was sworn

THE CLERK: Please have a seat. Please state and spell your full name for the record.

THE WITNESS: My name is Michael Paul Maloney. M-I-C-H-A-E-L. Middle name P-A-U-L. Last name M-A-L-O-N-E-Y.

THE COURT: You may proceed.

MR. BROWN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BROWN:

Q. Good morning, Dr. Maloney.

A. Good morning.

Q. What is your profession?

A. I am a licensed clinical psychologist. I am a board certified forensic psychologist, but my main occupation is chief of psychological services for the L.A. County jail, general mental health services.

Q. How long have you been in that position?

A. That position just was promoted about two months ago. I have been the program head of women's health at Lynwood jail for about eight years.

Q. Prior to that what did you do?

A. Prior to that I was pretty much functioning as an independent forensic psychologist for state and federal courts and I was program head for a unit of Child Health USA where I ran the family evaluation program for the children's court. Prior to that I was an associate professor and psychologist at L.A. County Medical Center.

Q. Do you do any teaching work now?

A. I am clinical professor at UCLA. I teach a course called forensic issues.

Q. Any other academic appointments?

A. I am still a clinical professor at UCLA Medical Center.

Q. In terms of your education, could you just describe that a little bit for the jury?

A. I have a Ph.D. in clinical psychology from University of Colorado. Prior to that I had a Master of Science in vocational rehabilitation, second Master's degree in clinical social psychology from the University of Colorado.

Q. Any other professional licenses, certifications?

A. I'm licensed as a psychologist and as a marriage/family therapist, State of California.

Q. Have you had any fellowships that we should be aware of?

A. I did a post-Doctoral fellowship at LA County USC, basically general hospital, in the emergency psychiatric hospital. And previously I had a fellowship from the United States Public Health Service.

Q. Published articles, books?

A. I have published three books and -- well, one sole author. Two as a senior author with a co-author and a fourth one, I'm one of three authors.

Q. And touching on your experience a little bit, you said you worked at the children's court or with the children's court for some time?

A. In approximately 1975, panels were formed of psychologists for the children's court, juvenile delinquency, adult criminal, and I was appointed on all those panels in about 1975. So I am still on the children's court panel. I do many less cases than

I used to but I'm still on that panel.

Q. And what kind of experience do you have with respect to interviewing young children?

A. Well, I started probably in about 19 -- before they had those panels, I was doing some of that work probably 1972 or '3. And over the years, done in the hundreds of evaluations for the children's court, appointed by the Court. And I have presented, for the American Academy of Forensic Psychology, numerous presentations on child sex abuse and allegations of sex abuse.

I was also on the sexually violent predator panel for the State Department of Mental Hygiene for about four years and was on the Mentally Disordered Sex Offender Panel, still do some of the followups for that.

Q. In the course of your experience or work, have you had to testify in court before?

A. Yes.

Q. As an expert?

A. Yes.

Q. How many times have you testified as an expert, would you say, Dr. Maloney?

A. I couldn't really estimate it. It would be in the hundreds.

MR. BROWN: Your Honor, may Dr. Maloney be declared an expert in child psychology?

THE COURT: I --

MS. DONAHUE: Objection, Your Honor, in child psychology specifically.

THE COURT: Would you like to voir dire or would you like to reformat your request?

MR. BROWN: May he be declared an expert in psychology?

THE COURT: Any objection?

MS. DONAHUE: No.

THE COURT: I will declare him an expert in psychology.

MR. BROWN: Thank you, Your Honor.

Q. Dr. Maloney, talking about your experience and expertise in interviewing techniques, you said you have interviewed hundreds of children?

A. Yes.

Q. And those interviews -- what were the purpose of those interviews generally? Do they range in -- in goals?

A. It's quite broad. The majority were in the context of the children's court where an issue has been raised regarding the well-being and welfare of children early on in the early '70s. Most of that dealt with parental problems, physical abuse, so forth.

As time went on, there were increasing numbers of allegations of child sex abuse. And so they're presented pretty broad, but my task is simply to provide information to the Court

regarding the makeup of parents, the children, whatever.

Q. And in the course of your education, training and experience, have you learned specific models or techniques for interviewing children who have been suspected victims of abuse?

A. I would broaden that a little and -- in a book with Oxford University Press, they have a chapter regarding interviewing pretty much across the board and present a model there. And the issue of interviewing children is a very complicated one because you have to take into account their age, level of brightness, how they relate to me, and so forth and their previous experiences.

So there is no single model right now. Probably the most cited book is by Katherine Kuehnle, and it's interviewing for allegations of child sex abuse, and in there, in all of the books written about this and studies, it's variable. You have to take the particular child into account. And there are certain guidelines. Interviewing children, what we're trying to do is get as much as we can of a spontaneous report from a child. So we want to avoid suggestion, leading questions, contamination, so forth.

How that's actually done really varies from child to child, situation to situation.

Q. Why is a spontaneous report the goal when interviewing children?

A. When I use the word spontaneous, what I'm really trying to

imply is if you get a report from a child and it's in their own words and it's consistent with their developmental level or cognitive level and looking through the whole case you cannot determine that anyone has talked to them about that, that is kind of a standard of what may well be a good report of their own experience. So spontaneous is used in that sense.

And, for example, if a child has been talked to in one case that I was working on, 69 times before I saw them, the odds of me getting a spontaneous report are very low.

Q. So if a child has been interviewed numerous times before meeting with you, it could potentially affect the quality of the information that is being provided? Is that fair to say?

A. Pretty much. And it deals a lot with how those interviews took place. I mean, for example, in the children's court, when I'm seeing a child it's pretty clear they've already been -- if it's an issue of child sex abuse, they have probably been interviewed by police officers, certainly by the Department of Children and Family Services. They may be in therapy. There may be all kinds of exposure before I ever see them. And in -- the more exposure, the less that I'm really going to be able to generate anew.

Q. Can you talk about the concept of a disclosure interview and the significance of that?

A. Well, I would -- I would say, No. 1, a person like myself, seeing children after an issue has already been brought up, it

it's very rare to have a disclosure interview. What that term really means is that it's the first time a child makes a report in this -- what we're talking about today, in terms of child sex abuse. So school teachers get a disclosure interview, a therapist might get a disclosure interview and that starts the ball rolling. And, you know, so in terms of where I would come in on most cases, I wouldn't get a disclosure interview.

Q. Ideally speaking, is it better to have less interviews than more with respect interviewing children who have been suspected of abuse?

A. In all of what we're going to talk about, the answer is a little more complicated.

In general, if you see children dozens and dozens of times and the interviewers are really interested in getting a report, it certainly is to the disadvantage of that child being spontaneous later on. So I would agree with that.

In other cases, children may not develop rapport with anybody for a while. When they see me, I have to be aware of the fact that a child is looking at an old guy with a patch and a beard and I have to overcome that before I can even really talk to children.

So sometimes it takes a little while but when you get into cases where they have been seen dozens and dozens of times, it really erodes what you're going to get out of a follow-up interview.

Q. You mentioned the word suggestibility. What is -- what is suggestibility?

A. If I can back up a bit. Depending on age, children can be very suggestible, meaning that they're easily influenced by some outside issue.

And I'll give you kind of a cut and dried example. They have done research where several children will be sitting in a room and a man will walk through the room wearing a blue shirt and adjust a clock. And then after a while, the interviewers say to the children one at a time did you see that guy walk through here with the red shirt adjust the clock, and they'll agree to that. And then thereafter, if you ask him he is wearing a red shirt -- and that's very limited -- but to the extent that an interviewer implies or tells a child certain things, they can be influenced by that. That whole umbrella of issues is put under suggestibility.

Q. Is that the same as coercion and contamination?

A. They all interact really. Contamination, when I talk about a spontaneous report, if someone goes into a child and says do you remember this guy, and they describe him, and what he did to you, that -- the child is already contaminated because you have presented them with something. Little kids are very vulnerable to that. The older ones can be less vulnerable to that.

But contamination is bringing in material to the child and -- that they didn't have before.

Q. And why --

A. And your other word, coercion, often occurs in what's called a dichotomist question, did he do this or this, you know, where you really -- there is pressure on the child to pick one of those two things.

And I might also mention on coercion, the very role of an adult examiner with a young child has a coercive effect in and of itself. I mean, they're aware that you have status as an adult. If you're a doctor or police officer, you have more status, and that will influence them.

Q. Is that because children have a need to please authority figures or is it something related to that?

A. Say it again?

Q. Is that because children have a need to please authority figures? Is that the concept?

A. It could be. I mean, developmentally, children figure out over time adults have a different status than they do. They become dependent on adults. They look to adults to make decisions for them. And that's a natural part of development.

Q. Are there other developmental factors that play into the risk of suggestibility, coercion and contamination?

A. There has been a lot of studies. Generally children that are less sophisticated, children that may be less bright, tend to be somewhat more vulnerable to suggestion.

Q. Are there ways to minimize the risk of suggestibility when

interviewing -- conducting interviews of children?

A. There are. The number one way is not to use questions or imply answers to questions with the child. That can be very frustrating at times because you're trying to get a child to talk about their own experience.

And in typical interviewing, the interviewee, the person you're talking to, should be saying more words than you are. And that does take some effort, and you have to build rapport and you have to facilitate them to talk.

Q. Is it fair to say that it's sometimes difficult to interview children in different situations? Sometimes children are reluctant to talk?

A. Oh, absolutely.

Q. Does that mean it's better to ask leading, closed-end questions to get a child to talk or to supply words?

A. Well, you can't force a child to talk. But on the other hand, there is a lot of things you could do to encourage them to talk. And, again, when I see a little child, let's say, four or five years old, they're -- and I interview them without other people present, they're afraid of me. So my task right off the bat is let's get rid of that, you know, and so sometimes using puppets, even playing tic-tac-toe, just cutting out that who's this guy and relating to them before you really try to get information.

Q. When you say relating to children, do you talk to them like

a kid? Do you talk to them in a baby -- using child language?

A. I don't. And some people do that. Some people, you know, play games of a very childlike nature. Sometimes that's good to get rapport but it also presents an image of this is game time so there has been cases I have worked on where they have said things like well, we'll use these dolls. You don't really have to say anything, the dolls will speak for you, that kind of thing. When you do that, you decrease the child's own responsibility and it becomes a game and what they say is very difficult to assess what it really means.

Q. Could you expand on that a little bit? What do you mean if a child -- are you saying that if a child is playing games during an interview, it --

A. What I'm saying is if the whole idea of your interview is we're playing games, it pulls away from the responsibility and the seriousness of what we're talking about.

Q. You mentioned that you interview children alone in a room. Is the setting important in terms of where interviews are conducted? Is that a risk factor with respect to --

A. Where it's conducted?

Q. Yes. In terms of the room itself, whether it's a quiet setting versus a crowded room with lots of people and lots of distractions?

A. Well, again, our goal is to get a child to talk in their own words and feel comfortable doing that. Whatever the

environment is that decreases that is probably not a good environment.

I interviewed a young boy who made certain statements to two uniformed police officers that came into his house, you know, replete with firearms. And he simply responded to whatever question they asked in the sense that they asked it. I can't say that that report was inaccurate or not but it certainly -- a young boy is going to speak to a uniformed police officer different than somebody else.

And if you have a situation where there are multiple people present, it does have an impact on what the child is going to say. They're overwhelmed. That social situation puts a lot of pressure on them.

Q. There is a concept reference called accusatory. In terms of other risk factors, increasing the risk of contamination and suggestibility, does an atmosphere of accusation increase the risk of contamination?

A. When you say that an atmosphere of accusation toward the alleged perpetrator? I presume you're not talking about the child.

Q. Yes. Yes.

A. Children will pick up, as anyone else will, on the tenor of what's going on. And if it's accusatory, if it's contending that they're negative, bad, whatever, they will reflect that. They can reflect that. I shouldn't say they will.

Q. Can you give an example of that, just generally speaking?
A. Well, you take a young child and you say, you know, not in these words but this is a bad guy, we already know it, you're setting the stage for the child to go along with that concept.
Q. What about -- what about the -- I guess it's kind of the inverse of that. What about supportive statements to a child?
A. Say it again?
Q. What about the converse of an accusatory tone? What about a supportive statement to a suspected --
A. About the perpetrator?
Q. About -- about what may or may not have happened to the alleged victim.
A. It would go either way. It could influence them either way.
Q. So if an investigator says something to a young child, "I know what happened to you was really bad, it was a horrible thing that happened to you," could that contaminate the interview process?
A. It certainly could. I mean, that's what I was talking about before. If you identify the alleged perpetrator as bad, you already tell them you know what's happening and so forth.
Q. What about if an interviewer asked a child, "What should happen -- what do you think should happen to the person who did this to you" in an interview?
A. That's a tough question. It depends largely on the issue

of age and brightness and so forth. Studies done on the development of morality would indicate that children until they're seven, eight, nine years old don't really have a level of morale development to even understand what that question would be. At an abstract level. At a very concrete level, he is a bad guy, get rid of him. But it puts a great deal of responsibility on a child when you ask him that kind of a question.

Q. Do you ask those kinds of questions in your interviews, Doctor?

A. I have never.

Q. Why not?

A. I don't know -- my task is to be able to provide information to the Court or the Department of Children and Family Services, whatever, and I don't think that provides any additional information. And it does put a child in a bind.

Q. What about the role of peers on -- with respect to the issue of suggestibility? Is peer pressure a factor in terms of that?

A. Definitely a factor. There was a case in the State of Minnesota in the mid 1980's -- and there were a lot of these cases going on at that time, these broad child abuse cases and infanticide, satanical rituals and so forth, so this case started with one child and developed and developed until they ended up with, I think it was, 21 alleged perpetrators. Hubert

Humphrey the III, who was the Attorney General of Minnesota at the time, brought in people from the federal government, psychologists, all kinds of people, to look at this case, and it fell apart. There was no basis for it.

One of the things they talked about was cross-germination.

Q. What is that?

A. And cross-germination is when you either tell a child, "We've already heard this before from other kids" or "other kids said this" or they talked to other kids. You know, so that's again a source of suggestibility. It happened to everybody, it must have happened to me, too. Or I'll go along with that. Whatever the mechanics of the mind are, they end up being affected by it.

Q. What about cultural factors or linguistic factors? For example, if a person is being interviewed, a person speaks Vietnamese but they're being interviewed in English but there is multiple interpreters in between kind of filtering the questions and filtering the responses, is that something that could increase the risk of contamination and suggestibility?

A. Let me start at the beginning. You said what about cultural factors.

In this case, they're just a huge number of cultural/language factors. And I would never attempt to evaluate children from Cambodia because I don't know enough

about that culture, I don't know the language. The very words that they say are critical, so if you interview in English, it's translated into Vietnamese and Cambodian, all those answers end up to be different. And there's, you know -- so it really complicates the issue.

And in some of these cases, like as far as I could determine, there was one child and eight people in the room. And when you look at the video, you only see the one child but there is obviously a whole cadre of people around the walls or something. I'm not sure where they were. That really puts a child in an anxious situation.

So the culture, the language, all those people. I don't know if it would be suggestibility per se but certainly can have an influence on them.

Q. Why did you say that the words that a child uses is crucial?

A. When we're interviewing children in English, if we start there, each child has their own words for, let's say, body parts. They have their own words for sexual activity, if they know about it. And these are often very personal words or family words. So if you ask them using a different term, they might not know what that is at all.

So in this case, there are -- there is a Vietnamese interpreter using certain terms, Cambodian interpreter using certain terms. They have this conversation, and then it goes

back to the English interviewer. And there is a whole number of steps there that seem to change the words.

And with a child, you really have to know their words, what they're talking about and how they use it.

Q. Not to disparage you, Doctor, but isn't what you're saying here really just -- just common sense?

A. I think all of what we've talked about right now is common sense. If you interview a lot of children, you know this happens, and I think if you're a parent, you know it happens, and it is common sense to a great degree what we're talking about.

Q. Are you saying that you can tell if a child has been abused or not based on your studies, based on a review of an interview?

A. Of this case?

Q. Yes.

A. I couldn't tell you if they were or were not. I don't know the other data in this case. I'm just looking at these interviews.

Q. So how do you see your role in terms of the -- the -- the undertaking that we asked you to do?

A. Well, I think the initial question, "Would you look at some of these interviews, look at some of these tapes and tell us, you know, what your thoughts are about it."

And I read a number of these interviews. It's a very involved, timely task, looked at the tapes, and in some cases, I

actually counted, with my associate, Dr. Howe, every single utterance of everybody in the room. And in one it was like 12,600 words from interpreters and interviews and 1,088 from the child.

So I started looking at it across the board, and really looking at the process of it, what's happening in these interviews. And then you could look at the content, which is what they're really saying. But it was very hard to take that content and see if the child was saying something new. And then also in the course of doing this, it became pretty clear that they had been interviewed before, obviously before, and they had probably been in counseling or therapy before. So you really don't know even where these cases come in on a timeline.

So my task was to look at it and I think I mentioned to you this is some of the challenges that we have here.

Q. If we could just back up and talk about your methodology again. You said in terms of reviewing the interviews in this case, you engaged in a multiple step process. You looked at the interview process -- you talked about the interview structure, you talked about the interview process, you talked about content.

Could you just kind of explain those terms generally and then we can talk about the specifics?

A. The interview structure is really what went on here, who is doing the interview, who is talking to these children, you know.

So you can -- you can identify that and I can count the words of these people. So that's just how it happened, where it happened, who's present, so forth. Those are things that we could all absolutely agree upon.

And then the process is really the interaction of these people with this child. We might not agree a hundred percent, but we would agree that there is one interpreter or translator asking a question using certain words and then another one asking the question maybe using different words. And in the course of that, I have no idea if those English words can even translate correctly into Cambodian and Vietnamese. I mean, you know, we have a concept but there is all kinds of different words that can be used for that concept. So that's really the process of what's going on.

And then the content is what are these children saying or what is the interviewer saying. So the structure, I think, is pretty clear. The process is that whole interaction, the social issues of a lot of people being in that room with the child, all of those things are a little harder to quantify. And then the content you can look through. And with some of these girls they say he tied me up, hands behind my back, raped me, engaged in oral sex, that's the content.

But what we've been talking about before that is where did that come from. It could be an actually true statement. It could also be, however, influenced by a whole bunch of other

variables.

Q. In this case, what did you do? How did you begin your review?

A. Well, what I began with is reading these transcripts. And it's -- it was a very challenging job because there is so much going on. And then you had sent me some DVD's, played them and the early ones I couldn't get to play. One of them I did.

And then I had a chance to look at the interview process, but it's really just focused on the child and maybe one other person, maybe the interviewer next, the English interviewer, maybe someone else. But all the rest isn't there. So I didn't find those DVD's of very much help to me.

Q. Based on your review in terms of the structure of the interviews generally in this case, what were your findings with respect to the interview structure?

A. I think that's what we've been talking about.

Q. Yes.

A. Multiple translators, the language issues, etc., who's in the room, all of those things.

Q. And you talked about the word count, is that a structural --

A. That's part of the structure, yes.

Q. And generally what did you -- you mentioned the word count, the number of words used by the interviewee versus the number of words used by the people who are asking questions.

A. The goal of interviewing anybody is to get that interviewee to talk, to put out words, their own words. And to the extent that you have many, many, many more words put out by the interviewer and the translators, it raises the issue of what are all these words and do they have in them issues of suggestibility, contamination, etc.

Q. And you said that you saw a disproportionate ratio of questions to answers? Or words to responses?

A. Actually words. Single words. And, you know, it doesn't come up and give you a finite answer, but it does represent what's going on.

And to be balanced, there was one interview that we looked at that there was one interviewer and one child. That interview was more balanced, you know. But the other ones, there's a huge amount of talking by other people.

Q. And what were your findings with respect to, I guess, the process issues in this case?

A. Well, that's the part I say we can't absolutely quantify, but we do know there is a number of people in those rooms, we do know that could have an impact on a child, we do know that some of the interviewing was very direct. For example, referring to some bodily secretion, was it sweet, sour or salty. When you ask a question like that, it's easy to pick one of them, and that's part of that process, how those words are being used.

Q. Anything else, Doctor? I'm sorry.

A. No, not really.

Q. And then under the content heading, what were your findings with respect to the content of these interviews?

A. The -- some of the children talk about very explicit sexual activity. And that's the content. That is definitely there. But how do you determine whether that's their own spontaneous recall, I couldn't tell, because there was too much of this other stuff going on. They had been talked to many times before, from what I could tell.

Q. Based on all of your experience and your review in this case, what's your conclusion with respect to the reliability of the interview process in this case or the quality of the interview process?

A. Well, I think what I've talked about previously brings me to the conclusion that there is a lot of questions about how this occurred, and what really went on there, and as I said before, if I only had this set of data, I couldn't tell you if these children were molested or not molested, but that's only dependent upon these interviews.

MR. BROWN: Thank you very much, Doctor.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MS. DONAHUE:

Q. Good morning, Dr. Maloney.

A. Good morning.

Q. Dr. Maloney, you are not saying that if an interview question is leading, that means the information provided by the child necessarily is untrue; right?

A. That's correct.

Q. In fact, one of the best ways to ensure that information provided by a child is not false is to look and see if there is information that corroborates what the child has said; right?

A. Correct.

Q. Corroborating meaning is there physical evidence independent of what the child has said that supports what the child has told law enforcement; right?

A. I -- in the -- in the recent books that have been put out, there's a good emphasis on getting other information.

Q. Are --

A. Not just interviewing, but looking at other data.

Q. And you look at all of the data in the case, not just the interview, to determine whether the information provided by the child is reliable; right?

A. If you're doing an evaluation for alleged child sex abuse, that's absolutely true.

Q. Are you aware of the corroborating information that -- seized in this case?

A. Purposely unaware. I wanted to just focus on the interviews.

Q. So you don't know, for example, what was seized from the

defendant's house in this case; is that right?

A. Only by implication. I don't know any exact information at all.

Q. You don't know what was on the computer in the defendant's house, do you?

A. I do not.

Q. You haven't seen any of the images that were recovered in this case, have you?

A. From the computers?

Q. Yes, sir?

A. No, I have not.

Q. Have you seen any of the photographs, hard copy photographs, recovered from the defendant's house in this case?

A. The only photographs I saw I think were of a headboard of a bed and a picture of a house. But nothing beyond that.

Q. And, in fact, you saw the headboard of a bed with sort of wooden carved flowers in it; is that right?

A. It looked that way to me, yes.

Q. And, in fact, that's a -- that headboard, the description of that headboard is something that several of the girls spontaneously provided to law enforcement in these interviews, isn't it?

A. I don't know what they provided to law enforcement. In one of the interviews I read, I think someone referred to it as an animal carving.

Q. Well, we'll go through it. But there's spontaneous statements from several of the victims regarding the floral carvings and the headboard; isn't that correct?

A. If it's in an arrest report -- not arrest, but investigative report, I don't know.

Q. No, I am referring to the same thing that you are. My understanding is you reviewed the transcripts of the interviews of the victims in this case; is that right?

A. Yes. Correct.

Q. And you saw a photograph of the bed and --

A. Correct.

Q. -- and you saw a photograph of the house?

A. Correct.

Q. And that is the universe of materials that you have examined in this case; is that right?

A. I believe it is. There may have been another photograph, but I don't remember what it was. Those, you know . . .

Q. You don't know --

A. No.

Q. If you were shown another photograph, you don't recall what was in it?

A. No.

Q. Now, Doctor, I'd like to ask you a couple of questions about your background.

You do primarily forensic work now; is that correct?

A. I primarily do correctional work, but I do forensic work, yes.

Q. By correctional work, you provide mental health counseling to inmates at the jail?

A. Well, programming, counseling, assessment, yes.

Q. Those are adults who are incarcerated?

A. Correct.

Q. And have you published within the last ten years in any of the major journals that address child sexual abuse?

A. No.

Q. You're not on the editorial board of any of those journals?

A. No, I'm not.

Q. Are you aware of what is the Journal For The International Society For Traumatic Stress Studies?

A. I'm aware of that journal, yes.

Q. Have you published in it?

A. No.

Q. How about the American Professional Society Against the Abuse of Children?

A. No.

Q. Have you published in that journal?

A. No.

Q. You're not on the board of that journal?

A. No, I'm not.

Q. In fact, as you -- as you said on direct examination, you

do many fewer cases in the area of child abuse than you used to.

Would that be fair to say?

A. That is correct, yes.

Q. And your experience in interviewing children is often in dependency court; is that right?

A. Yes.

Q. Those are not necessarily criminal cases, right?

A. They are -- they are independent of criminal cases, but there may be a criminal case parallel to it.

Q. There may or there may not be?

A. Correct.

Q. You also mentioned you work on the Sexually Violent Predator Panel. That's doing evaluations of the predator, not the child; right?

A. That's correct.

Q. And also your work on the Mentally Disordered Offender Panel, same thing, that's focusing on the mental health of the offender, not of the child victim; right?

A. In both those cases, mental health and risk, yes.

Q. Now, Doctor, several times during your direct examination, you mentioned young children, very young children. Doesn't the research show that children from age 11 on up are no more suggestible than adults are?

A. Well, I think the model that is referred to most is by Piaget, and by age 11 to about 14, normal children develop what

is hypothetical deductive reasoning. It's the same reasoning adults use. You make observations, you make a conclusion about it, you can test things out. Younger children can't really do that.

Q. So studies focusing on the suggestibility of children in the four, five, six-year-old range really would have no application to children who are, say, between the ages of 11 and 14; is that right?

A. Well, even adults, everybody is vulnerable to suggestibility. So they are in a better place than younger children for sure.

Q. They're in the same place that you and I are essentially as adults regarding suggestibility; right?

A. They have the cognitive mechanics that we have, but with experience and so forth and so on, there is still a difference.

Q. Doctor, can you cite me any peer-reviewed study that compares the suggestibility of someone between the ages of 11 and 14 and the suggestibility of an adult and concludes that somehow they are more suggestible than adults are?

A. I think a study by Steven Ceci and Elizabeth Loftus. I can't give you the cite for it, but it discusses those issues of suggestibility. Loftus actually discusses them with adults as well.

Q. Loftus focuses on suggestibility of adults?

A. More so, yes.

Q. And in fact, almost all of the suggestibility research is on children under the age of seven; isn't that correct?

A. I don't believe that is correct. But the focus really was on young children to start with, but it expanded beyond that.

Q. Okay.

So -- and that's based on the Loftus study that you just cited; is that right?

A. That's just one that I remember, but Steven Ceci and Brock -- I think Maggie Brock wrote a book that was published by the American Psychological Association, which is fairly rare, called *Jeopardy in the Courtroom*. And it's a scientific study or scientific analysis of sexual abuse allegations. And they cite hundreds of studies in that book and it's pretty expansive. It's not limited to just young children.

Q. And does that study say that children in the range of 11 to 14 are more suggestible than adults?

A. I can't tell you exactly if it says that. The implication is that with increased sophistication, you're less suggestible.

Q. So a more sophisticated adult is less suggestible than a -- someone -- an adult with lesser sophistication?

A. Yes.

Q. Doctor, you talked about word count, and I think you counted up some of the words in one of the interviews.

Are there any peer-reviewed studies that correlate the number of words used in an interview with the reliability of the

information provided by the child being interviewed?

A. I don't know if there are peer review studies on that.

Q. Have you done any empirical study yourself of that?

A. In another case I did, but in -- could not submit it for publication because of the case.

Q. You also mentioned that the number of times that a child has been interviewed can make a difference?

A. Yes.

Q. Can you cite any peer-reviewed articles that discuss how many times is too many times?

A. I believe in the -- the Katherine Kuehnle book -- I don't know the pronunciation of her name -- but that was published in 1996. And she does comment on that issue in there and does cite studies. I can't tell you which ones they are.

Q. So is there some number which is considered the cutoff point beyond which there are too many interviews --

A. No.

Q. -- and the subsequent interviews are unreliable?

A. No. You'd have to look -- the number of words put out is a structure issue. Then you look at the process, then you look at the content. So none of these in isolation are going to give you the final answer.

Q. But specifically looking at the number of times the child has been interviewed -- you mentioned dozens and dozens of times in one instance, you mentioned 69 times in another instance.

Is there some sort of benchmark or number that your profession looks at to determine after what point the interview is no longer reliable?

A. No. You'd have to look at the child's age, their level of intellectual functioning. There is a whole bunch of variables involved in that. Most critically is the content of what was in those previous interviews.

In a case in San Diego, the Court allowed me pretty broad access and I got data from therapy groups, so forth and so on. The minimum time that any child was talked to by other people was 69 and the highest was 144. So when I went to look at it, the same material is talked about in these interviews, you know, repetitively.

Q. So if a child has been interviewed 69 times about the same thing, then you would question whether maybe on the 70th run, you're getting any spontaneous information?

A. Exactly. But I don't think there is any magic to the number.

Q. Are you aware of the number of prior interviews that were done on the -- had been conducted of the victims in this case?

A. No, I'm not.

Q. Let's talk about some of those interviews. Do you have transcripts of those interviews with you?

A. I do not have all of them. I have a whole box of . . .

Q. Let's talk about the interview of -- her name is NTDx.

It's N-T-D-x. That's an interview that was done on November 3rd of 2006.

A. I do not have that with me, but we can certainly talk about it.

Q. I have got an extra copy.

Your Honor, could we just give him a copy of the transcript --

THE COURT: Certainly.

THE AGENT: May I? Doctor, this is for you and they're each tabbed --

THE WITNESS: Okay. Thank you.

BY MS. DONAHUE:

Q. You should have in front of you a transcript of an interview done on November 3rd, 2006, from 4:10 p.m. until 5:55 p.m.

A. Yes. I think I do have this but I have it labeled as NTD.

Q. Yes. Those are her initials.

And there were four people present at this interview; is that correct?

A. I believe so. Well, actually in the note it says six people at interview.

Q. That's the -- because the note double-counted an interpreter with one of the participants.

This is an interview. The child was there, Special Agent Hung Nguyen was there, Vansak Suos from the State

Department was there, and a child counselor by the name of Sook, that's S-O-O-K, Sinh, S-I-N-H, was there; is that right?
A. Yes.
Q. In fact, this interview was conducted in Vietnamese; isn't that right? This is the interview that you referred to on direct examination when you said there was no translation?
A. Yes. Okay. Fine.
Q. The interviewer went straight from -- spoke in Vietnamese, and the victim also spoke in Vietnamese; is that right?
A. It appears that way, yes.
Q. And if I can have you turn to Page 10 of the transcript.
A. Yes.
Q. NTDx, the girl who is being interviewed, raises the subject of Mrs. Khia, K-H-I-A; isn't that right?
A. Yes.
Q. That Ms. Khia is not a person whom the interviewer suggested to her; correct?
A. She brings it up.
Q. It's a spontaneous statement from her, she brings up the topic of Ms. Khia. The interviewer doesn't say, "Mrs. Khia is the person who brought you"; right?
A. It's spontaneous if you went back and determined that no investigative officer or anyone else ever brought it up.
Q. And this interview was on November 3rd of 2006; right? That's the date on the front of the transcript?

A. Yes.

Q. And are you familiar with the circumstances under which this girl was rescued and brought to law enforcement for an interview?

A. No, I'm not.

Q. I would like to turn your attention to Page 11 of the transcript, near the bottom of the page.

A. Yes.

Q. In fact, the second to the bottom, she is asked about the house and she volunteers the house had a plum tree and a custard apple tree in front.

That's volunteered information, right?

A. Again, if it wasn't brought up previously, yes.

Q. In fact, this interview, Doctor, of NTDx is replete with information that certainly is not suggested by Special Agent Nguyen in this interview; right?

A. Not in the interview, that's correct.

Q. So if there was suggestibility going on here, your testimony is that it must be because she got it from an outside source before this interview?

A. Yeah. In the words we're using before, it is a form of suggestibility, but it would be contamination. That she already knew this.

Q. You're not saying that this interview -- that this was a suggestible interview; you're saying that there could have been

contamination -- you're speculating there may have been contamination, but you don't know?

A. It is -- it is possible. I have some notes on this interview.

Q. Well, that's not my question, Doctor. My question is you're speculating that this may be contaminated by other interviews of which you're unaware; is that right?

A. It's certainly a possibility, yes.

Q. I would like to just turn your attention to Page 15. Again, near the bottom of the page, you can see the agent's question is, "Then what happened?"

And she goes on to say in detail: "I fought back, he hit me. He was afraid of my screams."

That's not something that the agent suggested to her, is it?

A. Not in the context of this interview.

Q. He's not the one who raises the subject of pressing the pillow on her face until she couldn't breathe, is he?

A. That's true.

Q. And if you can turn to Page 16 of that interview, about two-thirds of the way down the page the agent says when you say that he, quote, went, close quote with you, what exactly did he do?

That would be an example of an open question; right?

A. Yeah. That's -- there's nothing in that question that

provides the answer.

Q. And in fact, when you interview a child, once you get the -- you ask the open questions, you do have to follow up with more pointed questions in order to draw out all of the details about the sexual abuse; isn't that true?

A. Yes. As long as you don't provide the answer in the question.

Q. For example, by saying, "When you say that he went with you, what exactly did he do."

And then I'd like to -- if you can just turn to the next page of that interview, Page 17. Do you see at the top of the page -- actually I'm -- the question at the very bottom of Page 16, "And what was his bed like?"

A. Yes.

Q. She responds, "It has pictures" -- "What does the bed frame look like?"

And she says, "It has pictures of flowers."

And the agent says, "Oh, it has photos of flowers displayed on it?"

And she corrects him and says, "No, the flowers are imprinted into the wood, they're carved into the wood."

She is describing the headboard of the bed. Obviously the agent doesn't know or didn't lead her and doesn't know what it looks like; correct?

A. That's correct.

MR. BROWN: Objection.

THE COURT: Overruled.

BY MS. DONAHUE:

Q. If you can turn to the next page of that interview, Page 18, look about -- it's near counter No. 38. It's about a third of the way down on the page. The agent says to her, "When he finished, what else did he do to you?" Arguably a leading question; right? Suggesting that he did something else to her?

A. It does suggest that but it isn't egregious in any sense.

Q. And her answer, though, is "Nothing." She doesn't take the -- take it as a leading question. She responds, "Nothing."

A. She said when he finished, she took a bath and went downstairs.

Q. And, in fact, this interview of NTDx is really replete with those examples. Doctor, I'll have you turn to Page 31 of the interview.

MR. BROWN: Your Honor, just for the record I am going to object to the prosecutor testifying.

THE COURT: I think statements like --

MS. DONAHUE: Sorry. I apologize. We will go through it.

Q. Turning to Page 31, about a third of the way down the page do you see the question, "Did he show you any photos of any sort?"

A. Yes.

Q. In fact, two questions up from that do you see the question, "When you were having sex with him or he with you, did he photograph or videotape?"
A. Yes.
Q. Is that a leading question?
A. It could be but she doesn't respond to it that way.
Q. How does she respond?
A. She says, "No, he didn't. Never did."
Q. And then he asks about, "Did he show you photos of any sort?"
And how does she respond?
A. "No. But he took me into the room belonging to the children under his care," and so forth.
Q. That's new, spontaneous information provided by the victim, isn't it?
A. It would appear to be. Again, with the qualifier that it wasn't talked about before.
Q. It certainly wasn't talked about before in this interview?
A. Not in this interview that I recall.
Q. And further down the page, same page, Page 31 of this interview, in response to the question, "When did Mrs. Khia tell you when she" --
The answer, "When she was taking me to his house."
"What did she say?"
That's followed by a long narrative from the girl

about what Mrs. Khia told her, isn't it?

A. Yes.

Q. "She said if I behaved myself and he wanted to take me in, he would spend a hundred dollars per month to take care of me. If I cried, he would not want me."

A. Correct.

Q. "At that time I had no clue as to the way a man would care for children. I only knew the way women cared for children, the way my mom took care of me. I did not know he was an American."

That's all new information provided by her, isn't it?

A. If it's not somewhere else. In this interview, it is.

Q. You don't know whether this is the first time that she spoke with ICE agents, do you?

A. No.

Q. It's the first interview, the first transcript; correct?

A. I believe it is.

Q. I would like to turn your attention to Page 32 of that transcript. About a third of the way down, the question is "When you were there, did he ever take a bath with you?"

And then she spontaneously provides the information, "When I was pleasant and playful with him on the Saturday morning before I left, that morning I was cheerful, and he did not tie me up."

That's also spontaneous information from her, isn't it?

A. In this interview, yes.

Q. And the agent again asks her, "so when he went with you, did he do anything else besides inserting his into yours?"

And she responds, "He only put his inside mine"; right?

A. Correct.

Q. She doesn't take that opportunity to go and expand upon all sorts of other activity?

A. No. But then the interviewer asked, "Did he lick you, force you, etc.?"

That's obviously leading, but she says "No."

Q. And she had previously in this interview described how she had been tied up and raped; isn't that correct?

A. That is.

Q. There is nothing in this interview of NTDx itself that suggests to you that she was impermissibly led, is there, Doctor?

A. Not in the context of this interview, that's correct.

Q. Well, as to her, that's the only thing that you interviewed -- that you reviewed, excuse me; isn't that right?

A. Pardon?

Q. I'm sorry. As to this victim, this is the only material that you've reviewed; isn't that correct?

A. That's correct. Yes.

Q. Now, if you -- do you have the transcripts of the

interviews of I.T. in front of you?

A. Which one?

Q. I.T., I.T., I period T period. You may have it up there as I.T., I-T-x-x. It's also in the binder.

A. Let me just see if I have that. The title of it is I.T.?

Q. Actually -- or unknown child.

Could I have the agent help him, Your Honor?

THE COURT: Why don't we take our 15 minute break and you can do it then.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We will take our 15 minute break.

(Recess taken)

(Jury In)

THE COURT: Everyone is back. Dr. Maloney, you are still under oath.

Ms. Donahue, you may continue.

MS. DONAHUE: Thank you, Your Honor.

BY MS. DONAHUE:

Q. Dr. Maloney, you have before you now the interviews of I.T.; is that right? She says, if you look at the first interview, the first page, "What is your name?"

The phonetic I-T-x-x-x-x. I.T. is how you say it.

Do you see that?

A. On which page --

Q. Page 1. If you look at the first page of the first interview.
A. Yes.
Q. And if you -- this is an interview that was done on June 16th of 2006; is that correct? Do you see that?
A. Yes.
Q. Do you know whether this interview was done before or after the search warrant was executed at the defendant's house?
A. No, I don't.
Q. Do you know where in the -- how long -- let me strike -- do you know how long after I.T.'s initial disclosure this interview was conducted?
A. No, I don't.
Q. Is this the interview you were referring to on direct examination where you said there were a number of people present?
A. This is one of them, yes.
Q. And the people present were obviously I.T., Gary Phillips, Special Agent Phillips from Immigration and Customs Enforcement who was doing the interview, Valorie Garcia, who is listed as a child counseling agent.
A. Yes.
Q. And then there was a Vietnamese interpreter?
A. Correct.
Q. And two different Cambodian interpreters who came in and

out?

A. Correct.

Q. And that's it; right?

A. It says Unknown Males 1, 2 and 3.

Q. The transcript refers to unknown males as listing the participants in front but, in fact, when you read the interview you can see that those are actually the interpreters; right?

A. I believe so.

Q. So it's misleading. It looks like there are more people there than there actually were if you were to just look at that list of participants, right?

A. Yes.

MR. BROWN: Objection. Argumentative.

THE COURT: Overruled.

BY MS. DONAHUE:

Q. So it's I.T., the counselor, Special Agent Phillips, the Vietnamese interpreter, and then two Cambodian interpreters who actually, if you look in the interview, sort of switch out.

So six people total; right?

A. I believe that's correct.

Q. Okay.

And your understanding is they were using Vietnamese and Khmer interpreters because they weren't sure which of the two languages the child would be most fluent in; is that correct?

A. I believe that's true.

Q. Some of these girls, although they live in Cambodia, are from Vietnam; right?

A. Correct.

Q. If you can look at page -- near the beginning of the first interview, Page 11, about halfway down the page, she's asked what she wants to do when she grows up or what kind of job she would prefer, and she says, "I like to sell rice noodles"?

A. Correct.

Q. And then further on down the page, the bottom of Page 11 and going over to the top of Page 12, the agent and the interpreter offer her a variety of sporting activities and ask if she likes any of them. And her answer is to reject all of their suggestions about sporting activities and say, "I only like to be with my maternal grandma"; isn't that correct?

A. Well, at the bottom of Page 11, she says yes to -- my guess is to television. And then on Page 12 at the top she says, "I like to be with my maternal grandma."

Q. So she shows an ability to reject all of the choices offered by the interviewer and assert herself; right?

A. Yes.

Q. Despite the fact that there are a number of adults in the room with her; isn't that right?

A. That's correct.

Q. If you could turn to Page 21 of that transcript. If you

look about halfway down the page, she's asked whether or not Michael wears glasses and she says "No," but then she spontaneously -- in fact, it says "adding" -- "when he went to work, he wore glasses"; right?

A. Correct.

Q. So even as to a small detail, with all of the adults in the room, she's still able to spontaneously provide information; isn't that correct?

A. Correct. They ask her a number of questions following that about the same issue, and she says she worked in his office, so . . .

Q. And she volunteers that the office is upstairs --

A. Correct.

Q. -- in the house?

And she explains that he drives a car?

A. Correct.

Q. And if you could turn to the next page, Page 22. Near the bottom of the page, she's asked, "Okay, does he speak Vietnamese or Khmer?"

That's a question -- one of those choice questions you talked about, right, where you give the child choose either A or B?

A. Correct.

Q. And she doesn't choose either of those.

A. She responds, "He only speaks English, if necessary. The

boss lady speaks to him in English."

Q. So it's an instance where she is given a closed question, a choice between A and B, and she rejects both choices offered by the agent and say no, C is the right answer?

A. That's correct.

Q. Doesn't that demonstrate, despite all the people in the room, an ability to listen to the question, think independently of the true answer and provide it?

A. Yes.

Q. I'd like you to turn to the second interview. It says 2 of 3. It's just a continuation. They just changed tapes. At Page 1. The question is about halfway down the page, it says, "Can you describe the house for me?"

A. Is this an interview at 6/16/06? On the front it says 52:50?

Q. Yes, sir. Same interview, same day, just changing the tapes, next transcript.

A. My copy starts at Page 3.

Q. Oh, okay. I apologize. Do you see about -- there about two-thirds of the way down the page, "Can you describe the house for me?"

A. This is on Page 3? I may be missing one interview in the middle of this.

Yes.

Q. Do you see where that is?

A. Yes, I do.

Q. And at that point in the interview, the agent had not shown her a photograph of the house; isn't that correct?

A. I'm not aware of that, but if that's the case.

Q. You have reviewed these transcripts --

A. Yes.

Q. -- and you haven't -- at this point in time he hadn't put the photograph in front of her?

A. Not in the course of this interview, right.

Q. Then she proceeds to give a description?

A. Correct.

Q. It you can turn to the very bottom of Page 2, do you see the question at counter 406, "Can you tell me what the inside of the house looks like?"

A. Yes.

Q. She responds, "There was a large fish inside the house."

And the interpreter says, "He raised a big fish."

And I.T. interrupts and says, "No, it was not a real fish. It was a wooden fish."

A. Correct.

Q. It shows she has the ability to interrupt the interpreter and say no, that's not -- that's not the right answer. I'm talking about a wooden fish?

A. Correct.

Q. If you can turn to Page 5 of that interview. And if you

look near the top of the page, again, as with NTDx, she explains that the bed has carved floral designs on the bed.

Do you see that?

A. Yes.

Q. And then looking down near the bottom of the page, same page, Page 5 of that interview, the -- the suggestion is made to her, "Does he have body pillows?"

And she says, "No, no body pillows. Just two head pillows on the bed."

A. Yes.

Q. And she's asked what's the color of the pillow, which is an open question; right?

A. Yes.

Q. And she responds "Orange."

A. Correct.

Q. So at least these examples indicate to you, Doctor, that she was asked open-ended questions and provided what you, I believe referred to earlier, as spontaneous answers; isn't that right?

A. Yes. The nature of these questions are neutral.

Q. She's describing the house --

A. Correct.

Q. -- where these things happened to her?

A. Correct.

Q. And by the way, do you know whether these descriptions

are -- that she gave of the bed and the house are accurate?

A. I don't know.

Q. In that same interview, if you can look at the bottom of Page 15, going on to Page 16, do you see at counter 27:10, Special Agent Phillips says, "Okay, what does that mean?"

And the interpreter says, "What does that mean?"

And the second interpreter says, "What did he do? Go on, try to describe."

And she raises, "He blindfolded me."

A. Correct.

Q. And the interpreter is surprised and says "Huh?"

A. Yes.

Q. And then the interpreter says, "He blindfolded -- when he put his penis inside I.T., he blindfolded her," and she responds spontaneously, "He made me bite on a piece of cloth."

A. Correct.

Q. And the cloth is not a question that was -- he made me bite on a piece of cloth is not an idea that was suggested to her?

A. Not in this interview, yes.

Q. So are -- you are speculating then that someone suggested it to her in a prior interview?

A. I'm not speculating that that occurred. I'm simply saying she may well have been interviewed about this material before.

Q. So if she was interviewed about this material before, then is it your testimony that it wouldn't necessarily be believable

because she said it again in this interview?

A. No. I'm just simply saying in the context of this interview, she is certainly saying things that are not being told to her, which she may have been investigated or interviewed previously and is reproducing what she said before.

Q. But at least in the context of this setting with this number of adults, she is certainly providing spontaneous information?

A. In the context of this interview, yes.

Q. Do you have before you the interview of L.K.xxx? That's L-K-x-x-x-x-x. Do you have that one up there?

A. How is it described again?

Q. It would be L.K.xxx, L-K-x-x-x-x-x, and I am going to ask Special Agent Phillips to go up and help you locate it.

THE COURT: Please.

THE AGENT: There you go, sir.

THE WITNESS: Okay. Thank you.

BY MS. DONAHUE:

Q. You can turn to -- her interview was done on June 20th --

A. Correct.

Q. -- of 2006.

And then there is an interview on June 26th of 2006; isn't that correct?

A. Well, I have the first one here. Does the next one follow right behind it?

Q. Yes. The next one follows behind it.

A. Yes.

Q. And obviously L.K.xxx was present at that interview. And Special Agent Phillips. And Suos Vansak from the State Department, an interpreter and then there was a second interpreter, and they kind of switched out; isn't that right?

A. Hum --

Q. Suos Vansak and Va Tong essentially kind of switched out, if you remember the tape.

A. Yes.

Q. And then there was someone running the camera from the International Justice Mission; right?

A. It looks that way, yes.

Q. So there was a total, including the victim, of five people?

A. Yes.

Q. Now, during the interview on June 20th, L.K.xxx described how she had been -- how the defendant had tied her up and raped her; isn't that right?

A. Can you give me a page reference?

Q. Yes. I can. She justly described that during that first interview, isn't that correct?

A. I believe it is, yes.

Q. And then in the second interview, on the 26 th, Special Agent Phillips went back with some physical evidence that had been seized from the house; isn't that correct?

A. I believe on the video of this he brought in some cloth and what appeared to be maybe wires or something to that effect, from memory.

Q. He -- and when he brought those items of physical evidence in, that was not the first time that he had interviewed L.K.xxx, was it?

A. I don't believe it was the first time.

Q. She -- he had already interviewed her and she had already disclosed that she had been tied up; right?

A. Yes.

Q. And then he returned with physical evidence to ask her if -- whether or not she recognized any of these ropes and cloth that had been seized from the defendant's house; right?

A. I believe that's correct.

Q. In fact, she said she did not recognize the rope, but she did recognize the cloth; isn't that correct?

A. I believe that's correct.

Q. Rejecting an item, saying no, that's not the rope, certainly shows a resistance to suggestibility, doesn't it?

A. It could.

Q. You can take a look at the June 26th interview. It's June 26th, '06, Page 18. If you'll look about two-thirds of the way down the page, you can see the agent is asking her to -- about a bottle, a pink tube or a bottle?

A. Yes.

Q. And he says, "Can you draw it for me?"

And her answer is, "That bottle was in the cook's room."

Do you see that?

A. Yes.

Q. That's not something that the agent suggested to her, is it?

A. It doesn't appear to be in this interview.

Q. It looks in this interview like that's her spontaneous statement about where the bottle of baby oil was located in the house, isn't it?

A. Correct.

Q. If you could take a look -- and I'll ask Special Agent Phillips to help you find it -- at the interview of K.S.x.

THE COURT: You may assist him.

MS. DONAHUE: Thank you, Your Honor.

Q. Do you have that before you, Doctor?

A. I do, yes.

Q. This was an interview that was done on September 27 of 2006; correct?

A. Correct.

Q. And the victim was present. The interviewer was Special Agent Taecook Cho from Immigration and Customs Enforcement, and there was a Cambodian interpreter and one Vietnamese interpreter.

A. Correct.
Q. And that's it?
A. Yes.
Q. And do you know how this child came to the attention of law enforcement on September 27 of 2006?
A. I do not, no.
Q. And do you know whether or not this was her first interview regarding the defendant in this case?
A. I don't know that.
Q. And if you could turn to Page 6 of this transcript. She describes where she lived, telling the agent she was in Sihanouk Ville and before that she had been in Thailand; isn't that correct?
A. Correct.
Q. And at least based on this interview, that certainly doesn't appear to be anything that was suggested by the agent; is that correct?
A. In the context of this interview, yes, it is.
Q. If you would turn to Page 11, if you look about a third of the way down the page at counter 19:28 she explains how she went from living with her parents to be in Sihanouk Ville?
A. Correct.
Q. And, again, that background does not appear to be something that the agents are feeding to her?
A. That's correct.

Q. And if you turn to Page 14, the same would be true regarding the activities that she likes to do in her spare time; isn't that correct?
A. Watching television and so forth, yes.
Q. If you turn to Page 15, the agent asks her if she knows an American, and she identifies him as Michael; isn't that right? The agent doesn't tell her that his name is Michael.
A. On which page are you --
Q. I'm sorry. Page 15, about halfway down the page.
A. That's correct.
Q. If you can turn -- if you'd turn near the end of that interview to Page 48, if you see she's asking -- actually, if you look near the top, the agent is asking about whether or not the defendant ever took photographs of her. Do you see, "Did he ever print naked photos of you which he took?" Answer: "No."

She rejects that notion, and she's asked again, "How about printout photos without clothes on? Did he have your photos without clothes?" Answer: "No."
A. Yes.
Q. Doctor, a couple more I'd like you to take a look at. The interview of S.R.xxx, S-R-x-x-x-x-x. If I could have Special Agent Phillips approach to --
A. I have it here.
Q. You have it there?
A. 6/20/06 --

Q. 6/20 --
A. 29:56.
Q. This is the girl who volunteers upfront that the doctor says one of her legs is broken and then tells the agent that she was just kidding.
Do you see that? That's on Page 1 of the first transcript?
A. Yes.
Q. She doesn't appear to be a child who is intimidated by the people in the room, does she?
A. Not at this point, no.
Q. The people who were there were obviously S.R.xxx, Special Agent Phillips, Suos Vansak from the state department, who also acted as an interpreter, a man from the International Justice Mission. So that's four people; right?
A. It has Unknown Male 1 and 2.
Q. That's because it's duplicated -- those are the interpreters, Mr. Suos Vansak and the man from the International Justice Mission, if you look in the transcript, right?
A. If they are duplicates, sure.
Q. Well, you have seen the tape.
A. I have seen the tapes but in most of them, it was just a shot of the alleged victim and the interviewer and maybe a translator, but there were other people I couldn't see.
Q. And the transcript lists, like here the man from the

International Justice Mission, Ming Lang, who obviously was operating the video camera?

A. Yes.

Q. And so she -- she -- she jokes about having the broken leg, and then if you can go a little further into that transcript to Page 5, if you look about a fourth of the way down the page at counter 8:41?

A. Yes.

Q. She's asked about the school she attends and whether or not it's far from the house. And she spontaneously says, "Oh, I remember now. It's the Tool Court No. 2 school."

A. Correct.

Q. Which is certainly not something the agent had mentioned to her earlier, is it?

A. Not that I can tell in this interview, no.

Q. If you look at Page 11 of this interview if you look down at count -- about halfway down the page at counter 22:43, Special Agent Phillips asks, "Can you tell me what Michael looks like?"

A. Yes.

Q. And she volunteers that he's fat and she volunteers that he has a mole.

A. Yes.

Q. And then she proceeds to point to it, the area on her body where the mole is located; right?

A. Yes.

Q. That's not information that is provided to her earlier in this interview; isn't that correct?

A. Not in this interview, that's correct.

Q. If you can move a little further into that transcript to Page 22, if you look about two-thirds of the way down the page, she's being asked to try to remember, there are pictures, there are photographs in Michael's house?

A. Yes.

Q. And you see she says downstairs there are pictures and then she says it has a cabinet. She volunteers the information about the cabinet in the house; isn't that right?

A. That's correct.

Q. If you go a couple more pages into that transcript at Page 24, she is describing the -- Michael's room.

A. Yes.

Q. And she explains that he keeps rope in there tying kids' hands and legs; isn't that right?

A. Yes.

Q. And that's her explanation?

A. She says rope, toys, yes.

Q. If you turn a little further into that transcript at Page 28, near the top of the page Special Agent Phillips says to her, "And what is oral sex? What is it?"

The interpreter tells her to tell it straight out.

And she says, "Eating penis."

Those are her words; right?

A. Yes.

Q. If you turn to Page -- further down to Page 23 in that transcript --

A. Which page?

Q. Page 23. I'm sorry. 23. Near the bottom of the page, it's at counter 46:29. Special Agent Phillips says to her, "Besides yum-yum and massage, did you do anything else with Michael?"

The interpreter, "Besides yum-yum and massage for Michael, did you do anything else?" Answer: "No."

Do you see that?

A. Can you give me that page again?

Q. Certainly. 23.

A. 23?

Q. Yes.

A. On this 23 I have counters that look like 48:10, 48:27.

Q. I'm sorry. That may be the next set of transcripts for S.R.xxx.

A. Okay. What was the counter again?

Q. 46:29.

A. Okay. And the question was that --

Q. You see where -- Special Agent Phillips asks her, as does the -- and then the interpreter interprets whether, "Besides

yum-yum and massage, did you do anything else with Michael?"

And she says "No"; isn't that correct?

A. Yes.

And then someone says, "Did he ever touch you? Did Michael ever touch you?"

And she says "Yes."

Q. And she describes it?

A. "How did he touch you?"

"Caress."

"Did he ever try to kiss you?"

"Yes."

Q. And then if you keep -- actually keep going, if you look at Page 26, about two-thirds of the way down the page at counter 51:47, Special Agent Phillips says, "Okay, did he ever boom boom with you?"

Translation, "Did he ever boom boom with you?"

Answer: "No."

"How about with your sister?"

Answer: "No."

Do you see that?

A. I do, yes.

Q. So certainly this child was given the opportunity to describe sexual conduct far in excess of the oral sex that she did describe, wouldn't that be fair to say?

A. It appears that way, yes.

Q. And she didn't. She said no?

A. Correct.

Q. Doesn't that suggest at least -- I shouldn't say -- doesn't that indicate to you a fair amount of resistance to any suggestibility that did occur in the interview?

A. Yeah. I mean in the context of this interview, yes. But I don't know what went on before. If this is repetition or not.

Q. But, Doctor, your entire testimony is based only on the context of these interviews; isn't that right?

A. It's on the nature of these interviews.

Q. And it's what they say, what the interviewers say and what the girls said, that's the -- your universe of information about this case?

A. Yes. But on direct I said this is what you would call the content part of an interview, and I -- based on these interviews, where they took place and how they took place, I can't say with firmness this is accurate or not accurate.

Q. Right. You can only say that when given -- presented with the opportunity to describe more explicit sexual conduct that could have happened to her, at least in this interview, she said no?

A. That's correct.

Q. She described what she -- she gave a description of what did happen and when asked what else happened, she stopped?

A. Correct.

Q. Okay.

And if you can take a look at the transcripts of the interviews of T.C.xx, and these are interviews that were done on August 25th of 2006.

Do you have those in front of you?

A. I'm searching. Yes.

Q. August 25th of 2006. And obviously the victim is present and she's interviewed by Special Agent Taecook Cho and there is a Cambodian interpreter present and Vietnamese interpreter; correct?

A. Correct.

Q. So the victim and three other people?

A. Correct.

Q. And she actually starts almost immediately, if you look at Page 1, by telling the agents that "It's cold in here," doesn't she.

A. Correct.

Q. She speaks right up. Doesn't appear, at least initially, to be intimidated by the law enforcement agents?

A. Well, she's certainly rubbing her arms and saying it's cold.

Q. And if you would take a look at this transcript. If you look, there are -- this -- there are five parts. If you look at the second one, just the way the tapes are broken up -- if you look at the second one, it's August 25th, start call duration is

31:53.

A. Yes.

Q. Page 1. About halfway down the page, she's asked, "Can you read and write in Vietnamese?"

A. Yes.

Q. And she says, "I cannot write in Vietnamese," but she goes on and volunteers information and says, "I can write in Khmer and in English"; isn't that right?

A. Correct.

Q. And if you look a little further into that transcript at Page 4, near the bottom of the page, she says she knows Michael.

And the agent says "Who else?"

And she says, "A Mr. Bobbo."

And the agent says, "Oh. Is that the same person -- are Bobbo and Michael the same people?"

And she says, "No, no. Different people."

A. Correct.

Q. She rejects any suggestion that they're the same people; isn't that correct?

A. Correct.

Q. And then when you get into the sexual conduct, if you turn to Page 9 of that transcript, about halfway down the page, the question is, "Then what happened?"

A. Correct.

Q. And she describes feeling sleepy. "He came in. He shut

the door. He tied my hands and feet. When I woke up, I saw the blood."

That's not something that's suggested to her in this interview, is it, Doctor?

A. Not in this interview, correct.

Q. And you don't know whether she had ever been interviewed by anyone about her contacts with the defendant in this case before this interview, do you?

A. I don't know.

Q. If you look at Page 11 of this interview. If you look about halfway down the page, she's asked, "Did you have your clothes on --

A. Yes.

Q. -- or off."

And she volunteers, "I only had the top."

A. Correct.

Q. That's not something that was suggested to her by the agents?

A. Well, in the interview right before that: "How were you dressed?" And the Cambodian says at that time what about her clothing. The Vietnamese: "Do you have clothes on?"

Then "Yes."

"So you were dressed? You're clothes were not off?"

"I only had the top."

Q. Nobody suggested to her that she was only wearing a top?

A. No, but the question right before that, so you were dressed, is a challenge. "Your clothes were not off." So she gives an in-between response.

Q. To a direct challenge?

A. Correct.

Q. I'd like you to turn to Page 14 of this interview. If you look about two-thirds of the way down the page, she's asked, "How are his eyes?"

Do you see that?

A. Yes.

Q. And how does she respond?

A. "They look like cat's eyes."

Q. That would certainly be an example of a spontaneous statement, wouldn't it?

A. It could be. It might have been good to ask why they look like cat eyes. The Vietnamese interpreter was giggling when she said that, so . . .

Q. It made the Vietnamese interpreter laugh. Certainly nobody suggested to T.C.xx that the person who raped her had cat's eyes?

A. No, they didn't. But again that's a question that could easily have been followed up upon.

Q. But that doesn't change the fact that she spontaneously provided the information?

A. Correct.

Q. So, Doctor, essentially your testimony is that all of these interviews should be placed in context with the rest of the evidence in the case; is that right?
A. Correct.
Q. And that looking at them in isolation really isn't necessarily all that informative, is it?
A. It does. What we have done is select out parts that present certain issues. There are other parts that are fairly egregious.
Q. And the -- but certainly the entire interview is not egregious; right?
A. Not all of them.
Q. Not one entire interview of any of them is egregious?
A. No. Not every single interchange, certainly not.
Q. And you can point to excerpts that show open-ended questions; isn't that right?
A. Yes.
Q. And you can point to excerpts that show leading questions; right?
A. Leading and suggesting, all the things that we have talked about, you can show all of them.
Q. And there are portions in these interviews where the suggestion is taken by the -- by the victim; isn't that right?
A. Yes.
Q. There are places where the victim rejects the suggestion;

isn't that right?
A. Correct.
Q. There are places where the victim provides spontaneous information; isn't that right?
A. Correct.
Q. So sometimes they follow the lead and sometimes they offer up their own information?
A. That's correct.
Q. Is there some sort of percentage of open questions or suggestible questions that we're supposed to look for to determine whether or not these interviews are valid?
A. There is no percentage. I'm not aware of anyone ever suggesting that kind of thing.
Q. There is no sort of national average for the percentage of open questions that are necessary in order to make an interview valid, is there, Doctor?
A. Not at all.
MS. DONAHUE: I have no further questions.
THE COURT: Redirect?
MR. BROWN: Your Honor, I do have some transcript excerpts that I would like the jury to have to follow along. I was also intending to play portions of the video and I do have copies for the Court and they are labeled. Counsel already has a copy. I was wondering if I could -- and also for the witness, Your Honor.

THE COURT: Okay.

MR. BROWN: May I approach?

THE COURT: Yes.

MR. BROWN: This stack is for the jury. There's three witnesses. This is for the Court and for the witness.

THE COURT: I don't know what you're doing but you need to stop it.

THE CLERK: Which one did you have first? I.T.?

MR. BROWN: I believe there is one for I.T..

THE CLERK: Is that the first one?

MR. BROWN: I.T. is marked Government Exhibit 172.

THE CLERK: Which one are you playing first?

MR. BROWN: T.C.xx.

THE COURT: Let's hand them all out together so we don't take up extra time doing this. And I am going to ask the agents to help my CRD get those together and pass those out or Mr. Brown can do it, but somebody needs to move this along. I guess the jurors are helping themselves. Thank you. Do they have all of the stuff from all these folders?

MR. BROWN: I believe there may be some extra copies.

THE COURT: I do I have three identical things for I.T.? Is there only one thing for I.T.?

MR. BROWN: Yes. There is only one thing for I.T..

THE COURT: So why do I have three in my folder?

MR. BROWN: It might have been an error on my part,

Your Honor. I do have --

THE COURT: Okay. And I have three for K.S.x.

MR. BROWN: That's right, Your Honor. I think each witness has three copies -- one for the Court, one for the witness and one for the clerk, Your Honor.

THE COURT: Okay. So you were supposed to give one each to you, me and the witness.

THE CLERK: He has one.

MR. BROWN: And I believe the Government counsel already has a copy.

MS. DONAHUE: I do.

THE COURT: So there is one I.T., one K.S.x and one T.C.xx.

MR. BROWN: That's correct.

THE COURT: All right. Everybody have each of one of those? Great. All right, Mr. Brown.

MR. BROWN: Thank you very much, Your Honor.

REDIRECT EXAMINATION

BY MR. BROWN:

Q. Before we get into the transcripts, I want to backtrack a little bit. The prosecutor was asking you about the developmental -- the level of development for an 11-year-old to a 14-year-old.

Do you remember that discussion?

A. Yes.

Q. You referred to a study or concept, I forget the name. It was developmental stages for children?

A. Correct.

Q. What was the name of that?

A. P-i-a-g-e-t.

Q. Could you just kind of summarize those different stages of development again for the jury.

A. Well --

THE COURT: Development with regard to what?

BY MR. BROWN:

Q. With respect to childhood -- does it measure intellectual function?

A. It's not a measure. It's a description of intellectual structure and how it changes. So the first period is called sensory motor intelligence and that's from birth to about 18 months. And during that period of time, there is not a lot of independent thought processing with a child. They're exploring their environment, bumping into things, reaching out and building up neural networks to represent the world. And that period ends with the introduction of language. So if you have children that are very quick with the development of language, that period is going to be shorter than 18 months. But it ends with the development of language.

And then you have a period that they call pre-operational thought. A child starts to use words to

represent the world. And in that period, the ability to identify objects, to talk about objects, to use the language, increase the vocabulary is what goes on.

And then the close of that phase, maybe six, seven years of age, the child has concrete operations. At this point they can start thinking about things not immediately there. They can use words to describe how things might work together.

And then that period ends at 11, 12, around that range with what we were talking about on cross, which is hypothetical deductive reasoning, which all that really means is you make observations, you can develop ideas to figure out what is going on with that set of operations and then act accordingly or predict accordingly.

And we were -- that's the structure of it. And as we get older, as we become more skilled with our words and our interchange, you get more sophisticated. But the basic mechanics are there about 11, 12 years of age.

Q. So when Ms. Donahue asks you if a person who is 11 to 14 is the same as an adult, common sense says that a 12-year-old is not the same as someone who is 50 years old in terms of their development and cognitive function; isn't that fair to say?

A. The mechanics are there but over time you get more experienced, you learn more tricks of the trade, so forth, you're not identical, no.

Q. Is education a function -- a person's educational level a

function of their level of sophistication and reasoning abilities?

A. Not necessarily.

Q. So if you have a 12-year-old who is in the first grade, is that an indicator of where they are in terms of their ability to -- to process?

A. It could be. But frankly when I was reading these and the girl said "I'm in the first grade," so forth, I don't know enough about that system of education to know what that means. In this country, if you were 12 years old and in the first grade, there would be some kind of implication that you may have had trouble, but I can't say that in Cambodia or Vietnam.

Q. On cross-examination there was a discussion about what you knew or did not know about how many times these girls had been interviewed before they were videotaped.

Do you recall that discussion?

A. Yes, I do.

Q. Doctor, if I told you that the girls in this case had been removed from their mothers and taken to a shelter and interviewed by counselors at the shelter and other individuals, would that be an indicator or factor that there was some prior interviews going on?

A. It could be.

MS. DONAHUE: Objection. That misstates the evidence.

THE COURT: That's not an appropriate question, as you

phrased it, and I don't think you meant to phrase it that way.

MR. BROWN: Fair enough.

Q. If I told you that the girls had been taken to a shelter and interviewed by non-governmental shelter officials, does that potentially increase the risk that you have described?

A. Depending on what went on.

MS. DONAHUE: Objection. That also mis -- badly misstates the evidence.

THE COURT: He's asking a question. He is not stating the evidence. The jury will decide whether that states it properly or not. The answer will stand.

BY MR. BROWN:

Q. If you could repeat your answer, Dr. Maloney. I'm sorry.

A. It could well be, depending on what went on in those discussions or interviews.

Q. The Government just asked you a question relating to T.C.xx, the young woman T.C.xx. And I'd like to, if you could, look at what has been marked as Defense Exhibit 171, Doctor.

A. Yes.

Q. If you could turn to what's handwritten in there, it's really the third page but it says Page 14 in my handwriting.

A. Yes.

Q. That's the portion where T.C.xx describes the perpetrator as having cat eyes and as being fat; right?

A. Yes.

Q. Okay. I'd like to, if I could, just play that -- a portion of that.

Your Honor, if I may publish?

THE COURT: You may.

MR. BROWN: I apologize to the Court, Your Honor. I seem to be having some technical difficulties. If I could perhaps ask Agent Wang for a little bit of assistance.

I apologize to the court.

THE COURT: That's okay.

MR. BROWN: For the record, I am playing -- I'm trying to start at counter 28 minutes exactly, give or take a few seconds.

THE COURT: Okay.

MR. BROWN: Of Volume 2 of 5.

Q. First of all, Dr. Maloney, how many people do you see on that screen there?

A. Four.

Q. Okay.

(Whereupon, the video was played for the jury)

BY MR. BROWN:

Q. I am pausing it. This is an example where the agent asks a question in English, it's translated from English to -- I'm sorry -- it goes to the Cambodian interpreter who is sitting on the left --

THE COURT: Mr. Brown, excuse me, but for the last

several questions this witness has no more expertise than our jurors.

MR. BROWN: Very well, Your Honor. I apologize.

Q. Dr. Maloney, if I told you that the woman sitting next to T.C.xx in that video is a Vietnamese interpreter, would you accept that --

Can we stipulate to that?

A. Certainly.

MS. DONAHUE: Of course.

MR. BROWN: Can we also stipulate that she works for World Hope International?

MS. DONAHUE: (Ms. Donahue nods head.)

(Whereupon, the video was played for the jury)

THE COURT: Do we have a transcript for this, Mr. Brown?

MR. BROWN: It's the T.C.xx transcript, Your Honor.

THE COURT: It's not in the transcript you gave me.

MR. BROWN: I'm sorry, Your Honor. I think the counter was at 29:07. If I could, Your Honor, I just want to play to the end of this segment. I think there is another perhaps minute and a half. I just need to make a point with respect to the next segment.

THE COURT: All right, but you should have provided transcripts. So you need to stick to the transcripts in the future.

MR. BROWN: I apologize, Your Honor.

(Whereupon, the video was played for the jury)

MR. BROWN: Now I am just going to play the next portion of this for you, which is the next page on my excerpt.

(Whereupon, the video was played for the jury)

BY MR. BROWN:

Q. Dr. Maloney, in reviewing the transcripts and listening to what you saw -- listening to the video, the girl never described the person as having blue eyes, did she?

A. I didn't hear that.

Q. In the segment before where she describes the person as having cat eyes, she never mentioned the word blue, did she?

A. No, she didn't.

Q. So in this segment where the Cambodian interpreter, the individual sitting on left was recapping what was said, it's he that inserted the concept of blue eyes into the equation; isn't that true?

A. It appears so, unless there was a discussion off the record when they were changing the batteries.

Q. Okay.

So we have in this case the Cambodian interpreter introducing the concept of blue eyes and then --

(Whereupon, the video was played for the jury)

BY MR. BROWN:

Q. So, Dr. Maloney, based on your experience where you have

an interpreter introducing concepts into the interview, is that, in your opinion, an example of an egregious suggestive situation? What does that indicate to you?

A. Well, as I said, I mean, there could have been a discussion off the record where that idea came up. If not, then there is information being introduced by the interviewer.

Color of eyes, I am not sure I'd call it egregious or very problematic. There is some cases, examples here, where there is introduction of material regarding sexual behavior by the interviewers, which I think is more problematic in a case like this.

MR. BROWN: Okay. For the record, Your Honor, I am going to the next portion of the T.C.xx transcript.

THE COURT: Thank you.

MR. BROWN: Which is Segment 5 of the August 25th interview. Minute counter 11:58.

(Whereupon, the video was played for the jury)

MR. BROWN: I'm sorry, Your Honor.

Q. Dr. Maloney, if you could look at the transcript that's referenced on Page 5 with the minute counter 11:58, do you see that discussion in front of you there?

A. I do.

Q. Do you see the footnote that was placed there after the Vietnamese interpreter describes the sexual -- alleged sexual conduct?

A. When you say "footnote," I'm not sure what you're referring to.

THE COURT: The line on the bottom.

THE WITNESS: Yes, I do.

BY MR. BROWN:

Q. Okay.

In that situation, the Cambodian interpreter is asking the question at the top, every time the second, third and fourth time and it uses the term "oral sex."

Do you see that?

A. Correct.

Q. And the Vietnamese interpreter uses language, according to the translator, which is much more graphic than the question that was asked.

Do you see that?

A. Yes.

Q. And the translator puts a footnote that says, "The VI" -- which is the Vietnamese interpreter -- "has a tendency to use crude language in her interpretation."

Do you see that?

A. Yes.

Q. Is that in your mind -- in your opinion, does the changing of the language somehow affect the quality of the interview in that situation?

A. I think the issue here, when they're talking about the

girl, they use terms like "birdie." And when the Cambodian interpreter asks "oral sex" and "caress you," then we get into a more street-like vernacular, and I don't know how that translates from Cambodian or Vietnamese, but "suck on his dick" is a more primitive discussion of what's going on here.

And I notice that in other parts of these interviews, that in talking about the alleged perpetrator, there is a subtle derogatory use of language, whereas it is not used the other way.

Q. Is that significant in your opinion?

A. It's hard to say, but if there are -- there are statements that this guy has told other people and other girls have heard, if they pitch him as a bad guy and then use, you know, cruder language, that just reinforces that concept.

Q. Dr. Maloney, if we could turn to what has been marked as Defense Exhibit 172, which is titled I.T.?

A. Yes.

Q. I'd like to play a portion of that.

And, Your Honor, I discussed this with Government Counsel ahead of time. I am just going to play the first minute of that. There is no transcript for that in the excerpt but I did discuss that with the Government just to illustrate a point.

THE COURT: Okay.

(Whereupon, the video was played for the jury)

BY MR. BROWN:

Q. Dr. Maloney, we talked about the issue of environment and interview setting. Based on what you have seen in that first 49 seconds of the I.T. interview, do you see anything that gives you concern with respect to the nature of the environment that she is being interviewed?

A. Well, there is a group of people there and this could well be intimidating to this girl. The physical environment at least has pictures and a plant, which the other one didn't.

Q. And normally when you interview a suspected victim of abuse, do you have a caretaker -- do you have her sitting in a caretaker's lap?

A. No.

Q. Why not?

A. A number of reasons. One is that the child may be apt to please the caretaker or the person that is supportive and close to them. And there may have been discussion before between them and it just clouds the situation, really.

Q. And what about the people that were walking back and forth on the screen that aren't on camera now? Is the noise and background distraction a factor?

A. Well, that whole situation with a lot of people present can well influence children.

Q. And in this case, it looks like the same -- I have my mouse -- if you could follow on the screen there, I have my mouse kind of circling the person who is the Vietnamese

interpreter from the other interview, Dr. Maloney. And if I told you that this Vietnamese interpreter was not a government agent but worked for the shelter where the alleged victim was living and she was interpreting the questions of the Government agent, is that a concern in terms of the risk of contamination and suggestibility, in your mind?

A. Well, what we're looking for in an interpreter or anyone else doing an interview is that they be objective, no a priori bias -- a priori bias. And this raises that specter, has there been any contact, is she in favor of a certain outcome.

Q. If I told you that the interpreter was, in fact, not -- did have a priori bias and that the alleged victim referred to her as sister and that they had known each other from before, would that -- does that increase the risk?

MS. DONAHUE: Objection. Argumentative. Assumes just erroneous facts as well as assuming facts not in evidence.

THE COURT: If they are not in evidence, then the jury will disregard them.

You can't testify, Mr. Brown.

MR. BROWN: I'm sorry, Your Honor.

Q. In your mind, a priori bias from an interpreter is a concern?

A. It would concern me, yes.

Q. I'm fast forwarding to counter 52:47, which is indicated on the transcript as well. I hope this is right. Forward the

record. 52:39 is as close as I can get, Your Honor.

THE COURT: Okay.

(Whereupon, the video was played for the jury)

BY MR. BROWN:

Q. In that example, Dr. Maloney, the alleged victim is presented a photograph; correct?

A. Correct.

Q. And she says that is not -- he is not the one; correct?

A. Yes.

Q. And later, on Agent Phillips.

(Whereupon, the video is played for the jury)

BY MR. BROWN:

Q. There is no question pending there from Agent Phillips, was there, Dr. Maloney, in the segment leading up to the FVI on the transcript, the female Vietnamese interpreter, she takes the photo apparently and presents it to I.T. on her own; right?

A. It appears that way, yes.

Q. And on the transcript, it's in Vietnamese but she says, "Daughter, look carefully, is he the one," after she had said -- well, strike that.

Did you note that, Dr. Maloney?

A. Yes.

Q. Is that, in your opinion, an indication of an egregious suggestive question or a suggestive or coercive situation?

A. Well, it's -- it certainly has a -- and it depends on

voice, tenor and so forth, which we can't really identify, but she gives a specific response. And then they say, "Look carefully. Is he the one?"

She responds, "No, his nose is longer." And then, "He has a long nose."

And then, "Do you know who that is?" "Have you ever seen this man?" And then, "Have you seen this man?" "Do you know this man?" "Don't forget to look closely."

There is obviously a pressure that she should identify this individual and she says "No." And then the interviewer: "No, keep in mind people may change a little bit." And then down at the end, "Daughter, take time, look carefully to see if this is the man. Does he look familiar without the mustache?"

And so this whole part of this interview, it appears to be to get her to say yes to these questions, although she has clearly said no.

THE COURT: It's about time for a break, Mr. Brown, unless the next one is going to be short.

MR. BROWN: It might be longer than five or ten minutes.

THE COURT: Then let's take our break.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We will take our 15 minute break.

(Recess taken)

(Jury In)

THE COURT: All right. Everyone is present. Dr. Maloney, you are still under oath.

Mr. Brown, you may continue.

MR. BROWN: Thank you very much, Your Honor.

Q. Dr. Maloney, before the break you had read the remainder of the excerpt that have marked as Defense Exhibit 172. I'd like to play out the remainder of that. I would ask you if you could please take a look at the video and see if there is anything else that comes through on the video that is not captured in the transcript or -- in terms of the issue of suggestibility.

(Whereupon, the video was played for the jury)

BY MR. BROWN:

Q. I'm sorry. Perhaps this isn't on the transcript. But did you hear the individual on the video say the picture we showed yesterday did not have a mustache by the Cambodian -- by the individual sitting next to the woman identified as a Vietnamese interpreter?

A. Yes. I can read that statement here.

Q. Was there anything else about the remainder of this excerpt that gives rise to concern?

A. Well, in terms of the process, the one interpreter leans forward and puts her arm over onto the furniture. I mean, certainly in terms of body gesture is intensive in terms of wanting a response and I think that's how that would be

interpreted.

Q. I just have one last segment I would like to show you, Doctor. The transcript has been marked for identification as Defense Exhibit 173 for indication. It's the K.S.x excerpt.

Your Honor, may these be received into evidence, the excerpts?

MS. DONAHUE: No objection.

THE COURT: Those will be admitted.

(Defendant's Exhibit 173 was received)

BY MR. BROWN:

Q. The quality of this video isn't quite as good, but Dr. Maloney, does that woman where the mouse is pointing look familiar to you?

A. It may be the one from the other interview.

THE COURT: Mr. Brown, please -- I assuming you are rising for an objection, Ms. Donahue.

MS. DONAHUE: Objection, but we will stipulate that it's Kim Fong, the Vietnamese interpreter.

THE COURT: This witness is here to give his expert opinion. The jury can figure out who is doing what in the video that they are watching at the same time as this witness.

MR. BROWN: I apologize, Your Honor.

THE COURT: That's all right.

MR. BROWN: For the record, I am going to counter 44:43 on this excerpt -- 44:35. I'm sorry.

44:21.

(Whereupon, the video was played for the jury)

MR. BROWN: Just pausing.

Q. In this case there appears to be someone else who is not on the screen, a Cambodian interpreter.

Is that fair to say, Dr. Maloney?

A. I believe that's who it would be.

Q. Is that what you meant when you testified earlier about the video not showing the whole picture, about the atmosphere, because there were people off camera speaking?

A. Correct.

(Whereupon, the video was played for the jury)

THE COURT: Are we meant to be hearing that, Mr. Brown, because I can't hear it.

MR. BROWN: I think the audio on this segment is not as good as the others, Your Honor.

THE COURT: Okay.

MR. BROWN:

Q. Dr. Maloney, I apologize. The audio on here is not very good. But if you look at the excerpt right after the handwritten notation that says 45:20, CI asks a question in italics and TC responds, when did VNI -- for Vietnamese interpreter -- has a comment there. What does she say there, Dr. Maloney? And is there anything significant about that?

A. If I might go up a bit --

Q. Yes.

A. -- to 44:35, the interviewer says: "When you said sleep with Michael, what do you mean by that?"

Cambodian interpreter: "When said sleep with Michael, what it mean, what want to say?"

Vietnamese interpreter then says, "What do you mean by sleeping and having sex with him?" That wasn't mentioned before by her, and that's an insertion.

And then the girl says, "Eat him."

And they say, "Say it clearly. How do you do it?" "I slept with him." "Don't be shy," exclamation point, so I would guess there was some voice thrown into that. "What else?" "I ate him" and then "Okay, suck Michael's genital" and then the interviewer, "Have oral sex with Michael? Michael ask her put her mouth into his penis."

THE COURT: Wait a minute. Is that the interviewer or CI interpreter?

THE WITNESS: That's the interpreter, yes.

And so then the Vietnamese interpreter -- this is an example we talked about before with the language -- "So you sucked on his cock? Speak frankly. The mister is here to help. Other girls have told the mister the true stories about him."

So there is two issues in that the interpreter's response using the more crude term for oral sex and then other girls have told the mister the truth introduce stories about

this man, that's an example of what we were talking about cross-germination or contamination. She is saying, listen, we have already heard it from other people.

BY MR. BROWN:

Q. Anything else about that excerpt, Dr. Maloney, as you continue?

A. Well, they go into the amount of time that she was there and so forth. But I -- I think the flow of that is -- is a characterization of some of the things we've been talking about.

Q. And going to the end of this segment, I would like to show you an example and see if -- and get your opinion on that, Dr. Maloney.

I'm trying to go to 48 -- 48:12.

(Whereupon, the video was played for the jury)

BY MR. BROWN:

Q. I don't know if you caught that. The audio is not very good. But let me back it up again. I am -- I guess I'm starting here at 47:48.

(Whereupon, the video was played for the jury)

BY MR. BROWN:

Q. That segment is TC, the agent, saying in the last -- second to the last line on the transcript, "The time is now 14:47, right?"

Did you hear that?

A. Yes, I did.

Q. On that last segment after the agent left, it appears that the Vietnamese interpreter is speaking with K.S.x and what she said got captured on tape and was transcribed. There was no question pending, right, from the agent?

A. That's the way I heard it, yes.

Q. It appears she says, "Don't be afraid, don't be shy, tell the mister how you were abused."

A. Yes.

Q. In your mind, is that problematic for the interpreter to be asking questions when the agent has left the room? Is that suggestive, in your opinion?

A. Professional translator or interpreter, when you're doing an interview, should interpret the words directly with no commentary whatsoever. And in this case, there's what appears to be pressure for her to say, "Tell me how you were abused."

Q. And finally, with respect to the NTD interview, the first interview that the prosecutor was asking about on cross-examination, if you could -- if you recall that, do you recall -- that interview, do you recall the agent speaking in -- I'm sorry.

Do you recall a portion where the examiner said something to NTD such as, "Tell uncle. Uncle is here to help you. Please talk to uncle"?

Do you recall that portion of the transcript?

A. I do recall that.

Q. And that was the beginning of the interview of NDT or NTDx; right?

A. Yes.

Q. In your mind, is there anything problematic with the agent -- is that an example of the kind of suggestive comforting that can contaminate an interview, in your mind?

A. And leading. And I was a little perplexed by what "uncle" meant. It seemed to me that it might have been a more generic term than anybody in authority or anybody involved could have been called as they call mister. But it, again, is a situation where the interpreter is overstepping the lines of interpretation or translation.

And in some of these cases, there's possibly a whole page going back and forth between the interpreter and the child, and the actual interviewer isn't involved in that process at all.

MR. BROWN: Your Honor, may I have one moment?

THE COURT: Yes.

(Mr. Brown and Mr. Gunn confer off the record)

MR. BROWN: Your Honor, I have no further questions.

MS. DONAHUE: Recross?

RECROSS-EXAMINATION

BY MS. DONAHUE:

Q. Dr. Maloney, you don't know how "uncle" translates from the Vietnamese, do you?

A. No, I don't.

Q. You don't know whether "uncle" means the -- what we know it to be, the brother of one's parent or whether it has a much broader and different meaning in Vietnamese, do you?

A. I don't, but my thought was it must have a broader use.

Q. Based on the context of the interview? Is that what your thought was based on?

A. Right.

Q. And going back to you have -- you were asked about the interview of K.S.x. that is actually K.S.x. do you still have the full transcript in front of you, the binder with the full transcripts?

A. Yes.

MS. DONAHUE: Agent, maybe you could get it out of the binder. K.S.x.

Q. If you could turn to Page 36?

A. Yes.

Q. At the top of the page, she was asked a fairly explicit leading question, wasn't she?

A. Yes.

Q. "Did he ever do anything through your butt? Did he ever have sex through your anus. Did he penetrate your anus with his dick?

All three questions were asked, and what did she say?

A. She says "No."

Q. "No." So she was able to withstand certainly the suggestibility of that question, wasn't she?

A. Yes.

Q. And with regard to I.T., the first video clip that you were shown, you said there was body pressure and other pressure from the adults to get her to identify the man in the photograph?

A. Yes.

Q. But she didn't do it, did she?

A. No.

Q. She said he did not have a moustache and no one in that room changed her mind on that point, did they?

A. She said no and seemed pretty certain about it.

MS. DONAHUE: I have no further questions.

THE COURT: Anything further, Mr. Brown?

MR. BROWN: No, thank you.

THE COURT: Thank you, sir. You're excused. You can leave all of that there and Agent Phillips will clean it up.

Does the Defense have another witness?

MR. GUNN: Our next witness would be Dr. Richard Bennett. With the Court's permission, I am going to see if Mr. Brown can change over the computer connection while I step out and get him.

THE COURT: You may.

Richard Gary Bennett, Defendant's witness, was sworn

THE CLERK: Please have a seat. Please state and

spell your full name for the record.

THE WITNESS: Richard Gary Bennett. B-E-N-N-E-T-T.

THE COURT: You may proceed.

MR. GUNN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. GUNN:

Q. Dr. Bennett -- and maybe I am signaling it by the way I am addressing you -- what is your profession?

A. I am a physician and dermatologist.

Q. What kind of practice do you have right now or what is your practice right now?

A. My practice is mostly confined to the treatment of skin cancers.

Q. And are you working for a hospital or an entity or do you have your own private practice?

A. I have my own private practice, as well as I have a part-time/full-time position at UCLA.

Q. And what is that part-time/full-time position at UCLA?

A. I run a clinic once a month where I treat skin cancers.

Q. And do you have any professorships at UCLA and/or any other institutions?

A. Yes. I am a clinical professor of dermatology at UCLA as well as being a clinical professor of dermatology at USC.

Q. And what do you do as a clinical professor?

A. I give lectures to the residents and medical students,

teach the residents and the medical students in clinics that we have when I go over there to attend.

Q. And I assume you went to medical school?

A. Yes.

Q. Where did you go to medical school and when did you graduate?

A. Case Western Reserve Medical School, Cleveland, Ohio, in 1970.

Q. And have you been practicing as a physician ever since then?

A. Yes.

Q. Are you licensed to practice as a physician in the State of California?

A. Yes.

Q. Do you have any board certifications?

A. Yes, I am a board certified dermatologist.

Q. Are you what is known as a diplomate of the National Board of Medical Examiners?

A. Yes.

Q. What exactly is that?

A. It's a -- just signifies you have taken an examination following and during medical school.

Q. Are you a diplomate of the American Board of Dermatology?

A. Yes.

Q. What's that?

A. That means that you have had training, usually with three years of dermatology and a residency that has been approved by certain governing bodies in this country, as well as having taken an examination given by the American Board of Dermatology.

Q. Do you have any what are known as hospital appointments?

A. Yes.

Q. What hospitals?

A. I have a hospital appointment at UCLA, at St. John's hospital, at Santa Monica Hospital, Huntington Hospital in Pasadena and at USC Medical Center.

Q. And what does it mean to have a hospital appointment?

A. It means that you basically fulfill their criteria. They give you a -- well, they give you a form to fill out which you have to complete and then it goes through various governing bodies at the hospital.

Q. And do they have to approve you --

A. Yes.

Q. -- as qualified to be appointed by their hospital?

A. Yes.

Q. Are you a member of any medical and professional societies?

A. Yes.

Q. Can you tell us what some of those are?

A. I'm a member of the American Academy of Dermatology, the Los Angeles Metropolitan Dermatologic Society, the American College of Mohs Micrographic Surgery, the American Society for

Dermatologic Surgery, the International Society for Dermatology.

Q. Several others as well?

A. And several others as well.

Q. Have you -- by the way, in your capacity -- have you been involved since becoming a physician back in the '70s with training other physicians?

A. Yes.

Q. And how and in what context is that?

A. Well, I was a full-time academic professor at Emory University in Atlanta, Georgia, before coming to UCLA where I was a full-time academic professor there. And I also have a fellowship I run in Mohs Micrographic Surgery which is a special kind of surgery for skin cancer. And I've trained 27 fellows. A fellow spends one year with me.

Q. Have you done any training or advising of residents and others who are studying medicine at UCLA and/or USC?

A. Well, we -- yes. I mean, I sometimes acted as a mentor or an adviser. We also have had several people from -- several individuals from my office go on and train in medical school that were laboratory technicians or other personnel in my office.

Q. Do you know Dr. Noah Craft?

A. Yes.

Q. How did you first meet him?

A. Noah Craft was a resident at UCLA and I met him when I went

over there to attend in the clinics.

Q. By attend, what does attend mean?

A. Well, it means that I would be a supervisor. Basically I go over there and practice one day a month. And then they would assign residents to assist me in the clinic and, you know, I would show the residents what I was doing and we'd also teach them surgery in the clinics.

Q. Was he one of the residents who was assigned to you at one time --

A. Yes.

Q. -- while you were attending or training?

A. Yes.

Q. Have you written any -- have you written at all in the area of medicine and dermatology?

A. Yes.

Q. Have you written actual book chapters?

A. Yes.

Q. How many book chapters have you written?

A. Probably six or seven book chapters.

Q. Have you published original papers that aren't in actual books but are in medical journals?

A. Yes.

Q. How many of those would you say you have published?

A. About 65.

MR. GUNN: Your Honor, I would offer Dr. Bennett

as an expert in the medical field of dermatology.

MR. LULEJIAN: No objection, Your Honor.

THE COURT: All right. I find he is an expert in that field.

MR. GUNN: Thank you, Your Honor.

Q. Dr. Bennett, have you been hired by the Federal Public Defender's office to consult with us in this case and testify, if necessary, regarding dermatology issues?

A. Yes.

Q. In the process of consulting for us, have you reviewed a PowerPoint presentation prepared by Dr. Craft?

A. Yes.

Q. Did you actually review two -- or at least part of two PowerPoint presentations?

A. Yes.

Q. In one of them were some photos redacted because they showed child pornography?

A. Yes.

Q. Before we started discussion of those specific PowerPoint presentations, I would like to ask you if you have heard something called teledermatology?

A. Yes.

Q. What is teledermatology?

A. Teledermatology is a fairly new concept which is an outgrowth of the Internet whereby individuals, frequently

physicians, will take photographs of skin lesions and pass them over the Internet to other physicians who are not as familiar with the skin lesions that are being photographed, in the hope that the individuals that are receiving them would be able to diagnose and offer some form of treatment for the lesions that are being photographed.

Q. Now, you used the term skin lesions which I think may be a little sort of too medical for some people.

What are skin lesions?

A. Well, skin lesions are growths on the skin or it could be rashes on the skin also.

Q. And would that, for example, include things that we commonly call moles?

A. Yes.

Q. Include other things as well?

A. Yes.

Q. To what -- going back to teledermatology, to what extent is teledermatology generally accepted among dermatologists and to what extent is there disagreement about its reliability and usefulness?

A. I don't think it's widely accepted in the field of dermatology for a number of reasons, and, in fact, there have been some instances where it's been tried and disbanded just because dermatologists look at things in more dimensions than what would be looked at with a photograph over the Internet.

Q. Are there also issues of photograph quality versus actually looking at something in person?

A. Yes.

Q. All right.

Could you explain why dermatologists don't generally accept teledermatology as reliable and useful, in your opinion?

A. Well, I think that one issue is the dermatologists frequently have to feel the lesions on the skin to make a diagnosis, and that is very difficult to do with the photograph.

Another reason why is frequently diagnoses are made by virtue of asking the patient several questions to -- that would indicate, you know, how long the patient has had the lesion, what treatments have been given, all those sorts of things, which is very difficult just looking at one snapshot in time. So it always makes me uneasy just to see a photograph of a lesion to make an adequate diagnosis.

Q. And how do issues of photograph quality versus looking at it with your own eye work into that?

A. Well, I think the photographic quality is variable, depending on several factors. The camera that's used, the ability of your computer to pass -- pass information over the Internet. If you have lower quality images, it's easier to pass over the Internet than higher quality images, and that also is a limitation.

Q. Are there major medical centers in the Los Angeles area

that don't have teledermatology practices?

A. I don't know of any teledermatology set up at UCLA in Westwood. Nor do I know of any teledermatology set up at USC.

Q. Have you heard of hospitals that have started teledermatology practices and then canceled them or dropped them?

A. Yes.

Q. Any specific examples that come to your mind?

A. Well, I have a friend at the Boston Children's Hospital who told me that they had tried to do this with pediatric cases and sort of disbanded it just because it was -- they just weren't confident in their ability to diagnose over the Internet.

Q. Now I would like to take you to Dr. Craft's PowerPoint presentations and be more specific to this case.

Did those include sets of photos in which Dr. Craft or a set of photos in which Dr. Craft highlighted with black circles what he believed were moles in several photos of thighs or knees?

A. Yes.

Q. Your Honor, could --

Did you look for other markings that in your opinion looked just as much like moles or other permanent skin lesions?

A. Yes.

Q. Did you prepare some PowerPoint -- a PowerPoint presentation with some alternative slides to show what you found

that would help you explain your opinions?

A. Yes.

MR. GUNN: Your Honor, could I have initially have some hard copies marked as Defense exhibits?

THE COURT: Sure.

MR. GUNN: If I could approach.

These would be Defense exhibits 282 through 284. A set of originals with exhibit tags and a copy for the Court.

THE COURT: Any objection to these, Mr. Lulejian?

MR. LULEJIAN: None, Your Honor.

THE COURT: All right. Those will be admitted.

(Defendant's Exhibits 282 through 284 were received)

MR. GUNN: Dr. Bennett, would you look -- I'm sorry, Your Honor just admitted them? Did I hear that?

THE COURT: Yes.

BY MR. GUNN:

Q. Would you look at Defense Exhibits 282, 283, and 284, Dr. Bennett, and tell us if those are sort of the final alternative slides you prepared with all of your additions? Or hard copies thereof?

A. Yes.

Q. And did you also send the actual PowerPoint presentation to me to put on my computer?

A. Yes.

MR. GUNN: Your Honor, what I would like to do now is

-- assuming the technology works -- and go to the PowerPoint presentation on my computer --

THE COURT: We're crossing our fingers for you.

MR. GUNN: Thank you, Your Honor.

It's magic, Your Honor.

THE COURT: Okay.

BY MR. GUNN:

Q. Dr. Bennett, I would like you to compare the screen. Is this one of the slides you sent me in your PowerPoint presentation?

A. Yes.

Q. And it has -- are those black circles the circles that were on what Dr. Craft prepared?

A. Yes.

Q. And does this actually have added in to your PowerPoint presentation two labels that say what Government exhibits the photographs are from?

A. No.

Q. On the screen.

A. On the screen. Oh, yes.

Q. Otherwise it's the same as the hard copy you have in front of you?

A. Yes.

Q. Now, these are the black circles that you understood Dr. Craft to have identified as moles or permanent skin lesions?

A. Yes.

THE COURT: For the record, Mr. Gunn, you're referring to your Exhibit 283 now?

MR. GUNN: Yes, Your Honor.

Q. And do I have the exhibit No. Correct, Dr. Bennett? This matches with your Exhibit 283? If you look at the exhibit tag on the back?

A. Yes.

Q. All right.

And did you circle -- did you look at these photographs and find some additional marks that you thought were equally likely to be moles or permanent skin lesions?

A. Yes.

MR. GUNN: Your Honor, if I could?

THE COURT: Yes.

BY MR. GUNN:

Q. Are those the marks that you found on the picture on the left, the blue circles?

A. Yes.

Q. And are the blue circles in the picture on the right the marks you found in that picture that you believed were equally likely to be moles or skin lesions?

A. Yes.

Q. Would you explain why the marks that you identified in blue are in your opinion just as likely to be moles or skin lesions

as the marks circled in black?

A. Well, the moles that were circled in black, as you can see, are small and lightly pigmented; that is, they're not dark. And, therefore, it's very difficult to make a diagnosis with a photograph as to whether or not these might be moles or not.

The other lesions that I circled were also lesions that were small and dark as well, although slightly less pigmented; that is, slightly less dark, but moles tend to vary in their color in terms of their darkness. We all know that very black moles can be a sign of melanoma, but most moles on our body have various shades of pigmentation, ranging all the way from no pigmentation where they are just absolutely white, to very dark. And so it's very difficult just based on size and the darkness of these lesions to make a diagnosis of moles or not moles.

Q. In your expert medical opinion, are the marks that you circled in blue on this exhibit just as likely to be moles or permanent skin lesions as the marks that are circled in black?

A. Yes.

Q. I would like to move to the next slide.

Is the slide that appears on the screen now identical to what you have in front of you as Government Exhibit 28 -- I'm sorry -- Defense Exhibit 284, except it doesn't have the blue circles that you added yet?

A. Actually, the one I have has blue circles but the one on

the screen does not.

Q. All right, then, I misspoke. That's what I meant.

And this is as you got it from Dr. Craft's PowerPoint presentation?

A. Yes.

Q. And you understood that what was circled in black were what he opined were moles or other permanent skin lesions?

A. Yes.

Q. And did you then look at it to identify others that you believed might be moles or permanent skin lesions?

A. Yes.

Q. And did you circle those in blue like on the previous slide?

A. Yes.

Q. Going to the next slide, is that a mark that you identified in the photograph on the left as?

A. Yes, but I wouldn't identify that as possibly a mole. It's more likely it's some sort of excoriation.

Q. All right.

And going to the next slide, are the marks on the right that you circled in blue other marks you identified?

A. Yes.

Q. And do you believe those -- well, do you believe those are just as likely to be moles or other permanent skin lesions as the marks circled in black?

A. Yes.

Q. Would you explain why.

A. They're very similar in appearance.

Q. And is there anything else about them?

A. No.

Q. And does the slide that's on the screen now match Defense Exhibit 284 in its entirety?

A. Yes.

Q. Except for the addition of Government exhibit numbers?

A. Yes.

Q. All right. I would like to now go to the next slide.

Does this PowerPoint slide that is on the screen now match what you have as Defense Exhibit 282, except it does not have yet the blue circles you added?

A. Yes.

Q. And are these marks you understood Dr. Craft to have identified as moles or other permanent skin lesions?

A. Yes.

Q. Did you then look for other marks that you thought would be moles or other permanent skin lesions on this?

A. Yes.

Q. Does this slide show marks of that sort that you found on the upper picture?

A. Yes.

Q. And does this show a mark that you found on the middle

picture?
A. Yes.
Q. And does this show a mark you found on the lower picture?
A. Yes.
Q. Now, in your opinion, are the marks you circled in blue -- and does the screen that's before you now exactly match Defense Exhibit 282, except it has Government exhibit numbers added?
A. Yes.
Q. Now, in your expert medical opinion, are the marks you circled in blue just as likely to be moles or other permanent skin lesions as the marks that are circled in black?
A. Yes.
Q. Would you explain why.
A. Because they are very similar in appearance. They are lightly pigmented, very small.
Q. All right.
Now, Your Honor, I would like to move to another subject, and I will take this off the screen.
THE COURT: Okay.
MR. BROWN: Actually, Your Honor, I may ask the prosecutor at this point to pull up some slides from Dr. Craft's PowerPoint presentation.
THE COURT: Did you give him fair warning that you were going to do that?
MR. GUNN: Yes, I did, Your Honor.

Has the TV not been on, Your Honor?

THE COURT: I haven't been looking.

MR. GUNN: If the actual -- actually, why don't we just go with the screen, Your Honor, since we had that on the previous --

Q. Did the PowerPoint presentations, Dr. Bennett, that Dr. Craft -- that we provided to you through Dr. Craft have one marking on the skin -- well, strike that. Let me step back.

Was there a separate set of photographs you looked at that had -- an older photo of Mr. Pepe with a young girl naked and then a more recent photograph of Mr. Pepe that showed his face so it was clear they were Mr. Pepe?

A. Yes.

Q. And did the Power -- and was that discussed in or part of Dr. Craft's PowerPoint presentation that you reviewed?

A. Yes.

Q. And did one of the photos in that PowerPoint presentation have a marking on the skin of Mr. Pepe's left inner thigh that Dr. Craft labeled "scar"?

A. Yes.

MR. GUNN: Your Honor, could I have the prosecutor put up PowerPoint slides -- I believe it will be 21 through 23.

THE COURT: Please, Mr. Lulejian.

MR. LULEJIAN: Yes, Your Honor.

MR. GUNN: If the prosecutor could go through 21, 22,

and 23 and stop on 26.

Q. Do you recognize those three slides that we just went through that show scar?

A. Yes.

Q. Did you meet me here at the courthouse last Tuesday and go to a room with me to conduct an examination of Mr. Pepe's inner thighs?

A. Yes.

Q. To see if you found such a mark and if you agree it was a scar?

A. Yes.

Q. If I could begin with a general question, what did you find with respect to the condition of the skin of Mr. Pepe's inner thighs generally?

A. Well, there were several lesions on the inner thighs, on both inner thighs, that appeared to be resolved areas where there had been previous folliculitis, which is inflammation of the hair follicles, that had resolved.

Q. Is that sort of similar to a pimple but it's a result of a hair follicle inflammation?

A. Yes.

Q. And they can be smaller or bigger, the same way acne pimples can be?

A. Yes.

Q. Do you have an opinion as to whether that condition you

observed is a temporary one-time condition or something more chronic and ongoing?

A. It's most likely chronic.

Q. And would you explain why you have that opinion?

A. Because the condition frequently occurs in individuals that are slightly obese because of skin chafing on the inner thighs, and they sometimes will get infected hair follicles in that area.

Q. Moving on to a more specific question, did you look for a scar are in the approximate place that Dr. Craft appeared to be highlighting in his PowerPoint pictures?

A. Yes.

Q. Did you find something in that area that might have been what Dr. Craft highlighted as a scar in his PowerPoint presentation?

A. Yes.

Q. Did it look like it did in Dr. Craft's presentation exactly or did it look somewhat different?

A. Are you asking me -- it looks like it does on this photograph here?

Q. Well, let's go back two slides to a photograph -- would it be easier for you to explain with a blown-up photograph or less blown-up photograph?

A. I think this photograph is fine. I mean, there is --

Q. All right.

A. -- there is a skin lesion or marking on the lower left-hand side of that photograph.

Q. In the lower left-hand corner?

A. Yes.

Q. Okay.

Did you find -- did what you find look exactly like that or did it look somewhat different?

A. It looked slightly different.

Q. In what way?

A. It was less pigmented, it was less dark. It was smoother than it probably -- than it appears in this picture. It was less apparent. And it was also smaller.

Q. What does that difference in appearance mean to you?

A. It means that whatever was there before has probably on its own just sort of shrunken up and resolved.

Q. Now, have you seen other slides in Dr. Craft's PowerPoint presentation that show what he calls a, quote, growth, unquote, on Mr. Pepe's left inner thigh?

A. Yes.

Q. Are those photos that you understand or were told were taken at another time?

A. Yes.

MR. GUNN: Your Honor, if I could have the prosecutor move back to PowerPoint slides 15 and 16 and I will look over his shoulder, if that's all right.

THE COURT: Okay.

BY MR. GUNN:

Q. Is this one of the slides I have just been referring to that you're recalling?

A. Yes.

Q. Could the scar you observed when you examined Mr. Pepe last Tuesday be related -- first of all, do you have an opinion about what that growth is?

A. Not much.

Q. Would you explain why?

A. Well, the picture -- the picture quality is not very good. It's very difficult to even make out the color of it. It's sort of reddish, but I can't be totally sure. It has a slightly irregular outline. It's difficult to tell to what degree it's elevated. It could be any number of -- types of growths.

Q. What are some of the types of things it could be?

A. Well, I mean, it could be a wart. It could be some sort of a skin cancer. It could be some sort of infectious process that may have occurred wherever he was at the time. It could be a fibroma, which is a type of cutaneous scar. There is a long list.

Q. Could it be something called a boil? Have you used that term with me before?

A. Yes. And it could be something like a boil.

Q. Could the scar you observed when you examined Mr. Pepe last

Tuesday, could it possibly be related to that growth?
A. Possibly.
Q. Is it definitely related to that growth, in your opinion?
A. Not a hundred percent. I would actually say it's probably related to the growth, not possibly.
Q. In your opinion, when you looked the scar or what might be the scar, was there anything about the way it looked that appeared to be the result of some surgical or other deliberate removal of an earlier growth like this?
A. Not that I could tell.
Q. Would you explain why?
A. Well, there was no -- no evidence of any suture marks, there was no evidence of any linear incision that might have been done. The -- what I found was something that was so small and miniscule that it -- you know, it's hard -- hard to believe that somebody would have done something surgically there. It was more likely just the result of the lesion just naturally resolving on its own.
Q. You talked about someone doing something surgically. What about some lay person on their own doing something to it? Was there anything about it that looked consistent with that?
A. No.
Q. Would you explain why.
A. Well, if some lay person had done something to the area, with a growth this size I would expect more of a scar to have

been present there. And . . .

Q. Now, going back to the photo of -- the earlier photo where it shows this thing that Dr. Craft called a growth, how and why would a growth like this disappear or resolve on its own?

A. Well, it's very common for -- if this was a result of a folliculitis, which is like a boil like you mentioned, it's very common for those lesions to come and go in this area, and it could have well resolved on its own.

Q. That leads to my next question, I guess. Could such a growth have a pattern of disappearing and then coming back and then disappearing and then coming back again?

A. Yes. It's very possible.

Q. Would you explain how and why that is.

A. Well, once you have a chronic infection of a hair follicle, you can have the -- have the lesion discharge pus, for instance, and then it seals over, but there is still a few bacteria left in and then it might regrow again.

Q. And then it could disappear again?

A. Yes.

MR. GUNN: No further questions, Your Honor.

THE COURT: Cross-examination?

MR. LULEJIAN: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. LULEJIAN:

Q. I guess it's still morning. Good morning, Doctor.

A. Good morning.
Q. Doctor, you testified a few minutes ago about your experience as a dermatologist.
A. Yes.
Q. And it seems you have had a very vast experience and a vast career in that field.
A. Yes.
Q. And in fact, it sounds like most of the work you're doing right now is in the very specialized area of dermatology relating to skin cancer; is that fair?
A. Yes.
Q. I think you called it M-O-H-S, was it Mohs?
A. Yes.
Q. So it's Mohs and -- it's Mohs.
And what is Mohs?
A. Mohs is a man's name that was -- was the inventor of a type of surgery that's used to remove skin cancers. And that's mainly what we use to remove more serious skin cancers in this day and age.
Q. And I understand when you remove this type of cancer, it's done with a microscope. You have to be very careful about how you do it; is that right?
A. Some -- it's removed with a scalpel blade, but then we map out what we've removed, and we have our own lab, and we gross the tissue, that is, cut it apart and look at it under a

microscope to make sure everything is looked at, so that all the edges are looked at.

Q. And you have to have specialized training to be able to do this kind of work?

A. Yes.

Q. About how long does it take to become trained to be able to do this kind of surgery?

A. Currently one year.

Q. I think you said you had 37 students that have gone through this?

A. Twenty-seven.

Q. Twenty-seven.

A. Yeah.

Q. Now, Doctor, when you do this kind of surgery, you examine the patient ahead of time; right?

A. Yes.

Q. In fact, a biopsy is common before you even consider doing this type of surgery?

A. Yes.

Q. So by the time a patient with this type of cancer comes to you, a number of tests have been done?

A. Yes.

Q. A number of doctors have seen this person?

A. Generally.

Q. So when you get it -- when you get this patient, you have

got biopsy results, you have got examination results, you have photographs as well?

A. Sometimes.

Q. But before you do the surgery, you examine the patient personally; right?

A. Yes.

Q. In fact, I think in the field it's called the gold standard, for a dermatologist to examine a patient?

A. Yes.

Q. Because that's really the only way you can come close to figuring out what something is?

A. That's right.

Q. And I understand that you can't actually know what something is unless you do a biopsy of it and analyze the cells?

A. And even then you may not be sure.

Q. So there is some doubt in this, but you can tell there is some type of growth there?

A. Yes.

Q. Now, you testified that you are on the faculty of UCLA and I think USC?

A. Yes.

Q. How does that play out around football season?

A. Well, I --

MR. GUNN: Objection, Your Honor.

THE COURT: That was a rhetorical question and

Mr. Lulejian will now ask another one.

MR. LULEJIAN: I'm sorry. I will try to come up with a non-rhetorical question, Your Honor.

MR. GUNN: He went to Chase Western, Your Honor.

MR. LULEJIAN: Mr. Gunn has got me there.

THE COURT: And I'm not interested in football so you need to move on.

MR. LULEJIAN: Yes, Your Honor.

Q. Doctor, when you are teaching at USC and UCLA, do you teach surgery?

A. Yes.

Q. So are you focused on this Mohs surgery or just general dermatological surgery?

A. Actually, I'm focused on Mohs Micrographic Surgery, but we also teach dermatological surgery as well.

Q. In fact, when Dr. Craft was your student, he took a surgical class from you; isn't that right?

A. I'm sure he took several.

Q. Now, when you teach surgery, you don't teach students how to look at photographs and make diagnoses, do you?

A. There's some of that. There is some of that.

Q. When you say "some of that" what do you mean?

A. Well, when I give lectures to the residents and the medical students, we show photographs of lesions and go over with them not only the photograph but also the pathology of the lesion and

what was done and so there is some of that goes on during the teaching process.

Q. So there is some reliability in a photograph of a lesion?

A. Yes.

Q. And in fact, you use that to teach students?

A. Yes.

Q. And in many cases, you actually analyze or examine the lesion that's up on the screen?

A. Yes.

Q. But for purposes of teaching the students how to do surgery, teaching them to take photographs for their practice isn't part of your curriculum, is it?

A. Well, it is with the fellows that I train but not with the residents. In other words, the fellows are a little bit more specialized than with the residents.

Q. And you teach them how to take specific photographs of these growths?

A. Yes.

Q. And the certain criteria that you teach them?

A. Yes.

Q. You teach them they have to have high quality photographs?

A. Yes.

Q. You teach them about lighting conditions?

A. Not so much lighting conditions. That's pretty much taken care of.

Q. Do you teach them about camera angles?

A. Yes.

Q. Do you teach them the importance of taking multiple photographs of the same thing to ensure that you can analyze it at a later date?

A. Sometimes, yes.

Q. And those things are important because if you need to meet with a colleague who doesn't have the ability to see the photograph, you need to have enough that they can get a sense of what is there?

A. Yes.

Q. Now, I notice that you give a series of lectures in your resume. And most of those appear to be related to surgery and some work in skin flaps; is that correct?

A. Yes.

Q. You don't give any lectures in teledermatology?

A. No.

Q. You don't give any lectures in the use of photography for the purposes of diagnosis of skin lesions?

A. I think I gave one once.

Q. How long ago was that?

A. Oh, probably six years ago.

Q. Technology has advanced a little bit since then, huh?

A. Yes.

Q. Now, you have given a -- you have written a number of

articles and books and very impressive number, I might say, and most of those were about Mohs surgery; right?

A. Probably the majority, yes.

Q. And cancer surgery?

A. Yes.

Q. Things related to skin flaps?

A. Yes.

Q. Items related to, I guess, plastic surgery?

A. Yes.

Q. None of those had to deal with teledermatology, did they?

A. No.

Q. And none of them had to do with the use of photographs for the purposes of diagnosing or examining skin lesions, did they?

A. No.

Q. Now, most of your practice is focused on surgery, and it doesn't depend on photography; is that right?

That's a bad question. Let me rephrase it.

Most of your practice in surgery does not depend on teledermatology?

A. No, although I occasionally get sent photographs over the Internet by physicians on how do I -- with the question how do I repair this wound, but generally not how to diagnose something.

Q. When you get one of those pictures, do you just send it back to them and say this is unreliable; I can't do anything with it?

A. I try my best.
Q. So --
A. -- but it's -- there is some unreliability in the photographs I get, yes.
Q. But as a trained dermatologist, there are certain things you can identify in those photographs that allow you to at least either give some indication of what it is or give some advice to another physician?
A. Yes.
Q. So you can actually assist another physician by looking at a photograph that he or she sends you?
A. To some degree, yes.
Q. And if there was no reliability in it, you wouldn't recommend anything to that person, would you?
A. Well, I just don't say I can't recommend anything, because basically they're asking for my help. But, you know, usually it comes down to you can do it this way, you can do it that way, you know, any number of ways. And so I just offer them a smorgasbord because when you are actually in the operative situation of repairing a wound, if they are going to ask me how to repair something, things can change during the surgery, so it's very, very difficult to offer them anything that's set in stone.
Q. But you can give them some substantive help based on what you see?

A. Yes.
Q. And you're able to make that assessment based on your training as a dermatologist?
A. Yes.
Q. And if it's in the area of, say, Mohs surgery it's going to be on the training that you have not only as you would have had as a fellow but as a professor in that area?
A. Yes.
Q. So there is something that one can do in the field of teledermatology with photographs?
A. Yes.
Q. And in fact, it's not infrequent that you get these photographs from other -- other doctors?
A. Yes.
Q. So other doctors that are not specialized in Mohs surgery may contact you with photographs to seek an expert's help like yourself?
A. Yeah, it's usually people that are specialized in Mohs surgery but it doesn't much matter.
Q. And those people that are specialized in it know the types of quality of photographs that you need?
A. Well, I'm not sure about that but . . .
Q. Have you ever been able to offer suggestions on poor quality photographs?
A. Yes.

Q. So while there is some requirement that you have a good quality photograph, if a photograph isn't perfect, you still can give some advice?

A. Yes.

Q. You still can make some determination of what is in that photograph?

A. Yes.

Q. So there is some value to teledermatology?

A. There is some.

Q. And there is some reliability in it because you're basing your opinion and your reputations as a dermatologist on it, aren't you?

A. Yes, there is some.

Q. Now, Doctor, you had an opportunity to take a look at a PowerPoint presentation that your colleague Dr. Craft put together; is that right?

A. Yes.

Q. And you went through and you made some identifications of lesions or nevi -- let's use the word lesions -- lesions in those photographs?

A. Yes.

Q. Now, did you look at any other photographs other than the ones inside the PowerPoint?

A. I believe -- I'm not sure, actually.

Q. For example, let's focus on Mr. Pepe's left knee. There

was, I believe, one or two photographs in that PowerPoint presentation.

Do you remember that?

A. Yes.

MR. GUNN: Your Honor, there were two PowerPoint presentations involved. If Mr. Lulejian could be more specific.

BY MR. LULEJIAN:

Q. I think both the presentations had photographs of Mr. Pepe's left knee.

A. Yes.

Q. But it was only from one angle; is that right?

A. I believe so.

Q. Okay.

Were you aware that Dr. Craft took over 100 photographs of Mr. Pepe?

A. Yes.

Q. So did you look at those photographs?

A. Not all 100.

Q. Did you look at the eight different angles that Dr. Craft took of Mr. Pepe's left knee?

A. No.

Q. In identifying the nevi or the lesions, did you look at those photographs to make a determination of what you were circling really was there or was maybe a trick of light?

A. No.

Q. And when you say that you looked at the photographs, you just circled things that just might be a lesion?

A. Yes.

Q. And you said because you couldn't tell?

A. Well, they were no more likely to be lesions than what was already circled.

Q. When you examined Mr. Pepe, did you take the photographs that Dr. Craft took on which he identified the moles?

A. No.

Q. You didn't bother comparing those photographs and the things he circled to determine whether or not you could determine -- see whether they were a mole or just a passing mark?

MR. GUNN: Objection. Argumentative, Your Honor.

THE COURT: Overruled.

THE WITNESS: I wasn't asked to do that.

BY MR. LULEJIAN:

Q. You were only asked to take a look at the left inner thigh?

A. Yes.

Q. But you were asked to make an opinion about a number of other photographs and -- number of other photographs; is that correct?

A. The -- yes. Basically the photographs in Dr. Craft's presentation.

Q. But a number of the photographs in Dr. Craft's presentation

were supported by his examination of Mr. Pepe.

MR. GUNN: Objection. Argumentative. No personal knowledge of this witness about what Dr. Craft was supported by.

MR. LULEJIAN: I will lay some foundation, Your Honor.

THE COURT: Thank you.

BY MR. LULEJIAN:

Q. Did you read Dr. Craft's report?

A. Not in its entirety.

Q. Did you see in Dr. Craft's report that he said he did a physical examination of the defendant?

A. Yes.

Q. And the -- but when you went to do the examination, you didn't examine Mr. Pepe all over his body, did you?

A. No.

Q. So when you read Dr. Craft's report, did you see that Dr. Craft based his choice of lesions or nevi not only on the photographs that he took but also on his physical examination?

MR. GUNN: Objection. Mis --

THE COURT: He is asking him a question.

THE WITNESS: Why don't you restate the question?

BY MR. LULEJIAN:

Q. Certainly.

In Dr. Craft's report, he states that he based his decision on both the photographs he took and his personal examination of the defendant; isn't that right?

A. Yes.

Q. But when you went, you didn't look at other parts of his body?

A. Not specifically.

Q. You didn't bother to look to see whether the things that Dr. Craft circled in black actually were relatively permanent?

A. No, I didn't look carefully at that.

Q. You didn't look to see whether there were maybe, in fact, hair follicles that are temporary?

A. Well, I did notice there were a number of lesions, when I looked at Mr. Pepe, that weren't on the photographs. Specifically the lesions I mentioned earlier that were on the inner thighs.

Q. Let me put up some of the photographs and let's talk about some of the specific things that Dr. Craft identified.

Perhaps counsel could put up the first photograph that you put up of Exhibit No -- -

MR. GUNN: Does counsel want just the black circles or all --

MR. LULEJIAN: I tell you what, let me put mine up and then we will go over to his.

Q. Doctor, I am going to show you a close up of Government Exhibit 2108. Doctor, in this photograph there are a number of black circles.

Do you see those?

A. Yes.

Q. And those are the circles that highlight the lesions that Dr. Craft determined would be useful in his assessment?

A. Yes.

MR. GUNN: Your Honor, could we have the PowerPoint slide on this so that we can look --

THE COURT: Do you want the number?

MR. GUNN: There should be a PowerPoint slide number.

MR. LULEJIAN: No. 34, Your Honor.

MR. GUNN: 34?

MR. LULEJIAN: 34.

Q. And it's a little hard to see with the light, but there appears to be one, two, three, four, five -- six circles that Dr. Craft made?

A. That's correct.

Q. In each of those circles, he has highlighted something that he believes is a mole.

Do you see that?

A. Okay. Yes.

Q. Now, you haven't ruled out the -- in your analysis, you haven't ruled out those six circles, have you?

A. Ruled out?

Q. You didn't dismiss those as not being present, did you?

A. No.

Q. So you would agree with the fact that these marks would be

on defendant's leg?
A. Yes.
Q. And you just said that there are other marks that go along with it?
A. There are -- there were other lesions that I saw on the inner thighs.
Q. All right.
We will go through some of those in a second, but for purposes of the assessment, there is no dispute that Dr. Craft hasn't identified six moles on the defendant's left thigh?
A. Well, I don't know if those are actually moles. They could be suborrheic keratosis, there could be other growths on there like warts. I can't say those are actually moles.
Q. So you can't say that because you didn't bother analyzing Mr. Pepe, did you?
MR. GUNN: Objection, Your Honor. Argumentative.
THE COURT: I don't think analyzing Mr. Pepe is the --
MR. LULEJIAN: How about examining Mr. Pepe?
THE COURT: Overruled.
BY MR. LULEJIAN:
Q. And even though they may not be moles per se -- I know I am going to mess up the pronunciation of this -- suborr --
A. Suborrheic keratosis.
Q. Thank you very much, Doctor.
Those are relatively permanent items on the skin as

well?

A. They are much less permanent.

Q. They last for several years?

A. They can.

Q. Did they tell you the time frame in which these pictures were taken?

A. Roughly.

Q. About two years, isn't it?

A. Yes.

Q. Now, so the six marks that we -- six marks that we see there, they are relatively permanent lesions or fixtures on Mr. Pepe's left inner thigh?

A. Likely, yes.

Q. Okay.

Now, let's take a look at -- one minute, Your Honor. This is Dr. Craft's slide. I am going to put up the one you put up in its place. I will just use the overhead, Your Honor.

THE COURT: Thank you.

MR. GUNN: I can do a slide show.

THE COURT: Why don't we take the break.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We will take a 15 minute break.

(Recess taken)

THE COURT: Everyone is present. Doctor, you are

still under oath.

Mr. Lulejian, you may continue.

MR. LULEJIAN: Thank you, Your Honor.

Q. Doctor, before the break we talked about the slides of Dr. Craft that you examined; remember?

A. Yes.

Q. I forgot to ask you a question, though.

When you examined Mr. Pepe, you said it was last week, did you take any photographs of his body?

A. No.

Q. So the slides we're working off are Dr. Craft's photos?

A. Yes.

Q. And they're just those photographs that are inside the PowerPoint presentation?

A. Yes.

Q. Okay.

Let's take a look at Defense Exhibit No. 2 -- 284. And we will go back to what Dr. Craft did. This is a diagram that you prepared; right?

A. Yes.

Q. And the left side is the photograph that Dr. Craft took?

A. Yes.

Q. And the right side is the photograph that was seized from the defendant's computer media?

A. Yes.

Q. Now, the photograph that you're using from Dr. Craft is actually slide show No. 32. I am going to put that up just for a second.

And the only difference between the photograph that you have and the one that Dr. Craft has is that you went ahead and drew in circles for the -- where Dr. Craft identified moles; right?

A. I drew in circles where there wasn't an identification of lesions.

Q. Well, let's look at yours. The black ones here are where you said Dr. Craft had drawn moles, and the blue ones are where you added marks that you thought should be considered in the analysis?

A. Yes.

Q. Okay.

There is a couple -- there is something unusual about this slide, isn't there, Doctor?

A. I don't know.

Q. Well --

THE COURT: Be a little bit more specific, Mr. Lulejian.

BY MR. LULEJIAN:

Q. The magnification of the pictures are very different, aren't they?

MR. GUNN: Your Honor, I object. May I consult with

counsel for a moment?

THE COURT: You may.

(Mr. Gunn and Mr. Lulejian confer off the record)

MR. GUNN: Actually, Your Honor, may I have one moment?

(Mr. Gunn and Mr. Lulejian confer off the record)

MR. GUNN: I may have a matter to raise with the Court later.

THE COURT: Okay.

BY MR. LULEJIAN:

Q. Regardless of the magnification, Doctor, what we have tried to do here is identify moles or lesions side-by-side. And you can see in the one on the left, the picture that Dr. Craft took, there are six -- there are six circles around moles?

A. Yes.

Q. And did you draw those circles in or did Dr. Craft draw them in?

A. The black circles.

Q. The black circles.

A. Dr. Craft drew those.

Q. The blue one on the left is the one that you drew in?

A. Yes.

Q. And the one on the right, the black circles are the ones that Dr. Craft drew in and the blue circles are the ones that you drew in?

A. Yes.

MR. LULEJIAN: May I have one moment, Your Honor?

THE COURT: Yes.

BY MR. LULEJIAN:

Q. All right. Doctor, I am going to show you now Slide No. 34 in Dr. Craft's most recent PowerPoint presentation. And what we are going to do is we are going to have to jump back and forth -- we are going to jump back and forth between this slide and Slide No. 34 because I think it's important that we look at them with the same magnification.

MR. GUNN: Objection.

THE COURT: Mr. Lulejian, just ask questions.

BY MR. LULEJIAN:

Q. These -- the black marks are what Dr. Craft identified; is that correct?

A. Yes.

Q. And there is one on the outside here? The very end?

THE COURT: Yes, Mr. Lulejian. We all know that. Move on.

BY MR. LULEJIAN:

Q. Going to your slide, Doctor, you circled one in blue there. So whether it was in Dr. Craft's original or not, we can agree this is a mole or mark on the left-hand side that we agree to? But there is a number of other --

MR. GUNN: Counsel is testifying or making statements

as opposed to questions.

THE COURT: Well, no. I think he is asking leading questions. So you may do that.

MR. LULEJIAN: Thank you, Your Honor.

Q. Dr. Bennett, there is a lot of slighter markings that you have circled; is that right?

A. Yes.

Q. And in fact, I think you testified earlier, if I got this down right, that you looked at the pictures and you said that even though some of them were light, they were lighter in color, you felt that they should be highlighted on the drawing?

A. Yes.

Q. But you weren't quite sure what they were; is that right?

A. Right. Some of them also were the same color and some of them were lighter in color.

Q. But the ones that Dr. Craft identified for the most part are pretty much darker than the other ones, aren't they?

A. Well, it's hard to say for sure, but some of them are the same color, some of them are darker.

Q. But what the goal is is to try to find -- if you are going to be comparing it with a photograph, you want to compare -- you want to take a very conservative approach; is that right?

A. I don't know.

MR. GUNN: Objection. Vague and ambiguous and may implicate the Court's prior ruling.

THE COURT: I have no idea what --

MR. LULEJIAN: I'm sorry. Let me try to restate.

Q. When looking at the photograph, Doctor, you want to be conservative in what you determine are moles?

MR. GUNN: Objection. Vague as to circumstances.

THE COURT: Sustained.

BY MR. LULEJIAN:

Q. Doctor, if you don't get an opportunity to examine the person in this photograph, the one on the left on Defense Exhibit No. 284, you want to be certain that the things that you select as moles are dark enough that you can be fairly certain they are semi-permanent?

MR. GUNN: Objection.

THE COURT: Mr. Gunn, why don't you take Mr. Lulejian aside and explain to him why you are objecting and why I am sustaining the objection.

(Mr. Gunn and Mr. Lulejian confer off the record)

BY MR. LULEJIAN:

Q. With respect to the photograph on the left, Doctor, you can't be certain what the circles in blue are without examining that person, can you?

A. No.

Q. So you're just trying to read the picture and make a guess?

A. Yes.

Q. Let's take a look at Defense Exhibit No. 283 now. The

picture on the right is a photograph Dr. Craft took; is that correct?

A. Yes.

Q. The photograph on the left is one seized out of evidence?

A. Yes.

Q. And with respect to the photograph on the left, this is Slide No. 39, Dr. Craft identified four marks that he was comfortable saying were lesions?

A. Okay.

Q. With respect to yours, you identified the same -- the same four were highlighted there but you also identified three other things right in here?

A. Yes.

Q. Okay.

And you also identified some other things on the -- you identified -- so you -- let me rephrase that.

There are three markings on Dr. Craft's photograph that you felt should be considered as possible lesions?

A. That's -- that's the photograph on the right?

Q. Yes, sir.

A. Yes.

Q. Let me zoom in on it. Technology. Let's look at them. Starting from the one on the top, that top circle, the top blue circle is significantly lighter than the one that Dr. Craft circled, isn't it?

A. Yes.
Q. The one immediately below that, that is also significantly lighter, isn't it?
A. Yes.
Q. And the -- and the one underneath it with the two -- with the two marks inside that oval?
A. Right.
Q. They took lighter too?
In fact, it looks like a different color?
A. To me they look almost the same.
Q. Unlike the mark that Dr. Craft circled, the bottom blue one doesn't have clear defined edges, does it?
A. I don't think any of them have clearly defined edges.
Q. Let's go to the photograph on the right now. Start at the top right-hand corner. Dr. Craft has a black circle around something he considers a lesion that he would say is semi-permanent, according to his report.
A. Okay.
Q. You have circled three other marks on here. It looks like all three of them are significantly lighter than the one Dr. Craft circled.
A. Well, they all look alike to me, including the one Dr. Craft circled.
Q. When you looked at this photograph, did you change the contrast at all?

A. No.

Q. Going now to the right of the photograph, Dr. Craft identified two marks here and you identified one on the far left, near the outer edge of the thigh; is that right?

A. Yes.

Q. And that one is significantly lighter than the other two, isn't it?

A. Maybe slightly lighter. I don't know what you mean by "significantly."

Q. Well -- but you can't tell what this is, can you?

A. You can't tell what any of them are.

Q. Let's go to the middle now. You have highlighted four marks that you believe should be considered in this analysis; is that correct?

A. Yes.

Q. And the one on the bottom right there, that's pretty large, isn't it?

A. Well, again, I don't know what you mean by "large."

Q. It fills up the oval you have drawn?

A. It fills up the oval.

Q. Doesn't have well defined edges?

A. No.

Q. Doesn't seem to change too much in the contrast of the skin around it?

MR. GUNN: Objection. Vague and ambiguous.

THE WITNESS: I'm not sure what he means.

THE COURT: Sustained.

BY MR. LULEJIAN:

Q. And the other three marks, the one on the top, the one in the middle and the one on the bottom left-hand corner, you're not sure what those are either?

A. No.

Q. They're just things you thought, as another dermatologist, should be highlighted?

A. I felt they were other skin lesions.

Q. I'm sorry?

A. I felt that they were other skin lesions.

Q. All right.

Turning to Defense Exhibit 282. Dr. Bennett, did you understand that the top two photographs were seized from the defendant's computer media?

A. Yes.

Q. The bottom one was a picture Dr. Craft took?

A. Yes.

Q. Let's start with the top photograph. There are a number of black marks that Dr. Craft has circled.

Do you see all those there?

A. Yes.

Q. And you would agree that they're marks or pigments on the skin?

A. Yes.

Q. Now, with respect to the top photograph, you have identified a small mark immediately to the right of the one on the right-hand corner.

Do you see that?

A. Yes.

Q. And you understand that the top picture and the second picture are believed to be the same person?

A. Yes.

Q. You don't see that mark in the second photograph, do you?

A. No.

Q. But you highlight it on the first but not the second?

A. Yes.

Q. It's possible that the reason it's not there is because it's just a trick of the camera; is that right?

A. Could be.

Q. The fact that it's in one photograph and not the other photograph suggests that maybe that's not the most reliable mark to pick; isn't that right?

A. You know, actually I do see it now that you have got it up. It's --

Q. Do you want me to zoom in?

A. Well, if you look at the central photograph -- yeah, there it is. I didn't circle it, though. You can see it right to the right of that black mark.

Q. Here?
A. No.
Q. I'm not talking about the middle one. I am talking about the one on the right-hand corner.
A. Okay. That one.
Q. So we're looking at this one. On this one you have the mark that Dr. Craft circled, and then you have drawn a circle over something significantly lighter.
Do you see that?
A. Yes.
Q. But on this one, the middle one, you have the black mark here, and you don't have that circled, do you?
A. No.
Q. Instead you have a mark that's -- it looks like it's a lot larger and a lot darker underneath it? Do you see that?
A. Right.
Q. But you don't really see that in the top photograph, do you?
A. No. And it can also be the angle.
Q. Okay.
So what I think we could say is that Dr. Craft identified the top photograph -- two marks that were fairly well defined between the two photographs; right?
A. Yes.
Q. And in the photograph -- in the circles that you have

drawn, there are two very different marks that don't appear in the same photograph; right?

A. Well, I'm not sure that the second mark that I drew -- let me see this. I'm not sure the second mark I drew up at the top is not in the central photograph because it could be the angle of the second photograph. You see if the patient -- if the defendant was turned slightly, those two circles might be more spread apart as in the central photograph there.

Q. But the problem is if it's the same person and you're trying to identify features that are common on both, you would want to find marks that appear in the same spots in both photographs; right?

A. Yes.

Q. And if you had one image that -- if you had one mark that was in one but not the other photograph --

MR. GUNN: I object. This is verging on the Court's ruling, I believe.

THE COURT: I don't think it is, if I'm understanding the question.

MR. LULEJIAN: I will try to rephrase it so we are very clear.

Q. Dr. Bennett, just so there is no dispute, the top photograph and the second photograph were both seized from defendant's computer media; right?

A. Yes.

Q. And it's your understanding that the person -- we don't know who that person is -- in the top photograph and the second photograph are the same person?

A. Yes.

Q. Okay.

Now, what I'm asking, Doctor, is that you have identified marks in the top photograph and the second photograph that do not appear in each one.

A. Or that I didn't indicate appear in each one.

Q. You have got some question about whether or not those marks are there; is that fair to say?

A. Well, you know, I just happen to see sitting here that I didn't happen to mark, for instance, on the -- there is one lesion I didn't happen to mark on the central photograph that I marked on the top photograph.

Q. Where would that be?

A. If you go to the middle photograph, sort of towards the center there is a black circle.

Q. This one?

A. Yes. If you go to right of that there is a lesion there. I marked that on the top but not the central photograph.

Q. Okay. We'll give you that.

But with respect to the one on the top right-hand corner and the middle right-hand corner or the middle corner, those marks aren't -- they are not consistent in both

photographs, are they?

A. They're not.

Q. So you probably shouldn't consider that when you pick it because you want to be as conservative as possible?

A. Well, I'm not sure because --

MR. GUNN: Objection. Argumentative.

THE COURT: Sustained.

MR. LULEJIAN: Hold on, please.

(Mr. Lulejian and Ms. Donahue confer off the record)

BY MR. LULEJIAN:

Q. Last week when you examined the defendant, were you asked to take photographs?

A. No.

Q. Now, you talked about a mark on the defendant's inner thigh; remember that?

A. Yes.

Q. And Dr. Craft in his report said that that mark was a scar?

A. Yes.

Q. And I think you said earlier that you went last week and examined Mr. Pepe for specifically that mark or that region of his leg?

A. Yes.

Q. And what did your examination consist of, Doctor?

A. My examination consisted of viewing the area and also feeling the area.

Q. When you viewed the area, that was a visual observation?
A. Yes.
Q. Did you touch the area and palpate the area?
A. Yes.
Q. Approximately how long did you spend doing that?
A. A few seconds.
Q. And when you looked in that region, you found some sort of a mark that was consistent with what Dr. Craft found; right?
A. Yes.
Q. But it's just your opinion is different than Dr. Craft's?
A. How is my opinion different --
Q. Actually it's not. I think you referred to that mark as a scar, turning to your direct testimony?
A. I believe so.
Q. So both you and Dr. Craft found a scar in the same position?
A. Very small scar.
Q. But there is a scar there nonetheless?
A. Yes.
Q. If you look very closely that the scar -- I will pull up Dr. Craft's slide show. This is Slide No. 23. If you look at that scar, in Dr. Craft's photograph you can see a straight line that runs across the top of that scar, don't you?
A. I see an indentation.
Q. So it's a linear groove?

A. Linear groove.

Q. It would be right about there?

A. Uh-huh.

Q. And would you -- now, would a linear groove -- if something was growing there and it fell off naturally, would the linear groove be present?

A. I don't quite know how to answer that.

Q. Let me rephrase the question.

A scar is trauma to the skin; is that right?

A. Not necessarily. I mean a scar could arise from natural resolution of a lesion that had nothing to do with trauma.

Q. But it's going to be left over from something that was present?

A. Yes.

Q. Okay.

So if something fell off, you might see a scar?

A. Yes.

Q. If something was cut off, you might see a scar?

A. Yes.

Q. If something was picked off, you might see a scar?

A. Yes.

Q. If something fell off naturally, would you see a linear marking such as in that photograph?

A. My interpretation of this slide and that groove that you're talking about is the fact that on either side of that groove

there's still some persistence of the lesion there. And it just has resolved on either side -- it has resolved on either side of that groove. It has no other meaning than that.

Q. If it was cut off, it wouldn't be clean-cut?

A. If it was cut off -- I don't see any evidence that anything was cut off.

Q. If it was picked off, you would see some residual material left over there; right?

A. I don't know what you would see if it was picked off.

Q. You just don't know?

A. I just don't know.

Q. But we can agree that that is a scar?

A. Well, actually I can agree that that is sort of a reddish lesion with irregular borders, and I have no way -- I can't tell you what that is.

Q. You testified on direct that it was a scar.

A. I testified on direct that I saw a scar when I examined him. I didn't testify on direct that I thought this was a scar.

Q. Do you know the location on this photograph of where this close-up is from?

A. It's from the inner thigh. I believe on the left.

Q. Go back one slide, I believe that's 22.

A. Yes.

Q. Where the red mark is, is that where what you saw was a scar was?

A. Yes.

Q. And is that the same location on which the growth that you saw in the picture was?

A. Yes.

MR. LULEJIAN: I have no further questions, Your Honor.

THE COURT: Re-direct?

MR. GUNN: Nothing Your Honor.

THE COURT: Thank you, sir, you are excused.

Does the Defense have another witness?

MR. GUNN: Your Honor, we would call Ung Huot. If I could send Mr. Brown out to get him or Mr. Williams, our investigator.

THE COURT: Okay.

THE CLERK: The interpreter has been previously sworn?

THE INTERPRETER: Yes.

Ung Huot, Defendant's witness, was sworn

THE CLERK: Please have a seat. Please state and spell your full name for the record.

THE WITNESS: My name is Ung Huot. Spelled U-N-G, H-U-O-T.

THE COURT: You may proceed.

MR. GUNN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. GUNN:

Q. Mr. Ung, where do you live?
A. Phnom Penh, Cambodia.
Q. And are you a Cambodian citizen?
A. Yes.
Q. Were you born in Cambodia?
A. Yes.
Q. Have you been a Cambodian citizen all your life?
A. Yes.
Q. Are there times when you have lived outside Cambodia?
A. Yes.
Q. And just generally, what sort of time periods were those and where was it?
A. From '71 to '92.
Q. And where did you live turning that period?
A. In Melbourne, Australia.
Q. Do you speak fairly good English?
A. Yes.
Q. Why are you using an interpreter here today?
A. Because all the witness speak Cambodian and I prefer to speak in Cambodian.
Q. How are you employed right now?
A. I'm the member of the Senate.
Q. Do you also have a personal business or personal employment or company or business?
A. No.

Q. Do you also have a farm? Do you also have a farm?
A. Yes, I do own some farm and land but it's not a business.
Q. Okay.
And so you're a member of the Cambodian Senate, you said?
A. Yes.
Q. You said -- when was it you returned to Cambodia? Did you say it was 1992?
A. Yes. 1992.
Q. How long have you been a member of the Senate?
A. Two years.
Q. And were you in political life before that in the government at some time before that?
A. Yes.
Q. And what sort of government positions have you been in?
A. In '93 I used to be a Minister of Communication and postal of service. In '94 I'm the Minister of Education. In '95 I'm the Minister of Interior -- Foreign Affairs.
THE INTERPRETER: I'm sorry.
THE WITNESS: From '97 to '98, I was the Prime Minister of Cambodia.
BY MR. GUNN:
Q. What about after '98?
A. The adviser of the Government. Until I became the Senate.
Q. Now, do you know a man named Sander DeMontero?

A. Yes.
Q. And how do you know him?
A. I knew Mr. Sander DeMontero since 1971 when I was in Australia to further my education until the present time.
Q. And since returning to Cambodia, have you -- how have you known Mr. DeMontero?
A. Well, in 1994 and '95, Mr. DeMontero went to Cambodia to help me in the educational program. And when I became the Prime Minister, he is the helper.
Q. So did you have sort of continuing contact with him, at least off and on, from 1994 through recent years?
A. Yes.
Q. Did there come a time several years back when you had discussions or conversations with Mr. DeMontero about an organization he was involved in that was distributing school supplies?
A. I think is in 2005. I heard him usually telling me that he brought some gift and some school supply, distribute it outside the city, the suburb of different province, with the American citizen. And I wasn't paying much attention at the time because I was very busy with my work.

And since he's mentioned to me so often, and I decided to go to the different province.

And since he told me that he has an organization called Socrates, and I think that if he have that kind of

organization, it will be good for me just to bring the gift to the childrens or the school.

Q. Let me stop you and take it with some questions. Okay.

THE COURT: Wait a minute. Did you finish the translation?

THE INTERPRETER: Yes.

BY MR. GUNN:

Q. Let me follow up on that with a question.

You said that he said it was run or organized by an American citizen.

A. Yes.

Q. And did it -- after hearing him talk about this, did you become interested in participating with this project or this school supply distribution?

A. Yes.

Q. And so what, if anything, did you say to Mr. DeMontero about that?

A. I told him that if you have that kind of program, I'm interested to deliver those gift to the children, unfortunate children living along the border of Cambodia and Thailand.

Q. And --

A. Remote area.

Q. Did you then say you wanted to do that with him and the American or did you say you would just do that on your own?

A. I wanted to cooperate with him also, but, you know, it's a

very far away. It's about 5 or 600 kilometers. It's very difficult to travel to that remote area.

Q. So then did he end up giving you some school supplies to distribute?

A. Yes. So it's enough to give it to 500 kids.

Q. What did you do with those?

A. I brought that and I distribute it to very remote area, a school -- primary school in Banteay Mean Cheay province.

Q. Did either he or the American citizen that was in charge insist that the American citizen be able to go with you?

A. No.

Q. As a result -- or after you did this school supply distribution and had these discussions with Mr. DeMontero, did you develop an interest in meeting the American citizen who was organizing this?

A. Yes. Because I feel that if he have an idea of helping, it's good for me to meet with him.

Q. Did you know his name at this point?

A. Before I met him, I do not know his name until he introduced me when he met with me.

Q. And so did you end up having a meeting with him?

A. I met with him and also showed him the picture that I took when I distributing the gift, show it to him.

Q. Did you find out his name when you met with him?

A. Yes.

Q. What was that name? Who was it?

A. His name Michael Pepe.

Q. Now, after that first meeting -- over time about how many times have you met Mr. Pepe?

A. Three or four times.

Q. Do you think you could recognize him if you looked around the courtroom today?

A. Yes.

Q. Would you point him out for us.

MR. GUNN: Your Honor, identifying Mr. Pepe or do you want more specific?

THE COURT: Well, Mr. Pepe has already identified himself, so --

MR. GUNN: I don't think it was going to be disputed.

Q. Did you have that first meeting with Mr. Pepe and meet him and get to know his name?

A. Not only know his name, I learned that he is a professor teaching management in Pannasastra University.

Q. Before we get to that, did you talk with him a little bit when you met about his school supply distribution program?

A. Yes, I did.

Q. But when you learned he was a management professor, did you have some other ideas about what you might like to have him do or do with him?

A. At that time when he mentioned that he was the professor of

management and I -- that's -- interest me because I have an MBA from Melbourne University, and I would like to discuss further regarding that project.

Q. What, if anything, did you suggest to him besides the school supply distribution activity after you found out about this?

A. I asked him how does he feel about the Cambodian student, and he explained that is a lot of -- lacking of a lot of other things. And I thought that if he and I join to open a school in order to train those Cambodian student.

Q. The type of students you're talking about here, are these small children students or sort of college or graduate students?

A. College student.

Q. So did you propose to him doing something like that? Just yes or no for now.

A. Yes.

Q. And did he respond by saying no, I'm just interested in working with children and doing the school supply distribution, or did he express interest in being involved in this sort of other activity?

A. He said that he want to join me in order to open that school.

Q. Did you then start making some plans and developing some ideas about that?

A. Yes. I ask him to go ahead and set up and prepare for

that.

MR. GUNN: Your Honor, may I approach and have an exhibit marked?

THE COURT: You may.

MR. GUNN: 391.

If I could speak briefly to counsel, Your Honor?

THE COURT: Sure.

MR. GUNN: If I could approach. I have an original with a paper clip on it and a copy for the report. I haven't, unfortunately, stapled everything together.

THE COURT: Thank you.

MR. GUNN: I am versed in using a stapler.

Q. Mr. Ung, would you look at Defense Exhibit No. 391 and tell us what that is.

A. Can you please repeat --

Q. Repeat the question?

A. Yes.

Q. Would you look at the whole group of papers I just handed had you. That have an exhibit tag on the back with the No. 391 right there in front of you. If you would, keep them clipped together for now.

Do you recognize those papers?

A. Yes.

Q. What are they? Generally?

A. It's correspondence letter between Mr. Pepe and I, we

talking about how he prepared this project.

MR. GUNN: Your Honor, I offer Defense Exhibit 391 into evidence.

MS. DONAHUE: Subsequently coming in, it's hearsay.

MR. GUNN: I'm not offering it for the truth.

THE COURT: What are you offering it for?

MR. GUNN: I am offering it to show Mr. Pepe went forward with a willingness and interest to be involved in program. Almost like a verbal offer in a sense. We could address it at a recess.

THE COURT: Ladies and gentlemen, this document is not being offered for the truth of the contents of the document and you should not consider it for that. I'm not sure I can articulate what it is being offered for but --

MR. GUNN: Just to corroborate that he expressed interest in being involved in this management training program.

THE COURT: To the extent you think that's relevant, you may consider it for that purpose only.

(Defendant's Exhibit 391 was received)

MR. GUNN: Your Honor, if I could approach and have one more exhibit marked?

THE COURT: Yes.

BY MR. GUNN:

Q. Would you also look at Defense Exhibit 390, Mr. Ung.

Do you recognize that?

A. Yes.

Q. What is that?

A. It's the letter that the gratitude accepting that he did a good job such as the delivery and providing some gift and stuff.

Q. Specifically the school supplies?

A. Yes.

MR. GUNN: Your Honor, I offer 391 into evidence.

MS. DONAHUE: No objection.

THE COURT: That will come in.

(Defendant's Exhibit 390 was received)

MR. GUNN: I have no further questions.

THE COURT: That was 390.

MR. GUNN: Yes. I meant 390. With the limiting instruction.

THE COURT: Correct.

Mr. Lulejian.

CROSS-EXAMINATION

BY MR. LULEJIAN:

Q. Good afternoon, sir. You testified that you met the defendant through Sander DeMontero; is that correct?

A. Yes.

Q. And before Mr. DeMontero introduced the defendant to you, you had never met him before?

A. That is correct.

Q. You had never spoken with him?

A. No.

Q. Never had him over at your home for dinner?

A. No.

Q. Never heard of him?

A. No.

Q. After Mr. DeMontero introduced you to him and you learned that he was a professor, did you check out his credentials?

A. I did not check out his credential but I happen to meet another person, different person. They told me that he is a professor.

Q. And during your entire relationship with the defendant, you had understood he was a professor?

A. Yes.

Q. Did you come to learn the defendant lost his job as a professor at that university?

MR. GUNN: Objection. Irrelevant, Your Honor. Move to strike.

THE COURT: Overruled.

THE WITNESS: I know that he took off from his job at the time that I think I met him, yes.

BY MR. LULEJIAN:

Q. When you met him and began working with him, the defendant was eager to work with you, wasn't he?

A. Yes. Because he did prepare all kind of document and plan.

Q. So whatever you proposed to him, he was eager to do?

A. Yes.

Q. And at that time, you were a senior member of the Funcipec party in Cambodia; isn't that right?

A. Yes.

Q. And the Funcipec party is one of the two leading political parties in Cambodia; isn't that right?

A. Yes.

Q. And even though you weren't Prime Minister at the time, you still had considerable influence within the party and the Cambodian government; isn't that right?

A. It's not really clear.

Q. You're still -- at the time that you met the defendant, you were still involved in Cambodian politics, weren't you?

A. I am in charge in the elections in that Funcipec party as the Secretary, Deputy Secretary in charge of election.

Q. Were you a Senator at that time?

A. No.

Q. You have had the defendant over at your home for dinner, haven't you?

A. Yes, I did.

Q. In fact, you had him over on two occasions?

A. I think only once. Yes, but I had breakfast with him twice in correspondence club.

Q. In fact, after you dined with him, he was arrested the next day, wasn't he?

MR. GUNN: Objection. Irrelevant, Your Honor.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. LULEJIAN:

Q. You have never been at defendant's house have you?

A. No.

Q. Never been inside the defendant's bedroom?

A. No.

Q. Never seen who lives in defendant's house?

A. I never been to his house.

Q. In fact, you don't really know that much about the defendant, do you?

A. No.

Q. You don't know whether or not he is married?

A. I did not ask. This is personal.

Q. You don't know whether or not he lives with any children?

MR. GUNN: I object. This is irrelevant.

THE COURT: Overruled.

THE WITNESS: No.

BY MR. LULEJIAN:

Q. You don't know what he does behind the locked door of his bedroom, do you?

A. No.

MR. LULEJIAN: No further questions.

THE COURT: Redirect?

MR. GUNN: Nothing, Your Honor.

THE COURT: Thank you, sir. You're excused.

Does the Defense have another witness?

MR. GUNN: Your Honor, we would call Khieu San, if Mr. Williams could step out and get him.

THE CLERK: Again, we have the assistance of the Cambodian interpreter.

Khieu San, Defendant's witness, was sworn

THE CLERK: Please state and spell your full name for the record.

THE WITNESS: My name is Khieu San, spelled K-H-I-E-U, and my first name San, S-A-N.

THE INTERPRETER: Spelled K-H-I-E-U and S-A-N.

DIRECT EXAMINATION

BY MR. GUNN:

Q. Do you speak English or fairly good English?

A. Yes. But I am pleased -- as a I am the member of Parliament in Cambodia, I better speak my own language officially.

THE COURT: Mr. Khieu, would you like to speak English here or would you like to use the Cambodian interpreter?

THE WITNESS: I prefer to speak in Cambodian.

THE COURT: Then please wait for the Cambodian interpreter to interpret the lawyer's questions and do not answer in English.

THE WITNESS: Okay.

THE COURT: Mr. Gunn?

MR. GUNN: Yes, Your Honor.

Q. Mr. Khieu, are you a Cambodian citizen?

A. Yes.

Q. One of the difficulties about knowing both languages is you have to try to listen to the Cambodian rather than my English, if you can.

A. Okay.

Q. Very good. Thank you.

Were you born in Cambodia?

A. Yes.

Q. And have you lived in Cambodia all your life or have you lived other places as well?

A. I live abroad quite a few other place.

Q. And where have you lived abroad?

A. Thailand, Vietnam, Japan, and United States.

Q. Where in the United States have you lived?

A. Ohio.

Q. How are you -- well, did you mention I think just now that you're in the National Assembly?

A. Yes.

Q. How long have you been in the National Assembly?

A. Five years.

Q. And how long have you been back in Cambodia since the other

places you have lived?
A. Since 1998. I went there and I became a Senator.
Q. Do you know -- strike that.
Do you know Sander DeMontero?
A. Yes, I do.
Q. How do you know him?
A. I know him because I was introduced. He was working with the Assistant Deputy Assistant in Funcipec party.
Q. And through him -- do you remember when it was you met him approximately?
A. I do not have the exact date but I remember maybe around 2003 or after or a little bit before. I'm not sure.
Q. All right.
Have you also met Michael Pepe?
A. Yes. Often.
Q. And would you be able to recognize him if you looked around the courtroom today?
A. Yes. I remember him well.
MR. GUNN: Your Honor, may the record reflect he has identified Mr. Pepe.
THE COURT: I don't know who he identified but Mr. Pepe identified himself, so . . .
BY MR. GUNN:
Q. How did you meet Michael Pepe?
A. After Mr. Sander introduced him to me and he told me about

how interested that he would like to explain or teach my teacher -- my student and explain to some of the Cambodian parents.

Q. When he -- did he tell you about a school supply distribution program he had?

A. Yes.

Q. What did he tell you that program involved or what did he tell you about what he did in that program or through that program?

A. He explained to me that he know very well Cambodian children's are poor. They need badly pencil, book, eraser, and the blackboard, little blackboard.

Q. Did he tell you that he had a program where he distributed those to children as gifts?

A. Yes.

Q. Did you, after that, participate with him on going on some school supply distribution trips?

A. Yes. Quite often. And sometime I also explain to them regarding what he felt about the democracy of the country.

Q. About how many times would you say you went on school supply distribution trips with him?

A. More than ten time. And if you count how many student, is over 10,000 student.

Q. Were the locations you went to with him all just close to Phnom Penh or were there some that were further away?

A. It's -- some in Phnom Penh, some in the suburb, and usually sometimes it's far away, hundreds of miles away from Phnom Penh.

Q. Was one of the locations you went to a naval base called Ream Naval Base?

A. Yes.

Q. And how far away is that from Phnom Penh?

A. Over a hundred mile.

MR. GUNN: Your Honor, could I approach and have some exhibits marked as 371 -- 370 through 373?

THE COURT: You may.

MR. GUNN: Providing copies to counsel.

THE COURT: Thank you.

MR. GUNN: And a copy for the Court and originals.

(Defendant's Exhibits 370 through 373 were marked)

BY MR. GUNN:

Q. Mr. Khieu, I would first like you to look at Exhibits 370, 371, and 372, the photographs that have been placed in front of you.

Just looking at those three photographs for now, do you recognize them?

THE INTERPRETER: There's four, Counsel.

BY MR. GUNN:

Q. I think it's a letter and three photographs; is it not?

THE COURT: It's three photographs.

THE INTERPRETER: Let's see here. 70, 71 --

MR. GUNN: I just want him to look at the three photographs.

THE INTERPRETER: 72.

THE COURT: That's it. Stop there.

THE WITNESS: Yes. I remember very clear this is the project that he and I went. It's a base, naval base in Ream.

BY MR. GUNN:

Q. Let me ask you a question to get us focused.

Are those three photographs from one of your school supply distribution trips, one or more of your school supply distribution trips to Ream Naval Base?

A. Yes.

Q. And do those show you and/or Mr. Pepe distributing school supplies?

A. Yes.

MR. GUNN: Your Honor, offer 370, 371 and 372 into evidence.

MR. LULEJIAN: No objection.

THE COURT: Those will come in. Thank you.

(Defendant's Exhibits 370 through 372 were received)

BY MR. GUNN:

Q. Is this the photograph that's marked as Defense Exhibit 370?

A. Yes.

Q. And is this you?

A. Yes.
Q. And is this Mr. Pepe next to you?
A. Yes.
Q. And what is this pink item that I am circling my pen around here?
A. Stationery.
Q. So those were the school supplies that you were distributing?
A. Yes.
Q. Is this Defense Exhibit 371?
A. Yes. That's the same.
Q. And that's you there?
A. Yes.
Q. And that's you handing out school supplies to the children?
A. Yes.
Q. And then is this Defense Exhibit 372?
A. Yes.
Q. Is that you there?
A. Yes.
Q. Is that Mr. Pepe?
A. Yes. He have his form of uniforms --
Q. This is him handing out school supplies here and you getting more off the table here?
A. Yes.
Q. Would you now look at Defense Exhibit 373.

Is that a letter you wrote that is stapled to a copy of an envelope it was sent in?

A. Yes. This is official letter that I sent to him to thank him for what he has done.

Q. With respect to the school supply distribution?

A. Yes. That's when -- at the Socrates Foundation.

Q. You said the Socrates Foundation. Is that what he called the school supply distribution group?

A. Yes.

MR. GUNN: Your Honor, I would offer 373 into evidence.

MR. LULEJIAN: No objection.

THE COURT: That will come in.

(Defendant's Exhibit 373 was received)

MR. GUNN: No further questions.

THE COURT: Cross-examination?

MR. LULEJIAN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. LULEJIAN:

Q. Good afternoon, sir.

A. Good afternoon.

Q. You testified a moment ago that you met the defendant through Sander DeMontero; is that right?

A. That is correct.

Q. And prior to being introduced to the defendant by

Mr. DeMontero, you had never met him before?

A. That's correct.

Q. You had never spoken with him before?

A. No.

Q. Never eaten with him before?

A. No.

Q. Never heard of him before?

A. No.

Q. It was only after Mr. DeMontero made the introduction that you got to know the defendant?

A. After Mr. DeMontero told me about him, showed me the project and the activity that they did to help the children, that's how I became interested to join him in order to do that.

Q. So the defendant ran what you would call a non-governmental organization; is that right?

A. Yes.

Q. Are non-governmental organizations required to register with the Cambodian government?

A. That is true.

Q. Was the Socrates Foundation registered with the Cambodian government as an NGO?

MR. GUNN: Objection, irrelevant, Rule 403, Your Honor.

THE COURT: Overruled.

THE WITNESS: I do not see the authorizations from the

Government but personally I see the American citizen happy to help and I'm glad to accept.

BY MR. LULEJIAN:

Q. So even though an NGO doesn't follow the rules, as long as they are willing to help the Cambodian people, that's okay?

MR. GUNN: Objection, argumentative, Your Honor.

THE COURT: I don't know what the question means so I'll sustain the objection.

MR. LULEJIAN: I'll bring it up in a minute, Your Honor.

Q. Before I forget, are you a citizen of any other country, sir?

A. I'm an American citizen.

Q. And you became naturalized to this country?

A. Yes.

Q. And in the process of becoming naturalized, you took the test that all new citizens have to take?

A. Yes. Yes.

Q. One of the topics of that test is the judicial system and the respect for it?

MR. GUNN: Objection. Irrelevant, Your Honor.

MR. LULEJIAN: I will tie it up in a few minutes, Your Honor.

THE COURT: All right. I'll allow it.

THE WITNESS: Yes. I follow the -- yes. The

requirement to become a natural citizen, I have to accept.

BY MR. LULEJIAN:

Q. Now, after you met Mr. Pepe, he offered to help you with your -- with the distribution of the school supplies, right?

A. Yes. And he also mentioned about democracy and the right of the student and also did explain all those to the teacher.

Q. So democracy was important to the defendant then?

A. Yes. And also have a monk join them.

Q. So it was fair to say that the defendant was eager to help you with your outreach program?

A. Yes.

Q. Has the defendant ever been to your home?

A. I invite him into my house to have coffee before we travel to distribution of those gifts. That's my wife also was there.

Q. How many times, sir?

A. I don't recall exactly but at least five times.

Q. Have you ever been to the defendant's home?

A. Yes.

Q. Approximately how many times?

A. Twice in a very short period of time. But outside in the yard, quite often when I pick him up in order to travel to distributing the gift.

Q. Did you ever go inside his home?

A. Yes. In the living room.

Q. Did you ever go upstairs?

A. No.
Q. You never went to the defendant's bedroom?
A. No.
Q. Never went to the room next door to the defendant's bedroom?
A. No.
Q. When you were at the defendant's home, did you see children there?
A. Sometimes I do.
Q. How old were the children?
A. To me maybe look like 13.

MR. LULEJIAN: One moment, please.

Q. Did you see one by the name of Chanry at the house?
A. I -- I don't recognize the name, and I don't know whether I met her or not because I don't spend a whole lot of time in there.
Q. Do you know if defendant is married?
A. He told me that he's divorced.
Q. The person he is divorced from, is she Cambodia?
A. He is divorced from the Caucasian or American citizen.
Q. Did you see Mr. Pepe with a Cambodian woman who you would describe as a girlfriend?
A. Yes. A petite woman. I do not remember her name.
Q. Where did you see her?
A. At the time that we took the gift in order to distribute to

the children.

Q. So she came on the trip with you?

A. Yes.

Q. Mr. Pepe was arrested on June 17th of 2006; is that right?

THE INTERPRETER: 2006, Counsel?

MR. LULEJIAN: Yes, sir.

THE WITNESS: Yes.

BY MR. LULEJIAN:

Q. After Mr. Pepe was arrested, you were pressured to offer assistance, weren't you?

MR. GUNN: Objection. Outside the scope, Your Honor.

THE COURT: Overruled.

THE WITNESS: Well, I willing to help because I felt that he did help the Cambodian children.

BY MR. LULEJIAN:

Q. My question is after Mr. Pepe was arrested, you were pressured to help him, weren't you?

A. Nobody pressured me. At the time I wasn't in the country.

Q. On March 4th of this year, did you meet with Special Agent Gary Phillips in your office in Phnom Penh?

A. Yes.

Q. And did you tell Special Agent Phillips that when Pepe was arrested, he, being you, was pressured to offer him assistance?

A. Plus not only that, I felt so bad. My tear came out because I felt sympathize with him.

Q. But you didn't do anything, did you?

A. I have so many thing to do, I unable to help him only.

Q. But afterwards, you did help some people involved in that case, in the Cambodian case, didn't you?

MR. GUNN: Objection. Outside the scope, Your Honor.

THE COURT: Overruled.

THE WITNESS: I don't think that I help them in a full capacity.

BY MR. LULEJIAN:

Q. In fact, you have launched an investigation on your own to find out what happened to mothers whose daughters were living with Mr. Pepe, haven't you?

A. Before I came to United States, five day before I came here, I want to know exactly what's happening, and I did -- I went to meet with the grandmother in the Tak Mao city. It is my job as a member of the Parliament.

Q. You met with Ly Kim Eng's family, didn't you?

A. I met with the mother, grandmother, and also the aunt.

Q. You met with Kumlang and their family, didn't you?

A. Yes.

Q. You're not a member of the Ministry of Justice?

A. No. But I'm the representative. I'm a member of the Parliament. I am the one that create the legislative, and I would like to follow what I am creating.

Q. In fact, you found out that the children of Kumlang and Ly

Kim Eng are currently with a non-governmental organization; isn't that right?

A. I'm not sure.

Q. You didn't go to the police after meeting with the two women, did you?

MR. GUNN: I object. This is outside the scope, Your Honor.

THE COURT: Overruled.

THE WITNESS: I did met with the police before I came. I want to know the truth.

BY MR. LULEJIAN:

Q. In fact, you --

A. I did meet with the official in the -- actually the judge in the judicial -- I did meet with the people in the court, call it the trial court. And also the appeal court in Phnom Penh.

Q. So you met with the judge by the name of -- I am going to spell it. S-A-O, next word is M-E-A-C-H, Sao Meach?

A. Sao Meach.

Q. My apologies, sir.

You met with this judge?

A. Yes.

Q. You talked to him?

A. Yes.

Q. You advocated on behalf of the mothers?

A. I just asked him what's happened in this case.

 MR. GUNN: I object. This is outside the scope, 403, irrelevant.

THE COURT: It seems relevant to me.

How much more do you have, Mr. Lulejian.

MR. LULEJIAN: Probably ten minutes, Your Honor. If you would like me to stop -- I could finish up this line of questioning and then finish him on Monday or Tuesday.

MR. GUNN: If we could finish, I think Mr. Khieu would like to go back to Cambodian.

THE COURT: That may be but it's the Friday before Memorial Day weekend and we have one juror with at least a 210 mile drive.

MR. LULEJIAN: Let me ask him some short questions and I'll just be finished.

THE COURT: Okay.

MR. LULEJIAN: Okay. I'm sorry, we will finish on Tuesday, we'll stop here.

THE COURT: Okay.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. You are ordered to return on Tuesday at 8:00 a.m. You're ordered to stay healthy and safe and have a great Memorial Day weekend.

(Jury Out)

THE COURT: Sir, you are ordered to return on Tuesday

at 7:45 a.m.

THE WITNESS: Okay.

THE COURT: You may be seated.

MR. GUNN: Your Honor, may I speak with my investigator for one minute?

THE COURT: You may.

I didn't want to state the specific reasons for my rulings in front of the jury, but it seems to me that Mr. Lulejian's line of questioning quite clearly goes to bias which is never outside the scope, and that's the basis of my ruling.

MR. GUNN: I appreciate the Court not articulating that in front of the jury. I wanted to make my objections. I understand the Court's position.

THE COURT: Okay. What do we need to talk about other than jury instructions? What else do we have on tap for Tuesday?

MR. GUNN: I can tell the Court about the Defense case. I am sort of keeping track of the witnesses. I guess that's the reason I am talking instead of Mr. Brown.

We have -- we will finish Mr. Khieu and then we have either two or three more lay witnesses, which should be short, and then we have the deposition, and then we will be done, at least that's unless we have some different idea over the weekend, which I don't expect.

THE COURT: So again at least a full day on --

MR. GUNN: Yes. The depositions, the four hours -- I would hope the other witnesses will be 10, 15 minutes, but I don't know for sure.

THE COURT: Ms. Donahue, I don't know whether you still intend to call a rebuttal witness after you heard the testimony of the Defense expert, but should you decide to do so and want to have that person here on Tuesday, we will interrupt the deposition or whatever else we're doing to put that witness on the stand, if you decide you want or need her. I don't want to take a risk of putting her off to another day and not having her be available.

MS. DONAHUE: Thank you, Your Honor. We may not put her up. I need to think about it. Right now she is firmly planned to arrive Monday and be available Tuesday morning here to testify and has organized her schedule around that. I will speak to Defense counsel. Should it turn out we are going to call her, I may ask for that.

Other than that, right now, I -- any other rebuttal would be maybe Special Agent Phillips for something very discrete and short.

THE COURT: Okay.

All right. I had a couple of thoughts as the testimony was coming in about jury instructions. Ordinarily I would add an instruction about the testimony being the evidence

and not the transcripts, but in this case we couldn't really hear testimony and the transcripts are in evidence so I'm inclined not to give that instruction.

MR. GUNN: Plus there is case law and a Ninth Circuit instruction on this point that says when the tapes are in a foreign language, the transcripts are admissible and are evidence.

THE COURT: So is there anything you want to do about that at all?

MR. GUNN: You know, we could have that instruction but I think the jury will think that -- if they're not instructed on it, they are just going to assume it. Unless there is something in our instructions that says to the contrary, but I don't think there is, is there?

THE COURT: I don't think there is, and I think the instruction about translations makes sense if one of the jurors speaks that language, but our jurors have confirmed that they don't speak those languages. So they're not going to be listening to the Cambodian and using it instead of the English translation.

MR. GUNN: So I think we can just leave it as the record now reflects they are in evidence, we will have them in as exhibits and no instructions and the jurors will just assume they get them like anything else.

THE COURT: I also had a different thought. I think

you can see from my instructions that I had sustained, in effect, the Defense objection to the instruction about the adult attendant; however, Dr. Maloney was asked about whether he would ever have an adult attendant or something about witness on the lap. I think I actually made a comment. It wasn't directly -- it wasn't that the witness was entitled to the attendant. It was that the attendant had to be videotaped and that was required by law. I still think we are probably okay but if the Government has a concern about that, I will reconsider my ruling based on the questioning of Defense counsel.

MS. DONAHUE: When Defense counsel said that, it re-raised, at least for me, the notion that they are probably planning to argue or include the fact in their argument that there was an attendant with a child and that somehow that influenced the child. And therefore, if they are going to do that, I think it's appropriate for the jury to know that that law permits every child witness to have an attendant up there. It's not special or in any way unusual to this case.

THE COURT: Or that it was not the Government's idea to try to influence the witness.

MS. DONAHUE: Yes, that's exactly right. That we weren't trying to somehow improperly influence them. And I expect there to be at least if not a direct argument some insinuation of that, as came out this morning in the questioning. So in light of that, we would submit that it's

appropriate.

The initial version that I had proposed to Defense counsel tracked the language of the statute, 18 U.S.C. 3509(i) which says the child witness is entitled to an attendant, I think it's for the purpose of comfort and care. And at defense counsel's request, I took out the last "for the purpose of helping" so it simply says "they are entitled to it," period, which I think is accurate and appropriate.

MR. GUNN: Your Honor, it is definitely possible we will -- we will certainly not say the Government has anything to do with it, but we will certainly suggest that part of this whole process of the interview process -- and I don't think coaching is quite the right word -- but contamination and suggestion and so on is then further aggravated when the child has an adult attendant up there while she's testifying whom she's told these things to already.

So it will certainly probably be overtly argued. I mean, Mr. Brown hasn't outlined his complete closing yet obviously, but I don't think that means there should or needs to be an instruction. I mean, it's certainly not going to be any position or suggestion that the Government is at fault for that.

THE COURT: I think if there is going to be any mention of it at all, that it's appropriate to instruct the jury that the law allows this.

MR. GUNN: Okay. We object.

THE COURT: Okay.

MR. GUNN: And the Court will do what it does.

I do think it's important to do it -- and I assume the Court will probably do this in a completely neutral way that doesn't it's a good thing or a bad thing.

THE COURT: I would make a facetious comment but it just doesn't look good on the record when one does it, so of course it will be neutral, and you will have an opportunity to review it and comment on it when I draft it.

MR. GUNN: We will see what the record looks like on what I just said.

THE COURT: It's frightening sometimes how. . .

Let's just briefly go over the comments I made. I added -- as I was looking at these, I added to Instruction 14, the second paragraph. The reason I made it a second paragraph instead of a new instruction is that I had already numbered these, but obviously I am going to have to renumber them anyway.

And the second paragraph, which is much too broad for what actually happened in the case, relates to that one chart with the three items that I actually didn't allow into evidence but I allowed Mr. Lulejian to show. I don't know that it's even worth adding this whole paragraph in for that but I just put it in there so everybody could consider it.

MR. GUNN: There is also a couple Defense exhibits. There are several spreadsheets and a table --

THE COURT: Right. But those are in evidence so the first paragraph that everybody had agreed to anyway covers that.

MR. GUNN: I understand.

THE COURT: So I am happy to remove the second paragraph. I just wanted you all to be able to consider that.

MS. DONAHUE: I think the first paragraph covers it. The second paragraph is -- maybe unnecessary language we don't need to give the jury.

THE COURT: Do you have a thought, Mr. Gunn?

MR. GUNN: I don't have a strong opinion one way or the other.

THE COURT: Let's just take it out.

17 -- 17 was my -- I think I agree with you Mr. Gunn, that both instructions need to be given, 16 and then 17 which as noted in the Ninth Circuit model instruction language, needs to be inserted in the brackets. I put in two concepts that I have in mind and I think there is really a third concept. I wasn't quite sure how to formulate, but I think the third concept is the one that the Government has repeatedly mentioned which is something like -- and I certainly wouldn't say it to the jury this way, but the concept is the true nature of the defendant's interest in children.

I -- I guess my question would be to the Government, what do you intend to argue? I certainly don't want to instruct them to consider it for anything that's broader than what you

actually intend to argue from that evidence. And reminding you again that we don't want -- even if my thought is that it's relevant for a particular issue, that doesn't necessarily mean we have to tell the jury that they can consider it for that. So narrower is safer but I'll hear from you about --

MS. DONAHUE: A little bit circular because I was waiting to see exactly what you were going to do with this instruction before finishing, crafting up part of the argument. Frankly, waiting for two things. One that, and two, we're getting more and more about this -- what really is character evidence. He is so interested in helping out these poor children. And the more that comes in, the more I think it's appropriate to respond and say here is really --

THE COURT: One of the jurors is on the phone and says she needs to speak to me. I will go talk to her and let you know what she says.

(Discussion off the record)

THE COURT: Counsel, we have had a discussion off the record about my conversation with a juror and I assume you all accept my representation, although Mr. Pierson is here to confirm it, if you wish. The conversation that I had with the juror, and that you have also confirmed that no one sees any reason to put the content of the conversation on the record.

MS. DONAHUE: The Government agrees with that, Your Honor.

MR. BROWN: The Defense is also agreeable.

THE COURT: It had nothing to do with the substance of the case or any improper conduct by any witness, juror or anything else.

Everyone agree?

MR. BROWN: Yes, Your Honor.

MS. DONAHUE: Yes, Your Honor, I agree.

MR. GUNN: Yes, Your Honor.

THE COURT: All right. So Ms. Donahue, I am sorry, you were interrupted and you were waiting to hear what I was going to say --

MS. DONAHUE: I was wanting to argue within the scope of your jury instruction, frankly, and also waiting to see what also comes in on the Defense case because --

THE COURT: Which isn't over yet.

MS. DONAHUE: We have maintained all along that his sexual interest in children is highly relevant. The more testimony that comes in to suggest that his interest in children has other motives, it is our view the more relevant that becomes. And probably -- not probably, but certainly it will be argued in the open/close very conservatively, in accordance -- really strict accordance with the Court's instruction.

Depending on what they say in their close, we may come to sidebar and just say -- maybe argue a little broader in response to what they say.

But it seems that all these high-ranking people from Cambodia have come in here and said that he has this interest in the welfare of poor children in Cambodia. And in arguing that, we think frankly that is so absurd. The pornography is one piece of evidence. But I plan to keep it very, very narrow, at least in the open/close, and limit it -- you stated identity and supporting the credibility. And perhaps maybe -- I don't know if the Court thinks it's appropriate to tell the jury in considering the testimony of the Defense witnesses, one thing to keep in mind are the photographs found on defendant's computer.

THE COURT: I don't think I would say it that way, if I were going to say anything. And I -- I guess I would leave it at this, so long as the Defense wasn't then going to object to the argument as you've just described it, because I think it's well within what I'm allowing the evidence for.

The touchy part is to try to say that in a neutral way and without pointing fingers at the defendant -- I mean, to say the true nature of the defendant's interest in children is certainly not an appropriate way to say it. I'm not sure -- you know I know it when I see it, but I don't know how to articulate it.

MS. DONAHUE: I am thinking very carefully about that and we will stay fairly far away from it in the open/close and then we will see what they have to say about it in their closing, and then I will ask your permission before launching

too far -- before expanding on that in rebuttal.

THE COURT: Mr. Gunn?

MR. GUNN: I see the Court's 404(b) instruction, and I'm -- I think No. 2, your clause or whatever we want to call it 2 is a perfectly reasonable way to express the identity concept which as court knows I have objected to. But it was pretty clear the Court was letting it in for at least that. I would just note that I don't think -- I don't think it's admissible. I guess I would object to it being considered substantively under 404(b) as to the credibility of the children.

THE COURT: Let me stop you and ask, Ms. Donahue, if you are not going to argue it in that context, then we should take it out, whether or not I have admitted for that purpose.

MS. DONAHUE: What? The credibility of the kids?

THE COURT: Yes.

MS. DONAHUE: I was going to argue --

THE COURT: Okay. I think that's appropriate.

MS. DONAHUE: He challenged the credibility on --

THE COURT: Yes. And I'll let you finish, Mr. Gunn. I just wanted to make sure.

MR. GUNN: I think the only way -- I think it only gets to credibility through a propensity reasoning, I guess is my thinking. It seems to me the only way -- it does, in a sense, logically reflect on credibility because it shows in a logical deductive sense that maybe he has a propensity to be

interested in abusing children, which logically makes it more likely he would. But that's the propensity reasoning that 404(b) says we don't do, even though it has some logic to it.

And I think when you are saying it's being used to judge their credibility, that's really the way it's being used. That's one of the steps in the reasoning there is a step to the propensity reasoning.

So I don't -- even though it may logically go to that from one chain of deductive reasoning, I don't think the chain -- the chain has that propensity link in it, and that's what you're not allowed under 404(b), even if it's logically defensible. So that's my objection and thinking on Clause 1.

MS. DONAHUE: It's admissible -- the 404(b) analysis goes to Clause 2, identity as modus operandi. Setting aside 404(b), it just is evidence that corroborates what the victims had to say in this case.

THE COURT: I think that's the analysis that I was making was it's sort of separate from the 404(b) it's just --

MS. DONAHUE: It's like the physical items that were seized from the house. Those are also evidence that sort of are itemizing what evidence is there to corroborate testimony of the victims since it was challenged both through cross-examination of them and now through the Defense expert, and clearly is going to be the subject of the Defense closing.

But -- so it seems to me it's like an itemization of

what supports -- what corroborates the testimony of these particular witnesses.

Separate from that, is this the person who did this or is this not the person who did this that's the evidence of identity.

My issue -- and I was thinking of not -- maybe just leaving the third -- the third area, third altogether for rebuttal. That's probably the most appropriate thing for the Government.

THE COURT: All right. Well, again, think about it, and we don't want to push the envelope, but it seems to me to be quite clearly relevant on that subject and so until I hear further from you, that would be the instruction I would give.

MR. GUNN: Your Honor, we are going to make the formal objections at another time when we have the final --

THE COURT: Sure. I added No. 18 after hearing about tapes yesterday and statements by Mr. Pepe to Mr. DeMontero. And obviously we have heard a whole bunch of other statements by the defendant.

And I view that as a defense protective instruction so I will look at you and just verify that you want that.

MR. GUNN: I think that's fine.

THE COURT: Okay.

Oh, 12 would be the judicial notice instruction, assuming that Mr. Lulejian is going to give me something that

can actually be read or provided to the jury.

MS. DONAHUE: We will, Your Honor.

THE COURT: And then 13 is the instruction I drafted for the deposition testimony, if anybody has any comments on. That last paragraph was the --

MR. GUNN: What about adding "it should not be considered by you in any way"?

THE COURT: I'm sorry. What?

MR. GUNN: Add to the first sentence of the paragraph "and should not be considered in any way."

THE COURT: "And should not be considered in any way." Okay.

MR. GUNN: The word "therefore" may not -- may need to be adjusted or something. I don't know if it flows as easily then either.

THE COURT: I can just take out "therefore" and say "You may consider all the testimony presented."

Instruction No. 22 and 23, as I indicated in the note I gave you, that 22 used to have the next instruction included in it but once -- since it referred to preponderance of the evidence and preponderance isn't defined until later, I moved the preponderance or copied the preponderance instruction into 23.

And then I thought it needed to be broken down because I didn't want to have it appear as if all of that Instruction

No. 22 only needed to be proved by a preponderance. Actually, it's -- the first part talks about things that the Government doesn't need to prove at all.

MS. DONAHUE: That makes sense, Your Honor.

THE COURT: Mr. Gunn?

MR. GUNN: I think that looks fine, Your Honor.

THE COURT: Well, this is not the final so you can obviously take a look at again.

MR. GUNN: The only hesitance I had was when I first read it I missed the words the "Government must prove." So I thought it applied to all issues except the one in Instruction No. 27. Read more carefully, that's not what it's saying, but I don't know -- I am getting punchy at the end of the day.

THE COURT: And I was punchy last night when I was doing it so you can certainly think about it over the weekend.

And as I noted, I looked back in the instructions. I don't know where the Government got 4.12. It hasn't existed since 2003.

MS. DONAHUE: I will not disclose my source, although it is a couple of lawyers very recently before you. So I will leave it at that. But anyway, I'll --

THE COURT: Well, we made substantial changes, for various reasons, because we had so many witnesses we didn't even know who was an accomplice.

MS. DONAHUE: Yes.

THE COURT: But in this case we are talking about just one witness. And the Ninth Circuit instruction, as I said, was revised in 2003 to combine all of those concepts. Otherwise, I have to read the introductory sentence and the last sentence three times, which doesn't make any sense especially when it's the same witness.

No. 27 I have revised so that it's the one proposed by the Defense. Just adding in that caveat that the proof beyond a reasonable doubt also applies to the instruction we have just spoken about. That's all I have at the moment.

Anything you can think of that we need to be aware of before Tuesday?

MR. BROWN: Your Honor, I did have a personal request on behalf of Mr. Pepe. I don't know if it has to be on the record or not.

THE COURT: We can go off the record.

(Discussion off the record)

THE COURT: Anything else?

Have a healthy, safe, Memorial Day weekend. We will see you 7:45 on Tuesday.

(Proceedings concluded at 2:31 p.m.)

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE PHILIP S. GUTIERREZ, JUDGE PRESIDING**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** Plaintiff, | ) |
| **Vs.** | ) **No. CR07-168(A)-DSF** |
| **MICHAEL JOSPEH PEPE,** Defendant. | ) |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL, DAY 11**

**LOS ANGELES, CALIFORNIA**

**TUESDAY, MAY 27, 2008**

**MIRIAM V. BAIRD, CSR 11893**
**OFFICIAL U.S. DISTRICT COURT REPORTER**
**255 East Temple Street, # 181-K**
**LOS ANGELES, CALIFORNIA 90012**
**(213) 894-2853**
**MVB11893@AOL.COM**

**A P P E A R A N C E S**

**IN BEHALF OF THE PLAINTIFF, UNITED STATES OF AMERICA:**

U.S. DEPARTMENT OF JUSTICE
U.S. ATTORNEY'S OFFICE
BY: PATRICIA DONAHUE
JOHN LULEJIAN
312 NORTH SPRING STREET
12TH FLOOR
LOS ANGELES, CALIFORNIA 90012

**IN BEHALF OF THE DEFENDANT, MICHAEL JOSPEH PEPE:**

FEDERAL PUBLIC DEFENDER
BY: CARLTON F. GUNN
CHARLES BROWN
312 NORTH SPRING STREET
SUITE G8
LOS ANGELES, CA 90012

**ALSO APPEARING:**
Chandra Hac, Khmer language interpreter

**INDEX**

| **WITNESS:** | **PAGE:** |
|---|---|
| **Khieu San Witness, previously sworn** | 8 |
| **CROSS-EXAMINATION, resumed** | 8 |
| **REDIRECT EXAMINATION** | 32 |
| **Sin Samna, Defense witness, sworn** | 33 |
| **DIRECT EXAMINATION** | 33 |
| **CROSS-EXAMINATION** | 38 |
| **Seng Lida, Defense Witness, sworn** | 47 |
| **DIRECT EXAMINATION** | 47 |
| **CROSS-EXAMINATION** | 52 |
| **REDIRECT EXAMINATION** | 53 |
| **Videotaped Deposition of Koeung Lang, Defense Witness** | 55 |

*****

| **EXHIBITS:** | |
|---|---|
| Exhibit 2112 received | 14 |
| Exhibit 2113 received | 17 |
| Exhibit 2114 received | 39 |
| Defense Exhibits 122-123 & 311-312 received | 55 |

*****

LOS ANGELES, CALIFORNIA; TUESDAY, MAY 27, 2008; 0800

---

THE COURT: Good morning.

MR. BROWN: Good morning, Your Honor.

MS. DONAHUE: Good morning, Your Honor.

THE COURT: Is there anything we need to discuss before the jury comes in?

MR. GUNN: There were some phone calls. I talked to the Government about putting in additional MDC calls. We're seeing if they agree, Your Honor.

THE COURT: I assume that's in the Government's rebuttal case?

MS. DONAHUE: It is, Your Honor.

THE COURT: I believe at least four hours from now.

MS. DONAHUE: Exactly right, Your Honor.

MR. GUNN: Only if there needs to be different excerpts prepared.

THE COURT: Is the Government going to provide a copy of the first superseding indictment to provide to the jury, or are you planning on not having the indictment go back? It doesn't matter to me.

MS. DONAHUE: I think we will have the indictment go back. I will provide you a copy, Your Honor.

THE COURT: Defense, any objection to that?

MR. GUNN: That's fine.

THE COURT: I did make some revisions to the jury instructions. I added Jury Number 11 which relates to the adult attendant. I made a slight change that I think Mr. Brown suggested to Instruction Number 14, took out the second portion of the charts and summaries. So far, I left 18 as it was when last we spoke.

Recognizing that I may be giving these tomorrow -- I hope I'm giving these tomorrow -- unless I hear further, this is the set I plan to give. The only change I see making right now is simply choosing whether to give the instruction about defendant testifying or not testifying.

MR. GUNN: If the Government plays the excerpts of MDC calls and gives transcripts to the jury, then we may need an instruction on the tapes being the evidence when they're in English, but the transcripts being the evidence when it's in a foreign language. There's pattern Ninth Circuit instructions on that. I think they suggest reading at the time of tape, though, I don't know. It probably makes sense. The jury is going to wonder why they aren't able to keep the transcripts.

THE COURT: They won't get to take them into the jury room. I'm happy to read it or tell them about it beforehand.

I also gave you a copy of the verdict form. The

changes I made are not substantive. I made it consistent and -- grammatical isn't the word, but it follows the grammar I learned when I was in school which is numbers over ten are in numerals. I did -- I took out the parenthesis which was inconsistent. There was a typographical error in Count 7. Under was, "U-N-D."

I did get from the Government something Saturday afternoon. I don't know whether you actually sent it Saturday afternoon or whether it just showed up Saturday afternoon.

MR. LULEJIAN: What was it, Your Honor?

MS. DONAHUE: It was the verdict form. No. It was sent before that. Our servers have had some issues.

THE COURT: You were both right. You had sent it and I hadn't received it.

MR. LULEJIAN: Which doesn't really surprise me.

THE COURT: It didn't have any changes, I assume?

MS. DONAHUE: No. Thank you, Your Honor.

THE COURT: Anything else before the jury comes in?

MR. GUNN: One housekeeping matter, Your Honor.

With the Court's permission -- I don't know if we need to say anything to the jury about this. I would like to substitute for Defense Exhibits 282, 283, 284, which were the hard copies of powerpoint slides from Dr. Bennett's testimony. I inserted from Government Exhibit Number such

and such on the powerpoint, but I didn't have it on the hard copies. I did it at the last minute. I am wondering if we can substitute new 282 through 284 that have those references so they match the powerpoint. I think the Government doesn't have an objection to that.

MR. LULEJIAN: That's fine, Your Honor.

THE COURT: I don't think we need to make a comment about that.

MR. GUNN: If I can approach the clerk?

THE COURT: Sure.

Anything else?

MR. LULEJIAN: At some point the Government is going to need to move Exhibit 21-11, Dr. Craft's powerpoint in evidence. Mr. Gunn reserved the right to object on a slide-by-slide basis. We removed all the offending slides. I will ask the Court to move it in evidence.

MR. GUNN: If I could look at the final version?

THE COURT: Sure.

MR. GUNN: Does the Court want an extra copy?

THE COURT: No.

MR. GUNN: I'll give a --

THE COURT: If I never see those pictures again, it will be just fine.

MR. LULEJIAN: You and me both.

THE COURT: Anything else?

MR. LULEJIAN: Nothing, Your Honor.

(Open court - jury present)

THE COURT: Good morning. I hope you all had a great holiday weekend.

Our witness is back on the stand. Both the witness and the interpreter are still under oath.

Mr. Lulejian, you may continue.

MR. LULEJIAN: Thank you, Your Honor.

**Khieu San, Defense Witness, previously sworn**

**CROSS-EXAMINATION, resumed**

BY MR. LULEJIAN:

Q. Good morning, Mr. Khieu.

A. Good morning.

Q. Last week when we were speaking, we spoke about you meeting the defendant through Sander Montero.

Do you remember that?

A. Yes.

Q. You testified about going out to the provinces. I think it was 9 or 10 times with the defendant to hand out school supplies?

A. Yes.

Q. The defendant was very anxious to work with you to distribute these school supplies?

A. Yes.

Q. Most of the places you went to were in Kango Province;

is that right?

A. Yes.

Q. You're a member of the National Assembly?

A. Yes.

Q. The province you represent is Kango Province?

A. Yes.

Q. So it's a good opportunity for you to go out and meet the constituents?

A. Yes.

Q. Good opportunity to get out there and show that you care about their needs?

A. Yes.

Q. It's an opportunity for you to talk to your constituents to see they elected the right man to the National Assembly?

A. Yes.

Q. The defendant helped you do that by accompanying you in giving out the school supplies?

A. Okay.

Q. In addition to giving out school supplies, I think you testified that he spoke about spreading democracy throughout Cambodia?

A. Yes.

Q. The defendant doesn't speak Khmer, did he?

A. That is correct.

Q. So when you were in the province, you would translate

for him?

A. That is correct.

Q. When the defendant spoke about spreading democracy, what did he speak about?

MR. GUNN: Objection. Irrelevant. Outside the scope.

THE COURT: Sustained.

BY MR. LULEJIAN:

Q. Now, the defendant had an affinity for children, didn't he?

MR. GUNN: Objection. Calls for opinion. Calls for speculation.

THE COURT: Why don't you rephrase that, Mr. Lulejian.

BY MR. LULEJIAN:

Q. Based on your observations of the defendant, he had an affinity for children --

THE COURT: "Affinity" was the word I had a problem with.

MR. LULEJIAN: "Affinity"?

THE COURT: I have a problem with that word.

BY MR. LULEJIAN:

Q. Based on your observation of the defendant, he got along well with children?

A. Yes.

Q. I think you told Special Agent Phillips one time that he actually loved children?
A. Yes.
Q. You told him he loved his students?
A. Yes.
Q. You said he talked and played with kids when you were out in the provinces?
A. Yes.
Q. The defendant would give gifts to the children?
A. Yes.
Q. And by going out with the defendant into the provinces and handing out school supplies and having breakfast with him, you got a chance to know the defendant, didn't you?
A. Yes.
Q. You had a chance to go to his home?
A. Yes.
Q. I think you said that your visits to the home were limited to the first floor only?
A. It's not limited, but I have no other reason to go anywhere else.
Q. You never been upstairs in his house?
A. No.
Q. Never been to his bedroom?
A. No.
Q. Never visited any of the rooms on the second story?

A. No.

Q. Now, when you were downstairs in the common area, you saw a cabinet, didn't you?

MR. GUNN: I object. It's outside the scope of direct.

THE COURT: Mr. Lulejian?

MR. LULEJIAN: I can tie it up with a photograph, Your Honor.

THE COURT: All right.

BY MR. LULEJIAN:

Q. I'm going to show you what has been admitted into evidence as Government's Exhibit 1132 and 1133.

MR. GUNN: I believe I still object. It's still outside the scope, Your Honor.

MR. LULEJIAN: If you would like me to lay some foundation, I can, Your Honor.

THE COURT: The objection is, it is outside the scope. Is it or is it not outside the scope?

MR. LULEJIAN: I would disagree, Your Honor.

THE COURT: Go ahead and show him the photograph. We'll see where it goes.

BY MR. LULEJIAN:

Q. This is Exhibit Number 1132. This is Exhibit Number 1133. Your picture is in that cabinet, isn't it?

A. I can't see it clearly.

Q. Let me zoom in, then.

MR. GUNN: Still object as outside the scope.

THE COURT: Overruled.

BY MR. LULEJIAN:

Q. This is a picture of you giving out school supplies with the defendant, isn't it?

A. Yes.

Q. This picture is framed?

A. Yeah. I see.

Q. It's in the display cabinet in the defendant's house?

A. It's the defendant's display. I don't know.

Q. Now, in addition to handing out school supplies, you had the opportunity to meet the defendant on other occasions as well, didn't you?

A. Yes.

Q. In fact, one of those occasions, was something called the plowing ceremony, wasn't it?

A. Yes.

Q. Mr. Khieu, I'm going to show you two exhibits, which I've marked Number 2112 and 2113 for identification.

MR. LULEJIAN: May I approach, Your Honor?

THE COURT: Yes.

MR. GUNN: Object as outside the scope, Your Honor.

THE COURT: Overruled.

///

BY MR. LULEJIAN:

Q. Mr. Khieu, let's take a look at Exhibit Number 2112.

Do you see that picture?

A. Yes.

Q. That's a picture of you and the defendant, isn't it?

A. Yes.

Q. And you're dressed up in the uniform of the National Assembly, are you not?

A. Yes.

Q. The defendant is dressed up in a suit?

A. Yes.

Q. This picture was taken of the plowing ceremony in Phnom Penh?

A. Yes.

Q. The plowing ceremony took place on May 16, 2006, did it not?

A. Yes.

MR. LULEJIAN: Your Honor, the Government would move the Exhibit 2112 into evidence.

MR. GUNN: Irrelevant, Your Honor.

THE COURT: I'll admit it.

**(Exhibit 2112 received)**

MR. LULEJIAN: May I publish, Your Honor?

THE COURT: You may.

///

BY MR. LULEJIAN:

Q. Now, would you please take a look at Exhibit Number -- before I move on, who took this picture?

A. I don't remember. Either my wife or someone else. I don't remember.

Q. Your wife was there as well?

A. Yes.

Q. Let's took a look at Exhibit Number 2113.

Do you have that in front of you? That's a picture of your wife, isn't it?

A. Yes.

Q. She's standing with the defendant who is also wearing a suit?

A. Yes.

Q. Your wife is wearing a similar uniform as you, isn't she?

A. Yes.

Q. Does your wife have a position in the Cambodian government?

A. Yes.

Q. What is that position?

A. The Secretary of State -- Secretary of State Planning.

Q. What does the Secretary of State Planning do?

A. She's the advice -- she's under the Secretary of State. Minister of Planning.

Q. She's under the Secretary of State or the Secretary of State for Planning?
A. Under.
Q. She works directly to the Minister of Planning?
A. Yes.
Q. Minister of Planning is one of the people in the Cambodian government that helps run the country?
A. Yes.
Q. She has a very important position in the government, doesn't she?
A. Yes.
Q. Your wife is part of the Funcinpec party as well?
A. Yes.
Q. The Funcinpec party is the one of the two main parties in Cambodia along with the Cambodian People's party that make up the Coalition Government?
A. Yes.
Q. This picture was taken of the plowing ceremony on May 16, 2006; is that right?
A. That is correct.
Q. In fact, you took this picture, didn't you?
A. Yes.
Q. The camera you used, that was the defendant's camera?
A. Yes.
MR. LULEJIAN: Your Honor, the Government would

 move 2113 into evidence and ask that it be published.

MR. GUNN: Same relevance objection.

THE COURT: Admitted.

**(Exhibit 2113 received)**

BY MR. LULEJIAN:

Q. Could anyone attend the plowing ceremony, sir?

A. Yes.

Q. Was the defendant invited to attend the plowing ceremony?

A. Yes, officially invited him there.

Q. Who officially invited him?

A. The organizer of the ceremony.

Q. So the plowing ceremony is an official government ceremony?

A. Yes.

Q. So the defendant was invited to the plowing ceremony as a guest of the Cambodian government?

A. Yes.

Q. All right.

Now, last week, we had talked about the events that followed June 17th of 2006.

Do you remember?

A. Yes.

Q. On June 17th of 2006, the Cambodian National Police arrested the defendant?

A. I knew that he was arrested through the newspaper.

Q. And you were not able to help him, were you?

A. No. I have no idea what it's all about.

Q. In fact, I think you said you were out of town when he was arrested; isn't that right?

A. Yes.

Q. But you said you were pressured to offer assistance to the defendant after his arrest; isn't that right?

A. No.

Q. You didn't testify last week that you were pressured to offer assistance to the defendant following his arrest?

MR. GUNN: Objection, Your Honor. The testimony last week speaks for itself.

THE COURT: It is simply a question.

You can answer the question, sir, if you remember what you testified.

THE WITNESS: I don't remember.

BY MR. LULEJIAN:

Q. Well, last week when we talked about this, you got very emotional, didn't you?

A. Yes.

Q. You felt very bad that you couldn't help your friend; isn't that right?

A. I was just sad to hear this kind of thing happen.

Q. You read in the paper what the charges in Cambodia were,

didn't you?
A. Well, I don't really give 100 percent accountable on what I read on the newspaper.
Q. You read in the paper that the defendant had been arrested for debauchery in Cambodia, didn't you?
A. Yeah.
Q. You didn't help him?
A. No.
MR. GUNN: Objection. Irrelevant, Your Honor.
THE COURT: Overruled.
BY MR. LULEJIAN:
Q. In fact, I think you said last week you were too busy to help him, didn't you?
A. Yes.
Q. But since his arrest, you've gotten involved in the overall case in Cambodia, haven't you?
A. Not exactly because my work was very busy at the time.
Q. I think you said you launched an investigation into the events that surrounded Mr. Pepe's arrest, didn't you?
A. Only when three days before I came to United States, I just want to know the truth of what is happening, so I launched the investigation on my own.
Q. So for the year and half to two years before coming to trial, you did absolutely nothing?
A. No, nothing to do with that.

Q. This was purely to find out what was happening in this case?
A. Three or five days before I came here, and I just took a look on the report -- what's happening in the case.
Q. Well, you met with Special Agent Phillips back in March of this year, didn't you?
A. Yes.
Q. Special Agent Philips asked you a number of questions about the case involving Mr. Pepe and the mothers, didn't he?
A. I think he asked some questions, but I don't recall.
Q. You did absolutely nothing back in March of this year?
A. No.
Q. Your investigation has consisted of just getting some reports and reading them, isn't right?
A. Yes.
Q. That's not all you did, is it?
A. I have my time outside the city. A lot of time I don't have a whole lot of time to investigate or read the whole thing.
Q. You did a lot more than just read the reports; isn't that right?
A. I don't think so. All I did was just to remember what we did and the distribution of gifts to the children. That's all.
Q. You testified last week that you went and interviewed

several of the mothers, didn't you?

A. Yes, I did before I came here.

Q. So that --

A. Two days or three days before I came here.

Q. You interviewed Ly Kim Eng? That's the mother of Kunthea?

A. Yes.

Q. You interviewed Koeung Lang -- that's the mother of S.S.XXX and S.R.XXX -- didn't you?

A. Yes.

Q. And you also talked to one of the grandmothers, didn't you?

A. Yes.

Q. What are you looking at there, sir?

A. The picture that I spoke to one of the mother of the children.

Q. Where did you get that picture from?

A. My security took that picture.

Q. May I see that picture, sir?

MR. LULEJIAN: May I approach, Your Honor?

THE COURT: Yes.

BY MR. LULEJIAN:

Q. This is a photograph of you talking to Ly Kim Eng, isn't it?

A. Yes.

Q. You're standing out in what looks like the country interviewing her?

A. Yes.

Q. Ly Kim Eng was arrested by the Cambodian National Police for selling her daughter to the defendant; isn't that right?

MR. GUNN: Objection. Move to strike. Hearsay. Irrelevant.

THE COURT: Goes to his state of mind only.

You may answer that, sir.

Excuse me. Rephrase it so it's relevant as to the time of the interview, the photograph.

MR. LULEJIAN: Yes, Your Honor.

BY MR. LULEJIAN:

Q. Ly Kim Eng was released from prison -- excuse me.

When did this interview take place, sir? I think you said it was two to three days before you came to the United States?

A. Yes.

Q. Your interview consisted of the events that led her to prison; isn't that right?

A. Yes.

Q. The Cambodian National Police charged her back in June of 2006 with selling her daughter; isn't that right?

MR. GUNN: Objection. Charges are irrelevant.

THE COURT: The only question is what this witness

knew at the time of the interview, not what may or may not have happened.

BY MR. LULEJIAN:

Q. Did you know at the time of the interview that she had been arrested for selling her daughter?

A. No. I have no idea what's happening. She never told me.

Q. What did she tell you during her interview, sir?

A. She said that she have no idea. The police took her in and throw her in jail.

Q. And we talked to Koeung Lang on --

Actually, do you have a picture of you talking to Koeung Lang?

A. Yes.

Q. Can I see that as well, too, sir?

A. Who is Koeung Lang? Is that her in the picture named Koeung Lang?

Q. Koeung Lang is the mother of S.S.XXX and S.R.XXX.

A. I'm not sure about the mother, and who was the -- who was her kid.

Q. How about this: It was the other mother you just testified about going to visit?

A. She is the mother of one kid, not two.

Q. You talked to one of the mothers that had two children, though, didn't you?

A. No. I could not locate her, just the one with one kid.

Q. Now, you didn't talk to anybody else, did you?

A. No.

Q. So you only talked to the one mother as part of your investigation?

A. Yes.

Q. You didn't go to Preysar prison and interview a woman by the name of Basang?

A. No.

Q. Did you go to the Ministry of Justice and to speak to Colonel Sun Ro?

A. I'm not sure. Can you rephrase that again?

Q. Certainly.

Did you -- I misspoke.

Did you go to Cambodia National Police and ask to speak with any of the investigators?

A. Yeah. About three days before I came here, yes, I went there.

Q. Who did you speak with?

A. I don't recall the name, but the commander that is in charge of the investigation.

Q. That was Colonel Sun Ro?

A. Maybe.

Q. Did you talk to General Un Sokunthea?

A. Yeah. In the office of the National Police, but I don't

know the name.

Q. Did you talk to anybody at the Ministry of Justice?

A. No.

Q. You didn't approach anybody in the United States Government, did you?

A. No.

Q. You didn't contact Gary Phillips, case agent?

A. No.

Q. You didn't go to the library and do research of newspaper articles, did you?

A. No.

Q. You just pulled a business card out of your wallet.

What does that card say, sir?

A. The Assistant United States Attorney and Mr. Gary Phillips business card.

Q. You didn't contact the United States Attorney's Office and ask what it knew about this investigation, did you?

A. No.

Q. You didn't -- you didn't contact General Un Sokunthea to see what he had to say, did you?

A. I'm not sure. Is that the name?

Q. General Un Sokunthea.

A. I don't recall.

Q. But you did approach somebody else, didn't you?

A. Only the defense attorneys' group that came to my

office.
Q. But you also spoke to an investigating judge in Cambodia, didn't you?
A. Yes, three or four days before I came here.
Q. You met with investigating Judge Sao Meach?
A. He's the judge, yes.
Q. This is the judge who is currently sitting in the Cambodian courts?
A. Yes, in Phnom Penh City.
Q. In fact, this judge had an active role in the investigation surrounding the defendant and the mothers, didn't he?
A. Yes.
Q. In Cambodia, the investigating judge is the one who gathers the evidence, doesn't he?
A. In Cambodia, the investigating judge is different from the judge that is ruling on the case.
Q. But the investigating judge is a jurist, supposed to be neutral; right?
A. Yes.
Q. What happens, sir, is the investigating judge gathers all of the evidence and then presents that to the trial judge for trial; isn't that right?
A. That is correct.
Q. Judge Sao Meach had intimate knowledge of the facts of

this case, didn't he?

A. Yes.

Q. In fact, he sat in on a number of the interviews of witnesses, didn't he?

A. I do not know. It's the judge's job.

Q. Let me show you something.

MR. GUNN: Your Honor, I object. This is outside the scope. Rule 403.

THE COURT: Let's have a side bar.

(Sidebar conference)

THE COURT: Mr. Lulejian, for somebody who is going to be done with five more minutes on Friday, this is getting really, really long and boring. I don't want to cut you off if it's relevant. So far it hasn't been relevant. It's bias and standard cross-examination when somebody has done their investigation before he comes to testify. Do you know where you're going?

MR. LULEJIAN: I know exactly where I'm going, Your Honor. Judge Meach was the judge. We have the Court documents to show that he stamped and approved these documents.

THE COURT: Who did?

MR. LULEJIAN: Judge Sao Meach.

THE COURT: So what? So what?

MR. LULEJIAN: It goes to the fact that he has

 knowledge of the case. It's an official court document.

THE COURT: Who has knowledge of the case?

MR. LULEJIAN: Judge Meach.

THE COURT: There's no question about that. Who cares.

MR. LULEJIAN: Okay.

THE COURT: Where is it going with this witness?

MR. LULEJIAN: Going with him -- this is the judge who was present for the interview of the mother when the complaint -- it goes to the heart of the bias.

THE COURT: We already established that he went to the judge. He talked to the judge. What else?

MR. LULEJIAN: I'll move along then.

(Sidebar conference concluded)

BY MR. LULEJIAN:

Q. When you went to go meet with Judge Sao Meach, you talked to him about the case involving the mothers, didn't you?

A. Yes.

Q. In fact, you advocated for the mothers, didn't you?

A. Well, I just went there to gather information at the time the mother already released from prison.

Q. The judge provided you that information?

A. Yes.

Q. Judges in Cambodia are appointed by the political party,

aren't they?

A. In the present time, yes.

Q. They serve at the pleasure of the party, don't they?

A. Well, by law, you have nothing to do with the party.

Q. But there are certain judges that are appointed by the Funcinpec party, and certain judges that are appointed by the Cambodian People's party, aren't they?

A. Yes.

Q. But the reality is that those judges are beholden to the party that appoints them, aren't they?

A. By law, the judge has to be neutral.

Q. As a member -- as a senior member of the Funcinpec party, you approached this judge and got information, didn't you?

A. It's not the party that involves whether I went there because he's in Funcinpec party. I'm the assemblyman. I did that for the sake of the people that vote for me.

Q. You're able to get access to the judge because you're a member of the National Assembly?

A. Yes.

Q. Now, in addition to talking to the judge, you told the mothers that you were going to sue the non-governmental organizations on their behalf, didn't you?

A. The mother of the kid informed me about the situation. All I did -- I said, if you unhappy, you file a formal

complaint, and the one that -- I'm the one that will look into it.

Q. In fact, you told Suos Vansak, an investigator from the embassy, that you were personally going to bring a suit on behalf of the mothers, didn't you?

A. I just said that this procedure is incorrect, according to procedure in my government, and I'm representing the people.

Q. The procedure that was wrong was that the NGO's didn't check with you before they took the children out of the country; isn't that right?

A. Not me. The mother.

Q. In fact, the NGO's have custody of the children, don't they?

A. Yes.

Q. So the mother has no legal rights to what happens to that child right now, does she?

MR. GUNN: Objection. Irrelevant. Rule 403. Beyond the scope.

THE COURT: Based on his state of mind. His belief.

THE WITNESS: Yes. Because the children is only 13 years old, they should not legally control them without their parents' knowledge.

BY MR. LULEJIAN:

Q. You understood that the NGO's had legal responsibility for the children; isn't that right?

A. That I'm not clear, but I'm sure about the mother and child.

Q. And the NGO's all have formal relationships and memos of understanding with the Cambodian government, don't they?

A. That I'm not sure.

Q. Those NGO's have various memorandums or project agreements with different ministries in Cambodia?

A. Yes. According to the rule, they have to.

Q. Those NGO's have no responsibility to contact a member of the National Assembly before they act, do they?

A. This -- the assembly has to know what is going on also because I can launch my own investigation because I'm representing the people.

Q. But if an NGO has -- let me rephrase that.

The National Assembly is part of the Cambodian government; is that right?

A. You have to have a different judicial -- the branch of the National Assembly and different from the senate and different from the judge and the police. Legislative branch, judiciary branch, and legislative branch, and executive branch. So they all different. They all separate because they are different from one another.

Q. So the NGO's have to register with the Cambodian

government in order to operate; right?

A. Yes.

Q. The Socrates Foundation, it wasn't registered with the Cambodian government?

THE COURT: We've done this, Mr. Lulejian. Don't repeat.

MR. LULEJIAN: I'm sorry. One moment, please, Your Honor.

(Brief pause in the proceedings)

BY MR. LULEJIAN:

Q. You are a member of the legislative branch, sir?

A. Yes.

MR. LULEJIAN: One moment please, Your Honor.

(Brief pause in the proceedings)

MR. LULEJIAN: I have no further questions, Your Honor.

THE COURT: Redirect?

**REDIRECT EXAMINATION**

BY MR. GUNN:

Q. Just to be clear, Mr. Khieu, these inquiries you made were just a few days before you came here to the United States for this case?

A. Yes.

Q. The mothers had already been released at that point?

A. Yes.

Q. So the case in Cambodia was already over?
A. Yes.

MR. GUNN: No further questions.

THE COURT: Mr. Lulejian?

MR. LULEJIAN: Nothing else, Your Honor.

THE COURT: Thank you very much, sir. You're excused.

Does the defense have another witness?

MR. GUNN: Yes, Your Honor. We call Sin Samna.

Your Honor, I'm going to need some exhibits that I think are physical exhibits. 1205, 1206, 1209, and 1215. I won't get to them immediately, Your Honor, but I'll get to them in about ten minutes.

We do need the interpreter, Your Honor.

**Sin Samna, Defense witness, sworn**

THE COURT: Please have a seat.

THE CLERK: Please state your full name and spell your last name for the record.

THE WITNESS: Sin Samna, S-I-N, S-A-M-N-N-A.

THE COURT: You may proceed.

**DIRECT EXAMINATION**

BY MR. GUNN:

Q. Ms. Sin, what country do you live in?
A. Cambodia.
Q. Have you lived in Cambodia all your life?

A. Yes.
Q. What part of Cambodia are you living in now?
A. (Khmer language spoken.)
Q. Is that part of Phnom Penh?
A. Yes.
Q. How are you employed?
A. I'm in charge of the Royal University of Agriculture. It's one of the ministries.
Q. Do you know Michael Pepe?
A. Yes, I do.
Q. How do you know him?
A. He rented my home.
Q. He rented the home you lived in or another home that you owned?
A. The other home that I have.
Q. When did you meet him?
A. First I met him in 2004 when he first approached me to rent my house.
Q. Could you look around the courtroom and tell us whether you see him in the courtroom here today?
A. Yes, I do.
Q. Would you just point him out for us?
THE COURT: Does anybody have a question that this witness identified Mr. Pepe?
MS. DONAHUE: No, Your Honor.

THE COURT: Let's just stipulate.

MR. GUNN: Thank you.

BY MR. GUNN:

Q. Did there come a time when Mr. Pepe spoke to you about distributing some school supplies?

A. Yes.

Q. About how many months was that before Mr. Pepe was arrested?

A. I don't recall exactly, but I think at least about a year before then.

Q. Can you describe the conversation and how the subject of distributing school supplies came up?

A. He wanted to give some gift to the children and to the people in the very far away -- in the rural area.

Q. Did you agree to participate in that distribution and that project?

A. Yes.

Q. What did Mr. Pepe do then?

A. He brought me some gift to me. We both went to Ba Phnom in Prey Veng Province to distribute those gifts.

Q. Did he tell you where he wanted to distribute them or did he let you suggest a place?

A. He asked me where. I suggested to him.

Q. Where's was the place you suggested?

A. It's the town named Ba Phnom in Prey Veng Province.

Q. How far is that away from Phnom Penh?
A. It's about 130 kilometers from Phnom Penh.
Q. Why did you choose that location or suggest that location?
A. I used to live in that town, and it's a lot of children and unfortunate children, very poor.
Q. Did Mr. Pepe say anything about wanting you to choose some place closer to Phnom Penh?
A. No, he did not say that.
Q. Did Mr. Pepe go with you when the school supplies were distributed?
A. Yes, he did. He went with me.
Q. Who else went with you and him?
A. I, my husband, Mr. Pepe, and his wife Chan Ry.
Q. On how many occasions did all of you go?
A. Once.
Q. What type of items were in the school supplies that were distributed?
A. It's a plastic bag. Contains some book and pencil, erasers, pencil sharpener, also a little blackboard.
Q. How many sets of these were distributed?
A. Four- or 500 packages.
Q. Did it seem like the materials were useful and appreciated by the schools and the students?
A. Yes.

Q. I'd like to move on to another topic.

MR. GUNN: Your Honor, if I could have Government's Exhibits 1205, 1206, 1209, and 1215 before the witness.

THE COURT: Could someone do that, please.

MR. GUNN: Maybe I can look at them very quickly.

Your Honor, if they could be placed before Ms. Sin.

THE COURT: Yes.

BY MR. GUNN:

Q. Ms. Sin, I'm having four exhibits that are placed before you. They have little yellow tags on them with the Numbers 1205, 1206, 1209, and 1215.

Do you recognize any of those?

THE COURT: Why don't you ask her one by one so we have a clear record.

MR. GUNN: First of all, if I could have the interpreter show her the one marked 1205

THE WITNESS: Yes.

BY MR. GUNN:

Q. Ms. Sin, do you recognize that?

A. Yes, that's mine.

Q. You said it's yours?

A. Yes.

Q. Are they sheets? Bed clothes?

A. Yes, it's the -- like a bed sheet.

Q. You said they're yours. What -- where were they or

what -- where were they on the day Mr. Pepe was arrested, if you know?
A. It's a little cover for the bed mattress.
Q. Are those sheets that went with the house when you rented it out?
A. Yes.
Q. Would you look at Exhibit 1206. I'm not sure about that one, but do you recognize it?
A. No, I don't know.
Q. Okay.
Would you look at 1209.
A. I don't think it's mine either.
Q. What about 1215?
A. Yes, this is mine.
Q. All right. So 1215 is also yours?
A. Yes.
Q. Is it also something that was left with the house or went with the house when it was rented out?
A. Yes.
MR. GUNN: No further questions, Your Honor.
THE COURT: Cross-examination?
MR. LULEJIAN: Yes, Your Honor.

**CROSS-EXAMINATION**

BY MR. LULEJIAN:
Q. Good morning, Ms. Sin.

Ms. Sin, on June the 17th, 2006, you were at your house when the Cambodian National Police executed a search warrant; is that right?

MR. GUNN: Your Honor, I object. Outside the scope.

THE COURT: Are you going to be able to get there quickly, Mr. Lulejian?

MR. LULEJIAN: Yes, Your Honor. Quickly.

THE WITNESS: Yes.

BY MR. LULEJIAN:

Q. I'm going to show you what has been marked as Government's Exhibit 2114.

MR. LULEJIAN: May I approach, Your Honor?

THE COURT: Yes.

BY MR. LULEJIAN:

Q. Do you recognize this photograph?

A. Yes, that's my picture.

Q. That's you on the day of the search?

A. Yes.

MR. LULEJIAN: Your Honor, the Government moves Exhibit 2114 into evidence.

THE COURT: Any objection?

MR. GUNN: No, other than outside the scope.

THE COURT: Admitted.

**(Exhibit 2114 received)**

MR. LULEJIAN: May I publish, Your Honor?

THE COURT: Yes.

BY MR. LULEJIAN:

Q. You were at the house the following day on the 18th of June, weren't you?

MR. GUNN: Objection. Outside the scope, Your Honor.

THE COURT: Mr. Lulejian, is this within the scope?

MR. LULEJIAN: Yes, Your Honor.

THE COURT: All right. Tie it up quickly.

THE WITNESS: I don't remember that I was there on that day.

BY MR. LULEJIAN:

Q. I'm going to show you a photograph that is identified as Government's Exhibit 2115 for identification.

MR. LULEJIAN: May I approach, Your Honor?

THE COURT: Yes.

BY MR. LULEJIAN:

Q. Do you recognize that photograph, Ms. Sin?

A. It's not clear.

Q. The person who is sitting in the table, is that you?

A. It's not clear.

Q. Is that your daughter sitting at the table as well?

A. Yes. I think that's my daughter, but the other picture is not clear.

MR. LULEJIAN: Your Honor, I think this has been admitted into evidence as Defense Exhibit 510.

THE COURT: All right.

MR. LULEJIAN: I ask to publish them.

BY MR. LULEJIAN:

Q. Ms. Sin, I'm going to zoom in to the people sitting at the table.

Is that you sitting at the table?

A. Yes.

Q. On that day, you spoke with Special Agent Phillips; is that correct?

A. I don't know who Phillips was.

Q. Special Agent Phillips is the gentleman sitting here at the end of the table?

A. I don't think I remember him.

Q. Do you remember speaking to an agent about Mr. Pepe's school supply program on that day?

A. Yes.

Q. And you said that Mr. Pepe ran a children's organization Socrates Foundation, didn't you?

A. Yes.

Q. You also said he has a school in Kilo 11 for victims of former sex crimes and sexual abuse, didn't you?

MR. GUNN: Objection. No foundation. Personal knowledge, Your Honor.

THE COURT: Overruled.

THE WITNESS: I do not know anything about the Kilometer 11.

BY MR. LULEJIAN:

Q. You said the defendant routinely provides young children with school supplies in Kilo 11 and other provinces; isn't that right?

MR. GUNN: Objection. No foundation. Personal knowledge, Your Honor.

THE COURT: Well, he's just asking her what she said. Doesn't matter whether she had any knowledge or not.

MR. GUNN: Irrelevant as to whether she said it, Your Honor.

THE COURT: Mr. Lulejian?

MR. LULEJIAN: I think it certainly goes to relevancy. The defendant opened the door to the school supply program. It goes to the heart of it.

THE COURT: You can certainly inquire about the school supply program and her knowledge of it.

MR. LULEJIAN: Okay.

BY MR. LULEJIAN:

Q. Did you tell the agent the defendant provides school supplies in the --

THE COURT: Mr. Lulejian, what she told the agents is not yet relevant. What she knows as she sits here today,

you may certainly inquire of that.

MR. LULEJIAN: Got it.

BY MR. LULEJIAN:

Q. Ms. Sin, you are aware -- are you aware that the defendant provided school supplies to Kilo 11 in the provinces?

MR. GUNN: No foundation. Personal knowledge.

THE COURT: He's asking her if she's aware.

THE WITNESS: That I don't know.

BY MR. LULEJIAN:

Q. As you sit here today, are you aware that when the defendant would give school supplies to the children and they would see him, that they were very happy?

A. Yes, they were happy.

Q. The defendant was happy when he saw the children too, wasn't he?

A. Yes.

Q. In fact, the defendant gave gifts to the children including candy; isn't that right?

A. Yes.

Q. He would give them money, as well, as much as 1000 to 2000 Reil; is that right?

A. That -- I don't know about the money.

Q. Now, as his landlord, you're responsible for collecting the rent, weren't you?

A. Yes.
Q. The rent was originally $400 month?
A. No. 800.
Q. It was 800 a month in June of 2006, wasn't it?
MR. GUNN: Objection. Outside the scope, Your Honor.
THE COURT: Overruled.
THE WITNESS: $800 from the beginning.
BY MR. LULEJIAN:
Q. At some point in time you refurnished the house, didn't you?
A. Yes. Add on.
Q. I'm going to show you a picture that's been admitted into evidence as Government's Exhibit Number 1332. It's been admitted.
This is a leather couch, wasn't it, that was in the house?
A. Yes.
Q. This was one of the items that you replaced?
A. Yes.
Q. On June 17th -- when did you replace them?
A. Well, it was there in the beginning. It's two of them. One is wood. One is leather like.
Q. At the time of the day of the arrest, that couch wasn't there, was it?

A. It was there.

Q. Now, when you went to collect the rent, you contacted the defendant before you went over; isn't that right?

A. Yes.

Q. In fact, you never went over to the house unannounced, did you?

A. Well, it's a clause in the lease agreement that we both agreed to let one another know ahead of time before we made any contact or visit.

Q. So you never went to the house unannounced?

A. That is correct.

Q. Each time you went to pick up the rent, you negotiated a time with the defendant of when to come and meet him?

A. Yes.

MR. GUNN: Objection. Outside the scope, Your Honor.

THE COURT: It's getting to look like it's outside the scope. Are you going to be done soon, Mr. Lulejian, or should we take our break?

MR. LULEJIAN: Why don't we take our break right now.

THE COURT: Ladies and gentlemen, please don't talk about the case or discuss the case until it has finally been submitted to you.

(Open court - jury not present)

(Recess)

THE COURT: Everyone ready?

MR. GUNN: We're going to get the witness, Your Honor.

THE COURT: Thank you. Let's bring the jury in.

(Open court - jury present)

THE COURT: Everyone is back. The witness is back on the stand. Both the witness and interpreter are still under oath.

Mr. Lulejian.

MR. LULEJIAN: Thank you, Your Honor.

BY MR. LULEJIAN:

Q. Ms. Sin, before May of 2006, you never saw any children at the house when you came to visit, did you?

MR. GUNN: Yes, Your Honor. Outside the scope.

THE COURT: It seems outside the scope, Mr. Lulejian.

BY MR. LULEJIAN:

Q. In late May to June of 2006, Mr. Pepe requested that you make an appointment with him at least two days prior to coming over; isn't that right?

MR. GUNN: Objection, Your Honor. Outside the scope.

THE COURT: It seems outside the scope, Mr. Lulejian.

MR. LULEJIAN: Nothing further, Your Honor.

THE COURT: Mr. Gunn?

MR. GUNN: Nothing, Your Honor.

THE COURT: Thank you, ma'am. You're excused.

Does the defense have another witness?

MR. BROWN: Yes, Your Honor. The defense calls Seng Lida.

THE CLERK: I'm sorry. Are you a minor?

THE COURT: How old are you?

MS. SENG: I'm 20 years old.

**Seng Lida, Defense Witness, sworn**

THE WITNESS: Seng Lida, S-E-N-G, L-I-D-A.

THE COURT: You may proceed.

MR. GUNN: Thank you very much, Your Honor.

**DIRECT EXAMINATION**

BY MR. BROWN:

Q. Good morning, Ms. Seng. What country are you from?

A. Cambodia.

Q. How old are you?

A. 20 years old.

Q. What year were you born?

A. 1988.

Q. And are you in college now or do you work?

A. I'm in school. I'm studying English.

Q. What school do you go to?

A. Panha Sas University.
Q. Do you also work?
A. Yes.
Q. Where do you work?
A. Riverside Restaurant.
Q. Ms. Seng, do you know a person named Michael Pepe?
A. Yes, I do.
Q. How do you know Michael Pepe?
A. Because he's -- he's my aunt's husband.
Q. Who is your aunt?
A. Chan Ry.
Q. Do you know how old Chan Ry is?
A. I think 25.
Q. Would you from time to time visit your aunt at Mr. Pepe's house?
A. Yes.
Q. Would you on occasion help your aunt and Mr. Pepe help distribute school supplies?
A. Yes.
Q. Could you describe just briefly for the jury what you did when you helped distribute school supplies?
A. Just prepare the gift package and also went along to distribute that.
Q. I'd like to show you a couple of photos, Ms. Seng. If you could identify a few pictures.

MR. BROWN: Your Honor, I'd like to publish a few photos from Defense Exhibit 380. I have them in computer form, if it pleases the Court. I think it would be a little easier.

THE COURT: Sure.

BY MR. BROWN:

Q. Ms. Seng, do you see the photo there?

A. Yes.

Q. Do you know who is in that photo?

A. Myself, Chan Ry, Michael, and Jason. Also the people that in the -- it's the handicap children in there.

Q. So you went with --

MR. BROWN: This, for the record, is defense Exhibit 380.

BY MR. BROWN:

Q. You went with Michael and your aunt to help distribute school supplies to the handicap children?

A. Yes.

Q. Do you remember when that was, Ms. Seng?

A. It's in 2006. I think it's a month before Michael was arrested.

Q. Is that you in the front of that picture with the little boy?

A. Yes.

Q. Is that Michael in the middle of the picture?

A. Yes.

Q. Is that your aunt Chan Ry sitting behind Michael?

A. Yes.

Q. You said that she's 25?

A. Yes, around there.

Q. Ms. Seng, do you see yourself in that photograph?

A. Yes.

Q. Is that also at the disabled child's center? Was it a school or a church, if you know?

A. I'm not sure whether church or school, but they live there.

Q. Who else is in that photo, if you know?

A. That picture?

Q. Yes.

A. My other aunt with her two children.

Q. When you say, your other aunt, is that the Chan Ry's sister?

A. Yes.

Q. She's the person who is married to Sander Montero?

A. Yes.

MR. BROWN: For the record, Your Honor, I've shown photo Number 20, Number 28, and this is 42 from Defense Exhibit 380.

THE COURT: Thank you.

///

BY MR. BROWN:

Q. Ms. Seng, is that another picture from the day you went to distribute school supplies?

A. Yes.

Q. How long were you there? Did you go there as a family?

A. Yes. I went there with Michael.

Q. How long were you there, if you know?

A. Two or three hours.

Q. Ms. Seng, you're 20 years old; right?

A. Yes.

Q. You go to school in Phnom Penh?

A. Yes.

Q. You also work in Phnom Penh?

A. Yes.

Q. So you're familiar with kind of the girls -- the students from your generation?

A. Yes.

Q. Is it a traditional part of Cambodian culture for daughters to do everything that their mothers tell them to do, based on your experience?

A. Well, I don't know the old-fashioned way, but my generation, especially myself, if my parent tell me to do something that I think is what I don't like, I will not do it.

MR. BROWN: Your Honor, I have no further

questions.

THE COURT: Cross-examination?

MR. LULEJIAN: Yes, Your Honor.

**CROSS-EXAMINATION**

BY MR. LULEJIAN:

Q. You testified on direct, ma'am, that you had visited your sister and brother-in-law at their house in Phnom Penh?

A. Yes, I visit their house.

Q. When you visited the house, did you stay there?

A. Yes, I do.

Q. Did you spend the night there?

A. Yes.

Q. What room did you sleep in?

A. Sometime downstairs. Sometime upstairs.

Q. Did you sleep in the bedroom downstairs?

A. Yes.

Q. When you slept upstairs, where did you sleep upstairs?

A. In the middle room.

Q. Was there a bed in that room?

A. Yes.

Q. Is that the room that is next to the master bedroom?

A. What do you mean, "master bedroom"?

Q. Did you sleep in the room next door to the room the defendant slept in?

A. Close.

Q. Did you ever go in the defendant's bedroom?

A. Yes, sometime.

Q. When were you at the house?

A. 2004.

MR. LULEJIAN: No further questions.

THE COURT: Redirect?

**REDIRECT EXAMINATION**

BY MR. BROWN:

Q. Ms. Seng, 2004 was not the only year you were at the house; is that right?

A. No. 2004 through 2006.

Q. You would visit from time to time in that time frame?

A. Yes.

MR. BROWN: No further questions.

THE COURT: Mr. Lulejian?

MR. LULEJIAN: No further questions, Your Honor.

THE COURT: Thank you, ma'am. You're excused.

Does the defense have another witness?

MR. GUNN: At this time we would read a stipulation into evidence.

THE COURT: You may do that.

MR. GUNN: One of the things I'm able to do.

THE COURT: All right.

MR. GUNN: Ladies and Gentlemen, this is a stipulation between the parties.

It is hereby stipulated by and between plaintiff United States of America through its counsel of record Assistant United States Attorney Patricia Donahue and Assistant United States Attorney John Lulejian and defendant Michael Pepe, through his counsel of record, Deputy Federal Public Defender Charles Brown and Deputy Federal Public Defender Carlton F. Gunn as follows:

One, Keith Williams, Federal Public Defender Chief Investigator, shall be deemed to be recalled as a witness and testified as follows: The set of photographs identified as Defense Exhibit 311 is a complete set of all of the photographs Mr. Williams took of Mr. Pepe on January 4, 2008.

And B, the set of photographs identified as Defense Exhibit 312, is a set of photographs Mr. Williams took of Mr. Pepe on June 13, 2007.

Two, defense Exhibit 123 is an accurate translation of the statement made by Basang to an investigating judge in Cambodian court which was identified as Defense Exhibit 122 during the defense cross-examination in the deposition of Basang.

Defense Exhibit 122 and Defense Exhibit 123 are admitted into evidence.

Your Honor, I'd offer 122, 123, 311, 312 into evidence.

MR. LULEJIAN: No objection, Your Honor.

THE COURT: Those would be admitted.

**(Defense Exhibits 122-123 & 311-312 received)**

MR. GUNN: Your Honor, would it be allowed to publish for the jury the translation of the Basang statement, Defense Exhibit 123?

THE COURT: I don't think we need to do that. They'll have it with them in the jury room.

MR. GUNN: All right, Your Honor.

Then our next witness or evidence would be the deposition of Koeung Lang, which we have on videotape.

With the Court's permission, we'll play that from here.

THE COURT: Any way that works.

MR. GUNN: There will be one point where there was a redaction a word short that we'll stop and read into the record.

THE COURT: Because we have a new court reporter, the court reporter is not transcribing the deposition itself. However, if counsel gets up and either shows an exhibit or reads something into the record, the court reporter will record that.

MR. GUNN: This one was prepared by the Government. It will play through without the stops.

THE COURT: That will be good.

**Videotaped Deposition of Koeung Lang, Defense Witness**

(Whereupon a videotaped deposition of Koeung Lang was played in open court.)

MR. GUNN: Your Honor, may I consult with counsel.

THE COURT: Yes.

MR. GUNN: Your Honor, for the record, the answer "no" to that last question should not have been redacted. The parties stipulate that the answer to that last question was "no."

THE COURT: Thank you.

(Whereupon the videotaped deposition of Koeung Lang was resumed.)

MR. GUNN: Your Honor, if I could consult with counsel again. There was a redaction of an answer there that should have not been redacted in response to the question, "Did they act unhappy or sad or upset in any way?" The witness answered, "No."

THE COURT: All right. Thank you.

MR. GUNN: Thank you.

(Whereupon videotaped deposition of Koeung Lang was resumed.)

THE COURT: Could you pause that. We're going to take our 15-minute break.

Ladies and Gentlemen, please don't talk about the case or form any opinions about the case until it is finally submitted to you.

(Recess)

THE COURT: Mr. Gunn.

MR. GUNN: Yes, Your Honor. So the record is complete, since parts of the DVD's of the interviews for T.C.XXX and I.T. and K.S.X were played for the jury, we figured those should be marked as exhibits. We marked them as Exhibit 174 for T.C.XXX; 175 for I.T.; and 176 for K.S.X. If I could approach the clerk and provide those.

THE COURT: You may.

MR. GUNN: They would only be in evidence to the extent that excerpts were played for the jury.

MS. DONAHUE: May I just inquire. So are these Exhibits 174, 175, 176 excerpts?

MR. GUNN: No. Complete DVD's. They don't go back to the jury anyway. If the jury wants to hear DVD's or tapes, they have to come into open court to view them anyway.

THE COURT: I think that's correct, but in any event, in this case, we won't be sending them back. If somebody wants to see or hear anything, we'll discuss it at that time.

MR. GUNN: For our position, that will be true of all tapes or videotapes --

THE COURT: Thank you.

MR. GUNN: -- even if they're excerpts.

THE COURT: Are we otherwise ready?

MR. GUNN: Yes, Your Honor.

MS. DONAHUE: Yes, Your Honor.

(Open court - jury present)

THE COURT: Everyone is present. You may continue playing the deposition.

(Whereupon the videotaped deposition of Koeung Lang was resumed.)

MR. LULEJIAN: The Government wishes to publish 1002.

THE COURT: You may. Thank you.

MR. LULEJIAN: Thank you, Your Honor.

(Videotaped deposition resumed)

MR. LULEJIAN: May we publish 1003, Your Honor?

THE COURT: You may.

(Videotaped deposition resumed)

MR. LULEJIAN: May we publish 1025, Your Honor?

THE COURT: You may.

(Videotaped deposition resumed)

MR. LULEJIAN: Your Honor, the question read, "You received money from the defendant after your children moved into his house." Ms. Lang's answer was cut off. The answer was, "Yes."

THE COURT: Thank you.

(Videotape deposition resumed)

MR. LULEJIAN: May we publish 1023?

THE COURT: You may. Why don't we get the answer to that question and then take a break.

(Videotaped deposition resumed)

THE COURT: Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it is finally submitted to you.

(Recess)

THE COURT: We're ready?

(Open court - jury present)

THE COURT: Everyone is back. You may continue with the deposition.

(Videotaped deposition resumed)

MR. LULEJIAN: Your Honor, may we publish 1025?

THE COURT: You may.

(Videotaped deposition resumed)

MR. LULEJIAN: Can we publish 1026, Your Honor?

THE COURT: You may.

(Videotape deposition resumed)

MR. LULEJIAN: May we publish 1024?

THE COURT: Yes.

(Videotaped deposition resumed)

MR. LULEJIAN: Your Honor, can we publish 1015?

THE COURT: You may.

(Videotaped deposition resumed)

MR. GUNN: Your Honor, there was a part -- if I

could just confer with counsel. The answer got cut off. "Whatever he said, I would not understand. I didn't pay attention. I was just standing there and cried and cried."

THE COURT: Thank you.

(Videotape deposition resumed)

MR. LULEJIAN: May we publish 1027, Your Honor?

THE COURT: You may.

(Videotaped deposition resumed)

MR. GUNN: Your Honor, there was another sentence cut off. If we can read into the record the complete answer.

MR. LULEJIAN: "If there is any way I could get my kids back" was the end of the sentence.

THE COURT: Thank you.

(Videotaped deposition)

MR. LULEJIAN: May we publish 2004, Your Honor?

THE COURT: You may.

(Videotaped deposition resumed)

MR. GUNN: Your Honor, I think it's good to stop at this section. The section just ended. The next section is about a page long. This is probably about a sensible place.

THE COURT: Ladies and gentleman, don't form or express any opinions. We are going to get the case to you for your deliberations sometime this week. You may want to start thinking about what you will want your schedule to be, and then you won't need me to be sitting on the bench waiting

for you. You can keep the same schedule from 8:00 to 2:00. If you want to take a lunch break and just go longer in the day, we'll leave that to you. So long as we have you here at least six hours so we can truthfully tell your employers that you have been working here with us, to the extent you have employers to report to. You can be thinking about that. That will be the first question I ask you tomorrow.

You're ordered to return tomorrow at 8:00 a.m. You're ordered to have a good evening.

(Open court - jury not present)

THE COURT: You may be seated.

How much longer do we have with the deposition?

MR. GUNN: Your Honor, it's -- timewise -- page wise we're on Page 75. It goes up through Page 87. Just barely 87. So percentage wise, if the redactions are proportional -- I'm not sure whether they are or not, we're about, 6/7ths of the way through. It sounds like that means another half hour to 45 minutes, but depends on how fast the witness is talking.

MR. LULEJIAN: There's a lot of redactions in this section. I think it will be shorter.

MR. GUNN: Could be.

THE COURT: Is that your last witness?

MR. GUNN: Yes. We rest.

THE COURT: What does the Government have planned

for tomorrow?

MS. DONAHUE: For rebuttal, as I have already told the defense, we are not going to call the expert witness that we had noticed. Our rebuttal are the tapes of the defendant's conversations from the Metropolitan Detention Center. We provided transcripts to the defense this morning. They asked for an additional portion. We have agreed to put that portion in as well. We'll make those excerpts tonight.

THE COURT: There is no disputes I need to resolve?

MS. DONAHUE: There are no disputes regarding MDC tapes the Court needs to resolve. I think their total is 40 minutes, maybe half an hour. It's short. They're like three short segments. It shouldn't take much more than a half hour to play.

THE COURT: Someone is going to deal with the request for judicial notice?

MR. LULEJIAN: Yes, Your Honor. Now that we know the two years that the witness referenced, we'll be making a very short judicial notice.

MS. DONAHUE: Those are the only two years we need.

MR. GUNN: I might want judicial notice of the whole calender if we do it, I guess.

MS. DONAHUE: We can work it out. That's fine if he wants the whole calender. Depending how far we go back, that's fine.

THE COURT: I will look at the jury instructions and come up with something with regard to the transcripts of the tapes. Obviously, they have no transcript for this videotape. I don't know if you want me to say anything about the video at all?

MR. GUNN: No. It's different. It's just testimony they hear like any other testimony, I think.

THE COURT: Okay.

MR. GUNN: There was one thing I caught in one of the instructions, Your Honor, that the Government and I agree on.

THE COURT: Okay.

MR. GUNN: Number 23, there's a paragraph for a person under 12 and a paragraph for less than 16 and more than 12.

THE COURT: Yes.

MR. GUNN: Leaving out the exact age of 12. As I looked at the statute, if someone is 12 exactly, they come under Paragraph 5. Paragraph 5 should read, "Less than 16 years old, but at least 12 years old."

THE COURT: You're suggesting that in Instruction 23 and presumably anywhere else where paragraph --

MS. DONAHUE: It also indicates it on the special verdict form. We'll make the same changes.

THE COURT: I'll make the change. You want the

word "more" in 5 to say --

MR. GUNN: Delete the words, "and more than" and substitute the words, "but at least."

THE COURT: The Government agrees with that?

MS. DONAHUE: Yes, Your Honor.

THE COURT: If you have anything else on those instructions, you need to let me know now or very first thing tomorrow.

MR. GUNN: We just have formal objections, but no argument. You want me to do that now?

THE COURT: Sure.

MR. GUNN: Your Honor, we would object to Court's Number 3 and request instead Defendant's Number 1. Note our exception to the Court giving its three instead of our Number 1.

THE COURT: That's the reasonable doubt instruction --

MR. GUNN: Correct.

THE COURT: -- which seems to have been used quite adequately for substantial period of time. I didn't think the Defense Number 1 was in any way preferable.

MR. GUNN: Back when I started, Ninth Circuit instructions didn't exist, Your Honor.

We would object to Court's Instruction Number 11. As we indicated previously, we don't think there should be an

instruction on that.

THE COURT: The Court is only giving that because there's been a suggestion made already about the presence of an adult attendant during interview. Counsel indicated that he may, in fact, mention that again. That's the Court's reasoning on that.

MR. GUNN: I assume the Court will take out the defendant has testified, Number 16? That's not really an exception, I assume.

THE COURT: Correct.

MR. GUNN: Court's Instruction Number 18, we take exception to or object to Clause One being included.

THE COURT: Let me just verify again with the Government, that you do intend to use that and want that in?

MS. DONAHUE: Yes, Your Honor. The Government will argue that evidence only for the two purposes set forth in that instruction.

THE COURT: Very good.

MR. GUNN: Court's Instruction Number 21, we object and note an exception and have requested instead Defendant's Number 2. That's related to our original motion to dismiss.

THE COURT: For the reasons stated therein in the Government's opposition, the Court has decided that the Instruction 21, as framed here, is the appropriate instruction.

MR. GUNN: Similarly, Your Honor, we would note an exception to Court's number 23 and request our Defendant's 3 instead. That also is related to arguments in the motion to dismiss.

THE COURT: Thank you.

Anything else?

MR. GUNN: That's it.

THE COURT: Anything from the Government?

MS. DONAHUE: No, Your Honor.

THE COURT: We will be -- I will instruct first before argument.

Does the Government have a time estimate for its argument?

MS. DONAHUE: It's an hour and 15 minutes, Your Honor.

THE COURT: Mr. Brown, do you have an estimate?

MR. BROWN: Probably about the same, Your Honor.

THE COURT: Okay.

For the Government --

MS. DONAHUE: That was open. For rebuttal, probably half an hour.

THE COURT: We'll see you tomorrow at 7:45.

(Whereupon proceedings were concluded at 2:15 p.m.)

CERTIFICATE

I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

**Certificate of Service**

I hereby certify that on May 28, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *James H. Locklin*

By: JAMES H. LOCKLIN
Deputy Federal Public Defender

No. 14-50095

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

MICHAEL JOSEPH PEPE,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
The Honorable Dale S. Fischer, Presiding
No. CR-07-00168-DSF

## Appellant's Excerpts of Record

**[Volume 10 of 12]**

HILARY L. POTASHNER
Acting Federal Public Defender
JAMES H. LOCKLIN
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012
213-894-2929

*Counsel for Defendant-Appellant*

## Table of Contents

Volume 1

Order Denying Defendant's Motion to Dismiss Indictment....................................1
[Filed December 3, 2007; Docket No. 57]

Order Denying Defendant's Motions to Suppress Evidence....................................9
[Filed December 5, 2007; Docket No. 60]

Order Denying Defendant's Motion to Suppress Evidence ...................................20
[Filed February 7, 2008; Docket No. 129]

Transcript – Sentencing (Excerpts).........................................................................26
[Dated February 28, 2014; Filed April 17, 2014; Docket Nos. 491, 512]

Volume 2

Defendant's Motion to Suppress Evidence* ........................................................42
[Filed June 26, 2007; Docket No. 21]

Defendant's Motion to Suppress Evidence (Excerpts)........................................120
[Filed August 1, 2007; Docket No. 33]

Government's Consolidated Opposition to Motions to Suppress Evidence* ........130
[Filed August 22, 2007; Docket No. 39]

Defendant's Reply re Motions to Suppress Evidence ..........................................208
[Filed September 4, 2007; Docket No. 40]

Defendant's Motion to Dismiss Indictment........................................................220
[Filed October 4, 2007; Docket No. 43]

Transcript – Motion Hearing ..............................................................................244
[Dated October 29, 2007; Filed February 26, 2008; Docket Nos. 50, 133]

* Documents marked with an asterisk have been redacted pursuant to Federal Rule of Appellate Procedure 25(a)(5) and Federal Rule of Criminal Procedure 49.1(a).

Government's Declaration re Motions to Suppress Evidence ..............................295
[Filed November 27, 2007; Docket No. 53]

Transcript – Motion Hearing (Excerpts)* ..........................................................299
[Dated December 3, 2007; Filed February 26, 2008; Docket Nos. 58, 134]

Volume 3

Defendant's Supplemental Memorandum re Motion to Suppress Evidence.........340
[Filed December 20, 2007; Docket No. 71]

Government's Supplemental Memorandum re Motion to Suppress Evidence .....350
[Filed December 20, 2007; Docket No. 72]

First Superseding Indictment .............................................................................372
[Filed December 20, 2007; Docket No. 83]

Government's Supplemental Declaration re Motion to Suppress Evidence (Excerpts) ...............................................................................................374
[Filed February 5, 2008; Docket No. 127]

Transcript – Motion Hearing (Excerpts)* ..........................................................380
[Dated February 6, 2008; Filed February 26, 2008; Docket Nos. 136]

Transcript – Trial – Day 2 (Excerpts).................................................................460
[Dated May 9, 2008; Filed May 18, 2010; Docket Nos. 259, 410]

Volume 4

Transcript – Trial – Day 3 (am) (Excerpts) ........................................................635
[Dated May 13, 2008; Filed May 18, 2010; Docket Nos. 260, 411]

Transcript – Trial – Day 3 (pm)..........................................................................766
[Dated May 13, 2008; Filed June 17, 2014; Docket Nos. 260, 532]

Volume 5

Transcript – Trial – Day 4 (Excerpts)................................................................805
[Dated May 14, 2008; Filed May 18, 2010; Docket Nos. 261, 412]

Transcript – Trial – Day 5 (Excerpts) ....... 942
[Dated May 15, 2008; Filed May 18, 2010; Docket Nos. 262, 413]

Volume 6

Transcript – Trial – Day 6 (Excerpts) ....... 1022
[Dated May 16, 2008; Filed May 18, 2010; Docket Nos. 263, 414]

Volume 7

Transcript – Trial – Day 7 (Excerpts)* ....... 1192
[Dated May 20, 2008; Filed May 18, 2010; Docket Nos. 264, 415]

Transcript – Trial – Day 8 (Excerpts) ....... 1343
[Dated May 21, 2008; Filed May 18, 2010; Docket Nos. 269, 416]

Volume 8

Transcript – Trial – Day 9 (Excerpts) ....... 1423
[Dated May 22, 2008; Filed May 18, 2010; Docket Nos. 270, 417]

Volume 9

Transcript – Trial – Day 10 (Excerpts) ....... 1538
[Dated May 23, 2008; Filed May 18, 2010; Docket Nos. 293, 418]

Transcript – Trial – Day 11 (Excerpts) ....... 1739
[Dated May 27, 2008; Filed June 2, 2010; Docket Nos. 294, 435]

Volume 10

Transcript – Trial – Day 12 (Excerpts) ....... 1805
[Dated May 28, 2008; Filed May 18, 2010; Docket Nos. 295, 419]

Transcript – Trial – Day 13 (Excerpts) ....... 1930
[Dated May 29, 2008; Filed May 18, 2010; Docket Nos. 296, 420]

Stipulation to Correct/Modify Record re Jury Instructions (Excerpts)[†] ..............1941
[Filed February 27, 2015; Docket No. 543]

Order Correcting/Modifying Record re Jury Instructions ..................................1961
[Filed March 2, 2015; Docket No. 545]

Order Correcting/Modifying Record re Video Testimony .................................1963
[Filed March 2, 2015; Docket No. 546]

Government's Sentencing Memorandum (Excerpts) ........................................1965
[Filed September 17, 2008; Docket No. 318]

Transcript – Victim Statements ..........................................................................1977
[Dated September 25, 2008; Filed June 18, 2014; Docket Nos. 333, 533]

Defendant's Supplemental Filing re Restitution................................................1998
[Filed March 25, 2009; Docket No. 348]

Judgment ..........................................................................................................2006
[Filed February 28, 2014; Docket No. 492]

Notice of Appeal ...............................................................................................2012
[Filed March 3, 2014; Docket No. 493]

Docket ..............................................................................................................2013

Volume 11 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 1)...................2053
[Filed March 3, 2015; Docket No. 547]

Volume 12 [FILED UNDER SEAL]

Stipulation to Correct/Modify Record re Video Testimony (Part 2)...................2309
[Filed March 3, 2015; Docket No. 547]

† Although this document and the two orders that follow were not filed until after the judgment and notice of appeal were filed, they are placed here in the excerpts because they relate to the trial proceedings.

Exhibit No. 101 .......... 2399

Exhibit No. 102 .......... 2401

Exhibit No. 103 .......... 2403

Exhibit No. 104 .......... 2405

Exhibit No. 106 .......... 2408

Exhibit No. 107 .......... 2410

Exhibit No. 108 .......... 2412

Exhibit No. 109 .......... 2414

Exhibit No. 110 .......... 2416

Exhibit No. 111 .......... 2418

Exhibit No. 114 .......... 2420

Exhibit No. 123 .......... 2423

Exhibit No. 2007 .......... 2428

Exhibit No. 2009 .......... 2454

Exhibit No. 2010 .......... 2456

Exhibit No. 2011 .......... 2458

Exhibit No. 2093 .......... 2460

Exhibit No. 2096 .......... 2462

Exhibit No. 2200A .......... 2464

Exhibit No. 2201A .......... 2467

Exhibit No. 2202A ....................2477

Verdict ....................2480
[Filed May 29, 2008; Docket No. 299]

Presentence Report ....................2488
[Dated July 30, 2008; Filed March 25, 2009; Docket No. 346]

Probation Office Letter to District Court ....................2517
[Dated September 3, 2008]

Government's Submission of Victim Impact and Restitution Information ....................2523
[Filed September 19, 2008; Docket No. 329]

Supplement to Presentence Report ....................2559
[Filed March 25, 2009; Docket No. 347]

Government's Response to Defendant's Filing re Restitution ....................2562
[Filed April 21, 2009; Docket No. 355]

Government's Supplemental Submission re Restitution ....................2583
[Filed February 28, 2014; Docket No. 490]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

United States of America, )
Plaintiff, )
)
vs. ) Case No.
) CR 07-168(A)-DSF
Michael Joseph Pepe, )
Defendant. )
________________________________ )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

Day 12

Los Angeles, California

Wednesday, May 28, 2008

Pamela A. Seijas, CSR, FCRR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California 90012
(213) 687-0446

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
BY: PATRICIA DONAHUE
ASSISTANT UNITED STATES ATTORNEY
JOHN LULEJIAN
ASSISTANT UNITED STATES ATTORNEY
312 N. SPRING STREET
LOS ANGELES, CA 90012

FOR DEFENDANT: OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY: CARL GUNN
DEPUTY FEDERAL PUBLIC DEFENDER
CHARLES BROWN
DEPUTY FEDERAL PUBLIC DEFENDER
321 EAST SECOND STREET
LOS ANGELES, CA 90012

ALSO PRESENT: ATTACHE GARY PHILLIPS
ICE SPECIAL AGENT EDDY WANG

Los Angeles, California, Wednesday, May 28, 2008

8:03 a.m.

-oOo-

(Jury Out)

THE COURT: Are we ready?

MR. LULEJIAN: I think so.

THE COURT: What have we done about the request for judicial notice?

MR. LULEJIAN: We have decided to turn it into a stipulation. We thought that would be cleaner and a little easier to do. We both have signed it and we will read it into the record.

THE COURT: Anything else, Mr. Gunn?

MR. GUNN: I have one other thing to note for the record, Your Honor. We have substituted redacted -- there were four newspaper clippings that were Government Exhibits 1234 to 1237. I had spoken to the Government about certain portions of those that I thought should be redacted if they were not being included in their entirety, and the Government agreed to that, and we have substituted copies with redactions that we have agreed on for those, just for the record.

MR. LULEJIAN: One last thing, Your Honor.

THE COURT: Yes.

MR. LULEJIAN: The Government wanted to revisit the issue of moving Dr. Craft's PowerPoint into evidence. We would

move the portions that Mr. Gunn --

THE COURT: Okay. The jury is waiting. How long is this going to take? That's why I take the bench at 7:45. You are supposed to be here and prepared to start at 7:45. Can you not agree on this?

MR. LULEJIAN: Mr. Gunn and I have talked about it --

THE COURT: What does revisit the issue mean? Have I already ruled?

MR. LULEJIAN: I think, Your Honor --

THE COURT: Then that's my ruling.

MR. LULEJIAN: Yes, Your Honor.

(Jury In)

THE COURT: Good morning. Everyone is present. You may continue with the deposition.

MR. GUNN: Thank you, Your Honor.

MR. BROWN: I apologize, Your Honor. It looks like we're having some technical difficulties.

MR. GUNN: We just had a computer crash, Your Honor.

(Whereupon, the video was played for the jury)

THE COURT: Is that the end of the deposition testimony?

MR. GUNN: Yes, Your Honor.

THE COURT: Does the Defense have any further witnesses?

MR. GUNN: Your Honor, I wanted to move Government

Exhibit 1215 into evidence. I had thought it was already in evidence. Sin Samna identified it, but I'm not sure it is. So we would like to move it into evidence if it's not.

THE COURT: Any objection?

MR. GUNN: If I could have a moment to speak with counsel.

MR. LULEJIAN: We have no objection, Your Honor.

THE COURT: All right. That will be admitted.

(Government's Exhibit 1215 was received)

THE COURT: Any further witnesses?

MR. BROWN: No further witnesses, Your Honor. The Defense rests.

THE COURT: Thank you.

Does the Government wish to present any rebuttal?

MR. LULEJIAN: Yes, Your Honor, we do. With the Court's permission, I would like to read three stipulations into the record.

THE COURT: You may.

MR. LULEJIAN: The first stipulation is entitled Stipulation Regarding the Accuracy of Government Exhibit No. 2005. And it reads as follows:

"Plaintiff, United States of America, by and through its counsel of record, United States Attorney for the Central District of California and defendant, Michael Pepe, through his counsel of record, Deputy Federal Public Defender Charles C.

Brown and Deputy Federal Public Defender Carl F. Gunn, hereby stipulate to the following:

"Government Exhibit No. 2005 is an accurate and correct translation of Government Exhibit No. 2004, the handwritten document written in Khmer bearing Kumlang's thumbprint."

The second stipulation is entitled Stipulation Regarding Cambodian Calendar.

Again, "The Plaintiff, the United States of America, by" --

THE COURT: We know who they are between. Just read the bodies.

MR. LULEJIAN: The stipulation reads as follows:

"The Cambodians follow the Chinese zodiac with two exceptions. First, the Cambodian New Year is celebrated on April 13th rather than a moving date. Second, the Cambodian calendar uses the zodiac signs of the mouse, hare and goat rather than the rat, rabbit and sheep.

"Two, the Chinese zodiac cycle is set forth in the calendar attached to the stipulation.

"Three, April 13th is the start of each Cambodian New Year, and on that day, a new zodiac sign is assigned for the upcoming year.

"And, four, a person born in Cambodia on or after April 13th of any of the above years would have been born under

the above zodiac sign which corresponds with the year of his or her birth."

The last stipulation is regarding telephone calls placed by the defendant, and the parties stipulate as follows:

"One, during the period of his incarceration, defendant Michael Joseph Pepe's telephone calls, with the exception of those between him and his lawyers, have been recorded and monitored by the Federal Bureau of Prisons.

"Two, when he entered the Federal Bureau of Prisons, defendant Michael Joseph Pepe agreed in writing that his non-legal telephone calls could be recorded and monitored, and he was aware at all relative times that his telephone calls were being recorded and monitored.

"Three, on September 28, 2007, defendant Michael Joseph Pepe telephoned and spoke with Sander DeMontero. Government Exhibit No. 2200 is a true and correct excerpt of this recorded telephone call.

"Four, on October 11th, 2007, defendant Michael Joseph Pepe telephoned and spoke with Sander DeMontero. Government Exhibit No. 2201 is a true and correct excerpt of this recorded telephone call."

And finally, "On February 4th, 2008, defendant Michael Joseph Pepe telephoned and spoke with Sander DeMontero. Government Exhibit No. 2202 is a true and correct excerpt of this recorded telephone call."

And at this point, Your Honor, the Government would move Exhibits No. 2200, 2201, and 2202 into evidence and ask permission to publish to the jury by playing them.

THE COURT: Those will be admitted.

(Government's Exhibits 2200 through 2202 were received)

THE COURT: Ladies and gentlemen, you are about to listen to tape recordings that have been received in evidence. Please listen to them very carefully. Each of you is being given transcripts of those recordings right now to help you identify the speakers and as a guide to help you listen to the tapes; however, bear in mind that the tape recordings are the evidence, not the transcripts. If you hear something different from what appears in the transcripts, what you heard is controlling. After the tapes have been played, the transcript will be taken from you.

MR. GUNN: Your Honor?

THE COURT: Yes.

MR. GUNN: Could the Court explain that this differs from the transcripts of the foreign language that were received in evidence earlier?

THE COURT: That's right. The transcripts that you will have with you in the jury room, those are the evidence, but you won't have these documents that we just gave you in the jury room because these are not the evidence. So if it's in the jury room, it's evidence; if it's not in the jury room, it's not.

It looks like everybody is ready, Mr. Lulejian.

MR. LULEJIAN: Thank you, Your Honor. The first call played is Government Exhibit No. 2200. That's on September 28th.

(Whereupon, the tape was played for the jury)

MR. LULEJIAN: The second call we will play is Government Exhibit No. 2202, which is a call that took place on February 4th of 2008.

THE COURT: All right.

(Whereupon, the tape was played for the jury)

THE COURT: Please stop that, Mr. Lulejian.

Ladies and gentlemen, in case you are searching for this, they put them in the wrong order so this is the last one you were given, not the second one.

Is that the way you wanted to play it?

MR. LULEJIAN: Yes, Your Honor.

May I resume?

THE COURT: Yes.

(Whereupon, the tape was played for the jury)

MR. LULEJIAN: Finally, Your Honor, the Government would publish Exhibit No. 2201. That is a telephone call that took place on October 11, 2007. I think that was the second transcript in the package.

THE COURT: Okay.

(Whereupon, the tape was played for the jury)

THE COURT: Does the Government have any further rebuttal?

MR. LULEJIAN: No, Your Honor. We would move the depositions of Ly Kim Eng and Kumlang into evidence.

MR. GUNN: We would object to 2004, I believe it is, Your Honor.

THE COURT: We will resolve that later.

Any surrebuttal?

MR. BROWN: No, Your Honor. The Defense would renew our Rule 29 motion.

THE COURT: All right. Thank you.

Nothing else from the Government?

MR. LULEJIAN: No, Your Honor. The Government rests.

THE COURT: Let's grab up those transcripts quickly, please.

THE JUROR: These are the ones from the other day that we had.

THE COURT: Just give those to the agent.

THE JUROR: Do you want those back, too?

THE COURT: Yes. If they are evidence, we will have the original set back in the jury room for you.

Thank you, sit back and relax.

Members of the jury, now that you have heard all the evidence, it is my duty to instruct up on the law that applies in this case. A copy of these instructions will be available in

the jury room for you to consult.

It is your duty to find the facts from all the evidence in the case. To those facts, you will apply the law as I give it to you. You must follow the law as I give to you whether you agree with it or not. You must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath promising to do so at the beginning of the case.

In following my instructions, you must follow all of them and not single out some and ignore others. They are all equally important.

You must not read into these instructions or into anything the Court may have said or done any suggestion as to what verdict you should return. That is a matter entirely up to you.

The charges in this case are set forth in a First Superseding Indictment which I will refer to simply as the Indictment. The Indictment is not evidence. The defendant has pleaded not guilty to the charges in the Indictment. The defendant is presumed to be innocent and does not have to testify or present any evidence to prove innocence. The Government has the burden of proving every element of the charges beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves

you firmly convinced that the defendant is guilty. It is not required that the Government prove guilt beyond all possible doubt. A reasonable doubt is a doubt based on reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence or from lack of evidence. If after a careful and impartial consideration of all the evidence you are not convinced beyond a reasonable doubt that the defendant is guilty of a particular charge, it is your duty to find the defendant not guilty on that charge.

On the other hand, if after a careful and impartial consideration of all the evidence you are convinced beyond a reasonable doubt that the defendant is guilty of a particular charge, it is your duty to find the defendant guilty of that charge.

A separate crime is charged against the defendant in each count. You must decide each separately. Your verdict on one count should not control your verdict on any other count.

The evidence from which you are to decide what the facts are consists of, one, the sworn testimony of any witness; two, the exhibits which have been received into evidence; and, three, any facts to which all the lawyers have stipulated.

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence and you may not consider them in deciding what

the facts are. I will list them for you.

One, arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

Two, questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the question, the objection, or the Court's ruling on it.

Three, testimony that has been excluded or stricken or that you have been instructed to disregard is not evidence and must not be considered. In addition, some testimony and exhibits have been received only for a limited purpose. Where I have given a limiting instruction, you must follow it.

And four, anything you may have seen or heard when the Court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact such as testimony of an eyewitness. Circumstantial evidence is indirect evidence; that is, proof of a chain of facts from which you could find that another fact exists even though it has not been proved directly.

You are to consider both kinds of evidence. The law permits you to give equal weight to both but it is for you to decide how much weight to give to any evidence.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says or part of it or none of it. In considering the testimony of any witness you may take into account, one, the opportunity and ability of the witness to see or hear or know the things testified to.

Two, the witness's memory.

Three, the witness's manner while testifying.

Four, the witness's interest in the outcome of the case or any bias or prejudice.

Five, whether other evidence contradicted the witness's testimony.

Six, the reasonableness of the witness's testimony in light of all the evidence.

And seven, any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testified.

You have heard testimony from persons who, because of education and experience, are permitted to state opinions and the reasons for their opinions. Opinion testimony should be judged just like any other testimony. You may accept it or

reject it and give it as much weight as you think it deserves considering the witness's education and experience, the reasons given for the opinion and all the other evidence in the case.

You have heard testimony from Sang or Basang, a witness who, one, received immunity. That testimony was given in exchange for a promise by the Government that the witness will not be prosecuted.

Two, admitted being an accomplice to the crime charged. An accomplice is one who voluntarily and intentionally joins with another person in committing a crime.

Or, three, was convicted of a crime arising out of the same events for which the defendant is on trial. This conviction is not evidence against the defendant and you may consider it only in determining the witness's believability.

For these reasons, in evaluating the witness's testimony, you should consider the extent to which or whether the witness's testimony may have been influenced by any of these factors. In addition, you should examine the witness's testimony with greater caution than that of other witnesses.

A child who is or is alleged to be a victim of illicit sexual conduct and who is testifying at a trial has the right to be accompanied in court by an adult attendant.

The parties have agreed to certain facts that have been stated to you. You should, therefore, treat these facts as having been proved.

When a person is unavailable to testify at trial, the deposition of that person may be used at trial. A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth, and lawyers for each party may ask questions. The questions and answers are recorded.

The deposition of Chhoeurn Thi Sang or Basang, Ly Kim Eng and Kumlang have been presented to you. Deposition testimony is entitled to the same consideration and is to be judged, insofar as possible, in the same way as if the witness had been present to testify.

The objections were resolved before the testimony was presented to you and should not be considered in any way. You may consider all of the testimony presented.

Certain charts and summaries have been received into evidence. Charts and summaries are only as good as the underlying supporting material. You should, therefore, give them only such weight as you think the underlying material deserves.

A defendant in a criminal case has a right not to testify. No presumption of guilt may be raised and no inference of any kind may be drawn from the fact that a defendant did not testify.

You are here only to determine whether the defendant is guilty or not guilty of the charges in the Indictment. Your

determination must be made only from the evidence in the case. The defendant is not on trial for any conduct or offense not charged in the Indictment. You should consider evidence about the acts, statements and intentions of others or evidence about other acts of the defendant only as they relate to the charges against this defendant.

You have seen evidence of sexual conduct other than the sexual conduct alleged in the Indictment. First, you must determine whether the other acts were engaged in by the defendant. If you conclude that the conduct was engaged in by the defendant, you may consider that evidence only as it bears on the credibility of the children who have testified and whether the defendant was the person who engaged in the acts alleged by those children and for no other purpose.

You have heard testimony that the defendant made statements. It is for you to decide whether the defendant made the statements and if so, how much weight to give to them. In making those decisions you should consider all of the evidence about the statements, including the circumstances under which the defendant may have made them.

The Indictment charges that the offenses alleged were committed between on or about certain dates. Although it is necessary for the Government to prove beyond a reasonable doubt that the specific offenses were committed between dates reasonably near the dates alleged in the Indictment, it is not

necessary for the Government to prove that the offenses were committed between the precise dates charged.

The defendant is charged in seven counts with traveling in foreign commerce and engaging in illicit sexual conduct with seven minor girls. In order for the defendant to be found guilty of these charges, the Government must prove each of the following elements beyond a reasonable doubt.

First, the defendant is a United States citizen.

Second, the defendant traveled in foreign commerce.

And third, while in Cambodia, the defendant engaged in illicit sexual conduct during the time and with the person alleged in the particular count.

Travel in foreign commerce means traveling from one country to another country.

The term illicit sexual conduct means any one of the following:

One, any commercial sex act with a person under 18 years of age.

Or, two, knowingly rendering another person who is under 18 years to be unconscious and thereby engaged in a sexual act with that other person.

Or, three, knowingly administering to another person who is under 18 years of age by force or threat of force or without the knowledge or permission of that person a drug, intoxicant or other similar substance and thereby substantially

impairing the ability of that other person to appraise or control conduct, and engaging in a sexual act with that person.

Or, four, knowingly engaging in a sexual act with a person under 12 years of age.

Or, five, knowingly engaging in a sexual act with a person who is less than 16 years old but at least 12 years old and who is at least four years younger than the defendant.

You must be unanimous as to which conduct, if any, you find defendant engaged in.

For Paragraph 4 in the previous instruction, the Government is not required to prove that the defendant knew that the other person engaging in the sexual act was under 12 years of age.

For Paragraph 5 in the previous instruction, the Government is not required to prove that the defendant knew the age of the person with whom he engaged in the sexual act.

And the Government is not required to prove that the defendant knew that the person with whom he engaged in the sexual act was at least four years younger than the defendant.

For Paragraph 5 in Instruction 22, it is a defense, which the defendant must establish by a preponderance of the evidence, that the defendant reasonably believed that the other person had attained the age of 16 years. To prove something by a preponderance of the evidence is to prove that it is more likely true than not true. This is a lesser standard than proof

beyond a reasonable doubt. The requirement of proof beyond a reasonable doubt applies to all issues that the Government must prove in this case, except as I will instruct you in Instruction No. 28.

The term "sexual act" means, one, contact between the penis and the vulva or the penis and the anus. And for purposes of this subparagraph, contact involving the penis occurs upon penetration, however slight.

Or, two, contact between the mouth and the penis, the mouth and the vulva or the mouth and the anus.

Three, penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object with an intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person.

Or, four, the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

The term "commercial sex act" means any sexual act on account of which anything of value is given to or received by any person.

An act is done knowingly if the defendant is aware of the act and does not act or failed to act through ignorance, mistake or accident. The Government is not required to prove

that a defendant knew that his acts or omissions were unlawful. You may consider evidence of a defendant's words, acts or omissions along with all the other evidence in deciding whether he acted knowingly.

Venue is the location where a criminal charge may be brought under the law. The Government must prove by a preponderance of the evidence that the last known address of the defendant in the United States is in the Central District of California. To prove something by a preponderance of the evidence is to prove that it is more likely true than not true. This is a lesser standard than proof beyond a reasonable doubt. The requirement of proof beyond a reasonable doubt applies to all other issues in this case, except as I have instructed you in Instruction No. 24.

You are also instructed that the Central District of California includes the counties of Los Angeles, Ventura, Santa Barbara, San Luis Obispo, Orange, Riverside and San Bernardino. You must consider venue in each count separately. If you find that the Government has not proven venue as to any count, you must find the defendant not guilty as to that count.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case quite yet. We'll take a 15 minute break and then hear from the lawyers.

(Recess taken)

THE COURT: Is everyone ready?

MS. DONAHUE: Yes, Your Honor.

MR. BROWN: Yes, Your Honor.

(Jury In)

THE COURT: Everyone is present.

Ladies and gentlemen, you have heard all the evidence, and now it's time to hear the arguments of counsel. I remind you again that what the attorneys say during argument is not evidence. Each attorney will outline for you his or her interpretation as to what the evidence shows. If the attorneys state the evidence to you differently from your recollection of the evidence, you should rely on your own recollection of the evidence. If the attorneys discuss the law and it's different from my instructions on the law, you must rely on the law as I have stated it to you.

First, the Government will give an opening argument. Then the Defense will give an opening argument and then the Government will give a closing argument.

Ms. Donahue?

MS. DONAHUE: Thank you very much, Your Honor.

Government's Opening Argument

MS. DONAHUE: Good morning, ladies and gentlemen. And I want to start by saying thank you very much. The evidence in this case has not always been very easy to listen to. Or very easy to look at. And we thank you very much for paying such

close attention to it.

We submit to you that all of this evidence that you have seen over the past couple of weeks proves beyond a reasonable doubt that the defendant is guilty of all seven counts charged in the Indictment.

The victims came into court and they all told you what he did to them in his bedroom in his house over in Cambodia.

The other evidence -- the other evidence in this case, besides what the victims told you, corroborates or confirms what they told you about what he did to them.

THE COURT: Excuse me, Ms. Donahue. You have got something on my screen and that screen but not this screen. Is that deliberate?

MS. DONAHUE: Yes. It's deliberate, Your Honor.

THE COURT: Fine.

MS. DONAHUE: There is a mountain of evidence that corroborates or confirms what the victims told you the defendant did to them, and I am going to go through it with you.

The defendant's own words, the things that were seized in his house, like the rope in his bedroom closet, the sedatives that were in his bedroom and his office, his Viagra, the photographs of him naked in his bedroom with L.K.xxx, the homemade child pornography on his computer, the testimony of Basang, the woman, the first deposition you heard, who went out and purchased children and brought them back to see if he wanted

to buy them for sex. And, of course, the medical examinations of the victims, which confirmed what they told you happened to them.

So let's take a look at some of this mountain of corroborating evidence. And one of the first things I want to take a look at is Government's Exhibit 2007. This is a letter that defendant wrote to his sister Elaine and her husband Richard. This letter was moved into evidence based on a stipulation and it's on the screen in front of you.

It's, "Dear Richard and Elaine. I need to start telling you about some of the things that have been happening." And the letter goes on and, in fact, he does explain some of the things that have been happening. He says, "I will try to cut this short and try not to be too graphic. But there may be some things that you have to understand." Keep in mind these are the defendant's own words. "Sang" -- that's Basang, the lady's deposition you heard -- "told her that L.K.xxxxx's mother was giving her to me in a status somewhere between wife and girlfriend." And L.K.xxxxx is L.K.xxx, the second girl who testified. Remember, she told you the defendant would call her either L.K.xxxxx or LKx. And what does the defendant have to say about his own conduct with her?

"Basang told me to tie up L.K.xxxxx. I asked the girl if it was okay. She said yes. So I did. Then Sang told me to slap her in the face. I asked her if it was okay. She said

yes. Sang said it had something to do with saving face and that L.K.xxxxx would feel better emotionally." Tying up, slapping his rape victim in the face apparently was going to make her feel better. "This is how it started. L.K.xxxxx never had any problems. She seemed happy most of the time."

In this letter, he is admitting tying up this little girl, he is admitting that he hit this little girl and he is admitting what she told you, the ongoing rapes that happened over the course of time that she lived in that house with him.

"Sang also told me that if I did not take the girls in, then their mother was going to sell them into the sex trade." I think based on the deposition testimony that you heard from two of the mothers, that's certainly not an accurate statement. "Things settled back into a routine." This is his routine. "It seemed to start, the girls would do the massage thing. Later, the massage thing turned into" -- in his own words -- "inappropriate touching, etc. I think Sang was teaching the girls things." And if you remember her testimony, she did teach them. She told them all how to perform oral sex on the defendant.

And then he talks about essentially his schedule. "Usually before the went off to school, one of them would bring me breakfast. They would come -- they would all come so I could check their school uniforms and I would give them a little kiss on the cheek before they went off to school. I went back to bed

at 9:00 a.m. The girls usually got home around noon and they woke me up with a massage. And then at 1:00, the tutor came."

Sang would usually come by with some Vietnamese coffee in the afternoon. Then the defendant would take another nap and around 8:00 that evening, by his own admission, another massage. Most of the time, according to him, it was not at all sexual.

These, ladies and gentlemen, are his words written to his own family beginning, as he says, to explain what was going on in his house in Phnom Penh, what he was doing to the little girls in his house.

But those are not his only words. There are also a couple of emails recovered from his computer. And those emails also give a lot of insight into the defendant. If you take a look at Government's Exhibit 2009, it's a short email that was written on March 30th of 2006, and it's written to a friend of his named Mack. And what he says in the email to Mack is, "The sweet things I have with me have the most perfect little bodies and attitudes." The most perfect little bodies and attitudes. And, of course, by attitudes, he means their submission to him. Their submission to whatever it is that he wanted to do with them. And, in fact, what he did with them is exactly what he is charged with in this case.

Judge Fischer read you that defendant is charged in seven counts with traveling in foreign commerce and engaging in illicit sexual conduct with seven children. In order to prove

this case, we have to show you three things beyond a reasonable doubt.

First, that he is a United States citizen. You heard a stipulation. Defendant is a United States citizen. He was born in 1953 in Massachusetts. So there is no question about that.

Second, we have to prove that he traveled in foreign commerce. And as Judge Fischer instructed you, traveling in foreign commerce just means traveling from one country to another country. And as you heard, we have stipulated in September of 2005, the defendant traveled from Los Angeles to Cambodia. So there is no question about the second element.

And the third element is that the defendant engaged in illicit sexual conduct during the time and with a person alleged in that particular count.

Illicit sexual conduct is what he did to these girls. Now, as Judge Fischer told you, illicit sexual conduct can mean one of five things, and she itemized those five things for you in the jury instructions. And we're going to focus for a minute on the first one.

Judge Fischer told you if you find unanimously, beyond a reasonable doubt, that any -- any one of these five definitions applies, any one of these applies to what he did to any particular girl, then you have to find him guilty of illicit sexual conduct with that girl. There are five definitions and

-- well, you have heard the evidence and most -- in most cases, all five definitions apply because of all of the things that he did to these girls, but we'll go through that.

The first definition that Judge Fischer read to you, however, applies across the board. And that is a commercial sex act. Illicit sexual conduct means a commercial sex act with any person under 18. Well, all the victims in this case are under 18. And, as Judge Fischer told you, a commercial sex act is any sexual act on account of which anything of value, anything at all is given to or received by any person. Anything of value given to or received by any person. And we have that in this case in spades. Anything of value.

How about a dollar for every rape? How about a dollar every time they performed oral sex on him? How about the fact that he paid Basang's rent in exchange for her bringing him girls for sex? Remember what she said about that? He likes them 13 or 14 years old and younger and he didn't like all of the girls that she brought to him. He had a particular kind of girl he liked, small, weak, no pubic hair. Paid Basang's rent every month. What did she have to do? Bring him girls from the slums.

She testified she brought the girl and defendant would look at the girl and he would decide the price. $600 for virginity. Anything of value. How about school tuition, clothes, stuffed animals, flowers, candy, jewelry? Photograph

after photograph after photograph shows all of the things that he gave to the victims in this case. Birthday parties, Christmas parties.

As you heard in the deposition of Kumlang -- Kumlang is the mother of S.R.xxx and S.S.xxx -- she got $30 per month per girl from January until May. And she said in the deposition this morning, she didn't get her June payment. That's because the defendant was arrested. Anything of value probably also includes the motorcycle that Kumlang said she bought with $150 of the money that the defendant paid her to have her two daughters live at his house and perform oral sex on him. Every single girl was paid, they were brought to him by Basang. Basang was paid. He showered them with all of these material items.

You have commercial sex act on every single victim in this case across the board. So we already have all three elements. He is a U.S. citizen, he traveled and he sure did engage in illicit sexual conduct by buying it in many, many, many different ways. These are just some of the examples.

Now, when you go back to deliberate, Judge Fischer is going to give you a verdict form, and the verdict form is going to look something like this. You see the form on the left? The verdict form lists each of the victims and they are listed both by their initials that are in the Indictment and by their name. And I'm going to go through with you the verdict form and go

through each victim and talk about each victim in the same order in which she came in and testified.

So we are going to start with T.C.xx. That's a photograph of T.C.xx. T.C.xx was the first girl. She came in the first Friday that we were in trial. T.C.xx told you that right now she's 15 years old. She was in the defendant's house around Valentine's day two years ago. That's Valentine's day in 2006. That means she was no more than 13 years old at the time that she was with the defendant. And T.C.xx told you that she comes from a family of eight children, three brothers and four sisters. Her dad is a construction laborer and her mom sells baked goods.

And remember she talked about these photographs? You see her in these photographs, and she is smiling. Remember what she said? She said she was smiling because the defendant told her to smile. And remember -- and we asked, how did he tell you to smile because she doesn't speak English and he doesn't speak Khmer, and remember she went like this? She pulled her face up.

This happens to be a picture of the defendant looking at L.K.xxx, Government's Exhibit 1310, but that's what he's doing. He is going like this. He is making sure that those girls smile when he takes their picture. He wants them to look happy in the photographs. And how many times during this trial have we heard were you happy, were you happy, look, you look happy in this photograph. Yeah. He is telling them be sure you

put a big smile on your face when I take your picture.

T.C.xx told you she was not happy. She did not want to smile. She smiled because she was scared, she was afraid he was going to hurt her. He had hit her. He had hit other children. She was scared.

What else did T.C.xx tell you? In the photograph she is holding a rose. And she testified that it was Valentine's day. In fact, the first Valentine's day that she ever celebrated, the first Valentine's day anybody had ever given her flowers. And that photograph of T.C.xx was recovered in a folder on defendant's computer media that was labeled Valentine Girls. Mr. Pixley told you there were a lot of folders on the defendant's computer media and he had given them different names. Valentine Girls contained the photograph of T.C.xx, and Government's Exhibits 1397 through 1403, those are photographs of T.C.xx that comes from the Valentine's Girls folder that was on one of the defendant's computer disks. Those photographs corroborate T.C.xx, both that she was in the house and that she remembered exactly when that was.

What else? Of course, T.C.xx told you what the defendant did to her. He put a pill in her soft drink. He took off her clothes. He was naked. She was naked. She said she started to feel really groggy, the effects of the medication. She -- he tied. Remember, he ties. He held her arms up, he tied her arms and he tied her legs apart. Pulled them apart to

the bed posts. What did she say? He used a white rope to tie her. What was found in the defendant's bedroom? White rope. He tied her wrists to the bed, he tied her legs to the bed, and he raped her until she bled, and she said she screamed and no one came to help her.

The evidence corroborates, it confirms that what she told you is what happened to her. She said he put a pill in her soft drink and it made her drowsy. You know from the search warrant and from the experts who testified they took a pharmacy of sedatives out of the defendant's house during that search warrant.

The defendant gave that girl enough sedative to make her feel groggy, to make her weak, to make her unable to resist, and he tied her with a white rope. What corroborates that? Well, you have, remember, the letter that he wrote to his own family admitting that he tied up L.K.xxx. So you know he -- he's -- he's admitted to tying up other girls, and the photographs found on his computer show what does he do, he ties girls to his bed.

This photograph came from a CD that was in the defendant's office. It's Government's Exhibit 1455. It's from a series that was labeled Ni, N-I. It was obviously taken in defendant's bedroom. That's his headboard. And remember when Dr. Berkowitz, the pediatrician came in, she testified that this girl is no more than 17 years old, probably 15.

So back to T.C.xx. Yeah, the evidence backs up what she told you, the physical evidence, the drugs, his own admission to tying girls up.

And what else did T.C.xx say? He did not stop with one rape. T.C.xx said he raped her three more times while she was in the house and she told you the second time, the third time, and the fourth time he did not tie her arms and legs. He raped her, but he didn't tie her up. And there are a couple of things that are significant about the fact that she said -- she described for you in graphic detail what he did the first time and then the second and the third and the fourth time. He didn't tie her up.

First this is his modus operandi. This is the way he works. Okay. The first time he gets submission by restraining. He drugs, he ties the girl up, he gets that girl to submit to what he wants. The first time.

After that he just gets submission through sheer fear. She knows what is going to happen if she doesn't submit so out of fear, she's so scared she submits. And how do we know that's true? Well, there is another email. The defendant wrote this email to a friend of his and he talks about "the first time was a bit of a bother, but after we had a break-through, everything was fine." He's talking about his sexual contact with a minor girl. "After we had a break-through." After he drugged her and tied her up and got her to submit, everything was fine.

Remember what T.C.xx said in response to the question how did you feel after the first rape? And she cried and she said despair. Despair. "The sweet young things I have with me are submissive. I have had a break-through."

This young girl takes the stand, 15 years old now, 13 at the time, and tells you despair. That's exactly -- that despair, ladies and gentlemen, is exactly what he wanted to bring about in these girls. Despair so they would just submit.

Another thing to keep in mind about T.C.xx telling you that she was drugged and tied up the first time and then later on wasn't. The Defense is claiming that the people who interviewed these girls have programmed them to lie and to exaggerate. And we would submit to you if the Vietnamese interpreter who interpreted the interview with T.C.xx or Special Agent Taekuk Cho, the man who came in last week and told you he had interviewed T.C.xx last week -- if they had programmed her to lie and exaggerate, why not just tell her to say the same thing happened all four times? Why not make it really easy for her to remember? Why have her say no, no, different things happened at different times?

Why? Because, ladies and gentlemen, she wasn't programmed. We submit to you, as the evidence showed, she was simply telling you what he did to her. And of course, as you heard over and over and over in this trial, he made T.C.xx perform oral sex on him. T.C.xx testified that she did, L.K.xxx

did it, S.R.xxx did it, S.S.xxx did it and another girl named Ngoc. They all had to give him massages and they all had to perform oral sex on him. More than once when T.C.xx was there. Oh, and don't forget Basang's testimony. She showed them how to do it. She showed them on him how to do it the way he liked it.

And of course, T.C.xx testified a dollar every time she was raped, a dollar every time she performed oral sex on him and on top of that, he gave her money to buy clothes and he gave her money to go buy Valentine flowers for him.

So when you go back to that verdict form and you decide whether or not he is guilty of illicit sexual conduct with T.C.xx, you have to go down and check what applies. Commercial sex acts applies in spades. Rendering another person under 18 -- that would be T.C.xx -- unconscious with drugs and then having a sexual act with her, yep, that one applies. The third one, knowingly administering to someone under 18 a drug and impairing their ability to appraise or control their conduct, that one applies. And knowingly engaging in a sexual act with someone who is between 12 and 16, that one applies.

Defendant pretty much runs the gamut when it comes to the sexual conduct that he engaged in with T.C.xx. There is no question that you can check the box straight down the verdict form on T.C.xx.

The second girl who came in and testified was L.K.xxx. What you have in front of you is the verdict form on L.K.xxx.

And that's the photograph of her that was taken on June 17th of 2006 when the Cambodian National Police came to the defendant's house to execute the search warrant. She was there. Remember, she was living there straight up until the time the police came and did the search warrant.

L.K.xxx told you that she was born in 1993. Remember, she said she saw her family book and that her birthday is in June. So she's 14 now, almost 15. When she was at the defendant's house, she was no more than 12 years old. And you remember Dr. Berkowitz, the pediatrician who came in and testified, she saw -- she looked at some of the pictures of naked girls in this case. And as you know, we have naked pictures of L.K.xxx from the defendant's computer.

Dr. Berkowitz told you that she's examined between 50 and 60,000 children over the course of her career as a pediatrician. She said L.K.xxx in those pictures had not even started to go through puberty. She thought L.K.xxx was 10. 10 years old. We asked her 12. She said maybe 12. Maybe 12.

And what did L.K.xxx have to say?

She told you a little bit about her family. Government's Exhibit 2093 is the house where she lived. And you also heard from L.K.xxx's mother, Ly Kim Eng, the second deposition that was played, the lady who talked about coming in and cleaning the house. Claiming not to know what was going on. That's L.K.xxx's mother. That's where L.K.xxx's mother and

L.K.xxx lived when they weren't at the defendant's house.

L.K.xxx said that the defendant and Basang gave her a soft drink that had medication in it that made her sleepy. Again, remember the pharmacy of sedatives that came out of defendant's house. The defendant took off her clothes and he tied her. And remember what she said? She begged him not to do it. She said, "Please, let me clean your house. Just don't rape me." Remember what she said? He tied her wrists and he tied her ankles and then he lifted up her legs and he raped her. And she screamed. He slapped her until she stopped screaming. And if you remember what Basang said about L.K.xxx, that girl screamed and screamed. L.K.xxx told you she passed out. Remember, she said she woke up to pain on -- pain in her vagina and blood all over the bed.

And L.K.xxx told you that he tied her up with strips of cloth with slip knots on the end of it. This came out of the closet in defendant's bedroom in his house in Phnom Penh where he raped L.K.xxx. So that is the first of many, many, many items of evidence in this case that corroborate, that confirm what L.K.xxx told you.

Let's go back to the letter. He admits that he tied her up. There is some rationalization in here that somehow this 10-year-old girl wanted to be tied up and raped. This letter is about L.K.xxx. He admits he tied her up. He admits he hit her. He admits this is how it started. He thinks that she never had

any problems, she seemed happy most of the time.

Remember the cross-examination of L.K.xxx? That girl was quizzed on the witness stand for two hours about exactly when she was first raped, exactly how many times she was first raped. Was it the first day she was there? Was it the first week that she was there? Was it the first month that she was there? He admits he did it. He admits that he did it.

The second time he raped had her, L.K.xxx testified he did not tie her up. He pinned her wrists down and he raped her. He did put a pillow over her face because, again, she screamed and she said it hurt. But then remember what she said after that? "I had no energy to fight back."

Despair from T.C.xx. "I had no energy to fight back." How many times did this happen? More than 20? Every day? Two to three times a week? She lived in that house for over six months. Think about anything that happens in your life that you do every day or a couple of times a week.

Do you remember exactly how many times it happened? She is a -- was a 12-year-old girl from a Third World country with no education. Not surprisingly, she did not keep a diary of each and every time that she was called up to that bedroom and raped. That does not mean that it didn't happen. And, of course, like all of the other girls, she was required to perform oral sex. Remember his letter. At some point the girls would do the massage thing. Later this turned into inappropriate

touching, etc. And L.K.xxx told you of after the massage, defendant had her perform oral sex. More oral sex than rapes.

And what else did L.K.xxx tell you about the oral sex? She told you he has a growth by his private part, a small growth. What color is it? Skin color. And, remember, she held up her hand and said it's about a quarter of an inch. That growth that she's talking about, it's there. There is -- there is no issue. Look at the picture. This photograph, if you -- corroborates L.K.xxx's testimony.

Who else performed the massage and the oral sex? S.R.xxx, her sister S.S.xxx, T.C.xx, I.T.. L.K.xxx told you sometimes she sucked while the other girls watched and massaged. Sometimes she watched while the other girls had their turn. She saw S.R.xxx do it, she saw S.S.xxx do it, she saw T.C.xx do it. She corroborates what T.C.xx and S.R.xxx told you, and, of course, like the other girls, a dollar for a rape, a dollar for oral sex.

But that doesn't even begin to cover the evidence that corroborates L.K.xxx. Remember, she testified that the defendant took photographs of her naked, more than once. She said it was in her bedroom and it was in his bedroom and it was in the bathroom. And remember her reaction? She was so humiliated she did not want him to take the photographs. At the time we put in front of her a redacted photo, it didn't show her naked, and asked her -- and we didn't publish it to you guys at

the time, and said, "Is this you?" And she said, "Yes." And it starts with Government's Exhibit No. 1311 is the first in the series.

The defendant, she testified that he took this photograph. You can go to the next one. He told her to smile. He took this whole series of photographs. That's L.K.xxx on the left and the other girl's name is Ngoc. And L.K.xxx told you that she is smiling, she was not happy. First he showed her what to do by pulling her cheeks. And then when she had this photograph in front of her, she said he positioned our legs. He came over and pushed our legs apart before he took the photograph of her on the bed.

Obviously the photographs that are on the defendant's computer media corroborate, they confirm for you what L.K.xxx said. Mr. Pixley when he was here, the computer expert, he told you about these pictures. He told you they were taken with that Minolta DImage camera. Mr. Pixley explained to you what did the defendant do? He took the pictures. Did he delete them right off his camera? Nope. He took the pictures to his office and he connected the camera to his computer.

Can we go to the next set. He created a photo album on his computer called Nap and LKx. Remember, LKx is one of the two nicknames that he had. He called L.K.xxx either LKx or L.K.xxxxx. So he created this album. He called it Nap and LKx 2. That's because he already had a photo album on his

computer called Nap and LKx 1. And then he moved all the photographs from his camera to his computer. And then Mr. Pixley told you five minutes later, he deleted five of those photographs right away. Five minutes later. Which five? They're the five that are on this PowerPoint in red.

The five photographs that he deleted are the five of him naked. The fact that he immediately deleted the photos that directly incriminate him show his own consciousness of his own guilt. He knows it's a really bad idea to have a photograph of himself naked, a photograph of his erect penis next to his naked child victim in his bedroom. So he deleted -- five minutes after he got them on the computer, he deleted the ones of himself naked. Not the ones of the girls naked, the ones of himself. The ones of L.K.xxx and Nap with their legs spread he moved on to a CD. And by the way, remember L.K.xxx said he took photographs of her naked in his bedroom and in the bathroom. That's the end of that series.

So he moved them from the camera to the computer and then from the computer to the CD and then he wrote the name of the album, Nap and LKx, on the CD insert. And that's Government's Exhibit 1286. The Cambodian National Police found that CD when they searched his house.

And then later on, he deleted these images from the CD. And of course, the Defense has made much of the fact that they were then deleted from the CD. Well, ladies and gentlemen,

the fact that he later deleted them does not mean that these photographs never existed. He took these photographs. He took these photographs of L.K.xxx. She was naked in his bedroom. He made her smile and he posed her. He cannot delete that fact. Nor can he delete the harm that he did to that 12-year-old girl by taking these pictures. The fact that he can delete the pictures doesn't change, doesn't delete the fact, the evidence that he raped her.

And there is more, hard as it is really to stomach. These were not the only photographs that he took of L.K.xxx naked. Remember, she said he took pictures of her naked in his bedroom, he took pictures of her naked in the bathroom and he took pictures of her naked, she said, in her bedroom. Well, another exhibit that we showed to L.K.xxx but we didn't -- and moved into evidence but we didn't publish to you at the time is this exhibit. It's Government Exhibit No. 2086. These are thumbnail images. Remember, Mr. Pixley told you those are the little two-inch-by-two-inch images. And they're redacted so that we weren't showing her a naked picture of herself.

But L.K.xxx looked at these pictures and she said yes, -- very emotionally, yes, that's me. Well, the entire series Mr. Pixley found and he showed you, the entire series is Government's Exhibit 2101 and it shows L.K.xxx posed naked on a chair and on the bed. Only the thumbnails were left on the defendant's hard drive, which means that at least on the

computer media that was found by the Cambodian National Police and turned over to the U.S. authorities the large pictures are gone. But the thumbnails are still there.

But the fact it was deleted doesn't change the fact that he made a 12-year-old girl take off her school uniform, pose naked on her bed with her legs spread for 30 photographs and then pose also sorts of different ways on a chair for 28 more photographs, all naked.

And, of course, in addition to all of this corroborating evidence, remember the testimony of the first witness in the case, Dr. Watson, the doctor who examined L.K.xxx right after she was rescued from the defendant's house. Her description was that L.K.xxx had a gaping vagina, the vagina of an adult woman. Why? Because of repeated penetration.

So when faced with overwhelming evidence, Dr. Watson's finding, all the photographs of her naked, the Defense cross-examined this girl by quizzing her about exactly when did the rapes start, exactly how many times, trying to humiliate her further by pointing out the fact that, yes, her mother was in the house at the same time that the defendant was raping her. A fact that she did not want to admit. A fact that her own mother can't even admit. The pictures of her naked with the defendant are in November of 2005, and according to her mother, her mother was staying in the bedroom downstairs at that time. Her mother was cleaning house.

Defendant says in the letter, "L.K.xxx's mother was giving her to me in a status between wife and girlfriend." And so the Defense quizzes her on just exactly what it is that her mother knew about really the most shameful, horrible things that have happened to her. And they cross-examined her by suggesting that she has somehow made up this story so that she can stay at the shelter where she is now.

Yeah. She didn't make up the photographs of his erect penis. She didn't make the thumbnails. She didn't make up the rope. She didn't make up defendant's letter. She didn't make up Dr. Watson's conclusion, nor did she make up the photographs that corroborate what she said.

Remember, the photographs of Ni tied up on the bed. That's defendant's bed, defendant's bedroom, same cloth, same bedroom, same bed, same computer media, same MO. This is what he does and this is what he did to L.K.xxx.

So going back to the verdict form, if you'd look, it's just like T.C.xx, you can go down the list on the left and check off every box. Commercial, yeah. On top of the money that she got for the oral sex and for the rapes, he gave her mother a job until he kicked her mother out of the house.

Oh, and he gave L.K.xxx an education, which, as you'll see, if you look at the physical evidence, there are lots and lots of school books that were taken out of the defendant's house. Virtually all of them are filled with her homework. You

can see. That girl is so desperate to get an education, to go to school, to not end up like her mother selling vegetables in the market, living in a shack with no running water. Remember what her mother said, when it rains, the mud pours through the house. She is so desperate to raise her out of those circumstances and to get an education, that she put up with all of this. But you'll see many, many, many of the books that came out of his house are from L.K.xxx.

Anything of value. Anything of value in exchange for sex. Clearly the education applies. Rendering her unconscious. Yeah. He drugged her and slapped her the first time and then, as is his MO, got her submission and didn't need to do it after that. Everything straight down the line applies on the verdict form to L.K.xxx.

After L.K.xxx, the third girl who came was NTDx. And that's a photograph of NTDx. Remember, she identified herself. She is lying on the couch in the living room at the defendant's house. Government's Exhibit 1159 is a picture of the house that she shares with her family. You can see the difference between her family house and the defendant's house. She told you that she is 14 years old now. So two years ago in the spring of 2006 when she was at defendant's house, NTDx was 12 years old.

She said that she was at defendant's house, she told you it was around the New Year holiday. That's actually corroborated. The Cambodian new year is in April. And that

photograph of her was on the defendant's computer media in a folder that was labeled New Years Girls. And the date of this photo, remember Mr. Pixley said to figure out the dates, you have to add 185 days. The defendant's camera was off by 185 days. When you figure out the date on this photo, it's taken April 17th, 2006, that's right around the Cambodian New Year.

What did NTDx say about her time at the defendant's house? She said she saw clothes there that showed -- clothes and books and stuffed animals showed that other girls lived at the house but the other girls were not there when she was there. The only other girl who was there is the other girl who is pictured in that photograph, Ty Lynn. That's not L.K.xxx, that's not S.R.xxx, that's not S.S.xxx, that's not I.T.. there were no other girls in the house.

Remember the deposition testimony of L.K.xxx's mother, Ly Kim Eng. She said she took half a month off at the New Year and she took her daughter home. It was the New Year holiday. The other girls, his regular girls went home, went home with their parents. They were out of the house.

So what did he do? Well, he can't go for even one week without raping a little girl, so he called Basang and he had Basang purchase NTDx to come in for a week. And if you look at that email, Government's Exhibit 2010, he talks about this. It's an email that's written May 14th of 2006. Remember the picture of her is taken in mid April of 2006.

And in this email he talks about how the girl -- the girls in this -- "the girls were here over the holiday. The one with the toothy grin was a fresh one. NTDx had never been there before. The first day she was a bit of a bother, but we had a break-through. Then everything was great. The other one did not look so great, but she had a great body. I brought her along for company. You know how these people are."

This is written three weeks after the Cambodian New Year, talking about the girls that he had at his house over the New year. This is the break-through that he was talking about.

And what did NTDx tell you about what happened? Remember, she testified he used rope to tie her hands and to tie had her legs and she screamed. He had hit her across the face with his open hand. We asked her if she recognized anything in this bag, and remember what she held up? She held up the tape and said he put this over her mouth to keep her quiet. And he put a pillow on top of her face, and she thought that she was going to suffocate. And she said how she was tied, right hand to right leg, left hand to left leg. Look familiar? Look at the picture of Ni taken in the defendant's bedroom on his bed. Same way.

NTDx struggled. She screamed, and then according to her, she told you she submitted. And according to the email that he sent in May of 2006, he -- he confirms she submitted. She told you that she was at the defendant's house for a week

and that he raped her many times during that week but that after the first time, she didn't struggle. She also said he didn't require her to perform oral sex on him. If she was coached, why not coach her to tell the same story? She said no, no oral sex. She was there for only a week, apparently. Basang didn't bother to teach her what to do. She was only there for a limited period of time.

He brought her in, he raped her, and then he just threw her back into the slums of Phnom Penh, like a used gum wrapper, tossed her out. Remember, she identified Basang. She knew Basang as Ms. Kia. She had met Basang at the market. Basang came to her house, picked her up, put her on the back of the motor bike, drove her to defendant's house. At the end of the week, picked her up, took her home. Defendant didn't even give the money directly to NTDx. Defendant gave the money to Basang, and Basang took the money back.

Basang had talked to NTDx's mother before Basang had even picked her up. And, remember, Basang is the one who has her rent paid every month by the defendant for bringing him girls, preferably girls -- small girls between the ages of 13 and 14, if not younger.

So when you have that verdict form on NTDx, you have got the commercial sex act, you have the force, and you have engaging in a sex act with a 12-year-old girl. Same thing, you can check the boxes straight down the column with NTDx.

The next girl who came in and testified was I.T.. I.T. told you that she is 13 years old now and that she was at defendant's house in the spring, right around this time actually two years ago. So I.T. was 11.

We showed you Government's Exhibit 1158. This is the building that I.T.'s family shares with eight other families. Her grandmother and her uncle live there and her father. And her father sells ice cream to support the family. One of the ladies in the neighborhood managed to hook I.T. up with Basang and so I.T. ended up at defendant's house. And I.T. told you that the defendant raped her twice. She also told you that she screamed and complained and didn't like it. This girl told you that she was not very submissive. And what happened to her?

Well, the first time she was in defendant's bedroom, he handed a pill to Basang. Basang put the pill in a glass of water and gave it to I.T.. remember, of course, the pharmacy of sedatives in defendant's house. She began to feel sleepy. He put her on the bed, he got out the ropes, he tied her wrists, he tied her ankles and then he looped it together, hog tying her. He blindfolded her and he gagged her. And she said what happened? She passed out. When she woke up, she was bleeding, bleeding from the mouth, and she had pain in her vagina. Again, tying up girls, it's what he does.

I.T. told you he raped her a second time, also in his bedroom. He told Basang to make I.T. take a shower, and she

said he did not touch her in the shower. When she got out of the shower, he put some cream on her vagina, and remember, she looked at the photograph and identified the KJ jelly. There is a photograph. And as you know, KY was found in the defendant's bedroom.

I.T. said the second time he pinned her down but he didn't tie her. Again, if they're programmed, why not just have her say she was bound, gagged and tied the second time as well as the first? And again this is consistent with his MO. He had a break-through with I.T. the first time. I.T., like the other girls, also testified about the oral sex. L.K.xxx, S.R.xxx, S.S.xxx performed oral sex on the defendant and the massages during a one-week period. He had her come to his room. He had her perform oral sex, she said, almost every day.

The letter that he wrote about L.K.xxx, the sexual massages, corroborate I.T. as well as the other girls.

Basang brought I.T. over to the defendant's house. I.T. thought she was going to be sent to school, and I.T. identified Basang.

I.T. also recognized the house and, if you remember from the interview, she also talked about a fish. And when asked what do you mean a fish in the house? Are there fish there. She said no, a carved fish. And, in fact, there was a wooden carved fish in the defendant's house.

The photographs that are taken of I.T. show that she

was at the defendant's house as early as April of 2006 and she was there through at least May 20th of 2006, based on the dates on the Government exhibits. If you look at Government's Exhibits 1341 and 1356, Mr. Pixley did that chart where he correlated all the dates of all the exhibits, and essentially it puts I.T. in the house in between April 21st and May 20th of 2006.

Defendant was taking her photograph during that time. She was performing oral sex on him. She said Basang taught her how to do it. Basang showed her how to do it. And she said that the defendant did to her what he did to the other girls, tied up and raped.

Now, the Defense has made a very big deal out of the identification, or misidentification. On June 16th, which was the day before the search warrant, special Agent Phillips interviewed I.T.. remember, I.T. had been kicked out of the house. She had come to the attention of law enforcement and law enforcement was investigating based on what I.T. had said. So the day before the search warrant, he interviewed her to find out where it happened, when it happened and who had done it.

And the only photograph he had of the defendant at the time was a photograph from 1986, a 20-year-old photograph. That's the photograph on the left. It's Government's Exhibit 2085. What did the defendant like look in May of 2006? Well, we know because he had his photograph taken with Khieu San

and Khieu San's wife at the plowing ceremony. Remember yesterday Khieu San said it was in May of 2006.

If you look at that photograph from May of 2006, defendant had gray hair. He hadn't died his hair black at the time anyway. The man that was raping I.T., the man that was having I.T. perform oral sex on him is the man -- is the defendant on the right with gray hair.

And she looked at the 20-year-old photograph of him with a mustache on the left and said, "No, that's not him." Well, that tells you a couple of things. One, it tells you she didn't let the agents talk her in to identifying anybody, which flies in the face of the claim that all of these girls were railroaded.

And No. 2, put it in context. She was in the house for a month. He was taking her picture for a month. Basang brought her there. Basang -- she was getting the money, a dollar for oral sex. This was not a one-time rape. And she was looking at a bunch of pictures and trying to identify somebody.

There was a lot more evidence. All the corroborating evidence in this case tells you that I.T. was in that house, being required to perform oral sex on him and being raped twice, as she told you, by him. And that is simply not undercut by the fact that she looked at a 20-year-old photograph of the defendant with a mustache and said, "No, I don't think so."

And remember what she said? His hair is lighter. You

know what? She was right. His hair was lighter. You can see it in the photograph from the plowing ceremony.

And there is one more piece of evidence that tells you, that corroborates I.T., that confirms. On June 3rd of 2006, which would be just after I.T. had left the house, the defendant wrote an email to his friend Mack, the same one that he talked about the sweet young things with the great attitudes. And he says at the bottom, it's highlighted, "There has been some problems related to a fresh one. I dare not put it all in writing so I will have to save that story for when we meet. Mack, remember do not be talking about our activities to anyone. Not even your brother."

"There have been some problems related to a fresh one." That fresh one would be I.T.. and he did have a problem with her because when he threw her back, she didn't just disappear into the slums of Phnom Penh; she came to the attention of law enforcement.

After I.T. testified -- oh, let's go back to the verdict form. I.T. is Count 1. That's first. And if you go down the verdict form, again, commercial sex act, force, drugs, it's all there. It's the same. You can check the box straight down the left-hand column on I.T..

The next girl who testified was K.S.x. K.S.x told you that she was -- she is 14 years old. When she was at the defendant's house, which was way back in the fall of 2005, this

girl was at most 12 years old. And you know she comes from a very poor family. Her mother supports the family by selling fruit in a market in Phnom Penh and her dad is unemployed. Her family could not afford to send her to school. She had to stay home and take care of a younger sibling.

And you remember K.S.x, you remember her demeanor in court. This is clearly a very traumatized girl. What do we know about K.S.x? She was obviously at defendant's house, if you look at the series of photographs, 1301 through 1307. No doubt about that.

And K.S.x testified that Basang brought her to the defendant's house. Basang taught her how to perform oral sex on the defendant. And remember Basang told you, as to the girls that she brought in, she demonstrated what to do.

And K.S.x told you the defendant gave her a dollar every time she performed oral sex on him or, as she put it, "He put his private sex part into my private sex part."

And she told you that it happened three times. The first time he didn't fully penetrate her. The second and third time he did.

K.S.x also said he never drugged her and he never tied her up. And you, I think, can judge for yourselves why if you look at her demeanor. That girl didn't fight back at all. She submitted from the get-go. She told you she thought she was supposed to stay at defendant's house. At some point the

defendant left. She was alone at the house with the maid. She stayed there anyway. When he came back, he required her to perform oral sex.

How do we know that's true? Well, if you look at Mr. Pixley's timeline, the pictures of K.S.x are from August of 2005. You know that he came to the United States, he was in the United States in late August. He flew back to Cambodia in early September of 2005. He came back to Cambodia and K.S.x was at his house and he raped her and he made her perform oral sex. If you look at the dates in Mr. Pixley's timeline you can see she was there right before he came to the United States. She told you he left and then he came back.

"After he came back were you required to engage in sex acts."

"Yes."

What else did K.S.x tell you? She said that her mom took her to the hospital after she left the defendant's house. Why? In K.S.x's words, it was so that they could sew her bottom. Remember what Dr. Watson told you about K.S.x? Wide vaginal opening. Evidence of previous trauma with splitting and healing of vaginal skin just inside the opening.

Really traumatized. She came to court. She told you what happened to her, the medical evidence. And the photographs clearly put that girl in his house. And if you look at the verdict form on her, commercial sex act and knowingly engaging

in a sex act with a young girl, it's tailored to fit exactly what it is that he did to her.

And finally, the last girl who came in here and who testified and who was cross-examined for a very long time was S.R.xxx. And you know how old S.R.xxx is because the second day that she testified she told you was her 12th birthday. She was celebrating her 12th birthday. So two years ago when she was in the defendant's house, she was nine, going on ten.

S.R.xxx told you that the defendant didn't even call her by her name. He didn't even call her S.R.xxx. He had a nickname for her. He called her Smaling. And if you listen in that deposition of Basang, Basang talks about Smaling and she points out, when she looks at the pictures, she is pointing at Smaling, Smiling, Smeling -- that's S.R.xxx.

S.R.xxx told you and S.R.xxx's mother, Kumlang, testified that the family house burned down shortly before the defendant generously, as Kumlang and others said over and over and over again, took S.R.xxx and S.S.xxx into her house.

And what did S.R.xxx tell you about the sex acts? She had been in defendant's bedroom many, many times, and at age nine, ten, she was naked, remember? Said how did you get naked? What happened? Sometimes the defendant took her clothes off for her. L.K.xxx was naked. S.S.xxx was naked. And Basang showed them all how to perform oral sex on the defendant.

And she told you sometimes the semen went into her

mouth. It tasted fishy. She went into the bathroom, she spit it out, and then she brushed her teeth. And, of course, she got a dollar every time she performed oral sex.

She also told you he never put his penis into her vagina. Oral sex. He did put his tongue all over her body, and she told you how that felt. She described how she had to sit naked on his face while he licked her. And she said it was very painful and she was embarrassed and she really didn't know whether she could tell him to stop. And he paid her for the oral sex. He paid her mother. You heard her mother. $30 per month per girl.

What else did S.R.xxx tell you? S.R.xxx also identified the mark on defendant's leg. Remember, she held up her little finger and she said it was this much, just this much, a little reddish mark at the end of her pinkie. And she said it was on the defendant's inner thigh. And remember on cross-examination Defense counsel kept pointing at his outer thigh and saying it was here, it was here, and she said no. She remembers very, very well exactly where that mark was on the defendant. And you saw the tape played, and on the tape she stood up and she showed the agents. She told the agents he's fat and he has a mark on his leg.

She spent six months with her head between his legs. She is 11 years old. What does she remember about him? She remembers about him what she saw. She was cross-examined about

this and said, "You're laughing. You're laughing on that tape when you're talking." And did you see the look on her face? She said she wasn't laughing. She said, "I was so ashamed. I was so ashamed."

And she's in picture after picture after picture at the defendant's house. He paid for her school. He paid her mother. He brought Christmas gifts. He paid for her clothes. Her mother bought a motorcycle with the money.

So as to S.R.xxx on the verdict form, you've got commercial sex, you've got oral sex, no question at all about that.

And finally, ladies and gentlemen, S.R.xxx's sister is S.S.xxx. S.S.xxx did not testify. That's her picture. It's Government's Exhibit 1392, and there are lots and lots of other pictures in this case that show S.S.xxx. She didn't testify, but there is plenty of evidence to convict defendant of engaging in illicit sexual conduct with S.S.xxx.

Remember, S.R.xxx said S.S.xxx is a year older than she is, so that means now she's 13. So two years ago she was 11.

L.K.xxx, T.C.xx and I.T. all testified that S.S.xxx performed oral sex on the defendant and, of course, Basang testified that she taught the girls how to do it. And you know the money that was paid to S.S.xxx's family in exchange for the sex. So as to the verdict form, commercial sex and oral sex

apply with equal force to S.S.xxx as they do to her sister, S.R.xxx.

That's all the girls. The mountain of evidence that corroborates them of course includes what you heard, lots and lots and lots of testimony about which is the fleshy growth on the defendant's thigh, the mole, the mark, whatever you want to call it.

What do we take away from all that testimony? One, it was there. The photographs show it. It was there in the summer of 2006. The pictures show it. Special Agent Phillips testified that on July 6th, which was after he had interviewed L.K.xxx and after he had interviewed S.R.xxx -- not before, after -- he saw the mole on the defendant's thigh and that now there is a scar. Whatever happened to it, whatever he did to it or didn't do to it, there is a scar there now. It was -- it was there.

Illicit sexual conduct, commercial sexual act, I submit to you, ladies and gentlemen, we have that in spades.

The medical evidence, in addition, is just summarized for you. The medical evidence, every girl who says that the defendant penetrated her with his penis is corroborated by Dr. Watson, the very first witness who testified. Seeing vaginal injury consistent with forced penetration. NTDx, no hymen visible. T.C.xx, no hymen visible, vaginal opening wide. And K.S.x I mentioned earlier.

So based with the mountain of corroboration, what is the Defense response? The Defense response is in some of the photographs that the defendant took of all these girls, these girls looked happy, and if they're happy, they're not being raped.

And, secondly, the interpreters asked the girls some leading questions; therefore, we can't trust anything about what the girls say. So let's take a quick look at those two responses by the Defense.

The Defense argument is essentially they appear happy in some of these pictures; therefore, defendant cannot have been the one who is sexually abusing them.

That's simply not true. Remember the second witness who testified, Special Agent Clemente from the FBI. He talked to you about grooming. He is an expert. But he had not examined any of the evidence in this case. He told you he doesn't know anything about this case. He is here as an expert just to display how sex offenders acquire victims and how sex offenders keep them compliant.

What Jim Clemente described for you the very first day of trial is exactly what the defendant did. He loved to take pictures of children. He loved to take pictures of the girls that were in his house, and essentially what he did is he documented his own grooming process. And grooming is simply how an offender gains sexual access, authority and control over a

child and then inhibits, prevents that child from moving forward and disclosing to the authorities. There is evidence of evidence of grooming in this case in spades.

Jim Clemente told you what lures do they use for children? Attention, affection and assets.

And assets, we only laid out some of the exhibits on the table. There is lots and lots of toys that came out of the defendant's house.

Attention, they're all dressed up. The party dresses. You can see the beautiful dresses that he got them. The Christmas presents. L.K.xxx's birthday party that you heard so much about from the Defense. Of course he is showering her with attention.

Affection, these are little girls from the slums of Cambodia who had absolutely nothing. Who came from families that were willing to give them up. And he took them into this home that compared to where they lived was an absolute palace. And he showered them. Monetarily with affection and with all sorts of presents. You can see them in all the photographs on the balconies. And what's interesting, if you look, ladies and gentlemen, even when they are surrounded by all of these wonderful things, they're not all smiling in every picture.

And I would encourage you to look particularly at the pictures of I.T. who resisted the defendant's efforts to groom her and is virtually never smiling when she is looking at the

camera, looking at the defendant. She may be smiling when she is looking at the other girls. But she sure is not smiling.

Jim Clemente told you poor kids are most at risk for grooming. Kids from intact families, families that can care for them, families who can provide for them? No. Children most at risk for grooming are children who come from poor families where this is very little parental support. He doesn't know about this case, but I'm sure if we ask him how about children that come from families that are absolutely more than willing to give them up. Some of these girls came almost pre-groomed to defendant's door.

And then, of course, Special Agent Clemente told you part of the grooming is building a relationship, not only with the child, but with the child's family. You gain the trust of the parent. You build a relationship with the parent. Where were these girls to go? Were they going to go back and tell their mother, gee, look what's going on?

He bought the mothers. He had the mothers over to his house for Christmas parties. And, of course, he exploited the victims' needs for attention and affection. Jim Clemente told you that's what groomers do. L.K.xxx at school. S.R.xxx and S.S.xxx and T.C.xx both in their beautiful birthday dresses. "My first birthday party ever, my first birthday presents ever, my first Christmas ever, my first Christmas presents ever, my first Valentine's Day ever." They all told you that.

He was very adept, as you heard from the Defense, at picking out needy children and satisfying their needs. You see them in their school uniforms. You heard from the girls the desperate desire for education. They're 11, 12, 13 years old. And they're only in the second, third, fourth grade. That's because they haven't had any education until they got to the centers where they are now. The defendant knew that. He knew that sending them to school was a weak point that he could exploit with the parents.

And he engaged in activities and held himself out to parents and the community as a person who is trustworthy around children. And this really goes to the Defense witnesses, who really have kind of confirmed the obvious, which is that the defendant has a very strong interest in poor children in Cambodia. We have heard over and over about his school supply distribution program. And we would submit to you it does confirm the obvious. That he is very strongly interested in children.

But it's more than that, ladies and gentlemen. What it does is it made his interest in children appear legitimate. All these important people in Cambodia would not question why he would have children around. And how do you think those kids felt seeing him with some of the most important people in Cambodia. What message did it send to them? The message that is sent to those kids is that he is a really important man. He

 knows really important people. You should just be quiet and submit. Because nobody is going to believe you. He had their world locked down. He bought the teachers at their school. He had the second in command in the school coming and tutoring them. Nobody at the school was going to believe them. He bought the parents, and he cooperated. He has got the former Prime Minister of Cambodia coming in here and testifying on his behalf. He locked these girls' world down. There was no place for these girls to go other than to stay at his house and submit.

And you heard from the tapes his very, very, very desperate attempts to get victims -- reunite the victims with their families, which is really ironic since he is the one who took them away from their families in the first place and brought them into his house. But he knows -- he knew that if he could get the victims away from the shelters and back with their families, they would not come to the United States. They would not testify. They would not tell you what he did to them.

Ladies and gentlemen, as you listen to Mr. Brown, keep in mind all of these facts, keep in mind all of this corroboration. As he talks to you about the Vietnamese interpreter who used bad language -- apparently using bad language is worse than actually raping the girls -- but who used bad language in front of the girls. And as he talks to you about the leading nature of the interviews and tries to persuade

you somehow that that means the defendant is not guilty, keep in mind the mountain of evidence that corroborates what the girls told you.

And I will speak with you very briefly after Mr. Brown does and I will ask you at that time to return verdicts of guilty on all seven counts of the Indictment for all seven of those girls.

Thank you.

THE COURT: Thank you.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case quite yet. It will be finally submitted to you soon. We will take our 15 minute break.

(Recess taken)

(Jury In)

THE COURT: Everyone is present.

Mr. Brown?

MR. BROWN: Thank you very much, Your Honor.

Defense Closing Argument

MR. BROWN: Good morning, ladies and gentlemen. We have come to the end of a long four week journey, and on behalf of Mr. Pepe and Mr. Gunn, we would like to thank you, first of all, for all of your attention in this case. I know at times the testimony was a little long and tedious, but we want to thank you for your attention.

There is no doubt that the allegations in this case are shocking and graphic and horrific. The allegations in this case are serious. And I think it's natural to want to empathize with the alleged victims in this case and it's natural to want to protect them. It's also easy to get swept up in the emotion of allegations like this. It's easy to get caught up in anger and snap judgments about what kind of person Mr. Pepe is. It's probably easy to conclude from what you have heard so far that you think he is a monster or a scumbag.

But in a case like this what is also required is the detached and reasoned judgment and the reasoned analysis of the facts. We ask that you not get caught up in the emotion of the allegations and look carefully at the Government's case.

As I said, these charges are serious and this is the kind of case that requires more judgment, more careful consideration of the evidence, more analysis, more careful critique of the Government's evidence. It's not as easy as checking a box in the Indictment. The Government has a high burden of proof in criminal cases for a reason. A person's liberty is at stake. A person's fundamental interests are at stake. And I think that the issues and the interests that are at stake in this case are exacerbated tremendously by the novel and unique nature of this extra-territorial prosecution.

If you look carefully at the Government's case, there is serious concern here. And we ask that you look carefully at

all the evidence. And I'm going to provide you with -- from our perspective, an umbrella or intellectual framework to kind of consider and weigh the problems with the Government's case.

There is three major areas of concern in this case. The first, as I touched on or alluded to, is the nature of the overseas investigation itself. The difficulty of -- that Mr. Pepe is placed in when he is accused of a crime that occurred thousands and thousands of miles away, and the difficulty of defending those kind of allegations. And that is unique to these charges.

The second area of concern is concern surrounding the testimony of the alleged victims. The Government highlighted some things that they thought proved their case, but they did not touch on some of the major, major inconsistencies that are present here. And we're going to talk about that.

The third major area of concern is the Government's theory of prosecution, and as I said, I think it's natural to want to empathize and reach out to protect the alleged victims in this case, but to infantilize them and say that they're from the scums of Cambodia without considering the larger context that this case arises in I think is a bit of an over-simplification. So we are going to talk about the problems with the Government's theory as well.

But back to the first heading, the concerns we have about the overseas prosecution. Mr. Gunn touched on this in his

cross-examination of Agent Phillips. What we have here is a semi-joint investigation with U.S. law enforcement and numerous officials from the Cambodian National Police. And it appears that from the beginning, there was at best a staging of crucial pieces of evidence here. At worst we have the planting of evidence.

This is again exacerbated because the rules of the game are a little bit different in Cambodia than they are in the United States. There is not the kind of judicial oversight that we have here of a law enforcement investigation, the concepts that we take for granted, Miranda, search and seizure, the Fourth Amendment. These bedrock concepts that we take for granted don't even exist in Cambodia. The concepts don't even exist.

We're talking about a Third World country that's not too far removed from a brutal genocide. Their legal infrastructure is just not the same that we have here. So we have -- we have the problems with distant oversight and there is no accountability really.

The Cambodian National Police is not accountable to the judge in this courtroom. So I think we really need to look at that and look at how this case began and the kind of investigative techniques that were used. And it -- it was sloppy. The house was not sealed probably. We have gross contamination of important forensic computer evidence. And like

I said, can we really trust the investigation that occurred thousands and thousands of miles away with a Third World police force.

First, I would like to talk about the staging of evidence. Remember in opening statement the prosecution referred to the bag of rope and tape as the so-called rape kit, Mr. Pepe's rape kit. Remember how she argued that in her opening statement.

And do you remember Government Exhibit 1057 where there is a photo of some panties next to some KY jelly. I think the staging of the evidence in this case is serious, serious cause for concern and I want to show you some examples of that.

Again, this is -- this sample is talking about the Government's so-called rape kit and let's see how the rape kit was really created.

(Video played for the jury)

MR. BROWN: What we have here is the investigating officers throwing items on a bed, cross-contaminating what they say they found in the closet with a condom, KY jelly and other lubricants from a totally different source. This is how the rape kit that the prosecutor referred to in opening statement was manufactured. And remember when Agent Phillips brought out this bag of evidence and testified that inside this bag was a wire. In addition to the rope and the tape and the jelly and the condoms, there was wire. Remember how dramatic that was

when he pulled the wire out of the bag.

First of all, there is no wire in the frame in the video sample that we're showing you. There are some stills from that same clip. No wire there. No wire there. We see the KY jelly and the condoms already on the bed. This is the photograph that was staged by the investigators. Here is a close-up photo of the bag. Again in this sample there is no wire.

In the second photo there's suddenly a red box appears of some drug. I think Mr. Gunn talked about that during his cross-examination.

This is the same bag in another photo with condoms and pills. This is the kind of evidence that really calls into question what is going on in Cambodia miles and miles way from home, miles and miles away from the Constitution. This type of staging of evidence would not happen here in the United States hopefully. But here we have it in color, in -- with video footage, government officials creating, manufacturing a rape kit with ordinary household items and putting innocuous items that individually might not appear incriminating into a bag to somehow create the illusion that something really, really horrific was going on. The condom wasn't in the bag. The pills weren't in the bag.

If the Government's case is as strong as they profess in their closing, then why are they doing this with the

evidence. That is a serious, serious concern.

As I stated, Agent Phillips claims that he -- during the trial, pulled a wire out of the same -- very same bag. There is no evidence of a wire. Where did it come from and why is it here in court. Why is it here to inflame your passions as a jury. If the evidence is as bad as the Government says, why in the world do they need to pull these kind of magic tricks. Why are they gilding a lily here if the evidence is as strong and reliable as they want you to believe.

Again with respect to the distant oversight and no accountability, remember the timing of the search in this case. Agent Phillips and the Cambodian National Police arrived at Mr. Pepe's house on June 17th. There was supposed to be a second search the next day on June 18th, but the Cambodian National Police did not show up so Agent Phillips and other people are at the house waiting with members from these non-governmental organizations.

The next day, the 19th, is when the search resumes but in the meantime, in this intervening day when the house itself is supposed to be sealed to protect the integrity of the evidence, this is what we see. If you look at the green arrows in this photo, you have the property seal on the top window or door. On the bottom we see the seal on the door. But if you look to the right -- I put my mouse over the red arrow -- the door to the house is wide open, ladies and gentlemen. That --

 that raises some concerns, that raises doubt about the quality and the integrity of the evidence that's been presented to you in court. We don't know what happened with that open door. But we know the people were there.

We have already seen one piece of evidence being staged and manufactured. There is another open door, another unsealed door to the house. Again another unsealed door. Somebody had access to this house before the search was completed. It really calls into question the physical evidence that we have here.

But in addition to the physical evidence, we also have the forensic evidence that has been contaminated. Do you recall when Mr. Pixley testified on direct examination that the first rule of computer forensics was to cause no harm. That was the first rule of computer forensics and those were his words on direct examination, cause no harm.

But when we -- when Mr. Gunn questioned him and we learned that someone somewhere had access to the thumb drive. Someone was putting files, after the thumb drive had been seized, onto the thumb drive. We have a photograph of Mr. Pepe which Agent Galante confirmed was added on June 23rd. Mr. Pixley stated that a photo was somehow deleted, added, and deleted before the thumb drive was secured.

We also have this mysterious DOC.EXE program that Mr. Pixley testified about on the thumb drive. He said the

functionality of the program was unknown but had been on the thumb drive and then deleted.

So the question becomes who was contaminating this evidence. Who was contaminating this crucial piece of evidence and why. And can we really trust what -- what is being presented in court. This is the photo that was found on the thumb drive. This is the photo that was placed on the thumb drive after it was seized. Somebody was accessing this evidence, somebody was contaminating this evidence, somebody was putting programs on this evidence and someone was putting files on this evidence.

And the Government wants us to trust everything that's been presented to you as if it's -- what did she say in opening -- black -- I forget the term -- black and white. In spades.

This evidence is not in spades. This evidence has been contaminated time and time again. We have talked about the physical evidence, we have talked about the forensic evidence.

There is also concerns regarding the testimony of the alleged victims in this case. From a general standpoint, there are serious concerns regarding the quality of the unusual interviews and the factors that went into how the original statements were obtained from these girls. We also have the case agent again when -- when I.T. failed to identify a picture of Mr. Pepe, when Mr. Gunn asked him why was that not included

in your report, we have the comment, "I usually don't report negative findings."

Those are the kind of things that really give us pause and should -- we ask that you seriously consider with respect to the credibility of this evidence.

We also have the role of the non-governmental organizations, and I'm going to talk about that. And there is also specific concerns regarding the individual alleged victims who testified, and we will walk through that just briefly.

Interview contamination and suggestivity.

We presented the testimony of Dr. Maloney. And I would submit to you that Dr. Maloney was a professional, credible expert in psychology. And his testimony was really unimpeached. And what he talked about was really this common sense concept of maintaining the integrity of the initial interview. That the ideal goal was to get a spontaneous report from an alleged victim in the victim's own words as to what happened.

Dr. Maloney looked at the interviews, he looked at the reports and he concluded that these interviews were completely unreliable because the way that the girls were questioned, the setting that they were questioned in, the environment that they were questioned in, the unknown factors that went into their interviews and their reports were -- were too -- I forget the word he used. I think he used the word -- something like gross

contamination. Don't quote me on that. But it was along those lines. That these interviews were so unreliable because of the nature of the way the statements were obtained.

He also talked about the fact that there is also this motion of cross-contamination when girls -- when people are placed in the same setting, when they're living together, when questions are asked to one person that -- claiming that another person said so and so, that they have this whole notion of cross-contamination of testimony. And that I think bears out from the evidence in this case; that the interviews themselves were really, really fatally flawed. And I just want to go through a few examples of that.

We have first the T.C.xx interview. And I just want to play a sample.

(Whereupon the tape was played for the jury)

MR. BROWN: Here is an example of a Cambodian interpreter inserting the concept of blue eyes into the interview of T.C.xx. T.C.xx, if you recall on my cross-examination when I played the prior tape, never identified the suspect as having blue eyes. We have a Cambodian interpreter on his own inserting that concept. I think that is evidence of contamination.

We also have the Vietnamese interpreter who is present during the interview who worked for World Hope International. And why is that. Ladies and gentlemen, why was there a

Vietnamese interpreter from World Hope International sitting in on this law enforcement investigation.

First of all, the girls when they testified in court spoke perfect Khmer. The Government would have you believe or the witnesses would have you believe they learned Khmer in the matter of the two years that they have been staying at the non-governmental organization. I find that highly implausible.

Why is this Vietnamese interpreter who appears in all the other interviews with victims, alleged victims, present and contaminating the interviews themselves. And I think there is clear unrefuted evidence of that.

I think it's compounded moreover by the fact that the Government has Vietnamese agents, Vietnamese-speaking agents who were present, who were available to interview the girls directly in their own native language. Remember, Taekuk, the Vietnamese ICE officer who claimed to be working for ICE who started working in 2006? Are we to believe that he is the only Vietnamese-speaking agent who works in the Bangkok office? Why are they filtering the critical evidence through not one interpreter, but two? So much has been lost in translation that it's not -- well, I think there is evidence -- I think it's clear that these interviews are unreliable.

The I.T. interview. Again, the same Vietnamese interpreter from World Hope International. What relationship does World Hope International have with ICE and why are they

playing such an active role in this investigation? They're not law enforcement. Why aren't these girls taken to a quiet setting, interviewed in a professional manner with a Vietnamese interpreter or Cambodian interpreter like they had here in court.

But look at the kind of setting, look at the kind of dynamics that Dr. Maloney testified to. Look at how unsupportive, unfriendly an atmosphere, how coercive the atmosphere here is. And this is the example of the I.T. interview.

(Whereupon the tape was played for the jury)

MR. BROWN: How many people are in that frame? And those are the people we just see on camera. Who are all these people and why are they here to question her? And why are they questioning her in so many languages and why are they sitting so close to her and why is she on this person's lap.

Again, it's perfectly understandable to sympathize with people who are making these kind of allegations. We're not saying that it's wrong to not care about the person that you're interviewing, but when the stakes are this high, when the stakes are this high in a case like this, I think it's important to expect a professional, objective interview. Professional and objective. Not this. People milling around, she's in someone's lap, she is talking, it's being filtered in two different languages at least.

(Whereupon, the tape was played for the jury)

MR. BROWN: Vietnamese interpreter who has clearly got a stake in the outcome. She works for World Hope International. The girls testified that she was her counselor at the NGO. She is not an objective interpreter. She is certainly not objective because the evidence shows that on more than one occasion she is coercing responses and eliciting, filtering questions and using language that was not used in the original English question.

We have the I.D. -- the supposed identification issue. Again, remember, Dr. Maloney said that the goal is to get the -- the girl's response in her own words. And when they showed her a picture of the person that they thought abused her, she said no. But they didn't leave it at that.

(Whereupon, the tape was played for the jury)

MR. BROWN: That's not this man. Now, the Government wants to make a big deal of the fact that -- or at least they say that the photo that they showed was an outdated picture of Mr. Pepe from 1985. Look at the Vietnamese interpreter saying, "Look carefully, daughter, is he the one?" And it looks like Mr. Phillips shows another picture to I.T. here.

(Whereupon, the tape was played for the jury)

MR. BROWN: He has got a long nose, it's not him. They don't stop there. The questioning continues. Remember, Dr. Maloney talked about the body language in the setting, how people were leaning in.

 (Whereupon, the tape was played for the jury)

MR. BROWN: "Don't forget to look closely, daughter."

(Whereupon, the tape was played for the jury)

MR. BROWN: I think one of the problems with this interview is that this is what we see on videotape. We don't know how many time that I.T. was interviewed prior to being taped. We know that she was at one of these shelters for some time. We know that all of these girls in this case have remained at shelters prior to their testimony in court today. So I think this raises serious doubt about the -- how these girls had been influenced.

Again, we have the K.S.x interview. Again, we have the interpreter from World Hope International. Again, we have the same type of suggestive and inflammatory language that did not exist in the original question. Then we have this interesting little snippet.

(Whereupon, the tape was played for the jury)

MR. BROWN: We have the agent leaving the interview, we have the interviewer leaving the interview, and the Vietnamese interpreter from World Hope International leaning toward K.S.x and telling her to make statements.

So what we have, ladies and gentlemen, is kind of the skewing of evidence and the skewing of testimony that is certainly not objective.

We have the case agent again stating that he does not

 report negative findings. And did you notice that when all of the witnesses were presented with their statements to Agent Phillips, they all denied making the statements. It seems that there is -- there is a serious skewing of evidence, and it really, really raises doubt as to the reliability of the Government's evidence in this case.

Again, if the case is as strong as they say, then why are they bending reality at the edges here. Why are they shifting things around and why are they manipulating the evidence the way that they are, the way that has been established.

Again, we talk about the role of the non-governmental organization in this case. It's not quite clear -- it hasn't been quite made clear their role in this investigation, but I think it has been made clear that they had -- they did take a lead role in this case. The NGOs were present during the search. Their representatives were present during the investigation. The girls had have been in their custody and control for the past two years, despite the fact that there is strong evidence that the parents are begging to have their children returned to them, so much so that they had to seek the assistance of -- from Mr. DeMontero and Khieu San, members of the Cambodia Parliament.

The Government wants to make a big deal out of the phone calls that Mr. Pepe made to Mr. DeMontero to kind of cast

his statements in a sinister light. But I think it's clear that there is a serious concern about the role of the NGO's and the role they played in this investigation and the impact their role has had on the quality of the evidence here.

But it's not just the fact that -- contrary to what the Government says, it's not just the fact that the interviews themselves were suggestive. The other evidence really raises doubt about what the girls said occurred while they were at Mr. Pepe's house. The demeanor of the girls in photos taken at or near the time of Mr. Pepe's arrest, their statements that have been attributed to them raise serious concern about what they say happened.

This L.K.xxx with her mother at the birthday party in June of 2006. The girls certainly don't look like they are abused or traumatized. And I don't want to overstate the significance of that, but I don't think that we can set common sense aside here and say that I think common sense would say that if a person is being brutally abused like the prosecution is describing occurred, you would not expect to see series and series of these kind of photos with this kind of demeanor in them. And I think that that casts doubt on the factual version of events. This is not a tortured scene here, ladies and gentlemen.

Let's talk about the specific alleged victims in this case. L.K.xxx. She testified that the rape occurred three

months after she moved into Mr. Pepe's house, but the photos -- there are some suggestive photos that are dated in November. She also told Mr. Pond that Mr. Pepe was good to her; although she denied making that statement in court. But if you look at the Defense stipulation, it's clear that she made a statement that Mr. Pepe was good to her.

There's also some question as to her age. The Government claims that the family book shows that she was born in 1993. But her mother testified that she was born in the year of the goat, which is 1991. She did not report any of this -- what they claim now is this brutal abuse. L.K.xxx did not tell her mother about this. She did not tell her teacher, her tutor. But not only that, she told -- according to her mother, L.K.xxx told her mother not to come to the house to visit her. And that when L.K.xxx went to visit her mother in the province, she wanted to go back to Mr. Pepe's house right away.

Moreover, L.K.xxx, after her mother was kicked out of Mr. Pepe's house -- which kind of defeats the Government's grooming theory that he would kick out the parent who he is trying to groom -- after Ly Kim Eng left the house, L.K.xxx asked to remain behind. I think that that raises some serious doubt as to what the girls are saying happened now. It's just not consistent with reality, ladies and gentlemen.

The teacher testified that the girls did not seem unhappy, they did not act afraid of Mr. Pepe, that they treated

Mr. Pepe like a father, that they hugged him when they saw him, which is consistent with the positive demeanor that is shown in the photographs. It's only when they come to court after being in the custody of this NGO for two years that suddenly all of the positive aspects are not -- are not testified to.

Again, S.R.xxx and S.S.xxx, their mom said that they were happy, they were playing, they were normal, they did not act unhappy in any way, which is corroborated by Mao Chann Thorn, the teacher.

Again, the statements to James Pond that Mr. Pepe was good to them.

We have S.R.xxx's interview during -- her demeanor, which seems inconsistent with the kind of abuse that has been described, the kind of repeated brutal abuse that has been attributed to Mr. Pepe. You do not expect the girls to be laughing in an interview, smiling in the photos, wanting to stay at the house.

The Government tried to characterize this whole scene as if somehow they were prisoners in Mr. Pepe's home. But the evidence has made it clear that the girls are definitely free to leave and come back. They went to school. They went to their parents' home for the weekend.

It's just not quite jibing what you would expect to find in a situation where someone is supposedly brutally abusing and torturing these girls, for them to want to stay there and

not go home with their parents.

And the Government's argument that they didn't want to return to the slums of Cambodia is just not persuasive. That a person who has a choice between brutal abuse and poverty would opt for this -- this type of characterization that the Government has described, it just does not jibe with common sense.

The Government promised you that they were going to introduce the testimony of Wendy Freed in their opening statement, an expert in child psychology, to somehow explain this mysterious dynamic. But there is no Wendy Freed. There is no expert testimony to tell us that this is some sort of a learned helplessness or something like that. There is no evidence of that. There is no evidence that these children somehow capitulated to this type of situation when they had the opportunity to go home, they had the opportunity to report and they didn't.

And that -- ladies and gentlemen, don't set your common sense aside when you are considering this case, despite the seriousness and the graphic nature of the allegations. We ask that you don't set your common sense aside. Common sense would say that somebody would have said something to somebody.

K.S.x. K.S.x denied being Sang's niece on the stand. I don't know if you remember that. I asked her that question. In fact, the evidence has born out that, in fact, she was Sang's

niece. Why did K.S.x deny being associated with Sang during her testimony in court? What is K.S.x hiding?

Again, I think it's perfectly natural to want to empathize and identify with the alleged victims in this case, but I think the reality of the situation is a little bit more complicated than the Government wants you to believe. And these -- these -- the girls -- I mean, there are some issues there that I think are relevant to the case.

K.S.x had other sexual experiences. And that's -- and I'm not saying that to somehow smear mud on K.S.x, but I think it's significant when Dr. Watson is examining -- doing a medical examination a year after the fact, a year after K.S.x has been in Thailand and makes graphic medical findings, but we learn that K.S.x has other sexual experiences. I think there's a question when they're trying to attribute that to Mr. Pepe. So it's not quite as if, you know -- it's not quite as simple or idyllic as the Government wants you to believe.

This is a completely different culture, ladies and gentlemen. There is a lot of different, unknown factors that have gone into this equation. It is not simple to say that these horrible things happened and Mr. Pepe is responsible. It's not just that easy.

NTDx, the same thing. I believe it was NTDx -- and I could be mistaken -- who talked about this mysterious Mr. O who she had prior sexual experiences with, prior to being evaluated

by Dr. Watson. So when the Government talks about, you know, the graphic explanations and the graphic injuries that were reported by Dr. Watson and having to have a vagina sewn up, it's a little bit more shaded when you learn that NTDx, K.S.x had other prior sexual experiences prior to seeing Dr. Watson.

It's just not so simple. It's just not an easy -- easy -- you know, this isn't a slam dunk situation, ladies and gentlemen. It's just not that easy. It's much more complicated.

And I believe it was NTDx who testified that Ty Lynn was in the room at the time of the alleged incident, but that was contradicted by some of the other witnesses when she said that she was alone at the time. So there are inconsistencies that bear on the credibility of these witnesses, ladies and gentlemen, that cannot be easily overlooked or easily swept aside.

T.C.xx. Again, there's issues with the interpreter. We have Sang's description of some of these girls as prostitutes. I think Sang said, "We were all prostitutes." I.T. testified she was at Mr. Pepe's house for one week. The Government says that it was a month. I don't recall that being her testimony. I believe the evidence showed she was there for one week. According to I.T., the other girls were teasing her because she didn't want to massage Mr. Pepe. And this was on the massage table that the girls testified were non-sexual

massages. I.T. was teased by the other girls which she admitted on the stand. The other girls denied teasing I.T.. why do we have this inconsistency here about this kind of fact.

I think -- I think -- I.T.'s testimony, I think, calls into question the credibility and reliability of the testimony of the other girls; that they're teasing her for not wanting to participate in these massages.

The Government talked about Mr. Pepe's letter to his sister. And you will have that in evidence. I ask that you look carefully at that letter and read that all in context. It certainly describes massages with some potential inappropriate touching, which might be what I.T. is describing here. But that's -- that's a far cry from brutal bloody rape, ladies and gentlemen.

There is also photographs -- I.T. testified that she wasn't happy in some of the pictures because she didn't want Mr. Pepe taking her pictures, but in the candid shots she looks happy. And you will be the judge of that evidence for yourselves, ladies and gentlemen. I mean, it's interesting that they all somehow recharacterize their emotion but it's not really borne out by the photos themselves. The photos speak for themselves.

This is my third and final over-arching point is that there is really some major problems with the Government's theory and their prosecution. First of all, the forensic evidence

isn't really there. I will talk about that. I am going to talk about this whole concept of grooming that they've developed, that they introduced Mr. Clemente to testify about, which really doesn't make a lot of sense when you look at it. There's examples of government over-reaching.

You remember the map that was testified to with the back of the map said "child sex abuse is a crime" and the Government introduced this evidence to somehow show that Mr. Pepe was aware that child sex abuse is a crime and they wanted to use that as incriminating evidence. But when you unfold the map, there's a thousand different items on the map just like you see -- it's an advertisement for the city of Phnom Penh. And that just happened to be one of many, many advertisements on that map.

So you see the quality of the Government's evidence. The kind of evidence that they're introducing at this trial is really questionable, especially in light of the fact that -- well, it calls into question why they're presenting you this type of evidence. They want to ride the wave of emotion against Mr. Pepe so that every item that is recovered in his house, as innocuous as it is in retrospect, suddenly looks like he is running a torture house there when that is not the case.

The same with the date rape drugs that the Government testified or commented on in their opening statement. They called these the date rape drugs. And then they introduce the

testimony of this pharmacist. And now they're calling Tylenol with codeine administered in adult quantities. Well, the codeine component could be used to -- as a sedative. It's Tylenol with codeine. The other drugs that were found in the house are consistent -- and we'll talk about that -- with Mr. Pepe's well-documented sleep disorder and anxiety.

And we will talk about the photos.

Well, let's go back. There is no forensic evidence. There is no DNA, no semen samples. The girls described things like waking up in a pool of blood. I mean, this is graphic, graphic, shocking type of testimony. But where are the blood-stained sheets. The sheets are here in court. The towels I think have been seized. Where are the blood stained sheets. Where are the blood-stained towels. Where is there evidence of blood. Where are the torn panties. Where are the blood-stained panties. The type of thing you would expect to find in a situation like this.

Again relating back to Dr. Watson, she comes in court and she testifies about things like seeing, you know, injuries gaping entrances. Her original reports don't use the word gaping, but when she comes into court she is using these emotionally charged terms. And I think most significantly, Dr. Watson didn't photograph any of her observations, she didn't document any of her findings. She should have -- if what she saw was there, she should have photographed it, she should have

sketched it, she should have identified it so we could have some reliable evidence to consider in court and not this kind of inflammatory testimony that was presented.

And why didn't Dr. Watson want to speak with the Defense team when we flew all the way to Cambodia to talk with her, among other things. How come she didn't want to talk with us. She met with the Government. Dr. Watson is supposed to be an objective physician, documenting her findings in an objective manner, but she doesn't want to talk to the Defense.

What's -- what's -- why? This evidence, according to the Government, is overwhelming. What are they afraid of? Let's just put it all out in the open and look at it and discuss it and analyze it. But they want to shade it, they want to hide it, they want to manipulate it, and then they want to present it to you in the most inflammatory manner possible.

Grooming. The Government brought in this person, Special Agent Clemente. Agent Clemente is a career FBI, career law enforcement. He used to be a prosecutor. And if you really think about it, having Agent Clemente testify was like having one of the prosecutors in this case testify. Everything he said was consistent with grooming. The person is a teacher. He pretends to be grooming. If he worked for a Boy Scout, he could be grooming. If he is nice to children, either he has got an ulterior motive or not. What did Clemente really add to the discussion? Not much.

The problem is -- and this is really the fatal problem with the Government's theory -- the Government can't really explain the positive aspects of Mr. -- of Mr. Pepe. They can't explain the fact that he has got a legitimate interest in education and it's not just children. They can't explain the fact that he is sending these girls to school and they can't explain why they look happy in the photos. They can't explain why the parents aren't accusing Mr. Pepe of this, why the parents say all these good things about Mr. Pepe, how he is compassionate, how he is supportive, how he sent the kids to school, how he sent the mothers rice.

They can't explain that away, so they put Clemente on the stand to say well, all that stuff, that's just grooming. That's just a person taking advantage of people's poverty so he could have access to children. That he is setting the parents up so he would buy these children from these poor people from the slums of Cambodia. That's kind of a skewed lens that they are looking at here, ladies and gentlemen.

First of all, the parents -- you saw those depositions. The parents never sold those girls to Mr. Pepe. You saw how credible those parents were in their depositions. They weren't lying about the circumstances of the children going to live with Mr. Pepe. It wasn't grooming. If you're living -- and this is really the flaw in the logic. If you're living in a country where you can buy prostitutes and sex for a dollar, why

do you need to groom?

Agent Clemente -- his analysis was totally not even based on the dynamics of a culture that was thousands of miles away. I mean, there really, really is no need to groom if that's the reality. But they need that kind of testimony to somehow explain away all of these other things that don't make any sense. The girls looked happy, their parents were happy, no one complained about abuse.

Again, where is Wendy Freed to explain this away? They used Clemente, but he is not even a child psychologist. He is a career prosecutor, FBI examiner. Where is Dr. Freed? Where is the psychological testimony about that? It really defies common sense and there is really no alternative explanation. I mean, there is a completely innocent explanation. In the face of all this overwhelming evidence that the Government has, there is a completely alternative theory that makes as much sense as what the Government is describing.

Well, they want to say that Mr. Pepe's school supply distribution program was really just so he could have access to kids, that he had -- I forget the word that's -- the prosecutor used. He had an interest in children.

But, I mean, if you really consider the testimony, it really wasn't just an interest in children, it was an interest in education generally. Mr. Pepe was a professor at a local university. That's how he met Sander -- I'm sorry -- that's --

that was kind of the common ground he had with Mr. Sander and that's why Mr. Sander wanted to introduce him to all these important Cambodian officials, because of his standing at the university, his interest in education.

Mr. Pepe was also married to Sander wife's sister but, I mean, the interest in education, I think, is bona fide and well-established by the evidence in this case. So it's not -- once again, the Government is oversimplifying it by saying well, he wanted to go out to the remote villages of K-11 so he could be near a bunch of, you know, children who were former prostitutes. I don't think that that's the case.

You heard from Father Son. It was Father Son's idea to go to K-11, it was not Mr. Pepe's.

Some of the distribution sites were remote, which is inconsistent with the theory of Mr. Pepe wanting to have access to children. That theory just does not make any sense.

Not only that, again, there was an adult component to the whole program itself. So, you know, I think it's a gross oversimplification to say well, he is distributing books to kids; therefore, he is grooming them. And when he gives them books and candy and a dollar, he is just setting them up to molest them. That just doesn't fly, considering the weight of the evidence in this case and evidence from people.

You got Father Son whose testimony was credible. You got Khieu San, a Parliamentary official who talked about his

 involvement with Mr. Pepe. You've got Ung Huot, the former Prime Minister of Cambodia. You've have got Sander DeMontero. These are people with no -- no real dog in the fight, so to speak. They don't have to fly all the way from Cambodia to testify on behalf of a man who is accused of brutally raping seven girls in his house. They didn't have to do that.

But the fact that those people came here to talk about what's really a small component of the case, but to show that this was a legitimate program and not some nefarious scheme on behalf of Mr. Pepe I think says a lot.

Disabled children. There is pictures of Mr. Pepe at the disabled children's school. Is it the Government's theory that because he is here he now wants to molest people in wheelchairs? It just doesn't make sense. These were legitimately organized programs executed -- I mean, he went there with his family. He went there with his friends. He went there with high-ranking government officials. He is there with his wife, his wife's sister, Sander's wife, Sander's children. I mean, the whole theory that he is somehow grooming the children at the school for future abuse is -- really, really does not jibe with reality.

Like I said before, it seemed like the Government is really, really over-reaching here in this case.

We talked about the map, the newspaper clippings that they tried to introduce. They took a couple of articles out of

 context to somehow attribute some nefarious motive on behalf of Mr. Pepe. But when Mr. Gunn puts the whole thing in context, he has got a stack of newspaper clippings having do with local Cambodian affairs.

He talks about Tylenol with Codeine, reconstruction of reality with everyday items.

I mean, if the evidence is as strong as the Government wants you to believe, then why are they doing this type of thing with the evidence?

We have got Mr. Pepe's letter to his family. There is certainly some emails that appear suggestive, but that doesn't really prove anything when you put it in context. We are certainly not saying that Mr. Pepe is a saint. But to take all these things out of context and to weave some kind of -- the type of story that has been woven is not really accurate and is not really fair.

The drugs. Well-documented sleep disorder. Prescription for Temazepam. Mr. Gunn elicited that if Temazepam wasn't working, then Rohypnol would be the next logical sleeping agent to use. This is another example of the Government being unable to or not willing to kind of accept the reality of Cambodia and our applying this lens as if all of these things occurred in the U.S. They're asking the pharmacist well, you know, if you were in the U.S. how would you prescribe this, what would you do here and how would a person go about getting this

type of drug. Isn't Rohypnol illegal in the United States. I mean, that's really interesting if this was a United States case and perhaps it would be persuasive if this was the United States and Mr. Pepe had in his house morphine, Rohypnol, which is illegal. This isn't the United States. This is Cambodia.

Our investigator, Keith Williams, went to the local pharmacy and bought Rohypnol without a prescription for $5. The agents did the same thing. All of these things were readily available. And if you really think about it, remember it was Sang, Basang, who testified that she was acting as Mr. Pepe's nurse and that she went out to the big store and bought these things. Well, she didn't consult with Mr. Pepe, she didn't get a prescription. She thought -- she went and got the things that she thought was best for Mr. Pepe's documented sleeping problems.

Remember, Mr. Pepe would call Sang at night because he trusted her, they had become friends. He would call her when he couldn't sleep and she would come by with all these teas and concoctions and drugs that she got herself from the big store, from the local pharmacy, corroborated by Mr. Williams and the case agent. These drugs are readily available.

And they want to make a big deal out of Tylenol with codeine. They want to make a big deal out of morphine. Well-documented medical problems. Also keep in mind that L.K.xxx described being supplied an ash-colored powder in a

package. And they said that that was the date rape drug. There is no evidence of any ash-colored powder in a package found in Mr. Pepe's house. No evidence of that whatsoever.

If you really consider the testimony of the Government's pharmacist, the Government's pharmacist was talking about codeine separate from Tylenol with codeine which was found in the house. Adult dosage -- prosecutors asking about all these adult dosages but, you know, she said that most of the items that were found in Mr. Pepe's house had a -- a delay, and it took 30 to 40 to 60 minutes for any of these items to put somebody out. So the evidence just doesn't really match up when you really, really look carefully at it.

Let's talk about Sang because the Government talked a lot about Basang, Sang. And she really is the key to the Government's case. And the Government highlighted that in their -- in their closing. Sang is really kind of the wild card here. Basang is a person who describes purchasing girls for Mr. Pepe, going out to the provinces and finding young girls to bring back to the home. But if you compare Sang's testimony to the testimony of both Ly Kim Eng and Kumlang -- yes, Kumlang, the mother, it doesn't match up. Sang says that she went out, found these people working at a vegetable stand, said, "Let me buy your daughters for $30." The parents, "Okay, go ahead and take them." I mean I'm oversimplifying, but that's basically Sang's testimony. "Let me buy your daughter." "Okay."

But if you look carefully, if you listen carefully to the testimony of Kumlang and Ly Kim Eng, they don't want to sell their daughters to Mr. Pepe. They didn't sell their daughters for $30 to Mr. Pepe. They have been wringing their hands over their inability to have access to the children because they have been with the NGO for two years and everyone they meet, especially Kumlang, they are begging, pleading. "Help me get my daughters back." They are contacting the Human Rights Commission. They are contacting Sander DeMontero. They are contacting Khieu San, "Help me get my daughters back from the NGOs, they have been brought to America and they never even consulted us."

They want to minimize -- the Government is trying to minimize the role of the parent in this whole case because their testimony doesn't jibe with the reality that they are trying to construct. Sang didn't buy these children. The mothers say that they want it, they certainly were aware, you know, that they were living in dire conditions, they certainly were aware that they were living in poverty, they certainly were aware that education afforded opportunities for their children.

But the Government, you know -- government's whole theory when they are cross-examining the parents at the deposition, you know, it just doesn't make sense. You live on a dirt road and you don't have running water. That's why you sold your daughter. Ly Kim Eng was certainly aware that she lived in

poverty but she didn't have the same type of -- she didn't appear ashamed of that.

Same with Ly Kim Eng -- Kumlang. So, I mean, there is this whole cultural lens that is somehow missing the reality of what's happening here. These are parents who love their children, who want opportunities for their children, who are concerned about their well-being. They didn't sell them to Sang. Sang is not telling the truth about that.

Sang is a person with the most to lose. She is the person who is living in these nightmarish conditions at Prey Sar prison. She is the one who talks about the torture, the people dropping dead from AIDS, from sleeping on a cement floor, eating pig rice, near starvation practically, no blanket, no cot. Sang is the person with the immunity agreement, Sang is the person with the letter from the prosecutor saying, you know, if -- what's the language -- we'll notify the appropriate authorities.

She certainly has the expectation of a positive recommendation from the prosecutor. Now, what weight does the word of a U.S. official have with the Cambodian National Police and her jailers at Prey Sar prison? I mean that's debatable. But somehow, some way, they got Sang out of Prey Sar for the deposition.

So there is certainly -- it's certainly clear that the Government officials in this case have quite a bit of influence with the Cambodian officials. More so than the Defense, that's

for sure. And that's what Mr. Pepe is talking about on these phone calls, how unfair this whole thing is because his defense team can't even -- doesn't have any access to Cambodia so he has got to have his friend meet his defense team in Cambodia to try to -- to contact witnesses, to investigate, to defend this case. And the Government has all these resources, all these contacts, all these connections. They can bring Sang out of Prey Sar for a depo. And she said -- Sang said that she would do almost anything to get out of Prey Sar.

So it's easy enough to call Basang untrustworthy and unreliable, but I think the evidence is clear if you compare the testimony of the Sang, the testimony of the parents, it's clear that the parents are much more credible and much more reliable than Sang.

Phone calls. The Government in its rebuttal case wants to introduce phone calls from Mr. Pepe to Sander as some evidence of attempting to bribe and influence the parents of these girls. Mr. Pepe himself says we're not saying anything wrong. We can't use power to do stuff. It's not really fair. My government is not fighting fair. That's what Mr. Pepe is saying in the phone calls. He is saying, "Sander, help me out because I am being charged with a crime that occurred thousands of miles away in Cambodia. I'm stuck here in Los Angeles, and I can barely defend myself. I can't even talk to witnesses. So, Sander, I'm going to send some money to my wife. She is going

to pay for your plane ticket to fly from Australia to Cambodia. Will you meet my defense team?" That's what these phone calls are about. "Will you meet my defense team and help them so they can help me? "There is nothing nefarious. There is no motive. Not trying to bribe anybody.

You heard Sander DeMontero. His testimony was corroborated by the parents. Mr. DeMontero went to meet with him at Prey Sar and afterwards the parents said they didn't trust anybody. They just need help getting the kids back. They needed help with food. They petitioned Sander to contact his friends at the Human Rights Commission to help them. And that's all there was to it. There is no evidence of bribery. There is no evidence of undue influence. No evidence of suggestiveness. Sander's testimony was directly corroborated by the parents in this case.

IJM is trying to ramrod this thing through. I mean, we have these NGO's, these quasi governmental officials who appear to have quite a bit of influence in Cambodia but aren't really accountable to Khieu San or Parliament. It's not quite clear what the relationship is in the country. We certainly know that they have noble objectives. They are trying to help people who have been victims. But in this case, it's just not quite clear that they -- that they are wearing the white hats, especially given the fact that the parents are begging, begging to have the kids back.

There is no explanation as to the relationship between the NGOs and the parents and why the parents only see the kids once a month. So there is a lot of complexity to this case. There is a lot more complexity, there is a lot more nuances than the Government wants you to believe.

The Government has shown very graphic photos, and there is no denying that those photos and those pictures are graphic. They are highly sexual and highly suggestive. We are not denying that. But, again, take a step back, look at it, analyze it, consider the evidence and really put this in context.

In the series of with Nap and LKx I think the evidence has been established that Ngoc, according to Sang, she is 20 or 21, so Nap is not a minor in those photos. We know that for a fact. Medical records.

If you look at the photo of L.K.xxx, again it is highly suggestive, but there is no evidence of sexual penetration or rape. If you look at the photo of Mr. Pepe in that photo, it looks like he has been drugged. And if the letter he writes back to his sister he says he is not even sure how old L.K.xxx is. And I think that that's a significant fact.

Remember Seng Lida. Remember when Seng Lida testified. She is 20 years old but she was asked are you a minor. Seng Lida is 20 and she looks like she is 12 years old. There is a cultural component that is really important to

consider here.

And the Government introduced the testimony of Dr. Berkowitz to say that well, these girls are definitely, based on my knowledge of sexual maturity ratings -- are clearly pre-pubescent. But Dr. Berkowitz's testimony is based on, number one, this flawed notion of relying on the Tanner scale to predict age, which Tanner himself -- which we listened to on cross-examination -- Dr. Tanner wrote a letter saying that that's not a good methodology, it should not be used to predict age. Berkowitz as well, you know, it's not the Tanner scale, it's new and improved sexual maturity rating.

And then she talked about the Singapore study, remember? Dr. Berkowitz said that the Singapore study is the basis for her belief that -- that you can predict or tell from a cross-racial standpoint the age of southeast Asian woman. But the Singapore study -- and she admitted this on cross-examination -- the Singapore study did not use Cambodian women or Vietnamese women as samples. So her testimony is based on this flawed premise that she can predict age based on these limited factors.

And the study itself is flawed. I mean, it's certainly clear that -- that the Cambodian girls in this case look young but you saw Seng Lida. She looked young, too, and she's 20. And Pepe said that he's not sure how old she is.

And the person, Ni, that is in the photograph of the

bondage, which the Government keeps showing as an example of how these alleged victims were tied up, if you look carefully at Ni and consider that evidence with respect to Dr. Berkowitz's testimony, remember, Dr. Berkowitz said that Ni had evidence of having a shaved pubic hair, shaved pubic region. Her age is not clear.

And again, there is this whole faulty reliance on this Singapore study to not even consider Cambodian ethnic factors or the study, the factors that go into predicting this is so flawed that you can't predict someone's age or estimate someone's age based on the photos, specially when you have this kind of cross-racial situation. You can't apply U.S. standards to people living in Cambodia. Their diet is different, they have different ethnic, genetic makeup. There is a lot of different factors that affect sexual maturity.

And when you have Ni, who is definitely -- according to Dr. Berkowitz, has evidence of sexual maturity, pubic hair and shaved pubic hair, certainly looks bad. But the most graphic photos in this case are graphic photos of Ni. The penetration, ejaculation that they are attributing to Mr. Pepe. We don't know how old she is.

And, again, I mean, if you look at that series of photos, which is the worst photographic evidence in this case, they're saying it's Mr. Pepe, but we don't see his face. And then they brought in a Dr. Craft to do this whole thing with

 mole identification and stuff and say that, well, the mole patterns in the known photos are the same as the known mole patterns in this series of photos, inferring that it's Mr. Pepe.

But, you know, you heard from Dr. Bennett who trained Dr. Craft who said that, you know, you can't rely on teledermatology. It's not widely accepted, number one. That are there are a ton of other lesions that Dr. -- that were similar to the ones that Dr. Craft circled that were not circled by Dr. Craft that are -- that could have easily been the same -- same type of mole. I mean, that kind of evidence isn't really that persuasive when you think about it in light of Dr. Bennett's testimony.

I guess in a way -- and this is kind of what I was alluding to in the beginning of my opening. This case is really a test of -- of our ideals, if we think about it. It's a serious test of our ideals. It's almost like an experiment. You have on the one hand a foreign country who does not share the same cultural values, the same legal concepts that we take for granted. Presumption of innocence, burden of proof, reasonable doubt. These concepts are ingrained in our cultural identity. These are the things -- these are bedrock concepts that we take for granted.

And we're -- there is somehow this overlay. This case is somehow overlaying these two competing ideals. And I don't think that it's easy. This is not an easy case. This is not a

slam dunk case. The Court talked about -- when we were selecting the jury, about the significance of our democracy and the role of the jury in the democratic process, and I think that that is so true. Because if you think about it, it's you, ladies and gentlemen, who are really the gatekeepers, and that's what the whole system is designed for, that the prosecutors don't get to automatically check a box and find Mr. Pepe guilty. They bring in people from the community who have no interest, who are completely objective, with varied experiences and background, to consider and weigh the facts and the evidence. You are not beholding to the prosecutor, you are not beholding to the Defense, you're not beholding to the Court.

I mean, this is really -- the criminal justice system is really about -- it's one big quality control process. And you are the gatekeepers of that process, because it's your decision that is so important and so significant. And it's even more so in a case like this. It's even more so in a case like this where they're bringing in foreign witnesses, foreign evidence, foreign procedures, questionable evidence, questionable witnesses, questionable interviews.

We ask that you hold the Government to its high burden of proof in this case. We ask that you hold the Government to its standards. Our standards. Not Cambodian standards. U.S. standards. The Government has not met its burden of proof in this case. And we ask that you return a verdict of not guilty.

Thank you.

THE COURT: Thank you. One last time, don't talk about the case or form or express any opinions about the case until it's finally submitted to you. We will take a 15 minute break and then hear the Government's closing.

(Recess taken)

(Jury Out)

THE COURT: What do counsel want me to do with the alternate? Do you want me to release him and have him stay on call if for some reason we need him?

MS. DONAHUE: That's fine with the Government, Your Honor.

THE COURT: Mr. Gunn? Mr. Brown?

MR. BROWN: No objection.

THE COURT: Are we ready?

MS. DONAHUE: Yes, thank you, Your Honor.

(Jury In)

THE COURT: All right. Everyone is present. Ms. Donahue, you may proceed.

Government's Closing Argument

MS. DONAHUE: Thank you, Your Honor.

Ladies and gentlemen, the defendant chose Cambodia, not the investigators. He is the one who chose to fly 9,000 miles to the other side of the planet, and he is the one that chose to commit the crimes over there, not here. So please keep

that in mind as you evaluate the complaints about how far away, the different procedures, how difficult this is. Nobody from the United States forced had him to go. It was his decision to go. And not to go for a little while but to go and to rent a house and stay there for a long time.

And Cambodia is a place where on the map you have to be told sex with children is a crime. Not inside some internal ad that you have to unfold the map. When you buy the map in Phnom Penh, it says, "Sex with children is a crime." You have to be told that.

When you come to Los Angeles, when you go to San Francisco, when you go to most cities in the United States, you do not pick up a map that says "Sex with children is a crime." Remember that. We don't have to be told.

There is a reason some people -- not everyone by any stretch of the imagination -- but there is a reason some people travel to Cambodia.

He chose a country. He chose a country where, as Father Un Son told you, they have a terrible, terrible problem with child exploitation. Remember what Father Un Son said about Svay Pak, which is where the defendant wanted to go. He chose the children's programs at the parish. Father Un Son said they went to Svay Pak. What is in Svay Pak? Brothels. Who are in those brothels? Children. Cambodia is a country that has a problem with sex with children. And he chose to go there.

It is also a country where, yes, it is apparently legal, perfectly easy to buy Rohypnol. The ICE agent did it and the Defense investigator. Walked up to a pharmacy on the street and purchased Rohypnol, the date rape drug which, as you heard, is not legal in the United States. It is legal in Cambodia. You can get it. The Defense investigator got it. The agents purchased it. The defendant purchased it. He had it at his house. He had Rohypnol and he had a lot of other sedatives. His choice. His choice to of move there. His choice to go to a place where you can get Rohypnol on the streets.

Now, his complaints about the investigation and how difficult it is are ironic at best in light of the Defense witnesses who came in here and testified. Sander DeMontero came, and first of all, didn't even tell you on direct examination that he is the defendant's brother-in-law. He is clearly a very influential person in Cambodia. The defendant obviously married into a family that has some political influence over in Cambodia.

What did that get him? Well, Sander DeMontero told you he helped get the mothers released from prison, Ly Kim Eng and Kumlang. Ly Kim Eng is L.K.xxx's mother. Kumlang is the mother of S.R.xxx and S.S.xxx. He could barely -- Sander DeMontero could barely pick those women out from the photographs that he was shown. In fact, he said he thought maybe Ly Kim Eng had served him iced tea at Pepe's house but he wasn't really

sure. He could barely pick them out from a photograph. "I didn't pay attention to that" when asked about children or anyone else at the defendant's house. That was DeMontero's answer. "I didn't pay attention to that."

Then the defendant is arrested, the mothers go to prison. DeMontero goes down to the prison looking for the mothers because he was so concerned about them. He testified he wanted to help them. They had no food. He had great concern for their welfare. He met with Ly Kim Eng's mother-in-law because she wanted to have someone watch David, L.K.xxx's little brother.

Sander DeMontero's profound interest in helping the mothers. He was helping them so that they would help the defendant. He helped get them out of prison in Cambodia. And what did they do? They turned around and came to a deposition and said, "I had no idea that anything was wrong with my daughter." They -- Sander DeMontero helped them, they helped the defendant. You can hear the defendant on the phone from the MDC telling Sander DeMontero, "That's great. It's good that you got the mothers out but that's not good enough. We have to go further. We have to figure out a way to prevent the victims from being brought to the United States. Stop them at the airport if you have to. Reunite them with their families."

Why does he want them reunited with their families? Because then they won't come to the United States. Then they

won't be able to testify against him. Without the girls, there is no case. That's what he told DeMontero. And he tasked DeMontero with trying to help him make that happen.

DeMontero is very good at helping the defendant. You saw DeMontero introduce the defendant to some of the most well-connected people in the country. He is complaining about not being able to put on a defense. He had the former Prime Minister of the country walk into this courtroom and tell you that what a great school distribution program he had going on in Cambodia. He had Khieu San, who -- obviously, both Khieu San and his wife are obviously very high-ranking officials in the Cambodia government who has a profound interest all of a sudden in the welfare of L.K.xxx's mother and in the welfare of S.S.xxx's and S.R.xxx's mother. And we would submit to you his profound interest in their welfare is helping them so that they will help the defendant.

You hear him on the telephone. "We need to get a statement. Get the thumbprint on the statement. Get a thumbprint on a statement that we can introduce in court. In the United States."

And then here comes the deposition and Kumlang, who says she's illiterate, she can't read, she can't write, some -- DeMontero gets a thumbprint from her on a document that says that the defendant didn't harm her children. And when she is asked the document, she said, "That's not what I thought it

said. I thought this was about getting my children back." She really had no idea what she was persuaded to put her thumbprint on. She has just been told over and over you need to get your children back. You need to get your children back. She is the one who sent her children away in the first place. So that's a separate issue.

But it is more than ironic that the Defense is claiming that the fact the case is in Cambodia has somehow created a problem for them. Not only did they bring in the high-ranking officials, but they brought in Mr. Mao, the tutor from the school. And, by the way, something about Mr. Mao's testimony. He said he was at the house tutoring the kids between June of '05 and December of '05. Since the victims were there between December of '05 and June of '06, it would seem fairly likely that Mr. Mao got his dates mixed up. Is he lying? No. He did go to the house and he did tutor the kids. But like a number of the children in this case, maybe he doesn't have his dates exactly perfect. His dates were a little bit off. Something to keep in mind when evaluating the testimony of a number of people.

What else does the defendant's Cambodian defense tell us? The school supply distribution program really gave him an aura of legitimacy and access to people in power that he thought essentially would take care of him. He thought that these people who were in power could help him and would take care

pretty much any problem that he had.

And they certainly have tried. The Defense is right, a lot of very high-powered people willing to fly 9,000 miles to testify on his behalf. He married well into a well-connected family, and those people have certainly done their best. That is the context within which to examine the Defense and his notion that somehow he is so prejudiced because the country that he chose to commit his crimes in is located halfway around the world.

Now, he we heard a number of attacks on the Government investigation. One of them involved Basang. Unlike the mothers who the defendant's brother-in-law helped secure the release from prison, she is not released from custody. As you heard, she is serving a 27-year sentence in a Cambodian prison for which she did in this case. And, of course, as the judge has instructed you, you have to keep that in mind when you evaluate her testimony. She is in prison. She was taken from the prison for the period of time that -- her deposition was taken. And she does have an agreement with the Government and you will have it in evidence. It is Exhibit No. 2006. And what it says -- what it says is in the second paragraph you can see that she has immunity for any information that she provides to ICE, Immigration and Customs Enforcement, concerning the sexual activities of Michael Joseph Pepe with minors in Cambodia. So the information won't be used against her in any prosecution in

 the United States except a prosecution for perjury. So the U.S. government has agreed not to prosecute her.

Well, the Cambodian government already has prosecuted her. She is already doing a 27-year sentence. And keep in mind what this law prohibits. It prohibits a U.S. citizen, someone who has all of the privileges that we have as U.S. citizens, from going to a foreign country and engaging in illicit sexual conduct. A U.S. citizen like the defendant.

She's not a U.S. citizen, she testified in her deposition. So unclear whether she even could be prosecuted even if we were to bring her halfway around -- take her out of prison and bring her halfway around the world to prosecute her.

But in any event, she is already serving a sentence over there. And it says the agreement is conditioned upon her full cooperation, including giving completely candid and truthful information and testimony. Which means you must tell ICE investigators the truth, the whole truth and nothing but the truth. And if you don't, this agreement is null and void.

This is the agreement that she has with the U.S. government. You have it in evidence. There is no such agreement requiring any sort of candid or truthful testimony regarding Ly Kim Eng or Kumlang, the two mothers who provided their daughters to the defendant and then subsequently turned around and testified for the defendant.

Now, the Defense goes out of its way to attack the

Government investigation. And I will just walk through those with you. These are all things which came out during the trial. I would submit to you nothing about this investigation has been hidden from you. It has been shown to you, warts and all, from the beginning.

And as you can see, the evidence that you saw here in court, the evidence that you will have back in the jury room, is the evidence that you saw Gary -- in the photographs that Gary Phillips took on June 17th of 2006. He went in that house, he was one of the first people in the door, and he took pictures of the evidence. June 17th, 2006, not four days later. Right when the Cambodian National Police went through the door. That same evidence we brought in here and showed to you.

So was the door -- was one door to the kitchen and the house open on June 18th? Yeah. It's open in the photo. What does that mean? Nothing. If you see the evidence in the house on June 17th and we're bringing the same piece of evidence in here that's been in the custody of Immigration and Customs Enforcement for three years, what that means is the evidence was in the house on June 17th, 2006 and now it's in U.S. custody.

The Defense made a big deal out of the bag. The bag -- the yellow bag, his rape kit. Special Agent Phillips testified about this. He came through the door -- this is Government's Exhibit 1100. He came through the door of the defendant's bedroom shortly after the Cambodian National Police.

Remember what special Agent Phillips said about the door to that bedroom in the defendant's house. It locks. When the Cambodian National Police went in to execute the search warrant, the defendant's bedroom door was locked and they had to force it open. Special Agent Phillips was in behind them. They opened up the closet and there was the bag, the yellow bag on the shelf. Not moved by anybody. You saw on the video they took the bag off the shelf and they opened it.

Government's Exhibit 1104 is that bag Special Agent Phillips testified about 20 seconds after they put it down on the bed. That's the bag as the defendant had it in his closet in his bedroom. With the rope.

Now, are there photographs, later photographs, where the Cambodian National Police had other items in that bag? Yes, there are. Special Agent Phillips testified about that. There was no effort to exaggerate anything, no effort to hide anything. This is the bag as it came out of the closet.

Did the Cambodian National Police engage in CSI-like evidence collection techniques? No, they didn't. But we have a photograph of what it looked like when it was in the closet and right after it came out of the closet. Nobody is trying to plant anything. Or hide anything. The video shows the Cambodian National Police dumped the bag out on the bed so they can see what's inside of it, and then they have other items that they're throwing down on the bed. The KY jelly, the condoms,

those are other items which were in the defendant's bedroom. Whether they were inside the bag or not is not the point. The point is they were in his bedroom, the same bedroom where the victims all uniformly say they were sexually assaulted.

The idea -- this showing the video and the photographs and complaining that the Cambodian National Police dumped the evidence out on the bed is an effort, I guess, to distract. I don't know. To make you focus on something which is not an issue.

What else is not an issue? The forensic evidence, the thumb drive. Again, this is something that Mr. Pixley testified about on direct examination. Okay. He went through this in probably painstaking detail. I will not go through it, but please remember this exhibit shows the three things that were added to this thumb drive in Cambodia. And the blue checks are the files that were accessed. Yes, somebody in Cambodia looked at the thumb drive, they didn't follow ICE, Immigration and Customs Enforcement, perfect forensic collection techniques.

Nobody from the Government ever walked in and told you that the evidence collection techniques on this thumb drive were perfect. Nobody walked in and said by the way, we write-protected this drive right from the beginning and we cannot imagine what happened. No one said that. We, from the beginning, explained what happened. And this was such a sophisticated effort to write to the thumb drive that what they

left -- what was left in Cambodia on his thumb drive is a picture of the defendant in custody. If you're going to fabricate evidence or make something up, probably not the -- the thing you're not going to make up and put on the computer media is a picture of the defendant in custody. Something which was clearly taken after the seizure. So what is this? It's a mistake. It's sloppy.

What does it mean in the context of this case and this investigation, which is really the question. Absolutely nothing. Because the pictures of L.K.xxx that you looked at earlier, the pictures of Ni that you looked at earlier, the photographs of him, of the defendant naked, weren't on this thumb drive. They were on the hard drive and the disks.

And remember what Mr. Pixley said about the hard drive and the disks. They were not improperly accessed. They were first looked at properly by computer -- by Immigration and Customs Enforcement computer forensic examiners. So the piece of media that was improperly accessed, which you were told from the get-go was improperly accessed, had nothing of value on it.

Like the issue with the bag, it is a red herring. It doesn't mean anything.

Dr. Maloney, the interviews. Okay. Dr. Maloney could not even qualify as an expert in child psychology. He qualified only as an expert in general psychology because as he said, he hasn't done this in about ten years. And essentially

Dr. Maloney said the same thing that Jim Clemente said at the beginning of the case about interviews of kids. Open questions are better than leading questions. If the question is an open question, does that necessarily mean the child is telling the truth? No. If the questions is a leading question, does that necessarily mean the child is lying? No. What happens when you have a leading question. Both of them said well, you look for corroboration. Okay. You know there is corroboration in this case.

But what else? You look to see if the child just buckled, just agreed with the suggestive questioning or whether the child stood up and said no, actually, no, neither choice that you have presented to me is accurate, it's this third choice. And you heard Dr. Maloney on cross-examination, he agreed with example after example after example of situations where every single victim spontaneously provided information or rejected a choice given by the agents that turned out to be -- where neither answer was correct. And Dr. Maloney agreed, agreed, agreed and then remember he said, well, maybe this was contaminated by another interview. So then he was asked, oh, do you have any evidence to suggest that. No.

So he has no evidence to suggest it's contaminated and he has a child who is volunteering information or a child like I.T. who says in response to the assembled group, no, this is not the man. She stands up and says huh-uh, I don't think so.

And there was example after example. That most obvious non-sexual example is the girls giving a description of the bed to agents who had never seen the bed. And the agent saying oh, the carving is wood, they're -- oh, it's wood flowers, volunteering information. Agents -- Agent Phillips, the case agent, didn't even conduct all of the interviews of the girls in this case. If you notice on cross-examination, for example, both K.S.x and T.C.xx were asked questions about what Special Agent Phillips said to them during the interviews. He wasn't even the agent who interviewed them. The Defense attorneys can't even keep it straight. He wasn't even the interviewer.

One of the interviews was conducted -- the first interview of NTDx was conducted in Vietnamese. It didn't even go through an interpreter.

The bottom line with the interviews is that Dr. Maloney and Jim Clemente agreed it's hard to interview kids. You look to see where there is corroboration. That's really -- the Defense made, by the way, very much during closing, of the Government not calling an expert on Cambodian culture. I told you in opening statement I would call an expert on Cambodian culture because the defendant did commit these crimes in Cambodia.

During voir dire it seemed a lot of people were not familiar with that culture and we thought that it would be

helpful. As it turned out, in large measure through the Defense case, you have had Cambodian culture I think presented to you in spades and you really don't need anybody to come in here and tell you any more than you have already heard about Cambodian culture. And quite frankly, the victims themselves I think very adequately conveyed to you their own demeanor, their own mindset and where they're coming from insofar as their ability to resist.

Oh, Mr. Brown made much out of the age of the other girl who is photographed with L.K.xxx. I'm not quite sure why. I guess to argue -- I don't know -- that L.K.xxx is older than 12 or 13. Keep in mind that the age cutoff for commercial sex is 18, and neither L.K.xxx or any other victim in this case is anywhere near 18 years old now, much less two years ago.

Dr. Berkowitz looked at that photograph and said she thought Ngoc was about 14 years old. Dr. Berkowitz does not use the Tanner scale that Mr. Brown so resoundingly criticized. Her aging is based on her vast experience. And she said it is true that there is some variance based on race. She has looked and sort of across the board, if you remember what she said, the studies that show variances based on race show age difference of at most a half a year. Maybe different races look, you know, half a year off. You can add half a year to the age of any of these girls and get nowhere near the age cutoff where defendant could have been legally engaging in any sort of sexual activity

with them.

Ladies and gentlemen, I think the testimony of the victims, well corroborated by this investigation, has more than adequately shown well beyond a reasonable doubt that he engaged in illicit sexual conduct with all seven of these girls and we would ask you to return verdicts of guilty on all seven counts of the Indictment and again thank you very much for your attention to this case.

Thank you, Your Honor.

THE COURT: Thank you.

When you begin your deliberations, you should elect one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in court. You will then discuss the case with your fellow jurors to reach agreement, if you can do so.

Your verdicts as to each individual count, whether guilty or not guilty, must be unanimous. Each of you must decide the case for yourself but you should do so only after you have considered all the evidence, discussed it fully with the other jurors and listened to the views of your fellow jurors. Do not be afraid to change your opinion if the discussion persuades you that you should, but do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach unanimous verdicts but, of course, only if each of you can do so after

having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Your verdicts must be based solely on the evidence and on the law as I have given it to you in these instructions; however, nothing that I have said or done is intended to suggest what your verdict should be. That is entirely for you to decide.

Some of you have taken notes during the trial. Whether or not you took notes, you should rely on your own memory of what was said. Notes are only to assist your memory. You should not be overly influenced by the notes.

The punishment provided by law for this crime is for the Court to decide. You may not consider punishment in deciding whether the Government has proved its case against the defendant beyond a reasonable doubt.

A verdict form has been prepared for you. After you have reached unanimous agreement on verdicts, your foreperson will fill in the form that has been given to you, sign and date it and advise the bailiff that you're ready to return to the courtroom.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by your foreperson or by one or more members of the jury. No member of the jury should ever attempt to communicate with me

except by a signed writing, and I will respond to the jury concerning the case only in writing or here in open court. If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question.

Remember that you are not to tell anyone, including me, how the jury stands numerically or otherwise on the question of the guilt of the defendant until after you have reached a unanimous verdict or have been discharged.

As I indicated, the first thing I will want you to do is jot us a note telling us what you want your schedule to be. Remember that if you're not finished by the end of this week, that you can deliberate on Monday because you won't need me very much. And so you should keep that in mind. And again, you can keep this 8:00 to 2:00 schedule or you can take a lunch break, whichever you prefer, just let us know what that schedule will be and make sure you give us a good six hours of your time as you have been now.

I am going to have the clerk swear in the bailiff and then we will ask the alternate to step out in the hall until after we have Mr. Pierson come out and talk to you and tell you what to do.

Mr. Pierson, will you please swear the bailiff.

THE CLERK: Will you please state and spell your name for the record.

THE BAILIFF: Stoney Jackson S-T-O-N-E-Y, J-A-C-K-S-O-N.

Stoney Jackson, Bailiff was sworn

THE COURT: All right. Thank you, Mr. Jackson. You can take the jurors.

(Jury Out)

THE COURT: You may be seated. Make sure before you leave that you give Mr. Pierson your office numbers and cell phone numbers so that there is no delay in reaching you. And I assume the furthest away anyone will be will be the public defender's office. We will let you know if we have any questions or need you for any other reason.

I am going to require you to stay here today until the jury leaves, just in case they send out a note for some reason. Usually a note comes out immediately asking for Post-It's or markers or something. Mr. Pierson will talk to the alternate, make sure he stays on call and we have a way to reach him.

Is there anything else anyone thinks we should talk about?

MR. GUNN: Is the jury going to have the option of staying past 2:00 today or they'll just stay until 2:00 today?

THE COURT: They can do whatever they want. The first thing we are waiting for is a note from them telling us what they want to do.

MR. GUNN: If they want us to stay until 5:00, do you

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

United States of America, )
Plaintiff, )
)
vs. ) Case No.
) CR 07-168(A)-DSF
Michael Joseph Pepe, )
Defendant. )
_________________________________ )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

Day 13

Los Angeles, California

Thursday, May 29, 2008

Pamela A. Seijas, CSR, FCRR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California 90012
(213) 687-0446

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
BY: PATRICIA DONAHUE
ASSISTANT UNITED STATES ATTORNEY
JOHN LULEJIAN
ASSISTANT UNITED STATES ATTORNEY
312 N. SPRING STREET
LOS ANGELES, CA 90012

FOR DEFENDANT: OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY: CARL GUNN
DEPUTY FEDERAL PUBLIC DEFENDER
CHARLES BROWN
DEPUTY FEDERAL PUBLIC DEFENDER
321 EAST SECOND STREET
LOS ANGELES, CA 90012

ALSO PRESENT: ATTACHE GARY PHILLIPS
ICE SPECIAL AGENT EDDY WANG

(Off the record from 9:05 a.m. to 10:58 a.m.)

(Jury Out)

THE COURT: Good morning.

MR. BROWN: Good morning, Your Honor.

MS. DONAHUE: Good morning, Your Honor.

THE COURT: Maybe we should have appearances of counsel.

MS. DONAHUE: Patricia Donahue and John Lulejian on behalf of the United States.

MR. BROWN: And Charles Brown and Carl Gunn on behalf of Mr. Pepe, who is present.

THE COURT: Good morning. Good morning, Mr. Pepe.

THE DEFENDANT: Good morning, Your Honor.

THE COURT: Ms. Donahue, I don't see any of the victims.

MS. DONAHUE: The victims are not close enough to the courthouse.

THE COURT: All right.

MS. DONAHUE: So they are not going to be here, Your Honor.

THE COURT: All right. I have received a note from the jury with a time written on it of 10:30 a.m. indicating that the jury has reached a unanimous verdict.

Mr. Brown, depending on -- or Mr. Gunn, depending on what the verdict is, do you believe you will want to have the

jury polled?

MR. BROWN: Yes, Your Honor.

THE COURT: It would be my plan, then, to ask the jurors individually as to whether those verdicts and findings collectively were their verdict.

MR. BROWN: Very well.

THE COURT: All right. Mr. Pierson.

(Jury In)

THE COURT: Who is our foreperson?

Juror No. 11. Thank you.

I understand that the jury has reached a unanimous verdict as to all counts and findings; is that correct?

THE JUROR: Yes, it is.

THE COURT: Would you hand that form to the bailiff, please.

The verdict form reads as follows:

"In the matter of the United States of America vs. Michael Joseph Pepe, CR 07-168(A)-DSF, as to Count 1" -- that's I.T. or I.T. -- "We, the jury in the above-entitled action, find the defendant, Michael Joseph Pepe, guilty as charged in Count One of the First Superseding Indictment.

"If you find defendant, Michael Joseph Pepe, guilty of the charge set forth in this count, please identify each of the following definitions of illicit sexual conduct that you unanimously find applies to his conduct with I.T.."

 The following items are checked and the following items only:

"Any commercial sex act with a person under 18 years of age;

"Knowingly rendering another person who is under 18 years of age to be unconscious and thereby engaging in a sexual act with that other person;

"Knowingly administering to another person who is under 18 years of age by force or threat of force or without the knowledge or permission of that person, a drug, intoxicant or other similar substance and thereby substantially impairing the ability of that other person to appraise or control conduct and engaging in a sexual act with that person;

"And knowingly engaging in a sexual act with a person under 12 years of age."

The remaining finding is not checked.

As to Count 2, L.K.xxx or L.K.:

"We, the jury in the above-entitled action, find the defendant, Michael Joseph Pepe, guilty as charged in Count 2 of the First Superseding Indictment.

"If you find defendant, Michael Joseph Pepe, is guilty of the charge set forth in this count, please identify each of the following definitions of illicit sexual conduct that you unanimously find applies to his conduct with L.K.xxx."

All of the items are checked.

That is:

"Any commercial sex act with a person under 18 years of age;

"Knowingly rendering another person who is under 18 years of age to be unconscious and thereby engaging in a sexual act with that other person;

"Knowingly administering to another person who is under 18 years of age by force or threat of force or without the knowledge or permission of that person a drug, intoxicant or other similar substance and thereby substantially impairing the ability of that other person to appraise or control conduct, and engaging in a sexual act with that person;

"And knowingly engaging in a sexual act with a person who is less than 16 years old but at least 12 years old and who is at least four years younger than defendant."

As to Count 3, S.R.xxx or S.R.:

"We, the jury in the above-entitled action, find the defendant, Michael Joseph Pepe, guilty as charged in Count 3 of the First Superseding Indictment.

"If you find defendant, Michael Joseph Pepe, is guilty of the charge set forth in this count, please identify each of the following definitions of illicit sexual conduct that you unanimously find applies to his conduct with S.R.xxx."

The jury has checked, "Any commercial sex act with a person under 18 years of age and knowingly engaging in a sexual

act with a person under 18 years of age."

The remaining item is not checked.

Count 4 as to S.S.xxx or S.S.:

"We, the jury in the above-entitled action, find the defendant, Michael Joseph Pepe, guilty as charged in Count 4 of the First Superseding Indictment.

"If you find defendant, Michael Joseph Pepe, is guilty of the charge set forth in this count, please identify each of the following definitions of illicit sexual conduct that you unanimously find applies to his conduct with S.S.xxx."

There is a check next to "Any commercial sex act with a person under 18 years of age and knowingly engaging in a sexual act with a person under 12 years of age."

The remaining item is not checked.

As to Count 5, K.S.x or K.S.:

"We, the jury in the above-entitled action, find the defendant, Michael Joseph Pepe, guilty as charged in Count 5 of the First Superseding Indictment.

"If you find defendant, Michael Joseph Pepe, is guilty of the charge set forth in this count, please identify each of the following definitions of illicit sexual conduct that you unanimously find applies to his conduct with K.S.x."

There is a check next to "Any commercial sex act with a person under 18 years of age."

And a check next to "Knowingly engaging in a sexual

act with a person who is less than 16 years old but at least 12 years old and who is at least four years younger than defendant."

The remaining box is not checked.

As to Count 6, NTDx or N.T.D.:

"We, the jury in the above-entitled action, find the defendant, Michael Joseph Pepe, guilty as charged in Count 6 of the First Superseding Indictment.

"If you find defendant, Michael Joseph Pepe, is guilty of the charge set forth in this count, please identify each of the following definitions of illicit sexual conduct that you unanimously find applies to his conduct with NTDx."

There is a check next to "Any commercial sex act with a person under 18 years of age."

And "Knowingly engaging in a sexual act with a person who is less than 16 years old but at least 12 years old and who is at least four years younger than defendant."

The remaining boxes are not checked.

Count 7, T.C.xx or T.C.: "We, the jury in the above-entitled action, find the defendant, Michael Joseph Pepe, guilty as charged in Count 7 of the First Superseding Indictment.

"If you find defendant, Michael Joseph Pepe, is guilty of the charge set forth in this count, please identify each of the following definitions of illicit sexual conduct that you

unanimously find applies to his conduct with T.C.xx."

There is a check in the boxes for "Any commercial sex act with a person under 18 years of age."

There is a check next to the box "Knowingly administering to another person who is under 18 years of age by force or threat of force or without the knowledge or permission of that person, a drug, intoxicant or other similar substance and thereby substantially impairing the ability of that other person to appraise or control conduct and engaging in a sexual act with that person."

And a check next to "Knowingly engaging in a sexual act with a person who is less than 16 years old but at least 12 years old and who is at least four years younger than defendant."

The remaining box is not checked.

And it's signed by our jury foreperson and dated this 29th day of May, 2008, at Los Angeles, California.

Ladies and gentlemen, are these your verdicts and findings, so say you one, so say you all?

(Jurors answer affirmatively)

THE COURT: Would counsel like the jury polled?

MR. BROWN: Yes, Your Honor.

THE COURT: Ladies and gentlemen, I am going to ask each of you whether these are your verdicts or your findings. Please answer "Yes" or "No."

Juror No. 1?

JUROR NO. 1: Yes.

THE COURT: Juror No. 2?

JUROR NO. 2: Yes.

THE COURT: Juror No. 3?

JUROR NO. 3: Yes.

THE COURT: Juror No. 4?

JUROR NO. 4: Yes.

THE COURT: Juror No. 5?

JUROR NO. 5: Yes.

THE COURT: Juror No. 6?

JUROR NO. 6: Yes.

THE COURT: Juror No. 7?

JUROR NO. 7: Yes.

THE COURT: Juror No. 8?

JUROR NO. 8: Yes.

THE COURT: Juror No. 9?

JUROR NO. 9: Yes.

THE COURT: Juror No. 10?

JUROR NO. 10: Yes.

THE COURT: Juror No. 11?

JUROR NO. 11: Yes.

THE COURT: Juror No. 12?

JUROR NO. 12: Yes.

THE COURT: Counsel, is there any reason that the

clerk should not record the verdicts as read?

MS. DONAHUE: No, Your Honor.

MR. BROWN: No, Your Honor.

THE COURT: All right. The clerk will do so.

Members of the jury, you have now completed your service as jurors on this case. On behalf of the United States District Court and all of us here, I want to thank you for giving your time and effort to the administration of justice in our community.

Believe me, we realize what an imposition it is to ask you to serve. Fortunately, we kept our trial within the time frame, and we really appreciate the time that you have spent doing this.

I hope that you all realize, especially those of you who haven't served before, how critical it is for members of the community like you to perform this service. And we want you to know how much we truly appreciate it.

You are no longer under orders not to speak to anyone about the case. You now have the absolute right to discuss or not to discuss your verdict and findings with anyone you choose. If you do choose to do, please remember that the proceedings have been very important to the parties, as I know they have been to you, and please also respect your fellow jurors and their privacy and the views they shared in the jury room. And so I suggest that you not say anything to anyone that you

wouldn't be willing to say here in open court and under oath.

Attorneys often appreciate any comments that you might have to assist them in the future. That is purely voluntary. You don't have to speak to them if you don't want to. If you are willing to speak to them, you may want to wait outside in the hall, and they can join you shortly.

If you're interested -- you are not compelled, but if you're interested, you can join me in my chambers briefly and see what a federal judge's chambers look like. If you want to do that, Stoney will show you how to get back to my chambers, and if not, then you are excused.

Counsel, I will be right with you.

(Jury Out)

THE COURT: All right. Mr. Gunn?

MR. GUNN: I'm sorry, Your Honor.

THE COURT: That's all right.

MR. GUNN: Just turning it off.

MR. BROWN: Your Honor, I think we just wanted to perhaps ask the Court to extend the deadline for filing of the trial motion.

THE COURT: All right. The outstanding Rule 29 motions are denied.

How much time do you want for the --

MR. GUNN: I would like a couple months, Your Honor. I just want to look at it carefully. There's a good chance we

HILARY L. POTASHNER (Bar No. 167060)
Acting Federal Public Defender
CHARLES C. BROWN (Bar No. 179365)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Tel: 213-894-1700
Fax: 213-894-0081

Attorneys for Defendant
MICHAEL PEPE

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL PEPE,

Defendant.

Case No. CR-07-00168-DSF

**Stipulation to Correct / Modify Record on Appeal re Jury Instructions and Verdict Form Pursuant to Fed. R. App. Proc. 10(e)**

**Stipulation to Correct / Modify Record on Appeal**

IT IS HEREBY STIPULATED BY AND BETWEEN plaintiff, United States of America, by Assistant United States Attorney Patricia Donahue, and defendant, Michael Pepe, by Deputy Federal Public Defender Charles C. Brown, as follows:

1. This case is currently pending in the Ninth Circuit, Case No. 14-50095. The parties submit this stipulation pursuant to Federal Rule of Appellate Procedure 10(e)(2), which states: "If anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected and a supplemental record may be certified and forwarded: (A) on stipulation of the parties; (B) by the district court before or after the record has been forwarded; or (C) by the court of appeals."
2. At trial, the following documents pertaining to the jury instructions were not filed and are therefore not reflected on the Court's docket:
   a. On May 20, 2008, at the direction of the Court, government counsel emailed the Court's clerk and defense counsel the following three documents:
      i. The Joint Jury Instructions that had been electronically filed on May 19, 2008. *See* Docket No. 255.
      ii. The Disputed Jury Instructions, a copy of which is attached hereto as Exhibit A.
      iii. The Government Proposed Jury Instructions, a copy of which is attached hereto as Exhibit B.
   b. On May 21, 2008, in the courtroom, the Court provided government counsel and defense counsel a set of proposed jury instructions complied by the Court. *See* RT (05/21/2008) 8. A copy of this document is attached hereto as Exhibit C.
   c. On May 23, 2008, in the courtroom, the Court provided government counsel and defense counsel a set of proposed jury instructions compiled by the Court.

*See* RT (05/23/2008) 3-4. A copy of this document is attached hereto as Exhibit D.

d. On May 27, 2008, in the courtroom, the Court provided government counsel and defense counsel a set of proposed jury instructions compiled by the Court. *See* RT (05/27/2008) 5. A copy of this document is attached hereto as Exhibit E. Although the words "and more than" are stricken on page 26 of Exhibit E, they were not stricken on the original version of this document provided by the Court.

3. At trial, the following documents pertaining to the verdict form were not filed and are therefore not reflected on the Court's docket:

a. On May 21, 2008, at the direction of the Court, government counsel emailed the Court's clerk and defense counsel a proposed verdict form. The victims' names were not redacted in the proposed verdict form emailed to the Court and to defense counsel. Attached hereto as Exhibit F is a copy of the document emailed to the Court, with the victims' names redacted. The Court received this email, and stated that this form did not have a signature page. *See* RT (05/21/2008) 8.

b. On May 24, 2008, at the direction of the Court, government counsel emailed the Court's clerk and defense counsel a proposed verdict form that included a signature block. The victims' names were not redacted in the proposed verdict form emailed to the Court and to defense counsel. Attached hereto as Exhibit G is a copy of the document emailed to the Court, with the victims' names redacted. Before receiving this email, the court had already modified the proposed verdict form, as stated on the record. *See* RT (05/27/2008) 5-6. This was the verdict form provided to the jury.

4. Because the portions of the trial transcripts pertaining to the discussion of, and the Court's rulings on, the jury instructions and verdict form refer to the above-described documents that were never filed and made part of the Court's docket,

the Ninth Circuit will not be able to follow what happened in this Court without having copies of those documents. The parties therefore agree and stipulate that the record should be corrected and modified to reflect that the attached documents were before the Court.

5. A proposed order consistent with this stipulation is being filed simultaneously with this stipulation.

February 27, 2015

Respectfully submitted,

HILARY L. POTASHNER
Acting Federal Public Defender

*/s/ Charles C. Brown*
CHARLES C. BROWN
Deputy Federal Public Defender

Attorneys for Defendant

STEPHANIE YONEKURA
Acting United States Attorney

*/s/ Patricia Donahue*
PATRICIA DONAHUE
Assistant United States Attorney

Attorneys for Plaintiff

(Per Email Authorization)

# Exhibit A

THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
PATRICIA A. DONAHUE (SBN: 132610)
Assistant United States Attorney
Violent & Organized Crime Section
United States Courthouse
312 North Spring Street, 15th floor
Los Angeles, California 90012
Telephone: (213) 894-0640
Facsimile: (213) 894-3713
E-mail: patricia.donahue@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL JOSEPH PEPE,<br><br>Defendant. | CR No. CR 07-168(A)-DSF<br><br>DISPUTED JURY INSTRUCTIONS |

Plaintiff United States of America and defendant Michael Joseph Pepe hereby submit the following Disputed Jury Instructions, with the parties' respective positions.

Dated: May 19, 2008

Respectfully submitted,

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

________________________________
PATRICIA A. DONAHUE
Assistant United States Attorney

DATED: May __, 2008

________________________________
CARLTON F. GUNN
Deputy Federal Public Defender

COURT'S INSTRUCTION NO. _____

GOVERNMENT'S PROPOSED INSTRUCTION NO. 4

The defendant is charged in seven counts with traveling in foreign commerce and engaging in illicit sexual conduct with seven minor girls. In order for defendant to be found guilty of these charges, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant is a United States citizen;

Second, the defendant traveled in foreign commerce; and

Third, while in Cambodia, the defendant engaged in illicit sexual conduct during the time and with the person alleged in the particular count.

18 U.S.C. § 2423(c)

Objection to Government's Proposed Instruction No. 4:

The defense objects to Government's Proposed Instruction No. 4 and requests that the Court instead give Defendant's Proposed Instruction No. 2 for reasons outlined in more detail in the defense's motions to dismiss the indictment which have been previously denied by the Court. 18 U.S.C. § 2423(c) must be read to require some temporal connection between the travel and the illicit sexual conduct, especially when the doctrine of constitutional avoidance is considered.

COURT'S INSTRUCTION NO. _____

DEFENDANT'S PROPOSED INSTRUCTION NO. __2__

The defendant is charged in seven counts with traveling in foreign commerce and engaging in illicit sexual conduct with seven minor girls. In order for defendant to be found guilty of these charges, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant is a United States citizen;

Second, the defendant traveled in foreign commerce; and

Third, while in Cambodia, the defendant engaged in illicit sexual conduct during the time and with the person alleged in the particular count.

Fourth, the defendant engaged in the illicit sexual conduct immediately or soon after the travel in foreign commerce.

18 U.S.C. § 2423(c); Webster's Encyclopedia Unabridged Dictionary of the English Language 77, 1967 (1996 ed.), cited in Motion to Dismiss Indictment, at 13.

Government's Response to Defendant's Objection to Government's Proposed Instruction No. 4, and Government's Objection to Defendant's Proposed Instruction No. 2

The government's proposed instruction tracks the language of the statute, 18 U.S.C. § 2423(c). Defendant seeks to add an element not contained in the statute, namely, that defendant engaged in the illicit sexual conduct "immediately or soon after" the travel in foreign commerce.

In its December 3, 2007 Order Denying Defendant's Motion to Dismiss Indictment, this Court rejected defendant's argument that the word "and" in section 2423(c) means "immediately soon afterward," "next in order of time," or "then." This Court also stated that there is nothing in the text of § 2423(c) that could be interpreted as imposing any temporal relationship between the elements of the offense. This Court found that § 2423(c) imposes criminal liability on "[a]ny United States citizen or alien admitted for permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct with another person," and that under that language, there is no requirement that the illicit sexual conduct occur within any period of time after travel.

Accordingly, the government requests that the Court give government's proposed instruction no. 4, not defendant's proposed instruction no. 2.

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 2031 of 2133

# Exhibit C

Pepe ER 1951

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. MICHAEL JOSEPH PEPE, Defendant. | CR No. CR 07-168(A)-DSF<br>JURY INSTRUCTIONS |

INSTRUCTION NO. _____

The defendant is charged in seven counts with traveling in foreign commerce and engaging in illicit sexual conduct with seven minor girls. In order for defendant to be found guilty of these charges, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant is a United States citizen;

Second, the defendant traveled in foreign commerce; and

Third, while in Cambodia, the defendant engaged in illicit sexual conduct during the time and with the person alleged in the particular count.

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 2034 of 2133

# Exhibit D

Pepe ER 1954

Counsel -

I have revised instruction numbers 14, 17 and 27.  I have added language to 14, which is usually a separate instruction.  I don't think it's necessary but I will add it if defense counsel wants it.

I have added instruction numbers 12, 13, 18.

I have made 2 instructions out of a previous instruction – numbers 22 and 23.  I separated them to try to make clear that the preponderance of the evidence standard applies only to the defendant's burden.  I have added "preponderance" language.

The current version of the Ninth Circuit instructions is reflected in instruction number 10. What the government proposed as Model Instruction 4.12 no longer exists.  It does not seem appropriate to separate these into two or more instructions as all paragraphs relate to the same witness and separating them would be repetitive.

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>MICHAEL JOSEPH PEPE,<br>Defendant. | CR No. CR 07-168(A)-DSF<br><br>JURY INSTRUCTIONS |

INSTRUCTION NO. 20

The defendant is charged in seven counts with traveling in foreign commerce and engaging in illicit sexual conduct with seven minor girls. In order for defendant to be found guilty of these charges, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant is a United States citizen;

Second, the defendant traveled in foreign commerce; and

Third, while in Cambodia, the defendant engaged in illicit sexual conduct during the time and with the person alleged in the particular count.

Case: 14-50095, 05/28/2015, ID: 9552896, DktEntry: 10-2, Page 2038 of 2133

# Exhibit E

Pepe ER 1958

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. MICHAEL JOSEPH PEPE, Defendant. | CR No. CR 07-168(A)-DSF<br>JURY INSTRUCTIONS |

INSTRUCTION NO. 21

The defendant is charged in seven counts with traveling in foreign commerce and engaging in illicit sexual conduct with seven minor girls. In order for defendant to be found guilty of these charges, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant is a United States citizen;

Second, the defendant traveled in foreign commerce; and

Third, while in Cambodia, the defendant engaged in illicit sexual conduct during the time and with the person alleged in the particular count.

HILARY L. POTASHNER (Bar No. 167060)
Acting Federal Public Defender
CHARLES C. BROWN (Bar No. 179365)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Tel: 213-894-1700
Fax: 213-894-0081

Attorneys for Defendant
MICHAEL PEPE

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>MICHAEL PEPE,<br>Defendant. | Case No. CR-07-00168-DSF<br><br>**Order** |

GOOD CAUSE HAVING BEEN SHOWN, IT IS HEREBY ORDERED THAT, pursuant to Fed. R. App. Proc. 10(e), the record shall be corrected and modified to reflect that the parties' Stipulation to Correct / Modify Record on Appeal re Jury Instructions and Verdict Form accurately reflects the documents that were before the Court during defendant's trial.

IT IS SO ORDERED.

DATED: 3/2/15

Dale S. Fischer

HON. DALE S. FISCHER
United States District Judge

Submitted by:

/s/ *Charles C. Brown*

CHARLES C. BROWN

Deputy Federal Public Defender

HILARY L. POTASHNER (Bar No. 167060)
Acting Federal Public Defender
CHARLES C. BROWN (Bar No. 179365)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Tel: 213-894-1700
Fax: 213-894-0081

Attorneys for Defendant
MICHAEL PEPE

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL PEPE,

Defendant.

Case No. CR-07-00168-DSF

**Order**

GOOD CAUSE HAVING BEEN SHOWN, IT IS HEREBY ORDERED THAT, pursuant to Fed. R. App. Proc. 10(e), the record shall be corrected and modified to reflect that the parties' Stipulation to Correct / Modify Record on Appeal re Video Testimony accurately reflects the video testimony that was presented at defendant's trial.

IT IS SO ORDERED.

DATED: 3/2/15

[signature]

HON. DALE S. FISCHER
United States District Judge

Submitted by:

*/s/ Charles Brown*

CHARLES C. BROWN
Deputy Federal Public Defender

THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
PATRICIA A. DONAHUE (SBN: 132610)
JOHN J. LULEJIAN (SBN: 186783)
Assistant United States Attorneys
Violent and Organized Crime Section
1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-0640/8603
Facsimile: (213) 894-3713
E-mail: Patricia.Donahue@usdoj.gov
E-mail: John.Lulejian@usdoj.gov

Attorney for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL JOSEPH PEPE,<br><br>Defendant. | ) Case No. CR 07-168(A)-DSF<br>)<br>) GOVERNMENT'S SENTENCING POSITION<br>)<br>) Date: Sept. 25, 2008<br>) Time: 2:30 p.m.<br>) Location: Courtroom of the Honorable Dale S. Fischer |

Plaintiff United States of America hereby submits its sentencing position. This position is based on the attached memorandum of points and authorities, the Government's Submission of Victim Impact and Restitution Information filed under seal concurrently herewith, the Presentence Report, the

court to impose a sentence of 210 years because, among other things, it may deter other predators. When he was in Phnom Penh purchasing children for sex, defendant cut out newspaper articles about other pedophiles. (PSR ¶ 52). Those articles were found in defendant's residence by the Cambodian National Police and introduced into evidence at trial. It is not uncommon for those who sexually prey upon children to seek information about (and validation from) other people who are sexually interested in children. Unfortunately, as the evidence and testimony showed at trial and as stated in Exhibit A hereto, the sale of children for sex is not uncommon in Cambodia. Imposition of the maximum available sentence in this case may deter other people like defendant, who have traveled or plan to travel to southeast Asia for sex with children. In addition, the government submits that the statutory maximum sentence is warranted based on the testimony and evidence presented at trial and on the victim impact information, and for all of the reasons set forth in Exhibit A and in the Probation Officer's recommendation letter.

**C. The Victims Are Entitled To Restitution**

The Mandatory Victims Restitution Act of 1996 (MVRA), 18 U.S.C. § 3663A, applies to this case. Under the MVRA, a restitution order is mandatory regardless of a defendant's ability to pay. 18 U.S.C. §§ 3663A(a)(1), 3664(f)(1)(A); see also United States v. Grice, 319 F.3d 1174, 1177 (9th Cir. 2003). In addition, even if the MVRA did not apply, the court would have discretion under the Victim and Witness Protection Act (VWPA), 18 U.S.C. § 3663, to order restitution.

The government requests that the Court order defendant to pay restitution to Agape International Missions, the entity that has custody of and is caring for five of the seven victims, L.K., S.S., S.R., K.S. and T.C., and to Hagar International, the entity that has custody of and is caring for two of the seven victims, I.T. and N.T.D., in the amounts set forth in the Government's Submission of Restitution Materials filed under seal concurrently herewith. The victims' guardians from Agape and Hagar will attend the sentencing hearing and be available to answer any questions the Court may have regarding the restitution amounts.[1]

Defendant has failed to comply with the court order mandating certain financial disclosures to the Probation Office. (PSR ¶ 185). The Probation Office has been unable to locate any assets. (PSR ¶ 185). Defendant retired from the United States Marines Corp., and he currently receives a monthly payment from the Department of Defense, Defense Finance and Accounting Service ("DFAS") for military retired pay.[2] The amount of his monthly payment will increase, based on legislation, in October 2008. The government respectfully requests that the Court issue an order and writ of garnishment for the full amount of defendant's DFAS payment, less the amount subject to a prior order. As there are seven victims, five at Agape and two at Hagar, the government

---

[1] They may seek to present any additional information to the court in camera. See 18 U.S.C. § 3664(d)(4) ("The privacy of any records filed, or testimony heard, pursuant to this section shall be maintained to the greatest extent possible, and such records may be filed or testimony heard in camera).

[2] The amounts are set forth in a letter from DFAS that is in the Government's Submission of Restitution Materials filed under seal concurrently herewith.

requests that the garnished amount be apportioned five-sevenths to Agape and two-sevenths to Hagar. A proposed order and writ of garnishment is filed concurrently herewith.[3]

**1. The MVRA Applies to Defendant's Violations of 18 U.S.C. § 2423(c) Because They Are Crimes of Violence in which Identifiable Victims Suffered Bodily Injuries**

Title 18, United States Code, Section 3663A provides in pertinent part, "Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense . . . ." 18 U.S.C. § 3663A(a)(1). The mandatory restitution provision applies to sentencing proceedings for convictions of "any offense that is a crime of violence, as defined in section 16 . . . and in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. §§ 3663A(c)(1)(A)(i), 3663A(c)(1)(B).

Section 16 defines a crime of violence as "(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b) any offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 16.

---

[3] In addition to his retirement pay from DFAS, defendant receives a monthly payment from the U.S. Department of Veteran's Affairs ("VA"). VA counsel have informed government counsel that, since defendant is an incarcerated beneficiary, under 38 CFR §§ 3.665(a) and (d), and 38 U.S.C. § 1114(a), defendant's monthly compensation from the VA should be reduced to approximately $115, which is not subject to garnishment.

Defendant's offenses of conviction, 18 U.S.C. § 2423(c), do not have as an element the use, attempted use, or threatened use of physical force. The elements of § 2423(c) are (1) that defendant is United States citizen; (2) that defendant traveled in foreign commerce; and (3) that while in Cambodia, the defendant engaged in illicit sexual conduct during the time and with the person alleged in the particular count. Illicit sexual conduct is defined as follows:

> (1) a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States; or
>
> (2) an commercial sex act (as defined in section 1591) with a person under 18 years of age.

18 U.S.C. § 2423(f).

Section 2246 defines "sexual act" as follows:

> (1) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph, contact involving the penis occurs upon penetration, however, slight; or
>
> (2) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;
>
> (3) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person; or
>
> (4) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

18 U.S.C. § 2246(2). A "commercial sex act" is "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(c)(1).

A § 2423(c) violation meets the definition of a crime of violence in § 16(b) because it does involve a substantial risk that physical force against another person may be used, as in fact happened in this case. Although the Ninth Circuit has not specifically addressed whether § 2423(c) is a crime of violence as defined in § 16, it has addressed a similar issue regarding § 2423(b). Section 2423(c) prohibits travel in foreign commerce and engaging in illicit sexual conduct. Section 2423(b) prohibits travel in interstate or foreign commerce for the purpose of engaging in illicit sexual conduct. In United States v. Butler, 92 F.3d 960, 964 (9th Cir. 1996), the Ninth Circuit stated that § 2423(b) is, by its nature, a crime of violence. In Butler, the defendant was convicted under § 2423(b) after he traveled interstate intending to engage in illicit sexual conduct with three children in response to an advertisement and subsequent correspondence with an undercover agent posing as the mother of the fictional children. No children were actually involved. Nonetheless, the court found that § 2423(b) violations "are crimes of violence, and due to their dangerous nature, attempts are treated the same as completed criminal acts." Id. at 964.

Other courts addressing similar issues have reached the same conclusion. See United States v. Searcy, 418 F.3d 1193 (11th Cir. 2005) (18 U.S.C. § 2422(b) is a crime of violence for career offender classification purposes, as "[p]lainly, the use of an Internet facility to entice a minor to engage in sexual activity [in violation of 18 U.S.C. § 2422(b)] presents the possibility of an encounter that could result in a serious risk of physical

injury to the minor") (citations omitted); United States v. Johnson, 183 F.3d 1175, 1179 (10th Cir. 1999) (rejecting defense argument that 18 U.S.C. §§ 2422(b) and 2423(c) are not crimes of violence under § 16 and affirming district court's application of MVRA). Accordingly, § 2423(c) is a crime of violence as defined in § 16(b). See 18 U.S.C. 3663A(c)(1)(A)(ii).

In addition, the identifiable victims suffered physical injury. See 18 U.S.C. § 3553A(c)(1)(B). In this case, as the trial testimony and evidence established, victims I.T., L.K, K.S., N.T.D., and T.C. all suffered bodily injury from defendant's sexual assaults on them. (PSR ¶¶ 16, 17, 20, 22, 23, 25, 33, 36, 38-40, 43, 45, 49). Although the injuries sustained by S.R. and S.S. were not as severe as those of the other victims, as set forth in the victim impact information filed under seal, S.R. and S.S. suffered bodily injury from defendant's crimes. Accordingly, defendant is convicted of an offense described in 18 U.S.C. § 3663A(c), and the MVRA applies to this case.[4]

---

[4] Even if defendant's crimes did not qualify for application of the MVRA under 18 U.S.C. § 3663A(c), the discretionary restitution provision, 18 U.S.C. § 3663, would apply. Section 3663 applies to convictions for any offense under Title 18. See 18 U.S.C. § 3663(a)(1)(A). Unlike the MRVA, however, § 3663 requires the Court to consider defendant's financial resources, financial needs and earning ability. See 18 U.S.C. § 3663(a)(1)(B)(i)(II). Neither indigence nor a present inability to pay precludes the imposition of restitution provided there is "some evidence" in the record that defendant "may be able to pay restitution in the amount ordered in the future." United States v. Ramilo, 986 F.2d 333, 335 (9th Cir. 1993). The sentencing court is not required to make factual findings on the defendant's financial condition before imposing restitution. United States v. Cannizzaro, 871 F.2d 809, 810-11 (9th Cir.), cert. denied, 493 U.S. 895 (1989). The record simply must reflect that the district court had at its disposal information

**2. The Seven Children are Victims Entitled to Restitution**

Each of the seven children in the seven counts of conviction qualifies as a "victim" under the MVRA. A "victim" is defined as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). The victims' legal guardians – Agape and Hagar – may receive the restitution on the victims' behalf. The MVRA states that "[i]n the case of a victim who is under 18 years of age" the "legal guardian of the victim . . . or any other person appointed as suitable by the court, may assume the victim's rights under this section, but in no event shall the defendant be named as such representative or guardian." 18 U.S.C. § 3663A(a)(2).

**3. The Restitution Amount Should Include the Costs of Necessary Medical and Related Professional Services relating to Physical, Psychiatric, and Psychological Care and the Costs of Education, and Rehabilitation for the Seven Victims**

When the crime results "in bodily injury to a victim" the MVRA requires the court to order the defendant to do the following:

> (A) pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;
>
> (B) pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation;

---

bearing on defendant's ability to pay. Id. at 811.

In this case, defendant will serve the rest of his life in prison, and will continue to be entitled to receive military retirement pay from DFAS. Defendant has no dependants. Defendant thus has the ability to pay restitution to the victims.

and

(C)  reimburse the victim for income lost by such victim as a result of such offense.

18 U.S.C. § 3636A(b)(2); See United States v. Cliatt, 338 F.3d 1089, 1091 (9th Cir. 2003) (language of § 3663A(b)(2)(A) "expresses Congress' intention that a defendant must, in every case involving bodily injury, pay what it costs to care for the victim, whether or not the victim paid for the care or was obligated to do so"); United States v. Johnson, 400 F.3d 187, 200 (4th Cir. 2005) ("The careful choice of words [in § 3663A(b)(2)(A)] indicates a legislative intent to require those convicted of crimes resulting in bodily injury to pay the entire 'amount equal to the cost of necessary medical . . . services,' even when the provider of those services has not taxed the victim herself with the full amount of those costs") (citing 18 U.S.C. § 3663A(b)(2)(A)).[5]

     The government requests that the court order restitution to be paid to Agape and Hagar, to pay for the physical, psychiatric, and psychological care, as well as occupational therapy and rehabilitation.  The victims are children who, as a result of defendant's purchasing them and using them for his sexual gratification, are in the custody and care of Agape and Hagar, where they will remain until they are 18 years old.  The costs that Agape and Hagar have incurred and will continue to incur for the rehabilitation from the horrors of what defendant did to them

---

     [5] See also United States v. Hicks, 997 F.2d 594, 601 (9th Cir. 1993) (costs of psychological counseling can be included in restitution order under 3663 only when the victim has suffered physical injury.

for their occupational therapy, i.e. education for child victims whose ability to learn has been diminished by defendant's crimes, and for their physical and psychological care are set forth in the materials filed concurrently herewith. The government requests restitution for both the costs that Agape and Hagar have incurred over the past two years, since mid 2006 when the victims arrived at these non-governmental organizations, and the future costs that Agape and Hagar will incur for the rehabilitation, occupational therapy, and physical and psychological care necessitated by defendant's crimes against the victims.

As the Ninth Circuit explained in affirming a restitution order for psychological and medical treatment, vocational training, and management fee to the non-governmental organization caring for the victims, and start-up capital to aid the victims in opening a business in United States v. Doe, 488 F.3d 1154 (9th Cir. 2007):

> We emphasize that this is a unique case. Doe traveled outside the United States to molest children in his native country. As such, he not only gets the windfall of paying only reduced developing-world rates, but the government is also hindered in its ability to investigate his remote activity, to locate all of the victims of his criminal conduct, and to provide supervision of the children's recovery. In a situation such as this, where all the child victims are minors in a foreign country, the government necessarily must contract with reputable outside organizations to preform services that might be readily available by more familiar institutions in the United States.

Doe, 488 F.3d at 1162.

In addition, the Ninth Circuit has approved restitution for future counseling for child sex abuse victims. See United States v. Laney, 189 F.3d 954, 966 (9th Cir. 1999) (future counseling expenses may be included in amount of restitution). Although the

court in Laney was interpreting 18 U.S.C. § 2259, the mandatory restitution provision applicable to violations of Chapter 110 of Title 18, rather than 18 U.S.C. § 3663A, the mandatory restitution provision applicable here, the court's reasoning applies to this case. Sections 2559 and 3663A both direct that restitution orders be issued and enforced in accordance with § 3664.

In Laney, the defendant objected to the restitution order including future counseling expenses on the ground that § 3664 has a mechanism for compensating the cost of future therapy. Section 3664 directs victims who subsequently discover further losses to petition the court within 60 days of that discovery for an amended restitution order, which the court may grant only if the victim shows good cause for failing previously to inform the court of the loss. 18 U.S.C. 3664(d)(5); Laney, 189 F.3d at 966-67. In rejecting this argument, the court stated that the victim and her family "will not 'discover' in the future that they need counseling; they already know that they do," and "[i]f Congress intended crime victims who required long-term psychological or physical therapy to receive restitution only after they actually paid their therapists, it created a strangely unwieldy procedure in section 3664, which would require a victim to petition the court for an amended restitution order every 60 days for as long as the therapy lasted." Id. at 967. As in Laney, the victims in this case already know that they will need counseling in the future. Accordingly, the government requests that the restitution order include future counseling expenses. Like the defendant in Doe, 488 F.3d at 1162, defendant's

restitution amount is much smaller than it would be if his victims were located in the United States rather than in a developing country.

In addition, as in Doe, 488 F.3d at 1162, the restitution amount will provide assistance to only a fraction of the victims whom defendant sexually violated. Defendant's computer contained photographs, including sexually explicit photographs, of minor girls in addition to the victims in this case. United States Immigration and Customs Enforcement and non-governmental organizations have gone to great effort to attempt to locate and provide assistance to these additional victims. Unfortunately, to date those efforts have been unsuccessful. Also, since there is no evidence that defendant photographed every one of his victims and saved the images on the media found by law enforcement, and since his travels to Cambodia predate his 2005 acquisition of the seized computer media, there are likely many more victims than those known to law enforcement. Thus, the requested restitution amount for the identified victims is only a small fraction of what defendant owes his numerous child victims.

## III

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence defendant to 210 years in custody, lifetime supervised release, a $700 special assessment, and restitution for the seven child victims.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DALE S. FISCHER

UNITED STATES DISTRICT JUDGE PRESIDING

United States of America, )
Plaintiff, )
)
vs. ) Case No. CR 07-168-DSF
)
Michael Joseph Pepe, )
Defendant. )
_________________________________ )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Thursday, September 25, 2008

Pamela A. Seijas, CSR, FCRR, RPR, RMR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California 90012
(213) 687-0446

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
BY: PATRICIA DONAHUE
ASSISTANT UNITED STATES ATTORNEY
JOHN LULEJIAN
ASSISTANT UNITED STATES ATTORNEY
312 N. SPRING STREET
LOS ANGELES, CA 90012

FOR DEFENDANT: OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY: CARL GUNN
DEPUTY FEDERAL PUBLIC DEFENDER
CHARLES BROWN
DEPUTY FEDERAL PUBLIC DEFENDER
321 EAST SECOND STREET
LOS ANGELES, CA 90012

INTERPRETERS: ANN SPIRATOS
MORYVANN PAIGNE

 Los Angeles, California, Thursday, September 25, 2008

2:35 p.m.

-oOo-

THE CLERK: Calling Item No. 2, CR 07-168(A)-DSF, *United States of America vs. Michael Joseph Pepe*.

MS. DONAHUE: Good afternoon, your Honor. Patricia Donahue and John Lulejian on behalf of the United States. And there are a number of other people that I would like to introduce after the Court takes the defense appearance.

THE COURT: Thank you.

MR. BROWN: Good afternoon, your Honor. Charles Brown and Carl Gunn on behalf of Mr. Pepe, who is present in custody.

THE COURT: Good afternoon.

Ms. Donahue?

MS. DONAHUE: Also in court today seated behind me are the seven victims in this case: I.T., L.K.xxx, S.R.xxx, S.S.xxx, NTDx, T.C.xx, and K.S.x. they are here with the guardians who accompanied them when they testified -- Sok Sinn, Sambo Lim and Sisarat Kheng -- as well as Sue Taylor, their guardian from Hagar, and Don and Bridget Brewster, the guardians from Agape International Mission, and of course the case agents, Special Agent Eddy Wang and Gary Phillips.

THE COURT: Thank you. Welcome to all of you.

This is the first phase of a bifurcated sentencing hearing. The bifurcation was ordered for the reasons stated on

the record on September 18.

The purpose of this portion of the hearing is to afford the victims and others the opportunity to present statements and to allow the Court to ask questions and address the victims.

The information presented will be considered by the Court in determining and imposing the sentence at the second phase of the sentencing hearing.

Ms. Donahue, would any of the victims like to address the Court, or anyone else on their behalf?

MS. DONAHUE: Yes, your Honor.

And I'm going to say -- if there are any of the victims who would like to address the Court, I'm going to ask sort of first and last and then maybe some their representatives who might want to come forward.

THE COURT: Sure. And if they want to speak, they can speak from wherever they want. They can come up here. Wherever we have a microphone. Wherever they are more comfortable.

MS. DONAHUE: Thank you, your Honor. We actually brought a stool to put here so they can speak into this microphone, if they would like to.

I should also note we have Ann Spiratos and Moryvann Paigne, who are the Vietnamese and Khmer interpreters respectively, who were present at trial.

THE COURT: Thank you.

MS. DONAHUE: Your Honor, this is NTDx.

THE COURT: Hello, NTDx.

NTDx: Yes.

THE COURT: Would you like to talk to me?

NTDx: Yes.

THE COURT: What would you like to say?

NTDx: I want to say that I want to come here so I could go to school. I want to be here so I can take care of my future. I would like to be here so I can learn and go to school so I can speak English. That's all.

THE COURT: Okay. Thank you very much.

KHENG SISARAT: Hello. With your Honor's respect, my name is Kheng Sisarat. I work at International Agape.

T.C.xx is my responsibility that was violated by Michael. When I spoke with her, T.C.xx told me that *Michael raped me*. All this that I have talked with her made me have -- I go through so many pain for them.

And Michael, what he did to T.C.xx, it made her suffer, her life suffer. And she's hopeless and she despair. She feels that she has no value and afraid for her future. And she hates herself. She blames herself that Michael -- what he did to her.

But today I'm very happy that this Court here come to this process and that the law that you made here as far -- for example, as for Michael, it's justice.

I do not want to see other kids go through this again. It doesn't matter who: Cambodians, Tai, Vietnam or American. Or any nationalities.

In the end, I want to say thank you for the government and the United States District Court that you help us out for this matters as far as rape, no matter where. Thank you.

THE COURT: Thank you.

SOK SINN: Good afternoon, your Honor, and all the attorneys here.

First of all, I like to thank God and all of the attorneys and the Court that I am given this chance to be here today so I can stand here to express my thoughts to you.

I have been the counselor for I.T. and NTDx. I have learned a lot about their stories and their lives, plus the person who harmed them, which is Michael.

The girls, they have told me a lot about what happened inside their mind and their pain. They are very sad and feeling miserable. They feel like they are worthless. Any time the girls told me the stories like that, these two girls, they think that their lives have nothing, no valuable, no life anymore.

After listening to their thoughts and what they have told me, that make me think about this a lot. I wonder why this happened to my own children, my own people. I wonder who would help these children to get justice.

Even though I love them so much, I would not be able

to fill their void in their soul and life.

Two years ago, since I.T. and NTDx came into Hagar to stay, I started to watch their mind and their behaviors. I feel like I am not able to do anything for them.

Today I am grateful that God and the Court and the attorneys have spent lots of time to help the children and also to love them very much. And also being very fair for the children, for my own kids.

Today I see the changes in I.T. and NTDx. I know one thing for sure. Their future with the help of God and the attorneys and the Court just bring good things to them, compensate them, the fairness, and from now on, the children wants to be somebody who can contribute to this society and this life and also their wishes. I like to thank the Court.

THE COURT: Thank you.

Will the interpreters interpret for the girls, please.

Ladies, our lawmakers here in America have considered it very important that victims of crimes be able to come and speak and tell the judge about the impact that the crimes have had on them. And so I don't want you to be afraid. This is a safe place.

If any of the others of you want to speak to me, even if it's just a few words, and tell me how you feel or anything else that you want, please do that.

Does anyone else want to talk to me?

THE INTERPRETER: No, your Honor.

I apologize. S.S.xxx wants to say something.

THE COURT: Sure.

S.S.xxx: Hello. Hello.

THE COURT: Hello.

That's okay. Take all the time you need. Why don't you tell me about school.

S.S.xxx: I am very happy that I came here, that I visit here. I don't want any other children to be like us. Please don't allow this to happen again. I would like to say thank you.

THE COURT: Thank you.

Would anyone else like to speak? You can come up with another girl or you can come up with your counselor.

K.S.x: Whatever he did to me, it's very painful. I don't want him to do this to anyone anymore. I'm very happy today. Thank you very much.

THE COURT: Thank you.

Ms. Donahue, for the record, who was that?

MS. DONAHUE: Your Honor, that was K.S.x.

THE COURT: Thank you.

Anyone else? Are you sure? You can tell me about school, you can tell me about your classes.

MS. DONAHUE: Your Honor, this is S.R.xxx.

THE INTERPRETER: This is S.R.xxx.

S.R.xxx: Hello everyone. I want to say I do not want this to happen again to any other children. When it happened to us, it made us very painful.

I am very happy today because I see justice. I'm -- I just want to say thank you that you helped me find justice here.

THE COURT: Thank you.

L.K.xxx: Hello. I want to say hello to everyone who is here. And thank you for allowing me to be here to speak. Thank you for helping me find justice and believe in me. Thank you for the government. Thank you.

THE COURT: Thank you for coming here.

MS. DONAHUE: Your Honor, that's L.K.xxx.

THE COURT: Thank you.

MS. DONAHUE: Your Honor, this is I.T..

I.T.: Yes. I would like to thank the Court to allow me to be here. I want to grow up to be a doctor. That's all.

THE COURT: Wonderful.

Is there another victim, Ms. Donahue, that wants to --

MS. DONAHUE: Yes, your Honor. This is T.C.xx.

T.C.xx: Thank you for finding -- for helping me find justice. I do not want other female children to be like this -- me. Thank you.

THE COURT: Thank you.

MS. DONAHUE: Your Honor, NTDx, who spoke first, would like to say something else to the Court.

THE COURT: That will be fine. Thank you.

NTDx: I want to tell the Court that I am grateful that you found the truth for me. I'm very happy because the Court find Michael is guilty. However, inside me is still very painful. When this happened to me, I'm very sad for my life. I never want this to happen to any other girls. I am very sad.

So many people worried for me about this. I like to see this problem would never happen again with anyone else. I would like to thank the Court.

THE COURT: Thank you.

Did I hear from all the victims?

MS. DONAHUE: You have heard from all of the victims, and I think nobody else wants to come back. I was just checking. They may change their minds, but right now, nobody else wants to come forward.

THE COURT: That's fine.

MS. DONAHUE: This is Sue Taylor from Hagar.

THE COURT: Ms. Taylor.

SUE TAYLOR: Thank you, your Honor, for providing the opportunity for us to come here. As you can hear in the voices, the pain is still there. Outwardly they smile and they laugh, but behind their eyes, it's silent pain.

My name is Sue Taylor, and I am the Senior Manager of Hagar children's programs, and I have the privilege of caring for I.T. and NTDx, both beautiful young girls, but both deeply

hurting young girls.

These girls have been betrayed by their families. They have been betrayed by adults. They should have been able to trust but have been looked down on by society and been shamed by society for acts that they had no control over.

Even after many years of experience of working with girls in Cambodia, like I.T. and NTDx, I still struggle to understand the depth of the impact, for these girls have been robbed of their childhood, been robbed of the ability to feel safe, robbed of the ability to trust an adult who should have instilled security and protection but instead instilled terror and even the threat of death.

Your Honor, I don't think that any of us here today truly understands how deeply the lives of these young girls have been affected. Even after two years of living in a caring, supportive, safe environment, these girls still experience high levels of trauma and psychosocial impairment. Will they ever be free from their inner nightmare?

It tears my heart to see the pain that is in their eyes and to see their little bodies shaking just with coming here today to express how they feel. I feel helpless to take their pain away.

What right does one person have to selfishly inflict such pain on one so young and powerless? The physical scars will heal, but what about the emotional scarring? This is for

life.

You know, each new developmental stage that these young girls go through will bring new challenges. When they start to date, when they enter relationships or marriage or childbirth, each new stage is going to bring new challenges, and each time, there are going to be new ghosts that need to be silenced from the past before they can experience any pleasure or success in their life.

Trauma interrupts normal development and one's ability to process and retain information, and these girls are up to five years behind their chronological age for their peers in their education. It's going to be a long road ahead for them to ever catch up and to ever have any hopes in the future. It's a journey.

What does the future hold for them? We will do our best and we will remain committed. But I ask your Honor to consider the depth of the impact of this crime on these young lives and that you assist in every way possible to return to them a future and a hope.

Thank you.

THE COURT: Thank you.

DON BREWSTER: I, too, want to thank you, your Honor, for giving us this opportunity and just the process that we've been able to go through here.

I do want to mention something I think about the

uniqueness of this situation. You've read, I'm sure, the girls' Victim Impact Statements and understand the depth of that trauma, which they're really not sharing here today.

THE COURT: I understand that.

DON BREWSTER: But that pain and that trauma that they -- the physical and emotional part might be like something that's happened here in this country, something you're used to dealing with. And the same thing might be true of the healing process where they're purging all this pain and really the evil that they've had to endure. But the uniqueness is the culture that they live in.

You see, the culture that they live in consider these children as refuse now. This is something they're going to have to fight the rest of their life, and as Sue mentioned, we can bring healing. I believe God will bring healing to their hearts, but they have a life sentence of overcoming what culture thinks of them, through no fault of their own.

Your Honor, I believe that anything less than the maximum sentence would truly fall far short of justice. I believe that it would dishonor these kids and this sacrifice and the courage they've shown to come here, and you've heard it from them because they're concerned that it would happen to another child.

And I just -- I don't -- I honestly don't believe justice can be found in this case, but the maximum sentence will

be as close as we can possibly get.

And, Mr. Pepe, I'd like you to know that I've been praying for you. I pray that you would redeem your life. And I don't mean by that, by life, being a former pastor and being at a Christian NGO -- I don't mean that you would fall on your knees and say a prayer and ask for forgiveness.

But you have an opportunity to redeem your life, and the fact that you would admit what you had done, that you would take responsibility for torturing and raping little girls, that you would step forward with the courage to do that, and that you wouldn't be asking the Court for leniency. That you would accept; again, take responsibility.

And, finally, spending the rest of your life in prison, you have the opportunity to redeem your life by helping law enforcement stop other pedophiles. You know names, you have knowledge, you know places. You could stop other pedophiles if you were willing to do that, if you were willing to have just a small bit of the courage that these kids have shown after what you've done to them.

And that's my prayer for you, that you would truly redeem your life.

Thank you.

THE COURT: Thank you.

MS. DONAHUE: Your Honor, just for the record, that is Don Brewster from Agape.

THE COURT: Thank you.

Would anyone else like to speak?

MS. DONAHUE: No, your Honor. I think that's it.

THE COURT: Thank you.

Would someone translate for the girls, please.

I want to thank the counselors and the caregivers for coming here and speaking so well on behalf of these victims.

And I want to thank all of you girls for sending me your statements and sending me the beautiful pictures that you drew.

And I want to tell you that nothing that happened to you was your fault. There is no reason for you to be embarrassed or ashamed.

You are all very brave and strong to come here and testify and to come here today and speak. And you should all be very proud of yourselves for having the courage to do that.

Thank you all very much. You have helped our system work because without you, justice would not have been achieved. So you thanked me, but the thanks really go to you. Thank you.

THE INTERPRETER: Thank you.

THE COURT: I do have some questions about restitution, Ms. Donahue, and I don't know that they need to be resolved here, but as long as you do have people here who might be witnesses, perhaps we should also ask Mr. Gunn and Mr. Brown if they have any issues or any evidence that they are going to

want to address?

I have a couple of questions. You have provided evidence about the counseling that's likely needed and the costs of that. I wasn't sure why the counseling required a translator.

Are there not counselors available who speak the language of the children?

MS. DONAHUE: That request came from Hagar, and it is my understanding they do not always have counselors who speak Vietnamese, and in some instances, the preference is to have the counseling done in Vietnamese.

The folks at Hagar -- I asked the same question of the folks at Hagar who told me that, and they said it's not -- sometimes they have someone who speaks that language and sometimes they don't, and when the counseling needs to be done or when there is a need for intervention, they want to be able to do it, even if they need to go through a translator.

THE COURT: Okay. I think it's somewhat obvious from the testimony that I heard at the trial, and so forgive me for raising it, but I think it's a justifiable question from the defense perspective, and that is in all of the circumstances, was it necessary for the girls to live at either Hagar or Agape? Were there no other situations? It appears that one of them might be with a foster family at this point.

MS. DONAHUE: At the time they were rescued in 2006,

there was absolutely no alternative to the aftercare shelters that are being offered.

I think right now -- and certainly Sue Taylor and Don Brewster can correct me if I'm wrong, so I'm glad you're asking me this while they're here.

They are trying out a foster situation. I'm not sure that it will work or that it is permanent. It is in a foster family located in Cambodia. And my understanding is that -- and this is only as to Hagar. This is not as to Agape.

My understanding is that Hagar still continues to incur costs for caring for the children, even though they may be physically with a foster family.

THE COURT: I guess my concern is looking ahead and contemplating what might be the defense position -- and if it's not the defense position and you're not going to argue this, then we don't need to go into it.

Ordinarily there would be a need for evidence that would support the request for restitution, and I don't know that we have the evidence that shows why they need to be at one of those facilities as opposed to being home with family.

MS. DONAHUE: Okay.

THE COURT: And that can be presented now or perhaps it can be presented by way of declaration or affidavit, but I think the defense has a right to ask for that, and unless they are not asking for it, then we should get it in the best way

that she can get it for us.

MS. DONAHUE: I think both Sue Taylor and Don Brewster can speak far more eloquently than I about why this really is the only option for the girls.

Sue?

SUE TAYLOR: We have explored all opportunities for the girls to go home. We maintain contact with their families regularly, but neither of their families in my two cases have been deemed to be safe families, so these two girls are now living with a Vietnamese foster family, a mom and a dad.

But due to the unsafe nature of the community in which the couple live, we've had to rent a property. And because of the high incidence of trafficking in their community, we are arranging a property in a safe community.

And so we have to pay this couple and we pay all of the needs of the children. So they will have to remain in their care until they are independent adults.

THE COURT: And the safety issue is the trafficking issue?

THE WITNESS: The risk, yes, of re-trafficking is very high.

THE COURT: Mr. Gunn, Mr. Brown, do you have any questions that you want to ask?

MR. BROWN: May we have one moment?

THE COURT: You may.

(Mr. Gunn and Mr. Brown confer off the record)

MR. BROWN: Your Honor, we don't have any additional questions at this time. If some questions do arise, perhaps we can brief it for the Court and proceed by way of declaration.

THE COURT: That would be great. That's on this issue or the counseling issue or costs or translators or anything?

MR. BROWN: Yes, your Honor.

THE COURT: Can we have someone from Agape?

DON BREWSTER: And our situation is the same as what Sue Taylor just described. The girls in question, the five that are with us, do not have safe families to be reintegrated to.

THE COURT: You've evaluated that for each of the girls?

DON BREWSTER: Yes. Independently for each girl.

THE COURT: Again, Mr. Brown, do you have any questions at this time?

MR. BROWN: No, your Honor. But we would like to reserve the right to perhaps question the care provider regarding some solutions that may come up. We don't have any at this time.

THE COURT: They're here now and they don't live in this country, so --

MR. BROWN: Certainly. I understand, your Honor.

The defense was not prepared to address those issues at this time. So we are still researching our perspective on

that.

THE COURT: All right. Thank you.

As I indicated at the last hearing, I want the government to investigate all options for either bringing the children back or providing a way for them to watch, perhaps through the Embassy.

Another thing I thought of and I -- this is just off the top of my head - is simply videotaping the proceedings and providing a videotape for them to be sent to them if they can't watch the proceedings live.

I don't know the efficacy of doing any of those things, but I do think that if there's anything at all that we can do, that that's what Congress would have intended that we do.

So you will look into all those things, Ms. Donahue?

MS. DONAHUE: Absolutely, your Honor.

THE COURT: Is there anything else we can do today?

MS. DONAHUE: No. That's everything.

Thank you very much, your Honor.

THE COURT: Anything from the defense?

MR. BROWN: No, your Honor.

THE COURT: Thank you all again for coming.

(Proceedings adjourned at 3:18 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

COUNTY OF LOS ANGELES )
)
STATE OF CALIFORNIA )

I, Pamela A. Batalo, Federal Official Realtime Court Reporter, Registered Professional Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 18, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: April 10, 2014

/s/ Pamela A. Batalo
Pamela A. Batalo, CSR No. 3593, FCRR, RMR
Federal Official Court Reporter

SEAN K. KENNEDY (No. 145632)
Federal Public Defender
(E-mail: sean_kennedy@fd.org)
CHARLES C. BROWN (No. 179365 )
Deputy Federal Public Defender
(E-mail: Charles_Brown@fd.org)
321 East 2nd Street
Los Angeles, California 90012-4206
Telephone (213) 894-4795
Facsimile (213) 894-0081

Attorneys for Defendant
MICHAEL PEPE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>MICHAEL PEPE,<br>Defendant. | NO. CR 07-168-DSF<br><br>DEFENDANT'S SUPPLEMENTAL FILING RE: RESTITUTION<br><br>DATE: March 26, 2009<br>TIME: 1:30 p.m. |

SEAN K. KENNEDY (No. 145632)
Federal Public Defender
(E-mail: sean_kennedy@fd.org)
CHARLES C. BROWN (No. 179365 )
Deputy Federal Public Defender
(E-mail: Charles_Brown@fd.org)
321 East 2nd Street
Los Angeles, California 90012-4206
Telephone (213) 894-4795
Facsimile (213) 894-0081

Attorneys for Defendant
MICHAEL PEPE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>MICHAEL PEPE,<br>Defendant. | NO. CR 07-168-DSF<br><br>DEFENDANT'S SUPPLEMENTAL FILING RE: RESTITUTION<br><br>DATE: March 26, 2009<br>TIME: 1:30 p.m. |

Defendant, MICHAEL PEPE, by and through his attorney of record, Deputy Federal Public Defender Charles C. Brown, hereby files the following supplemental filing addressing the issue of restitution in this case.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: March 25, 2009

By [signature]
CHARLES C. BROWN
Deputy Federal Public Defender

# I.
# INTRODUCTION

Pursuant to the mandatory restitution provisions of 18 U.S.C. § 2248, both the probation office and the government recommend that the court order restitution payments to Hagar International Missions and Agape – international charitable organizations that provided care for the victims in this case. The government concludes that Hagar is entitled to restitution in the amount of $78,616.22. This amount includes the cost of past and future counseling services and care. Government's Submission of Restitution Information at 2. The government concludes that Agape is entitled to restitution in the amount of $282,296.35. This amount also includes the cost of past and future care. Government's Submission of Restitution Information at 3. The defense contends that the requested restitution amount is improper under 18 U.S.C. § 2248.

# II.
# DISCUSSION

## A.
## Under 18 U.S.C. § 2248 Charitable Organizations Are Not "Victims" and Therefore are Not Entitled to Mandatory Restitution and Any Future Costs Would Be Speculative

In 2001, the Ninth Circuit analyzed whether a government funded crises center that provided services to a victim of sexual abuse at no cost to the victim was entitled to restitution under § 2248. *United States v. Follet*, 269 F.3d 996 (9th Cir. 2001). After a careful analysis of the statute, the *Follet* court concluded that § 2248 did not permit a restitution order requiring the defendant to pay restitution to the crisis center when (a) such services where provided free of charge and (b) such order would apply

to future costs that have not been yet incurred and are nothing more "than a mere possibility." *Id.* at 1002.

In *Follet,* the Court analyzed the district court's authority to impose restitution, recognizing that "Federal courts have no inherent power to award restitution, but may do so only pursuant to statutory authority." *Follet,* 269 F.3d at 999, *citing United States v. Hicks*, 997 F.2d 594, 600 (9th Cir.1993). Thus, courts have such authority under the Victim and Witness Protection Act of 1982 ("VWPA"), providing for discretionary awards of restitution after conviction for certain crimes, 18 U.S.C. § 3663, and under the Mandatory Victims Restitution Act of 1996 ("MVRA"), providing for mandatory restitution for crimes of violence and property offenses, 18 U.S.C. § 3663A. Finally, courts have authority under 18 U.S.C. § 2248, which provides for mandatory restitution for crimes involving the "sexual abuse of a minor." *Follet,* 269 F.3d at 999.

To decide whether § 2248 permits a court to order restitution where the entity providing services to the victim does not charge the victim for them, the *Follet* Court began with language of the statute. *Id.* According to the statute,

> section 2248 provides for mandatory orders of restitution in the "full amount of the victim's losses ...." § 2248(a), (b)(1). Paragraph (3), in turn, defines the term "full amount of the victim's losses" to include "any costs incurred by the victim for .... medical services relating to physical, psychiatric, or psychological care." § 2248(b)(3)(A). The "victim" is "the individual harmed as a result of a commission of a crime under this chapter." § 2248(c). Finally, any order of restitution under § 2248 is to be "issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A." § 2248(b)(2).

*Id.*

The *Follet* Court went on to conclude,

> The Crisis Center "incurred" "costs ... for medical services

> relating to .... psychological care" on account of Follet's crime. That the Crisis Center was not the "victim" of Follet's crime, however, seems obvious. The crime was sexual abuse of a minor, a crime that may - indeed, usually will-result in psychological harm to the girl abused. That the girl will seek and obtain counseling for that harm is not, though, assured by the fact that the crime was committed (although we may hope that she does), and that she will seek such counseling, if she does, from a free clinic rather than one for which she pays, while perhaps predictable if one knows her economic circumstances, is certainly not something one can foresee from the fact that the crime was committed. So the connection between the commission of statutory rape and the economic cost to the Crisis Center for the services provided to Follet's niece is simply too attenuated to bring the Crisis Center within the statutory definition of "victim." We conclude that the Crisis Center was not the victim of Follet's crime, even though it ended up bearing some of the economic loss Follet caused.

*Id.*

In other words, under the precise language of § 2248, "[a] cost for which the victim will never have to pay because the services will be provided directly by a governmental or charitable organization is not "incurred" by the victim, even if that organization will incur costs for the benefit of the victim." *Id.* Thus, § 2248 is therefore different from other mandatory restitution provisions that use different language "that may well permit orders of restitution to governmental or charitable institutions that provide covered services to the victim." *Id.* at 1000.

Here, both Hagar International Missions and Agape are international charitable organizations that are funded by either private donations, governmental grants, or

both. They provided treatment and care to victims of the offense free of charge, even though that have incurred costs as a result of their efforts. To that extent, they are indistinguishable from crises center in *Follet.* As such, like the government funded crisis center in that case, Hagar and Agape are not technically "victims" of the offense and are therefore not entitled to mandatory restitution under the precise language of § 2248.

Moreover, even assuming for the sake of argument that the Court finds restitution proper in this case, much of the requested restitution amount is for the cost of *future* care. Although the district court may in some instances order restitution in a definite amount for future therapy, the government must provide proof of the need for such therapy and a reasonable estimate of the cost of such future counseling. *Follet*, at 1001, 1002. Here it does not appear that the estimated cost of care is reasonable under the circumstances. For example, the government opines that in the case of Agape, it is anticipated that five girls "will remain in Agape's care for at least three to five years." Govt's Submission of Restitution Information at 3. This request is speculative at best. As noted above, as an initial matter, the government must provide proof of the need for additional therapy. Speculation that the girls will require and additional three to five years of therapy, without more, is insufficient to support a request for future restitution.

/

/

/

/

/

/

/

/

/

## III.

## CONCLUSION

For the reasons set forth above, it is respectfully requested that this Court find that the requested restitution order is not proper in this case.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: March 25, 2009

By ______________________

CHARLES C. BROWN
Deputy Federal Public Defender

/

PROOF OF SERVICE

I, the undersigned, declare that I am a resident or employed in Riverside County, California; that my business address is the Federal Public Defender's Office, 3801 University Avenue, Suite 150; Riverside, California 92501; that I am over the age of eighteen years; that I am not a party to the above-entitled action; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, and at whose direction I served the Defendant's Supplemental Filing Re: Restitution.

On March 25, 2009, following ordinary business practice, service was:

[X]Placed in a closed envelope, for collection and hand-delivery by our internal staff, addressed as follows:

[ ] By hand-delivery addressed as follows:

[ ] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows:

Patricia A. Donahue
Assistant United States Attorney
John J. Lulejian
Assistant United States Attorney
United States Court House
312 North Spring Street, Suite
Los Angeles, California 90012 [ECF]

Pamela Chen
U.S. Probation Officer
312 N. Spring St., 6th Fl.
Los Angeles, CA 90012

This proof of service is executed at Riverside, California, on March 25, 2009.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Kristina Beck

**United States District Court**
**Central District of California**

**UNITED STATES OF AMERICA vs.** **Docket No.** **CR 07-168 (A) DSF**

**Defendant** Michael Joseph Pepe **Social Security No.** 2 5 4 9 (2 5 4 4)

akas: ______ (Last 4 digits)

## JUDGMENT AND PROBATION/COMMITMENT ORDER

In the presence of the attorney for the government, the defendant appeared in person on this date.

| MONTH | DAY | YEAR |
|---|---|---|
| 2 | 28 | 14 |

**COUNSEL** **Charles Brown, Deputy Federal Public Defender**
(Name of Counsel)

**PLEA** ☐ **GUILTY,** and the court being satisfied that there is a factual basis for the plea. ☐ **NOLO CONTENDERE** ☐ **NOT GUILTY**

**FINDING** There being a finding/verdict of **GUILTY,** defendant has been convicted as charged of the offense(s) of:
18 U.S.C. §2433(c): Engaging in Illicit Sexual Conduct with a Minor in Foreign Places - Counts 1 through 7 of the First Superseding Indictment

**JUDGMENT AND PROB/ COMM ORDER** The Court asked whether there was any reason why judgment should not be pronounced. Because no sufficient cause to the contrary was shown, or appeared to the Court, the Court adjudged the defendant guilty as charged and convicted and ordered that: Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that defendant, Michael Joseph Pepe, is hereby committed on Counts 1 through 7 of the First Superseding Indictment to the custody of the Bureau of Prisons for a term of 210 years. This term consists of 30 years on each of Counts 1 through 7 of the First Superseding Indictment, to be served consecutively.

In the event defendant is released from prison, on release from imprisonment, the defendant shall be placed on supervised release for a term of life. This term consists of life on each of Counts 1 to 7, all such terms to run concurrently under the following terms and conditions:

1. The defendant shall comply with the rules and regulations of the U. S. Probation Office and General Order 318;

2. During the period of community supervision the defendant shall pay the special assessment and restitution in accordance with this judgment's orders pertaining to such payment;

3. The defendant shall cooperate in the collection of a DNA sample from the defendant;

**Sex Offender Treatment and Conditions**

4. The defendant shall register with the state sex offender registration agency in any state where the defendant resides, is employed, carries on a vocation, or is a student, as directed by the Probation Officer. The defendant shall provide proof of registration to the Probation Officer within 30 days of release from imprisonment;

5. The defendant shall participate in a psychological counseling and/or psychiatric treatment and/or a sex offender treatment program, which may include inpatient treatment, as approved and directed by the Probation Officer. The defendant shall abide by all rules, requirements, and conditions of such program, including submission to risk assessment evaluations and physiological testing, such as polygraph and Abel testing. The Probation Officer shall disclose the presentence report and any previous mental health evaluations or reports to the treatment provider;

6. As directed by the Probation Officer, the defendant shall pay all or part of the costs of treating the defendant's psychological/psychiatric disorder(s) to the aftercare contractor during the period of community supervision, pursuant to 18 U.S.C. § 3672. The defendant shall provide payment and proof of payment, as

directed by the Probation Officer;

7. The defendant shall not possess any materials, including pictures, photographs, books, writings, drawings, videos, or video games, depicting and/or describing child pornography, as defined in 18 U.S.C. § 2256(8), except in connection with the preparation of an appeal;

8. The defendant shall not contact the victims by any means, including in person, by mail or electronic means, or via third parties. Further, the defendant shall remain at least 100 yards from the victims at all times. If any contact occurs, the defendant shall immediately leave the area of contact, and report the contact to the Probation Officer.

9. The defendant shall not associate or have verbal, written, telephonic, or electronic communication with any person under the age of 18, except: a) in the presence of the parent or legal guardian of said minor; and b) on the condition that the defendant notify said parent or legal guardian of his conviction in the instant offense. This provision does not encompass persons under the age of 18, such as waiters, cashiers, ticket vendors, etc., with whom the defendant must deal in order to obtain ordinary and usual commercial services;

10. The defendant shall not affiliate with, own, control, volunteer or be employed in any capacity by a business and or organization that causes him to regularly contact persons under the age of 18;

11. The defendant's employment shall be approved by the Probation Officer, and any change in employment must be pre-approved by the Probation Officer. The defendant shall submit the name and address of the proposed employer to the Probation Officer at least 10 days prior to any scheduled change;

12. The defendant shall not reside within direct view of school yards, parks, public swimming pools, playgrounds, youth centers, video arcade facilities, or other places primarily used by persons under the age of 18. The defendant's residence shall be approved by the Probation Officer, and any change in residence must be pre-approved by the Probation Officer. The defendant shall submit the address of the proposed residence to the Probation Officer at least 10 days prior to any scheduled move.

The drug testing condition mandated by statute is suspended based on the Court's determination that the defendant poses a low risk of future substance abuse.

The Court recommends that the Bureau of Prisons conduct a mental health evaluation of the defendant and provide all necessary treatment.

It is ordered that the defendant shall pay to the United States a special assessment of $700, which is due immediately.

It is ordered that the defendant shall pay restitution in the total amount of $247,213 pursuant to 18 U.S.C. § 2248.

The amount of restitution ordered shall be paid as follows:

| Victim | Amount |
|---|---|
| Hagar International on behalf of victims I.T. & N.T.D. | $ 35,400 |
| Agape International Missions (AIM) for victims T.C., L.K., K.S., S.S., and S.R. | $211,813 |

Any unpaid balance of the special assessment and restitution shall be due during the period of imprisonment, at the rate of not less than $4,000 per month, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program. If any amount of the special assessment or the restitution remains unpaid if defendant is released from custody, monthly payments of at least $4,000 shall be made during the period of supervised release. These payments shall begin 30 days after the commencement of supervision.

If the defendant makes a partial payment, each payee shall receive approximately proportional payment unless another priority order or percentage payment is specified in this judgment.

USA vs. Michael Joseph Pepe Docket No.: CR 07-168 (A) DSF

The defendant shall comply with General Order No. 01-05.

All fines are waived as it is found that the defendant does not have the ability to pay a fine in addition to restitution.

The Court grants the government's request to dismiss the underlying Indictment in this matter.

The Court recommends that defendant be designated to a facility that is dedicated to the treatment and housing of sex offenders or has a sex offender treatment program.

The Court advised the defendant of the right to appeal this judgment.

SENTENCING FACTORS: The sentence is based on the factors set forth in 18 U.S.C. §3553, including the applicable sentencing range set forth in the guidelines, as more particularly reflected in the court reporter's transcript.

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release within this judgment be imposed. The Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

2/28/14
Date

Dale S. Fischer
U. S. District Judge/Magistrate Judge

It is ordered that the Clerk deliver a copy of this Judgment and Probation/Commitment Order to the U.S. Marshal or other qualified officer.

Clerk, U.S. District Court

2/28/14
Filed Date

By /s/ Debra Plato
Deputy Clerk

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below).

**STANDARD CONDITIONS OF PROBATION AND SUPERVISED RELEASE**

While the defendant is on probation or supervised release pursuant to this judgment:

1. The defendant shall not commit another Federal, state or local crime;
2. the defendant shall not leave the judicial district without the written permission of the court or probation officer;
3. the defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;
4. the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
5. the defendant shall support his or her dependents and meet other family responsibilities;
6. the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
7. the defendant shall notify the probation officer at least 10 days prior to any change in residence or employment;
8. the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;
9. the defendant shall not frequent places where controlled substances are illegally sold, used, distributed or administered;
10. the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
11. the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
12. the defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
13. the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
14. as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to conform the defendant's compliance with such notification requirement;
15. the defendant shall, upon release from any period of custody, report to the probation officer within 72 hours;
16. and, for felony cases only: not possess a firearm, destructive device, or any other dangerous weapon.

[X] The defendant will also comply with the following special conditions pursuant to General Order 01-05 (set forth below).

**STATUTORY PROVISIONS PERTAINING TO PAYMENT AND COLLECTION OF FINANCIAL SANCTIONS**

The defendant shall pay interest on a fine or restitution of more than $2,500, unless the court waives interest or unless the fine or restitution is paid in full before the fifteenth (15th) day after the date of the judgment pursuant to 18 U.S.C. §3612(f)(1). Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. §3612(g). Interest and penalties pertaining to restitution, however, are not applicable for offenses completed prior to April 24, 1996.

If all or any portion of a fine or restitution ordered remains unpaid after the termination of supervision, the defendant shall pay the balance as directed by the United States Attorney's Office. 18 U.S.C. §3613.

The defendant shall notify the United States Attorney within thirty (30) days of any change in the defendant's mailing address or residence until all fines, restitution, costs, and special assessments are paid in full. 18 U.S.C. §3612(b)(1)(F).

The defendant shall notify the Court through the Probation Office, and notify the United States Attorney of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay a fine or restitution, as required by 18 U.S.C. §3664(k). The Court may also accept such notification from the government or the victim, and may, on its own motion or that of a party or the victim, adjust the manner of payment of a fine or restitution-pursuant to 18 U.S.C. §3664(k). See also 18 U.S.C. §3572(d)(3) and for probation 18 U.S.C. §3563(a)(7).

Payments shall be applied in the following order:

1. Special assessments pursuant to 18 U.S.C. §3013;
2. Restitution, in this sequence:
   - Private victims (individual and corporate),
   - Providers of compensation to private victims,
   - The United States as victim;
3. Fine;
4. Community restitution, pursuant to 18 U.S.C. §3663(c); and
5. Other penalties and costs.

**SPECIAL CONDITIONS FOR PROBATION AND SUPERVISED RELEASE**

As directed by the Probation Officer, the defendant shall provide to the Probation Officer: (1) a signed release authorizing credit report inquiries; (2) federal and state income tax returns or a signed release authorizing their disclosure; and (3) an accurate financial statement, with supporting documentation as to all assets, income and expenses of the defendant. In addition, the defendant shall not apply for any loan or open any line of credit without prior approval of the Probation Officer.

The defendant shall maintain one personal checking account. All of defendant's income, "monetary gains," or other pecuniary proceeds shall be deposited into this account, which shall be used for payment of all personal expenses. Records of all other bank accounts, including any business accounts, shall be disclosed to the Probation Officer upon request.

The defendant shall not transfer, sell, give away, or otherwise convey any asset with a fair market value in excess of $500 without approval of the Probation Officer until all financial obligations imposed by the Court have been satisfied in full.

These conditions are in addition to any other conditions imposed by this judgment.

---

**RETURN**

I have executed the within Judgment and Commitment as follows:

Defendant delivered on ____________________ to ____________________

Defendant noted on appeal on ____________________

Defendant released on ____________________

Mandate issued on ____________________

Defendant's appeal determined on ____________________

Defendant delivered on ____________________ to ____________________

USA vs. Michael Joseph Pepe Docket No.: CR 07-168 (A) DSF

at ______________________________

the institution designated by the Bureau of Prisons, with a certified copy of the within Judgment and Commitment.

United States Marshal

By ______________________________

Date Deputy Marshal

**CERTIFICATE**

I hereby attest and certify this date that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

Clerk, U.S. District Court

By ______________________________

Filed Date Deputy Clerk

---

**FOR U.S. PROBATION OFFICE USE ONLY**

Upon a finding of violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed) ______________________________ ______________________________

Defendant Date

______________________________ ______________________________

U. S. Probation Officer/Designated Witness Date

Name Charles C. Brown (No. 179365)
Address 321 E. 2nd Street
City, State, Zip Los Angeles, CA 90012
Phone (213) 894-1700
Fax (213) 894-0081
E-Mail Charles_Brown@fd.org
☒ FPD ☐ Appointed ☐ CJA ☐ Pro Per ☐ Retained

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, PLAINTIFF(S), v. | CASE NUMBER: CR 07-00168-DSF |
| MICHAEL JOSEPH PEPE, DEFENDANT(S). | **NOTICE OF APPEAL** |

NOTICE IS HEREBY GIVEN that Michael Joseph Pepe (*Name of Appellant*) hereby appeals to the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☒ Judgment

☐ Interlocutory Appeals

☐ Bail status:

**Civil Matter**

☐ Order (specify):

☐ Judgment (specify):

☐ Other (specify):

Imposed or Filed on February 28, 2014. Entered on the docket in this action on February 28, 2014.

A copy of said judgment or order is attached hereto.

March 3, 2014
Date

/s/ Charles C. Brown
Signature
☐ Appellant/ProSe ☒ Counsel for Appellant ☐ Deputy Clerk

**Note:** The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party. Also, if not electronically filed in a criminal case, the Clerk shall be furnished a sufficient number of copies of the Notice of Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

APPEAL,CLOSED

# UNITED STATES DISTRICT COURT for the CENTRAL DISTRICT OF CALIFORNIA (Western Division − Los Angeles)
# CRIMINAL DOCKET FOR CASE #: 2:07−cr−00168−DSF−1

Case title: USA v. Pepe
Magistrate judge case number: 2:06−mj−01717−DUTY

Date Filed: 03/08/2007
Date Terminated: 02/28/2014

---

Assigned to: Judge Dale S. Fischer

Appeals court case number: 14−50095 9th CCA

**Defendant (1)**

**Michael Joseph Pepe**
*TERMINATED: 02/28/2014*

represented by

**Carlton F Gunn**
Kaye McLane Bednarski and Litt LLP
234 East Colorado Boulevard Suite 230
Pasadena, CA 91101
626−844−7660
Fax: 626−844−7670
Email: cgunn@kmbllaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Charles C Brown**
Federal Public Defenders Office
321 East 2nd Street
Los Angeles, CA 90012−4202
213−894−1700
Fax: 213−894−0081
Email: zzCAC_FPD_Document_Receiving@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**James H Locklin**
Federal Public Defenders Office
321 East 2nd Street
Los Angeles, CA 90012−4206
213−894−2929
Fax: 213−894−0081
Email: zzCAC_FPD_Document_Receiving@fd.org

| **Pending Counts** | **Disposition** |
|---|---|
| 18:2423(c) ENGAGING IN ILLICIT SEXUAL CONDUCT WITH A MINOR IN FOREIGN PLACES (1−2) | The Court grants the governments request to dismiss the underlying Indictment in this matter. |
| 18:2423(c): ENGAGING IN ILLICIT SEXUAL CONDUCT WITH A MINOR IN | Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that defendant, Michael Joseph Pepe, is hereby committed on Counts 1 through 7 of the |

| | |
|---|---|
| FOREIGN PLACES (1s−6s) | First Superseding Indictment to the custody of the Bureau of Prisons for a term of 210 years. This term consists of 30 years on each of Counts 1 through 7 of the First Superseding Indictment, to be served consecutively. Supervised Release for a term of life. comply with the rules and regulations of the U. S. Probation Office and General Order 318 and General Order No. 01−05.. A special assessment of $700 is due immediately. Restitution in the amount of $242,213 pursuant to USC 2248. All fines waived. The Court grants the governments request to dismiss the underlying Indictment in this matter. |
| 18:2423(c): ENGAGING IN ILLICIT SEXUAL CONDUCT WITH A MINOR IN FOREIGN PLACES (7s) | Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that defendant, Michael Joseph Pepe, is hereby committed on Counts 1 through 7 of the First Superseding Indictment to the custody of the Bureau of Prisons for a term of 210 years. This term consists of 30 years on each of Counts 1 through 7 of the First Superseding Indictment, to be served consecutively. Supervised Release for a term of life. comply with the rules and regulations of the U. S. Probation Office and General Order 318 and General Order No. 01−05.. A special assessment of $700 is due immediately. Restitution in the amount of $242,213 pursuant to USC 2248. All fines waived. The Court grants the governments request to dismiss the underlying Indictment in this matter. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| 18:2423.F COERCION OR ENTICEMENT OF MINOR FEMALE | |

---

**Respondent**

**Agape International Mission** represented by **Steven Clifford Bailey**
Law Office of Steven C. Bailey
3980 Missouri Flat Rd − Suite 201
Placerville, CA 95667
530−626−4906
Fax: 530−626−5623
*TERMINATED: 05/13/2010*

---

**Plaintiff**

**USA** represented by **Patricia Ann Donahue**
AUSA − Office of US Attorney

Criminal Div − US Courthouse
312 North Spring Street 13th Floor
Los Angeles, CA 90012−4700
213−894−0640
Fax: 213−894−6436
Email: Patricia.Donahue@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joey L Blanch**
AUSA − Office of US Attorney
Criminal Division − US Courthouse
312 North Spring Street 15th Floor
Los Angeles, CA 90012−4700
213−894−3315
Fax: 213−894−3713
Email: joey.blanch@usdoj.gov
*ATTORNEY TO BE NOTICED*

**John J Lulejian**
AUSA − Office of US Attorney
Criminal Division − United States Courthouse
312 North Spring Street 15th Floor
Los Angeles, CA 90012
213−894−8603
Fax: 213−894−3713
Email: john.lulejian@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/27/2006 | 1 | COMPLAINT filed as to Defendant Michael Joseph Pepe in violation of 18:2423.F COERCION OR ENTICEMENT OF MINOR FEMALE. Approved by Magistrate Judge Victor B. Kenton as to Michael Joseph Pepe (1). (ca ) [2:06−mj−01717−DUTY] (Entered: 10/03/2006) |
| 02/07/2007 | 2 | REPORT COMMENCING CRIMINAL ACTION as to Defendant Michael Joseph Pepe; defendants Year of Birth: 1953; date of arrest: 2/7/2007 (rm, ) [2:06−mj−01717−DUTY] (Entered: 02/13/2007) |
| 02/08/2007 | 3 | MINUTES OF INITIAL APPEARANCE ON LOCAL COMPLAINT held before Magistrate Judge Jennifer T. Lum as to Defendant Michael Joseph Pepe. Defendant arraigned and advised of the charges. Attorney: Charles C Brown for Michael Joseph Pepe, DFPD, present. Court orders defendant permanently: detained. Defendant remanded to the custody of the USM. Post−Indictment Arraignment set for 3/12/2007 08:30 AM before Duty Magistrate Judge. Tape #: 07−103. (rm, ) Modified on 2/13/2007 (rm, ). [2:06−mj−01717−DUTY] (Entered: 02/13/2007) |
| 02/08/2007 | 4 | FINANCIAL AFFIDAVIT filed as to Defendant Michael Joseph Pepe. (Not for Public View pursuant to the E−Government Act of 2002) (rm, ) Modified on 2/13/2007 (rm, ).[2:06−mj−01717−DUTY] (esa). Modified on 10/10/2014 (esa). (Entered: 02/13/2007) |
| 02/08/2007 | 5 | WAIVER of Preliminary Examination or Hearing by Defendant Michael Joseph Pepe (rm, ) [2:06−mj−01717−DUTY] (Entered: 02/13/2007) |
| 02/08/2007 | 6 | NOTICE DIRECTING DEFENDANT TO APPEAR for Preliminary Hearing and Arraignment on Indictment/Information. Defendant Michael Joseph Pepe is directed to appear and for Post Indictment Arraignment on 3/12/07 at 8:30 A.M. before the Duty Magistrate Judge. (rm, ) Modified on 2/13/2007 (rm, ). [2:06−mj−01717−DUTY] (Entered: 02/13/2007) |
| 02/08/2007 | 7 | ORDER OF DETENTION by Magistrate Judge Jennifer T. Lum as to Defendant Michael Joseph Pepe, (rm, ) [2:06−mj−01717−DUTY] (Entered: 02/13/2007) |

| | | |
|---|---|---|
| 02/09/2007 | 8 | ARREST WARRANT RETURNED Executed on 2/8/07 as to Defendant Michael Joseph Pepe. (ghap, ) [2:06−mj−01717−DUTY] (Entered: 02/15/2007) |
| 02/20/2007 | 9 | ABSTRACT OF COURT PROCEEDINGS Returned Executed as to Michael Joseph Pepe Abstract received on 02/09/07. The aforementioned order was complied with on 02/09/07 and 02/12/07. (rts, ) [2:06−mj−01717−DUTY] (Entered: 02/27/2007) |
| 03/08/2007 | 10 | INDICTMENT Filed as to Michael Joseph Pepe (1) count(s) 1−2. (ab, ) (Entered: 03/12/2007) |
| 03/08/2007 | 11 | CASE SUMMARY filed by AUSA Patricia A. Donahue as to Defendant Michael Joseph Pepe; defendants Year of Birth: 1953. (ab, ) (Entered: 03/12/2007) |
| 03/08/2007 | 12 | MEMORANDUM filed by Plaintiff USA as to Defendant Michael Joseph Pepe. This criminal action, being filed on 3/8/07, is not pending in the U. S. Attorneys Office before the date on which Judge Stephen G. Larson began receiving criminal matters. (ab, ) (Entered: 03/12/2007) |
| 03/08/2007 | 13 | MEMORANDUM filed by Plaintiff USA as to Defendant Michael Joseph Pepe. is seeking authority for an investigative action, does not relate to Magistrate Judge Jacqueline Chooljian, Patrick J. Walsh, Jennifer T. Lum, Jeffrey W. Johnson. (ab ) (Entered: 03/12/2007) |
| 03/12/2007 | 14 | MINUTES OF POST−INDICTMENT ARRAIGNMENT: held before Magistrate Judge Jennifer T. Lum as to Michael Joseph Pepe (1) Count 1−2,1−2. Defendant arraigned, states true name: as charged. Defendant entered not guilty plea to all counts as charged. Attorney: Special Appearance by Angel Navarro for Charles C Brown, DFPD. Jury Trial set for 5/1/2007 at 09:00 AM before Judge Dale S. Fischer. Status Conference set for 3/19/2007 at 08:30 AM before Judge Dale S. Fischer. Pretrial Conference set for 3/19/2007 at 08:30 AM before Judge Dale S. Fischer. Defendant and counsel are ordered to appear before said judge at the time and date indicated. Tape #: CS 03/12/2007. (vm, ) (Entered: 03/13/2007) |
| 03/12/2007 | 15 | STATEMENT OF CONSTITUTIONAL RIGHTS filed by Defendant Michael Joseph Pepe (vm, ) (Entered: 03/13/2007) |
| 03/19/2007 | 16 | MINUTES OF Status Conference held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe; counsel advise the court of their respective trial readiness and mutually indicate that a continuance of trial date will be necessary; the court directs counsel to contact the clerk regarding viable new trial date will be necessary; the court directs counsel to contact the clerk regarding a viable new trial date and submit the appropriate stipulation with a proposed order pursuant to the Speedy Trial Act. Court Reporter: Pamela Seijas. (ab, ) (Entered: 03/22/2007) |
| 04/25/2007 | 17 | STIPULATION to Continue Trial Date from May 1, 2007 to January 29, 2008 filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order Regarding Continuance Of Trial Date and Excludable Time Periods Under Speedy Trial Act) (Donahue, Patricia) (Entered: 04/25/2007) |
| 04/26/2007 | 18 | ORDER REGARDING CONTINUANCE OF TRIAL DATE AND EXCLUDABLE TIME PERIODS UNDER SPEEDY TRIAL ACT by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, re Stipulation to Continue, 17 . Jury Trial continued to 1/29/2008 08:00 AM; Pretrial Conference continued to 1/7/2008 08:30 AM before Judge Dale S. Fischer. (ab, ) (Entered: 04/30/2007) |
| 06/18/2007 | 19 | NOTICE OF MOTION AND MOTION for Discovery of COMPUTER EVIDENCE Filed by Defendant Michael Joseph PepeMotion set for hearing on 7/9/2007 at 08:30 AM before Judge Dale S. Fischer. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D)(Gunn, Carlton) (Entered: 06/18/2007) |
| 06/22/2007 | 20 | NOTICE of Change of Attorney Information for attorney Carlton F Gunn counsel for Michael Joseph Pepe. Adding CARLTON F. GUNN as attorney as counsel of record for MICHAEL JOSEPH PEPE for the reason indicated in the G−06 Notice. Filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 06/22/2007) |
| 06/26/2007 | 21 | NOTICE OF MOTION AND MOTION to Suppress EVIDENCE *MEMORANDUM OF POINTS AND AUTHORITIES* Filed by Defendant Michael Joseph PepeMotion set for hearing on 7/30/2007 at 08:30 AM before Judge Dale S. Fischer. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Exhibit A thru I)(Gunn, Carlton) (Entered: 06/26/2007) |
| 06/27/2007 | 22 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents. The following deficiency was found: Table of Contents was placed at the end of document: RE MOTION to Suppress EVIDENCE *MEMORANDUM OF POINTS AND AUTHORITIES* 21 (cbr) (Entered: 06/27/2007) |
| 07/03/2007 | 23 | EX PARTE APPLICATION to Continue Discovery Hearing Dates and Suppression Motion from July 9, 2007 (Discovery Motion); July 30, 2007 (Suppression Motion) to July 23, 2007 (Discovery Motion); September 17, 2007 (Suppression Motion). RE: MOTION to Suppress EVIDENCE *MEMORANDUM OF POINTS AND AUTHORITIES* 21 , MOTION for Discovery of COMPUTER EVIDENCE 19 . Filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order Continuing Hearing on Defendant's Discovery and Suppression Motions [Proposed])(Donahue, Patricia) (Entered: 07/03/2007) |
| 07/05/2007 | 24 | ORDER continuing hearing dates on defendant's discovery and suppression motions filed by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, re EX PARTE APPLICATION to Continue Discovery Hearing Dates and Suppression Motion from July 9, 2007 (Discovery Motion); July 30, 2007 (Suppression Motion) to July 23, 2007 (Discovery Motion); September 17, 2007 (Suppression Motion). RE: MOTION to Suppr EX PARTE APPLICATION to Continue Discovery Hearing Dates and Suppression Motion from July 9, 2007 (Discovery Motion); July 30, 2007 (Suppression Motion) to July 23, 2007 (Discovery Motion); September 17, 2007 (Suppression Motion). RE: MOTION to Suppr EX PARTE APPLICATION to Continue Discovery Hearing Dates and Suppression Motion from July 9, 2007 (Discovery Motion); July 30, 2007 (Suppression Motion) to July 23, 2007 (Discovery Motion); September 17, 2007 (Suppression Motion). RE: MOTION to Suppr 23 . (vc) (Entered: 07/10/2007) |
| 07/11/2007 | 25 | OPPOSITION to MOTION for Discovery of COMPUTER EVIDENCE 19 filed by Plaintiff USA as to Defendant Michael Joseph Pepe. (Donahue, Patricia) (Entered: 07/11/2007) |
| 07/18/2007 | 26 | REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION for Discovery of COMPUTER EVIDENCE 19 filed by Defendant Michael Pepe. (Attachments: # 1 Exhibit A, B)(Gunn, Carlton) (Entered: 07/18/2007) |
| 07/18/2007 | 27 | NOTICE OF MANUAL FILING filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 07/18/2007) |
| 07/23/2007 | 28 | MINUTES OF Motion Hearing held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, Re MOTION for Discovery of COMPUTER EVIDENCE 19 Defendant Michael Joseph Pepe is charged with four counts of engaging in illicit sexual conduct in foreign places in violation of 18 U.S.C. § 2423(c). The indictment alleges that, between September 2005 and June 2006, Defendant traveled to Cambodia and engaged in illicit sexual conduct with four minors. Presently before the Court is Defendant's Motion for Discovery of Computer Evidence. For the reasons set forth below, Defendant's Motion is granted in part and denied in part. Court Reporter: Not Present. (es) (Entered: 07/24/2007) |
| 07/23/2007 | 30 | MINUTES OF HEARING ON DEFENDNAT'S MOTION FOR DISCOVERY ON COMPUTER EVIDENCE (FILED 6/18/07) held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, re MOTION for Discovery of COMPUTER EVIDENCE 19 ; the court orders defendant's motion to suppress reset for 9/17/2007 at 10:00 AM and invites counsel to present their respective oral arguments regaring the above−referenced motion; the court requests counsel to advise the clerk if certain aspects of this motion have been resolved and advises counsel that a written order will issue Court Reporter: Pamela Seijas. (ab) (Entered: 07/26/2007) |
| 07/24/2007 | 31 | EX PARTE APPLICATION To File Summary of Forensic Computer Examination Problems in United States v. Chris Buesseman, In Camera and Under Seal Filed by Defendant Michael Joseph Pepe.(cbr) (Entered: 07/30/2007) |
| 07/24/2007 | 32 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe GRANTING EX PARTE APPLICATION To File Summary of Forensic Computer Examination Problems in United States v. Chris Buesseman, In Camera and Under Seal 31 . (cbr) |

| | | |
|---|---|---|
| | | (Entered: 07/30/2007) |
| 08/01/2007 | 33 | NOTICE OF MOTION AND MOTION to Suppress Evidence Discovered As Result of Computer Media Search Warrant Filed by Defendant Michael Joseph PepeMotion set for hearing on 9/17/2007 at 10:00 AM before Judge Dale S. Fischer. (Attachments: # 1 Exhibit A−B)(Gunn, Carlton) (Entered: 08/01/2007) |
| 08/03/2007 | 34 | STIPULATION for Order Pursuant to 18 U.S.C. Section 3509d filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order Pursuant To 18 U.S.C. Section 3509d)(Donahue, Patricia) (Entered: 08/03/2007) |
| 08/03/2007 | 35 | ABSTRACT OF COURT PROCEEDINGS Returned Executed as to Michael Joseph Pepe Abstract received on MDC. complied with on 7/20/07. (es) Modified on 8/3/2007 (es, ). (Entered: 08/03/2007) |
| 08/03/2007 | 36 | NOTICE OF CLERICAL ERROR, as to Defendant Michael Joseph Pepe: Due to clerical error Re: Abstract of Court Proceedings (CR−53) Returned Executed 35 WAS PROCESSED ON THE INCORRECT CASE NUMBER, THE CORRECT CASE NUMBER SHOULD READ: 2:07CR00618CAS. (es) (Entered: 08/03/2007) |
| 08/03/2007 | 37 | ORDER Pursuant to 18 USC 3509(d) by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, 34 (es) (Entered: 08/03/2007) |
| 08/07/2007 | 38 | TRANSCRIPT filed as to Michael Joseph Pepe for date of 7/23/07 before Judge Dale S. Fischer, re Motion Hearing 30 . Court Reporter: Pamela A Seijas. (lom) (sm). (Entered: 08/10/2007) |
| 08/22/2007 | 39 | OPPOSITION to MOTION to Suppress EVIDENCE *MEMORANDUM OF POINTS AND AUTHORITIES* 21 , MOTION to Suppress Evidence Discovered As Result of Computer Media Search Warrant 33 (Attachments: # 1 Declaration Gary J. Phillips# 2 Declaration Eddy Wang (Part 1)# 3 Declaration Eddy Wang (Part 2))(Donahue, Patricia) (Entered: 08/22/2007) |
| 09/04/2007 | 40 | REPLY to Government's Consolidated Opposition to Motions to Suppress Evidence MOTION to Suppress EVIDENCE *MEMORANDUM OF POINTS AND AUTHORITIES* 21 , MOTION to Suppress Evidence Discovered As Result of Computer Media Search Warrant 33 filed by Defendant Michael Pepe. (Gunn, Carlton) (Entered: 09/04/2007) |
| 09/05/2007 | 41 | STIPULATION to Continue Hearing on Defendant's Motion to Suppress Evidence and Motion to Suppress Evidence Discovered as Result of Computer Media Search Warrant from September 17, 2007 to October 29, 2007 filed by Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Gunn, Carlton) (Entered: 09/05/2007) |
| 09/05/2007 | 42 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, re Stipulation to Continue, 41 ; IT IS HEREBY ORDERED that the hearing on defendant's motin to suppress evidence and motiont to suppress evidence discovered as a result of computer media search warrant shall be continued to 10/29/2007 at 10:00 AM before Judge Dale S. Fischer. (ab) (Entered: 09/06/2007) |
| 10/04/2007 | 43 | NOTICE OF MOTION AND MOTION to Dismiss Case Filed by Defendant Michael Joseph PepeMotion set for hearing on 10/29/2007 at 10:00 AM before Judge Dale S. Fischer. (Brown, Charles) (Entered: 10/04/2007) |
| 10/09/2007 | 44 | NOTICE OF APPEARANCE OR REASSIGNMENT of AUSA John J Lulejian on behalf of Plaintiff USA. Filed by Plaintiff USA. (Lulejian, John) (Entered: 10/09/2007) |
| 10/18/2007 | 45 | NOTICE of Manual Filing of 1. Government's Ex Parte Application For Order Sealing Document; Declaration of John J. Lulejian; 2. [Proposed] Order Sealing Document; and 3. Under Seal Document filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Lulejian, John) (Entered: 10/18/2007) |
| 10/18/2007 | 46 | OPPOSITION to MOTION to Dismiss Case 43 filed by Plaintiff USA as to Defendant Michael Joseph Pepe. (Attachments: # 1 Exhibit A Part 1 To Lulejian Declaration# 2 Exhibit A Part 2 To Lulejian Declaration# 3 Exhibit B To Lulejian Declaration)(Lulejian, John) (Entered: 10/18/2007) |

| | | |
|---|---|---|
| 10/23/2007 | 67 | SEALED DOCUMENT − GOVERNMENT'S EX PARTE APPLICATION FOR ORDER SEALING DOCUMENT. (cbr) (Entered: 12/20/2007) |
| 10/23/2007 | 68 | SEALED DOCUMENT − ORDER SEALING DOCUMENT 67 . (cbr) (Entered: 12/20/2007) |
| 10/23/2007 | 69 | SEALED DOCUMENT − DECLARATION OF EDDY WANG IN SUPPORT OF GOVERNMENT'S OPPOSITION TO MOTION TO DISMISS INDICTMENT 43 . (cbr) (Entered: 12/20/2007) |
| 10/25/2007 | 47 | STIPULATION to Continue Defendants Motion to Dismiss Indictment from October 29, 2007 to November 26, 2007 filed by Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Gunn, Carlton) (Entered: 10/25/2007) |
| 10/25/2007 | 48 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, Granting Stipulation to Continue the Hearing on Defefendant's Motion to Dismiss Indictment from 10/29/07 to 11/26/07 10:00 AM 47 (es) (Entered: 10/31/2007) |
| 10/29/2007 | 50 | MINUTES OF Motion (EVIDENTIARY) Hearing held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, re 21] The case is called and counsel state their appearances. Defense calls Agent Gary Phillips, who is swornand testifies as to evidence as reflected in the record. After the testimony is completed, the Court and counsel confer re availability of additional witnesses. Counsel are to contact the clerk for an agreed upon date to continue the hearing on defendants motions to suppress. See attached witness and exhibit list. Court Reporter: Pamela Seijas. (pj) (Entered: 11/05/2007) |
| 10/29/2007 | 51 | LIST OF EXHIBITS AND WITNESSES at trial as to Michael Joseph Pepe. (Attachments: # 1 Main Document # 2 Main Document) (ca) (Entered: 11/05/2007) |
| 11/02/2007 | 49 | REPLY to Government's Opposition to Defense MOTION to Dismiss Case 43 filed by Defendant Michael Pepe. (Brown, Charles) (Entered: 11/02/2007) |
| 11/20/2007 | 52 | STIPULATION to Continue Hearing Date on Defendant's Motion to Dismiss the Indictment from November 26, 2007, at 10:00 a.m. to December 3, 2007, at 10:00 a.m. filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order Continuing Hearing)(Donahue, Patricia) (Entered: 11/20/2007) |
| 11/21/2007 | 55 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, GRANTING Stipulation to Continue, 52 . Continuing MOTION to Suppress Evidence Discovered As Result of Computer Media Search Warrant 33 , and MOTION to Dismiss the Indictment 43 . Motion set for hearing on 12/3/2007 at 10:00 AM before Judge Dale S. Fischer. (ca) (Entered: 11/28/2007) |
| 11/27/2007 | 53 | DECLARATION of David Nguyen−Galante re MOTION to Suppress EVIDENCE *MEMORANDUM OF POINTS AND AUTHORITIES* 21 , MOTION to Suppress Evidence Discovered As Result of Computer Media Search Warrant 33 filed by Plaintiff USA as to Defendant Michael Joseph Pepe. (Donahue, Patricia) (Entered: 11/27/2007) |
| 11/28/2007 | 54 | NOTICE of Manual Filing of EX PARTE APPLICATION TO FILE IN CAMERA AND UNDER SEAL ; ORDER, IN CAMERA AND UNDER SEAL; EX PARTE APPLICATION IN CAMERA AND UNDER SEAL; ORDER IN CAMERA AND UNDER SEAL filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 11/28/2007) |
| 11/30/2007 | 56 | NOTICE of Manual Filing of Ex Parte Application to File Notice Under Seal; NOtice; Order Filed Under Seal; Proposed Order Filed Under Seal; Proposed Request Filed Under Seal filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 11/30/2007) |
| 12/03/2007 | 57 | MINUTES OF IN CHAMBERS ORDER by Judge Dale S. Fischer : DENYINTG Defendant's MOTION to Dismiss Indictment 43 . (ca) (Entered: 12/06/2007) |
| 12/03/2007 | 58 | MINUTES OF Motion Hearing held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, re MOTION to Dismiss Case 43 . Witnesses called. Exhibits identified and admitted. Written order on this motion wille issue Court Reporter: Pamela Seijas. (pj) (Entered: 12/07/2007) |

| | | |
|---|---|---|
| 12/04/2007 | 99 | EXPARTE APPLICATION to File Motion for Depositions and Letters Regatory Under Seal; Declaration of Counsel. Filed by Defendant Michael Joseph Pepe. (jp) (Entered: 01/22/2008) |
| 12/04/2007 | 110 | SEALED DOCUMENT − ORDER 99 . (jp) (Entered: 01/27/2008) |
| 12/05/2007 | 60 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, re MOTION to Suppress Evidence Discovered As Result of Computer Media Search Warrant 33 . Defendant's Motion to Supress Evidence Discovered as Result of Computer Media Search Warrant is DENIED. Defendant's Motion to Suppress Evidence is DENIED in part. The parties should submit additional briefing addressing the issue raised by the Court by December 20, 2007. (rj) (Entered: 12/07/2007) |
| 12/07/2007 | 59 | NOTICE of Manual Filing of EX PARTE APPLICATION, FILED IN CAMERA AND UNDER SEAL; ORDER, FILED IN CAMERA AND UNDER SEAL filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 12/07/2007) |
| 12/11/2007 | 61 | NOTICE OF MOTION AND MOTION to Suppress STATEMENT; MEMORANDUM OF POINTS AND AUTHORITIES Filed by Defendant Michael Joseph PepeMotion set for hearing on 1/7/2008 at 10:00 AM before Judge Dale S. Fischer. (Attachments: # 1 Exhibit)(Gunn, Carlton) (Entered: 12/11/2007) |
| 12/12/2007 | 62 | NOTICE OF MOTION AND MOTION to Dismiss Case Filed by Defendant Michael Joseph PepeMotion set for hearing on 1/7/2008 at 10:00 AM before Judge Dale S. Fischer. (Brown, Charles) (Entered: 12/12/2007) |
| 12/14/2007 | 63 | NOTICE OF MOTION AND MOTION to Continue Trial from January 29, 2008 to March 25, 2008. Filed by Defendant Michael Joseph PepeMotion set for hearing on 1/7/2008 at 10:00 AM before Judge Dale S. Fischer. (Attachments: # 1 Exhibit)(Brown, Charles) (Entered: 12/14/2007) |
| 12/14/2007 | 64 | NOTICE of Manual Filing of EX PARTE APPLICATION TO FILE APPLICATION IN CAMERA AND UNDER SEAL; ORDER FILED IN CAMERA AND UNDER SEAL; APPLICATION FILED IN CAMERA AND UNDER SEAL; ORDER FILED IN CAMERA AND UNDER SEAL filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 12/14/2007) |
| 12/14/2007 | 66 | MINUTES OF IN CHAMBERS ORDER by Judge Dale S. Fischer : The Court has received a courtesy copy of Defendants motion to continue the trial. While it is unusual to comment on a motion even before an opposition is filed, the Court concludes it is in the best interest of the defense for it to do so before the January 7, 2008 hearing date. (tad) (Entered: 12/19/2007) |
| 12/18/2007 | 65 | NOTICE of Manual Filing of (1) EX PARTE APPLICATION TO FILE APPLICATION, FILED IN CAMERA & UNDER SEAL (2) ORDER, FILED IN CAMERA & UNDER SEAL (3) THIRD EX PARTE APPLICATION FILED IN CAMERA & UNDER SEAL; (4) ORDER, FILED IN CAMERA & UNDER SEAL filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 12/18/2007) |
| 12/19/2007 | 123 | ORDER GRANTING EXPARTE APPLICATION. ***FILED IN CAMERA AND UNDER SEAL***. (jp) (Entered: 02/01/2008) |
| 12/20/2007 | 70 | NOTICE of Manual Filing of ORDER, FILED IN CAMERA AND UNDER SEAL; EX PARTE APPLICATION FILED IN CAMERA AND UNDER SEAL filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 12/20/2007) |
| 12/20/2007 | 71 | SUPPLEMENT filed by Defendant Michael Joseph Pepe, re Order on Motion, 60 . (Attachments: # 1 Exhibit)(Gunn, Carlton) (Entered: 12/20/2007) |
| 12/20/2007 | 72 | OPPOSITION to MOTION to Suppress EVIDENCE *MEMORANDUM OF POINTS AND AUTHORITIES* 21 filed by Plaintiff USA as to Defendant Michael Joseph Pepe. (Donahue, Patricia) (Entered: 12/20/2007) |
| 12/20/2007 | 74 | MEMORANDUM filed by Plaintiff USA as to Defendant Michael Joseph Pepe. This criminal action, being filed on 12/20/07, was not pending in the U. S. Attorneys Office before the date on which Judge Stephen G. Larson began receiving criminal matters. (yca) (Entered: 12/27/2007) |

| | | |
|---|---|---|
| 12/20/2007 | 75 | MEMORANDUM filed by Plaintiff USA as to Defendant Michael Joseph Pepe regarding the following Magistrate Judges: John C. Rayburn, Jr., Jacqueline Chooljian, Patrick J. Walsh, Jennifer T. Lum, Jeffrey W. Johnson.(yca) (Entered: 12/27/2007) |
| 12/20/2007 | 83 | FIRST SUPERSEDING INDICTMENT Filed as to Michael Joseph Pepe (1) count(s) 1s−7s. (ca) (Entered: 01/04/2008) |
| 12/20/2007 | 87 | CASE SUMMARY filed by AUSA John J. LleLulejian as to Defendant Michael Joseph Pepe; defendants Year of Birth: 1953. (ca) (Entered: 01/09/2008) |
| 12/21/2007 | 73 | OBJECTIONS TO SUPPLEMENTAL DECLARATIONS IN SUPPORT OF OPPOSITION TO MOTION TO SUPPRESS EVIDENCE filed by Defendant Michael Joseph Pepe Re: Order on Motion, 60 (Gunn, Carlton) (Entered: 12/21/2007) |
| 12/31/2007 | 76 | OPPOSITION to MOTION to Continue Trial from January 29, 2008 to March 25, 2008. 63 filed by Plaintiff USA as to Defendant Michael Joseph Pepe. (Lulejian, John) (Entered: 12/31/2007) |
| 12/31/2007 | 77 | OPPOSITION to MOTION to Suppress STATEMENT; MEMORANDUM OF POINTS AND AUTHORITIES 61 filed by Plaintiff USA as to Defendant Michael Joseph Pepe. (Lulejian, John) (Entered: 12/31/2007) |
| 12/31/2007 | 78 | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR DEPOSITIONS AND LETTERS ROGATORY (64) filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Lulejian, John) (Entered: 12/31/2007) |
| 12/31/2007 | 79 | OPPOSITION to MOTION to Dismiss Case 62 filed by Plaintiff USA as to Defendant Michael Joseph Pepe. (Lulejian, John) (Entered: 12/31/2007) |
| 01/02/2008 | 80 | REPLY MOTION to Continue Trial from January 29, 2008 to March 25, 2008. 63 filed by Defendant MICHAEL JOSEPH PEPE. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G# 8 Exhibit H# 9 Exhibit I)(Gunn, Carlton) (Entered: 01/02/2008) |
| 01/03/2008 | 81 | REPLY MOTION to Suppress STATEMENT; MEMORANDUM OF POINTS AND AUTHORITIES 61 filed by Defendant MICHAEL PEPE. (Gunn, Carlton) (Entered: 01/03/2008) |
| 01/03/2008 | 82 | REPLY TO GOVERNMENTS OPPOSITION TO DEFENDANTS MOTION FOR DEPOSITIONS AND LETTERS ROGATORY filed by Defendant Michael Joseph Pepe Re: Notice of Manual Filing (G−92) 54 (Gunn, Carlton) (Entered: 01/03/2008) |
| 01/04/2008 | 84 | EX PARTE APPLICATION for Order for Authorizing The Examination of Defendant's Body Filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Lulejian, John) (Entered: 01/04/2008) |
| 01/04/2008 | 85 | NOTICE of Manual Filing of Ex Parte Application For An Order Sealing Document; [Proposed] Order; Under Seal Document filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Lulejian, John) (Entered: 01/04/2008) |
| 01/04/2008 | 86 | filed by Defendant Michael Joseph Pepe *Reply to Government's Opposition to Dismiss for Lack of Compulsory Process* Re: Opposition to Motion (CR) 79 (Brown, Charles) (Entered: 01/04/2008) |
| 01/04/2008 | 91 | MINUTES OF In Camera Hearing held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. The Court discusses with counsel the reasons for today's proceeding as stated on the sealed record. Court Reporter: Mark Schweitzer. (ca) (Entered: 01/10/2008) |
| 01/07/2008 | 92 | MINUTES (IN CHAMBERS) ORDER DENYING Motion to Dismiss Based on Lack of Compulsory Process by Judge Dale S. Fischer. (ca) (Entered: 01/10/2008) |
| 01/07/2008 | 93 | MINUTES (IN CHAMBERS) ORDER by Judge Dale S. Fischer : GRANTING in part and DENYING in part Defendant's MOTION to Suppress STATEMENT 61 . Evidence that defendant lifted his shorts in response to a question regarding distinguishing marks is suppressed. Defendant's Motion is otherwise DENIED. (ca) (Entered: 01/10/2008) |

| | | |
|---|---|---|
| 01/07/2008 | 96 | MINUTES of Arraignment on the First Superseding Indictment, Hearing on Defendant's Motion for Depositions and Letters Rogatory, Motion to Dismiss, Motion to Suppress, and Pretrial Conference held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. Defendant arraigned and enters plea of Not Guilty to all counts as charged in the First Superseding Indictment. Jury Trial set for 4/8/2008 8:00 AM before Judge Dale S. Fischer. Status Conference set for 3/10/2008 10:00 AM before Judge Dale S. Fischer. Court Reporter: Pamela Seijas. (csi) (Entered: 01/11/2008) |
| 01/08/2008 | 94 | MINUTES (IN CHAMBERS) ORDER by Judge Dale S. Fischer : GRANTING MOTION to Continue Trial 63 . Jury Trial set for 4/8/2008 at 8:00 AM; Status Conference set for 3/10/2008 at 10:00 AM before Judge Dale S. Fischer. (ca) (Entered: 01/10/2008) |
| 01/08/2008 | 95 | MINUTES (IN CHAMBERS) ORDER DENYING Defendant's Motion for Depositions and Letters Rogatory by Judge Dale S. Fischer. (ca) (Entered: 01/10/2008) |
| 01/08/2008 | 103 | SEALED DOCUMENT − GOVERNMENT'S EX PARTE APPLICATION FOR AN ORDER SEALING DECLARATION OF EDDY WANG IN SUPPORT OF GOVERNMENT'S APPLICATION FOR AN ORDER AUTHORIZING THE EXAMINATION OF DEFENDANT'S BODY (cbr) (Entered: 01/22/2008) |
| 01/08/2008 | 104 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe GRANTING EXPARTE APPLICATION TO SEAL 103 . (cbr) (Entered: 01/22/2008) |
| 01/08/2008 | 105 | SEALED DOCUMENT − DECLARATION OF EDDY WANG IN SUPPORT OF GOVERNMENT'S EX PARTE APPLICATION FOR AN ORDER AUTHORIZING THE EXAMINATION OF DEFENDANT'S BODY 84 . (cbr) (Entered: 01/22/2008) |
| 01/10/2008 | 88 | OPPOSITION TO GOVERNMENTS EX PARTE APPLICATION FOR AN ORDER AUTHORIZING THE EXAMINATION OF DEFENDANTS BODY filed by Defendant Michael Joseph Pepe Re: EX PARTE APPLICATION for Order for Authorizing The Examination of Defendant's Body 84 (Attachments: # 1 Photographs)(Gunn, Carlton) (Entered: 01/10/2008) |
| 01/10/2008 | 89 | NOTICE of Manual Filing of EX PARTE APPLICATION, FILED IN CAMERA AND UNDER SEAL; ORDER, FILED IN CAMERA AND UNDER SEAL; AND MEMORANDUM OF POINTS AND AUTHORITIES, FILED IN CAMERA AND UNDER SEAL filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 01/10/2008) |
| 01/10/2008 | 90 | ORDER RE CROSS−EXAMINATION OF DECLARANTS SUPPORTING THE GOVERNMENT'S SUPPLEMENTAL BRIEFING RE SUPPRESSION OF EVIDENCE OBTAINED IN THE SINGAPORE SEARCH by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe re: Supplement (non−motion) 71 . (se) (Entered: 01/10/2008) |
| 01/11/2008 | 97 | MINUTES OF IN CHAMBERS ORDER by Judge Dale S. Fischer ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe GRANTING EX PARTE APPLICATION for Order for Authorizing The Examination of Defendant's Body 84 . (se) (Entered: 01/11/2008) |
| 01/14/2008 | 98 | NOTICE OF MOTION AND MOTION for Inspection of AND EXAMINATION OF COMPUTER EVIDENCE. Filed by Defendant Michael Joseph PepeMotion set for hearing on 2/4/2008 at 10:00 AM before Judge Dale S. Fischer. (Attachments: # 1 Exhibit A, Pt. 1# 2 Exhibit A, Pt. 2# 3 Exhibit A, Pt. 3# 4 Exhibit B)(Gunn, Carlton) (Entered: 01/14/2008) |
| 01/25/2008 | 106 | NOTICE OF MOTION AND MOTION for Inspection of Foreign Witness (Deposition). Filed by Plaintiff USA as to Defendant Michael Joseph PepeMotion set for hearing on 2/6/2008 at 10:00 AM before Judge Dale S. Fischer. (Donahue, Patricia) (Entered: 01/25/2008) |
| 01/27/2008 | 114 | SEALED DOCUMENT − NOTICE OF MOTION for Deposition and Letters Regatory; Hearing Date: January 7, 2008; Hearing Time: 10:00 a.m. (jp) (Entered: 01/27/2008) |
| 01/31/2008 | 120 | NOTICE OF WITHDRAWAL of Motion filed by Defendant Michael Joseph Pepe RE: MOTION for Inspection of AND EXAMINATION OF COMPUTER |

| | | |
|---|---|---|
| | | EVIDENCE. 98 (Attachments: # 1 Agreement)(Gunn, Carlton) (Entered: 01/31/2008) |
| 02/05/2008 | 127 | DECLARATION of KOEUT RITH filed by Plaintiff USA as to Defendant Michael Joseph Pepe RE: MOTION to Suppress EVIDENCE *MEMORANDUM OF POINTS AND AUTHORITIES* 21 *SUPPLEMENTAL* (Attachments: # 1 Exhibit A# 2 Exhibit B)(Donahue, Patricia) (Entered: 02/05/2008) |
| 02/05/2008 | 128 | OPPOSITION to MOTION for Inspection of Foreign Witness (Deposition). 106 filed by Defendant Michael Joseph Pepe. (Brown, Charles) (Entered: 02/05/2008) |
| 02/06/2008 | 130 | MINUTES (IN CHAMBERS) ORDER by Judge Dale S. Fischer: Order GRANTING the Government's Motion to Take Foreign Deposition. (mg) (Entered: 02/11/2008) |
| 02/07/2008 | 129 | MINUTES (In Chambers)by Judge Dale S. Fischer: On 6/26/06, Defendant filed a Motion to Suppress Evidence, seeking, among other things, the exclusion of evidence obtained in a forensic examination conducted by US officials in Singapore. The Court requested further briefing. The parties submitted their supplemental briefs on 12/20/07. Having considered these submissions, and heard testimony, the Court DENIES Defendant's Motion. IT IS SO ORDERED.(See minute order for further details) (yl) (Entered: 02/07/2008) |
| 02/15/2008 | 131 | STIPULATION for Order To Take Depositions Of Foreign Witnesses Pursuant To Federal Rule Of Criminal Procedure 15 filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Lulejian, John) (Entered: 02/15/2008) |
| 02/15/2008 | 132 | ORDER by Judge Dale S. Fischer GRANTING Request to depose Ly Srey Vyna and the mothers of L.K., S.S., and S.R. on February 26, 27, 28, 2008, and if necessary to accommodate Defendant's attorneys, March 1, 2008. The Court further GRANTS the government's motion to depose San Thi Chhoeurn on 2/29/08. (mg) (Entered: 02/15/2008) |
| 02/26/2008 | 133 | TRANSCRIPT filed as to Michael Joseph Pepe for dates of 10/29/07 before Judge Dale S. Fischer, re Motion Hearing, 50 . Court Reporter: Pamela A. Seijas. (mo) (sm). (Entered: 02/28/2008) |
| 02/26/2008 | 134 | TRANSCRIPT filed as to Michael Joseph Pepe for dates of 12/3/07 before Judge Dale S. Fischer, re Motion Hearing, 58 . Court Reporter: Pamela A. Seijas. (mo) (sm). (Entered: 02/28/2008) |
| 02/26/2008 | 135 | SEALED DOCUMENT − REPORTER'S TRANSCRIPT for date of 12/3/07. (Proceedings sealed from page 41 line 4 to page 41 line 19) (mo) (Entered: 02/28/2008) |
| 02/26/2008 | 136 | TRANSCRIPT filed as to Michael Joseph Pepe for dates of 2/6/08 before Judge Dale S. Fischer, Court Reporter: Pamela A. Seijas. (mo) (sm). (Entered: 02/28/2008) |
| 02/26/2008 | 137 | SEALED DOCUMENT − REPORTER'S TRANSCRIPT for date of 2/6/08. (Sealed Transcript page 80 line 17 to page 82 line 13) (mo) (Entered: 02/28/2008) |
| 03/06/2008 | 138 | EXHIBIT filed by Defendant Michael Joseph Pepe in support of Re: Discovery Status for Consideration at Pretrial Conference. (Attachments: # 1 Exhibits)(Gunn, Carlton) (Entered: 03/06/2008) |
| 03/07/2008 | 139 | NOTICE OF MOTION AND MOTION to Suppress EVIDENCE FOUND IN ADDITIONAL WARRANTLESS COMPUTER SEARCHES CONDUCTED IN UNITED STATES; MEMORANDUM OF POINTS AND AUTHORITIES Filed by Defendant Michael Joseph PepeMotion set for hearing on 3/31/2008 at 10:00 AM before Judge Dale S. Fischer. (Attachments: # 1 Exhibit A# 2 Exhibit B)(Gunn, Carlton) (Entered: 03/07/2008) |
| 03/10/2008 | 141 | MINUTES OF Status Conference held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. The Court and counsel address numerous pretrial issues, as stated on the record. Court Reporter: Pamela Seijas. (mg) (Entered: 03/14/2008) |
| 03/13/2008 | 140 | STIPULATION to Continue Trial Date And Excludable Time Periods Under Speedy Trial Act from April 8, 2008 to May 6, 2008 filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Donahue, Patricia) (Entered: 03/13/2008) |

| | | |
|---|---|---|
| 03/14/2008 | 142 | ORDER by Judge Dale S. Fischer Regarding Continuance of Trial Date and Excludable Time Periods Under Speedy Trial Act as to Defendant Michael Joseph Pepe. Jury Trial continued to 5/6/2008 at 08:00 AM before Judge Dale S. Fischer. The Court will conduct a Status Conference on 4/14/2008 at 10:00 AM before Judge Dale S. Fischer. Re Stipulation to Continue 140 . (mg) (Entered: 03/18/2008) |
| 03/21/2008 | 143 | OPPOSITION to MOTION to Suppress EVIDENCE FOUND IN ADDITIONAL WARRANTLESS COMPUTER SEARCHES CONDUCTED IN UNITED STATES; MEMORANDUM OF POINTS AND AUTHORITIES 139 filed by Plaintiff USA as to Defendant Michael J. Pepe. (Donahue, Patricia) (Entered: 03/21/2008) |
| 03/25/2008 | 144 | REPLY TO GOVERNMENT'S OPPOSITION TO MOTION to Suppress EVIDENCE FOUND IN ADDITIONAL WARRANTLESS COMPUTER SEARCHES CONDUCTED IN UNITED STATES; MEMORANDUM OF POINTS AND AUTHORITIES 139 filed by Defendant MICHAEL J. PEPE. (Gunn, Carlton) (Entered: 03/25/2008) |
| 03/28/2008 | 145 | NOTICE OF MOTION AND APPLICATION to Shorten Time for Hearing Filed by Defendant Michael Joseph PepeMotion set for hearing on 4/14/2008 at 10:00 AM before Judge Dale S. Fischer. (Attachments: # 1 Proposed Order # 2 Motion For Discovery# 3 Exhibit)(Gunn, Carlton) (Entered: 03/28/2008) |
| 03/31/2008 | 146 | MINUTES (IN CHAMBERS) by Judge Dale S. Fischer: Proceedings: Order DENYING Defendant's MOTION to Suppress Evidence Found in Additional Warrantless Computer Searches Conducted in United States 139 . (mg) (Entered: 04/01/2008) |
| 03/31/2008 | 148 | MINUTES OF Motion Hearing held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, re MOTION to Suppress EVIDENCE FOUND IN ADDITIONAL WARRANTLESS COMPUTER SEARCHES CONDUCTED IN UNITED STATES 139 : The case is called and counsel state their appearances. The Court addresses the above−referenced motion and defense counsels ex parte application to file a discovery motion, invites oral argument after advising the parties of itstentative ruling, and indicates a written order will issue. The Court orders parties to return on 4/14/08 at 10:00 a.m. Court Reporter: Pamela Seijas. (yl) (Entered: 04/02/2008) |
| 04/01/2008 | 147 | NOTICE OF MOTION AND MOTION in Limine to Introduce Evidence Under Federal Rule of Evidence 404(b); Memorandum of Points and Authorities Filed by Plaintiff USA as to Defendant Michael Joseph PepeMotion set for hearing on 4/21/2008 at 10:00 AM before Judge Dale S. Fischer.(Donahue, Patricia) (Entered: 04/01/2008) |
| 04/03/2008 | 149 | NOTICE OF MOTION AND MOTION in Limine to Introduce Evidence Under Federal Rule of Evidence 404(b); Memorandum of Points and Authorities Filed by Plaintiff USA as to Defendant Michael Joseph PepeMotion set for hearing on 4/28/2008 at 10:00 AM before Judge Dale S. Fischer.(Donahue, Patricia) (Entered: 04/03/2008) |
| 04/08/2008 | 151 | STIPULATION to Continue GOVERNMENT'S MOTION from APRIL 21, 2008, 10:00 A.M. to APRIL 28, 2008, 10:00 A.M. Re: MOTION in Limine to Introduce Evidence Under Federal Rule of Evidence 404(b); Memorandum of Points and Authorities MOTION in Limine to Introduce Evidence Under Federal Rule of Evidence 404(b); Memorandum of Points and Authorities 149 filed by Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Gunn, Carlton) (Entered: 04/08/2008) |
| 04/08/2008 | 152 | NOTICE of Errata filed by Defendant Michael Joseph Pepe RE: Stipulation to Continue, 151 . (Attachments: # 1 Proposed Order)(Gunn, Carlton) (Entered: 04/08/2008) |
| 04/08/2008 | 153 | STIPULATION for Order For Extension of Time to April 22, 2008 for Steven C. Bailey, Esq., to Produce Documents or File Motion Pursuant to Subpoena filed by Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Gunn, Carlton) (Entered: 04/08/2008) |
| 04/09/2008 | 154 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, re Stipulation to Continue 151 : GOOD CAUSE HAVING BEEN SHOWN, IT IS HEREBY |

| | | |
|---|---|---|
| | | ORDERED that the hearing on the governments Motion for Introduction of Evidence under Federal Rule of Evidence 404(b) shall be continued from April 21, 2008, at 10:00 a.m., to April 28, 2008, at 10:00 a.m. (bm) (Entered: 04/09/2008) |
| 04/09/2008 | 155 | OPPOSITION to MOTION in Limine to Introduce Evidence Under Federal Rule of Evidence 404(b); Memorandum of Points and Authorities MOTION in Limine to Introduce Evidence Under Federal Rule of Evidence 404(b); Memorandum of Points and Authorities 147 filed by Defendant Michael Pepe. (Gunn, Carlton) (Entered: 04/09/2008) |
| 04/09/2008 | 156 | GOVERNMENT'S RESPONSE TO DEFENDANT'S DISCOVERY MOTION re APPLICATION to Shorten Time for Hearing 145 filed by Plaintiff USA as to Defendant Michael Joseph Pepe. (Donahue, Patricia) (Entered: 04/09/2008) |
| 04/11/2008 | 157 | NOTICE of Manual Filing of Ex Parte, Motion and Order filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 04/11/2008) |
| 04/11/2008 | 158 | NOTICE of Manual Filing of Ex Parte Application to File Motion in Limine Under Seal; Order; Motion in Limine, Under Seal. filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 04/11/2008) |
| 04/14/2008 | 161 | MINUTES OF Pretrial Conference held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. The case is called and counsel state their appearances. The Court addresses with counsel various pretrial issues as stated on the record. Counsel are ordered to submit their respective proposed voir dire, jury instructions, and verdict form as soon as possible. Defense counsel requests the Courts assistance with their clients custodial arrangements. The Court orders counsel to return on 4/28/2008 at 03:00 PM for hearing on motions in limine. Court Reporter: Pamela Seijas. (sch) (Entered: 04/16/2008) |
| 04/14/2008 | 165 | EXPARTE APPLICATION to file Motion in Limine under seal, filed by Defendant Michael Joseph Pepe(mat) (Entered: 04/18/2008) |
| 04/14/2008 | 166 | ORDER by Judge Dale S. Fischer granting EXPARTE APPLICATION to file document under seal, 165 . (mat) (Entered: 04/18/2008) |
| 04/14/2008 | 167 | SEALED DOCUMENT−MOTION IN LIMINE TO EXCLUDE "MOLE INDENTIFICATION" TESTIMONY AND REQEUST FOR DAUBERT HEARING; MEMORANDUM OF POINTS AND AUTHORITIES.(mat) Modified on 4/18/2008 (mat, ). (Entered: 04/18/2008) |
| 04/14/2008 | 168 | EXPARTE APPLICATION TO FILE MOTION IN LIMINE UNDER SEAL, filed by Defendant Michael Joseph Pepe(mat) (Entered: 04/18/2008) |
| 04/14/2008 | 169 | ORDER by Judge Dale S. Fischer GRANTING EXPARTE APPLICATION TO SEAL TO FILE MOTION IN LIMINE UNDER SEAL 168 . (mat) (Entered: 04/18/2008) |
| 04/14/2008 | 170 | SEALED DOCUMENT− MOTION IN LIMINE TO EXCLUDE EVIDENCE.(mat) (Entered: 04/18/2008) |
| 04/15/2008 | 159 | filed by Defendant Michael Joseph Pepe *Proposed Order Re Housing of Defendant at MDC* (Brown, Charles) (Entered: 04/15/2008) |
| 04/15/2008 | 160 | DECLARATION of DR. RICHARD GARY BENNETT filed by Defendant Michael Joseph Pepe RE: Notice of Manual Filing (G−92) 158 (Attachments: # 1 Exhibit A−Bennett CV)(Gunn, Carlton) (Entered: 04/15/2008) |
| 04/17/2008 | 162 | NOTICE OF MOTION AND MOTION in Limine to Exclude Testimony of Govt Cultural Expert Wendy Freed and to Preclude Characterizing the Allegations in this Case as Torture Filed by Defendant Michael Joseph Pepe (Attachments: # 1 Exhibit)(Brown, Charles) (Entered: 04/17/2008) |
| 04/18/2008 | 163 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents. The following error(s) was found: Proposed Order shall be included as an attachment to the main electronically filed document pursuant to General Order 08−02 RE: Miscellaneous Document 159 . In response to this notice the court may order (1) an amended or correct document to be filed (2) the document stricken or (3) take other action as the court deems appropriate. (sch) (Entered: 04/18/2008) |

| | | |
|---|---|---|
| 04/18/2008 | 164 | MINUTES OF IN CHAMBERS ORDER by Judge Dale S. Fischer re Housing of Michael Pepe 159 . Counsel has proposed that the Court order special housing conditions for Defendant due to the nature of the charges against him, and to protect the confidential and privileged materials provided by his counsel. The Court DENIES the request without prejudice. (sch) (Entered: 04/18/2008) |
| 04/21/2008 | 171 | NOTICE OF MOTION AND MOTION in Limine to Exclude Testimony of Govt Grooming Expert SA James T. Clemente Filed by Defendant Michael Joseph Pepe (Attachments: # 1 Exhibit)(Brown, Charles) (Entered: 04/21/2008) |
| 04/21/2008 | 172 | REPLY in support MOTION in Limine to Introduce Evidence Under Federal Rule of Evidence 404(b); Memorandum of Points and Authorities MOTION in Limine to Introduce Evidence Under Federal Rule of Evidence 404(b); Memorandum of Points and Authorities 149 filed by Plaintiff USA as to Defendant Michael Joseph Pepe. (Donahue, Patricia) (Entered: 04/21/2008) |
| 04/22/2008 | 173 | NOTICE of Manual Filing of (1) Ex Parte Application to File Deposition Objections Under Seal; (2) Order; (3) Memorandum of Points and Authorities re Objections Made During Deposition Testimony (Filed Under Seal); and (4) Memorandum of Points and Authorities re Objections Made During Deposition Testimony (Filed Under Seal) filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 04/22/2008) |
| 04/22/2008 | 177 | EXPARTE APPLICATION TO FILE DEPOSTION OBJECTIONS UNDER SEAL.(mat) (Entered: 04/28/2008) |
| 04/23/2008 | 174 | NOTICE OF MOTION AND MOTION in Limine to Permit Adult Attendant For Child Victim Witnesses Filed by Plaintiff USA as to Defendant Michael Joseph PepeMotion set for hearing on 5/7/2008 at 08:00 AM before Judge Dale S. Fischer. (Attachments: # 1 Proposed Order Re Adult Attendant For Child Victim Witnesses)(Donahue, Patricia) (Entered: 04/23/2008) |
| 04/24/2008 | 175 | NOTICE of Manual Filing of Ex Parte Application To File Under Seal; Proposed Order Sealing Document; Government's Opposition To Defendant's Motion To Exclude Evidence filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Donahue, Patricia) (Entered: 04/24/2008) |
| 04/24/2008 | 178 | SEAL DOCUMENT−ORDER FILED UNDER SEAL (mat) Additional attachment(s) added on 4/28/2008 (mat, ). Modified on 4/28/2008 (mat, ). (Entered: 04/28/2008) |
| 04/24/2008 | 190 | SEALED DOCUMENT − MEMORANDUMOF POINTS AND AUTHORITIES RE OBJECTIONS MADE DURING DEPOSITION TESTIMONY OF LY KIM ENG (sm) (Entered: 04/30/2008) |
| 04/24/2008 | 191 | MEMORANDUM OF POINTS AND AUTHORITIES RE OBJECTIONS MADE DURING DEPOSITION TESTIMONY OF CHEONG THI SANG (sm) (Entered: 04/30/2008) |
| 04/28/2008 | 176 | NOTICE of Manual Filing of Ex Parte Application to file Under Seal, [Proposed] Order, Memorandum of Points and Authorities to be filed UNDER SEAL filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 04/28/2008) |
| 04/28/2008 | 179 | OPPOSITION to MOTION in Limine to Exclude Testimony of Govt Cultural Expert Wendy Freed and to Preclude Characterizing the Allegations in this Case as Torture 162 , MOTION in Limine to Exclude Testimony of Govt Grooming Expert SA James T. Clemente 171 filed by Plaintiff USA as to Defendant Michael Joseph Pepe. (Attachments: # 1 Exhibit # 2 Exhibit A Tab 1# 3 Exhibit A Tab 2# 4 Exhibit A Tab 3# 5 Exhibit A TAB 3 PART 2# 6 Exhibit A Tab 4# 7 Exhibit A Tab 5# 8 Exhibit B# 9 Exhibit B Part 2# 10 Exhibit B Part 3)(Donahue, Patricia) (Entered: 04/28/2008) |
| 04/28/2008 | 180 | TRIAL MEMORANDUM filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Exhibit A)(Lulejian, John) (Entered: 04/28/2008) |
| 04/28/2008 | 181 | NOTICE of Manual Filing of Ex Parte Application and [Proposed] Order to be filed In Camera and Under Seal filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 04/28/2008) |
| 04/29/2008 | 182 | NOTICE of Manual Filing of Ex Parte Application and Order In Camera and Under Seal filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 04/29/2008) |

| | | |
|---|---|---|
| 04/29/2008 | 183 | NOTICE of Manual Filing of Government's Ex Parte Application To File Under Seal; (Proposed) Order Sealing Document; Government's Opposition To Defendant's Motion In Limine To Exclude "Mole Identification" Testimony And Request For Daubert Hearing filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Lulejian, John) (Entered: 04/29/2008) |
| 04/29/2008 | 184 | PROPOSED VOIR DIRE QUESTIONS filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Donahue, Patricia) (Entered: 04/29/2008) |
| 04/29/2008 | 185 | NOTICE OF MOTION AND MOTION in Limine to Preclude ANY TESTIMONY, EVIDENCE, REFERENCES, OR ARGUMENTS ABOUT DEFENDANT'S ALLEGED MENTAL CONDITIONS Filed by Plaintiff USA as to Defendant Michael Joseph PepeMotion set for hearing on 5/5/2008 at 08:00 AM before Judge Dale S. Fischer. (Attachments: # 1 Proposed Order)(Lulejian, John) (Entered: 04/29/2008) |
| 04/29/2008 | 203 | SEALED DOCUMENT − GOVERNMENT'S EX PARTE APPLICATION TO FILE GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE MOLE IDENTIFICATION TESTIMONY AND REQUES FOR DAUBERT HEARING UNDER SEAL. (cbr) (Entered: 05/02/2008) |
| 04/29/2008 | 231 | MINUTES OF Motion Hearing held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, HEARING ON: 1) Governments Motion in limine to Introduce Evidence Under Rule 404(b) [filed 4/1/08]; 2) Governments Re−filed Motion in limine to Introduce Evidence Under Rule 404(b) [filed 4/3/08]; 3) Defendants Under Seal Motion in limine [filed 4/14/08]; 4) Defendants Motion in Limine to Exclude Testimony of Govt Cultural Expert Wendy Freed and to Preclude Characterizing the Allegations in this Case as Torture [filed 4/17/08]; 5) Defendants Motion in Limine to Exclude Testimony of Government Grooming Expert of Special Agent James T. Clemente [filed 4/21/08]; and 6) Defendants In Camera/Ex Parte Applications: The case is called and counsel state their appearances. The Court and counsel address the above−referenced motions and further discuss the trial that is now scheduled to begin on 5/7/08 at 10:00 a.m., as stated on the record. The Court sets a Daubert hearing on 5/5/08 at 10:00 a.m. and advises counsel that written orders will issue. Court Reporter: Pamela Seijas. (bm) (Entered: 05/08/2008) |
| 04/30/2008 | 186 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, GRANTING GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE ANY TESTIMONY, EVIDENCE, REFERENCES, OR ARGUMENTS ABOUT DEFENDANT'S ALLEGED MENTAL CONDITIONS 185 . Good cause having been shown and the defendant having stated that he does not intend to assert such a defense, IT IS HEREBY ORDERED that the Government's Motion in Limine to Preclude Any Testimony, Evidence, References, or Arguments about Defendant's Alleged Mental Conditions is GRANTED. Accordingly, Defendant is PRECLUDED from introducing any testimony, evidence, references, or arguments about any real or perceived mental condition. (sch) (Entered: 04/30/2008) |
| 04/30/2008 | 188 | NOTICE of Manual Filing of 1. Ex Parte Application; 2. Order Filed Under Seal; 3. Response to Government's Motion in Limine filed Under Seal filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 04/30/2008) |
| 04/30/2008 | 189 | NOTICE of Manual Filing of Ex Parte Application to file Under Seal, [Proposed] Order, Reply to Government's Opposition to Motion in Limine to Exclude Evidence filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 04/30/2008) |
| 04/30/2008 | 193 | MINUTES OF (IN CHAMBERS) ORDER by Judge Dale S. Fischer GRANTING IN PART AND RESERVING CONSIDERATION OF ASPECTS OF THE Government's MOTION for Introduction of Evidence Under Federal Rule of Evidence 404(b) 147 . The Court GRANTS the Governments Motion for Introduction of Evidence Under Federal Rule of Evidence 404(b) with regard to the first group of proposed photographs. The Court defers consideration of the second and third groups. (sch) (Entered: 05/01/2008) |
| 04/30/2008 | 194 | ORDER RE ADULT ATTENDANT FOR CHILD VICTIM WITNESSES 174 by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. (See Order for Further Details). (sch) (Entered: 05/01/2008) |

| | | |
|---|---|---|
| 04/30/2008 | 201 | MINUTES OF IN CHAMBERS (TENTATIVE) ORDER by Judge Dale S. Fischer GRANTING IN PART AND DENYING IN PART Defendant's MOTION in Limine to Exclude the Testimony of Government Cultural Expert Wendy Freed, M.D. and to Preclude Characterizing the Allegations in this Case as "Torture" 162 , and GRANTING IN PART AND DENYING IN PART Defendant's MOTION in Limine to Exclude the Testimony of Government "Grooming" Expert Special Agent James T. Clemente 171 . (See Order for Further Details). (sch) (Entered: 05/02/2008) |
| 04/30/2008 | 205 | ORDER GRANTING EX PARTE APPLICATION TO SEAL TO FILE GOVERNMENT' OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE MOLE IDENTIFICATION TESTIMONY AND REQUES FOR DAUBERT HEARING UNDER SEAL 203 by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. (cbr) (Entered: 05/02/2008) |
| 04/30/2008 | 206 | SEALED DOCUMENT − MINUTES OF IN CHAMBERS ORDER TENTATIVE ORDER DENYING DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF ERECTILE DYSFUNCTION MEDICATION. (cbr) (Entered: 05/02/2008) |
| 04/30/2008 | 207 | EX PARTE APPLICATION TO SEAL To File Koeung Lang Deposition Objections Unde Seal. Filed by Defendant Michael Joseph Pepe(cbr) (Entered: 05/02/2008) |
| 04/30/2008 | 208 | ORDER GRANTING EX PARTE APPLICATION To File Koeung Lang Deposition Objections Unde Seal 207 by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. (cbr) (Entered: 05/02/2008) |
| 04/30/2008 | 209 | SEALED DOCUMENT − MEMORANDUM OF POINTS AND AUTHORITIES RE: OBJECTIONS MADE DURING DEPOSITION TESTIMONEY OF KOEUNG LANG. (cbr) (Entered: 05/02/2008) |
| 04/30/2008 | 216 | SEALED DOCUMENT − GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE MOLE IDENTIFICATION TESTIMONY AND REQUEST FOR DAUBERT HEARING. (cbr) (Entered: 05/02/2008) |
| 04/30/2008 | 219 | SEALED DOCUMENT − EX PARTE APPLICATION To File Under the Government's Opposition to Defendant's Motion to Exclude Evidence.(cbr) (Entered: 05/05/2008) |
| 04/30/2008 | 220 | SEALED DOCUMENT − ORDER FILING UNDER SEAL THE GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE EVIDENCE. (cbr) (Entered: 05/05/2008) |
| 04/30/2008 | 221 | SEALED DOCUMENT − GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE EVIDENCE. (cbr) (Entered: 05/05/2008) |
| 05/01/2008 | 192 | PROPOSED VOIR DIRE QUESTIONS filed by Defendant Michael Joseph Pepe (Brown, Charles) (Entered: 05/01/2008) |
| 05/01/2008 | 195 | NOTICE of Manual Filing of Government's Ex Parte Application To File IN CAMERA AND UNDER SEAL; (Proposed) Order Sealing Document; Government's Witness Statements Filed IN CAMERA AND UNDER SEAL filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Lulejian, John) (Entered: 05/01/2008) |
| 05/01/2008 | 196 | REPLY To Opposition To MOTION in Limine to Exclude 167 filed by Defendant Michael Pepe. (Gunn, Carlton) (Entered: 05/01/2008) |
| 05/01/2008 | 210 | EX PARTE APPLICATION TO SEAL To File Motion Reply in Limine Under Seal. Filed by Defendant Michael Joseph Pepe(cbr) (Entered: 05/02/2008) |
| 05/01/2008 | 211 | ORDER GRANTING EXPARTE APPLICATION To File Motion Reply in Limine Under Seal 210 by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. (cbr) (Entered: 05/02/2008) |
| 05/01/2008 | 212 | SEALED DOCUMENT − REPLY TO GOVERNMENT'S OPPOSITION IN LIMINE TO EXCLUDE EVIDENCE OF ERECTILE DYSFUNCTION MEDICATION. (cbr) (Entered: 05/02/2008) |
| 05/01/2008 | 213 | EX PARTE APPLICATION To File Response to Motion In Limine With Attached Medical Records Under Seal. Filed by Defendant Michael Joseph Pepe(cbr) (Entered: |

| | | |
|---|---|---|
| | | 05/02/2008) |
| 05/01/2008 | 214 | SEALED DOCUMENT − ORDER. (cbr) (Entered: 05/02/2008) |
| 05/01/2008 | 215 | SEALED DOCUMENT − RESPONSE TO GOVERNMENT'S MOTION IN LIMINE. (cbr) (Entered: 05/02/2008) |
| 05/02/2008 | 202 | STIPULATION for Order Protective Order For Materials From Non−Government Organizations filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order Protective Order For Materials From Non−Government Organizations)(Donahue, Patricia) (Entered: 05/02/2008) |
| 05/02/2008 | 204 | STIPULATION for Order Protective Order Re Documents From Agape International Missions filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order Protective Order Re Documents From Agape International Missions)(Donahue, Patricia) (Entered: 05/02/2008) |
| 05/05/2008 | 217 | RESPONSE TO COURTS PROPOSED JURY QUESTIONS filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 05/05/2008) |
| 05/05/2008 | 218 | NOTICE OF MOTION AND MOTION in Limine to Preclude ANY TESTIMONY, EVIDENCE, REFERENCES, OR ARGUMENTS ABOUT THE MCMARTIN PRESCHOOL CASES Filed by Plaintiff USA as to Defendant Michael Joseph PepeMotion set for hearing on 5/7/2008 at 08:00 AM before Judge Dale S. Fischer. (Attachments: # 1 Exhibit A)(Lulejian, John) (Entered: 05/05/2008) |
| 05/05/2008 | 224 | PROTECTIVE ORDER For Materials From Non−Government Organizations by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. Re: Stipulation between the parties 202 . (mg) (Entered: 05/06/2008) |
| 05/05/2008 | 232 | SEALED DOCUMENT − EX PARTE APPLICATION TO FILE UNDER SEAL EX PARTE APPLICATION TO SHORTEN TIME.(cbr) (Entered: 05/08/2008) |
| 05/05/2008 | 233 | SEALED DOCUMENT − ORDER FILING UNDER SEAL THE MOTION TO SHORTEN TIME. (cbr) (Entered: 05/08/2008) |
| 05/05/2008 | 234 | SEALED DOCUMENT − APPLICATION FOR EX PARTE ORDER SHORTENING TIME. (cbr) (Entered: 05/08/2008) |
| 05/05/2008 | 236 | SEALED DOCUMENT − NOTICE OF MOTION TO QUASH (cbr) Additional attachment(s) added on 5/8/2008 (cbr, ). (Entered: 05/08/2008) |
| 05/05/2008 | 237 | SEALED DOCUMENT − ORDER TO QUASH DENIED AS MOOT. (cbr) (Entered: 05/08/2008) |
| 05/05/2008 | 257 | MINUTES OF Daubert Hearing held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. The case is called and counsel state their appearances. The Court and counsel briefly discuss several pretrial issues. Governments expert witness, Dr. Noah Craft, is called, sworn and testifies. The Court advises counsel of its tentative ruling and invites argument. A written order will follow. Court Reporter: Pamela Seijas. (sch) (Entered: 05/21/2008) |
| 05/05/2008 | 266 | LIST OF EXHIBITS AND WITNESSES at Daubert Hearing as to Michael Joseph Pepe. Dr. Noah Craft Called by GOV. (bm) (Entered: 05/22/2008) |
| 05/06/2008 | 222 | MEMORANDUM OF LAW filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Donahue, Patricia) (Entered: 05/06/2008) |
| 05/06/2008 | 223 | MEMORANDUM OF LAW filed by Plaintiff USA as to Defendant Michael Joseph Pepe *Regarding Prior Consistent Statements And Identifications Of Defendant Pursuant To Federal Rules Of Evidence 801(d)(B) And (C)* (Lulejian, John) (Entered: 05/06/2008) |
| 05/06/2008 | 225 | RESPONSE TO COURTS MINUTE ORDER RE: GOVERNMENTS MOTION FOR INTRODUCTION OF EVIDENCE UNDER FEDERAL RULE OF EVIDENCE 404(b) filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 05/06/2008) |
| 05/06/2008 | 227 | EXHIBIT LIST filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Lulejian, John) (Entered: 05/06/2008) |

| | | |
|---|---|---|
| 05/06/2008 | 228 | MINUTES (IN CHAMBERS)ORDER GRANTING in Part and DENYING in PartDefendants Motion in Limine To Exclude MoleIdentification Testimony (Docket No. 167) by Judge Dale S. Fischer : Defendant Michael Joseph Pepe is charged with seven counts of engaging in illicit sexual conduct in foreign places in violation of 18 U.S.C. § 2423(c). The First Superseding Indictment alleges that, between September 2005 and June 2006, Defendant traveled to Cambodia and engaged in illicit sexual conduct with seven minors. Having considered the parties submissions, taken evidence, and heard the oral arguments of counsel, the Court GRANTS in part and DENIES in part Defendants Motion. (See Minute Order for further details) (yl) (Entered: 05/07/2008) |
| 05/06/2008 | 229 | Seal Document− Government's Exparte Application for Order sealing the Government's witness statements filed In Camera and Under Seal.(mat) (Entered: 05/08/2008) |
| 05/06/2008 | 230 | ORDER granting Exparte Application for Order sealing the Government's witness statements filed In Camera and Under Seal 229 , by Judge Dale S Fischer. (mat) (Entered: 05/08/2008) |
| 05/07/2008 | 258 | MINUTES OF JURY TRIAL − 1st Day held before Judge Dale S. Fischer, jury selection begun as to Defendant Michael Joseph Pepe (1) on Count 1−2,1−2,1s−7s. Jury empanelled and sworn. Jury Trial continued to 5/9/2008 at 8:00 AM. Court Reporter: Pamela Seijas. (bm) (Entered: 05/21/2008) |
| 05/08/2008 | 235 | SEALED DOCUMENTS OBJECTION to Exhibit List 227 , filed by Defendant Michael Joseph Pepe (Attachments: # 1 Exhibit 1201# 2 Exhibit 1219# 3 Exhibit 1234−1237# 4 Exhibit 1266−1270# 5 Exhibit 2010, 2011# 6 Exhibit 2012−2015)(Gunn, Carlton) Additional attachment(s) added on 5/9/2008 (sm, ). Modified on 5/9/2008 (sm, ). (Entered: 05/08/2008) |
| 05/08/2008 | 239 | NOTICE of Manual Filing of Ex Parte Application to Seal Document; (Proposed) Order To Seal Document; and Government's Submission Regarding Deposition Testimony of Cheong Thi Sang And Response To Defendant's Objections filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Donahue, Patricia) (Entered: 05/08/2008) |
| 05/08/2008 | 240 | MEMORANDUM OF POINTS AND AUTHORITIES RE: TESTIMONY ABOUT REASONS FOR INVESTIGATING DEFENDANT filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 05/08/2008) |
| 05/09/2008 | 241 | RESPONSE TO GOVERNMENT SUBMISSION REGARDING DEPOSITION TESTIMONY OF CHEONG THI SANG IN RESPONSE TO DEFENDANTS OBJECTIONS filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 05/09/2008) |
| 05/09/2008 | 242 | NOTICE of Manual Filing of Ex Parte Application to Seal Document; [Proposed] Order Sealing Document; and Government's Response To Defendant's Memorandum Of Points And Authorities Re: Objections Made During Deposition Testimony Of Defense Witness Koeung Lang filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Lulejian, John) (Entered: 05/09/2008) |
| 05/09/2008 | 256 | TRANSCRIPT filed as to Michael Joseph Pepe for dates of 5/5/08 before Judge Dale S. Fischer, Court Reporter: Pamela A. Seijas. (bem, ) (sm). (sm). (Entered: 05/21/2008) |
| 05/09/2008 | 259 | MINUTES OF Jury Trial − 2nd Day held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. Opening statements made both government and defense counsel. Witnesses called, sworn and testified. Exhibits identified and admitted. Jury Trial continued to 5/13/2008 at 8:00 AM. Court Reporter: Pamela Seijas. (bm) (Entered: 05/21/2008) |
| 05/12/2008 | 244 | NOTICE of Manual Filing of Ex Parte Application to Seal Document; (Proposed) Order Sealing Document; and Government's Response To Defendant's Objections Made During The Deposition Testimony of Ly Kim Eng filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Lulejian, John) (Entered: 05/12/2008) |
| 05/12/2008 | 246 | MINUTES (IN CHAMBERS) by Judge Dale S. Fischer: Proceedings: Order Re Objections to Exhibits. (See document for details). (mg) (Entered: 05/13/2008) |

| | | |
|---|---|---|
| 05/12/2008 | 248 | SEALED DOCUMENT − EX PARTE APPLICATION TO FILE UNDER SEAL THE GOVERNMENT'S SUBMISSION REGARDING DEPOSITION TESTIMONY OF CHEONG THI SANG AND RESPONSE TO DEFENDANT'S OBJECTIONS. (cbr) (Entered: 05/14/2008) |
| 05/12/2008 | 249 | SEALED DOCUMENT − ORDER FILING UNDER SEAL GOVERNMENT'S SUBMISSION REGARDING DEPOSITION TESTIMONY OF CHEONG THI SANG AND RESPONSE TO DEFENDANT'S OBJECTIONS. (cbr) (Entered: 05/14/2008) |
| 05/12/2008 | 250 | SEALED DOCUMENT − GOVERNMENT'S SUBMISSION REGARDING DEPOSITION TESTIMONY OF CHEONG THI SANG AND RESPONSE TO DEFENDANT'S OBJECTIONS. (cbr) (Entered: 05/14/2008) |
| 05/12/2008 | 251 | SEALED DOCUMENT − MINUTES OF IN CHAMBERS ORDER. (cbr) (Entered: 05/14/2008) |
| 05/13/2008 | 247 | RESPONSE TO GOVERNMENTS RESPONSE TO DEFENDANTS OBJECTIONS MADE DURING THE DEPOSITION TESTIMONY OF LY KIM ENG filed by Defendant Michael Joseph Pepe Re: Notice of Manual Filing (G−92), Notice of Manual Filing (G−92) 244 (Attachments: # 1 Exhibit A)(Gunn, Carlton) (Entered: 05/13/2008) |
| 05/13/2008 | 260 | MINUTES OF Jury Trial − 3rd Day held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. Witnesses called, sworn and testified. Exhibits identified and admitted. Jury Trial continued to 5/14/2008 at 8:00 AM. Court Reporter: Pamela Seijas. (bm) (Entered: 05/21/2008) |
| 05/13/2008 | 276 | NOTICE of Manual Filing of Notice to Withdraw Motion to Quash the Subpoena of the Federal Public Defender for Records Held by Agape International Mission; [Proposed] Order Granting Notice to Withdraw Motion to Quash; filed by Respondent Agape International Mission (mg) (Entered: 05/28/2008) |
| 05/14/2008 | 252 | RESPONSE TO GOVERNMENTS RESPONSE TO DEFENDANTS MEMORANDUM OF POINTS AND AUTHORITIES RE: OBJECTIONS MADE DURING THE DEPOSITION TESTIMONY OF DEFENSE WITNESS KOEUNG LANG filed by Defendant Michael Joseph Pepe Re: Notice of Manual Filing (G−92), Notice of Manual Filing (G−92) 242 (Gunn, Carlton) (Entered: 05/14/2008) |
| 05/14/2008 | 261 | MINUTES OF Jury Trial − 4th Day held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. Witnesses called, sworn and testified. Exhibits identified and admitted. Jury Trial continued to 5/15/2008 at 8:00 AM. Court Reporter: Pamela Seijas. (bm) (Entered: 05/21/2008) |
| 05/15/2008 | 254 | MINUTES (IN CHAMBERS) by Judge Dale S. Fischer: Proceedings: Further Order Re Objections to Deposition Testimony of Cheong Thi Sang. (mg) (Entered: 05/19/2008) |
| 05/15/2008 | 262 | MINUTES OF Jury Trial − 5th Day held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. Witnesses called, sworn and testified. Exhibits identified and admitted. Jury Trial continued to 5/16/2008 at 8:00 AM. Court Reporter: Pamela Seijas. (bm) (Entered: 05/21/2008) |
| 05/16/2008 | 253 | MINUTES (IN CHAMBERS) by Judge Dale S. Fischer: Proceedings: Order Re Objections to Deposition Testimony of Ly Kim Eng. (mg) (Entered: 05/19/2008) |
| 05/16/2008 | 263 | MINUTES OF Jury Trial − 6th Day held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. Witnesses called, sworn and testified. Exhibits identified and admitted. Jury Trial continued to 5/20/2008 at 8:00 AM. Court Reporter: Pamela Seijas. (bm) (Entered: 05/21/2008) |
| 05/19/2008 | 255 | PROPOSED JURY INSTRUCTIONS (Joint set) filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Donahue, Patricia) (Entered: 05/19/2008) |
| 05/19/2008 | 265 | MINUTES (IN CHAMBERS) by Judge Dale S. Fischer: Proceedings: Order Re Objections to Deposition Testimony of Keoung Lang (Docket No. 209). See document for details. (mg) (Entered: 05/22/2008) |

| | | |
|---|---|---|
| 05/20/2008 | 264 | MINUTES OF Jury Trial − 7th Day held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. Witnesses called, sworn and testified. Exhibits identified and admitted. Jury Trial continued to 5/21/2008 at 8:00 AM. Court Reporter: Pamela Seijas. (bm) (Entered: 05/21/2008) |
| 05/20/2008 | 267 | MINUTES OF (IN CHAMBERS) ORDER by Judge Dale S. Fischer GRANTING the Government's MOTION in Limine to Preclude ANY TESTIMONY, EVIDENCE, REFERENCES, OR ARGUMENTS ABOUT THE MCMARTIN PRESCHOOL CASES 218 . The Governments motion is GRANTED. Defendant may not present any testimony, evidence, references, or arguments regarding the McMartin Preschool cases or other unrelated cases where improper questioning of children was alleged. Mr. Maloney may, however, state that he was consulted or testified as an expert in that case. (See Order for Further Details). (sch) (Entered: 05/22/2008) |
| 05/21/2008 | 269 | MINUTES OF Jury Trial − 8th Day held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. Witnesses called, sworn and testified. Exhibits identified and admitted. Government rests. Motion for judgment of acquittal (FRCrP 29) is submitted. Jury Trial continued to 5/22/2008 at 8:00 AM. Court Reporter: Pamela Seijas. (bm) (Entered: 05/23/2008) |
| 05/21/2008 | 277 | NOTICE OF WITHDRAWAL of Motion to Quash, filed by Respondnet Agape International Mission. (Attachments: # 1 Proposed Order)(mg) (Entered: 05/28/2008) |
| 05/22/2008 | 268 | GOVERNMENT'S REQUEST FOR JUDICIAL NOTICE; MEMORANDUM OF POINTS AND AUTHORITIES filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Lulejian, John) (Entered: 05/22/2008) |
| 05/22/2008 | 270 | MINUTES OF Jury Trial − 9th Day held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. Witnesses called, sworn and testified. Exhibits identified and admitted. Jury Trial continued to 5/23/2008 at 8:00 AM. Court Reporter: Pamela Seijas. (bm) (Entered: 05/23/2008) |
| 05/23/2008 | 293 | MINUTES OF Jury Trial − 10th Day held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. Witnesses called, sworn and testified. Exhibits identified and admitted. Motion for judgment of acquittal (FRCrP 29) is submitted. Jury Trial contined to 5/27/2008 at 8:00 AM. Court Reporter: Pamela Seijas. (bm) (Entered: 06/10/2008) |
| 05/27/2008 | 271 | Seal Document− Exparte Application to file Under Seal the Government's response to defendant's objections made during the depostion testimony of Ly Kim Eng.(mat) (Entered: 05/28/2008) |
| 05/27/2008 | 272 | Seal Document− Order filing Under Seal the Government's response to defendant's objections made during the deposition testimony of Ly Kim Eng. (mat) Modified on 5/28/2008 (mat). (Entered: 05/28/2008) |
| 05/27/2008 | 273 | Seal Document− Government's Response to defendant's objections made during the deposition testimony of Ly Kim Eng. (mat) (Entered: 05/28/2008) |
| 05/27/2008 | 274 | Seal Document− Exparte Application to file Under Seal the Government's Response to defendant's memorandum of points and authorities Re: Deposition testimony of defense witness Koeung Lang.(mat) (Entered: 05/28/2008) |
| 05/27/2008 | 275 | Seal Document− Order filing Under Seal the Government's response to defendant's memorandum of points and authorities Re: Deposition testimony of defense witness Koeung Lang. (mat) (Entered: 05/28/2008) |
| 05/27/2008 | 278 | Seal Document− Government's Response to defendant's Memorandum of Points and Authorities Re: Objections made during deposition testimony of defense witness Koeung Lang. (mat) (Entered: 05/28/2008) |
| 05/27/2008 | 294 | MINUTES OF Jury Trial − 11th Day held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. Witnesses called, sworn and testified. Exhibits identified and admitted. Jury Trial continued to 5/28/2008 at 8:00 AM. Court Reporter: Miriam Baird. (bm) (Entered: 06/10/2008) |
| 05/28/2008 | 295 | MINUTES OF Jury Trial − 12th Day held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. Exhibits identified and admitted. Defendant(s) rest. Closing arguments made. Court instructs jury. Baliff sworn. Alternates excused. Jury |

| | | |
|---|---|---|
| | | retires to deliberate. Jury Trial continued to 5/29/2008 at 8:00 AM. Court Reporter: Pamela Seijas. (bm) (Entered: 06/10/2008) |
| 05/29/2008 | 279 | STIPULATION REGARDING ACCURACY OF GOVERNMENT EXHIBIT NO. 1242 filed by Plaintiff USA as to Defendant Michael Joseph Pepe(sch) (Entered: 05/30/2008) |
| 05/29/2008 | 280 | STIPULATION REGARDING DEFENDANT'S CITIZENSHIP filed by Plaintiff USA as to Defendant Michael Joseph Pepe(sch) (Entered: 05/30/2008) |
| 05/29/2008 | 281 | STIPULATION REGARDING DEFENDANT'S TRAVEL FROM THE UNITED STATES OF AMERICA TO THE KINGDOM OF CAMBODIA filed by Plaintiff USA as to Defendant Michael Joseph Pepe(sch) (Entered: 05/30/2008) |
| 05/29/2008 | 282 | STIPULATION REGARDING TESTIMONY OF MAUREEN O'HARA filed by Plaintiff USA as to Defendant Michael Joseph Pepe(sch) (Entered: 05/30/2008) |
| 05/29/2008 | 283 | STIPULATION REGARDING COMPUTER MEDIA filed by Plaintiff USA as to Defendant Michael Joseph Pepe(sch) (Entered: 05/30/2008) |
| 05/29/2008 | 284 | STIPULATION REGARDING ACCURACY OF GOVERNMENT EXHIBIT NO. 2005 filed by Plaintiff USA as to Defendant Michael Joseph Pepe(sch) (Entered: 05/30/2008) |
| 05/29/2008 | 285 | STIPULATION REGARDING CAMBODIAN CALENDAR filed by Plaintiff USA as to Defendant Michael Joseph Pepe(sch) (Entered: 05/30/2008) |
| 05/29/2008 | 286 | STIPULATION REGARDING TELEPHONE CALLS PLACED BY DEFENDANT filed by Plaintiff USA as to Defendant Michael Joseph Pepe(sch) (Entered: 05/30/2008) |
| 05/29/2008 | 287 | STIPULATION filed by Plaintiff USA as to Defendant Michael Joseph Pepe (See Stipulation for Further Details). (sch) (Entered: 05/30/2008) |
| 05/29/2008 | 288 | STIPULATION filed by Plaintiff USA as to Defendant Michael Joseph Pepe (See Stipulation for Further Details)(sch) (Entered: 05/30/2008) |
| 05/29/2008 | 289 | STIPULATION filed by Plaintiff USA as to Defendant Michael Joseph Pepe (See Stipulation for Further Details).(sch) (Entered: 06/02/2008) |
| 05/29/2008 | 290 | STIPULATION REGARDING CHILDREN'S NAMES filed by Plaintiff USA as to Defendant Michael Joseph Pepe (See Stipulation for Further Details).(sch) (Entered: 06/02/2008) |
| 05/29/2008 | 291 | RECEIPT FOR RELEASE OF EXHIBITS to Counsel Upon Verdict/Judgment at Trial; as to Defendant Michael Joseph Pepe. Pursuant to stip of counsel and/or by Order of the Court, all exhibits listed on Joint exhibits list are returned to counsel for respective party(ies) (yl) (Entered: 06/02/2008) |
| 05/29/2008 | 292 | Jury Instructions (Given) by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, (yl) (Entered: 06/02/2008) |
| 05/29/2008 | 296 | MINUTES OF Jury Trial − 13th Day held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. Completed by jury verdict/submitted to court. Motion for mistrial by Defense is denied. Bailiff sworn. Jury Verdict as follows: Michael Joseph Pepe (1) Guilty on Count 1s−6s. Jury polled. Filed Witness & Exhibit lists. Filed Jury notes. Filed Jury instructions. Filed Jury Verdict. Defendant referred to Probation Office for Investigation and Report and continued to 9/3/2008 at 3:00 PM for sentencing. Court Reporter: Pamela Seijas. (bm) (Entered: 06/10/2008) |
| 05/29/2008 | 298 | AMENDED MINUTES OF Jury Trial − 13th Day held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. Completed by jury verdict/submitted to the court. Motion for mistrial by Defense is denied. Baliff sworn. Jury Verdict as follows: Dft Guilty on count(s) 1−7. Jury polled. Filed Witness & Exhibit lists. Filed Jury notes. Filed Jury Instructions. Filed Jury Verdict. Defendant referred to Probation Office for Investigation and Report and continued to 9/3/08 @ 3pm for sentencing. Court Reporter: Pamela Seijas. (bm) (Entered: 06/17/2008) |

| | | |
|---|---|---|
| 07/14/2008 | 300 | STIPULATION for Order for Extension of Time to File a Motion for New Trial filed by Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Gunn, Carlton) (Entered: 07/14/2008) |
| 07/14/2008 | 301 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, GRANTING Stipulation for Order, 300 . GOOD CAUSE HAVING BEEN SHOWN, IT IS HEREBY ORDERED that the deadline for filing a motion for new trial in this matter shall extended to August 11, 2008. (ca) (Entered: 07/15/2008) |
| 08/11/2008 | 302 | EX PARTE APPLICATION to Continue Sentencing Hearing from September 3, 2008 at 8:30 a.m. to November 4, 2008 at 8:30 a.m.. Filed by Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Brown, Charles) (Entered: 08/11/2008) |
| 08/11/2008 | 303 | ORDER CONTINUING SENTENCING HEARING by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, re EX PARTE APPLICATION to Continue Sentencing Hearing 302 . GOOD CAUSE having been shown, it is hereby ordered that the sentencing hearing currently scheduled for September 3, 2008 at 8:30 a.m. shall be continued until 11/4/2008 at 08:30 A.M. or to another date and time convenient with the court. (sch) (Entered: 08/12/2008) |
| 08/13/2008 | 304 | EX PARTE APPLICATION for Reconsideration re Order on Ex Parte Application,, Order to Continue Trial, Change of Plea or Sentencing, 303 Filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Lulejian, John) (Entered: 08/13/2008) |
| 08/14/2008 | 305 | DECLARATION of filed by Defendant Michael Joseph Pepe RE: EX PARTE APPLICATION for Reconsideration re Order on Ex Parte Application,, Order to Continue Trial, Change of Plea or Sentencing, 303 304 (Gunn, Carlton) (Entered: 08/14/2008) |
| 08/14/2008 | 306 | MINUTES OF IN CHAMBERS ORDER by Judge Judge Dale S. Fischer:, RE: EX PARTE APPLICATION for Reconsideration re Order on Ex Parte Application,, Order to Continue Trial, Change of Plea or Sentencing, 303 304 . Motion granted in part. Se Minute Order for specifics. (dp) (Entered: 08/14/2008) |
| 08/15/2008 | 307 | MINUTES OF IN CHAMBERS ORDER by Judge Judge Dale S. Fischer:, ( Status Conference set for 8/20/2008 03:00 PM before Judge Dale S. Fischer.) (dp) (Entered: 08/15/2008) |
| 08/20/2008 | 308 | STIPULATION to Continue Sentencing from 9/3/08 to 9/18/08 filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order Continue Sentencing)(Donahue, Patricia) (Entered: 08/20/2008) |
| 08/20/2008 | 309 | ORDER CONTINUING SENTENCING by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, re Stipulation to Continue 308 . Having received the Stipulation to Continue Sentencing, the Court HEREBY ORDERS that the Sentencing is continued from September 3, 2008 to 9/18/2008 at 03:00 P.M. (sch) (Entered: 08/21/2008) |
| 08/25/2008 | 310 | EX PARTE APPLICATION for Order for Scheduling a Status Conference re Defendant Request for New Counsel Filed by Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Gunn, Carlton) (Entered: 08/25/2008) |
| 08/28/2008 | 311 | STIPULATION to Continue Sentencing from September 18, 2008 to September 25, 2008 filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order Continue Sentencing)(Donahue, Patricia) (Entered: 08/28/2008) |
| 08/28/2008 | 312 | ORDER Re EX PARTE APPLICATION for Order Scheduling a Status Conference 310 by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. GOOD CAUSE HAVING BEEN SHOWN, IT IS HEREBY ORDERED that a status conference shall be scheduled in this matter, on 9/3/2008, at 03:00 P.M. for the Court to consider a request by defendant for appointment of new counsel for the purpose of investigating defendants belief that he was possibly not provided with effective assistance of counsel. (sch) (Entered: 08/28/2008) |
| 08/28/2008 | 313 | ORDER CONTINUING SENTENCING by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, re Stipulation to Continue 311 . Having received the Stipulation to Continue Sentencing, the Court HEREBY ORDERS that the Sentencing is |

| | | |
|---|---|---|
| | | continued from September 18, 2008 to 9/25/2008 at 02:30 PM. (sch) (Entered: 08/28/2008) |
| 09/02/2008 | 314 | RESPONSE filed by Plaintiff USA as to Defendant Michael Joseph Pepe *Regarding Defendant's Request For Appointment of New Counsel To Investigate Ineffective Assistance Of Counsel* (Donahue, Patricia) (Entered: 09/02/2008) |
| 09/03/2008 | 315 | MINUTES OF IN CHAMBERS PROCEEDINGS: Hearing on Defendant's Request to Investigate a Claim of Inefective Assistance of Counsel. (Under Seal) (mat) (Entered: 09/10/2008) |
| 09/09/2008 | 316 | MINUTES OF IN CHAMBERS PROCEEDINGS:(In Chambers and Under Seal) Order Granting Request of Paul Horgan to be Relieved and Denying Appointment of New CJA Counsel. (mat) (Entered: 09/10/2008) |
| 09/16/2008 | 317 | NOTICE of Manual Filing of Application to File Under Seal; Order to file Under Seal; Second Ex Parte; Order bifurcating Sentencing; Order Continuing Sentencing filed by Defendant Michael Joseph Pepe (Brown, Charles) (Entered: 09/16/2008) |
| 09/16/2008 | 324 | SEALED DOCUMENT − APPLICATION TO FILE MICHAEL JOSEPH PEPE'S EX PARTE REQUEST FOR CONTINUANCE UNDER SEAL. (cbr) (Entered: 09/26/2008) |
| 09/16/2008 | 325 | SEALED DOCUMENT − ORDER GRANTING DEFENSE REQUEST TO FILE SECOND EX PARTE APPLICATION FOR A COTINUANCE UNDER SEAL**DOCUMENT SEALED** (cbr) (Entered: 09/26/2008) |
| 09/16/2008 | 326 | SEALED DOCUMENT − SECOND EX PARTE APPLICATION AND PROPOSED ORDERS CONTINUING OR BIFURCATING THE SENTENCING HEARING.(cbr) (Entered: 09/26/2008) |
| 09/17/2008 | 318 | POSITION WITH RESPECT TO SENTENCING FACTORS filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Exhibit A)(Donahue, Patricia) (Entered: 09/17/2008) |
| 09/18/2008 | 319 | NOTICE of Manual Filing of Government's Ex Parte Application For Order Sealing Document; Proposed Order Sealilng Document; Under Seal Document filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Donahue, Patricia) (Entered: 09/18/2008) |
| 09/18/2008 | 320 | OBJECTION to Notice of Manual Filing (G−92) 317 , filed by Plaintiff USA as to Defendant Michael Joseph Pepe *Government's Opposition To Defendant's Second Ex Parte Application To Continue or Bifurcase Sentencing* (Donahue, Patricia) (Entered: 09/18/2008) |
| 09/18/2008 | 321 | MINUTES OF HEARING ON SECOND EX PARTE APPLICATION TO CONTINUE SENTENCING DATE by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. The case is called and counsel state their appearances. The Court and counsel discuss the application. Government counsel will inform the Clerk by September 22, 2008 regarding the September 25, 2008 sentencing date. The Court will issue an order. Court Reporter: Pamela Seijas. (sch) (Entered: 09/19/2008) |
| 09/18/2008 | 322 | MINUTES OF (IN CHAMBERS) ORDER Granting Defendant's Second Ex Parte Application 317 by Judge Dale S. Fischer. The Court has received the Defendants Second Ex Parte Application and [Proposed] Orders Continuing (or) Bifurcating the Sentencing Hearing. The Government should advise the Court and counsel no later than September 22 whether it wishes to have the victims present to be heard on the issue of sentencing on September 25. The Defendant's Ex Parte Application is GRANTED. (See Order for Further Details). (sch) (Entered: 09/19/2008) |
| 09/19/2008 | 327 | SEALED DOCUMENT − GOVERNMENT'S EX PARTE APPLICATION FOR ORDER (1) SEALING GOVERNMENT'S SUBMISSION OF VICTIM IMPACT AND RESTITUTION INFORMATION; AND (2) ALLOWING DEFENDANT TO READ BUT NOT TO KEEP, A COPY OF THE GOVERNMENT'S SUBMISSION OF VICTIM IMPACT AND RESTITUTION.(cbr) (Entered: 09/26/2008) |
| 09/19/2008 | 328 | SEALED DOCUMENT − ORDER **DOCUMENT SEALED** (cbr) (Entered: 09/26/2008) |

| | | |
|---|---|---|
| 09/19/2008 | 329 | SEALED DOCUMENT − GOVERNMENT'S SUBMISSION OF VICTIM IMPACT AND RESTITUTION INFORMATION. (cbr) (Entered: 09/26/2008) |
| 09/24/2008 | 323 | NOTICE of Manual Filing of Government's Ex Parte Application For Order Sealing Doncument; (Proposed) Order Sealing Document; Under Seal Document filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Donahue, Patricia) (Entered: 09/24/2008) |
| 09/24/2008 | 330 | SEALED DOCUMENT− Government's Exparte Application for Order (1) Sealing Government's Supplemental Submission of Victim Impact Information; And (2) Allowing defendant to read, but not to keep, a copy of the Government's Supplemental Submission of Victim Impact Information. (mat) (Entered: 09/26/2008) |
| 09/24/2008 | 331 | ORDER granting 330 , by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. (mat) (Entered: 09/26/2008) |
| 09/24/2008 | 332 | SEALED DOCUMENT− Government's Supplemental Submission of Victim Impact Information (mat) (Entered: 09/26/2008) |
| 09/25/2008 | 333 | MINUTES OF Bifurcated Sentencing Proceeding − Victim Impact Statements And Restitution Issues held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. The case is called and counsel state their appearances. The victims and their guardians/custodians provide their statements to the Court. (See Minute Order for Further Details). Court Reporter: Pamela Seijas. (sch) (Entered: 09/29/2008) |
| 10/28/2008 | 334 | STIPULATION to Continue sentencing from November 4, 2008 at 8:30am to January 12, 2009 at 8:30 am filed by Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Brown, Charles) (Entered: 10/28/2008) |
| 10/28/2008 | 335 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe Stipulation to Continue 334 GOOD CAUSE having been shown, it is hereby ordered that the sentencing hearing currently scheduled for November 4, 2008 at 8:30 a.m. shall be continued until January 12, 2009 at 8:30 a.m., or another date and time convenient with the court. (yl) (Entered: 10/29/2008) |
| 01/05/2009 | 337 | ORDER by Judge Dale S. Fischer Continuing Sentencing Hearing as to Defendant Michael Joseph Pepe. It is hereby ordered that the sentencing hearing currently scheduled for January 12, 2009 at 8:30 a.m., shall be continued until March 26, 2009 at 1:30 p.m. before Judge Dale S. Fischer. Any additional defense pleadings shall be filed by February 25 and any government response shall be due by March 11 with any defense reply due by March 18, 2009. Re Stipulation 336 . (mg) (Entered: 01/06/2009) |
| 01/06/2009 | 336 | STIPULATION to Continue Sentencing Hearing from January 12, 2009 at 8:30 a.m. to March 26, 2009 at 1:30 p.m. filed by Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Brown, Charles) (Entered: 01/06/2009) |
| 03/11/2009 | 338 | NOTICE of Manual Filing of Ex Parte Application To Seal Government's Response To Defendant's Position Re Sentencing Factors; [Proposed] Order; Government's Response To Defendant's Position Re Sentencing Factors filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Donahue, Patricia) (Entered: 03/11/2009) |
| 03/12/2009 | 339 | NOTICE of Manual Filing of Ex Parte Application to File Under Seal; Memorandum of Points and Authorities; [Proposed] Orders, in the Alternative; Defendant's Position Re: Sentencing Factors; Exhibits filed by Defendant Michael Joseph Pepe (Brown, Charles) (Entered: 03/12/2009) |
| 03/12/2009 | 340 | SEALED DOCUMENT− Exparte Application to Seal Government's Response to Defendant's Position Re: Sentencing Factors.(mat) (Entered: 03/17/2009) |
| 03/12/2009 | 341 | Order Granting Exparte Application 340 to Seal by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. (mat) (Entered: 03/17/2009) |
| 03/12/2009 | 342 | SEALED DOCUMENT− Government's Response to Defendant's Position Re: Sentencing Factors. (mat) (Entered: 03/17/2009) |
| 03/16/2009 | 343 | SEALED DOCUMENT− Exparte Application to File Under Seal; Memorandum of Points and Authorities.(mat) (Entered: 03/18/2009) |

| | | |
|---|---|---|
| 03/16/2009 | 344 | SEALED DOCUMENT− Orders (mat) (Entered: 03/18/2009) |
| 03/16/2009 | 345 | SEALED DOCUMENT− Defendant's Position Re: Sentencing Factors; Exhibits.(mat) (Entered: 03/18/2009) |
| 03/25/2009 | 348 | SUPPLEMENT filed by Defendant Michael Joseph Pepe *Re: Restitution* (Brown, Charles) (Entered: 03/25/2009) |
| 03/25/2009 | 349 | MINUTES OF IN CHAMBERS ORDER by Judge Dale S. Fischer: as to Defendant Michael Joseph Pepe, The Court, having just received supplemental papers from the defense, continues the sentencing hearing on its own motion. The parties are to contact the Court's clerk with a mutually convenient date for sentencing. (sce) (Entered: 03/26/2009) |
| 04/03/2009 | 350 | NOTICE OF LODGING filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Lulejian, John) (Entered: 04/03/2009) |
| 04/06/2009 | 351 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, ( Sentencing continued to 4/28/2009 01:30 PM before Judge Dale S. Fischer.) (sce) (Entered: 04/07/2009) |
| 04/20/2009 | 352 | NOTICE of Manual Filing of Government's Ex Parte Application to Seal Document; (Proposed) Order; and Under Seal Document filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Lulejian, John) (Entered: 04/20/2009) |
| 04/21/2009 | 353 | SEALED DOCUMENT− Government's Exparte Application for an Order (1) Sealing Government's Response to Defendant's Supplemental Filing Re: Restitution, and (2) Allowing Defendant to Read, But Not to Keep a Copy of The Government's Response to Defendant's Supplemental Filing Re: Restitution; Memorandum of Points & Authorities; Declaration of John J. Lulejian [Proposed] Order.(mat) (Entered: 04/23/2009) |
| 04/21/2009 | 354 | SEALED DOCUMENT− ORDER (mat) (Entered: 04/23/2009) |
| 04/21/2009 | 355 | SEALED DOCUMENT− Government's Response to Defendant's Supplemental Filing Re: Restitution; Memorandum of Points and Authorities; Declaration of Don Brewster. (mat) (Entered: 04/23/2009) |
| 04/23/2009 | 356 | NOTICE of Manual Filing of Government's Ex Parte Application for An Order Sealing In Camera Filing; Memorandum of Points and Authorities; Declaration of John J. Lulejian; (Proposed) Order in Camera and Under Seal; and in Camera and Under Seal Document filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Lulejian, John) (Entered: 04/23/2009) |
| 04/23/2009 | 357 | MINUTES OF IN CHAMBERS ORDER by Judge Dale S. Fischer: as to Defendant Michael Joseph Pepe,( Sentencing continued to 6/29/2009 03:00 PM before Judge Dale S. Fischer.) (sce) (Entered: 04/24/2009) |
| 06/23/2009 | 361 | NOTICE of Manual Filing of Government's Ex Parte Application For An Order Sealing In Camera and Under Seal Filing; [Proposed] Order Sealing Document In Camera And Under Seal; Under Seal Document filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Donahue, Patricia) (Entered: 06/23/2009) |
| 06/23/2009 | 362 | MINUTES OF IN CHAMBERS ORDER by Judge Dale S. Fischer: as to Defendant Michael Joseph Pepe. The Court, on its own motion, continues the sentencing to a date to be agreed to bycounsel after consultation with this Courts Courtroom Deputy Clerk. (sce) (Entered: 06/25/2009) |
| 07/15/2009 | 367 | STIPULATION for Hearing as to BRIEFING SCHEDULE AND HEARING DATE, STIPULATION for Order BRIEFING SCHEDULE AND HEARING DATE filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Donahue, Patricia) (Entered: 07/15/2009) |
| 07/15/2009 | 368 | ORDER re BRIEFING SCHEDULE AND HEARING DATE by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe: GRANTING stipulation for Hearing, Stipulation for Order 367 . IT IS HEREBY ORDERED as follows: 1. The deadline for defendant to file any pleading in response to the governments in camera filings produced to defendant pursuant to a protective order is July 27, 2009. 2. The deadline for the government to file any pleading in reply to a defense pleading is August 14, |

| | | |
|---|---|---|
| | | 2009. 3. If the court conducts a hearing on this matter, that hearing will take place on September 2, 2009 at 2:30 p.m.. (shb) (Entered: 07/16/2009) |
| 07/20/2009 | 369 | NOTICE of Manual Filing of Government's EX Parte Application For An Order Sealing In Camera And Under Seal Filing; (Proposed) Order (Filed In Camera and Under Seal; and In Camera and Under Seal Document filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Donahue, Patricia) (Entered: 07/20/2009) |
| 07/27/2009 | 370 | NOTICE of Manual Filing of Defense Response to Government's In Camera Filing; Request for Evidentiary Hearing and Motion to Compel Discovery Re: Evidence of Possible Government Misconduct; Ex Parte Application to File Under Seal; [Proposed] Orders, in the Alternative filed by Defendant Michael Joseph Pepe (Brown, Charles) (Entered: 07/27/2009) |
| 07/28/2009 | 374 | SEALED DOCUMENT− Exparte Application to File Under Seal; Defense Response to Government's In Camera Filing; Request for Evidentiary Hearing and Motion to Compel Discovery Re: Evidence of Possible Government Misconduct. (mat) (Entered: 08/03/2009) |
| 07/28/2009 | 375 | SEALED DOCUMENT− Defense Response to Government's In Camera Filing; Request for Evidentiary Hearing and Motion to Compel Discovery Re: Evidence of Possible Government Misconduct. (mat) (Entered: 08/03/2009) |
| 07/28/2009 | 376 | ORDERS, IN THE ALTERNATIVE by Judge Dale S. Fischer: Granting 374 Exparte Application that Defense Response to Government's In Camera Filing; Request for Evidentiary Hearing and Motion to Compel Discovery Re: Evidence of Possible Government Misconduct(1) shall be filed under seal (es) (Entered: 08/04/2009) |
| 08/17/2009 | 377 | NOTICE of Manual Filing of Government's Ex Parte Application For An Order Sealing Government's Reply to Defendant's In Camera Filing; (Proposed) Order; and Government's Reply To Defendant's Response To Government's In Camera Filing. filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Donahue, Patricia) (Entered: 08/17/2009) |
| 08/18/2009 | 378 | SEALED DOCUMENT− Government's Exparte Application for Order Sealing Government's Reply to Defendant's Response to Government's In Camera Filing; Declaration of Patricia A. Donahue. (mat) (Entered: 08/19/2009) |
| 08/18/2009 | 379 | SEALED DOCUMENT− Order (mat) (Entered: 08/19/2009) |
| 08/18/2009 | 380 | SEALED DOCUMENT− Government's Reply to Defendant's Response to Government's In Camera Filing. Pepe (mat) (Entered: 08/20/2009) |
| 09/02/2009 | 381 | MINUTES OF Evidentiary Hearing held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, Witnesses sworn and examined. Counsel will contact the clerk to set up a hearing date on theremaining matters for an evidentiary hearing. Court Reporter: Pamela Batalo. (sce) (Entered: 09/03/2009) |
| 02/17/2010 | 386 | NOTICE of Manual Filing of Government's Ex Parte Application For An Order Sealing Document Under Seal and In Camera; (Proposed) Order (Under Seal); and Under Seal and In Camera Document filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Donahue, Patricia) (Entered: 02/17/2010) |
| 02/17/2010 | 387 | SEALED DOCUMENT − GOVERNMENT'S EX PARTE APPLICATION FOR AN ORDER SEALING GOVERNMENT'S IN CAMERA SUBMISSION IN RESPONSE TO COURT'S ORDER(lra) (Entered: 02/19/2010) |
| 02/17/2010 | 388 | SEALED DOCUMENT− ORDER (lra) (Entered: 02/19/2010) |
| 02/17/2010 | 389 | SEALED DOCUMENT − IN CAMERA (lra) (Entered: 02/22/2010) |
| 03/09/2010 | 390 | MINUTES OF IN CHAMBERS ORDER by Judge Dale S. Fischer: as to Defendant Michael Joseph Pepe: The Court has reviewed the documents provided by the government under seal with the exception of the phone records. The Court finds that the documents reviewed are not relevant. The request for the documents is denied. (shb) (Entered: 03/09/2010) |
| 03/18/2010 | 391 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 5/27/08 8:00 am. Court Reporter/Electronic Court Recorder: Miriam V. Baird, phone |

| | | |
|---|---|---|
| | | number mvb11893@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/8/2010. Redacted Transcript Deadline set for 4/18/2010. Release of Transcript Restriction set for 6/16/2010.(Baird, Miriam) (Entered: 03/18/2010) |
| 03/18/2010 | 392 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings 5/27/08 8:00 am (Baird, Miriam) (Entered: 03/18/2010) |
| 03/23/2010 | 393 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 5−13−2008. Court Reporter/Electronic Court Recorder: Lynne Nicholson, phone number 213−620−0431. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/13/2010. Redacted Transcript Deadline set for 4/23/2010. Release of Transcript Restriction set for 6/21/2010.(Smith, Rita) (Entered: 03/23/2010) |
| 03/23/2010 | 394 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings 05−13−2008(Smith, Rita) (Entered: 03/23/2010) |
| 04/07/2010 | 395 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 05/07/08; 9:02 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/28/2010. Redacted Transcript Deadline set for 5/8/2010. Release of Transcript Restriction set for 7/6/2010.(Seijas, Pamela) (Entered: 04/07/2010) |
| 04/07/2010 | 396 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 05/09/08; 7:50 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.co. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/28/2010. Redacted Transcript Deadline set for 5/8/2010. Release of Transcript Restriction set for 7/6/2010.(Seijas, Pamela) (Entered: 04/07/2010) |
| 04/07/2010 | 397 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 05/13/08; 7:54 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/28/2010. Redacted Transcript Deadline set for 5/8/2010. Release of Transcript Restriction set for 7/6/2010.(Seijas, Pamela) (Entered: 04/07/2010) |
| 04/07/2010 | 398 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 05/14/08; 7:52 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/28/2010. Redacted Transcript Deadline set for 5/8/2010. Release of Transcript Restriction set for 7/6/2010.(Seijas, Pamela) (Entered: 04/07/2010) |
| 04/07/2010 | 399 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 5/15/08; 7:50 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/28/2010. Redacted Transcript Deadline set for 5/8/2010. Release of Transcript Restriction set for 7/6/2010.(Seijas, Pamela) (Entered: 04/07/2010) |

| | | |
|---|---|---|
| 04/07/2010 | 400 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 05/16/08; 7:50 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/28/2010. Redacted Transcript Deadline set for 5/8/2010. Release of Transcript Restriction set for 7/6/2010.(Seijas, Pamela) (Entered: 04/07/2010) |
| 04/07/2010 | 401 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 05/20/08; 7:46 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/28/2010. Redacted Transcript Deadline set for 5/8/2010. Release of Transcript Restriction set for 7/6/2010.(Seijas, Pamela) (Entered: 04/07/2010) |
| 04/07/2010 | 402 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 05/21/08; 7:47 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/28/2010. Redacted Transcript Deadline set for 5/8/2010. Release of Transcript Restriction set for 7/6/2010.(Seijas, Pamela) (Entered: 04/07/2010) |
| 04/07/2010 | 403 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 05/22/08; 7:50 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/28/2010. Redacted Transcript Deadline set for 5/8/2010. Release of Transcript Restriction set for 7/6/2010.(Seijas, Pamela) (Entered: 04/07/2010) |
| 04/07/2010 | 404 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 5/23/08; 7:50 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/28/2010. Redacted Transcript Deadline set for 5/8/2010. Release of Transcript Restriction set for 7/6/2010.(Seijas, Pamela) (Entered: 04/07/2010) |
| 04/07/2010 | 405 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 5/28/08;8:03 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/28/2010. Redacted Transcript Deadline set for 5/8/2010. Release of Transcript Restriction set for 7/6/2010.(Seijas, Pamela) (Entered: 04/07/2010) |
| 04/07/2010 | 406 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 5/29/08; 9:00 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/28/2010. Redacted Transcript Deadline set for 5/8/2010. Release of Transcript Restriction set for 7/6/2010.(Seijas, Pamela) (Entered: 04/07/2010) |
| 04/07/2010 | 407 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings 5/7/08 9:02 a.m.;5/9/08 7:50 a.m.;5/13/08 7:54 a.m.;5/14/08 7:52 a.m.;5/15/08 7:50 a.m.;5/16/08 7:50 a.m.;5/20/08 7:46 a.m.;5/21/08 7:47 a.m.;5/22/08 7:50 a.m.;5/23/08 7:50 a.m.; 5/28/08 8:03 a.m.; 5/29/08 9:00 a.m. (Seijas, Pamela) |

| | | |
|---|---|---|
| | | (Entered: 04/07/2010) |
| 04/07/2010 | 408 | SEALED DOCUMENT − TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 05/7/08, 12:14 p.m. to 12:15 p.m.. Court Reporter/Electronic Court Recorder: Pamela A. Seijas, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/28/2010. Redacted Transcript Deadline set for 5/8/2010. Release of Transcript Restriction set for 7/6/2010.(cbr) (Entered: 04/08/2010) |
| 05/12/2010 | 409 | NOTICE of Manual Filing of Government's Ex Parte Application for An Order Sealing Government's Transcript Redaction Request; [Proposed] Order Sealing Government's Transcript Redaction Request; and Government's Transcript Redaction Request filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Donahue, Patricia) (Entered: 05/12/2010) |
| 05/18/2010 | 410 | REDACTED TRANSCRIPT filed as to Defendant Michael Joseph Pepe, re Transcript 396 . Redaction Request due 6/8/2010. Redacted Transcript Deadline set for 6/18/2010. Release of Transcript Restriction set for 8/16/2010.(Seijas, Pamela) (Entered: 05/18/2010) |
| 05/18/2010 | 411 | REDACTED TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 05/13/08, re Transcript 397 . Redaction Request due 6/8/2010. Redacted Transcript Deadline set for 6/18/2010. Release of Transcript Restriction set for 8/16/2010.(Seijas, Pamela) (Entered: 05/18/2010) |
| 05/18/2010 | 412 | REDACTED TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 05/14/08, re Transcript 398 . Redaction Request due 6/8/2010. Redacted Transcript Deadline set for 6/18/2010. Release of Transcript Restriction set for 8/16/2010.(Seijas, Pamela) (Entered: 05/18/2010) |
| 05/18/2010 | 413 | REDACTED TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 05/15/08, re Transcript 399 . Redaction Request due 6/8/2010. Redacted Transcript Deadline set for 6/18/2010. Release of Transcript Restriction set for 8/16/2010.(Seijas, Pamela) (Entered: 05/18/2010) |
| 05/18/2010 | 414 | REDACTED TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 05/16/08, re Transcript 400 . Redaction Request due 6/8/2010. Redacted Transcript Deadline set for 6/18/2010. Release of Transcript Restriction set for 8/16/2010.(Seijas, Pamela) (Entered: 05/18/2010) |
| 05/18/2010 | 415 | REDACTED TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 5/20/08, re Transcript 401 . Redaction Request due 6/8/2010. Redacted Transcript Deadline set for 6/18/2010. Release of Transcript Restriction set for 8/16/2010.(Seijas, Pamela) (Entered: 05/18/2010) |
| 05/18/2010 | 416 | REDACTED TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 5/21/08, re Transcript 402 . Redaction Request due 6/8/2010. Redacted Transcript Deadline set for 6/18/2010. Release of Transcript Restriction set for 8/16/2010.(Seijas, Pamela) (Entered: 05/18/2010) |
| 05/18/2010 | 417 | REDACTED TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 05/22/08, re Transcript 403 . Redaction Request due 6/8/2010. Redacted Transcript Deadline set for 6/18/2010. Release of Transcript Restriction set for 8/16/2010.(Seijas, Pamela) (Entered: 05/18/2010) |
| 05/18/2010 | 418 | REDACTED TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 05/23/08, re Transcript 404 . Redaction Request due 6/8/2010. Redacted Transcript Deadline set for 6/18/2010. Release of Transcript Restriction set for 8/16/2010.(Seijas, Pamela) (Entered: 05/18/2010) |
| 05/18/2010 | 419 | REDACTED TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 05/28/08, re Transcript 405 . Redaction Request due 6/8/2010. Redacted Transcript Deadline set for 6/18/2010. Release of Transcript Restriction set for 8/16/2010.(Seijas, Pamela) (Entered: 05/18/2010) |

| | | |
|---|---|---|
| 05/18/2010 | 420 | REDACTED TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 05/29/2010, re Transcript 406 . Redaction Request due 6/8/2010. Redacted Transcript Deadline set for 6/18/2010. Release of Transcript Restriction set for 8/16/2010.(Seijas, Pamela) (Entered: 05/18/2010) |
| 05/18/2010 | 421 | NOTICE OF FILING REDACTED TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings 5/9/08 7:50 a.m.; 5/13/08 7:54 a.m.; 5/14/08 7:52 a.m.; 5/15/08 7:50 a.m.;5/16/08 7:50 a.m.; 5/20/08 7:46 a.m.; 5/21/08 7:47 a.m.; 5/22/08 7:50 a.m.; 5/23/08 7:50 a.m.; 5/28/08 8:03 a.m.; 5/29/08 9:00 a.m. (Seijas, Pamela) (Entered: 05/18/2010) |
| 05/18/2010 | 422 | NOTICE OF CLERICAL ERROR, as to Defendant Michael Joseph Pepe: Due to clerical error Re: Redacted Transcript (CR) 410 (Seijas, Pamela) (Entered: 05/18/2010) |
| 05/18/2010 | 423 | NOTICE OF CLERICAL ERROR, as to Defendant Michael Joseph Pepe: Due to clerical error Re: Redacted Transcript (CR), Redacted Transcript (CR) 420 (Seijas, Pamela) (Entered: 05/18/2010) |
| 05/18/2010 | 424 | GOVERNMENT'S EX PARTE APPLICATION for an Order sealing government's transcript redaction request; Declaration of Patricia A Donahue Filed by Plaintiff USA as to Defendant Michael Joseph Pepe(shb) (Entered: 05/20/2010) |
| 05/18/2010 | 425 | ORDER by Judge Dale S. Fischer: granting 424 Ex Parte Application for Order for Government's Transcript Redaction Request Under Seal as to Michael Joseph Pepe (1) (shb) Modified on 5/14/2013 (mat). (Entered: 05/20/2010) |
| 05/18/2010 | 433 | SEALED DOCUMENT− Transcript Redaction Request. (mat) (Entered: 06/02/2010) |
| 05/20/2010 | 426 | NOTICE of Manual Filing of Government's Ex Parte Application For An Order Sealing Document; Order Sealing Government's Document; and Government's Transcript Redaction Request filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Donahue, Patricia) (Entered: 05/20/2010) |
| 05/24/2010 | 427 | NOTICE of Manual Filing of Government's Ex parte A;;ocation For An Order Sealing Government's Transcript Redaction Request; Proposed order Sealing Government's Transcript Redaction Request; and Government's Transcript Redaction Request filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Donahue, Patricia) (Entered: 05/24/2010) |
| 05/24/2010 | 428 | EX PARTE APPLICATION for Order sealing government's transcript redaction request; Declaration of Patricia A Donahue Filed by Plaintiff USA as to Defendant Michael Joseph Pepe Lodged Proposed Order.(shb) (Entered: 05/26/2010) |
| 05/24/2010 | 429 | EX PARTE APPLICATION For an Order Sealing Government's Transcript Redaction Request as to Defendant Michael Joseph Pepe. Filed by Plaintiff USA as to Defendant Michael Joseph Pepe(cbr) (Entered: 05/26/2010) |
| 05/24/2010 | 430 | ORDER by Judge Dale S. Fischer: granting 429 Exparte Application to Seal Government's Transcript Redaction Request as to Michael Joseph Pepe (1) (cbr) (Entered: 05/26/2010) |
| 05/24/2010 | 434 | SEALED DOCUMENT− Transcript Redaction Request. (mat) (Entered: 06/02/2010) |
| 05/25/2010 | 431 | ORDER by Judge Dale S. Fischer: granting 428 Ex Parte Application for Order for sealing government's transcript redaction request as to Michael Joseph Pepe (1) (shb) (Entered: 05/27/2010) |
| 05/25/2010 | 440 | SEALED DOCUMENT− Transcript Redaction Request. (mat) (Entered: 07/02/2010) |
| 05/25/2010 | 441 | SEALED DOCUMENT− Transcript Redaction Request. (mat) (Entered: 07/02/2010) |
| 06/01/2010 | 432 | NOTICE of Manual Filing of Government's Ex Parte Application For An Order Sealing Government's Transcript Redaction Request; Proposed order Sealing Government's Transcript Redaction Request; and Government's Transcript Redaction Request filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Donahue, Patricia) (Entered: 06/01/2010) |

| | | |
|---|---|---|
| 06/02/2010 | 435 | REDACTED TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 5/27/08, re Transcript 391 . Redaction Request due 6/23/2010. Redacted Transcript Deadline set for 7/3/2010. Release of Transcript Restriction set for 8/31/2010.(Baird, Miriam) (Entered: 06/02/2010) |
| 06/02/2010 | 436 | NOTICE OF FILING REDACTED TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings 5/27/08 (Baird, Miriam) (Entered: 06/02/2010) |
| 06/02/2010 | 437 | SEALED DOCUMENT− Transcript Redaction Request. (mat) (Entered: 06/03/2010) |
| 06/02/2010 | 438 | GOVERNMENT'S EX PARTE APPLICATION for Order Sealing Government's Transcript Redaction Request for CR 391; Declaration of Patricia A. Donahue. Filed by Plaintiff USA as to Defendant Michael Joseph Pepe. (jp) (Entered: 06/04/2010) |
| 06/02/2010 | 439 | ORDER SEALING GOVERNMENT'S TRANSCRIPT REDACTION REQUEST by Judge Dale S. Fischer. Pursuant to 18 USC section 3509(d)(2), that the Government's Transcript Redaction Request for CR 391 438 filed on 6/1/2010, shall be filed under seal. (jp) (Entered: 06/04/2010) |
| 07/19/2010 | 442 | NOTICE of Manual Filing of Ex Parte Application To File Under Seal; Proposed Orders, In The Alternative, Defense Motion For New Trial Based On Newly Discovered Evidence Of Interpreter Bias And Misconduct filed by Defendant Michael Joseph Pepe (Brown, Charles) (Entered: 07/19/2010) |
| 07/21/2010 | 443 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, DENYING WITH PREJUDICE Notice of Manual Filing re Ex Parte Application to File Under Seal (G−92) 442 . (shb) (Entered: 07/22/2010) |
| 07/21/2010 | 444 | SEALED DOCUMENT− Orders, In the Alternative (mat) (Entered: 07/23/2010) |
| 07/28/2010 | 445 | NOTICE OF MOTION AND MOTION for New Trial *Based On Newly Discovered Evidence Of Interpreter Bias And Misconduct* Filed by Defendant Michael Joseph Pepe (Attachments: # 1 Exhibit A)(Brown, Charles) (Entered: 07/28/2010) |
| 09/13/2010 | 446 | MINUTES OF IN CHAMBERS ORDER by Judge Dale S. Fischer: as to Defendant Michael Joseph Pepe. This matter is set for a status conference on October 5, 2010 at 3:00 p.m. (shb) (Entered: 09/14/2010) |
| 10/05/2010 | 447 | MINUTES OF STATUS CONFERENCE held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe: The matter is called and counsel state their appearances. The Court and counsel discuss the interpreter translations as set forth on the record. Court Reporter: Pamela Batalo. (ake) (Entered: 10/14/2010) |
| 01/18/2011 | 448 | NOTICE of Change of Attorney Information for attorney Charles C Brown counsel for Defendant Michael Pepe. Changing Address to 3801 University Avenue, Suite 700, Riverside, CA 92501. Filed by Defendant Michael Pepe (Brown, Charles) (Entered: 01/18/2011) |
| 05/05/2011 | 449 | NOTICE of Manual Filing of Supplemental Motion for New Trial − Filed Under Seal PUrsuant to 18 U.S.C. Sec. 3509(d)(2) filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 05/05/2011) |
| 05/05/2011 | 450 | NOTICE of Manual Filing of SUPPLEMENTAL MOTION FOR NEW TRIAL − PUBLIC REDACTED VERSION FILED PURSUANT TO § 18 U.S.C. § 3509(d)(2) filed by Defendant Michael Joseph Pepe (Gunn, Carlton) (Entered: 05/05/2011) |
| 05/05/2011 | 451 | SUPPLEMENTAL MOTION 445 for New Trial Based On Newly Discovered Evidence; Memorandum of Points and Authorities filed by Defendant Michael Pepe. (vdr) (Entered: 05/05/2011) |
| 05/05/2011 | 452 | SEALED DOCUMENT− Supplemental Motion for New Trial Based on Newly Discovered Evidence; Memorandum of Points and Authorities. (mat) (Entered: 05/09/2011) |
| 06/07/2011 | 454 | MINUTES OF IN CHAMBERS ORDER RE CERTAIN DOCUMENTS by Judge Dale S. Fischer: as to Defendant Michael Joseph Pepe. The Court concludes it is appropriate for the parties to brief the legal issue of whether some or all of the documents in the Courts possession should be turned over to the government, and the manner in which they should be provided. Counsel are ordered to meet and confer no |

| | | |
|---|---|---|
| | | later than 6/21/2011 and determine whether an agreement can be reached concerning this issue. If no agreement is reached, defense counsel should file a brief no later than 7/5/2011. The government may file an opposing brief no later than 7/19/2011. The defense may, but is not required to, file a reply brief no later than 7/26/2011. The Court will hear argument on this matter on 8/8/2011. (vdr) (Entered: 06/07/2011) |
| 06/20/2011 | 455 | STIPULATION for Order That Government Provide Documents to Court for Comparison, etc. filed by Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Gunn, Carlton) (Entered: 06/20/2011) |
| 06/22/2011 | 456 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, GRANTING Stipulation for Order that the Government Provide Documents 455 . IT IS ORDERED that: 1. The government shall provide to the Court documents bearing Bates numbers IJM100 through IJM111, IJM162, IJM164, and IJM165, so the Court maycompare the documents already in the governments possession to the documents theCourt is holding. (See order for further details) (shb) (Entered: 06/22/2011) |
| 08/09/2011 | 457 | MINUTES OF IN CHAMBERS ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe: Pursuant to the Stipulation 455 filed on June 20, 2011 and the related Order 456 filed June 22, 2011, the Court examined documents bearing Bates numbers IJM 100 through 111, IJM 162, IJM 164, and IJM 165. The parties should consider and advise the Court as to the disposition of the items. Pursuant to the stipulation, the Court maintains custody of the documents provided to the Court by defense counsel in or about October 2007. (rne) (Entered: 08/09/2011) |
| 08/12/2011 | 458 | STIPULATION for Order Hold Documents Until Defense Reviews *And Confer With Government* filed by Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Gunn, Carlton) (Entered: 08/12/2011) |
| 08/12/2011 | 459 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, re GRANTING Stipulation for Order to Hold Documents 458 . Defense counsel will contact the clerk upon returning from annual leave to arrange to review the material. (rne) (Entered: 08/12/2011) |
| 09/20/2011 | 460 | STIPULATION for Order filed by Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Gunn, Carlton) (Entered: 09/20/2011) |
| 09/23/2011 | 461 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, re Stipulation for Order 460 . IT IS HEREBY ORDERED that the Court shall continue to hold the documents bearing the numbers 3692−3700, 3716, and 3717 as Exhibit A to the defense in camera ex parte application to which they are attached, except that the documents and the ex parte application to which they areattached may be destroyed if the clerk confirms that they are merely a copy of an original application and exhibit elsewhere in the Courts file. IT IS FURTHER ORDERED that the Court shall also continue to hold the DVD marked IJM 00000197 until after sentencing, and the parties shall further conferregarding the appropriate disposition of the documents at that time. (shb) (Entered: 09/23/2011) |
| 01/16/2013 | 462 | TEXT ONLY ENTRY: ORDER SETTING STATUS CONFERENCE by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe Status Conference set for 2/4/2013 08:30 AM before Judge Dale S. Fischer. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(dp) TEXT ONLY ENTRY (Entered: 01/16/2013) |
| 02/04/2013 | 463 | MINUTES OF Status Conference held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. The matter is called and counsel state their appearances. The Court hears from counsel as to the status of the matter as set forth on the record. The next hearing is March 25, 2013 at 8:30 a.m. Court Reporter: Pamela Batalo. (bp) (Entered: 02/05/2013) |
| 03/04/2013 | 464 | NOTICE OF APPEARANCE OR REASSIGNMENT of AUSA Joey L Blanch on behalf of Plaintiff USA. Filed by Plaintiff USA. (Blanch, Joey) (Entered: 03/04/2013) |
| 03/25/2013 | 465 | MINUTES OF STATUS CONFERENCE: Status Conference held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. The matter is called and counsel state their appearances. The Court hears from counsel as to the status of the matter as set forth on the record. The parties will stipulate to a proposedbriefing schedule and |

| | | |
|---|---|---|
| | | hearing date. Court Reporter: Pamela Batalo. (shb) (Entered: 03/26/2013) |
| 07/11/2013 | 466 | TEXT ONLY ENTRY: (IN CHAMBERS) NOTICE: Judge Dale S. Fischer is participating in a pilot program regarding the submission of sealed documents. Effective July 8, 2013, all proposed documents related to under seal filings must be submitted via e−mail to the Judges Chambers e−mail at DSF_Chambers@cacd.uscourts.gov. Please refer to the judges pilot program procedures for detailed instructions for submission of sealed documents as set forth on the website in the Judges Procedures and Schedules tab, Judge Fischers Procedures. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(dp) TEXT ONLY ENTRY (Entered: 07/11/2013) |
| 12/13/2013 | 467 | TEXT ONLY ENTRY: (IN CHAMBERS) ORDER SETTING STATUS CONFERENCE by Judge Dale S. Fischer as to defendant Michael Pepe. The Court sets a status conference for January 6, 2014 at 8:30 a.m. If the parties file a stipulation and proposed order for the Court's signature setting forth a briefing schedule prior to January 2, 2014, the conference will go off calendar. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(dp) TEXT ONLY ENTRY (Entered: 12/13/2013) |
| 12/13/2013 | 468 | STIPULATION for Order Briefing Schedule and Hearing filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Donahue, Patricia) (Entered: 12/13/2013) |
| 12/16/2013 | 469 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, re Stipulation for Order re Briefing Schedule 468 . 1. January 13, 2014 is the deadline for the government to file oppositions to the motions filed by defendant for a new trial (CR 445, 449−452); 2. January 27, 2014 is the deadline for defendant to file any reply papers; 3. February 3, 2014, at 8:30 a.m., is the hearing on the motions. (shb) (Entered: 12/16/2013) |
| 01/13/2014 | 470 | EXHIBIT A−E to MOTION for New Trial *Based On Newly Discovered Evidence Of Interpreter Bias And Misconduct* 445 filed by Plaintiff USA as to Defendant Michael Joseph Pepe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Donahue, Patricia) (Entered: 01/13/2014) |
| 01/14/2014 | 471 | OPPOSITION to MOTION for New Trial *Based On Newly Discovered Evidence Of Interpreter Bias And Misconduct* 445 filed by Plaintiff USA as to Defendant Pepe. (Donahue, Patricia) (Entered: 01/14/2014) |
| 01/14/2014 | 472 | BRIEF Filed by Plaintiff USA as to Defendant Michael Joseph Pepe *Oppositon to New Trial Motion Based on Alleged Witness Recantation* RE: Supplement to Motion (CR) 451 . (Donahue, Patricia) (Entered: 01/14/2014) |
| 01/14/2014 | 473 | DECLARATION of Special Agent Eddy Wang filed by Plaintiff USA as to Defendant Michael Joseph Pepe RE: Supplement to Motion (CR) 451 , Brief (non−motion, non−appeal) 472 *in Support of Opposition to New Trial Motion based on Alleged Witness Recantation* (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Donahue, Patricia) (Entered: 01/14/2014) |
| 01/14/2014 | 474 | NOTICE of Manual Filing of Under Seal Documents filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Donahue, Patricia) (Entered: 01/14/2014) |
| 01/15/2014 | 475 | SEALED DOCUMENT− GOVERNMENT'S EXPARTE APPLICATION for Order Sealing Document; Declaration of Patricia A. Donahue. (mat) (Entered: 01/16/2014) |
| 01/15/2014 | 476 | SEALED DOCUMENT− ORDER Sealing Document. (mat) (Entered: 01/16/2014) |
| 01/15/2014 | 477 | SEALED DOCUMENT− SUPPLEMENT DECLARATION of Special Agent Eddy Wang Re: Government's Opposition to Motion for New Trial Based on Newly Discovered Evidence of Alleged Witness Recantation. (mat) (Entered: 01/16/2014) |
| 01/15/2014 | 478 | SEALED DOCUMENT− GOVERNMENT'S EXPARTE APPLICATION for Order Sealing Document; Declaration of Patricia A. Donahue.(mat) (Entered: 01/16/2014) |
| 01/15/2014 | 479 | SEALED DOCUMENT− ORDER Sealing Document. (mat) (Entered: 01/16/2014) |

| | | |
|---|---|---|
| 01/15/2014 | 480 | SEALED DOCUMENT− SUPPLEMENT DECLARATION of Special Agent Eddy Wang Re: Government's Opposition to Motion for New Trial Based on Newly Discovered Evidence of Alleged Witness Recantation. (mat) (Entered: 01/16/2014) |
| 01/27/2014 | 481 | REPLY In Support MOTION for New Trial *Based On Newly Discovered Evidence Of Interpreter Bias And Misconduct* 445 filed by Defendant Michael Pepe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Brown, Charles) (Entered: 01/27/2014) |
| 02/01/2014 | 482 | NOTICE OF MOTION AND MOTION to Withdraw *Supplemental Motion for New Trial Based on Newly Discovered Evidence of Witness Recantation* Filed by Defendant Michael Joseph Pepe Motion set for hearing on 2/3/2014 at 08:30 AM before Judge Dale S. Fischer. (Brown, Charles) (Entered: 02/01/2014) |
| 02/03/2014 | 483 | MINUTES OF STATUS CONFERENCE; HEARING ON MOTION FOR NEW TRIAL held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe: The matter is called and counsel state their appearances. Also present are the governments interpreters, Rithy Lim and Chau Stotelmyre, and Special Agent Eddy Wang. The Court hears oral argument as set forth on the record. The matter is under submission and a written ruling will issue. The matter is set for sentencing on March 3, 2014 at 10:00 a.m. Court Reporter: Pamela Batalo. (kti) (Entered: 02/03/2014) |
| 02/05/2014 | 484 | MINUTES (IN CHAMBERS): ORDER re Motion for New Trial 445 by Judge Dale S. Fischer as to Michael Joseph Pepe (1): The Court in no way condones what appears to be egregious misconduct by the case agent and Vietnamese interpreter. Nonetheless, the above errors likely reflect the inherent imprecision of translation, which is only heightened in the context of translating for minors. Regardless of their cause, any mistranslations did not have a material effect on the trial such that a new trial would probably result in acquittal especially given the voluminous evidence of Pepes guilt. See Sarno, 73 F.3d at 1507; see also Long, 301 F.3d at 1103 (We generally view interpreter problems within the context of an entire trial,... and the government had other evidence and witnesses... to support its case against Long.). For the reasons stated above and the reasons stated in the Opposition, Pepes motion for a new trial is DENIED. IT IS SO ORDERED. (See order for details.) (kti) (Entered: 02/05/2014) |
| 02/25/2014 | 485 | TEXT ONLY ENTRY: (IN CHAMBERS) ORDER CONTINUING SENTENCING by Judge Dale S. Fischer as to defendant Michael Joseph Pepe. On agreement of the parties, the sentencing has been rest to 2/28/2014 09:00 AM before Judge Dale S. Fischer. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(dp) TEXT ONLY ENTRY (Entered: 02/25/2014) |
| 02/26/2014 | 486 | SUPPLEMENTAL FACTUAL CORRECTIONS TO PRESENTENCE REPORT filed by Defendant Michael Joseph Pepe (Brown, Charles) (Entered: 02/26/2014) |
| 02/27/2014 | 487 | EX PARTE APPLICATION for Order for Order Sealing Document Filed by Plaintiff USA as to Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Donahue, Patricia) (Entered: 02/27/2014) |
| 02/28/2014 | 488 | SEALED DOCUMENT − EX PARTE APPLICATION FOR ORDER SEALING SUBMISSION OF SUPPLEMENTAL RESTITUTION INFORMATION; MEMORANDUM Filed by Plaintiff USA as to Defendant Michael Joseph Pepe(shb) Modified on 2/28/2014 (shb). (Entered: 02/28/2014) |
| 02/28/2014 | 489 | SEALED DOCUMENT − ORDER by Judge Dale S. Fischer (shb) (Entered: 02/28/2014) |
| 02/28/2014 | 490 | SEALED DOCUMENT − GOVERNMENT'S SUPPLEMENTAL SUBMISSION RE RESTITUTION filed by Plaintiff USA as to Defendant Michael Joseph Pepe (shb) (Entered: 02/28/2014) |
| 02/28/2014 | 491 | MINUTES OF SENTENCING AND JUDGMENT HEARING: SENTENCING Hearing held before Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. Defendant Michael Joseph Pepe (1), Count(s) 1−2, The Court grants the governments request to dismiss the underlying Indictment in this matter.; Count(s) 1s−6s, 7s, Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that defendant, Michael Joseph Pepe, is hereby committed on Counts 1 through 7 of the First Superseding Indictment to the custody of the Bureau of Prisons for a term of 210 years. This term consists of 30 years on each of Counts 1 through 7 of the First Superseding Indictment, to be served consecutively. Supervised Release for a term of |

| | | |
|---|---|---|
| | | life. comply with the rules and regulations of the U. S. Probation Office and General Order 318 and General Order No. 01−05.. A special assessment of $700 is due immediately. Restitution in the amount of $242,213 pursuant to USC 2248. All fines waived. The Court grants the governments request to dismiss the underlying Indictment in this matter. Defendant advised of right of appeal. Court Reporter: Pamela Batalo. (shb) (Entered: 03/03/2014) |
| 02/28/2014 | 492 | JUDGMENT AND COMMITMENT by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe (1), Count(s) 1−2, The Court grants the governments request to dismiss the underlying Indictment in this matter.; Count(s) 1s−6s, 7s, Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that defendant, Michael Joseph Pepe, is hereby committed on Counts 1 through 7 of the First Superseding Indictment to the custody of the Bureau of Prisons for a term of 210 years. This term consists of 30 years on each of Counts 1 through 7 of the First Superseding Indictment, to be served consecutively. Supervised Release for a term of life. comply with the rules and regulations of the U. S. Probation Office and General Order 318 and General Order No. 01−05.. A special assessment of $700 is due immediately. Restitution in the amount of $242,213 pursuant to USC 2248. All fines waived. The Court grants the governments request to dismiss the underlying Indictment in this matter. (shb) (Entered: 03/03/2014) |
| 03/03/2014 | 493 | NOTICE OF APPEAL to Appellate Court filed by Defendant Michael Joseph Pepe re Judgment and Commitment,,,, 492 . Filing fee WAIVED. (Brown, Charles) (Entered: 03/03/2014) |
| 03/04/2014 | 495 | NOTIFICATION by Circuit Court of Appellate Docket Number 14−50095 as to Defendant Michael Joseph Pepe, 9th CCA regarding Notice of Appeal to USCA − Final Judgment 493 . (mat) (Entered: 03/07/2014) |
| 03/21/2014 | 496 | TRANSCRIPT ORDER re: Court of Appeal case number 14−50095, as to Defendant Michael Joseph Pepe. Court Reporter.Order for: Criminal Appeal. Transcript portion requested:Sentencing on 02−28−14. Pre−Trial Proceeding: Status Conf 3−19−07, Motion Hrg 07−23−07, Motion Hrg 10−29−07, Motion Hrg 12−03−07, Status Conf 12−04−07, In Camera Hrg 1−04−08, Arraignment Mtn Hrg 1−07−08, Evidentiary Hrg 2−06−08, Status Conf 3−10−08, Motion Hrg 3−31−08, Pretrial Conf 4−14−08, Motion Hrg 4−29−08, Daubert Hrg 5−05−08,. Other: Trial day 1 5−07−08, Trial day 2 5−9−08, Trial day 3 5−13−08, Trial day 4 5−14−08, Trial Day 5 5−15−08, Trial day 6 5−16−08, Trial day 7 5−20−08, Trial day 8 5−21−08, Trial day 9 5−22−08, Trial day 10 5−23−08, Trial day 11 5−27−08, Trial day 12 5−28−08, Trial day 13 5−29−08, Staus Con 9−03−08, Motion Hrg 9−18−08, Bifurcated Sentencing 9−25−08, Evidentiary Hrg 9−02−09, Status Conf 10−05−10, Status Conf 2−04−13, Status Conf 3−25−13, Status Conf 2−03−14,. Criminal case appeal. 60 day deadline automatically set (Attachments: # 1 Attachment to Transcript Designation, # 2 Voucher court reporter Schweitzer, # 3 voucher court reporter Stride, # 4 voucher 1 court reporter Seijas Batalo, # 5 voucher 2 court reporter Seijas Batalo, # 6 voucher 3 court reporter Seijas Batalo)(Brown, Charles) (Entered: 03/21/2014) |
| 04/17/2014 | 497 | TRANSCRIPT ORDER re: Court of Appeal case number 14−50095, as to Defendant Michael Joseph Pepe. Court Reporter.Order for: Criminal Appeal. Transcript portion requested: Other: Sealed Proceedings only for 12−3−2007, Sealed proceedings only for 2−6−2008, Sealed proceedings only for 5−7−2008. Criminal case appeal. 60 day deadline automatically set (Attachments: # 1 Voucher)(Brown, Charles) (Entered: 04/17/2014) |
| 04/17/2014 | 498 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 03/19/07, 8:35 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/8/2014. Redacted Transcript Deadline set for 5/18/2014. Release of Transcript Restriction set for 7/16/2014.(Seijas, Pamela) (Entered: 04/17/2014) |
| 04/17/2014 | 499 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 01/07/08; 10:53 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public |

| | | |
|---|---|---|
| | | terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/8/2014. Redacted Transcript Deadline set for 5/18/2014. Release of Transcript Restriction set for 7/16/2014.(Seijas, Pamela) (Entered: 04/17/2014) |
| 04/17/2014 | 500 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 03/10/08; 9:10 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/8/2014. Redacted Transcript Deadline set for 5/18/2014. Release of Transcript Restriction set for 7/16/2014.(Seijas, Pamela) (Entered: 04/17/2014) |
| 04/17/2014 | 501 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 03/31/08; 11:54 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/8/2014. Redacted Transcript Deadline set for 5/18/2014. Release of Transcript Restriction set for 7/16/2014.(Seijas, Pamela) (Entered: 04/17/2014) |
| 04/17/2014 | 502 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 04/14/08; 11:11 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/8/2014. Redacted Transcript Deadline set for 5/18/2014. Release of Transcript Restriction set for 7/16/2014.(Seijas, Pamela) (Entered: 04/17/2014) |
| 04/17/2014 | 503 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 04/29/08; 3:12 p.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/8/2014. Redacted Transcript Deadline set for 5/18/2014. Release of Transcript Restriction set for 7/16/2014.(Seijas, Pamela) (Entered: 04/17/2014) |
| 04/17/2014 | 504 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 09/03/08; 3:06 p.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/8/2014. Redacted Transcript Deadline set for 5/18/2014. Release of Transcript Restriction set for 7/16/2014.(Seijas, Pamela) (Entered: 04/17/2014) |
| 04/17/2014 | 505 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 09/18/08; 3:00 p.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/8/2014. Redacted Transcript Deadline set for 5/18/2014. Release of Transcript Restriction set for 7/16/2014.(Seijas, Pamela) (Entered: 04/17/2014) |
| 04/17/2014 | 506 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 09/25/08; 2:35 p.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction |

| | | |
|---|---|---|
| | | Request due 5/8/2014. Redacted Transcript Deadline set for 5/18/2014. Release of Transcript Restriction set for 7/16/2014.(Seijas, Pamela) (Entered: 04/17/2014) |
| 04/17/2014 | 507 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 09/02/09; 2:37 p.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/8/2014. Redacted Transcript Deadline set for 5/18/2014. Release of Transcript Restriction set for 7/16/2014.(Seijas, Pamela) (Entered: 04/17/2014) |
| 04/17/2014 | 508 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 10/05/10; 3:00 p.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/8/2014. Redacted Transcript Deadline set for 5/18/2014. Release of Transcript Restriction set for 7/16/2014.(Seijas, Pamela) (Entered: 04/17/2014) |
| 04/17/2014 | 509 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 02/04/13; 9:21 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/8/2014. Redacted Transcript Deadline set for 5/18/2014. Release of Transcript Restriction set for 7/16/2014.(Seijas, Pamela) (Entered: 04/17/2014) |
| 04/17/2014 | 510 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 3/25/13; 8:45 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/8/2014. Redacted Transcript Deadline set for 5/18/2014. Release of Transcript Restriction set for 7/16/2014.(Seijas, Pamela) (Entered: 04/17/2014) |
| 04/17/2014 | 511 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 02/03/14; 9:22 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/8/2014. Redacted Transcript Deadline set for 5/18/2014. Release of Transcript Restriction set for 7/16/2014.(Seijas, Pamela) (Entered: 04/17/2014) |
| 04/17/2014 | 512 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 2/28/14; 9:01 a.m.. Court Reporter/Electronic Court Recorder: Pamela A. Batalo, phone number www.pamelabatalo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/8/2014. Redacted Transcript Deadline set for 5/18/2014. Release of Transcript Restriction set for 7/16/2014.(Seijas, Pamela) (Entered: 04/17/2014) |
| 04/17/2014 | 513 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings 3/19/07, 8:35 a.m.; 1/7/08, 10:53 a.m.; 3/10/08, 9:10 a.m.; 3/31/08 11:54 a.m.; 4/14/08 11:11 a.m.; 4/29/08 3:12 p.m.; 9/3/08, 3:06 p.m.; 9/18/08 3:00 p.m.; 9/25/08, 2:35 p.m.; 9/2/09, 2:37 p.m.; 10/5/10, 3:00 p.m.; 2/4/13, 9:21 a.m.; 3/25/13, 8:45 a.m.; 2/3/14 9:22 a.m.; 2/28/14, 9:01 a.m. re Transcript 508 , 501 , 509 , 507 , 506 , 500 , 498 , 503 , 504 , 511 , 502 , 510 , 499 , 512 , 505 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(Seijas, Pamela) TEXT ONLY ENTRY (Entered: 04/17/2014) |

| | | |
|---|---|---|
| 04/29/2014 | 518 | TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 5−13−08 PM Session. Court Reporter/Electronic Court Recorder: Lynne Smith, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/20/2014. Redacted Transcript Deadline set for 5/30/2014. Release of Transcript Restriction set for 7/28/2014.(pfb) (Entered: 04/29/2014) |
| 04/29/2014 | 519 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings 5−13−08 PM Session re Transcript 518 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(pfb) TEXT ONLY ENTRY (Entered: 04/29/2014) |
| 05/08/2014 | 520 | EX PARTE APPLICATION for Disclosure *of Sealed Transcripts to Defense for Purposes of Appeal* Filed by Defendant Michael Joseph Pepe. (Attachments: # 1 Proposed Order)(Attorney James H Locklin added to party Michael Joseph Pepe(pty:dft)) (Locklin, James) (Entered: 05/08/2014) |
| 05/09/2014 | 521 | EX PARTE APPLICATION for Order *Sealing Government's Transcript Redaction Request; Declaration of Patricia A. Donahue* Filed by Plaintiff USA as to Defendant Michael Joseph Pepe. (Attachments: # 1 Proposed Order) (Donahue, Patricia) (Entered: 05/09/2014) |
| 05/09/2014 | 522 | ORDER by Judge Dale S. Fischer, GRANTING 520 Ex Parte Application for Disclosure of Sealed Transcripts to Defense for Purposes of Appeal as to Michael Joseph Pepe (1) (es) (Entered: 05/12/2014) |
| 05/09/2014 | 523 | ORDER SEALING GOVERNMENT'S TRANSCRIPT REDACTION REQUEST by Judge Dale S. Fischer, GRANTING 521 Government's Ex Parte Application for Order Sealing Government's Transcript Redaction Request as to Michael Joseph Pepe (1) (es) (Entered: 05/12/2014) |
| 05/09/2014 | 524 | SEALED DOCUMENT − REQUEST TO REDACT TRANSCRIPT submitted to Court Reporter Rita Lynne Smith Nicholson re Transcript 518 filed by Plaintiff USA as to Defendant Michael Joseph Pepe. (shb) (Entered: 05/14/2014) |
| 05/19/2014 | 525 | MINUTES OF IN CHAMBERS ORDER RE RE CERTAIN DOCUMENTS by Judge Dale S. Fischer: as to Defendant Michael Joseph Pepe. The parties are ordered to confer and to advise the Court concerning the appropriate disposition of the documents no later than June 16. If the parties conclude the documents should remain in the possession of the Clerk of the Court, they are to advise of the legal authority supporting that position. (shb) (Entered: 05/19/2014) |
| 06/10/2014 | 528 | EX PARTE APPLICATION for Order for Seal Document Filed by Plaintiff USA as to Defendant Michael Joseph Pepe. (Attachments: # 1 Proposed Order) (Donahue, Patricia) (Entered: 06/10/2014) |
| 06/11/2014 | 530 | ORDER by Judge Dale S. Fischer: granting 528 Ex Parte Application for Order for sealing Government's Transcript Redaction Request as to Michael Joseph Pepe (1) (shb) (Entered: 06/13/2014) |
| 06/11/2014 | 535 | SEALED DOCUMENT− TRANSCRIPT REDACTED REQUEST. (mat) (Entered: 06/19/2014) |
| 06/12/2014 | 529 | STIPULATION for Order That The Court Hold Certain Documents At Issue filed by Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Brown, Charles) (Entered: 06/12/2014) |
| 06/12/2014 | 531 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe, IT IS HEREBY ORDERED THAT the Court shall continue to hold the following documents while the defendants appeal is pending: (1) documents submitted to the Court in camera by the defense in October 2007; and (2) documents and a DVD provided to the Court in camera in response to a subpoena. Within 21 days after the Ninth Circuit issues its mandate in this case, the defendant shall file a status report, stipulation, or motion concerning the appropriate disposition of these documents. 529 (es) (Entered: 06/13/2014) |

| | | |
|---|---|---|
| 06/13/2014 | 534 | ORDER of USCA filed as to Defendant Michael Joseph Pepe, CCA #14−50095. The appellant's unopposed motion for an extension of time in which to file the opening brief is granted. The brief schedules have been set. Order received in this district on 6/13/14. (mat) (Entered: 06/18/2014) |
| 06/17/2014 | 532 | REDACTED TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 5−13−08 PM Session, re Transcript 518 . Redaction Request due 7/8/2014. Redacted Transcript Deadline set for 7/18/2014. Release of Transcript Restriction set for 9/15/2014.(pfb) (Entered: 06/17/2014) |
| 06/18/2014 | 533 | REDACTED TRANSCRIPT filed as to Defendant Michael Joseph Pepe for proceedings held on 09/25/08, re Transcript 506 . Redaction Request due 7/9/2014. Redacted Transcript Deadline set for 7/19/2014. Release of Transcript Restriction set for 9/16/2014.(Seijas, Pamela) (Entered: 06/18/2014) |
| 08/14/2014 | 536 | EX PARTE APPLICATION for Disclosure of Non−Public Docket and Jury Note and Verdict to Defense for Purposes of Appeal. Filed by Defendant Michael Joseph Pepe. (Attachments: # 1 Proposed Order) (Locklin, James) (Entered: 08/14/2014) |
| 08/14/2014 | 537 | ORDER by Judge Dale S. Fischer: IT IS HEREBY ORDERED THAT: The Court clerk shall provide Defendant's counsel with a copy of the Court's complete, non−public docket. This docket sheet shall remain under seal as to the public, but counsel may provide a copy of it to the government and may file it under seal in the Ninth Circuit if necessary. The Court clerk shall either: file public versions of the jury's not (Docket No. 297) and the jury's verdict (Docket No. 299) that redact any juror names; or provide Defendant's counsel with unredacted copies of the jury's note and verdict. These documents shall remain under seal as to the public, but counsel may provide copies of them to the government and may file them under seal in the Ninth Circuit if necessary. Counsel may obtain copies of the documents from the records department,granting 536 Ex Parte Application for Disclosure as to Michael Joseph Pepe (1) (bp) (Entered: 08/14/2014) |
| 10/24/2014 | 538 | ORDER of USCA filed as to Defendant Michael Joseph Pepe, CCA #14−50095. The appellant's unopposed motion for a second extension of time in which to file the opening brief is granted. [See document for further information]. Order received in this district on 10/24/2014. (car) (Entered: 10/29/2014) |
| 02/05/2015 | 539 | EX PARTE APPLICATION for Disclosure of Sealed Order Dated May 9, 2008 (Docket No. 245) to Defense for Purposes of Appeal. Filed by Defendant Michael Joseph Pepe. (Attachments: # 1 Proposed Order) (Locklin, James) (Entered: 02/05/2015) |
| 02/05/2015 | 540 | ORDER by Judge Dale S. Fischer: 539 "see order for specifics" (bp) (Entered: 02/06/2015) |
| 02/25/2015 | 541 | ORDER of USCA filed as to Defendant Michael Joseph Pepe, CCA #14−50095. The appellant's unopposed motion for a third extension of time in which to file the opening brief is granted. Order received in this district on 2/25/15. (car) (Entered: 02/25/2015) |
| 02/26/2015 | 542 | MINUTES OF IN CHAMBERS ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe re docket numbers 383, 384, and 385. See Minute Order for specifics. (dp) (Entered: 02/26/2015) |
| 02/27/2015 | 543 | STIPULATION to Amend/Correct *Stipulation to Correct/Modify Record on Appeal re Jury Instructions and Verdict Form Pursuant to Fed. R. App.Proc. 10(e)* filed by Defendant Michael Joseph Pepe (Attachments: # 1 Proposed Order)(Brown, Charles) (Entered: 02/27/2015) |
| 02/27/2015 | 544 | NOTICE of Manual Filing of Stipulation to Correct/Modify Record on Appeal re Jury Instructions and Verdict Form Pursuant to Fed. R.; Exhibits Under Seal filed by Defendant Michael Joseph Pepe (Brown, Charles) (Entered: 02/27/2015) |
| 03/02/2015 | 545 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe: GOOD CAUSE HAVING BEEN SHOWN, IT IS HEREBY ORDERED THAT, pursuant to Fed. R. App. Proc. 10(e), the record shall be corrected and modified to reflect that the parties' Stipulation to Correct/Modify Record on Appeal re Jury Instructions and Verdict Form accurately reflects the documents that were before the Court during defendant's trial. 544 (cr) (Entered: 03/02/2015) |

| | | |
|---|---|---|
| 03/02/2015 | 546 | ORDER by Judge Dale S. Fischer as to Defendant Michael Joseph Pepe. IT IS HEREBY ORDERED THAT, pursuant to Fed.R.App.Proc. 10(e), the record shall be corrected and modified to reflect that the parties' Stipulation to Correct/Modify Record on Appeal re Video Testimony accurately reflects the video testimony that was presented at defendant's trial. (bp) (Entered: 03/04/2015) |
| 03/03/2015 | 547 | **SEALED** EX PARTE APPLICATION TO FILE STIPULATION TO CORRECT/MODIFY RECORD AND VIDEO EXHIBITS UNDER SEAL Filed by Defendant Michael Joseph Pepe. (bp) (Entered: 03/06/2015) |
| 03/03/2015 | 548 | SEALED DOCUMENT− NOTICE OF LODGING Exhibits A, B and C to Defendant's Stipulation to Correct/Modify Record on Appeal Re Video Testimony Pursuant to Fed R. App. Proc. 10(e) by Defendant Michael Joseph Pepe (mat) (Entered: 03/10/2015) |
| 03/03/2015 | 549 | SEALED DOCUMENT− STIPULATION to Correct / Modify Record on Appeal re Video Testimony Pursuant to Fed. R. App. Proc. 10(e) (mat) (Entered: 03/10/2015) |
| 03/03/2015 | 550 | SEALED DOCUMENT− STIPULATION to Correct / Modify Record on Appeal re Video Testimony Pursuant to Fed. R. App. Proc. 10(e). (Attachments: Part 2)(mat) (Entered: 03/10/2015) |

**Certificate of Service**

I hereby certify that on May 28, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *James H. Locklin*

By: JAMES H. LOCKLIN
Deputy Federal Public Defender