No. 14-50095

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

*v.*

MICHAEL JOSEPH PEPE,
*Defendant-Appellant.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE CENTRAL DISTRICT OF CALIFORNIA*
*DISTRICT COURT NO. CR 07-168-DSF*

## GOVERNMENT'S ANSWERING BRIEF

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

PATRICIA A. DONAHUE
Assistant United States Attorney
Chief, National Security Division

NANCY B. SPIEGEL
Assistant United States Attorney
Criminal Appeals Section

1000 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Telephone: (213) 894-2391

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**DESCRIPTION**                                                     **PAGE**

TABLE OF AUTORITIES ......................................................................vi

I     ISSUES PRESENTED .....................................................................1

II    STATEMENT OF THE CASE ........................................................2

     A.   Jurisdiction, Timeliness, And Bail Status .............................3

     B.   Statement Of Facts And Procedural History..........................3

          1.   Pertinent Procedural History.......................................3

          2.   The Offense Conduct...................................................5

              a.   Basang's Testimony…………...........................6

              b.   Victim L.K. (count ...................................8

              c.   Victim S.R. (count three) ....................................11

              d.   Victim K.S. (count five) ......................................12

              e.   Victim N.T.D. (count six)....................................13

              f.   Victim T.C. (count seven) ...................................14

              g.   Victim I.T. (count one) ........................................14

          3.   Defendant's Conduct Comes to the Attention of Nongovernmental Organizations, the Cambodian National Police, and U.S. Law Enforcement ..............16

          4.   The CNP Arrests Defendant for Rape and Debauchery in Violation of Cambodian Law..............18

          5.   The CNP Searches Defendant's Residence Pursuant to a Cambodian Search Warrant................19

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                        **PAGE**

6. Singapore Search ..................................................23

7. U.S. Search...........................................................24

8. Evidence on Defendant's Digital Devices ...................27

9. The Drug Evidence .................................................29

10. The District Court Orders Defendant to Pay $247,213 in Restitution ........................................30

III ARGUMENT.................................................................34

A. Congress Had Constitutional Authority To Enact 18 U.S.C. § 2423(c) ................................................34

1. Standard of Review.....................................................34

2. Legislative History.....................................................34

a. The Optional Protocol.........................................34

b. Title 18, United States Code, § 2423(c) ..............35

3. Both the Foreign Commerce Clause and the Necessary and Proper Clause of the Constitution Authorized Congress to Enact § 2423(c) .....................36

a. This Court has held that § 2423(c)'s regulation of commercial sex acts is a valid exercise of Congress's Foreign Commerce Clause Powers.....................................................36

b. Section 2423(c) is a proper exercise of Congress's power to ensure compliance with the United States' treaty obligations

ii

**TABLE OF CONTENTS (continued)**

**DESCRIPTION**                                                    **PAGE**

through the Necessary and Proper Clause of
the Constitution ...................................................39

B.   Section 2423(c) Applies To Defendant's Criminal
     Conduct ..........................................................43

     1.   Standard of Review ......................................43

     2.   The Statute Applies to Defendant's Offense
          Conduct ...................................................44

          a.   The statute applies to any United States
               citizen who travels in foreign commerce and
               engages in illicit sexual conduct .......................44

          b.   Defendant engaged in illicit sexual conduct
               within a reasonable time after he traveled
               to Cambodia .......................................49

C.   The District Court Correctly Found That The Searches
     Of Defendant's Residence, Computer And Computer
     Media Were Proper .............................................56

     1.   Standard of Review ......................................56

     2.   The Search of Defendant's Cambodia Rental
          House Was Proper Because It Was Not a Joint
          Venture and, in any Event, Complied with
          Cambodian Law ..........................................57

          a.   The search conducted by the Cambodian
               National Police was not a joint venture with
               United States law enforcement...........................57

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                    **PAGE**

      b.    In any event, the search of defendant's Phnom Penh residence complied with Cambodian law ...................................................... 67

    3.    The Singapore Search Satisfied the Fourth Amendment Because It Was Reasonable and Complied with Cambodian Law ................................... 68

    4.    The Court Properly Found That the Search of Defendant's Computer Media Pursuant to a United States Search Warrant Was Valid.................. 73

D.    The Evidence Was Sufficient To Sustain Defendant's Convictions .............................................................. 81

    1.    Standard of Review...................................................... 81

    2.    The Victims Testified Truthfully ................................. 82

    3.    The Government Presented Overwhelming Forensic, Physical, and Testimonial Evidence to Corroborate the Testimony of the Victims ................. 83

    4.    Basang's Testimony Corroborated the Testimony of the Victims ............................................................. 87

    5.    Defendant's Claim That He Had an Interest in Educating Cambodian Children Was Not Credible ...................................................................... 88

    6.    Defendant's Letter to His Sister and Emails to Family Members Contained Tacit Admissions of His Illicit Sexual Conduct with the Child Victims ...... 89

iv

# TABLE OF CONTENTS (continued)

**DESCRIPTION**        **PAGE**

E.    The Jury Instruction Regarding The Elements Of Section 2423(c) Was Proper ......................................... 90

     1.    Standard of Review ........................................ 90

     2.    The District Court's Jury Instruction Regarding the Elements of Section 2423(c) Was Proper ............... 92

F.    The Restitution Order Was Proper ........................................ 94

     1.    Standard of Review ........................................ 94

     2.    Defendant Has Waived His Right to Argue That the District Court Imposed Restitution Under the Wrong Statute and the Amount of Restitution Ordered Was Not Plainly Erroneous ........................... 95

         a.    The invited error doctrine precludes defendant from arguing that the district court ordered restitution pursuant to the wrong statute ........................................ 95

         b.    The restitution amount is not erroneous, let alone plainly erroneous ........................................ 98

IV    CONCLUSION ........................................ 107

# TABLE OF AUTHORITIES

**DESCRIPTION**                                  **PAGE(S)**

## Federal Cases

*Bond v. United States*,
    134 S. Ct. 2077 (2014) .......................................................................... 40

*Hughey v. United States*,
    495 U.S. 411 (1990) ............................................................................. 99

*Illinois v. Gates*,
    462 U.S. 213 (1983) ............................................................................. 75

*Jackson v. Virginia*,
    443 U.S. 307 (1979) ............................................................................. 81

*Johnson v. United States*,
    135 S. Ct. 2551 (2015) ........................................................................ 56

*Missouri v. Holland*,
    252 U.S. 416 (1920) ................................................................. 39, 41, 43

*Murray v. United States*,
    487 U.S. 533 (1988) ....................................................................... 75, 80

*Phillips v. United States*,
    2011 WL 4436526 (E.D. Tenn. Sept. 23, 2011) ............................... 51

*Puckett v. United States*,
    556 U.S. 129 (2009) ............................................................................. 91

*Radzanower v. Touche Ross & Co.*,
    426 U.S. 148 (1976) ............................................................................. 49

*Reid v. Covert*,
    354 U.S. 1 (1957) ................................................................................ 39

*Stonehill v. United States*,
    405 F.2d 738 (9th Cir. 1968) ........................................... 57, 58, 59, 62

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Akins,*
276 F.3d 1141 (9th Cir. 2002) ........................................................ 34

*United States v. Arriaga-Segura,*
743 F.2d 1434 (9th Cir. 1984) ........................................................ 81

*United States v. Barajas-Avalos,*
377 F.3d 1040 (9th Cir. 2004) .................................................... 74, 75

*United States v. Barona,*
56 F.3d 1087 (9th Cir. 1995) .................................................. passim

*United States v. Becker,*
23 F.3d 1537 (9th Cir. 1994) ........................................................ 57

*United States v. Belfast,*
611 F.3d 783 (11th Cir. 2010) ...................................................... 40

*United States v. Benedict,*
647 F.2d 928 (9th Cir. 1981) .................................................. 58, 62

*United States v. Bianchi,*
386 F. Appx. 156 (3d Cir. 2010) .................................................. 38

*United States v. Blitz,*
151 F.3d 1002 (9th Cir. 1998) ...................................................... 81

*United States v. Bollinger,*
798 F.3d 201 (4th Cir. 2015) ........................................................ 38

*United States v. Bollinger,*
966 F. Supp. 2d 568 (W.D.N.C. 2013) ........................................ 43

*United States v. Chao Fan Xu,*
706 F.3d 965 (9th Cir. 2013) ........................................................ 91

*United States v. Clark,*
435 F.3d 1100 (9th Cir. 2006) ................................................ passim

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                    **PAGE(S)**

*United States v. Clark,*
   315 F. Supp. 2d 1127 (W.D. Wash. 2004) ........................................ 46

*United States v. Cliatt,*
   338 F.3d 1089 (9th Cir. 2003) ...................................................... 100

*United States v. Comstock,*
   560 U.S. 126 (2010) ................................................................... 40

*United States v. Cordero-Rosario,*
   786 F.3d 64 (1st Cir. 2015) ...................................................... 78, 80

*United States v. Devorkin,*
   159 F.3d 465 (9th Cir. 1998) ......................................................... 56

*United States v. Doe,*
   488 F.3d 1154 (9th Cir. 2007) ...................................... 103, 104, 105

*United States v. Duran-Orozco,*
   192 F.3d 1277 (9th Cir. 1999) ................................................ 75, 79, 80

*United States v. Flath,*
   845 F. Supp. 2d 951 (E.D. Wis. 2012) ........................................ 38, 51

*United States v. Follet,*
   269 F.3d 996 (9th Cir. 2001) ...................................................... 100

*United States v. Frank,*
   486 F. Supp. 2d 1353 (S.D. Fla. 2007) ........................................... 41

*United States v. Fu Sheng Kuo,*
   620 F.3d 1158 (9th Cir. 2010) ....................................................... 97

*United States v. Gordon,*
   393 F.3d 1044 (9th Cir. 2004) ....................................................... 99

*United States v. Heckenkamp,*
   482 F.3d 1142 (9th Cir. 2007) ....................................................... 75

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                           **PAGE(S)**

*United States v. Herrera-Blanco,*
232 F.3d 715 (9th Cir. 2000) ........................................... 97

*United States v. Hicks,*
997 F.2d 594 (9th Cir. 1993) ........................................ 100

*United States v. Hill,*
459 F.3d 966 (9th Cir. 2006) ........................................... 75

*United States v. Hovsepian,*
422 F.3d 883 (9th Cir. 2005)(en banc) ............................. 69

*United States v. Jackson,*
480 F.3d 1014 (9th Cir. 2007) ......................................... 49

*United States v. Johnson,*
400 F.3d 187 (4th Cir. 2005) ........................................ 100

*United States v. Juda,*
46 F.3d 961 (9th Cir. 1995) ....................................... 70, 72

*United States v. Keiser,*
57 F.3d 847 (9th Cir. 1995) ............................................ 91

*United States v. Keith,*
754 F.2d 1388 (9th Cir. 1985) ...................................... 105

*United States v. Laney,*
189 F.3d 954 (9th Cir. 1999) ........................................ 105

*United States v. Lindsey,*
634 F.3d 541 (9th Cir. 2011) .......................................... 95

*United States v. Lorenzo,*
995 F.2d 1448 (9th Cir. 1993) ...................................... 102

*United States v. Maher,*
645 F.2d 780 (9th Cir. 1981) .......................................... 59

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Marcus,*
    560 U.S. 258 (2010) ........................................................... 91

*United States v. Martinez,*
    599 F. Supp. 2d 784 (W.D. Tex. 2009) ............................... 38

*United States v. Naghani,*
    361 F.3d 1255 (9th Cir. 2004) ........................................... 34

*United States v. Odeh,*
    552 F.3d 157 (2d Cir. 2008) ...................................... 70, 71

*United States v. Pallares-Galan,*
    359 F.3d 1088 (9th Cir. 2004) ........................................... 94

*United States v. Pendleton,*
    658 F.3d 299 (3d Cir. 2011) .............................. 38, 44, 51

*United States v. Perez,*
    116 F.3d 840 (9th Cir. 1997) (en banc) ............................ 95

*United States v. Peterson,*
    812 F.2d 486 (9th Cir. 1987) ...................................... 59, 64

*United States v. Reed,*
    15 F.3d 928 (9th Cir. 1994) ............................................. 75

*United States v. Rose,*
    570 F.2d 1358 (9th Cir. 1978) ......................................... 59

*United States v. Rubio-Villareal,*
    967 F.2d 294 (9th Cir. 1992) (en banc) ............................ 81

*United States v. Santiago,*
    466 F.3d 801 (9th Cir. 2006) ........................................... 94

*United States v. Simmonds,*
    235 F.3d 826 (3d Cir. 2000) ............................................ 99

# TABLE OF AUTHORITIES (continued)

## DESCRIPTION                                                    PAGE(S)

*United States v. Soderling,*
    970 F.2d 529 (9th Cir. 1992) ........................................... 94

*United States v. Stokes,*
    726 F.3d 880 (7th Cir. 2013) ........................................... 51

*United States v. Varela,*
    993 F.2d 686 (9th Cir. 1993) ........................................... 95

*United States v. Vasey,*
    834 F.2d 782 (9th Cir. 1987) ........................................... 75

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) ........................................... 70

*United States v. Wanless,*
    882 F.2d 1459 (9th Cir. 1989) ........................................... 74

*United States v. Watson,*
    792 F.3d 1174 (9th Cir. 2015) ........................................... 43

*United States v. Yian,*
    905 F. Supp. 160 (S.D.N.Y. 1995) ........................................... 41

*United States v. Zink,*
    107 F.3d 716 (9th Cir. 1997) ........................................... 94

**Federal Statutes**

18 U.S.C. § 2241.............................................................. 96

18 U.S.C. § 2247 .............................................................. 6

18 U.S.C. § 2248.............................................................. passim

18 U.S.C. § 2248(a)(3) .............................................. 104

18 U.S.C. § 2251(c)(1) .............................................. 104

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                      **PAGE(S)**

18 U.S.C. § 2259 ............................................................ 104, 105

18 U.S.C. § 2259(c) ......................................................... 104

18 U.S.C. § 2260 ............................................................ 79

18 U.S.C. § 2423(b) ........................................................ 36, 46

18 U.S.C. § 2423(c) ........................................................ passim

18 U.S.C. § 2423(f) ......................................................... 36

18 U.S.C. § 2423(f)(2) ..................................................... 93

18 U.S.C. § 3231 ............................................................ 3

18 U.S.C. § 3509(m)(1) .................................................... 10

18 U.S.C. § 3663A .......................................................... passim

18 U.S.C. § 3663A(a)(2) ................................................... 99

18 U.S.C. § 3663A(b ........................................................ 99

18 U.S.C. § 3663A(b)(2) ................................................... 100

18 U.S.C. § 3663A(b)(2)(A) ............................................... 103

18 U.S.C. § 3663A(b)(4) ................................................... 101

18 U.S.C. § 3664(e) ........................................................ 104

18 U.S.C. § 3742 ............................................................ 3

28 U.S.C. § 1291 ............................................................ 3

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                         **PAGE(S)**

**Federal Rule**

Fed. R. App. P. 4(b) ................................................................... 3

No. 14-50095

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

*v.*

MICHAEL JOSEPH PEPE,
*Defendant-Appellant*.

*APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE CENTRAL DISTRICT OF CALIFORNIA*
*DISTRICT COURT NO. CR 07-168-DSF*

## GOVERNMENT'S ANSWERING BRIEF

# I

## ISSUES PRESENTED

A.    Whether Congress had constitutional authority to enact 18 U.S.C. § 2423(c).

B.    Whether § 2423(c) applies to defendant's conduct.

C.    Whether the district court properly denied defendant's motions to suppress evidence.                    .

D.    Whether the evidence was sufficient to sustain defendant's convictions.

E.    Whether the district court properly instructed the jury on the elements of § 2423(c).

F.    Whether the district court properly imposed restitution pursuant to the Mandatory Victims Restitution Act ("MVRA").

## II

## STATEMENT OF THE CASE

Defendant Michael Joseph Pepe ("defendant") raped, tied up, slapped, gagged and drugged seven young girls in Cambodia.  He lured the girls, all of whom were from poor families and who could not afford to attend school, to live at his home by promising them and their families that he would pay for the girls to go to school.  Defendant paid the girls for each act of oral sex and sexual intercourse that he caused them to perform.  He now challenges his convictions on seven counts of traveling in foreign commerce and engaging in illicit sexual conduct, pursuant to 18 U.S.C. § 2423(c), and the court's restitution order.

## A.    Jurisdiction, Timeliness, And Bail Status

The district court's jurisdiction rested on 18 U.S.C. § 3231.  This Court's jurisdiction rests on 28 U.S.C. § 1291 and 18 U.S.C. § 3742.  The district court entered judgment on March 3, 2014.  (CR 492; ER 2006-11.) [1]

Defendant filed a notice of appeal on March 3, 2014.  (CR 493; ER 2012.)  The notice was timely.  *See* Fed. R. App. P. 4(b).   Defendant is in custody.

## B.    Statement Of Facts And Procedural History

### 1.    *Pertinent Procedural History*

On December 20, 2007, a federal grand jury returned a first superseding indictment that charged defendant with seven counts of violating 18 U.S.C. § 2423(c), traveling in foreign commerce and engaging in illicit sexual conduct with seven minor girls.  (CR 83; ER 372-73.)

---

[1] "CR" refers to the Clerk's Record in the district court and is followed by the docket number.  "ER" refers to the Excerpts of Record filed by defendant, "GER" refers to the Excerpts of Record filed by the government; and "AOB" refers to Appellant's Opening Brief; all such references are followed by the applicable page references.  "Ex." refers to the government's trial exhibits, followed by the exhibit number.

On October 4, 2007, defendant filed a motion to dismiss the indictment on the grounds that 18 U.S.C. § 2423(c) violates the commerce and due process clauses and international law, and that the United States does not have extra-territorial jurisdiction over offenses committed in Cambodia. (CR 43; ER 275-43.) The government opposed the motion on October 18, 2007. (CR 46.) On December 3, 2007, the court heard argument and issued a written order denying the motion. (CR 57; ER 1-8, 319-24.)

On June 26, 2007 and August 1, 2007, defendant filed two motions seeking suppression of evidence obtained from (1) the search of his residence in Cambodia; (2) the digital media forensic examination conducted in Singapore; and (3) the digital media forensic examinations conducted in the United States pursuant to a United States warrant. (CR 21, 33; ER 9, 42-129.) The government filed its opposition on August 22, 2007, and defendant filed his reply on September 4, 2007. (CR 39, 40; ER 130-219.) The court conducted an evidentiary hearing on October 29, 2007. (CR 133; ER 244-94.)

On December 5, 2007, the court issued an order denying defendant's motions to suppress the evidence obtained in the

Cambodian and U.S. searches, and ordering supplemental briefing addressing the Singapore search. (CR 60; ER 9-19.) On December 20, 2007, the parties filed supplemental pleadings. (CR 71, 72; ER 340-71.) On February 6, 2008, the court conducted a second evidentiary hearing. (CR 136; ER 380-459.) On February 7, 2008, the court issued an order denying suppression of the Singapore search. (CR 129; ER 20-25.)

On May 29, 2008, following a 13-day trial, the jury returned guilty verdicts on all seven counts of the first superseding indictment. (CR 298; ER 2480-87.) On February 28, 2014, the court sentenced defendant to 210 years of imprisonment, 30 years on each count of conviction to run consecutively. (CR 492; ER 2006-11.) The court also ordered defendant to pay $247,213 in restitution.

## 2. *The Offense Conduct*

Defendant was born in 1953 and is a United States citizen. (ER 1333.) Between September 1 and September 3, 2005, defendant flew from Los Angeles, California to Phnom Penh, Cambodia. (ER 192, 1332-33, 1831.)

In Phnom Penh, defendant lived in a two-story rental house. He paid a woman named Basang, whom he had met several years earlier at

a bar in Phnom Penh where she was working as a prostitute, to find and bring young girls to his house who he would sexually abuse. (ER 2078, 2079, 2081, 2086-90.) Seven of these girls are the victims identified by their initials in the first superseding indictment. Six testified at trial; although S.S. did not testify, the jury heard evidence about defendant's illicit sexual conduct with S.S. from the other six victims. Basang testified at a video recorded deposition taken in Cambodia, portions of which were played for the jury. (ER 2057-2218.) At the time of defendant's trial, Basang was incarcerated in Cambodia, serving a 27-year sentence following her convictions for pimping and trafficking. (ER 1334-37, 1347-53, 2063, 2068-69, 2075.)

### a. *Basang's testimony*

Basang testified that she brought girls to defendant's residence; if defendant liked a girl, Basang and defendant discussed the price defendant would pay for that girl's virginity, and Basang brought defendant's money to the girl's mother. (ER 2086-89.)

Defendant told Basang that he liked "girls that have small build," and were skinny, weak, 13 or 14 years old or younger, with no pubic hair and that he liked to take pictures of the girls she brought for him.

6

(ER 2092.) At one point, he showed Basang naked pictures of the girls that he had taken and loaded on his computer. (ER 2093.)

Defendant asked Basang to teach all of the girls she brought to the house how to perform oral sex on him the way he liked it. (ER 2083-84, 2116-17.) She performed oral sex on defendant and explained to the girls what to do and how to do it. (ER 2121-22.) Defendant gave the girls presents after they performed oral sex on him. (ER 2085.)

Defendant used rope and cloth strips to tie the girls to the bed, and told Basang that if a girl screamed, he gagged her so the neighbors would not hear. (ER 2098-2102.) Defendant told Basang he gagged L.K. and Basang knew this was true because Basang heard noise coming from defendant's room while he was having sex with L.K. and because L.K. said she was in unbearable pain. (ER 2102.)

Basang brought L.K. to defendant. (ER 2110.) Defendant paid L.K.'s mother hundreds of dollars to have sex with L.K. and for the mother to cook and clean. (ER 2104-11.) Defendant paid for L.K. to go to school in exchange for sex. (ER 2107.) Defendant told Basang that he paid L.K. $100 every month and L.K. gave the money to her mother. (ER 2108.)

Basang identified several government exhibits as defendant's medications. (ER 2156; GER 5-16.) She saw defendant give the girls medication before having sex with them. (ER 2157.) Defendant also instructed Basang to give a sleeping pill to L.K. because she screamed a lot. (ER 2158.)

Basang negotiated with the mother of S.R. and S.S. to have them live with defendant, arriving before Christmas 2005. (ER 2122-29.) About two weeks after the sisters came to the house, defendant asked Basang to teach them how to perform oral sex on him. (ER 2130.) She also brought other girls to defendant's house. (ER 2134-37, 2148-51.)

### b. *Victim L.K. (count two)*

L.K. testified that she was approximately 12 years old when she, her brother, and her mother lived at defendant's house in late 2005 after Basang hired L.K.'s mother to work there as a maid. (ER 808, 810-11, 817-10, 844, 901.) L.K.'s mother and brother slept in a downstairs bedroom while she shared a bedroom upstairs with other victims, including S.R. and S.S. (ER 819.)

L.K. testified that at one point, Basang gave her a soft drink that made her feel sleepy and defendant came into the room naked; then he

8

took her clothes off, tied her legs and wrists, lifted her legs, and raped her.  (ER 821.)  She screamed and he slapped her until she stopped screaming.  (ER 820-22, 846-48, 851.)  When she awoke, she saw blood on the bed, her vagina hurt and she was bleeding.  (ER 820.)  The second time, defendant did not tie her up but put a pillow on her face, told her to bite on the pillow, held down her wrists with his hands and raped her.  (ER 822.)  Although it hurt, she did not have the energy to fight back.  (ER 823.)  Defendant raped her many times after that.  (ER 822-24.)  Defendant sometimes rubbed clear oil on his penis before raping her.  (ER 830.)

L.K. also testified that defendant had her give him massages and would sometimes ask her to perform oral sex on him.  (ER 823-24.)  Sometimes other girls were present, including S.R., S.S., and T.C.  (ER 825.)  They would take turns performing oral sex on him.  (ER 824-27, 848-50, 898-99.)  L.K. saw a small growth "nearby his private part."  (ER 825.)[2]

---

[2] On cross examination, L.K. was shown a photograph of a red mark on the inner thigh of a man who was not defendant.  L.K. testified that it was not defendant.  (ER 845-46.)

L.K. testified that defendant gave L.K. one dollar every time he raped her or she performed oral sex on him. (ER 826-28.) Defendant said he would marry her when she turned 18. (ER 830.)

L.K. testified that defendant took many photographs of her naked in her bedroom and on his bed, and that defendant was naked in some of the photos. (ER 833-36, 897-900.) Photographs of L.K. naked on defendant's bed with her legs spread were found on defendant's computer. (Ex. 2101.) [3] L.K. identified herself in a photograph found on defendant's computer media of herself and defendant, both naked, taken in defendant's bedroom. (ER 897; Ex 1019.)[4]

On June 20, 2006, Laura Watson, M.D. conducted a genital examination of L.K.[5] (ER 500.) Dr. Watson testified that normally, she

---

[3] Pursuant to 18 U.S.C. § 3509(m)(1), the government has not included in its GER copies of trial exhibits that might be deemed to contain child erotica or child pornography. However, at the Court's request, the government will provide a compact disk containing the relevant images.

[4] A redacted version of this photograph was shown to L.K. (ER 897.)

[5] Dr. Watson had examined thousands of children in her twelve years of medical practice and was declared an expert in the field of general practice and family medicine. (ER 494-95.)

would expect to see a narrow, slit-like vagina with a visible hymen on a child. (ER 501). The doctor observed that L.K. had a wide, gaping vaginal opening, consistent with repeated penetration. (ER 501-02, 528.)

### c. Victim S.R. (count three)

S.R. was approximately 10 years old when she and her sister, S.S., lived at defendant's house. (ER 1002, 1004.)[6] S.R. testified that she and her sister came to live at defendant's house because her family's house burned down. (ER 1010-11.) Before she and her sister moved, S.R. saw Basang talk to S.R.'s mother. (ER 1011.)

At some point, S.R., S.S., and L.K. started giving defendant massages and oral sex at Basang's direction. (ER 1013-15, 1060.) Basang showed S.R. how to perform oral sex on defendant. (ER 1014.) S.R. saw S.S. and L.K. perform oral sex on defendant. (ER 1015.) Defendant wore no clothes during the massages and told S.R. to take off her clothes and sometimes would take them off for her. (ER 1013.) Defendant gave her one dollar after each time she performed oral sex.

---

[6] S.S. was unable to testify at trial due to the ongoing impact of the trauma she suffered from defendant's sexual acts on her.

(ER 1015-17, 1060.)  S.R. testified that defendant had a reddish mole on his thigh.  (ER 1017.)[7]  S.R. rubbed oil on defendant's penis, and she identified the bottle of oil in a photograph.  (ER 1018-19; GER 52-53.)

Defendant also performed oral sex on her and one time put something in her anus after giving her medicine.  (ER 1015-16.)  Although defendant never raped her, he did have her sit on his mouth and licked her.  (ER 1014.)  When people came over, defendant would tell her to hide in her bedroom.  (ER 1020.)

### d.    Victim K.S. (count five)

K.S. was 12 years old when Basang brought her to defendant's house.  (ER 971, 984, 989, 991.)[8]  Basang showed her how to perform

---

[7] On cross examination, S.R. was shown a photograph of a red mark on the thigh of a man who was not defendant.  S.R. testified that it was not the mole she saw on defendant's thigh.  (ER 1028-29.)  On cross examination, S.R. was asked about her laughing when talking about defendant's sexual abuse of her and her sister during a video recorded interview.  (ER 1046-47.)  S.R. testified, "You understand, I was so embarrassed, I didn't want to speak."  (ER 1047.)

[8] K.S. testified that when she lived at defendant's house, the other victims were not there.  (ER 978-79.)  K.S. also testified that defendant engaged her in illicit sexual conduct both before and after he left Cambodia.  Photographs of K.S. taken at defendant's residence in August 2005 were introduced at trial.  Defendant left Cambodia on August 25, 2005 and returned on September 5, 2005.  (ER 229, 1113.)

oral sex on defendant; defendant would pull K.S.'s head towards his penis when he wanted her to suck on it. (ER 981.) Defendant gave her one dollar each time she performed oral sex on him. (ER 982.) Defendant also penetrated her vagina with his penis on three occasions. (ER 984.) Defendant gave her money each time.

### e. Victim N.T.D. (count six)

N.T.D. was 12 years old when Basang brought her to defendant's house, where she lived for about one week. (ER 902-03, 905-06, 912-14, 925, 928.) Defendant used a rope to tie her hands and legs. (ER 908.) She struggled and screamed but defendant hit her with his hand on her face multiple times, used a pillow to push on her face, and covered her mouth with tape before raping her. (ER 908-10.) Defendant raped her many times during the week she was there, and he gave Basang money for procuring her. (ER 912-13, 916.) N.T.D. tried to leave after the first and second times defendant raped her but she could not find a way out. (ER 912, 916.)

N.T.D. identified a photograph taken by defendant of N.T.D. on the couch in the living room of defendant's house. (ER 906-07; Ex 1332.)

13

### f.    Victim T.C. (count seven)

T.C. was 13 years old when she lived at defendant's house.  (ER 770, 791.)  Basang brought her there around Valentine's Day 2006 and T.C. remained there for two to three weeks.  (ER 771, 772, 775, 786-87, 797-99.)  Defendant raped her five times.  (ER 777, 781, 783-84.)  The first time, he put a pill in her drink that made her feel tired.  Defendant took off her clothes, tied her arms and legs to the bed with white rope, and inserted his penis into her vagina.  (ER 778-80.)  Defendant took a pill before he raped her.  (ER 781.)   Defendant made her perform oral sex on him.  (ER 780.)  L.K., S.R., and S.S. were present and also performed oral sex on defendant.  (ER 784-85.)   Defendant gave T.C. money after each rape and oral sex session, and he gave her money for clothes.  (ER 785-86.)  When visitors came to defendant's house, defendant would tell her to hide in a closet.  (ER 790.)

### g.    Victim I.T. (count one)

In May 2006, when I.T. was approximately 11 years old, Basang brought her to live at defendant's house.  (ER 930, 934-35, 959, 962-64, 969.)  L.K., S.R., and S.S also lived there.  (ER 933-34.)  The four girls shared a bedroom on the second floor.  (ER 933-34, 946-47.)

The first time I.T. was in defendant's bedroom, defendant had Basang give medicine to I.T. that made I.T. feel sleepy. (ER 948.) Defendant tied her wrists and tied her legs at the ankles with rope and raped her. (ER 948-52.) When she cried, defendant took a black string or rope and covered her eyes and put cloth in her mouth. (ER 951.)

Defendant raped I.T. a second time, putting cream on her vagina and his penis first. (ER 954.) I.T. identified the tube of cream in a photograph. (ER 955; GER 36-37.) I.T. gave defendant massages and performed oral sex on him, and saw L.K., S.R. and S.S. perform oral sex on defendant. (ER 956-59, 968-69.) While I.T. massaged him, he asked another girl to perform oral sex. (ER 957.) Defendant gave I.T. one dollar after she performed oral sex and gave Basang $100 after the second time he raped her. (ER 960-61.)

On June 20, 2006, Dr. Watson examined I.T. and observed that I.T. had an "obviously disrupted hymen" and bruising around the vaginal area that were consistent with vaginal trauma. (ER 495, 498-99.)

### 3. Defendant's Conduct Comes to the Attention of Nongovernmental Organizations, the Cambodian National Police, and U.S. Law Enforcement

On June 14, 2006, ICE Bangkok Assistant Attaché ("AIA") Gary Phillips learned that the U.S. Embassy in Cambodia had received information from two nongovernmental organizations ("NGOs") that a 12-year old-girl claimed that she had been purchased, tied up, and raped by an American English teacher who had not been identified. (ER 160). Later that day, one of the NGOs informed AIA Phillips that an American citizen was allegedly involved in sexually abusing females between the ages of 10 and 18, and that one victim had been bound and raped. (ER 63,160.) The NGO had also informed the Cambodian National Police ("CNP"). (*Id.*) The NGO told AIA Phillips that, based on these allegations, the CNP had an American under surveillance. (*Id.*)

On or about June 15, 2006, the NGO told AIA Phillips that the CNP and municipal police in Phnom Penh were surveilling the American, who was inside his residence with the victims. (ER 160.) The NGO also told AIA Phillips that, in a June 12, 2006 interview conducted by another NGO, 12-year old I.T. identified the man with

whom she had had "sex" as "Michael" from the United States, described
Michael's residence, and stated that "some young girls" were being tied
up for the purpose of having sex with Michael. (ER 160-61.) The NGO
also told AIA Phillips that an NGO investigator had located the
residence; local police were surveilling it. The NGO provided AIA
Phillips with a report, prepared by the NGO, identifying defendant by
name, date of birth, and U.S. passport number, including I.T.'s
statement that she was bound and sexually abused at defendant's
house, and stating that a medical examination at a Phnom Penh
hospital showed injuries to I.T.'s vagina. (ER 161.)

AIA Phillips commenced a parallel investigation. (ER 162.) He
had been assigned since May 2002 to ICE Bangkok and had
participated in over 70 child exploitation cases within the jurisdiction of
ICE Bangkok, which included Cambodia. (ER 159, 161, 598-99.) As
was his practice, whenever he received information that a U.S. citizen
might be involved in child abuse within ICE Bangkok's jurisdiction, he
conducted a parallel investigation with whatever investigation was
being run by local police. (ER 162.) Where, as here, it appears that the
child's family was involved in selling the child to the perpetrator, an

NGO becomes the legal guardian and caregiver of the child.  (ER 138.)

AIA Phillips asked the NGO with custody of I.T for permission to

interview her without the police present.  (ER 162.)  On June 16, 2006,

AIA Phillips conducted a recorded interview of I.T. for the purpose of

memorializing her statements in the event of a prosecution in the

United States.  (ER 63, 161.)  The CNP was not present at that

interview.  (ER 161.)

On June 16, 2006, AIA Phillips informed a CNP General that ICE

was conducting a parallel investigation and offered ICE assistance.  (ER

162.)  The CNP did not seek ICE assistance until after it had executed a

Cambodian search warrant at defendant's residence and seized

computer media.  (ER 162.)  The assistance that the CNP sought was

forensic analyses of the computer media.  (ER 162.)

### 4. *The CNP Arrests Defendant for Rape and Debauchery in Violation of Cambodian Law*

On June 17, 2006, at approximately 12:40 p.m., the CNP arrested

defendant for rape and debauchery in violation of Cambodian law.  (ER

163.)  After arresting defendant, CNP transported him to his residence.

(*Id.*)  AIA Phillips was not present when the CNP arrested defendant,

and Phillips did not instruct or advise the CNP to arrest defendant.

AIA Phillips learned about the arrest from the NGO. (ER 163.)

### 5. *The CNP Searches Defendant's Residence Pursuant to a Cambodian Search Warrant*

Before arresting defendant, the CNP had obtained a warrant to search his residence. (ER 96-97 163, 166.) On June 17, 2006, at about 1:20 p.m., the CNP began to execute the warrant. (ER 163, 190, 601-02, 711-13, 722.) L.K. was at the residence when the CNP arrived. (ER 168, 714.) CNP officers seized many items, including a stick, cloth strips with knots, baby oil, rope, masking tape, wire, KY lubricating jelly, condoms, bed sheets, pillow cases, a dream catcher, towels, many stuffed animals, a pillow, children's clothes, books, games, tampons, photograph albums, a map of Phnom Penh (the back of which contained a warning that sex with a child is a crime), a calendar, applications for a school and receipts for that school, newspaper clippings about child sex offenders who had been arrested, a "family book," computer-related documentation, and paper inserts for CD cases. (ER 64-65, 168-69, 605-34, 676-711; GER 34-57; Ex 1171, 1174-75, 1178, 1181, 1185, 1187-90, 1192, 1197-99, 1202, 1204-05, 1209, 1212-13, 1217, 1222-38, 1241, 1246,

1277-84, 1286.)[9]  The CNP also seized numerous drugs, including

Rohypnol, Valium, morphine, and codeine as well as erectile-

dysfunction drugs such as Viagra.  (ER 581-94, 624, 638-61, 711; GER

58-59; Ex 1179-80, 1251-60, 1263-65, 2037-39.)

Defendant and the Cambodian prosecutor were present during the

search.  (ER 163, 272-73, 603.)  AIA Phillips and individuals from the

U.S. Department of State and from the two NGOs were also present.

(ER 139, 190.)  AIA Phillips observed the search, and took photographs

for his parallel investigation.[10]   (ER 139, 164, 479, 602-34, 676-711.)

AIA Phillips observed many items that corroborated the information

provided by I.T.  (ER 139.)  Among other things, he saw a bag of

medications, a bottle of baby oil, and cloth strips with rope underneath.

(ER 613-14; GER 38-39.)  He also observed a number of stuffed animals,

children's books, and boxes containing children's clothing.  (ER 628-33,

677; GER; 46-47, 54-55; Ex. 1188-90, 1197, 1204.)  AIA Phillips also

---

[9] A "family book" is a registry of family members and their dates
of birth; in Cambodia, it operates like a birth certificate.  (ER 697.)

[10] Defendant's continued false claim that "American agents" and
"persons affiliated with NGOs" participated in the search (AOB 31) was
repeatedly rebutted by the testimony of AIA Phillips.

observed and photographed a stack of one-dollar bills. (ER 681, 785-86, 827, 960, 982, 1015, 1060; GER 50-51.) A videotape of portions of the search showed CNP officers searching the house and putting evidence in certain areas. (ER 272.) It also showed AIA Phillips observing the seized evidence, viewing some of the seized evidence and taking pictures. (ER 272.) The video also shows AIA Phillips looking through and photographing documents at the end of the search on June 19, 2006 after asking CNP officers for permission to do so, picking up a stuffed animal from the floor and throwing it on the bed after asking CNP officers if they wanted to take it, telling a CNP officer that he should seize a pink bottle of baby oil that one victim had told AIA Phillips was used as a lubricant prior to her being raped by defendant, and shining a black light on a mattress in an effort to show the CNP officers how an alternative light source works because they thought there was a blood stain on the sheet which would have soaked through the mattress. (ER 259-65, 273-75, 277.) At trial, L.K. identified a photograph of the baby oil seized by the CNP as the clear oil that defendant sometimes rubbed on his penis before penetrating her. (ER 831.)

The CNP stopped the search on June 17, 2006 and returned on June 19, 2006 to complete it. (ER 164, 281, 283.) CNP officers placed the seized items into burlap bags, put the bags into trucks, and drove all of the seized items to the CNP Department of Human Trafficking Prevention. (ER 164, 169, 283.) AIA Phillips did not take any evidence into ICE custody. (ER 283.)

Among the items seized by the CNP were a Maxtor computer hard drive (the "Hard Drive"), a JetFlash thumb drive (the "Thumb Drive"), a Lexar Compact Flash, 31 CDs, five floppy disks, a Hewlett Packard computer tower, and 27 CDs with titles indicating they contained pornography. (ER 164, 191, 686-87, 698-99, 1122-23; Ex. 1143, 1275, 1276, 1274.) The CNP did not have the forensic capability to analyze computer media. (ER 164, 288.) Because ICE has that capability, ICE offered to assist the CNP in its analysis of the computer and media. (ER 164.) After accepting ICE's offer of assistance, the CNP requested that ICE write a letter requesting access to the computer and computer media evidence for computer forensic testing. (ER 287-88.) The CNP subsequently turned over the Hard Drive, the Thumb Drive, and the Compact Flash to ICE, which sent those items to ICE Singapore for

22

forensic analysis. (ER 101, 164-65, 191, 297.) The other digital media seized by the CNP from defendant's residence were not sent to ICE Singapore, and were not searched by the CNP or by ICE in Cambodia. (ER 191).

### 6. Singapore Search

On June 30, 2006, AIA Phillips told ICE Singapore SA David Nguyen-Galante, a trained forensic specialist, that the CNP had requested assistance in making a mirror image of and forensically analyzing media seized from defendant on or about June 17, 2006. (ER 297.) AIA Phillips told SA Nguyen-Galante that the CNP had obtained a valid search warrant and that the computer evidence was seized pursuant to Cambodian law. (ER 297-98.) SA Nguyen-Galante subsequently conducted a forensic examination of the Hard Drive, the Thumb Drive, and the Compact Flash. (ER 191, 297-98.) He found homemade child pornography images taken with a digital camera on the Hard Drive and the Thumb Drive. (ER 192-93.) A search of the

unallocated space on the Hard Drive and Thumb Drive revealed images of minors engaging in sexually explicit conduct.  (ER 192.)[11]

### 7.   *U.S. Search*

On November 16, 2006 and April 17, 2007, ICE agents in Ventura, California, received the items seized by the CNP from defendant's residence in Cambodia that had not previously been forensically examined by ICE Singapore.  (ER 170-71.)  These items included one Hewlett-Packard CPU and compact disks.  (ER 170, 175-79.)  On May 17, 2007, a warrant to search these items was signed by a federal magistrate judge.  (ER 171, 174-200.)

The affidavit stated that on June 14, 2006, ICE Bangkok received information from two NGOs that a U.S. citizen, later identified as defendant, had sexually abused and raped a number of children at his compound in Phnom Penh and that AIA Phillips had interviewed four of the child victims, each of whom identified defendant as their abuser.

---

[11]  The affidavit explained that when computer files are erased or deleted, the content of the file is not actually erased, and that the data from that file continues to exist in an area commonly referred to as "unallocated space" and can be recovered with forensic software.  (ER 192.)

Case: 14-50095, 06/07/2016, ID: 10005665, DktEntry: 35, Page 39 of 124


(ER 190).  The CNP had arrested defendant and executed a search warrant at his compound, where evidence of his sexual abuse of the child victims was seized.  (ER 190.)  U.S. Customs and Border Protection ("CBP") records showed that between September 1 and 3, 2005, defendant had flown from Los Angeles to Phnom Penh.  (ER 192.) The affidavit also contained statements from a letter that defendant had written to his sister who provided it to ICE.  (ER 197.)  The letter was postmarked August 15, 2006, when defendant was incarcerated in Cambodia.  (*Id.*)  As set forth in the affidavit, in the letter defendant mentioned several of his child victims by name, including one depicted in dozens of pornographic and sexually-explicit photographs on his computer; stated that his daily routine usually included a massage from the girls after they returned from school and another later in the evening, and that these massages led to "inappropriate touching, etc."; admitted that on one occasion, after he had taken Viagra, he bound a child and slapped her in the face, explaining that the child's mother had "given" her to him as a wife/girlfriend; described his "sex drive" and his "willpower" as "very low"; and admitted that he had taken naked

pictures of Basang's nieces, at her request, and that he had erased these files from his computer. (ER 197.)

The affidavit also contained descriptions of some of the images found on the Hard Drive and the Thumb Drive, including child pornography and photographs of the victims in various stages of undress. (ER 171, 192-96.) The affidavit stated that even if ICE had been unaware of the evidence found in the Singapore search, or was precluded from using that information, based on the nature of the crime ICE still would have sought a search warrant for the digital devices received on November 16, 2006 and April 17, 2007. (ER 171). In his declaration in opposition to defendant's suppression motion, the affiant stated that based on the affiant's training and experience, he believed that the computer media might contain evidence of defendant's crimes because people who have a sexual interest in children often photograph their victims, correspond with others about their crimes and collect and store child pornography. (ER 171-72.)

Between May 17, 2007 and July 12, 2007, ICE searched the digital devices pursuant to the warrant. (ER 172). ICE found visual depictions of minors on some of the disks and determined that a more detailed

26

analysis was required.  (ER 172, 201-07.)  On or about July 12, 25, and

26, 2007, Bruce Pixley, a computer forensic expert retained by the

government, copied the disks and, using forensic tools, conducted a

more detailed analysis of them.  (ER 172-73.)

### 8.    *Evidence on Defendant's Digital Devices*

At trial, Pixley testified about the result of his examination of

images of the Hard Drive, Thumb Drive and ten of the disks

(collectively the "Digital Media").  (ER 1122-23.)  Pixley found digital

photographs, emails, and software to download photographs on the

Digital Media.  (ER 1124.)  On the Hard Drive, Pixley found an email,

sent on March 6, 2006, stating in part, "Dear Mack:  Thank you for the

email with pictures.  It helps me to make up my mind and continue to

stay here longer.  The sweet things I have with me have the most

perfect little bodies and attitudes. . . . Michael."  (ER 1185-87; Ex 2097.)

Pixley determined that the digital photographs were taken with a

Minolta Dimage S414 camera; he purchased that make and model

camera, figured out how that camera stored, named and dated photos,

and learned that the date embedded by the camera onto the digital

photographs is set by the user.  (ER 1133-36, 1149, 1203-04; Ex 2098.)

27

Pixley found software on the Hard Drive that copies photographs from the camera to the computer. (ER 1137-38; Ex 1277].) Pixley purchased that software and used it to transfer photos that he had taken with the Minolta Dimage camera to the Hard Drive to see the naming convention for the photographs established by the software. (ER 1138-39.) He examined the contents of and dates associated with the digital photographs on the Digital Media, compared those contents and dates with known events, and concluded that the date set in the camera that took the photographs on the Digital Media was 185 days earlier than the actual date. (ER 1149-52.) Pixley created a summary chart of the non-pornographic photographs of the victims on the Digital Media that showed both the camera date and the camera date plus 185 days. (ER 1152-55; Ex. 2093.) Pixley created a second chart that listed the photographs chronologically. (ER 1156-59; GER 102-03.) The chart shows that defendant photographed the victims from August 2005 through June 2006, shortly before his arrest. (*Id.*)

Using the same process, Pixley created a chart that chronologically lists the pornographic photographs. (ER 1161-62; Ex. 2096.) Those photographs were taken in October and November 2005.

(*Id.*)  Photographs of L.K. and defendant, standing naked next to one another in defendant's bedroom, with defendant's arm around L.K. and her hand on his stomach, and a photograph of defendant's erect penis, were taken in November 2005.  (ER 1271-72; Ex. 1327, 1338, 1331.) The photographs of defendant show a fleshy growth on his left upper inner thigh.  (ER 1272-74; Ex. 1328.)   A doctor examined defendant in January 2008 and saw a scar in the location where the fleshy growth had been.  (ER 1274-76.)

### 9.    *The Drug Evidence*

In addition to the Digital Media and other items discussed above, the CNP seized numerous pills from defendant's residence.  (ER 584).  A senior forensic chemist from the Drug Enforcement Administration ("DEA") laboratory conducted a chemical analysis of the substances seized from defendant's residence and identified them as Rohypnol, Valium, morphine, codeine and acetaminophen, Temazepam, Xanax, and Viagra.  (ER 585-93).

An expert in pharmacology and toxicology prepared a chart summarizing the sedative drugs seized from defendant.  (ER 646; GER 58-59).  She testified that morphine and codeine increase a person's

threshold or tolerance for pain, codeine is a painkiller used for moderate to severe pain, Rohypnol is a very potent sleeping pill or drug used before surgery to put someone to sleep, Diazepam is a muscle relaxant, Temazepam is a sleeping pill, and Xanax is used to treat anxiety and has a calming, sedative effect.  (ER 647-48, 653-56, 658).  The expert also testified that Viagra is used to maintain an erection.  (ER 659-60.)

### 10.   *The Court Orders Defendant to Pay $247,213 in Restitution*

The Presentence Report ("PSR") was disclosed to the parties on July 30, 2008.  (ER 2488.)  The Probation Officer recommended that the court order restitution in the amount of $116,359.81 pursuant to 18 U.S.C. § 2248.  (ER 2515.)  The restitution would be paid to the two non-governmental organizations that had legal guardianship of the seven victims until they turned 18:  Agape International Missions ("Agape") and Hagar International ("Hagar").   (ER 2497).

In its Sentencing Position, the government requested restitution for the seven child victims pursuant to the Mandatory Victims Restitution Act of 1996 (MVRA), 18 U.S.C. § 3663A.  (CR 318; ER 1966-76.)  The government stated that the restitution amount should include the costs of necessary medical and related professional services relating

30

to physical, psychiatric, and psychological care and the costs of
education and rehabilitation for the seven victims.  (ER 1972-76.)

On September 19, 2008, the government filed its submission of
victim impact and restitution information under seal.  (CR 329; ER
2523-58.)  The submission included letters and drawings from six of the
victims as well as statements and spreadsheets from the two NGOs
setting forth costs incurred and anticipated to be incurred on behalf of
the seven victims.  (*Id.*)  On September 24, 2008, the government filed a
supplemental submission of victim impact information.  (CR 332; ER
2583-94.)

On March 25, 2009, defendant filed a supplemental sentencing
position regarding restitution in which he argued that the restitution
recommended by the Probation Office and the government was
improper under 18 U.S.C. § 2248.  (CR 348; ER 1998-2005.)  Defendant
claimed that charitable organizations such as Agape and Hagar are not
"victims" under § 2248 and therefore are not entitled to mandatory
restitution.  (ER 2000-03.)  Defendant also argued that any restitution
for future costs would be speculative and lacked evidentiary support.
(ER 2003.)

31

The government filed a response on April 21, 2009. (CR 355; ER 2562-82.) The government pointed out that defendant's claim that the NGOs were not "victims" under § 2248 was incorrect because § 2248 is not the restitution provision applicable in this case and that 18 U.S.C. § 3663A, which does apply here, provides that a legal guardian of a minor victim under 18 is entitled to receive restitution payments on behalf of the victims in their care. (ER 2564.) As for defendant's objection to restitution for future care of the victims, the government explained that its previously filed submission of victim impact and restitution information and supplemental submission of victim impact information set forth in detail the costs associated with the care of the victims. (ER 2564.) The government recounted that during a hearing held before the court on September 25, 2008, representatives of the two NGOs testified that all seven victims would be unable to return to their families due to the risk of re-trafficking. (ER 1994-95; ER 2565.) In addition, the government pointed out that defendant's argument ignored the victims' trial testimony as well as the victim impact information submitted by the government that demonstrated the victims' need for therapy until they are 18 years old. (ER 2565.)

The government attached a declaration from the executive director of Agape, legal guardian for five of the victims, explaining why the victims needed to remain under the care of Agape for at least three to five years and why none of them could safely be returned to their families.  (*Id.*)  He specified that the families of each of the victims were all complicit in the trafficking of their daughters and financially benefitted from their actions; therefore, returning the girls to their families would put them at great risk of being trafficked and sexually exploited again.  (*Id.*)

On February 28, 2014, the court conducted defendant's restitution hearing.  (CR 512; ER 26-41.)  Defendant reiterated his argument that § 2248 does not allow money to go to anyone other than the victims themselves.  (ER 30.)  In response, the court stated that it agreed with the government's position on that issue.  (ER 31.)  The court ordered defendant to pay $247,213 in restitution to Hagar ($35,400 for I.T. and N.T.D.) and Agape ($211,813 for T.C., L.K., K.S., S.R., S.S.).  (CR 492; ER 34-35, 2007.)[12]

---

[12] The court mistakenly stated that the restitution was ordered pursuant to § 2248 rather than § 3663A.  (ER 34.)

33

## III

## ARGUMENT

### A. Congress Had Constitutional Authority To Enact 18 U.S.C. § 2423(c)

#### 1. *Standard of Review*

This Court reviews the district court's denial of a motion to dismiss an indictment based upon an interpretation of a federal statute de novo. *United States v. Akins*, 276 F.3d 1141, 1146 (9th Cir. 2002). The constitutionality of a statute is a question of law that is also reviewed de novo. *United States v. Naghani*, 361 F.3d 1255, 1259 (9th Cir. 2004).

#### 2. *Legislative History*

##### a. *The Optional Protocol*

On July 5, 2000, the United States signed a protocol aimed, in part, at combating child sex tourism. *See* Optional Protocols to the Convention on the Rights of the Child on the Involvement of Children in Armed Conflict and on the Sales of Children, Child Prostitution and Child Pornography, May 16, 2009, 39 I.L.M. 1285 ("Optional Protocol"). The Protocol notes "deep[] concern[] at the widespread and continuing practice of sex tourism, to which children are especially vulnerable, as it

34

directly promotes the sale of children, child prostitution and child pornography." Optional Protocol at 1290 (emphasis omitted.) To address this concern, Article 3 mandates that each nation "shall ensure that . . . [sexual exploitation offenses are] . . . covered under its criminal or penal law, whether these offences are committed domestically or transnationally." *Id.* at 1292. Moreover, Article 4 requires each nation to establish jurisdiction over offenses when the alleged offender is a national. *Id.* Thus, the Protocol mandates that members create laws to address sexual exploitation offenses committed by their citizens abroad.

### b. *Title 18, United States Code, § 2423(c)*

Shortly after Senate ratification of the Optional Protocol, in December 2002, Senator Orrin Hatch introduced the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 (the "PROTECT Act"). Pub. L. No. 108-21, 117 Stat. 650 (2003). One purpose of the bill was "to make it a crime for a U.S. citizen to travel to another country and engage in illicit sexual conduct with minors." H.R. Rep. No. 107-525, at 5 (2002). The PROTECT Act includes four "travel statutes," one of which, 18 U.S.C. § 2423(c), provides criminal penalties for "[a]ny United States citizen or alien

35

admitted for permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct with another person." 18 U.S.C. § 2423(f). Congress removed the intent requirement from § 2423(b)[13] so that "the Government would only have to prove that the defendant engaged in illicit sexual conduct with a minor while in a foreign country." H.R. Rep. No. 107-525, at 2.

This proposed legislation passed the House of Representatives but not the Senate. As a result, what is now § 2423(c) was reintroduced in the 108th Congress and was ultimately adopted as part of the PROTECT Act, which became effective on April 30, 2003.

### 3. Both the Foreign Commerce Clause and the Necessary and Proper Clause of the Constitution Authorized Congress to Enact § 2423(c)

#### a. This Court has held that § 2423(c)'s regulation of commercial sex acts is a valid exercise of Congress's Foreign Commerce Clause Powers

In *United States v. Clark*, 435 F.3d 1100, 1114 (9th Cir. 2006), this Court upheld § 2423(c) against a Foreign Commerce Clause challenge. The defendant was a United States citizen who had lived in Cambodia

---

[13] Section 2423(b) provides, in pertinent part: "[A] United States citizen . . . who travels in foreign commerce, for the purpose of engaging in any illicit sexual conduct with another person" shall be punished.

for five years, returning to the United States once a year.  435 F.3d at 1103.  While in Cambodia, the defendant was caught with two young boys whom he had promised to pay for engaging in sexual activities.  *Id.* at 1103-04.  This Court rejected the defendant's challenge to § 2423(c) as beyond Congress's powers, concluding that "[t]he combination of [the defendant]'s travel in foreign commerce and his conduct of an illicit commercial sex act in Cambodia shortly thereafter puts the statute squarely within Congress's Foreign Commerce Clause authority." *Id.* at 1116.  The Court stated that, "[i]n light of Congress's sweeping powers over foreign commerce, . . . Congress acted within its constitutional bounds in criminalizing commercial sex acts committed by U.S. citizens who travel abroad in foreign commerce." *Id.* at 1109.[14]

The Court concluded that "§ 2423(c)'s combination of requiring travel in foreign commerce, coupled with engagement in a commercial transaction while abroad, implicates foreign commerce to a constitutionally adequate degree." *Clark*, 435 F.3d at 1114.  In drafting the statute, Congress pinned criminal liability to foreign travel.  This

---

[14] Defendant's appeal is limited to his convictions for committing commercial sex acts under § 2423(c).  (AOB 58.)

jurisdictional link "unequivocally establishes that Congress specifically invoked the Foreign Commerce Clause," *Clark*, 435 F.3d at 1114. This is therefore a settled issue. [15]

Every other court that has directly reviewed the constitutionality of § 2423(c) has upheld it under the Foreign Commerce Clause. *See United States v. Bollinger*, 798 F.3d 201, 218 (4th Cir. 2015) ; *United States v. Flath*, 845 F. Supp. 2d 951, (E.D. Wis. 2012); *United States v. Pendleton*, 658 F.3d 299, 311 (3d Cir. 2011); *United States v. Bianchi*, 386 Fed. Appx. 156, 162 (3d Cir. 2020); *United States v. Martinez*, 599 F. Supp. 2d 784, 802-08 (W.D. Tex. 2009).

Section 2423(c) is therefore a valid regulation of the channels of foreign commerce and persons who travel in foreign commerce.[16]

---

[15] Inasmuch as defendant relies on the dissenting opinion in *Clark* for his argument, it is worth noting that, in the 10 years since *Clark* was decided, no court has adopted the dissent's reasoning.

[16] To the extent defendant contends that a gap of more than two months between the travel and the sexually illicit conduct elements of the statute is unconstitutional (AOB 61-63), that argument is address below in Section IV-B.

### b. *Section 2423(c) is a proper exercise of Congress's power to ensure compliance with the United States' treaty obligations through the Necessary and Proper Clause*

The court properly found that Congress also had authority to enact § 2423(c) under the Necessary and Proper Clause because this legislation was "necessary and proper" to the implementation of the Optional Protocol.  (ER 5-6.)

It is well-established that Congress may enact laws to implement treaties to which the United States is a party.  U.S. CONST. art. I, § 8, cl. 18.  *See Missouri v. Holland*, 252 U.S. 416, 432 (1920) ("If the treaty is valid there can be no dispute about the validity of the statute under Article 1, Section 8, as a necessary and proper means to execute the powers of the Government.").[17]  These laws are subject only to general constitutional constraints.  *See Holland*, 252 U.S. at 433.[18]  The treaty

---

[17] Treaties and laws passed pursuant to them are not "free from the restraints of the Constitution," *Reid v. Covert*, 354 U.S. 1, 16 (1957), such as the Bill of Rights.  However, defendant primarily contends that § 2423(c) exceeds Congress's constitutional authority, not that it infringes his enumerated constitutional rights.

[18] Defendant's argument that the Necessary and Proper Clause is more limited than *Holland* suggests (AOB 65-66) is unpersuasive and

<span style="float:right">(continued  . . . .)</span>

power is thus a specific, enumerated source of authority for Congressional legislation.

The Necessary and Proper Clause grants Congress broad authority to enact federal legislation. *United States v. Belfast*, 611 F.3d 783, 804 (11th Cir. 2010). That authority includes the power "to enact laws that are 'convenient, or useful' or 'conducive' to the [legislative] authority's beneficial exercise." *United States v. Comstock*, 560 U.S. 126, 133-34 (2020). "Necessary," as used in the Necessary and Proper Clause does not mean "absolutely necessary." *Id.* at 134. Instead, courts "look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power," *id.*, or, as applicable to this case, a treaty, *see United States v. Belfast*, 611 F.3d 783, 804 (11th Cir. 2010).

The Supreme Court has never held that a treaty-implementing statute exceeds Congress constitutional law-making authority. Much of

---

unsupported by any binding authority as defendant once again relies on a dissent (and concurrence) rather than the precedential majority opinion of a case to make his argument. *See Bond v. United States*, 134 S. Ct. 2077 (2014).

the law governing treaty implementation descends from the Supreme
Court's opinion in *Holland*, from which a rational basis test emerged to
determine whether a treaty-implementing statute is constitutional.
*See, e.g., United States v. Yian*, 905 F. Supp. 160, 163 (S.D.N.Y. 1995)
("[T]he appropriate judicial standard for reviewing the Act is not strict
scrutiny, but, rather, rational basis review."). This test "provides that
implementing legislation need only bear a 'rational relationship' to the
treaty that it is ostensibly designed to execute." *United States v. Frank*,
486 F. Supp. 2d 1353, 1358 (S.D. Fla. 2007).

The Optional Protocol provides an explicit framework for
extraterritorial jurisdiction over United States citizens who engage in
the sexual exploitation of children overseas. Because § 2423(c)
reasonably implements the Optional Protocol, Congress had authority
under the Necessary and Proper Clause to enact the statute. First,
§ 2423(c) bears a rational relationship to the Optional Protocol, which
explicitly requires each member state to ensure that certain crimes
such as the sale of children for sexual exploitation are fully covered
under its criminal laws. Second, § 2423(c) reasonably implements the
Optional Protocol. Articles 3(3) and 4(2) require that countries take

41

appropriate measures to establish the liability of individuals for offenses such as paying a child for sex. Section 2423(c) creates the liability.

When the Senate voted to ratify the Optional Protocol, it stated that the provisions of the Protocol were non-self-executing, meaning Congress had to pass a law to implement the treaty. *See* 148 Cong. Rec. S5717-01, § 4, 2002 WL 1332171 (June 18, 2002). It then stated that because current United States law fulfilled the obligations of the Protocol, "the United States does not intend to enact new legislation to fulfill its obligations under the Protocol." *Id.* However, a year later Congress did enact legislation, including § 2423(c), that addresses the very concerns underlying the Optional Protocol. Therefore, the fact that the legislative history of the PROTECT Act is silent as to the source of Congressional authority for § 2423(c) should not be interpreted to mean that the statute was not, at least in part, an implementation of the Optional Protocol, as it criminalizes the very activity that the Protocol addresses–illicit sexual conduct engaged in by United States citizens who travel abroad.

Two district courts have published opinions upholding § 2423(c) as a valid exercise of Congress treaty-implementing power under the Necessary and Proper Clause, and no court has struck down § 2423(c) on that (or any other) basis. In *United States v. Bollinger*, 966 F. Supp. 2d 568 (W.D.N.C. 2013), the court upheld § 2423(c) on both Foreign Commerce Clause and Necessary and Proper grounds.[19] The court found that the Optional Protocol empowered Congress to pass § 2423(c) as necessary and proper to the implementation of a non-self-executing treaty. *Id.* at 574-75 (citing *Holland*, 252 U.S. at 432). The court then found that § 2423(c) bears a rational relationship to the Optional Protocol which explicitly exhorts signatories to criminalize sexual exploitation of children. *Id.* at 575.

## B. Section 2423(c) Applies To Defendant's Criminal Conduct

### 1. *Standard of Review*

This Court reviews questions of statutory interpretation de novo. *United States v. Watson*, 792 F.3d 1174, 1177 (9th Cir. 2015).

---

[19] The Third Circuit affirmed only on Foreign Commerce Clause grounds, finding that it need not reach the issue of § 2423(c)'s constitutionality under the Necessary and Proper Clause.

**2.    The Statute Applies to Defendant's Offense Conduct**

**a.    The statute applies to any United States citizen who travels in foreign commerce and engages in illicit sexual conduct**

Defendant contends that because he was a resident, not a tourist, in Cambodia, his conduct fell outside § 2423(c).  Defendant is wrong.  The plain language of the statute clearly applies to any U.S. citizen who travels in foreign commerce and engages in illicit sexual conduct, regardless where the person resides.  The fact that defendant continuously abused victims in a rental house, rather than in a brothel during a short vacation to Cambodia, does not take his conduct outside the statute.  Regardless where defendant resided, he traveled in foreign commerce from Los Angeles to Cambodia.

In enacting § 2423(c) to reach "[a]ny United States citizen . . . who travels in foreign commerce, and engages in any illicit sexual conduct with another person," Congress did not limit the statute's applicability to citizens who reside in the United States.  *Cf. Pendleton*, 658 F.3d at 304 ("The crime of conviction thus comprises three elements: (1) being a United States citizen or permanent resident; (2) traveling in foreign commerce; and (3) engaging in illicit sexual conduct.").  Defendant does

44

not dispute that he was a United States citizen and that he traveled to and from the United States during the relevant time period. His place of residence at the time he committed the crimes is irrelevant.[20]

Defendant argues that §2423(c) does not apply to an American citizen who resides in, rather than just travels to, a foreign country. (AOB 43-46.) Defendant's argument is flawed because the statute makes no distinction between U.S. travelers and foreign residents but rather applies to any American citizen who travels in foreign commerce. At the time of defendant's criminal conduct, he was a U.S. citizen who traveled in foreign commerce.

Defendant's argument is inconsistent with *Clark*. The *Clark* defendant "primarily resided in Cambodia from 1998 until his extradition in 2003." 435 F.3d at 1103. Although the defendant did not

---

[20] Defendant's claim that he had permanently relocated to Cambodia is undercut by the facts. Defendant traveled to Cambodia in September 2005 with a valid United States passport that bore a California address. (GER 22.) Throughout 2005, defendant had social security and veteran's benefits deposited into his credit union account in California. Defendant maintained his California driver's license, renewing it in September 2002 and 2007, both times listing his residence in California. Defendant also maintained a storage space in Colorado. On January 13, 2003, he wrote a letter to that facility providing a change of address to California. (GER 104-10.)

contest the applicability of the statute on this ground, this Court also did not find it problematic that the defendant "primarily resided" in Cambodia for the five years preceding his arrest. Rather, the Court explained that the statute clearly applied to the defendant as a "[U.S.] citizen . . . who travel[ed] in foreign commerce" and "engaged in illicit sexual conduct." *Id.* at 1107-09; *see also id* at 1106-07.

Defendant's focus on the term "sex tourism" is misplaced as it ignores the purpose of the statute and Congress intent in enacting it. (AOB 44.) Nothing in the legislative history, statutory language or case law can be fairly read to define "sex tourism" or limit the statute to "sex tourists."[21] As defendant's argument addresses the traveler's intent, it is irrelevant to § 2423(c), which eliminated the intent requirement of § 2423(b) in order to reach a broader class of criminals. Congress eliminated the intent requirement so that "the government would only

---

[21] The defendant in *Clark* made the same argument before the district court. *United States v. Clark*, 315 F. Supp. 2d 1127, 1130 (W.D. Wash. 2004). The court rejected this claim, finding that the defendant was "attempting to add elements to the crime with which he is charged (and to which he pled guilty) that simply do not exist in the statute." *Id.* at 1130. Even if he was a resident of Cambodia, he was "within the class of persons whose conduct Congress intended to criminalize by enacting 18 U.S.C. § 2423(c).

46

have to prove that the defendant engaged in illicit sexual conduct with a minor while in a foreign country."  H.R. Rep. No. 107-525, at 2; *Clark*, 435 F.3d at 1108.  Likewise, it does not make sense that Congress would limit the statute to offenders on a "sex tour," but exclude those who travel on their own to a foreign place and sexually abuse children.

In March 2013, Congress amended 18 U.S.C. § 2423(c) to include a U.S. citizen who "resides, either temporarily or permanently, in a foreign country, and engages in any illicit sexual conduct with another person."  Pub. L. No. 113-4, 127 Stat. 142 (2013).  The amendment has no effect on defendant.  Regardless where defendant resided, in September 2005 he traveled in foreign commerce from Los Angeles to Cambodia.  The addition of the "or resides, temporarily or permanently, in a foreign country" language did not eliminate or alter the "travels in foreign commerce" language.

The amendment was intended to close the loophole of the prior version of the statute that did not criminalize the illicit sexual conduct committed by Americans residing abroad who had not traveled in foreign commerce.  The clause to extend the reach of §2423(c) to U.S. citizens residing abroad was first considered as part of the Trafficking

47

Victims Protection Reauthorization Act (TVPRA) of 2011. S. Rep. No. 112-96 (2011). A Senate Judiciary Committee report regarding the TVPRA of 2011 stated that the goal of the bill was to "combat the scourge of human trafficking in the United States and around the world." S. Rep. No. 112-96, at 18. Specifically referencing the relevant change to § 2423(c), the report stated that § 2423(c) was "strengthened to hold criminally liable those U.S. citizens and lawful permanent residents residing outside of the United States who engage in illicit sexual conduct with a minor. Current law only reaches U.S. citizens and lawful permanent residents who travel abroad in foreign commerce." *Id.* at 8.

The amendment's elimination of a "travel" requirement for American citizens who reside abroad and engage in illicit sexual conduct clearly serves to criminalize conduct that was formerly not covered by the statute if the U.S. citizen residing abroad did not travel. Regardless where defendant resided, he traveled in foreign commerce

from Los Angeles to Cambodia.[22]  Thus, his illicit sexual conduct was

properly covered by § 2423 both before and after it was amended.[23]

### b. *Defendant engaged in illicit sexual conduct within a reasonable time after he traveled to Cambodia*

Defendant's claim that this Court should limit § 2423(c) to cases

where the gap between the defendant's travel in foreign commerce and

his illicit sexual conduct is no greater than the two months found

acceptable in *Clark* (AOB 42-51) should be rejected.  The plain language

of the statute is silent regarding any temporal link between the travel

and illicit sexual conduct elements.  Furthermore, no court has imposed

a bright-line temporal requirement as defendant suggests.

There is nothing in § 2423(c) that could be interpreted as imposing

any temporal relationship between the elements of the offense.  Section

---

[22] Furthermore, the passage of a statute does not retroactively restrict the scope of pre-existing statutes.  *Radzanower v. Touche Ross*, 426 U.S. 148, 154 (1976).

[23] Defendant's argument that the travel element of §2423(c) is completed when a defendant arrives in a foreign country rather than when a defendant "takes up residence in a foreign country" (AOB 46-47) is both irrelevant to any issue in this appeal and is contradicted by this Court's finding in *United States v. Jackson*, 480 F.3d 1014, 1023-24 (9th Cir. 2007), that either definition is plausible.

2423(c) imposes criminal liability on any U.S. citizen "who travels in foreign commerce, and engages in any illicit sexual conduct with another person."  There is no requirement that the illicit sexual conduct occur within any specific period of time after travel.

In *Clark*, this Court stated that "[t]he statute is plain on its face" and "unambiguous."  435 F.3d at 1107.  In *Clark*, the lapse in time between the defendant's travel and his arrest in Cambodia was less than two months, and the Court stated that "[w]e see no plausible reading of the statute that would exclude itas application to [the defendant's] conduct because of this limited gap."  *Id.* at 1107.

In *Clark*, this Court explicitly declined to find a temporal nexus between the requisite travel and illicit sexual conduct elements of the statute:  "Whether a longer gap between the travel and commercial sex act could trigger constitutional or other concerns is an issue we leave for another day."  *Clark*, 435 F.3d at 1107 n.11; *see also United States v. Jackson*, 480 F.3d at 1024 (under *Clark*, "a lapse in time between a defendant's travels and his sex act will ordinarily not preclude prosecution under the statute").

50

Every court to have considered this issue has concluded that
§ 2423(c) is constitutional even where the gap between the travel in
foreign commerce and the illicit conduct is longer than the two months
approved in *Clark*. *See, e.g. Pendleton*, 658 F.3d at 301 (affirming
§ 2423(c) conviction where defendant's illicit sexual conduct abroad took
place six months after travel); *Flath*, 845 F. Supp. 2d at 955 (denying
motion to dismiss a § 2423(c) count where the gap between travel and
arrest was almost four years); *Phillips v. United States*, 2011 WL
4436526 at *1 (E.D. Tenn. Sept. 23, 2011) (rejecting a habeas corpus
challenge in a case involving a gap of almost three years between travel
and illicit conduct); *cf. United States v. Stokes*, 726 F.3d 880, 886 (7th
Cir. 2013) (affirming conviction under related § 2423(b) "travel with
intent" statute where indictment charged a five-month gap between
initial travel in foreign commerce and the illicit sexual conduct).

In denying defendant's motion to dismiss, the court held that
"there is nothing in the text of § 2423(c) that could be interpreted as
imposing any temporal relationship between the elements of the
offense" (ER 7) and rejected his claim that the statute requires a close
temporal proximity between travel and illicit sexual conduct: "Under

51

*Clark*, an eight or nine month gap between travel and illicit sexual conduct does not render application of § 2423(c) in excess of Congress's foreign commerce power." (ER 5.) The court specifically found that because Congress's foreign commerce power is construed broadly and the *Clark* Court held that a defendant's illicit sexual conduct engaged in two months after travel fell "squarely within" that authority, "an asserted eight or nine month gap between travel and engaging in illicit sexual conduct would not render application of § 2423(c) in excess of Congress's foreign commerce power." (ER 4.)

The first superseding indictment charged defendant with engaging in illicit sexual conduct, after traveling in foreign commerce, between September 1, 2005 and June 12, 2006. (ER 372-73.) Although the government presented evidence that defendant's criminal conduct began as early as December 2005,[24] defendant disputed this evidence, and the court found no need to resolve the dispute because it found that

---

[24] This evidence consisted of disks dated December 2005 through February 2006 that contain photographs of some of the victims at defendant's house. (GER 106, 109.)

"even an eight or nine month gap would not be grounds for dismissal." (ER 3 n.2.)

The facts adduced at trial conclusively demonstrated that defendant's sexual abuse of his victims began earlier. This evidence includes: (1) photographs of L.K. at defendant's house in November 2005 and on Christmas Day 2005 (ER 812; GER 70-71) coupled with her testimony that she lived with defendant from before Christmas 2005 until defendant's arrest in June 2006 (ER 816-17) and that defendant raped her many times (ER 822); (2) testimony of N.T.D. that she lived at defendant's house for one week in 2005 (ER 906) and that defendant raped her many times (ER 913); (3) a photograph of S.R. taken at Christmastime 2005 by defendant (ER 1007-08; GER 72-73) and her testimony that she performed oral sex on defendant (ER 1012-15); and (4) photographs of T.C taken at defendant's house in February 2006 and her testimony that defendant raped her more than once and required her to perform oral sex on him along with other girls for two or three weeks (ER 774-76, 786, 779-81; Ex. 1398, 1402). Thus, the trial record shows that defendant was sexually abusing these victims three to five months after his travel to Cambodia.

Defendant advocates a narrow interpretation of the statute that would preclude liability whenever sexual abuse begins more than two months after the travel in foreign commerce.  Section 2423(c) does not impose any such temporal relationship; it imposes criminal liability on "[a]ny United States citizen . . . who travels in foreign commerce and engages in any illicit sexual conduct with another person."  As the district court noted, if Congress had intended that the illicit sexual conduct must occur within a specified period of time after the travel it could have explicitly said so.  "It did not.  The statute is simply silent on the temporal relationship between the elements."  (ER 7.)

Defendant argues that the word "and" joining the elements of the offense indicates a temporal nexus between the travel and the illicit sexual conduct because the function of the word "and" "is to introduce a historical sequel or consequence of a fact."  (AOB 49-50.)  However, as the court found, "arguing that 'and' means 'then' and that 'then' means 'immediately soon afterward' does not establish the plain meaning of the word 'and.'  In ordinary usage, 'and' means 'and.'"  (ER 7.)  Defendant provides no support for his interpretation.  It is clear that

the absence of any temporal link or time limit in the plain language of the statute was intentional.

Defendant contends that § 2423(c)'s history supports his position, stating that "the target of that provision was 'sex tourism,' which implies a sex act occurring soon after travel." (AOB 50.) Defendant's argument is unfounded. The legislative history does not support defendant's assumption but rather illustrates § 2423(c)'s broad purpose to "address a number of problems related to persons who travel to foreign countries and engage in illicit sexual relations with minors," and to "close significant loopholes in the law that persons who travel to foreign countries seeking sex with children are currently using to their advantage in order to avoid prosecution." H.R. Rep. No. 107-525, at 3.

Given this intent, it makes no sense that Congress would severely limit the statute to those instances in which the sexual abuse occurred "immediately" or "soon after" the travel as defendant advocates. Likewise, it is nonsensical that Congress would limit the statute's reach to defendants on a "sex tour," and exclude those who reside in a foreign place and sexually exploit minors for a potentially longer period of time.

Defendant urges this Court to apply the rule of lenity and the canon of constitutional avoidance. (AOB 50-51.) Neither doctrine applies here. The Supreme Court has found the rule of lenity "to be 'inapplicable unless there is a grievous ambiguity or uncertainty in the language and structure of the [law], such that even after a court has seize[d] everything from which aid can be derived, it is still left with an ambiguous statute.'" *United States v. Devorkin*, 159 F.3d 465, 469 (9th Cir. 1998) (citations and quotations omitted). Moreover, the canon of constitutional avoidance has no place here, as defendant fails to cast any doubt on § 2423(c)'s constitutionality.[25]

## C. The Court Correctly Found That The Searches Of Defendant's Residence, Computer And Computer Media Were Proper

### 1. *Standard of Review*

This Court reviews a district court's determination of a motion to suppress de novo and its factual findings for clear error. *United States v. Becker*, 23 F.3d 1537, 1539 (9th Cir. 1994).

---

[25] Defendant's citation to *Johnson v. United States*, 135 S. Ct. 2551 (2015), is misleading, as that case has nothing to do with § 2423(c) but rather concerns the residual clause of the Armed Career Criminal Act.

**2. *The Search of Defendant's Cambodia Rental House Was Proper Because It Was Not a Joint Venture and, in any Event, Complied with Cambodian Law***

> **a. *The search conducted by the Cambodian National Police was not a joint venture with United States law enforcement***

Generally, neither the Fourth Amendment nor the exclusionary rule applies to acts of foreign officials. *United States v. Barona*, 56 F.3d 1087, 1091 (9th Cir. 1995). Thus, evidence obtained by foreign police officers from searches conducted in their own countries is generally admissible, regardless whether the search complied with the Fourth Amendment. *See Stonehill v. United States*, 405 F.2d 738, 743 (9th Cir. 1968) ("Neither the Fourth Amendment of the United States Constitution nor the exclusionary rule of evidence, designed to deter Federal officers from violating the Fourth Amendment, is applicable to the acts of foreign officials."). Two "very limited exceptions apply." *Barona*, 56 F.3d at 1091. The first occurs "if the circumstances of the foreign search and seizure are so extreme that they 'shock the [judicial] conscience,' [so that] a federal appellate court in the exercise of its

57

supervisory powers can require exclusion of the evidence." *Id.* (internal

quotation omitted; alteration in original).[26]  The second exception

> applies when United States agents' participation in the
> investigation is so substantial that the action is a joint
> venture between United States and foreign officials.  If a
> joint venture is found to have existed, the law of the foreign
> country must be consulted at the outset as part of the
> determination whether or not the search was reasonable.  If
> foreign law was not complied with, the good faith exception
> to the exclusionary rule becomes part of the analysis.

*Id.* at 1092-93.

"Whether the search does become a joint venture can be

determined only by a comparison of what the Federal agent did in the

search and seizure with the totality of acts done in the search and

seizure." *Stonehill*, 405 F.2d at 744.  Whether the involvement of

United States agents rises to the level of substantial participation is a

fact-specific inquiry, with no one factor being determinative. *See, e.g.*,

*United States v. Benedict*, 647 F.2d 928, 930 (9th Cir. 1981) (no joint

venture where search initiated by Thai police under Thai law, search

warrant procured under Thai law, and DEA agents invited by Thai

---

[26] Defendant does not contend that the search of his Cambodian residence shocked the judicial conscience.

police to accompany them during search); *United States v. Maher*, 645 F.2d 780, 783 (9th Cir. 1981) (no joint venture where investigation initiated and controlled by Canadian police with limited support and assistance from American officials in the United States); *United States v. Rose*, 570 F.2d 1358, 1362 (9th Cir. 1978) (no joint venture where United States Customs officials did not direct or request Canadians to search defendant's luggage, did not participate in the search, and "[t]here is no evidence that United States agents were attempting to undermine the Fourth Amendment rights of a citizen by circuitous and indirect methods." (citations omitted)); *Stonehill*, 405 F.2d at 741-42, 745 (no joint venture where United States officials present during planning of searches in the Philippines and a few days after the searches obtained some of the seized evidence). By contrast, in *United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987), this Court found substantial participation where DEA agents termed their actions a "joint investigation," were involved daily in translating and decoding transmissions from a Philippine wiretap, and assumed a substantial role not subordinate to that of Philippine authorities.

United States participation has been deemed substantial enough to constitute a joint venture where the investigation was essentially initiated and carried out by United States law enforcement in a foreign country. Here, Cambodian authorities initiated the investigation into defendant's violation of Cambodian law, and the decision to arrest defendant and search his residence was made solely by them. The actual seizures and custody of the evidence were in furtherance of a Cambodian prosecution for violation of Cambodian law. AIA Phillips did not initiate or carry out a joint investigation with the CNP. NGOs independently informed both CNP and ICE that they had received information that defendant had sexually abused children. (ER 160.) When they so informed AIA Phillips, the CNP had already begun its investigation of defendant. (ER 160.) The CNP surveilled defendant, located defendant's residence, obtained a search warrant, arrested defendant, executed the search warrant and seized substantial evidence, all without the assistance of AIA Phillips. (ER 160.) AIA Phillips did not instruct or advise the CNP to arrest defendant or obtain a search warrant. (ER 163.) AIA Phillips was present during the search in his capacity as a law enforcement agent conducting an

investigation into the violation of U.S. criminal laws separate from, but parallel to, the role of the CNP, which was to investigate, search for, and seize evidence pertaining to violations of Cambodian criminal law. Although AIA Phillips offered assistance to the CNP, they did not request help in their investigation until after the search.  (ER 162.)

Similarly, AIA Phillips conducted his own parallel investigation, without the assistance or participation of the CNP.  He interviewed I.T. outside the presence of the CNP, he was not present when the CNP arrested defendant for violating Cambodian law,[27] he did not instruct or advise the CNP to obtain a search warrant for defendant's residence in Cambodia, he did not assist the CNP in obtaining the search warrant, he did not execute the warrant, and he did not seize any evidence.[28]  His

---

[27] Defendant continues to contend that U.S. officials were present at the arrest without any support for this assertion and despite the fact that the district court found otherwise.

[28] Defendant points to a paragraph from an ICE report stating that several different agencies and NGOs, including ICE and the CNP, initiated an investigation into defendant's criminal activity as proof that the search was a joint venture between American and Cambodian authorities.  (AOB 71.)  However, defendant cites only to the introductory paragraph of what is a five-page report that, when read in its entirety, establishes that AIA Phillips actually conducted his own investigation, separate from but parallel to that of the CNP.  (ER 79-

(continued  . . . .)

presence during the search and his conduct during the search were solely in furtherance of his own investigation. These facts support the court's finding that there was no joint venture. *See Benedict*, 647 F.2d at 930-31 (presence of DEA agents at search did not render the investigation joint where decision to search was made solely by Thai authorities and seizures and arrest of defendant were effected in furtherance of Thai prosecution).

As the court correctly concluded, AIA Phillips' role in planning and executing the search was insubstantial. Although AIA Phillips was present at the search, took photographs, and observed evidence, this is not sufficient to make the search a joint venture. *See Stonehill*, 405 F.2d at 741-42 (U.S. agents' suggestion of areas to search and evidence to seize did not create joint venture). Likewise, that evidence from the search was later turned over to U.S. officials does not create a joint venture. *See id.*

---

83.) In fact, other than the first two introductory paragraphs, the rest of the report describes the substance of interviews with child victims conducted by AIA Phillips and an investigator from the U.S. Embassy, without the presence or assistance of the CNP.

Defendant insinuates that AIA Phillips was not telling the truth when he testified that he and ICE had nothing to do with the CNP's decision to obtain a search warrant for defendant's house. (AOB 74.) As support, defendant points to the Cambodian report used to obtain the warrant and its citation to reports the CNP had received from the U.S. Embassy and several NGOs. (ER 96-97.) In fact, the report does not support defendant's joint venture argument. First, there is no mention of either AIA Phillips or ICE generally anywhere in that report. Second, the only American entity referenced in the report is the U.S. Embassy. Third, the fact that the Cambodian report was based on a report by the American embassy does not transform the CNP investigation into a joint venture. In any event, nothing in that report contradicts AIA Phillips's testimony that he had no involvement in the CNP's obtaining and executing the search warrant for defendant's residence.

Defendant also misrepresents the role of AIA Phillips during the execution of the search. (AOB 74-76.) The record is uncontroverted that AIA Phillips neither participated in the search of defendant's Cambodian residence nor seized evidence during that search. Although

AIA Phillips was present, took photographs and touched a few items of evidence, the sole purpose of his presence was to further his own parallel investigation into violations of U.S. law by defendant.

As the court properly found, these activities do not establish a joint venture. They show at most a tangential role in the search and are consistent with AIA Phillips' statements that he was engaged in an independent, parallel investigation. Such activities fall far short of the coordinated conduct in cases finding a joint venture. *See Barona*, 56 F.3d at 1094 (finding a joint venture where "American agents requested the wiretaps, information obtained was immediately forwarded to them, and throughout the surveillance a Spanish to English interpreter was provided by the United States."); *Peterson*, 812 F.2d at 490 (finding joint venture where U.S. agents were "involved daily in translating and decoding intercepted transmissions, as well as advising the Philippine authorities of their relevance.").

Defendant's contention that the video of portions of the search shows a joint venture (AOB 75-76) is without merit. As the court stated, the video showed AIA Phillips looking through documents at the end of the search, picking up a stuffed animal, telling a CNP officer that

64

he should seize a bottle of oil that one victim had told AIA Phillips was used in sexually assaulting her, asking CNP to seize a wooden carving of a fish that a victim had described as above defendant's bed, and shining a black light on a mattress. These activities do not establish a joint venture. They show AIA Phillip's tangential role in the search and are consistent with his statements that he was engaged in an independent, parallel investigation. They fall far short of the coordinated conduct in cases fining a joint venture.

Defendant also points to reports prepared by Cambodian authorities after the search listing AIA Phillips and other American law enforcement agencies as "participants" in a "combined force," and a receipt showing that some of the seized evidence was provided to U.S. law enforcement soon after the last day of the search as establishing a joint venture. (AOB 76.) Neither CNP's subsequent characterization of the search, nor its decision after seizing considerable evidence to provide some of it to U.S. officials constitute the substantial participation required to show a joint venture

Finally, a PowerPoint slide shown by AIA Phillips at a subsequent training stating that U.S. and Cambodian law enforcement agencies

"coordinated" the execution of defendant's arrest warrant (AOB 76-77) does not establish a joint venture. The court heard AIA Phillips' testimony and found that the presentation, which was compiled by multiple authorities and was not intended to detail the respective activities of U.S. and foreign agents relating to defendant's arrest, did not impeach AIA Phillips' testimony that U.S. officials were not involved in defendant's arrest. The court credited AIA Phillips' testimony that the presentation reflected the fact that the CNP kept U.S. officials informed of the arrest. (ER 267-68, 278-80, 2419.)

As the court correctly found, AIA Phillips's conduct during the investigation, arrest, and search was not that of a participant but rather, that of a fellow law enforcement agent who is conducting his own investigation into defendant's violations of American, not Cambodian, law. AIA Phillips had no role in the procurement of an arrest warrant and subsequent arrest of defendant. He had nothing to do with the CNP's preparation of a search warrant for defendant's residence and functioned independently during the execution of the search. His suggestion that the CNP officers seize several items of relevance to the American investigation does not require a finding that

the search was a joint venture. The use of terms such as "participant" and "coordinated" during events that occurred subsequent to the search does not counterbalance the actual activities of American and Cambodian law enforcement authorities during the course of their independent investigations. Because the district court properly held that the Cambodian search was not a joint venture with American agents, it was not subject to the Fourth Amendment.

### b. In any event, the search of defendant's Phnom Penh residence complied with Cambodian law

Defendant contends that the court erred in finding that the search complied with Cambodian law. (AOB 79-82.) Because the search was not the product of a joint venture, the Fourth Amendment does not apply, and whether the search complied with Cambodian law is irrelevant. (AOB 79-82.) Defendant's argument also should be rejected because the search complied with Cambodian law.

As required by Cambodian law, the search was conducted in the presence of defendant and two witnesses who were family members, neighbors, or owners of the building. The Cambodian residential search report states that defendant was present during the search. (ER 168.) The report also shows that 10 witnesses were present during the search

in addition to the owner of the house and two of the victims. (ER 147, 167-68.) Defendant's claim that the inclusion of AIA Phillips, a U.S. Embassy representative and an NGO official does not count because they are listed as "participants" rather than "witnesses" and that the government is required to show the presence of "defendant-friendly" witnesses (AOB 81) is unfounded. Cambodian law does not require the presence of "defendant-friendly" witnesses; the applicable Cambodian law provides only that "searches must be conducted in the presence of the suspect and two witnesses, preferably neighbors or owners of the building."[29] Defendant's argument must therefore be rejected.[30]

### 3. *The Singapore Search Satisfied the Fourth Amendment Because It Was Reasonable and Complied with Cambodian Law*

The court held that the Singapore search of computer media seized from defendant's Cambodian residence was a joint venture because it was conducted at the request of Cambodian officials, and

---

[29] *See* Article 20, Provisions Relating to the Judiciary and Criminal Law and Procedure Applicable in Cambodia During the Transitional Period. (ER 147.)

[30] Defendant's claim that the search was not conducted in good faith has no support in the record. (AOB 81-82.)

thus fell within the reasonableness requirement of the Fourth Amendment. (ER 18.)[31] The court further held that compliance with Cambodian law is sufficient to meet the requirements of the Fourth Amendment and that the Singapore search did comply with Cambodian law. (ER 21-24.) The court also found that the Singapore search was conducted in good faith. (ER 24-25.)

Defendant contends that the Singapore search was subject to the Fourth Amendment's warrant clause. The law is well settled that in a joint venture case, the search must comply with the Fourth Amendment's reasonableness requirement; however, this Court has never required a warrant issued in the United States as a prerequisite

---

[31] Defendant's claim that the forensic examination of computer media in Singapore was the result of an American request for assistance (AOB 82-83) is based on a letter submitted by the U.S. Embassy in Cambodia to the Cambodian Police Commissioner General purporting to be an American request for assistance. (ER 99.) However, in both his declaration and at the suppression hearing, AIA Phillips explained that although it was the CNP that requested assistance in the forensic examination of the computer media, they asked him to write the letter to the Cambodian Police Commissioner General so that it would not appear as if Cambodian authorities needed help from U.S. agents. (ER 164-65, 287-88.) The district court specifically stated that it "credits this testimony." (ER 17.) Such credibility determinations are virtually untouchable on appeal. *See United States v. Hovsepian*, 422 F.3d 883, 885 (9th Cir. 2005) (en banc).

for admitting evidence from a foreign search. *See Barona*, 56 F.3d at 1095 (allowing evidence because the court was "satisfied that Danish law was followed"); *United States v. Juda*, 46 F.3d 961, 969 (9th Cir. 1995) (rejecting defendant's Fourth Amendment claims). In fact, no court to date has required a warrant for a foreign search.

In *Barona*, this Court noted that "foreign searches have neither been historically subject to the warrant procedure, nor could they be as a practical matter." 56 F.3d at 1092 n.1. Likewise, in *In re Terrorist Bombings of the U.S. Embassies in East Africa ("Odeh")*, 552 F.3d 157, 167 (2d Cir. 2008), the Second Circuit held that the Fourth Amendment's warrant requirement does not govern searches conducted abroad by U.S. agents, and that such searches need only satisfy the Fourth Amendment's reasonableness requirement. In *Odeh*, the court explained that the Supreme Court provided guidance in *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274 (1990),[32] where the Court expressed doubt that the warrant clause governed overseas searches

---

[32] Although the Court's holding applied to a search by American authorities of the Mexican residence of a Mexican citizen and resident, the principles discussed in the opinion regarding the application of the warrant clause to searches abroad are relevant here.

conducted by U.S. agents, noting that a search warrant issued in the United States to search in a foreign country would be a "dead letter outside the United States."[33]

The court in *Odeh* stated that a number of factors "weigh against imposing a warrant requirement on overseas searches. The court explained that "[f]irst, there is nothing in our history or our precedents suggesting that U.S. officials must first obtain a warrant before conducting an overseas search," and "[s]econd, nothing in the history of the foreign relations of the United States would require that U.S. officials obtain warrants from foreign magistrates before conducting searches overseas or, indeed, to suppose that all other states have search and investigation rules akin to our own." 552 F.3d at 169-70. "Third, if U.S. judicial officers were to issue search warrants intended to have extraterritorial effect, such warrants would have dubious legal significance, if any, in a foreign nation," and "[f]ourth and finally, it is

---

[33] *See also id.* at 278 (Kennedy, J., concurring) (explaining that several factors counsel against overseas application of the warrant requirement, including "[t]he absence of local judges or magistrates available to issue warrants, the differing and perhaps unascertainable conceptions of reasonableness and privacy that prevail abroad, and the need to cooperate with foreign officials.").

by no means clear that U.S. judicial officers could be authorized to issue warrants for overseas searches." *Id.* at 171.

What the Fourth Amendment requires above all is reasonableness, and the case law is clear that in a joint venture case, compliance with foreign law satisfies this reasonableness standard. *Juda*, 46 F.3d at 968 ("a foreign search is reasonable if it conforms to the requirements of foreign law."). Joint ventures by their nature involve substantial U.S. participation, yet their reasonableness is judged by compliance with foreign law. *Barona*, 56 F.3d at 1092. As the Court explained in *Barona*, 56 F.3d at 1093 n.1, "[c]ompliance with foreign law alone determines whether the search violated the Fourth Amendment." This is true even where United States officials direct foreign law enforcement authorities to gather information for the United States officials' use. *See Barona*, 56 F.3d at 1094. In *Barona*, a foreign search directed by U.S. officials where information obtained was immediately forward to U.S. officials was deemed to meet Fourth Amendment requirements where local search and seizure law was observed. *See id.* at 1094-95. Even if such a search is unreasonable under foreign law, evidence obtained in the search is not excluded if the

U.S. participants acted in the good faith belief that the search complied with local law.  *Id.* at 1092-93.[34]

Accordingly, the court properly found that the Fourth Amendment's reasonableness requirement applies here and that compliance with Cambodian law was sufficient to meet this standard. Defendant does not contest the court's finding that the Singapore examination complied with Cambodian law.  (ER 24.) Therefore, the validity of the Singapore search should be affirmed.[35]

### 4.    The Court Properly Found That the Search of Defendant's Computer Media Pursuant to a United States Search Warrant Was Valid

Defendant contends that the U.S. search of computer disks seized from his Cambodian residence was invalid because the "vast majority" of the affidavit underlying the U.S. search warrant stated information learned during the forensic analysis of defendant's computer and

---

[34] Defendant's assertion that AIA Phillips "deliberately" sent the computer and computer media seized from defendant's residence to ICE Bangkok instead of to the United States to avoid obtaining an American warrant (AOB 86) is without any basis in the record and contracted by the court's finding that AIA Phillips's testimony was credible.

[35] The court also found that the forensic examination was carried out in good faith.  (ER 24-25.)

computer media in Singapore, which, defendant argues, was an unconstitutional search.  (ER 182-200.)  Defendant further claims that, even if the information obtained from the Singapore search is excised from the warrant underlying the U.S. search warrant, there remains insufficient probable cause to support the U.S. search of defendant's computer disks.

The court held that the Singapore forensic examination was constitutional because, as the product of a joint venture, it complied with Cambodian law.  (ER 24.)  Affirmance would therefore preclude defendant's claims.  However, even if this Court finds that the evidence from the Singapore examination was improperly included in the subsequent U.S. search warrant, sufficient probable cause remains in the redacted affidavit to support the search.

"'[E]vidence which is obtained as a direct result of an illegal search and seizure may not be used to establish probable cause for a subsequent search.'"  *United States v. Barajas-Avalos*, 377 F.3d 1040, 1054 (9th Cir. 2004) (quoting *United States v. Wanless*, 882 F.2d 1459, 1465 (9th Cir. 1989)).  Nonetheless, "the mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the

evidence seized pursuant to the warrant." *United States v. Heckenkamp*, 482 F.3d 1142, 1149 (9th Cir. 2007) (quoting *United States v. Reed*, 15 F.3d 928, 933 (9th Cir. 1994)); *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987).

Thus, "[w]hen an affidavit contains evidence illegally obtained, '[a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant.'" *Barajas-Avalos*, 377 F.3d at 1054 (quoting *Vasey*, 834 F.2d at 788); *see Heckenkamp*, 482 F.3d at 1149. "Probable cause means only a 'fair probability,' not certainty, and requires consideration of the totality of the circumstances." *United States v. Hill*, 459 F.3d 966, 970 (9th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). If, after redacting the warrant, the reviewing court determines that there is probable cause and that the agents would have sought the warrant without the excised information, then the warrant stands. *See Murray v. United States*, 487 U.S. 533, 542-43 (1988); *United States v. Duran-Orozco*, 192 F.3d 1277, 1281 (9th Cir. 1999).

The court found that, after excising all references to evidence obtained in the Singapore search,[36] the affidavit detailed the following: (1) the victims' identification of defendant as the person who sexually abused them, (2) the labeling of computer media to be searched with names indicating that they contained child pornography, and (3) a letter from defendant to his sister in which defendant mentioned several of his victims by name, described massages by his victims that led to "inappropriate touching, etc.," described binding and slapping one of the victims after taking Viagra, and recounted taking and storing on his computer naked pictures of two nieces of the prostitute who brokered the sale of victims for him (Basang). (ER 15.) The court concluded that, after excising all references to the Singapore search from the affidavit, the remaining portions of the affidavit provided sufficient probable cause to support the search warrant. (ER 15.)

Defendant contends that the unredacted information in the affidavit was insufficient to provide probable cause that he produced

---

[36] This finding was stated in the court's December 5, 2007 order. The court ruled that the Singapore search was valid on February 7, 2008. (ER 24.)

child pornography because "[t]he titles alone on a couple of the CDs without any discussion of their actual content do not create a fair probability that they contained child pornography." (AOB 90.) Defendant is wrong. First, searching defendant's computer when defendant possessed disks entitled "14 Years Old Unsensor" and "15 years old little girls with crazy sex event" (ER 191) was not only sufficient to create a reasonable inference that these disks contained child pornography but, when coupled with defendant's admission that he took naked pictures of Basang's two nieces and stored them on his computer[37] (ER 197), also supported probable cause to search his computer and computer media for evidence of child pornography production.

Second, defendant contends that the excised affidavit does not provide probable cause to believe that he engaged in illicit sexual conduct with minors because it did not describe the specific evidence of sexual abuse that was seized from defendant's residence and there was

---

[37] Defendant's self-serving claim that he erased these files, even if true, at least demonstrates that he had stored these images on his computer at some point.

77

no indication that the accounts of defendant's rape and sexual abuse by four child victims was credible. (AOB 90-91.) The affidavit need only show a "fair probability" that evidence of the alleged crimes would be found on the specified computer media. The fact that the affidavit alleges evidence of sexual abuse was seized during the search of his home and the statement that four minors told AIA Phillips that defendant sexually abused them provides that fair probability. Defendant also asserts that the letter to his sister does not constitute evidence of sexual abuse. While the letter itself may not be evidence beyond a reasonable doubt, it is certainly sufficient for that inference to be drawn, as defendant stated in his letter that a "child victim" was given to him by the victim's mother to serve as his "wife/girlfriend." (ER 197.) The letter also contains defendant's admission that he took naked pictures of Basang's two nieces. (ER 197.)

Defendant also claims that the affidavit was deficient because it did not provide a connection between the child pornography sought and defendant's crimes which, according to defendant, do not involve the use of pornography. (AOB 91.) Defendant's argument is based on a faulty assumption, and his reliance on *United States v. Cordero-Rosario*, 786

F.3d 64 (1st Cir. 2015), is misplaced. First, in *Cordero-Rosario*, the only crime under investigation was the commission of lewd acts against a minor in violation of Puerto Rico law, *id.*at 69, which does not require the possession of pornography. Here, the crimes under investigation included the production of sexually explicit depictions of a minor for importation into the United States, in violation of 18 U.S.C. § 2260. (ER 182.) This offense, by its very nature, involves child pornography since possession of the product of the crime—i.e., child pornography—is often used as proof of its production.

Second, the affidavit in *Cordero-Rosario* sought pornography, which, unlike child pornography, is legal to possess. As the First Circuit stated, "the affidavit says nothing at all about why the existence of otherwise lawful pornography on a home desktop computer would be relevant to" an investigation into the crime of lewd acts against a minor. *Id.* at 70. Here, by contrast, the list of items to be seized was limited and included only visual depictions of minors (including some of the victims in this case) and any material that identified any of the minors depicted, correspondence related to child pornography, and material containing child erotica, which, the affidavit explains, are

"materials that are sexually arousing to individuals who are sexually interested in minors" but are not child pornography. (ER 181.)

Finally, the affidavit provided a sufficient connection between these items and the stated crimes because, even after excising any information obtained from the Singapore search,[38] the affidavit states that, in defendant's letter to his sister, he admitted possession of "dozens of pornographic and sexually-explicit photographs" of several of his child victims on his computer and also admitted taking naked pictures of two of Basang's nieces. (ER 197.)

Once probable cause is established, the only remaining issue that the Court must address is whether the ICE agents would have sought the search warrant without the evidence discovered in the Singapore search. *See Murray*, 487 U.S. at 542-43; *Duran-Orozco*, 192 F.3d at 1281. ICE SA Wang, the search warrant affiant, stated in his

---

[38] Of course, if the information obtained from the Singapore search is included in the affidavit, there can be no question that there was a sufficient nexus between the crimes under investigation and the items to be seized, as the affiant detailed the numerous visual depictions of minors engaging in sexually explicit conduct, including some of the victims in this case, on defendant's computer and computer media. (ER 191-96.)

declaration that ICE would have sought a search warrant for the computer disks even if it did not have any of the evidence examined in Singapore. (ER 171-72.) The court found the evidence in the redacted warrant sufficient for the agents to have sought the search warrant.

## D. The Evidence Was Sufficient To Sustain Defendant's Convictions

### 1. Standard of Review

"The standard of review employed in sufficiency of the evidence cases is highly deferential." *United States v. Rubio-Villareal*, 967 F.2d 294, 296 (9th Cir. 1992) (en banc). This Court must view the evidence "in the light most favorable to the prosecution and ask[] whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Blitz*, 151 F.3d 1002, 1006 (9th Cir. 1998) (citing and quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). In evaluating the evidence, the Court must draw all reasonable inferences favorable to the government. *United States v. Arriaga-Segura*, 743 F.2d 1434, 1435 (9th Cir. 1984).

## 2.    *The Victims Testified Truthfully*

Defendant contends that the testimony of the victims was contaminated by the manner in which they were interviewed prior to trial.  (AOB 15-19.)  This argument is meritless and is contradicted by the government's cross-examination of Dr. Michael Maloney, an expert in psychology, which demonstrated that the victims were not suggestible; in fact, they rejected the suggestions of their interviewers and made spontaneous statements that were incriminating to defendant.

Dr. Maloney conceded that leading questions do not necessarily elicit incorrect answers.  (ER 1565.)  He conceded that he worked primarily with adults, not children, and did not ordinarily work with children in criminal cases.  (ER 1568-69.)  Furthermore, when confronted with transcripts of interviews conducted with the victims in this case, Dr. Maloney was forced to admit that they contained open questions and spontaneous statements from the victims, were replete with information not suggested by the interviewers and demonstrated that the victims were not just giving memorized answers to the

questions but rather would listen to the question, and think about it before answering. (ER 1574-1608.)

The fact that the victims testified truthfully in this case is further demonstrated by the extensive physical evidence introduced at trial that corroborates their testimony. Dr. Maloney admitted that one of the best ways to determine if children are telling the truth is to find physical evidence that corroborates their statements. (ER 1565.)

### 3. *The Government Presented Overwhelming Forensic, Physical, and Testimonial Evidence to Corroborate the Testimony of the Victims*

Defendant's contention that the government failed to present sufficient forensic evidence to corroborate the victims' testimony (AOB 20-21) is contradicted by the trial record. Defendant specifically complains that there was no DNA evidence. However, the plethora of physical evidence introduced at trial, most of which was taken from defendant's own bedroom, was more than sufficient to corroborate the victims' testimony.

Among the myriad items of physical evidence introduced at trial, the government presented cloth strips and rope found in defendant's bedroom that were used to tie up some of the girls, drugs used to sedate

the girls so that they would be more complaint when defendant raped

them, as well as Viagra found in defendant's bedroom, homemade child

pornography found on defendant's computer, dollar bills defendant gave

to the victims each time they performed oral sex on him, baby oil and

KY lubricating jelly as well as defendant's own words as stated in a

letter to his sister and emails to a friend.  The testimony of the victims

was also corroborated by the testimony of Basang and Dr. Watson.

These items, among others, corroborated the testimony of the

victims:

- White rope and cloth strips found in defendant's

  bedroom corroborated testimony of victims I.T.,

  L.K., N.T.D., and T.C. that defendant tied them to

  the bed before raping them (ER 778-80, 821, 908,

  948-52; GER 1-4, 42-43) ;

- KY lubricating jelly corroborated I.T.'s testimony

  that defendant put cream on her vagina before

  raping her (ER 954; GER 36-37);

- Dollar bills corroborated the testimony of I.T. and

  S.R. who specifically stated that defendant gave

them dollar bills every time they performed oral sex

on him (ER 960-61, 1015-17; GER 50-51);

- Sedatives and other medications corroborated the

  testimony of victims T.C., S.R., L.K., and I.T., who

  all described being drugged before they were raped

  (ER 778-80, 819, 948, 1015-16; Ex. 1251-72);

- A bottle of baby oil corroborated the testimony of

  L.K. that defendant rubbed clear oil on his penis

  before raping her (ER 830) and the testimony of S.R.

  who testified that she rubbed oil on defendant's

  penis at his request (ER 1018; GER 52-53; Ex. 1183,

  1185);

- Naked pictures of L.K. found on defendant's

  computer corroborated her testimony that defendant

  took many naked photographs of her (ER 833-36,

  897-98; Ex. 1016-19); and

- Masking tape corroborated N.T.D. 's testimony that

  defendant put tape over her mouth to stop her from

screaming when he tied her up and hit her (ER 908-
10; Ex. 1172.)

The government presented more than 145 photos containing child
pornography which were found on the hard drive of defendant's
computer and one of the CDs. (ER 1160-75, 2463; Ex. 1309-23; 1357,
2096.) The government also presented more than 80 pornographic
photos of the child victims that were found on the hard drive of his
computer as well as on some of the CDs. (ER 1133-36, 1148-60, 2461;
GER 102-03) Several photos show L.K. standing next to defendant,
both of whom are nude. (ER 833-36, 897-98; Ex. 1016-19, 2086.)

Finally, defendant's attempt to minimize the impact of Dr.
Watson's testimony (AOB 20-21) also fails. She did not simply testify
that her physical examinations revealed evidence of vaginal
penetration. Rather, she testified in detail about the actual condition of
L.K.'s and I.T.'s vaginas and concluded that her examinations revealed
evidence of vaginal trauma, which she defined as forced penetration.
(ER 494-98.)

### 4.     Basang's Testimony Corroborated the Testimony of the Victims

Defendant contends that Basang's testimony was unreliable. (AOB 22-26.)  First, he claims that she had an incentive to cooperate because she was treated poorly in jail.  (ER 2162-80, 2208-12.)  (AOB 22.)  However, as Basang herself stated during her deposition, she was not promised release from prison in exchange for her testimony.  (ER 2210.)  Therefore, her cooperation did not result in any favorable change in the conditions of her confinement.

Second, defendant relies on a statement Basang gave to a Cambodian judge in October 2006 in which she denied seeing defendant sexually abuse anyone.  (AOB 22.)  However, Basang subsequently explained that she was told to say that by defendant's Cambodian lawyer who told her that otherwise she would go to prison.  (ER 2190.)

Third, the fact that the mothers of L.K. and S.R. and S.S. testified that they did not know anything about defendant's sexual abuse of their daughters (ER 1793-98, 1808, 2319-25) does not cast doubt on the reliability of Basang's testimony as defendant suggests.  (AOB 23-24.) The mothers may have been testifying falsely to avoid further criminal

liability in Cambodia[39] or out of embarrassment or shame that they had sold their daughters to defendant for sexual purposes or to avoid further criminal liability. Even if their testimony was truthful, however, it is of very limited value, as only one of the mothers was ever present with the girls in defendant's home overnight and that was for a limited period of time.

### 5. Defendant's Claim That He Had an Interest in Educating Cambodian Children Was Not Credible

The jury soundly rejected defendant's claim that his only purpose in having the victims live at his house was to provide them with an education. (AOB 26-28.) He presented testimony of Cambodian officials, most of whom were relatives, to try and paint a picture of himself as a benevolent person who traveled the country distributing school supplies to poor and remote areas. This behavior by was merely a front to mask his real interest in the girls, which was to rape and dominate them. This portion of the defense was not credible especially when contrasted with the painstakingly detailed testimony of six child

---

[39] Both Koueng Lang, mother of S.R. and S.S., and Ley Kim Eng, mother of L.K., were arrested along with defendant and Basang and spent time in prison in Cambodia. (ER 2287, 2362.)

88

victims, many of whom were visibly upset while they were on the witness stand.

**6.** ***Defendant's Letter to His Sister and Emails to Family Members Contained Tacit Admissions of His Illicit Sexual Conduct with the Child Victims***

Defendant contends that a letter he wrote to his sister after his arrest demonstrates that it was Basang, not defendant, who "was the driving force behind any misconduct" and that "she may have drugged" him. (AOB 29.) Defendant's claim that he sexually abused the victims because a Cambodian prostitute somehow tricked him into committing these crimes is not credible. This letter and several emails defendant sent to a friend are actually incriminating. These include:

- A letter defendant wrote to his sister stating, *inter alia*, that L.K.'s mother gave L.K. to defendant in a status somewhere between wife and girlfriend, that he tied up L.K. and hit her, that he had young girls living at his house who massaged him, that the massages later turned into inappropriate touching,

and that he thought Basang was teaching the girls things.[40] (ER 2428-53.)

- An email defendant sent to a friend that stated: "The sweet things I have with me have the most perfect little bodies and attitudes." (ER 2455); and

- An email to the same friend, in which defendant stated that one of the girls (later identified as N.T.D.) had never been to defendant's house before and that the first day "she was a bit of a bother" but that once they had a "'breakthrough' everything was great." (ER 2457).

## E. The Jury Instruction Regarding § 2423(c)'s Elements Was Proper

### 1. *Standard of Review*

Defendant's claim that that the court's jury instruction failed to include, as an element of § 2423(c), that the illicit sexual conduct must occur immediately or soon after the travel in foreign commerce is

---

[40] Defendant knew very well that Basang was teaching the girls how to perform oral sex on him because, as she testified, it was defendant who instructed her to do so.

reviewed de novo. *See United States v. Keiser*, 57 F.3d 847, 850 (9th Cir. 1995).

However, defendant's argument that the court erred by not giving a jury instruction stating that defendant is not guilty if he is a resident of Cambodia is reviewed only for plain error because, as defendant concedes (AOB 56), he never proposed that the court give such an instruction. *United States v. Chao Fan Xu*, 706 F.3d 965, 985 (9th Cir. 2013). To secure reversal under the plain error standard, defendant bears the burden of establishing four things: (1) there was error; (2) the error was plain, meaning that it was clear or obvious, rather than subject to reasonable dispute; (3) the error affected defendant's substantial rights, which in the ordinary case means it affected the outcome of the court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings. *United States v. Marcus*, 560 U.S. 258, 262 (2010) (internal quotation marks and alterations omitted); *Puckett v. United States*, 556 U.S. 129, 135 (2009).

### 2. The Court's Jury Instruction Regarding § 2423(c)'s Elements Was Proper

Defendant argues that the court's jury instruction regarding the elements of § 2423(c) was erroneous because it omitted two essential elements: (1) that defendant engaged in illicit sexual conduct immediately or soon after he traveled in foreign commerce (AOB 55) and (2) that he is not guilty if he was a resident of Cambodia (AOB 56). Both arguments fail because these are not elements of the crime; the court's refusal to instruct on these elements was not erroneous.

The government proposed that the court instruct the jury on the elements of § 2423(c) as follows:

> First, the defendant is a United States citizen;
>
> Second, the defendant traveled in foreign commerce; and
>
> Third, while in Cambodia, the defendant engaged in illicit sexual conduct during the time and with the person alleged in the particular count.

(ER 1947.) *See Clark*, 435 F.3d at 1114 ("The elements that the government must prove under § 2423(c)'s commercial sex acts prong are straightforward. First, the defendant must travel[ ] in foreign commerce. 18 U.S.C. § 2423(c). Second, the defendant must engage[ ] in any illicit sexual conduct with another person, *id.*, which in this case

92

contemplates any commercial sex act ... with a person under 18 years of age.  18 U.S.C. § 2423(f)(2).") (internal citations omitted); *Pendleton*, 658 F.3d at 304 ("The crime of conviction thus comprises three elements: (1) being a United States citizen or permanent resident; (2) traveling in foreign commerce; and (3) engaging in illicit sexual conduct. *See Clark*, 435 F.3d at 1105.");

Defendant proposed that the court add the following fourth element:  "Fourth, the defendant engaged in the illicit sexual conduct immediately or soon after the travel in foreign commerce."  (ER 1949.) The court declined to give this instruction.

The government's proposed instruction tracked the language of the statute.  Defendant sought to add an element not contained in the statute.  Nothing in the text of § 2423(c) imposes any temporal relationship between the travel in foreign commerce and engaging in illicit sexual conduct elements of the offense.

With regard to defendant's claim that the court should have *sua sponte* given an instruction that the jury could not find defendant guilty if he was a resident of Cambodia, there was no error, let alone plain error.  As discussed above, the statute contains no residency

93

requirement; it only requires that a U.S. citizen travels in foreign commerce and engages in illicit sexual conduct.

## F.    The Restitution Order Was Proper

### 1.    *Standard of Review*

Ordinarily, this Court reviews a district court's imposition of restitution for an abuse of discretion. *United States v. Zink*, 107 F.3d 716, 718 (9th Cir. 1997); *United States v. Soderling*, 970 F.2d 529, 534 (9th Cir. 1992).  Here, however, defendant failed to object on the grounds argued in his opening brief.[41]  Therefore, review is only for plain error.

---

[41] Before the district court, defendant challenged only (1) the right of Agape and Hagar, as legal guardians, to receive restitution payments under § 2248 and (2) payment of restitution for future costs of therapy. (ER 30, 1998-2004.)  Contrary to defendant's assertion (AOB 92 n.307), he did not make a "general objection" to the restitution order, and his reliance on *United States v. Pallares-Galan*, 359 F.3d 1088, 1094-95 (9th Cir. 2004), is misplaced because in that case, the defendant's argument was not a new claim but "rather . . . an alternative argument to support what has been his consistent claim from the beginning." *Id.* at 1095.  Here, by contrast, defendant's arguments on appeal do not address either of the issues raised below.  In any event, a general objection is insufficient to preserve an issue for appeal because it does not alert the court to its error. *See United States v. Santiago*, 466 F.3d 801, 803 (9th Cir. 2006) ("When a party does not lodge a specific objection in the district court, yet asserts error on appeal, we review under our familiar plain error standard.").  To preserve the right to

(continued  . . . .)

**2.    *Defendant Has Waived His Right to Argue That the Court Imposed Restitution under the Wrong Statute and the Amount of Restitution Ordered Was Not Plainly Erroneous***

**a.    *The invited error doctrine precludes defendant from arguing that the court ordered restitution pursuant to the wrong statute***

Under the invited error doctrine, defendant should not be permitted to argue that the restitution order was improper because the court mentioned the wrong statute at the restitution hearing.  (AOB 93.)  The government specifically explained in both its sentencing position (ER 1966) and in its response to defendant's supplemental filing regarding restitution (ER 2565-66) that the applicable statute was 18 U.S.C. § 3663A, not § 2248.  Despite this, defendant based his argument on § 2248.  (ER 2000-03.)

For the invited error doctrine to apply, a defendant must invite the error and relinquish a known right.  *United States v. Lindsey*, 634 F.3d 541, 555 (9th Cir. 2011); *see also United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (en banc) (reasoning that the invited error

---

appellate review of an issue, the defendant must have objected properly in the district court, stating distinctly the matter to which he objects and the grounds for the objection.  *See United States v. Varela*, 993 F.2d 686, 688 (9th Cir. 1993).

doctrine applies where a defendant induced or caused the error or where a defendant intentionally relinquished or abandoned a known right).

Defendant invited error by both filing a sentencing position in which he ignored the government's arguments pursuant to the correct statute (§ 3663A) and himself relied on the wrong statute (§ 2248) and by failing to object or point out to the court that it mentioned the incorrect statute when imposing restitution.[42]  The Probation Officer recommended restitution pursuant to § 2248.  (ER 2515).[43]  However, in the government's sentencing position, the government explained that the seven victims and their legal guardians were entitled to restitution pursuant to the MVRA (§ 3663A).  (ER 1966-71.)  Defendant's sentencing position ignored the government's argument that restitution was mandatory pursuant to § 3663A and instead argued against restitution, citing only § 2248.  (ER 2000-03.)  The government again

---

[42] The government did not object to the court's misstatement either.

[43] This was incorrect because § 2248 applies only to offenses committed pursuant to Title 18 U.S.C. §§ 2241-2247.  *See* 18 U.S.C. § 2248(a).

explained why § 3663A was the correct statute in its response to defendant's sentencing position, explicitly stating that "Section 2248 is not the restitution provision applicable in this case." (ER 2564-66).

At sentencing, the court adopted the government's recommendations and sentenced defendant accordingly. The court, however, mistakenly referenced § 2248 instead of § 3663A as the basis for its restitution order. As the totality of the circumstances clearly shows, this was simply an inadvertent misstatement. The court adopted in full the government's recommendation of the appropriate restitution amount, which was calculated pursuant to § 3663A. Thus, this Court should remedy the court's misstatement by ordering a limited remand for the sole purpose of ordering the court to issue a corrected judgment and commitment order that substitutes § 3663A for § 2248. *Cf., e.g., United States v. Herrera-Blanco*, 232 F.3d 715, 719 (9th Cir. 2000) (remanding for limited purpose of deleting judgment's erroneous reference to 8 U.S.C. § 1326(b)).

Defendant's reliance on *United States v. Fu Sheng Kuo*, 620 F.3d 1158, 1163-66 & n.2 (9th Cir. 2010) (AOB 93) is misplaced. In that case, this Court found that the court plainly erred because the court

affirmatively rejected the method for calculating restitution mandated by § 3663A and instead derived its restitution calculation from a different statute not applicable to the crime at issue. *Id.* at 1164. Here, by contrast, the court affirmed that it was adopting the government's position, which was that restitution was appropriate under § 3663A. Furthermore, unlike the situation in *Fu Sheng Kuo*, where this Court was unable to determine whether the amount of restitution was appropriate, here it is clear that the restitution amounts ordered by the court were correctly imposed under § 3663A because the court explicitly adopted the government's calculations.

### b. The restitution amount is not erroneous, let alone plainly erroneous

Defendant argues that the restitution amount of $247,213 was improper because many of the expenses incurred by the NGOs were not appropriate for restitution under § 3663A. (AOB 94-100.) Defendant failed to raise these claims before the court and his arguments must be rejected because the court did not err, let alone plainly err, in its calculation of restitution.

The Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, applies here. The MVRA defines "victim" as "a person

directly and proximately harmed as a result of the commission of an

offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2).

In addition, the statute provides that "[i]n the case of a victim who is

under 18 years of age, . . . the legal guardian of the victim . . . may

assume the victim's rights under this section . . . ." 18 U.S.C.

§ 3663A(a)(2).

The MVRA also provides guidance regarding the calculation of the

restitution amount. 18 U.S.C. § 3663A(b). The basic rule is that the

victim is entitled to be made whole. *See United States v. Gordon*, 393

F.3d 1044, 1053 (9th Cir. 2004) ("'[T]he primary and overarching goal of

[the MVRA] is to make victims of crime whole, to fully compensate

these victims for their losses and to restore these victims to their

original state of well-being.'") (quoting *United States v. Simmonds*, 235

F.3d 826, 831 (3d Cir. 2000)); *see also Hughey v. United States*, 495 U.S.

411, 416 (1990) (observing that the "meaning of 'restitution' is restoring

someone to a position he occupied before a particular event").

When the crime results "in bodily injury to a victim" the MVRA

requires the court to order the defendant to do the following:

> (A)   pay an amount equal to the cost of necessary medical
> and related professional services and devices relating to

99

physical, psychiatric, and psychological care, including
nonmedical care and treatment rendered in accordance with
a method of healing recognized by the law of the place of
treatment;[44]

(B)    pay an amount equal to the cost of necessary physical
and occupational therapy and rehabilitation;

and

(C)    reimburse the victim for income lost by such victim as
a result of such offense.

18 U.S.C. § 3663(A)(b)(2); *see United States v. Johnson*, 400 F.3d 187,

200 (4th Cir. 2005); *United States v. Cliatt*, 338 F.3d 1089, 1091 (9th

Cir. 2003).

---

[44] Defendant's argument that the victims are entitled to
restitution for psychological counseling only to the extent that the need
for it arises as a result of any bodily injury is simply wrong.  (AOB 99.)
Although the statute requires that the victim sustain bodily injury in
order to be eligible for restitution for psychiatric and psychological
services, nothing in either the statute or the cases defendant cites
states that the amount of restitution must be limited to that portion of
the counseling resulting from the bodily injury.  Rather, this Court in
both *United States v. Follett*, 269 F.3d 996, 1001 (9th Cir. 2001), and
*United States v. Hicks*, 997 F.2d 594, 601 (9th Cir. 1993), merely stated
that bodily injury is a prerequisite for restitution related to
psychological counseling, paraphrasing the plain language of the
statute.

However, another subsection of the MVRA applies to all victims,

regardless of whether the defendant's offense results in bodily injury.

Section 3663A(b)(4) provides that the defendant shall:

> in any case, reimburse the victim for lost income and
> necessary child care, transportation, and other expenses
> incurred during participation in the investigation or
> prosecution of the offense or attendance at proceedings
> related to the offense.

Thus, defendant's argument that § 3663A "narrowly limits" (AOB 94)

restitution in this case is simply incorrect.

At sentencing, the government requested that the court order

defendant to pay restitution to Agape International Missions and

Hagar International, the non-governmental organizations that had

custody of and were caring for the seven victims. (ER 1967.) The

evidence at trial proved that all the seven victims suffered physical

injury as a direct result of defendant's crimes.

Defendant objects to the types of expenses listed on the

spreadsheets for Hagar and Agape, arguing that he should not have to

pay restitution for expenses incurred by the NGOs for the daily care of

the victims under § 3663A. (AOB 95-98.)[45] The inclusion of these
expenses in the court's restitution order was not plainly erroneous.
Defendant's crimes against these seven children were the proximate
cause of the listed expenses because it was due to defendant's sexual
abuse of these girls that they are forced to live in NGO facilities until
they turn 18. Therefore, the costs incurred by the NGOs in caring for
them are properly assigned to defendant. The costs that Agape and
Hagar have incurred and will continue to incur for the rehabilitation of
these victims include education for the victims, whose ability to learn
has been diminished by defendant's crimes, and any costs incurred to
ensure their safety, including the cost of housing and daily care as well
as for their continuing physical and psychological care. The statute
explicitly provides for restitution to cover "nonmedical care . . . rendered
in accordance with a method of healing recognized by the law of the

---

[45] Defendant's failure to object on the specific grounds he now raises on
appeal unfortunately results in a record that is incomplete as to the
factual bases for the expenses defendant now, for the first time,
contests. *United States v. Lorenzo*, 995 F.2d 1448, 1457 n.4 (9th Cir.
1993) (when "plain error analysis applies, it appears that the
appellants, rather than the government, pay the price for the
inadequacy of the record.")

place of treatment." *See* 18 U.S.C. § 3663A(b)(2)(A). (ER 2589-90

(spreadsheet of Hagar costs), ER 2592-94 (spreadsheet of Agape costs).)

In *United States v. Doe*, 488 F.3d 1154 (9th Cir. 2007), this Court

affirmed a restitution order for psychological and medical treatment,

vocational training, and a management fee to the non-governmental

organization caring for the victims, and start-up capital to aid the

victims in opening a business, explaining:

> [The defendant] traveled outside the United States to molest
> children in his native country. As such, he not only gets the
> windfall of paying only reduced developing-world rates, but
> the government is also hindered in its ability to investigate
> his remote activity, to locate all of the victims of his criminal
> conduct, and to provide supervision of the children's
> recovery. In a situation such as this, where all the child
> victims are minors in a foreign country, the government
> necessarily must contract with reputable outside
> organizations to perform services that might be readily
> available by more familiar institutions in the United States.

*Id.* at 1162.

As in *Doe*, § 3663A should be construed broadly here due to the

unique circumstances of this case. It is only because defendant sexually

abused children outside of the United States, rather than within its

103

borders, that the broader restitution provisions of §§ 2248 and 2259[46] do not apply. In *Doe*, because the defendant was convicted of production of child pornography outside the United States, in violation of 18 U.S.C. § 2251(c)(1), as well as engaging in illicit sexual conduct with minors in foreign places, in violation of 18 U.S.C. § 2423(c), the court was able to award restitution under 18 U.S.C. § 2259 as well as under § 3663A.

Section 3664 provides that the burden of proving the amount of the victim's losses is on the government. 18 U.S.C. § 3664(e). This

---

[46] Section 2248 is a mandatory restitution provision applicable to any offense under Chapter 109A of Title 18, which includes sexual abuse, aggravated sexual abuse, sexual abuse of a minor or ward, and abusive sexual contact. Section 2248 provides for restitution for medical services relating to physical, psychiatric, or psychological care; physical and occupational therapy or rehabilitation; necessary transportation, temporary housing, and child care expenses; lost income; attorneys' fees and costs; *and any other losses suffered by the victim as a proximate result of the offense.* 18 U.S.C. § 2248(a)(3). (emphasis added)

Section 2259 is a mandatory restitution provision applicable to any offense under Chapter 110 of Title 18, which includes the production, possession, and dissemination of child pornography. Section 2259 provides for restitution for medical services relating to physical, psychiatric, or psychological care; physical and occupation therapy or rehabilitation, transportation, temporary housing and child care expenses; lost income; attorneys' fees and costs; *and any other losses suffered by the victim as a proximate result of the offense.* 18 U.S.C. § 2259(c). (emphasis added)

Court has held that the government must provide the court with enough evidence to allow the court to estimate the "full amount of the victim's losses" with "some reasonable certainty." *Doe*, 488 F.3d at 1159-60. This is not a requirement "approaching mathematical precision." *Id.* at 1160. In *United States v. Laney*, 189 F.3d 954 (9th Cir. 1999), this Court rejected the defendant's narrow reading of § 2259 and held that future counseling expenses were included within the scope of the statute. *Id.* at 965. The Court stated that the statute is "phrased in generous terms, in order to compensate the victims of sexual abuse for the care required to address the long term effects of their abuse." *Id.* at 966; *see also United States v. Keith*, 754 F.2d 1388, 1393 (9th Cir. 1985) (affirming restitution for cost of victim's airfare to visit family, finding that airfare fell within the category of non-medical care and treatment in 3663A because a court "could properly find that the support and comfort of the family are important elements in the care and treatment of the psychological trauma caused by" defendant's criminal conduct.)

Finally, defendant's argument that he is not solely responsible for the injuries suffered by the victims is meritless. (AOB 99-100.) First,

105

because defendant failed to raise this argument below, the government

had no opportunity to respond and the court had no opportunity to rule

on the claim.  Therefore, it cannot be plain error for the court to not

have taken this claim under consideration.  Second, there can be no

question that the physical and emotional harm suffered by defendant's

victims is the fault of no one other than defendant.  This is readily

apparent from the detailed accounts of the numerous forms of harm

inflicted on these victims as reported by the NGOs.  (ER 2525-55.)

There is not a shred of evidence that any of these harms resulted from

the fact that the families of these girls may have "sold" them to

defendant or that two of them previously had engaged in "the sex trade"

before meeting defendant.

# IV

# CONCLUSION

For the reasons set forth above, defendant's convictions should be affirmed.

DATED: June 7, 2016          Respectfully submitted,

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

*/s/ Patricia A. Donahue*
PATRICIA A. DONAHUE
Assistant United States Attorney
Chief, National Security Division

*/s/ Nancy B. Spiegel*

NANCY B. SPIEGEL
Assistant United States Attorney
Criminal Appeals Section

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

The government states, pursuant to Ninth Circuit Rule 28-2.6, that it is unaware of any cases related to this appeal.

**Form 8.**   **Certificate of Compliance Pursuant to 9th Circuit Rules 28-4,**
   **29-2(c)(2) and (3), 32-2 or 32-4[1] for Case Number** <u>14-50095</u>

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (check appropriate option):

☐ This brief complies with the enlargement of brief size permitted by Ninth Circuit Rule 28-4. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). This brief is _____ words,_____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

☒ This brief complies with the enlargement of brief size granted by court order dated <u>5-17-16</u>. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). This brief is <u>20,912</u> words, _____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

☐ This brief is accompanied by a motion for leave to file an oversize brief pursuant to Circuit Rule 32-2 and is _____ words, _____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

☐ This brief is accompanied by a motion for leave to file an oversize brief pursuant to Circuit Rule 29-2(c)(2) or (3) and is _____ words, _____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or
Unrepresented Litigant | s/ Nancy B. Spiegel

("s/" plus typed name is acceptable for electronically-filed documents)

Date | June 7, 2016

[1] If filing a brief that falls within the length limitations set forth at Fed. R. App. P. 32(a)(7)(B), use Form 6, Federal Rules of Appellate Procedure.

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the
### Appellate CM/ECF System

I hereby certify that on (date) June 7, 2016 , I electronically filed the foregoing
with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit
by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will
be accomplished by the appellate CM/ECF system.

Signature  /s/ Nancy B. Spiegel

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the
### Appellate CM/ECF System

I hereby certify that on (date) , I electronically filed the foregoing
with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit
by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate
CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.
I have mailed the foregoing document by First-Class Mail, postage prepaid, or have
dispatched it to a third party commercial carrier for delivery within 3 calendar days to the
following non-CM/ECF participants:

Signature