No. 14-50095

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

MICHAEL JOSEPH PEPE,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
The Honorable Dale S. Fischer, Presiding
No. CR-07-00168-DSF

# Appellant's Reply Brief

HILARY L. POTASHNER
Federal Public Defender
JAMES H. LOCKLIN
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California  90012
213-894-2929

*Counsel for Defendant-Appellant*

# Table of Contents

Table of Authorities ..................................................................................v

Reply ........................................................................................................1

1.  Given the issues before the Court, factual disputes about the alleged illicit sex acts are irrelevant........................................................................1

2.  The Court should reverse Pepe's convictions and direct entry of a judgment of acquittal because the trial evidence was insufficient to prove any 18 U.S.C. §2423(c) violations for two separate and independent reasons. ..................................................................................................3

    A.  Section 2423(c) does not apply to U.S. citizens who reside in, rather than just travel to, a foreign country; and the government does not dispute that the trial evidence established that Pepe resided in Cambodia (or at least failed to establish that he did not), so it has waived any arguments to the contrary........................................................4

    B.  The evidence established that the alleged illicit sex acts occurred long after Pepe's travel, which ended for purposes of §2423(c) when he returned to Cambodia, so the required temporal nexus between the travel and the sex acts was lacking.........................................................13

3.  The Court should also reverse Pepe's convictions and preclude a retrial because §2423(c) is unconstitutional................................................................21

  A.  Congress exceeded its powers under the Foreign Commerce Clause, especially to the extent that §2423(c) is construed to permit a significant gap between the travel in foreign commerce and subsequent illegal sex acts........................................................22

  B.  Section 2423(c) cannot be upheld as a valid exercise of Congress's authority under the Necessary and Proper Clause to execute the Treaty Power, especially given that Congress never invoked any treaty in passing that statute........................................................28

4.  If the Court does not reverse Pepe's convictions in a way that precludes a retrial, then it should at least remand for a new trial due to erroneous jury instructions........................................................32

5.  The Court should also remand for a new trial, at a minimum, because the district court admitted significant evidence derived from unconstitutional searches........................................................33

  A.  The search of Pepe's Cambodian home violated the Fourth Amendment. ........................................................34

iii

B. The subsequent search of computer drives at an American facility in Singapore also violated the Fourth Amendment. ....................................39

C. The subsequent search of other computer disks in the United States also violated the Fourth Amendment. ......................................................42

D. The government does not dispute that it should not be given another chance to satisfy its burden under the Fourth Amendment, so it has waived any contrary arguments. ..............................................................45

6. If the Court does not reverse Pepe's convictions, then it should vacate the restitution portion of the judgment. .............................................................46

Conclusion ........................................................................................................53

Certificate of Compliance re Brief Length ..............................................................54

Certificate of Service ............................................................................................55

iv

# Table of Authorities

## **Cases**

*Arizona v. Tohono O'odham Nation*
    818 F.3d 549 (9th Cir. 2016).............................................................................12

*Bond v. United States*
    134 S.Ct. 2077 (2014) ......................................................................... 28, 29, 31

*Herrera v. Collins*
    506 U.S. 390 (1993) ..........................................................................................11

*In re Terrorist Bombings of U.S. Embassies in East Africa*
    552 F.3d 157 (2nd Cir. 2008)............................................................................41

*Jackson v. Virginia*
    443 U.S. 307 (1979)...........................................................................................11

*Phillips v. United States*
    2011 WL 4436526 (E.D. Tenn. 2011), *affirmed on other grounds*,
    734 F.3d 573 (6th Cir. 2013)........................................................................ 25, 26

*Pierce County v. Guillen*
    537 U.S. 129 (2003) ..........................................................................................10

*Radzanower v. Touche Ross & Co.*
    426 U.S. 148 (1976)............................................................................................9

*Stonehill v. United States*
    405 F.2d 738 (9th Cir. 1968).............................................................................36

*United States v. Al-Maliki*
    787 F.3d 784 (6th Cir.), *cert. denied*, 136 S.Ct. 204 (2015)...............................25

*United States v. Barona*
    56 F.3d 1087 (9th Cir. 1995)........................................................................ 36, 41

*United States v. Belfast*
    611 F.3d 783 (11th Cir. 2010) ..........................................................................30

*United States v. Benedict*
 647 F.2d 928 (9th Cir. 1981)...............................................................36

*United States v. Bollinger*
 966 F.Supp.2d 568 (W.D.N.C. 2013), *affirmed on other grounds*,
 798 F.3d 201 (4th Cir. 2015), *cert. denied*, 136 S.Ct. 2448 (2016)............. 25, 31

*United States v. Caceres-Olla*
 738 F.3d 1051 (9th Cir. 2013) ..........................................................12

*United States v. Castillo-Marin*
 684 F.3d 914 (9th Cir. 2012)........................................................ 33, 49

*United States v. Cervantes*
 703 F.3d 1135 (9th Cir. 2012) ..........................................................38

*United States v. Clark*
 315 F.Supp.2d 1127 (W.D. Wash. 2004), *affirmed*,
 435 F.3d 1100 (9th Cir. 2006) ................................................... passim

*United States v. Doe*
 488 F.3d 1154 (9th Cir. 2007) ..........................................................51

*United States v. Ferdman*
 779 F.3d 1129 (10th Cir. 2015) .........................................................50

*United States v. Flath*
 845 F.Supp.2d 951 (E.D. Wis. 2012)................................................26

*United States v. Frank*
 486 F.Supp.2d 1353 (S.D. Fla. 2007), *affirmed on other grounds*,
 599 F.3d 1221 (11th Cir. 2010) .........................................................31

*United States v. Fries*
 781 F.3d 1137 (9th Cir.), *cert. denied*, 136 S.Ct. 583 (2015)............................29

*United States v. Fu Sheng Kuo*
 620 F.3d 1158 (9th Cir. 2010) ..........................................................48

*United States v. Galan*
 804 F.3d 1287 (9th Cir. 2015) ..........................................................50

*United States v. Jackson*
480 F.3d 1014 (9th Cir. 2007) ................................................................ passim

*United States v. Jimenez*
258 F.3d 1120 (9th Cir. 2001) ...........................................................48

*United States v. Juda*
46 F.3d 961 (9th Cir. 1995)................................................................41

*United States v. Maher*
645 F.2d 780 (9th Cir. 1981)................................................................36

*United States v. Martinez*
599 F.Supp.2d 784 (W.D. Tex. 2009)................................................25

*United States v. Murguia-Rodriguez*
815 F.3d 566 (9th Cir. 2016)................................................................2

*United States v. Pallares-Galan*
359 F.3d 1088 (9th Cir. 2004) ...........................................................46

*United States v. Pendleton*
658 F.3d 299 (3rd Cir. 2011) ...........................................................25

*United States v. Perez*
116 F.3d 840 (9th Cir. 1997)............................................................ 47, 48

*United States v. Peterson*
812 F.2d 486 (9th Cir. 1987)................................................................36

*United States v. Rose*
570 F.2d 1358 (9th Cir. 1978) ...........................................................36

*United States v. Stokes*
726 F.3d 880 (7th Cir. 2013)................................................................26

*United States v. Strong*
489 F.3d 1055 (9th Cir. 2007) ...........................................................13

*United States v. Torres*
794 F.3d 1053 (9th Cir. 2015), *cert. denied*, 136 S.Ct. 2005 (2016)....................2

*United States v. Vargem*
747 F.3d 724 (9th Cir. 2014)...............................................................52

*United States v. Verdugo-Urquidez*
494 U.S. 259 (1999) .........................................................................41

*United States v. Walls*
784 F.3d 543 (9th Cir.), *cert. denied*, 136 S.Ct. 226 (2015)................29

*United States v. Weingarten*
632 F.3d 60 (2nd Cir. 2011)...............................................................27

*United States v. Willis*
795 F.3d 986 (9th Cir. 2015)...............................................................12

*United States v. Yian*
905 F.Supp. 160 (S.D.N.Y. 1995), *affirmed sub nom.*,
*United States v. Lue*, 134 F.3d 79 (2nd Cir. 1998) .............................31

*Webster v. Fall*
266 U.S. 507 (1925) ...........................................................................6

## Constitution

U.S. CONSTITUTION, Article I, §8.................................................. passim

U.S. CONSTITUTION, Article II, §2 ........................................... 28, 29, 30

U.S. CONSTITUTION, Amendment IV .............................................. passim

## Statutes

18 U.S.C. §2248 ....................................................... 46, 47, 48

18 U.S.C. §2423 ................................................................ passim

18 U.S.C. §3663A ................................................... 47, 48, 49, 51

42 U.S.C. §16911 ....................................................................12

## **Other Authorities**

*Black's Law Dictionary* (9th ed. 2009).......................................................................12

Optional Protocol to the United Nations Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography, S. Treaty Doc. No. 106-37, 2000 WL 33366017 (July 5, 2000)..................................... 28, 29, 30

# Reply

## 1. Given the issues before the Court, factual disputes about the alleged illicit sex acts are irrelevant.

Michael Pepe is serving a 210-year sentence for purportedly violating 18 U.S.C. §2423(c) (2006)[1] by traveling in foreign commerce and engaging in illicit sexual conduct with minors.[2] He vehemently denies that he engaged in the alleged sexual activity, and his opening brief explained that the evidence presented at his trial to prove that conduct suffered from significant problems.[3] The government's brief ignores these problems and thus overstates the weight of the evidence against Pepe.[4] At this point, however, factual disputes about the alleged sex acts are irrelevant.

First, although the answering brief includes an argument that the trial evidence, when viewed in the light most favorable to the government, was sufficient to prove

---

[1] Unless otherwise noted, references to §2423 are to this version of the statute, which is set forth in the opening brief's addendum.

[2] ER 2006. "ER" refers to the appellant's excerpts of record. "GER" refers to the government's excerpts of record. "AOB" refers to the appellant's opening brief. "GAB" refers to the government's answering brief.

[3] AOB 3-35.

[4] GAB 5-15, 27-30, 82-90.

1

the alleged sex acts,[5] Pepe never argued that the sex-act evidence was
constitutionally insufficient under that deferential standard.  His only insufficient-
evidence claim focused on the government's failure to prove §2423(c)'s travel
element.[6]  The facts related to that discrete issue are discussed below in §2.

The only other relevant factual issues concern the circumstances surrounding
the challenged searches, which are discussed below in §5.  The trial evidence
pertaining to the alleged sex acts would ordinarily be relevant to whether the
government met its burden to prove that any Fourth Amendment violations were
harmless beyond a reasonable doubt.  *United States v. Torres*, 794 F.3d 1053,
1061-62 (9th Cir. 2015), *cert. denied*, 136 S.Ct. 2005 (2016).  But the government
does not contend that any such errors were harmless,[7] so it has *waived* all
harmlessness arguments.  *United States v. Murguia-Rodriguez*, 815 F.3d 566, 572-
73 (9th Cir. 2016).  In any event, the government's brief supports Pepe's
undisputable assertion that most of the significant nontestimonial evidence offered
against him came from the challenged searches.[8]  Under these circumstances, the

---

[5]  GAB 81-90.

[6]  AOB 51-54.

[7]  GAB 56-81.

[8]  AOB 31-35; GAB 27-30, 83-86.

2

Court could not find that the district court's failure to suppress the evidentiary fruits of those illegal searches was harmless, even if that issue had not been waived. Because the government has waived the harmlessness issue, however, the sex-act evidence is irrelevant to any issue on appeal.

Thus, with narrow limited exceptions, this appeal hinges on legal (rather than factual) issues, to which we now turn.

## 2. The Court should reverse Pepe's convictions and direct entry of a judgment of acquittal because the trial evidence was insufficient to prove any 18 U.S.C. §2423(c) violations for two separate and independent reasons.

At the relevant time, §2423(c) applied to any U.S. citizen "who travels in foreign commerce, and engages in any illicit sexual conduct with another person[.]"[9] Because the trial evidence failed to support the charges under this statute for two separate and independent reasons (discussed below), the Court should reverse Pepe's convictions and direct entry of a judgment of acquittal.[10]

---

[9] AOB 40; GAB 44.

[10] AOB 51-52. As discussed below in §4, the statutory-construction issues discussed in this section at least require reversal and a retrial due to jury-instruction

**A. Section 2423(c) does not apply to U.S. citizens who reside in, rather than just travel to, a foreign country; and the government does not dispute that the trial evidence established that Pepe resided in Cambodia (or at least failed to establish that he did not), so it has waived any arguments to the contrary.**

Both of Pepe's insufficient-evidence claims hinge on the proper interpretation of §2423(c). The first question is whether that provision applies to U.S. citizens who reside in—as opposed to just travel to—a foreign country. Four principles of statutory construction support Pepe's position that it does not.

1. The starting point is §2423(c)'s plain language.[11] The Court recognized in *United States v. Jackson*, 480 F.3d 1014, 1022 (9th Cir. 2007), that someone who "permanently resettles abroad" is not "traveling" within the ordinary meaning of the word. Although the Court has not yet considered—in *Jackson* or elsewhere— whether §2423(c) may nevertheless still reach citizens who reside abroad, its recognition that a traveler is significantly different from a resident supports

---

errors if the Court does not reverse based on the grounds set forth in this section or those in §3, which would preclude a retrial.

[11]   AOB 40; GAB 44.

interpreting the statute to cover the former but not the latter.[12]  The government

contends that the statute's failure to mention residency one way or the other means

that Congress did not intend to limit its applicability based on that; all that matters,

it claims, is that the defendant traveled at some point in foreign commerce.[13]  It's

hardly surprising that Congress did not feel the need to specifically mention

residents abroad, or any other category of persons *not* covered by the statute for

that matter.  Rather, it defined the class of potential defendants using a phrase—

"United States citizen or alien admitted for permanent residence who travels in

foreign commerce"—with limited scope that excludes such persons.  Thus,

Congress clearly intended the statute to apply to people living in the United States

who visit a foreign country and engage in illegal sex acts there.  Citizens who

already reside abroad are a different class of people entirely, regardless of whether

they might visit the United States occasionally.

The government's reliance on *United States v. Clark*, 435 F.3d 1100 (9th Cir.

2006), is misplaced because even it acknowledges that the defendant in that case

did not raise the issue presented here.[14]  The government does not, and cannot,

---

[12]  AOB 43-44.

[13]  GAB 44-45.

[14]  GAB 45-46.

dispute the well-established principle that such questions that "merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925).[15] And, of course, the district-court decision in *Clark* cited by the government in a footnote is also not precedent.[16] That decision also isn't persuasive for three reasons. First, Clark did not make the text-based argument that Pepe makes here; he relied solely on the legislative history (discussed below) that supports Pepe's plain-meaning interpretation. *United States v. Clark*, 315 F.Supp.2d 1127, 1130-31 (W.D. Wash. 2004). Second, the district court rendered its decision in 2004, nearly a decade before Congress amended §2423(c) in a way that further supports Pepe's position (also discussed below). Finally, the district court's cursory discussion of the residency issue did not include any supporting authority or meaningful analysis. *Id*.

2. The statutory scheme and legislative history support Pepe's plain-language interpretation. As explained in the opening brief, the other provisions of §2423, the title of the Act that added subsection (c), and congressional reports establish

---

[15] AOB 44 n.218.

[16] GAB 46 n.21.

that it was meant to target "sex tourism."[17]  The government doesn't dispute that a

person is not a tourist where he lives, but it contends that Congress did not intend

to cover offenders on "sex tours" but not "those would travel on their own to a

foreign place and sexually abuse children."[18]  The government misunderstands

Pepe's position.  "Sex tourism" may encompass both those who organize foreign

trips themselves and those whose trips are organized by others, but it does not

include those who already reside abroad because they are not "tourists" in their

own home.  And despite what the government contends, Pepe does not seek to

insert an additional intent element into §2423(c).[19]  The issue isn't the defendant's

intent but whether, as a matter of fact, he resided in the foreign country where the

alleged sex acts occurred.

3.  The 2013 amendment to §2423(c) further supports Pepe's interpretation.  By

changing the statute so that it now expressly covers a citizen who "resides, either

temporarily or permanently, in a foreign country," Congress acknowledged that the

---

[17]  AOB 39-40, 44.

[18]  AOB 44; GAB 46-47.

[19]  GAB 46-47.

prior version of the statute did not reach such persons.[20]  Indeed, a Senate report

confirms that the amendment was intended to close that perceived loophole.[21]

   The government responds that the sole purpose of this amendment was to reach

"Americans residing abroad who had not traveled in foreign commerce."[22]  It

ignores that that purportedly-affected group would include only the undoubtedly-

small number of expatriates who last traveled from the United States before

§2423(c) was originally enacted in 2003.  *See Jackson*, 480 F.3d at 1018 (holding

that §2423(c) applies only if both the travel and the illicit sex act occurred after its

enactment).  Under the government's incorrect interpretation of §2423(c) to not

require *any* temporal nexus between its travel and sex-act elements (discussed

below in §2(B)), the 2013 amendment would have been unnecessary to reach any

foreign residents who had traveled at any point in the preceding decade.  It's highly

unlikely that Congress would go to the trouble of enacting an amendment targeting

such a trivial number of potential defendants (relatively few of which, it's

assumed, would also engage in illegal sex acts), particularly without any reference

in the legislative history suggesting that it was addressing such a specific problem.

---

[20]  AOB 45.

[21]  AOB 45-46.

[22]  GAB 47-48.

On the other hand, Congress's amendment of §2423(c) makes perfect sense in light of Pepe's interpretation of the statute to require a relatively-small gap between when the travel ends and when the sex act occurs. By adding an entirely-new class of potential defendants—U.S. citizens residing in a foreign country—Congress greatly expanded the scope of the statute to eliminate the travel requirement as to such people such that it now reaches current *and future* American residents of foreign countries regardless of any temporal nexus between travel and sex acts. It's far more likely that Congress intended its amendment to have that significant effect rather than the trivial effect envisioned by the government.

The government asserts in a footnote that a statute cannot "retroactively restrict the scope of pre-existing statutes."[23] But the case it cites in support of that proposition concerns the inapplicable principle of statutory construction that *repeals by implication* are disfavored. *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154 (1976). The government ignores the authority Pepe cited that requires the Court to presume that Congress intends *amendments* to a statute "'to

---

[23]  GAB 49 n.22.

have real and substantial effect.'" *Pierce County v. Guillen*, 537 U.S. 129, 145 (2003).[24]

4. Finally, if there is any remaining doubt about whether the applicable version of §2423(c) applies to a U.S. citizen residing in a foreign country, the rule of lenity requires the Court to give Pepe the benefit of that doubt.[25]

Under the proper interpretation of §2423(c), Pepe's convictions cannot stand because the evidence presented at his trial established that he resided in Cambodia.[26] At the very least, the government failed to prove that he was not such a resident. Given its refusal to acknowledge that the applicable pre-2013 version of the statute does not cover residents of a foreign country, the government gives short shrift to whether Pepe resided in Cambodia. It's only discussion of the issue appears in a footnote, and even then it points mostly to assertions made in an agent's declaration concerning a pretrial motion.[27] But the relevant question here is whether *the evidence actually presented to the jury at trial* was sufficient, so the

---

[24] AOB 45.

[25] AOB 46.

[26] AOB 3-5, 52.

[27] GAB 45 n.20 (citing GER 104-10).

government cannot rely on other evidence to meet its burden.[28]  *Herrera v. Collins*,

506 U.S. 390, 402 (1993) (citing *Jackson v. Virginia*, 443 U.S. 307, 318 (1979)).

The government does not point to any *trial evidence* even suggesting that Pepe was

not a resident of Cambodia,[29] and it ignores the considerable trial evidence—

discussed in the opening brief[30]—reflecting that he was such a resident.[31]  Because

---

[28]  Even *__if__* it could consider the pretrial-motion evidence cited by the government,
the Court would also have to consider the additional evidence presented by Pepe in
connection with that motion showing that he resided in Cambodia: before leaving
the United States, he gave away his vehicle, computer, and other valuables; he
registered at the U.S. embassy in Cambodia; he joined the Phnom Penh Veterans of
Foreign Wars and became a lifetime member; he obtained a Cambodian driver's
license and registered his vehicle with Cambodian authorities; and upon marrying
his Cambodian wife, he jointly owned her property, including livestock.  (ER 229,
235)

[29]  The government points to Pepe's passport, which was *marked* as trial exhibit
number 1061.  (GAB 45 n.20 (citing GER 22))  But that exhibit was never used at
trial, let alone *admitted* into evidence (ER 460-1814), and thus it's irrelevant to the
insufficient-evidence analysis.  Indeed, it doesn't appear that this exhibit is
legitimately part of the appellate record *at all*.  In any event, the government cites
no authority suggesting that the fact that Pepe's passport included the "bearer's
address in the United States" precluded him from being a resident of Cambodia.

[30]  AOB 3-5.

the government failed to respond to Pepe's argument that *the trial evidence* showed that he resided in Cambodia at the relevant times, it has waived any arguments to the contrary. *United States v. Willis*, 795 F.3d 986, 997 n.11 (9th Cir. 2015) (government waives argument by not raising it in answering brief); *United States v. Caceres-Olla*, 738 F.3d 1051, 1054 n.1 (9th Cir. 2013) (by not responding

---

[31] Contrary to what the government suggests without supporting authority in its footnote, Pepe did not reside in Cambodia only if he "permanently relocated" there. (GAB 45 n.20) Even after Congress amended §2423(c) to add the resides-in-a-foreign-country language, it did not define "resides." It must therefore be given it's ordinary, contemporary, and common meaning. *Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 556 (9th Cir. 2016). "Residence" means "[t]he place where one actually lives, as distinguished from a domicile" (which "requires bodily presence plus an intention to make the place one's home"); a person "may have more than one residence at a time but only one domicile." *Black's Law Dictionary* 1423 (9th ed. 2009). This is consistent with how Congress defined "resides" for purposes of SORNA: "The term 'resides' means, with respect to an individual, the location of the individual's home or other place where the individual habitually lives." 42 U.S.C. §16911(13). Thus, Pepe could simultaneously reside in both Cambodia and California, although it's worth noting that the evidence reflects that he was domiciled in Cambodia as well, if it makes a difference. Nevertheless, because the government has waived any argument that the trial evidence proved that Pepe did not reside in Cambodia, the Court need not establish the definitive meaning of "resides" here.

to argument raised in opening brief, government waives contrary arguments);
*United States v. Strong*, 489 F.3d 1055, 1060 n.4 (9th Cir. 2007) (summary
mention of issue in footnote, without supporting reasoning, is insufficient to raise
issue on appeal).[32]  The Court should therefore reverse Pepe's convictions and
direct entry of a judgment of acquittal.

**B. The evidence established that the alleged illicit sex acts occurred long after Pepe's travel, which ended for purposes of §2423(c) when he returned to Cambodia, so the required temporal nexus between the travel and the sex acts was lacking.**

Even *if* §2423(c) could be construed to apply to a resident of a foreign country
like Pepe, the trial evidence was still insufficient to prove the requisite temporal
nexus between his international travel and the alleged illicit sex acts.  For the
following reasons, the Court should reject the government's argument that the
statute contains no such requirement.

1. Preliminarily, the Court must decide when travel ends for purposes of
§2423(c).  Contrary to what the government claims, that is not irrelevant to any

---

[32]  As noted below, the government has also waived other arguments.  Rather than
repeat this authority below, Pepe will cross-reference to this footnote.

issue in this appeal.[33]  The Court obviously can't address the temporal nexus between travel and subsequent illicit sex acts without ascertaining when a defendant's travel ends and thus the time gap begins.  In the opening brief, Pepe explained that in *Jackson*, 480 F.3d at 1023-24, the Court proffered two possible definitions—(1) travel ends as soon as a citizen arrives in a foreign country, or (2) travel ends only when the citizen resettles in or takes up residence in a foreign country—but the rule of lenity requires the Court to adopt the first definition, which is narrower.[34]  Without acknowledging the rule of lenity or presenting any substantive argument whatsoever, the government baldly asserts in a footnote that because either definition is plausible, Pepe's position that the defendant-friendly version applies is incorrect.[35]  That, of course, improperly flips the rule of lenity to give the government, rather than the defendant, the benefit of the statute's ambiguity.  Because the government offers no substantive response to Pepe's contention that travel ends as soon as a citizen arrives in a foreign country, it has waived any argument to the contrary.[36]

---

[33]  GAB 49 n.23.

[34]  AOB 46-47.

[35]  GAB 49 n.23.

[36]  *See* footnote 32, *supra*.  Even ***if*** *Jackson*'s alternate definition of travel could be adopted, it should not make a difference in this case.  As explained above in §3(A),

2.  The next question is whether the government is correct that §2423(c) doesn't require *any* temporal relationship between its travel and sex-act elements.[37]  The opening brief explained that use of the word "and" to connect the travel and sex-act clauses of §2423(c) supports reading the statute to require a temporal nexus between the two.[38]  The government responds that "and" purportedly reflects "the absence of *any* temporal link or time limit[.]"[39]  It ignores that this interpretation would lead to unreasonable and impracticable results by encompassing all downstream sexual activities, even those that occur (for example) 50 years after the defendant last traveled in foreign commerce.[40]  And as discussed below in §3(A), that would also render §2423(c) unconstitutional.

Pepe's interpretation of §2423(c) to require a temporal nexus between the travel and the sex acts is also consistent with the clear purpose of the statute to combat

---

the trial evidence established that Pepe resided in Cambodia before he visited the United States in 2005, so when he returned to Cambodia, he had already taken up residence there.  Thus, Pepe's travel ended at that time under either definition.

[37]  GAB 49-51, 54.

[38]  AOB 49-50.

[39]  GAB 54-55 (emphasis added).

[40]  AOB 48-49.

15

"sex tourism."[41]  Although the government acknowledges language in the

legislative history referring to the problem of persons traveling to foreign countries

to have sex with minors, it insists that the statute was not targeting sex tourism.[42]

That, however, ignores that the Act adding §2423(c) referred to "Penalties Against

Sex Tourism," and the legislative history used the term "sex tourism" as well.[43]

And sex *tourism* clearly contemplates a sex act occurring soon after travel, not one

that happens many months, or even years, later.

3.  Once the Court recognizes that there must be *some* temporal nexus between

§2423(c)'s travel and sex-act elements, it must determine how long the gap may be

before conviction under that statute is impermissible.  Three rules of statutory

construction support permitting a gap no longer than the less-than-two-months

period allowed in *Clark*, 435 F.3d at 1107 n.11.  First, the rule of lenity requires

the Court to resolve any ambiguity in Pepe's favor.[44]  The government claims that

§2423(c) is not ambiguous, but its position is based on its interpretation of the

statute to not require *any* temporal nexus.[45]  If the statute does require such a

---

[41]  AOB 44, 50.

[42]  GAB 55.

[43]  AOB 39-40, 44.

[44]  AOB 47, 50.

[45]  GAB 56.

16

nexus, however, it is clearly ambiguous as to exactly what nexus is sufficient to support a conviction. Second, the doctrine of constitutional avoidance requires the Court to construe §2423(c) to eliminate even "grave doubts" about whether the statute is unconstitutional.[46] The government asserts that this doctrine is inapplicable given its position that there's no doubt about §2423(c)'s constitutionality.[47] As discussed below in §3, however, there are significant constitutional issues with the statute, so the Court must be guided by the avoidance doctrine. Finally, unless the temporal nexus between §2423(c)'s travel and sex-act elements is clearly defined and limited, the statute is unconstitutionally vague.[48] The government does not respond to this point, so it has waived any arguments to the contrary.[49]

The temporal gap between Pepe's last travel from the United States—which ended when he returned to Cambodia on September 3, 2005[50]—and the alleged sex acts exceeded two months as to each of the seven counts:

---

[46] AOB 50-51.

[47] GAB 56.

[48] AOB 51.

[49] *See* footnote 32, *supra*.

[50] ER 1332-33; AOB 52-53.

17

- *Count 1*: The government does not dispute that I.T. supposedly came to Pepe's house in May 2006.[51] Thus, the temporal gap for this Count was at least eight months.

- *Count 2*: The government does not dispute that L.K. started living with Pepe at the end of 2005 but the alleged sexual abuse did not start until about three months later.[52] Thus, the temporal gap for this count was at least five months.

- *Counts 3 and 4*: The government points out, as did Pepe, that S.R. and S.S. were apparently at Pepe's house at Christmas 2005, but the government does not acknowledge, dispute, or otherwise respond to Pepe's argument that there is no evidence about how long after that the alleged sex acts occurred.[53] The government has therefore waived any arguments to the contrary.[54] Because the government failed to prove what the temporal gap was for these two counts, the evidence was clearly insufficient.

---

[51]  AOB 53; GAB 14-15, 53.

[52]  AOB 53; GAB 8-11, 53.

[53]  AOB 53; GAB 11-12, 53.

[54]  *See* footnote 32, *supra*.

18

- *Count 5*: In a footnote and without citation to the record, the government asserts that K.S. "testified that defendant engaged her in illicit sexual conduct both before and after he left Cambodia."[55] That is not accurate. As explained in the opening brief,[56] K.S. could not remember when she supposedly lived at Pepe's house, but the government contended that she came there sometime *before* the alleged travel.[57] K.S. testified that, at some point, Pepe left the house, was gone for some unspecified period of time, came back, and thereafter engaged in additional sex acts.[58] The government asked the jury to infer from that vague testimony alone that K.S. must have been referring to Pepe's trip to the United States in September 2005.[59] As previously noted, however, that wasn't a *reasonable* inference because K.S. didn't say whether

---

[55] GAB 12 n.8. Notably, the government doesn't even refer to K.S. in its discussion of the temporal-nexus issue. (GAB 53)

[56] AOB 53-54.

[57] ER 973-77, 1859.

[58] ER 985.

[59] ER 1858-59.

Pepe was gone for an hour, a day, or a week.[60] The jury therefore could not conclude that K.S. was left behind for the particular trip to the United States (as opposed to some other outing Pepe may have had within Cambodia, for example) without engaging in the kind of impermissible speculation that can't support a finding beyond a reasonable doubt.[61] Because there was no legitimate basis for the jury to conclude that *any* of the alleged sex acts with K.S. occurred *after* the international travel, as required by §2423(c), the evidence for this count is clearly insufficient regardless of whether §2423(c) includes a temporal-nexus requirement.

- *Count 6*: N.T.D. purportedly lived at Pepe's house for about one week around the Vietnamese New Year.[62] Although the government contends in its brief that this happened at some unspecified point in 2005,[63] it argued to the jury that the offense

---

[60] AOB 53-54.

[61] AOB 51-52.

[62] AOB 54.

[63] GAB 13, 53.

20

occurred in April 2006.[64]  Thus, the temporal gap for this count
was at least seven months.

- *Count 7*: The government does not dispute that T.C. claimed to
  have lived at Pepe's house for about two or three weeks around
  Valentine's Day 2006.[65]  Thus, the temporal gap for this count was
  about five months.

For all these reasons, the evidence was insufficient to prove any violation of
§2423(c), so the Court should reverse Pepe's convictions and direct entry of a
judgment of acquittal.

## 3. The Court should also reverse Pepe's convictions and preclude a retrial because §2423(c) is unconstitutional.

Even if it finds the trial evidence sufficient as to some or all of the counts, the
Court must still reverse Pepe's convictions and preclude a retrial because §2423(c)
is unconstitutional.  As discussed below, Congress lacked the power to enact that

---

[64]  ER 1849-50; AOB 54 n.233.

[65]  AOB 54; GAB 14, 53.

statute under either the Foreign Commerce Clause or the Necessary and Proper Clause.[66]

**A. Congress exceeded its powers under the Foreign Commerce Clause, especially to the extent that §2423(c) is construed to permit a significant gap between the travel in foreign commerce and subsequent illegal sex acts.**

To the extent Congress identified any constitutional basis for enacting §2423(c), it pointed to the Foreign Commerce Clause.[67]  The Court has already held in *Clark*,

---

[66]  Contrary to what the government suggests in a footnote, Pepe's appeal is not "limited to his convictions for committing commercial sex acts[.]"  (GAB 37 n.14) Rather, as clearly explained in the opening brief, Pepe focused on commercial sex acts for purposes of addressing the statute's constitutionality because there "appears to be no doubt that Congress's purported powers are at their strongest with regard to commercial sex acts, so it follows that if Congress could not validly criminalize the commercial sex acts covered by §2423(c), then it clearly couldn't criminalize the noncommercial sex acts covered by that statute."  (AOB 58)  The government does not dispute this assertion, so it has waived any arguments to the contrary.  *See* footnote 32, *supra*.  Therefore, if the Court concludes that Congress lacked the power to enact §2423(c) as to commercial sex acts, it must reverse Pepe's convictions, even to the extent they are based on noncommercial sex acts.

[67]  AOB 67-69.  *See also* §3(B), *infra*.

435 F.3d at 1102-03, 1109-17, that this clause allowed Congress to regulate commercial sex acts abroad by means of that statute, at least to some degree.[68]  For the reasons given by Judge Ferguson in his dissent in that case, *id*. at 1117-21, Pepe maintains that §2423(c) is *wholly* unconstitutional, but he recognizes that a three-judge panel must follow the majority's decision.[69]  This reply will therefore focus on the question expressly left open in *Clark*—namely, whether interpreting §2423(c) to allow a significant gap between the travel and the illicit sex act would cause the reach of the statute to exceed what is allowed by the Foreign Commerce Clause.  *Id*. at 1107 n.11.[70]

The significant constitutional concerns raised by Judge Ferguson in *Clark* were discussed at length in the opening brief and will not be repeated here.[71]  Suffice it to say, he correctly concluded that if Congress can regulate, under the Foreign Commerce Clause, "every act" abroad that has "a bare economic component" and occurs "downstream" from international travel—even many months or years afterwards—then "the Commerce Clause will have been converted into a general

---

[68]  AOB 58-60.

[69]  AOB 60-63.

[70]  AOB 47-48.

[71]  AOB 60-63.

grant of police power." *Id*. at 1119-20 (Ferguson, J., dissenting). This significant constitutional problem reaches its apex under the government's interpretation of §2423(c) to not require *any* temporal relationship between its travel and sex-act elements.[72] The *Clark* majority therefore decided the case narrowly to uphold the statute only to the extent there was a "limited gap" of less than two months such that the sex act occurred "shortly []after" the international travel. *Id*. at 1107, 1116. It left for another day whether a longer gap triggers "constitutional or other concerns[.]" *Id*. at 1107 n.11; *see also Jackson*, 480 F.3d at 1017 n.6 (leaving the question open).

Ignoring, for the most part, that the Court has expressly left open the question presented here, the government insists that this is "a settled issue."[73] It therefore doesn't engage that issue in any meaningful way. In a footnote, the government dismisses (without analysis) the significant concerns raised in Judge Ferguson's *Clark* dissent—which also influenced the *Clark* majority to the extent it limited its holding—by asserting that none of the relatively-few courts that subsequently addressed §2423(c)'s constitutionality adopted his reasoning.[74] But as *this Court*

---

[72] *See* §2(B), *supra*.

[73] GAB 36-38. *But see* GAB 50 (noting *Clark*'s reservation of the issue).

[74] GAB 38 n.15.

addresses, *for the first time*, the question it expressly reserved in *Clark*, it should consider Judge Ferguson's well-reasoned and persuasive decision.

The out-of-circuit cases string-cited by the government without analysis do not support its position because none of them addressed the issue presented here.[75]  In *United States v. Bollinger*, 798 F.3d 201, 208-19 (4th Cir. 2015), *United States v. Pendleton*, 658 F.3d 299, 305-11 (3rd Cir. 2011), *United States v. Bianchi*, 386 Fed.Appx. 156, 160-62 (3rd Cir. 2010), and *United States v. Martinez*, 599 F.Supp.2d 784, 802-08 (W.D. Tex. 2009), courts rejected arguments that §2423(c) is *wholly* unconstitutional, but none of those cases considered the question left open in *Clark* or otherwise addressed whether the Foreign Commerce Clause requires some limit on the temporal gap between the travel and the sex acts.[76]  The temporal-nexus issue was also not addressed in *Phillips v. United States*, 2011 WL 4436526 (E.D. Tenn. 2011), *affirmed on other grounds*, 734 F.3d 573, 579-85 (6th Cir. 2013), where the Sixth Circuit simply rejected the defendant's claim that he

---

[75]  GAB 38, 51.

[76]  In another case not cited by the government, the Sixth Circuit was "skeptical" that §2423(c) was a valid exercise of Congress's Foreign Commerce Clause power, at least with regard to noncommercial sex acts, but it did not need to decide the issue because only the plain-error standard of review applied.  *United States v. Al-Maliki*, 787 F.3d 784, 791-94 (6th Cir.), *cert. denied*, 136 S.Ct. 204 (2015).

could file an untimely §2255 motion based on this Court's then-recent decision in *Jackson* holding that the travel required by §2423(c) must occur after its 2003 enactment.[77] And *United States v. Stokes*, 726 F.3d 880, 894-95 (7th Cir. 2013), did not even involve a §2423(c) conviction but rather subsection (b) of that statute, which contains materially-different language; and even then, the defendant did not raise, and therefore the court did not consider, any temporal-nexus arguments like the one at issue here. Finally, in *United States v. Flath*, 845 F.Supp.2d 951, 955-56 (E.D. Wis. 2012), a district court rejected some kind of nexus argument, but it's unclear whether the defendant's argument in that case was the same as the one Pepe makes here; and in any case, that decision was never reviewed by the Seventh Circuit.

In short, no circuit has addressed the question reserved in *Clark*. But clearly there must be *some point* where the gap between the travel in foreign commerce and the illicit sex act will be too wide to pass constitutional muster. To hold otherwise would convert the Foreign Commerce Clause into a broad grant of international police power. *Clark*, 435 F.3d at 1119-20 (Ferguson, J., dissenting).

---

[77] The government cites only the district-court decision in *Phillips*, 2011 WL 4436526, *3-5, which disagreed with this Court's *Jackson* decision.

26

Once the travel has ended and two months have passed,[78] any subsequent sex acts no longer have "a constitutionally tenable nexus with foreign commerce" and do not "bear[] a rational relationship to Congress's authority under the Foreign Commerce Clause." *Id*. at 1114 (majority decision).[79] The Court should therefore interpret §2423(c) to require a temporal nexus between the travel and the sex act— namely, a gap of less than two months—because any other interpretation would render it unconstitutional. *Cf. United States v. Weingarten*, 632 F.3d 60, 70-71 (2nd Cir. 2011) (interpreting §2423(b) to not extend to travel occurring wholly between foreign nations and without any territorial nexus to United States avoided necessity of addressing whether such an exercise of congressional power would comport with Foreign Commerce Clause).

---

[78]  Again, so far, the Court has only upheld §2423(c) as applied to a temporal gap of "less than two months." *Clark*, 435 F.3d at 1107.

[79]  Pepe, like Judge Ferguson, *id*. at 1120, disagrees that a rational-basis standard applies, but he understands that a three-judge panel must follow the precedent of *Clark*.

27

**B. Section 2423(c) cannot be upheld as a valid exercise of Congress's authority under the Necessary and Proper Clause to execute the Treaty Power, especially given that Congress never invoked any treaty in passing that statute.**

The government contends that §2423(c) may be upheld as a valid exercise of Congress's power under the Necessary and Proper Clause to enact legislation implementing the Optional Protocol to the United Nations Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography, S. Treaty Doc. No. 106-37, 2000 WL 33366017 (July 5, 2000) (hereinafter "Optional Protocol").[80]  That's wrong for two reasons.

1.  Because modern treaties "'touch on almost every aspect of domestic, civil, political, and cultural life,'" an overbroad interpretation of the Necessary and Proper Clause as it relates to the Treaty Power "places Congress only one treaty away from acquiring a general police power." *Bond v. United States*, 134 S.Ct. 2077, 2100-01 (2014) (Scalia, J., joined by Thomas, J, concurring in the judgment).  The Treaty Power must therefore be limited to matters of legitimate international concern. *Id*. at 2102-11 (Thomas, J., joined by Scalia and Alito, JJ, concurring in the judgment); *id*. at 2111 (Alito, J., concurring in the judgment); *see*

---

[80]  GAB 39-43.

*also United States v. Fries*, 781 F.3d 1137, 1147-48 (9th Cir.) (referring to

"'Treaty Power's core'"), *cert. denied*, 136 S.Ct. 583 (2015).  Sexual abuse

occurring entirely within another country is not such a matter.[81]  Although the

government faults Pepe for relying on the concurring decisions in *Bond*,[82] the

majority in that case did not disagree with those decisions; rather, it avoided the

Treaty Power issue by narrowly interpreting the statute at issue.  *Bond*, 134 S.Ct at

2087.

2.  In any event, regardless of whether Congress *could have* enacted §2423(c) to

implement the Optional Protocol, there's no evidence that it actually did so.

Nothing in §2423(c)'s legislative history expressly invokes any treaty, let alone the

Optional Protocol.[83]  On the other hand, three things strongly suggest that Congress

intended to invoke the Foreign Commerce Clause, not the Treaty Power.  First, the

statute refers to "travel[] in foreign commerce," which reflects this intent.  *Cf.*

*United States v. Walls*, 784 F.3d 543, 547 (9th Cir.) (use of "affecting commerce"

in statute reflects Congress's intent to use Commerce Clause powers), *cert. denied*,

136 S.Ct. 226 (2015).  Second, although the legislation that actually enacted

---

[81]  AOB 64-66.

[82]  GAB 39-40 n.18.

[83]  AOB 67-69; GAB 35-36.

§2423(c) did not include a "Constitutional Authority Statement," the predecessor bill that first proposed that provision did include such a statement and invoked only the Commerce Clause. *Clark*, 435 F.3d at 1104.[84] Finally, in ratifying the Optional Protocol, the Senate stated that existing federal laws fulfilled the country's obligations under the treaty and therefore it did not intend to enact any new legislation to effectuate the treaty.[85]

Despite all this, the government contends that the Court can uphold §2423(c) simply because (a) that provision was enacted after the Optional Protocol was ratified, and (b) it deals with the same subject matter.[86] When Congress intends to implement a treaty, however, it expressly says so.[87] The government doesn't point

---

[84]  AOB 67-69.

[85]  AOB 68.

[86]  GAB 41-43.

[87]  AOB 70.  In addition to the examples given in the opening brief, other cases on which the government relies illustrate how Congress expressly utilizes the Necessary and Proper Clause to execute the Treaty Power.  *See United States v. Belfast*, 611 F.3d 783, 802, 806 (11th Cir. 2010) (Congress enacted the Torture Act with the express intent to implement the Convention Against Torture, and the Act tracked the provisions of the treaty in all material respects); *United States v. Yian*, 905 F.Supp. 160 (S.D.N.Y. 1995), *affirmed sub nom.*, *United States v. Lue*, 134

to any authority from this Court or any other circuit supporting the proposition that Congress's necessary-and-proper powers pertaining to treaties may be *inferred*. It cites only two district court cases that have so held—*United States v. Frank*, 486 F.Supp.2d 1353, 1355-59 (S.D. Fla. 2007), *affirmed on other grounds*, 599 F.3d 1221 (11th Cir. 2010); *United States v. Bollinger*, 966 F.Supp.2d 568, 572-75 (W.D.N.C. 2013), *affirmed on other grounds*, 798 F.3d 201 (4th Cir. 2015).[88] Although that holding was not adopted by the appellate court in either of those cases, the Fourth Circuit's comments in *Bollinger* when declining to reach the issue are instructive.[89] First, that court recognized the "danger … in stretching Congress's treaty-implementing powers to a point where they transgress principles of federalism and interfere with state police power" and cautioned that "courts should tread carefully in expanding that power." *Bollinger*, 798 F.3d at 208 n.3 (citing *Bond*). The Fourth Circuit also noted that "Congress chose not to expressly invoke its treaty-implementing powers in enacting Section 2423(c)." *Id*. These

---

F.3d 79, 81 (2nd Cir. 1998) (Hostage Taking Act designed to implement International Convention Against the Taking of Hostages). (GAB 40-41)

[88]   GAB 41, 43.

[89]   In his opening brief, Pepe noted the erroneous analysis in the district-court decision in *Bollinger*. (AOB 69) The Fourth Circuit issued its decision in that case after the opening brief was filed.

observations support Pepe's argument that Congress's use of those powers should not be inferred.  Otherwise, because treaties touch on almost every aspect of life, virtually any law could be justified as implicitly implementing some existing treaty, even where (as here) the law could not be upheld as a valid exercise of any other power enumerated in the Constitution.  In short, however expansive Congress's treaty-implementing powers may be, they must be clearly and expressly invoked.  That did not happen here.

## 4. If the Court does not reverse Pepe's convictions in a way that precludes a retrial, then it should at least remand for a new trial due to erroneous jury instructions.

For the reasons given above in §2, the trial evidence was insufficient to support Pepe's convictions under §2423(c), as properly construed.  But if the Court disagrees—and if it does not find the statute unconstitutional for the reasons set forth in §3—then it should still reverse Pepe's convictions and remand for a new trial for two separate and distinct jury-instruction errors.  First, the district court plainly erred in not instructing the jury that Pepe could not be convicted if he was a Cambodian resident.[90]  Second, the district court also erroneously rejected Pepe's

---

[90]  AOB 56.

request for an instruction requiring the jury to find that the alleged sex acts occurred immediately or soon after his travel in foreign commerce.[91] The government's only response to these arguments is that there were no instructional errors at all given its interpretation of the statute,[92] which is refuted above. Thus, the government does not dispute, and thereby concedes, that if Pepe's interpretation of the statute is correct, then these instructional errors require reversal. *See, e.g., United States v. Castillo-Marin*, 684 F.3d 914, 919 (9th Cir. 2012) (government conceded by waiver plain-error prongs not expressly challenged in answering brief).[93]

## 5. The Court should also remand for a new trial, at a minimum, because the district court admitted significant evidence derived from unconstitutional searches.

A retrial is also required due to multiple Fourth Amendment violations. As explained above in §1, the government has waived all harmlessness arguments, so if the Court concludes that any of the three challenged searches was unconstitutional, it should reverse Pepe's convictions.

---

[91]  AOB 48, 55.

[92]  GAB 93-94.

[93]  *See also* footnote 32, *supra*.

33

**A. The search of Pepe's Cambodian home violated the Fourth Amendment.**

The parties agree that the search of Pepe's Cambodian home violated the Fourth Amendment if (a) it was a joint venture between American and local agents, (b) it failed to comply with Cambodian law, and (c) the good-faith exception to the exclusionary rule doesn't apply.[94] All three of these things are true.

1. As detailed in the opening brief, the following facts establish that the search was the product of a joint venture between American agents and Cambodian police: BICE Agent Gary Phillips admitted that, from the beginning, he was interested in investigating Pepe for a possible criminal prosecution in the United States; a U.S. Embassy report was used to support the warrant for the search; Phillips played an active role in the search; a Cambodian search report refers to a "combined force" including American agents; the seized items were almost immediately turned over to the American agents; and a BICE report and PowerPoint slide prepared soon after the search (but before the government had a reason to minimize the American agents' role in the search during the suppression proceedings) reflect that the Americans and Cambodians were working closely

---

[94] AOB 72, 79, 81; GAB 58.

together.[95]  These facts are mostly undisputed; the government primarily contests only the characterization and significance of these facts.[96]

For example, it emphasizes Agent Phillips's claim that he was running a "parallel," not a "joint," investigation with Cambodian police.[97]  But what matters is how Phillips and the other American agents acted, not how they described their actions.  The government also claims that Agent Phillips did not play an active role in the search.[98]  The Court will be able to judge that for itself because there is a video of the search showing Phillips' involvement.[99]  Next, the government complains that Pepe mischaracterized a BICE report by quoting verbatim the opening paragraph reflecting that the investigation was a joint venture between American agents, local police, and NGOs.[100]  Again, the Court can evaluate the report itself.[101]  Finally, the government contends that Pepe improperly claims,

---

[95]  AOB 71-77.

[96]  GAB 16-23, 60-67.

[97]  GAB 17-18, 60-62.

[98]  GAB 20-22 & n.10, 62-65.

[99]  AOB 74-76.  Pepe has transmitted a copy of this video (Exhibit 105) to the Court.  *See* Docket Nos. 41-42.

[100]  AOB 71; GAB 61-62 n.28.

[101]  ER 79-83.

without support, that Phillips was present at his arrest.[102]  That is not true.  Pepe

accurately noted Phillips' denial that was present for the arrest,[103] but he also noted

Phillips' post-search PowerPoint slide that stated: "After interviewing victims, ICE

BKK, NGO's and CNP coordinated in the execution of an arrest warrant for

Pepe."[104]  Although the government tries to explain away that slide,[105] it is what it

is.

Pepe noted in his opening brief that this case is far more similar to cases where

this Court has found a joint venture to have existed than to those where it hasn't.

*Compare United States v. Barona*, 56 F.3d 1087, 1094 (9th Cir. 1995); *United*

*States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987), *with United States v.*

*LaChapelle*, 869 F.2d 488, 490 (9th Cir. 1989); *United States v. Benedict*, 647 F.2d

928, 929-31 (9th Cir. 1981); *United States v. Maher*, 645 F.2d 780, 783 (9th Cir.

1981); *United States v. Rose*, 570 F.2d 1358, 1362 (9th Cir. 1978); *Stonehill v.*

*United States*, 405 F.2d 738, 740-42, 746 (9th Cir. 1968).[106]  The government cites

---

[102] GAB 18-19, 61 & n.27.

[103] AOB 74.

[104] AOB 77.

[105] GAB 65-66.

[106] AOB 77-79.

the same cases but no others.[107]  Because the applicable authority has already been addressed in the opening brief, it does not merit further discussion here.  It remains true that under the Court's precedent, the totality of the circumstances in this case establish that there was a joint venture between American and Cambodian authorities.

2.  The joint-venture search of Pepe's home was unreasonable under the Fourth Amendment if it did not comply with Cambodian law.[108]  There's no dispute that Cambodian law required the search to be conducted in the presence of two witnesses, preferably neighbors, family members, or owners of the building.[109]  The government argues that a Cambodian police report proves that this requirement was satisfied because it reflects that "10 witnesses were present during the search in addition to the owner of the house and two of the victims."[110]  That report, however, lists "participants," not "witnesses."[111]  Even though these participants were clearly law-enforcement oriented, the government insists that "Cambodian law does not require the presence of 'defendant-friendly'

---

[107] GAB 57-59, 62, 64.

[108] AOB 79; GAB 58.

[109] AOB 79-80; GAB 67.

[110] GAB 67-68.

[111] ER 167-69.

witnesses[.]"[112]  But the only authority it cites in support of this assertion is the Cambodian law itself, which expressly reflects a preference for neighbors, family members, or building owners—in other words, *impartial* witnesses with no stake in the investigation.[113]  While it *might* be true that other Cambodian legal authority permits satisfaction of the law's two-witness requirement by prosecution-oriented participants, the government did not *prove* that.  That omission is fatal to the search given that *the government* had the burden to prove that it complied with the Fourth Amendment.  *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012).

3.  Finally, Pepe explained in the opening brief why the search cannot be salvaged by the good-faith exception to the exclusionary rule.[114]  The government's only response to this argument is its conclusory assertion in a footnote that it "has no support in the record."[115]  Because that unsupported statement is insufficient to raise a disputable issue on appeal, the government has

---

[112] GAB 68.

[113] ER 111-12, 146-47.

[114] AOB 81-82.

[115] GAB 68 n.30.

waived any reliance on the good-faith exception.[116]  The Court should therefore

find that the evidentiary fruits of the home search should have been suppressed.[117]

## B.  The subsequent search of computer drives at an American facility in Singapore also violated the Fourth Amendment.

BICE Agent Phillips sent computer drives seized during the search of Pepe's

home to an American facility in Singapore for forensic analysis by American

agents.[118]  The government contends that the request to have the drives forensically

searched by the United States came from the Cambodian government rather than

American agents.[119]  As explained in the opening brief, however, the request truly

originated with the Americans.[120]  Anyway, Phillips himself admitted that,

regardless of who made the request, he knew at the time that the forensic search

---

[116] *See* footnote 32, *supra*.

[117] If the Court so finds, then the subsequent searches of the computer drives and disks are irrelevant because those items (and anything on them) must be suppressed as the fruits of the home search.  (AOB 87 n.300)  Again, because the government does not dispute this, it has waived any arguments to the contrary.  *See* footnote 32, *supra*.

[118] AOB 82-83.

[119] GAB 69 n.31.

[120] AOB 82-83.

would further his own ongoing investigation.[121]  But none of this should really make a difference to the question presented here—namely, whether the government must comply with the Fourth Amendment's warrant requirement when a search is conducted on premises within the special territorial jurisdiction of the United States.[122]  In other words, it doesn't matter how the disks got to the American facility in Singapore if the warrant requirement applied once they arrived there.

The government evaluates the Singapore search entirely as a joint-venture foreign search.[123]  It therefore misses the point entirely.  The Fourth Amendment's warrant requirement applies—and thus the joint-venture doctrine is inapplicable— if, as Pepe contends, a search on premises within the special territorial jurisdiction of the United States is not a *foreign* search at all.[124]

The government does not dispute the key facts: (1) the location of the search (the BICE Attaché Office in Singapore, under the control of the U.S. Embassy there) is within the special territorial jurisdiction of the United States; and (2)

---

[121] ER 289-91.

[122] AOB 84-86.

[123] GAB 68-73.

[124] AOB 84-86.

federal courts have the authority to issue search warrants for such areas.[125]  The

government offers no response to Pepe's argument that the Fourth Amendment's

warrant requirement therefore applied, except for citing cases that are clearly

inapplicable because they deal with true foreign searches not conducted in areas of

American jurisdiction.  *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 262,

274-75 (1999) (search of private residence in Mexico); *Barona*, 56 F.3d at 1090

(wiretaps of European phone lines); *In re Terrorist Bombings of U.S. Embassies in

East Africa*, 552 F.3d 157, 159 (2nd Cir. 2008) (search of private residence in

Kenya and wiretaps there); *United States v. Juda*, 46 F.3d 961, 967-68 (9th Cir.

1995) (transmitter placed on private vessel in Australia).[126]  As noted in the

opening brief and acknowledged by the government, the problem with applying the

Fourth Amendment's warrant requirement to true foreign searches is that an

American warrant would have dubious legal significance in a foreign

jurisdiction.[127]  But that is simply not an issue where, as here, the items to be

searched are within an American jurisdiction where an American search warrant

can be executed.

---

[125]  AOB 85-86; GAB 68-73.

[126]  GAB 70-73.

[127]  AOB 84; GAB 70-72 & n.33.

The government notes in a footnote that the district court found that the Singapore search was conducted in good faith.[128]  But that finding was based entirely on the mistaken legal conclusion that the joint-venture doctrine applied and thus the American agents only had to have a good-faith belief that the search complied with Cambodian law.[129]  The government does not argue that the American agents could, in good faith, fail to obtain an American warrant for a search conducted in an area clearly under United States jurisdiction.  It has therefore waived any such argument.[130]

## C. The subsequent search of other computer disks in the United States also violated the Fourth Amendment.

If the Court concludes that the Singapore search was unconstitutional, then the parties agree that the final search of other computer disks in the United States was also unconstitutional unless the government proved *both* that the affidavit supporting the warrant for that search, when stripped of all references to the fruits of the Singapore search, established probable cause that Pepe committed the identified crimes (§2423(c) and the production-of-child-pornography-for-

---

[128] GAB 73 n.35.

[129] ER 24-25.

[130] *See* footnote 32, *supra.*

importation statute) *and* that the agents would have actually applied for the warrant if they had only the untainted information.[131]  Pepe explained in the opening brief why the government did not meet this burden given the limited information left in the affidavit after the Singapore evidence is excised.[132]  Only some of the government's arguments in response merit attention here.

The government contends that the suggestive file names and a claim that Pepe took naked photos of a woman's two nieces (whose ages were not stated) provided probable cause to search "for evidence of child pornography production."[133] That's not true for the reasons previously stated,[134] but even if it was, the government ignores that the crime alleged in the affidavit was production of child pornography *for importation into the United States*.[135]  The government offers absolutely no basis for concluding that child-pornography photos allegedly possessed and taken in Cambodia are sufficient, either standing alone or considered with the other untainted allegations in the affidavit, to even suggest that

---

[131] AOB 88-90; GAB 74-75.

[132] AOB 88-91.

[133] GAB 77.

[134] AOB 90.

[135] ER 182, 188, 200.

Pepe intended to *import* such images into the United States.[136]  It has therefore

waived any such arguments.[137]  It follows that the Court should reject the

government's contention that the affidavit supported searching for child

pornography as evidence *of that crime*.[138]  And contrary to what the government

claims, the affidavit did not supply a sufficient basis for connecting the child

pornography that was the object of the search to the only other alleged crime,

namely, illicit sex acts under §2423(c).[139]  Indeed, the government misstates the

facts when it contends that the letter described in the affidavit included Pepe's

admission that he possessed dozens of pornographic images of his child victims.[140]

Here's what the affidavit actually states: "Pepe mentioned several of his child

victims by name, including one for which Pepe had dozens of pornographic and

sexually-explicit photographs on his computer."[141]  Only the first clause of this

sentence reflects what's in the letter; the second clause refers to what was

---

[136] AOB 90.

[137] *See* footnote 32, *supra*.

[138] GAB 78-79.

[139] AOB 91; GAB 79-80.

[140] GAB 80.

[141] ER 197.

purportedly found on Pepe's computer during the Singapore search, which cannot be considered as part of the probable-cause analysis.

The government's claim that the redacted affidavit established probable cause for a §2423(c) violation also doesn't withstand scrutiny.[142]  Once references to the Singapore search are eliminated, the affidavit contains only bald allegations of undescribed evidence of sexual abuse, an unsubstantiated claim that four minors accused Pepe of sexually abusing them, and relatively-vague comments in a letter supposedly written by Pepe; that is not enough.[143]

## D. The government does not dispute that it should not be given another chance to satisfy its burden under the Fourth Amendment, so it has waived any contrary arguments.

In the opening brief, Pepe argued that because the government failed to meet its burden to show that the above-described searches did not violate the Fourth Amendment, the Court should remand with instructions requiring the suppression of the evidentiary fruits of the searches and preclude the government from presenting new evidence or legal theories in an attempt to justify the searches on

---

[142] GAB 77-78.

[143] AOB 90-91.

45

remand.[144]  The government did not respond, so it has waived any argument that this is not the appropriate remedy.[145]

## 6. If the Court does not reverse Pepe's convictions, then it should vacate the restitution portion of the judgment.

At the very least, the Court should vacate the quarter-million-dollar restitution order because the district court committed two errors, one of which the government concedes.  Contrary to what the government claims,[146] the plain-error standard does not apply here because Pepe's restitution objection was sufficient to preserve the issues.  *United States v. Pallares-Galan*, 359 F.3d 1088, 1094-95 (9th Cir. 2004).[147]  As discussed below, however, the district court's restitution mistakes amount to plain error anyway.

1.  The government concedes that the district court cited an inapplicable restitution statute (18 U.S.C. §2248) in imposing the challenged order.[148]  It nevertheless insists that this was "simply an inadvertent misstatement" because the

---

[144]  AOB 91.

[145]  *See* footnote 32, *supra*.

[146]  GAB 94-95 & n.41.

[147]  AOB 92 n.307.

[148]  AOB 93; GAB 96-97 & n.43.

district court purportedly must have intended to adopt the government's position that restitution was appropriate under 18 U.S.C. §3663A.[149] But the district court's silence on the matter actually reflects that it adopted the probation office's position, which was that §2248 applied.[150]

Contrary to what the government claims, Pepe did not "invite," and thereby "waive," this issue by citing the statute identified by the probation office (§2248) in his restitution filing, and thereby failing to recognize and object to the probation office's mistake.[151] First, as noted above, this issue was preserved by Pepe's objection to the restitution order.[152] In any event, Pepe's right to have restitution imposed under the correct statute was, at most, *forfeited* (and thus subject to plain-error review), not *waived*, which requires "the intentional relinquishment or abandonment of a known right." *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (en banc) (internal quotation marks omitted). Waiver occurs only if the defendant, with knowledge of the controlling law, "considered objecting ... but 'for some tactical or other reason rejected the idea.'" *United States v. Jimenez*, 258

---

[149] GAB 97.

[150] ER 2515, 2517, 2522.

[151] GAB 95-97 (citing ER 2000-03).

[152] AOB 92 n.307.

F.3d 1120, 1124 (9th Cir. 2001) (quoting *Perez*, 116 F.3d at 845). On the other hand, where a defendant "is unaware of a right that is being violated," the error is only forfeited. *Perez*, 116 F.3d at 846. Here, the record reflects that (at most) only an inadvertent forfeiture, not an affirmative waiver, occurred, so the Court can reverse for plain error.[153] And in *United States v. Fu Sheng Kuo*, 620 F.3d 1158, 1163-66 & n.2 (9th Cir. 2010), the Court recognized that the plain-error standard is satisfied where, as here, the district court used the wrong restitution statute and this Court cannot tell whether the restitution amount should have been lower.[154] As noted in the opening brief, and uncontested by the government, §2248 permits restitution for losses that are not covered by §3663A, so the permissible restitution is not the same under both statutes.[155]

The government claims that *Fu Sheng Kuo* is distinguishable because the district court here purportedly adopted the government's position and applied §3663A.[156] That argument, which has already been refuted above, goes to whether

---

[153] *See* ER 2000 (defense restitution filing mistakenly stating: "*Pursuant to* the mandatory restitution provisions of *18 U.S.C. §2248*, both the probation office *and the government* recommend that the court order restitution"; emphasis added).

[154] AOB 93.

[155] AOB 93.

[156] GAB 97-98.

there was error in the first place.  Thus, the government does not dispute, and thereby concedes, that if the district court did err, then the Court should grant relief under the plain-error standard.  *See, e.g., Castillo-Marin*, 684 F.3d at 919 (government conceded by waiver plain-error prongs not expressly challenged in answering brief).[157]

2.  Even *if* §3663A was the statute actually used by the district court, it still plainly erred in assessing the amount of restitution.[158]  Although the government cites boilerplate language about restitution making victims "whole," it acknowledges that §3663A only permits restitution for limited kinds of expenses: medical / psychological treatment; physical / occupational therapy and rehabilitation; lost income; and expenses related to participating in the criminal case.  *See* 18 U.S.C. §3663A(b)(2)&(4).[159]  As detailed in the opening brief, the majority of the claimed expenses do not fall into any of these categories.[160]  The government offers a weak argument, unsupported by any authority, that *all* of the NGOs' expenses were legitimately covered by the restitution order simply because

_____

[157] *See also* footnote 32, *supra*.

[158] AOB 94-100.

[159] AOB 94; GAB 98-101.

[160] AOB 95-97.

Pepe was supposedly the reason the girls had to live there.[161]  But even *if* that fact

is true, it doesn't justify characterizing every single NGO expense as "treatment"

for the girls.  Understandably, the government doesn't even try to defend the

multitude of clearly-inappropriate expenses claimed by the NGOs, which include,

for example, maintenance, salaries (for the cook / cleaner, groundskeeper,

maintenance worker, and security personnel), staff cell phones / phone cards,

employee education, "staff appreciation," staff healthcare, staff training translator,

government advocacy, kitchen supplies, office supplies, and unidentified "other

expenses."[162]  The government also denies that it had to prove what portion of the

girls' losses was attributable to Pepe as opposed to others who also victimized

them,[163] even though that's clearly required.  *Cf. United States v. Galan*, 804 F.3d

1287, 1289-91 (9th Cir. 2015).[164]  The government may favor a slapdash approach,

but §3663A requires "some precision" when calculating restitution, so mere

speculation that every expense actually furthered the girls' "treatment" isn't

sufficient.  *United States v. Ferdman*, 779 F.3d 1129, 1133 (10th Cir. 2015).

---

[161] GAB 101-03.

[162] AOB 95-97.

[163] GAB 105-06.

[164] AOB 97-100.

Rather, a court must estimate restitution "with some reasonable certainty." *United States v. Doe*, 488 F.3d 1154, 1160 (9th Cir. 2007).

The government cites *United States v. Doe*,[165] but that case actually highlights the district court's errors in this one. Significantly, the much-different restitution statute at issue in *Doe* included a broad catchall provision covering "any other losses suffered by the victim as a proximate result of the offense." *Id*. at 1159. Even then, however, the district court questioned certain claimed medical expenses and required assurances that the money would go only to services causally related to the offense. *Id*. at 1161. That kind of inquiry should have happened in Pepe's case. If it had, then the restitution order probably would have been closer to the average $2,000 per victim upheld in *Doe*, *id*. at 1160-62, instead of the average $35,000 per victim imposed in this case.

Contrary to what the government suggests at one point, that *other* (perhaps broader) restitution statutes *would have* applied to Pepe had he been convicted of *other* offenses is no reason to interpret §3663A "broadly here due to the circumstances of this case."[166] The meaning of that restitution statute does not

---

[165] GAB 103.

[166] GAB 103-04.

vary from case to case.  It has the same scope here as it has in every other case where it applies, so the restitution amount must be calculated accordingly.

In short, the restitution proceedings in the district court were deeply flawed. The Court should therefore vacate the restitution order and remand for the district court to apply the correct restitution statute and identify the appropriate restitution-eligible expenses.  This relief is appropriate even under the plain-error standard,[167] particularly given that correcting these errors "is so simple a task" because it does not require Pepe to "'be released or retried, but simply allows [the] district court to exercise properly its authority to impose a legally appropriate'" restitution order. *Cf. United States v. Vargem*, 747 F.3d 724, 729 (9th Cir. 2014) (regarding sentencing errors).

---

[167] AOB 94, 100.

52

# Conclusion

For the foregoing reasons, the Court should reverse Pepe's convictions. In the alternative, it should vacate the restitution award.

November 18, 2016

Respectfully submitted,

HILARY L. POTASHNER
Federal Public Defender

_____/s/ _James H. Locklin_____
JAMES H. LOCKLIN
Deputy Federal Public Defender

*Counsel for Defendant-Appellant*

# Certificate of Compliance re Brief Length

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify that: the foregoing brief uses 14 point Times New Roman proportionately spaced type; text is double spaced and footnotes are single spaced; a word count of the word processing system used to prepare the brief indicates that the brief (not including the table of contents, the table of authorities, the statement of related cases, the certificate of compliance re brief length, the addendum, or the certificate of service) contains approximately 10,130 words.  I am simultaneously filing a motion for leave to file this brief in excess of the applicable type-volume limitations.

November 18, 2016

  */s/ James H. Locklin*
JAMES H. LOCKLIN
Deputy Federal Public Defender

*Counsel for Defendant-Appellant*

54

# Certificate of Service

I hereby certify that on November 18, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *James H. Locklin*

JAMES H. LOCKLIN
Deputy Federal Public Defender

*Counsel for Defendant-Appellant*