No. 14-50095

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) |
| | ) |
| MICHAEL PEPE, | ) |
| | ) |
| Defendant-Appellant. | ) |
| | ) |

R E C E I V E D
MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**JUL 1 1 2017**

FILED _____
DOCKETED _____
                    DATE          INITIAL

---

**RONALD BOYAJIAN'S MOTION FOR RECONSIDERATION AND OR CLARIFICATION OF THE COURT'S ORDER OF JUNE 26, 2017 DENYING INTERVENTION; DECLARATION OF RONALD BOYAJIAN; EXHIBITS**

---

On Appeal from the United States District Court
for the Central District of California

The Honorable Dale S. Fischer, Presiding
No. CR-07-00168-DSF

Ronald G. Boyajian

Register # 33900-112,
U.S. Penitentiary Tucson
P.O. Box 24550
Tucson, AZ 85734

Proposed Intervenor,
In Pro Per

## MOTION FOR RECONSIDERATION AND OR CLARIFICATION OF THE COURT'S ORDER OF JUNE 26, 2017 DENYING INTERVENTION

On June 26, 2017, the same date Mr. Boyajian mail-filed his Reply [dkt #65] to the Government's Response, the Merits Panel (Judges Kleinfeld, Thomas, and Nguyen) summarily denied [doc. # 63] his Motion to Intervene.

Mr. Boyajian accordingly moves for reconsideration.

Reconsideration is necessary because the Merits Panel ruled without the benefit of the Reply brief due to its crossing in the mail with the court's Order.

Without the Reply brief the motion to intervene litigation is incomplete in large part because the government's interjecting a false and misleading novel assertion that its handling of the Pepe and Boyajian matters are entirely independent and wholly unrelated. The government argues Mr. Boyajian accordingly lacks standing to intervene.

A large portion of Mr. Boyajian's Reply, now supported by the attached Declaration, is dedicated to rebut the government's contention of "unrelatedness" between the Pepe and Boyajian prosecutions.

In view of the government's tendering facts in dispute, which it then argues are dispositive to the motion, this panel should remand to the distrct court in order to expand the record. In his Reply Mr. Boyajian, who is in federal custody, has asked the court for time to access records in order to prepare and present an

1

appendix supporting a showing as to "relatedness" between and across the Pepe and Boyajian prosecutions.

If denied reconsideration and or a remand, Mr. Boyajian asks the court is issue an Order for Clarification reciting issues and reasoning otherwise Mr. Boyajian's ability to obtain further review in this circuit and or in the Supreme Court could be jeopardized.

Conclusion

Mr. Boyajian Requests the court issue the following order(s):

1. Granting reconsideration, and vacating the June 26, 2017 order denying intervention; or if reconsideration is denied, then

2. Order for Clarification.

3. Remand to the district court for determination of "relatedness" of the prosecutions, if relevant to the court's determination.

Dated July 6, 2017                     Respectfully submitted,

Ronald Boyajian
Defendant-Appellant in pro se

## Declaration of Ronald Gerard Boyajian

I, Ronald Boyajian, in pro per, seek limited intervention as the proposed intervenor in the above captioned criminal appeal for Michael Pepe No. 14-50095 [hereinafter "Pepe"], and I am also the defendant-appellant in U.S. v Ronald Boyajian 16-50327 [hereinafter "Boyajian"].

This declaration is provided in support of my Reply to the Government's Response to the Motion to Intervene [dkt #65, mail-filed June 26, 2017, docketed July 3, 2017].

The specific purpose of this statement is to rebut the government's unsubstantiated assertion, first raised in said Government's Response that the government's handling of the Michael Pepe and Ronald Boyajian matters are "wholly unrelated." In my Reply Brief, I have asked the court to grant me three weeks' time in order to access case files and other materials in order to develop a cogent document-indexed appendix in response to the government assertion. Meanwhile, I am proffering the following information to assist the court. This statement is generated with the disability of extended federal custody in reliance on recollection of files and records long since removed at government instigation from my personal access. If called upon to testify I could competently state the following:

1.  There exist numerous indicia of relatedness between and across the

3

prosecutions of Pepe and Boyajian [myself].

2. Alone and or in combination these indicia favor a finding of relatedness over unrelatedness.

3. Exemplars of these indicia favoring finding "relatedness," and or the government's intertwining the Pepe and Boyajian prosecutions include:

   a. The same prosecutor [AUSA Patricia Donahue, AUSA Robert Dugdale, U.S. Attorney Thomas Obrien, AUSA Elizabeth Yang, to name a few] and U.S. Attorney Office [Los Angeles] micromanaging and simultaneously directing both investigations and prosecutions,

   b. The same DOJ staff micromanaging the international affairs[ DOJ Office of International Affairs]

   c. The same Homeland Security investigative teams in Washington, Long Beach, and Bangkok, Thailand

   d. The same U.S. law enforcement sweep operation(s),

   e. The same foreign provisional arrest and detention under torture conditions abroad;

   f. The same initiating target's "disruption" by alleging the same alleged conduct [sexual contact with underage minor] followed later by the same in secret and by surprise extra-judicial intercontinental rendition to the United States for trial on a domestic [US] allegation under 18

4

U.S.C. 2423(c) [sexual contact with underage minor].

g. The same panoply of law enforcement agencies partnering with said same prosecutor/U.S. Attorney across the Pepe and Boyajian matters,

h. The same prosecution-partnered foreign sovereign, including e.g., the Royal Kingdom of Cambodia's executive branch (among additional entities and branches of participating or otherwise involved foreign sovereigns)

i. The same "in country" [i.e. acting on foreign soil] teams of U.S. contractors and proxies and "fixers" right down to the identical operatives [e.g., Mr. Va Tong among others]

j. The same US government direct employs as Foreign Service National "fixers," [e.g., DHS ICE FSN Mr. Suos Vansak[1] and also

---

[1] Mr. Vansak served as "fixer/enforcer" working in Cambodia under the express directions of U.S. Attorney Los Angeles simultaneously in the Pepe and Boyajian investigations and prosecutions. Although a Cambodian native citizen and at least green carded, if not naturalized U.S. citizen he was prohibited from responding to criminal court subpoena in Cambodia by intervention by the DOS RSO asserting Mr. Vansak carries full diplomatic immunity, and he could not be enforceable subpoenaed to trial proceedings in the U.S. case as he is beyond the courts power as occurred in the Boyajian case. This fixer was thus by intricate orchestration made NOT subject to any jurisdiction or rules based official conduct. Importantly he holds critical information as to both Boyajian and Pepe government misconduct and he himself is accused of and relieved from service in relation to extensive unmonitored associations and contacts with the kidnapped children and others foundational to both Pepe and Boyajian investigation and prosecutions and defense. The government's ingenius creation of and use of Mr. Vansak's double

5

simultaneously DOS Division of Diplomatic Security Regional Security Office subordinate agent].

k. The same Department of State officials, in U.S. and in Phnom Penh, Cambodia and in Bangkok, Thailand

l. The same foreign national law enforcement, the Cambodian National Police from commandant of the National Police right down to the identical case officers fronting for U.S. operations in Phnom Penh Capital City;

m. The same executive branch agencies and officials [the same Minister of Interior and same undersecretaries, the same Minister of Justice and same undersecretaries, e.g. especially Undersecretary His Excellency Mr. Koeut Rith]

n. The same foreign courts and foreign court procedures.

4. I further assert on information and belief that there exist specific operational characteristics, that is modes of implementation that are or appear identical and likely to be intertwined between and across the Pepe and Boyajian prosecutions including:

a. The consistent deliberate U.S. violations of the national, territorial, and judicial sovereignty of Cambodia. for example, the U.S.

country subpoena-exempt fixer role to boost the Pepe and Boyajian cases is proof they are intertwined at many levels.

unrestrained illegal search and seizure of foreign domiciled persons, their images, their speech, their property, including surveillance of their digital activities and all activities, the search and seizure of Cambodian nationals their persons, images, speech and surveillance of their activities without limitation—all without any lawful Cambodia court authority.

b. The same "end run" around the Cambodian Ministry of Foreign Affairs to facilitate "document-less" sovereignty violations

c. The same drive by U.S. officials and their proxies to coerce and bribe Cambodian officials to serve the interests of the U.S. officials [universally termed "what the U.S. wants"] as prioritized over and above and almost always at the expense of crucial Cambodian sovereignties.

5. I further assert on information and belief that these same gross human rights violators who engineered abuses toward Pepe and Boyajian were also the government's fixers of choice to kidnap and confine a gaggle of Vietnamese minors through force, fraud, coercion, sequestration, and intensive religious deprogramming. All Vietnamese minors placed into Boyajian's and Pepe's first Cambodian court and then later US court prosecutions were removed from their family homes. There were no movie script style rescues from

"lock and key" child brothels. This difference is critical because Asian counties like Cambodia share modern civilization rule of law as to family matters including especially requiring use of JUDICIAL legal process, as required under Cambodian domestic law, TO LIMIT OR IN THE MOST RARE AND EXTREME CASES TO DISSOLVE PARENTAL GUARDIANSHIP WITH TRANSFER OF CUSOTDY TO ANOTHER RELATIVE. After government kidnapping Vietnamese children by home invasion forcible removals they were all warehoused by sequential captors. Vietnamese children, uniquely, are able to be easily passed from shell organization to shell organization in Cambodia before rendition to the United States. Each shell entity has a specific assembly-line like subcontracted function, e.g. Cambodia's World Hope function is to immediately break down the autonomy and intensively deprogram all vestiges of the native/traditional Vietnamese religious orientations and install a new "religion" in place; Hagar's function is to long-term consolidate the new "religion" and prevent recrudescence of native religious urgings, while also intensively coaching for projected needs counseled by U.S. prosecutors and their proxies. Here, the same prosecutor in Pepe and Boyajian instructed the same proxies to a) maintain the same illegal forcible lock and key confinement for one decade and longer, and with b) the same

8

formulaic sequestration from their parents although some parents were dying and did die without ever reuniting with their kidnapped children. The sequestration and imprisonment has continued in Pepe and Boyajian until the children [all adults] testified in U.S. court but several though adults are held permanently imprisoned. The U.S. government's /contractors' child kidnapping and child trafficking crimes are identical in Pepe and Boyajian, featuring:

a. The same avoidance of Cambodian domestic law and use of covert removing children from families without any custody proceedings,

b. The same forcible religious deprogramming

c. The same HEAVY "U.S. diplomatic cover" provided by the government. The need for shielding complicit U.S. agencies and contractors' conducting these extraordinary child rights abuses is chronicled in diplomatic cables.[2] The diplomatic cables purport to suggest interference in Cambodian judiciary should be joined with aggressive pressure on Cambodian executive branch to stamp out any

---

[2] See Exhibit A. Diplomatic Cable_ 09PHNOMPENH628 sent from US Ambassador Phnom Penh to Secretary of State Hillary Clinton bemoaning **"there is no guardian ad litem law in Cambodia that transfers legal guardianship of children to the State**," discussing the need to provide diplomatic cover for criminal liability of the government's proxies' to use Embassy intervention to "dismiss" and otherwise stave off indictments for felony child kidnappings and illegal confinements in actions attempted to be brought by Vietnamese parents and families seeking reunification with their stolen children.

9

native Vietnamese resistance to kidnapping and religiously

reprogramming their children. There are several examples of the

Cambodian judiciary being stopped in its tracks from assisting

Vietnamese families seeking reunification or visitation right with their

kidnapped children being warehoused for US interests.

6. I further assert under information and belief that the very same official and

unofficial parties engaged in a) the illegal kidnapping detention and

rendition of Pepe and Boyajian and also in parallel b) kidnapping and

illegally confining the Vietnamese children they need for their promotional

interests.[3] In all known instances the government and its contractors operate

---

[3] See Exhibit B. USAID report INTERNATIONAL JUSTICE MISSION
ANTI-TRAFFICKING PROGRAM IN CAMBODIA: ASSESSMENT (at pages
13-14) detailing the concerns levied by women and child rights advocacy groups
regarding how no one can do anything about U.S. contractors specifically accused
International Justice Mission among others, documenting their actively kidnapping
and illegally forcibly confining Vietnamese minors in Cambodia in violation of
domestic laws and universal human and child rights. There are no standard
guidelines or policies for aftercare facilities. Both COSECAM and
Asia Regional Cooperation to Prevent People Trafficking (ARCPPT) are currently
developing their own standards. Of major concern is whether shelters should have
an open door policy, allowing victims to leave at any time. Some shelters,
including World Vision, Children of Cambodia and Hagar attempt to hold victim-
witnesses against their will while awaiting the trial of their traffickers or brothel
owners. AFESIP holds victims for two weeks to assess their situation, after which
they are free to leave. In some cases, the children's families ask for their return but
the shelter may refuse out of a fear of re-trafficking. There are repeated incidences
of children, especially Vietnamese, escaping from aftercare facilities.
**The issue of holding children and women against their will and under what
conditions was unclear among the legal organizations interviewed**. Some,

in deliberate knowing indifference to their extreme violation of applicable

international treaties and conventions, U.S. law,[4] and Cambodian domestic

law. Paragraph (b) above pertains especially to Action Pour Les Enfants,

World Vision, International Justice Mission [aka IJM], World Hope

International, Hagar, and AGAPE religious contractors.

7. I am informed and believe that the U.S. prosecutor already years ago

conceded on many of the above referenced foundational facts that I am using

in drawing the parallels made here between Pepe and Boyajian to rebut the

governments novel assertion that its investigations and prosecutions of Pepe

---

including AFESIP and CWCC claimed that it was illegal to hold people against
their will. Others contend that shelters can hold children with permission from their
parents. **The Cambodian National Council for Children is lobbying for a law
making it illegal to hold children against their will pending trial**. If the parents
are implicated in trafficking of their children, shelters can seek legal custody
through the court."... "Although there is no evidence of discrimination against
Vietnamese girls in brothels, this is not the case in aftercare facilities. **The enmity
between the Khmer and Vietnamese spills over to these victims. Vietnamese
victims may not be treated as well as others in some shelters**..."

[4] For example, contractor's usage of heavy psychotropic [mind altering]
medications to ensure behavioral compliance require proper custody for lawful
administration. Federal Judges may not be aware since all these kidnapped
Vietnamese children are in de facto U.S. government custodial detention their
**psychotropic control regimens must be authorized by a medical doctor under
a JUDICIAL ORDER.** See Exhibit C, Medical Board of California Winter 2017
Newsletter, at page 13, Prescribing Psychotropic Medications to Children in Foster
Care: specifically "*the [six-page] form filled out by the treating physician is
considered by the judge, who also considers input from several parties prior to
authorizing the medication: the child, the child's caregiver, the child's Indian
tribe, and the Court Appointed Special Advocate.*" Such judicial orders are
identically lacking in both Pepe and Boyajian.

and Boyajian are "completely" and "wholly unrelated."

I declare under penalty of perjury the foregoing factual assertions contained therein are true and fair representations according to my information and belief, to the best of my recollection while for extended duration sequestered from any files during my federal custody circumstances.

Executed on July 6, 2017 in Tucson, Arizona.

Ronald Boyajian

Ronald Boyajian

# EXHIBIT A

WikiLeaks    Leaks   News   About   Partners        Search        🔍 Shop   Donate   Submit

# PUBLIC LIBRARY OF US DIPLOMACY

Specified Search     View Map     Make Timegraph     View Tags     Image Library

|  |  |
|---|---|
| Date: **1970 January 1, 00:00 (Thursday)** | Canonical ID: **09PHNOMPENH628_a** |
| Original Classification: **-- N/A or Blank --** | Current Classification: **-- N/A or Blank --** |
| Handling Restrictions | Character Count: **12314** |
| Executive Order: **-- N/A or Blank --** | Locator: **-- N/A or Blank --** |
| TAGS: **-- N/A or Blank --** | Concepts: **-- N/A or Blank --** |
| Enclosure: **-- N/A or Blank --** | Type: **-- N/A or Blank --** |
|  | Archive Status: **-- N/A or Blank --** |
| From: **-- N/A OR BLANK --** | Markings: **-- N/A or Blank --** |
| To: **-- N/A OR BLANK --** |  |

```
UNCLAS SECTION 01 OF 03 PHNOM PENH 000628


SENSITIVE
SIPDIS


STATE FOR EAP/MLS, H, P, D, DRL, G/TIP


E.O. 12958: N/A
TAGS: PGOV, PHUM, PREL, OREP, KTIP, KWMN, CB
SUBJECT: STAFFDEL LERNER VISITS CAMBODIA


REF: PHNOM PENH 549 AND PREVIOUS


SENSITIVE BUT UNCLASSIFIED


1. (SBU) SUMMARY:  A Senate staff delegation (STAFFDEL)
visited Cambodia from August 15-19 to discuss trafficking in
persons, human rights, and refugee issues.  The STAFFDEL met
with government officials at both the provincial and national
levels, opposition politicians, and a variety of
non-governmental organizations.  The STAFFDEL noted how
foreign donor interest in HIV/AIDS and TIP has yielded a
patchwork quality of government that is quite progressive in
its response to some issues, but deeply lacking in others.
Moreover, they agreed it was still early for this
post-conflict society to address effectively some of these
difficult issues.  END SUMMARY.


DPM Sar Kheng: Cooperation Key to Anti-TIP Efforts
-------------------------------------------- -----


2.  (SBU) STAFFDEL Lerner, comprised of Robin Lerner, Counsel
```

Committee; and Ann Norris, staff to Senator Barbara Boxer had
a varied schedule of meetings in Cambodia August 15-19,
primarily focused on TIP.  In their highest level meeting,
the STAFFDEL, accompanied by the Deputy Chief of Mission
(DCM), met on August 18 with Deputy Prime Minister (DPM) and
Minister of Interior Sar Kheng.  The DPM, head of the Royal
Government of Cambodia's (RGC) anti-TIP efforts, described
the interagency structure the RGC is putting in place to
improve cooperation and communication between ministries, and
between the RGC and NGOs, to combat human trafficking.  He
stated that this improved National Commission to counter
trafficking will be formalized with a Sub-Decree signed by
the Prime Minister this fall.  Following the adoption of the
Sub-Decree, the National Commission will examine and put a
five-year anti-trafficking plan in place (covering
2009-2013).

3.  (SBU) The DPM noted that he had reviewed convictions in
TIP cases with the Minister of Justice, and indicated his
intention to continue joint reviews of arrests and
convictions, and to establish clear standards for
investigating and pursuing TIP cases.  In addition, the DPM
has proposed that a police officer be present at every
TIP-related trial, to provide additional testimony as needed,
and to protect cases for successful prosecution.

4.  (SBU) The DPM acknowledged that defining TIP can be
difficult, especially when relating it to cases of interest
to the USG.  Ultimately, he said, the RGC defines TIP
perpetrators as those who persuade people to travel to a new
place with the promise of a good job, and then place them in
a brothel or other exploitative situation. (COMMENT: This
definition demonstrates that the DPM has a clear
understanding of the issue, as defined in U.S. law, though
lower-level officials in the RGC often struggle to understand
the problem.  END COMMENT.)  The DPM lamented that many
victims claim they participate in exploitative activities
voluntarily, making intervention difficult.  He stated that
the problem cannot be solved quickly, but that he believed it
was slowly getting better.

5.  (SBU) When asked about the main challenges facing
anti-TIP efforts, the DPM said that the RGC needs greater
efforts to spread information about the TIP problem to the
general public, especially in the provinces.  He thanked
USAID and The Asia Foundation for their assistance in these
efforts, but recognized that the RGC must still do more with

national seminar, to broaden knowledge and experience with
TIP cases to all members of the police forces.  He expressed
appreciation for U.S. cooperation toward this goal.


Victim Protection Challenges Remain
------------------------------------

6.  (SBU) The STAFFDEL also met with working-level contacts
on TIP at the Ministry of Social Affairs (MOSAVY), Ministry
of Interior (MOI) and Ministry of Justice (MOJ).  All
meetings raised the issue of victim protections, and the need
to improve protection standards to support more prosecutions.
 MOI officials emphasized a need for the RGC to provide
incentives to encourage victims to identify themselves and
testify against their abusers.  At MOJ, contacts said witness
reluctance to testify against perpetrators remained a
challenge, but that because victim testimony in court is
required under Cambodia's legal system, encouraging victim


PHNOM PENH 00000628  002 OF 003


testimony was a key priority.

7.  (SBU) As evidence of the need for the RGC to improve and
standardize victim protections, one MOJ contact described a
call she received from a victim protection NGO requesting
help because a victim's parents were suing the shelter for
illegal detention of their daughter.  Victims located by
police and social workers are referred to shelters through an
order signed by the MOSAVY, but there is no guardian ad litem
law in Cambodia that transfers legal guardianship of children
to the State.  In this case, a female minor was referred to a
shelter for care, but her mother, who is believed to have
sold the victim initially, has sued individual shelter
workers for refusing to return her daughter to her.  The NGO
workers could countersue for personal defamation, or file a
civil complaint on behalf of the victim alleging human
trafficking, but the groups involved say they are highly
reluctant to do so because they don't want the public
spotlight attendant with a countersuit.  The shelter director
believes the suit is without merit, since they have the
referral form signed by MOSAVY, and has asked the MOJ for
assistance in getting the case dismissed.


NGO Meetings Describe Anti-Trafficking Programs
--------------------------------------------- --

Phnom Penh, including International Justice Mission (IJM),
LICADHO, The Asia Foundation (TAF), International
Organization for Migration (IOM), the UN Inter-Agency Project
on Human Trafficking (UNIAP), and World Hope International.
Of particular note was the conversation with IOM and UNIAP
that focused on labor-trafficking issues and the effects of
the economic downturn on the commercial entertainment
industry that is often a front for prostitution and a gateway
to trafficking.  UNIAP discussed the outcome of its survey of
women currently working in entertainment venues such as bars,
karaoke parlors, and massage parlors.  UNIAP's Lim Tith said
the study found that approximately 10% of the women surveyed
self-reported that they believed they had been trafficked
into the industry.  The study found an increase in the number
of women entering entertainment work in the last nine months,
but no increase in reported use of deception, cheating, or
brokering that is typically involved with trafficking.


Opposition Discusses Human Rights and Women's Issues
--------------------------------------------- -------

9.  (SBU) The DCM hosted a reception for the STAFFDEL and a
select group of politicians representing opposition political
parties.  Approximately 15 guests attended from the Sam
Rainsy Party (SRP) and Human Rights Party (HRP), including
Party Presidents Sam Rainsy and Kem Sokha.  The STAFFDEL
spoke in-depth with the politicians about recent
constrictions on free speech and assembly.  Tioulong Saumura,
the MP from Phnom Penh and Sam Rainsy's wife, discussed the
unequal treatment of women in Cambodia and the need to
provide better opportunities for education to women and girls
in Cambodia.  Referring to the recent defamation case against
MP Mu Sochua (septels), Tioulong expressed support for Mu's
case against the PM, opined that many Cambodian women were
offended by the Prime Minister's April 4 speech, and believed
that many would think differently about supporting the PM in
the future.


Trip to Siem Reap Highlights NGO Activity
-----------------------------------------

10. (SBU) The STAFFDEL also spent two days in Siem Reap
visiting NGOs and provincial government officials.  A stop at
the rehabilitation shelter run by Somaly Mam's AFESIP
organization provided an overview of the problems facing
trafficking victims.  Of the more than 60 girls resident at

**WikiLeaks**    Leaks   News   About   Partners          Q   Shop   Donate   Submit

hairdressing, and other tasks, many of the girls struggle
with basic literacy and numeracy they would need to open
their own businesses. Some of the girls had recently
returned to Siem Reap after attending a program in Colorado
to work on English-language skills, and they led the tours
around the shelter. Mam told the STAFFDEL of her goal to
train a group of former victims as public speakers, who could
tell their stories and be representatives of trafficking
victims world-wide.

11. (SBU) The STAFFDEL also visited a USAID-funded
hospitality school for at-risk youth, which trains young
people to become restaurant cooks, servers, hotel
housekeepers, or front desk representatives. Students of the

PHNOM PENH 00000628  003 OF 003

school, Sala Bai, are often in high demand by industry
businesses, since the one-year training program ensures the
students have the necessary skills to do the work. Several
former students were on hand during the school holiday break
to describe how the opportunity to train for a hospitality
job meant increased employment options, higher starting
salaries, and more rapid advancement in their careers.

12. (SBU) The STAFFDEL met with representatives of four
provincial government departments who are members of the Siem
Reap Provincial Command Unit (PCU), along with three
permanent staff of the PCU Secretariat. Where the National
Task Force brings together high-level representatives from
all national ministries with a role in anti-trafficking
policy, the PCU does the same at a provincial level. All
provinces in Cambodia have been asked to establish such a
unit, and two - in Siem Reap and Svay Rieng - have received
additional training and assistance through a USAID pilot
program to improve the functioning of the group. As in Phnom
Penh, the provincial officials stressed the importance of a
strong victim protection network and how better protections
might persuade frightened victims to identify themselves.

COMMENT
-------

13. (SBU) This was the first visit to Cambodia for all three
staffers. The variety of meetings during their trip made it
clear that in this post-conflict society, "it's still early

**WikiLeaks**   Leaks   News   About   Partners          Q   Shop   Donate   Submit

yielded a patchwork quality of government that is quite
progressive in its response to some issues, but deeply
lacking in others.  They cited as an example the existence of
the 2008 anti-TIP law, but the lack of a current Penal Code
that defines crimes.  The staffers each noted that "you
really have to come here to understand; it's so much easier
to judge the deficiencies when you haven't been here to
understand what's missing."

14.  (SBU) For their part, the Cambodian interlocutors
welcomed the STAFFDEL, using the opportunity to emphasize and
highlight the work being done to combat TIP.  Government
contacts were relatively forthcoming with the visitors, with
one MOI contact noting that they "know the anti-TIP law is
not perfect," but they are working on implementation and hope
to improve it as a tool over time.  The STAFFDEL seemed quite
pleased with the apparent good cooperation and the work being
done by many USG agencies in Cambodia.  The trip was
successful in promoting a realistic picture of the successes
and challenges of Cambodia's anti-trafficking efforts; we
hope in turn that it helps inform a realistic view in
Washington as well.  END COMMENT
RODLEY

**References to this document in other cables**                     **References in this document to other cables**
           09PHNOMPENH709                                              09PHNOMPENH549
           09PHNOMPENH707

If the reference is ambiguous all possibilities are listed.

## Help Expand The Public Library of US Diplomacy

Your role is important:
WikiLeaks maintains its robust independence through your contributions.

Use your credit card to send donations

The Freedom of the Press Foundation is tax deductible in the U.S.

### Donate to WikiLeaks via the
### Freedom of the Press Foundation

**For other ways to donate please see https://shop.wikileaks.org/donate**

# EXHIBIT B



# INTERNATIONAL JUSTICE MISSION
# ANTI-TRAFFICKING PROGRAM IN CAMBODIA

# ASSESSMENT

February 10, 2006

U.S. Agency for International Development
1300 Pennsylvania Avenue, NW
Washington, DC 20523
www.usaid.gov

## CONTENTS

Executive Summary                                                                          iv

SECTION I       Assessment Objective and Methodology                                        6

SECTION II      Scope of the Trafficking Situation                                          7

SECTION III     Analysis of IJM Activities                                                  9
                A.  Overview of Activities                                                   9
                B.  Analysis                                                                10
                B1. Strengths                                                               10
                B2. Challenges                                                              11

SECTION IV      Recommendations                                                            16

SECTION V       Overview of Anti-Trafficking Responses in Cambodia                         19
                A.  Rescue Services                                                         19
                B.  Shelter and Support Services                                            20
                C.  Legal Services                                                          21
                D.  Prosecution and Government Support                                      21
                E.  Technical Assistance and Research                                       23

ANNEX A         List of Interviews                                                         24

ANNEX B         Bibliography                                                               27

## List of Abbreviations

| | |
|---|---|
| AHTJPU | Anti-human Trafficking Juvenile Protection Unit |
| ARCPPT | Asia Regional Cooperation to Prevent People Trafficking |
| CDP | Cambodia Defenders Project |
| COMMIT | The Coordinated Mekong Ministerial Initiative against Trafficking |
| CWCC | Cambodian Women's Crisis Center |
| CWDA | Cambodian Women's Development Association |
| HPI | Human Poverty Index |
| IJM | International Justice Mission |
| INGO | International non-governmental organization |
| IOM | International Office of Migration |
| LSWC | Legal Support for Women and Children |
| MOI | Ministry of the Interior |
| MoSAVY | Ministry of Social Affairs, Veterans and Youth Rehabilitation |
| MOU | Memorandum of Understanding |
| MoWA | Ministry of Women's Affairs |
| NGO | Non-governmental organization |
| PJJ | Protection of Juvenile Justice |
| RGC | Royal Government of Cambodia |
| SOW | Scope of Work |
| TAF | The Asia Foundation |
| TIP | Trafficking in persons |
| UN | United Nations |
| UNIAP | UN Inter Agency Project on Human Trafficking |
| UNICEF | United Nations Children's Fund |
| WH | World Hope |
| WID | Women in Development |
| WV | World Vision |

# Executive Summary

Cambodia is a source, transit and destination country for children and adults trafficked for sexual exploitation and forced labor. Khmer and Vietnamese women and girls, both within Cambodia and from other countries, are trafficked into the commercial sex trade, often ending up in tourist destinations such as Siem Reap, Sihanouvkville, Phnom Penh, and until recently, Svay Pak. The majority of trafficking victims come from rural areas. Traffickers recruit victims within their villages, while they are attempting to migrate, or soon after arrival to an urban area.

USAID has provided funding for a number of organizations to implement anti-trafficking activities in Cambodia. In September 2003, USAID's Office of Women in Development (WID Office), provided $994,761 to support the International Justice Mission's (IJM) 2-year anti-trafficking program in Cambodia. This cooperative agreement marked the first funding that IJM had received from USAID. IJM's programs to combat trafficking focus on rescue and prosecution through investigations of trafficking, provision of technical assistance to the police and support for brothel raids and prosecutions of traffickers.

An assessment of the IJM anti-trafficking program in Cambodia was conducted from November 1- 11, 2005 by USAID. The purpose was to determine whether IJM met its objectives and to identify the strengths and weaknesses of its proactive rescue and prosecution approach within the Cambodian context. IJM's objective in Cambodia is to reduce the victimization of minors who are at risk of, or who have been trafficked into sexual exploitation, through three activities:

1) Establishment of a **permanent office** in Phnom Penh;

2) **Investigative training** for officers of the Anti-human Trafficking Juvenile Protection Unit (AHTJPU); and

3) **Legal advocacy** to ensure prosecution of human traffickers

The assessment included a review of pertinent documents, a pre-trip meeting with IJM/Washington to discuss the assessment and extensive interviews with stakeholders during a two-week visit to Cambodia. Although the purpose of this assessment centered on the IJM cooperative agreement, it was important to look at IJM's approach and work within the context

of the human trafficking situation in Cambodia and of their relationship to other anti-trafficking programs. IJM's approach is only one piece, albeit an important one, of the strategy needed to combat trafficking. Its effectiveness depends, importantly, upon connections and collaboration with those who are working on other components of the strategy to eliminate trafficking, particularly aftercare, legal representation and law enforcement.

Prior to this cooperative agreement IJM did not have an office in Cambodia, although it was working in the country. At that time, NGOs and the government saw IJM's approach to investigations and rescues as uncooperative and aggressive. IJM took a very central and activist role in the actual raids and rescues. During the past two years, IJM has established a permanent office and staff in Cambodia and has become much more open and approachable. The organization is working well with the police who now are taking the upfront role in the raids and rescues and who have benefited from the training provided by IJM.

IJM's efforts play a useful role in fighting trafficking in persons in Phnom Penh. Its investigations provide thorough and valuable evidence, sufficient to obtain convictions of traffickers. IJM has forged strong collaboration with AHTJPU in the Ministry of Interior and the Municipal police. Its investigation of brothels using underage girls and its quick action in mobilizing the police to organize raids on brothels and rescue victims is proactive and effective. IJM has exceeded the number of trainings, rescues and prosecutions originally targeted.

Corruption and poorly trained law enforcement are exogenous factors with which IJM must contend. Despite these significant obstacles, IJM has continued to respond in a proactive and aggressive manner, and to increase cooperation within the anti-trafficking community. In light of some criticisms of IJM for lack of collaboration with NGOs and certain government ministries, IJM should continue to work on building bridges with several government departments, particularly the Ministry of Women's Affairs (MoWA), and Ministry of Social Affairs, Veterans and Youth Rehabilitation (MoSAVY), as well as with international NGOs, UN agencies and local NGOs.

**SECTION I**

## Assessment Methodology

The USAID Office of Women in Development (WID Office) supported this assessment of the International Justice Mission's (IJM) anti-trafficking cooperative agreement with USAID for Cambodia. The assessment, which took place from November 1-11, 2005, included Katherine Blakeslee, Director of the WID Office, Wendy Blanpied, consultant and Serey Chan of USAID/Cambodia. The objective of the assessment was to determine if IJM met its program objectives and to identify the strengths and weaknesses of IJM's proactive rescue and prosecution approach within the Cambodian context.

Prior to arrival in Cambodia, pertinent literature and documents were reviewed and organizations and individuals to be interviewed in Cambodia were identified with the assistance of IJM and USAID/Cambodia. Kostos Kotopoulos, Director of Program Development for IJM in Washington DC, provided background information on IJM. Upon arrival in country, the Mission Director and mission staff discussed details of the assessment. Over the course of two weeks, meetings were held with over 30 non-governmental organizations (NGOs), international non-governmental organizations (INGOs), the United States Embassy, the Royal Government of Cambodia (RGC), United Nations agencies and IJM. One or more individuals from USAID/Cambodia attended most of the stakeholder meetings. A debrief was conducted with the United States Ambassador to the Kingdom of Cambodia, Joseph A. Mussomeli; the Deputy Chief of Mission, Mark Storella; USAID Mission Director, Jonathan Addleton; USAID Office of General Development Director, Reed Aeschliman; and USAID Office of General Development Program Officer, Bruce Etling. A separate debrief was held with IJM Director Kaign Christy and Director of Operations, Ron Dunne.

This report provides background on the trafficking situation in Cambodia as the context, identifies the extent to which IJM achieved its objectives, the effectiveness of its approach, its fit with other anti-trafficking activities in Cambodia, and its strengths and challenges. The assessment focused on IJM's activities including criminal investigation, assistance to and cooperation with the police, rescues and prosecutions. Because IJM's activities form only one part of the range of activities needed to combat trafficking in persons, related anti-trafficking activities, aftercare for rescued victims, security and legal representation were reviewed. A list of those interviewed and written sources consulted are included in the annexes.

**SECTION II**

# Scope of the Trafficking Situation

The Kingdom of Cambodia has a total of 13.4 million inhabitants, 90 percent Khmer and 10 percent other, including Vietnamese, Chinese, Cham and indigenous hill tribes. It is one of the poorest countries in Southeast Asia. The overall literacy rate is 37.1 percent, although for adult females it is only 29.2 percent. Cambodia's infant, child and maternal mortality rates are the highest in Asia. Cambodia has achieved a significant decline in its HIV/AIDS prevalence rate because of effective health outreach. According to the last HIV Sentinel Surveillance report in 2003, the prevalence rate for brothel-based prostitutes was 20.8%.

Cambodia is a source, transit and destination country for children and adults trafficked for commercial sexual exploitation and forced labor. Cambodian women and girls are trafficked into Thailand and Malaysia for sexual exploitation. Khmer, ethnic Vietnamese residing in Cambodia, and Vietnamese women and girls are trafficked into the sex trade, often ending up in tourist destinations such as Siem Reap, Sihanouvkville, Phnom Penh, and until recently, Svay Pak. Traffickers in Cambodia are not believed to be involved in large well-organized mafia-like networks. According to IJM, two-thirds of traffickers are women, referred to as *mamasans*.

Cambodian NGOs report that domestic violence and rape often are precursors to trafficking among Khmer girls. Girls who have been raped are stigmatized and believe they have no chance of a normal life, leaving them vulnerable to traffickers. There are two common forms of recruiting rural girls into the sex trade. The girls are either sold to a trafficker by a parent or acquaintance aware of their fate, or are tricked into believing they will be married or gain employment elsewhere. The girls are often aware of what is happening, but their culturally ingrained sense of gratefulness to and responsibility for their parents lead them to accept this lot in life. This ingrained sense is common in daughters, but not in sons. A Khmer adage sums it up well: "A son does not feel responsible to take care of his parents, whereas a daughter, even when she works as a prostitute, will still think of her mother." Louise Brown, the author of the book *Sex Slaves*, argues that family problems are a more significant factor than poverty in pushing girls into prostitution. "Troubled families are the breeding grounds for sex workers. And troubled families in poor, marginal, and crisis-ridden communities generate the most reliable supply of cheap girls."

Traffickers recruit victims within their villages, while they are attempting to migrate, or soon after arrival to an urban area. A PACT study found that many trafficking victims were in fact not the poorest or most isolated, but rather those who lived near road access. With USAID/Cambodia funding, IOM is conducting a multi-media campaign emphasizing blind migration[1] and targeting potential victims during the migration process.

There is a belief among Asian men that having sex with young virgins enhances their health; many believe that sleeping with a virgin will cure HIV/AIDS. As a result, Cambodia has had an influx of wealthy Asian sex tourists over the past decade. A 2002 study by AidéTous asserts that sex tourists have increased prostitution in Cambodia. Willingness of clients to pay as much as $1000 for three days with a virgin has led brothel owners to search for younger and younger girls as prostitutes. AidéTous found that 55 percent of the prostituted girls interviewed had sex for the first time with a foreign client. Sixty-six percent of the girls were between the ages of 13 and 18 when they lost their virginity to a client. This study reveals that the younger a girl is when first sexually exploited, the more likely she is to spend her life in a brothel. After girls have lost their virginity, brothel owners sell them for half the amount they originally commanded for a short period of time.

Corruption and impunity among police and high-ranking government officials are factors in Cambodia's sex trade. IJM and other NGOs reported that several rescues, aftercare placement and prosecution efforts were thwarted due to police corruption. An AidéTous study on the impact of closing Svay Pak found that 10 to 20 sexually exploited children between the ages of 10 and 12 bring in approximately $1000 per night to their "pimp." This study indicates that the "pimp" pays between $200 and $300 per day to high-ranking police officials, with some "pimps" paying $80,000 annually for police protection.

The United States Government has been instrumental in shaping the anti-trafficking political environment in Cambodia. The threat of the Tier 3 ranking in the 2005 US Department of State Trafficking in Person's Report highlighted the issue within Cambodia. When Cambodia was placed on Tier 3 in June 2005, the Cambodian government increased its response to fighting trafficking. However, remaining on Tier 3 after the re-evaluation caused disappointment and frustration within the Cambodian government.

---

[1] Un or ill informed migration that puts the migrant at risk of trafficking.

## SECTION III

# IJM Activities

### A. Overview

In September 2003, the WID Office provided $994,761 to IJM through a two-year cooperative agreement to implement an anti-trafficking program in Cambodia. The program was managed by USAID/Cambodia. IJM subsequently received a no-cost extension from WID to continue programming through December 30, 2005.

IJM's overall project goal is to reduce the victimization of minors who are at risk for, or who have been trafficked into, commercial sexual exploitation in Cambodia. The program is composed of three activities:

1) Establishment of a **permanent office** in Phnom Penh to assist in investigations and prosecutions of sex trafficking and commercial sexual exploitation;

2) **Investigative training** for officers of the Cambodian Ministry of Interior Anti-Human Trafficking and Juvenile Protection Unit (AHTJPU); and

3) **Legal advocacy** to ensure prosecution of individuals accused of human trafficking.

IJM operated in Cambodia prior to September 2003 but only opened a full-time office in Phnom Penh after receiving USAID funding. IJM signed a lease for the office on February 1, 2004; 4 months after the cooperative agreement was signed. Ron Dunne, the current Director of Operations, was the acting Director. Prior to that time IJM operated on an ad hoc basis with personnel working temporarily in the country to organize raids. Full-scale IJM operations began in April 2004 with the acting Director, an aftercare coordinator and assistant aftercare coordinator. Kaign Christy, the current country Director, took up his position with IJM/Cambodia in August 2004. Today IJM has three expatriate and nineteen local staff members, not including operatives working in the field. IJM's strategy is to indigenize its efforts in Cambodia within five years, employing only local staff to pursue its initiatives.

During the past two years, IJM has placed emphasis on building the capacity of the AHTJPU of the Ministry of Interior to respond effectively to trafficking. Investigative training materials, including documents, manuals, and audio/visual devices developed at the University of North Texas were reviewed, adapted to the Cambodian context and translated into Khmer. The first training course for the AHTJPU focused on ethics in basic law enforcement. Additional

trainings included Basic Intelligence Gathering, Suspect Identification and Fugitive Apprehension, Interviewing Witnesses and Victims Course, General Criminal Investigation and Report Writing Course Part I and Part II, Physical Evidence Collection and Preservation, Witness Protection and Criminal Network Investigation.

IJM's target was to conduct eight training courses for eighty officers. They exceeded the goal, providing ten training sessions for 161 officers. Following the training sessions with the AHTJPU, IJM worked to strengthen the prosecution of alleged traffickers and to secure appropriate care for rescued victims. This included the development of evidentiary systems to maintain the chain of custody and support and preparation of witnesses for trial. IJM planned to support the arrest of 20 perpetrators, leading to 15 trials and 10 convictions. Forty-five perpetrators were arrested, with 27 trials, and 29 convictions. As of November 11, 2005, IJM had rescued 109 victims.

The assessment reviewed not only the achievement of quantitative targets, but also the level and effectiveness of IJM's coordination with other anti-trafficking organizations. More than 30 meetings were conducted with NGOs, government bodies, UN agencies, and the US Embassy to evaluate effectiveness.

## B. Analysis

### B1. Strengths

There is consensus among stakeholders that IJM collects solid evidence through its investigations of trafficking cases. Several stakeholders have stated that, of the rescue organizations working in Cambodia, IJM is the most professional and its investigations the most thorough. The Protection of Juvenile Justice (PJJ), an NGO that provides legal services and investigations, notes that when working with IJM, it seldom has to collect additional evidence. IJM has contributed to successful prosecutions through its collection of overwhelming evidence.

IJM obtains its evidence by utilizing numerous operatives throughout Phnom Penh and Siem Reap with whom the Director of Investigations is in weekly contact. These operatives and informants include Westerners, tour guides, *tuk tuk* drivers, a disk jockey and others. Once IJM obtains evidence from its operatives, IJM works with the anti-trafficking police to pursue the case. IJM documents its cases with video evidence collected by undercover agents and maintains case files with written reports.

IJM employs two methods for rescuing victims, one is brothel raids in cooperation with the police, and the other is the "buy-bust" operation. In the latter, undercover agents attempt to

purchase the services of an underage girl. Once the perpetrator accepts the money, the police who are watching and waiting, step in and arrest them. [2] These raids and "buy-busts" are targeted at perpetrators discovered through information provided by undercover operatives.

IJM's presence in Cambodia has aided law enforcement's capacity to fight trafficking. IJM has closely supported the AHTJPU and the Municipal Police Chief, both of which expressed appreciation for IJM's assistance and dedication to fighting human trafficking. General B.G Un Sokhunthea, the Director of AHTJPU, specifically acknowledged the value of police training and equipment provided by IJM including a camera, video equipment, a television, microphones and CD player. This equipment has also been used by the police force to train other officers and staff.

Following rescues, MoSAVY temporarily holds victims from four to twenty-four hours before placing them in shelters. Prior to December 2004, when police conducted brothel raids, cooperating NGOs chose the shelter location for victims. This policy changed after a raid conducted by AFESIP on the Chai Hour 2 hotel resulted in the victims' abduction from the shelter by the brothel owners. In this raid, only two of the 80 victims rescued claimed to be trafficking victims and several of the rescued victims called their brothel owners to tell them their whereabouts. After that incident, MoSAVY began processing victims and transferring them to shelters. MoSAVY social workers assess each case and decide if and where to place victims. Although some shelters have expressed frustration over the new policy, IJM acknowledged that MoSAVY's placements to date have been appropriate.

IJM has assisted MoSAVY by purchasing cots and food for the children during their stay. IJM also provided transportation when needed, driving victims from the police station to MoSAVY and to their permanent aftercare facility. IJM's aftercare coordinator accompanies the children from their rescue until their placement in shelters, staying overnight at the police station or MoSAVY, if required. Once victims are placed in permanent shelters, the aftercare coordinator continues to monitor their situation.

## B2. Challenges
### Collaboration

IJM's operations in Cambodia, prior to their funding through USAID, were more sporadic than they are now. Before its permanent residence in Cambodia, IJM representatives came into the country, organized raids and left. NGOs and the government complained that there was little or no collaboration between IJM with other anti-trafficking groups. Since August

---

[2] IJM reports that the funds used to "buy" girls are not provided by USAID.

2004 when Kaign Christy became Director, IJM's work and contact with other anti-trafficking organizations has been strengthened. Mr. Christy has made significant efforts to meet and coordinate with other agencies and organizations involved in combating trafficking.

Although IJM's reputation for openness and coordination has improved, various stakeholders still perceive IJM as keeping to itself. Stakeholders have acknowledged that the sensitive nature of IJM's work may account for some of the perceived isolation. IJM collaborates well with the AHTJPU and municipal police as well as with AFESIP, World Vision, World Hope and Children of Cambodia shelters. However, IJM had not met with the Minister of Women's Affairs, who was appointed in August 2004, and IJM's working relationship with MoSAVY and several NGOs involved in fighting trafficking is not as smooth as it could be. An NGO expressed concern over IJM's perceived reluctance to share its police training materials. It is the perception of some groups that IJM did not attend network meetings with the other anti-trafficking organizations as frequently as they could have.

### Rescues

IJM is one of several organizations involved in brothel raids in Cambodia. Others include: the Cambodian League for the Promotion and Defense of Human Rights (Licado), Cambodia Human Rights and Development Association (Adhoc) and Agir Pour Les Femmes En Situation Precaire (AFESIP), an organization that provides aftercare for victims of trafficking. Among those involved in brothel raids, IJM is the most proactive basing its approach on undercover operatives actively searching brothels for underage girls, cooperation with the police to conduct raids, and the rescue of girls and women. Licado, Adhoc and AFESIP all use a reactive approach; rescuing victims based upon complaints from family members or from tip offs about victims from health outreach trips or other sources. Those critical of the proactive approach argue that some of those rescued may not consider themselves trafficking victims or may not want to be rescued for fear of losing their means of economic survival.

Some Cambodian legal aid NGOs raised questions about the legality of IJM's rescue approaches, considering it entrapment. IJM operatives offer money to brothel owners for young girls who are then rescued by waiting police. Because there is no *mens rea* (guilty mind) requirement under the Cambodian criminal statute, some attorneys defending traffickers and even a judge have accused IJM of being guilty of the offense of trying to buy the sexual services of a minor. IJM is seeking a Memorandum of Understanding (MOU) with the Ministry of Interior and the Ministry of Justice to protect them from prosecution. Despite the criticisms, it is clear that these proactive investigations and rescues are an effective tool for catching and prosecuting traffickers and brothel owners. Among the legal aid NGOs there were differences of

opinion about IJM, some working well with the organization while others did not enjoy as collaborative a relationship. Opinions also varied internally within at least one legal aid group.

IJM and other organizations, including AFESIP, were instrumental in closing down Svay Pak (officially closed down during the summer of 2004), the notorious brothel area 11 kilometers from Phnom Penh where men from Cambodia and abroad sought underage girls and boys for sex. Since the closure, traffickers and brothel owners are no longer openly displaying children. A recent study conducted by AidéTous and the Coalition to Address Sexual Exploitation of Children in Cambodia (COSECAM) evaluated the impact of closing Svay Pak on the children. The study pointed out that Svay Pak's closure did not stop the commercial sexual exploitation of these children. Many of the children were scattered to other brothels in Phnom Penh, Siem Reap and Sihanoukville. Some women took to freelancing in nightclubs like Martini's and Sharkey's. According to the study, some of the exploited children are now living in worse conditions in underground operations.

*Aftercare*

In 2003 when IJM received USAID funding for work in Cambodia, there were inadequate aftercare facilities, which IJM saw as a major challenge, hampering its ability to organize rescues. At that time, only a few shelters in Phnom Penh accepted sexually exploited children and they were often full. IJM only conducts rescue operations with assurance for the safekeeping of rescued victims. Today, IJM believes there is adequate and safe shelter space for rescued victims in Phnom Penh. IJM and a number of NGOs noted that shelter space in the provinces is inadequate, requiring transportation of girls rescued there to shelters in Phnom Penh.

There are no standard guidelines or policies for aftercare facilities. Both COSECAM and Asia Regional Cooperation to Prevent People Trafficking (ARCPPT) are currently developing their own standards. Of major concern is whether shelters should have an open door policy, allowing victims to leave at any time. Some shelters, including World Vision, Children of Cambodia and Hagar attempt to hold victim-witnesses against their will while awaiting the trial of their traffickers or brothel owners. AFESIP holds victims for two weeks to assess their situation, after which they are free to leave. In some cases, the children's families ask for their return but the shelter may refuse out of a fear of re-trafficking. There are repeated incidences of children, especially Vietnamese, escaping from aftercare facilities.

The issue of holding children and women against their will and under what conditions was unclear among the legal organizations interviewed. Some, including AFESIP and CWCC claimed that it was illegal to hold people against their will. Others contend that shelters can hold children with permission from their parents. The Cambodian National Council for Children is

 lobbying for a law making it illegal to hold children against their will pending trial. If the parents are implicated in trafficking of their children, shelters can seek legal custody through the court. Although shelters are registered with MoSAVY, the government does not monitor them. 

About 75% of the victims rescued through the efforts of IJM are Vietnamese. Many jobs available to Vietnamese women are in the sex industry, massage parlors, and karaoke bars. One study, completed in 2003, found that 95% of trafficked prostitutes were Vietnamese.[3] This study also found that many of these Vietnamese women were subject to debt contracts, having been trafficked into Cambodia by family members. Because of these debt contracts, the Vietnamese women feel pressure from their families to remit money and to comply with their exploitative situation. IJM targets brothels, especially those known for underage prostitutes, the great proportion of whom are Vietnamese.

Although there is no evidence of discrimination against Vietnamese girls in brothels, this is not the case in aftercare facilities. The enmity between the Khmer and Vietnamese spills over to these victims. Vietnamese victims may not be treated as well as others in some shelters and also face possible deportation to Vietnam. Some of these Vietnamese girls were born in Cambodia, but have neither Cambodian nor Vietnamese citizenship. NGOs reported a high incidence of flight from shelter by Vietnamese victims.

### Legal issues

Challenges to combating trafficking in Cambodia include the high level of corruption, weak rule of law and lack of capacity among law enforcement officers. The current law, adopted in 1996, on the Suppression of the Kidnapping, Trafficking and Exploitation of Human Persons is weak, punishing traffickers based on the age of the victim and only covering those below age 15. Many victims either lie or do not know their age. Although medical techniques can determine age through wrist measurements, many judges do not give this method much credence.

Despite police training from IJM, CDP and ARCPPT, the investigative capacity of the police remains weak, presenting a serious challenge for IJM. Although anti-trafficking training is essential, CDP felt that police need basic investigative training skills before they can comprehend the material taught in IJM's courses. When working with the police, IJM is keenly aware of possible corruption that could thwart their efforts. Entrusting information to the wrong officials may result in a brothel owner being "tipped off" to a raid. Improperly collected or maintained evidence can lead to dismissal of a case. In the time that IJM has been working with

---

[3] Steinfatt, T.M. (2003) Measuring the Number of Trafficked Women and Children in Cambodia: A Direct Observation Field Study – Part 3 of a Series (United States Agency for International Development)

the AHTJPU, they have worked with a core group of about 10 police officers. IJM has confidence in these officers and cooperates closely with them, providing information and support to conduct raids.

The lengthy trial process and lack of judicial capacity also has negative affects on IJM's work. A trafficking prosecution can take up to six months before trial and many victims do not want to remain in a shelter waiting to testify. The longer they wait, the more likely a victim will change their mind about testifying or be offered compensation by a trafficker to drop the case.

## SECTION IV

# Recommendations

Despite obstacles, IJM has responded in a proactive and positive manner to Cambodia's trafficking problem. During the past two years, it has worked to improve its cooperation with, and respect within the anti-trafficking community, utilizing lessons learned from its experience and from others. IJM exceeded its quantitative goals for victims rescued, trafficking convictions, and police officers trained. Its Director is well respected in the community and it is generally known for its professional investigatory work. Even with these achievements, more can be done to build on its effectiveness.

Specific recommendations include:
1. **Increase collaboration with:**
   - Ministry of Women's Affairs (MoWA )
   - Ministry of Social Affairs, Veterans and Youth (MoSAVY)
   - International and Cambodian Anti-trafficking NGOs
   - UN organizations

IJM should broaden collaboration with government agencies, particularly the Ministry of Women's Affairs (MoWA), Ministry of Social Affairs, Veterans and Youth Rehabilitation (MoSAVY), the United Nations, and other anti-trafficking organizations.

- IJM should meet and collaborate with the Minister of Women's Affairs, Dr. Ing Kantha Phavi. IJM has yet to meet with her since her appointment more than a year ago. The MoWA plays a critical role in Cambodia's anti-trafficking activities through nationwide outreach. The MoWA was recently named the implementer of the new trafficking MOU between Vietnam and Cambodia, which affects IJM given the majority of its rescued victims are Vietnamese. MoWA has been working with the Ministry of Justice on legal reform, with IOM on prevention activities, and with UNIAP on regional coordination. Given their leadership role on this issue, the MoWA is a strategic partner for any organization fighting trafficking in Cambodia.

- IJM should also strengthen its collaboration with the MoSAVY, based on the agency's role in selecting aftercare shelters for trafficking victims. Currently, MoSAVY feels as if IJM distrusts and scrutinizes them. IJM initially kept a close watch on MoSAVY's aftercare placement, but they now consider MoSAVY's placement of victims to be

appropriate. The two groups could become closer, supporting one another in order to provide and improve victim services.

- IJM should attend more regular meetings with local and international NGOs and UN agencies working on raids, aftercare, and legal issues to avoid any duplication of efforts. This effort would also assist in the coordination of available services. A number of NGO networks in the anti-trafficking community meet regularly to discuss their efforts and needs. IJM should be actively involved in those networks, including those led by UNICEF and UNIAP (regular stakeholder meeting on Human Trafficking) that relate directly to their work, sharing data, improving services, and exchanging lessons learned.

- IJM should coordinate with other NGOs that provide investigative training for the police. Working together with these organizations, IJM can improve the capacity of police and share data that will lead to an increased number of arrests and prosecutions. IJM can provide the benefit of its experience to these NGOs, thereby increasing their capacities to pursue cases. Some proposed organizations include: CDP, ARCPPT and CWCC, Adhoc and AFESIP. By working together, they with whom IJM might increase coordination will not only avoid duplication of efforts, but will expand the number of qualified personnel available to conduct investigations.

## 2. **Work within Cambodia's legal system to**:
- Improve law enforcement capacity
- Avoid negative legal implications for IJM
- Increase respect for the rule of law

IJM should build on its good efforts to increase police capacity by continuing to train and provide technical support for their police entities in connection with anti-trafficking activities. IJM's eventual goal should be for Cambodian law enforcement to conduct all investigations themselves.

- IJM should continue providing anti-trafficking investigative training to those law enforcement officers working on trafficking cases, by tailoring different training courses to the skill level of the police and needs on the ground. To combat police and judicial corruption, IJM should work to increase ethical standards for police and the judiciary in the context of their anti-trafficking training. Responding to a demand for police capacity building in other provinces, IJM has already taken their anti-trafficking training outside of Phnom Penh. They should continue to be aware

of and respond to the needs of police training related to trafficking throughout Cambodia.

- IJM has encountered some problems in their proactive brothel raids, which some have construed as entrapment. In October 2005, a prosecutor threatened to charge IJM for provoking an offense when an "undercover" agent went into a brothel and requested a virgin girl. IJM is working on an MOU with the Ministry of Interior and the Ministry of Justice, which would protect them from prosecution.

- Cultural sensitivity should be a prime consideration for IJM in its activities to ensure buy-in from the government and NGO community, allowing them to be more effective.

## SECTION V

# Overview of Anti-trafficking Organizations in Cambodia

NGOs, international organizations, foreign donors, and the Cambodian government are conducting a number of anti-trafficking prevention and protection efforts. This assessment focused on trafficking rescues and prosecutions, specifically the work of IJM. Although prevention and protection efforts are beyond the scope of this assessment, they are important to the on-going anti-trafficking efforts in Cambodia. The next section contains a synopsis of some of these activities and the organizations conducting them, organized by theme.

## A. Rescues
**ADHOC**
- A human rights organizations with offices in several provinces
- Founded in 1991 by a group of former political prisoners
- Investigates trafficking situations, working with the police to gain access to brothels when a complaint is filed
- Assists rescued victims to find shelter, medical care and legal services
- Conducts research and provides training on the trafficking of women and children in seven of Cambodia's provinces.

**AFESIP**
- Conducts health outreach, advocacy initiatives and rescues
- Employs a reactive approach to raids
- Sends health outreach workers into brothels to distribute condoms and health information, thereby providing an opportunity to search for trafficking victims
- Provides intensive care to newly rescued victims for two weeks at a drop-in center and three additional long term shelters located in Siem Reap, Kampong Cham, and on the outskirts of Phnom Penh
- Women and children remain at the drop-in center for 14 days, before choosing whether to go to a longer-term rehabilitation program or to leave the shelter.

**AHTJPU**
- Created in 2002 within the Ministry of Interior in direct response to the demand for law enforcement officers with skills to fight human trafficking
- Has good working relationship with IJM, cooperating in trafficking investigations and conducting brothel raids

19

- Provides training for law enforcement officials in Sihanoukville, Siem Reap, and Kampong Cham

**The Municipal Police**
- Conducts trafficking investigations and brothel raids

## B. Shelter and Support Services
**The Children of Cambodia**
- Operates a shelter with a maximum capacity of 20
- Provides aftercare services for trafficking victims
- Provides psychological counseling, vocational training, English and computer classes, and art training

**Cambodian Women's Crisis Center (CWCC)**
- Provides aftercare services for trafficking victims
- Operates three shelters providing services including vocational training, psycho/social counseling, and literacy programs
- Provides education services, trainings, case monitoring, legal services and research
- Provides help with repatriation of Cambodian girls trafficked to Malaysia

**World Hope**
- Assessment center began operations 11 months ago, providing intensive evaluation of a maximum of 12 rescued children for up to three months
- At the end of three months, WH determines where the child should receive long-term support and transfers them to either World Vision or Hagar
- Focus on quality care and protection, employing 18 staff members as caregivers, teachers, counselors and guards

**World Vision**
- Shelter capacity for 56 victims for a period ranging from six months to one and a half years
- Programs includes counseling, vocational training, literacy courses, reintegration and repatriation services

**Hagar**
- Aftercare program serves children ages five to 13 with an onsite capacity of 22
- Places children, who cannot be reintegrated into their communities, with foster mothers

- Emphasizes quality care, striving to improve the self-esteem and mental health of their residents

### C. Legal Services
### Legal Support for Children and Women (LSWC)
- Provides legal services to rescued trafficking victims
- Provided legal training on women and children's issues to their staff and to lawyers

### The Cambodian Defenders Project (CDP)
- Provides legal services to victims of trafficking
- Provides police training designed to improve their investigation techniques

### Protection of Juvenile Justice (PJJ)
- Provides legal services to victims of trafficking
- Conduct investigations of trafficking cases

### D. Prosecution and Government Support
### The International Organization of Migration (IOM)
- Works closely with the Ministry of Women's Affairs at the provincial and district levels to provide communities with accurate information on trafficking
- Has focused on return, recovery and reintegration of victims of cross border trafficking since 1996
- IOM and MOSAVY released a detailed study of their work on the return and reintegration of victims of trafficking from Thailand to Cambodia and the repatriation of Vietnamese from Cambodia to Vietnam

### The United Nations Children's Fund (UNICEF)
- Works to sensitize police on trafficking issues; train them on the trafficking law and the rights of children; and identify committed police at the provincial level to work with NGOs on anti-trafficking
- Helped organize the Anti-Human Trafficking Juvenile Police Unit (AHTJPU) within the Ministry of Interior in 2002
- Continues to assist in case monitoring

### UN Inter Agency Project on Human Trafficking (UNIAP)
- Established in 2000 to provide a more coordinated response to human trafficking in the Greater Mekong Sub-region

- At the regional level consists of 6 governments, 13 UN agencies and 8 international NGOs and in Cambodia is a network of governmental bodies, local and international NGOs, UN organizations and donors
- Holds quarterly donor and stakeholder meetings to identify gaps and determine ways to respond to those needs
- Developing a database of trafficking activities, date, funders and reports that will be accessible by the public

## Ministry of Women's Affairs (MoWA)
- In cooperation with IOM, conducts information campaigns and grassroots meetings on safe migration and illegal migration in several provinces
- Provided economic support to some of the most vulnerable families living in Svay Rieng
- In October 2005 appointed as the implementing institution for an MOU with Vietnam on the Bilateral Cooperation for Eliminating Trafficking in Women and Children and Assisting Victims of Trafficking

### Ministry Social Affairs, Veterans and Youth Rehabilitation (MoSAVY)
- Since early 2005, has been in charge of placing rescued victims of trafficking in aftercare facilities
- Trained counselors interview victims when they arrive from the police station
- In some cases, victims spend the night at MOSAVY before being placed in a more permanent shelter

## Coordinated Mekong Ministerial Initiative against Trafficking (COMMIT)
- An inter-governmental process that began in 2003 between China, Cambodia, Thailand, Lao PDR, Viet Nam and Myanmar
- Works on a range of trafficking issues, including criminal justice, repatriation, victim support, safe and legal migration and exploitative labor practices
- In October 2004, representatives from the six countries that comprise the Greater Mekong Sub-Region signed an MOU that outlines a framework for concrete action on human trafficking, making it the first comprehensive regional trafficking agreement

## Asia Regional Cooperation to Prevent People Trafficking (ARCPPT)
- Works in Thailand, Laos, Myanmar and Cambodia
- Main objective is to strengthen the criminal justice process to deal effectively with trafficking
- In Cambodia, has provided police training on operational procedures and reactive investigation techniques, legal reform and support to the Cambodian courts

**E. Technical Assistance and Research**

**The Asia Foundation (TAF)**
- Serves as an umbrella organization, providing sub-grants and technical assistance to 17 local NGOs
- Working with the Center of Advanced Studies to collect all research and studies conducted on trafficking in Cambodia
- Organizing research into a public database that will provide easy access to the information

**Coalition to Address the Sexual Exploitation of Children**
- Serves as a network of 23 member NGOs
- Organized and drafted guidelines for minimum shelter standards in Cambodia
- Conducts research on trafficking in Cambodia

**AidéTous**
- Conducts research on sex tourism in Cambodia
- Collaborated with COSECAM on the study "Impact of Closing Svay Pak"

## ANNEX A

## List of Individuals Interviewed

### United States Government

Jonathan Addleton, Mission Director, USAID/Cambodia

Margaret McKean and Kurt Stoppkotte, Political Section, US Embassy Cambodia

Serey Chan, Bruce Etling, Office of General Development, USAID/Cambodia

Darlene Foote, IWID Fellow, USAID/Cambodia

### Cambodian Government

Ministry of Social Affairs, Labor, Vocational Training, and Youth Rehabilitation (MoSAVY), Mr. Chea Sorn, Director of Department

Ministry of Women's Affairs, H.E. You Ay, Secretary of State and H.E. Chou Bun Eng, Director General of Social Development

Ministry of Interior, Anti-human Trafficking and Juvenile Protection Unit (AHTJPU), General B.G Un Sokunthea, Director of Anti-human Trafficking and Juvenile Protection Unit

Ministry of Justice, Heng Peo, Municipal Police Chief

### Cambodian Organizations

ADHOC, Ms. Lim Mony and Ms. Ol Sokhan, Legal Advisors

Cambodian Defenders Project (CDP), Mr. Sok Sam Oeun, Director and Mr. Yung Phanit, Attorney and Coordinator of Center against Trafficking

Cambodian Women's Crisis Center, Ms. Sin Li Pov, Director and Mr. Sok Phay, Legal Advisor

Children of Cambodia, Ean Nil, Shelter Manager and Psychologist

Coalition to Address Sexual exploitation of Children in Cambodia (COSECAM), Tuon Vicheth, Coalition Coordinator

Legal Support for Women and Children, Ms. Ly Vichuta, Director

Protection of Juvenile Justice, Samphon Sopharath, Attorney and Yin Savat, Attorney

### International NGOs

Action Pour Les Enfants (APLE), Stephanie Remion, Departing Director and Beatrice Nagnier, Director

AFESIP, Sao Chhoeurth, Technical Coordinator

AidéTous Advisor, Mr. Fédéric Thomas, Independent Consultant

Asia Foundation, Jackie Pomeroy, Representative and Annette Kirchner, Assistant Representative

Asian Regional Cooperation to Prevent People Trafficking, Janet Ashby, Program Manager

East West Management Institute, Peter Harris, Chief of Party and Kim Sean, Senior Grants Manager

End Child Prostitution, Child Pornography and Trafficking of Children for Sexual Purposes (ECPAT), Chin Chanveasna

Hagar, Sue Hanna, Aftercare Program

IJM, Kaign Christy, Country Director and Ron Dunne, Director of Operations

Pact International, Worth Program, Kurt A. MacLeod, Asia Regional Director, Ms. Hor Sakphea, Program Officer, and Keo Keang, Deputy Country Representative

World Hope, Gregg Burgess, Director and Ruth Elliott, Psychologist

World Vision, Sorn Navy, Project Manager

## UN Organizations

United Nations Inter-Agency Project on Human Trafficking (UNIAP), Ly Sunlina, National Project Coordinator and Felicia Johnston, Project Advisor

International Labor Organization, In Focus Program on Child Labor (ILO-IPEC) Mr. Khleang Rim, National Project Coordinator

International Organization of Migration (IOM), Anne Horsley, Project Coordinator, and John McGeoghan, Project Officer

United Nations Children's Fund (UNICEF), Christian Guth, Project Officer and Lesley Miller, Head of Child Protection Program

## ANNEX B

## Cambodia Bibliography

Agreement between the Royal Government of Cambodia and the Socialist Republic of Vietnam on Bilateral Cooperation for Eliminating Trafficking in Women and Children and Assisting Victims of Trafficking. (October 10, 2005)

AIDéTous. (2002). *Surveys on the behaviors and attitudes of tourists and foreign clients with sex-abused children and young women, Kingdom of Cambodia 2001-2002.*

AIDéTous and COSECAM. (2005) Impact of Closing Svay Pak.

Asia Regional Cooperation to Prevent People Trafficking. (March 2005). *Gender, Human Trafficking, and the Criminal Justice System in Cambodia.*

Asia Regional Cooperation to Prevent People Trafficking. (2004). *The Role of Victim Support Agencies in the Criminal Justice Response to Human Trafficking.*

Asia Regional Cooperation to Prevent People Trafficking. (2005). *Asia Regional Cooperation to Prevent People Trafficking: Gender and Rights Strategy.*

Brown, L. (London: Virago, 2000). *Sex Slaves: the trafficking of women in Asia.*

Cambodian National Council for Children. (2000). *Five Year Plan against Sexual Exploitation of Children: 2000-2005.*

Combating Trafficking in Asia: A Resource Guide to International Instruments, Political Commitments and Recommended Practices.

International Labor Organization Mekong Sub-regional Project to Combat Trafficking in Women and Children. (2005). *Human Trafficking: Redefining Demand.*

ILO and Save the Children, UK. (2005). *Making History, People, Processes and Participation: Mekong Children's Forum on Human Trafficking.*

Kingdom of Cambodia. (1996). *Anti-Trafficking Law.*

Kingdom of Cambodia. (1994). *Law on Immigration.*

Legal Support for Women and Children. (2005). *Gender Analysis of the Patterns of Human Trafficking into and through Koh Kong Province.*

Memorandum of Understanding on Cooperation against Trafficking in Persons in the Greater Mekong Sub-Region, 2004.

Memorandum of Understanding between the Royal Government of the Kingdom of Cambodia and the Royal Government of the Kingdom of Thailand on Bilateral Cooperation for Eliminating Trafficking in Children and Women and Assisting Victims of Trafficking, 2003.

Ministry of Health of Kingdom of Cambodia, National Center for HIV/AIDS, Dermatology, and STD. (2003). *HIV Sentinel Survey.*

Ministry of Social Affairs, Veterans and Youth Rehabilitation and IOM/Cambodia. (2005). *Repatriation from Cambodia to Vietnam of Vietnamese Victims of Trafficking from 15 May 1999- 30 March 2005.*

Pact Cambodia. (2004). *Preventing Trafficking in Women: A Study of Origin and Vulnerability Factors for Trafficking Victims and Direct Sex Workers in Four Cambodian Cities.*

Rithy Niron, N., Viriya, Y., and Gray, L. (2001). *Child Sex Tourism- The Problem in Cambodia.* (Published by World Vision)

Save the Children. (2001). *Advocacy Paper on Comparative Laws of the Countries in the Mekong Sub-region with Respect to Trafficking in Women and Children.*

Save the Children. (2000). *Comparative Study of the Legal Provisions of the Six Countries in the Mekong Sub-region with Respect to Trafficking in Women and Children: Research Findings and Recommendations.*

Steinfatt, T. (2003). *Measuring the Number of Trafficked Women and Children in Cambodia: A Direct Observation Field Study* (sponsored by USAID).

UNESCAP Regional Seminar on the Social Implications of International Migration 24-26 August, 2005. Bangkok. *Irregular Migration and Trafficking in Cambodia- The Road Ahead.* Presented by HE Dr. Ing Kantha Phavi, Minister of Women's Affairs, Royal Government of Cambodia.

Yasunobu, T. (2004). *Combating Human Trafficking in Cambodia: Establishing a Legal Environment for the Effective Counter Trafficking Measure.*

# EXHIBIT C

# Prescribing Psychotropic Medications to Children in Foster Care

Physicians who prescribe for foster children or wards of the court should be aware of changes to the Welfare and Institutions Code (*section 369.5* and *section 739.5*)



as well as the California Rules of Court (*rule 5.640*) which took effect in 2016. The changes concern requirements for prescribing psychotropic medications to minors who have been removed from the custody of their parents or guardian. All psychotropic medications administered to such children must be authorized by the court. Physicians must fill out the six-page *Form JV-220 (A)* in order for the court to authorize the administration of such drugs. Physicians must fill out the four-page *Form JV 220 (B)* to continue a psychotropic medication previously-prescribed by the same physician.

These forms replace other forms used previously, which are no longer acceptable to the court and should be discarded. Using outdated forms will slow down the process of getting appropriate treatment for the children.

The form filled out by the treating physician is considered by the judge, who also considers input from several parties prior to authorizing the medication: the child, the child's caregiver, the parents, the child's Indian tribe, and the Court Appointed Special Advocate, if applicable. For more information, please see the *Guide to Psychotropic Medication Forms* (form JV-217-INFO).

## Former Board President Honored

David Serrano Sewell, former president of the Medical Board of California, was honored for his work at the Board's January meeting in Sacramento. He is pictured at right with current Board President Dr. Dev GnanaDev. In recognition of his service to the Board, the Board members gave Mr. Serrano Sewell a gavel and a plaque.

Mr. Serrano Sewell, an attorney, was originally appointed to the Board in 2012 by Governor Jerry Brown. He served as the Board's vice president before being elected president in 2014, then re-elected in 2015.

A long-time health advocate, he was appointed in 2014 as regional vice president for the San Francisco district of the Hospital Council of Northern and Central California. He also previously served on the California Institute for Regenerative Medicine's Independent Citizens Oversight Committee, and was a Deputy City Attorney for the City and County of San Francisco.



## PROOF OF SERVICE

I hereby declare under penalty of perjury that on July 6, 2017, I deposited into the U.S. mail **RONALD BOYAJIAN'S MOTION FOR RECONSIDERATION AND OR CLARIFICATION OF THE COURT'S ORDER OF JUNE 26, 2017 DENYING INTERVENTION; DECLARATION OF RONALD BOYAJIAN; EXHIBITS** in an envelope with first-class postage affixed addressed as follows:

Clerk of the Court
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012

U.S. Attorney's Office
312 N. Spring Street
Los Angeles, CA 90012

Executed on July 6, 2017 in Tucson, AZ.

Ronald G. Boyajian