No. 14-50095

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

MICHAEL JOSEPH PEPE,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of California, No. 2:07-cr-168-DSF-1

## BRIEF OF AMICI CURIAE INTERNATIONAL JUSTICE MISSION, ATEST, AGAPE INTERNATIONAL MISSIONS, CHAB DAI, HAGAR INTERNATIONAL, AND WORLD HOPE INTERNATIONAL IN SUPPORT OF PANEL REHEARING AND/OR REHEARING EN BANC

**(Decided July 11, 2018—Kleinfeld, *Nguyen*; Thomas (dissenting))**

Benjamin Beaton
Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, DC 20037
202-457-6420
benjamin.beaton@squirepb.com

Brent Owen
Squire Patton Boggs (US) LLP
1801 California Street, Suite 4900
Denver, CO 80202
303-830-1776
brent.owen@squirepb.com

Melissa Arbus Sherry
Latham & Watkins LLP
555 Eleventh Street, NW
Washington, DC 20004
202-637-2200
melissa.sherry@lw.com

Manuel A. Abascal
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 900710
213-485-1234
manny.abascal@lw.com

*Counsel for amici curiae*

# TABLE OF CONTENTS

**Page**

INTERESTS OF AMICI CURIAE ............................................................. 1

SUMMARY OF ARGUMENT ................................................................. 5

ARGUMENT .......................................................................................... 8

    I.    THE 2003 ACT PUNISHES THE PRECISE
           CONDUCT AT ISSUE HERE: ILLICIT SEX AFTER
           TRAVEL.............................................................................. 8

    II.   THE 2013 AMENDMENT PRESERVED THE 2003
           TRAVEL PROHIBITION AND PROHIBITED A NEW
           CATEGORY OF CONDUCT: ILLICIT SEX BY
           AMERICANS RESIDING ABROAD. .................................. 15

    III.  THE CONSEQUENCES OF THE PANEL MAJORITY
           ARE TROUBLING AND FAR-REACHING........................ 18

CONCLUSION....................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*United States v. Clark,*
315 F. Supp. 2d 1127 (W.D. Wash. 2004), 435 F.3d 1100
(9th Cir. 2007) ................................................................. *passim*

*United States v. Jackson,*
480 F.3d 1014 (9th Cir. 2007) ........................................... 17

*United States v. Pendleton,*
658 F.3d 299 (3d Cir. 2011) .............................................. 11

*United States v. Pepe,*
895 F.3d 679 (9th Cir. 2018) ....................................... *passim*

## Statutes

18 U.S.C. § 2423(b) ........................................................... 10

18 U.S.C. § 2423(c) ..................................................... *passim*

18 U.S.C. § 3299 .............................................................. 21

108 Stat. 1796, § 160001 ................................................... 10

## Other Authorities

Amy Fraley, *Child Sex Tourism Legislation Under the
PROTECT Act: Does it Really Protect?*, 79 St. John's L.
Rev 449 (2012) ................................................................ 10

Eric Thomas Berkman, *Responses to The International Child
Sex Tourism Trade*, 19 B.C. Int'l & Comp. L. Rev. 397
(1996) .................................................................... 9, 11, 22

Fed. R. App. P. 32(a)(5) ................................................... 25

Fed. R. App. P. 32(a)(6) ................................................... 25

Fed R. App. P. 32(a)(7)(B)(iii) .................................................... 25

Fed. R. App. P. 35(a) ................................................................. 6

H.R. Rep. 107-525 (2002) ..................................... 10, 12, 13, 19

Heather C. Giordanella, *Prosecuting United States Nationals for Sexually Exploiting Children in Foreign Countries*, 12 TEMP. INT'L COMP. L.J. 133 (1998) ......................................... 9

IJM, Child Sex Trafficking in Angeles City (2016), .............. 20

IJM, Child Sex Trafficking in Metro Manila, (2016) .............. 20

IJM, External Evaluation of IJM's Program to Combat Sex Trafficking of Children in Cambodia, 2004-2014 (2015) ................... 20

S. Rep. 112-96 (2011) ........................................................ 15, 18

United Nations Office on Drugs and Crime, GLOBAL REPORT ON TRAFFICKING IN PERSONS (2016) .................................. 22

## INTERESTS OF AMICI CURIAE

Amici curiae are human-rights organizations working to halt international child sex abuse and exploitation. Many have been directly involved with the statute and prosecution at issue—by advocating for Congress' enactment and expansion of the PROTECT Act; assisting in the investigation, extradition, and prosecution of defendant/appellant Michael Pepe (and many other child-sex defendants); or supporting child victims in this and other cases. Indeed, the panel majority expressly cited the work of one amicus, ATEST, in construing the Act. *United States v. Pepe*, 895 F.3d 679, 687 (9th Cir. 2018). Given their collective connection with the Act, the following groups can offer this Court a unique perspective as it considers the government's rehearing petition.[1]

***International Justice Mission***, one of the world's largest anti-slavery organizations, protects the poor from violence by holding perpetrators accountable. IJM conducts casework in over 17 communities in 10

---

[1] Both parties consented to the filing of this brief. Amici further state, pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), that no counsel for a party authored this brief in whole or in part, and no person other than the amici curiae or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

countries, including Cambodia. Working with its partners in national criminal justice systems, IJM has rescued more than 4,500 victims of child sex abuse and trafficking and supported the prosecution of more than 2,600 child sex offenders. Globally, IJM has rescued over 45,000 individuals from violence and significantly improved the functionality of justice systems. In this case, IJM's Cambodia team has worked closely— for more than a decade—with U.S. and Cambodian law enforcement, plus other NGOs, to investigate these crimes, rescue six young girls, gather evidence, support witness testimony at trial, and seek justice and accountability for these crimes.

**The Alliance to End Slavery and Trafficking ("ATEST")** is a U.S.-based coalition that advocates to end human trafficking and slavery around the world. Its members include the Coalition of Immokalee Workers, the Coalition to Abolish Slavery & Trafficking, Free the Slaves, the Human Trafficking Institute, National Network for Youth (NN4Y), Polaris, Safe Horizon, Solidarity Center, T'ruah: The Rabbinic Call for Human Rights, United Way Worldwide, Verité, and Vital Voices Global Partnership. The panel majority expressly cited ATEST's advocacy regarding the 2013 amendment to the PROTECT Act. 895 F.3d at 687.

2

*Agape International Missions* is an aid organization focused on prevention, rescue, restoration, and reintegration for human-trafficking victims and perpetrators. Agape was founded in 1988 in Cambodia, and has started aftercare programs in Myanmar, Vietnam, Spain, Tanzania, and the United States. Some of the victims in the Pepe case and many similar cases received aftercare restoration and legal support through Agape programs, and Agape members have testified in many U.S. and international human-trafficking proceedings.

*Chab Dai*, which means "joining hands" in Khmer, was founded in Cambodia in 2005 to abolish all forms of abuse and exploitation. Chab Dai now works in 20 countries with a variety of international and local member groups to facilitate collaboration and coordination among diverse stakeholders in the anti-trafficking movement. The coalition coordinates advocacy and relief efforts concerning human trafficking, exploitation, and abuse—and supported the victims in this case.

*Hagar International* is a non-profit organization that works with survivors of human trafficking, sexual abuse, and other forms of violent exploitation in Cambodia, Afghanistan, Vietnam, and Singapore. Hagar provides intensive and individualized accommodation, counseling, legal,

3

education, and employment support. Its team of counselors, case managers, lawyers, social workers, and other specialists work intensively to rebuild survivors' lives. A significant amount of Hagar's work has focused on supporting children who have suffered sexual abuse, including the victims in this case.

***World Hope International*** is a Christian relief and development organization working in 16 countries to alleviate poverty and injustice for all people, regardless of ethnicity, gender, race, or religion. WHI operated a residential Assessment Center in Phnom Penh, Cambodia, which provided immediate emergency aftercare for more than 1,100 child survivors of human trafficking. WHI's Assessment Center cared for four survivors in this case immediately after their rescue. WHI also helped bring these survivors to the United States to offer testimony at Pepe's trial.

## SUMMARY OF ARGUMENT

The PROTECT Act is a cornerstone of the United States' criminal laws and global leadership on the issue of child sex abuse. As applied in this case, it prohibits Americans from traveling abroad and engaging in illicit sexual conduct. 18 U.S.C. § § 2423(c). U.S. law enforcement, foreign sovereigns, and international nongovernmental organizations like amici rely on the Act to punish and deter international sex crimes. The law is crucial for the United States and its global partners: it holds Americans accountable for horrific acts in foreign countries, and helps those foreign countries confront sexual abuse and exploitation within their borders.

The decision of the panel majority, however, drastically weakens the reach and effectiveness of the Act. In 2013, Congress clarified and extended the Act to apply to an additional category of U.S. persons who "resid[e]" abroad and engage in illicit sexual conduct. This supplemented and retained Congress' 2003 provision criminalizing the acts of U.S. persons—like Pepe—who "trave[l]" abroad and engage in illicit sexual conduct. Under the panel's reasoning, this amendment had the perverse effect of overruling the Ninth Circuit's interpretation of a previous version of the statute. *See* 895 F.3d at 692-94 (dissenting op. of Thomas, C.J.).

5

The effect of the panel decision is to narrow the class of U.S. persons subject to prosecution for illicit sexual conduct after traveling abroad based on subsequent legislative history—and a misreading of the history at that.

As the government's petition explains, the panel's slit decision warrants further review for several reasons: it conflicts with an earlier panel decision; it creates a split with other courts of appeals; it is wrong on the merits; and it presents a statutory interpretation question of significant importance. Rehearing is necessary to restore the uniformity of the law of this Circuit. Fed. R. App. P. 35(a).

Amici write separately to address the mistaken inferences the panel majority draws from the 2003 and 2013 legislative enactments, and to emphasize the "exceptional importance" of this question. *Id.* The panel majority's effort to give effect to the 2003 and 2013 amendments misread and significantly curtailed Congress' prohibition of child sexual abuse by Americans traveling abroad. And this mistake carries terrible consequences for child victims, their families and communities, and U.S. leadership in the global fight against child sex abuse.

6

*First*, the Pepe prosecution was entirely consistent with the law Congress enacted in 2003. Remarkably, the panel opinion excluded from the 2003 Act precisely what Congress aimed to punish: the abhorrent conduct of Americans like Pepe who travel abroad and engage in illicit child sex.

*Second*, the 2013 amendment retained the law of this Circuit and focused on a completely different type of offender. Congress expanded liability for a *new* category of Americans who "reside" abroad and engage in illicit sex. 18 U.S.C. § 2423(c). But Congress expressly preserved every relevant word of the 2003 provisions covering Americans—like Pepe— who "travel" abroad and engage in illicit sex. In holding otherwise, the panel majority gravely misconstrued the legislative advocacy of amicus ATEST. The panel's conclusion that the human-rights community advocated for the 2013 amendments because it interpreted the 2003 Act *not* to reach perpetrators like Pepe is simply wrong. ATEST was advocating for liability *beyond* that already recognized in existing Ninth Circuit precedent.

*Third*, the panel majority's upending of Congress' scheme would have extraordinary and damaging consequences. These would be felt by

7

amici as well as U.S. law enforcement, foreign sovereigns, victims, and the communities terrorized by child sex abusers. The United States would find it harder to hold Americans abroad accountable, and foreign sovereigns would find it harder to work with the United States to punish sex crimes within their borders. *See* Letter from Chou Bun Eng, Deputy Prime Minister of Cambodia, to Noel Francisco and Nicola Hanna (Sept. 28, 2018) (Attachment A). Amici know firsthand the challenge and importance of deterring international sex crime—and the devastation that follows if sexual offenders go unpunished.

Accordingly, this Court should grant rehearing and restore this Circuit's previous and proper interpretation of this critical tool for protecting child victims.

## **ARGUMENT**

## I. **THE 2003 ACT PUNISHES THE PRECISE CONDUCT AT IS-SUE HERE: ILLICIT SEX AFTER TRAVEL.**

The PROTECT Act of 2003 strengthened the United States' human-rights leadership by adopting a powerful criminal prohibition on international sexual misconduct. It did so by enacting 18 U.S.C. § 2423(c), which provided:

> Any United States citizen or alien admitted for permanent residence who travels in foreign commerce, and engaged in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

This legislation, passed overwhelmingly by Congress and signed into law by President Bush, implemented the United States' profound commitment to global human-rights leadership. Specifically, U.S. foreign policy sought to "discourage human trafficking" and protect the "hundreds of thousands of teenage girls, and others as young as five, who fall victim to the sex trade." George W. Bush, Address to the United Nations General Assembly, Sept. 23, 2003, georgewbush-whitehouse.archives.gov/news/releases/2003/09/20030923-4.html.

Poverty, desperation, conflict, and political instability had fueled the continued growth of the international illegal sex trade. *See* Eric Thomas Berkman, *Responses to The International Child Sex Tourism Trade*, 19 B.C. INT'L & COMP. L. REV. 397, 402-03 (1996). Poor families sometimes sold their children for sex to meet basic needs. Heather C. Giordanella, *Prosecuting United States Nationals for Sexually Exploiting Children in Foreign Countries*, 12 TEMP. INT'L COMP. L.J. 133, 134-35

(1998). And wealthy men—including a disproportionate number of American men—continued to perpetrate these horrific crimes worldwide.[2] By 2002, there was little doubt that "the worldwide sexual exploitation of children . . . [wa]s increasing." *See* H.R. Rep. 107-525, at 3 (2002).

The 2003 Act expanded the reach of the Child Abuse Prevention Act of 1994. 18 U.S.C. § 2423(b). That law prohibited "travel in foreign commerce . . . *for the purpose of* engaging in" specific sexual misconduct. Violent Crime Control and Law Enforcement Act of 1994, 108 Stat. 1796, § 160001 (emphasis added). This required the government to prove that "travelers *intended* to engage in sexual misconduct with children at the time they left the United States." *Pepe*, 895 F.3d at 683-84 (emphasis added).

The difficulty of establishing intent had shielded many perpetrators from prosecution. *See United States v. Clark*, 315 F. Supp. 2d 1127, 1130

---

[2] Amy Fraley, *Child Sex Tourism Legislation Under the PROTECT Act: Does it Really Protect?*, 79 ST. JOHN'S L. REV 449, n. 19 (2012) (estimating that approximately "a quarter of the sex tourists in the world are from the United States"); DOJ, the National Strategy for Child Exploitation Prevention and Interdiction 36 (2010), http://www.justice.gov/psc/docs/natstrategyreport.pdf (estimating that in 2005, one million children were abused.)

(W.D. Wash. 2004) (explaining that 1994 Act created "'significant loop-holes in the law that persons who travel to foreign countries seeking sex with children are currently using to their advantage in order to avoid prosecution.'" (quoting H.R. Rep. No. 107-525, at 2 (2002)); *United States v. Pendleton*, 658 F.3d 299, 310 (3d Cir. 2011) ("Congress found that American citizens were using the channels of foreign commerce to travel to countries where 'dire poverty and . . . lax enforcement' would allow them to 'escape prosecution' for their crimes of child sexual abuse.") (citing 148 Cong. Rec. 3884).

Meanwhile, an unconscionable rise in international child sex abuse was underway—and attributed in significant part to American men. *Id.* ("Sadly, we know that many American go abroad to prey on young girls in other countries because laws protecting women are very weak, non-existent, or not enforced."); Berkman, 19 B.C. INT'L & COMP. L. REV. at 403 (foreign participants in the sex trade "come primarily from Western Europe, the United States, and Australia seeking boys and girls for sex or pornography"). Thus, when Congress took up this pressing issue by amending the law in 2003, it did so with the understanding that "the

11

Government would only have to prove that the defendant engaged in illicit sexual conduct with a minor *while in a foreign country*." H.R. Rep. 107-525, at 2 (2002) (emphasis added).

When the Ninth Circuit first confronted this law in 2006, it interpreted the statute to mean precisely what Congress intended. In *United States v. Clark*, a U.S. citizen "had been involved in sexual activity with approximately 40-50 children since he began traveling in 1996." 435 F.3d 1100, 1103-04 (9th Cir. 2007). Clark did not contest that he engaged in sex acts with 10- and 13-year-old boys, but on appeal challenged the scope and jurisdiction over the statute. *Id.* at 1104. He argued that the PROTECT Act reached only sex acts undertaken while the defendant was literally still in transit.

This Court's decision in *Clark* properly rejected the defendant's misreading of the Act. The Court explained that the provision was "plain on its face," and that nothing required the Government to establish that the illicit sexual conduct occur "*while*" traveling in foreign commerce." *Id.* at 1107. Rather, the law reached illicit sexual conduct undertaken by Americans in foreign commerce after they had traveled. *Id.* at 1116. Indeed,

12

the Court could find "no plausible reading of the statute that would exclude its application to Clark's conduct" based on the "gap" between the defendant's illicit sexual conduct and his "actual use of the channels" of foreign commerce. *Id.* at 1107, 1116; *see Pepe*, 895 F.3d at 693 (Thomas, C.J., dissenting).

The *Clark* decision also accounted for the context in which Congress had acted. *Id.* (legislative history "strongly suggested that Congress intended for the original statute to encompass conduct after the completion of travel…"). This Court recognized that the clear "purpose of the [law]" was: "'to make it a crime for a U.S. citizen to travel to another country and engage in illicit sexual conduct with minors.'" *Clark,* 435 F.3d at 1104 (quoting H.R. Rep. 107-525 (2002) (proposing legislation adopted verbatim as part of the PROTECT Act); *see id.* (citing H.R. Rep. 108-66 (2003 Conf. Report)).  That same history and context highlighted why this legislation was important for foreign sovereigns working alongside the United States to combat child sex abuse: foreign countries were struggling to "successfully prosecut[e] U.S. citizens or resident aliens for the child sex crimes *committed within their borders*." H.R. Rep. 107-525, at 3 (2002).

13

The conduct of Pepe in Cambodia, therefore, represents a paradigmatic example of what Congress sought to punish and deter when it legislated in 2003, and precisely what this Court construed that law to cover in 2006—the sexual exploitation of children by Americans after they traveled abroad. *See Clark*, 435 F.3d at 1108.

The facts of Pepe's case demonstrate this in harrowing detail. Pepe traveled to Cambodia. He paid a prostitute to bring him 10- to 12-year-old girls. He requested a specific build and youthful features. He raped seven girls—some after drugging them. He paid girls $1 for oral sex. And he tied, slapped, gagged, bloodied, or disfigured them. *See* Gov't Petition [Dkt. 85] 3-4 (citing record excerpts); *Pepe*, 895 F.3d at 681.

The U.S. Department of Justice, in partnership with the Cambodian government and amici, applied the statute as enacted by Congress and interpreted in *Clark*. The United States extradited, prosecuted, and convicted Michael Pepe for his hideous crimes. As even the panel majority concedes, until this decision, the law of this Circuit as set forth in *Clark* authoritatively interpreted the PROTECT Act to punish "individuals who, like Pepe, at some point traveled in foreign commerce *and thereafter*

14

engaged in any illicit sexual conduct." *Pepe*, 895 F.3d at 682; *id.* at 693–94 (Thomas, C.J., dissenting).

## II. THE 2013 AMENDMENT PRESERVED THE 2003 TRAVEL PROHIBITION AND PROHIBITED A NEW CATEGORY OF CONDUCT: ILLICIT SEX BY AMERICANS RESIDING ABROAD.

In 2013, Congress—urged by amicus ATEST and others—clarified and expanded PROTECT Act liability. It endorsed *Clark* by preserving every word of the 2003 Act's prohibition against illicit sexual conduct by Americans who "travel" abroad. And it criminalized an additional category of illicit sexual conduct by Americans who "reside" abroad.

As discussed in Chief Judge Thomas' dissent, the 2013 amendment addressed the risk that courts would construe the Act not to apply to U.S. "citizens who had permanently resettled in a foreign country." 895 F.3d at 694 (citing *United States v. Jackson*, 480 F.3d 1014, 1023 (9th Cir. 2007)). When Congress reauthorized the Trafficking Victims Protection Act, therefore, groups like amicus ATEST urged Congress to "reaffirm and augment[] the United States' commitment to fighting human trafficking" by closing this potential loophole. S. Rep. 112-96, at 2 (2011).

15

Congress agreed. It proceeded to "strengthen" the existing legislation by explicitly prohibiting illicit sexual conduct by U.S. persons who *resided* abroad, as well as those already covered by the PROTECT Act's prohibition on illicit sexual conduct by U.S. persons who *traveled* abroad. *See* Gov't Petition at 17 (identifying "three groups of offenders [who] were not subject to prosecution under § 2423(c) until 2013").

Congress' amendment did nothing to call into question the travel prohibition construed by this Court in *Clark*. In fact, Congress preserved the text applicable to the *Clark* and *Pepe* prosecutions in its entirety; the amendment did not change one word of the preexisting foreign-travel prohibition: "Any United States citizen … who travels in foreign commerce." *See* 895 F.3d at 692 (Thomas, C.J., dissenting); *see also Clark*, 435 F.3d at 1109 ("Congress … criminaliz[ed] commercial sex acts committed by U.S. citizens who *travel abroad in foreign commerce*."). The panel majority identified nothing in Congress' re-adoption of this provision that would serve to overturn the law of this Circuit. *See* Gov't Petn. 16.

As noted above, ATEST and other groups had encouraged Congress to strengthen the PROTECT Act by clarifying that it reached U.S. persons who reside abroad and commit illicit sexual conduct. Yet the panel

16

majority cited an ATEST legislative submission for the proposition that "the word 'travel' … has been interpreted to mean a brief stay and not include resettlement…" 895 F.3d at 687 (citing ATEST, *Recommendations for the Reauthorization of the Trafficking Victims Protection Act of 2000*, at 31 (2011)) (Attachment B). The panel opinion implies that ATEST called into question the decision in *Clark*. But the ATEST submission did not even *mention Clark*; it instead cited *Jackson*'s suggestion—in dicta—that the 2003 "travel" provision "does not include *resettlement* in a foreign jurisdiction." *Id.* (emphasis added). And *Jackson*, in turn, does not call *Clark*'s holding into question—but in fact expressly relied on *Clark*'s interpretation of section 2423(c): "As *Clark* indicates, the illicit sex act does not need to take place *during* the course of travel, but can occur thereafter." 480 F.3d at 1023.

On this basis, ATEST (and others) advocated for Congress to "close the loophole that allows Americans *living* abroad to exploit children in sex tourism in a foreign nation without risk of criminal penalties by the U.S. government." Attachment B at 31 (emphasis added). ATEST never interpreted the 2003 Act to cover only Americans actually in transit—and

17

the panel majority was wrong to ascribe to ATEST this unreasonably narrow reading of *Clark*. Rather, Congress rightly understood this advocacy to recommend the expansion of the Act to cover an additional category—any American who "resides, either temporarily or permanently in a foreign jurisdiction." 18 U.S.C. § 2423(c). The panel erred in reading ATEST's advocacy for *strengthening* the law as gutting the provision in effect from 2003 to 2013.

## III.   THE CONSEQUENCES OF THE PANEL MAJORITY ARE TROUBLING AND FAR-REACHING.

If allowed to stand, the panel opinion would have significant repercussions for U.S. human-rights leadership, perpetrator accountability and deterrence, and child sexual abuse victims. The United States' role in combatting crimes against children is not measured only "by the number of criminal convictions secured against human traffickers." S. Rep. 112-96, at 2 (2011). These investigations and prosecutions send a much larger signal to the rest of the world regarding our leadership on this seminal issue. *See* Attachment A (Letter from Chou Bun Eng).

That leadership is reflected in partnerships with countries, like Cambodia, which cooperate with the United States in investigating and

prosecuting sex crimes. When Congress promulgated § 2423(c) in 2003, it was clear that "countries reach out to the United States for help and some even blame the United States for the problem":

> There would be no need for a sex tourism statute if foreign countries successfully prosecuted U.S. citizens or resident aliens for the child sex crimes committed within their borders. However, for reasons ranging from ineffective law enforcement, lack of resources, corruption, and generally immature legal systems, sex tourist often escape prosecution in the host countries.

H.R. Rep. 107-525, at 3. Adding § 2423(c) responded to these foreign "request[s]" and "indicated that the United States [would] act to deal with this growing problem." *Id.* The panel's interpretation, however, undermines Congress's effort to assist "'host' countries experiencing significant problems with sex tourism." *Id.*

Indeed, statutes such as the PROTECT Act have had a tremendous deterrent effect for those who previously could abuse children in developing nations with impunity. Well-publicized convictions, including Pepe's, send a message to would-be abusers: crossing national boundaries does not circumvent U.S. sexual-abuse law. Cambodia and the Philippines have seen significant reductions (up to 85%) in the trafficking of children

19

within their borders over the past 15 years.[3] Strong local and international law enforcement (such as that enabled by the PROTECT Act) has been a key factor in both limiting local supply and international demand for illicit child sex.

This deterrence does not come easily. U.S. and foreign governmental and nongovernmental actors invest tremendous time and resources to investigate, prosecute, and care for victims. Cases like Pepe's are incredibly labor-intensive and difficult. They involve foreign investigation, apprehension, detention, testimony, and extradition—even *before* any U.S. criminal proceedings. And they inevitably involve a trade-off between the risks and benefits of foreign versus United States prosecution. In this case, for instance, the Cambodian government decided to forego its own criminal proceeding against Pepe in favor of extradition on the understanding that he would be held accountable under U.S. criminal laws. *See*

---

[3] *See* IJM, Child Sex Trafficking in Metro Manila, 28 (2016), https://www.ijm.org/documents/studies/ijm-manila-final-web-v2.pdf; IJM, Child Sex Trafficking in Angeles City, 8 (2016), https://www.ijm.org/studies/child-sex-trafficking-in-angeles-city/; IJM, External Evaluation of IJM's Program to Combat Sex Trafficking of Children in Cambodia, 2004-2014, 11 (2015), https://www.ijm.org/studies/external-evaluation-of-ijms-program-to-combat-sex-trafficking-of-children-in-cambodia-2004-2014/.

20

Attachment 1. Thus the impact of the panel's ruling on future deterrence and cooperation should not be underestimated.

The *Pepe* ruling unsettles the law in other ways as well. It saps the incentive to pursue any number of pre-2013 cases. (The Act contains no statute of limitations. 18 U.S.C. § 3299.) Because disclosure in such cases may be delayed, the panel opinion could affect numerous pre-2013 cases yet to come forward. Even cases already tried or reduced to judgment could face collateral attacks, which could have devastating consequences for U.S. criminal justice and accountability. *See* Gov't Petition 20.

The impact on victims, families, and communities is equally profound. The ripples from a case like Pepe's reach far indeed. Here, Pepe raped seven children. *See Pepe*, 895 F.3d at 681. (Scholarly research indicates each offender threatens numerous victims, with a high degree of recidivism for sexual crimes and molestation.[4]) Each individual perpetrator affects numerous victims and countless family and community mem-

---

[4] Heil, P., Ahlmeyer, S., & Simons, D., Crossover sexual offenses. Sexual Abuse: A JOURNAL OF RESEARCH AND TREATMENT (2003) (18 victims per average abuser).

bers. Sex crimes are plagued by low rates of reporting, arrest, and conviction. And the number of victims per case far exceeds the number of offenders identified and prosecuted.

Each victim must face countless spillover consequences. The abuse often results in cycles of more abuse, illiteracy, and entrenched poverty. Berkman, 19 B.C. Int'l & Comp. L. Rev. at 403. Victims carry a burden of trauma whose devastating effects often linger throughout their lives. This trauma can lead to survivors of violent sexual abuse struggling with intimate family relationships, entering into abusive relationships, and engaging in drug abuse or other harmful behaviors. *Id.* at 401. Where, as here, a foreign predator promises substantial sums of money to families and communities, it results in a betrayal of trust between neighbors or even family members. *See* United Nations Office on Drugs and Crime, Global Report on Trafficking in Persons 7, 32, 36-38 (2016) https://www.unodc.org/documents/data-and-analy-sis/glotip/2016_Global_Report_on_Trafficking_in_Persons.pdf. Some of the most destructive predators are those who—like Pepe—engage with the foreign community to exploit the children in that community. This

22

creates cycles of abuse within communities where abuse by wealthier foreigners becomes normalized and the rule of law is undermined.

The panel majority opinion undid a tremendous amount of work by Congress, foreign governments, law enforcement, and nongovernmental organizations around the world to stop this devastating cycle of abuse. This Court should not allow that decision to stand.

## **CONCLUSION**

Amici respectfully request that this Court grant rehearing.


Dated: October 4, 2018                       Respectfully submitted,


                                             *s/ Benjamin Beaton*
                                             Benjamin Beaton
                                             Brent Owen
                                             Squire Patton Boggs (US) LLP
                                             2550 M Street, N.W.
                                             Washington, DC 20037
                                             (202) 457-6420
                                             benjamin.beaton@squirepb.com

                                             *Counsel for amici*

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO NINTH CIRCUIT RULE 35-4 and 40-1

I certify that:

1. Pursuant to Circuit Rules 35-4(a) and 40-1(a), the attached Brief Of Amici Curiae International Justice Mission, Atest, Agape International Missions, Chab Dai, Ha-Gar International, And World Hope International In Support Of Panel Rehearing And/Or Rehearing En Banc contains 4,178 words, excluding the parts of the brief exempted by Fed R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2010.

DATED: October 4, 2018   *s/ Benjamin Beaton*
           BENJAMIN BEATON

           *Counsel for amici*

25

9th Circuit Case Number(s) | 14-50095

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) Oct 4, 2018 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/ Benjamin Beaton

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date)                .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) |

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 14-50095

Short Caption: United States of America v. Pepe

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[  ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

International Justice Mission; Alliance to End Slavery & Trafficking; Agape International Missions;

Chab Dai; Hagar International; World Hope International

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Squire Patton Boggs (US) LLP

Latham & Watkins LLP

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

None

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

None

Attorney's Signature:  s/  Benjamin Beaton          Date: 10/4/18

Attorney's Printed Name:  Benjamin Beaton

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes**  X     **No** _____

Address:  Squire Patton Boggs (US) LLP

2550 M. Street, NW, Washington, DC 20037

Phone Number:  (202) 457-6420          Fax Number:

E-Mail Address:  benjamin.beaton@squirepb.com

rev. 01/15 GA

Attachment A

**Kingdom of Cambodia**

**Nation Religion King**

**National Committee for**

**Counter Trafficking (N.C.C.T)**

N: 134 / 18



September 28 2018

Noel Francisco, Esq.
Solicitor General
Office of the Solicitor General
950 Pennsylvania Ave., NW
Washington, D.C. 20530-0001

Nicola T. Hanna, Esq.
United States Attorney
United States Attorney's Office
Central District of California
312 N. Spring Street
Suite 1200
Los Angeles, CA 90012

Dear Solicitor General Francisco and United States Attorney Hanna,

I write with warm greetings and respect on behalf of the Royal Government of Cambodia. The Royal Government of Cambodia has long regarded the United States as a leader in global efforts to counter trafficking-in-persons, and the nation of Cambodia has enjoyed a strong partnership with the United States in combatting the scourge of human trafficking and the sexual abuse of children in Cambodia and abroad.

For these reasons, I was surprised and disappointed to learn of the vacating of the conviction of Michael Joseph Pepe by the Ninth Circuit Court of Appeals in *U.S. v. Pepe*, 895 F.3d 679 (9th Cir. 2018). The overwhelming evidence, not disputed in the Court's decision, is that Mr. Pepe violently sexually abused many young Cambodian girls in Phnom Penh in 2006. This decision would allow Mr. Pepe to walk free. The court's decision is not only an injustice to the victims of Mr. Pepe's abuse; it also places children in the United States and abroad in grave danger should he be released. I am also greatly concerned that the effect of this decision might be to exonerate other American sex offenders who resided in Cambodia between 2003 and 2013.

As you are aware, the Royal Cambodian Government agreed that Mr. Pepe be extradited to the United States to stand trial under your PROTECT Act, because we had every confidence that justice would be done on behalf of the young Cambodian victims, and that the United States, a leader in counter-trafficking efforts with an admirable record of upholding human rights, would hold Mr. Pepe accountable for his crimes. Of course, you are aware that if Mr. Pepe had *not* been extradited, he would have faced trial in Cambodia. For your information, his co-offender, one Ms. Cheung Thy SANG, was convicted in Phnom Penh in 2007 and is currently serving her sentence of 20 years' imprisonment.

Therefore, I hope and trust that you will grant the review of Ninth Circuit Court's vacation of the conviction, that justice can be found in this case and the right decision finally reached. We wish

1

to extend again the offer of any assistance that the Royal Cambodian Government may provide toward your efforts.

Please accept, Mr. Francisco and Ms. Hanna, the assurances of my highest consideration.

Sincerely,

H.E. Mrs. CHOU BUN ENG
For Deputy Prime Minister & Minister of Interior
Permanent Vice Chairperson of the National Committee for Counter Trafficking

CC:
William A. Heidt,
Ambassador
United States of America
No.1, Street 96,
Sangkat Wat Phnom
Khan Daun Penh
Phnom Penh,
Cambodia

*Attorneys for the Cambodian victims:*
Melissa Arbus Sherry
Manny Abascal
Latham and Watkins
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304

2

Attachment B

# RECOMMENDATIONS FOR THE REAUTHORIZATION OF THE TRAFFICKING

Presented by



1250 Connecticut Ave. NW, Suite 200
Washington, DC 20036
T: 202-457-9493 E: info@endslaveryandtrafficking.org
www.endslaveryandtrafficking.org

          

# TABLE OF CONTENTS

I.  **Introduction**

       a.  Who is ATEST?
       b.  Why Reauthorize the Trafficking Victims Protection Act?

II.  **ATEST Recommendations for TVPA Reauthorization in 2011**

       a.  Prevention of Human Trafficking and Modern-day Slavery
           **i.**  Domestic
           **ii.**  International
       b.  Protection of Victims of Human Trafficking and Modern-Day Slavery
           **i.**  Domestic
           **ii.**  International
       c.  Prosecution of Cases of Human Trafficking and Modern-Day Slavery
           **i.**  Domestic
       d.  Partnership and Increased Capacity to Combat Human Trafficking and Modern-day Slavery
           **i.**  Domestic
           **ii.**  International
       e.  Authorization of Appropriations

III.  **ATEST Contact Information**

**ATEST**  2

# INTRODUCTION

## WHO IS ATEST?

The Alliance to End Slavery and Trafficking (ATEST) is a diverse alliance of U.S.-based human rights organizations, acting with a shared agenda to end modern-day slavery and human trafficking around the world. We work together to create fundamental change—from strengthening laws and business standards to building public will—to change the accepted norms that enable the phenomenon to persist around the world. The fact that the enslavement and trade in human beings exists in our modern world as a disturbingly large, highly profitable illicit industry is unacceptable. Legal nowhere but present in every country across the globe, slavery damages our communities, taints the products and services we consume and the profits we earn, and is one of the most pressing human rights challenges of our time. ATEST member organizations include: Coalition to Abolish Slavery and Trafficking (CAST), Coalition of Immokalee Workers (CIW), ECPAT-USA, Free the Slaves, International Justice Mission, Not For Sale Campaign, Polaris Project, Safe Horizon, Solidarity Center, Vital Voices for Global Partnership, World Vision, and one individual member, Julia Ormond, former U.N. Goodwill Ambassador and president and founder of the Alliance to Stop Slavery and End Trafficking (ASSET).

## WHY REAUTHORIZE THE TRAFFICKING VICTIMS PROTECTION ACT?

The Trafficking Victims Protection Act (TVPA) of 2000, which has been reauthorized in 2003, 2005 and 2008, must be reauthorized again in 2011. This is an opportunity to continue the fight to end modern-day slavery in our generation. Although the United States has taken significant steps to combat human trafficking through a comprehensive approach commonly referred to as the 4P's (prevention, protection, prosecution and, most recently, partnership), more needs to be done. ATEST members struggle daily to effectively address this issue both here in the United States and abroad. The following recommendations stem from our programmatic work helping survivors in the field and working hand-in-hand with U.S. government and international agencies addressing this issue. Our recommendations are also bolstered by the 2010 Trafficking in Persons (TIP) report, which included, but was not limited to, strengthening enforcement tools related to the restriction of importing goods made from forced and child labor; strengthening enforcement of temporary worker programs; intensifying enforcement and workers' rights infrastructure; mandating victim identification training for immigration, detention and removal officers, and immigration services officers; increasing funding for victim services; and increasing U.S. government efforts to identify and assist U.S. citizen victims. We urge the President and the U.S. Congress to expeditiously enact a Trafficking Victims Protection Reauthorization Act in 2011.

**ATEST**  3

**ATEST RECOMMENDATIONS FOR TVPA REAUTHORIZATION**

**PREVENTION of Human Trafficking and Modern-Day Slavery**

- **DOMESTIC**

<u>**TOPIC #1**</u>: ***Foster care plans must report on efforts to combat trafficking and commercial sexual exploitation of children, including prevention and protection.***

<u>**PURPOSE**</u>: To require state foster care programs, which receive federal funds under the Social Security Act, to report in their annual plan their existing efforts regarding human trafficking and commercial sexual exploitation of children in their care or future plans to address the issue.

<u>**PROPOSED STATUTORY LANGUAGE**</u>:

Sec. __. Improving Local Efforts to Combat Trafficking and Sexual Exploitation of Children.

Section 471(a) of the Social Security Act (42 U.S.C 671) is amended by inserting after paragraph (33) the following:

> "(34) not later than January 1, 2013, describes State child welfare existing practice and future plans regarding the human trafficking and commercial sexual exploitation of foreign, U.S. citizen and legal resident children including but not limited to:
> - (A) collaborations with local and state agencies and non-profit organizations to identify and care for children believed or confirmed to be, or at-risk of becoming victims of a severe form of trafficking;
> - (B) training for child welfare employees who are likely to come into contact with child victims of human trafficking;
> - (C) jurisdictional limits and other issues that hinder State child welfare response to aid child victims of human trafficking;
> - (D) data collection regarding children identified by child welfare services as victims of trafficking and, if known, relationship to exploiter; and
> - (E) prevention education to families and at-risk children, including runaway and homeless youth, regarding human trafficking and commercial sexual exploitation."

<u>**EXPLANATION AND SUPPORTING MATERIAL**</u>:

The child state welfare system already is assisting many children who have been trafficked. Utilizing all states' child welfare systems to better identify trafficked children so they can receive the specialized support and services they need will hopefully lead to earlier identification of these cases and greater prevention of future abuse. Training caseworkers in our state welfare systems and creating appropriate system responses will utilize existing resources and frameworks to provide terribly needed services for trafficked children.

 4



**TOPIC #2**: *Strengthen regulation of foreign labor recruiters (in the U.S. and abroad) to prevent trafficking.*

**PURPOSE:** Labor recruiters are often complicit with employers or directly involved in the trafficking of workers, especially migrant workers. Recruiters often charge exorbitant fees for their services, forcing workers into debt bondage. They falsify documents, including identity documents and contracts, and may lie to workers about the terms and conditions of work. Stricter regulation of labor recruiters is needed to protect workers from human trafficking, especially in temporary or guest worker programs.

## PROPOSED STATUTORY LANGUAGE:

ATEST is consulting with member offices that have expressed an interest in legislation on labor recruiting. We will provide draft legislation as soon as possible.

Any such legislation should, at a minimum, include provisions along the following lines:

1) Requirements for full disclosure of terms of employment to workers being recruited.

2) Prohibiting false or misleading statements and modification or waivers of rights of workers being recruited.

3) Restrictions on fees that can be charged by foreign labor recruiters.

4) A system administered by the Department of Labor to register foreign labor recruiters, to be funded by fees from the foreign labor contractors, which shall include a list of certified foreign labor recruiters that shall be publicly available.

5) Authority of the Department of Labor to receive complaints and pursue civil remedies against foreign labor recruiters, including obtaining back pay for workers who have not received pay.

6) Establish liability against employers who do not use registered foreign labor recruiters or use foreign labor recruiters knowing or acting in reckless disregard of the fact that foreign labor recruiters are violating the standards established by law.

7) Provide for a safe harbor for employers if they use a registered recruiter, have no knowledge of violations, and report any violation they discover in a timely manner.

8) Provide for a civil cause of action by workers who disclose practices of foreign labor recruiters or others in violation of the standards established by law, including protection from removal during pendency of such civil action.

Many of these principles were embodied in section 202(g) of H.R. 3887, 110th Congress, 1st Sess., as passed by the House of Representatives on December 4, 2007, by a vote of 405-2.

## EXPLANATION AND SUPPORTING MATERIAL:

This provision is designed to address the particular vulnerability of migrant/immigrant workers to human trafficking, and the specific role that foreign labor recruiters play in this. As the recent U.S. Department of Justice indictment of Global

**ATEST**

6

Horizons has highlighted – a case involving over 400 human trafficking victims in the agricultural industry who all initially entered the United States lawfully – labor recruiters play a major role in trafficking of migrant/immigrant workers. They often deceive or coerce workers into accepting jobs that later turn out not to be as promised. They often charge workers exorbitant fees to migrate, which in turn leads to debt bondage, and then use legal threats to maintain control of them, often by manipulating the immigration process.

As noted in a recent report by Verité, a leading organization that addresses labor practices:

> Traditional assumptions would hold that workers who enter a country legally, under programs designed to manage their temporary labor, would be better off than those who are undocumented. Verité's research, however, found that, in the U.S. case, migrants who enter the U.S. through guest worker programs are vastly more vulnerable to forced labor than their undocumented counterparts.[1]

The House of Representatives passed a version of the 2008 TVPRA included provisions to regulate labor recruiters as a means of preventing human trafficking.  We have learned so much more since 2008 about the major role that foreign labor recruiters play. In fact, many U.S.-based service providers state that regulating foreign labor recruiters is one of the most important initiatives needed to combat human trafficking in the United States. The provisions proposed would go a long way in preventing what are often the largest cases of human trafficking in our own backyard.

---

[1] *Job Seekers as Modern-Day Slaves: How to Protect Workers from the Labor Broker Trap in the Globalized Economy*, Verité.

**ATEST**

7

**TOPIC #3**: *Increasing transparency to prevent trafficking in supply chains.*

**PURPOSE:** To create incentives for businesses to prevent and remediate slavery and human trafficking that exists within their supply chains. Through transparency about their own efforts in this regard, companies will become more accountable to consumers and responsible investors that demand slavery-free goods.

**PROPOSED STATUTORY LANGUAGE:**

Proposed statutory language will be in accordance with draft language under development by Congresswoman Carolyn Maloney, who publicly announced her intention of introducing legislation in this area. ATEST is consulting with her on suggestions for this legislative proposal.

**EXPLANATION AND SUPPORTING MATERIAL:**

Similar to the new law enacted in California in 2010, this provision would require retail sellers and manufacturers doing business inside the United States to develop, maintain, implement, and publically disclose their policies on eliminating human trafficking and slavery from their supply chains.

The current legislative and regulatory framework to prevent goods produced by forced labor and slave labor from passing into the stream of commerce in the U.S. is gravely inadequate. The Smoot-Hawley Tariff Act of 1930, which prohibits importation of goods made with forced labor or convict labor, has major loopholes for goods that cannot be produced in the United States in sufficient quantities to meet the consumptive demands of American consumers. Courts have also ruled that consumers do not have standing to sue for enforcement of this law, because the legislative intent was to protect American manufacturers from unfairly priced goods, not to protect consumers from tainted goods. Consequently, there are fewer than 40 enforcement actions on record in the past 80 years.

Other mechanisms related to slavery and trafficking in the stream of commerce suffer from similar problems of limited scope, broad exceptions, and inability to provide information about specific suppliers whose goods are tainted. (A more detailed legal analysis of these mechanisms, including the Generalized System of Preferences, Executive Order 13126, the TVPA-mandated DOL list of goods produced by child labor and forced labor, ILO Conventions, and the "Hot Goods" Remedy under the Fair Labor Standards Act, is available upon request.)

Our proposal empowers the public, including consumers and responsible investors, to pressure companies to improve their policies, without excessive regulation or new federal government responsibilities.

It is also worth noting that, with the momentum created behind the new law in California, advocates in other states are already considering similar state legislation. Passage of a federal law would pre-empt states' passage of additional laws, protecting companies from having to ensure compliance with multiple and likely different state requirements. In the meantime, federal action would prevent a competitive advantage for companies that do not happen to do business in California and thus are not subject to the requirements of its law.

**ATEST**

## INTERNATIONAL

**TOPIC #1:** *Direct Department of Labor (DOL) to update the child-made and slavery-made products list and to include names of producers wherever possible.*

**PURPOSE:** To get a more valuable list of slavery-made products with identified producers so as to allow consumers to make better choices and governments to investigate identified abusers.

## PROPOSED STATUTORY LANGUAGE:

Sec. __ Report on Child-Made and Slavery-Made Goods.

Section 105(b) of the Trafficking Victims Protection Act of 2005 (22 U.S.C. 7112) is amended—

(1) in subsection (b)(2)(C) by striking the semi colon and inserting, "(including goods that are produced with inputs that are produced with forced labor or child labor), and, to the extent practicable, to identify persons or businesses that produce such goods using such labor;" and

(2) by adding at the end the following:

"(3) Transmission to Congress. The lists and information described in paragraph (2)(C) shall be provided no later than April 1, 2012, and every two years thereafter."

## EXPLANATION AND SUPPORTING MATERIAL:

The current list segments the production chain. This is useful insofar as it allows the U.S. government to focus on that part of the production process where child or forced labor is the biggest problem and to address it with whatever technical assistance it may provide. If this list is to have any power to dissuade employers from using child or forced labor, or encourage U.S. manufacturers and retailers to deal only with companies that do not engage in child labor or forced labor, it must also include company names. The language should be amended to allow for the listing of company names.

The list should also be maintained to ensure that products made by forced or child labor are not imported into the United States. For this purpose, however, the segmentation of the production chain is problematic. If, for example, child/forced labor is used for the planting and harvesting of cotton (which is not imported), but is not used in the making of fabric or the sewing of shirts (which are imported), the transformation of the cotton into the shirt would remove any taint of child/forced labor.

The proposed legislative language provides that any good produced with child or forced labor at any point in the production chain be put on the list. The list should further specify where in the production chain the forced or child labor occurred. Otherwise, garment producers could purchase cotton harvested by such labor and avoid an import ban simply because the raw cotton itself is not imported into the U.S. market.



9

**PROPOSED REPORT LANGUAGE:** The report issued by the International Labor Affairs Bureau (ILAB) on goods produced by forced labor and child labor has sparked an important debate regarding supply chains. However, there is no requirement for an updated version of this report. This section provides that this report be done on a semi-annual basis, in part to determine whether progress is being made on supply chains. In addition, work on eliminating forced or child labor from supply chains would be enhanced if entities responsible for using such labor were specifically identified and goods made with inputs produced with slave labor were included on the list.

**TOPIC #2:** *Ensuring goods made with forced or indentured labor do not enter the United States.*

**PURPOSE:** Prohibition on importation of goods made with forced or indentured labor or by benefit of human trafficking.

**PROPOSED STATUTORY LANGUAGE:**

Proposed statutory language drawn from Section 308, the Customs Facilitation and Trade Enforcement Act of 2009, S. 1631, 111th Congress.

Sec. __Prohibiting Importation of Goods Made with Forced or Indentured Labor or by Benefit of Human Trafficking.

(a) Goods Made With Forced Labor-

(1) IN GENERAL- Section 307 of the Tariff Act of 1930 (19 U.S.C. 1307) is amended to read as follows:

"(a) Prohibition on Importation- No good may be imported into the United States, if that good was produced, in whole or in part--
　　`(1) with convict labor, forced labor, or indentured labor under penal sanctions;
　　`(2) by means of coercion (as defined in section 103 of the Trafficking Victims Protection Act of 2000 (22 U.S.C. 7102)), including by means of an employer withholding the passport or other travel documents of a foreign worker in order to compel the production of that good; or
　　`(3) by 1 or more individuals who, at the time of the production were being subjected to a severe form of trafficking in persons (as defined in section 103 of the Trafficking Victims Protection Act of 2000 (22 U.S.C. 7102)).
`(b) Civil Penalties-
　　`(1) IN GENERAL- Any person who violates any provision of this section or any regulation issued under this section may, in addition to any other civil or criminal penalty that may be imposed under this Act or title 18, United States Code, or any other provision of law, be assessed a civil penalty by the Secretary of Homeland Security of not more than--
　　　　`(A) for the first violation, an amount equal to 3 times the value of the goods imported or attempted to be imported in violation of this section; and
　　　　`(B) for the second and subsequent violations, an amount equal to 6 times the value of the goods imported or attempted to be imported in violation of this section.
　　`(2) DEBARMENT-
　　　　`(A) IN GENERAL- The Secretary may prohibit a person from importing any good into the United States, or exporting any good from the United States, if the Secretary finds that the person has engaged in a pattern or practice of actions that has resulted in a final determination with respect to the assessment of civil or criminal penalties for knowing and intentional or grossly negligent violations of any provision of this section or any regulation issued under this section.

 11

`(B) REINSTATEMENT- The Secretary may retract a prohibition imposed with respect to a person under subparagraph (A) if the Secretary determines that changed circumstances warrant such a retraction.

`(3) NOTICE- No penalty may be assessed under this section against a person for violating a provision of this section or a regulation issued under this section unless the person is given notice and opportunity for a hearing with respect to such violation in accordance with section 554 of title 5, United States Code.

`(c) Definitions- In this section:

`(1) CHILD LABOR- The terms `forced labor' and `indentured labor' include forced or indentured child labor.

`(2) CONVICT LABOR- The term `convict labor' means work performed by an individual while imprisoned by a foreign government and without compensation.

`(3) FORCED LABOR- The term `forced labor' means all work or service that is exacted from any person under the menace of any penalty for nonperformance and in which the person does not engage voluntarily.

`(4) GOODS- The term `goods' means goods, wares, articles, and merchandise.

`(5) INDENTURED LABOR UNDER PENAL SANCTIONS- The term `indentured labor under penal sanctions' means work performed under a contract if the contract can be enforced through the imposition of a penalty or imprisonment.

`(6) PRODUCED- The term `produced' means produced, mined, or manufactured.'.

(2) EFFECTIVE DATE- The amendment made by this subsection applies to goods entered, or withdrawn from warehouse for consumption, on or after the date that is 15 days after the date of the enactment of this Act.

(b) Monitoring and Reporting-

(1) ESTABLISHMENT OF OFFICE FOR LABOR ENFORCEMENT-

(A) IN GENERAL- There is established within the U.S. Immigration and Customs Enforcement Agency of the Department of Homeland Security an Office for Labor Enforcement (in this subsection referred to as the `Office') to coordinate enforcement of the prohibition on importing goods described in section 307 of the Tariff Act of 1930, as amended by this section.

(B) ASSISTANT DIRECTOR- The Office shall be headed by the Assistant Director for Labor Enforcement who shall--

(i) be appointed by the Secretary of Homeland Security, in consultation with the Secretary of the Treasury; and

(ii) report to the Director of U.S. Immigration and Customs Enforcement.

(C) DUTIES- The Assistant Director shall--

(i) oversee the investigations of the U.S. Immigration and Customs Enforcement Agency with respect to the prohibition on importing goods described in section 307 of the Tariff Act of 1930;

(ii) coordinate efforts to enforce the prohibition on importing goods described in section 307 of the

**ATEST** 12

Tariff Act of 1930, and centralize information collected with respect to that prohibition, by--

(I) the U.S. Immigration and Customs Enforcement Agency;

(II) the U.S. Customs and Border Protection Agency;

(III) the Department of the Treasury;

(IV) the Department of State;

(V) the Department of Labor;

(VI) the Department of Commerce; and

(VII) the Foreign Agricultural Service of the Department of Agriculture;

(iii) coordinate with foreign governments to prevent the exportation to the United States of goods prohibited under section 307 of the Tariff Act of 1930;

(iv) prepare and publish the list of producers described in paragraph (2); and

(v) report annually, as described in paragraph (3), to the Committee on Finance of the Senate and the Committee on Ways and Means of the House of Representatives.

(2) LIST OF PRODUCERS-

(A) IN GENERAL- The list described in this paragraph is a list compiled and regularly updated by the Assistant Director for Labor Enforcement that includes the name and country of each producer of goods the importation of which is prohibited under section 307 of the Tariff Act of 1930. The list and regular updates shall be published in the Federal Register.

(B) REMOVAL FROM LIST- The Assistant Director may remove a producer from the list under subparagraph (A) if the Assistant Director determines that changed circumstances warrant such a removal.

(3) REPORT- The report required by paragraph (1)(C)(vi) is a report submitted 180 days after the date of the enactment of this Act, and annually thereafter, that contains the following:

(A) The volume and value of goods made with child labor, convict labor, forced labor, indentured labor under penal sanctions, or any other coercion (as such terms are defined in section 307 of the Tariff Act of 1930) that are seized upon arrival in the United States.

(B) A description of the goods described in subparagraph (A).

(C) An assessment of the extent to which child labor, convict labor, forced labor, indentured labor under penal sanctions, or any other coercion are used in producing goods destined for the United States.

(D) The progress being made in identifying and interdicting goods that are destined for the United States that are made with child labor, convict labor, forced labor, indentured labor under penal sanctions, or any other coercion.

(E) The most recent list of producers compiled pursuant to subsection (b)(2).

(4) OTHER DUTIES- The Office shall also be responsible for investigations relating to fraud, gross negligence,

**ATEST** 13

and negligence under section 592 of the Tariff Act of 1930 (19 U.S.C. 1592) with respect to violations of section 307 of such Act.

(c) Conforming Amendment- Section 501 of the U.S.-China Relations Act of 2000 (22 U.S.C. 6961) is repealed.

## **EXPLANATION AND SUPPORTING MATERIAL**:

As highlighted by the Department of Labor, Bureau of International Labor Affairs, "List of Goods Tainted by Forced Labor and Child labor" and noted by the State Department's Office to Monitor and Combat Trafficking in Persons, "it is impossible to get dressed, drive to work, talk on the phone, or eat a meal without touching products tainted by forced labor." Currently, an effective mechanism to ensure goods consumed in the United States are not produced using convict, forced, or indentured labor does not exist. The proposed language would create a procedure by which such goods could be identified and blocked from importation into the United States. The increase in consumer interest of both third-party production monitoring systems, such as Fair Trade Certification and federally regulated monitoring programs, like USDA Organic Certification are strong indicators that U.S. consumers are concerned with how their goods are produced and that enactment of this provision is timely.

**TOPIC #3:** *Increase access to educational materials available for workers lawfully entering the United States, including pre-departure education, informational pamphlets, and video resources.*

**PURPOSE:** Reduce the likelihood of human trafficking by increasing pre-departure education.

**PROPOSED STATUTORY LANGUAGE:**

Sec. __.  Ensuring Enhanced Education to Prevent Trafficking.

(a) Coordination of Pre-departure Education.—

(1) In General.--The Secretary of State, acting through the Assistant Secretary of Consular Affairs, is strongly encouraged to coordinate pre-departure education sessions for holders of U.S. non-immigrant visas with governments in the country of origins or relevant civil society organizations, or both, such as the information described in section 202(b) of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008.

(2) Verification.--A consular officer shall verify that each non-immigrant visa applicant has attended a pre-departure education session, including any pre-departure video viewed during the process of obtaining a non-immigrant visa, and shall record such data in the Department of State's report on non-immigrant visas.

(b) Authorization of Appropriations. Of the amounts authorized to be appropriated under section 113(c)(1), there are authorized to be appropriated such sums as may be necessary to carry out the provisions of section 202 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, including the further development and distribution of the pamphlet described in section 202(a) and any pre-departure video presentation created to meet or further the requirements of section 202(e) and this section.

**EXPLANATION AND SUPPORTING MATERIAL:**

As an anti-trafficking measure, U.S. consulates should strongly encourage country of origin governments and human rights organizations to establish pre-departure education sessions for persons going to work in the USA on non-immigrant visas to ensure that workers know their rights and the resources available to them. Money should also be allocated for development and distribution of pamphlets required by the TVPRA 2008. Additionally a "Know Your Rights" video should be developed and funded to play continually in the local languages while individuals are waiting in line at the consulate.

Currently, H-2 guest workers receive little information as to their rights under their contracts or other U.S. laws or where to seek assistance in the U.S. before they depart their home countries. This results in vulnerable workers who are easily exploited and/or trafficked.  Currently, the Department of State, as required by the TVPRA of 2008, provides a pamphlet to all non-immigrant visa applicants, which is an important step forward. However, sometimes written materials are confiscated by recruiters and/or difficult to understand if a worker has limited education. Mandatory pre-departure education programs coordinated between the U.S. consulates,

**ATEST** 15

appropriate home country government entities, and/or local human rights organizations will empower H-2 workers.

If it is not feasible for the U.S. consulates to offer these trainings themselves, the U.S. consulates should be strongly encouraged to work with foreign governments and/or foreign human rights organizations to coordinate these trainings. This would include the U.S. consulate informing the petitioners (U.S employers) that the trainings are available and strongly encouraging the employers to inform the workers. During the visa interview, the U.S. consulate officials should inquire where and when the worker attended the training and if there are any questions. At a minimum funding should be authorized for more widespread distribution of information pamphlets and an informational video in local languages.

**TOPIC #4:** *Provide a mechanism for non-immigrant visa holders to find assistance and/or file a complaint about a trafficking experience in the USA from their country of origin.*

**PURPOSE:** To ensure that cases of human trafficking are identified and that future cases of human trafficking are prevented when trafficking victims are returned to their country of origin by establishing point of contacts in U.S. consulates trained to identify and assist with human trafficking cases.

## PROPOSED STATUTORY LANGUAGE:

Sec. __.  Enhancing Information on Human Trafficking.

(a) In General.--The Secretary of State shall ensure that each U.S. diplomatic mission has a person who shall be responsible for receiving information from any person [who is holding or has held a non-immigrant visa and] who has been subject to a severe form of trafficking in persons while in the United States.

(b) Provision of Information. Information received pursuant to subsection (a) shall provide the information to the Department of Justice, the Department of Labor, or any other relevant federal agency. The Department of Justice and the Department of Labor shall ensure that there is a mechanism for any actions that need to be taken in response to such information.

(c) Assistance from Foreign Government. The person designated for receiving information pursuant to subsection (c) is strongly encouraged to coordinate with governments and/or civil society organizations in the countries of origin to ensure the victim receives additional support.

## EXPLANATION AND SUPPORTING MATERIAL:

Not all persons who are trafficked remain in the United States. For that reason, it is critical to create mechanisms in the countries of origin so that trafficked persons can find assistance in the United States, otherwise the traffickers will go unpunished and more persons may be victimized. Under this proposal, the Department of State (DOS) will assign a point person in each consulate to receive individual complaints from potential trafficking victims. This person must be trained in identifying trafficking victims and must know what resources are available in the United States. It is also important for the DOS point person to work with local human rights/anti-trafficking organizations so that the person has local support as well. Another method would be to develop an international hotline that workers and/or family members could call with complaints.

This provision would be invaluable in identifying cases of workers entering the United States lawfully and still ending up in a human trafficking situation. A case example of how this provision could increase human trafficking victim identification and prevent future cases of human trafficking in the United States is provided below.

Pablo's Story

Armed with a U.S. H-2B guest worker visa, "Pablo" boarded a plane to North Carolina, where he believed he had secured a high-wage job planting pine trees for a U.S.



17

company. Upon his arrival in the United States, however, Pablo was ensnared in a human trafficking scheme.

Without explanation, the contractor forced Pablo and 14 fellow workers into a van and drove them to the northeast. There the contractor confiscated Pablo's passport and warned him not to leave the workers' hovel-like apartment, claiming that the urban streets were dangerous. Scared to leave and not knowing where to turn, Pablo was forced to work for well under the U.S. federal minimum wage. Pablo begged the employer to let him return to Guatemala. Once home, Pablo was fortunate enough to come into contact with one of the few nonprofit organizations, Global Workers, working on the ground to assist workers returned to their countries of origin but exploited in the United States. Within 48 hours of learning of the case, the NGO assembled a top-level legal team that liberated the remaining workers. Global Workers served as the bridge between the workers who have returned to Guatemala and the U.S. advocates and officials working on the case, to hold the employer criminally liable and recover the unpaid wages.

The proposal would ensure that workers exploited in the United States would have access to direct contacts within the United States government in their countries of origin who could assist more trafficked workers around the world.

**PROTECTION of Victims of Human Trafficking and Modern-Day Slavery**

- **DOMESTIC**

**TOPIC #1:** *Extending existing protections to crime victims whose lives have been destroyed by foreign labor contractor fraud.*

**PURPOSE:** The TVPRA of 2008 created a new crime to punish individuals who recruit and defraud individuals outside the United States with regard to employment. Many individuals in this situation have mortgaged their home, gone in debt to loan sharks, and/or expended their life savings and that of their family members to lawfully enter the United States and seek gainful employment. If they have been defrauded and are unable to pay these loans by working in the United States as was promised, they place themselves and their families at risk.

Additionally, workers who bring civil cases based on the fraud in labor contracting provision need U.S. government protection to pursue legal remedies. These workers should be granted advanced parole to remain temporarily in the United States.

**PROPOSED STATUTORY LANGUAGE:**

Sec.__ Extending Protections to Persons Subject to Fraud in Foreign Labor Recruiting.

(a) Fraud.-- Subparagraph 101(a)(15)(U) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(U)(iii) is amended by inserting the following after perjury: "fraud in foreign labor contracting;"

(b) Federal Action. Section 202 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (8 USC § 1375b is amended by adding the following subsection at the end:

"(g) Pursuing Civil Actions.

"(1) In General.-- If a worker files a civil action under Section 1351 of title 18 of the United States Code or a civil action regarding any violation of any of the terms contained in the contract or violation of any other federal, state or local law in the United States governing the terms and conditions of employment that are associated with acts covered by such a section, the Attorney General and the Secretary of Homeland Security shall permit the individual to remain legally in the United States for a time sufficient to fully and effectively participate in all legal proceedings related to such action.

"(2) Exception-An Alien described in subparagraph (1) may be removed from the United States before the conclusion of the legal proceedings for the same reasons listed in Section 203(c)(1)(b) of the Trafficking Protection Reauthorization Act of 2008."

**EXPLANATION AND SUPPORTING MATERIAL:**

Large numbers of T-visas have been denied because the applicant does not meet the definition of severe form of human trafficking, but has been defrauded and his or her life destroyed by the promise of gainful employment in the United



19

States Usually these individuals do not qualify for other forms of immigration relief and sometimes are even barred from ever entering the United States again because their employers did not process the correct immigration papers. Examples of these cases involve large numbers of individuals from Thailand, India and the Philippines. These workers are crime victims under federal law and should have a right to remain in the United States as other crime victims do who qualify for U-visas. They should also have the right to remain in the United States to seek justice through our civil courts.

**TOPIC #2**: *Ensuring that individuals trafficked in the United States are eligible for T-visas despite having been deported or fled the U.S.*

**PURPOSE:** Currently trafficking survivors who have left the U.S. and returned after their trafficking experience are ineligible for a T-visa. Notably, other crime victims applying for U-visas do not need to show they are in the U.S. on account of those crimes and can apply for U-visas from outside the United States. A higher standard should not be applied for trafficking victims applying for T-visas; instead these standards should be made uniform.

**PROPOSED LANGUAGE:**

Sec. __.  Applications for Visas Relating to Trafficking.

Section 101(a)(15)(T)(i) of the Immigration and Nationality Act  (8 U.S.C. 1101(a)(15)(T) is amended by deleting subclause (II) and redesignating clauses (III) and (IV) as (II) and (III).

**EXPLANATION AND SUPPORTING MATERIAL**:

Carmen, a Mexican national, was trafficked in the United States as a child and forced into prostitution. After fleeing her traffickers she returned to Mexico, but returned to the U.S. shortly thereafter to join family members for increased support and protection and fear of her trafficker whose family lived close to her home. After being identified as a human trafficking victim by a service provider she reported her human trafficking case to law enforcement and cooperated with their requests. However, because she left the U.S. after her trafficking occurred she was ineligible to apply for a T-visa.

**ATEST** 21

**TOPIC #3**: *Response time for granting continued presence.*

**PURPOSE:** Until undocumented human trafficking victims receive status to be lawfully in the United States, they often remain fearful of their traffickers' threats of deportation. Also, their recovery is often hindered by an inability to work in the United States, which can lead to further exploitation. Continued Presence, created by the TVPA of 2000, is meant to be a temporary interim status for undocumented victims of human trafficking cooperating in an investigation with law enforcement. It can be immediately granted to victims and should take only 3-6 weeks to be processed, as it requires limited paperwork. Despite the original intent of the TVPA to create temporary relief to assist potential trafficking victims quickly, law enforcement often takes months to make a decision as to whether or not to grant continued presence to a human trafficking victim. The following statutory language is designed to ensure that law enforcement makes timely responses to a request for Continued Presence.

## PROPOSED STATUTORY LANGUAGE:

Sec. __.  Ensuring Timely Response to Requests for Continued Presence.

Section 107(c)(3) of the Trafficking Victims Protection Act of 2000 (22 U.S.C. § 7105(c)(3)(A)(i) is amended by adding after the period: "If a request for Continued Presence is made to a federal law enforcement agency, such agency shall respond to the request within fifteen days, stating whether the agency has submitted the application for Continued Presence to the Department of Homeland Security and, if not, whether it expects to do so. Within one month of a request for Continued Presence from any federal, state, or local law enforcement officer, the Department of Homeland Security shall approve or deny this request."

## EXPLANATION AND SUPPORTING MATERIAL:

The Federal Bureau of Investigation (FBI) investigated a large case of deaf Mexican individuals forced to peddle trinkets on the street for over nine months before the FBI agreed to grant Continued Presence to all the victims.

A large number of Filipino workers were trafficked in the U.S. to work in the hotel industry. Immigration and Customs Enforcement (ICE) only agreed to grant Continued Presence to some victims eight months after the case had been reported and investigated. These victims are still waiting for the Continued Presence promised. At this point many of the victims already have T-visas, and remained out of status the whole time their T-visa application was pending.

California State law has similar language for responses to grant law enforcement certifications.



22

<u>TOPIC #4</u>: *Providing flexibility to victims of human trafficking to cooperate with law enforcement.*

<u>PURPOSE</u>: Many protections for victims of human trafficking are linked to showing cooperation with law enforcement. Even when law enforcement is nonresponsive after a human trafficking victim has reported to law enforcement and been willing to cooperate, the burden remains on the victim to establish that he/she cooperated with law enforcement to receive benefits and protection under the law. This provision ensures that human trafficking victims who have taken the brave step to report their case to law enforcement are not penalized for law enforcement's lack of responsiveness.

<u>PROPOSED STATUTORY LANGUAGE</u>:

Sec. __. Demonstrating Cooperation with Law Enforcement.

Section 107(e) of the Trafficking Victims Protection Act of 2000 (8 USC 1§ 101(a)(15) is amended by adding at the end of section 107(e)(i)(III)(aa), "For purposes of this subsection, an alien who has made an initial report to federal, state or local law enforcement authorities shall be presumed to have complied with any reasonable request for assistance or"

<u>EXPLANATION AND SUPPORTING MATERIAL</u>:

Oftentimes victims of human trafficking who are willing to cooperate with law enforcement have reported their cases but are never interviewed by law enforcement and experience delays in their applications for T-visas. Government officials processing their applications often ask for additional evidence from victims showing their cooperation with law enforcement. These types of request can delay a victim's application by six months or more. During this period of time, victims remain undocumented and unable to work lawfully.

**ATEST** 23

**TOPIC #5**: *Harmonize ground of inadmissibility standards for U-visas, T-visas, and T-visa adjustments of status.*

**PURPOSE:** Currently those applying for a U-visa can receive a waiver of inadmissibility for immigration purposes if it is in the national or public interest. T-visa applicants have to show that the ground of inadmissibility is linked to the trafficking. Trafficking victims would benefit if they could qualify for either of these waiver standards when applying for a T-visa and have a similarly broad waiver as other crime victims. T-visa holders applying for adjustment of status should have a similarly broad waiver.

**PROPOSED STATUTORY LANGUAGE:**

Sec.__ Harmonization of Standards.

(a) Inadmissibility.--Section 212(d) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(13)(B)) is amended-
(1) by striking subsection (i);
(2) redesignating subsection (ii) as subsection (i); striking "other" before "provision", inserting "or" at the end of subsection (i); and
(3) by inserting as subsection (ii) the following new language:
"(ii) application of subsection (a) (other than paragraph (3)(E)) in the case of a nonimmigrant described in section 101(a)(15)(T) [8 USCS § 1101(a)(15)(T)], if the Secretary of Homeland Security considers it to be in the public or national interest to do so.

(b) Adjustment of Status. Section 245 of the Immigration and Nationality Act (8 U.S.C. 1255(l)(2) is amended--:

(1) by striking subsection (A);
(2) redesignating subsection (B) as subsection (A); striking "other" before "provision, inserting "or" at the end of subsection (A); and
(3) by inserting as subsection (B) the following:
"(B) application of subsection (a) (other than paragraph (3)(E)) in the case of a nonimmigrant described in section 101(a)(15)(T) [8 USCS § 1101(a)(15)(T)], if the Secretary of Homeland Security considers it to be in the public or national interest to do so.

**EXPLANATION AND SUPORTING MATERIAL:**

Oftentimes grounds of inadmissibility for human trafficking survivors may occur before or after the trafficking experience. This provision ensures that human trafficking survivors can apply for a T-visa instead of a U-visa if these types of waivers are needed. For example, Eunice, a Korean national, entered the United States on her own without proper documentation. Two years later she was tricked by a trafficker with promises of employment in a restaurant, only to be held in house, beaten every day, and forced into prostitution. Because Eunice originally entered the United States on her own, despite her clear abuse as a trafficking victim, she could be ineligible to apply for a T-visa.

Similarly T-visa holders will not be barred from adjusting status if grounds of inadmissibility arise after the T-visa is granted that are not related to the trafficking.



24

**TOPIC #6:** *Access to employment authorization for applicants with pending T and U-visa applications.*

**PURPOSE:** Current adjudication of T and U-visas can sometimes take more than one year. Early access to work authorization promotes victims' economic security, making them less vulnerable to re-victimization and exploitation. This provision will provide T and U-visa applicants with a specified date they can apply for work authorization after their applications are pending.

**PROPOSED STATUTORY LANGUAGE:**

Sec. __ Enhancing Self-Sufficiency of Victims.

 (a) T-Visas.--Subsection 214(o) of the Immigration and Nationality Act (8 U.S.C. 1184(o)) is amended by adding at the end the following paragraph:
 ---
 "(8) The Secretary shall make prima facie determinations on applications filed under section 101(a)(15)(T) within 45 days of filing. Upon receiving a prima facie determination the applicant shall be granted deferred action status and employment authorization."

 (b) U-Visas.--Subsection 214(p) of the Immigration and Nationality Act (8 U.S.C. 1184(p)) is amended in Paragraph (6) by striking in the last sentence and inserting the following new sentence:

 "The Secretary shall make prima facie determinations on applications filed under section 101(a)(15)(U) within 45 days of filing. Upon receiving a prima facie determination the applicant shall be granted deferred action status and employment authorization."

**EXPLANATION AND SUPPORTING MATERIAL:**

Under the current T-visa regulations applicants are supposed to receive a bona fide letter from United States Customs and Immigration Services (USCIS) to allow them to apply for temporary work authorization based on their pending T-visa applications. However, USCIS rarely issues this letter even when it is requested by an attorney-of-record, and this process generally takes 6-9 months or more to receive work authorization. With a better process for when a T-visa applicant can receive deferred action status, victims will be able to work within 3-4 months, thus aiding their recovery process.

U-visas applicants suffer the same barrier. Additionally, U-visa applications often take even longer to process than T-visa applications because more U-visas are issued. In July of this year, U-visa applicants were informed that there were no more visas available. Thus, applicants must wait until visas become available and are oftentimes out of status throughout this whole time period.

**ATEST** 25

**TOPIC #7**: *Adjustment of status for U and T-visa holders even after U and T-visa has expired.*

**PURPOSE:** Currently, if a U or T-visa expires and an individual does not adjust status, the individual is ineligible to adjust status at a later date. The proposed statutory language ensures that U or T-visa holders can remain in the United States in lawful status to protect their health and safety.

**PROPOSED STATUTORY LANGUAGE:**

Sec.. __ Improvements to Existing Adjustment of Status Provisions.

(a) T-visa. Section 245 of the Immigration and Nationality Act (8 U.S.C. 1255(l)(1)(C)(iii) is amended by inserting after "alien lawfully admitted for permanent residence" the following: "regardless of whether or not the nonimmigrant is presently in 101(a)(15)(T) status."

(b) U-visa. Section 245 of the Immigration and Nationality Act (8 U.S.C. 1255(m)(1)is amended by inserting after "alien lawfully admitted for permanent residence" the following: "regardless of whether or not the nonimmigrant is presently in 101(a)(15)(U) status."

**EXPLANATION AND SUPPORTING MATERIAL:**

After obtaining a T-visa, many trafficking survivors do not adjust their status to that of legal permanent resident because of lack of resources, lack of understanding about the standards for adjustment of status for T-visa holders in the legal community, or barriers created by the trauma of their trafficking experience. Some case examples are provided below.

Mary, a trafficking survivor, received her T-visa with the help of an attorney. After her T-visa was granted, Mary's attorney closed her legal case. Four years later her T-visa expired. Because Mary failed to find an attorney to assist her with her adjustment application, she is ineligible to adjust her status to that of lawful permanent resident.

Gina, a sex trafficking survivor, received her T-visa after assisting with a criminal prosecution. Gina's immigration attorney did not know that Gina had to apply for adjustment of status prior to her T-visa expiring. Because of her attorney's lack of experience in this area Gina is forever barred from adjusting her status.

- **INTERNATIONAL**

**TOPIC #1**: *Strengthen influence of GTIP by elevating Ambassador position to Assistant Secretary.*

**PURPOSE:** Strengthen the ability of the TIP Office to have impact within the Department of State.

**PROPOSED STATUTORY LANGUAGE:**

Sec. ___ . Strengthening Trafficking in Persons Efforts at the Department of State

Section 105(e)(1) is amended in the second sentence by striking the period and including, "and shall be deemed to be equivalent to an Assistant Secretary of State."

**EXPLANATION OF SUPPORTING MATERIAL:**

As the TIP Report has gained additional prominence, tier ratings of countries have become more controversial. This is particularly true given that there is now a mechanism for Tier II Watch List countries to become Tier III countries. Since we understand that the head of the TIP office is considered by some State Department officials "an office director" while many decisions are made at the Assistant Secretary level, this change in status will help achieve parity between the bureaus and offices addressing trafficking issues. Such parity will lead to better decisions by the Department that will ultimately assist in the protection of more trafficking victims.



**TOPIC #2:** *Highlight anti-trafficking successes.*

**PURPOSE:** Designate a portion of the TIP Report to highlight countries that have achieved important gains, administered innovative programs, upgraded services, secured precedent-setting convictions, etc. The purpose would be to spotlight "best practices" in eradication of trafficking and slavery and recognize governments that may not be Tier I but have nonetheless done unusually well in the previous reporting period.

## PROPOSED STATUTORY LANGUAGE:

Sec.___.  Recognition of Efforts Against Slavery and Trafficking in Persons.

Section 110 (b)(1) of the Trafficking Victims Protection Act (22 U.S.C. 7107) is amended to include the following sentence at the end:

"The annual Trafficking in Persons Report shall include a section entitled 'Best Practices in Slavery Eradication' to highlight innovations in prevention, protection, and/or prosecution of trafficking perpetrators."

## EXPLANATION AND SUPPORTING MATERIAL:

While we often cite good things countries have done within the text of their narratives, this often gets buried in the sheer length of the Report and few read it or learn of it outside of those in that country. This requirement would help draw some of those things out for public notice. Also, the provision lifts up important innovations, activities and strategies by governments, as opposed to civil society. This is important, because most governments see the TIP report as a negative reflection. Highlighting specific efforts by governments (especially those not on Tier I) to battle trafficking honors those efforts, and recognizes the importance of political will.

For example, in the Philippines, a Regional Anti-trafficking Force of the Philippines National Police has been created in Cebu that has had significant success in rescue of victims and prosecution of perpetrators.  The government should be commended for the effort, but the model deserves additional recognition as an example that could be replicated elsewhere.

**TOPIC #3**: *Clarify Definition of Trafficking.*

**PURPOSE:** This provision would clarify that holding a person in servitude, irrespective of whether it was proved that the person was moved from abroad, is considered trafficking in persons for the purposes of the TVPA.

**PROPOSED STATUTORY LANGUAGE:**

Sec. ___. Technical Amendment.

Section 103(8)(A) and section 103(9) of the Trafficking Victims Protection Act of 2000 are amended by striking "or obtaining" and inserting, "obtaining or controlling;" an alternative being: ". . . and inserting "obtaining or maintaining."

**EXPLANATION AND SUPPORTING MATERIAL:**

The original TVPA was designed by its terms to address all forms of modern-day slavery. See e.g., Section 102(b)(1), (7), (10), (13) and (14). The Office to Monitor and Combat Trafficking in Persons and the annual Trafficking in Persons Report deals with a wide range of abuses including debt bondage, child soldiers, and other slavery like practices that do not require proof of movement. In addition, in order to obtain services and visas under the TVPA, survivors are not required to show movement in their petitions. Clarifying this provision will ensure that trafficking survivors do not remain inadvertently unprotected.

**PROPOSED REPORT LANGUAGE:**

The original TVPA was designed by its terms to address all forms of modern-day slavery. See e.g., section 102(b)(1), (7), (10), (13) and (14). The Office to Monitor and Combat Trafficking in Persons and the annual Trafficking in Persons Report deals with a wide range of abuses including debt bondage, child soldiers, and other slavery like practices that do not require proof of movement. In addition, in order to obtain services and visas under the TVPA, survivors are not required to show movement in their petitions. This provision clarifies the original intent of Congress that under the TVPA, trafficking includes a situation where a person is being held in servitude even where there is no evidence that the person has been transported or moved. The Committee believes that whether a survivor can show that they were transported by a trafficker or whether they can only show they were held in place in forced labor, the survivor should be entitled to the services provided for under the TVPA.

**PROSECUTION of Cases of Human Trafficking and Modern-Day Slavery**

- **DOMESTIC**

**TOPIC #1**: *Prohibit employers from holding worker's identification and immigration documents.*

**PURPOSE:** Currently, one of the many forms of coercion used to control trafficking victims is through taking identification documents and visa paperwork. Although taking someone's documents is currently federally criminally punishable as document servitude, to prevent human trafficking, employers must understand that holding an individual's papers, even for a short period of time, is unacceptable as it can make someone incredibly vulnerable to exploitation.

**PROPOSED STATUTORY LANGUAGE:**

Section __ .  Prosecuting Illegal Retention of Passports.

Section 1592 of title 18, United States Code is amended by adding the following new subsection at the end:

"(d) For the purposes of subsection (a), any person who conceals, removes, confiscates, or possesses a passport or document of another person described in subsection (a) for more than 32 hours shall be presumed to be withholding the passport or other document against the will of such other person in violation of this section. It is not a violation of this section to obtain a person's passport for up to 32 hours for the purpose of complying with federal or state law, regulations, or government procedures.

**EXPLANATION AND SUPPORTING MATERIAL:**

This clarification in federal criminal law will ensure that employers understand the criminal liability of holding an employee's passport, which often can make an individual vulnerable to human trafficking. Employers will no longer be able to use the excuse that they are holding an employee's documents for safekeeping when in fact they are holding a document to ensure someone keeps working despite exploitative conditions.

**ATEST** 30

**TOPIC #2**: *Exploitation of children by U.S. citizens traveling or living overseas.*

**PURPOSE:** To close the loophole that allows Americans living abroad to exploit children in sex tourism in a foreign nation without risk of criminal penalties by the U.S. government and to prevent a sex tourist from using cultural "acceptance" of illicit sex with a child as an affirmative defense.

**PROPOSED STATUTORY LANGUAGE:**

Sec. __ Enhancing Offenses Relating to the Exploitation by children abroad.

Section 2423 of Title 18 is amended—

(1) In subsection (c) by inserting "(or resides, either temporarily or permanently, in a foreign jurisdiction)" after "foreign commerce"; and

(2) By inserting after subsection (g) the following—
"(h) Non-Defenses. – In prosecution under this section based on illicit sexual conduct as defined in subsection (f)(2), it is no defense that the defendant is not criminally liable or is subject to reduced criminal liability due to the de jure or de facto acceptance of the illicit conduct in the foreign jurisdiction in which the defendant travels or resides, either temporarily or permanently."

**EXPLANATION AND SUPPORTING MATERIAL:**

Current federal law only allows the U.S. government to pursue criminal charges against U.S. citizens and lawful permanent residents who exploit children while traveling in foreign commerce. Due to the use and intent of the word "travel," this has been interpreted to mean a brief stay and not include resettlement or intent to stay. Arguments have been tried in U.S. v. Jackson, 480 F. 3d 1014, 1022-24 (9th Cir. 2007). The Ninth Circuit found that travel in Section 2423(c) does not include resettlement in a foreign jurisdiction.

The U.S. government brief in Jackson argues that the government can reach to illicit conduct by Americans living overseas: 2005 WL 3128250 (see fn. 5: "In any event, Congress has the power to enact legislation that reaches United States citizens in foreign countries whether the citizen is present in the foreign place as a tourist, traveler, or resident. See Blackmer v. United States, 284 U.S. 421, 437 (1932).").

Additionally, the case of Gons Gutierrez Nachman on federal pornography charges in 2008 shows one example of the cultural defense in use. Nachman claimed that it was culturally acceptable in Congo and Brazil for him to have sex with teen girls. The judge delayed sentencing to consider this defense and whether it should impact the length of Nachman's sentence.

**TOPIC #3**: *Enhancing prosecution of trafficking offenses by providing whistleblower protections to trafficked workers.*

**PURPOSE:** To encourage workers to report abusive employers, protect them from the threat of deportation by employers who are angry that they have complained about abuse, prevent exploitation and abuse in the work place, and ensure that trafficking victims are not deported from the United States prior to their identification as victims of this crime.

**PROPOSED STATUTORY LANGUAGE:**

Sec. ___. Victims of Serious Labor and Employment Violations or Crime.

    (a) Protection for Victims of Labor and Employment Violations- Section 101(a)(15)(U) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(U)) is amended--

        (1) in clause (i)--

            (A) by amending subclause (I) to read as follows:

                `(I) the alien--

                    `(aa) has suffered substantial abuse or harm as a result of having been a victim of criminal activity described in clause (iii);

                    `(bb) has suffered substantial abuse or harm related to a violation described in clause (iv);

                    `(cc) is a victim of criminal activity described in clause (iii) and would suffer extreme hardship upon removal; or

                    `(dd) has suffered a violation described in clause (iv) and would suffer extreme hardship upon removal;'

            (B) in subclause (II), by inserting `, or a labor or employment violation resulting in a workplace claim described in clause (iv)' before the semicolon at the end;

            (C) in subclause (III)--

                (i) by striking `or State judge, to the Service' and inserting `, State, or local judge, to the Department of Homeland Security, to the Equal Employment Opportunity Commission, to the Department of Labor, to the National Labor Relations Board'; and

                (ii) by inserting `, or investigating, prosecuting, or seeking civil remedies for a labor or employment violation related to a workplace claim described in clause (iv)' before the semicolon at the end; and

            (D) in subclause (IV)--

                (i) by inserting `(aa)' after `(IV)' and

                (ii) by adding at the end the following: `or

                `(bb) a workplace claim described in clause (iv) resulted from a labor or employment violation;'

        (2) in clause (ii)(II), by striking `and' at the end;

        (3) in clause (iii), by striking `or' at the end and inserting `and'; and

        (4) by adding at the end the following:



32

`(iv) in the labor or employment violation related to a workplace claim, the alien--

`(I) has filed, is a material witness in, or is likely to be helpful in the investigation of, a workplace claim (as defined in section 274A(e)(10)(C)(iii)(II)); and

`(II) reasonably fears, has been threatened with, or has been the victim of, an action involving force, physical restraint, retaliation, or abuse of the immigration or other legal process against the alien or another person by the employer in relation to acts underlying the workplace claim or related to the filing of the workplace claim; or'.

(b) Temporary Protection for Victims of Crime, Labor, and Employment Violations - Notwithstanding any other provision of law, the Secretary of Homeland Security may permit an alien to temporarily remain in the United States and grant the alien employment authorization if the Secretary determines that the alien--

(1) has filed for relief under section 101(a)(15)(U) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(U)); or

(2)(A) has filed, or is a material witness to, a bona fide workplace claim (as defined in section 274A(e)(10)(B)(iii)(II) of such Act, as added by section 3(b)); and

(B) has been helpful, is being helpful, or is likely to be helpful to--

(i) a Federal, State, or local law enforcement official;

(ii) a Federal, State, or local prosecutor;

(iii) a Federal, State, or local judge;

(iv) the Department of Homeland Security;

(v) the Equal Employment Opportunity Commission;

(vi) the Department of Labor;

(vii) the National Labor Relations Board; or

(viii) other Federal, State, or local authorities investigating, prosecuting, or seeking civil remedies related to the workplace claim.

(c) Conforming Amendments- Section 214(p) of the Immigration and Nationality Act (8 U.S.C. 1184(p)) is amended--

(1) in paragraph (1), by inserting `or investigating, prosecuting, or seeking civil remedies for workplace claims described in section 101(a)(15)(U)(iv)' after `section 101(a)(15)(U)(iii)' each place such term appears;

(2) in paragraph (2)(A), by striking `10,000' and inserting `20,000'; and

(3) in paragraph (6)--

(A) by inserting `or workplace claims described in section 101(a)(15)(U)(iv)' after `described in section 101(a)(15)(U)(iii)'; and

(B) by inserting `or workplace claim' after `prosecution of such criminal activity'.

(d) Adjustment of Status for Victims of Crimes- Section 245(m)(1) of the Immigration and Nationality Act (8 U.S.C. 1255(m)(1)) is amended by inserting `or an investigation or prosecution regarding a workplace claim' after `prosecution'.

(e) Change of Nonimmigrant Classification- Section 384(a)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1367(a)(1)) is amended--

(1) in subparagraph (E), by striking `physical or mental abuse and the criminal activity' and inserting `abuse and the criminal activity or workplace claim';

(2) in subparagraph (F), by adding `or' at the end; and

(3) by inserting after subparagraph (F) the following:

`(G) the alien's employer,'.

SEC. __. Labor Enforcement Actions.

(a) Removal Proceedings- Section 239(e) of the Immigration and Nationality Act (8 U.S.C. 1229(e)) is amended--

(1) in paragraph (1)--

(A) by striking `In cases where' and inserting `If;' and

(B) by inserting `or as a result of information provided to the Department of Homeland Security in retaliation against individuals for exercising or attempting to exercise their employment rights or other legal rights' after `paragraph (2);' and

(2) in paragraph (2), by adding at the end the following:

`(C) At a facility about which a workplace claim has been filed or is contemporaneously filed.'

(b) Unlawful Employment of Aliens- Section 274A(e) of the Immigration and Nationality Act (8 U.S.C. 1324a(e)) is amended by adding at the end the following:

`(10) CONDUCT IN ENFORCEMENT ACTIONS-

`(A) ENFORCEMENT ACTION- If the Department of Homeland Security undertakes an enforcement action at a facility about which a workplace claim has been filed or is contemporaneously filed, or as a result of information provided to the Department in retaliation against employees for exercising their rights related to a workplace claim, the Department shall ensure that--

`(i) any aliens arrested or detained who are necessary for the investigation or prosecution of workplace claim violations or criminal activity (as described in subparagraph (T) or (U) of section 101(a)(15)) are not removed from the United States until after the Department--

`(I) notifies the appropriate law enforcement agency with jurisdiction over such violations or criminal activity; and

`(II) provides such agency with the opportunity to interview such aliens; and

`(ii) no aliens entitled to a stay of removal or abeyance of removal proceedings under this section are removed.

`(B) PROTECTIONS FOR VICTIMS OF CRIME, LABOR, AND EMPLOYMENT VIOLATIONS-

`(i) STAY OF REMOVAL OR ABEYANCE OF REMOVAL PROCEEDINGS- An alien against whom removal proceedings have been initiated under chapter 4 of title II, who has filed a workplace claim, who is a material witness in any pending or anticipated proceeding involving a workplace claim, or who has filed for relief under section 101(a)(15)(U), shall be entitled to a stay of removal or an abeyance of removal proceedings and to employment authorization until the resolution of the workplace claim or the denial of relief under section 101(a)(15)(U) after exhaustion of administrative appeals,

whichever is later, unless the Department establishes, by a preponderance of the evidence in proceedings before the immigration judge presiding over that alien's removal hearing, that--

`(I) the Department initiated the alien's removal proceeding for wholly independent reasons and not based on, or as a result of, any information provided to, or obtained by, the Department--

`(aa) from the alien's employer;
`(bb) from any outside source, including any anonymous source or any individual described in subparagraphs (A) through (G) of section 1384(a)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1367(a)(1)); or
`(cc) during the prosecution or investigation of the workplace claim; and

`(II) the workplace claim was filed in a bad faith with the intent to delay or avoid the alien's removal.

`(ii) DURATION- Any stay of removal or abeyance of removal proceedings and employment authorization issued pursuant to clause (i) shall remain valid until the resolution of the workplace claim or the denial of relief under section 101(a)(15)(U) after the exhaustion of administrative appeals, and shall be extended by the Secretary of Homeland Security for a period of not longer than 3 additional years upon determining that--

`(I) such relief would enable the alien asserting a workplace claim to pursue the claim to resolution;
`(II) the deterrent goals of any statute underlying a workplace claim would be served; or
`(III) such extension would otherwise further the interests of justice.

`(iii) DEFINITIONS- In this section:

`(I) MATERIAL WITNESS- Notwithstanding any other provision of law, the term `material witness' means an individual who presents a declaration from an attorney investigating, prosecuting, or defending the workplace claim or from the presiding officer overseeing the workplace claim attesting that, to the best of the declarant's knowledge and belief, reasonable cause exists to believe that the testimony of the individual will be relevant to the outcome of the workplace claim.

`(II) WORKPLACE CLAIM- The term `workplace claim' means any written or oral claim, charge, complaint, or grievance filed with, communicated to, or submitted to the employer, a Federal, State, or local agency or court, or an employee representative related to the violation of applicable Federal, State, and local labor laws, including laws concerning wages and hours,

35

labor relations, family and medical leave, occupational health and safety, or nondiscrimination.'.

SEC. __ Authorization of Appropriations.

There are authorized to be appropriated such sums as may be necessary to carry out sec. __ and sec. __.

**EXPLANATION AND SUPPORTING MATERIAL:**

This provision is designed to provide temporary immigration relief to workers who are whistleblowers of severe labor exploitation. There have been a number of human trafficking cases recently in the United States where workers who raised the alarm about severe abuse by employers have initially been threatened with deportation as a way to keep them quiet. These workers have had to remain in the United States in an undocumented status in order to stay in the country to pursue their cases against the abusive employers. After many years, these same workers have been certified as trafficking victims and receive "T" visas, but had to struggle for many years without status. Examples of this include Global Horizons, the largest forced labor case in U.S. history involving over 400 victims, and a group of Indian workers known in the media as the Signal Workers. This provision would give trafficked workers likes these access to temporary immigration relief in the United States while they pursue claims here, even if they are not initially identified as trafficking victims.

**TOPIC #4:** *Tax law enforcement against traffickers.*

**PURPOSE:** To authorize appropriations for the purpose of establishing an office within the Internal Revenue Service to focus on violations of the internal revenue laws by persons who are under investigation for conduct relating to human trafficking or the promotion of commercial sex acts, and to increase the criminal monetary penalty limitations for the underpayment or overpayment of tax due to fraud.

**PROPOSED STATUTORY LANGUAGE:**

Sec. __. Authorization of Appropriations for Tax Law Enforcement Relating to Human Trafficking and Related Crimes.

(a) Authorization of Appropriations-

(1) In General- There is authorized to be appropriated $4,000,000 for fiscal year 2012 for the purpose of establishing an office within the Internal Revenue Service to investigate and prosecute violations of the internal revenue laws by persons that appear to be engaged in conduct in violation of section 1589, 1590, 1591(a), 1592, section 2421, section 2422, subsection (a), (d), or (e) of section 2423, or section 1952 of title 18, United States Code, or comparable laws of any State or territory that prohibit human trafficking (as such term is defined in section 1702(8) of title 22, United States Code) or the promotion of prostitution or any commercial sex act (as such term is defined in section 1591(e)(3) of title 18, United States Code).

(2) Availability- Any amounts appropriated pursuant to the authority of paragraph (1) shall remain available for fiscal year 2013.

(b) Additional Funding for Operations of Office- Unless specifically appropriated otherwise, there is authorized to be appropriated and is appropriated to the office established under subsection (a)(1) for fiscal years 2012 and 2013 for the administration of such office an amount equal to the amount of any tax under chapter 1 of the Internal Revenue Code of 1986 (including any interest) collected during such fiscal years as the result of the actions of such office, plus any civil or criminal monetary penalties imposed under such Code relating to such tax and so collected.

(c) Report- Not later than one year after the date of the enactment of this Act, the Secretary of the Treasury shall report to the Committee of Ways and Means of the House of Representatives and the Committee on Finance of the Senate on the enforcement activities of the office established under subsection (a)(1) and shall include any recommendations for statutory changes to assist in future prosecutions under this section.

(d) Applicability of Whistleblower Awards to Victims of Human Trafficking- For purposes of making an award under paragraph (1) or (2) of section 7623(b) of the Internal Revenue Code of 1986 with respect to information provided by victims of any person convicted of violating section 1589,

**ATEST**

37

1590, 1591(a), 1592, section 2421, section 2422, subsection (a), (d), or (e) of section 2423, or section 1952 of title 18, United States Code, or comparable laws of any State or territory that prohibit human trafficking (as such term is defined in section 1702(8) of title 22, United States Code) or the promotion of prostitution or any commercial sex act (as such term is defined in section 1591(e)(3) of title 18, United States Code), the determination of whether such person is described in such paragraph shall be made without regard to paragraph (3) of section 7623(b) of such Code.

SEC. __. Increase in Criminal Monetary Penalty Limitation for the Underpayment or Overpayment of Tax due to Fraud.

    (a) In General-

        (1) ATTEMPT TO EVADE OR DEFEAT TAX- Section 7201 (relating to attempt to evade or defeat tax) is amended--

            (A) by striking `$100,000 ($500,000' and inserting `$500,000 ($1,000,000', and

            (B) by striking `5 years' and inserting `10 years'.

        (2) WILLFUL FAILURE TO FILE RETURN, SUPPLY INFORMATION, OR PAY TAX-

            (A) IN GENERAL- Section 7203 (relating to willful failure to file return, supply information, or pay tax) is amended--

                (i) in the first sentence--

                    (I) by striking `Any person' and inserting the following:

    (a) In General- Any person', and

                    (II) by striking `$25,000' and inserting `$50,000',

                (ii) in the third sentence, by striking `section' and inserting `subsection', and

                (iii) by adding at the end the following new subsection:

    (b) Aggravated Failure to File-

        (1) IN GENERAL- In the case of any failure described in paragraph (2), the first sentence of subsection (a) shall be applied by substituting--

            (A) `felony' for `misdemeanor',



38

(B) `$500,000 ($1,000,000' for `$50,000 ($100,000', and

(C) `10 years' for `1 year'.

(2) FAILURE DESCRIBED- A failure described in this paragraph is--

(A) a failure to make a return described in subsection (a) for a period of 3 or more consecutive taxable years if the aggregate tax liability for such period is not less than $100,000, or

(B) a failure to make a return if the tax liability giving rise to the requirement to make such return is attributable to an activity which is a felony under any State or Federal law.'.

(B) PENALTY MAY BE APPLIED IN ADDITION TO OTHER PENALTIES- Section 7204 (relating to fraudulent statement or failure to make statement to employees) is amended by striking `the penalty provided in section 6674' and inserting `the penalties provided in sections 6674 and 7203'.

(3) FRAUD AND FALSE STATEMENTS- Section 7206 (relating to fraud and false statements) is amended--

(A) by striking `$100,000 ($500,000' and inserting `$500,000 ($1,000,000', and

(B) by striking `3 years' and inserting `5 years'.

(b) Increase in Monetary Limitation for Underpayment or Overpayment of Tax Due to Fraud- Section 7206 (relating to fraud and false statements), as amended by subsection (a)(3), is amended--

(1) by striking `Any person who--' and inserting `(a) In General- Any person who--', and

(2) by adding at the end the following new subsection:

(b) Increase in Monetary Limitation for Underpayment or Overpayment of Tax Due to Fraud- If any portion of any underpayment (as defined in section 6664(a)) or overpayment (as defined in section 6401(a)) of tax required to be shown on a return is attributable to fraudulent action described in subsection (a), the applicable dollar amount under subsection (a) shall in no event be less than an amount equal to such portion. A rule similar to the rule under section 6663(b) shall apply for purposes of determining the portion so attributable.'.

(c) Effective Date- The amendments made by this section shall apply to actions, and failures to act, occurring after the date of the enactment of this Act.



**EXPLANATION AND SUPPORTING MATERIAL:**

The IRS Human Trafficking and Fraud Act would accomplish three main objectives: 1) establish an office within the Internal Revenue Service to investigate and prosecute tax law violations by persons under investigation for human trafficking or the promotion of prostitution; 2) increase the criminal monetary penalties for underpayment or overpayment of tax due to fraud; and 3) expand the eligibility for whistleblower awards.

The language in the bill has expanded the original idea to include all human traffickers, but is based on the language in http://www.govtrack.us/congress/billtext.xpd?bill=h110-3424.

Representative Carolyn Maloney introduced this legislation last Congress (H.R. 6491, 111th Congress), and Senator Chuck Grassley has supported similar legislation in the past (e.g, section 320, S. 1321, 109th Congress, as reported out by the Senate Finance Committee).

**TOPIC #5:** *Wage & Hour funding specific for human trafficking-training and investigation/or specialized investigators.*

**PURPOSE:** To encourage the Department of Labor Wage & Hour division to investigate and identify more cases of trafficking for labor exploitation in workplaces.

**PROPOSED STATUTORY LANGUAGE:**

Sec. __ Enhancing Trafficking Investigations.

(a)   Increased Training.  Section 107(c)(4) of the Trafficking Victims Protection Act of 2000 (22 U.S.C. section 7105) is amended—
    (1). In the first sentence by striking "Services," and inserting "Services, the Department of Labor, the Equal Employment Opportunity Commission";
    (2). In the first sentence by striking "Attorney General" and inserting "Attorney General, the Secretary of Labor, and "

(b)   Furthering Investigation.--Section 107(c)(3)(A)(i) of the Trafficking Victims Protection Act of 2000 (22 U.S.C. section 7105(c)(3)(A)(i)) is amended by inserting after "If a federal law enforcement official"  the following:  "or Department of Labor official"

(c) Authorization of appropriations.  Section 113(f) is amended –
    (1) by striking "section 107(b)" and inserting "section 107(b) and section 107(c)"; and
    (2) by striking "2008 through 2011" and inserting "2012 through [2014].

**EXPLANATION AND SUPPORTING MATERIAL:**

Department of Labor officials, specifically Wage and Hour Inspectors, have a particularly important role in combating trafficking. Often, labor inspectors have greater access to workplaces where vulnerable workers toil. With DOL's new regulatory role in the H2 visa programs, it is more important than ever that labor inspectors receive proper training on how to identify and find victims of trafficking in the workplace. The recent Global Horizons and Signal Workers cases highlight that trafficking for labor exploitation may be found in formal workplaces in the United States. As such, labor inspectors must be part of the law enforcement effort to combat trafficking in persons. As labor inspectors are separated from immigration enforcement, they may be more strategically placed than DHS officials for example, to identify trafficking victims. Such inspectors need training on the types of questions to ask, danger signs to look for, and other indications of a trafficking victim.

**ATEST** 41

**PARTNERSHIP and Increased Capacity to Combat Human Trafficking and Modern-Day Slavery**

- **DOMESTIC**

**TOPIC #1:** *Human Trafficking Emergency Fund.*

**PURPOSE:** Create emergency funds available for the unexpected needs of human trafficking survivors occurring in the United States which can be tapped by service providers and law enforcement to meet emergency needs such as shelter, interpretation, legal services, medical care, and the specialized needs of trafficked children, so that survivors have access to basic protections and service providers and law enforcement are not overwhelmed by unexpected costs or needs, especially those that arise in larger cases.

**PROPOSED STATUTORY LANGUAGE:**

Sec. – Emergency Assistance for Trafficking Victims.

(a) In General. -- The Attorney General, acting through the Office of Victim of Crimes, is authorized to provide assistance to meet the unexpected, urgent needs of victims of severe forms of trafficking.

(b) Response to Requests. Upon request from a human trafficking service provider, a human trafficking taskforce funded by the Bureau of Justice Assistance any victim witness coordinator or investigating agent from the Department of Justice, Department of Homeland Security, Department of Labor, or the Equal Opportunity Employment Commission, or any representative from the Department of Health and Human Services, the Office of Victims of Crime shall assess the request and within 72 hours or less grant the request or provide reasons for the denial of the request.

(c) Promulgation of Regulations. Not later than 60 days after the enactment of this Act, the Office of Victims of Crime shall establish a procedure for making such a request, which shall not be unduly burdensome.

(d) Authorization of Appropriations. There is authorized to be appropriated to the Office of Victims of Crime, 10,000,000 for fiscal year 2012, 2013, and 2014. Amounts appropriated pursuant to this section are authorized to be available until expended.

**EXPLANATION AND SUPPORTING MATERIAL:**

Recently large cases of human trafficking victims have surfaced in the United States and no service provider or law enforcement agency can plan in advance to meet the needs of these cases which can appear at any time or place in the country. For example, the Global Horizon case recently brought to light in Hawaii involved over 400 potential victims, and a case out of Kansas involved over 70 victims.



**TOPIC #2**: *Legal services for human trafficking victims.*

**PURPOSE:** Human trafficking victims have complex immigration, criminal and civil legal needs. Attorneys are needed who specialize in assisting human trafficking cases so that victims can seek justice, compensation, and protection in the United States for the crimes committed against them.

**PROPOSED STATUTORY LANGUAGE:**

Sec. __ Obtaining Services for Cooperating Trafficking Victims.

(a) Additional Use of Funds.--Section 107(b)((2) of the Trafficking Victims Protection Act of 2000 (22 USC 7105(b)(2)) is amended by striking the period and inserting ", including providing legal services to assist them in obtaining immigration benefits, file civil suits, and provide assistance with criminal victim-witness advocacy."

(b) Authorization.—

(1) Department of Health and Human Services.--Sec. 113(b) is amended by inserting at the end "(3) To carry out the purposes of section 107(b)[22 USCS 7105(b)] and 107(f)[22 USCS 7105(f) there are authorized 5,000,000 to provide legal services for trafficking victims."

(2) Department of Justice.--Sec. 113(d) is amended by interesting at the end the following: "(D) To carry out the purposes of section 107(b)[22 USCS 7105(b)] and 107(f)[22 USCS 7105(f) there are authorized 5,000,000 to provide legal services for trafficking victim."

**EXPLANATION AND SUPPORTING MATERIAL:**

Funding for legal services is virtually nonexistent. Under the current funding structure, limited legal services are available through the Office of Victims of Crime (OVC) for pre-certified victims only. Since OVC's reduction in funding in 2005, grant levels available generally do not allow for the support of even one full-time staff member qualified to provide legal services. Additionally, there is no funding available for U.S. citizen victims and the Office of Refugee Resettlement (ORR) has prohibited the use of its funds for legal representation to certified victims and pre-certified victims not being served by OVC grantees. Additionally, the limited funds available are generally used solely for immigration services, when trafficking victims often need assistance accessing the civil court system as well as criminal victim-witnesses advocacy. Human trafficking victims routinely report that legal services are their top priority. However, because of lack of legal services funding in this relatively new field, there are few to no attorney who currently specialize in this complex service area. If victims are fortunate enough to be able to access attorneys they usually have to receive legal services from multiple advocates further complicating a difficult process.

**ATEST** 43

**TOPIC #3**: *Separate funds for human trafficking taskforces.*

**PURPOSE:** Create an authorized pool of funding for human trafficking taskforces identifying and investigating all forms of severe forms of human trafficking. Currently, funds of law enforcement human trafficking taskforces are taken from monies allocated for victim service provision.

**PROPOSED STATUTORY LANGUAGE:**

Sec. _____. Enhancing state and local efforts to combat trafficking in persons.

(a) Establishment of Grant Program for Law Enforcement.--The Attorney General may make grants to States and local law enforcement agencies to establish, develop, expand, or strengthen State of joint State-Federal task forces to investigate and prosecute acts of severe forms of trafficking in persons.

(b) Authorization of appropriations—There is authorized to be appropriated $7,500,000 for each of the fiscal years 2012, 2013, and 2014.

**EXPLANATION AND SUPPORTING MATERIAL:**

In 2005 over half of the Office of Victim of Crime (OVC) funds for victim service providers was diverted to create law enforcement human trafficking taskforces. Although taskforces are considered necessary by victim service providers to better coordinate the complex relationships between federal and state agencies that human trafficking investigations entail, this funding shift has made it impossible for victim service providers to maintain staffing needs and meet the complex, everyday needs of human trafficking survivors as number of victims identified have increased by over 300% during that same period.

- **INTERNATIONAL**

**TOPIC #1**: *Funding to support threshold programs to bring Tier II or Tier II Watch List into compliance.*

**PURPOSE:** Focus threshold grants on countries on Tier II Watch List for the second year to help them avert a downgrade to Tier III. Take advantage of maximum diplomatic influence during this second year when significant foreign aid might be at risk if they are downgraded.

**PROPOSED STATUTORY LANGUAGE:**

Sec. __. Promoting Adherence to Trafficking Standards.

Section 134 of the Foreign Assistance Act of 1961 (22 U.S.C. 2152d) is amended —

(1) in paragraph (3) by striking "and;"

(2) in paragraph (4) by striking the period and inserting "; and;" and

(3) by adding the following at the end:

"(5) threshold grants to address specific challenges in prevention, protection or prosecution in countries on the list described in section 110(b)(3). ".

**EXPLANATION AND SUPPORTING MATERIAL:**

The TIP Office needs both carrots and sticks in its diplomatic tool kit. The Tier II Watch List should be seen as a wake-up call for governments, which stand to lose significant foreign assistance if they do not address particular weaknesses in their approach to trafficking and slavery. The TIP Office should be looking for ways to help governments address the gaps and infirmities that TIP itself has exposed in its annual report and move off the Tier II Watch list. For example, if a country needs to reform its court system to move trafficking cases more quickly, a threshold grant could help them do that. Or if failure to address gross deficiencies in victim after care contributes to a country's being on the Tier II Watch list, a threshold grant could help a government address the problem quickly.

**ATEST** 45

**TOPIC #2**: *CPCA provisions regarding increased funding for comprehensive strategic programs in eligible focus countries.*

**PURPOSE:** To provide assistance (grants, cooperative agreements, or contracts) for an eligible country with a significant prevalence of trafficking in children that enters into a Child Protection Compact with the United States to support policies and programs to eradicate the trafficking of children.

**PROPOSED STATUTORY LANGUAGE:**

See S.3184, 111th Congress, as amended.

**EXPLANATION AND SUPPORTING MATERIAL:**

This proposal is designed to increase cooperation between the United States and countries that show a commitment to end the trafficking of children within their borders. It would authorize the Secretary of State, through the Ambassador-at-Large of the Department of State's Office to Monitor and Combat Trafficking in persons, to provide assistance (grants, cooperative agreements, or contracts) for an eligible country that enters into a Child Protection Compact with the U.S. to support policies and programs to eradicate the trafficking of children.

According to the CBO score for the bill introduced in the last Congress, this amendment would require an additional $10 million/year for 3 years. An individual compact cannot exceed $15 million total.

We recommend using the same legislative language contained in S3184 from the 111th Congress. ATEST members have collectively coordinated hundreds of meetings with members' staffs and written tens of thousands of postcards in support of the CPCA, which passed SFRC unanimously on 9/21/10. The concept has broad bipartisan support including 117 cosponsors on the House version (HR2737) and 27 cosponsors on the Senate version (S3184) from the 111th Congress.

**ATEST** 46

**TOPIC #3**: *Funding to support efforts to overcome focus problems (e.g., restaveks, Nigerian fishing children, Chennai's bonded brick makers).*

**PURPOSE:** Encourage the TIP Office to engage in a multi-dimensional program, in collaboration with non-governmental actors, to address a particular human trafficking problem in a holistic manner.

## PROPOSED STATUTORY LANGUAGE:

Sec. __.  Special Program to Eradicate Trafficking in Persons from Specific Sectors.

The Trafficking victims Protection Act is amended by inserting the following after section 107A.

Sec. 107B.  Special Program to Eradicate Trafficking in Persons from Specific Sectors.

(a) In General.--The Secretary of State, acting through the Ambassador at Large for Trafficking in Persons established by section 105(e), is authorized to establish a program to eradicate severe forms of trafficking in persons from a particular sector or region within a country by developing a comprehensive approach and with the assistance of non-government entities such as foundations, not-for-profit entities and for-profit enterprises that demonstrate a commitment to ending trafficking in persons, including forced labor.

(b) Criteria for Program.  The program described in subsection (a) shall use the following criteria:
(1) The program shall be designed to eliminate severe forms of trafficking in persons from the particular sector or region.
(2) The program should be designed to be a program that will make progress over several years.
(3) The program shall be based on the prevalence and severity of the problem, including by drawing from the commodities and products listed in the latest report by the Department of Labor pursuant to section 105(b)(2)(C) of the Trafficking Victims Protection Reauthorization Act of 2005( 22 U.S.C. 7112).
(4) The program shall be designed to leverage resources from the United States with resources from non-governmental resources to maximize the impact of the program.

(c) Authorization of Appropriations.  Amounts authorized to be appropriated under section 113(c)(1) are authorized to be appropriated to carry out this section.

## EXPLANATION AND SUPPORTING MATERIAL:

More needs to be done to demonstrate holistic solutions to trafficking in specific sectors, developing a partnership between the United States, the private sector (as appropriate), non-governmental organizations, and the foreign country. Examples of specific sectors that could benefit from this provision include children in the Nigerian fishing industry, bonded slavery in South Asian brick production, and Burmese migrants enslaved in the Thai shrimp farming industry. This program will entail no additional new funding as it will come from existing program funds.



**TOPIC #4**: *Strengthen rapid response capacity including fund for emergency victim assistance, additional FTEs, and explicit authority to provide expert assistance in humanitarian emergencies and post-conflict settings.*

**PURPOSE:** To allow for emergency assistance in cases of humanitarian crisis or other unanticipated emergencies.

**PROPOSED STATUTORY LANGUAGE:**

Sec. ___.  Enhancing prevention of trafficking in Conjunction with Post-Conflict and Humanitarian Emergencies.

Section 106(h) of the Trafficking Victims Protection Act of 2000 (22 U.S.C.7104) is amended –

    (1) by inserting after the title the following: "—(1) Incorporation of Measures Into Existing Programs.—"; and

    (2) by inserting the following at the end:

    "(2) Program to Specifically Address Post-Conflict and Emergency Situations.— The Secretary of State, acting through the Ambassador at Large for Trafficking in Persons established by section 105(e), is authorized to establish a fund to provide immediate assistance to prevent or otherwise address problems related to trafficking in persons of vulnerable populations, particularly women and children, in conjunction with post-conflict situations and humanitarian emergencies. Such assistance may include security assessments, direct legal services for victims, assistance to public justice systems for apprehension and prosecution of perpetrators, witness protection, and emergency shelter, food, and medical services for victims.  Funds used to carry out this paragraph may be used to fund the costs of the Ambassador-at-Large to carry out this program."

**EXPLANATION AND SUPPORTING MATERIAL:**

Current law, Section 101 of TVPRA 2005 gives authority to the Secretary of State, Administrator of USAID, and DOD, to incorporate anti-trafficking efforts into post-conflict and humanitarian emergency response. This amendment provides specific authority to the TIP office to conduct programs in such post-conflict and emergency situations. It allows funding that is dedicated for such purpose to be used to address urgent needs and also allows such funds to be used for positions within the TIP office to carry out the program.

For example, when the Haitian earthquake occurred in January 2010, the TIP office had to move resources and scarce personnel from current programs to respond (TIP was provided additional resources in the Haiti supplemental). In other emergencies, the TIP office has had to locate individuals with expertise in other bureaus, and pay for their deployment to the field. This amendment ensures that the TIP office

**ATEST** 48

has the capacity and staffing to share its expertise when needed. Additionally, by having in-house expertise for capacity building, the TIP office will be able to offer these services proactively to governments that want and need the help.

**PROPOSED REPORT LANGUAGE:** U.S. government expertise on trafficking and slavery resides in the State Department Office to Monitor and Combat Trafficking in Persons. Such expertise is required in humanitarian emergencies and post-conflict settings where women and children are particularly vulnerable to trafficking, violence, and exploitation. Additional personnel and resources are required to equip the TIP office to respond quickly and effectively, and to train other U.S.-funded emergency responders in how to recognize and combat trafficking.

**TOPIC #5:** *Provide G/TIP office with special "prevalence research fund" to enable it to investigate in certain areas, gather baseline data, study impact of the programs it funds, do data collection to help with Tier rankings, and other impactful research.*

**PURPOSE:** To give the TIP office authority and resources to carry out or commission investigations and data collection on slavery and trafficking prevalence so as to measure and improve effectiveness of its own programs and the effectiveness of national government initiatives to combat slavery and trafficking. Such baseline setting and follow-up measurement should be required for focus countries designated under CPCA (see above).

**PROPOSED STATUTORY LANGUAGE:**

Amend TVPRA 2008, Section 108, "Research on Domestic and International Trafficking in Persons," by substituting the following section:

Sec. __.  Providing for Additional Research.

Section 112A of the TVPA of 2000 (22 U.S.C. 7109a) is amended by adding the following at the end:

(6) An effective mechanism for quantifying the number of victims of trafficking in countries and the capacities of governments to address the problem for purpose of informing the annual report required by section 110 and measuring the effectiveness of efforts by foreign governments to relieve victims of slavery and deter future acts of trafficking.

**EXPLANATION AND SUPPORTING MATERIAL:**

The TIP Office does not presently have funds to collect vital data on the location and prevalence of slavery and the capacity of governments, including public justice systems and labor ministries, in the countries it monitors.  While it is not necessary or practicable to collect such data in all instances, data could make an enormous contribution to evaluating the efforts of governments to relieve victims, apprehend perpetrators, and prevent future acts of trafficking. In all cases research should be collected for purposes of informing U.S. diplomacy and grant-making and building capacity within developing countries to end trafficking and slavery. This proposal would likely cost $5 million per year.

## AUTHORIZATION OF APPROPRIATIONS

**TOPIC #1:** *Increase authorizations of appropriations for federal programs to combat human trafficking in the United States and internationally.*

**PURPOSE:** Amounts authorized for federal programs to combat human trafficking both in the United States and internationally should be increased significantly. Calls requesting assistance and services to the National Human Trafficking Hotline have increased exponentially over the past three years. Additionally, service providers and law enforcement regularly report the lack of services for human trafficking victims identified in the United States. Meanwhile, U.S. efforts to combat trafficking have reached a critical stage in developing partnerships with countries that are showing increasing commitment to eradicate trafficking and modern day slavery. Additional resources to expand those potential partnerships can have a potentially dramatic impact on reducing this scourge. The TVPRA of 2011 should increase authorizations in a graduated way over the duration of the authorization to keep pace with the increased needs in the United States and the increased opportunities abroad.

## PROPOSED INCREASE AND JUSTIFICATON:

Although ATEST is prepared to make recommendations based on the basis of a needs assessment, ATEST believes that baselines established after the completion of the FY2011 appropriations process and the release of the President's budget for FY2012 must be evaluated before it can make serious funding proposals. After analysis of these key benchmarks, ATEST will provide further information regarding proposed authorization levels.

**ATEST** 51

**ATEST Contact Information**

**HUMANITY UNITED**

David Abramowitz
Director, Policy and Government Relations
T: (202) 457-9492
E: dabramowitz@humanityunited.org

Meredith Larson
Director, Alliance to End Slavery and Trafficking (ATEST)
T: (202) 457-9493
E: mlarson@humanityunited.org

Cory Smith
Policy Consultant
T: (202) 361-1442
E: csmithhu@gmail.com

**COALITION TO ABOLISH SLAVERY AND TRAFFICKING (CAST)**

Stephanie Richard
Director, Policy and Legal Services
T: (213) 365-1906 ext. 115
E: stephanie@castla.org

**INTERNATIONAL JUSTICE MISSION**

Holly Burkhalter
Vice President, Government Relations
T: (703) 465-5495
E: hburkhalter@ijm.org

**VITAL VOICES GLOBAL PARTNERSHIP**

Melysa Sperber
Senior Program Officer, Human Rights
T: (202) 296-2980
E: melysaSperber@vitalvoices.org

 52